**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; and STATE OF WASHINGTON,<br><br>              Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OF AMERICA; DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; BUREAU OF OCEAN ENERGY MANAGEMENT; WALTER CRUICKSHANK, Acting Director of Bureau of Ocean Energy Management, in his official capacity; BUREAU OF LAND MANAGEMENT; JONATHAN RABY, State Director of the Bureau of Land Management, in his official capacity; UNITED STATES FISH AND WILDLIFE SERVICE; PAUL SOUZA, Regional Director of the United States Fish and Wildlife Service, in his official capacity; DEPARTMENT OF COMMERCE; HOWARD LUTNICK, Secretary of Commerce, in his official capacity; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, Chief of Staff of the National Oceanic and Atmospheric Administration, in her official capacity; NATIONAL MARINE FISHERIES SERVICE; EUGENIO | C.A. No. 1:25-cv-11221<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

PIÑEIRO SOLER, Director of the National Marine Fisheries Service, in his official capacity; UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL WILLIAM H. "BUTCH" GRAHAM, JR., Chief of Engineers for the United States Army Corps of Engineers, in his official capacity; ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, Administrator of Environmental Protection Agency, in his official capacity; DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, Secretary of Agriculture, in her official capacity; DEPARTMENT OF ENERGY; CHRIS WRIGHT, Secretary of Energy, in his official capacity; DEPARTMENT OF THE TREASURY; and SCOTT BESSENT, Secretary of the Treasury, in his official capacity,

Defendants.

## **COMPLAINT**

### **INTRODUCTION**

1.     Plaintiffs New York, Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, and Washington (States) bring this action to challenge President Trump's unlawful Presidential Memorandum halting federal approvals of wind-energy development and to enjoin federal agencies' implementation of that Memorandum.

2.     On January 20, 2025, President Trump issued a Presidential Memorandum that, *inter alia*, categorically and indefinitely halted all federal approvals necessary for the development of offshore- and onshore-wind energy, pending an amorphous, redundant, extra-statutory, and multi-agency review of unknown duration. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing*

2

*and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo). Although the States do not concede the legality of any aspect of the Wind Memo, this case challenges Section 2(a)'s halt on federal approvals for wind-energy projects (the Wind Directive).

3.      Citing unspecified "legal deficiencies" and "inadequacies" in past federal wind-energy reviews, the Wind Directive orders the heads of relevant federal agencies to relinquish their congressionally-imposed responsibilities. It orders that Agency Defendants instead "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore-wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices"—a review, grounded in no statute and duplicative of already required reviews, that is to be conducted by the Secretary of the Interior with six separate federal agencies. *Id*. at 8364.

4.      The Wind Directive has stopped most wind-energy development in its tracks, despite the fact that wind energy is a homegrown source of reliable, affordable energy that supports hundreds of thousands of jobs, creates billions of dollars in economic activity and tax payments, and supplies more than 10% of the country's electricity.

5.      And the Wind Directive was issued the very same day President Trump declared a "National Energy Emergency," purportedly brought on by the country's alleged "insufficient energy production," to shore up the "inadequate energy supply" by facilitating the development of "a reliable, diversified, and affordable supply of energy." Exec. Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025) (Energy Emergency Order); *see also* Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025) (Unleashing Order) ("encourag[ing] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States

as a global energy leader long into the future"). These and numerous other executive actions similarly encouraged domestic energy development—that is, all but wind and other renewable energy—and also directed agencies to shortcut environmental reviews for other forms of energy—the very same reviews the Wind Directive labels as inadequate as to wind energy.

6.      Since issuance of the Wind Directive, Agency Defendants have duly ceased all wind-energy project permitting and approval activities, and have even issued a stop-work order invoking the Wind Directive to halt construction of an offshore wind project that previously had received all federal permits required for construction.

7.      The wind-energy industry, like many other capital-intensive industries in and beyond the energy sector, operates in a tremendously complex logistical and regulatory environment, where even minor setbacks can dramatically increase costs and delay or even altogether derail wind-energy projects. Accordingly, the Wind Directive and Agency Defendants' actions implementing it create an existential threat to the wind industry.

8.      The Wind Directive and Agency Defendants' categorical and indefinite halt on federal wind-energy approvals harms the States' efforts to secure reliable, diversified, and affordable sources of energy to meet the ever-increasing demand for electricity; their billions of dollars in investments in supply chains, workforce development, and wind-industry-related infrastructure, including transmission upgrades; and their statutory- and policy-based efforts to protect public health and welfare from harmful air pollutants like nitrogen oxides and sulfur dioxide, as well as greenhouse-gas emissions.

9.      The various actions taken by Agency Defendants to implement the Wind Directive are arbitrary and capricious under the Administrative Procedure Act (APA). First, the Wind Directive was issued with no reasoned explanation for its categorical and indefinite halt of wind-

energy development. Second, neither the Wind Directive nor Agency Defendants have offered any detailed justification to explain the abrupt change in longstanding federal policy supporting the development of wind energy.  Indeed, one Agency Defendant had recently described wind energy as "a critical source of power generation, reliability, and decarbonization." Jonah Ury et al., *Pathways to Commercial Liftoff: Offshore Wind*, U.S. Dep't of Energy, at 11 (Apr. 2024), https://perma.cc/A4KL-6Z3W. Nor have Agency Defendants provided any explanation for their departure—using the President's newly-imposed, extra-statutory review requirement—from past findings, based on numerous comprehensive assessments, that wind projects can proceed with minimal or mitigable adverse effects on the environment and other interests. Third, the Wind Directive and Agency Defendants took no account of the serious reliance interests the States have developed as a result of the federal government's long-running support for and approvals of wind-energy development and its issuance of leases for offshore-wind generation facilities, which continued even during the first Trump administration. Finally, the Wind Directive not only was internally inconsistent—proclaiming that the United States must provide "reliable," "afford[able]" energy to its residents as it hobbles a growing source of that energy, 90 Fed. Reg. at 8363—but also contradicted, without explanation, President Trump's aforementioned Energy Emergency Order and other contemporaneous executive actions calling for increased domestic energy production and curtailed environmental review.

10.     Agency Defendants' implementation of the Wind Directive is also contrary to and in excess of statutory authority under numerous federal statutes including the Clean Air Act, the Endangered Species Act, and the Outer Continental Shelf Lands Act (OCSLA), among others, which demand comprehensive, and prompt, permitting and approval proceedings.

11.     Further, the Wind Directive and Agency Defendants' actions implementing it are ultra vires because no act of Congress authorizes the President or federal agencies to categorically and indefinitely halt approvals of wind-energy projects pending an extra-statutory review process.

12.     Because the Wind Directive and Agency Defendants' halt on wind-energy approvals are unlawful and jeopardize the continued development of a power source critical to the States' economic vitality, energy mix, public health, and climate goals, the States ask this Court to declare the Wind Directive unlawful and enjoin Agency Defendants from implementing it to halt development of wind-energy projects.

## PARTIES

13.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

14.     The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

15.     The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

16.     The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

17.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who is the chief legal representative of Colorado.

18.    The State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

19.    The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathleen Jennings, who is the chief law enforcement officer of Delaware.

20.    The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb.

21.    The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

22.    The State of Maine is a sovereign state in the United States of America. Maine is represented by Attorney General Aaron Frey, who is the chief law enforcement officer of Maine.

23.    The State of Maryland is a sovereign state in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law enforcement officer of Maryland.

24.    The People of the State of Michigan are represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan. pursuant to Mich. Comp. Laws § 14.28.

25. The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota.

26. The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

27. The State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

28. The State of Oregon is a sovereign state in the United States of America. Oregon is represented by Attorney General Day Rayfield, who is the chief law enforcement officer of Oregon.

29. The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

30. The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

31. Defendants are the President and the United States, along with the federal officials and agencies responsible for implementation of the Wind Directive.

32. Donald J. Trump is the President of the United States. He is responsible for issuing the Wind Directive and is sued in his official capacity.

33.     Defendant United States of America includes all federal agencies and departments responsible for implementation of the Wind Directive.

34.     The United States Department of the Interior (DOI) is a cabinet agency within the executive branch of the United States government. 43 U.S.C. § 1451. The Bureau of Ocean Energy Management (BOEM), DOI, Secretarial Order 3299, Section 3 (May 19, 2010); Bureau of Land Management (BLM), 43 U.S.C. 1731; and U.S. Fish and Wildlife Service (USFWS), 16 U.S.C. § 742b are bureaus and agencies within DOI.

35.     Douglas Burgum is the Secretary of the Interior, and that agency's highest-ranking official. 43 U.S.C. § 1451. He is sued in his official capacity.

36.     Walter Cruickshank is the Acting Director of BOEM, and that agency's highest-ranking official. DOI, Secretarial Order 3299, Section 3 (May 19, 2010). He is sued in his official capacity.

37.     Jonathan Raby is a State Director of BLM, exercising the delegated authority of the Director of BLM, that agency's highest-ranking official. 43 U.S.C. § 1731. He is sued in his official capacity.

38.     Paul Souza is a Regional Director of the USFWS, exercising the delegated authority of the Director, that agency's highest-ranking official. 16 U.S.C. § 742b. He is sued in his official capacity.

39.     The Department of Commerce is a cabinet agency within the executive branch of the United States government. 15 U.S.C. § 1501.

40.     The National Oceanic and Atmospheric Administration (NOAA) is an agency within the Department of Commerce. 15 U.S.C. § 1503b. The National Marine Fisheries Service (NMFS) is a federal agency within NOAA.

41.     Howard Lutnick is the Secretary of Commerce, and the department's highest-ranking official. 15 U.S.C. § 1501. He is sued in his official capacity.

42.     Laura Grimm is NOAA's Chief of Staff and is exercising the delegated authority of Administrator of NOAA, and that agency's highest-ranking official. 15 U.S.C. § 1503b. She is sued in her official capacity.

43.     Eugenio Piñeiro Soler is the Director of NMFS, and that agency's highest-ranking official. He is sued in his official capacity.

44.     The United States Army Corps of Engineers (Corps) is a branch of the U.S. Army. 10 U.S.C. § 7036.

45.     Lieutenant General William H. "Butch" Graham, Jr., is the Chief of Engineers for the Corps, and that agency's highest-ranking official. 10 U.S.C. § 7036. He is sued in his official capacity.

46.     The United States Environmental Protection Agency (EPA) is an independent agency within the executive branch of the United States government. 42 U.S.C. § 4321.

47.     Lee Zeldin is the Administrator of EPA, and that agency's highest-ranking official. 42 U.S.C. § 4321. He is sued in his official capacity.

48.     The United States Department of Agriculture is a cabinet agency within the executive branch of the United States government. 7 U.S.C. § 2201.

49.     Brooke Rollins is the Secretary of Agriculture, and the department's highest-ranking official. 7 U.S.C. § 2202. She is sued in her official capacity.

50.     The Department of Energy is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 7131.

51.    Chris Wright is Secretary of Energy and the department's highest-ranking official. 42 U.S.C. § 7131. He is sued in his official capacity.

52.    The Department of the Treasury is a cabinet agency within the executive branch of the United State government. 31 U.S.C. § 301.

53.    Scott Bessent is the Secretary of the Treasury and the department's highest-ranking official. 31 U.S.C. § 301. He is sued in his official capacity.

## JURISDICTION AND VENUE

54.    This Court has subject-matter jurisdiction over this case and authority to grant the relief requested under 28 U.S.C. §§ 1331 (action arising under the laws of the United States), 2201(a) (declaratory relief), and 43 U.S.C. § 1349 (OCSLA citizen suit provision). The United States has waived sovereign immunity under 5 U.S.C. § 702 and 43 U.S.C. § 1349(a)(1).

55.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States officers, bureaus, and agencies sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Massachusetts.

## LEGAL BACKGROUND

56.    Numerous statutes and their implementing regulations require Agency Defendants to consider and issue decisions on applications for wind-energy project approvals.

57.    These statutes include but are not limited to OCSLA, the Clean Water Act, the Rivers and Harbors Act, the Clean Air Act, the National Environmental Policy Act (NEPA), the Endangered Species Act, the Bald and Golden Eagle Protection Act, the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation and Management Act, the National

Historic Preservation Act, the Federal Land Policy and Management Act (FLPMA), and the Fixing America's Surface Transportation Act.

58.     Under these authorities, Agency Defendants must comprehensively, but promptly, review, approve, deny, or otherwise act on applications to construct and operate wind-energy facilities, following specific procedures and standards.

## A.     The Outer Continental Shelf Lands Act

59.     OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public." 43 U.S.C. § 1332(3). OCSLA directs DOI to facilitate the Outer Continental Shelf's "expeditious and orderly development" while maintaining competition and environmental safeguards. *Id.*

60.     OCSLA allows the Interior Secretary to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," including offshore wind. 43 U.S.C §§ 1337(p)(1)(C), 1356c.

61.     Once BOEM sells a commercial lease, a lessee must submit to BOEM a Site Assessment Plan for site-assessment activities and a Construction and Operations Plan for facility construction activities. 30 C.F.R. § 585.600. BOEM must then process these documents by reviewing them and either approving, disapproving, or requesting revisions. *See id.* §§ 585.613; 585.628; 585.648.

62.     OCSLA does not authorize agencies to cease permitting for issued wind leases.

## B.     The Clean Water Act

63.     Under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, wind-energy developers must obtain a permit from the Corps before discharging dredge-and-fill material into waters of the United States, *id.* §§ 1344(a), 1362(7).

64.     When processing Section 404 permits, the Corps must issue public notice within 15 calendar days of a complete application and issue a decision within 60 days unless additional information is needed. 33 C.F.R. § 325.2(d).

65.     Section 404 also mandates that the Corps minimize permitting delays, requiring decisions on a dredge-and-fill permit application "to the maximum extent practicable . . . not later than the ninetieth day after the date the notice for such application is published." 33 U.S.C. § 1344(q).

66.     The Corps's regulations in turn prioritize wind and other energy projects, classifying them as a "major national objective" and giving the processing of their permit applications "high priority." 33 C.F.R. § 320.4(n).

67.     The Clean Water Act also provides that any entity—including a wind-energy developer—who plans to discharge pollutants from a point source into waters of the United States must first obtain a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. §§ 1311, 1342.

68.     Once it receives a NPDES permit application, EPA or a state agency with delegated NPDES permitting authority must determine within 30 days whether the application is complete and thereafter prepare a draft permit and solicit public comment before issuing a final permit. 40 C.F.R. §§ 124.3(c); 124.10(a); 124.11–124.12.

**C.     The Rivers and Harbors Act**

69.     Section 10 of the Rivers and Harbors Act of 1899 bars construction, excavation, or modification of waterways unless authorized by the Corps through permits issued under Section 10 of the Act. 33 U.S.C. § 403; 33 C.F.R. § 320.2(b).

70.    Under OCSLA, Section 10 permits (either individual or nationwide) are required for "devices" and associated infrastructure such as offshore-wind turbines and cables. 43 U.S.C. § 1333(e); *see also id.* § 1333(a)(1)(A)(iii)–(iv).

71.    For individual Section 10 permits, the Corps must, among other things, notify applicants of incomplete applications within 15 calendar days; issue public notice within 15 days of receipt of a complete application; and decide applications within 60 days, unless additional information is needed. 33 C.F.R. § 325.2.

72.    For nationwide permits, if the Corps doesn't respond to a complete pre-construction notification within 45 days, the activity is automatically authorized by the nationwide permit. Reissuance and Modification of Nationwide Permits, 86 Fed. Reg. 73,522 (Dec. 27, 2021).

73.    The Corps's regulations recognize that "energy conservation and development are major national objectives" and provide that "[d]istrict engineers will give high priority to the processing of permit actions involving energy projects." 33 C.F.R. § 320.4(n).

**D.    The Clean Air Act**

74.    The Clean Air Act requires EPA to establish National Ambient Air Quality Standards (NAAQS) and classify air-quality-control regions as attainment or nonattainment regions based on NAAQS compliance. 42 U.S.C. § 7407(d)(1)(A)–(B).

75.    New "major" sources of air pollution must obtain a Prevention of Significant Deterioration permit in attainment areas or a Nonattainment New Source Review permit in nonattainment areas before construction. 42 U.S.C. §§ 7475(a), 7502(c)(5).

76.    For activities on the Outer Continental Shelf, such as offshore wind, Clean Air Act regulations require EPA to count emissions from certain associated vessels when determining if a source is "major." 40 C.F.R. § 55.2; *see* 42 U.S.C. § 7627. And the permit type for an offshore-wind facility depends on the nearest onshore area's attainment status. 40 C.F.R. § 55.5.

14

77.     The Clean Air Act requires permitting authorities to issue permit decisions within one year of receiving an application for a Prevention of Significant Deterioration permit and within 18 months of receiving an application for a Nonattainment New Source Review permit. 42 U.S.C. §§ 7475(c), 7661b(c).

78.     EPA regulations set additional timelines. *See* 40 C.F.R. § 71.5(a)(2).

**E.     The National Environmental Policy Act**

79.     NEPA requires federal agencies to consider the effects of proposed major federal actions on the human environment. 42 U.S.C. §§ 4321 *et seq*.

80.     NEPA requires each agency to draft a "detailed statement"—called an environmental impact statement—for every proposed "major Federal action[] significantly affecting the quality of the human environment" that analyzes the action's reasonable foreseeable environmental effects, the effects that cannot be avoided, and a range of alternatives to the action, among other elements. 42 U.S.C. § 4332(C)(i)–(iii).

81.     NEPA applies to most federal permitting requirements including Outer Continental Shelf and federal land leasing; OCSLA Construction and Operations Plan (and sometimes Site Assessment Plan) approvals; Endangered Species Act incidental-take determinations; Clean Air Act approvals; and Clean Water Act approvals.

82.     In 2023, Congress passed the Fiscal Responsibility Act, amending NEPA to impose strict deadlines. Now, the lead agency "shall complete" an environmental assessment (the assessment required under NEPA to determine whether a project's effects are so significant as to require preparation of a full environmental impact statement) not later than one year after certain conditions are met, and "shall complete" an environmental impact statement not later than two years after those conditions are met. 42 U.S.C. § 4336a(g). Those deadlines can be extended only

15

by "so much additional time as is necessary to complete such environmental impact statement or environmental assessment." *Id.*

F.    **The Endangered Species Act**

83.    Under the Endangered Species Act, each federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any endangered or threatened species "or result in the destruction or adverse modification of habitat" the Secretary of Interior determines to be critical. 16 U.S.C. § 1536(a)(2); *see Bennett v. Spear*, 520 U.S. 154, 158 (1997).

