# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK; COMMONWEALTH
OF MASSACHUSETTS; STATE OF
ARIZONA; STATE OF CALIFORNIA; STATE
OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF
ILLINOIS; STATE OF MAINE; STATE OF
MARYLAND; THE PEOPLE OF THE STATE
OF MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF OREGON; STATE OF
RHODE ISLAND; and STATE OF
WASHINGTON,

                    Plaintiff,

                    v.

DONALD J. TRUMP, in his official capacity as
President of the United States; UNITED
STATES OF AMERICA; DEPARTMENT OF
THE INTERIOR; DOUGLAS BURGUM,
Secretary of the Interior, in his official capacity;
BUREAU OF OCEAN ENERGY
MANAGEMENT; WALTER CRUICKSHANK,
Acting Director of Bureau of Ocean Energy
Management, in his official capacity; BUREAU
OF LAND MANAGEMENT; JONATHAN
RABY, State Director of the Bureau of Land
Management, in his official capacity; UNITED
STATES FISH AND WILDLIFE SERVICE;
PAUL SOUZA, Regional Director of the United
States Fish and Wildlife Service, in his official
capacity; DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, Secretary of Commerce,
in his official capacity; NATIONAL OCEANIC
AND ATMOSPHERIC ADMINISTRATION;
LAURA GRIMM, Chief of Staff of the National
Oceanic and Atmospheric Administration, in her
official capacity; NATIONAL MARINE
FISHERIES SERVICE; EUGENIO PIÑEIRO

CASE NO. 1:25-cv-11221

SOLER, Director of the National Marine
Fisheries Service, in his official capacity;
UNITED STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT GENERAL
WILLIAM H. "BUTCH" GRAHAM, JR.,
Chief of Engineers for the United States Army
Corps of Engineers, in his official capacity;
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, Administrator of
Environmental Protection Agency, in his official
capacity; DEPARTMENT OF AGRICULTURE;
BROOKE ROLLINS, Secretary of Agriculture,
in her official capacity; DEPARTMENT OF
ENERGY; CHRIS WRIGHT, Secretary of
Energy, in his official capacity; DEPARTMENT
OF THE TREASURY; and SCOTT BESSENT,
Secretary of the Treasury, in his official
capacity,

Defendants.

### [PROPOSED] COMPLAINT IN INTERVENTION

Alliance For Clean Energy New York ("ACE NY") brings this civil action against the

above-listed Defendants for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.      This case concerns a sudden and indefinite prohibition of any new or renewed

federal agency approvals needed for offshore and onshore wind energy projects nationwide.

Following a Presidential directive ("Presidential Memorandum"), multiple federal agencies have

abruptly ceased issuing approvals needed for offshore and onshore wind projects, causing

extensive disruption to businesses and workers in the wind industry and delaying vitally needed

expansion of our nation's energy supply. The Presidential Memorandum's directed stoppage of

federal approvals for wind projects and federal agencies' adoption and implementation of that

directive are collectively referred to herein as the "Wind Ban." The Wind Ban is arbitrary and capricious, unsupported by any factual record, *ultra vires*, procedurally deficient, unconstitutional, and otherwise unlawful.

2.     On January 20, 2025, the first day of the current Administration, a Presidential Memorandum unlawfully directed the heads of federal agencies to indefinitely abdicate their congressionally imposed obligations to issue decisions with respect to "approvals, rights of way, permits, leases, or loans" needed for wind energy development in the United States. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects¸* Section 2(a), 90 Fed. Reg. 8363 (Jan. 20, 2025). A copy of the Presidential Memorandum is attached as Exhibit A hereto.

3.     The Presidential Memorandum's directive is massive in scope and defies numerous longstanding statutory and regulatory schemes by commanding federal agencies to halt, without reason, all authorizations necessary to facilitate the development of wind projects nationwide. This targeted attack on one of America's fastest growing, least expensive, and most environmentally friendly forms of energy production severely harms a critical domestic industry and the millions of people who would be served by the extensive electrical power it generates. The Wind Ban brings an immediate halt to hundreds of critical wind energy projects on offshore waters and public and private lands, jeopardizing billions of dollars in investment and hundreds of thousands of U.S. jobs. Wind energy provides 10.1 percent of the nation's electricity, is highly cost-effective, and is the cheapest source of new electricity in many parts of the country. Wind energy is also a key U.S. industry, with nearly $330 billion of private investment over the past 20 years, and creation of an extensive domestic supply chain for wind turbines and their

components. The industry supports over 300,000 American jobs and delivers more than $2 billion in state and local tax payments and lease payments annually.

4.      Issuance, adoption, and implementation of the far-reaching Wind Ban directly contravenes the Administrative Procedure Act ("APA") and multiple other congressional and regulatory mandates providing for orderly decisions on proposed wind energy projects and, in turn, is *ultra vires*. No statute or constitutional provision grants the Administration authority to order a blanket stop of wind energy development. In fact, the opposite is true. By mandating that agencies disregard statutory and regulatory requirements, the Wind Ban usurps Congress's authority.

5.      The Wind Ban additionally circumvents legally required public process. In contravention of well-developed regulatory regimes duly promulgated through notice-and-comment rulemakings, the Wind Ban directs federal agencies to withhold all new wind approvals immediately and indefinitely, without notice or opportunity for public comment required by law. In carrying out their constitutionally protected police powers, state and local governments are relying on wind energy development to meet their growing electricity needs and to address the ongoing climate crisis. Before taking far-reaching actions of national consequence, which could affect grid reliability and energy costs for ratepayers, federal agencies should have followed laws requiring them to seek the views of stakeholders who might be affected. But here, legally required decision-making processes were not followed, and, in the absence of a publicly available administrative record accompanying these major agency actions, it does not appear that reasoned decision-making has occurred.

6.      The Presidential Memorandum's purported concerns regarding the environmental impacts of wind energy have no basis in fact. Instead, they appear to be an arbitrary and

politically driven pretext for "end[ing]" the wind industry and ensuring that there will not be "even one [wind turbine] built" during this Administration.[1] In light of such pledges, there is no cause to believe that the Wind Ban is short-term in nature.

7.    The purported "comprehensive assessment and review" commissioned by the Presidential Memorandum may not even exist, as there are no reported updates during nearly four months. In any event, the Wind Ban does not establish any timeframe and will operate, in practice, as an indefinite moratorium on wind energy development. The stated reasons for the Wind Ban ignore extensive research and scientific analyses demonstrating that wind energy is a safe, environmentally sound, and cost-effective technology. These analyses include multiple, years-long, robust permitting processes by several federal, state, and local agencies necessary to authorize leasing, construction, and operations of wind energy projects. Scientific evidence overwhelmingly supports the conclusion that wind energy is safe and reliable. The Presidential Memorandum's mandate for a new, generalized, and undefined study on the environmental and economic impacts of wind energy before approving any offshore or onshore wind project is entirely inconsistent with these findings.

8.    Tellingly, while the Presidential Memorandum claims that the Wind Ban is needed to allow federal agencies an indefinite amount of time to reevaluate "various environmental reviews required by the National Environmental Policy Act to lease or permit wind projects" to search for "potential inadequacies" in them, it inexplicably excludes all other energy sources (e.g., oil and gas) from such a review. As outlined in detail in subsequent paragraphs, wind energy projects undergo extensive environmental reviews—but the Presidential Memorandum

---

[1] Martinez, A., et al., "Trump wants to 'Drill, baby, drill.' What does that mean for climate concerns?" https://www.npr.org/2024/11/13/nx-s1-5181963/trump-promises-more-drilling-in-the-u-s-to-boost-fossil-fuel-production.

makes no mention of those reviews. This is the case even though these other sources have, at a minimum, equal potential to cause environmental harm and are subject to the same environmental review processes. The Administration's inexplicably disparate treatment of similarly situated energy technologies is wholly arbitrary and unjustified.

9.      Further demonstrating its irrationality, the Wind Ban directly contravenes the Administration's own stated commitment to addressing what it has characterized as a nationwide "Energy Emergency" due to an "inadequate energy supply." Executive Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025)—issued on the very same day as the Presidential Memorandum precipitating the Wind Ban—states that the United States needs a "reliable, diversified and affordable supply of energy." The country will require nearly 1,000 TWh of new electricity by 2035 to meet growing demand from data centers, manufacturing, industrial demand, and electrification. Wind is already America's largest source of renewable energy, providing 10.1 percent of the nation's electricity. Indeed, including both offshore and onshore wind, the overall wind pipeline in 2024 totaled 40 GW, with 20 GW under construction. As a conservative estimate,[2] this would be enough to power 4 million homes. Thus, wind energy plays a significant role in meeting this growing energy demand. If federal agencies stop permitting wind energy projects altogether, that will create an energy shortage that will diminish grid security nationwide and impede economic growth, frustrating the Administration's own declared objective of establishing a "reliable, diversified and affordable" energy supply.

10.     The failure of the Administration to consider reliance interests in freezing wind development further demonstrates the lack of any legal foundation for the Wind Ban. Acting in

---

[2] https://cbsaustin.com/news/local/expert-speaks-on-how-many-homes-can-be-powered-by-1-mw-when-peak-demand-sits-at-85000-mw (noting varying methodologies for estimating homes powered per megawatt, which range from 200 to 670 homes).

reliance on legislative promises enacted by Congress, federal regulatory requirements, and contractual agreements executed by government agencies responsible for wind energy development on public lands, the wind energy industry has invested hundreds of billions of dollars developing many gigawatts of electricity production to meet our nation's energy needs-while creating hundreds of thousands of jobs in the process. Prompt permitting decisions are critical to realizing the fruits of these investments, particularly given the finite duration of leases and rights of way and long lead times for procuring necessary equipment, labor, and services for construction, and inflationary pressures over time.

11.     Accordingly, the Wind Ban and all federal actions in furtherance thereof must be vacated and enjoined, and federal agencies should be ordered to carry out their congressionally and regulatorily prescribed requirements to facilitate the development of wind energy without regard to the Presidential Memorandum or the timing of its purported study.

## PARTIES

12.     Plaintiff Alliance for Clean Energy New York ("ACE NY") is a 501(c)(3) not-for-profit organization that serves as the premier multi-technology clean energy industry organization for the State of New York. ACE NY's mission is to promote the use of clean electricity technologies and energy efficiency in the State of New York, increase energy diversity and security, boost economic development, improve public health, and reduce air pollution. ACE NY's diverse membership includes companies engaged in the development and operation of land-based wind and solar power within the State of New York and nationwide; companies developing offshore wind power facilities; and companies engaged in energy efficiency contracting and consulting to or supporting the clean energy industry. ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean

energy industry in the State of New York. ACE NY's members have operations nationwide, rely on the existence of an integrated nationwide wind energy supply chain, and otherwise have region-wide and nationwide interests. Some ACE NY members are in the process of developing wind facilities on lands that entail federal actions by agencies such as the Army Corps of Engineers ("the Corps") and the U.S. Fish and Wildlife Service ("USFWS"). ACE NY also has members who are involved in manufacturing and industrial supply chain operations and rely on wind energy development on both public and private lands for their businesses. ACE NY's members develop projects nationwide, and source supplies, sell or lease products, and otherwise operate as part of nationwide markets.

13.     Defendants are the United States and the federal agencies and officials responsible for the issuance, adoption, and implementation of the Wind Ban.

14.     The Department of the Interior ("DOI") is an agency of the United States.

15.     The Bureau of Ocean Energy Management ("BOEM"), Bureau of Land Management ("BLM"), and USFWS are agencies within DOI. BOEM and USFWS have expressly stated that they are implementing the Wind Ban.

16.     Douglas Burgum is the Secretary of the Interior, DOI's highest ranking official. He is sued in his official capacity.

17.     Walter Cruickshank is the Acting Director of BOEM, BOEM's highest ranking official. He is sued in his official capacity.

