# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>    Defendants. | No. 25-cv-11221-FDS |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS'
# MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.   Legal Background ....................................................................................... 2

    B.   Factual Background .................................................................................... 4

        1.   Longstanding Executive Support for and Extensive Review of Wind
            Energy ............................................................................................... 4

        2.   The Executive's Sudden Halt on Wind-Energy Development ............................... 6

        3.   Harms to the States' Sovereign, Economic, and Public Health Interests ............... 9

            a.   Significant Harms and Existential Threat to the Wind-Energy Industry .......... 9

            b.   Impacts to Electricity Grid Reliability and Energy Costs ............................. 11

            c.   Stranded State Investments and Lost Economic Benefits ............................. 12

            d.   Sovereign Harms to States' Climate and Clean-Energy Policies .................... 14

            e.   Climate, Public Health, and Environmental Harms to States and their
               Residents ...................................................................................... 16

        4.   Concurrent Executive Action to Promote and Limit Review for Other
            Forms of Domestic Energy Generation ................................................... 18

ARGUMENT ........................................................................................................ 19

    I.   The States Have Standing To Challenge The Halt on Wind-Energy
       Approvals. ................................................................................................ 19

    II.   The States Are Likely to Succeed on the Merits. ......................................... 21

        A.   Agency Defendants' Implementation of the Wind Directive Is Arbitrary
            and Capricious and Contrary to Law Under the APA. .............................. 22

            1.   Agency Defendants' Halt on Wind-Energy Approvals Is Arbitrary and
               Capricious (Count I). .................................................................... 22

             a.   Agency Defendants Offer No Reasoned Basis for Categorically and
               Indefinitely Halting Wind-Energy Approvals ................................. 23

            b.   Agency Defendants Fail To Explain Their Abrupt Change in
               Longstanding Policy Supporting Wind-Energy Development. .............. 24

       c.       Agency Defendants Fail To Account for the States' Serious  Reliance Interests. ........................................................................................ 26

       d.       Agency Defendants Fail To Explain Inconsistencies with Other Executive Action Promoting Domestic Energy Development. .................... 28

      2.      Agency Defendants' Halt on Wind-Energy Development Is Contrary to Law and In Excess of Authority (Counts II, III, & V). ................................. 30

   B.   The Wind Directive and Agency Defendants' Implementation Thereof Are Ultra Vires under Common Law (Count IV). ........................................................ 33

III.   A Preliminary Injunction Is Necessary To Prevent Irreparable Harm to the States. ....................................................................................................................... 34

IV.   The Equities and Public Interest Favor Preliminary Relief. ...................................... 39

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018)................................................................38

*Akiachak Native Cmty. v. Jewell,*
    995 F. Supp. 2d 7 (D.D.C. 2014).............................................38

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989)................................................20

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982)................................................................20

*Amerijet Int'l, Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014)..............................................23

*Amoco Prod. Co. v. Village of Gambell,*
    480 U.S. 531 (1987)................................................................38

*ANR Storage Co. v. FERC,*
    904 F.3d 1020 (D.C. Cir. 2018)..............................................30

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015)................................................................31

*Belmont Mun. Light Dep't v. FERC,*
    38 F.4th 173 (D.C. Cir. 2022)................................................20

*California v. EPA,*
    72 F.4th 308 (D.C. Cir. 2023)................................................21

*Chef Time 1520 LLC v. Small Bus. Admin.,*
    646 F. Supp. 3d 101 (D.D.C. 2022)........................................37

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020)....................................................31

*Comm. for a Constructive Tomorrow v. DOI,*
    No. 1:24-cv-00774, 2024 WL 2699895 (D.D.C. May 24, 2024) ............................................6

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
   743 F. Supp. 3d 325 (D.N.H. 2024) .................................................................37

*Corp. Techs., Inc. v. Harnett*,
   731 F.3d 6 (1st Cir. 2013) .................................................................................19

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017) ..........................................................................................20

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ....................................................................22, 28–29, 31

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) ..............................................................................................27

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ...............................................................................23, 26–28

*Ensco Offshore Co. v. Salazar*,
   781 F. Supp. 2d 332 (E.D. La. 2011) ...............................................................32

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...............................................................................22–23, 26

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..........................................................................................22

*General Chem. Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987) ..........................................................................28

*Goldstein v. Batista Contracting LLC*,
   671 F. Supp. 3d 68 (D. Mass. 2023) .................................................................19

*Gulf Power Co. v. FERC*,
   983 F.2d 1095 (D.C. Cir. 1993) ........................................................................30

*Hornbeck Offshore Servs., LLC v. Salazar*,
   696 F. Supp.2d 627 (E.D. La. 2010) ................................................................24

*Housatonic River Initiative v. EPA*,
   75 F.4th 248 (1st Cir. 2023) ...............................................................23, 26

*In re Evenflo Co., Marketing, Sales Practices, & Prods. Liab. Litig.*,
   54 F.4th 28 (1st Cir. 2022) ................................................................................21

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) ................................................................................34

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ...........................................................................38

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ..................................................................................21

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) .............................................................................................34

*League of Women Voters of the United States v. Newby*,
    838 F.3d (D.C. Cir. 2016) .....................................................................................40

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .............................................................................................31

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021) ..................................................................39

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................32–34, 37

*Louisiana v. Biden*,
    No. 2:24-cv-00406, 2024 WL 3253103 (W.D. La. July 1, 2024) ..........................37

*Maine v. Norton*,
    257 F. Supp. 2d 357 (D. Me. 2003) .....................................................................20

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .......................................................................................20–21

*Massachusetts v Nat'l Insts. of Health*
    No. 1:25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) .........................24

*Massachusetts v. Nat'l Insts. of Health*,
    No. 1:25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ...............23, 26, 40

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004) ...........................................................................23

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024) .................................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................................22

*N.H. Indonesian Cmty. Support v. Trump*,
    No. 1:25-cv-00038, 2025 WL 457609 (D.N.H. Feb. 11, 2025)..............................39

*Nantucket Residents Against Turbines v. BOEM*,
    100 F.4th 1 (1st Cir. 2024)..................................................................................6

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020)..............................................................................21

*Nat'l Ass'n of Consumer Advocates v. Uejio*,
    521 F. Supp. 3d 130 (D. Mass. 2021)..................................................................20

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    No. 1:25-cv-00239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)..............................31

*Nat'l Fed. of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)............................................................................................31

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
    407 F. Supp. 2d 323 (D. Mass. 2005)..................................................................40

*New York v. Trump*,
    No. 1:25-cv-00039, 2025 WL 715621 (D.R.I. Mar. 6, 2025)..............................39

*Nieves-Marquez v. Puerto Rico*,
    353 F.3d 108 (1st Cir. 2003)..............................................................................34

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................19

*Orr v. Trump*,
    No. 1:25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025)........................28

*Physicians for Social Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020)............................................................................24

*Protect our Cmtys. Found. v. Salazar*,
    No. 1:12-cv-02211, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013)..........................6

*Responsible Offshore Dev. All. v. DOI*,
    No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025)..............................................6

*Rhode Island Hosp. v. Sebelius*,
670 F. Supp. 2d 148 (D.R.I. 2009)........................................................................28

*Rhode Island v. Trump*,
No. 1:25-cv-00128, 2025 WL 1303868 (D.R.I. May 6, 2025)................................27

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)...................................................................................34

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................................40

*Seafreeze Shoreside, Inc. v. DOI*,
123 F.4th 1 (1st Cir. 2024).....................................................................................6

*Sierra Club v. Ga. Power Co.*,
180 F.3d 1309 (11th Cir. 1999) .............................................................................36

*Smiley v. Citibank (South Dakota), N.A.*,
517 U.S. 735 (1996)........................................................................................23, 26

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
472 F.3d 1097 (9th Cir. 2006) ...............................................................................38

*Southwest Airlines Co. v. FERC*,
926 F.3d 851 (D.C. Cir. 2019) ..............................................................................24

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) .................................................................................36

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................................................20

*United States v. Morton Salt*,
338 U.S. 632 (1950)...............................................................................................31

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001)...............................................................................................40

*United States v. Rivera-Rivera*,
No. 3:16-cv-02160, 2016 WL 7868753 (D.P.R. Dec. 6, 2016)..............................37

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024)................................................................................19

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ...............................................................................34

*Webb v. Injured Workers Pharmacy, LLC*,
    72 F.4th 365 (1st Cir. 2023) ................................................................................20

*Woonasquatucket River Watershed Council v. U.S. Dept of Agric.*,
    No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ..........................37

## Federal Statutes

5 U.S.C.
    § 551(8) ..............................................................................................................33
    § 706(2)(A) ............................................................................................22, 31, 33
    § 706(2)(C) ............................................................................................22, 31, 33

16 U.S.C.
    § 688 ..............................................................................................................3–4, 33
    §§ 1361 *et seq.* ......................................................................................................3
    § 1371 ..............................................................................................................4, 33
    §§ 1531 *et seq.* ....................................................................................................33
    § 1536 ....................................................................................................................3
    § 1536(b)(3)(A) ......................................................................................................4
    § 1855(b)(2) ............................................................................................................3

33 U.S.C.
    § 403 ............................................................................................................2–3, 33
    § 408 ....................................................................................................................33
    § 1311 ....................................................................................................................3
    § 1342 ................................................................................................................2-3
    § 1344 ............................................................................................................2, 32

42 U.S.C.
    § 4332(2)(C) ..........................................................................................................3
    § 4336a(g) ........................................................................................................3, 33
    § 4370m–2(b) ........................................................................................................4
    §§ 7401 *et seq.* ......................................................................................................3
    § 7475(c) ........................................................................................................3, 33
    § 7661b(c) ......................................................................................................3, 33

43 U.S.C.
    §§ 1331 *et seq.* ......................................................................................................2
    § 1332(3) ........................................................................................................32, 34
    § 1341(a) ........................................................................................................32, 34
    §§ 1701 *et seq.* ....................................................................................................33
    § 1712(a) ................................................................................................................4

54 U.S.C.
 § 306108.................................................................................................................4

**Federal Regulations**

30 C.F.R.
 § 585.600.............................................................................................................3
 § 585.613.......................................................................................................3, 32
 § 585.628.......................................................................................................3, 32
 § 585.648.......................................................................................................3, 32

33 C.F.R.
 § 325.2................................................................................................................3
 § 325.2(d).....................................................................................................3, 32

40 C.F.R.
 § 124.3(c)............................................................................................................3

43 C.F.R.
 § 2804.35............................................................................................................33

50 C.F.R.
 § 13.11...........................................................................................................4, 33
 § 222.302(b)........................................................................................................4
 § 600.920(h)(4)...................................................................................................3

90 Fed. Reg. 16,777 (Apr. 21, 2025) .................................................................19, 29–30

90 Fed. Reg. 8363 (Jan. 29, 2025) ........................................1, 7–8, 23, 28–29, 33

**Executive Orders**

Exec. Order 14154, Unleashing American Energy, 90 Fed. Reg. 8353 (Jan. 29, 2025) .........18, 29

Exec. Order 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025) ...................................................................................................18, 29

Exec. Order 14261, Reivigoriationg America's Beautiful Clean Coal Industry and Amending Executive Order 14241, 90 Fed.Reg. 15,517 (Apr. 14, 2025).........................19, 29

Exec. Order 14262, Strengthening the Reliability and Security of the National Electric Grid, 90 Fed. Reg. 15,521 (Apr. 14, 2025).......................................................19, 29

Exec. Order 14270, Zero-Based Regulatory Budgeting to Unleash American Energy, 90 Fed. Reg. 15,643 (Apr. 15, 2025) .................................................................19, 30

Exec. Order 14285, Unleashing America's Offshore Critical Minerals and Resources,
   90 Fed. Reg. 17,735 (Apr. 29, 2025) ..............................................................................19, 30

## **INTRODUCTION**

In this case, seventeen states and the District of Columbia (States) challenge a federal cessation in permitting that threatens to derail development of wind energy—a homegrown source of clean, reliable, and affordable energy that supports hundreds of thousands of jobs, creates billions of dollars in economic activity and tax payments, and supplies more than ten percent of the nation's electricity. On his first day in office, President Trump issued a Presidential Memorandum entitled *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025). Section 2(a) of the Memorandum (Wind Directive)—the provision challenged here—and Agency Defendants' implementation thereof arbitrarily and unlawfully halted all federal approvals for wind-energy development pending a redundant, extra-statutory environmental and economic review, with no end in sight.