84.    Federal agencies must consult with USFWS or NMFS (collectively, Services), and the relevant Service must issue a written biological opinion regarding how the activity—wind-energy development, for example—will impact the listed species or critical habitat. 16 U.S.C. § 1536(b)(3)(A).

85.    Consultation must conclude promptly, "within 90 days after its initiation unless extended," and the relevant Service must complete the biological opinion within 45 days thereafter. 50 C.F.R. § 402.14(e).

86.    If the relevant Service determines the activity will jeopardize a species's ongoing existence or destroy critical habitat, the biological opinion must include "reasonable and prudent alternatives" to avoid that consequence. *Id.* § 402.14(g)(5).

87.    Alternately, if the Services find the action may only cause incidental impacts, the relevant Service must issue an incidental-take statement that identifies the species impacts, incorporates minimization measures, and sets forth requirements the agency must follow. 16 U.S.C. § 1536(b)(4); *see also Bennett*, 520 U.S. at 158.

88.    The Endangered Species Act also provides for incidental-take permits for otherwise unlawful takes without a federal nexus if the applicant for such a permit, like a wind-energy developer, obtains an approved conservation plan. 16 U.S.C. § 1539(a)(1)(B).

89.    Upon receipt of an incidental-take application, USFWS or NMFS follow specific notice-and-comment procedures and issue the permit if the applicable requirements are met. *Id.* § 1539(a)(2)(B); 50 C.F.R. Parts 13, 17, 222, 402.

90.    USFWS must timely process complete applications and render permit decisions. 50 C.F.R. § 17.22(b)(1)–(2). NMFS must process applications "in the shortest possible time" and issue permits unless specific findings bar approval. *Id.* §§ 222.302(b), 222.303(e).

## G.    The Bald and Golden Eagle Protection Act

91.    The Bald and Gold Eagle Protection Act prohibits the take—i.e., harming, killing, or disturbing—of bald or golden eagles without a permit issued by USFWS. 16 U.S.C. § 668.

92.    The Act allows USFWS to authorize a bald or golden eagle take for disturbance (either an incidental take or nest removal) if it is compatible with eagle preservation. *Id.* § 668a; *see* 50 C.F.R. § 22.280.

93.    USFWS must issue a general incidental-take permit for an activity, such as a wind-energy project, if (1) the activity is necessary to protect a legitimate interest; (2) the take is not the activity's purpose; and (3) the take cannot practicably be avoided. 50 C.F.R. §§ 22.210(d), 22.250.

94.    Wind-energy projects that are ineligible for a general permit may request a letter of authorization to apply for a specific permit according to specific criteria. *Id.* § 22.200(b)(7).

95.    USFWS is to process all applications for Bald and Gold Eagle Protection Act permits "as quickly as possible." 50 C.F.R. § 13.11.

**H.** **The Marine Mammal Protection Act**

96.     The Marine Mammal Protection Act generally prohibits the take of a marine mammal or any attempt to do so. 16 U.S.C. §§ 1371(a), 1362(13).

97.     The Commerce and Interior Secretaries, however, can authorize the incidental take of a small number of marine mammals from commercial activities, such as wind-energy development. *Id.* § 1371(a)(5)(A).

98.     The Secretaries "shall allow" an incidental take if it will have a "negligible impact" on the species and no "unmitigable adverse impact" on subsistence uses of the species. *Id.*

99.     If an incidental take is authorized, the relevant Secretary must then issue regulations on permissible take methods and measures to minimize harm—especially to critical habitats—and set monitoring and reporting requirements. 16 U.S.C. § 1371(a)(5)(A).

100.    The Services are to process all applications for Marine Mammal Protection Act permits "as quickly as possible." 50 C.F.R. § 13.11.

**I.** **The Magnuson-Stevens Fishery Conservation and Management Act**

101.    The Magnuson-Stevens Fishery Conservation and Management Act requires federal agencies to consult with NMFS "with respect to any action authorized, funded, or undertaken" or proposed "by such agency that may adversely affect any essential fish habitat" under the Act. 16 U.S.C. § 1855(b)(2).

102.    Implementing regulations require the lead agencies to provide NMFS "with a written assessment of the effects of that action on [essential fish habitat]." 50 C.F.R. § 600.920(e)(1).

103.    NMFS must respond to the lead agency within 30 days of receiving its essential-fish-habitat assessment. *Id.* § 600.920(h)(4).

**J.      The National Historic Preservation Act**

104.    The National Historic Preservation Act requires the lead federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State," including license issuance, to "take into account the effect" that approving a proposed project may have "on any historic property." 54 U.S.C. § 306108. The Act gives the Advisory Council on Historic Preservation has opportunity to comment. *Id.*

105.    The Act can be triggered if a project may have an effect on either a listed or eligible historic property, which can include shipwrecks, historic buildings, and historic landmarks.

**K.      The Federal Land Policy and Management Act**

106.    FLPMA governs BLM and the Interior Secretary's administration of onshore public lands. 43 U.S.C. §§ 1701 *et seq*.

107.    The Act mandates that the Secretary develop, maintain, revise, and manage public lands in accordance with resource-management plans, 43 U.S.C §§ 1712(a), 1732(a); 43 C.F.R. § 1610.5-3. In a resource-management plan, BLM, the Secretary's FLPMA designee, can designate sections of public lands as open or closed for certain uses, including rights-of-way for the production of wind energy. 43 C.F.R. § 1610.1.

108.    Specific procedures, like Federal Register and congressional notification, govern the withdrawal of future uses of land including rights of way for wind-energy production. 43 U.S.C. § 1714(a), (b)(1), (e).

109.    BLM may only deny a right-of-way application for specific reasons detailed in BLM regulations. 43 C.F.R. § 2804.26. And before suspending a right-of-way, holders of the right must receive written notice and time to comply. 43 U.S.C. § 1766.

**L.     The Fixing America's Surface Transportation Act**

110.    The Fixing America's Surface Transportation Act streamlines environmental review and permitting for covered infrastructure projects—including wind-energy projects. 42 U.S.C. §§ 4370m *et seq*.

111.    The Act requires the Federal Permitting Improvement Steering Council to maintain an online permitting dashboard following strict protocols to track federal environmental review and approval timelines. *Id*. § 4370m–2(b).

112.    All federal agencies must adhere to permitting timelines. *Id.* § 4370m–2(c). If an agency anticipates missing or misses a deadline, it must notify the Council's Executive Director, propose a new completion date, and submit status reports to the Executive Director until the agency has taken final action on the delayed authorization or review. *Id.*

## FACTUAL ALLEGATIONS

**A.     Federal Agencies Have Long Encouraged and Thoroughly Assessed the Development of Wind Energy**

113.    The development of both onshore- and offshore-wind energy has long enjoyed bipartisan support.

114.    President George W. Bush celebrated the fact that wind energy had increased by more than 400% between 2001 and 2007.

115.    President Barack Obama oversaw a tripling of the amount of wind power generated in the United States, due in part to the $90 billion invested in renewable energy as part of the American Recovery and Reinvestment Act passed in 2009.

116.    President Trump's first administration conducted seven offshore wind lease auctions, granted multiple leases to offshore-wind energy developers, and moved forward environmental reviews of proposed wind projects.

117.    President Joe Biden signed the 2022 Inflation Reduction Act, which provided clean-energy tax credits that are expected to help add, on average, 24 gigawatts of onshore wind energy per year by 2030. The Biden administration pledged that the United States would deploy 30 gigawatts of offshore wind by 2030. By the time President Biden left office, Agency Defendants had approved 15 gigawatts of offshore wind, and the industry had attracted billions in investment.

118.    Agency Defendants conducted extensive evaluation of wind-energy projects before granting approvals under the statutory authorities described above.

119.    For example, NMFS studied the impacts of offshore wind on the North Atlantic right whale, as required under the Endangered Species Act. NMFS, *North Atlantic Right Whale 5-Year Review: Summary and Evaluation*, at 24–25 (Nov. 2022), https://perma.cc/62QZ-6XTE. Just last year, USFWS studied the impacts of wind projects on eagles in connection with its revision of the rules governing incidental take. USFWS, *Final Environmental Assessment, 2024 Eagle Take Permit Rulemaking*, 170–82 (Feb. 2024), https://perma.cc/5W4T-HY77. Biological Opinions for individual wind projects have incorporated numerous mitigation measures to protect marine life. *North Atlantic Right Whale 5-Year Review*, *supra*, at 24–25. And environmental impact statements for existing projects have also extensively studied wildlife impacts. *See*, *e.g.*, BOEM, *Revolution Wind Farm and Revolution Wind Cable Export Project Final Environmental Impact Statement*, 3.15-1–3.15-7, E1-45–E1-80, F-24–F-36, F-55–F-67, G-242–G-243 (2023), https://perma.cc/FS8W-4C55.

120.    Agency Defendants have also already studied wind energy's impacts on the fishing industry and addressed in detail ways to mitigate those impacts. *See, e.g.*, BOEM, *Atlantic Shores Offshore Wind South Final Environmental Impact Statement*, App. G at 14 (2024), https://perma.cc/5W6S-JH9P; BOEM, *Record of Decision: Vineyard Wind 1 Offshore Wind Energy*

*Project Construction and Operations Plan* (Vineyard Wind ROD), at 42–43 (May 10, 2021), https://perma.cc/NL5V-DVDF. Agency Defendants' findings have even shown that offshore wind may benefit the fishing industry, including the artificial-reef effect from the turbine structures and the discharge of fill material that could create new fish habitat. *See* BOEM, *Record of Decision: Atlantic Shores Offshore Wind South Project Construction and Operations Plan* (Atlantic Shores COP ROD), at 22 (July 1, 2024), https://perma.cc/HQ7P-ZY56; Vineyard Wind ROD, *supra*, at 36, 39.

121.    Likewise, Agency Defendants have thoroughly reviewed the economic impacts of wind energy, both generally and with regard to specific projects. As a result of those reviews, Agency Defendants have concluded that already-permitted offshore-wind projects would have little or no impact on local tourism industries. *See, e.g.*, BOEM, *Record of Decision: Empire Offshore Wind: Empire Wind Project (EW1 and EW2) Construction and Operations Plan,* at 28 (Nov. 20, 2023), https://perma.cc/JQE9-Q2AM. And Agency Defendants have also relied on multiple studies concluding there is no evidence showing wind farms negatively impact property values. *See, e.g.*, BOEM, *Atlantic Shores Offshore Wind South Final Environmental Impact Statement Appendix F* (Atlantic Shores FEIS Appendix F), at 3.6.3-21 (2024), https://perma.cc/KS2Z-EUXB (relying on these studies to determine the project will have negligible to minor impacts on property value). In fact, Agency Defendants have found that wind projects will benefit the economy. *See* Atlantic Shores FEIS Appendix F, *supra*, at 3.6.3-26; *id*. at 3.6.3-16 (noting study finding that "every $1.00 spent building an offshore-wind farm is estimated to generate $1.83 for New Jersey's economy"); *id*. at 3.6.3-18 (wind development supports port employment and surrounding businesses, especially during construction); BOEM, *Record of Decision: Revolution Wind Farm and Revolution Wind Export Cable Project Construction and*

*Operations Plan*, at 16 (Aug. 21, 2023) (preferred alternative expected to have beneficial economic impacts), https://perma.cc/HZ36-WMSH.

122.    Multiple courts have determined that federal permitting agencies have fulfilled their statutory obligations, and in these cases have not found any legal deficiencies or inadequacies in environmental review. *See, e.g.*, *Seafreeze Shoreside, Inc. v. DOI*, 123 F.4th 1 (1st Cir. 2024); *Nantucket Residents Against Turbines v. BOEM*, 100 F.4th 1 (1st Cir. 2024), *cert. denied sub nom. Nantucket Residents v. BOEM*, No. 24-337, 2025 WL 76449 (U.S. Jan. 13, 2025); *Comm. for a Constructive Tomorrow v. DOI*, No. CV 24-774 (LLA), 2024 WL 2699895 (D.D.C. May 24, 2024); *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014).

123.    Agency Defendants have also comprehensively reviewed onshore-wind-energy projects.

124.    As one example, BLM issued a programmatic environmental-impact statement regarding the impacts of wind-energy development on roughly 20 million acres of public lands in 11 western states, including several of the State parties to this complaint. BLM concluded that "[e]ffective mitigation measures could be implemented to address many of the direct and indirect adverse impacts that could occur" and that "[t]he potential impacts of wind-energy development on local and regional economies would be largely beneficial." BLM, *Final Programmatic Environmental Impact Statement on Wind Energy Deployment on BLM-Administered Lands in the Western United States,* at ES-5 (June 2005), https://perma.cc/L9D9-E26Z.

125.    BLM also determined that granting rights-of-way for wind-energy projects "contributes to the public interest in developing renewable energy to meet Federal and state goals." BLM, *ROD Tule Wind Project Decision to Grant Right-of-Way*, at 2 (Dec. 2011), https://perma.cc/J56V-2T6Q. BLM has found that project terms and conditions "will ensure" that

onshore-wind-energy projects "will protect environmental resources and comply with environmental standards." *Id*.

126.    Courts also have upheld these environmental reviews and analyses of onshore-wind projects. *See, e.g.*, *Protect our Cmtys. Found. v. Salazar*, No. 12CV2211-GPC PCL, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013), *aff'd sub nom. Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017); *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571 (9th Cir. 2016).

## B.    President Trump and Agency Defendants Reversed Longstanding Policy by Halting Wind-Energy Development Despite Promoting Other Domestic Energy Production

127.    President Trump issued the Wind Memo—including the Wind Directive's categorical and indefinite halt on wind-energy approvals—on January 20, 2025.

128.    The Wind Directive reverses the robust federal support for wind energy that had spanned decades and multiple administrations, does not account for Agency Defendants' extensive past federal review of wind development, and conflicts with President Trump and Agency Defendants' concurrent promotion of domestic energy production, both as a general matter and specifically in several of our States.

129.    In Section 1, despite citing "the country's growing demand for reliable energy," the Wind Directive indefinitely prohibits new wind-energy leasing but assures that it does not affect "rights under existing leases." 90 Fed. Reg. at 8363.

130.    Section 2(a) of the Wind Memo—the Wind Directive at issue in this case— prohibits Agency Defendants from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects" until "the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id.* at 8364.

24

131.    The Wind Directive orders that halt "[i]n light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals," as well as alleged "potential inadequacies in various environmental reviews" under NEPA. *Id.*

132.    The Secretary of the Interior must conduct the new extra-statutory assessment, the Wind Directive commands, in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. *Id.*

133.    And despite the extensive past reviews of wind-energy projects by Agency Defendants—indeed, ignoring the existence of these reviews—the Directive orders that the assessment consider anew "the environmental impact of onshore and offshore-wind projects upon wildlife" and the "economic costs associated with the intermittent generation of electricity." *Id.*

134.    The Wind Directive provides no time frame for completion of that open-ended assessment.

135.    Section 2(c) also requires the Interior Secretary to report to the President on "the environmental impact and cost to surrounding communities of defunct and idle windmills." *Id.*

136.    The Wind Directive also conflicts with Defendants' simultaneous promotion of domestic energy production in various Executive Orders and other actions.

137.    For example, President Trump issued the Wind Directive indefinitely stalling wind-energy approvals within hours of issuing two executive orders that emphasized the need for

domestic energy production and ordered agencies to expedite and curtail environmental reviews for other forms of energy.

138.    In the Energy Emergency Order, President Trump declared a "national emergency" allegedly brought on by "insufficient energy production" constituting an allegedly "extraordinary threat to our Nation's economy, national security, and foreign policy." 90 Fed. Reg. at 8434. The Energy Emergency Order announced measures purporting to encourage the development of "a reliable, diversified, and affordable supply of energy," but excluded wind energy from its definitions. *Id.* at 8433. The announced measures specifically included "identify[ing] obstacles to domestic energy infrastructure specifically deriving from implementation of the ESA or the Marine Mammal Protection Act" and developing "procedural, regulatory, and interagency improvements" (while the Wind Directive simultaneously invokes claimed inadequacies of reviews and approvals under such authorities to altogether halt wind-energy development). *Id*. at 8436. The Order also singled out Northeastern and West Coast states for allegedly causing a deficient U.S. energy supply and further directed agencies to "use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy" in these states. *Id.* at 8434.

139.    The Day 1 Unleashing Order similarly proclaimed that it is "the policy of the United States" to "encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf." 90 Fed. Reg. at 8353. Like the Energy Emergency Order, this order excluded wind as a source of energy to be expanded. *Id*. at 8354.

140.    More recently, President Trump issued multiple executive orders bolstering the coal industry, claiming that, "in order to ensure adequate and reliable electric generation in America, to meet growing electricity demand, and to address the national emergency declared pursuant to [the Energy Emergency Order], our electric grid must utilize *all available power generation*

*resources*." Exec. Order 14262, *Strengthening the Reliability and Security of the National Electric Grid*, 90 Fed. Reg. 15,521 (Apr. 14, 2025) (Grid Reliability Order) (emphasis added) (ordering certain energy-generation resources to remain online); *see also id.* at 15,521 ("The United States' ability to remain at the forefront of technological innovation depends on a reliable supply of energy from *all available electric generation sources . . . .*" (emphasis added)); Exec. Order 14261, *Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241*, 90 Fed. Reg. 15,517 (Apr. 14, 2025) (Reinvigorating Coal Order) ("[I]n order to secure America's economic prosperity and national security, lower the cost of living, and provide for increases in electrical demand from emerging technologies, we must *increase domestic energy production . . . .*" (emphasis added)).