18.     Jon Raby is a State Director of BLM, exercising the delegated authorities of the BLM Director, BLM's highest ranking official. He is sued in his official capacity.

19.    Paul Souza is the Regional Director of the USFWS, exercising the delegated authorities of the USFWS Director, USFWS's highest ranking official. He is sued in his official capacity.

20.    The Department of Commerce is an agency of the United States.

21.    The National Oceanic and Atmospheric Administration ("NOAA") is an agency within the Department of Commerce. NOAA Fisheries is a federal agency within NOAA, and is also referred to as National Marine Fisheries Service ("NMFS").

22.    Howard Lutnick is the Secretary of Commerce, the Department of Commerce's highest ranking official. He is sued in his official capacity.

23.    Eugenio Piñeiro Soleris the Director of NOAA Fisheries, which is NOAA Fisheries' (NMFS') highest ranking official. He is sued in his official capacity.

24.    The U.S. Army Corps of Engineers ("Corps") is located within the U.S. Department of Defense. The Corps has expressly stated that it is implementing the Wind Ban.

25.    Lieutenant General William H. "Butch" Graham, Jr. is the Chief of Engineers for the Corps, which is the Corps' highest ranking official. He is sued in his official capacity.

26.    The Environmental Protection Agency ("EPA") is an agency of the United States.

27.    Lee Zeldin is the Administrator of EPA , which is EPA's highest ranking official. He is sued in his official capacity.

## JURISDICTION AND VENUE

28.    This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701-706; 43 U.S.C. § 1349.

29.     This Court is authorized to award the requested relief under 5 U.S.C. § 706, 28

U.S.C. § 1361, 28 U.S.C. §§ 2201, 2202, 43 U.S.C. § 1349, and the Court's inherent equitable

powers.

30.     Venue is proper in this District. Defendants' actions have nationwide impacts.

Defendants are the United States and United States agencies or officers sued in their official

capacities. A substantial part of property that is the subject of the action is situated in this

District, and a substantial part of the events or omissions giving rise to the Complaint occurred

within this District. *See* 28 U.S.C. § 1391(e)(1).

## FACTUAL BACKGROUND

31.     Wind is America's largest source of renewable energy, and one of its largest

sources of total energy. The wind industry as a whole directly and indirectly supports more than

300,000 U.S. jobs, including 20,000 wind manufacturing jobs at over 450 domestic facilities. In

2023 alone, the wind industry invested $10 billion in new projects in the U.S.

32.     As the United States Department of Energy has acknowledged, wind energy is a

proven, widely supported, abundant, and inexhaustible clean energy resource.[3]

33.     "Electricity generated by wind turbines does not pollute the water we drink or the

air we breathe, so wind energy means less smog, less acid rain, and fewer greenhouse gas

emissions."[4]

34.     Using one representative year, "[t]he health and climate benefits of wind were

impressive in 2023—with climate and health benefits together contributing on average

---

[3] *See* United States Department of Energy, *Advantages and Challenges of Wind Power*,
http://energy.gov/eere/wind/advantages-and-challenges-wind-energy; *also see* United States Department of Energy,
*Wind Energy Benefits* (2015), https://www.nrel.gov/docs/fy15osti/62823.pdf.
[4] *Id.*

$162/MWh. When combined with the $21/MWh grid-system value of wind energy—that is, the value of the services wind energy provided to the grid, calculated based on market prices where and when wind energy was generated—the total value of wind energy is $183/MWh."[5]

35.    Wind energy "delivers an estimated $2 billion in state and local tax payments and land lease payments each year," creates a diverse and secure power grid, and provides one of the lowest-priced energy sources available today.[6]

36.    Since 1978 federal law has supported tax credits for renewable energy development, including wind development to encourage the commercialization of a broad range of energy technologies and resources. *See* Energy Tax Act of 1978 (Pub. L. No. 95-618). In addition, for over two decades federal law has declared it the policy of the United States to support renewable energy (including wind) research, development, demonstration, and deployment. *See* Energy Policy Act of 2005 (Pub. L. No. 109-58); the Energy Independence and Security Act of 2007 (Pub. L. No. 110-140); the Energy Improvement and Extension Act, enacted as Division B of the Emergency Economic Stabilization Act of 2008 (Pub. L. No. 110-343); the American Recovery and Reinvestment Act of 2009 (Pub. L. No. 111-5); the Energy Act of 2020, enacted as Division Z of the Consolidated Appropriations Act of 2021 (Pub. L. No. 116-260); the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58), also known as the Bipartisan Infrastructure Law (BIL); and the Inflation Reduction Act of 2022 (Pub. L. No. 117-169). This policy of supporting renewable energy development is also reflected in substantive statutory changes. The Energy Policy Act of 2005 added 43 U.S.C. 1337(p), which authorized wind leasing of the Outer Continental Shelf ("OCS"), and the IRA amended the definition of the

---

[5] *Id.*
[6] United States Department of Energy, Advantages and Challenges of Wind Power, http://energy.gov/eere/wind/advantages-and-challenges-wind-energy.

OCS specifically to allow for additional leasing for offshore wind projects. Inflation Reduction Act, Pub. L. No. 117-169, § 50251(b)(1)-(2), 136 Stat. 1818, 2054-55 (2022).

37.     Thirty-eight states and the District of Columbia have renewable portfolio standards and goals requiring increased production of energy from renewable energy sources. Many of these states rely on wind energy projects to meet these mandated renewable energy targets, and to meet growing energy demands.

## I.     Extensive Review of Wind Projects on Federal Lands.

38.     To date, BOEM has approved eight commercial-scale offshore wind projects.

39.     Each project underwent multiple levels of environmental review. First, at the leasing stage, BOEM prepared "Environmental Assessments" ("EAs") that assess the potential impact of and reasonable alternatives to commercial wind lease issuance, site characterization activities (geophysical, geotechnical, archaeological, and biological surveys) and site assessment activities (including the installation and operation of a meteorological tower or buoys). These surveys form the basis of proposed "construction and operations plans" ("COPs") submitted to BOEM for review. Then before approving a project and its COP, BOEM conducts site-specific review that includes the preparation of a draft and final "Environmental Impact Statement" ("EIS") pursuant to the National Environmental Policy Act ("NEPA") with the assistance of other cooperating agencies with consulting or permitting roles, including NMFS, the Corps, the Department of Defense ("DOD"), the United States Coast Guard, the Bureau of Safety and Environmental Enforcement ("BSEE"), EPA, and cooperating states, localities, and tribes.

40.     These multi-year reviews are extensive and analyze a wide range of potential impacts, including the effects on air quality, bats, benthic resources, birds, coastal habitat and fauna, finfish and essential fish habitat, marine mammals, sea turtles, scenic and visual resources,

water quality, wetlands, and cultural resources. BOEM also consults extensively with DOD to ensure the project will not adversely affect national security.

41.     After taking a hard look at the impacts associated with offshore wind development, BOEM, in consultation with other relevant agencies, has, for example, determined that projects "could be conducted safely, would contain appropriate mitigation to avoid and minimize environmental impacts, and would not unreasonably interfere with other uses of the area."[7] Regarding whales, BOEM after extensive studies both internally and by third parties has found that "[t]he main threats to whales are vessel strikes and fishing gear entanglement."[8] BOEM has announced that "[a]ll current evidence indicates that there are no links between large whale deaths and ongoing offshore wind activities."[9]

42.     After extensive studies, NMFS has reached similar conclusions. As of the filing of this Complaint, NMFS's website still affirms: "We work with our partners to analyze and understand the causes of death when we are able, following the science and data. At this point, there is no scientific evidence that noise resulting from offshore wind site characterization surveys could potentially cause whale deaths. There are no known links between large whale deaths and ongoing offshore wind activities."[10]

43.     In numerous court cases, the government has successfully defended the sufficiency of BOEM's review and accuracy of its conclusions, demonstrating that the relevant agencies fulfilled all statutory environmental review and protection obligations. *See, e.g.,*

---

[7] Defendants' Memorandum In Opposition To Summary Judgment, *Seafreeze Shoreside, Inc. v. Department of the Interior*, No. 1:22-cv-11091-IT, ECF No. 75 (D. Mass Dec. 20, 2022).
[8] Answering Brief for the Federal Appellees, *Nantucket Residents Against Turbines v. BOEM*, No. 23-1501, Doc. No. 00118073811 (1st Cir. Nov. 13, 2023).
[9] BOEM, Offshore Wind Development and Whales (May 2024), https://www.boem.gov/environment/offshore-wind-development-and-whales-may-2024.
[10] https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales.

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024);

*Nantucket Residents Against Turbines v. BOEM.*, 100 F.4th 1, 8 (1st Cir. 2024), *cert. denied,* No.

24-337, 2025 WL 76449 (U.S. Jan. 13, 2025).

44.     To date, BLM has issued 43 right of way grants for wind energy projects on

federal public lands.

45.     These projects have likewise undergone extensive, multi-level and, in many cases,

multi-agency environmental review. BLM conducted a programmatic environmental impact

statement ("PEIS") of the impacts that would be associated with wind energy development on

the roughly 20 million acres of public lands in 11 western states with wind energy potential.

This review analyzed "the positive and negative environmental, social, and economic impacts;

discussion of relevant mitigation measures to address these impacts; and identification of

appropriate, programmatic policies and best management practices (BMPs) to be included" in

the 52 BLM land use plans amended following the completion of the PEIS.[11] BLM concluded

that "[e]ffective mitigation measures could be implemented to address many of the direct and

indirect adverse impacts that could occur" and that "[t]he potential impacts of wind energy

development on local and regional economies would be largely beneficial."[12]

46.     The PEIS contemplated that the agency would supplement its analysis with site-

specific reviews. Before approving any specific project, BLM prepares a project-specific

assessment of potential environmental effects including effects to air quality, bat populations and

roosting habitat, avian populations, eagles, greater sage-grouse, climate and greenhouse gas

emissions, endangered and threatened species, wetlands, and cultural resources. The review also

---

[11] BOEM, *Wind Energy Final Programmatic Environmental Impact Statement* (2005),
https://windeis.anl.gov/documents/fpeis/index.cfm.
[12] *Id.*

considers economic factors such as employment, local and regional economies, residential

property values, fire and fuels management, livestock, and recreation.

47.    Following such review, BLM has determined that granting ROWs for wind

energy projects "contributes to the public interest in developing renewable energy to meet

Federal and state goals" and that project terms and conditions designed to minimize, monitor,

and mitigate environmental and economic effects "will ensure that authorization of this project

will protect environmental resources and comply with environmental standards."[13]

48.    BLM has also successfully defended its thorough review of wind energy projects

on BLM lands in court, showing that the review is sufficient and consistent with all statutory

obligations. *See, e.g., Protect our Communities Found. v. Salazar*, No. 12cv2211-GPC PCL,

2013 WL 5947137, at *18 (S.D. Cal. Nov. 6, 2013*), aff'd sub nom. Backcountry Against Dumps

v. Jewell*, 674 F. App'x 657 (9th Cir. 2017); *Protect Our Communities Found. v. Jewell*, 825 F.3d

571 (9th Cir. 2016).

## II.    Wind Projects on Non-Federal Lands.

49.    Of the over 60,000 utility scale wind turbines installed in the United States, 99

percent are on nonfederal lands. Many of these projects entail limited federal approvals.

50.    The U.S. Department of Energy Office of Energy Efficiency & Renewable Energy

has recognized that "[w]ind energy projects provide many economic benefits" to states and local

communities. These benefits include "direct and indirect employment, land lease payments, local

tax revenue, and lower electricity rates–plus other financial incentives. Although these benefits

depend on factors such as location, size, and ownership, the overall economic impacts of wind

---

[13]Tule Wind Project, BLM Record of Decision (2011) (DOI Control Number: FES 11-06), https://www.tulewindeccmp.com/Record%20of%20Decision.pdf.

energy development are easy to see. Wind energy projects create jobs and provide a revenue source for farmers and ranchers—which can be spent in the neighboring community."[14]

51.     Those developing wind projects on private lands have a right to decide the best economic use of their property without having their economic interests arbitrarily held hostage by a policy of withholding federal approvals. Similarly, states, localities and tribes have a sovereign right to develop property that they own, free of arbitrary restrictions on federal approvals imposed by federal agencies.