The States are entitled to preliminary relief enjoining Agency Defendants from implementing or relying on the Wind Directive. First, the States are likely to succeed on the merits of their claims. Agency Defendants' implementation of the Wind Directive is arbitrary and capricious in violation of the Administrative Procedure Act (APA) because they provide no reasoned basis for categorically and indefinitely halting wind-energy approvals and departing from longstanding agency policy supporting wind-energy development. Nor have Agency Defendants accounted for the States' significant reliance interests based on that prior policy. Moreover, the indefinite halt on approvals, pending further "comprehensive assessment and review," is irreconcilable with other contemporaneous executive actions boosting other forms of energy development. Agency Defendants' implementation of the Wind Directive is also contrary to the myriad laws that require comprehensive—and prompt—federal review and decisions.

Second, the States are suffering irreparable harm that will worsen absent preliminary relief.

Defendants' halt of wind-energy development will hinder the States' ability to secure reliable and affordable electricity; strand billions of dollars in States' investments and impede economic development; obstruct the States' abilities to meet their energy and climate goals; and delay reductions in harmful emissions. The threat of these harms has sharply mounted in recent weeks— necessitating preliminary relief from this Court—as Agency Defendants have frozen ongoing construction and chilled investment in pending wind-energy projects, and now threaten the very existence of the nascent offshore-wind industry in particular.

Third, for these reasons, and because Agency Defendants would suffer no countervailing harm, the public interest and the balance of the equities strongly weigh in favor of resuming the status quo of duly issuing decisions under the rigorous laws governing wind-energy approvals.

The Court thus should grant the States' preliminary injunction and enjoin Agency Defendants from implementing the Wind Directive to impede wind-energy development.

## **BACKGROUND**

### A. **Legal Background**

Wind energy is a highly regulated industry governed by numerous federal permitting laws designed to ensure responsible siting, planning, construction, operation, and decommissioning of projects. *See* Compl., ECF 1 ¶¶ 56–112. For offshore-wind projects, developers must obtain approval of a Construction and Operations Plan under the Outer Continental Shelf Lands Act (OCSLA), which governs Bureau of Ocean Energy Management (BOEM) leasing and permitting for development on the Outer Continental Shelf. 43 U.S.C. §§ 1331 *et seq*. Both onshore- and offshore-wind projects often also need permits under many other federal statutes, including: permits for obstructions of navigable waters from the Army Corps of Engineers (Corps) under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403; dredge-and-fill permits from the Corps or pollutant-discharge permits from the Environmental Protection Agency (EPA) under

sections 404 and 402 of the Clean Water Act, 33 U.S.C. §§ 1344, 1342, respectively; various types of permits for emissions of air pollutants under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.; and various types of approvals for impacts on protected species under the Endangered Species Act, 16 U.S.C. § 1536, Bald and Golden Eagle Protection Act, 16 U.S.C. § 688, and Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq*. These, and other, approvals also trigger review under the National Environmental Policy Act (NEPA), which requires thorough assessment of impacts of major federal actions on the human environment. 42 U.S.C. § 4332(2)(C).

Each of these laws and implementing regulations reflects specific procedures and standards for permitting and approval, along swift timelines. For example, OCSLA requires developers to submit several planning documents, including a Construction and Operations Plan, to BOEM before construction. 30 C.F.R. § 585.600. BOEM must review and either approve or disapprove them, or request revisions. *See id.* §§ 585.613, 585.628, 585.648. The Corps must timely process and issue decisions on Clean Water Act dredge-and-fill permits, 33 C.F.R. § 325.2(d) (requiring decision within 60 days), and National Pollutant Discharge Elimination System (NPDES) permits, *id.* §§ 1311, 1342; 40 C.F.R. §§ 124.3(c) (review for completeness within 30 days); 124.10–12 (notice-and-comment requirements); 124.15 ("Regional Administrator shall issue a final permit decision" after notice and comment). Other applicable laws follow this pattern. *E.g.*, 33 U.S.C. § 403 & 33 C.F.R. § 325.2 (Corps to act on Rivers and Harbors Act applications to install turbines and cables within 60 days); 42 U.S.C. §§ 7475(c), 7661b(c) (action on Clean Air Act permits within one year to eighteen months); 42 U.S.C. § 4336a(g) (agencies "shall complete" NEPA Environmental Impact Statement (EIS) within two years); 16 U.S.C. § 1855(b)(2) & 50 C.F.R. § 600.920(h)(4) (National Marine Fisheries Service (NMFS) to respond within 30 days after Magnuson-Stevens Fishery Conservation and Management Act essential fish habitat assessment).

Other regimes require processing of permit applications "in the shortest possible time" or "as quickly as possible" under specific standards. 16 U.S.C. § 1536(b)(3)(A) & 50 C.F.R. § 222.302(b) (NMFS to issue Endangered Species Act incidental-take permits "in the shortest possible time"); 50 C.F.R. § 13.11 (permits under Bald and Gold Eagle Protection Act, 16 U.S.C. § 668, and Marine Mammal Protection Act, 16 U.S.C. § 1371, to issue "as quickly as possible"). Other statutes prescribe procedures and standards for wind-energy reviews and approvals. 54 U.S.C. § 306108 (National Historic Preservation Act Section 106); 43 U.S.C. § 1712(a) (Federal Land Policy and Management Act (FLPMA)). Federal law holds agencies accountable to these procedures. 42 U.S.C. § 4370m–2(b) (public posting of permitting timelines).

**B. Factual Background**

**1. Longstanding Executive Support for and Extensive Review of Wind Energy**

Agency Defendants have long promoted wind energy, supported by extensive reviews of its environmental and economic impacts. President George W. Bush, for example, celebrated the more than 400% increase in wind energy between 2001 and 2007. The White House, *Fact Sheet: Diversifying Our Energy Supply and Confronting Climate Change* (Dec. 15, 2008), https://perma.cc/3HEV-7WYV. President Obama tripled U.S. wind-energy generation. The White House, *Fact Sheet: The Recovery Act Made the Largest Single Investment in Clean Energy in History, Driving The Deployment of Clean Energy, Promoting Energy Efficiency, and Supporting Manufacturing* (Feb. 25, 2016), https://perma.cc/HR8Q-Q5ZH. President Trump's first administration was "very bullish" on wind energy, with seven offshore-wind auctions. Dep't of the Interior (DOI), *Trump Administration Delivers Historic Progress on Offshore Wind* (Oct. 18, 2018), https://perma.cc/GX5B-HB6B; BOEM, *Lease and Grant Information*, https://perma.cc/3GBK-AQTK. President Biden supported onshore and offshore wind energy, too. *See* Owen Roberts, et al., *Potential Impacts of the Inflation Reduction Act on Domestic*

4

*Manufacturing and Deployment for Land-Based Wind Turbines*, NAT'L RENEWABLE ENERGY LAB.,

3 (Mar. 2024), https://perma.cc/SC2B-GUCJ; DOI, *Fact Sheet: Biden-Harris Administration*

*Announces New Actions to Expand U.S. Offshore Wind Energy* (Sept. 15, 2022),

https://perma.cc/88BY-FRUJ.

During that period, Agency Defendants conducted numerous assessments under applicable

law extensively studying environmental, commercial, and security impacts of wind-energy

development and found impacts minimal and mitigable. *See* Decl. of Benjamin R. Brazell in Supp.

of Movant-Intervenor Mot. for Preliminary Injunction (Brazell Decl.), ECF 55-6, ¶¶ 13–20 & Ex.

B & Decl. of Maria Hartnett in Supp. of Movant-Intervenor Mot. for Preliminary Injunction

(Hartnett Decl.), ECF 55-7, ¶¶ 11–28 & Ex. B (detailing comprehensive federal onshore- and

offshore-wind-energy reviews and approvals). For example, Agency Defendants assessed wind-

energy impacts on wildlife, including the North Atlantic right whale, and incorporated mitigation

measures into multiple projects. *See, e.g.*, NMFS, *North Atlantic Right Whale 5-Year Review:*

*Summary and Evaluation*, 24–25, 28 (Nov. 2022), https://perma.cc/62QZ-6XTE; U.S. Fish and

Wildlife Serv. (USFWS), *Final Environmental Assessment, 2024 Eagle Take Permit Rulemaking*,

170–82 (Feb. 2024), https://perma.cc/5W4T-HY77. BOEM extensively reviewed wind energy's

effects on the fishing industry, finding potential benefits and adopting mitigation measures. *See,*

*e.g.*, BOEM, *Record of Decision: Atlantic Shores Offshore Wind South Project Construction and*

*Operations Plan* (Atlantic Shores COP ROD), 22 (July 1, 2024), https://perma.cc/HQ7P-ZY56;

Vineyard Wind, LLC, *Draft Construction and Operations Plan*, 4-17 (June 3, 2020),

https://perma.cc/KQS5-RNP2. And BOEM has also found that wind-energy development will

have little to no effect on local tourism and property values, and will benefit local economies. *See,*

*e.g.*, BOEM, *Record of Decision: Empire Offshore Wind: Empire Wind Project (EW1 and EW2)*

*Construction and Operations Plan,* 28 (Nov. 20, 2023), https://perma.cc/JQE9-Q2AM; Bur. of Land Mgmt. (BLM), *Final Programmatic EIS on Wind Energy Deployment on BLM-Administered Lands in the Western United States*, ES-5 (June 2005), https://perma.cc/L9D9-E26Z. Courts— including the First Circuit—have repeatedly rejected claims that these and other wind-energy assessments were deficient or inadequate.[1]

### 2. The Executive's Sudden Halt on Wind-Energy Development

Prior to issuance of the Wind Directive, numerous offshore- and onshore-wind projects were in different phases of permitting and development under applicable federal laws, with many more in the pipeline. To take two examples, the SouthCoast offshore-wind project, expected to deliver over 1000 megawatts (MW) to Massachusetts and 200 MW to Rhode Island, had secured most of its federal approvals, including its OCSLA Construction and Operations Plan, and had completed NEPA review. SouthCoast Wind, *Construction and Operations Plan: Volume 1*, ES-1 (Nov. 2024), https://perma.cc/TBA7-ARZQ. But its Marine Mammal Protection Act, Clean Water Act NPDES, and Rivers and Harbors Act approvals were outstanding, due to be completed in a matter of months. Permitting Dashboard, SouthCoast Wind Energy, LLC, https://tinyurl.com/3knbk2zy. Empire Wind 1, an 810-MW project located 15 to 30 miles off the coast of Long Island with enough electricity to power up 500,000 homes, was slated to be the first offshore-wind project to deliver power directly to New York City. Empire Wind, *Project*

---

[1] *E.g.*, *Seafreeze Shoreside, Inc. v. DOI*, 123 F.4th 1 (1st Cir. 2024), *cert. denied sub nom. Seafreeze Shoreside, Inc. v. DOI*, No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025), *and Responsible Offshore Dev. All. v. DOI*, No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025); *Nantucket Residents Against Turbines v. BOEM*, 100 F.4th 1 (1st Cir. 2024), *cert. denied sub nom. Nantucket Residents v. BOEM*, No. 24-337, 2025 WL 76449 (U.S. Jan. 13, 2025); *Comm. for a Constructive Tomorrow v. DOI*, No. 1:24-cv-00774, 2024 WL 2699895 (D.D.C. May 24, 2024); *Protect our Cmtys. Found. v. Salazar*, No. 1:12-cv-02211, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013), *aff'd sub nom. Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017).