141.    These and other Executive Orders and actions between January 20, 2025, and the present emphasized the need for expedited domestic energy development—but not wind energy— and ordered agencies to altogether skip or otherwise curtail the very environmental reviews that the Wind Directive invokes to block wind energy. *See, e.g.*, Exec. Order 14270, *Zero-Based Regulatory Budgeting to Unleash American Energy*, 90 Fed. Reg. 15,643 (Apr. 15, 2025) (Zero-Based Budgeting Order) (ordering agencies to sunset regulations governing environmental reviews that impact energy development); *see also* Exec. Order 14153, *Unleashing Alaska's Extraordinary Resource Potential*, 90 Fed. Reg. 8347 (Jan. 29, 2025) (announcing policy to "expedite the permitting and leasing of energy and natural resource projects in Alaska"); Reinvigorating Coal Order, 90 Fed. Reg. 15,517 (Apr. 14, 2025) (ordering Secretary of Interior, *inter alia*, to "identify[] opportunities to provide for expedited environmental reviews" of coal mining); Proclamation 10914 of Apr. 8, 2025, *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025) (exempting coal-fired generation from 2024 mercury

air toxics standards); Exec. Order 14285, *Unleashing America's Offshore Critical Minerals and Resources*, 90 Fed. Reg. 17,735 (Apr. 24, 2025) (directing Secretary of Interior to "establish an expedited process for reviewing and approving permits for prospecting and granting leases for exploration, development, and production of seabed mineral resources within the United States Outer Continental Shelf"). Agency Defendants took the commands to heart; indeed, Defendant DOI recently announced expedited permitting for nearly all forms of domestic energy production *except* wind energy. *See* DOI, *Press Release: Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply*.

### C.    Agency Defendants Have Adopted the Wind Directive's Indefinite and Categorical Halt on Wind-Energy Approvals

142.    Since January 20, 2025, Agency Defendants have adopted and implemented the Wind Directive to indefinitely and categorically halt wind-energy approvals.

143.    Upon information and belief, Agency Defendants have ceased all pending approvals necessary for construction of wind-energy projects.

144.    The implications for individual projects and the States have become increasingly clear over the past several months, resulting in irreparable and mounting harms to the States.

145.    For example, on January 20, 2025, the same day the Wind Directive was issued, Acting Secretary of the Interior Walter Cruickshank suspended delegations of authority to "Department Bureaus and Offices" to "issue any onshore or offshore renewable energy authorization, including but not limited to a lease, amendment to a lease, right of way, amendment to a right of way, contract, or any other agreement required to allow for renewable energy development." Walter Cruickshank, Order No. 3415, *Temporary Suspension of Delegated Authority* (Jan. 20, 2025), https://perma.cc/N4X8-8JQF. DOI revised this secretarial order on January 29, restoring all but five of the delegations of authority, but the suspension of delegation

of authority for offshore renewable-energy development remained in place during the effective period of that Secretarial Order.

146.     The next day, a NOAA representative informed an offshore-wind developer that its Marine Mammal Protection Act incidental-take authorization was subject to the Wind Directive's pause. NOAA indicated the pause to any new permits for this developer's project would last 90 days. NOAA indicated the need for a 90-day delay to issue the developer's permit as a result of the Wind Directive.

147.     Just three days later, on January 24, the USFWS website provided the following notice to eagle incidental-take permit applicants:

> The U.S. Fish and Wildlife Service, pursuant to Presidential Memorandum 'Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leading and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects' is temporarily ceasing issuance of permits to wind facilities until further notice.

USFWS, *3-200-71: Eagle Incidental Take (General Permit)*, https://perma.cc/HC9J-UMND.

148.     On January 28, BOEM postponed virtual public meetings on its draft Programmatic Environmental Impact Statement for Potential Mitigation of Future Development of Wind Lease Areas Offshore California, stating in the postponement notice posted on its website that:

> The Department of the Interior and the Bureau of Ocean Energy Management are implementing the Administration's Presidential Memorandum (PM) temporarily halting offshore wind leasing on the Outer Continental Shelf. The PM also pauses new or renewed approvals, rights-of-way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices.

BOEM, *Postponed: Public Meetings on Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California* (Jan. 28, 2025), https://perma.cc/AN9R-5FBQ.

149.    On January 30, FAST-41 dashboards that track the progress of wind projects in completing environmental review and permit processes reflected sudden permitting delays. Just three days earlier, on January 27, the FAST-41 dashboard for the SouthCoast Wind Energy LLC (SouthCoast) project in Massachusetts indicated it had completed seven out of ten environmental review and permitting processes, and review and permitting were estimated to be completed by March 27, 2025. On January 30, the dashboard indicated that the same number of environmental review and permitting processes were completed, but the estimated completion date was pushed back to June 26, 2025. Permitting Dashboard, *SouthCoast Wind Energy, LLC*, https://tinyurl.com/3knbk2zy.

150.    On February 4, BOEM announced that, due to President Trump's Wind Directive, it was canceling the virtual public meetings BOEM had scheduled in February to take up its Notice of Intent to prepare an environmental-impact statement for a Construction and Operations Plan submitted by Vineyard Mid-Atlantic LLC. BOEM, *Virtual Meetings Cancelled for Vineyard Mid-Atlantic Offshore Wind Project* (Feb. 4, 2025), https://perma.cc/N449-GUWA.

151.    Soon thereafter BOEM posted the following notice on the webpage for the Vineyard Mid-Atlantic project:

> The Department of the Interior and BOEM are implementing President Trump's memorandum temporarily halting offshore wind leasing on the Outer Continental Shelf. The memorandum also pauses new or renewed approvals, rights of way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices. . . . As a result, the February virtual public meetings on BOEM's NOI to prepare an EIS for the proposed Vineyard Mid-Atlantic Project have been cancelled.

*Id.*

152.    On February 5, the Corps paused permitting for 168 renewable energy projects. The Corps lifted the halt a few days later—but not for wind projects. The Corps has even implemented

the Directive to halt Clean Water Act and Rivers and Harbors Act permitting for projects intended to support the wind-energy industry, such as the Arthur Kill Terminal wind component staging and assembly project in Staten Island, NY, as discussed below.

153.    On February 26, the Federal Permitting Improvement Steering Council granted BOEM's request to extend the final completion date for a NPDES permit decision under Section 402 of the Clean Water Act for the SouthCoast project in Massachusetts. Permitting Council, *Executive Director Determination on Request to Extend FAST-41 Final Completion Date by More Than 30 Days* (Feb. 26, 2025), https://perma.cc/ESG5-V5Q7. BOEM sought this extension on behalf of EPA, claiming "EPA needs additional time to evaluate the applicability of [the Wind Directive] to issuance of the final NPDES permit decision." *Id*. The NPDES permit completion date was moved from March 27 to June 25, 2025. *Id*.

154.    On February 28, despite full merits briefing, EPA Region 2 filed a motion requesting that the Environmental Appeals Board remand Atlantic Shores Offshore-Wind Project 1's Clean Air Act permit back to the Region for reevaluation. The motion cited the Wind Directive as its basis. *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 3, 2025). On March 14, the Environmental Appeals Board granted EPA's request. *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 14, 2025).

155.    On April 16, the Interior Secretary issued a memorandum instructing BOEM to order that the Empire Wind project off the coast of New York indefinitely "cease all construction activities." Memorandum from Doug Burgum, DOI, to Acting Dir., BOEM (Apr. 16, 2025), https://perma.cc/93NP-8B5Y. As explanation for its order, the memorandum stated only that, pursuant to the review ordered in the Wind Directive, DOI had "obtained information that raises serious issues with respect to the project approvals." *Id*. The memorandum also ordered BOEM

"to continue [its] review of Federal wind permitting practices with respect to both existing and pending permits." *Id.*

156.    Within hours, BOEM issued a stop work order for Empire Wind, effective immediately, "to allow time for [BOEM] to address feedback it has received, including from . . . NOAA, about the environmental analyses for that project." Letter from Walter Cruickshank, BOEM, to Empire Offshore Wind LLC (Apr. 16, 2025), https://perma.cc/EV6D-TKSK. This feedback, the acting director wrote, was an "outgrowth" of the review DOI is undertaking pursuant to the Wind Directive. *Id.* The acting director's order warned that activities related to Empire Wind may not resume until "BOEM has completed its necessary review." *Id.*

157.    To date, Agency Defendants have offered no explanation for the delays and disruptions to wind-energy permitting and development other citing the Wind Directive.

158.    Furthermore, at no point did any Agency Defendant provide a reasoned explanation for its sharp reversal of federal policy or decisions regarding wind-energy development.

**D.    States Are Relying on Continued Wind Energy Development and Deployment to Provide Reliable and Affordable Energy while Promoting Economic Growth, Reaching Their Climate Goals, and Protecting the Health and Welfare of Their Residents**

159.    Wind power provides over 10% of the country's renewable energy, making it the largest source of renewable energy in the United States. Its continued development is critical to meet the increasing demand for reliable and affordable energy in the States' jurisdictions while creating well-paying jobs, advancing energy diversity, reaching their climate goals, and protecting the health and welfare of their residents.

160.    The United States is projected to see a 16% increase in electricity demand by 2029.

161.    According to the Department of Energy, "wind turbines provide one of the lowest-priced energy sources available today." U.S. Dep't of Energy, *Advantages and Challenges of Wind*

*Energy*, https://perma.cc/XGJ2-PFH4. Wind power will be necessary to meet the increasing demand for reliable and affordable electricity.

162.    Given its promise, wind energy has already attracted billions of dollars of investment—much of which has come from the States themselves. In 2022 alone, the federal government estimated that wind projects added $20 billion to the U.S. economy. *Id.*

163.    These investments, among other things, have created and continue to create thousands of well-paying jobs in the States. The industry directly employs 131,000 Americans, and also supports over 300,000 jobs, such as wind turbine technicians and blade fabricators. Wind-turbine technicians are projected to be the fastest-growing job in the country.

164.    Energy produced from offshore and onshore wind energy provides a source of reliable electricity to our States. With developments in battery storage technology, wind energy has been increasingly paired with battery storage systems that efficiently store surplus electricity generated during peak wind periods for future use.

165.    Wind generation not only provides reliable and affordable energy and creates economic opportunity in the States, but also is critical to States' ability to mitigate harms from climate change. The States are counting on continued growth in the wind industry to decarbonize their electricity generation to meet state greenhouse-gas emission-reduction goals and mitigate the impacts of climate change.

166.    Wind energy also produces major health benefits for our residents. Specifically, wind power reduces the impact of air pollutants such as nitrogen oxides and sulfur dioxide associated with fossil-fueled energy resources. These reductions in turn reduce adverse health impacts, including asthma, bronchitis, lower- and upper-respiratory symptoms, and heart attacks. U.S. Dep't of Energy, *How Wind Can Help Us Breathe Easier* (Aug. 21, 2024),

https://perma.cc/A9NZ-GLHW. For example, one study found that in 2014 alone, improvements in air quality associated with wind power resulted in $2 billion in health benefits in the United States. Massachusetts Institute of Technology, *A healthy wind* (Dec. 2, 2022), https://perma.cc/9UKT-QUZF.

167.    All these benefits are at risk now because the Agency Defendants' implementation of the Wind Directive is threatening the wind industry in the States. In April 2024, the Department of Energy warned that offshore wind was "at an inflection point"—that "[f]ailure to build projects today would risk delaying cost reductions and extending risk exposure to the longer-term project pipeline, freezing investments, and pushing an industry with both short-term and long-term decarbonization momentum into dormancy." *Pathways to Commercial Liftoff: Offshore Wind*, *supra*, at 16.

168.    In other words, the Wind Directive and Agency Defendants' implementation of it risk depriving States of energy reliability and affordability benefits, economic activity, health benefits, and environmental protection that were to come from their substantial investments in wind power. The deleterious effects the Wind Directive and its implementation are having on the States are detailed below.

## New York

169.    New York is developing both offshore and onshore wind energy to serve its growing electricity load and to reduce harmful emissions. The Wind Directive and Agency Defendants' categorical and indefinite halt on project approvals threaten New York's ability to pursue those goals and, more specifically, the State's progress toward its wind-specific statutory-procurement and greenhouse-gas emission targets.

34

170.    New York's 2019 Climate Leadership and Community Protection Act (Climate Act), which sets forth statutory targets for greenhouse-gas reductions on an economywide basis and specific capacity targets for offshore wind, is designed to work alongside other state efforts to reduce the financial impacts of climate change and increase the quality of life for New Yorkers.

171.    The Climate Act establishes greenhouse-gas emission-reduction targets of 40% by 2030 and 85% by 2050, both from 1990 levels, with a goal of net zero emissions by 2050. It also includes a target that New York have a 100% emissions-free electricity sector by 2040 and be powered by 70% renewable energy by 2030. The Climate Act also specifically sets forth a development target of 9,000 megawatts of offshore-wind energy by 2035.

172.    The Public Service Commission incorporated the Climate Act's targets of 70% renewable energy and 9,000 megawatts of offshore wind energy into New York's Clean Energy Standard, under which the New York State Energy Research and Development Authority (NYSERDA) issues regular procurements to purchase renewable energy certificates from new clean energy generation projects. Those renewable energy certificates are sold to load-serving entities and offered for sale to the voluntary market, reducing costs of the program to ratepayers.

173.    Onshore- and offshore-wind projects are expected to play increasingly significant roles as the State pursues a zero-emissions electricity system consistent with the Climate Act's objectives. The Climate Act Scoping Plan, which provides comprehensive recommendations for reducing greenhouse-gas emissions and achieving net-zero emissions, forecasts that to achieve a fully decarbonized grid, New York will need to deploy approximately 14,600 megawatts of onshore wind and 14,900 megawatts of offshore wind by 2040.

174.    New York has three offshore-wind projects in advanced stages, one of which has been fully constructed, and the second and third of which have been under construction.

175.    The 132-megawatt South Fork Wind project is New York's first operational offshore wind farm, consisting of 12 turbines. It is located within federal waters on the Outer Continental Shelf, approximately 35 miles east of Montauk. The project delivered energy from its first turbine to the local Long Island electric grid beginning in December 2023 and became fully operational in 2024.

176.    Among New York's offshore wind projects currently under construction is a 924-megawatt offshore wind farm located roughly 30 miles off the coast of Montauk Point, in federal waters on the Outer Continental Shelf. It is expected to power nearly 600,000 New York homes with commercial operations planned to begin in 2027. Onshore construction in New York State is substantially progressed, pursuant to state and local permits and approvals, with the onshore converter station nearing completion. Offshore construction is also underway, having begun in the first quarter of 2025, and will follow a carefully sequenced schedule. The project has employed and is currently employing thousands of people in New York and across the country, and has a supply chain spanning dozens of states, including ships built in Louisiana, Mississippi, Texas, and Pennsylvania and major components produced in upstate New York and South Carolina.

177.    The other offshore wind project in advanced stages, Empire Wind, is an 80,000-acre wind project located in federal waters on the Outer Continental Shelf, 15–30 miles southeast of Long Island. The project includes development of the lease area in two wind farms, known as Empire Wind 1 and Empire Wind 2. The developer projects that Empire Wind 1 will produce 816 megawatts with 60–80 turbines, enough to power 500,000 homes. The project will be the first offshore-wind project to deliver power directly to New York City. BOEM approved the project's Construction and Operations Plan in February 2024. Construction on Empire Wind 1 began in June

2024. The first power is expected to be delivered in late 2026, with the project fully operational in 2027.

178.    On April 16, however, as noted above, the Acting Director of BOEM, at the request of the Interior Secretary, issued a stop work order for Empire Wind, effective immediately. Letter from Walter Cruickshank, BOEM to Empire Offshore Wind LLC (Apr. 16, 2025), https://perma.cc/EV6D-TKSK.

179.    In addition to the projects for which construction has been completed or has begun, there are twelve offshore-wind lease areas in the region without contractual commitments to a state that could provide energy to New York. Of the twelve, three have successfully secured their COP approvals from BOEM.

180.    Thirty-one land-based wind projects have been constructed and are currently operating in New York (totaling over 2,800 megawatts), and two are under construction representing 457 megawatts of nameplate capacity.

181.    There are more than more than 20 land-based wind projects in development in New York State in various stages of development. Many of these projects have not yet received their necessary federal permits. Land-based wind projects contracted with NYSERDA are expected to provide hundreds of millions of dollars in incremental economic benefits to New York State. Of this, a significant amount is expected to be paid directly to local authorities (including towns, counties and school districts) via Payments In Lieu Of Taxes (PILOT) and host community agreements. These projects would also provide financial support directly to the residents of towns where the projects are built through bill credits paid annually over the first 10 years of the projects' operation.

182.    The wind-energy industry supported over 4,400 jobs in New York State as of 2023. Additional wind projects are anticipated to accrue similar economic benefits, amounting to many billions of dollars of in-state spending, many thousands of local jobs (in aggregate, approximately 18,000 to 23,000 jobs are projected to be tied to offshore wind development in New York State), and significant attendant economic benefits throughout the state and the country.

183.    The Wind Directive and Agency Defendants' implementation also threaten supply chain projects related to the wind industry. For example, Atlantic Offshore's Arthur Kill Terminal, a 32-acre state-of-the-art offshore-wind staging and assembly port facility under development in Staten Island, is poised to play an important role as part of the infrastructure supporting offshore wind energy servicing New York and the region. The Terminal is expected to bring thousands of jobs to Staten Island and regional workers during both construction and operation of the port facility, as well as hundreds of millions of dollars in local spending to Staten Island and the surrounding area. Construction of the project is being partially financed by a $48 million grant from the New York State Urban Development Corporation through a federal grant. *See* 89 Fed. Reg. 65,483 (Aug. 9, 2024).

184.    After a multiyear design phase, construction of the Arthur Kill Terminal project was to begin this year, with operations expected to begin in 2027. That schedule has been disrupted, however, because, upon information and belief, the Corps has halted consideration of applications for permits under section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, citing the Wind Directive as the basis for halting its review of those permits. That delay is not just holding up the project, but also jeopardizing the Terminal's ability to use the $48 million grant given the September 30 deadline for completion of NEPA review.

38

185.    As another example of a supply-side business premised on continued wind-energy development, Equinor is also executing on a major capital investment plan to turn the South Brooklyn Marine Terminal (SBMT), located in the Sunset Park neighborhood of Brooklyn, into a state-of-the-art staging and assembly facility for offshore-wind components that will also serve as a regional operations and maintenance hub for Empire Wind 1 and other offshore wind projects. NYSERDA has entered into a grant agreement with the Equinor subsidiary responsible for these improvements to SBMT, under which NYSERDA has committed to provide $60 million upon substantial completion of the work. Construction on the project commenced in June 2024 and is well underway.