52.     Regulation of wind projects on private property primarily implicates issues of land use and economic development that are within the historic police power of states and localities. Some states have state siting councils or boards that have mandatory siting jurisdiction over state and local permits for wind energy facilities. In states with no state siting process, wind energy projects are permitted by the local government.

53.     These states and localities generally have applicable environmental and public safety laws with which any construction project must comply. Projects on non-federal lands generally undergo extensive environmental and public interest review at the state and local levels.

54.     Given that the states and localities have siting authority and are responsible for determining whether wind energy development is in the public interest, the federal government's role in this permitting process is highly circumscribed, though federal approval may nonetheless be needed before a project can proceed.

55.     For example, if a project on private lands impacts jurisdictional wetlands, the Corps may need to issue an authorization under Section 404 of the Clean Water Act, or USFWS

---

[14] WINDExchange, Economics and Incentives for Wind, U.S. Department of Energy, https://windexchange.energy.gov/projects/economics.

may need to issue an incidental take permit relating to an endangered species. The federal agencies may have to conduct environmental analyses before issuing these permits, but the analysis is generally limited to the environmental impacts associated with the specific activity requiring the federal permit, not the energy project as a whole. Moreover, though the Corps is required to engage in a public interest review that includes an evaluation of economic need for the project, "[w]hen private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place." 33 C.F.R. § 320.4(q).

56.     In other words, federal agencies generally defer to state and local decisions, and business decisions, to site renewable energy development on private lands. To do otherwise would offend fundamental notions of federalism and states' rights. By ordering federal agencies to step into the shoes of states, localities, and businesses, and perform an independent (and unnecessary) evaluation of, inter alia, the merits of wind energy development generally, the Wind Ban seeks to grant the federal administrative state authority to usurp police powers belonging to the states.

57.     The Wind Ban also impairs the rights of owners and lessees of private property, who are entitled to develop their property free of arbitrary restrictions imposed by the federal government for its own policy reasons. Applicable federal laws do not authorize defendant federal agencies to hold private property rights hostage to their policy agenda or systematically target and obstruct particular types of private economic development.

III.    **Defendants' Unlawful Actions to Halt All Wind Permitting.**

58.    On the new Administration's first day in office, the above-referenced Presidential Memorandum effectuated an unlawful cessation of all wind energy federal permitting on private land and public onshore and offshore lands and waters. *See* Exhibit A.

59.    Section 2(a) of the Presidential Memorandum states:

> In light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm — including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals — and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit wind projects, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Energy, the Administrator of the Environmental Protection Agency, and the heads of all other relevant agencies, shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices. The Secretary of the Interior shall lead that assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals. The assessment shall also consider the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry.

60.    The Presidential Memorandum provides no explanation of the vaguely stated "alleged legal deficiencies" or "potential inadequacies in various environmental reviews" underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, or of how or why it determined that they warrant the immediate cessation of all Federal wind leasing and permitting. Likewise, the Presidential Memorandum provides no explanation of why the "alleged legal deficiencies" or "potential inadequacies" warrant a "comprehensive assessment and review," accompanied by a blanket cessation of wind permitting, even though federal agencies have repeatedly conducted such analyses on both programmatic and project-

specific bases and have successfully defended their decisions in court. It is irrational for the

Administration to rely on unfounded legal allegations that courts have uniformly rejected. The

Presidential Memorandum does not even affirmatively claim that any such deficiencies or harms

in fact exist for wind projects, instead utilizing qualified terms like "alleged," "may," and

"potential." Furthermore, based on the plain language of the Presidential Memorandum, it is

questionable whether the "comprehensive environmental assessment" will address all of the so-

called—and conspicuously undefined—"grave harm" outlined in the document. For example,

analysis of the cost of intermittent electricity generation or the impact of wind subsidies does not

relate to purported navigational safety and transportation concerns. Taken together, these vague

and unsupported allegations against the wind industry strongly suggest that the true basis for the

Presidential Memorandum is an unfounded animus against the wind energy industry, and the

desire to deliver on a campaign promise to stop all wind energy development.

61.    Defendants have adopted policies that seek to expedite domestic energy

production but exclude the wind industry from their terms. One executive order issued on the

same day as the Presidential Memorandum declares a national energy emergency and directs

agencies to use emergency authorities to facilitate energy production, but arbitrarily excludes

wind energy from its provisions. Executive Order 14156, *Declaring a National Energy

Emergency,* 90 Fed. Reg. 8433 (January 20, 2025), Section 8(a) ("The term 'energy' or 'energy

resources' means crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum

products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and

critical minerals …."). That executive order specifically directs in Sections 4 and 5 that agencies

use emergency procedures to expedite covered Corps actions and Endangered Species Act (ESA)

actions and directs in Section 6 that agencies convene the so-called "God Squad" committee,

which can overrule ESA Section 7, to further expedite covered ESA actions. Another same-day executive order directs agencies to revise regulations and permitting processes to facilitate energy production, again arbitrarily excluding wind energy. Executive Order 14154, *Unleashing American Energy,* 90 Fed. Reg. 8353 (January 20, 2025), Section 3 ("with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources"). Despite the Administration's broad endorsement of domestic energy production from multiple sources, the Wind Ban singularly, summarily, and systemically discriminate against wind.

62.     The Wind Ban has induced agencies to disregard their statutory obligations under applicable laws, as set forth in this complaint. Implementation has, and will continue to, unlawfully bring to a halt onshore and offshore wind energy development on both public and private lands.

63.     The Administration does not have statutory or constitutional authority to unilaterally halt wind development without any documented reasoned basis and in disregard of applicable law.

64.     As evidenced by the cessation of all wind energy leasing, permitting, and approval processes across all agencies, the Wind Ban is being implemented, and each decision to implement constitutes a final agency action, even if the agencies have not all formally announced their decision to implement to the public. No federal agency has given any indication that it intends to defy the Presidential Memorandum by proceeding to issue legally required decisions on permits and authorizations for wind projects.

65.     DOI issued a memorandum on January 20, 2025, suspending certain delegations of decision-making authority within the Department. On January 29, 2025, DOI issued a revised memorandum that restored all but five of those delegations. Among the delegations that

remained suspended was the delegation of authority "to issue any onshore or offshore renewable energy authorization, including but not limited to a lease, amendment to a lease, right of way, amendment to a right of way, contract, or any other agreement required to allow for renewable energy development." DOI Order No. 3395, Amendment No. 1 (Jan. 29, 2025).  As a result, during the term of that memorandum, authorizations and agreements relating to renewable energy development, including wind energy, had to be approved by an Assistant Secretary, the Solicitor, the Deputy Secretary, or the Secretary.

66.    BOEM's website with lease and grant information for renewable energy now begins with the following statement: "The Department of the Interior and BOEM are implementing President Trump's memorandum temporarily halting offshore wind leasing on the Outer Continental Shelf. The memorandum also pauses new or renewed approvals, rights of way, permits, leases or loans for offshore wind projects pending a review of federal wind leasing and permitting practices."[15]

67.    On January 28, BOEM posted a notice for its virtual public meetings on the Programmatic Environmental Impact Statement for Potential Mitigation of Future Development of Wind Lease Areas Offshore California stating that the meetings had been postponed.  The notice stated: "The Department of the Interior and the Bureau of Ocean Energy Management are implementing the Administration's Presidential Memorandum (PM) temporarily halting offshore wind leasing on the Outer Continental Shelf. The PM also pauses new or renewed approvals, rights of way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices."

---

[15] https://www.boem.gov/renewable-energy/lease-and-grant-information.

68.    On February 2, BOEM posted the following notice on its website: "The Department of the Interior and BOEM are implementing President Trump's memorandum temporarily halting offshore wind leasing on the OCS. The memorandum also pauses new or renewed approvals, rights of way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices…. As a result, the February virtual public meetings on BOEM's NOI to prepare an EIS for the proposed Vineyard Mid-Atlantic Project have been cancelled."    https://www.boem.gov/newsroom/notes-stakeholders/postponed-public-meetings-draft-environmental-review-potential

69.    The FAST-41 permitting dashboard contains the following notation for the Bluepoint Wind offshore wind project: "The CPP and permitting timetable were due on February 7, 2025. BOEM has not submitted a CPP or comprehensive permitting timetable, which FAST-41 requires to be publicly posted within the statutory 60-day timeframe. BOEM is choosing to delay development of a permitting timetable until completion of the assessments outlined in the recently issued Presidential Memorandum, Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects. The Executive Director will work with BOEM, when BOEM is ready, to attain compliance under FAST-41."    https://www.boem.gov/renewable-energy/state-activities/vineyard-mid-atlantic#:~:text=As%20a%20result%2C%20the%20February,regulations.gov%20under%20Docket%20No.

70.    The FAST-41 permitting dashboard for the SouthCoast Offshore Wind project contains a notation citing the Presidential Memorandum and stating that, because of this directive, "the milestone date for the final rule has been extended three months to allow time to

complete the final rule. In addition, the final Marine Mammal Protection Act ("MMPA")

milestone has also been shifted by 3 months to allow for the 30-day rule cooling off period

between publication of the final rule and issuance of the ITA decision. The new milestone target

dates for the final rule and ITA decision are May 26, 2025, and June 25, 2025,

respectively. However, these dates may need to be revisited depending on timing of the

comprehensive assessment and review required by the January 20 Executive Order."

https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/bluepoint-

wind-1. The date for completion of the SouthCoast Offshore Wind Clean Water Act permit has

likewise been extended, citing the Presidential Memorandum.

https://www.permits.performance.gov/sites/permits.dot.gov/files/2025-02/2025-02-

26%20SouthCoast%20Executive%20Director%20Determination.pdf

71.     Upon information and belief, the Corps has stopped all new CWA jurisdictional

determinations, environmental assessments, public notices, and other permitting activities only

for wind projects. The Corps initially paused all projects for renewable energy projects, and then

resumed permitting for all renewables apart from wind. A press article on February 12, 2025,

quoted an email from Corps spokesman Douglas Garman as stating "The pause was lifted for

renewable projects, and the pause remains in place for wind and wind-related projects in

accordance with the attached Executive Order." The article states that the latter reference is to the

January 20 Presidential Memorandum.

72.     USFWS has posted a notice on its website stating that the USFWS, "pursuant to

Executive Order 'Temporary Withdrawal of All Areas on the OCS from Offshore Wind

Leasing['] … is temporarily ceasing issuance of eagle permits to wind facilities until further

notice. In the interim, ePermits will no longer automatically issue general permits."

https://fwsepermits.servicenowservices.com/fws?id=fws_kb_view&sys_id=63943c8edbb042900

a66e46b13961966. USFWS's spreadsheet tracking eagle incidental take permits issued for wind

projects lists 111 permits issued in 2024 and 6 issued in 2025, a pace of approximately 9 such

permits per month. On information and belief, no such permits have been issued since January

20, 2025.

73.     Upon information and belief, the USFWS has stopped issuing technical assistance

letters (TAL) to all wind projects. TALs are advisory documents that provide project applicants

with guidance regarding how a proposed project or action might affect federally listed species

under the ESA.

74.     USFWS sent the following email in response to requests to discuss wind projects:

"Pursuant to Executive Order 'Temporary Withdrawal of All Areas on the Outer Continental

Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and

Permitting Practices for Wind Projects', [USFWS is] unable to communicate with wind facilities

regarding permitting at this time."

75.     In implementing the Wind Ban, agencies have provided no explanation, beyond

citing the Presidential Memorandum, for refusing to authorize wind permits contrary to their

statutory obligations. Equally, the agencies have provided no opportunity for the public to

comment on actions that amount to substantive policy and regulatory changes.