*Description*, https://perma.cc/KU8J-YVEG. The project has obtained all of its federal permits, including its OCSLA Construction and Operations Plan, which it received from BOEM in February 2024. Permitting Dashboard, Empire Wind, https://tinyurl.com/5ddjyaje; Letter from Karen Baker, BOEM to Empire Offshore Wind LLC (Feb. 21, 2024), https://perma.cc/34BX-UBZ4. Construction began in June 2024, with a schedule for the project to be fully operational in 2027. Empire Wind, *Offshore Installation*, https://perma.cc/M7TW-ZKZN. In January 2025, these and numerous other projects were headed toward approval or completion, with Agency Defendants processing and issuing permit decisions in due course.

But this progress came to a standstill on January 20, when President Trump issued the Presidential Memorandum. As relevant here, the Wind Directive prohibits Agency Defendants from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects" until "the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices" conducted by the Interior Secretary in consultation with certain Agency Defendants. 90 Fed. Reg. at 8364. The Wind Directive orders that halt "[i]n light of various alleged legal deficiencies" in leasing and permitting wind energy, "the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals," as well as alleged "potential inadequacies in various [NEPA] environmental reviews." *Id.* at 8363. And despite the extensive past reviews of wind-energy projects by Agency Defendants—indeed, altogether ignoring such reviews—the Wind Directive commands that the assessment consider anew the purported "environmental impact of onshore and offshore wind projects upon wildlife," "economic costs associated with the intermittent generation of electricity[,] and the effect of subsidies on the viability of the industry." *Id.* at 8364. The Wind

Directive provides no time frame for completion of that vague, extra-statutory assessment.

Since January 20, Agency Defendants have heeded the Wind Directive's call to stop wind-energy development, both onshore and offshore. For example, the USFWS posted a notice that "[t]he U.S. Fish and Wildlife Service, pursuant to [the Wind Directive] is temporarily ceasing issuance of permits to wind facilities until further notice." USFWS, *3-200-71: Eagle Incidental Take (General Permit)*, https://perma.cc/HC9J-UMND; *see also* Decl. of Marguerite Wells in Supp. of Mot. to Intervene of Alliance for Clean Energy New York (Wells Decl.), ECF 23-2, ¶¶ 22–24 (halt froze permitting for onshore facilities). Similarly, by January 30, the completion deadline for SouthCoast's three outstanding approvals for its offshore project was pushed back from March 27 into June due to the Wind Directive. Permitting Dashboard, SouthCoast Wind Energy, LLC, https://tinyurl.com/3knbk2zy; *e.g.*, Permitting Council, SouthCoast Wind Energy Project NPDES Permit - FAST-41 Extension Determination (Feb. 26, 2025), https://tinyurl.com/yu778vdd ("Given the need to assess applicability and implementation of the Presidential Memorandum, extending EPA's final NPDES permit decision date is warranted."). And in late January and early February, BOEM postponed and canceled public meetings on NEPA proceedings for California offshore-wind development and for a Massachusetts project, respectively. BOEM, *Postponed: Public Meetings on Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California* (Jan. 28, 2025), https://perma.cc/AN9R-5FBQ; BOEM, *Virtual Public Meetings Cancelled for Vineyard Mid-Atlantic Offshore Wind Project* (Feb. 4, 2025), https://perma.cc/N449-GUWA. And the Corps even halted permitting for projects intended to *support* the wind-energy industry, such as the Arthur Kill Terminal staging and assembly facility in Staten Island, New York. Decl. of Turner Smith (Smith Decl.) Ex. 7 [NY-Gawlik] ¶ 8.

Agency Defendants further invoked the Wind Directive *beyond* pending approvals. EPA

cited the Wind Directive to reopen an already issued permit. *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 14, 2025), https://perma.cc/QK75-J2EK. And most recently, Agency Defendants invoked the Wind Directive to stop work on a *fully approved* project. On April 16, Defendant Burgum directed BOEM to issue a stop work order for the Empire Wind project, citing the Wind Directive and claiming that DOI had "obtained information that raises serious issues with respect to the project approvals." Memo. from Sec'y Doug Burgum, DOI, to Acting Dir., BOEM (Apr. 16, 2025), https://perma.cc/93NP-8B5Y. He also ordered BOEM "to continue [its] review of Federal wind permitting practices with respect to both existing and pending permits." *Id.* Within hours, BOEM issued a stop work order, effective immediately, "to allow time for [BOEM] to address feedback it has received, including from . . . (NOAA), about the environmental analyses for that project." Letter from Walter D. Cruickshank, BOEM, to Empire Offshore Wind LLC (Apr. 16, 2025), https://perma.cc/EV6D-TKSK. The fate of the project is now in doubt. AP, *An offshore wind project for New York may be abandoned over Trump Administration delays* (May 9, 2025), https://tinyurl.com/mtnz9ay3.

### 3. Harms to the States' Sovereign, Economic, and Public Health Interests

Defendants' halt on wind-energy approvals is causing, and will continue to cause, significant harms to the States and the wind industry.

#### a. Significant Harms and Existential Threat to the Wind-Energy Industry

In the wind industry, minor setbacks can dramatically increase costs and delay or even derail wind-energy development. Wells Decl. ¶¶ 10–15, 21; Decl. of Elizabeth Burdock in Supp. of Movant-Intervenor Mot. for Preliminary Injunction (Burdock Decl.), ECF 55-3, ¶ 10. Wind-energy projects require numerous financing, planning, approval, and development steps, all of which are impacted by the halt on approvals. Smith Decl. Ex. 14 [NY-Williams] ¶ 12; *id.* Ex. 12 [NJ-Perry] ¶¶ 38-44; *see also* Wells Decl. ¶¶ 10–15, 21. Because these steps can take a decade or

more, severe project delays or abandonment in turn risk delaying wind-energy development for years, preventing the States from realizing significant benefits on which they rely. Smith Decl. Ex. 14 [NY-Williams] ¶¶ 12, 43, 45; *id.* Ex. 11 [MA-Mahony] ¶ 50; *id.* Ex. 6 [CT-Dykes] ¶ 49; *id.* Ex. 13 [MD-Hoagland] ¶ 31; *id.* Ex. 4 [ME-Burgess] ¶ 45; *see also* Wells Decl. ¶ 10.

Here, the industry figures tell a grim story, as further detailed in Movant-Intervenor Alliance for Clean Energy New York's Proposed Motion for Preliminary Injunction and attached declarations. ECF 55; *see e.g.*, Decl. of Kara McNutt in Supp. of Movant-Intervenor Mot. for Preliminary Injunction (McNutt Decl.), ECF 55-5, ¶¶ 9–15 & Ex. B (projecting reductions in installation of wind energy as a result of the halt). Since Defendants' halt on wind-energy approvals, companies have been forced to lay off thousands of workers, Burdock Decl. ¶¶ 31, 49. And compared to the quarterly average in 2024, supply-chain contracts for wind energy have fallen by about 95% and supply-chain investments have shrunk by 98%. *Id.* ¶¶ 18–21.

Additionally, projects with a significant federal nexus, which include all offshore-wind projects, are particularly vulnerable to arbitrary delays in approvals that can make it impossible to commit to construction timelines and construction contracts. *See* Smith Decl. Ex. 14 [NY-Williams] ¶¶ 12, 44; *id.* Ex. 12 [NJ-Perry] ¶ 42; Wells Decl. ¶¶ 10–15. The permitting halt is also eroding investor confidence in current and future projects, making investors increasingly reluctant to invest in wind projects. Smith Decl. Ex. 14 [NY-Williams] ¶ 44; *id.* Ex. 12 [NJ-Perry] ¶ 42; Wells Decl. ¶ 14; Burdock Decl. ¶¶ 10–11, 17.

Taken together, these circumstances will not just suppress, but could very quickly destroy, the nascent offshore-wind industry. Burdock Decl. ¶ 10. So too, for onshore-wind, where developers face substantial economic losses from delay of permits and authorizations, and may even be forced to abandon their projects. Wells Decl. ¶¶ 22–24; McNutt Decl. ¶¶ 9–15 & Ex. B.

### b. Impacts to Electricity Grid Reliability and Energy Costs

The halt impairs States' ability to use wind energy to ensure reliable electricity without contributing to climate change. Smith Decl. Ex. 6 [CT-Dykes] ¶ 46; *id.* Ex. 13 [MD-Pinsky] ¶¶ 27–29; *id.* Ex. 14 [NY-Williams] ¶ 41; *id.* Ex. 4 [ME-Burgess], ¶ 39. Independent System Operators (ISOs) have integrated wind energy projects into their regional models to ensure continued reliability. *See* Decl. of Michael Goggin in Supp. of Movant-Intervenor Motion for Preliminary Injunction (Goggin Decl.), ECF 55-8, ¶¶ 10–13, 19–26, 36 (discussing how wind energy plays important role in meeting electricity demand—especially during peak periods—including in ISO-NE, ISO-NY, and PJM regions); Smith Decl. Ex. 6 [CT-Dykes] ¶ 35; *id.* Ex. 14 [NY-Williams] ¶¶ 27, 31; *id.* Ex. 4 [ME-Burgess] ¶ 27; *id.* Ex. 11 [MA-Mahony] ¶ 36, 45. For example, "New England has been counting on offshore wind as a major new source of energy and [ISO-NE] studies have shown substantial reliability benefits." Statement of Gordon van Welie, President & CEO, ISO-NE, Energy Subcomm. Hearing: Keeping the Lights On: Examining the State of Regional Grid Reliability (Mar. 25, 2025), https://perma.cc/9KWE-EGQA. As ISO-NE has found, offshore wind energy can benefit grid reliability by easing demand during peak periods such as winter storms. ISO-NE, *High-Level Assessment of Potential Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell*, 3 (Dec. 17, 2018), https://perma.cc/YG4T-AQ6Z. Wind energy also provides fuel diversity, which is projected to enhance grid reliability especially during the winter in areas like New England and New York that currently rely significantly on natural gas for heating and electricity. Smith Decl. Ex. 6 [CT-Dykes] ¶ 34 (wind energy can "help fill the[] gaps" during winter months); *id.* Ex. 11 [MA-Mahony] ¶ 45 (wind energy would ease supply constraints in winter when wind resources have highest output); *id.* Ex. 14 [NY-Williams] ¶ 31 (discussing NYISO study finding offshore wind energy would enhance grid reliability in New York City and Long Island during cold weather events).