186.    The Wind Directive and Agency Defendants' implementing actions also risk stranding significant investments New York has made in support of wind energy.

187.    For example, the Public Service Commission has approved over $8 billion investment in transmission improvement projects that support wind and other renewable resources. This investment includes the approval of 62 local transmission projects to support the integration of clean energy sources in upstate areas, including wind generation; Con Edison's proposal to develop the Brooklyn Clean Energy Hub to address the local reliability needs and increased demand associated with the electrification of vehicles and buildings in New York City as well as provide interconnection points for up to 4,500 megawatts of new energy resources, including offshore wind; and upgrades to enhance reliability for Long Island and New York City and allow more efficient distribution of electricity generated by existing resources as well as the potential integration of new electric generation resources including renewable-energy resources.

188.    The continued addition of wind generation in New York's energy mix provides critical resource diversity benefits to the State's energy system. The New York Independent System

Operator (NYISO) has found that resource diversity of all types in fuel source, mode of operation, geography, and size can contribute to the resilience and reliability of the system. Wind power can produce electricity at times when solar energy facilities cannot. In this way, wind energy complements the increasing amount of solar generation being developed in New York.

189.    NYISO modeling also shows that deployment of renewable energy resources—including land-based and offshore-wind projects—has the potential to reduce resource production costs by displacing generation that would otherwise clear the market at a higher price. This effect occurs because these resources reduce the need for low-efficiency power plants and provide long-term price stability, while also increasing energy independence by reducing the need to import fuels into New York from other states and countries.

190.    Offshore wind projects such as Empire Wind 1, Sunrise Wind, and future projects will interconnect to New York's Zones J (New York City) and K (Long Island), which the NYISO identifies to be constrained areas, meaning that each zone must be served primarily by local generators (such as offshore-wind projects) due to transmission limitations.

191.    Offshore wind projects can provide critical energy diversity benefits to these constrained zones. A recent analysis commissioned by the NYISO found that the availability of a large quantity of offshore-wind energy able to be injected directly into the grid serving New York City and Long Island enhances grid reliability in modeled seventeen-day cold weather events as a complement to natural gas and oil-fired units by reducing dependency on oil inventories and helping to preserve limited oil and natural gas supplies.

192.    The Wind Directive and the Agency Defendants' actions categorically and indefinitely halting wind-energy approvals also undermine New York's implementation of the

Climate Act by increasing the need for and cost of state actions to further reduce greenhouse-gas emissions to achieve its statewide emission limits under the Climate Act.

193.    In addition, the Wind Directive and the Agency Defendants' implementing actions threaten significant adverse environmental and public health consequences to New York residents, including by delaying much needed air quality improvements by stalling the transition from fossil fuels to renewable energy sources, increasing reliance on aging natural gas "peaking units." Increased offshore-wind generation in the locations where these peaking facilities are most used— the New York City metropolitan ozone nonattainment area—would reduce emissions and improve air quality for New Yorkers.

## Massachusetts

194.    In 2022, Massachusetts enacted An Act Driving Clean Energy and Offshore Wind. St. 2022, c. 179. The Act aimed to move Massachusetts toward its mandate of net-zero greenhouse-gas emissions by 2050 through the promotion and development of offshore wind, including by requiring procurement of 5,600 megawatts of offshore wind by June 30, 2027. *Id.* § 61(b). Massachusetts also has an RPS, which requires that retail energy suppliers annually increase the share of renewable energy generation that is supplied to electricity customers. Mass. Gen. Laws ch. 25A, § 11F.

195.    The Act directed the Massachusetts Department of Energy Resources to coordinate and lead a wind-energy procurement process with a staggered schedule. The fourth and fifth procurement processes are underway. Massachusetts thus far has three projects that are currently in different stages of development and permitting, which together, once constructed, would provide 2,678 megawatts of offshore wind.

41

196.    Vineyard Offshore and Avangrid's Vineyard Wind 1, selected in the Commonwealth's first procurement process, will ultimately supply 800 megawatts of electricity, enough to power over 400,000 homes and businesses in Massachusetts. Vineyard Wind 1 received its final federal permits in 2021 and started producing reliable and affordable energy to Massachusetts customers in January 2024.

197.    Massachusetts's second project, Ocean Winds's SouthCoast Wind, is expected to produce 1,087 megawatts of electricity for Massachusetts and 200 megawatts for Rhode Island. Although the project has secured most federal approvals—including its Construction and Operations Plan—progress on outstanding approvals has been paused pursuant to the Wind Directive. Ocean Winds is negotiating power purchase agreements with Massachusetts utilities in the fourth procurement, but negotiations are delayed. The uncertainty created by the Wind Directive creates risk for the project and its power purchase agreement negotiations.

198.    The third offshore-wind project in the Massachusetts pipeline is Avangrid's New England Wind 1, a 791-megawatt project that was set to begin construction in 2025 and to start generating electricity in 2029. The project has obtained all required federal permits, and Avangrid is negotiating power purchase agreements with Massachusetts utilities in the fourth procurement. Negotiations are delayed in tandem with the Ocean Winds negotiations.

199.    Onshore wind is also an important part of the electricity generation mix serving Massachusetts. Electric Distribution Companies in the Commonwealth have signed long-term contracts with seven utility-scale projects, which have achieved commercial operation and are currently generating 625 megawatts of renewable energy for Massachusetts residents and businesses.

200.    Additionally, there are substantial onshore-wind resources available in northern New England that have not yet been developed. Massachusetts, along with other New England states, has been working with the regional grid operator ISO-New England (ISO-NE) to unlock this potential, but the uncertainty created by the federal government presents new hurdles and drives up costs.

201.    The Wind Directive and the Agency Defendants' actions categorically and indefinitely halting wind-energy approvals threaten energy reliability and affordability to Massachusetts ratepayers, including the Commonwealth as a ratepayer.

202.    In 2024, 55% of the electricity produced by New England's power plants was fueled by natural gas. ISO-NE, *Resource Mix*, https://perma.cc/3EA3-6T96.

203.    Massachusetts is on its way to becoming a winter-peaking state, meaning electricity demand is highest in the colder months, and Massachusetts's natural-gas infrastructure is running close to maximum capacity on the coldest days.

204.    When natural-gas power plants cannot secure enough supply to generate electricity, more expensive and often more polluting generators are brought online to produce electricity, resulting in higher prices for Massachusetts electricity customers and more harmful emissions for Massachusetts communities.

205.    And Massachusetts's reliance on natural gas leaves consumers vulnerable to fluctuations in natural-gas prices, and corresponding fluctuations and spikes in electricity prices.

206.    Offshore-wind generation is expected to reduce the instances of higher variable cost electric generators being dispatched by ISO-NE.

207.    Offshore wind has its highest capacity factor during the coldest months, when the generating system for electricity production in Massachusetts is most strained. ISO-NE, *Variable Energy Resource Data*, https://perma.cc/2ZCX-NZTC.

208.    Wind energy can lower wholesale energy market costs in New England by displacing more expensive marginal-cost generation from fossil fuels. ISO-NE recently found that without offshore wind the cost of energy to New England customers is expected to increase by about 50% in 2050. Kornitsky et al., *2024 Economic Study*, ISO-NE, at slide 23 (Mar. 19, 2025), https://perma.cc/EDS6-NJZJ.

209.    Additionally, ISO-NE found in 2023 that New England would need to replace over 5,000 megawatts of aging fossil fueled generation in the coming years with new sources of power generation to maintain a reliable grid. ISO-NE, *Overview and Regional Update*, at slide 13 (Jan. 19, 2023), https://perma.cc/U4BB-Y48S; ISO-NE, *Operational Impact of Extreme Weather Events* (2023), https://perma.cc/9UXZ-299Q. By contributing new power generation and diversifying the region's electricity mix, wind and other renewable energy resources can help address these reliability concerns.

210.    As a case in point, in 2018 ISO-NE found that 1,600 megawatts of offshore-wind generation during an extended cold weather period from December 24, 2017, to January 8, 2018, could have resulted in substantial economic environmental benefits, including: (1) lowering regional electricity production costs by $80 million to $85 million, resulting in an $11 to $13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; (2) avoiding emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and (3) avoiding consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil. ISO-NE, *High-Level Assessment of Potential*

*Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell* (Dec. 17, 2018), https://perma.cc/U5G7-4UV6.

211. The Wind Directive and the Agency Defendants' actions categorically and indefinitely halting wind-energy approvals also risk stranding significant investments by Massachusetts in wind energy.

212. Massachusetts, through the Massachusetts Clean Energy Center (MassCEC), has invested more than $330,000,000 since 2011 in offshore-wind infrastructure; workforce training; supply chains; and research and development. This includes: $135,000,000 via the Massachusetts Offshore Wind Ports Investment Challenge program; $149,000,000 in funding for facility improvements to ensure that New Bedford Marine Commerce Terminal, which MassCEC owns and operates, can accommodate future offshore-wind projects; $18,000,000 to various organizations as a part of the Offshore Wind Works grant program, designed to increase the Commonwealth's capacity to create a capable offshore-wind workforce; and $5,600,000 to developing and administering a supply chain directory.

213. The Wind Directive and the Agency Defendants' implementing actions also threaten Massachusetts's ability to meet its greenhouse-gas emission-reduction goals and RPS, as well as its specific requirements for procuring offshore wind.

214. With 1,500 miles of coastline, and 5.2 million people or 73% of the Commonwealth's population residing in coastal communities, Massachusetts is particularly vulnerable to sea-level rise and increasingly frequent extreme weather events attributed to climate change. Over the twenty-first century, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea-level rise, and estimates of coastal property damage for the Commonwealth are expected to reach over $1 billion per year by the 2070s.

215.    Without wind-energy development, Massachusetts will need to find different and more expensive ways to achieve its climate goals and mitigate the risk of these impacts. Indeed, without offshore-wind energy available to bring online, the total annualized build costs to Massachusetts's climate mandates would increase by $26 billion. Kornitsky et al., *supra*, at 21.

### Arizona

216.    Arizona has more than 1,300 megawatts of onshore wind capacity under development at three sites in northern and eastern Arizona: Forged Ethic, West Camp, and Lava Run. Despite being sited on private and Arizona State Trust Land, all three projects are subject to federal permitting review, including under the Bald and Golden Eagle Protection Act.

217.    In Arizona, State Trust Land is leased to private land users. State Trust Land lease revenues are used to fund public education from kindergarten through college.

218.    Forged Ethic will provide 323 megawatts of wind-generation capacity, millions of dollars in State Trust Land lease payments, lease payments to local, private landowners, and tens of millions of dollars in local tax revenues or PILOT payments to Coconino County.

219.    The Bureau of Reclamation will conduct a NEPA review of Forged Ethic's request to interconnect to a transmission system partially owned by the Bureau.

220.    West Camp is designed to provide up to 504 megawatts of wind generating capacity. West Camp will pay millions of dollars to lease State Trust Land, as well as lease payments to private landowners, and local tax revenues or PILOT payments to Navajo County.

221.    Lava Run will provide 500 megawatts of wind generating capacity, while contributing an estimated $75 million to lease State Trust Land and $31.5 million in property tax revenues over 35 years to Apache County. Lava Run will also provide revenue to local landowners.

222.    Arizona's three largest electric utilities plan to procure gigawatts of additional wind generating capacity over the next two decades. Utilities plan to invest in wind because, in concert with solar, battery energy storage, and natural-gas-fired generation, wind energy provides the least expensive and most reliable power.

### California

223.    Wind energy provides many benefits to California, including as an important renewable energy resource and in meeting California's renewable energy and climate policies.

224.    In 2023, wind energy accounted for approximately 11% of California's total energy generation and approximately 6% of total in-state energy generation.

225.    California has enacted several renewable energy and climate goals and policies. For example, California's 100 Percent Clean Energy Act of 2018 (SB 100) and Clean Energy, Jobs, and Affordability Act (SB 1020), among other things, require that renewable-energy resources and zero-carbon resources supply 100% of all retail sales of electricity to California end-use customers by December 31, 2045, and 100% of electricity procured to serve all state agencies by December 31, 2035. Cal. Pub. Util. Code § 454.53. Additional interim targets require that renewable energy resources and zero-carbon resources supply 90% of all retail sales of electricity to California end-use customers by December 31, 2035, and 95% of all retail sales of electricity to California end-use customers by December 31, 2040. *Id.* SB 100 also increased California's Renewables Portfolio Standard (RPS) target to require utilities to procure 60% of retail sales from renewable sources by 2030. Cal. Pub. Util. Code § 399.15.

226.    The California Global Warming Solutions Act of 2006 (SB 32) also requires reducing statewide greenhouse-gas emissions to 40% below 1990 levels by 2030. Cal. Health & Safety Code § 38566. The California Climate Crisis Act (AB 1279) requires California to achieve

carbon neutrality as soon as possible, but no later than 2045, and to reduce statewide greenhouse-gas emissions to at least 85% below 1990 levels by 2045. Cal. Health & Safety Code § 38562.2.

227.    The State anticipates using wind energy to meet these climate goals and energy policies. California has set goals to develop 2 to 5 gigawatts of offshore wind by 2030 and 25 gigawatts by 2045 pursuant to California Public Resources Code section 25991.1. California has also established a program to support, including via financial incentives, the buildout of offshore- wind facilities by supporting the improved capabilities of California ports, harbors, and other waterfront facilities. Cal. Pub. Resources Code § 25666. In September 2024, the California Energy Commission released a competitive solicitation pursuant to that program to fund proposed projects.

228.    Wind energy helps to diversify California's portfolio of renewable electricity resources, reduce total resource costs, and improve the reliability and resiliency of California's electricity system. Wind energy can also complement the generation attributes of other renewable-energy resources.

229.    There are five federal wind leases off California's coast. Two are located offshore in Northern California near Humboldt, California, the remaining three are located offshore in Central California near Morro Bay. The leases were effective as of June 1, 2023. The leases support the development of floating offshore wind in deep-water sites.

230.    In exchange for bidding credits, the lessees committed to providing collectively over $50 million to communities, Native American tribes, or interested parties that may be impacted from the lease development through Community Benefit Agreements. The lessees also committed to providing workforce training and domestic supply chain development benefits.

231.    The offshore-wind leases are expected to provide additional economic and workforce benefits to California.

232.    There are over one hundred onshore-wind projects throughout California. Additional onshore-wind projects are also proposed to be built in the state.

233.    California is also currently processing an application for an offshore-wind project in state waters near Vandenberg Space Force Base in Santa Barbara County. The developer has indicated that the project is likely to require federal review and approvals, which would likely be impacted by the Wind Directive and Agency Defendants' implementation. This wind project is also anticipated to provide economic and workforce benefits to California.

234.    As discussed above, BOEM has cancelled virtual public meetings regarding BOEM's programmatic NEPA review for future offshore-wind development in California, citing the Wind Directive.

235.    The Wind Directive and the Agency Defendants' actions categorically and indefinitely halting wind-energy approvals threaten the viability of proposed and future wind-energy generation projects in California. Those wind-energy projects would deliver economic benefits; reduce air pollution, including in areas in nonattainment of federal and state air quality standards, by stalling the transition from fossil fuels to renewable energy sources; and improve grid reliability through increased diversification of energy sources.

## Colorado

236.    Wind energy has played a role in the evolution of Colorado's greenhouse-gas emission-reduction goals. In 2019, Colorado enacted legislation setting statewide greenhouse-gas emission reduction targets of 26% by 2025, 50% by 2030, and 90% by 2050, all compared to a 2005 baseline. Colo. Rev. Stat. § 25-7-102(2)(g) (2019). Four years later, Colorado increased

interim targets to include a 65% reduction by 2035, 75% reduction by 2040, and a 90% reduction by 2045, and updated the 2050 target to set a 100% reduction goal in net statewide greenhouse-gas pollution by 2050. Colo. Rev. Stat. § 25-7-102(2)(g). To meet these goals, the statute instructs utilities to seek to provide their customers with energy generated from 100% clean energy resources by 2050. Colo. Rev. Stat. § 40-2-125.5(3)(a)(II).

237.    Colorado energy producers utilize wind energy to meet Colorado's greenhouse-gas emission-reduction goals. In 2023, wind power accounted for 28% of the state's total energy generation and 70% of renewable generation in Colorado. After more than quadrupling its use of wind energy from 2010, Colorado now ranks sixth nationwide for installed wind generating capacity. Continued installation of wind energy is essential for Colorado to achieve its 100% reduction goal in net statewide greenhouse-gas pollution by 2050, as contained in Colo. Rev. Stat. § 25-7-102.

238.    Colorado had roughly 5,000 megawatts of wind installed in 2022. In 2021, Colorado modeled meeting state-wide energy needs through 2040. Under the least-cost scenario, utilities would need to deploy an additional 9,300 megawatts of wind energy to meet the state's 2030 goal of reducing greenhouse-gas emissions by at least 80% from a 2005 baseline.

239.    Wind provides the lowest cost electricity, supplying the state with roughly 71% of its total electricity. Replacing wind with other resources increases costs to consumers.

240.    The same study also showed that utilities would have roughly 10.6 gigawatts of wind installed in 2040. Other scenarios range from 12 gigawatts to roughly 22 gigawatts.

### Connecticut

241.    Connecticut has worked to shift reliance away from fossil fuels and toward renewable-energy sources, including wind. Connecticut has had an RPS in some form since 1998.

The RPS requires electric suppliers to obtain a specified percentage of the energy they sell or distribute to Connecticut customers from renewable sources through the purchase of Renewable Energy Certificates (RECs). The total renewable output targets have increased each year, and Public Act 18-50, codified at Connecticut General Statutes § 16-245a, doubled the RPS requirement from 20% by 2020 to 40% by 2030.

242.    Under Public Act 18-82, "An Act Concerning Climate Change Planning and Resiliency," Connecticut must achieve state economy-wide greenhouse-gas emission reductions of at least 45% below 2001 levels by 2030, adding to the existing requirement of at least 80% below 2001 levels by 2050. Public Act 22-5, "An Act Concerning Climate Change Mitigation," requires Connecticut to achieve a 100% greenhouse-gas emissions-free electricity supply by 2040.