76.     ACE NY and its members are experiencing severe and ongoing harms as a direct

result of the Wind Ban and federal agencies' failure to issue necessary permits and approvals.

These harms include substantial daily costs incurred in connection with wind projects in

development that cannot proceed without federal permits, costs in the form of lost income from

projects whose completion has been greatly delayed or cancelled, impairment of legal

obligations under existing contracts, and harms to financing of projects affected by the severe uncertainty caused by the Wind Ban. The Wind Ban has also caused and continues to cause severe harm to the wind energy supply chain, including substantial loss of business for suppliers, escalating costs for materials for wind energy projects, disruption of contracts for specialized transportation and installation equipment, and the potential closure of some businesses. Because the wind energy industry is an integrated nationwide industry, these harms are not specific to the implementation of the Wind Ban in the State of New York, but are occurring as a result of its implementation nationwide.  If federal agencies resume issuing permits and approvals, these harms will be mitigated or cease.

## LEGAL  BACKGROUND

### I.    The Outer Continental Shelf Lands Act

77.    Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") more than 70 years ago. OCSLA declares the Outer Continental Shelf ("OCS") to be "a vital national resource reserve held by the Federal Government for the public," and directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

78.    In 2005, Congress amended OCSLA to support the development of offshore wind projects. Outer Continental Shelf Lands Act, § 1337, as amended by Energy Policy Act of 2005, Pub L. No. 109-58, § 388, 119 Stat. 744 (2005); *Seafreeze Shoreside, Inc.*, 123 F.4th at 26 (stating that OCLSA is a statute that encourages the development of offshore wind projects).

OCSLA allows the Secretary to "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, storage, or transmission of energy sources other than oil and gas," namely offshore wind. 43 U.S.C § 1337(p)(1)(C). The 2005 Amendments oblige the Secretary, in processing such applications, to ensure the project "is carried out in a manner" consistent with specified criteria. 43 U.S.C § 1337(p)(4). This includes requirements for the Secretary to balance potentially competing environmental, health, safety, navigational, national security, and other specified concerns. *Id.* OCSLA further requires the Secretary to undertake specified activities in determining whether to issue a lease for an offshore wind project, such as coordinating with other relevant permitting agencies and engaging in public notice and comments for proposed leases. *Id.*

79.    Offshore wind leases are sold and processed individually in accordance with BOEM regulations, which were originally promulgated in 2009 and then amended pursuant to the Renewable Energy Modernization Rule in 2024. 30 C.F.R. part 585.

80.    Once BOEM has awarded a commercial lease, the lessee must submit several documents, including a Site Assessment Plan ("SAP") and a Construction and Operations Plan ("COP"). 30 C.F.R. § 585.600. Non-commercial lessees and grantees must submit a SAP and General Activities Plan ("GAP") to BOEM. *Id.* A COP or GAP must describe all aspects of the proposed projects, such as the location of transmission infrastructure, and other key features of the project. 30 C.F.R. §§ 585.626, 585.645.

81.    BOEM regulations bind BOEM in its administration of activities on offshore wind leases. The regulations require that BOEM issue or deny requested approvals based on the respective merits of each request. They provide that BOEM will review a submitted SAP, COP, or GAP; that BOEM will notify the applicant if the application is incomplete; and that upon

26

completion of the review BOEM will approve, disapprove, or approve with conditions a SAP, COP, or GAP. *See* 30 C.F.R. §§ 585.613, 585.628, 585.648. The regulations further establish that if a permit is denied, the applicant will have an opportunity to re-submit a revised plan. *Id.* The regulations also require BOEM to prepare (pursuant to NEPA) an analysis of potential environmental and economic effects in the course of issuing these approvals. *Id.*

82.     These regulations make clear that BOEM is required to process permit applications and make decisions on permits and does not have authority to abdicate this responsibility.

## II.     The Federal Land Policy and Management Act.

83.     Enacted in 1976, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*., is a planning statute that governs the Secretary's and BLM's administration of onshore public lands.

84.     Among other requirements, FLPMA provides that the Secretary "shall, with public involvement … develop, maintain and, when appropriate, revise land use plans." 43 U.S.C § 1712(a). These plans, known as resource management plans ("RMPs") are developed by the BLM, the agency designated by the Secretary to comply with FLMPA's requirements. 43 C.F.R. § 1610.1(b).

85.     In an RMP, BLM can, following public input, designate sections of public lands as open or closed for certain uses, including rights of way for wind energy, and may identify stipulations that will attach to such activities.

86.     FLPMA mandates specific procedures prior to the Secretary closing an area to a particular use. The statute requires that the Secretary notify both chambers of Congress of a decision in an RMP "that excludes (that is, totally eliminates) one or more of the principal or

major uses for two or more years with respect to a tract of land of one hundred thousand acres or more." 43 U.S.C. § 1712(e)(2). A "principal or major use" is defined to include rights of way. *See id.* § 1702(l).

87.    Once finalized, the Secretary is prohibited from taking actions on public lands inconsistent with the provisions of the applicable RMP. *See* 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands … in accordance with the land use plans developed by" his or her predecessors…); 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions … shall conform to the approved plan.").

88.    BLM's promulgation of, or amendments to, RMPs are treated as major federal actions with environmental consequences that are analyzed pursuant to NEPA. Consequently, these actions trigger BLM's obligations under NEPA and require the agency to analyze the environmental and economic impacts of such actions.

89.    FLPMA further provides that rights of way "shall be granted, issued, or renewed … under such regulations or stipulations, consistent with the provisions of this subchapter or any other applicable law, and shall also be subject to such terms and conditions as the Secretary concerned may prescribe regarding extent, duration, survey, location, construction, maintenance, transfer or assignment, and termination." 43 U.S.C. § 1764(c). BLM has adopted regulations specifically governing issuance of rights of way for renewable projects (wind and solar) on BLM lands. "Rights of Way, Leasing, and Operations for Renewable Energy," 43 C.F.R. part 2800. FLPMA requires that before suspending a right of way the Secretary give the holders "written notice …. of the grounds of such action and shall give the holder a reasonable time … to comply with this subchapter condition, rule, or regulation." 43 U.S.C. § 1766.

90.     FLPMA also provides requirements for the withdrawal of lands from future uses. "Withdrawal" is defined as "withholding an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C § 1702(j).

91.     The Secretary may only "make, modify, extend, or revoke withdrawals" of public lands "in accordance with the provisions and limitations" of FLPMA. 43 U.S.C. § 1714(a). Specifically, the Secretary "shall publish a notice in the Federal Register" outlining the proposed withdrawal and the "extent to which the land is to be segregated while the application is being considered by the Secretary." 43 U.S.C. § 1714(b)(1).

92.     For withdrawals totaling five thousand acres or more, such withdrawals may be "only for a period of not more than twenty years" and the Secretary "shall notify both Houses of Congress … no later than its effective date." 43 U.S.C. § 1714(c)(1).

93.     The Secretary may withdraw public lands from development in an emergency, but only if "an emergency situation exists" and "extraordinary measures must be taken to preserve values that would otherwise be lost." Such withdrawal "shall last only for a period not to exceed three years and may not be extended" except in limited situations. 43 U.S.C. § 1714(e).

94.     Upon information and belief, no previous Administration has indefinitely closed or withdrawn all onshore public lands from wind energy development.

95.     BLM's regulations delineate BLM's land use planning process, including that the public shall be provided "opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities." 43 C.F.R. § 1610.2.

96.     BLM's regulations bind BLM in its administration of onshore wind energy activities on BLM-managed lands. They require BLM to issue or deny requested approvals based on the respective merits of each request. The regulations provide that BLM will prioritize certain wind applications and evaluate the application based on the information provided by the applicant and input from other parties, such as federal, State, Tribal, and local government agencies, as well as comments received in preliminary application review meetings and any public meeting held under this section. 43 C.F.R § 2804.25. The regulations further provide that based on these evaluations, in processing the application BLM will "[t]ake any other action necessary to fully evaluate and decide whether to approve or deny [an] application." *Id.*

97.     BLM may only deny a right of way application for specific reasons detailed in BLM regulations. 43 C.F.R. § 2804.26.

98.     These statutory and regulatory provisions impose non-discretionary responsibilities that BLM does not have authority to abdicate.

## III.    Clean Water Act Section 404.

99.     Congress enacted the Clean Water Act ("CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

100.    Section 404 of the CWA requires developers to obtain a permit from the Corps prior to discharging dredge and fill material into waters of the United States. 33 U.S.C. §§ 1344(a), 1362.

101.    The CWA allows the Corps to process Section 404 permits individually, or to create general permits for activities that "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

102.    Section 404 also provides that the Corps shall "minimize … delays in the issuance of permits" by entering into agreements with other agencies to ensure a decision will be reached on a permit application "to the maximum extent practicable …  not later than the ninetieth day after the date the notice for such application is published." 33 U.S.C. § 1344(q).

103.    The Corps' regulations have reinforced this statutory mandate in the context of energy projects, as they have designated "energy conservation and development [as a] major national objective" and have therefore directed district engineers "to give high priority to the processing of permit actions involving energy projects." 33 C.F.R. § 320.4.

104.    Section 404 of the CWA and its implementing regulations impose requirements on the Corps' processing of dredge and fill permits. For example, when processing individual Section 404 permits, the Corps' regulations provide that public notice "will" be issued within 15 calendar days of receipt of a complete application. 33 C.F.R. § 325.2.

105.    Additionally, the regulations mandate that the Corps "will decide on all applications not later than 60 [calendar] days after receipt of a complete application," unless "[i]nformation needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period." *Id.*

106.    With respect to general permits, if a Nationwide Permit ("NWP") requires the applicant to submit a pre-construction notification, the Corps' regulations provide that the district engineers are required to respond within 45 days (barring limited exceptions for non-federal permittees who meet specified conditions). Should the Corps fail to respond within this administrative deadline, "the activity is deemed authorized by the NWP," and the district engineers must act in accordance with specified procedures before modifying, suspending, or

revoking the NWP authorization. *Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 73522 (Dec. 27, 2021); 33 C.F.R. § 330.1(e)(1); 33 C.F.R. § 330.5.

107.    The CWA and implementing regulations demonstrate that once the Corps receives an application for a Section 404 permit, it must process and render a timely decision on the application in accordance with relevant provisions of the CWA and implementing regulations, and does not have authority to take actions inconsistent with these requirements.

## IV.    Clean Water Act Section 402.

108.    Pursuant to the CWA, the EPA Administrator may issue a National Pollutant Discharge Elimination System ("NPDES") permit for the discharge of any pollutant or combination of pollutants if the requested discharge meets the requirements provided in the statute. 33 U.S.C. § 1342.  *See also* 33 U.S.C. § 1342(b); 40 C.F.R. § 123.1 (providing for approval of State permitting programs).

109.    EPA's regulations provide procedures for submitting permit applications.  40 C.F.R. § 122.21. The Administrator is required to review NPDES permit applications for completeness within 30 days of receipt. 40 C.F.R. § 124.3(c). The Administrator or other appropriate official must also send the permit applicant a timeline no later than the effective date of the permit that outlines the dates by which the official will: "(1) Prepare a draft permit; (2) Give public notice; (3) Complete the public comment period, including any public hearing; and (4) Issue a final permit." *Id*. § 124.3(g); *see also* 40 C.F.R. §§ 122.62, 124.5 (procedures for modifying, revoking, and reissuing permits).

110.    Pursuant to these provisions, both onshore and offshore wind facilities may be required to obtain a NPDES permit in certain circumstances. EPA is required to act on such permit applications and does not have authority to ignore this obligation.

V.      **Rivers and Harbors Act Sections 10 and 14.**

111.    Under Section 10 of the Rivers and Harbors Act of 1899 ("RHA"), "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited …." 33 U.S.C. § 403.