Agency Defendants' halt on wind-energy approvals will also yield higher energy costs for States and their residents. Wind energy is a local source of electricity that both alleviates transmission constraints and reduces production costs by displacing generation that would otherwise clear the market at a higher price. Smith Decl. Ex. 14 [NY-Williams] ¶ 29. Replacing wind energy with other sources will require customers, including the States' residents and the States themselves, to pay more. Smith Decl. Ex. 6 [CT-Dykes] ¶ 47 (halt undermines state's ability to ensure affordable electricity by developing wind-energy resources that will lower wholesale energy and capacity market costs and reduce state's reliance on price-volatile fossil fuels); *id.* Ex. 13 [MD-Pinsky] ¶ 21 (US Wind project expected to lower wholesale costs and reduce congestion in Maryland's Eastern Shore); *id.* Ex. 14 [NY-Williams] ¶ 44 (halt causes higher risk premia for projects that will be passed along as increased electricity costs to New York's ratepayers); *id.* Ex. 15 [MN-Wyckoff] ¶¶ 13, 15 (wind energy is cheapest form of electricity in Minnesota); *id.* Ex. 11 [MA-Mahony] ¶ 45 (cost of electricity in Massachusetts will be dramatically higher without ability to utilize offshore-wind energy); *id.* Ex. 12 [NJ-Perry] ¶ 73 (without offshore wind, scarcity and congestion issues will worsen, leading to higher electricity costs); *see also* Goggin Decl. ¶ 37. Indeed, ISO-NE estimates that without offshore wind, energy costs in the region would increase by about 50% in 2050. Kornitsky et al., *2024 Economic Study*, ISO-NE, at 22–25 (Mar. 19, 2025), https://perma.cc/EDS6-NJZJ. These cost increases will harm States' residents and the States themselves. Smith Decl. Ex. 16 [MA-Barton] ¶ 11 (based on ISO-NE study, without offshore wind capacity, University of Massachusetts would pay about $39 million more in energy costs in 2050).

### c.  Stranded State Investments and Lost Economic Benefits

The States have invested billions of dollars in wind-energy-related infrastructure, research and development, jobs training programs, and supply chains. Each day the wind-energy halt continues delays the return expected on investments and, if the Wind Directive remains in effect

indefinitely, threatens to strand these investments entirely. For example, Massachusetts has spent over $347 million on port-related infrastructure since 2011, including $75 million to convert a former coal-fired power plant into an offshore-wind marshalling port for assembling turbine components before loading. Smith Decl. Ex. 5 [MA-Carlisle] ¶¶ 22, 25–27 (over $18 million invested in developing offshore-wind workforce, $5.6 million in supporting a local offshore-wind supply chain, and over $12 million in offshore-wind research and development); *see also id.* Ex. 6 [CT-Dykes] ¶¶ 40–41 (over $200 million to redevelopment of the State Pier Terminal to assemble offshore-wind turbines for delivery); *id.* Ex. 14 [NY-Williams] ¶¶ 9–11, 26 ($60 million committed upon substantial completion of state-of-the-art staging and assembly facility for offshore-wind components in South Brooklyn, construction of which is well underway). States are also spending billions of dollars on transmission infrastructure to connect wind-energy projects to the grid. *See* Smith Decl. Ex. 14 [NY-Williams] ¶ 35 (utility commission has approved over $8 billion of investment in transmission to connect wind and other renewable resources with the grid).

The indefinite permitting halt also jeopardizes substantial economic benefits States are anticipating from wind development. For example, New York's contract for Empire Wind calls for $1.765 billion in total economic benefits to accrue to the State by the end of the third year of the project's operation. *Offshore Wind Renewable Energy Certificate Purchase and Sale Agreement for Empire Offshore Wind LLC*, 6–7 (May 31, 2024), https://perma.cc/XS3W-XY2G. As another example, Atlantic Shores made financial commitments to spend $36.5 million dollars on a lease with the New Jersey Wind Port, $10 million for workforce training and innovation activities, and $4 million to establish a workforce development fund, the vast majority of which remains unpaid. Smith Decl. Ex. 12 [NJ-Perry] ¶¶ 47–51; *see also id.* Ex. 15 [MN-Wyckoff] ¶ 10 (wind farms benefit rural agricultural communities via state production tax credit and developer payments); *id.*

13

Ex. 7 [NY-Gawlik] ¶¶ 4, 8–10 (building of wind component staging and assembly facility in Staten Island held up by permitting halt, jeopardizing $48 million construction grant, project viability, and anticipated economic benefits to State).

In addition, the halt threatens important and growing employment opportunities from wind-energy projects and supply-chain businesses. Smith Decl. Ex. 14 [NY-Williams] ¶¶ 25, 40 (anticipating 18,000–23,000 additional jobs in New York due to wind industry); *id.* Ex. 5 [MA-Carlisle] ¶ 38 (three selected Massachusetts offshore-wind projects anticipated to create more than 10,000 jobs); *id.* Ex. 11 [MA-Mahony] ¶ 48 (Massachusetts's existing offshore-wind project has generated 3,405 full-time equivalent jobs); *id.* Ex. 13 [MD-Pinsky] ¶ 15 (US Wind project expected to create 13,600 direct and secondary jobs); *id.* Ex. 12 [NJ-Perry] ¶¶ 55, 57, 59, 63, 65, 67 (State-approved projects in New Jersey to create thousands of new jobs).

Finally, the halt could cause States to lose hundreds of millions of dollars in tax revenue. For example, Empire Wind 1 is expected to generate approximately $25 million in state and local taxes during the construction phase, and roughly $49 million in state and local taxes during operation and maintenance. Empire Wind, *Construction and Operations Plan – App. O: Economic Impacts of the Empire Wind Project*, 15, 19 (May 2022), https://perma.cc/9U53-285D; *see also* US Wind, *Rebid Application to the PSC–Appendix 5.1: Offshore Wind Impact Analysis*, Doc. 172 Appx., 19 (July 28, 2024) (Maryland US Wind project expected to generate approximately $59 million in state and local taxes), https://perma.cc/K349-UKSG.

### d.   Sovereign Harms to States' Climate and Clean-Energy Policies

The halt also impedes States' sovereign interests in crafting and attaining greenhouse-gas emission-reduction and clean-energy goals. Many States have enacted statutes requiring greenhouse-gas emission reductions by dates certain to mitigate impacts of climate change. Smith Decl. Ex. 1 [NY-Binder] ¶ 4 (40% by 2030 and 85% by 2050, from 1990 levels); *id.* Ex. 11 [MA-

Brizius] ¶ 22 (50% below 1990 levels by 2030, 75% by 2040, and net zero by 2050); *id.* Ex. 6 [CT-Dykes] ¶ 15 (45% below 2001 levels by 2030); *id.* Ex. 8 [IL-Granahan] ¶ 13 (all electricity generation emission-free by 2045); *id.* Ex. 4 [ME-Burgess] ¶ 10 (45% by 2030, and 80% by 2050, below 1990 levels); *id.* Ex. 15 [MN-Wyckoff] ¶ 5 (50% by 2030 and net zero by 2050); *id.* Ex. 9 [MD-Hoagland] ¶ 20 (60% from 2006 levels by 2031; net-zero by 2045); *id.* Ex. 3 [NJ-Brunatti] ¶ 5 (80% below 2006 levels by 2050), *id.* Ex. 10 [RI-Kearns] ¶ 14 (45% by 2030, 80% by 2040, and net-zero by 2050, below 1990 levels). The halt renders States unable to rely on wind energy to help attain their statutory short- and long-term emission-reduction requirements. And States will have to pay significantly more to meet their climate goals. For example, without the addition of wind energy, the total annualized costs to meet New England's climate goals would increase by $26 billion. Kornitsky et al., *supra,* at 21.

The halt on wind-energy approvals also will impair our States' ability to implement renewable-energy standards and procurement goals. For example, multiple States have enacted Renewable Portfolio Standards (RPS) that require achieving specified percentages of electricity from renewable resources by dates certain. Smith Decl. Ex. 1 [NY-Binder] ¶ 37 (70% by 2030, 100% by 2040); *id.* Ex. 11 [MA-Mahony] ¶ 7 (increasing percentage on an annual basis); *id.* Ex. 6 [CT-Dykes] ¶ 26 (100% by 2040); *id.* Ex. 8 [IL-Granahan] ¶ 8 (40% by 2030, 50% by 2040); *id.* Ex. 4 [ME-Burgess] ¶ 11 (80% by 2030, 100% by 2050); *id.* Ex. 15 [MN-Wyckoff] ¶ 5 (100% by 2040); *id.* Ex. 9 [MD-Hoagland] ¶ 21 (50% by 2030); *id.* Ex. 10 [RI-Kearns] ¶ 16 (100% by 2033); *id.* Ex. 12 [NJ-Perry] ¶ 13 (35% by 2025; 50% by 2030). States rely on wind energy to meet their RPSs; the halt makes it more difficult to do so. *Id.* Ex. 11 [MA-Mahony] ¶ 50; *id.* Ex. 6 [CT-Dykes] ¶ 44; *id.* Ex. 8 [IL-Granahan] ¶ 17; *id.* Ex. 4 [ME-Burgess] ¶ 39; *id.* Ex. 15 [MN-Wyckoff] ¶ 6; *id.* Ex. 9 [MD-Hoagland] ¶¶ 21–22, 30.

Finally, for five of the States—Massachusetts, New York, Maryland, Maine, and New Jersey—the halt on wind-energy approvals will also impede compliance with statutes that call for procurement of certain amounts of offshore-wind energy by specified deadlines. Massachusetts must procure 5,600 MW of offshore wind energy by 2027. Smith Decl. Ex. 11 [MA-Mahony] ¶ 10. In the ongoing procurement process, the Wind Directive and its implementation have contributed to uncertainty in power-purchase-agreement negotiations and threaten Massachusetts's ability to timely meet its 2027 target. *Id.* ¶ 34. Similarly, New York's climate law calls procurement of 9 gigawatts (GW) of offshore-wind energy by 2035; Agency Defendants' halt will impair State's ability to timely achieve that target. *See id.* Ex. 14 [NY-Williams] ¶¶ 4, 39; *see also id.* Ex. 9 [MD-Hoagland] ¶¶ 21–22, 28, 30 (8.5 GW offshore wind by 2031); *id.* Ex. 4 [ME-Burgess] ¶ 24 (3,000 MW offshore wind by 2040); *id.* Ex. 12 [NJ-Perry] ¶ 13 (3,500 MW offshore wind by 2030).