243.    In addition, in passing Public Act 19-71, "An Act Concerning the Procurement of Energy Derived from Offshore Wind," the Connecticut Legislature created a process for the Department of Energy and Environmental Protection (DEEP) to work with other state officials to solicit competitive proposals for offshore-wind projects. The Act also authorizes DEEP to direct the state's electric distribution companies to enter into long-term contracts with bidders meeting certain criteria, which DEEP has done. DEEP also has similar procurement authority for additional Class I renewable-energy resources, including both onshore and offshore wind. Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

244.    In 2018 and 2019, using its authority under Conn. Gen. Stat. §§ 16a-3n and 16a-3m, DEEP selected 200 megawatts and 104 megawatts from the Revolution Wind offshore-wind project in two separate competitive solicitations. The Public Utilities Regulatory Authority (PURA) subsequently approved contracts with Connecticut's electric distribution companies, Eversource and United Illuminating. The project is expected to reach commercial operation in

2026, at which point it will deliver electricity, and associated renewable-energy credits, to Connecticut, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

245.    Connecticut had previously approved procurements from two onshore-wind projects: 126 megawatts from the Cassadaga project and 5 megawatts from the Holiday Hill Community Wind project. These projects achieved commercial operation in 2021 and 2018, respectively, and are providing energy and RECs to support Connecticut's energy needs and clean energy targets.

246.    Connecticut also has an interest in future procurements of wind energy. Public Act 19-71 provides DEEP with existing statutory authority to conduct competitive solicitations for up to 2,000 megawatts of additional offshore wind to meet Connecticut's energy needs and clean-energy targets. DEEP also has additional authority to conduct new competitive solicitations for offshore wind and onshore wind under Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m. DEEP's October 2021 Integrated Resources Plan found that, to achieve the state's target of a 100% greenhouse-gas emissions-free electricity supply by January 1, 2040, significant additions of new zero-carbon generation will be required. This need includes potentially 352–557 megawatts of new onshore wind and 3,745-5,710 megawatts of new offshore wind by 2040 under a range of assumptions and scenarios, including availability of other generating resources.

247.    Connecticut is also working regionally with other states and ISO-NE to advance wind energy. On March 31, 2025, ISO-NE issued a request for proposals (RFP) from transmission developers to upgrade the transmission grid in Maine to accommodate the interconnection of at least 1,200 megawatts of onshore wind generation to the New England grid.

248.    This RFP is the first procurement being conducted as part of a new regional transmission planning and procurement process that Connecticut worked to develop with ISO-NE and the other New England states, and which the Federal Energy Regulatory Commission (FERC) approved last year. One piece of this approved framework was an agreement by the six New England states to allocate the costs of any selected project equitably across the states based on each state's share of regional electricity load. The New England states requested that the first RFP issued by ISO-NE under this new process focus on transmission upgrades in Maine to facilitate onshore-wind development, which will lower wholesale energy and capacity market costs and improve grid reliability in Connecticut and across the region.

249.    Wind generation contributes to grid reliability by reducing Connecticut's reliance on fossil fuels, all of which must be imported from outside the region. New England currently relies on natural gas to generate approximately half of the region's electricity. This creates reliability concerns during the winter, when there is high natural gas demand for heating, or in cases where unanticipated disruptions to the pipeline system or unavailability of gas limit the ability of natural gas-fired generators to run. Wind energy can help fill these gaps and reduce the region's reliance on natural gas.

250.    By reducing reliance on fossil fuels, Connecticut's efforts to bring wind energy online also help insulate the state's electricity ratepayers from price spikes and volatility associated with fossil fuels.

251.    In addition to procuring energy from wind, Connecticut has invested in facilities such as the redeveloped Connecticut State Pier Terminal in New London to support the development of offshore wind and create new jobs and economic-development opportunities in the State. The State has committed over $200 million to the redevelopment of the State Pier

Terminal. The Terminal is one of only three marshaling facilities on the East Coast that are assembling offshore-wind turbines for deployment, and was the first one with open ocean access. The Terminal is already supporting the assembly and delivery of approximately 160 turbines for three offshore wind projects—South Fork Wind, Revolution Wind, and Sunrise Wind—that will provide power to Connecticut, New York, and Rhode Island. Once installed, these projects will have an estimated output of 1,760 megawatts, enough to power more than 1 million homes. Staging and assembly operations at the terminal are expected to generate more than 100 well-paying jobs. The Terminal also has the potential to support further offshore wind deployments, together with associated jobs in Connecticut.

252.    By introducing regulatory uncertainty in the development of new onshore wind and offshore wind, the Wind Directive and Agency Defendants' implementation harm Connecticut in numerous ways.

253.    The Wind Directive and its implementation undermine Connecticut's ability to procure additional energy from onshore- and offshore-wind generation as needed to meet the state's energy and environmental requirements, including statutory requirements to reduce in-state greenhouse-gas emissions and transition the state's electricity supply to non-greenhouse-gas-emitting sources of power. As a result, the Wind Directive and its implementation harm Connecticut's ability to protect its residents, as part of a broader effort, from the growing impacts of climate change, which include increased flooding, extreme heat, wildfires, and extreme storms.

254.    The Wind Directive and its implementation also threaten the reliability of Connecticut's electricity grid. Delaying or preventing development of new wind energy in the region prevents Connecticut and other New England states from bringing new energy resources online that ISO-NE has determined are important to ensuring a reliable grid.

255.     Furthermore, the Wind Directive and its implementation undermine Connecticut's ability to ensure affordable electricity and protect the state's electricity ratepayers by developing wind-energy resources that will lower wholesale energy and capacity-market costs and will reduce the state's reliance on price-volatile fossil fuels.

### Delaware

256.     Wind energy is one of the sources of energy covered in Delaware's Renewable Energy Portfolio Standards Act. 26 *Del. C.* § 352. The law was based on a finding that the benefits of electricity from renewable energy resources accrue to the public at large, and that electric suppliers and consumers share an obligation to develop a minimum level of clean energy in the electricity supply portfolio of the State. These benefits include improved regional and local air quality, improved public health, increased electric supply diversity, increased protection against price volatility and supply disruption, improved transmission and distribution performance, and new economic development opportunities. 26 *Del. C.* § 351. The Act required that retail sales of electricity include a minimum percentage of "eligible energy resources" and solar photovoltaics, culminating in 2035 with at least 40% of the former and at least 10% of the latter. 26 *Del. C.* § 354(a). Wind energy qualifies as an "eligible energy resource[]." 26 *Del. C.* § 352(8).

257.     In enacting Delaware Climate Change Solutions Act of 2023, 84 Del. Laws, c. 141, § 1, the Delaware's General Assembly found that: (1) anthropogenic emissions of greenhouse gases are contributing to climate change; (2) climate change threatens the health and well-being of the people of Delaware; (3) climate change poses risk to Delaware's continued economic vitality; and (4) actions taken to reduce greenhouse gas emissions and increase resiliency have co-benefits to economic development, job opportunities, public health and air and water quality. 7 *Del. C.*

c. 100. The Climate Change Solutions Act mandates a 50% reduction in greenhouse-gas emissions below 2005 levels by 2030. The goal by 2050 is net zero greenhouse-gas emissions.

258.     Related to these goals, Delaware is the future home to infrastructure necessary to support the U.S. Wind project in Maryland, described below. U.S. Wind has purchased 140 acres of land surrounding the existing Indian River Power Plant in Delaware for up to three substations to accommodate the incoming power and connect it to the grid. The project, which is undergoing county review, could generate over two gigawatts of electricity, suitable to power over 718,000 homes. This would save Delaware ratepayers a projected $253 million in utility bills over the twenty-year lifespan of the turbines, reducing average bills by $9 a month.

## District of Columbia

259.     Under the District of Columbia's RPS, D.C. is currently required to receive 52% of its energy supply from renewable energy sources located within the PJM Interconnection (PJM)'s footprint. Each year, the required amount of clean energy supply increases, reaching 100% by 2032. Further, under the Clean Energy D.C. Omnibus Amendment Act, the District must reduce greenhouse-gas emissions each year with the ultimate goal of achieving a 100% reduction—or net zero greenhouse-gas emissions—by 2045. Currently, wind energy from projects within PJM supply 4–5% of the District's energy directly, while the balance is supplied through the purchase of RECs generated from clean-energy sources within PJM. Thus, the cost of energy in D.C. is highly dependent on the supply of clean energy in PJM. And while the amount of energy supplied directly by wind to D.C. is small in comparison to fossil fuel sources, wind is by far the largest source of clean energy within PJM—the future development of which holds the greatest potential of helping D.C. achieve its clean energy and climate goals at a reasonable price.

260.    Conversely, policies that hinder the development of wind energy—such as the Wind Directive and Agency Defendants' implementation—will drive up the cost of energy in D.C. and make it less likely that the District will meet its clean-energy and climate goals.

## Illinois

261.    Illinois has a robust wind industry, with 10,198 megawatts of wind projects operating as of November 2024.

262.    Wind power constituted 12.27% of all electricity generated in Illinois in 2023, with over 21 million megawatt hours generated from wind projects.

263.    In 2021, Illinois enacted the Climate and Equitable Jobs Act, which directs greenhouse-gas emission reductions across all areas of Illinois's economy, including electricity generation. The law commits Illinois to 100% carbon-free energy generation by 2045, with interim goals of 40% by 2030 and 50% by 2040.

264.    Illinois also has an RPS, as memorialized through Section 1-75(c) of the Illinois Power Agency Act, which requires the Illinois Power Agency to attempt to procure cost-effective renewable energy resources equal to 40% of each Illinois electric utility's load by 2030, climbing to 50% of each utility's load by 2040. Additionally, to comply with the Illinois RPS, the Illinois Power Agency "shall endeavor to procure 45% from new and repowered wind and hydropower projects." Because RPS compliance may not involve the development of new dams, hydropower is not expected to play a significant role in achieving the RPS.

265.    To meet its statutory commitments, the Illinois Power Agency periodically conducts procurements for new wind farms.

266.    One procurement yielded a successful bid for a 300 megawatt utility-scale wind farm from Apex Clean Energy. This wind farm, Prosperity Wind, is currently under construction

in Galesville, Illinois, a rural farming community. It will produce enough power for 99,000 homes and will consist of up to 50 turbines.

267.    Other recent Illinois procurements have yielded successful bids for onshore utility-scale wind farms that ranged in capacity from 200 megawatts to 450 megawatts.

268.    Meeting the Illinois RPS is important to maintain a stable, reliable, and cost-effective power supply for at least two reasons. First, new sources of electricity are needed to meet unexpected projected load growth Illinois is facing due to data centers and other large load customers, while simultaneously maintaining a cost-effective power supply for Illinois residents.

269.    Second, as outlined in Section 9.15 of the Illinois Environmental Protection Act (415 ILCS 5), Illinois law requires that all electricity generating units reduce carbon dioxide and co-pollutant emissions to zero by 2045 on a progressive retirement or emission-reduction schedule that takes effect in 2030. Without bringing new wind projects online, Illinois is unlikely to be able to satisfy this obligation.

## Maine

270.    Wind energy likewise plays a role in Maine's achievement of climate and clean-energy goals. In 2019, Maine enacted a state law, 38 Me. Rev. Stat. § 576-A, to expand the original greenhouse-gas emission-reduction goals set forth in prior 2003 legislation. The new goals include the reduction of greenhouse-gas emissions to at least 45% below 1990 levels by January 1, 2030, and to at least 80% below 1990 levels by 2050. In 2019, Maine Governor Janet Mills signed an executive order adding the goal of achieving carbon neutrality in Maine by 2045, which was codified in 38 Me. Rev. Stat. § 576-A(2-A).

271.    Maine also has an RPS that requires 80% of the electricity sold in Maine to be supplied by renewable energy resources by 2030, and 100% by 2050.

272.    In addition, the Maine Wind Energy Act, 35-A Me. Rev. Stat. §§ 3402, 3404, includes onshore and offshore statutory goals and requirements, recognizes that wind energy can achieve reliable, cost-effective, sustainable energy production, and is a valuable domestic energy resource that can help achieve the state's climate and clean-energy requirements.

273.    With respect to future energy procurements that influence Maine's ability to meet its RPS, the 2021 Maine Renewable Energy Goals Market Assessment released by the Governor's Energy Office (GEO) states that "many lower-cost pathways to meet Maine's RPS requirements in the next decade are achievable through the development of high-quality wind resources in western and northern Maine, which in turn require new transmission investments." Kasina et al., *State of Maine Renewable Energy Goals Market Assessment,* State of Maine GEO, at 2 (Mar. 2021), https://perma.cc/S6HW-N2RH.

274.    Onshore-wind energy generated 27% of Maine's renewable electricity generation in 2023, the 10th highest wind power share among U.S. states.

275.    Maine currently hosts the majority of New England's onshore-wind resources with over 1000 megawatts installed. Onshore wind generally has its highest capacity at night and during the winter months and therefore balances the almost 7000 megawatts of solar installed in the region, providing an important energy and capacity resource precisely when it is most needed during winter cold spells. Furthermore, Maine enjoys very high wind capacity potential both in northern Maine as well as along the western Maine mountains and to the east near the shore. These different resource areas ensure that even if the wind is not blowing in one area, there can be energy produced from another. Overall, the 1000+ megawatts of onshore wind are currently producing fossil-free low-cost energy to benefit Maine ratepayers and helping ensure winter reliability to the entire regional grid.

276.    In January 2024, the GEO issued the Maine Energy Plan, which outlines strategies to further reduce energy costs, ensure reliability and resilience, and increase the diversity of energy resources. State of Maine GEO, *Maine Energy Plan* (Jan. 2025), https://perma.cc/3DRJ-6P93. The Plan was informed by an 18-month stakeholder engagement process and an expert technical report. The report found that 100% clean energy is achievable, beneficial, and results in lower overall energy costs across the economy. Murphy et al., *Maine Pathways to 2040: Analysis and Insights*, State of Maine GEO (Jan. 2025), https://perma.cc/PJ3U-R8BU. Both onshore and offshore wind development will play a crucial role in achieving that goal.

277.    The Maine legislature has found that integrating Maine's wind resources is in the public interest and will provide a valuable local energy resource that will reduce reliance on fossil fuels and will benefit Maine ratepayers. 35-A 38 Me. Rev. Stat. 3402.

278.    On April 1, 2025, the Maine Public Utilities Commission (PUC) released a Request for Information to advance the procurement of northern Maine resources, including wind, and associated transmission. Participation by interested states, such as Massachusetts, would reduce costs to Maine by spreading the investment across all participating states.

279.    Developing renewable resources and associated transmission in northern Maine provides a significant opportunity to meet Maine and the region's energy goals and stabilize costs for ratepayers. Northern Maine possesses some of the highest quality renewable energy potential in the region. But Maine has been unable to fully unlock that potential and the accompanying economic and community benefits due to interconnection limitations and a need for additional transmission capacity. Projects developed under the 2021 Northern Maine Energy Act are poised to address these longstanding challenges, bring jobs, tax revenue, and economic opportunities to northern Maine, and provide important improvements to system reliability and resiliency. In

addition, these projects aim to help reduce energy costs over the long-term by placing downward pressure on regional electricity prices while also helping confront challenges from climate change by reducing greenhouse-gas emissions.

280.    In July 2023, Governor Mills signed "An Act Regarding the Procurement of Offshore Wind Energy Resources" into law, which requires procurement of at least 3000 megawatts of offshore wind by 2040. P.L. 2023, Ch. 481.

281.    Maine's Energy Plan identifies offshore wind as a key energy generation source to help meet Maine's long-term energy and reliability needs. Maine Energy Plan, *supra*. Responsible and sustainable development of offshore wind is essential to meet Maine's growing electricity demand as well as the state's clean energy, climate, and economic development goals. Offshore wind is also identified as an important sector in the State's 10-Year Economic Strategy. Maine Dep't of Econ. and Cmty. Dev., *Maine Economic Development Strategy* (Nov. 15, 2019), https://perma.cc/CF9P-67YZ.

282.    ISO-NE has identified offshore wind as a key element in meeting the region's energy and reliability needs for a variety of reasons, including the ability to locate generators in close proximity to large population hubs, which can help reduce strain on the transmission system. ISO-NE found that es: "[a] large share of the region's future offshore-wind production will likely come from the Gulf of Maine lease area." ISO-NE, *2050 Transmission Study: Offshore Wind Analysis*, at 9 (Mar. 21, 2025), https://perma.cc/TVN7-9KLW. Delaying offshore-wind projects will have significant adverse impacts to Maine ratepayers and consumers in the entire region.

283.    Maine is also pursuing floating offshore wind energy. In August 2024, BOEM announced the execution of the nation's first floating offshore-wind energy research lease for the State of Maine. The lease area covers a little less than 15,000 acres located 28 nautical miles off

Maine on the Outer Continental Shelf and could allow for the deployment of up to 12 floating offshore wind turbines capable of generating up to 144 megawatts.

284.    Maine is unique in that it has acquired from BOEM its own offshore-wind leasehold, specifically, the Research Array leasehold, separate from the commercial leaseholds in the Gulf of Maine. The Maine Research Array will advance the University of Maine's patented technology; conduct important research to examine offshore wind's effects on the Gulf of Maine fishing, wildlife, and ecosystem; and support economic development through the advancement of an offshore-wind supply chain and workforce. The Research Array project would be the first major floating offshore-wind farm in the United States and would position Maine as a leader in this important technology. The GEO has been working with staff at the Maine PUC, the developer and the state's regulated utilities on a draft power purchase agreement. This effort was recently suspended, however, at the request of the developer "due to recent shifts in the energy landscape that have in particular caused uncertainty in the offshore-wind industry," New England Aqua Ventus, LLC, Procedural Order Suspending Negotiations, Me. Pub. Util. Comm'n Dkt. No. 2022-00100 (Mar. 28, 2025), particularly the Agency Defendants' implementation of the Wind Directive.

285.    Separately, with respect to commercial offshore-wind development off the coast of Maine, after years of extensive stakeholder engagement and analysis, BOEM executed commercial offshore-wind leases in the Gulf of Maine in December 2024. In October 2024, the DOI announced the results of the lease sale in the Gulf of Maine, which included two winners on four lease areas. Invenergy NE Offshore Wind, LLC, secured a lease that includes 97,854 developable acres and is approximately 46.2 nautical miles from Maine. Invenergy also won a southern lease that consists of 117,780 developable acres and is approximately 21.6 nautical miles from Massachusetts.