112.    Section 10 also provides that it "shall not be lawful to build … structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States …" or to "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge …[or] channel of any navigable water of the United States," except as recommended and authorized by the Corps. *Id.*

113.    Section 14 of the RHA makes it unlawful for any person or persons "take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States …." 33 U.S.C. § 408.

114.    However, the Secretary, "on the recommendation of the Chief of Engineers, may grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest." *Id.*

115.    The Corps issues permits and permission under these statutory authorities. 33 C.F.R. § 320.2. The Corps' regulations recognize that "energy conservation and development are major national objectives" and provide that "[d]istrict engineers will give high priority to the processing of permit actions involving energy projects." 33 C.F.R. § 320.4.

116.     Corps regulations set forth specific requirements that must be fulfilled when the agency processes RHA Section 10 permits.

117.     With respect to individual permits, Corps regulations provide that the agency "shall" notify the applicant of an incomplete Section 10 application within 15 calendar days. 33 C.F.R. § 325.2.  They also provide that public notice "will" be issued within 15 calendar days of receipt of complete application. *Id.* They establish that "[d]istrict engineers will decide on all applications not later than 60 [calendar] days after receipt of a complete application," unless "[i]nformation needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period." *Id.*

118.     For NWPs, "[e]xcept for activities conducted by non-federal permittees that require [pre-construction notifications] under paragraph (c) of the "Endangered Species" and "Historic Properties" general conditions (general conditions 18 and 20, respectively), if the Corps district does not respond to the [pre-construction notification] within 45 days of a receipt of a complete [pre-construction notification], the activity is deemed authorized by the NWP." *Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 73,522 (Dec. 27, 2021).

119.      Once a permit application for a Section 10 permit is received, the Corps is required to process and render a timely decision on the permit applications. The Corps does not have authority to take actions inconsistent with these requirements.

**V.     The Endangered Species Act.**

120.     The Endangered Species Act ("ESA") prohibits the "take" of any endangered or threatened species. 16 U.S.C. § 1538(a).

121.     Section 7 of the ESA requires federal agencies approving, funding, or carrying out activities to ensure such actions will not "jeopardize the continued existence of any endangered

species or threatened species …" 16 U.S.C. § 1536(a)(2).  To meet this requirement, Federal

agencies must consult with USFWS or NMFS if an endangered or threatened species may be

present in the area of a proposed action. 16 U.S.C. § 1536(a)(2).

122.    For the purposes of complying with requirements of Section 7, the action agency

is required to prepare a biological assessment (BA) identifying any endangered or threatened

species which is likely to be affected by an action, for any action where an endangered or

threatened species may be present. 16 U.S.C. § 1536(c)(1).

123.    If after consultation, the Secretary concludes that the agency action will not

violate the ESA, or offers reasonable and prudent alternatives that will not violate the ESA, and

the taking of an endangered or threatened species will be incidental to the agency action, the

Secretary shall prepare and provide the action agency and any applicant concerned a Biological

Opinion and incidental take statement specifying the impact of such incidental taking, specifying

reasonable and prudent measures necessary to minimize such impact, and setting forth terms and

conditions that must be complied with to implement those measures. 16 U.S.C. § 1536(b)(4).

124.    USFWS and NMFS regulations set forth specific requirements that must be

fulfilled during the Section 7 process. For BAs, the regulations require the Director to respond

within 30 days to a notification or request from a federal agency. 50 C.F.R. § 402.12. They

further provide that after a federal agency submits a BA, the "Director will respond in writing

within 30 days as to whether or not he concurs with the findings of the biological assessment."

50 C.F.R. 402.12(j). For informal consultations, "the Service *shall* provide written concurrence

or non-concurrence with the Federal agency's determination [that the action is not likely to

adversely affect listed species or critical habitat] within 60 days" of a written request. 50 C.F.R.

§ 402.13 (emphasis added). A formal consultation must conclude "within 90 days after its

initiation unless extended as provided below," and "[w]ithin 45 days after concluding formal consultation, the Service *shall* deliver a biological opinion to the Federal agency and any applicant." 50 C.F.R. § 402.14(e) (emphasis added).

125.    For projects on private lands without a federal nexus, Section 10 of the ESA provides a critical exception to the prohibition on "taking" endangered species by allowing a person to obtain an "incidental take" permit. 16 U.S.C. § 1539. Section 10 of the ESA provides that the USFWS or NMFS may issue such a permit for "any taking otherwise prohibited by [Section 9] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). To receive an "incidental take" permit, an applicant must submit a "conservation plan" to the USFWS or NMFS in a manner consistent with the requirements provided by Section 10. *Id.*

126.    Upon the receipt of an ESA Section 10 application, the ESA requires the USFWS and NMFS to publish notice of the application in the Federal Register and to provide an "opportunity for public comment" on the application and the corresponding proposed habitat "conservation plan." 16 U.S.C. § 1539(a)(2)(B). Furthermore, the ESA mandates that the USFWS or NMFS "shall issue the [incidental take] permit" if they determine that the applicant will meet the requirements specified in Section 10. *Id.*; 50 C.F.R. parts 13, 17, 222, 402.

127.    USFWS and NMFS regulations provide specific non-discretionary actions the agencies must take when processing and issuing incidental take permits. USFWS regulations provide that "[t]he Service will process the application when the Director determines the application is complete." 50 C.F.R. § 17.22(b)(1). The regulations further provide that "[u]pon receiving … [ a completed] application … the Director will decide whether a permit should be issued." 50 C.F.R. § 17.22(b)(2). NMFS regulations provide that "NMFS will attempt to process

applications deemed sufficient in the shortest possible time" 50 C.F.R. § 222.302(b). NMFS regulations further provide that the "Assistant Administrator shall issue the permit unless" the Administrator makes certain findings. 50 C.F.R. § 222.302(e).

128.    These statutory and regulatory provisions impose non-discretionary obligations on USFWS and NMFS that cannot be abdicated.

## VI.    The Marine Mammal Protection Act.

129.    The MMPA generally prohibits the taking of marine mammals, with certain statutory exceptions. 16 U.S.C. § 1371(a)(3).

130.    The Secretary may authorize the incidental—but never intentional—take of a small number of marine mammals in a specified geographic area as a result of commercial activities. 16 U.S.C. § 1371(a)(5)(A). The Secretary "shall allow" the incidental taking if the Secretary determines that the cumulative taking "will have a negligible impact" on the species and that such taking "will not have an unmitigable adverse impact on the availability of such species of stock for taking for subsistence uses." *Id.* Finally, such taking authorization must be limited to a period of not more than five consecutive years. *Id.*

131.    If the Secretary authorizes an incidental taking, the Secretary "must prescribe regulations setting forth: (i) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for subsistence uses; and (ii) requirements pertaining to the monitoring and reporting of such taking." 16 U.S.C. § 1371(a)(5)(A).

132.    The MMPA authorizes the Secretary of Commerce to promulgate regulations related to the protection and conservation of whales, dolphins, porpoises, seals, and sea lions. 16

U.S.C. § 1373. DOI is responsible for promulgating regulations related to all other marine mammals not regulated by the Secretary of Commerce. *Id.*

133.    USFWS and NMFS regulations set forth specific requirements that the agencies must follow when determining whether to authorize limited incidental take of marine mammals. USFWS regulations provide that "the Director shall evaluate each request to determine, based on the best available scientific evidence, whether the total taking will have a negligible impact on the species or stock and, where appropriate, will not have an unmitigable adverse impact on the availability of such species or stock for subsistence uses." 50 C.F.R. § 18.27(d)(4). The regulations further provide that "if the Director cannot make a finding that the total taking will have a negligible impact … the Director shall publish in the Federal Register the negative finding along with the basis for denying the request." *Id.* Similarly, USFWS regulations provide that the "Assistant Administrator shall evaluate each request to determine, based upon the best available scientific evidence, whether the taking by the specified activity within the specified geographic region will have a negligible impact on the species or stock and, where appropriate, will not have an unmitigable adverse impact on the availability of such species or stock for subsistence uses." 50 C.F.R. § 216.104(c).

134.    These statutory and regulatory provisions impose non-discretionary obligations that NMFS does not have authority to disregard.

**VIII.    The Bald and Golden Eagle Protection Act.**

135.    The Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668 *et seq.*, prohibits the "take" of any bald eagle or golden eagle "at any time or in any manner" "without being permitted to do so" by USFWS.

136. BGEPA authorizes USFWS to authorize the take or disturbance of bald and golden eagles, but only if such take "is compatible with the preservation" of eagles. *Id.* § 668a. The statute provides for two different types of authorizations. The first type applies to activities where the taking is associated with—i.e., incidental to—but not the purpose of the permitted activity (frequently known as "incidental take"). 50 C.F.R. § 22.250. The second type applies to the deliberate removal of eagle nests for specific purposes (i.e., ensuring human or eagle safety). 50 C.F.R. § 22.85.

137. Incidental take permits fall into two categories—specific and general. Pursuant to its regulations, USFWS is required to automatically issue a general permit to an applicant, provided that the applicant's activity qualifies for a general permit and the take: (1) is necessary to protect a legitimate interest in a particular locality; (2) results from, but is not the purpose of, the activity; and (3) cannot practicably be avoided. 50 C.F.R. § 22.210(d). The development of wind energy projects is specifically listed as eligible for general take permits. *Id.* § 22.250.

138. Finally, applicants may apply for a specific permit if the activity does not meet the eligibility criteria for a general permit or if the activity in question is not identified in USFWS regulations. *Id.* § 22.220(a). Wind energy projects that are ineligible for a general permit may request a Letter of Authorization from the USFWS to apply for a general permit. *Id.* § 22.220 (b)(7).

139. These statutory and regulatory provisions impose non-discretionary obligations that USFWS does not have authority to disregard.

## IX.    The Clean Air Act.

140. The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, was enacted in 1970 to, among other things, "protect and enhance the quality of the Nation's air resources so as to

promote the public health and welfare and the productive capacity of its population." 42 U.S.C.
§ 7401(b). It directs the EPA to set National Ambient Air Quality Standards ("NAAQS") for air
pollutants, 42 U.S.C. § 7409(b)(1), establish air quality control regions, and designate those
regions as "attainment" for "any area …that meets" the NAAQS, "nonattainment" for "any area
that does not meet" the NAAQS. 42 U.S.C. § 7407(d)(1)(A).

141.    Under the CAA, new "major sources," meaning facilities with the potential to
emit certain threshold levels of specified air pollutants, may not be constructed without a permit.
42 U.S.C. §§ 7407(a), 7475(a), 7502(c)(5). The proposed source must obtain a Prevention of
Significant Deterioration ("PSD") permit, if located in an area in attainment with relevant air
quality standards, *id.* § 7475(a), or a Nonattainment New Source Review ("NNSR") permit, if
located in an area not in attainment with such standards, before beginning construction or
making major modifications, *id.* § 7502(c)(5).

142.    The CAA contains special requirements for activities occurring on large portions
of the OCS. 42 U.S.C. § 7627(a)(1). The CAA requires the EPA to count certain emissions from
certain vessels used for construction and operation of an activity on the OCS, such as fossil fuel
production or development of wind energy, in determining whether the activity constitutes a
"major source" and will need a CAA permit based on onshore air quality effects. 42 U.S.C.
§ 7627(a)(4)(C); *see also* 40 C.F.R. § 55.2. The type of permit needed will depend on whether
the nearest onshore area and corresponding areas are attainment or nonattainment areas. 40
C.F.R. § 55.5.

143.    Most New Source Review permits are issued by state or local air pollution control
agencies. EPA issues permits in some cases. OCS air regulations are generally implemented and
enforced by the EPA Regional Offices, but this authority may be delegated to state or local air

permitting agencies that meet specific criteria. To date, EPA has delegated authority to administer OCS Air Regulations to three state permitting authorities (Delaware, Maryland, and Virginia) and four local permitting authorities in California. EPA, *Outer Continental Shelf Air Permits*, https://www.epa.gov/caa-permitting/outer-continental-shelf-air-permits.