### e.  Climate, Public Health, and Environmental Harms to States and their Residents

States are experiencing numerous adverse effects from climate change, including adverse impacts on state finances and to state-owned property and infrastructure stemming from more severe storms and hurricanes, intense heat waves, flooding, sea level rise, more frequent wildfires, and drought. *See*, *e.g.*, Smith Decl. Ex. 1 [NY-Binder] ¶¶ 22, 24–29 (financial impacts to New York from more frequent and increasingly intense storms, including to transportation and grid infrastructure); *id.* Ex. 2 [MA-Brizius] ¶ 17–18 (climate change will impact approximately 177 coastal state-owned parks, beaches, reservations, wildlife refuges, roads, parkways, piers and dams, necessitating significant state expenditures to protect, repair, and rebuild, and annual flood damage costs for state properties is expected to increase to about $17 million in the 2030s and over $52 million in the 2070s); *id.* Ex. 4 [ME-Burgess] ¶¶ 6–9 (between March 2022 and May 2024, Maine experienced nine natural disasters, each severe enough to merit Presidential disaster or

emergency declarations, and climate change will severely impact Maine's coastal communities, an economic engine for the state); *id.* Ex. 9 [MD-Hoagland] ¶¶ 10–11 (climate change projected to jeopardize Port of Baltimore facilities supporting 51,000 jobs and $5 billion in wages). And States are facing threats to grid reliability from increasingly severe weather fueled by climate change. Smith Decl. Ex. 1 [NY-Binder] ¶ 29; *id.* Ex. 6 [CT-Dykes] ¶¶ 7–10 (frequency of coastal flooding likely to increase along with frequency and intensity of storms, like Hurricanes Irene and Sandy, which cut power to hundreds of thousands of customers and caused billions of dollars in damages).

The delay in transitioning from fossil-fueled generation caused by the halt on wind-energy approvals also will harm the health of our residents, which could increase State healthcare costs. The development of wind energy would replace fossil-fueled generation with zero-emitting wind generation. *See* Res. for the Future, *Offshore Wind Power Examined: Effects, Benefits, and Costs of Offshore Wind Farms Along the US Atlantic and Gulf Coasts*, 9, 15 (Oct. 2024, updated Feb. 2025) (addition of 32 planned or proposed wind farms would reduce fossil-fueled generation "to a remarkable degree," reducing total power sector greenhouse gas emissions by 5%). And when it replaces fossil-fueled generation such as coal or gas, wind energy in turn reduces air pollutants such as nitrogen oxides and sulfur dioxide that cause respiratory and other illnesses. For example, in New York City, delays in bringing wind energy generation online is likely to postpone much needed air quality improvements due to the continued operation of gas "peaker" plants. Smith Decl. Ex. 1 [NY-Binder] ¶¶ 39, 43. The foregone air quality benefits will result in public health harms and lost health care savings. *See id.* Ex. 13 [MD-Pinsky] ¶ 17 (US Wind project would reduce pollution over 20-year period, resulting in $275 million in total health savings, some of which would likely accrue to State); *see also* Mass. Inst. of Tech., *A healthy wind* (Dec. 2, 2022)

(in 2014, improvements in air quality associated with wind power resulted in $2 billion in U.S. health benefits), https://perma.cc/9UKT-QUZF.

### 4. Concurrent Executive Action to Promote and Limit Review for Other Forms of Domestic Energy Generation

While halting wind-energy development and harming the States, Defendants have nonetheless undertaken numerous other actions emphasizing the need for domestic energy development and expediting and curtailing review for fossil-fuel energy—the very environmental reviews that the Wind Directive casts as inadequate for wind energy. Within hours of issuing the Wind Directive, President Trump declared a "National Energy Emergency," purportedly brought on by "insufficient energy production," to facilitate development of "a reliable, diversified, and affordable supply of energy." Exec. Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025) (Energy Emergency Order). The Order singled out Northeast and West Coast states for allegedly constraining energy supply nationwide and directed agencies to "use all lawful emergency or other authorities available to them to facilitate the supply . . . of energy" in those states. *Id.* at 8434. Another Day 1 order "encourag[ed] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf." Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353, 8353 (Jan. 29, 2025) (Unleashing Order).

Since then, the President has taken numerous other actions that promote, expedite, and curtail review of domestic energy resources—but not wind energy. *See, e.g.*, Exec. Order 14262, *Strengthening the Reliability and Security of the National Electric Grid,* 90 Fed. Reg. 15,521 (Apr. 14, 2025) (Grid Reliability Order); Exec. Order 14261, *Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241*, 90 Fed. Reg. 15,517 (Apr. 14, 2025)

18

(Reinvigorating Coal Order).[2] Agency Defendants followed suit; indeed, DOI recently announced expedited permitting for nearly all forms of domestic energy *except* wind. *See* DOI, *Press Release: Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://perma.cc/A5UF-P72L.

## ARGUMENT

When considering a request for a preliminary injunction, the "district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). "While all four factors are relevant, likelihood of success is the 'main bearing wall' of the preliminary injunction framework." *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.  The States Have Standing To Challenge The Halt on Wind-Energy Approvals.

To establish standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). "'[A] material risk of future harm can satisfy the concrete-harm

---

[2] *See also, e.g.*, Proclamation 10914 of Apr. 8, 2025, *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025) (Exemption Order); Exec. Order 14270, *Zero-Based Regulatory Budgeting to Unleash American Energy*, 90 Fed. Reg. 15,643 (Apr. 15, 2025) (Zero-Based Budgeting Order); *cf.* Exec. Order 14285, *Unleashing America's Offshore Critical Minerals and Resources*, 90 Fed. Reg. 17,735 (Apr. 29, 2025).

requirement,' at least as to injunctive relief, when 'the risk of harm is sufficiently imminent and substantial.'" *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021)).

If Agency Defendants' halt on wind-energy approvals continues, the States stand to lose a critical source of energy due to project delays and cancellations. *See supra* Section B.3.a. That loss would cause numerous cognizable harms to the States, including threatening grid reliability and higher electricity costs. *See supra* Section B.3.b; *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (States suffered injury from increased electricity costs due to interest "in protecting their citizens and electric ratepayers in the traditional government field of utility regulation"). It would jeopardize state investments in offshore wind and deprive the States of economic benefits and tax revenue. *See supra* Section B.3.c; *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 463–64 (2017) ("a loss of even a small amount of money is ordinarily an 'injury'"); *Nat'l Ass'n of Consumer Advocates v. Uejio*, 521 F. Supp. 3d 130, 145 (D. Mass. 2021) (constitutionally cognizable injury established by the loss of an opportunity to pursue a benefit). And it threatens States' ability to effectuate their own laws and policies. *See supra* Section B.3.d; *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) ("States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'" (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 601 (1982))); *Maine v. Norton*, 257 F. Supp. 2d 357, 374 (D. Me. 2003) (federal interference with state sovereign interests in managing its natural resources and "enacting and enforcing its own legal code" constitutes injury in fact). Additionally, the loss of wind-energy generation would delay emission reductions, increasing and prolonging climate, public health, and environmental harms and impacting States as property owners and their residents. *See supra* Section B.3.e; *Massachusetts v. EPA*, 549 U.S. at 518–19; *Nat. Res. Def.*

20

*Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) (finding standing where agency action "will lead to an increase in [greenhouse gas] emissions, which will in turn lead to an increase in climate change, which will threaten petitioners' coastal property"); *see also California v. EPA*, 72 F.4th 308, 313 (D.C. Cir. 2023) (similar).

As to traceability and redressability, Defendants are indisputably the cause of the halt on wind-energy development, and a favorable resolution of the States' claims would prompt Defendants to resume duly processing and issuing permit decisions according to the statutes they administer. That remedy would redress the infinite limbo and uncertainty plaguing the industry, allow projects to proceed in due course, and prevent the significant harms to the States outlined herein. *See In re Evenflo Co., Marketing, Sales Practices & Prods. Liab. Litig.*, 54 F.4th 28, 34 (1st Cir. 2022) ("Traceability 'requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm.' And redressability requires the plaintiff to 'show that a favorable resolution of her claim would likely redress the professed injury.'" (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71–72 (1st Cir. 2012) (cleaned up))); *see* Wells Decl. ¶ 17.

Accordingly, the States have standing to press their claims before this Court.

## II.    The States Are Likely to Succeed on the Merits.

The States are likely to succeed on the merits for several reasons, each independently sufficient to invalidate the halt on wind-energy approvals. *First*, Agency Defendants' implementation of the Wind Directive is arbitrary and capricious in multiple respects. *Second*, Agency Defendants' halt on wind-energy development is contrary to and exceeds their authority under the laws governing federal approvals of wind energy. *Third*, Defendants' halt is ultra vires under federal common law, because no law allows the Executive to categorically and indefinitely halt approvals of wind-energy projects, pending an amorphous extra-statutory review.

### A. Agency Defendants' Implementation of the Wind Directive Is Arbitrary and Capricious and Contrary to Law Under the APA.

The APA requires that a court "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Agency Defendants' halt on wind-energy approvals should be set aside on each ground.

### 1. Agency Defendants' Halt on Wind-Energy Approvals Is Arbitrary and Capricious (Count I).

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), that is, "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*); *see Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). Agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). They may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 784–85.

Further, when an agency changes its existing policy, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quotation marks omitted). And a "more detailed justification" for a change in policy may

be required when its prior policy has "engendered serious reliance interests." *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Fox*, 556 U.S. at 515); *accord Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996).

      **a. Agency Defendants Offer No Reasoned Basis for Categorically and Indefinitely Halting Wind-Energy Approvals.**

It is a "fundamental requirement of administrative law" that "an agency set forth its reasons for decision." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.*

Here, Agency Defendants have provided no reasoned basis to categorically and indefinitely halt wind-energy development, beyond conclusory reference to the Wind Directive. And the one-paragraph Wind Directive does not supply a reasoned explanation because it, too, lacks any reasoning or support. The Wind Directive alleges "various alleged legal deficiencies" in the leasing and permitting and claims "potential inadequacies in various [NEPA] reviews," but fails to identify even a single such instance, much less a factual basis. 90 Fed. Reg. at 8363. Similarly, the Wind Directive alleges that wind-energy development risks "grave harm" including to navigational, transportation, national security, and commercial interests and marine mammals, *id.*, but fails to cite any specific risk. Nor could it, given Agency Defendants' comprehensive reviews and findings that no unmitigable risks exist, *supra* Section B.1, findings upheld by courts against similar claims, *supra* n.1. The Court should "not defer to the[se] . . . conclusory or unsupported suppositions" made in the Wind Directive and relied on by Agency Defendants. *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *accord Massachusetts v. Nat'l Insts. of Health*, No. 1:25-cv-10338, 2025 WL 702163, at *18 (D. Mass. Mar. 5, 2025) (agency's "conclusory statements hardly rise to the level of 'reasoned decisionmaking' required by the APA."), *judgment entered*, No. 1:25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

The States are thus likely to succeed in demonstrating that Agency Defendants' sweeping and indefinite halt on wind-energy approvals, untethered to any relevant standards or evidence, is arbitrary and capricious. *See Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp.2d 627, 637 (E.D. La. 2010) ("[T]he Court is unable to divine or fathom a relationship between the findings and the immense scope of the moratorium.").