Avangrid Renewables, LLC, won two southern leases that each sit approximately 29.5 nautical miles from Massachusetts, and include 98,565 and 124,897 developable acres, respectively.

286.    The Wind Directive and its implementation directly impact Maine's ability to meet its statutory energy and climate goals. Onshore wind is the lowest cost clean energy resource available, and Maine has the best regional wind potential. For example, the Wind Directive and its implementation have directly and negatively impacted the collective work of the six New England states and ISO-NE on transmission solutions to the region's growing energy needs.

287.    The Wind Directive and its implementation also threaten the State's ability to effectively implement its statutory requirements to begin its first commercial offshore-wind solicitation in 2025. Further delays could threaten the state's ability to achieve its statutory requirement of procuring 3000 megawatts of offshore wind by 2040. Moreover, the Wind Directive and its implementation threaten the ability to deliver low-cost onshore wind resources, as required by statute, in northern Maine. 35-A Me. Rev. Stat. § 3210-I.

## Maryland

288.    Offshore wind also figures into Maryland's strategy to address climate change. The Climate Solutions Now Act of 2022 requires Maryland to achieve net-zero emissions by 2045. Md. Code. Env't. § 2-1204.2. These requirements build on over a decade of state climate action, investments, and planning, all of which have specifically relied on developing offshore-wind resources.

289.    Maryland's Offshore Wind Energy Act of 2013 set a statewide RPS of 25% by 2020 and created a carveout for offshore wind not to exceed 2.5% of the state's electricity. The Clean Energy Jobs Act, passed in 2019, increased the RPS to 50% by 2050, removed the 2.5% cap on offshore-wind electricity, and set a new goal of procuring at least 1,200 megawatts of offshore

wind through the issuance of offshore-wind renewable-energy credits. The Promoting Offshore Wind Energy Resources (POWER) Act of 2023 further strengthened that goal by increasing the state's offshore-wind procurement goal to 8,500 megawatts by 2031 and also established new procurement processes.

290.    The POWER Act of 2023 also required the state Public Service Commission to engage with Maryland's regional grid manager (PJM) to study transmission models that would facilitate the planned development of offshore-wind resources. That process is well underway.

291.    There are currently three offshore-wind leaseholders in Maryland-adjacent waters. One of those, the Maryland Offshore Wind Project, under development by U.S. Wind, received its final Construction and Operation Permit in late 2024. U.S. Wind's project will provide 1,710 megawatts of clean energy from a maximum of 114 turbines sited approximately 11 to 26 miles off the coast of Maryland. Upon information and belief, the company has spent over $280 million developing this project to date.

292.    The project is slated to create $6.2 billion in total economic benefit to the state, including over $1 billion in direct in-state expenditures. Those expenditures include significant investments in a Maryland steel fabrication plant planned for the site of the former Bethlehem Steel facility in Baltimore County; port improvement projects; and the construction of an in-state cable facility. The project is expected to create 13,600 direct and secondary jobs through development, construction, and operation.

293.    Maryland has provided additional support to the offshore-wind industry through its Offshore Wind Supply Chain Investment Program and the Wind Workforce and Education Program. The Supply Chain Investment program provides grant funding for businesses entering the offshore wind supply chain in Maryland. Maryland provided $2 million for this program in

Fiscal Year 2025. The Workforce and Education Program provides grant funding for workforce training centers and academic institutions to build programs that support the state's offshore-wind workforce. That program received $3 million in state funding for Fiscal Year 2025.

294.    The Wind Directive and Agency Defendants' actions indefinitely and categorically halting wind-energy approvals threaten Maryland's ability to achieve its statutory goals and exacerbate the harms Maryland is facing from climate change.

## Michigan

295.    Wind energy is a crucial resource in Michigan's renewable energy planning. Michigan law, 2023 Mich. Pub. Act 235, requires that electric utilities operating in the state provide 15% of electricity sales from renewable energy each year through 2029, increasing to 50% of electricity sales for 2030, and then 60% in 2035 and thereafter. The law further requires that each utility supply 80% of electricity sales from 2035 through 2039, and 100% of electricity sales from 2040 and thereafter, from renewable energy, nuclear, or natural gas with carbon capture and sequestration.

296.    Wind energy, a key wintertime resource, has a central role in meeting these requirements. Wind also has the lowest cost per unit energy of any new resource type.

297.    Michigan currently has approximately 3,400 megawatts of land-based wind generation, providing about 7% of Michigan's electricity consumption. Michigan utilities plan to develop or acquire more than 6,560 megawatts of land-based wind generation by 2035, most of which is in the development process now or will be in the next three years. By 2035, wind generation will provide about 25% of Michigan's electricity consumption. Given that wind has the lowest cost per unit energy among the resource types required by Mich. Pub. Act 235, additional wind development is expected in the period after 2035.

298.    Based on utility filings, projected wind development in Michigan will require investment of approximately $15 billion and is projected to save Michigan utility customers approximately $2.5 billion net present value through 2045 compared to using natural gas plants to provide comparable electricity. It is anticipated that most of the 6,560 megawatts in planned wind projects to be built will be required to apply for necessary permitting following federal reviews. Additionally, as wind projects will be disincentivized due to regulatory uncertainty from the Wind Directive, reducing the development of this least-cost renewable resource relative to other renewable resources will raise the cost of coming into compliance with Mich. Pub. Act 235, as borne by Michigan ratepayers.

## Minnesota

299.    Abundant wind-energy resources are important to achieving Minnesota's emission-reduction goals and to the state's economy. The 2023 Minnesota State Legislature adopted laws to reduce emissions by 50% by 2030 and achieve net-zero emissions by 2050. It also adopted a carbon-free standard for Minnesota utilities. Minn. Stat. 216B.1691. Electricity generated or procured to serve Minnesota's retail electricity customers must be 80% carbon free for public utilities and 60% carbon free for other electric utilities by 2030, 90% for all electric utilities by 2035, and 100% for all electric utilities by 2040. Minn. Stat. § 216B.1691 (2024).

300.    The Minnesota Climate Action Framework (Framework) aims for Minnesota to produce 45% of total electricity generation from wind by 2034. The Framework also calls for transitioning to an energy mix that is over 75% carbon-free by the same year.

301.    Wind-energy generation is vital for Minnesota to meet its 2040 climate goals. Wind provides the largest share of Minnesota's electricity generation from renewable resources. In 2023, wind energy accounted for more than 75% of the state's renewable generation and 25% of the

state's total net generation, up from 22% in 2021. In 2023, Minnesota was among the ten states with the largest share of in-state generation from wind. Minnesota ranked eighth in the nation in wind capacity and accounted for more than 3% of the U.S. total.

302.    The Framework aims for Minnesota to produce 45% of total electricity generation from wind by 2034. The Framework also calls for transitioning to an energy mix that is over 75% carbon-free by the same year.

303.    Furthermore, wind is an important renewable-energy resource as Minnesota transitions away from reliance on fossil fuels. Wind energy represents a homegrown, reliable, affordable, and clean energy resource that is produced entirely in Minnesota. Transitioning to wind energy allows Minnesota to reduce its reliance on fossil fuels, thereby reducing the cost volatility associated with fossil fuels.

304.    Minnesota's best wind resources are in the western and southern parts of the state. Accordingly, Minnesota's wind farms are located primarily in rural, agricultural counties in western and southern Minnesota.

305.    Wind farms supplement income to agricultural counties and communities. This is so for three primary reasons: first, agricultural farming and wind farms work well together because wind turbines have a small footprint; second, the Minnesota production tax credit provides money to counties and townships based on wind generation; and third, landowners work with developers to create wind projects and receive annual payments for hosting wind turbines. There is no eminent domain involved; willing private landowners develop these resources.

306.    Minnesota has over 50 operating, repowered (i.e., retrofitted with new or refurbished technology), permitted, in process, or expected wind-energy facilities, most of which are permitted through the Minnesota Public Utilities Commission and have undergone an

environmental review by the Minnesota Department of Commerce, Energy Environmental Review and Analysis. While most Minnesota wind farms are on private land, facilities may be subject to federal reviews and approvals.

307.    Wind generation is important to Minnesota's economy by furthering job creation, especially construction jobs in rural and agricultural communities. The Commission and Minnesota Legislature have, in recent years, been supportive of the benefits of local labor for wind-energy facilities, which are generally located in rural and agricultural communities. These same communities that support wind farms could lose production tax benefits and the economic opportunities that they create.

### New Jersey

308.    With its extensive coastline, which is projected to experience higher sea-level rise than elsewhere, and a temperature that is rising faster than the rest of the Northeast region, New Jersey has taken legal steps to achieve greenhouse-gas-emission reductions including by spurring offshore wind. For instance, it passed the Global Warming Response Act, N.J. Stat. Ann. § 26:2C-40, which requires New Jersey to achieve 80% reductions from 2006 greenhouse-gas emissions by 2050. As the power generation sector is the second largest greenhouse-gas emissions sector, reducing those emissions is key to achieving these goals. Governor Murphy therefore established a goal of reaching 11,000 megawatts in offshore-wind generation by 2040. Exec. Order No. 307 (Murphy) (Sept. 21, 2022).

309.    Three offshore wind projects have Outer Continental Shelf leases from BOEM and regulatory approvals from the New Jersey Board of Public Utilities (NJBPU) to sell their electricity to the grid. The first is Atlantic Shores Offshore Wind Project 1, LLC, a 1,509.6 megawatt project that had received all federal approvals. The other two are Invenergy Wind Offshore, LLC's 2400-

megawatt project and Attentive Energy, LLC's 1,342 megawatt-project, neither of which has yet submitted a COP to BOEM.

310.    As described above, citing to the Wind Directive, EPA moved to remand Atlantic Shores Offshore Wind Project 1, LLC's Clean Air Act permit to the agency, citing the Wind Directive as the basis for the request. On March 14, the Environmental Appeals Board granted EPA's request. *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 14, 2025).

311.    Seven other projects have Outer Continental Shelf leases, but do not yet have the NJBPU approvals, and there are other Outer Continental Shelf sites off New Jersey's coast that BOEM has considered for possible leasing.

312.    The Wind Directive and Agency Defendants' categorical and indefinite halt on project approvals threatens New Jersey's ability to reach its statutory offshore-wind-energy-generation-procurement and greenhouse-gas emission-reduction requirements, and they put at risk the resources New Jersey has invested in those goals to date.

313.    In 2010, the New Jersey Legislature enacted the Offshore Wind Economic Development Act, which authorized NJBPU to conduct competitive solicitations to select proposed offshore-wind projects to receive offshore-wind renewable-energy credits in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations was to enable a percentage of New Jersey's electric load to be supplied by offshore-wind energy.

314.    By 2023, after a series of executive orders, statutory enactments and policy planning documents, Governor Murphy increased New Jersey's offshore-wind-generation goal from 7,500 megawatts by 2035 to 11,000 megawatts by 2040, and accelerated the timeline for reaching New Jersey's renewable-energy goal of 100% clean energy from 2050 to 2035.

315.    NJBPU has approved several offshore-wind-energy-generation projects, three of which are currently in development. NJBPU's approval of offshore-wind-energy-generation projects enables the State to satisfy minimum statutory requirements related to the amount of offshore wind New Jersey relies upon as a source of electricity. New Jersey has also worked with PJM, New Jersey's regional grid manager, and FERC to award an electricity transmission project and commence a solicitation for the award of a second transmission project, which are necessary to facilitate the introduction of electricity from offshore-wind-energy-generation projects into the State's electricity grid.

316.    Wind-energy projects are expected to bring significant economic benefits to New Jersey. For example, Atlantic Shores Offshore Wind Project 1, LLC's project includes a guarantee to spend $848 million during the development and construction phases of the project, which are expected to lead to a total $1.869 billion in direct, indirect, and induced economic benefits into the New Jersey economy throughout the life of the project, including both construction-related and permanent jobs. The developer made other financial commitments, including to invest tens of millions of dollars in the development of offshore-wind-related manufacturing facilities and leases and in offshore-wind-related workforce training and innovation, business development, educational and community programs. By its application and as required by NJBPU's order approving the project, the company committed to provide infrastructure investments, commitments to public institutions, and commitments to community groups and other initiatives.

317.    Similarly, Invenergy Wind Offshore, LLC's project includes a guarantee to spend $1.7 billion dollars during the first ten years of operation, with an estimated total of $3.7 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project. Invenergy is required to pay a research and monitoring fee of $24 million to New

Jersey, which is to be dedicated to research initiatives and regional environment, wildlife, and fisheries monitoring initiatives for assessing the impacts of offshore-wind development on New Jersey's natural resources. The company made various other financial commitments, including commitments to invest tens of millions of dollars in the development of offshore-wind-related manufacturing facilities and leases, operations and maintenance facilities, and in offshore-wind-related workforce training and innovation, business development, and educational and community programs. Invenergy's investments in offshore-wind facilities are expected to directly create hundreds of permanent jobs and support 1,382 jobs during the design, permitting, and construction phases of the Invenergy Wind Offshore, LLC, project.

318.    As another example, Attentive Energy, LLC's project includes a guarantee to spend $760 million during the first ten years of operation, and an estimated $3.1 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project. The company is also required to pay New Jersey a research and monitoring fee of $15 million. Attentive Energy, LLC, made other financial commitments, including commitments to invest tens of millions of dollars in the development of offshore-wind-related manufacturing facilities and leases, operations and maintenance facilities, and in offshore-wind-related workforce training and innovation, business development, educational and community programs. The company's investments in offshore-wind facilities are expected to create hundreds of permanent jobs and support hundreds of jobs during design, permitting, and construction phases of the project.

319.    NJBPU's offshore-wind-related activities are also critical to New Jersey's long-term strategy to meet forecasted capacity demands on New Jersey's electric grid using clean energy. By eliminating New Jersey's ability to rely upon offshore-wind energy as part of that strategy, the Wind Directive and resultant federal actions make execution of New Jersey's current

plan, reliant upon offshore wind, impossible. Scarcity and congestion issues on New Jersey's electrical grid will worsen without offshore-wind energy, leading to greater costs for electricity to both the State and its residents. In addition, the execution of a new plan without offshore wind delay New Jersey's ability to address climate change harms.

320.    The need for additional supply from offshore wind is critical because PJM's forward-looking planning studies already envision a worsening ratio of supply relative to demand—even when accounting for 11,000 megawatts of offshore wind in New Jersey beginning in the early 2030s. Demand for electricity is currently outpacing supply on the regional grid as rapidly increasing electricity consumption (known as "load growth") outpaces the addition of new generation. New Jersey's plan of adding 11,000 megawatts of offshore-wind-energy generation by 2040, including the three NJBPU approved projects, and as-yet unapproved projects on existing BOEM leases, would ease this problem by increasing available supply. Delay or loss of that generation would exacerbate the forecasted electricity supply problem, which also does not account for increasing demand from data centers and artificial intelligence.

321.    The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs. For example, from 2021 to 2022 alone, congestion costs rose from $995 million to $2.5 billion. When the transmission system is congested, the most efficient source of electricity is not used, and the area with remaining electricity demand is served from alternative, less efficient, more expensive, sources of supply.

322.    New Jersey's planned offshore-wind generation and transmission development would ease congestion and reduce costs, ultimately passing savings on to ratepayers, including New Jersey and its residents. New Jersey's offshore-wind generation would complement the west-to-east supply of electricity, while also serving as an alternative source of electricity that would

increase reliability and resilience for the PJM grid. Building out transmission infrastructure that connects NJBPU projects to the grid could alleviate congestion, thereby reducing the costs of electricity to New Jersey and its residents, by creating an additional source of electricity supply close to, and to the east of, areas with significant demand.

### New Mexico

323.    Wind energy is important to New Mexico's environmental and economic goals. With the lowest water-to-land ratio of all fifty states, New Mexico is particularly susceptible to drought conditions caused by climate change. Like many other states that are bearing the brunt of these impacts, New Mexico committed its public utilities to zero-carbon energy production by 2045. *See* N.M. Stat. Ann. § 62-16-4(A)(6); N.M. Code R. 17.9.572.10(B)(6). New Mexico is currently on track to meet these goals: in 2024's third quarter, New Mexico's renewable electricity generation reached 49% of total electric sales, which exceeds the statutory portfolio requirement that at least 40% of public utility retail sales comprise renewable energy sources by January 1, 2025. N.M. Stat. Ann. § 62-16-4(A)(3).

324.    New Mexico's ability to harness its strong wind-power potential is vitally important to its zero-carbon energy-production goals and to its economy. Wind produced 38% of New Mexico's in-state generated power in 2023. Based on data for 2024's first quarter, New Mexico ranks eighth in wind capacity. In 2023, New Mexico generated a net total of 39,269,000 megawatt hours, of which 14,915,000 megawatt hours were produced by wind. In 2024, New Mexico generated 40,148,000 megawatt hours, of which 15,285,000 were generated by wind. Wind power far outstrips any other source of renewable energy production in New Mexico. In part because of its strong wind-power assets, New Mexico is a net exporter of electricity.

325.    Approximately 250,000 acres of New Mexico state lands are currently leased for wind projects that are not yet operational. Some of these projects still need federal permits, which the Wind Directive promises to delay or halt. Agency actions implementing the Wind Directive will endanger these projects and likely impact state-lands leasing revenue in the future.

326.    Several renewable energy transmission projects are currently under development in New Mexico. The Wind Directive's order to agencies to pause the issuance or renewal of federal rights of way poses a threat to at least one of these transmission projects.

327.    The Wind Directive's chilling effect will deter investment in New Mexico's wind power and delay its ability to reach its capacity for wind-powered energy generation and export.

### Oregon

328.    The Wind Directive and the Agency Defendants' categorical and indefinite halt on project approvals threaten Oregon's ability to develop least-cost, large-scale electricity generating resources to meet rapidly increasing industrial, commercial, and residential demand for power. The halt also threatens Oregon's ability to reach its statutory clean electricity and economy-wide procurement and net-zero greenhouse-gas emissions-reduction requirements.

329.    Oregon is committed to meeting its energy needs with wind energy and other renewable energy sources. Oregon law requires Oregon's investor-owned electric utilities to reduce greenhouse-gas emissions to 80% below baseline levels by 2030 and to zero by 2040. Or. Rev. Stat. § 469A.410(1)(a)-(c) (2023).