144.    For PSD permits, the CAA provides that "[a]ny completed [PSD] permit application…shall be granted or denied not later than one year after the date of filing of such completed application." 42 U.S.C. § 7475(c). For NNSR permits, the CAA mandates that "the permitting authority shall approve or disapprove a completed application …within 18 months after the date of receipt thereof." *Id.* § 7661b(c). The CAA also specifies that "the source's failure to have a permit shall not be a violation …unless the delay in the final action" was the fault of the applicant. *Id.* § 7661b(d).

145.    EPA's regulations build upon the statutory requirements. The OCS air regulations provide that the Administrator will follow the applicable procedures of 40 C.F.R. part 124, which apply to the PDS permitting program, or 40 C.F.R. part 71, which apply to the NNSR permitting program, in processing applications under this part. 40 C.F.R. § 55.6.

146.    The PSD regulations provide that EPA "shall" review submitted applications for completeness within 30 days of receipt. 40 C.F.R. § 124.3. EPA must notify the applicant in writing regarding completeness of the application and then must decide whether to prepare a draft permit or deny the permit application. *Id.* § 124.6. All draft permits "shall" be publicly noticed and made available for public comment. *Id.* The regulations provide that EPA "shall" shall issue a final permit decision after the close of public comment. *Id.* § 124.15. EPA has announced its goal to "make a final permit decision (to issue or deny) on a PSD permit

application within 10 months after the date that the Regional Office has determined that the application is complete."[16]

147.    The NNSR regulations provide that, unless the Administrator determines an application is incomplete within 60 days of receipt, the application will be deemed complete. 40 C.F.R. § 71.5(a)(2). EPA "shall" take final action on each permit application (including a request for permit modification or renewal) within 18 months after receiving a complete application. 40 C.F.R. § 71.7.

148.    These statutory and regulatory provisions impose non-discretionary obligations that EPA does not have authority to disregard.

## X.    FAST-41.

149.    The Fixing America's Surface Transportation Act ("FAST Act") was enacted in 2015 to streamline the environmental review and permitting process for covered infrastructure projects, and evidences Congress's intention that such projects, including wind energy projects, are permitted through a process that is transparent, predictable, and expeditious.

150.    As determined by the Federal Permitting Improvement Steering Council ("FPISC"), the Act covers most offshore wind projects and several onshore wind projects, as well as transmission projects and a range of other energy and infrastructure projects.

151.    The FAST Act establishes a process for tracking and expediting covered projects, governed by FPISC.  Under this process, the Council "shall maintain an online database to be known as the 'Permitting Dashboard' to track the status of Federal environmental reviews and authorizations for any covered project in the inventory." 42 U.S.C. § 4370m–2(b). The Executive

---

[16] Memorandum from Stephen D. Page on Timely Processing of Significant Deterioration (PSD) Permits when EPA or a PSD=Delegated Air Agency Issues the Permit (Oct. 15, 2012), https://www.epa.gov/sites/default/files/2015-07/documents/timely.pdf

Director of the Council "shall create" a specific entry on the Dashboard for projects not later than 14 days after the project sponsor submits a notice of project initiation. *Id.* Lead and cooperating agencies "shall post" updates and information about the project status to the Dashboard "not later than 5 business days after the date on which the Federal agency receives the information." *Id.* The Executive Director "shall publish to the Dashboard" the permitting timetable, the status of each agency's compliance with the permitting timetable, and an explanation of any modifications to the permitting timetable. *Id.*

152.    The Act requires that the lead agency "shall establish a concise" project review and authorization plan 60 days after the Executive Director adds a project to the Dashboard. 42 U.S.C. § 4370m–2(c). This "Coordinated Project Plan" "shall include" a "permitting timetable" setting forth a "comprehensive schedule of dates by which all environmental reviews and authorizations, and to the maximum extent practicable, State permits, reviews and approvals must be made." *Id.* The Act establishes a mandatory process for resolving disputes relating to the permitting timetable. *Id.*

153.    The established project timetable can only be subsequently modified if the lead agency consults with the Executive Director regarding the need for modification, all agencies involved agree to the modification, the agencies consult with the project sponsor, and the agencies provide a written justification. *Id.*

154.    In those cases where the modification would extend the completion date by more than 30 days, modification must be formally approved by the Executive Director, who must make a "determination on the record." *Id.* Before issuing such a determination, the Executive Director must consult with the project sponsor. *Id.* A completion date in the permitting timetable may not be modified within 30 days of the completion date. *Id.* The statute further sets limits on

the total length of modifications: the timeline can only be extended by half of the amount of time originally allotted for the project. *Id.* The project timetable may only be extended beyond this limitation only if the Director of the Office of Management and Budget approves it and provides a report on the extension to Congress. *Id.*

155.    The statute provides that "[e]ach Federal agency shall conform to the intermediate and final completion dates set forth in the permitting timetable established under subparagraph (A), or with any intermediate or final completion date modified under subparagraph (D)." *Id.* If an agency fails to conform with an "intermediate or final completion date," or reasonably believes it "will fail to conform with a completion date 30 days before such a completion date," the agency "shall" notify the Executive Director and propose an alternative completion date and submit status reports to the Executive Director until the agency has taken final action on the delayed authorization or review. *Id.*

156.    FAST-41 imposes non-discretionary responsibilities on agencies that they may not disregard, and evidences Congress's intent that agencies process permits for covered infrastructure projects in a transparent, predictable, and expeditious manner.

## XI.    NEPA and the Fiscal Responsibility Act.

157.    NEPA's purpose is to focus the attention of the federal government and the public on the potential environmental effects of proposed "major Federal actions." 42 U.S.C. §§ 4321, *et seq*.

158.    In 2023, Congress passed the Fiscal Responsibility Act, a NEPA reform law that imposed new statutory deadlines on agency's NEPA processes and highlighted Congress's intent to streamline and expedite the environmental review process and decision-making to allow critical projects to proceed without unnecessary delays. The 2023 amendments provide that the

lead agency "shall complete" an environmental assessment not later than 1 year after certain conditions are met, and "shall complete" an EIS not later than 2 years after those conditions are met. 42 U.S.C § 4336a(g).

159.     These amendments evidence Congress's intent that NEPA processes and environmental decision-making be completed expeditiously to facilitate development of essential infrastructure projects.

## XI.     APA Section 558 Bars Agencies From Indefinitely Declining To Take Legally Required Actions on Permits and Approvals.

160.     The APA provides: "When application is made for a license required by law, the agency … within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision." 5 U.S.C. 558(c). The APA defines the term "license" broadly, stating that the term "'includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. 551(8). The APA therefore requires that federal agencies act on permits and approvals "within a reasonable time" after which the agency "shall make its decision."

161.     Adoption of an agency policy of indefinitely declining to take legally required actions on permits and approvals is inconsistent with these APA requirements.

**CLAIMS FOR RELIEF**
**COUNT I**
**Administrative Procedure Act**
**(The Wind Ban Is Arbitrary and Capricious)**
**5 U.S.C. § 706(2)(A)**

162.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-161 as if set forth fully herein.

163.    Under the APA, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

164.    Judicial review of the Wind Ban is based on applicable law and the underlying administrative record. 5 U.S.C. § 706.

165.    When a federal agency shifts its policy or reverses prior decisions, it must provide a reasoned explanation for the change, or the action will be deemed arbitrary and capricious. This is particularly true when its prior policy has engendered serious reliance interests or where its new policy rests upon factual findings that contradict those which underlay its prior policy.

166.    Moreover, when an agency has not stated any reasons to support a decision, its decision is inherently arbitrary and capricious. The agency must be able to provide the essential facts upon which the administrative decision was based and explain what justifies the determination with actual evidence beyond conclusory statements.

167.    Each agency's implementation of the Wind Ban, including the wholesale halt of any new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind development, constitutes final agency action.

168.    Upon information and belief, no administrative record exists to support the Wind Ban.

169.    Defendants' decisions to radically depart from prior policy by implementing a wind energy permitting cessation without offering a reasoned explanation was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

170.    There is no rational connection between the Defendants' imposition of the Wind Ban and the relevant facts regarding wind energy development. The safety and environmental

risks presented by wind energy development have been thoroughly studied, and there is no new evidence that justifies this decision.

171.    Defendants also fail to acknowledge that the Wind Ban impacts different technologies (onshore and offshore wind). It is arbitrary to issue a blanket directive that treats all types of wind energy projects alike, without any regard to individualized risks (or lack thereof).

172.    The Wind Ban's bald assertion of risks only from permitting wind energy projects arbitrarily ignores relative risks of other forms of energy that Defendants continue to authorize and promote without delay or further study, notwithstanding Defendants' own acknowledgement of those relative risks.

173.    The Wind Ban also ignores the vast body of caselaw in which courts have consistently rejected claims related to wind energy's environmental risks, in contrast to multiple court decisions recognizing relative risks of other forms of energy that Defendants nevertheless continue to authorize and promote without delay or further study.

174.    The Wind Ban arbitrarily not only excludes wind energy from Defendants' simultaneously adopted policies to expedite multiple forms of energy production, but also singles out wind energy for adverse treatment. The Wind Ban has no rational basis for singling out the American businesses and workers involved in the wind energy industry for differential treatment, which is causing and will cause severe economic burdens.

175.    Defendants fail to explain their departure from prior policies prioritizing and expediting wind energy development, including due to the climate benefits associated with renewable energy, the benefits of diversified "all of the above" energy sources, and the comparative safety benefits of wind energy. Such an abrupt about-face in agency policy requires substantial justification, and no such justification exists.

176.    Moreover, Defendants fail to acknowledge that the Wind Ban is directly at odds with the current Administration's call to action on its declared "national energy emergency" due to a lack of energy generating capacity. Indeed, the Wind Ban is precisely "an undue burden on the identification, development, or use of domestic energy resources" that Executive Order 14154 directs agencies to "suspend, revise, or rescind." Such an internal inconsistency requires substantial justification, and no such justification exists.

177.    Agencies must take reliance interests into account in their decision-making. Wind energy companies and stakeholders have acted in reliance on the longstanding policies and statutes established by Congress and federal agency regulations authorizing and encouraging development of wind energy, and have invested billions of dollars in wind energy development projects and entered into contractual agreements to construct wind energy facilities and to supply wind energy. The Wind Ban will compromise and potentially destroy these investments and contractual agreements. Failure to consider reliance interests is arbitrary and capricious.

178.    Agencies are required to consider costs and benefits in their decision-making. The current Administration has recently acknowledged the importance of addressing the "massive costs" and "restraint[s] on … economic growth and ability to build and innovate" associated with federal regulation. Executive Order 14102, *Unleashing Prosperity through Deregulation,* 90 Fed. Reg. 9065 (January 31, 2025). Agencies' implementation of the Wind Ban imposes extensive costs on the public and on Plaintiff's members, in exchange for insubstantial and likely nonexistent benefits. Failure to consider the Wind Ban's costs and benefits in this context is arbitrary and capricious.

179.    The Wind Ban arbitrarily imposes severe burdens on development of private property, as well as development of property owned by states, localities, and tribes. It also

arbitrarily impairs existing investment-backed expectations. The current Administration has issued an executive order directing agencies to "de-prioritize" "enforcement actions" that "go beyond the powers vested in the Federal Government by the Constitution" and "direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or administration policy," and defining an "enforcement action" as "all attempts, civil or criminal, by any agency to deprive a private party of life, liberty or property, or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action." Executive Order 14219, *Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative,* 90 Fed. Reg. 10583 (Feb. 19, 2025) sections 3, 6(d). Agencies implementing the Wind Ban must provide especially substantial justification for their actions to justify impairing private property rights. Defendants cannot provide such justification.