### b. Agency Defendants Fail To Explain Their Abrupt Change in Longstanding Policy Supporting Wind-Energy Development.

"Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (cleaned up).

Here, Agency Defendants failed to explain their abrupt change in longstanding federal policy encouraging the development of wind energy, grounded in their extensive review finding minimal or mitigable impacts of wind-energy projects. As described above, *supra* Section B.1, wind energy has enjoyed bipartisan support for decades through multiple presidential Administrations. Agency Defendants have offered no explanation for their sudden shift now. *See Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("[H]owever the agency justifies its new position, what it may not do is gloss over or swerve from prior precedents without discussion." (brackets and quotations marks omitted)).

Nor have Agency Defendants acknowledged—let alone explained away—the numerous comprehensive, careful, and consistent findings regarding wind-energy impacts that many Agency Defendants have made. Agency Defendants have extensively evaluated all the potential risks they now cite to stop wind-energy development—from marine mammals to commercial fishing—in their way to approving wind projects pursuant to the many statutory authorities described above, *see supra* Section B.1; *see also* Brazell Decl. ¶¶ 13–20 & Ex. B; Hartnett Decl. ¶¶ 11–28 & Ex. B.

For example, Defendants fail to acknowledge prior agency assessments that have extensively examined impacts on marine mammals, as well as adoption of measures to mitigate any impacts. Indeed, for example, as recently as last month, the Government Accountability Office acknowledged that "NOAA Fisheries does not anticipate any death or serious injury to whales from offshore wind related actions and has not recorded marine mammal deaths from offshore wind activities." U.S. Gov't Accountability Off., *Offshore Wind Energy*, 15 (Apr. 2025), https://perma.cc/YFG2-3LTJ; *see also* NMFS, *North Atlantic Right Whale 5-Year Review: Summary and Evaluation*, 24–25, 28 (Nov. 2022), https://perma.cc/62QZ-6XTE; BOEM & NOAA Fisheries, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, 24–25, 41–50 (Jan. 2024), https://perma.cc/2ZUX-SMJM.

Agency Defendants also have already exhaustively studied and mitigated impacts on the fishing industry, and even found potential benefits. *See, e.g.*, BOEM, *Record of Decision: Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan*,  36, 39, 93 (May 10, 2021), https://perma.cc/NL5V-DVDF; BOEM, *Atlantic Shores Offshore Wind South Final EIS*, App. G, 13-14 (2024), https://perma.cc/5W6S-JH9P; BOEM, Atlantic Shores COP ROD, 22 (July 1, 2024), https://perma.cc/HQ7P-ZY56. Agency Defendants also already have concluded that approved offshore-wind projects would have little or no impact on local tourism. *See, e.g.*, BOEM, *Record of Decision: Empire Offshore Wind: Empire Wind Project (EW1 and EW2) Construction and Operations Plan,* 28 (Nov. 20, 2023), https://perma.cc/JQE9-Q2AM; *see also* BOEM, *Atlantic Shores Offshore Wind South Final EIS App. F* (Atlantic Shores FEIS Appendix F), 3.6.3-21 (2024), https://perma.cc/KS2Z-EUXB (no evidence of negative property value impacts). In fact, Agency Defendants have found that wind projects *benefit* the economy. *See* BOEM, *Vineyard Wind 1 Offshore Wind Energy Project Final EIS*, 3-135, 3-142 (Mar. 2021), https://perma.cc/X7XK-

VZXM; BLM, *Final Programmatic EIS on Wind Energy Deployment on BLM-Administered Lands in the Western United States*, ES-5 (June 2005), https://perma.cc/L9D9-E26Z ("The potential impacts of wind energy development on local and regional economies would be largely beneficial."); Atlantic Shores FEIS Appendix F, *supra,* at 3.6.3-26, 3.6.3-16 ("every $1.00 spent building an offshore wind farm is estimated to generate $1.83 for New Jersey's economy").

That failure to acknowledge, much less address, Agency Defendants' policy change—as well as their failure to grapple with their own prior findings following comprehensive reviews—renders their halt on wind-energy development arbitrary and capricious too. *Encino Motorcars*, 579 U.S. at 221 (although agencies remain "free to change their existing policies," they still must "provide a reasoned explanation for the change"); *accord Massachusetts v. Nat'l Insts. of Health,* 2025 WL 702163, at *19 (finding likelihood of success on claim of arbitrary and capricious action where agency "failed to provide even the most basic level of 'reasoning,' let alone recognize or justify the disregarded facts that underlay its existing policy").

### c. Agency Defendants Fail To Account for the States' Serious Reliance Interests.

Agencies also must provide "more detailed justification" for a change in policy when their prior policy "engendered serious reliance interests." *Housatonic River Initiative*, 75 F.4th at 270 (quoting *Fox*, 556 U.S. at 515). A "change that does not take account of legitimate reliance on prior interpretation may be arbitrary [and] capricious." *Smiley*, 517 U.S. at 742 (cleaned up). Here, Agency Defendants' halt on wind-energy approvals is arbitrary and capricious because it fails to account for the serious reliance the States have developed based on Defendants' long-running and consistent federal support for and approvals of wind-energy development.

As described *supra* Sections B.3.b.–e, the States have developed significant reliance interests on the federal government's past policy supporting wind-energy development and duly

processing and issuing decisions on wind-energy approvals under applicable law. The States have invested hundreds of millions of dollars in state-of-the-art facilities for turbine staging and assembly; relied on forthcoming wind-energy resources to boost energy reliability and affordability and serve increasing demand; invested in supply chains and workforce-training programs with the expectation that jobs and economic stimulus will accompany wind-industry development; incorporated wind energy into State laws and policies to meet greenhouse gas emission-reduction and clean-energy goals; and relied on wind energy to mitigate the negative impacts of climate change and public health harms from fossil-fueled energy generation.

Agency Defendants' implementation of the indefinite halt on approvals could "necessitate systemic" or at least "significant change[s]" to the States' policies and planning for securing these benefits, integrating new clean-energy generation into their portfolios, meeting climate goals, and programmatic or investment planning for specific state entities. *Encino Motorcars*, 579 U.S. at 222. But Agency Defendants neither considered these reliance interests, nor weighed them against any competing policy concerns. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) ("[B]ecause DHS was "not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." (cleaned up)). The States are likely to succeed in demonstrating that this failure, too, renders the halt on wind-energy approvals arbitrary and capricious. *See Rhode Island v. Trump*, No. 1:25-cv-00128, 2025 WL 1303868, at *11–12 (D.R.I. May 6, 2025) (finding agencies' failure to consider states' reliance interest on library, museum, and minority business funding prior to grant terminations and layoffs arbitrary and capricious); *Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025) (plaintiffs likely to succeed on arbitrary and capricious claim where "State Department jettisoned its practice

of more than thirty years with no explanation of the facts on which it premised its new determination and no consideration of the reliance interests in its prior policy.").

### d. Agency Defendants Fail To Explain Inconsistencies with Other Executive Action Promoting Domestic Energy Development.

Agency Defendants' categorical and indefinite halt on wind-energy approvals pending further environmental review is also arbitrary and capricious because it reflects "unexplained inconsistenc[ies]" with other executive actions, *Encino Motorcars* 579 U.S. at 222, and fails to offer "genuine justifications . . . that can be scrutinized by courts and the interested public," *Dep't of Commerce v. New York*, 588 U.S. at 785. Specifically, it inexplicably conflicts with Defendants' promotion of domestic energy and curtailment of environmental reviews for other forms of energy.

*First*, the blanket halt on wind-energy approvals is irreconcilable with President Trump's promotion of domestic energy production to meet growing energy demand with reliable, affordable resources. The Wind Directive itself reflects this contradiction: Section 1 cites "the country's growing demand for reliable energy," yet prohibits further Outer Continental Shelf wind-energy leasing. 90 Fed. Reg. at 8363; *see General Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) ("internally inconsistent and inadequately explained" analysis is arbitrary and capricious); *Rhode Island Hosp. v. Sebelius*, 670 F. Supp. 2d 148, 155 (D.R.I. 2009) (agency's decision that employed "inconsistent and confusing criteria" arbitrary and capricious).

The halt also contradicts the Day 1 Energy Emergency Order, issued within hours of the Wind Directive. Citing "insufficient energy production" as an allegedly "extraordinary threat" to the Nation, the Order announced the need for emergency measures—including in several of plaintiff States specifically—to encourage development of "a reliable, diversified, and affordable supply of energy." 90 Fed. Reg. at 8434. But it inexplicably, and arbitrarily, excluded wind energy, upon which our States rely. *Id.* The Day 1 Unleashing Order too proclaimed it "the policy of United

States" to "encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf," but, again, excluded wind energy. 90 Fed. Reg. at 8353. More recently, President Trump issued multiple orders deregulating fossil-fueled generation, claiming in one such order that, "our electric grid must utilize *all available power generation resources*." Grid Reliability Order, 90 Fed. Reg. at 15,521 (emphasis added). The Wind Directive and Agency Defendants' removal of wind energy from this resource mix is unexplained and inexplicable, and thus arbitrary. *Dep't of Commerce*, 588 U.S. at 785.[3]

*Second*, the freeze on federal wind-energy approvals pending further environmental review runs in stark contrast to the Administration's contemporaneous efforts to short-circuit environmental reviews for other types of energy generation. The Wind Directive cites as its basis "potential inadequacies" in NEPA environmental reviews and calls for an extra-statutory "comprehensive assessment and review" of wind development's impacts on wildlife including "birds and marine mammals." 90 Fed. Reg. at 8363–64. But the Energy Emergency Order directs expedited environmental review and permitting and labels the Endangered Species Act and Marine Mammal Protection Act as "obstacles" to energy development. 90 Fed. Reg. at 8436. Pursuant to that order, DOI has already announced emergency permitting under NEPA and the Endangered Species Act "designed to *expedite the review and approval*, if appropriate, of projects related to . . . leasing, siting, production, . . . or generation of energy within the United States," taking "a multi-year process down to just 28 days at most." DOI, *Press Release: Dep't of the Interior Implements*

---

[3] *See also, e.g.*, Reinvigorating Coal Order, 90 Fed. Reg. at 15,517 ("In order to . . . provide for increases in electrical demand from emerging technologies, we must increase domestic energy production, including coal."); Proclamation 10914, 90 Fed. Reg. at 16,777 ("Coal-fired electricity generation is essential to ensuring that our Nation's grid is reliable and that electricity is affordable for the American people, and to promoting our Nation's energy security.").

*Energy Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://perma.cc/RR3U-ZULC (emphasis added). Those directives conspicuously omit wind energy, for which Agency Defendants have instead halted permitting altogether.[4] And that contradiction is wholly unexplained. *See Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions . . . it must explain its reasoning.").

In sum, Agency Defendants' categorical and indefinite halt on wind-energy approvals—based on allegedly inadequate environmental review—cannot be squared with President Trump's priority to rapidly increase domestic energy production with little to no environmental review. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024–26 (D.C. Cir. 2018) (agency decision that did not "give a reasoned analysis to justify the disparate treatment of regulated parties that seem similarly situated" was arbitrary and capricious (quotation marks omitted)). The States are thus likely to succeed in demonstrating that such actions, taken together, reflect "contrived" explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce*, 588 U.S. at 784–85.