330.    Oregon's RPS incentivizes the use of new renewable resources like wind and solar. At least 27% of electricity sold by "large" investor-owned utilities (e.g., PacifiCorp and Portland General Electric Company) to retail electricity consumers located in Oregon must come from qualifying renewable resources, and that requirement gradually increases to 50% by 2040. Or. Rev.

Stat. § 469A.052(1)(e)-(h) (2023). Large consumer-owned utilities (e.g., the Eugene Water & Electric Board) must ensure that at least 25% of the electricity they sell to retail electricity consumers located in Oregon comes from qualifying renewable resources by 2025 and in subsequent calendar years. Or. Rev. Stat. § 469A.052(d) (2023). And for "small" electric utilities, they must ensure that at least five percent of the electricity they sell to retail customers comes from qualifying renewable resources starting in 2025 and in subsequent calendar years. Or. Rev. Stat. § 469A.055(2) (2023).

331.    As of 2022, Oregon had 50 operating wind-energy facilities in the state with a total capacity of 3,981 megawatts. Wind energy produced 8.8 megawatts of total electricity in 2020 and 8.2 megawatts in Oregon in 2022. Wind energy accounted for 12.6% of Oregon's primary energy production and 13.3% of electricity generated in Oregon in 2022.

332.    Oregon continues to develop and site new wind-energy facilities, including hybrid energy facilities that include a wind-energy component. In 2023, for example, the Oregon Energy Facility Siting Council (EFSC) approved the Nolin Hills Wind Power Project, a wind and solar energy generation facility with a nominal generating capacity of approximately 600 megawatts (340 megawatts from wind and 260 megawatts from solar).

333.    Offshore wind is another major potential source of energy in Oregon. The National Renewable Energy Laboratory estimates that Oregon has the technical potential for 62 gigawatts of offshore-wind electricity generation capacity. The Oregon Department of Land Conservation has initiated a multiyear Offshore Wind Energy Roadmap process to define the standards to be considered for offshore-wind energy development and approval, including supporting effective stakeholder engagement; consideration of input of coastal communities; support of sustainable local and regional economic opportunities and workforce; protection of tribal cultural and

archaeological resources; protection of culturally significant viewsheds and other interests of Native American tribes; protection of the environment and marine species; and achievement of state energy and climate policy objectives, including energy resource diversity, reliability and resilience of state and regional energy systems. 2024 Or. Laws Ch. 31 § 3.

334.    The wind-energy power generation sector provided 1,633 jobs in Oregon in 2022, an increase of 149 jobs from 2020.

## Rhode Island

335.    Rhode Island has a long history of supporting development of wind power. The state successfully developed and permitted the 30-megawatt Block Island Wind Farm in state and federal waters in the 2010s. The Block Island Wind Farm became operational in the fall of 2016, making it the nation's first commercial offshore wind farm.

336.    As of 2024, Rhode Island's clean-energy portfolio included 148 megawatts of onshore wind and 430 megawatts of offshore wind from projects that are operational or awarded contracts and working toward operation.

337.    Rhode Island is set to receive 400 megawatts of energy from Revolution Wind. As outlined above, that project will also provide power for Connecticut and is expected to be completed and generate electricity in 2026.

338.    As also noted above, Rhode Island is also expected to receive 200 megawatts of offshore wind from Ocean Winds's SouthCoast Wind project, which will also provide power for Massachusetts.

339.    Rhode Island is committed to combatting climate change and its harmful impacts. To that end, the 2021 Act on Climate sets aggressive decarbonization requirements for the State. *See* R.I. Gen. Laws §§ 42-6.2-1, *et seq*. This includes mandates that statewide greenhouse-

gas emissions reach 45% below 1990 levels by 2030; 80% below 1990 levels by 2040, and net-zero emissions by 2050. *See* R.I. Gen. Laws § 42-6.2-9 (2021).

340.    Additionally, Rhode Island's Renewable Energy Standard (RI RES) requires retail electricity sales in the state to include increasing renewable energy each year, ultimately reaching 100% renewable energy by 2033. *See* R.I. Gen. Laws § 39-26-4 (2022).

341.    In passing the RI RES, Rhode Island's legislature found, *inter alia*, that "[i]t is in the interest of the people, in order to protect public health and the environment and to promote the general welfare, to establish a renewable energy standard program to increase levels of electrical energy supplied in the state from renewable resources [including wind]." R.I. Gen. Laws § 39-26-1(5) (2024).

342.    The express purpose of the RI RES is to "to facilitate the development of new renewable energy resources to supply electricity to customers in Rhode Island with goals of stabilizing long-term energy prices, enhancing environmental quality, and creating jobs in Rhode Island in the renewable energy sector." R.I. Gen. Laws § 39-26-3 (2024).

343.    Per its Affordable Clean Energy Security Act (RI ACES), "Rhode Island is committed to the increased use of no- and low-carbon energy resources that diversify our energy supply portfolio, provide affordable energy to consumers, and strengthen our shared quality of life and environment, and new energy infrastructure investments may help facilitate the development and interconnection of these resources[.]" R.I. Gen. Laws § 39-31-1 (2014).

344.    In June 2022, the state amended RI ACES to support procurement of between 600 to 1,000 megawatts of offshore-wind capacity for Rhode Island. R.I. Gen. Laws § 39-31-10 (2022).

345.    By introducing regulatory uncertainty in the development of new onshore wind and offshore wind, the Wind Directive harms Rhode Island in numerous ways.

346.    The Wind Directive and its implementation undermine Rhode Island's ability to procure additional energy from onshore and offshore-wind generation to meet the state's energy and environmental requirements, including statutory requirements to reduce statewide greenhouse-gas emissions and reach net-zero by 2050, and to attain 100% renewable energy by 2033. As a result, the Wind Directive also harms Rhode Island's ability to protect its residents, as part of a broader effort, from the growing impacts of climate change.

347.    As outlined above, delaying or preventing development of new wind energy in the region prevents New England states, including Rhode Island, from bringing new energy resources online that are important to ensure a reliable grid and cleaner renewable energy, and to combat the price volatility related to continued reliance on fossil fuels in the region.

## Washington

348.    The Wind Directive and the Agency Defendants' indefinite halt on project approvals could threaten Washington's ability to meet its greenhouse-gas emissions requirements and renewable energy goals. It also threatens the existence of the wind industry, which is an increasingly important part of Washington's economy.

349.    In 2019, Washington enacted the Clean Energy Transformation Act (CETA). CETA commits Washington to an electricity supply free of greenhouse-gas emissions by 2045. Wash. Rev. Code § 19.405.010 (2019).

350.    In 2021, Washington enacted the Climate Commitment Act (CCA). In combination with a market-based cap-and-invest program and other policies, the CCA sets Washington on the path to reducing greenhouse-gas emissions 95% by 2050. Wash. Rev. Code § 70A.45.020 (2021).

351.    Wind power has been and will continue to be a vital tool for Washington to meet its climate and renewable-energy goals. Washington is third in the nation in utility-scale renewable-

energy generation from all sources, and wind power is the second largest contributor to Washington's renewable-energy generation after hydroelectric power. In 2024, Washington generated 8,421 megawatt-hours from wind power alone.

352.    Washington has recently authorized the construction of the 1,150-megawatt Horse Heaven Wind Farm Project through its Energy Facility Site Evaluation Council, which will further enhance Washington's wind power energy portfolio when construction is finished.

353.    Wind power is one of the most promising sources of renewable energy for Washington. It is an abundant and sustainable energy source that does not produce any greenhouse-gas emissions. In contrast to fossil fuels, which are often subject to volatile market conditions, wind power enhances Washington's energy security and economic stability.

354.    Wind power helps boost the Washington economy by creating jobs in manufacturing, installation, and maintenance. Developers in Washington are exploring innovative dual use approaches to minimize any disruption to agricultural productivity and traditional land uses while providing new economic opportunities for Washingtonians.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Administrative Procedure Act - 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious Agency Action)**
**(Against Agency Defendants)**

355.    The States incorporate by reference the allegations contained in the preceding paragraphs.

356.    Agency Defendants are "agenc[ies]" under the Administrative Procedure Act (APA). 5 U.S.C. §§ 551(1), 701(b)(1).

357.    Agency Defendants have adopted and implemented the Wind Directive's categorical and indefinite halt on approvals through numerous actions beginning on January 20, 2025, and continuing to the present. *See supra* ¶¶ 142–58.

358.    Each Agency Defendant's adoption and implementation of the Wind Directive constitutes final agency action. *See* 5 U.S.C. § 704. Specifically, the adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects "mark[s] the consummation of the agency's decisionmaking process" and is an action "from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal quotations omitted).

359.    The APA requires that a court "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

360.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation and quotation marks omitted).

361.    Additionally, agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

362.    Further, when an agency changes its existing policy, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). An agency must provide

"a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id*. An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal citation and quotation marks omitted).

363.    Agencies also must provide a more detailed justification "when [their] prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515.

364.    Here, Agency Defendants provided no reasoned basis for adopting and implementing the Wind Directive's categorical and indefinite halt on approvals. Nor did they provide any justification acknowledging or reconciling their stark departure from past agency policy on wind energy development, prior findings regarding impacts of wind energy, the significant reliance interests that have developed based on that prior policy, or the inconsistencies with contemporaneous Executive actions emphasizing the need for and promoting domestic energy development while curtailing review for non-wind domestic energy sources.

365.    First, the only explanation provided by Agency Defendants for indefinitely and categorically halting wind approvals—that they are implementing the Wind Directive—does not constitute a reasoned explanation because the Wind Directive itself lacks reasoned explanation.

366.    Specifically, the Wind Directive cites "alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects" and alleged "potential inadequacies in various environmental reviews." 90 Fed. Reg. at 8363. Neither the Wind Directive nor Agency Defendants have pointed to any alleged legal deficiencies or inadequacies that could justify the categorical and indefinite halt on approvals of wind-energy projects. Nor could they, as prior to the issuance of the Wind Directive, Agency Defendants followed the

numerous statutory authorities governing wind-energy-project reviews and approvals and successfully defended such reviews and approvals in courts.

367.    Similarly, although the Wind Directive alleges that wind-energy development risks "negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals," 90 Fed. Reg. at 8363, it fails to cite any specific risk or factual basis that could warrant the categorical and indefinite halt—nor could it, given Agency Defendants' comprehensive reviews and findings regarding such risks and available mitigation. Tellingly, even the vaguely described scope of the "assessment" ordered in the Wind Directive does not include all of these purported "negative impacts" from wind projects.

368.    Agency Defendants' categorical and indefinite halt on project approvals marks a stark departure from the federal government's longstanding, bipartisan policy of encouraging wind-energy development and fails to provide any factual findings or explanation regarding its departure from the findings that underlay its prior policy, much less provide "a more detailed justification" to explain any such conflicting findings.

369.    Indeed, past Presidential administrations have repeatedly supported the development of offshore- and onshore-wind energy.

370.    Agency Defendants have repeatedly assessed wind-energy development and found no impacts warranting denial of approvals under relevant authorities.

371.    By way of example, the Wind Directive's purported need to consider the environmental impact of wind projects on marine mammals ignores prior agency studies and findings that have examined marine-mammal impacts generally, as well as individual permits that have included mitigation measures to alleviate impacts on marine mammals.

372.    As another example, the Wind Directive's claim of threats to "commercial interests" ignores the fact that the economic impacts of wind energy have been extensively studied, both generally and with regard to specific projects.

373.    Agency Defendants' categorical and indefinite halt on project approvals also fails to account for the significant reliance interests that the States and other stakeholders have formed based on Agency Defendants' policies and decisions supporting and approving wind-energy development.

374.    For example, States have invested hundreds of millions of dollars to create state-of-the-art facilities capable of accommodating wind turbine construction; relied on predictable permitting processes to bring online wind resources that will boost reliability and affordability to alleviate burdens associated with increasing energy demand; invested in supply chains and workforce training programs with the expectation that jobs and economic stimulus will accompany wind industry development; and relied on wind energy to alleviate the negative impacts of climate change and public health harms associated with fossil-fueled energy generation.

375.    Agency Defendants' halt on approvals of wind-energy projects altogether failed to account for the States' reliance interests.

376.    Agency Defendants' categorical and indefinite halt on approvals of wind-energy projects is also arbitrary and capricious because it reflects significant "unexplained inconsistenc[ies]" with the federal government's *current* policy toward the development of energy resources in the United States. *Encino Motorcars*, 579 U.S. at 222.

377.    In adopting and implementing the Wind Directive, Agency Defendants have failed to explain the inconsistencies between the Wind Directive's categorical and indefinite halt on federal approvals of wind-energy projects until completion of an extra-statutory assessment and

83

numerous other Executive Orders issued on the same day and since, as well as agency actions implementing those Executive Orders, that emphasize a need for and direct the expedited development or continued operation of domestic energy resources, including (i) the Energy Emergency Order, 90 Fed. Reg. 8433, (ii) the Unleashing Order, 90 Fed. Reg. 8353, and (iii) the Grid Reliability Order, 90 Fed. Reg. 15,521.

378.    Nor have Agency Defendants explained the inconsistencies between the Wind Directive's categorical and indefinite halt on federal approvals of wind-energy projects until completion of an extra-statutory assessment and multiple contemporaneously or subsequently issued Executive Orders that direct the expedited review of or relaxed standards for other domestic energy resources, including (i) the Energy Emergency Order, 90 Fed. Reg. 8433 (and Agency Defendants' expedition of permits in reliance on it); (ii) the Reinvigorating Coal Order, 90 Fed. Reg. 15,517; (iii) the Zero-Based Budgeting Order, 90 Fed. Reg. 15,643, (iv) Exec. Order 14153, *Unleashing Alaska's Extraordinary Resource Potential*, 90 Fed. Reg. 8347 (Jan. 29, 2025); and (v) Proclamation 10914 of Apr. 8, 2025, *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025); *cf.* Exec. Order 14285, *Unleashing America's Offshore Critical Minerals and Resources*, 90 Fed. Reg. 17,735 (Apr. 24, 2025).

379.    Finally, Agency Defendants have failed to explain their implementation of the Energy Emergency Order's edict to use "all lawful emergency or other authorities available" to expedite non-wind-energy development in the Northeastern and West Coast States while implementing the Wind Directive by categorically and indefinitely halting wind-energy development in those very same states.

84

380.    Because Agency Defendants failed to explain these inconsistencies, their implementation of the Wind Directive is arbitrary and capricious.

381.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the States are entitled to a declaration that the Agency Defendants' adoption and implementation of the Wind Directive to categorically and indefinitely halt approvals of wind-energy projects violates the APA because it is arbitrary and capricious.

382.    Pursuant to 5 U.S.C. § 706, the States are entitled to vacatur of Agency Defendants' adoption and implementation of the Wind Directive to categorically and indefinitely halt approvals of wind-energy projects, as well as a preliminary and permanent injunction preventing Agency Defendants from implementing the Wind Directive, including taking any action(s) to impede wind-energy development in reliance, in whole or in part, on the Wind Directive.

**COUNT II**
**Administrative Procedure Act - 5 U.S.C. § 706(2)(A), (C)**
**(Agency Action Contrary to Law and In Excess of Authority)**
**(Against Agency Defendants)**

383.    The States incorporate by reference the allegations contained in the preceding paragraphs.

384.    Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "not in accordance with law." 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

385.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

386.    An agency thus may not take any action that exceeds the scope of its statutory authority.

387.    Each Agency Defendant's adoption and implementation of the Wind Directive to categorically and indefinitely halt approvals of wind-energy projects is final agency action as it marks the consummation of the agency's decision-making process and is an action from which legal consequences flow. *See Bennett*, 520 U.S. at 177–78.

388.    Because Agency Defendants have disregarded the specific requirements of laws and regulations governing federal permitting and approvals of wind energy by categorically and indefinitely halting approvals of wind-energy projects, and because they have done so pending an extra-statutory review grounded in no statute, Agency Defendants have acted contrary to law and in excess of their authority. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

389.    Specifically, none of the statutory authorities governing federal approvals of wind-energy development—including, but not limited to, OCSLA, the Clean Water Act, the Rivers and Harbors Act, the Clean Air Act, NEPA, the Endangered Species Act, the Bald and Golden Eagle Protection Act, the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation and Management Act, the National Historic Preservation Act, FLPMA, and the Fixing America's Surface Transportation Act—authorizes the Wind Memo's categorical and indefinite halt on wind-energy-project approvals implemented by Agency Defendants. To the contrary, each such authority and its implementing regulations contemplates comprehensive, but prompt, review and decision pursuant to specific approval procedures and standards.

390.    For example, DOI and BOEM's adoption and implementation of the Wind Directive for offshore-wind-energy projects are contrary to and in excess of statutory authority under OCSLA. 43 U.S.C. §§ 1331 *et seq*. OCSLA does not grant agency officials authority to

indefinitely cease permitting for particular types of projects, such as wind energy. *Id.* Instead, BOEM's regulations under OCSLA make clear that it must process permit applications and issue decisions by either approving, disapproving, or requesting revisions of permit applications. *See* 30 C.F.R. §§ 585.613, 585.628, 585.648.

391.    By categorically and indefinitely halting permitting for wind-energy projects pending a new, extra-statutory review, DOI and BOEM also have acted in excess of statutory authority under and contrary to OCSLA, which provides for the "expeditious and orderly development" of Outer Continental Shelf resources. 43 U.S.C. § 1332.

392.    The Corps's adoption and implementation of the Wind Directive likewise are contrary to and in excess of statutory authority under Section 404 of the Clean Water Act. 33 U.S.C. § 1344. Section 404 does not grant the Corps authority to cease permitting and authorizations for particular types of projects, such as wind energy. *Id*. To the contrary, Section 404 mandates that the Corps minimize permitting delays, requiring decisions on a dredge-and-fill permit application "to the maximum extent practicable . . . not later than the ninetieth day after the date the notice for such application is published." *Id.* § 1344(q). Moreover, the Corps's regulations classify wind and other energy related projects as "major national objectives" and direct that "[d]istrict engineers will give high priority to the processing of permit actions involving energy projects" and to promptly process permit applications and issue permit decisions. 33 C.F.R. § 320.4(n).