180.    Agencies are required to consider alternatives in their decision-making. The Wind Ban is arbitrary and capricious because defendant agencies did not consider alternatives that might lessen the impact of the agency action on the wind industry and others affected by the Wind Ban. Similarly, the Wind Ban is arbitrary and capricious because it fails to articulate why immediate implementation was required, despite the extensive disruption caused by that decision.

181.    The Presidential Memorandum's vague reference to alleged "deficiencies" in the environmental review processes undertaken in support of wind energy development does not identify any such deficiency or any basis for agencies' dramatic changes in position and provides no reasoned basis for agency action. Furthermore, the issues to review mandated by the Presidential Memorandum (i.e., impact to birds and marine mammals, effects of intermittent

energy, and impact of wind subsidies) fail to address the supposed "grave harm" it imagines from wind projects (such as the "negative impacts to transportation interests.").

182.    Because Defendants failed to acknowledge their departure from prior policy and decision-making, failed to provide a reasoned explanation for the new policy, failed to consider important aspects of the alleged problem, and failed to consider reliance interests and costs and benefits in this context, the Wind Ban is arbitrary and capricious.

**COUNT II**
**Administrative Procedure Act**
**(The Wind Ban Failed to Undergo Public Notice and Comment Rulemaking)**
**5 U.S.C. 706(2)(D)**

183.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-182 as if set forth fully herein.

184.    A "reviewing court shall … hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

185.    The Wind Ban is a substantive rule that was issued without the notice-and-comment period required by 5 U.S.C. § 553. In addition, to the extent that the Wind Ban conflicts with existing regulatory provisions, it is also an unlawful amendment of each agency's regulations conducted without observing the notice and comment process required by law.

186.    The Wind Ban has had substantial effects on energy resources, investments, and jobs nationwide; those effects are of great importance to a wide range of communities and stakeholders, including ACE NY and its members.

187.    Defendants have failed to elicit or consider the views of these constituents and their governments, and have failed to adequately evaluate the potentially devastating economic impact of the Wind Ban on the domestic wind energy industry and the domestic supply chain that supports that industry.

188.     Because the Wind Ban is a substantive rule and does not fit an exception to the notice-and-comment requirement, it has been adopted and implemented in violation of the requirements of the APA.

## COUNT III
### Administrative Procedure Act
### (The Wind Ban Is Contrary to Law)
### 5 U.S.C. § 706(2)(A), (C)

189.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-188 as if set forth fully herein.

190.     Under the APA, a reviewing court must set aside a challenged agency action that is found to be, inter alia, "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

191.     Adoption of an agency policy of indefinitely declining to take legally required actions on permits and approvals is inconsistent with APA Section 558 and is therefore "not in accordance with law."

192.     The Wind Ban's blanket cessation of permitting for offshore wind energy projects is contrary to law under OCSLA. 43 U.S.C. §§ 1331 *et seq.* OCSLA does not grant agency officials authority to cease leasing and permitting for wind energy. *Id.* Moreover, BOEM's regulations under OCSLA make clear that these agencies have a general obligation to process permit applications and issue permit decisions. BOEM cannot abdicate this responsibility. 30 C.F.R. part 585. These regulations confirm that BOEM acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed OCSLA's clear mandate to administer the permitting program. *Id.*

193.     The Wind Ban's blanket cessation of permitting for onshore wind energy projects is contrary to law under FLPMA. 43 U.S.C. §§ 1701 *et seq.* FLPMA does not grant agency

officials authority to cease issuing ROW decisions for wind energy. *Id.* Moreover, BLM's regulations make clear that BLM has an obligation to process permit applications and issue permitting decisions under FLPMA, and that a failure to do so constitutes a de facto revision to a land use plan. 43 C.F.R. Part 1600, Part 2800. These regulations confirm that BLM acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed FLPMA's clear mandate to administer the permitting program. *Id.*

194.    The Wind Ban is contrary to law under Section 404 of the CWA. 33 U.S.C. § 1344. Section 404 does not grant Corps officials authority to cease permitting and authorizations for wind energy. *Id.* Moreover, the Corps' regulations under CWA Section 404 make clear that it has a responsibility to process permit applications and issue permit decisions, as well as issue wetlands-related determinations, and cannot abdicate this responsibility. 33 C.F.R. §§ 320, 325, 330, 331. These regulations confirm that the Corps acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed the CWA's clear mandate to administer the permitting program. *Id.*

195.    The Wind Ban is contrary to law under the RHA. 33 U.S.C. §§ 403, 408. RHA Sections 10 and 14 do not grant Corps officials authority to wholesale cease issuing wind energy permit decisions. *Id.* Moreover, the Corps' regulations make clear that it has an obligation to process permit applications and issue permits and cannot simply abdicate this responsibility in response to a Presidential Memorandum. 33 C.F.R. parts 320, 325, 330, 331. These regulations confirm that the Corps acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed the RHA's clear mandate to administer the permitting program. *Id.*

196.    The Wind Ban is contrary to law under the ESA. 16 U.S.C. § 1531 *et seq*. The ESA and USFWS and NMFS regulations make clear that those agencies have an obligation to

engage in and timely complete necessary consultation and cannot simply abdicate this responsibility in response to a Presidential Memorandum. 50 C.F.R. parts 13, 17, 222, 402. These regulations confirm that USFWS acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed the ESA's clear mandate to administer that program. *Id.*

197.    The Wind Ban is contrary to law under the MMPA. 16 U.S.C. §§ 1371 *et seq*. The MMPA and NMFS and USFWS regulations make clear that those agencies have an obligation to decide incidental take authorizations. 50 C.F.R. part 18. These regulations confirm that NOAA and USFWS acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed MMPA's clear mandate to administer that program. *Id.*

198.    The Wind Ban is contrary to law under BGEPA. 16 U.S.C. § 668. BGEPA and USFWS's regulations make clear that USFWS has an obligation to decide incidental take authorizations. 50 C.F.R. part 22. These regulations confirm that USFWS acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed BGEPA's clear mandate to administer that program. *Id.*

199.    The Wind Ban is contrary to law under the CAA. 42 U.S.C. § 7627. The CAA does not grant EPA officials authority to cease permitting wind energy. *Id.* Moreover, EPA's regulations make clear that EPA must process permit applications and issue permit decisions. 40 C.F.R. § 124. These regulations confirm that EPA acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed the CAA's clear mandate to administer the permitting program. *Id.*

200.    In adopting and implementing the Wind Ban, EPA likewise acted "not in accordance with law" in contravention of 5 U.S.C. § 706(2)(A) by failing to heed the

requirements of the CWA and its own regulations in administering the NPDES program where applicable to wind projects. 33 U.S.C. § 1342; 40 C.F.R. parts 122, 124.

201.    By adopting and implementing the Presidential Memorandum's indefinite and categorical cessation of wind permitting, and thereby unlawfully and systematically disregarding the provisions of applicable statutes and regulations, Defendant agencies have taken actions that are "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and accordingly violate the APA as well as the statutory and regulatory provisions cited above.

### COUNT IV
### U.S. Constitution
### (The Wind Ban Violates the U.S. Constitution,
### Article I, Section 8, Clause 3; Article IV, Section 3, Clause 2; Amendment V)

202.    Plaintiffs repeats and re-alleges the allegations in paragraphs 1-201 as if set forth fully herein.

203.    Plaintiff has a right of action and courts should enjoin and declare unlawful official actions that are *ultra vires* and exceed the executive branch's constitutional authority.

204.    The U.S. Constitution vests in Congress exclusive lawmaking authority. U.S. Const., art. 1, § 8. The President may not, simply because of policy objections, usurp the lawmaking powers of Congress, and act or refuse to act in violation of the laws enacted by Congress. Pursuant to its authority under the property clause and the interstate commerce clause, Congress has established federal statutes governing permitting of all types of energy, including wind energy. These statutes govern management of the Outer Continental Shelf and onshore public lands, and the factors agencies may consider when deciding to issue authorizations, and require agencies to affirmatively act. They do not grant the agencies the authority to indefinitely

refute to make decisions pertaining to wind energy authorizations in an effort to halt wind development across the nation. The President and executive branch do not have the authority to direct agencies to ignore these statutory mandates.

205.    Under the Property Clause of the U.S. Constitution, Congress—and not the executive branch—has the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2.

206.    The executive branch has authority to regulate federal property only to the limited extent that Congress has delegated such authority.

207.    Congress's limited delegation of authority is set forth in OCSLA, FLPMA, and other statutes. These statutes require agencies to issue permit and authorization decisions for activities on federal lands and require agencies to follow certain processes and timeframes. The executive branch lacks constitutional authority to override legislation enacted by Congress, ignore processes prescribed by this legislation, and unilaterally and arbitrarily cease approvals for all wind projects.

208.    With respect to activities on non-federal property, the Constitution grants Congress exclusive power to regulate foreign and interstate commerce. U.S. Const., art. I, § 8, cl. 3. Congress has enacted legislation under which agencies are required to issue permits and authorizations for certain activities occurring on private property, and on property owned by states, tribes, and other governmental entities. Absent congressional action, property owners have the right to develop their property, and any regulatory authority resides with states, tribes, and localities. U.S. Const. Amend. X. The executive branch does not have the authority to override

legislation enacted by Congress and impede private property rights and the interests of other sovereigns, by unilaterally and arbitrarily ceasing approvals for all wind projects.

209.    The Wind Ban unlawfully deprives owners or lessees of private property or other non-federal property of their property interests without due process. U.S. Const. amend. V. The Wind Ban also destroys rights in leases and rights of way on federal property. In general, a lease or right of way conveys a property interest enforceable against the government. While the nature of this property interest varies depending on the terms of the lease or right of way and the statutory and regulatory authority under which it is leased, those investing in development of wind facilities have a right to due process before being deprived of their property interests. U.S. Const. amend. V.

210.    Accordingly, the Wind Ban is illegal, and agencies instead should comply with applicable law.

## COUNT V
### *Ultra Vires*
**(The Wind Ban Is *Ultra Vires* Action Beyond the Authority Conferred by Congress)**

211.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-210 as if set forth fully herein.

212.    Plaintiff has a right of action and courts should enjoin and declare unlawful executive branch actions that are *ultra vires* and exceed statutory authority.

213.    No act of Congress authorizes the President to order or agencies to implement a blanket cessation of all authorizations necessary for wind energy development. Indeed, Congress has restricted such cessations of decision-making in APA § 558(c) and required agencies to act "within a reasonable time" on requests for licenses (defined to include permits and other approvals). The Wind Ban is therefore *ultra vires*.

214.     The Wind Ban is *ultra vires* under OCSLA. OCSLA does not provide the President or agencies the authority to unilaterally cease all permitting of wind projects on the OCS.

215.     The statutory purpose of OCSLA is to ensure that the Secretary makes the OCS "available for *expeditions and orderly development,* subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3) (emphasis added). The Wind Ban contravenes OCSLA, including its provisions establishing an orderly process for carrying out development on the OCS and assigning those permitting obligations to DOI.

216.     Moreover, by ordering agencies to cease issuing all "approvals, rights of way, permits, leases, or loans" needed for wind energy development on the OCS, the Wind Ban effectively withdraws those leased areas from use and disposition. The Presidential Memorandum purports to preserve rights under existing leases, stating in its Section 1 that "[n]othing in this withdrawal affects rights under existing leases in the withdrawn areas," but its ordered cessation of wind permitting in Section 2(a) gravely impairs the rights of lessees in a way that cannot be reconciled with the terms of existing leases. No provision of OCSLA grants the President the authority to withdraw leased lands from use and disposition on the OCS. Congress has only authorized the President to "withdraw from disposition any of the *unleased* lands." 43 U.S.C. § 1341(a) (emphasis added). Thus, by ordering federal agencies to effectively withdraw leased areas from use, the Wind Ban violates OCSLA.

217.     The Wind Ban is *ultra vires* under FLPMA. FLPMA does not provide the President authority to unilaterally cease permitting ROWs for wind energy development.