## 2. Agency Defendants' Halt on Wind-Energy Development Is Contrary to Law and In Excess of Authority (Counts II, III, & V).

Agency Defendants "are creatures of statute," *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022), and "literally have no power to act except to the extent Congress has authorized,"

---

[4] Other Executive Orders similarly limit environmental review and standards for other forms of energy. On April 9, 2025, for example, the Zero-Based Budgeting Order directed certain agencies, including EPA, BOEM, BSEE, and USFWS, to sunset all regulations "governing energy production" issued pursuant to OCSLA, FLMPA, the Endangered Species Act, the Marine Mammal Protection Act, the Bald and Golden Eagle Protection Act, and the Magnuson-Stevens Fishery Conservation and Management Act, among others. 90 Fed. Reg. at 15,643; *cf.* Exemption Order, 90 Fed. Reg. at 16,777 (exempting power plants from hazardous air pollutant emission requirements to "ensur[e] that the Nation's power supply remains secure and reliable."); *cf.* 90 Fed. Reg. at 17,736 (directing expedited permitting for Outer Continental Shelf minerals development).

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 1:25-cv-00239, 2025 WL 597959, at

*15 (D.D.C. Feb. 25, 2025) (cleaned up); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir.

2020). The APA enforces this limit on agencies' power by serving "as a check upon administrators

whose zeal might otherwise have carried them to excesses not contemplated in legislation creating

their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States*

*v. Morton Salt*, 338 U.S. 632, 644 (1950)). Thus, under the APA, a court "shall . . . hold unlawful

and set aside" agency action found to be "not in accordance with law" or "in excess of statutory .

. . authority." 5 U.S.C. § 706(2)(A), (C); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *15

("[i]f an agency exceeds that power [authorized by Congress], the court must set aside its action.").

Additionally, federal courts possess power in equity to enjoin "violations of federal law by federal

officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

Here, each of the statutory authorities governing federal approvals of wind-energy

development—including OCSLA, the Clean Water Act, the Rivers and Harbors Act, the Clean Air

Act, NEPA, the Endangered Species Act, the Bald and Golden Eagle Protection Act, the Marine

Mammal Protection Act, the Magnuson-Stevens Fishery Conservation and Management Act, the

National Historic Preservation Act, FLPMA, and the Fixing America's Surface Transportation

Act—require the Executive to comprehensively review and promptly process and issue decisions

on applications for such approvals, following specific procedures and applying specific standards.

Agency Defendants have unlawfully sidestepped those requirements with their categorical and

indefinite halt pending an extra-statutory review.

For example, OCSLA calls for the "expeditious and orderly development" of Outer

Continental Shelf resources. 43 U.S.C. § 1332(3). And BOEM's regulations under OCSLA make

clear that it must promptly process applications and issue permit decisions by either approving,

disapproving, or requesting revisions. *See* 30 C.F.R. §§ 585.613, 585.628, 585.648. By categorically and indefinitely halting wind-energy permitting, the President and Defendants DOI, Burgum, BOEM, and Cruickshank (the DOI Defendants) have abdicated their clear mandate to administer the OCSLA permitting program and acted in excess of statutory authority under the statute. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 294 (W.D. La. 2022) (holding agency actions pausing Outer Continental Shelf oil and gas lease sales unlawful under OCSLA); *cf. Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) ("It seems to the Court that Congress anticipated a process that would generally embrace a rational time frame for agency action; one faithful to OCSLA's mandate of expeditious development."). Moreover, by indefinitely preventing all lessees from obtaining approvals and permits necessary for offshore-wind projects, the DOI Defendants have effectively—and unlawfully, under OCSLA—removed *already leased* areas in the Outer Continental Shelf from use. 43 U.S.C. § 1341(a). The States are thus likely to succeed in demonstrating that the DOI Defendants have acted contrary to and in excess of their authority under OCSLA (Counts II, III, and V).

Regulations governing the process for securing dredge-and-fill permits under Section 404 of the Clean Water Act likewise provide for the timely adjudication of permit applications according to specific procedures. *See, e.g.*, 33 C.F.R. § 325.2(d) (Corps must issue a decision within 60 days); *id.* § 320.4(n) (classifying wind and other energy projects as a "major national objective" and directing high-priority permit processing). Indeed, every other statutory regime governing wind-energy approvals requires prompt federal review and decision making; none allows an indefinite halt on those approvals, pending an extra-statutory interagency review. *See, e.g.*, 16 U.S.C. §§ 1531 *et seq.* (Endangered Species Act); 42 U.S.C. §§ 7475(c), 7661b(c) (Clean Air Act); 42 U.S.C § 4336a(g) (NEPA); 33 U.S.C. §§ 403, 408 (Rivers and Harbors Act); 16 U.S.C.

§ 668 (Bald and Golden Eagle Protection Act); 16 U.S.C. §§ 1371 *et seq.* & 50 C.F.R. § 13.11 (Marine Mammal Protection Act); 43 U.S.C. §§ 1701 *et seq.* & 43 C.F.R. § 2804.35 (Federal Land Policy and Management Act). And the APA itself provides a statutory limit of its own, also violated here: "when application is made for a license"—including a "permit" or "approval," 5 U.S.C. § 551(8)—that is "required by law, the agency . . . within a reasonable time, shall set and complete . . . proceedings required by law and shall make its decision." *id.* § 558(c).

As such, the States are likely to succeed in demonstrating that Agency Defendants' categorical and indefinite halt of approvals of wind-energy projects are contrary to both the APA and the laws they are charged with implementing. 5 U.S.C. §§ 551(8), 706(2)(A), (C).

**B.  The Wind Directive and Agency Defendants' Implementation Thereof Are Ultra Vires under Common Law (Count IV).**

Nothing in the Constitution nor any act of Congress authorizes the President or Agency Defendants to categorically and indefinitely halt wind-energy approvals. *See Louisiana,* 622 F. Supp. 3d at 288. The freeze on wind-energy approvals is thus ultra vires.

The Wind Directive categorically suspends all federal permitting and approval activities under numerous federal laws. And it does so pending completion, at some unspecified time, of an open-ended extra-statutory "comprehensive assessment and review" to consider anew the very environmental and economic impacts applicable law already requires federal agencies to consider according to specific procedures and standards. 90 Fed. Reg. at 8364. That assessment is to be conducted by the Interior Secretary in consultation with other federal agencies, some of which handle permitting under applicable law and some of which, like the Treasury Department, do not. The Wind Directive cites no authority for that sweeping action; nor could it, because none exists.

To the contrary, as detailed *supra* Sections A & II.A.2, applicable law requires prompt processing and action on permits. OCSLA, for example, directs the "expeditious and orderly

development" of Outer Continental Shelf resources. 43 U.S.C. § 1332(3). Moreover, although OCSLA authorizes the President to withdraw *unleased* areas from use, it does not grant the President authority to indefinitely withdraw *leased* areas from use. 43 U.S.C. § 1341(a). By indefinitely preventing lessees from obtaining approvals and permits necessary for wind projects, however, the Wind Directive effectively removes leased areas in the Outer Continental Shelf from use. But "there is no statutory authority that authorizes the Executive Branch to pause the OCSLA" program. *Louisiana*, 622 F. Supp. 3d at 289. The States are thus likely to show that the Wind Directive is ultra vires and that Agency Defendants acted "beyond th[e] limitations" of federal law and should be enjoined. *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 689 (1949).

## III.    A Preliminary Injunction Is Necessary To Prevent Irreparable Harm to the States.

This Court should grant preliminary relief to address irreparable—and mounting—harm to the States from the categorical and indefinite halt of federal approvals of wind-energy projects. Without relief, the States will "suffer[] a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (internal quotations omitted)). Here, the States have demonstrated "a significant risk of irreparable harm if the injunction is withheld . . . ." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

As described *supra* Section B.3.a, the uncertainty wrought by Defendants' halt on wind-energy development has severely damaged the U.S. wind industry already, and it threatens existential harm if allowed to continue. *See* McNutt Decl. ¶¶ 9–15 & Ex. B. Indeed, just last year Defendant Department of Energy itself warned of "an inflection point:" "[f]ailure to build projects

today would risk delaying cost reductions and extending risk exposure to the longer-term project pipeline, freezing investments, and pushing an industry with . . . momentum into dormancy." Jonah Ury et al., *Pathways to Commercial Liftoff: Offshore Wind*, U.S. Dep't of Energy, at 11 (Apr. 2024), https://perma.cc/A4KL-6Z3W. And that prediction has proven prophetic: Defendants' indefinite halt on wind-energy approvals at this critical time threatens significant delay and even dormancy. As a result, absent preliminary relief, the States will experience numerous irreparable harms.

*First*, as detailed *supra* Section B.3.b, the States will be irreparably harmed absent a preliminary injunction because they will be unable to obtain significant energy reliability and affordability benefits from wind-energy projects. As fossil-fueled generation ages and becomes more expensive to maintain, and renewable technologies such as wind energy have become less expensive, States have increasingly counted on wind-energy development to maintain grid reliability. For example, offshore-wind, which has its highest output during winter months, will be particularly important to ensuring energy reliability during peak cold periods in New England and New York by easing supply constraints and increasing fuel diversity to serve higher demand. Smith Decl. Ex. 6 [CT-Dykes] ¶ 34; *id.* Ex. 11 [MA-Mahony] ¶ 45; *id.* Ex. 14 [NY-Williams] ¶ 31. Defendants' halt on wind-energy approvals will delay and potentially derail those benefits, threatening grid reliability within our States.

Agency Defendants' halt on wind-energy approvals will also yield higher energy costs— for States and their residents alike. Wind delivers a homegrown energy source that can serve local demand, alleviate transmission constraints, and lower prices for ratepayers. Indeed, it is presently among the lowest-priced forms of electricity in the nation. Dep't of Energy, *Advantages and Challenges of Wind Energy*, https://perma.cc/XGJ2-PFH4. Without wind resources, energy costs will rise—in New England, for example, by about 50% in 2050. Kornitsky et al., *supra at* 21–23.

Such significant threats to grid reliability and energy costs constitute irreparable harm to States and their residents. *See Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (state would be irreparably harmed where agency rule increased the "threat of grid instability and potential brownouts"); *cf. Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical.").

*Second*, Defendants' indefinite halt on federal approvals jeopardizes state investments in and economic benefits from wind-energy projects now stuck in limbo and threatens to strand those assets or derail those benefits altogether. *Supra* Section B.3.c. Take, for example: the $347 million Massachusetts has spent on port-related infrastructure since 2011, including $75 million in an offshore-wind marshalling port in Salem; Connecticut's $200 million investment in an offshore-wind assembly facility in New London; or the more than $1.3 billion in economic benefits to accrue to New York from the Empire Wind project. Smith Decl. Ex. 5 [MA-Carlisle] ¶¶ 22, 25–27; *id.* Ex. 6 [CT-Dykes] ¶¶ 40–41. *Offshore Wind Renewable Energy Certificate Purchase and Sale Agreement for Empire Offshore Wind LLC* at 6 (May 31, 2024), https://perma.cc/XS3W-XY2G. And it threatens well-paying jobs in our States; indeed, industry directly employs 131,000 people, and supports over 300,000 jobs such as turbine technicians and blade fabricators, like the 18,000 to 23,000 wind-energy-related jobs expected in New York. Am. Clean Power Ass'n, *Wind Power Facts,* https://perma.cc/U6J7-V7DG; Smith Decl. Ex. 14 [NY-Williams] ¶ 25.