393.    By indefinitely and categorically halting permitting for wind-energy projects, the Corps has abdicated its clear mandate to administer the Clean Water Act Section 404 permitting program.

394.    EPA's adoption and implementation of the Wind Directive are also contrary to and in excess of statutory authority under Section 402 of the Clean Water Act. 33 U.S.C. § 1342.  Under

Section 402, EPA or a state agency with delegated NPDES permitting authority must determine within 30 days whether the application is complete and thereafter prepare a draft permit and solicit public comment before issuing a final permit. 40 C.F.R. §§ 124.3(c); 124.10(a); 124.11–124.12.

395.    By indefinitely and categorically halting permitting for wind-energy projects, the Corps has abdicated its clear mandate to administer the Clean Water Act NPDES permitting program.

396.    The Corps's actions also are contrary to and in excess of statutory authority under the Rivers and Harbors Act. 33 U.S.C. §§ 403, 408. Sections 10 and 14 of the Act do not grant the Corps authority to cease processing or issuing permit decisions for particular types of projects, such as wind energy. *Id*. For individual Section 10 permits, the Corps must, among other things, notify applicants of incomplete applications within 15 calendar days; issue public notice within 15 days of receipt of a complete application; and decide applications within 60 days, unless additional information is needed. 33 C.F.R. § 325.2. Moreover, the Corps's regulations require the Corps to timely process permit applications and issue permits. 33 C.F.R. §§ 320.4(n), 325.2.

397.    By categorically and indefinitely halting permitting for wind-energy projects, the Corps has abdicated its clear mandate to administer the River and Harbors Act permitting program.

398.    EPA's adoption and implementation of the Wind Directive are also contrary to and in excess of statutory authority under the Clean Air Act. 42 U.S.C. § 7627. The Act does not grant EPA officials authority to cease permitting for particular types of projects, such as wind energy. *Id.* The Clean Air Act requires permitting authorities to issue permit decisions within one year of receiving an application for a Prevention of Significant Deterioration permit and within 18 months of receiving an application for a Nonattainment New Source Review permit. 42 U.S.C. §§ 7475(c), 7661b(c). EPA's regulations set additional timelines. 40 C.F.R. § 71.5(a)(2).

399.    By categorically and indefinitely halting permitting for wind-energy projects, EPA has abdicated its clear mandate to administer the Clean Air Act permitting program.

400.    Agency Defendants' adoption and implementation of the Wind Directive are also contrary to and in excess of statutory authority under NEPA. 42 U.S.C. §§ 4321 *et seq*. Under NEPA, as amended by the Fiscal Responsibility Act, lead agencies "shall complete" the required environmental assessments not later than one year after certain conditions are met, and "shall complete" required environmental impact statements not later than two years after those conditions are met. 42 U.S.C. § 4336a(g).

401.    By categorically and indefinitely halting NEPA reviews for wind-energy projects, Agency Defendants have abdicated their clear mandates to administer NEPA.

402.    The Services' adoption and implementation of the Wind Directive are contrary to and in excess of statutory authority under the Endangered Species Act. 16 U.S.C. §§ 1531 *et seq*. The Act does not authorize USFWS or NMFS to stop engaging in or foreclose completion of consultation for particular types of projects, such as wind energy. Furthermore, USFWS and NMFS regulations require those agencies to engage in and timely complete consultation. 50 C.F.R. Part 13; *id.* Part 17; *id.* Part 222; *id.* § 402.14(e). Indeed, the NMFS is directed to process permit applications "in the shortest possible time." *Id.* § 222.302(b), 222.303(e).

403.    By categorically and indefinitely halting permitting for wind-energy projects, the Services have abdicated their clear mandates to administer the Endangered Species Act.

404.    USFWS's actions also are contrary to and in excess of statutory authority under the Bald and Golden Eagle Protection Act. 16 U.S.C. § 668. The Act does not authorize USFWS to stop issuing incidental-take authorizations for particular types of projects, such as wind energy. *Id.*

The Act and USFWS's regulations instead direct the USFWS to process "all applications as quickly as possible." 50 C.F.R. § 13.11.

405.    By adopting and implementing the Wind Directive, USFWS has abdicated its clear mandate to administer the Bald and Golden Eagle Protection Act.

406.    The Services' actions also are contrary to and in excess of statutory authority under the Marine Mammal Protection Act. 16 U.S.C. §§ 1371 *et seq*. The Act as well as USFWS and NMFS regulations direct the Services to process permit applications "as quickly as possible." 50 C.F.R. § 13.11.

407.    By adopting and implementing the Wind Directive, the Services have abdicated their clear mandates to administer the Marine Mammal Protection Act.

408.    DOI and BLM's adoption and implementation of the Wind Directive for onshore-wind-energy projects are contrary to and in excess of statutory authority under FLPMA. 43 U.S.C. §§ 1701 *et seq*. FLPMA does not grant agency officials authority to altogether cease issuing right-of-way decisions for particular types of projects, such as wind energy, and instead enumerates specific bases that allow BLM to deny a right-of-way application request. 43 C.F.R. § 2804.26. Moreover, BLM's regulations have specific provisions that authorize "the prioritization [of] solar and wind development rights-of-way," indicating an intention that BLM should promptly process rights-of-way. 43 C.F.R. § 2804.35. Finally, BLM's regulations provide that one of the core objectives of the right-of-way program is to "[p]romote[] the use of rights-of-way in common wherever practical, considering engineering and technological compatibility, national security, and land use plans[.]" 43 C.F.R. § 2801.2.

409.    By indefinitely and categorically halting permitting for wind-energy projects, BLM has abdicated its clear mandate to administer the FLPMA right-of-way program.

410.    The adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects by each of these Agency Defendants thus are "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and accordingly violate the APA as well as the statutory and regulatory provisions cited above.

411.    Furthermore, adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects by each of these Agency Defendants is contrary to APA Section 558, which requires approval applications to be processed within a "reasonable time," 5 U.S.C. § 558(c); *cf. id.* § 554(b), and for that reason, as well, is "not in accordance with law," *id.* § 706(2)(A).

412.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the States are entitled to a declaration that adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects by each of the Agency Defendants violates APA Sections 706(2)(A) and (C).

413.    Pursuant to 5 U.S.C. § 706, the States are entitled to vacatur of the Agency Defendants' adoption of the Wind Directive to categorically and indefinitely halt approvals of wind-energy projects, as well as a preliminary and permanent injunction preventing Agency Defendants from implementing the Wind Directive, including taking any action(s) to impede wind-energy development in reliance, in whole or in part, on the Wind Directive.

**COUNT III**
**Equitable Claim for Violations of Federal Law by Federal Officials**
**(Against Agency Defendants)**

414.    The States incorporate by reference the allegations contained in the preceding paragraphs.

415.    Federal courts also possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 326–27 (2015).

416.    As set out above, *supra* ¶¶ 389-411, Agency Defendants have violated the statutes governing permits and approvals for wind-energy development by adopting and implementing the Wind Directive to categorically and indefinitely halt approvals of wind-energy projects.

417.    These statutes include, but are not limited to, OCSLA, the Clean Water Act, the Rivers and Harbors Act, the Clean Air Act, NEPA, the Endangered Species Act, the Bald and Golden Eagle Protection Act, the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation and Management Act, the National Historic Preservation Act, FLPMA, and the Fixing America's Surface Transportation Act.

418.    By adopting and implementing the Wind Directive to indefinitely and categorically halt permits and approvals for wind-energy projects, Agency Defendants have violated these statutes, which, along with their regulations, require comprehensive, but prompt, review and decision pursuant to specific approval procedures, *supra* ¶¶ 389–411.

419.    Because the Agency Defendants are violating the statutes governing wind-energy permitting and approvals, the States are entitled to equitable relief in the form of a preliminary and permanent injunction preventing Agency Defendants from implementing the Wind Directive, including taking any action(s) to impede wind-energy development in reliance, in whole or in part, on the Wind Directive.

### COUNT IV
### Common Law Ultra Vires – Conduct Outside the Scope of
### Statutory Authority Conferred on the Executive
### (Against All Defendants)

420.    The Wind Directive's categorical and indefinite halt on approvals of wind projects,

and Agency Defendants' adoption and implementation of it, are ultra vires because no act of Congress authorizes the President to order that federal agencies "not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore-wind projects" pending completion, at an unspecified time, of another assessment of alleged impacts of the industry.

421.    Specifically, none of the statutory authorities governing federal approvals of wind-energy development—including, but not limited to, OCSLA, the Clean Water Act, the Rivers and Harbors Act, the Clean Air Act, NEPA, the Endangered Species Act, the Bald and Golden Eagle Protection Act, the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation and Management Act, the National Historic Preservation Act, FLPMA, and the Fixing America's Surface Transportation Act—authorizes the Wind Directive and Agency Defendants' categorical and indefinite halt on wind-energy-project approvals pending a redundant extra-statutory review in consultation with six agencies. To the contrary, these statutes require the Executive to promptly process distinct federal approvals for such development, according to specific procedures and standards.

422.    For example, under OCSLA, in contrast to its express authorization of lease withdrawals, OCSLA does not provide the President or BOEM with authority to categorically and indefinitely halt all approvals of wind projects on the Outer Continental Shelf.

423.    The Wind Directive and Agency Defendants' categorical and indefinite halt of approvals is incompatible with OCSLA's directive for the "expeditious and orderly development" of the Outer Continental Shelf resources.

424.    In addition, by indefinitely preventing lessees from obtaining approvals and permits necessary for wind projects, the Wind Directive and BOEM's implementation of it effectively remove leased areas in the Outer Continental Shelf from use. While OCSLA allows the President

to withdraw unleased areas from use, it does not grant the President or BOEM authority to indefinitely withdraw leased areas from use. 43 U.S.C. § 1341(a).

425.    Pursuant to 28 U.S.C. § 2201, the States are therefore entitled to a declaration that the Wind Directive's categorical and indefinite halt on approvals of wind projects, and Agency Defendants' implementation of it, are ultra vires.

426.    Because the Agency Defendants' implementation of the Wind Directive is ultra vires, the States are entitled to equitable relief in the form of a preliminary and permanent injunction preventing Agency Defendants from implementing the Wind Directive, including taking any action(s) to impede wind-energy development in reliance, in whole or in part, on the Wind Directive.

### COUNT V
### OCSLA Citizen Suit – 43 U.S.C. § 1349
### (Against Defendants United States, DOI, Burgum, BOEM, and Cruickshank)

427.    The States incorporate by reference the allegations contained in the preceding paragraphs.

428.    OCSLA provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

429.    "The term 'person' includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation." 43 U.S.C.

§ 1331(d).

430.    An OCSLA citizen suit may be brought "immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).

431.    Pursuant to 43 U.S.C. § 1349(a)(3), on May 5, 2025, the States provided notice of violations of OCSLA by Defendants the United States, DOI, Burgum, BOEM, and Cruickshank.

432.    The Wind Directive and Defendants DOI, Burgum, BOEM, and Cruickshank's (the DOI Defendants) adoption of its categorical and indefinite halt on permitting of wind-energy projects is immediately adversely affecting the States' legal interest in the "expeditious and orderly development," 43 U.S.C. § 1332(3), of wind energy on the Outer Continental Shelf.

433.    The States have invested hundreds of millions of dollars in wind-energy development and even more in transmission upgrades needed to bring wind-energy resources onto the electricity grid. This investment has spurred the wind-energy industry to spend billions on infrastructure, jobs training programs, and supply-chain development.

434.    The States have relied on wind energy as a reliable, affordable source of electricity that helps meet rising demand.

435.    The States also rely on wind energy to help meet their goals, often required by state law, to decarbonize their electricity grids and mitigate greenhouse-gas emissions. These decarbonization efforts are designed to mitigate the impacts of climate change, which are harming and will continue to harm the wellbeing and stability of the States' communities and economies.

436.    The Wind Directive and the DOI Defendants' adoption and implementation of its categorical, indefinite halt on approvals of wind-energy projects violate OCSLA and its regulations

by ignoring the statute's clear mandate that the DOI Defendants' follow its procedures to administer the Outer Continental Shelf permitting and leasing program, as described *supra* ¶¶ 390–91, 422–24.

437. Pursuant to 28 U.S.C. § 2201, the States are entitled to a declaration that the Wind Directive and the DOI Defendants' adoption and implementation to categorically and indefinitely halt permitting of wind-energy projects violate OCSLA as inconsistent with the statute and its implementing regulations.

438. The States are further entitled to a preliminary and permanent injunction preventing the DOI Defendants from implementing the Wind Directive, including taking any action(s) to impede wind-energy development in reliance, in whole or in part, on the Wind Directive.

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court:

1. Declare that each Agency Defendant's adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A);

2. Declare that each Agency Defendant's adoption and implementation of the Wind Directive's categorical and indefinite halt on approvals of wind-energy projects are not in accordance with law or are in excess of statutory right in violation of the APA, 5 U.S.C. § 706(2)(A), (C), and OCSLA, 43 U.S.C. § 1349(a);

3. Declare that the Wind Directive's categorical and indefinite halt on wind-energy approvals, and Agency Defendants' adoption and implementation thereof, are ultra vires;

4. Pursuant to 5 U.S.C. § 706(2) and 43 U.S.C. § 1349(a), order vacatur of the Agency Defendants' adoption and implementation of the Wind Directive;

5.    Preliminarily and permanently enjoin, without bond, the Agency Defendants from

implementing or otherwise giving effect to any action that halts or otherwise impedes wind-energy

development based in whole or in part on the Wind Directive; and

6.    Grant all other relief as the Court may deem just and proper, including, but not

limited to, attorney's fees and costs.


Respectfully submitted,                                    May 5, 2025


**LETITIA JAMES**
   *Attorney General of New York*

By: */s/ Michael J. Myers*
Michael J. Myers*
   *Senior Counsel*
Laura Mirman-Heslin*
Rene Hertzog*
   *Assistant Attorneys General*
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
Michael.Myers@ag.ny.gov


*Counsel for the State of New York*

**ANDREA JOY CAMPBELL**
   *Attorney General of Massachusetts*

By: */s/ Turner H. Smith*
Turner H. Smith, BBO No. 684750
   *Assistant Attorney General & Deputy Chief*
Nathaniel Haviland-Markowitz*
   *Assistant Attorney General*
Jonathan Whitney, BBO No. 694760
   *Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
Turner.Smith@mass.gov


*Counsel for the Commonwealth of*
*Massachusetts*

**KRISTIN K. MAYES**
   *Attorney General of Arizona*

By: */s/ Mary M. Curtin*
Mary M. Curtin*
   *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
   *Attorney General of California*

By: */s/ Kate M. Hammond*
Kate M. Hammond*
   *Deputy Attorney General*
Robert Swanson*
   *Acting Supervising Deputy Attorney General*
Jamie Jefferson*
   *Deputy Attorney General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6531
Kate.Hammond@doj.ca.gov
Robert.Swanson@doj.ca.gov
Jamie.Jefferson@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
   *Attorney General of Colorado*

By: */s/ Carrie Noteboom*
Carrie Noteboom*
   *Assistant Deputy Attorney General*
Jessica L. Lowrey*
   *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6288 (Noteboom)
(720) 508-6167 (Lowrey)
Carrie.Noteboom@coag.gov
Jessica.Lowrey@coag.gov
FAX: (720) 508-6040

*Counsel for the State of Colorado*

**WILLIAM TONG**
   *Attorney General of Connecticut*

By: */s/ Jill Lacedonia*
Jill Lacedonia*
   *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
  *Attorney General of Delaware*

By: /s/ *Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Ralph Durstein III*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*


**BRIAN L. SCHWALB**
  *Attorney General of the District of Columbia*

By: /s/ *Estefania Y. Torres Paez*
Estefania Y. Torres Paez, BBO No. 705952
  *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Estefania.TorresPaez@dc.gov

*Counsel for the District of Columbia*


**KWAME RAOUL**
  *Attorney General of Illinois*

By: /s/ *Jason E. James*
Jason E. James*
  *Assistant Attorney General*
Office of the Attorney General
Environmental Bureau
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.James@ilag.gov

*Counsel for the State of Illinois*


**AARON M. FREY**
  *Attorney General of Maine*

By: /s/ *Robert Martin*
Robert Martin*
  *Assistant Attorney General*
6 State House Station
Augusta, ME 04333
(207) 626-8579
Robert.Martin@maine.gov

*Counsel for the State of Maine*

99

**ANTHONY G. BROWN**
   *Attorney General of Maryland*

By: */s/ Steven J. Goldstein*
Steven J. Goldstein*
   *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


**KEITH ELLISON**
   *Attorney General for the State of*
   *Minnesota*

By: */s/* Catherine Rios-Keating
Catherine Rios-Keating*
   *Special Assistant Attorney General*
Environmental and Natural
Resources Division
445 Minnesota Street, Suite 1800
Saint Paul, MN 55101
(651) 300-7302
Catherine.Rios-Keating@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**DANA NESSEL**
   *Attorney General of Michigan*

By: */s/ Lucas Wollenzien*
Lucas Wollenzien*
Michael Moody*
   *Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
WollenzienL@michigan.gov
Moodym2@michigan.gov

*Counsel for the People of the State of Michigan*


**MATTHEW J. PLATKIN**
   *Attorney General for the State of New Jersey*

By: */s/ Terel L. Klein*
Terel L. Klein*
   *Deputy Attorney General*
Office of the Attorney General
25 Market Street, 7th Floor
Trenton, NJ 08625
(609) 376-2818
Terel.Klein@law.njoag.gov

*Counsel for the State of New Jersey*

100

**RAÚL TORREZ**
  *Attorney General of New Mexico*

By: */s/ William Grantham*
William Grantham*
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
  *Attorney General of Oregon*

By: */s/ Paul Garrahan*
Paul Garrahan*
  *Attorney-in-Charge*
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

By: */s/ Nicholas M. Vaz*
Nicholas M. Vaz, BBO No. 693629
  *Special Assistant Attorney General*
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

By: */s/ Yuriy Korol*
Yuriy Korol*
  *Assistant Attorney General*
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, WA 98104-3188
 (206) 332-7098
Yuriy.Korol@atg.wa.gov

*Counsel for the State of Washington*

*\*pro hac vice application forthcoming*