218.    The Wind Ban is inconsistent with underlying land use plans and constitutes a de facto revision to a land use plan. FLPMA requires the Secretary to manage lands in accordance with land use plans developed by the Secretary. 43 U.S.C. § 1732(a). Management decisions, including exclusions of uses such as ROWs, remain subject to reconsideration only through revision of the land use plan involved. 43 U.S.C. § 1712(e). Revision of land use plans requires the Secretary to complete a formal process that allows for public involvement. 43 U.S.C § 1712. The Wind Ban violates FLPMA because FLPMA and its implementing regulations provide a defined process for amending land use plans that neither the President nor BLM has followed.

219.    The Wind Ban violates FLPMA also because it unlawfully withdraws all lands governed by FLPMA from wind energy development. The Wind Ban falls within the definition of "withdrawal" under FLPMA. *See* 43 U.S.C. § 1702(j). The Wind Ban's withdrawal of public lands violates FLPMA because withdrawal decisions are made by DOI, not by the President, and because neither the President nor BLM has complied with the procedural requirements of the Act in withdrawing Federal land from wind energy development. 43 U.S.C. §§ 1714 and 1739(e).

220.    The Wind Ban is *ultra vires* under the CWA and RHA. 33 U.S.C. § 1344; RHA §§ 10, 14**.** Section 404 and the RHA do not grant the President authority to order the Corps to cease permitting and authorizations for wind energy and instead assign responsibility for permitting to the Corps, subject to applicable statutory and regulatory requirements.

221.    The Wind Ban contravenes the CWA's requirements that the Secretary "minimize delays in the issuance of permits" to the maximum extent practicable. 33 U.S.C. § 1344(q) and "assure that, to the maximum extent practicable" a decision will be reached on a permit application "not later than the ninetieth day after the date the notice for such application is

published." *Id*. RHA Sections 10 and 14 likewise do not grant the President or agencies authority to cease all permitting for wind energy.

222.    The Wind Ban is unlawful because it orders the Corps to ignore this requirement to act on permit applications. It likewise unlawfully orders EPA to ignore mandatory requirements under the CWA. 33 U.S.C. § 1342; 40 C.F.R. parts 122, 124.

223.    The Wind Ban is *ultra vires* also under the ESA, BGEPA, and MMPA.

224.    The President, NMFS, and USFWS lack authority to unilaterally cease consultation and incidental take authorization for all wind projects. The ESA provides that "if the Secretary, after opportunity for public comment, with respect to a permit application" makes certain findings, "the Secretary shall issue the [incidental take] permit." 16 U.S.C. § 1539(a)(2)(B); *see also* 16 U.S.C. § 1371(5)(A)(i) (MMPA). The Wind Ban is unlawful because it orders the agencies to ignore requirements under the ESA, BGEPA, and MMPA.

225.    The Wind Ban is *ultra vires* under the CAA. The CAA directs EPA to "establish requirements to control air pollution from Outer Continental Shelf sources" 42 U.S.C. § 7627. The Wind Ban is unlawful because EPA does not have authority to unilaterally override these requirements.

**COUNT VI**
**OCSLA Citizen Suit**
**43 U.S.C. § 1349**

226.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-225 as if set forth fully herein.

227.    OCSLA's citizen suit provision provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any

other government instrumentality or agency (to the extent permitted by the Eleventh Amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1). And "[a]n action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).

228.    Implementation of the Wind Ban by the United States and Defendant agencies violates OCSLA and its regulations by attempting to circumvent the comprehensive procedures governing the administration of the OCS permitting and leasing program. 43 U.S.C. § 1337; 30 C.F.R. part 585. OCSLA confers no authority on the President and agencies to unilaterally cease wind permitting and, consequently, the Wind Ban doing so has no basis in law.

229.    Plaintiff's and its members' injuries are within the zone of interests protected by OCSLA. The violations by the United States and Defendant agencies immediately affect Plaintiff's and its members' legal interests by denying Plaintiff's members' ability to advance development of offshore wind energy on tracts leased to them.

230.    The actions by the United States and Defendant agencies immediately affect a legal interest of Plaintiff and its members by causing the immediate and ongoing harm set forth in this complaint.

231.    Under OCSLA's citizen suit provision, Plaintiff is entitled to vacatur of the Wind Ban and related agency actions, a preliminary and permanent injunction barring Defendant agencies from taking further actions based in whole or in part on the Wind Ban, and the costs of this litigation, "including reasonable attorney and expert witness fees." 43 U.S.C. § 1349(a)(5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Declare that Defendant agencies' adoption and implementation of the Wind Ban are arbitrary and capricious in violation of the APA;

2.      Declare that Defendant agency adoption and implementation of the Wind Ban are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right and otherwise not in accordance with law in violation of the APA;

3.      Declare that Defendant agencies failed to observe procedure required by law when adopting and implementing the Wind Ban by not undergoing public notice and comment rulemaking in violation of the APA;

4.      Declare that the Presidential Memorandum directing the Wind Ban and actions by the United States and its agencies to adopt and implement the Wind Ban are *ultra vires* under applicable statutes and the U.S. Constitution and violate the separation of powers;

5.      Declare that actions by the United States and Defendant agencies to adopt and implement the Wind Ban violate OCSLA as inconsistent with the statute and its implementing regulations;

6.      Preliminarily and permanently enjoin on a nationwide basis, without bond, the United States and its agencies from implementing or otherwise relying on the Wind Ban, in whole or in part, to halt or otherwise impede development of wind energy projects;

7.      Vacate Section 2(a) of the Presidential Memorandum directing the Wind Ban and all individual agency actions adopting and implementing the directives contained therein, in whole or in part, to halt or otherwise impede development of wind energy projects;

8.    Grant all other relief as the Court may deem just and proper, including, but not limited to, attorney's fees and costs. 28 U.S.C. § 2412; 43 U.S.C. § 1349(a)(5).

Dated: May 7, 2025                                    Respectfully submitted,

                                                      BEVERIDGE & DIAMOND, P.C.


                                                      /s/ Brook J. Detterman
                                                      Brook J. Detterman, BBO No. 675396
                                                      James M. Auslander, *pro hac vice pending*
                                                      155 Federal Street
                                                      Suite 1600
                                                      Boston, MA 02110-1716
                                                      (617) 419-2345
                                                      bdetterman@bdlaw.com
                                                      jauslander@bdlaw.com

                                                      *Attorneys for Proposed Intervenor-Plaintiff*
                                                      *Alliance for Clean Energy New York*

# EXHIBIT A


# Presidential Documents

Memorandum of January 20, 2025

## Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects

**Memorandum for the Secretary of the Treasury[,] the Attorney General[,] the Secretary of the Interior[,] the Secretary of Agriculture[,] the Secretary of Energy[, and] the Administrator of the Environmental Protection Agency**

**Section 1**. *Temporary Withdrawal of Areas.* Consistent with the principles of responsible public stewardship that are entrusted to this office, with due consideration for a variety of relevant factors, including the need to foster an energy economy capable of meeting the country's growing demand for reliable energy, the importance of marine life, impacts on ocean currents and wind patterns, effects on energy costs for Americans—especially those who can least afford it—and to ensure that the United States is able to maintain a robust fishing industry for future generations and provide low cost energy to its citizens, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition for wind energy leasing all areas within the Offshore Continental Shelf (OCS) as defined in section 2 of the Outer Continental Shelf Lands Act, 43 U.S.C. 1331. This withdrawal shall go into effect beginning on January 21, 2025, and shall remain in effect until this Presidential Memorandum is revoked.

To the extent that an area is already withdrawn from disposition for wind energy leasing, the area's withdrawal is extended for a time period beginning on January 21, 2025, until this Presidential Memorandum is revoked.

This withdrawal temporarily prevents consideration of any area in the OCS for any new or renewed wind energy leasing for the purposes of generation of electricity or any other such use derived from the use of wind. This withdrawal does not apply to leasing related to any other purposes such as, but not limited to, oil, gas, minerals, and environmental conservation.

Nothing in this withdrawal affects rights under existing leases in the withdrawn areas. With respect to such existing leases, the Secretary of the Interior, in consultation with the Attorney General as needed, shall conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, identifying any legal bases for such removal, and submit a report with recommendations to the President, through the Assistant to the President for Economic Policy.

**Sec. 2**. *Temporary Cessation and Immediate Review of Federal Wind Leasing and Permitting Practices.* (a) In light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals—and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit


## Presidential Documents

Memorandum of January 20, 2025

### Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects

**Memorandum for the Secretary of the Treasury[,] the Attorney General[,] the Secretary of the Interior[,] the Secretary of Agriculture[,] the Secretary of Energy[, and] the Administrator of the Environmental Protection Agency**

**Section 1**. *Temporary Withdrawal of Areas.* Consistent with the principles of responsible public stewardship that are entrusted to this office, with due consideration for a variety of relevant factors, including the need to foster an energy economy capable of meeting the country's growing demand for reliable energy, the importance of marine life, impacts on ocean currents and wind patterns, effects on energy costs for Americans—especially those who can least afford it—and to ensure that the United States is able to maintain a robust fishing industry for future generations and provide low cost energy to its citizens, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition for wind energy leasing all areas within the Offshore Continental Shelf (OCS) as defined in section 2 of the Outer Continental Shelf Lands Act, 43 U.S.C. 1331. This withdrawal shall go into effect beginning on January 21, 2025, and shall remain in effect until this Presidential Memorandum is revoked.

To the extent that an area is already withdrawn from disposition for wind energy leasing, the area's withdrawal is extended for a time period beginning on January 21, 2025, until this Presidential Memorandum is revoked.

This withdrawal temporarily prevents consideration of any area in the OCS for any new or renewed wind energy leasing for the purposes of generation of electricity or any other such use derived from the use of wind. This withdrawal does not apply to leasing related to any other purposes such as, but not limited to, oil, gas, minerals, and environmental conservation.

Nothing in this withdrawal affects rights under existing leases in the withdrawn areas. With respect to such existing leases, the Secretary of the Interior, in consultation with the Attorney General as needed, shall conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, identifying any legal bases for such removal, and submit a report with recommendations to the President, through the Assistant to the President for Economic Policy.

**Sec. 2**. *Temporary Cessation and Immediate Review of Federal Wind Leasing and Permitting Practices.* (a) In light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals—and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit

wind projects, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Energy, the Administrator of the Environmental Protection Agency, and the heads of all other relevant agencies, shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices. The Secretary of the Interior shall lead that assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals. The assessment shall also consider the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry.

(b) In light of criticism that the Record of Decision (ROD) issued by the Bureau of Land Management on December 5, 2024, with respect to the Lava Ridge Wind Project Final Environmental Impact Statement (EIS), as approved by the Department of the Interior, is allegedly contrary to the public interest and suffers from legal deficiencies, the Secretary of the Interior shall, as appropriate, place a temporary moratorium on all activities and rights of Magic Valley Energy, LLC, or any other party under the ROD, including, but not limited to, any rights-of-way or rights of development or operation of any projects contemplated in the ROD. The Secretary of the Interior shall review the ROD and, as appropriate, conduct a new, comprehensive analysis of the various interests implicated by the Lava Ridge Wind Project and the potential environmental impacts.

(c) The Secretary of the Interior, the Secretary of Energy, and the Administrator of the Environmental Protection Agency shall assess the environmental impact and cost to surrounding communities of defunct and idle windmills and deliver a report to the President, through the Assistant to the President for Economic Policy, with their findings and recommended authorities to require the removal of such windmills.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to any aspect of the Federal leasing or permitting of onshore or offshore wind projects or the Lava Ridge Wind Project, and may, in the Attorney General's discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) or subsection (b) of this section, as applicable. This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. You are authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, January 20, 2025*

[FR Doc. 2025–01966
Filed 1–28–25; 8:45 am]
Billing code 4310–10–P