Defendants' halt on wind-energy approvals places all of these investments and economic benefits at substantial risk. S*ee Woonasquatucket River Watershed Council v. U.S. Dept of Agric.*, No. 1:25-cv-00097, 2025 WL 1116157, at *22–23 (D.R.I. Apr. 15, 2025) (irreparable harm demonstrated based on reduced hiring, layoffs, cancelled contracts with local businesses,

shuttering planned projects, and disruption or waste of thousands of hours of planning); *Louisiana v. Biden*, 622 F.Supp.3d 267, 297 (W.D. La. 2022) (substantial threat of irreparable "damages through loss of jobs in the oil and gas sector, higher gas prices, losses by local municipalities and governments, as well as damage to Plaintiff States' economy"). And without a preliminary injunction the States also will lose out on hundreds of millions of dollars in tax revenue. *Louisiana v. Biden*, No. 2:24-cv-00406, 2024 WL 3253103, at *24 (W.D. La. July 1, 2024); *United States v. Rivera-Rivera,* No. 3:16-cv-02160, 2016 WL 7868753, at *2 (D.P.R. Dec. 6, 2016) (irreparable injury from defendant's continued failure to pay lawfully due tax revenues). Absent preliminary relief, such harm would be irreparable. *See Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 362–63 (D.N.H. 2024) (financial loss irreparable where movant will be unable to recoup monetary damages in the future from a federal agency); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (unavailability of money damages for APA claims counsels in favor of finding irreparable harm).

*Third,* the Wind Directive's indefinite halt on wind energy projects also will irreparably harm the States' ability to achieve their statutory obligations to reduce greenhouse gas emissions, procure clean energy, and meet specific statutory targets for wind energy. *See supra* Section B.3.d. Many of the States—including New York, Massachusetts, Connecticut, Illinois, Maine, Maryland, Minnesota, New Jersey, and Rhode Island—are relying on greenhouse gas emissions reductions from wind energy replacing fossil-fueled electricity generation to achieve state law requirements and mitigate the harmful effects of climate change on our States and our residents. Those States also have renewable portfolio standards requiring that a specified percentage of electricity supplied to customers be generated by renewable-energy resources by specific dates. And as one concrete step to meet their emission-reduction requirements, a number of States—including Massachusetts,

New York, Maine, Maryland, and New Jersey—also have specific targets under state law for procuring certain amounts of wind energy by dates certain.

The halt also impedes the States' ability to timely meet these targets, harming their sovereign interests in mitigating climate change by securing renewable, reliable, and affordable electricity. Such threats to state sovereignty are irreparable. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (where federal "decision places [Kansas's] sovereign interests and public policies at stake, we deem the harm the State stands to suffer as irreparable…"); *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (threats to state sovereignty can constitute irreparable harm); *cf. Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.").

*Fourth*, the halt will delay replacement of older, more polluting generation, delaying reductions in harmful emissions and exacerbating climate, public-health, and environmental harms to the States and their residents. *Supra* Section B.3.e. States are already feeling the effects of climate change. Defendants' halt on wind-energy approvals is delaying emission reductions, and will further exacerbate the States' climate harms if projects are cancelled. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be remedied by money damages and is often permanent, . . . i.e., irreparable"); *Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) (denying motion to vacate injunction noting "[o]ngoing harm to the environment constitutes irreparable harm warranting an injunction").The air-quality benefits lost by delaying replacement of more polluting generation also will result in public health harms and healthcare costs. For example, the US Wind project off of Maryland would yield pollution reductions over a 20-year period, with $275 million in health savings. Smith Decl. Ex. 13 [MD-Pinsky] ¶ 17. Actions, like the Wind

Directive, that "hamper" "state efforts to . . . mitigate air pollution" cause irreparable harm. *See New York v. Trump*, No. 1:25-cv-00039, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025).

## IV.     The Equities and Public Interest Favor Preliminary Relief.

The balance of the equities and the public interest strongly favor preliminary relief enjoining Agency Defendants from implementing the Wind Directive's unlawful halt in the States. "A continuation of the status quo during the pendency of this litigation will only shortly prolong the longstanding practice and policy of the United States" to promptly act on federal wind-energy approvals. *N.H. Indonesian Cmty. Support v. Trump*, No. 1:25-cv-00038, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025); *Louisiana v. Biden*, 543 F. Supp. 3d 388, 418 (W.D. La. 2021) (if agencies implementing Executive Order pausing new oil and gas leases "were enjoined, the Government Defendants would simply be doing . . . what they were statutorily required to do under OCSLA"), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022).

Here, "imposition of the Executive Order would impact the plaintiffs . . . in numerous ways, some of which—in the context of balancing equities and the public interest—are unnecessarily destabilizing and disruptive." *New Hampshire Indonesian Cmty. Support*, 2025 WL 457609, at *5; *Louisiana*, 543 F. Supp. 3d at 418 (equity and public interest favored the states where pause on new oil and gas leases threatened local government funding, jobs, and other reliance interests). As explained *supra* Sections B.3. & III, the Wind Directive and Agency Defendants' actions implementing it are causing immediate and irreparable harm to the States by adversely affecting the States' ability to procure reliable, affordable electricity; jeopardizing the States' significant investments in the wind industry; threatening States' sovereign interests; damaging the States' sovereign territory; and harming the health of the States' residents.

Additionally, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d

323, 343 (D. Mass. 2005); *League of Women Voters*, 838 F.3d at 12 ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citations omitted)); *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019). Conversely, "there is no public interest in upholding unlawful agency action," and an injunction that merely ends an unlawful practice cannot cause the federal government harm. *Massachusetts v. Nat'l Inst. of Health*, 2025 WL 702163, at *32. Indeed, courts may not "consider any and all factors that might relate to the public interest" if it would "reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). As the States have shown, Defendants' arbitrary categorical and indefinite halt of all wind-energy project approvals violates the APA and numerous federal laws. There is thus a strong public interest in stopping that unlawful conduct and resuming federal approval processing in due course.

## CONCLUSION

For the foregoing reasons, the States respectfully request that the Court grant their motion for a preliminary injunction.

**LETITIA JAMES**
  *Attorney General of New York*

By: */s/ Michael J. Myers*
Michael J. Myers*
  *Senior Counsel*
Laura Mirman-Heslin*
Rene F. Hertzog*
  *Assistant Attorneys General*
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
Michael.Myers@ag.ny.gov

*Counsel for the State of New York*


Dated: May 12, 2025

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

By: */s/ Turner H. Smith*
Turner H. Smith, BBO No. 684750
  *Assistant Attorney General & Deputy Chief*
Nathaniel Haviland-Markowitz**
  *Assistant Attorney General*
Jonathan Whitney, BBO No. 694760
  *Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
Turner.Smith@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
  *Attorney General of Arizona*

By: */s/ Mary M. Curtin*
Mary M. Curtin*
  *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
  *Attorney General of California*

By: */s/ Kate M. Hammond*
Kate M. Hammond*
  *Deputy Attorney General*
Robert Swanson*
  *Acting Supervising Deputy Attorney General*
Jamie Jefferson*
  *Deputy Attorney General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6531
Kate.Hammond@doj.ca.gov
Robert.Swanson@doj.ca.gov
Jamie.Jefferson@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
  *Attorney General of Colorado*

By: */s/ Carrie Noteboom*
Carrie Noteboom*
  *Assistant Deputy Attorney General*
Jessica L. Lowrey*
  *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6288 (Noteboom)
(720) 508-6167 (Lowrey)
Carrie.Noteboom@coag.gov
Jessica.Lowrey@coag.gov
FAX: (720) 508-6040

*Counsel for the State of Colorado*

**WILLIAM TONG**
  *Attorney General of Connecticut*

By: */s/ Jill Lacedonia*
Jill Lacedonia*
  *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
   *Attorney General of Delaware*

By: /s/ *Ian R. Liston*
Ian R. Liston**
   *Director of Impact Litigation*
Vanessa L. Kassab**
   *Deputy Attorney General*
Ralph Durstein III**
   *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
   *Attorney General of the District of Columbia*

By: /s/ *Estefania Y. Torres Paez*
Estefania Y. Torres Paez, BBO No. 705952
   *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Estefania.TorresPaez@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
   *Attorney General of Illinois*

By: /s/ *Jason E. James*
Jason E. James*
   *Assistant Attorney General*
Office of the Attorney General
Environmental Bureau
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.James@ilag.gov

*Counsel for the State of Illinois*

**AARON M. FREY**
   *Attorney General of Maine*

By: /s/ *Robert Martin*
Robert Martin*
   *Assistant Attorney General*
6 State House Station
Augusta, ME 04333
(207) 626-8579
Robert.Martin@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
   *Attorney General of Maryland*

By: */s/ Steven J. Goldstein*
Steven J. Goldstein*
   *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


**KEITH ELLISON**
   *Attorney General for the State of Minnesota*

By: */s/* Catherine Rios-Keating
Catherine Rios-Keating*
   *Special Assistant Attorney General*
Environmental and Natural
Resources Division
445 Minnesota Street, Suite 1800
Saint Paul, MN 55101
(651) 300-7302
Catherine.Rios-Keating@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


**RAÚL TORREZ**
   *Attorney General of New Mexico*

By: */s/ William Grantham*
William Grantham**
   *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmdoj.gov

*Counsel for the State of New Mexico*


**DANA NESSEL**
   *Attorney General of Michigan*

By: */s/ Lucas Wollenzien*
Lucas Wollenzien**
Michael Moody**
   *Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
WollenzienL@michigan.gov
Moodym2@michigan.gov

*Counsel for the People of the State of Michigan*


**MATTHEW J. PLATKIN**
   *Attorney General for the State of New Jersey*

By: */s/ Terel L. Klein*
Terel L. Klein**
   *Deputy Attorney General*
Office of the Attorney General
25 Market Street, 7th Floor
Trenton, NJ 08625
(609) 376-2818
Terel.Klein@law.njoag.gov

*Counsel for the State of New Jersey*


**DAN RAYFIELD**
   *Attorney General of Oregon*

By: */s/ Paul Garrahan*
Paul Garrahan*
   *Attorney-in-Charge*
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

*Counsel for the State of Oregon*

43

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Nicholas M. Vaz*
Nicholas M. Vaz, BBO No. 693629
*Special Assistant Attorney General*
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
*Attorney General of Washington*

By: */s/ Yuriy Korol*
Yuriy Korol*
*Assistant Attorney General*
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, WA 98104-3188
(206) 332-7098
Yuriy.Korol@atg.wa.gov

*Counsel for the State of Washington*

*\*admitted pro hac vice*
*\*\*pro hac vice application forthcoming*