# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

        Plaintiffs,

    v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

        Defendants.

Case No. 25-cv-11221-FDS

## DECLARATION OF TURNER SMITH

I, Turner Smith, am an attorney admitted to practice before this Court, do hereby state the following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am an Assistant Attorney General and Deputy Chief of the Energy and Environment Bureau in the Office of the Attorney General for the Commonwealth of Massachusetts, and I appear on behalf of the Plaintiffs in this action.

2.      I submit this declaration in support of Plaintiff States' Motion for a Preliminary Injunction, pursuant to Federal Rule of Civil Procedure 65.

3.      The facts set forth herein are based upon my personal knowledge or a review of the files in my possession.

4.      I have attached to this declaration true and correct copies of publicly promulgated or issued documents and factual declarations, as follows:

5.      Attached hereto as Exhibit 1 is the declaration of Jonathan Binder of New York.

6.      Attached hereto as Exhibit 2 is the declaration of Dr. Alison Brizius of Massachusetts.

7.     Attached hereto as Exhibit 3 is the declaration of Megan Brunatti of New Jersey.

8.     Attached hereto as Exhibit 4 is the declaration of Dan Burgess of Maine.

9.     Attached hereto as Exhibit 5 is the declaration of Bruce K. Carlisle of Massachusetts.

10.     Attached hereto as Exhibit 6 is the declaration of Katherine S. Dykes of Connecticut.

11.     Attached hereto as Exhibit 7 is the declaration of Stephen Gawlick of New York.

12.     Attached hereto as Exhibit 8 is the declaration of Brian P. Granahan of Illinois.

13.     Attached hereto as Exhibit 9 is the declaration of Christopher R. Hoagland of Maryland.

14.     Attached hereto as Exhibit 10 is the declaration of Christopher Kearns of Rhode Island.

15.     Attached hereto as Exhibit 11 is the declaration of Elizabeth Mahony of Massachusetts.

16.     Attached hereto as Exhibit 12 is the declaration of Katharine Perry of New Jersey.

17.     Attached hereto as Exhibit 13 is the declaration of Paul G. Pinsky of Maryland.

18.     Attached hereto as Exhibit 14 is the declaration of John Williams of New York.

19.     Attached hereto as Exhibit 15 is the declaration of Dr. Pete Wyckoff of Minnesota.

20.     Attached hereto as Exhibit 16 is the declaration of Denise Barton of Massachusetts.

21.     Attached hereto as Exhibit 17 is the Presidential Memorandum entitled *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025).

2

Dated: May 12, 2025
Boston, Massachusetts


/s/ Turner Helen Smith
Turner Smith, BBO No. 684750
Assistant Attorney General and Deputy Chief
Energy and Environment Bureau
Office of the Attorney General
Commonwealth of Massachusetts

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 25-cv-11221 |

## DECLARATION OF JONATHAN BINDER

## DEPUTY COMMISSIONER

## NEW YORK STATE DEPARTMENT OF
## ENVIRONMENTAL CONSERVATION

Pursuant to 28 U.S.C § 1746, Jonathan Binder declares:

1.    I am the Deputy Commissioner for Climate Change, Air Resources, and Energy at the New York State Department of Environmental Conservation (NYSDEC), where I have worked since 2008. I submit this declaration in support of motion of the Plaintiff States (States) for a preliminary injunction.

### PERSONAL BACKGROUND AND QUALIFICATIONS

2.    I have a Bachelor of Science degree in Policy Analysis and Management from Cornell University. I have a Juris Doctor degree, with a Certificate in Environmental Law, from Tulane University Law School. I am an attorney licensed to practice law in the State of New York.

3.    I have been the NYSDEC Deputy Commissioner for Climate Change, Air Resources, and Energy for approximately two years. In addition to my current position as NYSDEC Deputy Commissioner, from 2008 through 2023, I held various legal positions as an attorney in NYSDEC's Office of General Counsel. Most recently, prior to being

1

appointed Deputy Commissioner, I was the Chief of the Bureau of Climate, Air, and Energy within the NYSDEC Office of General Counsel.

4.      My responsibilities as Deputy Commissioner include leading NYSDEC's implementation of the State's Climate Leadership and Community Protection Act (Climate Act), Chapter 106 of the Laws of 2019. Specifically, the Climate Act directs New York to reduce statewide greenhouse gas (GHG) emissions by 40 percent by 2030 and no less than 85 percent by 2050 , both from 1990 levels.[1] In addition, the Climate Act mandates that the New York State Public Service Commission establish programs to require the procurement of at least 9 gigawatts of offshore wind by 2035 and zero emissions from the electricity sector by 2040.[2]

5.      As Deputy Commissioner, I oversee NYSDEC's Division of Air Resources (DAR) and its Office of Climate Change (OCC). Among other functions, DAR carries out the development and implementation of regulations to reduce both GHG and co-pollutant emissions. This includes regulations to help implement the State's Climate Act, as well

---

[1] ECL § 75-0107. *See also* ECL § 75-0101(8) and (14) and § 75-0109(1) and (2).
[2] PSL § 66-p.

2

as regulations to ensure compliance with the requirements of the federal Clean Air Act (Act).

6.    In addition, DAR is responsible for the development and submittal of Act-mandated State Implementation Plans and State Plans, the permitting of individual stationary sources that incorporate all applicable State and federal requirements, and the enforcement of regulatory and permitting provisions at individual stationary sources.

7.    Among other responsibilities, OCC leads the development of policies, programs, and other initiatives to help address climate change. This includes through mitigation actions that reduce the GHG emissions that cause climate change, as well as adaptation and resiliency measures that help the State to be prepared for the changing climate. For example, OCC helps to ensure NYSDEC and the State utilize the best available science and technical analyses with respect to climate change-related impacts and assessments.

8.    In addition to overseeing DAR and OCC, I also play a part in NYSDEC's energy policy and regulatory actions at a state and federal level, including relating to onshore and offshore wind matters and planning, as well as fossil fuel projects.

3

**New York State Department of Environmental Conservation**

9.      NYSDEC is an environmental regulatory agency in New York State formed on April 22, 1970 under the Environmental Conservation Law (ECL) with a mission, among other things, "to conserve, improve and protect New York's natural resources and environment and to prevent, abate and control water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state and their overall economic and social well-being."[3]

10.      To meet part of this mission, NYSDEC participates in numerous energy-related matters, including onshore and offshore wind, through planning efforts, permitting, and participation in regulatory processes led by other state and federal agencies. NYSDEC's participation ensures that projects meet the substantive requirements of NYSDEC's environmental laws and regulations, and comply with NYSDEC's mission.

---

[3] ECL § 1-0101(1).

4

**Climate Change Impacts**

## A. Climate Change is Already Harming New Yorkers' Health

11.    Climate change is posing numerous health threats to our State. As the climate continues to change, the demand for health services and the need for public health surveillance and monitoring in New York will increase. Hotter temperatures are projected to result in more heat-related illnesses and deaths.[4] In addition, increased coastal and riverine flooding resulting from more severe storms increases the risk of releasing contaminants or even toxic substances from wastewater treatment facilities, industrial facilities, and superfund sites with multiple attendant adverse physical and mental health effects. Water- and food-borne diseases, for example, are likely to increase without mitigation and adaptation intervention.[5]

12.    Climate change is likely to worsen the harms in New York, especially the New York City metropolitan area, which is already

---

[4] New York State. 2024. Extreme Heat in New York State. Summary of Impacts and Vulnerabilities. https://dec.ny.gov/environmental-protection/climate-change/effects-impacts/extreme-heat

[5] Barnes, J., Sheffield, P., Graber, N., Jessel, S., Lanza, K., Limaye, V. S., Morrow, F., Sauthoff, A., Schmeltz, M., Smith, S., & Stevens, A. (2024). New York State Climate Impacts Assessment Chapter 07: Human Health and Safety. Ann NY Acad Sci., 1542, 385–445.https://doi.org/10.1111/nyas.15244

suffering from ozone pollution. As the EPA recognized many years ago when making its 2009 Endangerment Determination regarding GHG emissions under Section 202(a) of the Clean Air Act, "climate change is expected to increase [ground level] ozone pollution over broad areas of the U.S., including in the largest metropolitan areas with the worst ozone problems, and thereby increase the risk of adverse effects on public health."[6]

## B. Climate Change is Already Harming New York's Environment

13. Anthropogenic emissions of carbon dioxide ($CO_2$), the predominant GHG, are contributing to the observed warming of the planet.[7] The Earth's climate is changing, with adverse consequences already well documented across the globe, in our nation and in the State. Extreme heat events are increasing, and intense storms are occurring with greater frequency. Many of the observed climate changes are beyond

---

[6] 74 Fed. Reg. at 66,525.

[7] IPCC, 2021: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, 2391 pp. doi:10.1017/9781009157896.

what can be explained by natural variability of the climate.[8] These changes are harming, and will continue to harm, New York State's environment, including shorelines, drinking water sources, agriculture, forests, and wildlife diversity.

14.     Temperatures in New York State have risen on average 0.21°F per decade from 1901-2022, with the greatest warming coming in the most recent decades. This warming includes an increase in the number of extreme hot days (days at or above 90ºF) and a decrease in the number of cold days (days at or below 32ºF).[9] The 2011 New York State ClimAID assessment,[10] the 2014 update to ClimAID,[11] and the 2023 New York State Climate Impact Assessment[12] present the numerous direct

---

[8] Ibid.

[9] N.Y. State Energy Research and Dev. Auth., Climate Impacts Assessment: Chapter 2 New York State's Changing Climate [Interim version for public release] (2014) (Christopher Lamie, et al., eds.) (hereinafter the "Climate Impacts Assessment"), at 9.

[10] ClimAID Report.

[11] N.Y. State Energy Research and Dev. Auth., *Climate Change in New York State: Updating the 2011 ClimAID Climate Risk Information* (2014) (Cynthia Rosenzweig, et al., eds.) (hereinafter the "ClimAID Update"), https://www.nyserda.ny.gov/climaid

[12] Stevens, A., & Lamie, C., Eds. (2024). New York State Climate Impacts Assessment: Understanding and preparing for our changing climate. https://nysclimateimpacts.org

impacts that have already been observed in the State. These impacts are described in more detail below.

Natural Resource Impacts

15.    New York State is likely to see widespread shifts in species composition in the State's forests and other natural landscapes within the next several decades due to climate change. Losses of spruce-fir forests and alpine terrain, as well as changes to boreal plant communities are expected. Climate change favors the expansion of some invasive species into New York, such as the hemlock woolly adelgid. Increased $CO_2$ in the atmosphere due to climate change is likely to preferentially increase the growth rate of fast-growing species, which are often weeds and other invasive species. Lakes, streams, inland wetlands and associated aquatic species will be highly vulnerable to changes in the timing, supply, and intensity of rainfall and snowmelt, groundwater recharge and duration of ice cover. Increasing water temperatures will negatively affect brook trout and other native cold-water fish.[13]

---

[13] Hess, S. S., Burns, D. A., Boudinot, F. G.,Brown-Lima, C., Corwin, J., Foppert, J. D., Robinson, G. R., Rose,K. C., Schlesinger, M. D., Shuford, R. L., Bradshaw, D., & Stevens,A. (2024). New York State Climate Impacts Assessment Chapter 05: Ecosystems. Ann NY Acad Sci., 1542, 253–340.https://doi.org/10.1111/nyas.15203

8

16.    New York State's forests and the economy that depends on them will be hurt by climate change. Climate change may affect the forest mix in New York, which could change from the current mixed forest to a temperate deciduous forest. The habitat for existing tree species will decrease as suitable climate conditions shift northward.[14] As forest species change, the resulting decrease in the vibrant display of New York State fall foliage could have a negative impact on regional tourism. New York State's Adirondack Park is the largest forested area east of the Mississippi and consists of six million acres, including 2.6 million acres of state-owned forest preserve.[15] The Adirondack Park, one the most significant hardwood ecosystems in the world, is likely to be threatened by these changes.[16] These changes will also further impact plant and

---

[14]  Hess, S. S., Burns, D. A., Boudinot, F. G.,Brown-Lima, C., Corwin, J., Foppert, J. D., Robinson, G. R., Rose,K. C., Schlesinger, M. D., Shuford, R. L., Bradshaw, D., & Stevens,A. (2024). New York State Climate Impacts Assessment Chapter 05: Ecosystems. Ann NY Acad Sci., 1542, 253–340.https://doi.org/10.1111/nyas.15203

[15] N.Y. State Adirondack Park Agency, "More about the Adirondack Park," https://www.apa.ny.gov/About_Park/more_park.html

[16] Hess, S. S., Burns, D. A., Boudinot, F. G.,Brown-Lima, C., Corwin, J., Foppert, J. D., Robinson, G. R., Rose,K. C., Schlesinger, M. D., Shuford, R. L., Bradshaw, D., & Stevens,A. (2024). New York State Climate Impacts Assessment Chapter 05: Ecosystems. Ann NY Acad Sci., 1542, 253–340.https://doi.org/10.1111/nyas.15203

wildlife species in the Adirondack Park and throughout the state, as the forest composition changes.

<u>Sea Level Rise Impacts</u>

17.    Warming ocean waters contribute to sea level rise, with adverse impacts for New York State. Warmer ocean water, which results in thermal expansion of ocean waters, melting of land ice, and local changes in the height of land relative to the height of the continental land mass, are the major contributors of sea level rise. Warming ocean water has the potential to strengthen the most powerful storms, and combined with sea level rise, will lead to more frequent and extensive coastal flooding. Sea level in the coastal waters of New York State and up the Hudson River has been steadily rising over the 20th century. Tide-gauge observations in New York indicate that rates of relative sea level rise were double the 1920-2022 global average rate.[17]

18.    Sea level rise increases the extent and magnitude of coastal flooding.  For example, the twelve inches of sea level rise the New York

---

[17] Lamie, C., Bader, D., Graziano, K.,Horton, R., John, K., O'Hern, N., Spungin, S., & Stevens, A.(2024). New York State Climate Impacts Assessment Chapter 02: New York State's Changing Climate. Ann NY Acad Sci.,1542, 91–145. https://doi.org/10.1111/nyas.15240

City area has experienced in the past century exacerbated the flooding caused by Hurricane Sandy by about twenty-five square miles, damaging the homes of an additional 80,000 people in the New York City area alone.[18] That flooding devastated several areas of New York City, including the Brooklyn-Queens Waterfront, the East and South Shores of Staten Island, Southern Queens, Southern Manhattan, and Southern Brooklyn. Some areas lost power and other critical services for extended periods. Overall, Hurricane Sandy caused 53 deaths and the estimated costs of response and recovery in New York State exceeded $30 billion.[19]

19.    New York State's tidal shoreline, including barrier islands, coastal wetlands, and bays, is expected to be particularly adversely affected by increased sea levels. New York State has 1,850 miles of tidal coastline,[20] and the State owns dozens of state parks within New York

---

[18] New York City Panel on Climate Change 2015 Report, Chapter 2: Sea Level Rise and Coastal Storms. Ann. N.Y. Acad. Sci. ISSN 0077-8923, *available at* http://onlinelibrary.wiley.com/doi/10.1111/nyas.12593/full

[19] N.Y. Senate Bipartisan Task Force on Sandy Recovery, *Preliminary Response & Recovery Report* at 1, 26 (Feb. 2013), https://www.nysenate.gov/sites/default/files/articles/attachments/Senate%20B ipartisan%20Task%20Force%20on%20Hurricane%20Sandy%20Report%20FI NAL%202-5.pdf

[20] U.S. Bureau of the Census, *Statistical Abstract of the United States 1987* at 187 (107th Ed.).

11

State's coastal boundary. Tidal shoreline property in the State held by private landowners is similarly at risk.

20.   As required by the State's Community Risk and Resiliency Act, based on the sea level rise impacts and projections just described, NYSDEC promulgated regulations, 6 NYCRR Part 490, Projected Sea-level Rise (Part 490). Part 490 provides science-based projections of future sea level rise over time and in different geographic regions of the State. NYSDEC adopted revisions to Part 490 in September 2024 to ensure these projections are based on the most up-to-date science.

More Severe Storms and Flooding

21.   Climate change is also increasing the frequency and magnitude of flood damage and storms. Rising air temperatures associated with climate change intensify the water cycle by driving increased evaporation and precipitation. The resulting altered patterns of precipitation include more rain falling in heavy events, often with longer dry periods in between. Heavy downpours have increased in New York State over the past 50 years. Heavy precipitation events can thereby overwhelm existing drainage systems, flooding streets, subways, and

basements, and posing threat to human life and wellbeing.[21] These trends towards increased frequency, duration, and intensity of precipitation events will increase localized flash flooding in urban areas and hilly regions.[22]

22.    New York State incurs significant costs from damage from flooding. Grants to the State from the Federal Emergency Management Agency (FEMA) Public Assistance Program made in the aftermath of flood disasters almost always require the State to fund a portion of the project. For example, in the aftermath of Hurricane Sandy, FEMA obligated over \$14 billion to New York State and local governments.[23] Even in the case of Hurricane Sandy, which was deemed damaging enough that New York State and local governments had to pay only 10%

---

[21] *See* Stevens, A., & Lamie, C., Eds. (2024). New York State Climate Impacts Assessment: Understanding and preparing for our changing climate. Case study, Hurricane Ida: Flooded Basements Reveal Hidden Inequities. https://nysclimateimpacts.org/explore-the-assessment/case-studies/flooded-basement-inequities/ (last visited April 22, 2025).

[22]  Lamie, C., Bader, D., Graziano, K.,Horton, R., John, K., O'Hern, N., Spungin, S., & Stevens, A.(2024). New York State Climate Impacts Assessment Chapter 02: New York State's Changing Climate. Ann NY Acad Sci.,1542, 91–145. https://doi.org/10.1111/nyas.15240

[23] Fed. Emergency. Mgmt. Agency, *New York Hurricane Sandy (DR-4085-NY)* (last updated Mar. 20, 2020), https://www.fema.gov/ar/disaster/4085

of eligible costs for most projects,[24] these grants entailed significant expenditures.

23.    Flooding due to climate change exacerbates harm to public health, as discussed above, and the environment in New York State. Contaminated floodwaters can spread water borne illnesses and carry toxic materials.[25] The U.S. Secretary of Health and Human Services issued Public Health Emergency Declarations in New York[26] following Hurricane Sandy and Tropical Storm Lee, in large part because of post-flood conditions.

24.    Climate change requires an increased commitment of State emergency response resources to protect lives and property in flood prone areas. For example, swift-water or air-rescue teams rescued over one thousand state residents during the flooding caused by Hurricane Irene in 2011 and Tropical Storm Lee in 2023. New York State committed

---

[24] Fed. Emergency. Mgmt. Agency, *New York; Amendment No. 9 to Notice of a Major Disaster*, 78 Fed. Reg. 32,413 (May 30, 2013).

[25] Barnes, J., Sheffield, P., Graber, N.,Jessel, S., Lanza, K., Limaye, V. S., Morrow, F., Sauthoff, A.,Schmeltz, M., Smith, S., & Stevens, A. (2024). New York State Climate Impacts Assessment Chapter 07: Human Health andSafety. Ann NY Acad Sci., 1542, 385–445.https://doi.org/10.1111/nyas.15244

[26] U.S. Dep't of Health & Human Serv., "Public Health Emergency Declarations," https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx

14

extensive emergency resources in response to the storms, including: deploying 1,700 State Police and 3,200 National Guard members, opening 200 shelters to house 18,000 citizens, and staffing 74 Disaster Recovery Centers to assist citizens during the recovery period.[27] The storms closed 400 road segments and bridges and required repairs at 945 locations on the State highway system.

25.    As EPA has previously recognized, "climate change is also expected to cause more intense hurricanes and more frequent and intense storms of other types, and heavy precipitation."[28] Over 15.5 million people live within coastal counties in New York, the second highest population within the United States (only California has a larger coastal population).[29] According to NOAA's Office of Coastal

---

[27] N.Y. State Office of the Governor, *New York State Responds – Hurricane Irene and Tropical Storm Lee:  One Year Later*. August 2012. Available at:

https://cdn.esd.ny.gov/DisasterRecovery/08232012_LeeIreneOneYear.pdf

[28] 74 Fed. Reg. at 66,525.

[29] Nat'l Oceanic and Atmospheric Admin., *National Coastal Population Report: Population Trends from 1970 to 2010* (Mar. 2013), available at:

https://aambpublicoceanservice.blob.core.windows.net/oceanserviceprod/facts/coastal-population-report.pdf

Management, New York has the most insured coastal properties in the country that are vulnerable to hurricanes ($2.92 trillion in value).[30]

<u>Threats to Infrastructure</u>

26.    New York State maintains or owns critical transportation infrastructure in lower Manhattan, including the Hugh L. Carey Tunnel (formerly the Brooklyn-Battery Tunnel),[31] the South Ferry Terminal,[32] and the West Side Highway, all of which are threatened by sea level rise and extreme weather events.[33]

27.    New York's Metropolitan Transit Authority (MTA) has, especially in the wake of Hurricane Sandy, taken extensive measures to prepare its infrastructure for climate change impacts such as increases in sea level rise, coastal storm surges, extreme winds, average air

---

[30] Nat'l Oceanic and Atmospheric Admin, Office for Coastal Mgmt., "Fast Facts: Hurricane Costs," https://coast.noaa.gov/states/fast-facts/hurricane-costs.html

[31] *See* MTA, *2017 Adopted Budget: February Financial Plan, 2017-2020, available at* http://web.mta.info/mta/budget/pdf/MTA%202017%20Adopted%20Budget%20February%20Financial%20Plan%202017-2020.pdf

[32] *Id.* at 106.

[33] N.Y. State Dep't of Transport., Real Estate Division, Notice of Appropriation, "Route 9A Reconstruction Project," *available at* http://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=FT_1840006500484

temperature and heat waves, and heavy precipitation.[34] In 2016, the MTA identified 46 resiliency projects across its transit system, requiring a total expenditure of just over $750 million, which included both state and federal funding.[35] These projects included:

a. Resiliency measures (e.g., hardening of pump systems, watertight doors, and portal-sealing) designed to improve underground and underwater subway tunnels from flooding from future Category 2 storms, with an additional three-foot safety factor;

b. Redesign of bus depots with interior and exterior flood protections;

c. Elevation of electric substations on the MTA Metro-North Railroad's Hudson Line four feet above projected flood levels; and

d. The installation of flood barriers on each side of the Hugh L. Carey Tunnel.[36]

---

[34] MTA, *MTA Climate Adaptation Task Force Resiliency Report* at 8, *available at* https://new.mta.info/document/10456

[35] *Id.* at 12.

[36] *Id.* at 16-27.

28.    As climate change continues to worsen, it is expected that the State will be required to develop and pay for additional, and increasingly expensive, resiliency projects, as well as bearing the costs of damage from extreme weather incidents associated with climate change. For example, in September 2021, Hurricane Ida caused over one hundred million dollars of damage to New York City alone, including damage to transportation infrastructure.[37]

29.    Reflecting and responding to this new reality due to ongoing climate change, state utility commissions and utilities themselves are taking action to harden the electricity grid and otherwise mitigate these risks. In New York, one utility prepared a comprehensive climate change vulnerability study that identified 52 climate adaptation measures to address climate risks, including hardening electric substations from increased incidence of heavy rain events and flooding, installing transformer cooling to address extreme heat, and moving overhead distribution system components underground to address hurricane force

---

[37] See, https://www.fema.gov/press-release/20211110/279-million-federal-funding-fuels-new-york-two-months-after-hurricane-ida

winds and storm surge.[38] A utility operating in Massachusetts and New York plans to invest \$35 billion over the next five years to harden its grid against extreme weather, as well as reduce emissions and facilitate clean energy development.[39]

## C. Climate Change is Harming New York's Economy

30.    Climate change is also expected to result in less frequent summer rainfall, increased evaporation, and additional, and possibly longer, summer dry periods, potentially impacting the ability of water supply systems to meet demands. Water resources that cross political boundaries and extend across numerous municipalities require coordinated water use to ensure all competing users have equitable access.[40]

---

[38] Con Edison, Climate Change Vulnerability Study at 66-67 (Sept. 2023), https://cdne-dcxprod-sitecore.azureedge.net/-/media/files/coned/documents/our-energy-future/our-energy-projects/climate-change-resiliency-plan/climate-change-vulnerability-study.pdf?rev=24fed7feb6894e7a9b80ed0073c24ad5&hash=05CAE67674E26EF58DF1EDDD458DAB98

[39] R. Walton, National Grid plans 5-year, \$35 B investment in New York, Massachusetts, Utility Dive (May 23, 2024), https://www.utilitydive.com/news/national-grid-plans-5-year-35-billion-investment-new-york-massachusetts/716960/.

[40] Leonard, K., Shaw, S. B., Francis, A.,Hermann, D., Josset, L., May, C. L., Wright, B., Yokota, K., &Stevens, A. (2024). New York State Climate ImpactsAssessment Chapter 10: Water Resources. Ann NY Acad Sci.,1542, 561–619. https://doi.org/10.1111/nyas.15197

31.    Climate change is expected to hurt agriculture in New York State. Increased summer heat stress will negatively affect cool-season crops, requiring farmers to take adaptive measures such as shifting to more heat-tolerant crop varieties and eventually resulting in a different crop mix for New York's farmers.  The loss of long cold winters could limit the productivity of apples and potatoes, as these crops require longer cold dormant periods. New York's maple syrup industry also requires specific temperature conditions for the sugar maples to produce sap. It is projected that sugar maple trees will be displaced to the north as the climate changes and temperatures increase. Increased invasive species pressure associated with longer growing seasons and warmer winters will be an increasingly important challenge. Water management will be a more serious challenge for New York farmers in the future due to increased frequency of heavy rainfall events, and more frequent and intense summer water deficits by mid-to late-century.

32.    Dairy farmers will also be impacted by warmer air temperatures associated with climate change. Milk production is

maximized under cool conditions ranging from 41°F to 68°F.[41]  New York is the third largest producer of milk in the United States, behind California and Wisconsin, with 14.8 billion pounds of milk produced in 2016.[42] During the unusually hot summer in 2005, declines in milk production of five to 15 pounds of milk per cow per day (an eight to 20 percent decrease) in many New York dairy herds were reported.[43] In 2019, New York reported approximately $2.5 billion dollars of cash receipts from its dairy industry.[44] A loss of milk production efficiency from heat effects could result in the loss of hundreds of millions of dollars annually for New York's dairy industry, and a consequential negative impact to the State's tax revenues.

33.    In sum, the effects of climate change on New York will be deadly, widespread, and extremely expensive.

---

[41] Alvaro Garcia, *Dealing with Heat Stress in Dairy Cows* (South Dakota Cooperative Extension Service, Sep. 2002) at 1.

[42] U.S. Dep't of Agric., *Milk Production, Disposition and Income: 2016 Summary* at 10, available at https://www.nass.usda.gov/Publications/Todays_Reports/reports/mlkpdi17.pdf

[43] Peter Frumhoff, *Confronting Climate Change in the U.S. Northeast: Science, Impacts, and Solutions*, Northeast Climate Impacts Assessment, July 2007 at 69.

[44] U.S. Dep't of Agric., *Milk Production, Disposition and Income: 2019 Summary* at 9, https://downloads.usda.library.cornell.edu/usda-esmis/files/4b29b5974/5h73qf66r/hd76sk303/mlkpdi20.pdf

**New York's Efforts to Address Climate Change Harms**

34.    Largely because of these and other impacts on the State due to climate change, the State has numerous programs and laws to reduce GHG emissions.

35.    As mentioned previously, the State's overall GHG emission reduction objectives include reducing statewide GHG emissions by 40 percent from 1990 levels by 2030, and by 85 percent from 1990 levels by 2050, as established by the Climate Act.[45]

36.    The Statewide GHG emission reduction directives established in the Climate Act are applicable to all sources of GHG emissions, including but not limited to, fossil-fuel fired electric generating units. As defined by the Climate Act, statewide GHG emissions include all emissions of GHGs from sources within the State, as well as GHGs produced outside of the State associated with either the generation of electricity imported into the State, or the extraction and transmission of fossil fuels imported into the State. ECL § 75-0101(13).

---

[45] ECL § 75-0107. *See also* ECL § 75-0101(8) and (14) and § 75-0109(1) and (2).

37.    In addition to these statewide GHG emission reductions, the Climate Act also sets forth that 70 percent of the State's electricity come from renewable energy sources by 2030, and that 100 percent of the State's electricity come from carbon-free energy generation sources by 2040. Public Service Law § 66-p. The Climate Act also calls for establishing state programs to procure at least nine gigawatts of offshore wind electricity generation by 2035. *See* Public Service Law § 66-p.

38.    New York also participates in the Regional Greenhouse Gas Initiative (RGGI), a cooperative effort among states (including Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Vermont) launched in 2009 to establish a regional cap on carbon dioxide emissions from power plants. In 2014, participating RGGI states set a cap of 91 million short tons of carbon dioxide emissions. From 2015 to 2020, the RGGI carbon dioxide cap declined by 2.5 percent each year before increasing to an annual decline of 3 percent from 2021 through 2030, representing a steady decline in carbon dioxide emissions from the power sector. Participating states sell emission allowances at quarterly auctions in proportion to their respective share of the regional cap.

NYSERDA invests New York's share of the resulting revenue into programs and initiatives that support GHG emissions reductions and clean energy.

39. In 2019, NYSDEC adopted a regulation, known as the "Peaker Rule," to reduce ozone precursor emissions from "peaking units" that are used to meet electric load during periods of peak electricity demand. These periods occur mostly on hot summer days that coincide with days where monitors record high ozone levels. The Peaker Rule requires facilities that operate "peaking units," which are electric generating units with a nameplate capacity of 15 megawatts or greater called upon to inject power into the transmission or distribution systems during periods of high demand to install control equipment that significantly reduces oxides of nitrogen (NOx) emissions or to no longer operate the peaking unit; noting that there is an "Electric System Reliability" provision built into the regulation that provides some flexibility.

40. Along with implementation of the Climate Act, NYSDEC participates in offshore and onshore wind regulatory and planning processes on a federal and state level. Federal processes for offshore wind

24

in which NYSDEC participates include intergovernmental offshore wind planning coordination led by the Bureau of Ocean Energy Management (BOEM), National Environmental Policy Act reviews. State regulatory processes in which NYSDEC participates include Public Service Law Article VII proceedings for transmission lines that connect offshore and onshore wind turbines to the grid (including through New York State jurisdictional waters for offshore wind projects), permitting for federally delegated regulatory programs, and permitting offshore wind port infrastructure projects. NYSDEC also participates in state interagency planning efforts, NYSERDA technical working groups, and the New York State Independent System Operator Public Policy Transmission Need process. NYSDEC's participation in such processes ensures offshore and onshore wind and related supply chain projects comply with various state environmental laws and regulations and are protective of the environment.

**The Federal Action**

41.    This litigation challenges a Presidential Memorandum issued on January 20, 2025, that indefinitely halted all federal approvals necessary for the development of offshore and onshore wind energy,

*Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Directive), and federal agency actions implementing that halt.

## The Harms the Wind Directive and Related Agency Actions Inflict on New York

42.    The indefinite halt on wind permitting undermines New York's implementation of the Climate Act by not only interfering with the State's offshore wind and zero emission electricity targets, but also by increasing the need for and cost of state actions to further reduce GHG emissions and achieve its statewide emission limits under the Climate Act.

43.    The permitting halt will also have significant adverse environmental and public health consequences to New York if left in place. The halt delays reductions in greenhouse gas emissions and much needed air quality improvements by stalling the transition from fossil fuels to renewable energy sources and increasing reliance on aging natural gas peaking units. In fact, 79 out of the 115 "peaking units" currently operating in New York are over fifty years old with emission rates for older peaking units as much as 97 percent greater than

26

emission rates for new peaking units. It is anticipated that incorporating offshore wind in the locations where these peaking facilities are most needed, such as the New York City metropolitan ozone nonattainment area, will reduce emissions and improve air quality for New Yorkers.

44.    Offshore and onshore wind projects are crucial to achieving emissions reductions that mitigate long-term impacts on public health, ecosystems, and infrastructure. These issues are extremely acute for offshore wind, given that the system mix of Zones G-K (downstate New York, from the Hudson Valley to New York City and Long Island) is currently only 10% zero emissions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Albany, New York on May 2, 2025.

**Jonathan Binder**

27

EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| STATE OF NEW YORK, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>       Defendants. |

Case No. 25-cv-11221

**DECLARATION OF ALISON BRIZIUS**

I, Alison Brizius, declare of my personal knowledge as follows:

1.      I am currently employed by the Massachusetts Executive Office of Energy and Environmental Affairs (EEA) as Assistant Secretary and Director of the Office of Coastal Zone Management (CZM). CZM is the lead policy, technical assistance, and planning agency on coastal and ocean issues in Massachusetts. I have held this position since May 6th, 2024. Prior to joining CZM, I held positions at the City of Boston and the University of Chicago.  At the City of Boston, I served as the Director of Climate and Environmental Planning from August 2017 to July 2021 and as the Commissioner of the Environment Department from August 2021 to April 2024 where I was responsible for leading the Environment Department's work to address climate change impacts, climate resilience, greenhouse gas (GHG) mitigation and environmental protection initiatives.  Prior to joining the City of Boston, from 2011 to 2017, I served as the Executive Director of the Center for Robust Decision-making on Climate and Energy Policy (RDCEP). I have extensive professional knowledge and experience regarding the impacts of climate change on coastal resources and communities in Massachusetts, as well as

Massachusetts' efforts to plan and prepare for such impacts. My job duties include providing oversight and administration for CZM and directing policy development, planning efforts, and technical approaches for CZM program areas. I supervise a team of 30 plus multidisciplinary professionals working in a range of program areas, including climate change adaptation and coastal resilience. Many of the staff I oversee have significant professional experience in coastal and environmental management, planning, science, policy, and other related fields. I routinely engage and partner with scientific and technical subject matter experts in federal agencies and academia. As part of my management responsibilities, I oversee CZM's work to provide information, strategies, tools, and financial resources to support communities and people working and living on the Massachusetts coast to address the challenges of erosion, flooding, storms, sea level rise, and other climate-change impacts. For instance, I oversee the development of sea level rise decision-support tools and services including inundation maps and guidance documents. I also direct CZM's work to provide policy and planning support and technical assistance to other state agencies, local communities, and private entities regarding adaptation and increasing resilience to current and future impacts of climate change on our coast. For example, I oversee CZM's coastal resilience program that offers competitive grants, hands-on technical and planning assistance, and decision-support tools to Massachusetts cities and towns and non-profit organizations for the purposes of planning for and adapting to sea level rise and other climate-change-related coastal hazards.

2.     In my role with CZM, I chair and participate in various legislative and executive branch groups, including the Massachusetts Ocean Advisory Commission and Science Advisory Council and associated work groups and the Seaport Economic Council. I also represent the Commonwealth of Massachusetts (Commonwealth) on several multi-state organizations,

including the Coastal States Organization, Northeast Regional Ocean Council, the Gulf of Maine Council on the Marine Environment, and Bureau of Ocean Energy Management's Gulf of Maine Intergovernmental Renewable Energy Task Force.

3.      I received a Ph.D. and a M.S. in Physics from the University of Chicago, and a B.S. in Physics from Stanford University. I am aware of and familiar with the science related to global and local climate change. My knowledge comes from my review of scientific peer-reviewed literature and consensus assessment reports, attendance at professional conferences and workshops, and professional exposure to other research and material. As a result of my professional experience and my knowledge of the peer-reviewed literature and reports, as well as my knowledge of the Massachusetts coastal resources and policies and planning related thereto, I can attest to the following.

4.      The purposes of this declaration are to: (i) briefly describe the serious harms that climate change, caused in part by greenhouse gas pollutants from conventional energy sources including natural gas and fuel oils, is causing and will continue to cause to Massachusetts' coastal resources, infrastructure, and communities; and (ii) briefly summarize extensive state and local initiatives, programs, and plans to prepare for the impacts of climate change.

5.      I am submitting this declaration in support of the States' motion for a preliminary injunction. I am generally familiar with the Executive Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (Memorandum) signed on January 20, 2025, by President Trump, and particularly the sections relevant to Massachusetts's offshore wind industry. Section one of the Memorandum withdraws from disposition all areas within the Outer Continental Shelf (OCS) as defined in the Outer

Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq*., but does not alter the existing rights associated with existing leases. Section two of the Memorandum directs all relevant members of the executive branch not to issue or renew approvals, rights of way, permits, leases, or loans for onshore and offshore wind projects. During that pause, the Secretary of the Interior will lead an assessment of the environmental impacts of wind energy on wildlife, and of the economic implications of wind energy.

### I.  Climate Change Threatens Massachusetts' Coastal Resources and Communities

6.      The accelerated rate of global sea level rise and the severity and timing of coastal impacts due to this rise in sea level are largely dependent on current and future global greenhouse gas emissions, including from conventional energy resources, and reduction measures. Climate scientists have high confidence that anthropogenic drivers have been the dominant cause of global mean sea level rise since 1970.[1] Continued emissions of greenhouse gases will result in increases in global temperature, yielding additional contributions to global sea level rise (*i.e.*, increased contributions from thermal expansion of warmer waters and melting of land-based ice sheets).[2]

7.      According to the U.S. Global Change Research Program, human-caused climate change has led to a rise in average sea level along the continental U.S. coastline of about 11 inches, which is higher than the rise in global mean sea levels of 7 inches since 1900, and a rate

---

[1] Oppenheimer, M., B.C. Glavovic et al., *Chapter 4: Sea Level Rise and Implications for Low-Lying Islands, Coasts and Communities*, *in* IPCC SPECIAL REPORT ON THE OCEAN AND CRYOSPHERE IN A CHANGING CLIMATE (H.-O. Pörtner et al. eds., 2019).

[2] *See generally* U.S. GLOBAL CHANGE RESEARCH PROGRAM, FIFTH NATIONAL CLIMATE ASSESSMENT (Crimmins, A.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, B.C. Steward, and T.K. Maycock, eds., 2023), https://doi.org/10.7930/NCA5.2023.

4

of rise (1.8 inches per decade) greater than global rates of rise (1.3 inches per decade) over the period of 1993-2020. Over this same time period, both the global and continental U.S. rates of sea level rise have accelerated.[3] Global average sea levels are projected to continue to rise by 1 to 6.5 feet by 2100 (compared to the baseline year 2000).[4] Due to the relationship of the East Coast to the Gulf Stream and melting Antarctic ice sheets, sea level rise will be higher than the global average on the East Coast of the United States.[5]

8.      A March 2018 report entitled *Massachusetts Climate Change Projections* (2018 Projections Report), informed by a team of scientists from the U.S. Department of the Interior's Northeast Climate Adaptation Science Center at the University of Massachusetts Amherst, presents the best available, peer-reviewed science on climate change downscaled, or localized, for Massachusetts through the end of this century.[6] A key component of the 2018 Projections Report is sea level rise projections for the state's coastline. The analysis for Massachusetts consisted of a probabilistic assessment of future relative mean sea level rise at tide gauge stations with long-term records at Boston Harbor, MA, Nantucket, MA, Woods Hole, MA, and Newport, RI.[7] The sea level projections are based on a methodology that provides complete probability distributions for different greenhouse gas emissions scenarios.[8] Working with the principal investigators (Dr. Robert DeConto and Dr. Robert Kopp) and a team of external peer reviewers,

---

[3] *Id.* at 10.

[4] *Id.*

[5] *Id.*

[6] Massachusetts Climate Change Projections (2018), https://eea-nescaum-dataservices-assets-prd.s3.us-east-1.amazonaws.com/resources/production/MA%20Statewide%20and%20MajorBasins%20Climate%20Projections_Guidebook%20Supplement_March2018.pdf.

[7] *See id.* at 11 (citing Robert M. DeConto & Robert E. Kopp, *Massachusetts Sea Level Assessment and Projections*, Technical Memorandum (2017)).

[8] *See id.* (citing Robert E. Kopp et al., *Probabilistic 21st and 22nd century sea level projections at a global network of tide gauge sites*, 2 Earth's Future 383–406 (2014)).

CZM reviewed and synthesized the downscaled projections, which are made available by the Commonwealth, to set forth a standard set of sea level rise projections to be used by municipalities, state government, industry, the private sector, and others to assess vulnerability and identify and prioritize actions to reduce risk. Given a high emissions pathway (Representative Concentration Pathway 8.5), compared to a baseline year of 2000, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea level rise over the twenty-first century (extremely unlikely to be exceeded, 99.5% probability), with as much as 10.2 feet possible when accounting for higher ice sheet contributions (exceptionally unlikely to be exceeded, 99.9% probability).[9]

9.      Massachusetts has approximately 1,500 miles of coastline[10] and a coastal zone (land areas from the shoreline to 100 feet inland of major roads or railways from New Hampshire to Rhode Island) that encompasses 886 square miles.[11] Approximately 5.2 million people or 73% of the Commonwealth's population reside in coastal counties.[12] According to the 2023 ResilientMass Plan (the state's hazard mitigation and climate adaptation plan), the total value of structures within the floodplain for the current 100-year return period coastal storm is about $55 billion, of which about $40 billion is residential, $12 billion is industrial, and $2.5 billion is

---

[9] MASSACHUSETTS CLIMATE CHANGE PROJECTIONS (2018), *supra* note 6.

[10] NOAA OFFICE FOR COASTAL MANAGEMENT - MASSACHUSETTS, https://coast.noaa.gov/states/massachusetts.html.

[11] MASSACHUSETTS OFFICE OF COASTAL ZONE MANAGEMENT, COASTAL ZONE MAP, https://www.mass.gov/doc/the-massachusetts-coastal-zone-map/download.

[12] NOAA OFFICE FOR COASTAL MANAGEMENT - MASSACHUSETTS, https://coast.noaa.gov/states/massachusetts.html.

commercial.[13] The number of vulnerable infrastructure assets and anticipated loss will grow over time as rising seas expand the coastal floodplain.

10.     In addition, there is very high confidence that climate change and sea level rise will increase the frequency and extent of flooding associated with coastal storms, such as hurricanes and nor'easters.[14] In response to higher sea levels, coastal flooding will occur 5–10 times more often by 2050 than 2020 in most locations, with damaging flooding occurring as often as disruptive "high tide flooding" does now if action is not taken.[15] Moderate to major coastal storm events will cause inundation of larger areas, and will occur more frequently, damaging or destroying coastal engineering structures such as seawalls; critical infrastructure such as pump stations, wastewater treatment plants, and transportation systems; and businesses and private property. When coastal storms intensify more rapidly and decay more slowly, it leads to stronger storms that extend farther inland with heavier rainfall and high storm surges. By the 2070s, the total areas flooded during a 100-year coastal flood event in Massachusetts can rise by up to 1.75 times of that in the current baseline (1997-2017).[16] The threat of coastal hazards is also magnified by the increased frequency and magnitude of compound events, which are events due to the joint occurrence of heavy precipitation, higher river flows, elevated groundwater levels, soil saturation, and elevated ocean water levels.[17] More frequent severe storm surges will create

---

[13] RESILIENTMASS PLAN: 2023 MASSACHUSETTS STATE HAZARD MITIGATION AND CLIMATE ADAPTATION PLAN (2023), https://www.mass.gov/doc/resilientmass-plan-2023/download.

[14] *See* U.S GLOBAL CHANGE RESEARCH PROGRAM, *supra* note 2, at 27.

[15] May, C.M., M.S. Osler et al., *Chapter 9: Coastal Effects*, *in* FIFTH NATIONAL CLIMATE ASSESSMENT (Crimmins, A.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, B.C. Stewart, and T.K. Maycock, eds., 2023), https://nca2023.globalchange.gov/chapter/9/.

[16] 2022 MASSACHUSETTS CLIMATE CHANGE ASSESSMENT VOLUME II – STATEWIDE REPORT Fig. 13 (2022), https://www.mass.gov/doc/2022-massachusetts-climate-change-assessment-december-2022-volume-ii-statewide-report.

[17] May, C.M., M.S. Osler et al., *supra* note 15.

7

serious risks for public safety and health, especially where roads, sewer mains, and pump stations are impacted. Frequent tidal flooding from sea level rise may also lead to increases in respiratory diseases due to mold from dampness in homes.[18] Saltwater intrusion—or the increased penetration of salt water into sources of fresh water—from sea level rise will impact water resources (such as drinking water) by contaminating freshwater sources with salt water and also through the corrosion of water supply infrastructure.

11.     The Massachusetts coast includes a diverse array of marine and estuarine ecosystems including, among others, sandy beaches, rocky shores, barrier beaches, islands, and salt marshes. These ecosystems offer immense commercial, recreational, cultural, and aesthetic values to the residents of and visitors to the Commonwealth, while also serving important ecological functions. For instance, natural coastal resources, especially beaches and salt marshes, provide valuable coastal resilience services to the Commonwealth by buffering inland coastal communities and the built environment from waves and storm surges. These coastal ecosystems are also a key driver of outdoor recreation and tourism, which is a significant contributor to the state's $8.3 billion marine economy.[19] Salt water will also impact natural coastal resources, as saltwater intrusion into salt marshes and freshwater wetlands will alter the composition of plant species and affect wildlife that depend on these ecosystems.

## II.  Massachusetts is Experiencing Economic Impacts from Climate Change and is Expending Significant Resources to Adapt and Prepare for Impacts of Climate Change on Our Coastal Areas

---

[18] *See generally* CENTERS FOR DISEASE CONTROL & PREVENTION, U.S. DEP'T OF HEALTH & HUMAN SERVS., COASTAL FLOODING, CLIMATE CHANGE, AND YOUR HEALTH: WHAT YOU CAN DO TO PREPARE (2017), www.cdc.gov/climateandhealth/pubs/CoastalFloodingClimateChangeandYourHealth-508.pdf.

[19] NOAA 2024 MARINE ECONOMY REPORT MASSACHUSETTS, https://coast.noaa.gov/data/digitalcoast/pdf/marine-economy-massachusetts.pdf.

12.     The Commonwealth is already experiencing impacts of climate change. The relative sea level trend at the Boston tide station is (+) 2.97 millimeters per year based on monthly mean sea level data from 1921 to 2024, which is equivalent to a change of 0.97 feet over 100 years.[20]

13.     These impacts are directly harming the welfare of Massachusetts residents and causing significant economic losses. Coastal storms currently result in flooding with extensive damages to public infrastructure (as well as to private homes and businesses), and a significant demand for emergency response and recovery services, including services funded and provided by the Commonwealth. For example, a nor'easter on March 2–3, 2018, which reached the third-highest water level recorded at the Boston Harbor tide gauge, resulted in major flooding, damages, and expenditures for response and recovery. On April 30, 2018, Massachusetts Governor Charles Baker requested a federal disaster declaration, which the Trump Administration approved on June 25, 2018. The disaster declaration authorized FEMA Public Assistance funding for eligible applicants (FEMA DR-4372-MA), and as of March 2023, FEMA has disbursed $15.6 million to coastal communities for public storm-related costs related to the event.[21]

14.     Sea level rise and other impacts of a changing climate pose major risks to communities in Massachusetts' coastal zone. Estimates of coastal property damage in the state are expected to reach over $1 billion a year, on average, by the 2070s with over 70% of damages in the Boston Harbor region, where a large portion of the Commonwealth's commercial

---

[20] *See* NOAA, *Relative Sea Level Trend 8443970 Boston, Massachusetts*, TIDES & CURRENTS, https://tidesandcurrents.noaa.gov/sltrends/sltrends_station.shtml?id=8443970.

[21] RESILIENTMASS PLAN: 2023 MASSACHUSETTS STATE HAZARD MITIGATION AND CLIMATE ADAPTATION PLAN (2023), https://www.mass.gov/doc/resilientmass-plan-2023/download.

economic base is located.[22]  These values are conservative and assume no change in adaptation strategies along the coast. These direct impacts of flooding are largest and grow most rapidly in the Boston Harbor region, where a large portion of the Commonwealth's commercial economic base is located.[23]

15.    Development along the Massachusetts coast is afforded protection from coastal buffers such as beaches and dunes, and from engineered coastal infrastructure such as revetments and seawalls. These coastal engineered structures will experience greater impacts from flooding and wave energy from the anticipated increase in frequency and intensity of coastal storm events associated with accelerated sea level rise and climate change. With these greater impacts will come more frequent need for maintenance and replacement of coastal engineered structures as well as beaches in the form of sediment nourishment at significant costs. For example, the Town of Winthrop needed additional protection from storm surge and flooding impacts for a suburban neighborhood with existing engineered shoreline structures (*i.e.*, seawalls, groins, and breakwaters) and an eroding beach. Between 2013 and 2014, at a cost of approximately $25 million in state funding, 460,000 cubic yards of sand, gravel, and cobble were placed along 4,200 linear feet of shoreline. The community gained approximately 150 feet of beach width at high tide and increased protection against wave energy and coastal storms. Other communities across Massachusetts have worked to design (e.g., Chatham, Provincetown, Nahant, New Bedford, and Rockport) and construct (e.g., Duxbury, Edgartown, Hull, Marshfield, Plymouth, and Scituate) a

---

[22] 2022 MASSACHUSETTS CLIMATE CHANGE ASSESSMENT VOLUME II – STATEWIDE REPORT 72 (2022), https://www.mass.gov/doc/2022-massachusetts-climate-change-assessment-december-2022-volume-ii-statewide-report.

[23] *Id.* at Appendix A: Full Statewide Impact Rankings and Scores by Sector. 2030 damages ($56 million) is equal to the sum of increase in damages from 2008 to "Current" ($22 million) and the increase in damages from "Current" to 2030 ($34 million).

variety of nourishment projects (e.g., cobble berms, beach and dune nourishment) to address erosion and failing coastal engineered structures that will be exacerbated by accelerated sea level rise and increased flooding from coastal storms. As described below, the Commonwealth provides substantial funding and technical assistance for these projects to protect coastal communities and their residents and businesses.

16.    Coastal engineered structures, such as seawalls and revetments, have been constructed along over a quarter of the Commonwealth's ocean-facing shoreline to protect public and private infrastructure and assets from flooding and erosion. The Commonwealth and its municipalities own approximately 92 miles of such structures along the coastline. As a result of wave forces on the coastal structures and lowered beach elevations, the Commonwealth and local governments routinely invest millions of dollars to repair and reinforce these structures so they can adequately protect coastal communities. For example, in 2018 a seawall reconstruction project was completed in the Town of Marshfield to address coastal flooding and public safety issues. The Commonwealth provided a $1.85 million grant and loan award to the town, which was matched with roughly $620,000 in local funds. The approximately 600-foot section of seawall sustained damages during a coastal storm in January 2015, and the state-funded project increased the height of the seawall by two to three feet to better protect a public road, utilities, and homes. The Town of Marshfield has 32 coastal engineered structures along approximately 12 miles of exposed shoreline, totaling over 20,000 feet (3.9 miles), that have been identified as needing repairs and retrofits to address the current and future threats of sea level rise and coastal storms. With higher flood levels and greater storm surges, significantly more investments will be required to achieve the current flood-design protections afforded by these engineered structures across the coast.

17.     The Commonwealth owns a substantial portion of the state's coastal property and infrastructure. The Commonwealth owns, operates, and maintains approximately 177 coastal state parks, beaches, reservations, and wildlife refuges located within the Massachusetts coastal zone. The Commonwealth also owns, operates, and maintains numerous properties, facilities, and infrastructure in the coastal zone, including roads, parkways, piers, and dams. Rising sea levels along the Massachusetts coast will result in either the permanent or temporary loss of the Commonwealth's coastal property through inundation, storm surge, flooding, and erosion events. These projected increases in sea levels will likely destroy or damage many of the state-owned facilities and infrastructure described above. The Commonwealth likely will be required to expend significant resources to protect, repair, rebuild, or possibly relocate the affected properties, facilities, and infrastructure. According to the Commonwealth's *2022 Massachusetts Climate Change Assessment*,[24] annual expected coastal flood damage to state- and state-authority owned properties is expected to increase relative to current risks of about $8 million statewide in the near term (2030s) to about $17 million and to over $52 million annually by the 2070s.[25]

18.     The Massachusetts coastal zone is home to several major ports including the Port of Boston and New Bedford/Fairhaven Harbor. A 2018 economic study indicates the income generated from the Massachusetts maritime economy supports 2.6% of the state's direct employment and 1.3% of gross domestic product.[26] In 2018, New Bedford/Fairhaven Harbor

---

[24] 2022 MASSACHUSETTS CLIMATE CHANGE ASSESSMENT (2022), available at: https://www.mass.gov/info-details/massachusetts-climate-change-assessment.

[25] *Chapter 5. Risk Assessment and Hazard Analysis, in* RESILIENTMASS PLAN: 2023 MASSACHUSETTS STATE HAZARD MITIGATION AND CLIMATE ADAPTATION PLAN 5.1-39 (2023), https://www.mass.gov/info-details/2023-resilientmass-plan.

[26] *See* DAVID R. BORGES ET AL., UMASS DARTMOUTH PUBLIC POLICY CTR., NAVIGATING THE GLOBAL ECONOMY: A COMPREHENSIVE ANALYSIS OF THE MASSACHUSETTS MARITIME ECONOMY 11 (2018), www.mass.gov/files/documents/2018/01/24/Maritime_Economy.pdf.

alone generated $3.7 billion in direct business revenue from seafood processing and fleet operation businesses.[27] By nature of their purpose, the state's ports and harbors are generally low-lying, coastal-dependent areas of high density-built environment and are susceptible to service interruption and associated revenue loss when flooded or otherwise impacted by coastal events. Additionally, coastal dependent businesses, maritime schools, and public facilities and departments will face disruptions in service in post-storm conditions. Acknowledging the cultural and economic importance of the developed port areas in the Commonwealth, in 2021, CZM undertook a pilot study of two ports - Gloucester Inner Harbor and Chelsea Creek - to assess climate vulnerabilities and adaptation opportunities in these areas. The study found that the Gloucester Inner Harbor faces significant current and future flood risks with 50% of all water-dependent industrial use buildings exposed to the historic monthly high tide and 91% of all water-dependent industrial use buildings exposed to the current 1% annual chance flood. Relative to 2008 conditions, the number of buildings exposed to monthly high tides is expected to increase 50% by the 2030s. The study provides tailored resilience strategies (e.g., flood preparedness/business continuity planning, relocation and/or elevation of critical assets and infrastructure, floodproofing, etc.) that could be implemented to address flood risks while continuing to support the operational needs of water-dependent industrial users in port areas, which must remain in vulnerable locations directly adjacent to the water to maintain operations.[28]

19.    The Commonwealth is committed to protecting public safety, human health, the environment, and public resources through programs and policies that address sea level rise and

---

[27] MARTIN ASSOCIATES & FOTH-CLE ENG'G GROUP, ECONOMIC IMPACT STUDY OF THE NEW BEDFORD/FAIRHAVEN HARBOR 5 (2019), https://www.fairhaven-ma.gov/system/files/uploads/economic_impact_study_nbfh_harbor_2019-martin-report_0.pdf.

[28] BUILDING RESILIENCE IN MASSACHUSETTS DESIGNATED PORT AREAS (2021), https://www.mass.gov/files/documents/2022/03/29/building-resilience-in-massachusetts-designated-port-areas.pdf.

other climate-change-related coastal hazards. EEA and CZM provide information, strategies, and tools to help other state agencies and communities plan for and address the challenges of erosion, flooding, storms, sea level rise, and other climate change impacts. In November of 2023, to address the impacts of climate change along the entire coastline of Massachusetts, EEA launched the CZM-led ResilientCoasts initiative.[29] Recognizing the significant threat climate change poses to the Commonwealth's coastal communities and the economy now and in the future, the initiative aims to develop a holistic statewide strategy for coastal resilience including identifying priority areas for regional collaboration and high priority locations where near-term flood risk intersects with high concentrations of people and housing, built infrastructure, and economic resources at risk.

20.    EEA and CZM have established climate grant programs to support the resilience needs of local communities. Since 2014, CZM has awarded approximately $51.2 million (of $101.9 million requested) in state-funded grants to local communities and non-profit organizations to support sea level rise adaptation planning and implementation through the Coastal Resilience Grant Program.[30] Local governments and non-profit organizations have matched these state funds with roughly $17.6 million in local funds and in-kind services. Since 2017, EEA has awarded over $185 million of $350 million requested in municipal grants for climate vulnerability planning and implementation coastwide through the Municipal Vulnerability Preparedness (MVP) Program. Since the start of the MVP Program, local coastal

---

[29] MASSACHUSETTS OFFICE OF COASTAL ZONE MANAGEMENT, RESILIENTCOASTS INITIATIVE, https://www.mass.gov/info-details/resilientcoasts-initiative.

[30] MASSACHUSETTS OFFICE OF COASTAL ZONE MANAGEMENT, CZM GRANT VIEWER, https://www.mass.gov/info-details/czm-grant-viewer.

14

governments have matched MVP grants with over $60 million in local funds and staff time. EEA

and CZM see a significant and growing need for funding support at the local level.

21.     Municipalities, private entities, and other partners are also supporting planning

and implementation of adaptation measures to address the impacts of sea level rise and other

climate change impacts in Massachusetts. Adaptation planning efforts include vulnerability

assessments to determine areas and infrastructure susceptible to coastal impacts, prioritization of

vulnerable assets and areas, and development of adaptation alternatives to mitigate climate risks

in the near and long term. One example is the City of Boston's "Climate Ready Boston"

initiative, which has been developing neighborhood/district-level adaptation plans to address

near-term (2030s-2050s) and long-term (2050s-2070s) actions for addressing future coastal

flooding risks created by sea level rise. The City of Boston has developed strategies for all

neighborhoods/districts along the City's 47-miles of coastline.[31] The City of Boston's reports

estimate the costs for these actions range from $1.68 billion to $2.88 billion.[32] Another example

of regional planning for the impacts of coastal climate change is the *Great Marsh Coastal*

*Adaptation Plan* led by the National Wildlife Federation in partnership with the Ipswich River

Watershed Association.[33] The plan assesses climate impacts and vulnerability for the Great

Marsh region and each of its six communities (Salisbury, Newburyport, Newbury, Rowley,

---

[31] City of Boston, *New Strategies to Enhance Coastal Resilience in East Boston and Charlestown* (2022), https://www.boston.gov/news/new-strategies-enhance-coastal-resilience-east-boston-and-charlestown.

[32] *See Coastal Resilience Solutions for East Boston and Charlestown Phase One (2017)*, estimates range from $153M-$262M; *Coastal Resilience Solutions for South Boston (2018)*, estimates range from $513M-$1,000M; *Coastal Resilience Solutions for Downtown and The North End* (2020), estimates range from $189M-315M; *Coastal Resilience Solutions for Dorchester* (2020), estimates range from $111M-$215M; and *Coastal Resilience Solutions for East Boston and Charlestown Phase Two* (2022), estimates range from $710M-$1,090M; http://boston.gov/departments/climate-resilience/coastal-resilience-planning.

[33] *See* TAJ SCHOTTLAND ET AL., GREAT MARSH COASTAL ADAPTATION PLAN (2017), www.nwf.org/-/media/Documents/PDFs/NWF-Reports/NWF-Report_Great-Marsh-Coastal-Adaptation-Plan_2017.ashx.

Ipswich, and Essex), examining the risk and exposure of critical infrastructure and natural resources, and identifies areas of special concern. The plan states that in Newburyport, estimated one-time damages to buildings and structures (not contents) from a 1% annual exceedance probability storm (also known as the 100-year storm) under 1.09 feet of sea level rise would be $18.3 million, and under 3.45 feet of sea level rise the damages would increase to $32.4 million.[34]

22.    As required by the Massachusetts Global Warming Solutions Act, Mass. Gen. Law ch. 21 N, and the Next-Generation Roadmap for Massachusetts Climate Policy, 2021 Mass. Acts ch. 8, the Massachusetts EOEEA Secretary released the Clean Energy and Climate Plan for 2025 and 2030 ("2025/2030 CECP," June 2022)[35] and the Clean Energy and Climate Plan for 2050 ("2050 CECP", December 2022).[36] The 2050 CECP requires that by 2050, the Commonwealth limit emission to achieve at least net zero greenhouse gas emissions statewide and economywide, and in no event higher than a level 85% below 1990 emissions baseline.[37] The 2025/2030 CECP sets interim limits requiring emissions at least 50% below 1990 by 2030, and at least 75% below by 2040.[38] In an effort to meet these climate goals, EEA has developed pathways to decarbonization, including increased use of offshore wind, solar, other clean energy sources, and energy storage solutions.[39] The 2050 CECP includes a benchmark of 23 gigawatts (GW) of installed offshore wind capacity, coupled with 27 GW of solar capacity, expected to be

---

[34] *Id.* at 49, Table 3.3-3.

[35] *See* MASSACHUSETTS CLEAN ENERGY AND CLIMATE PLAN FOR 2025 AND 2030 (2022), https://www.mass.gov/doc/clean-energy-and-climate-plan-for-2025-and-2030/download.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *See* MASSACHUSETTS 2050 DECARBONIZATION ROADMAP (2020), https://www.mass.gov/doc/ma-2050-decarbonization-roadmap/download.

needed by 2050 to provide the 50 GW in clean electricity resources required to meet carbon emissions limits. The 2050 CECP also estimates that up to 9,500 additional full-time offshore wind workers will be needed by 2050, with an additional 16,400 additional workers required for related sectors of electricity distribution and transmission.

23.     By indefinitely pausing permitting review and approval, and introducing regulatory uncertainty, the Memorandum hinders development of wind energy, which is crucial to meeting Massachusetts' climate mandate.

24.     Without action, sea level rise and increases in the frequency, magnitude, and severity of coastal flooding, erosion, and storms related to greenhouse gas emissions will exacerbate harms to the Commonwealth and its residents, requiring expenditure of additional resources and incurring additional economic, social, and environmental costs.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Boston, Massachusetts on May 2nd, 2025.

_____

Alison Brizius
Executive Office of Energy and Environmental Affairs
Office of Coastal Zone Management
Assistant Secretary and Director

EXHIBIT 3

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

                              Plaintiffs,

            v.                                                    Case No. 25-cv-11221

DONALD J. TRUMP, et al.,

                              Defendants.


# DECLARATION OF MEGAN BRUNATTI
# CHIEF OF STAFF OF THE NEW JERSEY DEPARTMENT OF
# ENVIRONMENTAL PROTECTION

I, Megan Brunatti, declare as follows:

1. I am currently employed by the State of New Jersey Department of Environmental Protection ("NJDEP") as the Chief of Staff.   NJDEP is a principal department in the Executive Branch of the State of New Jersey with offices at 401 East State Street, Trenton, New Jersey.   NJDEP administers programs and enforces laws and regulations to conserve the natural resources of the State, to promote environmental protection, and to prevent pollution of the environment of the State.  N.J. Stat. Ann. § 13:1D-9.

2. I am submitting this declaration in support of the Plaintiff States' Motion for a Preliminary Injunction. This declaration describes climate change impacts that New Jersey is already experiencing and will worsen in the near future, actions New Jersey has undertaken to mitigate these impacts, and how renewable energy such as offshore wind can further mitigate and minimize these harms. This declaration also briefly outlines the typical federal permits that offshore wind ("OSW") projects require which may be impacted by the January 20, 2025 Presidential Memorandum targeting OSW ("Memorandum") and describes the Memorandum's negative impact on one OSW project in New Jersey.

3. The following information and data have been gathered for me, and I am personally familiar with the NJDEP programs discussed herein based on my role at NJDEP.

**NJDEP's Obligation to Consider and Address Climate Change**

4. N.J. Stat. Ann. § 13:1D-9 authorizes the NJDEP Commissioner to formulate, implement, and enforce policies to protect the environment, including policies to reduce greenhouse gas emissions and address climate change.

5. The 2007 New Jersey Global Warming Response Act (GWRA) puts a statutory limit on greenhouse gas emissions. N.J. Stat. Ann. § 26:2C-40.

The limit is to achieve 80% reductions from 2006 levels by 2050. The GWRA was reauthorized and updated in 2019 with additional, more directed mandates. The GWRA requires NJDEP to issue a report that outlines the State's strategy to achieve the 2050 limit, N.J. Stat. Ann. § 26:2C-42, which is found at https://dep.nj.gov/climatechange/mitigation/80x50-report/.

6. Pursuant to Executive Order No. 89 (Murphy) (2019), an Interagency Council on Climate Resilience was created to assist NJDEP in developing a Statewide Climate Change Resilience Strategy. The 2021 New Jersey Climate Change Resilience Strategy report can be accessed at https://dep.nj.gov/climatechange/resilience/resilience-council/.

7. Executive Order No. 100 (Murphy) (2020), directs NJDEP to: (1) take immediate regulatory actions to prevent further increases of harmful greenhouse gas emissions and other climate pollutants that could prevent the State from reaching its clean energy goals and exacerbate the current climate crisis; and (2) integrate climate change considerations, such as sea level rise and chronic flooding, into its regulatory and permitting programs.

8. In response to Executive Order No. 100 and Administrative Order No. 2020-01, NJDEP in 2023 drafted the Strategic Climate Action Plan, available at https://dep.nj.gov/strategic-climate-action-plan/, and also launched the New

Jersey Protecting Against Climate Threats (NJ PACT) initiative in 2020. Through NJ PACT, as explained more below, NJDEP has advanced state-specific climate science to ground planning and policy actions, invested in clean energy and climate resilience strategies, and pursued regulatory reforms to modernize various environmental requirements.

9. NJDEP has a webpage devoted to climate change and has established the NJDEP Office of Climate Resilience to provide strategic direction and support to the Interagency Council on Climate Resilience and other cross-departmental climate change resilience initiatives. https://dep.nj.gov/climatechange/.

10. New Jersey's Legislature has also charged NJDEP with providing technical assistance to municipalities preparing a climate change related hazard vulnerability assessment. N.J. Stat. Ann. § 40:55D-28.1.

**Major Sources of Greenhouse Gas Emissions**

11. According to the United States Environmental Protection Agency ("EPA"), the largest source of greenhouse gas emissions from human activities in the United States is from burning fossil fuels for electricity, heat, and transportation. www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions. Greenhouse gas emissions from the commercial, residential, and industrial sectors increase substantially when indirect emissions from

electricity end-use are included, due to the relatively large share of electricity use by buildings (e.g., heating, ventilation, and air conditioning; lighting; appliances and plug load) and use of electricity for powering industrial machinery. *Id.*

12. In New Jersey, the largest source of greenhouse gas emissions is the transportation sector, followed by electric generation. https://dep.nj.gov/ghg/nj-ghg-inventory/.

13. Under existing federal law, New Jersey is generally preempted from taking independent action directly regulating new motor vehicle emissions in a way that departs from the federal government's standards. 42 U.S.C. § 7543(a). At most, New Jersey can adopt any more stringent standards California adopts that are approved by the federal government under a Clean Air Act waiver, 42 U.S.C. § 7507, and § 7543(b), but New Jersey cannot exceed either the federal government's or California's new motor vehicle emission standards. This unfortunately limits some of the actions New Jersey can take to address climate change emissions from the transportation sector.

14. To address emissions from the transportation sector to the extent it can, New Jersey among other things has implemented various electric vehicle (EV) incentive programs that incentivize the purchase of EVs and EV chargers.

[www.njcleanenergy.com/residential/programs/electric-vehicle-incentive-programs](www.njcleanenergy.com/residential/programs/electric-vehicle-incentive-programs).

15. New Jersey's goal is to ensure that increased electricity demand due to increased EV usage is supplied by renewable energy, including offshore wind. Energy Master Plan, chpt. 2 (2019), [www.nj.gov/emp/docs/pdf/2020_NJBPU_EMP.pdf](www.nj.gov/emp/docs/pdf/2020_NJBPU_EMP.pdf).

**New Jersey is Suffering Now from the Harmful Impacts of Climate Change**

16. New Jersey currently is suffering the consequent harms of climate change. These include sea-level rise and attendant flooding, erosion, damage to riparian lands and submerged lands, and loss of wetlands and beaches; increased frequency and intensity of extreme weather events, including coastal and inland storms and associated flooding, drought, extreme heat, extreme precipitation events, wildfires, habitat loss, species impacts, and others; ocean warming and acidification; and the resulting social, economic, health and other consequences of climate change. *See generally* 2020 New Jersey Scientific Report on Climate Change, chpt. 4.

17. New Jersey's total coastal zone encompasses 1,792 miles of coastline, and covers a vast portion of the state, including parts of 17 counties and 239 municipalities (42% of total municipalities). [https://dep.nj.gov/wlm/lrp/coastal-zone/](https://dep.nj.gov/wlm/lrp/coastal-zone/). Eighty percent of New Jersey

residents, approximately seven million people, live year-round in the coastal zone. State of New Jersey Climate Change Resilience Strategy, 75, 98 (Oct. 12, 2021). https://dep.nj.gov/climatechange/resilience/resilience-strategy/.

18. NJDEP itself owns and manages numerous State-owned coastal and water-front properties, including Barnegat Lighthouse State Park, Cape May Point State Park, Island Beach State Park, Liberty State Park, and the North Brigantine Natural Area. https://www.nj.gov/dep/parksandforests/. Examples of such properties include:

   a. Island Beach State Park is a narrow barrier island that stretches for 10 miles between the Atlantic Ocean and Barnegat Bay. The island encompasses over 2,000 acres and 10 miles of coastal dunes, and is one of the few remaining undeveloped barrier beaches on the north Atlantic coast.

   www.nj.gov/dep/parksandforests/parks/islandbeachstatepark.html.

   b. Liberty State Park is located directly on the Hudson River. It is currently undergoing revitalization to create a central park in its center and build resilience to flooding and climate change. https://dep.nj.gov/revitalizelsp/.

c. Located on the Atlantic Ocean shoreline, Cape May Point State Park contains 244 acres of freshwater meadows, ponds, forests, dunes and beach.  The famous Cape May Lighthouse is located here, and the park is known for its world-renowned fall bird migration, monarch butterflies, and Cape May diamonds. www.nj.gov/dep/parksandforests/parks/capemaypointstatepark.html.

d. North Brigantine Natural Area was created in the 1960s as a conservation preserve with the management objective of "preservation of salt marsh habitat, coastal dune, and rare species habitat." www.nj.gov/dep/parksandforests/parks/northbrigantinenaturalarea.html.  The vast majority of the North Brigantine Natural Area is bordered by the Atlantic Ocean, bays, and channels, and hosts listed threatened or endangered species such as piping plover, red knot, northern diamondback terrapin, least tern, and seabeach amaranth.  *Id.*  Together with the adjacent federal sites of Holgate and Little Beach (two parts of the Edwin B. Forsythe National Wildlife Refuge), the combined area is the longest stretch of undeveloped barrier island beach on the New Jersey coast.  *Id.*

19. New Jersey's coastal zone is critical to a $50 billion maritime industry, which includes ports and terminals, cargo movement, boat manufacturing

and sales, ferry operations, and marine trade, among other things.  State of New Jersey Climate Change Resilience Strategy, at 77.

20. As part of the coastal zone, New Jersey has about 125 miles of white sand beaches along the Atlantic coastline.  The so-called Jersey Shore is a major tourist destination, attracting millions of visitors each year and generating billions of dollars for the state's economy.  More than 50 million visitors visited four coastal counties at the Shore (Monmouth, Ocean, Atlantic, and Cape May), spending approximately $23.39 billion, in 2022.  chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://visitnj.org/sites/default/files/2023-05/2022_Tourism_Economic_Impact_Study.pdf.

21. With its large and economically important coastline, New Jersey is especially vulnerable to harms from rising sea levels.  The sea level along the Jersey coast is rising faster than the global average.  In Atlantic City, Cape May, and Sandy Hook, sea level rise has averaged .2 to .5 inches per year since 1900.  2020 New Jersey Scientific Report on Climate Change, Exec. Summary at ix; chpt 4.3 at 44.

22. As the sea level has risen, the occurrence of high-tide floods, which are instances where upland flooding occurs solely due to the high tide levels in the absence of any precipitation, also has increased.  In Atlantic City, the frequency of tidal flooding events has increased from an average of one per

year in the 1950s to an average of eight per year from 2007 to 2016. *Id.* at 45.

23.  The State-owned East Point Lighthouse, located on the Delaware Bay shore, also is suffering from a disappearing shoreline. Originally built 500 feet back from the water, today the lighthouse is less than 100 feet from the high tide line. In 2019, New Jersey spent approximately $460,000 on a 570-foot geo-tube berm, but a longer-term solution may be necessary.

24. New Jersey's temperature is rising faster than the rest of the Northeast region. Since 1895, New Jersey's annual temperature has increased by 3.5°F. 2020 New Jersey Scientific Report on Climate Change, Exec. Summary at vii; chpt 4.1 at 31. June and July 2024 were the second hottest on record in New Jersey since the state began keeping records in 1895. Eight of the 10 warmest Julys, going back to 1895, have occurred since 2010. Rutgers New Jersey Weather Network. www.njweather.org/news.

25. The urbanization of large parts of New Jersey has resulted in large expanses of asphalt and concrete, and the loss of forests, fields, and other open spaces. These conditions make heat waves especially pronounced and lead to increased impacts in densely populated urban areas, the so-called heat island effect. 2020 New Jersey Scientific Report on Climate Change, Exec. Summary at vii; chpt 4.1 at 30.

26. New Jersey's freshwater and coastal wetlands have experienced increased levels of salinity from increased sea-levels and flooding during storms. This saltwater inundation has caused New Jersey to experience "ghost forests," or stands of dead trees, surrounded by transitional marshes. 2020 New Jersey Scientific Report on Climate Change, Exec. Summary at xii-xiii, chpt. 5.5-2.5 at 106.

27. Over the last 50 years storms in New Jersey that resulted in extreme rain increased by 71%, which is a faster rate than anywhere else in the United States. *Id.* at ix. By the end of this century, heavy precipitation events are projected to occur two to five times more often, and with more intensity than in the last century. *Id.* at viii. Total annual precipitation in New Jersey has been about 3.7 inches above the long-term average for the past 16 years. Runkle et al., New Jersey State Climate Summary 2022, at 1-5, NOAA Technical Report NESDIS 149-NJ, https://statesummaries.ncics.org/chapter/nj/.However, small decreases in the amount of precipitation may occur in the summer months, resulting in greater potential for more frequent and prolonged droughts. 2020 New Jersey Scientific Report on Climate Change, Exec. Summary at xiii.

28. These increased precipitation levels and more intense storms have subjected New Jersey residents to more extreme storms, including coastal

nor'easters, snowstorms, spring and summer thunderstorms, tropical storms, and, on rare occasions, hurricanes. *Id.* Extreme storms that resulted in major flooding in the State include storm events in 2000, 2004, 2005, 2006, 2007, 2010, 2011, 2012, and 2016. Id., 42. *See also* https://www.ncei.noaa.gov/access/billions/state-summary/NJ (summarizing numerous extreme weather events that resulted in severe flooding in New Jersey). One major example of a combined hurricane and nor'easter is Superstorm Sandy, which landed in in New Jersey in October 2012 causing widespread flooding inundation that damaged or destroyed 346,000 homes, and resulted in the loss of 38 lives, power to 2 million people for an extended period, and approximately $30 billion in damages. https://dep.nj.gov/sandy-10/.

29. Tropical Storm Ida in 2021 caused extensive damage to NJ Transit's maintenance facility in Woodbridge Township, which continues to be risk-prone due to destructive weather events. To alleviate this danger, NJ Transit is now building a new facility in another town. https://www.njtransit.com/press-releases/nj-transit-receives-75-million-grant-fta-new-rail-maintenance-way-facility. Superstorm Sandy damaged more than 300 NJ Transit rail cars and locomotives, and flooding devastated the Hoboken rail yard and the Meadowlands maintenance complex,

resulting in more than $400 million in damage.  https://jerseydigs.com/nj-transit-storage-yard-breaks-ground/#:~:text=In%202012%20Superstorm%20Sandy%20damaged,than%20%24400%20million%20in%20damage.

30. In sum, climate change is already causing more extreme weather in New Jersey, with attendant physical and environmental consequences, including coastal flooding, coastal erosion, inland flooding, extreme heat events, and drought.  Climate Change Report at 42.  Coastal storms have already caused tens of billions in damages in New Jersey, along with floods, power outages, sewerage spills, and other disasters.

**New Jersey Will Continue to Suffer the Harmful Impacts of Climate Change if Mitigating Action is not Taken**

31. New Jersey has also studied what impacts it could reasonably expect if anthropogenic greenhouse gas emissions continue at their current rate.  The results of these studies are stark.

32. By 2050 – in 25 years - there is a 50% chance that New Jersey experiences sea-level rise that meets or exceeds 1.4 feet, and a 17% chance that sea-level rise exceeds 2.1 feet.  These levels are within the "likely range" of sea-level rise.  2020 New Jersey Scientific Report on Climate Change at 46, Table 4.3.  By the end of the century (2100), those levels rise to 3.3 and 5.1 feet, respectively, under a moderate emissions regime.  *Ibid.*

33. By 2030 –five years from now – a one-foot sea level rise is expected to inundate approximately 757 acres of Island State Beach State Park, comprising around 30% of total beach area. Cape May State Park is expected to lose approximately 100 acres due to sea level rise by 2030, which is about 38% of the park's total beach area. State-wide, a one-foot rise in sea level will inundate approximately 97,000 acres of State-owned property.

34. In Atlantic City, by the year 2100 it is extremely likely (i.e., greater than a 95% chance) that the city will experience high-tide flooding at least 95 days per year, and likely (50% chance) that the city will experience high-tide flooding 355 days per year. *Id.* at 45.

35. Climate change also is expected to continue to alter the frequency and intensity of precipitation events in New Jersey. The rise in precipitation levels will subject New Jersey residents to more frequent and severe flooding events. *Id.* at 42. Additionally, extreme precipitation events will degrade water quality as increased runoff deposits exceed sediment and contaminants into the State's surface water, thereby causing eutrophic conditions and increasing the potential for harmful algal blooms. <u>Ibid.</u>

**New Jersey Is Undertaking Various Actions to Mitigate Climate Change Impacts**

36. New Jersey has incurred significant costs on various actions to address sea-level rise, including but not limited to: conducting comprehensive surveys of sea-level rise threats to the State, analyzing sea-level rise in certain transportation infrastructure projects, incorporating sea-level rise as a core criterion in storm and flood reduction and coastal resilience projects, funding local resilience planning efforts for coastal communities, providing floodplain management assistance to local communities, buying out homes located in flooding zones, rebuilding beaches and barrier islands along the Atlantic shoreline, restoring coastal wetlands and sea grass beds, and incurring past and future cost commitments of approximately $2.5 billion for flood resilience and shore protection projects. See generally https://dep.nj.gov/climatechange/.

37. New Jersey's climate resilience protection and planning programs include Rebuild by Design, Resilient NJ, the Liberty State Park Revitalization, and Blue Acres.

38. Rebuild by Design is a program funded by the U.S. Department of Housing and Urban Development ("HUD") to develop projects and ideas to improve resiliency in regions affected by Superstorm Sandy. New Jersey has two Rebuild by Design projects, one on the Hudson River and the other in the Meadowlands, that are using $380 million in HUD funding. NJDEP is

responsible          for          administering          the          projects.
https://dep.nj.gov/floodresilience/.

   a.  The Hudson River project, funded by $230 million in federal funds, aims to protect three Hudson River communities from coastal storm surge events.

   b.  The Meadowlands project, funded by $180 million in federal funds, encompasses the design and construction of various stormwater management activities to reduce flooding risks and enhance resiliency in the area. https://dep.nj.gov/floodresilience/rebuild-by-design-meadowlands-project-overview/.

39. Resilient NJ is an assistance program, funded by the State, to support local and       regional       climate       resilience       planning. www.nj.gov/dep/bcrp/resilientnj/. Using best available science on precipitation, temperature, and sea-level rise, Resilient NJ helps communities plan for how climate change may affect the natural and built environments in their communities. *Id.* To date, four multi-municipal regions – Northeastern New Jersey, Raritan River & Bay Communities, Long Beach Island Region, and Atlantic County Coastal Region - have developed and implemented their own Regional Resilience and Adaptation Action Plans.

40. The Blue Acres program provides guidance regarding State acquisition of lands that increases host community resilience to sea-level rise and storm-related flooding, and that helps buffer or protect other lands from such damage.  https://dep.nj.gov/blueacres/.  Funding is provided by both the state and federal governments.  In Fiscal Years 2023 and 2024 alone, New Jersey spent approximately $100 million funding the Blue Acres program.

41. New Jersey's Coastal Area Facility Review Act, or CAFRA, also created the Shore Protection Fund to provide funding for projects designed to protect New Jersey's shoreline from wave, storm, and flooding damage. N.J. Stat. Ann. § 13:19-16.1.  Recent legislation has set the annual appropriation at $25 million.  N.J. Stat. Ann. § 46:15-8(c)(1).  Shore protection projects include the design, construction, and maintenance of engineered dunes and beach berms that are then subject to periodic replenishment, as well as the construction and maintenance of so-called hard structures such as bulkheads, jetties, and seawalls.

42. New Jersey has partnered with the United States Army Corps of Engineers to build and maintain shore protection projects including, most notably, the engineered dune and beach berm projects along the Atlantic Ocean coastline after Superstorm Sandy. *See*, *e.g.*, www.nan.usace.army.mil/Missions/Civil-Works/Projects-in-New-Jersey/.

The Army Corps is Congressionally authorized to design, build, and then replenish these projects through a cost-sharing agreement with New Jersey, wherein both governments bear a portion of the project costs. https://dep.nj.gov/wlm/drec/ce/federal-projects/.

43. New Jersey also has undertaken regulatory reform efforts to modernize environmental laws as part of NJ PACT.  NJ PACT consists of taking actions: (1) to cut emissions of greenhouse gases and short-lived climate pollutants, and (2) to tailor land use and planning policies to adapt to the impacts of climate change such as sea-level rise, extreme weather events, and chronic flooding.  https://dep.nj.gov/njpact/.

44. Some of the regulatory actions New Jersey has taken pursuant to NJ PACT to address climate change emissions are

   a. Adopting regulations that set declining $CO_2$ emissions limits for electric generating units and end the in-State use of certain heavy fuel oils, N.J.A.C. 7:27C;

   b. Adopting California's Advanced Clean Trucks rule, which has two main components: (1) a manufacturer's Zero Emissions Vehicle ("ZEV") sales requirement starting in model year 2025, and (2) a one-time reporting requirement for large entities and fleets, N.J.A.C. 7:27-31 and -33;

c. Adopting California's Omnibus Rule establishing stricter NOx limits for heavy-duty engines and vehicles, taking effect in 2025, N.J.A.C. 7:27-28A;

d. Adopting regulations requiring monitoring and reporting for methane emissions by facilities that emit 100 tons of methane or more per year, refrigerant usage by facilities that use 50 pounds or more of high global warning potential refrigerants, and natural gas lines, leak detection and blowdown events by natural gas public utilities, N.J.A.C. 7:27-21.2; N.J.A.C. 7:27E; and

e. Adopting California emission standards for various mobile sources including mobile cargo handling equipment at ports and railyards, N.J.A.C. 7:27-34.  (draft) NJDEP Strategic Climate Action Plan (Sept. 2023), at 20.  https://dep.nj.gov/climatechange/.

45. NJDEP also adopted the Inland Flood Protection Rule under NJPACT's land development regulatory regime, which amends both New Jersey's Flood Hazard Area Control Act rules, N.J.A.C. 7:13, and the Stormwater Management Rules, N.J.A.C. 7:8, to bolster community resilience in the face of anticipated increases in the intensity of precipitation events, based on climate-informed precipitation data.  The Inland Flood Protection Rule updates the nearly 30-year-old rainfall data collected in the 1970s and 1980s

to modern precipitation rates, accounts for future increases in climate change-induced precipitation and how that may require alterations in stormwater system design, and updates flood mapping to account for current and future conditions.  https://dep.nj.gov/inland-flood-protection-rule/.

46. Also, under NJ PACT, NJDEP has proposed updating land resource protection rules governing coastal resources, freshwater wetlands, and flood hazard areas to better address resilience to sea-level rise, extreme weather, flooding, and other impacts of climate change.  The Reform to Support Resilient Environments and Landscapes (REAL) regulations, if adopted, would, among other things, adjust the coastal flood hazard area to account for rising sea levels and attendant storm surge, and create an inundation risk zone.  https://dep.nj.gov/njreal/; *see also* 56 N.J.R. 1282(a) (Aug. 5, 2024).

47. In 2019, New Jersey rejoined the Regional Greenhouse Gas Initiative ("RGGI"), a multistate market-based program that establishes a regional cap on carbon dioxide emissions from the electric-sector and requires fossil fuel power plants with a capacity greater than 25 megawatts ("MW") to obtain an allowance for each ton of $CO_2$ emitted annually.  www.nj.gov/dep/aqes/rggi.html.   In 2024, the RGGI auction allowance

process allocated approximately $267 million to New Jersey for investment in clean energy and greenhouse gas reduction strategies in the State.  *Ibid.*

48. New Jersey has implemented numerous opportunities for climate funding and grants, including a program to offset the cost of purchasing and maintaining electric vehicle charging stations, providing funding for modernizing storm water infrastructure and management strategies, and instituting a climate pollution reduction grant program to fund actions that will achieve significant greenhouse gas emission reductions by 2030.

## New Jersey has Undertaken or Funded Various Research Work Related to Offshore Wind Development

49. New Jersey's Research and Monitoring Initiative funds scientific research projects addressing the need for regional research and monitoring of marine and coastal resources during offshore wind development, construction, operation, and decommissioning in New Jersey. https://dep.nj.gov/offshorewind/rmi/.

50. Funding for the initiative is provided by developers of offshore wind and developers must commit $10,000 per megawatt of project capacity awarded. The Research and Monitoring Initiative has received around $26 million

from New Jersey's Offshore Wind Solicitation 2, and additional funds have been obligated through New Jersey's Offshore Wind Solicitation 3. https://njcleanenergy.com/renewable-energy/programs/nj-offshore-wind/solicitations.

51. Projects funded under the initiative include an aerial survey of whales, a whale satellite-tagging study, a study of seasonable water-mixing dynamics, the expansion of an existing tracking system for birds and bats, and a study focused on sea turtle behavior and health. https://dep.nj.gov/newsrel/24_00325/.

**New Jersey Relies on the Federal Government to Facilitate Construction of Offshore Wind as Climate Change Mitigation**

52. Although New Jersey is working to reduce climate change emissions through numerous avenues, including pursuing responsibly designed and located offshore wind projects, numerous agencies within the federal government play a significant role in offshore wind project authorizations, as detailed in the Complaint filed in this case.

53. The typical New Jersey OSW energy generating facility also requires a number of New Jersey permits before it can begin construction, often related to the transmission cables, supporting infrastructure, and any associated onshore facilities landward of the mean high water line. These include:

a.  An individual permit under the Coastal Area Facilities Review Act, N.J. Stat. Ann. §13:9-1, et seq.,

b.  A Waterfront Development Act permit under N.J. Stat. Ann. § 12:5-3,

c.  A Coastal Wetlands Act permit under N.J. Stat. Ann. § 13:9A-1, et seq.,

d.  A permit under the Freshwater Wetlands Protection Act, N.J. Stat. Ann. § 13:9B-1, et seq., related to any onshore freshwater wetlands fill or disturbance,

e.  A Flood Hazard Area Control Act permit under N.J. Stat. Ann. § 58:16A-1, et seq, for facilities that are constructed in a flood zone, and

f.  A Tidelands Conveyance under N.J. Stat. Ann. § 12:3-1 for any part of the project, including utility lines, that occupies or bisects an area that is currently or was previously flowed by the tide.

54. While an offshore energy generation facility applicant must successfully obtain all these approvals or authorizations before project construction can begin, because the project is physically located within federal waters and is subject to so many more federal approvals than State approvals, the federal government plays an outsize role in offshore wind development.

55. The federal government's permitting authority has already had an impact on the construction timeline for at least one New Jersey OSW project.

56. Specifically, Atlantic Shores Offshore Wind Project 1, LLC ("Atlantic Shores") has proposed an OSW project beginning approximately 8 miles off of New Jersey's shore consisting of upwards of 200 wind turbines.

57. Atlantic Shores obtained an OCS Clean Air Act permit from the EPA on September 30, 2024 for air pollutants emitted during the project's construction and later operational phases.

58. The Clean Air Act permit was challenged in EPA's Environmental Appeals Board ("EAB").

59. On February 28, 2025, Region 2 of the EPA filed a motion with the EAB for voluntary remand of the Clean Air Act permit back to EPA "to reevaluate" the project "in light of the January 20, 2025 Presidential Memorandum entitled *Temporary Withdrawal of All Area on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*." In re Atlantic Shores Offshore Wind, LLC Permit No. OCS-EPA-R2 NJ 02, Environmental Appeals Board March 14, 2025 order at 2.

60. Though Atlantic Shores objected, on March 14, 2025, the EAB granted EPA's remand motion, relying in part on the "Board's broad discretion to grant a voluntary remand" even where the Region does not provide

"specific substantive changes to the final permit it wishes to make or specific elements of the permit decision it seeks to reconsider." *Id.* at 6.

61. To the best of my knowledge, EPA has taken the position that Atlantic Shores does not have a final Clean Air Act permit at this time as a result of the appeal and the remand.

62. Atlantic Shores must obtain a Clean Air Act permit before it can begin constructing its OSW project.

**A Significant Portion of New Jersey's Greenhouse Gas Emissions is Attributable to the Power Generation Sector, and New Jersey is Relying in Part on Offshore Wind to Mitigate Further Climate Change Impacts by Reducing Greenhouse Gas Emissions from that Sector**

63. In 2021, electric generation accounted for approximately 19 metric tons of carbon dioxide-equivalent emissions in New Jersey, equal to approximately 20% of total carbon dioxide-equivalent emissions in New Jersey for 2021. https://dep.nj.gov/ghg/nj-ghg-inventory/. Emissions at these rates generated 64,512 GWh worth of power output. *Id.*

64. New Jersey has a goal of generating 11 gigawatts ("GW") (11,000 MW) of OSW energy by 2040. Executive Order No. 307 (Murphy) (Sept. 21, 2022). Based on NJ's total electric generation for 2023, this represents approximately 17% of total electric generation at 2023 generation levels. https://njenergydata.rutgers.edu/electricity/, New Jersey Total Annual Generating Capacity by Fuel (Megawatt Hours).

65. OSW has the potential to deliver the scale of clean, renewable energy generation needed to meet New Jersey's goals of 50% clean energy by 2030 and 100% clean energy by 2050, which will help ensure that greenhouse gas emissions from the power sector in New Jersey are significantly reduced, if not wholly eliminated by 2050.  See EO Nos. 307 (Murphy) (Sept. 21, 2022), 92 (Murphy) (Nov. 19, 2019), and 8 (Murphy) (Jan. 31, 2018).

66. New Jersey has set statutory targets for offshore wind development.  The New Jersey's Offshore Wind Development Act, P.L. 2010, c.17, provides authority for the New Jersey Board of Public Utilities ("NJBPU") to establish an offshore wind renewable energy certificate ("OREC") program and NJBPU has developed rules overseeing the OREC program.  N.J.A.C. 14:8-6.6 and 6.7.

67. New Jersey also has planned for the transmission infrastructure required to support offshore wind development.  Declaration of Katharine Perry, ¶¶69-72.

68. If New Jersey is unable to increase renewable energy capacity from offshore wind, it may have to buy power from higher polluting power sources outside the State.  In 2023 New Jersey obtained nearly one-fifth of its power from generators in other states by way of the regional grid.

https://www.eia.gov/state/?sid=NJ, Analysis, Electricity.  New Jersey is part of PJM Interconnection, L.L.C., a regional transmission organization that coordinates the movement of wholesale electricity in all or part of 13 states and the District of Columbia.  https://www.pjm.com/about-pjm. While New Jersey's electric distribution companies theoretically could purchase renewable energy certificates (representing power generated by renewable energy) from out-of-state generators, greater demand for electricity and renewables across the region could drive up the cost of such certificates.  Further, New Jersey is a transmission-constrained state, meaning New Jersey is limited in the amount of power it can import depending on numerous variables.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Megan Brunatti*

Megan L. Brunatti

Chief of Staff

New Jersey Department of Environmental Protection

Dated: May 1, 2025

EXHIBIT 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTES

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 25-cv-11221 |

## DECLARATION OF DAN BURGESS
## DIRECTOR OF THE MAINE GOVERNOR'S ENERGY OFFICE

I, Dan Burgess, declare as follows:

1.    I am Director of the Maine Governor's Energy Office ("GEO") and have served in this role since 2019, when I was appointed by Maine Governor Janet Mills. I submit this declaration in support of the Plaintiff States' motion for a preliminary injunction.

**Personal background and qualifications**

2.    I hold a Bachelor of Science degree in Business Administration from the University of Maine and Masters in Public Administration from Northeastern University.

3.    Prior to my current role at the GEO, I served as Deputy Commissioner and Chief of Staff at the Massachusetts ("MA") Department of Energy Resources and prior to that as Acting Commissioner. Before working at the MA Department of

Energy Resources, I worked as Legislative Director for Energy at the Executive Office of Energy and Environmental Affairs in Boston, MA.

4.    Pursuant to 2 M.R.S. § 9, I was appointed as Director of the GEO by the Governor, and in this position, I am responsible for the execution of the duties of the GEO, including, among other things, serving on the Board of Efficiency Maine Trust, collaborating with state agencies to coordinate state energy policy, and drafting a comprehensive state energy plan for submission to the Governor and the Maine Legislature.

**The Maine Governor's Energy Office**

5.    The Maine GEO was established in 2008 as a part of the Executive Branch and reports directly to the Governor.  The GEO is the state's designated energy office responsible for energy resource policy, planning, and development.  As the lead energy office for the State of Maine, the GEO is responsible for several activities, such as providing policy leadership and technical assistance, developing energy programs, monitoring energy markets, and reporting on heating fuel and energy prices.  The GEO works in partnership with various Maine state agencies, federal and local officials, industry, nonprofit interests, and academia on energy issues.

**Impacts from Climate Change in Maine**

6.    The impacts of climate change can already be seen in Maine and will continue to confront the state for years to come. Between March 2022 and May 2024, Maine experienced an extraordinary nine natural disasters, each severe enough to

merit Presidential disaster or emergency declarations.[1] In just one of these events, storm winds and downed trees left more than 440,000 properties without power for days.[2]  The rising severity and frequency of these storms and floods raise urgent alarms about the risks that climate change is escalating in our state and drives home the imperative that Maine plan for and invest in climate resilience at the state, regional, and local levels.

7.    With 3,500 miles of tidal coastline, Maine has the fourth-longest coast in the continental United States. The Maine coast is an economic engine for the state, attracting millions of visitors annually and supporting working waterfronts for the state's important fishing, lobstering, aquaculture, and shipbuilding industries, and related marine businesses. Rising sea levels and a rapidly warming Gulf of Maine caused by climate change threaten coastal communities and the marine resources they depend on. In addition to the coastal impacts, Maine's central and western mountain areas have been hit repeatedly with intense storms that caused severe flooding along major rivers and minor streams alike, resulting in serious infrastructure and economic damage to natural-resource-based industries and important tourism sectors, such as outdoor recreation.

8.    Since 2000, the rate of sea level rise in Maine has been roughly 2.5 times faster than the long-term trend since 1912.[3] Between January and December 2023, in Maine, the record for highest monthly mean water level was broken at all long-

---

[1] https://www.maine.gov/future/sites/maine.gov.future/files/2024-11/_GOPIF_IRRC_2024_digital_111224.pdf
[2] *Id.* at 10.
[3] https://www.maine.gov/future/sites/maine.gov.future/files/inlinefiles/STS_2024_digital.pdf

term gauges in Maine for 6 months, with mean water levels between 6 and 10 inches higher than the long-term averages for those months. The trend continued in 2024 with new record sea levels set for 5 of the first 9 months. An analysis conducted in 2020 by Maine's Climate Council ("MCC") found that forecasted sea level rise by 2050 threatens more than 21,000 coastal jobs in tourism, fishing, and real estate, which is equivalent to 3 percent of Maine's workforce.[4]

9.     As the most heavily forested state in the country, Maine is susceptible to frequent and long-duration power outages caused by severe storms, floods, and other natural disasters. In 2024, over 50 percent of outage hours reported by the largest utility serving Maine were the result of tree damage both in and out of utility rights-of-way.[5] As global energy markets remain volatile, and climate change continues to increase the severity and frequency of disaster events, it is imperative that Maine's energy systems are resilient and reliable. Prioritizing renewable energy sources, leveraging innovative resilience technologies, and coordinating with local emergency management, transmission and utility operators, and state agencies are critical to ensuring Maine's energy systems are resilient and reliable in the face of growing challenges.

---

[4] "Assessing the Impacts Climate Change May Have on the State's Economy, Revenues, and Investment Decisions: Volume 2: Cost of Doing Nothing Analysis" available at https://climatecouncil.maine.gov/future/sites/maine.gov.future/files/inline-files/ERG_MCC_Vol2_CostOfDoingNothing_9-1-2020.pdf

[5] Central Maine Power – 2024 Interruptions Summary by Cause reported 2,437,172.6 customer outage hours of which 1,268,632.5 are attributed to trees in and out of the right of way. *Central Maine Power*, Request for Annual Compliance Filing and Price Change, Docket No. 2025-00018, Initial Filing Attachment 26 (Me. PUC, Feb 28, 2025)

**Maine's Climate and Clean Energy Laws**

10.     In 2003, the Maine Legislature enacted "An Act To Provide Leadership in Addressing the Threat of Climate Change" (the "2003 Climate Act"), Public Law 2003, Chapter 237, which established Maine's greenhouse gas ("GHG") reduction goals. The 2003 Climate Act set a goal for reduction of GHG emissions within the state, in the short term, to 1990 levels by January 1, 2010, and to 10% less than 1990 levels by 2020, and was codified at 38 M.R.S. § 576 (2003). In 2019, 38 M.R.S. § 576-A was enacted to expand the original GHG emissions goals set forth in the prior 2003 legislation, which are now Maine's current goals. These current goals include the reduction of gross GHG emissions to at least 45% below 1990 levels by January 1, 2030, and to at least 80% below 1990 levels by 2050. On September 23, 2019, Maine Governor Janet Mills signed an executive order adding the goal of achieving carbon neutrality in Maine by 2045. This additional carbon neutrality goal was codified in 38 M.R.S. § 576-A(2-A) on August 8, 2022.

11.     Established in 1997, Maine's renewable portfolio standard ("RPS") establishes the portion of electricity sold in Maine that must be supplied by renewable energy resources. In 2019, Maine Governor Mills signed bipartisan legislation (P.L. 2019, Ch. 477) that increased Maine's RPS to 80 percent by 2030, an increase from 40 percent, and set a goal of 100 percent by 2050. By 2030, 50 percent of Maine's electricity must be satisfied by new renewable resources (Classes I and IA) and 30 percent by existing renewable electricity generation (Class II). 35 A M.R.S. § 3210.

12.     In February 2023, recognizing the key role clean energy resources already play in Maine's economy and energy system, Maine Governor Janet Mills directed the GEO to develop a plan to reach 100% clean energy by 2040.[6] In addition to the RPS, the Maine Wind Energy Act, 35-A M.R.S. § 3402, 3404, which includes onshore and offshore statutory goals and requirements, recognizes that wind energy can achieve reliable, cost-effective, sustainable energy production, and is a valuable indigenous energy resource that can help achieve the state's climate and energy laws.

13.     Maine's RPS has been an important policy tool to implement the state's policy objectives and accurately account for renewable energy attributes. In 2024, the GEO issued An Assessment of Maine's Renewable Portfolio Standard ("2024 Maine RPS Report"), as directed by the Maine Legislature.[7] According to the 2024 Maine RPS Report, the state's RPS has supported renewable development and operation resulting in over $100 million in direct investment, approximately $900 million in operations and maintenance spending, and over 1,000 full-time equivalent jobs between 2008 and 2022.

14.     For Maine's electric ratepayers, the net annual average benefit has been approximately $21.5 million between 2011 and 2022. Maine's RPS compliance costs average $17.5 million per year, and the energy associated with Renewable Energy Credits ("RECs") used for compliance yielded wholesale price reduction benefits

---

[6] Maine State of the Budget Address, February 13, 2023 available at
https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/Gov.%20Mills%202023%20State%20of%20the%20Budget%20Address.pdf
[7] "An Assessment of Maine's Renewable Portfolio Standard, March 31, 2024 available at
Maine-RPS-Impacts-and-Procurement-Policy-Options-Report-Master-FINAL.pdf

averaging $39 million per year. Maine has also derived significant economic and price suppression benefits from state energy procurements and hosting renewable energy facilities used to satisfy RPS policies in other states.

15.     Importantly, with respect to future energy procurements that influence Maine's ability to meet its RPS, the 2021 Maine Renewable Energy Goals Market Assessment released by the GEO outlines that "many lower-cost pathways to meet Maine's RPS requirements in the next decade are achievable through the development of high-quality wind resources in western and northern Maine, which in turn require new transmission investments."[8]

16.     Maine's RPS policy continues to be an important policy tool and one that is driving benefits to Maine's economy in several ways: encouraging investment through its incentive to develop renewable generating facilities in the state which create direct investments in Maine associated with construction, operations, and maintenance; supporting broader spending and revenue generation to other Maine industries through the purchase and spending on supporting service, worker income and spending in Maine, and added state tax revenues; suppressing wholesale energy prices as renewable generators tend to have lower marginal costs than fossil fuel plants; and by supporting the growth and maintenance of renewable power in Maine which reduces imports of fossil fuels to the state. Large new wind projects reduce

---

[8] https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/GEO_State%20of%20Maine%20Renewable%20Energy%20Goals%20Market%20Assessment_Final_March%202021_0.pdf

7

emissions and put a significant downward pressure on wholesale market prices by displacing more expensive generation resources.[9]

17.     According to the Energy Information Administration, onshore wind energy generated 27% of Maine's renewable electricity generation in 2023, the 10th highest wind power share among the states.[10]  The largest wind farm in Maine is the 186-megawatt Bingham Wind project, which began operating in late 2016.  As of September 2024, Maine had about 1,030 megawatts of onshore wind-powered generating capacity.

18.     Pursuant to 2 M.R.S. § 9, the GEO is required to prepare and submit a comprehensive energy plan to the Maine Legislature every two years. Within the comprehensive state energy plan, the GEO is required to identify opportunities to lower the total cost of energy to consumers in Maine.  This includes identifying transmission capacity infrastructure needs and facilitating the development and integration of new renewable energy generation within Maine to support Maine's renewable resource portfolio requirements specified in 35-A M.R.S. § 3210 and wind energy development goals specified in 35-A M.R.S. § 3404. The comprehensive state energy plan must include a section that specifies Maine's progress in meeting the oil dependence reduction targets, 2 M.R.S § 9(5), which are designed to reduce the state's dependence on the consumption of oil. The recommendations must also include a cost

---

[9]  https://cleanpower.org/wp-content/uploads/gateway/2022/12/ACP_Daymark_MarketEnv_Benefits_Final_Public.pdf
[10] U.S. EIA, Electricity Data Browser, Net generation all sectors, Maine, Conventional hydroelectric, Other renewables, Wind, Biomass, All solar, Annual, 2001-23.

and resource estimate for technology development needed to meet the reduction targets.

19.     In January 2024, the GEO issued the Maine Energy Plan,[11] which outlines strategies to further reduce energy costs, ensure reliability and resilience, and increase the diversity of energy resources to meet the Maine Governor's goal of 100 percent clean electricity by 2040. The Plan was informed by an 18-month stakeholder engagement process and an expert technical report[12] – the first of its kind for Maine – which demonstrates 100 percent clean energy is achievable, beneficial, and results in lower overall energy costs across the economy. Both onshore and offshore wind development will play a crucial role in achieving that goal.

20.     With respect to onshore wind, Maine currently hosts the majority of New England's onshore wind resources with over 1000 MW installed.[13] Onshore wind generally has its highest capacity at night and during the winter months and therefore balances the almost 7000 MW of solar installed in the region, therefore providing an important energy and capacity resources precisely when it is most needed during winter cold spells. Furthermore, Maine enjoys very high wind capacity potential both in northern Maine as well as along the western Maine mountains and

---

[11] Maine Energy Plan, January 2025 available at
https://www.maine.gov/energy/sites/maine.gov.energy/files/2025-01/Maine%20Energy%20Plan%20January%202025.pdf
[12]https://www.maine.gov/energy/sites/maine.gov.energy/files/2025-01/Maine%20Pathways%20to%202040%20Analysis%20and%20Insights.pdf
[13] WINDExchange: U.S. Installed and Potential Wind Power Capacity and Generation at
https://windexchange.energy.gov/maps-data/321

to the east near the shore.[14] These different resource areas ensure that even if the wind is not blowing in one area, there can be energy produced from another. Overall, the 1000+ MW of onshore wind are currently producing fossil-free low-cost energy to benefit Maine ratepayers and materially help ensure winter reliability to the entire regional grid.

21.    Currently, there are numerous active onshore wind projects in the ISO-NE Interconnection Queue. These projects, located primarily in northern and western Maine, total over 2400 MW in nameplate capacity.[15] The importance of future wind projects to Maine cannot be overstated. The Maine legislature has found that integrating Maine's wind resources is in the public interest and will provide a valuable local energy resource that will reduce reliance on fossil fuels and will benefit Maine ratepayers. 35-A 38 M.R.S. 3402.

22.    <u>Northern Maine Onshore Wind Development</u>. Maine has significant onshore wind and other renewable energy potential in northern Maine. Recognizing this potential, in 2021 the Maine Legislature passed the Northern Maine Renewable Energy Development Program (the "2021 Northern Maine Energy Act"). 35-A M.R.S. § 3210-I. The purpose of this act is to "remove obstacles to the use of and to promote development of the substantial renewable energy resources in northern Maine." It directs the Public Utilities Commission (the Maine "PUC") to approve a contract or contracts for selected transmission infrastructure to interconnect at least 1200 MW

---

[14] <u>WINDExchange: U.S. Wind Power Resource at 100-Meter Hub Height</u> available at https://windexchange.energy.gov/maps-data/321
[15] ISO-NE IRTT System available at https://irtt.iso-ne.com/reports/external

of renewable energy generation in Northern Maine.  On April 1, 2025, the Maine PUC released a Request for Information to advance the procurement of northern Maine resources, including wind, and associated transmission.[16] Recognizing the benefits of low-cost onshore wind resources in Maine, the Commonwealth of Massachusetts has authority to join Maine's procurement of generation and transmission resources. Participation by interested states, such as Massachusetts, would reduce costs to Maine by spreading the investment across all participating states.

23.     Developing renewable resources and associated transmission in northern Maine provides a significant opportunity to meet Maine, and the region's, energy goals and stabilize costs for ratepayers. Northern Maine possesses some of the highest quality renewable energy potential in the region, but Maine has been unable to unlock that potential and the significant economic and community benefits that accompany it due to significant interconnection limitations and a need for additional transmission capacity. Projects developed under the 2021 Northern Maine Energy Act are poised to address these longstanding challenges and bring jobs, tax revenue, and economic opportunities to northern Maine, and provide important improvements to system reliability and resiliency. Specifically, the Act is designed to "[p]romote energy equity, high-quality jobs and the development of a skilled workforce, with particular consideration given to the economic circumstances and opportunities in

---

[16] Maine PUC RFI, Docket 2024-00099, April 1, 2025 at https://mpuc-cms.maine.gov/CQM.Public.WebUI/Common/ViewDoc.aspx?DocRefId={F09CF195-0000-C719-8ED4-CF1C1EDCAEE7}&DocExt=pdf&DocName={F09CF195-0000-C719-8ED4-CF1C1EDCAEE7}.pdf

the State's socially vulnerable counties and communities."[17] In addition, by bringing substantial new clean energy resources to Maine and neighboring state, these projects aim to help reduce energy costs over the long-term by placing downward pressure on regional electricity prices while also helping confront challenges from climate change by reducing greenhouse gas emissions.

24.    Maine's Offshore Wind Energy Development.  In July 2023, Governor Mills signed "An Act Regarding the Procurement of Offshore Wind Energy Resources" into law ("P.L. 2023, Chapter 481").   This law requires the GEO to lead the procurement of at least 3000 MW of offshore wind installed by 2040, and fulfills one of the five objectives outlined in the Maine Offshore Wind Roadmap (the "Roadmap") published in 2023 – to harness abundant offshore wind energy to reduce long-term energy costs, reduce reliance on fossil fuels, and fight climate change.

25.    Public Law 2023 Chapter 481 established the Maine Offshore Wind Renewable Energy and Economic Development Program, which will further the development of responsible offshore wind projects in the Gulf of Maine in a way that helps the State meet its greenhouse gas reduction obligations, stabilize energy prices, benefit Maine's economy and families, and minimize and compensate for any impacts to wildlife, habitat, fisheries, and coastal communities. The 3000 MW procurement authorization was established through a data-driven process, including the Wind Energy Needs Assessment, a technical study conducted as part of the Roadmap

---

[17] *Id.*

process, and the ongoing Maine Energy Plan: Pathway to 2040 ("Energy Plan").
Public Law 2023, Chapter 481 also requires critical port development, creating
opportunities for all Maine workers and businesses in the emerging industry, and
protecting critical lobster fishing areas from offshore wind development.

**Current Status of Offshore Wind Generation in Maine**

26.    Maine's Energy Plan identifies offshore wind as a key energy generation
source to help meet Maine's long-term energy and reliability needs.[18]  Responsible
and sustainable development of offshore wind is essential to meet Maine's growing
electricity demand as well as the state's clean energy, climate, and economic
development goals. Offshore wind is also identified as an important sector in the
State's 10 Year Economic Strategy.[19] In 2019, the state launched the Maine Offshore
Wind Initiative, which is engaged in offshore wind planning, research, infrastructure
development, and policy. In 2021, Maine initiated the development of a
comprehensive plan for responsible offshore wind development. Following an 18-
month stakeholder-driven process led by the GEO, the Maine Offshore Wind
Roadmap was published in 2023 with key actions to realize the economic and climate
benefits of an offshore wind industry.[20]  Continuing to implement the Roadmap
objectives through the Maine Offshore Wind Initiative is crucial to meeting the state's

---

[18] Maine Energy Plan, January 2025 available at
https://www.maine.gov/energy/sites/maine.gov.energy/files/2025-
01/Maine%20Energy%20Plan%20January%202025.pdf
[19] https://www.maine.gov/decd/sites/maine.gov.decd/files/inline-files/DECD_120919_sm.pdf
[20] Maine Offshore Wind Roadmap, February 2023 available at
https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/Maine_Offshore_Wind_Roadmap_February_2023.pdf

13

energy needs and positioning Maine as a competitor and beneficiary in the emerging global offshore wind industry. These objectives include conducting offshore wind energy procurements, building critical port infrastructure, proactively engaging in the federal offshore wind leasing and development processes supporting the Maine Offshore Wind Research Array and Research Consortium, advancing Maine based innovation, and engaging in regional transmission and interconnection planning, among other priorities. The State conducted a socioeconomic analysis for the Roadmap[21] and a workforce analysis related to offshore wind for Maine.[22] The State also established the Maine Research and Development Consortium to identify how best to reduce impacts to Maine's ecosystem and existing ocean users.[23]

27.     Offshore wind has been identified by ISO-NE as a key element in meeting the region's energy and reliability needs for a variety of reasons including the ability to locate generators in close proximity to large population hubs, which can help reduce strain on the transmission system. The ISO-NE's 2050 Offshore Wind Analysis states: "A large share of the region's future offshore wind production will likely come from the Gulf of Maine lease area."[24] Any delay in moving forward with offshore wind will have significant adverse impacts to Maine ratepayers and

---

[21] Socioeconomic Analysis of Offshore Wind in the Gulf of Maine, December 2022 available at https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/Maine%20OSW%20DNV%20Socioeconomic%20Analysis%20of%20Offshore%20Wind%20in%20the%20Gulf%20of%20Maine%20Final%20Report.pdf
[22] 2022 Maine Offshore Wind Talent Analysis available at https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/2022%20ME%20OSW%20Talent%20Analysis.pdf
[23] https://www.maine.gov/energy/initiatives/offshorewind/researchconsortium
[24] ISO-NE 2050 Transmission Study: Offshore Wind Analysis available at https://www.iso-ne.com/static-assets/documents/100021/2050_osw_report_final.pdf

consumers in the entire region.  ISO-NE notes: "In 2050 alone, the net present value (production costs + capital costs) of the buildout with no [offshore wind (OSW)] is $7.2 billion higher than the reference case."[25]  ISO-NE adds: "With no OSW, the cost of energy to consumers increases by about 50% in 2050."[26]  Finally, the analysis notes that "[c]arbon emissions are 1.1 million tons higher in the case with no OSW."[27]  In testimony to the U.S. House Energy and Commerce Committee on March 25, 2025, the President and CEO of ISO-NE highlighted that the region is counting on large quantities of offshore wind to maintain resource and energy adequacy.[28]

28.    On August 19, 2024, the Bureau of Ocean Energy Management ("BOEM") announced the execution of the nation's first floating offshore wind energy research lease for the State of Maine. The lease area covers a little less than 15,000 acres located 28 nautical miles offshore on the outer continental shelf ("OCS").  This lease area could allow for the deployment of up to 12 floating offshore wind turbines capable of generating up to 144 MW of renewable energy.  The State of Maine submitted the application for the lease to BOEM in 2021 after undergoing an extensive stakeholder engagement process to guide the siting and research strategy. The research array will allow the State of Maine, the fishing community, wildlife experts, the offshore wind industry, and others to conduct in-depth studies and

---

[25] ISO-NE 2024 Economic Study at https://www.iso-ne.com/static-assets/documents/100021/a06_2025_03_19_pac_2024_economic_studies_policy_scenario_sensitivities_and_follow_up_to_stakeholder_requested_scenarios.pdf
[26] Id.
[27] Id.
[28] https://www.iso-ne.com/static-assets/documents/100021/final_isone_written_testimony_house_energy_committee_testimony_3_25_2025.pdf

thoroughly evaluate floating offshore wind as a renewable energy source in the region. Research conducted on the array will evaluate its compatibility with existing ocean uses and assess its potential effects on the environment, supply chains, and job creation. As directed by Maine statute, M.R.S. § 3210-H, the Maine Public Utilities Commission has been overseeing the negotiation of a power purchase agreement between Maine's developer partner and one of Maine's utilities for the array.

29.     Maine is unique in that it has acquired from BOEM its own offshore wind leasehold, specifically, the Research Array leasehold, separate from the commercial leaseholds in the Gulf of Maine. The Maine Research Array will advance the University of Maine's patented technology; conduct important research to examine offshore wind's effects on the Gulf of Maine fishing, wildlife and ecosystem; and help build support economic development in the state through the advancement of an offshore wind supply chain and workforce. The Research Array project would be the first major floating offshore wind farm in the U.S. and would position Maine as a leader in this important technology. The GEO has been working with staff at the Maine PUC, the developer and the state's regulated utilities on a draft power purchase agreement. This effort has been recently suspended at the request of the developer due to uncertainty caused by the actions of the Defendants.[29]

---

[29] "Maine Offshore Wind On Pause," Maine Public, April 1, 2025 available at https://www.mainepublic.org/climate/2025-04-01/maine-offshore-wind-array-on-pause; "Developer for Gulf of Maine Offshore Wind Project Puts Power Contract Talks on Hold," April 2, 2025 available at https://www.pressherald.com/2025/04/02/developer-for-gulf-of-maine-offshore-wind-project-puts-power-contract-talks-on-hold/

30.    In addition, the University of Maine, alongside private sector partners, the U.S. Department of Energy, the National Science Foundation, and the Maine Technology Institute, has successfully deployed the first floating wind turbine in U.S. waters at 1/8 scale, which will provide power for 18-months' time. Floating offshore wind technology has been making increasing headway in Europe and beyond.

31.    On April 14, 2025, the U.S. Department of Energy suspended funding for the University of Maine's work on the deployed floating turbine. This floating turbine project is a critical building block for purposes of moving the State of Maine's research lease and the offshore wind industry forward in Maine.

32.    Separately, with respect to commercial offshore wind development off the coast of Maine, after years of extensive stakeholder engagement and analysis, BOEM executed commercial offshore wind leases in the Gulf of Maine in December 2024. At the request of Governor Mills and the Maine Congressional Delegation, the lease areas identified by BOEM exclude the entirety of Lobster Management Area 1 to protect Maine fishing grounds, including the lobster fishery, On October 29, 2024, the federal Department of the Interior announced the results of the OSW lease sale in the Gulf of Maine, which included two winners on four lease areas and over $21.9 million in winning bids. Invenergy NE Offshore Wind, LLC, won one northern lease area (Lease OCS-0562) at a cost of $4,892,700. Lease OCS-0562 includes 97,854 developable acres and is approximately 46.2 nautical miles from Maine. Invenergy also won one southern lease area (Lease OCS-0567) at a cost of $5,889,000. Lease OCS-0567 consists of 117,780 developable acres and is approximately 21.6 nautical

miles from Massachusetts. Avangrid Renewables, LLC, won two southern lease areas - Lease OCS-0564 and Lease OCS-0568 - at a cost of $4,928,250 and $6,244,850, respectively. Both lease areas sit approximately 29.5 nautical miles from Massachusetts, and include 98,565 and 124,897 developable acres, respectively.

33.    While the leases awarded do not authorize the construction or operation of any OSW facilities, they support the development of floating OSW in deep water sites by providing lessees the right to submit a project plan for BOEM's review and environmental impact assessment. The lease sale also resulted in over $5.4 million in total bidding credits, which is represented in binding commitments by companies to invest over $2.7 million in workforce training and domestic supply chain development, and an additional $2.7 million for fisheries compensatory and mitigation. Furthermore, portions of bidding fees from the commercial offshore wind solicitation would support future research.

Transmission

34.    As discussed above, in 2021, the Maine Legislature established the Northern Maine Renewable Energy Development Program, directing the Commission to issue a new request for proposals for the development and construction of cost-effective transmission and generation in northern Maine.

35.    In addition, the GEO is actively working with the U.S. Department of Energy on projects exploring advanced transmission technologies in Maine to maximize the transfer capacity of the existing Maine grid to permit the interconnection of new energy resources including onshore wind. Beyond this state

lead effort with DOE, Maine agencies are coordinating with neighboring states through the New England States Committee on Electricity ("NESCOE") on transmission planning activities. NESCOE asked ISO-NE to study the transmission upgrades needed to meet state goals by 2050. This study showed that the grid in Maine needed to be upgraded to eliminate congestion. ISO-NE has published an RFP seeking solutions to this high priority concern and bid proposals are due later this year.

**The Federal Actions**

36.    On January 20, 2025, President Trump issued a memorandum that halted all federal approvals necessary for the development of offshore- and onshore-wind energy. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo).

37.    Specifically, Section 2 of the Wind Memo directs the heads of relevant federal agencies that they "shall not issue new or renewed approvals, rights or way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."

38.    Since issuance of the Wind Memo, federal agencies have ceased all permitting and approval activities. As discussed in further detail here, these actions are having an adverse impact on, among other things, Maine's ability to meet its climate goals, Maine's investments in clean energy to date, and future economic

growth that Maine would see as a result of additional onshore and offshore wind development.

**The Harms Wind Memo and Agency Permitting Freezes Inflict on Maine**

39.    As noted above, the challenged federal actions directly impact Maine's ability to meet its statutory energy and climate goals.  Onshore wind is the lowest cost clean energy resource available, and Maine has the best regional wind potential. ISO-NE has acknowledged this in its 2050 Transmission Study and based on the conclusions in that study, has initiated an RFP seeking transmission solutions to integrate the needed onshore wind.  Thus, the six New England states are working collectively with ISO-NE on a solution to the region's growing energy needs.  The Federal Actions have directly and negatively impacted that work.

40.    In terms of offshore wind, ISO-NE has clearly and independently evaluated the impacts to the region from the loss of access to offshore resources and, at a minimum, found them to be $7.2 billion in 2050 alone.  Ratepayer costs will rise 50% if offshore wind is not developed.  These numbers do not include the impacts associated with the loss of clean energy jobs, loss of the potential to develop Tier 1 supply chain manufacturing in New England, reduction in emissions resulting from displacement of fossil fuel use, and impacts to reliability from overdependence on natural gas.

41.    The Federal Actions also threaten the State's ability to effectively implement its statutory requirements to begin its first commercial offshore wind solicitation in 2025 and further delays could threaten the state's ability to achieve its

statutory requirement of procuring 3000 megawatts of offshore wind by 2040. Moreover, the Federal Actions also threaten the ability to deliver low-cost onshore wind resources, as required by statute, 35-A M.R.S. § 3210-I, in northern Maine.

42.     As discussed above, the recent lease sale for offshore commercial wind development in the Gulf of Maine resulted in over $5.4 million total bidding credits and represent binding commitments by companies to invest over $2.7 million in workforce training and domestic supply chain development, and an additional $2.7 million for fisheries compensatory mitigation. These funds may not be realized by Maine and other northeastern states if developers delay or pull out of projects, or if leases are cancelled due to the Federal Actions.

43.     Other harms from the Federal Action include the pause of the Maine Research Array power purchase agreement negotiations, at the request of the developer, "due to recent shifts in the energy landscape that have in particular caused uncertainty in the offshore wind industry." *See* Maine PUC procedural order, March 28, 2025.[30] As shown by Maine's recent experiences, these Federal Actions endanger projects' ability to reach operational status because they create significant uncertainty for heavily regulated entities that are already highly sensitive to delay.

44.     Moreover, these projects require critical port development and would create opportunities for Maine workers and businesses in the emerging industry. L.D.

---

[30] *See* "Maine Offshore Wind Array on Pause" available at
https://www.mainepublic.org/climate/2025-04-01/maine-offshore-wind-array-on-pause;
"Developer for Gulf of Maine Offshore Wind Project Puts Power Contract Talks on Hold"
available at https://www.pressherald.com/2025/04/02/developer-for-gulf-of-maine-offshore-wind-project-puts-power-contract-talks-on-hold/.

1895, ch. 481, §§ 5, 6. The Federal Actions put these economic benefits to Maine in jeopardy.

## Conclusion

45.     The Federal Actions are having a direct impact on Maine by, among other things, hindering its ability to implement its Offshore Wind Renewable Energy and Economic Development Program and the 2021 Northern Maine Energy Act, which were developed to help the State meet its greenhouse gas reduction obligations, stabilize energy prices, benefit Maine's economy and families, and minimize and compensate for any impacts to wildlife, habitat, fisheries, and coastal communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Augusta, Maine on April 30, 2025.

Dan Burgess
Director of the Maine Governor's Energy Office

EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| STATE OF NEW YORK, et al., |
| Plaintiffs, |
| v. |
| DONALD TRUMP, in his official capacity as President of the United States, et al., |
| Defendants. |

Case No. 25-cv-11221

## DECLARATION OF BRUCE K. CARLISLE

I, **Bruce K. Carlisle**, declare as follows:

1.      I am the Managing Director of Offshore Wind at the Massachusetts Clean Energy Technology Center ("MassCEC"). I submit this declaration in support of Plaintiffs preliminary injunction motion.

### I. Personal Background

2.      As Managing Director of Offshore Wind at MassCEC, I lead efforts to advance the successful and responsible development of the offshore wind industry in Massachusetts. These efforts include project planning, stakeholder engagement, and sector development. They also include research and innovation to reduce risk, increase market confidence, and realize the climate, economic, and workforce benefits of offshore wind and other ocean renewable energy.

3.      My responsibilities as Managing Director of Offshore Wind also include the following: leading initiatives and investments in offshore wind port assessment and utilization; developing workforce training and education programs; helping grow the offshore wind supply

1

chain; directing technical and applied research projects and stakeholder engagement on marine wildlife, fisheries, weather and ocean  data, and transmission studies; overseeing leasing, operations, and expansion of the New Bedford Marine Commerce Terminal—the nation's first purpose-built facility specifically designed to support the construction, assembly, and deployment of offshore wind projects as well as other marine cargo and commodities; acting as principal for the redevelopment of the Salem Offshore Wind Terminal; serving as a designated lead on Intergovernmental Renewable Energy Task Forces for offshore wind planning, siting, leasing, and permitting with the U.S. Bureau of Ocean Energy Management; and representing Massachusetts in coordination and collaboration with offshore wind leads from other states along the Atlantic coast on topics relating to the offshore wind supply chain, workforce training and development, and energy procurement.

4.       In my role at MassCEC, I represent Massachusetts in various groups and professional organizations, including the Oceantic Network's State Advisory Group, New England Partner Association for Offshore Wind Supply Chain, the Massachusetts Interagency Council on Offshore Wind, the Special Initiative for Offshore Wind, and the Connecticut Wind Collaborative.

5.       I have held the position of Managing Director of Offshore Wind at MassCEC for over six years.

6.       Prior to this role, I served in various leadership roles, including Director and Assistant Director, at the Massachusetts Office of Coastal Zone Management, which is the lead agency for ocean and coastal policy in Massachusetts.

7.       Since graduating with a bachelor's degree and a master's degree in Environmental Policy from Tufts University, I have amassed over 25 years of professional working experience in

coastal and ocean policy and management, with over 15 of those years focused on the offshore wind industry specifically.

8.     I make this declaration as a representative of MassCEC, in part based on the business records of MassCEC, and in part based on my personal knowledge of and experience with offshore wind matters.

9.     The purpose of this declaration is to provide information regarding the investments Massachusetts has made in support of its offshore wind industry and its continued reliance on federal action to ensure the full social, environmental, and economic benefits of the industry and Massachusetts's investments.

## II. MassCEC

10.     MassCEC is a state economic development authority dedicated to accelerating the growth of the clean energy sector across Massachusetts to spur job creation, deliver statewide environmental benefits, and secure long-term economic growth for the people of Massachusetts. It was established by Chapter 23J of the Massachusetts General Laws and began operating in 2009.

11.     MassCEC's programs focus on offshore wind, clean energy workforce development (including the offshore wind workforce), building decarbonization, clean transportation, electrical grid modernization, and funding and investing in climatetech companies from research through commercialization.  MassCEC makes funding awards through competitive Request for Proposals and grant solicitation processes.  It evaluates all applications for funding based on the project's alignments with the stated program goals.

12.     MassCEC is funded primarily by the Massachusetts Renewable Energy Trust Fund ("RET"), which was authorized by the Massachusetts legislature in 1997 as part of the electric utility restructuring process. The RET is funded by a systems benefit charge of 2.5 mills per

kilowatt-hour—or approximately 30 cents per month for the average residential customer—paid by ratepayers of electric utilities in Massachusetts, as well as nine municipal electric departments that have elected to join the RET.

13.    In addition to the systems benefit charge, MassCEC also receives funding from the state budget ($20 million in FY25) and from partner state agencies like the Department of Energy Resources. Over time, MassCEC has also received a smaller portion of its funding from federal resources, including the American Rescue Plan Act of 2021 ("ARPA"), Department of Energy, the Bureau of Ocean Energy Management, and the Environmental Protection Agency.

14.    In 2022, the Massachusetts legislature also created the Offshore Wind Industry Investment Trust Fund ("OSW Trust"), which is administered by MassCEC and exclusively focuses on supporting the offshore wind sector.  It was initially funded by a one-time appropriation of ARPA funds; however, it has also been funded with state funds including $15,000,000 in budget appropriations in FY 2024.

15.    In a demonstration of future commitment to the offshore wind industry, in 2024, the Massachusetts legislature allocated up to $200,000,000 in bond funding to the OSW Trust to support the offshore wind industry.

16.    MassCEC is governed by a fifteen-member Board of Directors, seven of whom are ex officio roles from government and public institutions, and eight of whom are appointed by the Governor from selected industry, education, and energy sectors. The Secretary of Energy and Environmental Affairs serves as the chair of MassCEC's Board.

### III. Massachusetts Has Made Significant
### Investments in the Offshore Wind Industry

17.     Massachusetts, through MassCEC, has made significant investments in the offshore wind industry. These investments (including commitments for future spending), totaling more than $330,000,000 since 2011, have strategically targeted key funding gaps and areas of need in the offshore wind industry, including port infrastructure like the New Bedford Marine Commerce Terminal; workforce development; supply chain development; and applied science, research, and analysis to address industry-identified challenges.

**A. Port Infrastructure**

18.     MassCEC manages investments for the development of important offshore wind port infrastructure. In doing so, MassCEC ensures the utility of certain Massachusetts ports for offshore wind deployment and associated activities. These associated activities, which MassCEC also helps coordinate, include trainings (e.g., for marine harbor pilots); coordination with port managers and users; and support for real-time monitoring of weather and ocean conditions.

19.     Since 2011, MassCEC has directed over $347,600,000 in port related infrastructure. These directed funds include expenditures for the assessment, planning, construction, and redevelopment of critical maritime infrastructure across the Commonwealth's coast as well as commitments to fund future improvements and expansion at the New Bedford Marine Commerce Terminal and the Wind Technology Testing Center in Charlestown, MA ("WTTC").

20.     One of these key port investments is the New Bedford Marine Commerce Terminal, which MassCEC owns and operates in the Port of New Bedford. This terminal is specifically designed to support the construction, assembly, and deployment of offshore wind projects, as well as handle bulk, break-bulk, container shipping and large specialty marine cargo.

a.  Since 2011, Massachusetts has invested more than $140,000,000 in the design, engineering, construction, and commissioning of the New Bedford Marine Commerce Terminal. With its unique design and engineering, this facility is capable of handling the massive components of offshore wind farms, including turbine towers, blades, nacelles, and foundations. This facility is the first of its kind in the U.S., and over the past several years, other states and private entities have recognized the need for this critical infrastructure and have also invested in the development of heavy-lift port infrastructure critical to the large-scale construction of offshore wind on the Atlantic Coast (which are necessary to meet state renewable energy goals), including over $3,000,000 in property expansion and more thatn $6,600,000 in redevelopment costs.

b.  In the summer of 2024, MassCEC announced a capital infrastructure project to improve the New Bedford Marine Commerce Terminal and increase the ability to support the needs of offshore wind developers. The project will expand the size of the terminal by 24%, increase the length of heavy load bearing quayside, and provide additional office and warehouse space. This project will maintain and increase Massachusetts's ability to provide infrastructure that will support the anticipated increased demand for port facilities to deploy offshore wind projects. The total estimated cost of this investment is $74,000,000. MassCEC has committed $53,000,000 to this project.

21.  As announced in late 2022 through the Massachusetts Offshore Wind Ports Investment Challenge program, MassCEC has awarded $135,000,000 in funding for port

infrastructure projects related to offshore wind. This state funding is anticipated to facilitate over $444,000,000 in new private capital expenditure.

22.    The $135,000,000 in funds awarded by Mass CEC included the following specific investments:

a.    $75,000,000 to Crowley Wind Services, Inc. and Salem, Massachusetts, for the conversion of a former coal-fired power plant into an offshore wind marshalling port.

b.    $25,000,000 to Prysmian Projects North America for the redevelopment of part of the Brayton Point Marine Commerce Center in Somerset, Massachusetts, which was set to construct a manufacturing facility and terminal for marine high-voltage cables. Prysmian cancelled its plans to construct the facility on January 17, 2025. Since March 2025, Massachusetts and the owners of the site have been working with another Tier 1 manufacturer who has expressed strong interest in establishing offshore wind related factory and indicates that the site is a finalist in its selection and due diligence process.

c.    $15,000,000 to the New Bedford Port Authority in New Bedford, Massachusetts, for the improvement of its North Terminal 1 port and to help modernize port-wide operations to efficiently manage increased vessel traffic.

d.    $15,000,000 to the New Bedford Foss Marine Terminal in New Bedford, Massachusetts, for the redevelopment of a former power plant into an offshore wind port capable of supporting offshore wind construction and operation activities.

e.    $4,639,200 to Shoreline Marine Terminals in New Bedford, Massachusetts, for construction of new bulkhead, docking space, lift piers, fueling capacity, and other

infrastructure, which will support the day-to-day operations of offshore-wind-crew transfer and vessel maintenance and repairs.

    f.  $360,800 to Gladding Hearn Shipbuilding for an upgrade to its Somerset, Massachusetts, facility, which will enable it to fabricate and repair aluminum high-speed crew-transfer vessels.

23.    MassCEC is also engaged in a project to expand the WTTC. The WTTC is the only facility in the U.S. currently capable of performing endurance and certification testing of full-scale offshore wind turbine blades. MassCEC is expanding the WTTC in order to accommodate the testing of increasingly large protypes in excess of 100 meters in length.  MassCEC has committed to expend up to $10,000,000 to develop a full design and has engaged the Massachusetts Port Authority to act as the project and construction manager and an external design firm to complete the design work by the end of 2026.

**B. Workforce**

24.    MassCEC works to develop and sustain a qualified, well-trained, safe, and diverse offshore wind workforce through grants and technical assistance for programs focused on health/safety and technical training certifications, industry and trades partnerships, undergraduate and graduate programs, and improving access to opportunities. MassCEC also convenes and facilitates offshore wind workforce development practitioners to exchange information and best practices through the Offshore Wind Workforce Community of Practice.

25.    Since 2018, MassCEC has offered the Offshore Wind Works grant program, which seeks to increase the Commonwealth's capacity to develop a Massachusetts workforce capable of contributing to the planning, deployment, and operations and maintenance of offshore wind farms in southern New England, as well as to support the manufacturing of offshore wind components

8

and otherwise maintain the offshore wind supply chain. This program has provided over $18,000,000 dollars to 30 different organizations since its inception. The 2024 Offshore Wind Works program will provide up to an additional $2,500,000 in funding.

**C. Supply Chain**

26.     MassCEC also supports the development of a local and robust offshore wind supply chain by: (1) facilitating a supply chain directory that allows local businesses to post information regarding services they can provide to the industry; (2) hosting events where developers can meet potential suppliers and service providers; and (3) completing a supply chain assessment that articulates offshore wind supply chain requirements and the ability of local businesses to fill those needs. MassCEC investment in this work totals over $5,600,000. MassCEC, in consultation with the Massachusetts Department of Revenue, has also established an offshore wind business tax incentive program for companies engaged in offshore wind development, manufacturing, or commercialization totaling up to $35,000,000 in tax credits over a five-year period beginning in 2024.

**D. Science, Research, and Analysis**

27.     MassCEC cultivates capacity and provides direct support for science, applied research, and analysis to advance responsible offshore wind development, reduce costs, increase reliability, and evaluate and mitigate fisheries, wildlife, supply chain, logistics, and transmission issues. Since 2011, MassCEC has invested over $16,900,000 of state funds in this program area, plus an additional $3,900,000 in federal funds.

28.     Among other things, these funds provided for the advancement of aerial marine wildlife surveys to better understand the spatial and temporal patterns of wildlife found within and around current and projected areas of offshore wind development. MassCEC, offshore wind

developers, and the Bureau of Ocean Energy Management have invested in these valuable surveys which inform the siting, construction, and operation of offshore wind facilities.

29.     MassCEC's investments in science, research, and analysis include $2,200,000 that enabled collaborations with other states and the United Kingdom, through the National Offshore Wind Research and Development Consortium, to address key areas of research need, such as floating offshore wind.

30.     In early 2025, MassCEC awarded funds to eight organizations totaling $3,200,000 to address a broad range of offshore wind related topics including potential effects on songbird migration routes; marine mammal density and detection analysis; offshore wind interactions with commercial fishing activities; and wireless sensor technology development for offshore wind blades.

31.     These significant and strategic investments that support many aspects of the offshore wind industry represent MassCEC's commitment to ensure that the Commonwealth is able to deploy gigawatts of renewable offshore wind energy for years to come.

**IV. President Trump's Wind Memorandum Threatens to Turn Massachusetts's
Offshore Wind Investments into Sunk Costs and Severely Limit
The Expected Benefits Flowing from Those Investments**

32.     I am familiar with the Presidential Memorandum titled "Temporary Withdrawal of

All Areas of the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal

Government's Leasing and Permitting Practices for Wind Projects" signed on January 20, 2025,

by President Trump ("Wind Memo"), and particularly the sections with relevance to the offshore

wind industry in Massachusetts.

33.     Section 1 of the Wind Memo withdraws from disposition all areas within the Outer

Continental Shelf ("OCS") as defined in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331

et seq., but does not propose to alter the rights associated with existing leases in the withdrawn

areas.

34.     Section 2 of the Wind Memo forbids anyone in the federal government from issuing

"new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind

projects"—at least until "the completion of a comprehensive assessment and review of Federal

wind leasing and permitting practices" conducted by the Secretary of the U.S. Department of the

Interior.

35.     The Wind Memo's moratorium on offshore wind development threatens to turn the

hundreds of millions of dollars Massachusetts has invested in the offshore wind industry into sunk

costs. An indefinite pause in offshore wind development will delay and potentially eliminate the

benefits expected to flow to Massachusetts and its residents from these investments—some of

which are described below.

36.     In order to meet the Commonwealth's carbon emission reduction goals and achieve

net zero emissions by 2050, as set forth in the Commonwealth's Clean Energy and Climate Plan

and as required by the Act Driving Clean Energy and Offshore Wind (2022), offshore wind will need to be a key component of the state's renewable energy portfolio.

37.    Massachusetts has selected three offshore wind projects through competitive procurements to provide offshore wind energy to Massachusetts residents. These offshore wind projects will create thousands of jobs across a national supply chain and generate billions in new investments, producing economic, environmental, and social benefits to the state, region, and nation.

38.    It is anticipated that the three selected Massachusetts projects—Vineyard Wind 1[1], SouthCoast Wind[2], and New England Wind 1[3]—together will create more than 10,000 jobs in Massachusetts and Rhode Island.

39.    On its own, the Vineyard Wind 1 project currently under construction has supported about 2,000 jobs[4] and generated more than 200 supply chain contracts across 29 states, yielding about $2 billion in new investments in the United States.[5]

40.    Additionally, construction related to the improvement and expansion of critical port infrastructure to meet the offshore wind industry's needs will create local jobs. For example, the construction of the Salem Offshore Wind Terminal is expected to generate more than 800 jobs (full time employee job years).[6]

---

[1] Vineyard Wind, America's First Large-Scale Offshore Wind Farm, Delivers Full Power from 5 Turbines to the New England Grid. (2025, May 1). Mass.gov Press Release. https://www.mass.gov/news/vineyard-wind-americas-first-large-scale-offshore-wind-farm-delivers-full-power-from-5-turbines-to-the-new-england-grid.
[2] Massachusetts and Rhode Island Announce Largest Offshore Wind Selection in New England History. (2025, May 1). Mass.gov Press Release. https://www.mass.gov/news/massachusetts-and-rhode-island-announce-largest-offshore-wind-selection-in-new-england-history.
[3] Avangrid's New England Wind 1 Project Selected by Massachusetts in Offshore Wind Solicitation. (2025, May 1). Press Releases. https://www.avangrid.com/w/avangrid-s-new-england-wind-1-project-selected-by-massachusetts-in-offshore-wind-solicitation.
[4] *Vineyard Wind 1 Impact on Jobs and Economic Output Annual Report* (Vineyard Wind 1, Nov. 3, 2024)
[5] Oceantic Network. Internal records. (2025, April 23).
[6] Crowley Wind Services Salem Offshore Wind Terminal. (2025, May 1). Salem Offshore Wind Terminal. https://www.crowley.com/wind/salem/.

41.     Offshore wind projects in Massachusetts have also generated more than 400 supply chain contracts across more than 30 states including shipbuilding in Louisiana, Florida, and Texas, cable manufacturing in North Carolina, and geotechnical survey services from Virginia.[7]

42.     The Wind Memo threatens these benefits—not only helping achieve Massachusetts's climate goals but also to its economy and livelihoods of its citizens. A major setback to the offshore wind industry would spoil years of careful work and strand the substantial resources the Commonwealth through MassCEC have invested to develop the industry in Massachusetts.

---

[7] Oceantic Network. *Offshore Energy at Work*. (2025, May 1). https://oceantic.org/offshore-energy-at-work/.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Sudbury, Massachusetts on May 2, 2025.


Bruce K. Carlisle
Managing Director of Offshore Wind
Massachusetts Clean Energy Center

EXHIBIT 6

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

                                    Plaintiffs,

                    v.                                   Case No. 25-cv-11221

DONALD J. TRUMP, et al.,

                                    Defendants.

## DECLARATION OF KATHERINE S. DYKES COMMISSIONER OF THE CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION

I, Katherine S. Dykes, declare as follows:

1.      I am the Commissioner of the State of Connecticut Department of Energy and Environmental Protection (DEEP).  I submit this declaration in support of Plaintiffs' preliminary injunction motion.

2.      I was appointed Commissioner of DEEP by Connecticut Governor Ned Lamont and confirmed by the Connecticut General Assembly on February 20, 2019. Prior to becoming Commissioner, I served DEEP as Deputy Commissioner for Energy (2012-2016) and as Chair of the Connecticut Public Utilities Regulatory Authority (2016-2019).

3.       I hold a bachelor's degree in history and environmental studies from Yale University, a master's degree in history, also from Yale, and a juris doctor from Yale Law School.

4.      In 2011, in recognition of the interconnectivity of effective energy and environmental policies, Connecticut Governor Dannel P. Malloy, in conjunction with the Connecticut General Assembly, merged the Department of Environmental Protection, the Department of Public Utility Control, and an energy office within the Office of Policy and Management to create the single agency of DEEP.  This action resulted in a more successful alignment of Connecticut's energy and environmental policies.

5.      I submit this declaration in support of the State Petitioners' motion for a preliminary injunction and challenge to Section 2 of Presidential Memorandum *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Executive Order).

6.      This declaration outlines the range of existing interests, from statutory to economic to health-based, that Connecticut has in developing both onshore and offshore wind as critical energy resources in the state's overall energy portfolio and the harms the EO is inflicting on these state interests.

## Connecticut is Experiencing Negative Effects of Climate Change

7.      Connecticut's dense population and geography make it particularly vulnerable to the effects of climate change. As a coastal state with 332 miles of shoreline fronting on Long Island Sound, and urbanized areas along several major navigable rivers, Connecticut is more susceptible than many other states to the effects of increased frequency and intensity of storm hazards.

8.    In Connecticut alone, Hurricane Irene (2011) caused power outages affecting 754,000 customers and inflicted over $1 billion in statewide damages, and Hurricane Sandy (2012) caused power outages affecting more than 600,000 customers and inflicted almost $2 billion in statewide damages, according to the National Oceanic and Atmospheric Administration (NOAA) National Centers for Environmental Information.

9.    Average annual temperatures in Connecticut have risen by over 0.9 degrees Celsius between 1980 and 2018.  Over the same period, winter temperatures have warmed by 1.6 degrees Celsius.  Conservative projections for Connecticut indicate annual mean temperatures will rise by three to six degrees Celsius by the end of this century, with winter warming at three times the rate of summer.

10.    Throughout the Northeast, coastal flooding has increased due to an approximately one-foot rise of sea level since 1900.  This rate of sea level rise exceeds the global average of approximately eight inches.  According to the Connecticut Institute for Resilience and Climate Adaptation (CIRCA), sea level rise along the Connecticut coast is projected to be as high as 20 inches by 2050.  Thus, the frequency and intensity of coastal flooding is likely to increase in the coming years.

**Connecticut Has Taken Action to Address Climate Change and Has a Legislative Mandate to Transition to Clean, Renewable Energy**

11.    As Commissioner of DEEP, I am responsible for carrying out programs that protect our air, water, and lands and power our state with clean, reliable, and

affordable energy. My role in leading and creating energy policies is to firmly place Connecticut on a successful clean energy trajectory to meet our climate change goals using a multifaceted approach. Although not a complete list, following are some of the key tools and requirements intended to guide us along this trajectory.

12.     We are reducing carbon dioxide ($CO_2$) emissions from fossil fuel-burning power plants through our participation in the multistate, market-based program known as the Regional Greenhouse Gas Initiative (RGGI).

13.     Connecticut is focused on implementing energy efficiency programs to reduce the demand for electricity and the amount of fuel needed to generate power and to in turn reduce costs for Connecticut residents and businesses.

14.     Connecticut has had a Renewable Portfolio Standard (RPS) in some form since 1998.  The RPS requires electric suppliers to obtain a specified percentage of the energy they sell or distribute to Connecticut customers from renewable sources through the purchase of Renewable Energy Certificates (RECs). The total renewable output targets have increased each year, and Public Act 18-50, codified at Connecticut General Statutes (CGS) §16-245a, doubled the RPS requirement from 20% by 2020 to 40% by 2030.

15.     Public Act 18-82, "An Act Concerning Climate Change Planning and Resiliency," requires Connecticut to achieve state economy-wide greenhouse gas (GHG) emission reductions of at least 45% below 2001's GHG emissions level by January 1, 2030, adding to the existing requirement of at least 80% below 2001's GHG emissions level by January 1, 2050.  The Act also incorporates GHG

reductions into Connecticut's Integrated Resources Plan, Comprehensive Energy Strategy, and various other state planning documents and efforts.

16.     Public Act 22-5, "An Act Concerning Climate Change Mitigation," requires Connecticut to achieve a 100% GHG emissions-free electricity supply in the state by January 1, 2040.

17.     In addition, in passing Public Act 19-71, "An Act Concerning the Procurement of Energy Derived from Offshore Wind," as codified in CGS § 16a-3n, the Connecticut Legislature created a process for DEEP to work with other state officials to solicit competitive proposals for offshore wind projects. The Act also authorizes DEEP to direct the state's electric distribution companies to enter into long-term contracts with bidders meeting certain criteria, which DEEP has done.

18.     DEEP also has similar procurement authority for additional Class I renewable energy resources, including both onshore and offshore wind, codified in CGS §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

**Connecticut Is Pursuing Both Offshore and Onshore Wind Generation to Meet the State's Energy and Environmental Needs**

19.     Connecticut has worked to shift reliance away from climate change-causing fossil fuels and toward renewable energy sources, including wind.

20.     One way in which Connecticut is doing so is through planned and existing onshore and offshore wind generation that it is procuring directly.

21.     In 2018 and 2019, using its authority under CGS §§ 16a-3n and 16a-3m, DEEP selected 200 megawatts (MW) and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. Rhode Island

separately selected an additional 400 MW from Revolution Wind, for a total project size of 704 MW.

22.     In Connecticut, the Revolution Wind project entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to the Connecticut Public Utilities Regulatory Authority (PURA) for review and approval. PURA approved those contracts in Docket Nos. 18-06-37 and 18-05-04. Rhode Island's utility regulator separately approved that state's contract with Revolution Wind.

23.     Revolution Wind has received all necessary federal permits and is currently under construction, both onshore and in federal waters. The project is expected to reach commercial operation in 2026. At that point, the project will deliver electricity and RECs to Connecticut and Rhode Island, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

24.     In two separate procurements in 2015 and 2016, DEEP selected 126 MW from the Cassadaga onshore wind project and 5 MW from the Holiday Hill Community Wind onshore wind project. These projects entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to PURA for review and approval. PURA approved those contracts in Docket Nos. 17-01-10 and 17-01-11. These projects achieved commercial operation in 2021 and 2018, respectively,

and are providing energy and RECs to support Connecticut's energy needs and clean energy targets.

25.     In addition to these examples of planned and existing onshore and offshore wind procurements, Connecticut also has an interest in potential future procurements of wind energy. Public Act 19-71 provides DEEP with existing statutory authority to conduct future competitive solicitations for up to 2,000 MW of additional offshore wind to meet Connecticut's energy and environmental requirements. DEEP also has additional authority to conduct new competitive solicitations for offshore wind and onshore wind under CGS §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

26.     Moreover, DEEP's October 2021 Integrated Resources Plan found that to achieve the state's target of a 100% GHG emissions-free electricity supply by January 1, 2040, significant additions of new zero-carbon generation will be required. This need includes potentially 352 MW to 557 MW of new onshore wind and 3,745 MW to 5,710 MW of new offshore wind by 2040 under a range of assumptions and scenarios, including availability of other generating resources.

**Connecticut Is Investing in the Region's Electricity Transmission Grid to Accommodate Higher Levels of Wind Energy**

27.     In addition to conducting state solicitations for new wind resources, Connecticut is also working regionally with other New England states and New England's independent regional grid operator, ISO New England (ISO-NE), to advance wind energy. On March 31, 2025, ISO-NE issued a request for proposals (RFP) from transmission developers to upgrade the transmission grid in Maine to

accommodate the interconnection of at least 1,200 MW of onshore wind generation located in that state to the New England transmission grid.

28.    This RFP is the first procurement being conducted as part of a new regional transmission planning and procurement process that Connecticut worked to develop with ISO-NE and the other New England states, and which the Federal Energy Regulatory Commission (FERC) approved last year.  One piece of this approved framework was an agreement by the six New England states to allocate the costs of any selected project equitably across the states based on each state's share of regional electricity load. The New England states requested that the first RFP issued by ISO-NE under this new process focus on transmission upgrades in Maine to facilitate onshore wind development.

29.    In determining whether a proposed transmission project submitted in response to the RFP is beneficial for electricity ratepayers, ISO-NE will factor in the benefits that the onshore wind unlocked by this new transmission will provide to Connecticut and the other New England states. These benefits include lower wholesale energy and capacity market costs and improved grid reliability.

30.    Connecticut and other New England states will still need to run separate state solicitations to purchase the wind energy that would be transmitted via the transmission upgrades in Maine, but the transmission upgrades resulting from the ISO-NE RFP will make such wind energy procurements possible by enabling the wind energy to flow to Connecticut and the other states.  These transmission upgrades will also make the eventual purchase of this wind energy

more affordable, by sharing the costs of the necessary transmission upgrades across the six states.

31.     Regionalization of a significant portion of these transmission costs will substantially reduce the costs of such future state procurements for onshore wind. This will lead to direct savings for states, including Connecticut, that procure this generation to meet our energy and environmental needs. It also will lead to savings for all six states by enabling the connection of new generation resources that can lower wholesale energy and capacity market costs in ISO-NE.

**Wind Generation Provides Electricity Reliability and Affordability Benefits to Connecticut**

32.     Connecticut's efforts to procure energy from onshore and offshore wind generation and to develop new transmission to interconnect this wind generation to the region's grid are important to both reliability and affordability.

33.     ISO-NE's December 2023 final report on the "Operational Impact of Extreme Weather Events" concluded that New England must add additional electricity generation. That additional generation would include potentially 4,000 MW of new offshore wind generation (over and above projects like Revolution Wind already under construction) as well as thousands of megawatts of other new renewable energy resources by 2032.

34.     A key way that wind generation contributes to grid reliability is by reducing Connecticut and the New England region's reliance on fossil fuels, all of which must be imported from outside the region. New England currently relies on natural gas to generate approximately half of the region's electricity. This creates

reliability concerns during the winter, when there is high natural gas demand for heating, or in cases where unanticipated disruptions to the pipeline system or unavailability of gas limit the ability of natural gas-fired generators to run. Wind energy can help fill these gaps and reduce the region's reliance on natural gas.

35.    ISO-NE's "Operational Impact of Extreme Weather Events" report further identifies a need for New England to replace over 5,000 MW of aging fossil fuel generation in the coming years with new sources of power generation to maintain a reliable grid. By contributing new power generation and diversifying the region's electricity mix, wind and other renewable energy resources can help address these reliability concerns.

36.    In addition to contributing to reliability, wind energy generation does not require fuel to operate and thus has low or no marginal production costs. Therefore, it can lower wholesale energy market costs in New England by displacing more expensive marginal cost generation from fossil fuels.

37.    A December 2018 assessment by ISO-NE found that 1,600 MW of offshore wind generation during an extended cold weather period from December 24, 2017, to January 8, 2018, could have 1) lowered regional electricity production costs by $80 million to $85 million, resulting in an $11 to $13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; 2) avoided emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and 3) avoided consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil.

38.     By reducing reliance on fossil fuels, Connecticut's efforts to bring wind energy online also help insulate the state's electricity ratepayers from price spikes and volatility associated with these fossil fuels. Fossil fuels like natural gas and oil are traded on global markets and the prices of these fuels are impacted by geopolitical events. For example, Russia's 2022 invasion of Ukraine led to increases in natural gas prices, which contributed to increased costs to generate electricity using natural gas and higher electricity bills in Connecticut. Reducing Connecticut's reliance on natural gas to generate electricity by bringing wind and other renewable energy resources online helps to limit these impacts on Connecticut ratepayers.

**Connecticut's Investments in Wind Are Providing Economic Development**

39.     Connecticut's focus on regional collaboration, supportive policies, and strategic infrastructure investments has positioned the state as a key player in the offshore wind industry in the United States, which benefits the state's economy.

40.     In addition to procuring energy from wind, Connecticut has invested in facilities such as the redeveloped Connecticut State Pier Terminal in New London, Connecticut, to support the development of offshore wind and create new jobs and economic development opportunities in the state. The State of Connecticut has committed over $200 million to the redevelopment of the State Pier Terminal, out of a total project cost of over $300 million.

41.     The State Pier Terminal is one of only three marshaling facilities on the East Coast that are currently assembling offshore wind turbines for deployment and was the first active turbine marshaling terminal with open ocean access. The

11

State Pier Terminal is already supporting the assembly and delivery of approximately 160 turbines for three offshore wind projects – South Fork Wind, Revolution Wind, and Sunrise Wind – that will provide power to Connecticut, New York, and Rhode Island. Once installed, these projects will have an estimated output of 1,760 MW – enough to power more than 1 million homes. Staging and assembly operations at the terminal are expected to generate more than 100 well-paying jobs. The State Pier Terminal also has the potential to support further offshore wind deployments, together with associated jobs in Connecticut.

42.     In October 2023, Connecticut released an "Offshore Wind Strategic Roadmap" and launched the Connecticut Wind Collaborative, a public-private organization, to leverage the state's strengths in infrastructure, manufacturing, workforce, and research and development and to catalyze further economic growth, attract investment, and foster innovation in the state's offshore wind industry.

**The Executive Order Harms Connecticut by Curtailing Wind Energy Development and Introducing Regulatory Uncertainty**

43.     By curtailing and introducing regulatory uncertainty in the development of new onshore wind and offshore wind, the challenged Executive Order harms Connecticut in numerous ways.

44.     The challenged Executive Order undermines Connecticut's ability to procure additional energy from onshore and offshore wind generation as needed to meet the state's energy and environmental requirements, including statutory requirements to reduce in-state GHG emissions and transition the state's electricity supply to non-GHG-emitting sources of power. As a result, the EO harms

12

Connecticut's ability to address GHG emissions and to protect its residents, as part of a broader effort, from the growing impacts of climate change, from increased flooding and extreme heat to fires and extreme storms.

45.    The challenged Executive Order further undermines Connecticut's efforts to develop new electricity transmission that will enable procurements of additional onshore wind generation. Specifically, the EO threatens to reduce or eliminate the anticipated economic and environmental benefits to Connecticut from the ISO-NE RFP for new transmission that will accommodate the interconnection of additional onshore wind; under the EO, required federal permits for new onshore wind infrastructure utilizing this transmission may be delayed or denied. The EO could be particularly harmful if the ISO-NE RFP results in the selection and construction of a transmission project but then the EO prevents or otherwise delays the development of the wind generation resources themselves. The harm to Connecticut from such an outcome would be higher transmission costs associated with the new transmission resulting from the ISO-NE RFP without the associated offsetting benefits from wind energy additions (wholesale energy and capacity market cost reductions and improved reliability).

46.    The challenged Executive Order threatens the reliability of Connecticut's electricity grid. Delaying or preventing development of new wind energy in the region prevents Connecticut and the other New England states from bringing new energy resources online that ISO-NE has determined are important to ensuring a reliable electricity grid.

13

47.     The challenged Executive Order undermines Connecticut's ability to ensure affordable electricity and protect the state's electricity ratepayers by developing wind energy resources that will lower wholesale energy and capacity market costs and will reduce the state's reliance on price-volatile fossil fuels, which all must be imported into the state and region and are vulnerable to price spikes caused by geopolitical events.

48.     The challenged Executive Order also undermines Connecticut's ability to benefit economically from the investments the state has made to develop a state offshore wind industry with associated jobs in Connecticut, including Connecticut's investments in the redevelopment of the State Pier Terminal.

49.     In conclusion, through the Executive Order being challenged in this lawsuit, the federal government is impeding both onshore and offshore wind energy development and thereby harming Connecticut, including by undermining compliance with the state's climate and renewable energy laws; damaging  grid reliability; forcing reliance on other, more environmentally damaging, import-constrained, and price-volatile sources of electricity; increasing electricity rates to consumers; and hurting the state's economy through foregone job creation and long-term damage to the development of the wind energy industry in our state.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, Connecticut on April 17, 2025.


Katherine S. Dykes

Commissioner of the Connecticut
Department of Energy and Environmental
Protection

15

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

STATE OF NEW YORK, et al,.

                    Plaintiffs,

         v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

                    Defendants.

Case No. 25-cv-11221

## <u>DECLARATION OF STEPHEN GAWLIK</u>

I, Stephen Gawlik declare as follows:

1.     I am a Senior Counsel and Vice President of Capital Projects for the New York State Urban Development Corporation d/b/a Empire State Development (ESD).  I submit this declaration in support of the Plaintiff States' motion for a preliminary injunction.

## <u>Personal background and qualifications</u>

2.     ESD is a public benefit corporation organized under the laws of New York State and is charged with promoting economic development in the state.

3.     In my role with ESD, I have been assigned to assist with implementation of the Arthur Kill Terminal project located in Staten Island, New York (the Project).

## <u>The Project</u>

4.     The Project consists of the development of a state-of-the-art port facility in Staten Island, New York that when completed would serve as the epicenter of offshore wind component staging and assembly on the east coast due to its prime location that is seaward of all bridges in the region and along the deep draft Arthur Kill channel. When completed, the Project will be an essential part of the infrastructure supporting offshore wind energy servicing New York and the region.

5.     The Project is being designed, constructed and developed by Arthur Kill Terminal LLC (AKT), a private corporation. In order to assist AKT in completing the Project, ESD has applied for and been awarded grants totaling

$48,008,231 from the U.S Department of Transportation Maritime Administration (MARAD) as part of the Port Infrastructure Development Program.

6.      ESD's role in the Project is to act as the government sponsor to apply for and receive the federal grant funding that will be provided to AKT to fund a portion of its costs incurred in the development, design, and construction of the Project. The total Project costs are expected to exceed $361 million.

**Current Status**

7.      The Project requires significant environmental review pursuant to the National Environmental Policy Act (NEPA) and the receipt of numerous permits prior to start of construction.

8.      ESD has been advised that the environmental review and processing of permits needed to start construction of the Project under the Clean Water Act and Rivers and Harbors Act has been paused by the Army Corps of Engineers because of a Presidential Memorandum issued by President Trump on January 20, 2025 that is called the *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, that has halted all federal approvals necessary for the development of offshore- and onshore-wind energy.

9.      This delay threatens receipt of the $48,000,000 in MARAD grants that are needed by AKT to fund and complete the Project because ESD has been advised by MARAD that the grant agreement between ESD and MARAD needs to be executed by September 30, 2025.  However, since the completion of NEPA review is

2

a prerequisite to execution of the grant agreement, the current indefinite delay jeopardizes the Project's timeline, and subsequently, the $48,000,000 grant on which the Project is relying.

## Conclusion

10.    The Project is an important economic development initiative to New York State and the wind energy industry. The current delay in completing the environmental review and processing the permits jeopardizes the viability of the Project and accompanying economic development benefits in New York State.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Buffalo, New York on May 2, 2025.

_____

STEPHEN GAWLIK

EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, et al.,

Plaintiffs,

v.                                                           C.A. No. 25-cv- 11221

DONALD J. TRUMP, et al.,

Defendants.

**DECLARATION OF BRIAN P. GRANAHAN**
**DIRECTOR OF THE ILLINOIS POWER AGENCY**

I, Brian P. Granahan, declare as follows:

1.      I am the Director of the Illinois Power Agency.  I submit this declaration in support of the preliminary injunction filed by Plaintiff States challenging the Jan. 20, 2025 Presidential Memorandum addressing wind energy. 90 Fed. Reg. 8363 (Jan. 20, 2025).

**Personal background and qualifications**

2.      I have a Bachelor of Science Degree with Honors from the University of Iowa in Political Science (obtained in 1999) and a Juris Doctor Degree from New York University School of Law (obtained in 2003).

3.      I have been working on energy and environmental policy and related matters since 2007, with a particular focus on supporting renewable energy development. My professional experience includes serving as a Clean Energy

Advocate for Environment Illinois, a legal and policy advisor to the Chairman of the Illinois Commerce Commission (the State's public utilities commission), a Vice President for strategic consulting firm Tur Partners and with the startup The Sustainability Exchange LLC, and serving as the Chief Legal Counsel of the Illinois Power Agency from 2014 to September 2022.

4.      Since October 2022, I have served as the Director of the Illinois Power Agency, having been appointed to my current term as Director in March of 2025.

**Illinois Power Agency**

5.      The Illinois Power Agency ("Agency") was established in 2007. Among its objectives are: 1) to develop procurement plans, including an electricity procurement plan, a zero-emission standard procurement plan, a carbon-free mitigation credit procurement plan, and a long-term renewable resources procurement plan, and 2) to conduct procurement events to achieve these plans. The Agency is focused specifically on the electricity supply requirements of residential and small commercial customers who receive fixed-price default electricity supply service from Illinois electric utilities.

6.      Along with developing procurement plans and conducting procurement events, the Agency also administers programs for implementation of the state's renewable portfolio standard ("RPS"). Under the Illinois RPS, the Agency administers and executes processes for the procurement and retirement of renewable energy credits ("RECs") by Illinois electric utilities to ensure that a progressively larger annual share of electricity supply is met through renewable

energy generation. RECs constitute the environmental attributes of 1 megawatt hour (MWh) of electricity generation produced by a qualifying renewable energy generation facility decoupled from the underlying electricity itself. Under Illinois law, RECs are used to both determine progress toward RPS goals and provide consideration for incentive payments used to facilitate new renewable energy generating facilities, such as wind farms.

**Renewable Energy in Illinois and Illinois Climate and Clean Energy Laws**

7.      Illinois has a robust wind industry, with 10,198 megawatts of wind projects currently operating as of November 2024 according to the United States Wind Turbine Database. According to the U.S. Energy Information Administration, wind power constituted 12.27% of all electricity generated in Illinois in 2023, with over 21 million MWh generated from wind projects.

8.      Illinois law contains requirements related to the further development of new wind projects. The Illinois RPS, as memorialized through Section 1-75(c) of the Illinois Power Agency Act (20 ILCS 3855/1-75(c)), requires the Agency to attempt to procure cost-effective renewable energy resources (through renewable energy credit procurements) equal to 40% of each Illinois electric utility's load by 2030, climbing to 50% of each utility's load by 2040. Overall retail electricity sales of Illinois electric utilities—the denominator in this percentage-based RPS calculation—is approximately 118 million megawatt hours, with that amount now expected to climb in coming years due to expected load growth.

9.     In order to comply with the Illinois RPS, "the Agency shall endeavor to procure 45% from new and repowered wind and hydropower projects" (20 ILCS 3855/1-75(c)(1)(C)(i)). RECs from hydropower projects, which only recently became eligible for RPS compliance through Public Act 103-0380, may not involve the development of new dams, and thus are not expected to comprise a substantial share of these RECs.

10.     Consequently, the Agency expects to need to procure over 20 million RECs delivered annually from new wind projects to meet 2030 RPS goals— equivalent to 20 million megawatt-hours of annual electricity generation from new wind projects. As RECs can only be procured from new projects, applying a standard capacity factor to determine the expected electricity generation from new wind projects relative to their nameplate capacity, the Agency understands that meeting the 2030 Illinois RPS goal will require the successful development of approximately 7000 MW of new wind projects.

11.     Since only approximately 2000 MW of wind projects are presently under contract, successfully meeting Illinois's 2030 RPS goals will require nearly 5000 MW of additional new wind project development.

12.     Meeting Illinois RPS goals is important for maintaining a stable, reliable, and cost-effective power supply for at least two reasons: first, as with many other states, Illinois is now facing unexpected projected load growth driven by new large load customers seeking to interconnect, with data centers being the primary driver of unexpected new load growth. For example, Commonwealth Edison

4

Company ("ComEd"), the electricity distribution utility serving much of Northern Illinois, recently projected a 4.5 gigawatt anticipated growth in electricity demand by 2035 due to increased electricity demand resultant from new data center development.

13.    Second, as outlined in Section 9.15 of the Illinois Environmental Protection Act (415 ILCS 5/9.15), Illinois law requires that all electricity generating units reduce carbon dioxide and copollutant emissions to zero by 2045 on a progressive retirement or emission reduction schedule that begins taking effect in 2030. Bringing new wind projects online, as outlined in the Illinois RPS, will be necessary to backfill electricity generation as carbon-intensive generating facilities retire across the coming years.

14.    With electricity demand rising and select sources of electricity supply scheduled for retirement due to prohibitions on harmful externalities, new sources of electricity supply are vital to the public health, safety, and welfare of Illinois residents. The State of Illinois's ability to facilitate the development of new wind projects is essential to that effort.

## Federal Moratorium on Wind Permitting and Approvals

15.    The Presidential Memorandum issued on January 20, 2025 directs federal agencies to cease federal wind permitting practices. 90 Fed. Reg. 8363 (Jan. 20, 2025).

16. Among other things, the Memorandum states that the heads of all relevant federal agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects . . . ." *Id*.

**The Harms the Federal Action Inflicts on Illinois**

17. While the Illinois RPS has not traditionally been reliant on wind projects developed on federal lands or requiring federal environmental permits, a robust national wind industry is vital for Illinois to meet its RPS goals.

18. Barriers to wind project development in other jurisdictions may harm Illinois through reduced investment in the wind industry generally, thus reducing competition and raising costs in the competitive procurements Illinois utilizes to support new wind project development. Robust capital investment in the wind industry is essential to supporting a sufficiently large pipeline of new wind projects to meet Illinois RPS and electricity demand needs. Withdrawal or diversion of that capital through new barriers to the wind industry's subsistence and growth may damage the State of Illinois's ability to cost-effectively facilitate necessary new wind projects.

**Conclusion**

19. In conclusion, as required by Illinois law, new wind projects are an essential component of the Illinois electricity mix across coming years. For Illinois to successfully facilitate new wind projects, the state requires a robust national wind industry with robust labor and supply chain availability.  Actions which

provide barriers to the continued growth of the wind industry may harm Illinois through potentially reducing the pool of available projects.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Springfield, Illinois on April 29, 2025.

Brian P. Granahan
Director, Illinois Power Agency
180 N. Wabash Ave., Suite 500
Chicago, IL  60601

EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | Case No. 25-cv-11221 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**DECLARATION OF CHRISTOPHER R. HOAGLAND**
**DIRECTOR OF THE MARYLAND AIR AND RADIATION**
**ADMINISTRATION**

I, Christopher R. Hoagland, declare as follows:

1.      I am the Director of the Air and Radiation Administration ("ARA") within the Maryland Department of the Environment ("MDE" or "the Department").  I submit this declaration in support of the States' motion for a preliminary injunction.

**Personal Background and Qualifications**

2.      I have been the Director of ARA since May of 2022. In this capacity, among other responsibilities, I oversee management of the State's air quality compliance, monitoring and planning programs, including the development of State Implementation Plans ("SIPs"), regulation development, mobile source control, climate change, air permitting, radioactive materials licensing, radiation machine registration and certification, and inspection/enforcement programs.

3.      Prior to my appointment as Director, I managed MDE's Climate Change Program.  The Department's Climate Change Program coordinates Maryland's climate change planning and analysis, supports the independent Maryland Commission on

Climate Change ("MCCC"), and manages Maryland greenhouse gas ("GHG") regulations, including the Regional Greenhouse Gas Initiative ("RGGI"). I have also served in climate change policy roles at the Federal level at the U.S. General Services Administration, U.S. Environmental Protection Agency, and Office of Information and Regulatory Affairs.

4.    I have master's degrees in both Forestry and Environmental Management from Duke University's Nicholas School of the Environment and a bachelor's degree in History from St. Mary's College of Maryland.

## Maryland Department of the Environment

5.    The Department was created in 1987 to protect and preserve the state's air, water, and land resources and safeguard the environmental health of Maryland's citizens. MDE's duties include enforcement of environmental laws and regulations, and long-term planning and research. MDE provides technical assistance to Maryland industries and communities for pollution and growth issues and responding to environmental emergencies. MDE is advancing offshore wind energy in coordination with the Maryland Energy Administration and the MCCC through the implementation of the Climate Pollution Reduction Plan, via grants targeted at infrastructure investments and incentives for development of clean and renewable energy, and workforce development initiatives. MDE also serves as the permitting authority for pollution permits associated with wind industry construction projects.

## Climate Change Impacts in Maryland

6.    Addressing climate change has been the biggest challenge I have encountered in my career working on pollution policy and control.  I have managed our

2

efforts, inside Maryland, to identify every feasible control program that could provide some meaningful benefit. I have organized, funded and been part of years of research related to climate change and efforts to reduce GHG emissions. I have worked with other states to try and adopt regional control programs to reduce GHG emissions, such as RGGI. I can, with certainty, state that unless the impacts of climate change are effectively reduced, Maryland faces severe consequences.

7.      Maryland is facing a pivotal time in our climate change history. The decisions we make now have major implications for the future of our state. With its 3,190 miles of shoreline, extensive low-lying coastal land, and productive estuarine habitats, Maryland is particularly vulnerable to the consequences of sea-level rise. Those consequences include shoreline erosion, inundation, increased storm surge flooding, inhibited drainage, saline intrusion into surface and groundwaters and soils, reduced agricultural yields, wetland loss and migration, ghost forests, and changes in estuarine ecosystems. These impacts are expected to become more severe over time.

8.      Maryland's Sea-Level Rise Projections 2023 Report,[1] issued by the MCCC's Science and Technical Working Group ("STWG") and the University of Maryland Center for Environmental Science notes that sea levels along Maryland's shorelines are rising, and they are rising faster than in the past.

9.      The report was prepared by a panel of scientific experts to provide projections of the likelihood of different amounts of future sea-level rise in Maryland. The findings indicate that sea-level along Maryland's shores will very likely rise a foot

---

[1] Maryland Sea Level Rise Projections 2023, available at https://www.umces.edu/sites/default/files/Maryland%20SeaLevel%20Rise%20Projections%202023%20report_0.pdf.

between 2000 and 2050—as much as it did over the whole of the last century—and could rise a foot and a half.

10.    Sea level rise could inundate some facilities at the Port of Baltimore, placing one of the most important ports along the East Coast at risk. In 2023, the Port of Baltimore supported over 51,000 jobs, generating over $5 billion in wages and salaries for Maryland residents, while moving over 55 million tons of cargo.

11.    The state's tourism sector is also likely to feel the impact of climate change.  In 2023, Maryland saw $20.5 billion in tourism related visitor spending, which directly supported more than 134,000 jobs. Rising sea levels, increased flooding and elevated storm surges from severe weather are likely to put an additional strain on Maryland's already vulnerable 3,100 miles of low-lying urban and coastal lands. These problems could make it more difficult for tourists to travel to the region and elevate the costs to coastal communities and the state of maintaining bridges, roads and boardwalks. Changes to the shoreline as a result of sea level rise will also impact the ways people access and interact with Maryland's natural resources for recreation, which may be further exacerbated by degraded water quality and its impact on the ecosystems that water resources support.

12.    There could be an impact on regional tourism from increased instances of extreme heat, given projections that by 2050 the number of 95-plus degree days could reach five times the current 30- year average of six days.  By 2100, that number could increase tenfold.  Rising temperatures could result in a 5 percent loss in tourism revenues.

13.    In 2022, the market value of agricultural products sold by farms in Maryland was over $3.3 billion.  Of this total, almost $900 million was in the form of grains and beans, an additional $106 million from vegetables, and over half of the total came from poultry, eggs, and dairy.  By 2050, if no additional action is taken and summer temperatures rise above thresholds where corn, soy and wheat can be grown, median annual losses for these crops could approach $150 million.  While the added warmer days could extend the growing season, it could also allow for an increase in invasive species and new animal and plant diseases. The health of livestock could also be at risk as the number of 95-plus degree days rises.

14.    Flooding of fields from sea-level rise or severe rain events can lead to increased salt-water intrusion of soil, decreased crop production, excessive soil erosion and nutrient runoff as well as declining water quality.  Increasingly frequent tidal inundation of fields in low-lying areas due to sea-level rise would impair soil drainage and cause soils to become saline, ultimately resulting in abandonment of valuable farmland from cultivation.  Sea-level rise may also cause salt water to infiltrate into some aquifers used for irrigation. More extreme rainfall events, a trend that is already being observed, could also result in greater soil erosion and the runoff of fertilizer nutrients, exacerbating water quality impairment of streams and the tidal waters of the Chesapeake Bay.

15.    Forests contribute an estimated $2.2 billion to Maryland's economy and $24 billion in ecological services.  The condition of these ecosystems and the services they provide will be affected by climate change.  Climate change will alter distributions of species and habitats and exacerbate existing stressors at a rate and degree that

cannot be fully predicted.  Native species populations are likely to decline or migrate from the state while new species are likely to migrate in due to habitat shifts.  Services provided by forests such as temperature regulation, water filtration, aesthetic value and habitat can be altered and existing stressors can be exacerbated by climate change.

16.     Finally, the Chesapeake Bay is the largest estuary in the United States, fed by a watershed that stretches from mountains to sea across 64,000 square miles (166,000 square kilometers), spanning six states - Maryland, Delaware, Virginia, West Virginia, Pennsylvania, and New York - and the District of Columbia.  Currently, revenues provided by the Bay and its watershed are estimated to be approximately $1 trillion annually.  However, human development and pollution have degraded the natural resilience of the ecosystems of the Bay and its watershed, leaving them more vulnerable to extreme events.  Climate change will likely exacerbate this problem, creating a greater threat to these ecosystems.  The Bay has already warmed by 3 degrees Fahrenheit and additional temperature increases could change the composition of commercial fisheries and increase anoxia, the absence of oxygen needed for aquatic life to survive, in the Bay.

17.     In terms of health impacts, the average number of days for which Maryland is likely to exceed temperatures of 90 degrees or higher is expected to rise considerably, markedly exacerbating heat-related illnesses and mortality, particularly among the elderly.  Pollution, excessively warm temperatures and other environmental factors such as extreme precipitation have been shown to increase the risk of a number of infectious diseases.  During the 2024 Maryland heat season, the Maryland Department of Health recorded 26 heat-related deaths, a significant increase from the 9

recorded the year prior.  Heat-related emergency department and urgent care visits were also higher than previous years, reaching 1,255 in 2024.  In 2012, to forecast heat-related mortality over the 21st century, an independent review of scientific literature found that for Baltimore, the only Maryland city included, an increase of 8 excessive heat days on average per summer to 45 such days by mid-century could be expected, resulting in 27 additional deaths per summer.

18.    The Department coordinates the 5 million trees program and implementation of the Climate Pollution Reduction Grant (CPRG). The 5 million trees program aims to increase carbon sequestration, sustainable forestry, and green space equity across the state, while the CPRG is focused on both afforestation and marsh restoration for carbon storage. The Moore-Miller Administration announced a $90 million investment on the state's climate plan to reduce emission of climate pollution and adapt to the already changing climate.

**Maryland Climate and Clean Energy Laws**

19.    In 2007, the MCCC was established by Executive Order and charged with evaluating and recommending state goals to reduce Maryland's GHG emissions to 1990 levels by 2020 and to reduce those emissions to 80 percent of their 2006 levels by 2050. The MCCC was also tasked with developing a plan of action that addressed the causes and impacts of climate change and included firm benchmarks and timetables for policy implementation. As a result of the work of more than 100 stakeholders and subject matter experts, the MCCC produced a climate action plan.

20.    That plan was the impetus of Maryland's Greenhouse Gas Emissions Reduction Act of 2009 ("GGRA").  This groundbreaking law required statewide, science-

based reductions in the GHGs that are changing our climate and threatening our health. In order to achieve those reductions, this law also required the creation of Maryland's Greenhouse Gas Reduction Plan. Maryland's Greenhouse Gas Reduction Plan laid out state actions to achieve a required 25% reduction in GHG from 2006 levels by 2020. The law was reauthorized by the Greenhouse Gas Reduction Act of 2016 which maintained the requirement for a 25% reduction in GHGs by 2020 and added a requirement that the state achieve a 40% reduction by 2030. Those targets were again amended by the Climate Solutions Now Act of 2022 which set goals of reducing statewide greenhouse gas emissions 60% as compared to 2006 levels by 2031 and achieving net-zero emissions by 2045.

21.    Maryland has consistently embraced offshore wind to help meet its climate goals. The legislature first embraced wind energy as a necessary component of its climate goals through the Maryland Offshore Wind Energy Act of 2013. That law also established a Renewable Portfolio Standard ("RPS") requiring that electric suppliers provide 25% of Maryland's electricity from renewable sources by 2020, with up to 2.5% of the state's electricity to come from offshore wind. In 2019, the state passed the Clean Energy Jobs Act of 2019, which increased the RPS to 50% by 2030 and required at least 1,200 MW of offshore wind in the state by directing the Public Service Commission to begin issuing Offshore Renewable Energy Credits ("ORECs") to procure this energy.

22.    The Promoting Offshore Wind Energy Resources Act of 2023 ("POWER Act") again increased the state's goal of developing 8.5 GW of offshore wind power by 2031 and directed the state Public Service Commission to request a study of the

8

updates to the transmission system necessary to facilitate these goals from the state's regional transmission system provider, PJM Interconnection. As of 2024, the Commission had formally requested this study and began working with PJM Interconnection on conducting this analysis.

23.     To support the growth of the offshore wind industry, the state must continue to work with neighboring states, federal agencies, and local municipalities to design and deploy offshore and onshore transmission systems to integrate the large number of offshore wind projects anticipated in the waters of the East Coast.

24.     The Climate Solutions Now Act of 2022 also required that MDE submit a plan outlining how Maryland can meet the statewide goal to reduce emissions by 60% relative to a 2006 baseline by 2031 and maintain a path to net zero by 2045. MDE submitted a detailed plan in December 2023 that outlines how existing and new policies would meet CSNA goals while generating up to $1.2 billion in public health benefits, $2.5 billion in increased personal income, and a net gain of 27,400 jobs between now and 2031 as compared with status-quo policies for Maryland. The Plan shows how average households would save up to $4,000 annually on energy costs and how air quality and public health outcomes would improve for everyone, especially people living in historically underserved and overburdened communities.

25.     The Maryland Public Service Commission has issued 1,710 MW of ORECs to US Wind, which is currently developing Maryland's only offshore wind energy project and is expected to begin commercial operations in 2029.[2]

---

[2] See MD PSC Order No. 91496

**The January 20 Wind Memo and Subsequent Actions**

26.    On January 20, 2025, shortly after inauguration, President Trump issued a memorandum titled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects." Section 2 of that memorandum instructed that federal agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." To the best of my knowledge that "comprehensive assessment and review" has not been completed.

27.    I am aware that on April 16, 2025 the Bureau of Ocean Energy Management sent a stop work order to Empire Offshore Wind, LLC citing the President's January 20 wind memo, despite Empire Offshore Wind having already received all of the federal permits required for it to begin construction.

**The Federal Actions Harm Maryland**

28.    Maryland will need to rely on wind energy, and offshore wind energy in particular, to meet its climate goals as set out in multiple state laws. The legislature has both set goals and directed agency action to support the growing offshore wind industry in the state and attain its climate objectives.

29.    Because the federal government maintains much of the permitting authority over offshore wind leasing on the outer continental shelf, Maryland is reliant on an active federal partnership to advance its state interest in developing offshore wind projects.

10

30.    The federal government's stated policies and actions aimed at halting all wind energy development threaten Maryland's ability to achieve its statutory goals and exacerbate the harms Maryland is already facing from climate change. These harms will continue to worsen if Maryland is not able to take advantage of the clean energy provided by offshore wind and is forced to instead rely on more carbon-intensive sources of electricity, contrary to state policy and mandates.

31.    Closing the door to offshore wind development may force states like Maryland to rely on polluting sources of electricity to meet growing demand, further exacerbating the effects of climate change and burdening communities with other forms of air pollution.

**Conclusion**

32.    Climate change is a real and complex problem that will disproportionately affect Maryland. Because of this, the state has already begun taking action to address climate change by imposing statutory requirements for clean electricity production and directing agencies to plan for and support those efforts.

33.    Wind energy, and offshore wind energy in particular, is necessary for Maryland to meet these climate goals. Maryland has invested valuable state resources in planning, permitting, and supporting its nascent offshore wind industry, but federal cooperation is necessary to ensure these investments are not wasted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in MARYLAND on APRIL 30, 2025.

Christopher R. Hoagland
Director, Air and Radiation Administration
Maryland Department of the Environment

11

EXHIBIT 10

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

     Plaintiffs,

     v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

     Defendants.

Case No. 25-cv-11221

## DECLARATION OF CHRISTOPHER KEARNS

I, Christopher Kearns, declare as follows:

1. I am the Acting Energy Commissioner at the Rhode Island Office of Energy Resources ("OER"). I have worked at OER for over 12 years and have held my current position since July 2022. I make this declaration as a representative of OER, in part based on the business records of OER and in part based on my personal knowledge, experience, and other sources of information I have obtained and reviewed in my official capacity. Based on these sources of information, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

**Personal Background and Qualifications**

2. I graduated from the University of Rhode Island in 2008 with a Bachelor of Science Degree in Environmental Economics and Management.

3. I have worked on a broad range of energy matters (natural gas, delivered fuels, solar, land-based wind, offshore wind, energy efficiency and energy security) since 2009.

4. I oversee the staffing operations of the Rhode Island Office of Energy Resources and the agency's implementation of state and federal energy policies and programs.

**The Rhode Island Office of Environmental Resources**

5. The Rhode Island Office of Energy Resources' (OER) was created in 2006 to consolidate state energy programs.

6. OER's mission expanded in 2012 as outlined in R.I. General Laws §23-82-6, § 39-1-27.7, and § 42-140.1-1, *et.seq.*

7. OER is responsible for developing policies and programs that respond to the State's evolving energy needs.

8. OER is committed to working with public- and private-sector stakeholders to ensure that all Rhode Islanders have access to clean, cost-effective, reliable, and equitable energy solutions.

**Grid Impacts from Climate Change in Rhode Island**

9. Rhode Island's geographical location makes the State vulnerable to powerful winter storms and hurricanes, which have become more frequent as a result of climate change. The State has experienced several severe weather-related events over the last fifteen years, including floods, Nor'easters, extended heat waves and cold snaps, and hurricanes.

10. These weather events pose significant financial and energy security risks to the State; endanger life and property; create barriers to economic growth; and threaten our shared quality of life and environment.

11. The direct energy security impacts of severe weather events include power outages and disruptions to liquid fuel supplies. For example, during Winter Storm Nemo in February 2013, all of Rhode Island's major fuel terminals lost electrical power and were unable to provide fuel (including gasoline, diesel, heating oil, and jet fuel) from terminal loading

racks to delivery trucks that service gas stations; homes and businesses; airports; and other critical facilities. The blizzard also resulted in widespread power outage events and electric customer interruptions. Similarly, January 2015's Winter Storm Juno also resulted in widespread power outage events and electric customer interruptions. In January 2022, Winter Storm Kenan broke snowfall records in all of Rhode Island's counties. Beyond weather-effected power outages, extended low temperatures have resulted in freezing and ice accumulation across significant portions of Narragansett Bay and nearby coastal areas. Such conditions cause delays and disruptions in delivering fuel supplies to Rhode Island.

12. The likelihood that future extreme weather events will occur and impact Rhode Island is high. Without preemptive efforts to address critical infrastructure energy resiliency, the State could face serious consequences, including significant economic damage.

13. To plan for this future, state agencies – including the OER – have worked diligently to identify opportunities for more effective and comprehensive energy assurance coordination and greater system resiliency.

**Rhode Island Climate and Renewable Energy Laws**

14. Rhode Island is committed to combatting climate change and its harmful impacts. To that end, the 2021 Act on Climate sets aggressive decarbonization requirements for the State. *See* R.I. Gen. Laws § 42-6.2-1, et. seq. This includes mandates that statewide greenhouse gas emissions reach forty-five percent (45%) below 1990 levels by 2030; eighty percent (80%) below 1990 levels by 2040, and that the State achieves net-zero emissions by 2050. *See* R.I. Gen. Laws § 42-6.2-9.

15. The Rhode Island Act on Climate also requires a comprehensive climate strategy by 2025, which will be updated every five years thereafter.

16. Additionally, Rhode Island's Renewable Energy Standard (RI RES) requires retail electricity sales in the State to include increasing renewable energy each year, ultimately reaching 100% renewable energy by 2033. *See* R.I. Gen. Laws § 39-26-4.

17. The express purpose of the RI RES is to "to facilitate the development of new renewable energy resources to supply electricity to customers in Rhode Island with goals of stabilizing long-term energy prices, enhancing environmental quality, and creating jobs in Rhode Island in the renewable energy sector." R.I. Gen. Laws § 39-26-3. Per the Affordable Clean Energy Security Act (ACES), "Rhode Island is committed to the increased use of no- and low-carbon energy resources that diversify our energy supply portfolio, provide affordable energy to consumers, and strengthen our shared quality of life and environment, and new energy infrastructure investments may help facilitate the development and interconnection of these resources[.]" R.I. Gen. Laws § 39-31-1.

18. In June 2022, the State amended ACES to support procurement of between 600 to 1,000 megawatts of offshore wind capacity for Rhode Island. R.I. Gen. Laws § 39-31-10.

**Current Status of Offshore Wind**

19. Rhode Island has been active with offshore wind development since 2007.

20. The State successfully developed and permitted the 30 megawatt (MW) Block Island Wind Farm in state and federal waters in the 2010s.

21. The Block Island Wind Farm became operational in the fall of 2016, making it the nation's first commercial offshore wind farm.

22. As of 2024, Rhode Island's clean energy portfolio included 148 MW of onshore wind and 430 MW of offshore wind from projects that are either operational or have been awarded contracts and are working towards operation.

4

23. Rhode Island is nearing completion of its second offshore wind project in partnership with the State of Connecticut. The 704-megawatt Revolution Wind project has been under development since 2018 and has received all of its federal and state permit approvals.

24. Rhode Island will receive 400 MW of capacity from Revolution Wind, and the remaining 304 MW of wind capacity will benefit Connecticut.

25. The Revolution Wind project has been under construction over the last year, with utility interconnection work at Quonset Point in North Kingstown, RI and the installation of the submerged utility cable, foundations and wind turbines at sea.

26. Revolution Wind is expected to be completed and generate electricity to the two states in 2026.

27. Rhode Island has partnered with the Commonwealth of Massachusetts on Rhode Island's third offshore wind project, the 1,287 MW SouthCoast Wind project. Rhode Island would receive 200 MW of offshore wind capacity from that project with the remaining 1,087 MW going to Massachusetts.

28. The SouthCoast Wind project is currently working to obtain its remaining state and federal permits, and negotiate, and receive approval of, a power purchase agreement. The SouthCoast Wind project operational timeline is in 2030.

**The Federal Action**

29. On January 20, 2025, President Trump issued a memorandum entitled *"Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind"* (the "Wind Memo").

30. Section 2 of the Wind Memo prohibits anyone in the federal government from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore

5

wind projects"—at least until "the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices" conducted by the Interior Secretary. The Wind Memo provides no time frame for completion of this assessment.

**The Harms the Wind Memo Inflicts on Rhode Island**

31. The Wind Memo and its implementation undermines Rhode Island's ability to procure additional energy from onshore and offshore wind generation to meet the State's energy and environmental requirements, including statutory requirements to reduce statewide greenhouse gas emissions and reach net-zero by 2050, and to attain 100% renewable energy by 2033.

32. Delaying or preventing development of new wind energy, and particularly, offshore wind, in the region prevents Rhode Island, and the New England region, from bringing new energy resources online that are important to ensure a reliable grid and cleaner renewable energy, and to combat the price volatility related to continued reliance on fossil fuels in the region.

33. Delaying or preventing development of new wind energy in the region also stands to negatively impact Rhode Island's economy, as the State has actively sought to create jobs in the renewable energy sector, including wind energy.

34. Further, delaying or preventing development of new wind energy in the region will negatively impact the State's ability to address and combat climate change.

**Conclusion**

35. Wind is an important resource in meeting the State's Act on Climate obligations, advancing the State's Renewable Energy Standard, supporting the State's clean energy economy, and diversifying the State's electric energy resources.

36. Any prevention or delay of wind projects in the region will significantly and negatively impact Rhode Island.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Providence on May 2, 2025.

Christopher Kearns

EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>DONALD TRUMP, in his official capacity as<br>President of the United States, et al.,<br><br>   Defendants. | Case No. 25-cv-11221 |

**DECLARATION OF ELIZABETH MAHONY**

I, Elizabeth Mahony, declare of my personal knowledge as follows:

1. I am currently employed by the Massachusetts Department of Energy Resources (DOER) as Commissioner. I have held this position since February 2023. Prior to joining DOER, I held positions at the Massachusetts Office of the Attorney General (AGO), DOER, and the Massachusetts Senate. At DOER, my job duties include directing the priorities of the agency, managing senior staff, engaging with internal and external stakeholders, and making final decisions on programming, financing, and policy.

2. I am a graduate of Marist University and Suffolk University School of Law. My professional focus has been on the energy field since 2011, beginning with my role as the Counsel for the Senate chair of the Joint Committee on Telecommunications, Utilities, and Energy, where I led staff in developing major

1

energy legislation.[1] Immediately following that experience, I joined DOER as legal counsel, eventually serving as Acting General Counsel, with a special focus on the development of solar incentive regulations, policy report drafting, and management of the joint procurement of clean energy resources with the Massachusetts Electric Distribution Companies (EDCs) pursuant to Green Communities Act, St. 2008, c. 169, § 83A (Section 83A), as amended by the Competitive Electricity Act.[2] During this time, I coordinated for DOER the drafting of three solicitations for clean energy under Section 83A, including a multi-state effort among three states and six electric companies, resulting in multiple contracts for onshore wind and solar energy generation. At the AGO, I served in the Energy and Telecommunications Division, since renamed the Energy and Ratepayer Advocacy Division, focusing primarily on adjudications and investigations at the Department of Public Utilities (DPU) regarding utility clean energy procurements, solar program development, and clean energy rate design, as well as consumer protection advocacy and legislative engagement. My advocacy before the DPU included the adjudication of the requests for proposals, and resulting long-term contracts, for onshore wind, solar energy, offshore wind, and hydroelectric power generation. In this role I was the lead on matters related to solar energy and other types of distributed energy generation.

---

[1] An Act relative to competitively priced electricity in the Commonwealth, c. 209 of the Acts of 2012; and An Act relative to the emergency service response of public utility companies, c. 216 of the Acts of 2012.
[2] Section 36, of c. 209 of the Acts of 2012.

2

3.     The purposes of this declaration are to provide: (i) background on Massachusetts's process for facilitating the financing of offshore wind projects through power purchase agreements; (ii) a status of offshore wind projects with current or former Massachusetts power purchase agreements; (iii) an overview regarding investments made in support of Massachusetts's emerging offshore wind industry and its reliance on federal actions; and (iv) a summary of offshore wind benefits for Massachusetts.

4.     I am submitting this declaration in support of the Commonwealth's motion for a preliminary injunction. I am generally familiar with the Executive Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (Memorandum) signed on January 20, 2025, by President Trump. Section one of the Memorandum withdraws from disposition all areas within the Outer Continental Shelf (OCS) as defined in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*, but does not alter the existing rights associated with existing leases. Section two of the Memorandum directs all relevant members of the executive branch not to issue or renew approvals, rights of way, permits, leases, or loans for onshore and offshore wind projects. During that pause, the Secretary of the Interior will lead an assessment

3

of the environmental impacts of wind energy on wildlife, and of the economic implications of wind energy.

**I.** **Background on the Process for Launching Offshore Wind Projects**

5.      As the State Energy Office, DOER is the primary energy policy agency for the Commonwealth. DOER's mission is to create a clean, affordable, resilient, and equitable energy future for all in the Commonwealth. DOER focuses on transitioning our energy supply to improve our energy system infrastructure, reduce and shape energy demand, and lower greenhouse gas emissions.  To meet DOER's objectives, DOER connects and collaborates with energy stakeholders to develop effective policy. DOER implements this policy through planning, regulation, and funding efforts. DOER provides tools to individuals, organizations, and communities to support their clean energy goals.

6.      Long-term contracts for offshore wind energy delivery support the Commonwealth's progress towards meeting its statutory requirements for renewable energy production and greenhouse gas emissions reductions. The Global Warming Solutions Act, M.G.L. c. 21N, § 3; St. 2008, c. 298, requires Massachusetts to achieve Net Zero greenhouse gas emissions by 2050.  Offshore wind plays a critical role in reducing emissions from the electric power sector.

7.      Massachusetts also has a long-standing Renewable Portfolio Standard (RPS), M.G.L. 25A, § 11F; 225 C.M.R. § 14.00, which requires that retail energy

4

suppliers annually increase the share of renewable energy generation when supplying Massachusetts electricity customers. Under these programs, clean energy generation is incentivized through the creation of transferrable renewable energy certificates (RECs) that are sold by generators at a market price to retail energy suppliers for their RPS compliance obligations. The Commonwealth therefore facilitates the financing of new clean energy projects by requiring the EDCs to solicit and enter into contracts with eligible clean energy projects, including RECs produced by offshore wind projects.

8.     To facilitate the financing of offshore wind energy, DOER and EDCs periodically solicit proposals from offshore wind developers for cost-effective long-term contracts for offshore wind energy, pursuant to the Green Communities Act, St. 2008, c. 169, § 83C (Section 83C), as amended by the Energy Diversity Act, and An Act Driving Clean Energy and Offshore Wind.[3]

9.     Offshore wind energy procured through the Section 83C process must "contribute to reducing winter electricity spikes" in an effort to capitalize on the power production of offshore wind during periods of grid stress in New England.

10.    An Act Driving Clean Energy and Offshore Wind, published as Chapter 179 of the Acts of 2022, codified the requirement of entering into cost-effective

---

[3] St. 2016, c. 188, s. 12 amended St. 2008, c. 169, s. 83. This section was later supplemented by St. 2018, c. 227, s. 21(a), and amended by St. 2021, c. 24, s. 69 and St. 2022, c. 179, s. 60-61.

long-term contracts following one or more competitive solicitations for 5,600 megawatts (MW) of offshore wind generation no later than June 30, 2027, and directed DOER to develop a staggered procurement schedule to meet that requirement.

11.    The process for Massachusetts's offshore wind solicitations includes development of a Request for Proposals (RFP), evaluation and selection of bids based on quantitative and qualitative factors, contract negotiations between project developers and the EDCs, and review of resulting contracts by the DPU. I will briefly outline each of these steps next.

12.    DOER coordinates with the EDCs and the AGO to develop the RFP to solicit competitive proposals for offshore wind projects. The RFP development process is overseen by an Independent Evaluator, to ensure the solicitation process is open, fair, and transparent. The drafting parties solicit public comment on the draft RFP, which the parties then file with the DPU for review and approval. Once approved, DOER and the EDCs jointly issue the final RFP publicly for bid submission.

13.    DOER and the AGO jointly select an Independent Evaluator to monitor and report on the timetable and method of solicitation and bid selection process to ensure an open, fair, and transparent solicitation and bid process that is not unduly influenced by an affiliated company. The Independent Evaluator submits a report to

6

the DPU regarding the RFP drafting process when the RFP is filed at the DPU, and a second report when contracts resulting from a solicitation are filed at the DPU for review and approval. DOER may request that the Independent Evaluator monitor contract negotiations between the selected developer(s) and the EDCs.

14.    Proposals received under a solicitation are reviewed and scored by the Evaluation Team, composed of DOER and the Executive Office of Economic Development, in consultation with the IE and EDCs. The evaluation process includes detailed analysis on both quantitative and qualitative factors to determine if proposals are cost-effective and meet various statutory criteria. The quantitative evaluation includes modeling of the regional electric power system to determine the impacts of the proposed project on wholesale electricity and environmental attribute market prices in New England and Massachusetts. The quantitative evaluation identifies the levelized unit net benefit of each proposal, which determines a numeric score combined with the qualitative evaluation numeric score to rank the proposed projects. Following the conclusion of the evaluation process, DOER, in consultation with the IE, issues a final, binding determination of any winning bid(s).

15.    Any selected project(s) then proceed to negotiate long-term Power Purchase Agreements (PPAs) with the EDCs. Prior to, or simultaneously with contract execution, Bidders are expected to negotiate and execute a memorandum of understanding (MOU) with DOER and the Massachusetts Clean Energy Center to

memorialize the commitments made in the bid package regarding economic development, environmental justice, and diversity, equity and inclusion plans.

16.    Executed PPAs are subject to DPU review and approval. The DPU considers recommendations by the AGO and DOER and approves a proposed contract if it finds that the contract is a cost-effective mechanism for procuring beneficial, reliable renewable energy on a long-term basis and in the public interest.

17.    Following regulatory approval of the PPAs, offshore wind developers proceed with project development, including securing financing and proceeding with necessary federal, state, and local permitting to site and construct the offshore wind farm and related transmission infrastructure.

18.    Offshore wind projects currently under development in the United States are subject to federal permitting and review by the Bureau of Ocean Energy Management (BOEM) since they are sited in federal waters on the Outer Continental Shelf. All projects need to submit a Construction and Operations Plan (COP) for BOEM review and approval. The approval of the COP and other federal permits is a necessary for offshore wind projects to proceed with successful financing, construction, and operation of a project.

## II.    The Status of Offshore Wind Projects in Massachusetts

19.     Following the Massachusetts Legislature's direction to facilitate a staggered procurement schedule, DOER has initiated four offshore wind solicitation processes, three of which are complete.

20.     The first solicitation process began in 2017 when DOER and the EDCs issued the first RFP for long-term contracts for offshore wind under Section 83C (referred to as "83C Round I"). Following a full evaluation and review of all bids received, DOER selected Vineyard Wind LLC's bid of 800 MW (Vineyard Wind 1) and the EDCs filed long-term contracts with the DPU for review and approval on July 31, 2018.   DOER submitted a letter requesting that the DPU approve the contracts, and the DPU approved the contracts on April 12, 2019.[4] The Vineyard Wind 1 project represented the first utility-scale procurement of an offshore wind project in the United States.

21.     Vineyard Wind 1 received its final permits from the federal government in 2021. To date, the facility has completed construction of all foundations and is finalizing tower construction and blade installations.

22.     Once all 62 turbines (806 MW) are installed and delivering offshore wind energy, they will produce enough electricity to power over 400,000 homes and businesses.

---

[4] D.P.U. 18-76, -77, -78, Order, at 89 (2019).

23.     DOER and the EDCs initiated the second round solicitation under Section 83C with the issuance of an RFP for up to 800 MW of offshore wind on May 23, 2019 (83C Round II). The RFP was revised and reissued on August 7, 2019, in response to legislative changes that removed the requirement for all proposals to have a price less than the price resulting from the previous solicitation (referred to as a "price cap" requirement).[5]

24.     The 83C Round II solicitation generated proposals from three developers: Bay State Wind, Mayflower Wind (subsequently renamed SouthCoast Wind), and Vineyard Wind. The outcome of the solicitation was the selection of the 804 MW Mayflower Wind project, and the EDCs executed PPAs with Mayflower Wind on December 13, 2019. The DPU reviewed and approved the contracts on November 5, 2020.

25.     Following a public comment period, DOER and the EDCs launched a third round offshore wind solicitation (83C Round III) with the release of an RFP for up to 1,600 MW of offshore wind on May 7, 2021. The 83C Round III solicitation generated proposals from two developers: SouthCoast Wind and Commonwealth Wind. The outcome of the solicitation was the selection of two projects: 1,200 MW of a 1,232 MW project from Commonwealth Wind and 405 MW of a 480 MW

---

[5] An Act Relative to Offshore Wind Contract Pricing (Chapter 48 of the Acts of 2019) temporarily eliminated the price cap requirement for the Section 83C Round II solicitation, and the 83C Round II RFP was revised to remove this requirement.

project from SouthCoast Wind. The EDCs executed PPAs with both project developers on March 28, 2022. The DPU reviewed and approved the contracts on December 30, 2022.

26.    However, in the summer of 2023, the EDCs filed agreements with the DPU, at the request of the developers, to terminate the Commonwealth Wind and SouthCoast Wind contracts. For SouthCoast Wind, the termination represented the full 1200 MW project selected through both 83C Round II and 83C Round III solicitations. Both SouthCoast Wind and Commonwealth Wind requested termination because the development of the projects was no longer tenable due to significant inflationary pressures and supply chain issues. The negotiated termination agreements between the developers and the EDCs included Termination Payments totaling $108 million, which were credited back to Massachusetts ratepayers.

27.    The termination of projects selected in 83C Round II and 83C Round III highlights that macroeconomic shocks can derail the offshore wind project financing and timelines. Massachusetts uses fixed-price, long-term contracts to facilitate the financing of offshore wind projects, which are highly capital-intensive to construct. The fixed-price contract structure requires bidders to price their projects in a way that accounts for risks in the cost drivers of the project, but the project developers were not able to absorb the level of macroeconomic shocks from

11

inflation, interest rates, and supply chain disruptions resulting in the termination of the contracts.

28.    Offshore wind projects are also vulnerable to disruptions from federal permitting processes that control the construction and operations of the projects. For instance, Vineyard Wind 1 was delayed over three years from its originally planned commercial operation date as it awaited final federal permitting approvals during 2017 and 2020, which were necessary to begin construction. This delay ultimately harmed Massachusetts ratepayers, all ratepayers in the regional wholesale market, and Massachusetts's progress on its greenhouse gas reduction goals by delaying the delivery of cost-effective offshore wind power.

29.    Prior to launching a fourth round 83C solicitation (83C Round IV), DOER and the EDCs issued a request for public comment. The 83C Round IV RFP included new provisions including an Indexed Price Bid option to address the macroeconomic risks that led to the 83C Round III project terminations. Additionally, prior to receiving bids under the 83C Round IV solicitation, Massachusetts entered into a historic multi-state MOU with Connecticut and Rhode Island on October 3, 2023. This Multi-State MOU outlined how the three states may coordinate selection of offshore wind as each state solicits offshore wind energy generation through their respective state procurements. The goal of the MOU was to allow the three states to seek multi-state offshore wind proposals that would expand

benefits for the region, capture cost reductions by developing projects at scale, and develop into viable projects.

30.    Following evaluation of bids, including Multi-State Bids, in the 83C Round IV solicitation, Massachusetts initially selected three bids, including one bid jointly selected with Rhode Island. The three bids selected were Ocean Winds' 1,287 MW SouthCoast Wind (jointly selected with Rhode Island), Avangrid's 791 MW New England Wind 1, and 800 MW of Vineyard Offshore's 1,200 MW Vineyard Wind 2 project. Vineyard Wind 2 withdrew from contracting following Connecticut's decision not to select any of the project's output because the project's viability was predicated on contracting for the full 1,200 MW.

31.    Currently, the Massachusetts EDCs are negotiating long-term contracts with the SouthCoast Wind and New England Wind 1 projects. Collectively, these projects are poised to more than double Massachusetts's existing offshore wind capacity, powering over 1,000,000 Massachusetts homes.

32.    On January 17, 2025, BOEM announced its approval of the COP for the SouthCoast Wind Project.[6] This is the final approval needed for the project from BOEM following the Department of the Interior's Record of Decision issued in

---

[6] "BOEM Approves Construction and Operations Plan for SouthCoast Wind Project"; Bureau of Ocean Energy Management; January 17, 2025; https://www.boem.gov/newsroom/press-releases/boem-approves-construction-and-operations-plan-southcoast-wind-project

December 2024.[7] Several ancillary federal permits (Section 10/404, Marine Mammal Protection Act Incidental Take Authorization, and National Pollutant Discharge Elimination System Permit) are submitted and pending approval. Construction is expected to begin following regulatory approval of the PPAs.

33.     On July 1, 2024, BOEM announced its approval of the New England Wind COP, which authorizes construction and operation of New England Wind 1.[8] This is the final approval needed for the project from BOEM following the Department of the Interior's Record of Decision issued in April 2024.[9] Construction is expected to begin following regulatory approval of the PPAs.

34.     Massachusetts law directs solicitations for offshore wind generation to occur within 24 months of the prior solicitation until Massachusetts procures 5,600 MW of offshore wind. As such, DOER plans to begin a fifth round of offshore wind procurement in 2025 to meet our statutory requirement. However, ongoing uncertainty regarding federal actions impacting offshore wind projects creates risks for conducting a competitive offshore wind procurement at this time. Projects

---

[7] Record of Decision SouthCoast Wind Project Construction and Operations Plan; Bureau of Ocean Energy Management, US Department of the Interior; December 20, 2024.
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record-of-Decision-SouthCoast-Wind-OCS-A-0521.pdf

[8] "BOEM Approves Construction and Operations Plans for New England Wind's Offshore Wind Projects"; Bureau of Ocean Energy Management; July 1, 2024; https://www.boem.gov/newsroom/press-releases/boem-approves-construction-and-operations-plan-new-england-winds-offshore

[9] Record of Decision New England Wind Farm and New England Wind Project Construction and Operations Plan; Bureau of Ocean Energy Management, US Department of the Interior; April 1, 2024;
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf

eligible to bid into a new Massachusetts solicitation face heightened risk and uncertainty regarding their project costs and schedules due to recent federal actions relating to import tariffs, BOEM permitting, and other federal approvals required to construct offshore wind projects. Additionally, the EDCs and offshore wind developers have not yet finalized contracts for the projects selected in the prior Round 4 solicitation. Uncertainties stemming from the Memorandum and other Federal actions create additional risk on these projects, and ultimately, the contract negotiations. Federal policy is an important factor in these projects and the EDCs and developers are working to gain greater certainty before finalizing the contracts.

### III.    Benefits of Onshore Wind to Massachusetts

35.    Onshore wind is an important part of the electricity generation mix serving Massachusetts residents and businesses with cost-effective, zero-emissions power. Under the statutory authority of Section 83 and Section 83A of the Green Communities Act, Massachusetts conducted competitive solicitations between 2010 and in 2015 for renewable energy resources that resulted in the Massachusetts EDCs signing long-term contracts for energy and RECs from seven utility-scale onshore wind projects in New England and New York that achieved commercial operation. These projects are currently generating over 600 MW of renewable energy for Massachusetts residents and businesses.

15

36.    There are substantial additional onshore wind resources available in northern New England which have not yet been developed. This is partly due to transmission constraints preventing the projects from exporting to the regional power grid. Recently, Massachusetts and the New England states worked with ISO New England, the regional grid operator, to build out the transmission system as a means to reduce wholesale power costs for ratepayers by unlocking access to these onshore wind resources. As an initial step in a multi-year process, ISO New England completed the 2050 Transmission Study in February 2024.[10]  The results provided a high-level assessment of the regional transmission system investment needed through 2050 to ensure reliability throughout the clean energy transition and informed stakeholders of the amount and type of transmission infrastructure necessary to ensure a reliable supply of cost-effective electricity for New England. The study demonstrated that additional transmission upgrades are needed to resolve bottlenecks on the interfaces between Maine and southern New England.

37.    Following the findings of the 2050 Transmission Study, ISO New England submitted tariff changes to FERC to create a process with the New England states to develop projects to realize the upgrades identified in the study, including a cost-allocation mechanism for those transmission improvements. FERC approved the tariff in July of 2024 and, at the request of the New England states and following

---

[10] https://www.iso-ne.com/static-assets/documents/100008/2024_02_14_pac_2050_transmission_study_final.pdf

a stakeholder process to solicit input and refine the process, ISO New England issued a Request for Proposals (RFP) for long-term transmission needs on March 31, 2025.[11] This RFP is the first-of-its-kind in the nation and seeks transmission upgrades that can allow the New England region to access new cost-effective generation to be built in northern Maine, including onshore wind resources.

38.    This transmission process opens a pathway for new generation to be built and delivered to load centers, however, challenges to financing posed by an uncertain federal framework present new hurdles and drive costs upward. Onshore wind projects proposed to be built in Northern Maine would require federal permits for construction. First, all structures over 200 feet (including utility-scale wind turbines) are required to receive a "Determinations of No Hazard" from the Federal Aviation Administration. Depending on the location of projects, additional federal permits related to impacts on wildlife and habitat may be required, such as Clean Water Act Section 404 from the Army Corps of Engineers, Incidental Take Permit under the Endangered Species Act from the US Fish and Wildlife Service, Migratory Bird Treaty Act from the US Fish and Wildlife Service, and others. Any changes to the federal permitting expectations and timelines for onshore wind permits could

---

[11] See RFP materials available at: https://www.iso-ne.com/system-planning/transmission-planning/competitive-transmission

jeopardize the ability of the resources in Northern Maine to proceed with construction and operations to benefit Massachusetts and New England ratepayers.

## IV.   **Benefits of Offshore Wind to Massachusetts**

39.    Offshore wind is expected to play a crucial role in decarbonizing the power sector for Massachusetts. The 2050 Clean Energy and Climate Plan (2050 CECP) for Massachusetts outlines the Commonwealth's strategy to transform our energy supply to meet our Net Zero greenhouse gas emission target by 2050, which is required by law. Modeling results from the 2050 CECP indicate that Massachusetts will likely require 22,000 MW or more of offshore wind energy by 2050 in all scenarios in order to meet the Net Zero statutory requirement.[12] In the near-term, modeling conducted for the 2025/2030 CECP indicate that having contracted offshore wind projects operational on schedule is crucial to achieve our 2030 greenhouse gas targets for the power sector.[13]

40.    Offshore wind provides unique benefits as a power source for Massachusetts. Offshore wind energy resources off the coast of Massachusetts are abundant, with analysis from the National Renewable Energy Laboratory showing

---

[12] Massachusetts Clean Energy and Climate Plan for 2050, Workbook of Modeling Results: https://www.mass.gov/info-details/massachusetts-clean-energy-and-climate-plan-for-2050#clean-energy-and-climate-plan-for-2050-

[13] Massachusetts Clean Energy and Climate Plan for 2025/2030: https://www.mass.gov/doc/clean-energy-and-climate-plan-for-2025-and-2030/download

that the wind resource potential offshore Massachusetts and southern New England is some of the strongest in the country.[14]

41.     Offshore wind resources are also located relatively close to load centers like Boston, where electricity demand is the highest in New England and is expected to grow significantly in coming decades.[15] This proximity reduces the amount of transmission infrastructure that is needed to move the power from the generation site to consumers, which reduces costs for consumers and helps minimize environmental impacts from siting the transmission infrastructure.

42.     The offshore wind contracts resulting from Massachusetts's competitive procurements are cost-effective, provide substantial benefits for Massachusetts ratepayers, and are in the public interest. The 83C statute requires that any projects be cost-effective, and the Vineyard Wind 1 contracts will provide energy and RECs at a price materially below the projected cost of buying them in the market over the 20-year term of the contract.[16] Over the life of the contract, for example, the 800 MW Vineyard Wind project is projected to provide an average of 1.4 cents/kWh (in real 2017 dollars) of direct savings to ratepayers.[17]

---

[14] https://www.nrel.gov/images/nrellibraries/gis-images/high-res/wtk-100m-2017-01-min.jpg?sfvrsn=72de0250_1

[15] ISO-NE 2024 CELT Report: https://www.iso-ne.com/static-assets/documents/100011/2024_celt_report.xlsx

[16] DOER Testimony in 83C Round 1 at 18:
https://fileservice.eea.comacloud.net/FileService.Api/file/fileroom//10251395

[17] DOER Testimony in 83C Round 1 at 18:
https://fileservice.eea.comacloud.net/FileService.Api/file/fileroom//10251395

43.     Offshore wind is a crucial new supply resource to meet growing power demand in the region. ISO New England expects summer peak demand to increase 9 percent, while winter peak demand is projected to increase 30 percent over the next 10 years.[18] Offshore wind projects are ready to be deployed now to meet this surging electricity demand in New England. There are several offshore wind projects at advanced development stages which have supply chain contracts in place and interconnection queue positions secured, which position them as "shovel-ready" to begin construction and be the best available option to come online to deliver much-needed new power supply for New England. Supply chain constraints are delaying conventional natural gas power plant development in other parts of the country,[19] highlighting the importance of expediting offshore wind projects that have supply chain contracts in place so they can begin construction and provide crucial new energy supply for New England.

44.     Offshore wind can also help reduce high winter electricity costs in Massachusetts and the New England region. New England experiences high wholesale electricity market prices in the winter months, when the region's natural

---

[18] ISO New England, Final Draft 2025 Energy and Seasonal Peak Forecasts (March 28, 2025), https://www.iso-ne.com/static-assets/documents/100021/energy_demand_fx2025_final.pdf.

[19] Plautz, Jason. "Want to build a gas plant? Get in line." E&E News. April 22, 2025. Available at: https://subscriber.politicopro.com/article/eenews/2025/04/22/want-to-build-a-gas-plant-get-in-line-00299503 (accessed April 24, 2025).

gas supply is constrained.[20] For example, the average wholesale electricity market price in December 2024 was $89/MWh, compared to $51/MWh during July (the summer peak demand period) and only $24/MWh during March (the "shoulder season" of lowest demand). The New England region is also highly exposed to price volatility from global commodity markets for fossil fuels. For instance, the region experienced severe electricity price spikes in 2022-2023 when the Ukraine invasion led to global natural gas price increases.[21] In 2023, more than half of the electricity produced in New England was produced by burning natural gas, resulting in an average of $3 billion flowing out of the region's economy every year.[22] Recent analysis by Synapse Energy Economics found that adding offshore wind to the New England grid could allow the region to retain $1.57 billion that would have otherwise flowed out of the region,[23] while also significantly reducing ratepayer costs by displacing high-cost natural gas and relieving pipeline constraints, particularly during winter.[24] After factoring in the cost of offshore wind contracts procured outside of the market, net annual electricity cost savings average $630 million under

[20] "Monthly LMP Indices"; ISO-NE; https://www.iso-ne.com/isoexpress/web/reports/pricing/-/tree/monthly-lmp-indices

[21] "Markets"; ISO NE; https://www.iso-ne.com/about/key-stats/markets

[22] "Charting the Wind: Quantifying the Ratepayer, Climate, and Public Health Benefits of Offshore Wind in New England"; Synapse Energy Economics, Inc.; June 3, 2024; page 2; https://www.synapse-energy.com/sites/default/files/Synapse%20Offshore%20Wind%20Benefits%20in%20New%20England%2020240603%24-024.pdf

[23] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12

[24] Synapse Energy Economics, Inc.; "Charting the Wind"; page 10

a reference case gas scenario, with annual savings increasing to more than $1 billion under a high natural gas price scenario.[25] Residential monthly bill savings would be $2.79 and $4.61, respectively.[26] Synapse also found significant public health benefits of $362 million every year, due to reduced criteria pollutants such as NOx, SOx, and particulates that result from fossil fuel combustion.[27]

45.     Analysis conducted by ISO New England, the regional electricity grid operator, shows that offshore wind resources' highest energy output occurs during winter months.[28] Adding offshore wind resources to the regional energy mix could significantly reduce winter supply constraints and reduce wholesale market prices. A 2018 assessment by ISO New England found that a hypothetical 1,600 MW offshore wind project would have performed particularly well during the region's 16-day cold spell in December of 2017 and January of 2018, during which natural gas and wholesale electricity prices dramatically spiked. The offshore wind project would have generated 435,257 MWh, saving the region $80 million to $85 million in production costs, reducing locational marginal prices by $11/MWh to $13/MWh, and avoiding 20% of natural gas usage during the period and 219,200 short tons of

---

[25] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12

[26] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12

[27] Synapse Energy Economics, Inc.; "Charting the Wind"; page 13

[28] ISO NE Variable Energy Resource (VER) Data

$CO_2$.[29] ISO New England is counting on offshore wind resources to contribute new supply to meet growing electricity demand in the region.[30] The queue of projects planning to interconnect to the ISO New England grid includes 14,577 MW of offshore wind resources. A sensitivity analysis completed by ISO New England as part of their 2024 Economic Study found that without any offshore wind capacity, the cost of energy to ISO New England customers is 50% higher in 2050.[31] Furthermore, without offshore wind, the total annualized build costs increase by $26 billion, or 16.6%.[32]

46.    Massachusetts also has prime coastal locations near offshore wind lease areas that are available to provide interconnection to the electric grid, including at the sites of retired fossil fuel infrastructure like the former coal-fired plant at Brayton Point in Somerset, MA, the former fossil fuel-fired Mystic Generating Station in Everett, MA, and the former Pilgrim nuclear plant in Plymouth, MA. These locations will make interconnection efficient and lower the cost to interconnect new supply

---

[29] High-Level Assessment of Potential Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell: https://www.iso-ne.com/static-assets/documents/2018/12/2018_iso-ne_offshore_wind_assessment_mass_cec_production_estimates_12_17_2018_public.pdf

[30] Gordon van Welie (ISO New England) Congressional testimony. Available at: https://www.iso-ne.com/static-assets/documents/100021/final_isone_written_testimony_house_energy_committee_testimony_3_25_2025.pdf

[31] "2024 Economic Study: Policy Scenario Sensitivities & Follow-Up to Stakeholder-Requested Scenario"; ISO NE; March 19, 2025; https://www.iso-ne.com/static-assets/documents/100021/a06_2025_03_19_pac_2024_economic_studies_policy_scenario_sensitivities_and_follow_up_to_stakeholder_requested_scenarios.pdf

[32] "2024 Economic Study: Policy Scenario Sensitivities & Follow-Up to Stakeholder-Requested Scenario"; ISO NE; March 19, 2025; https://www.iso-ne.com/static-assets/documents/100021/a06_2025_03_19_pac_2024_economic_studies_policy_scenario_sensitivities_and_follow_up_to_stakeholder_requested_scenarios.pdf

resources to replace retired resources. Further, an operating co-generation plant in Sandwich, MA, may provide an interconnection point to maximize its current transmission capacity.

47.    Offshore wind is an intermittent resource and the region is taking a variety of steps to reliably integrate a growing supply of intermittent resources into the electricity system. For example, the region is investing in energy storage to charge during low-cost periods when there is excess offshore wind and to discharge during high-cost peak times. Pairing energy storage with offshore wind will allow the Commonwealth to meet peak demand times with clean energy instead of high-cost and high-emissions fuel oil. Massachusetts is pursuing a suite of policies to support the deployment of cost-effective energy storage in Massachusetts, including through the first-in-the-nation Clean Peak Standard and a solicitation for attributes from energy storage in 2025. Vineyard Wind 1 has committed to providing $15 million to establish the Resiliency and Affordability Program to support funding for the construction of battery energy storage and solar energy projects to enhance resiliency and provide low-income ratepayer benefits in communities hosting Vineyard Wind 1.[33]

---

[33] "Citizens, Vineyard Wind Collaborate on Resiliency and Affordability Fund to Benefit Residents and Communities on Cape Cod, Islands and South Coast"; https://www.vineyardwind.com/news-and-updates/2018/3/29/citizens-vineyard-wind-collaborate-on-resiliency-and-affordability-fund-to-benefit-residents-and-communities-on-cape-cod-islands-and-south-coast

48.     The offshore wind industry has already provided substantial economic development benefits for Massachusetts. To-date, the Vineyard Wind 1 project has generated 3,405 full-time equivalent jobs, $331.1 million in labor incomes, and over $890 million in economic output.[34] The project's development, construction, and operation will support roughly 2,000 total jobs, generate more than 200 supply chain contracts across 29 U.S. states, and yield $2 billion in new investments in the United States. Offshore wind industry activity across the region is supporting shipbuilding in Louisiana, Florida, and Texas, cable manufacturing in North Carolina, and geotechnical survey services in Virginia. Vineyard Wind 1 has committed to mentoring and apprenticeship programs for skilled workforce training and has committed $10 million to the Offshore Wind Industry Accelerator Initiative to accelerate the offshore wind supply chain, businesses and infrastructure in Massachusetts.[35]

49.     Given the inability for offshore wind developers to receive sufficient revenue certainty from the wholesale market, offshore wind projects will not be able to be financed and constructed solely from the wholesale market at this time.

50.     An indefinite halt of federal permitting for onshore and offshore wind projects would harm Massachusetts residents and business through increased costs

---

[34] Vineyard Wind 1 Impact on Jobs and Economic Output. Annual Report #3; November 2024.
[35] "Committing $15m to make Massachusetts the center of the offshore wind industry;" https://www.vineyardwind.com/masswinds

and absent sufficient generation to meet load growth would hinder local and national economic growth. Without a timely and predictable federal permitting process, wind developers will be unable to perform on existing state-level contracts for power, nor develop and build out new projects that are urgently needed to meet growing regional demand reliably and affordably, leading to increase costs for Massachusetts and New England ratepayers. A halt in wind project development would also jeopardize the thousands of good-paying, long-term jobs that the wind industry has already created and plans to create in Massachusetts and across the nation to build out thousands of megawatts of new power projects. Massachusetts is also counting on substantial new wind resources being built in the coming years to reduce carbon emissions that are already contributed to harmful climate impacts on residents, businesses, and communities. In conclusion, offshore wind is a critical energy resource to help reliably and affordably achieve Massachusetts's energy demands and legislative greenhouse gas reduction mandates, while simultaneously reducing our reliance on out-of-state, emission-intensive energy sources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Boston, Massachusetts on May 2, 2025.


Elizabeth Mahony
Commissioner of the Massachusetts
Department of Energy Resources

EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-11221

**DECLARATION OF KATHARINE PERRY**
**DEPUTY DIRECTOR FOR RESOURCE ADEQUACY,**
**NEW JERSEY BOARD OF PUBLIC UTILITIES**

I, Katharine Perry, declare as follows:

1.      I am currently employed by the State of New Jersey Board of Public Utilities ("NJBPU") as Deputy Director for Resource Adequacy within the Division of Clean Energy, which includes responsibility for the Offshore Wind Program. I have been employed by the State of New Jersey since early 2024. Prior to joining the State, I held roles in the private sector working on large-scale energy infrastructure projects, both as a consultant and as part of the development management team of an offshore wind developer.

2.      I have extensive professional knowledge and experience regarding the role of offshore wind ("OSW") energy in New Jersey's plans to prepare for the

1

impacts of climate change and greenhouse gases, stimulate economic development, and support the development of new sources of clean electricity that can help meet the State's energy needs. My job duties include overseeing the development and execution of the NJBPU's OSW program, ensuring the timely and responsible procurement of OSW projects on behalf of the State in accordance with the State's clean energy goals and initiatives, further detailed below, and ensuring all procured OSW projects comply with the requirements imposed by any NJBPU project approval.

3.    I have a bachelor's degree in Natural Resource Studies, and a master's degree in Environmental Science and Management.

4.    In my capacity as Deputy Director I am aware of and familiar with the science related to global and local climate change as well New Jersey's plans to rely upon OSW energy to address them. As a result of my professional experience and my personal knowledge, my review of and involvement in the development of cited materials, and my personal knowledge of the NJBPU policies and planning related thereto, I can attest to the following.

5.    I am submitting this declaration in support of the Plaintiff States' Motion for a Preliminary Injunction.

## THE NEW JERSEY BOARD OF PUBLIC UTILITIES

6.     NJBPU is the New Jersey state agency with authority to oversee regulated utilities, which provide critical services such as natural gas, electricity, water, telecommunications, and cable television.[1] The law requires the NJBPU to ensure safe, adequate, and proper utility services at reasonable rates for customers in New Jersey.[2]  On this basis, NJBPU regulates the rates of electric utilities, and more generally, the utilities' distribution of electricity to millions of homes throughout New Jersey. This includes the approval of utility-run energy efficiency programs intended to reduce overall energy consumption and related emissions consistent with State law. NJBPU also regulates electric utilities' compliance with statutorily mandated renewable portfolio standards.[3] These standards require that a minimum percentage of the total amount of electricity the electric utilities purchase and sell to customers in New Jersey come from renewable sources, including OSW energy.[4]

7.     In furtherance of NJBPU's responsibility to ensure safe, adequate, and proper utility service, in the context of interstate electricity transmission, NJBPU also advocates for the interests of New Jersey ratepayers before the Federal Energy

---

[1] N.J. Stat. Ann. § 48:2-13.

[2] N.J. Stat. Ann. § 48:2-21; N.J. Stat. Ann. § 48:2-23.

[3] N.J. Stat. Ann. § 48:3-87(d).

[4] *Id.*

Regulatory Commission ("FERC") and through NJBPU's relationship with regional electricity grid operator PJM Interconnection, LLC ("PJM").

8.      NJBPU also plays an integral role in the generation of statewide energy master plans, which are developed by a committee of interested state agencies and must be updated periodically.[5]

9.      In 2010, NJBPU was authorized by the Offshore Wind Economic Development Act ("OWEDA") to conduct competitive solicitations to select proposed OSW projects to receive offshore wind renewable energy credits ("ORECs") in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations is to enable a percentage of New Jersey's electric load to be supplied by OSW energy.[6] The OREC is the NJBPU approved price the project will be compensated for each megawatt ("MW") hour of electricity it generates and delivers to the grid, which is funded through charges passed through to New Jersey ratepayers by their electric utilities.[7] NJBPU's role in these respects is addressed further, *infra*.

### NEW JERSEY'S MANDATE TO DEVELOP OSW ENERGY TO COMBAT CLIMATE CHANGE AND SPUR ECONOMIC DEVELOPMENT

---

[5] N.J. Stat. Ann. § 52:27F-14.

[6] P. L. 2010, c. 57, §§ 1-6.

[7] N.J.A.C. 14:8-6.6(c) (directing electric utilities to facilitate the transfer of OREC funding payments from ratepayers to OSW developers); *see* N.J. Stat. Ann. § 48:3-87(d)(4).

10.    For over a decade, New Jersey has invested substantial resources in developing and implementing its plan to use OSW energy as a mechanism to a) limit greenhouse gas emissions, b) stimulate economic development, and c) support the development of new sources of clean electricity that can help meet the State's energy needs.

11.    On July 6, 2007, the State enacted the Global Warming Response Act, P. L. 2007, c.112 ("GWRA"), which established a statewide limit on greenhouse gas emissions ("GHG") of 80 percent below 2006 GHG levels by 2050. In 2010, OWEDA was enacted.

12.    In 2018, New Jersey Governor Phil Murphy signed an Executive Order ("EO") that affirmed the State's commitment to "combat the threat of global climate change" to protect New Jersey and also "provide reliability and relief for the regional electric grid, which is the largest, most congested and most costly in the nation."[8] Moreover, the Governor saw that "an aggressive offshore wind energy production goal" could result in the State housing key parts of the OSW supply chain for the Atlantic Coast, which would "contribute to a stronger New Jersey economy."[9] To

---

[8] *Exec. Order No. 8* (Jan. 31, 2018), 50 N.J.R. 887(a) (Feb. 20, 2018).

[9] *Id.*

this end, Governor Murphy set a "goal of 3,500 MW of offshore wind energy generation by the year 2030."[10]

13.     Later that year, New Jersey's Clean Energy Act ("CEA"), P. L.2018, c.17, established one of the most ambitious renewable portfolio standards in the nation, which provides for 35 percent of the electricity sold in New Jersey to be supplied from renewable resources by 2025, and 50 percent by 2030, through a market-based system of matching electricity consumption with renewable energy certificates. This included increasing the number of MWs of offshore wind energy to be procured through the NJBPU's OSW renewable energy certificate program from 1,100 megawatts to 3,500 MW.[11]

14.     On January 21, 2020, the Legislature amended OWEDA to authorize NJBPU to conduct competitive solicitations for open access transmission facilities to facilitate delivery of electricity from OSW energy generation projects to the electric grid in New Jersey.[12]  Transmission facilities are facilities that electricity generation facilities, such as OSW energy generation projects, need to connect to in order to deliver electricity to the electrical grid.  The concept of open access means that electricity generation facilities have the opportunity to connect to the

---

[10] *Id.*

[11] *Id.*, § 2.

[12] P. L. 2019, c. 440 § 2; N.J. Stat. Ann. § 48:3-87.1(e).

transmission facility, and thereby to the grid, on a fair basis pursuant to rules set by PJM subject to FERC approval.

15.    On January 27, 2020, the NJBPU released New Jersey's 2019 Energy Master Plan ("EMP"), which provided a comprehensive, forward-thinking blueprint for an equitable and smooth transition from reliance on fossil fuels that contribute to climate change to 100 percent clean energy sources on or before January 1, 2050.

16.    The EMP proposed that the NJBPU develop a consistent and transparent OSW solicitation schedule through 2035 that supports a steady, long-term project pipeline, and coordinate with regional electric grid operator PJM to determine how much of New Jersey's energy demand should be met with OSW through 2050. The EMP also established goals related to the development of the OSW energy industry, including development of OSW supply chain facilities, jobs and job training programs to serve the mid-Atlantic OSW industry, and development port facilities to support the OSW industry.

17.    The EMP also recommended expanding New Jersey's electric grid to accommodate New Jersey's then-current goal of 7,500 MW of OSW energy generation by 2035.[13] The EMP explained how "planned transmission to accommodate the [S]tate's [OSW] goals provides the opportunity to decrease

---

[13] EMP, Goal 2.2.1 ("Develop Offshore Wind Energy Generation") at 114.

ratepayers costs and optimize the delivery of [OSW] generation into the state's transmission system."[14]

18.    In September 2020, NJBPU issued the New Jersey Offshore Wind Strategic Plan ("Strategic Plan").[15] The Strategic Plan found that "[i]nvestments in planning and infrastructure are necessary to build the transmission infrastructure and regional markets needed for offshore wind energy to support a clean energy future."[16]

19.    By 2023, through a series of EOs, and consistent with the GWRA, CEA, and OWEDA, Governor Murphy increased New Jersey's OSW generation goal from 7,500 MW by 2035 to 11,000 MW by 2040, and accelerated New Jersey's renewable energy goal from 100 percent clean energy by 2050 to 100 percent clean energy by 2035.[17]

20.    In furtherance of the GWRA, CEA, and OWEDA, the NJBPU has approved several OSW energy generation projects, three of which, described below in greater detail, are currently in development. Each of the three approvals resulted

---

[14] EMP at 117.

[15] Ramboll US Corporation, New Jersey Offshore Wind Strategic Plan (September 2020), https://www.nj.gov/bpu/pdf/Final_NJ_OWSP_9-9-20.pdf.

[16] *Id.* at 77.

[17] *Exec. Order No. 92* (Nov. 19, 2019), 51 N.J.R. 1817(b) (Dec. 16, 2019); *Exec. Order No. 307* (Feb. 15, 2023), 54 N.J.R. 1945(a) (Oct. 17, 2022); *Exec. Order No. 315* (Feb. 15, 2023), 55 N.J.R. 509(a) (March 20, 2023).

from NJBPU proceedings in which NJBPU solicited proposals from developers to build OSW energy generation projects in Department of Interior, Bureau of Ocean Energy Management ("BOEM") lease areas off the coast of New Jersey for a specified OREC for a 20-year period of operations.[18] NJBPU's approval of OSW energy generation projects supports the statutory directive that at least 3,500 MW of electricity generation come from OSW.

21.    To reach New Jersey's 11,000 MW OSW goal, the NJBPU intends to conduct at least three additional solicitations for proposed OSW energy generation and expects these to take place by 2029.[19]  New Jersey has also worked with PJM and FERC to award an electricity transmission project and commence a solicitation for the award of a second transmission project, also detailed below, which are necessary to facilitate the injection of electricity from OSW energy generation projects into the State's electrical grid.

### THE LANDSCAPE OF HEAVILY REGULATED OSW PROJECTS IN NEW JERSEY

22.    OSW energy generation projects need a variety of federal and state approvals and authorizations.

---

[18] N.J. Stat. Ann. § 48:3-87.1(c).

[19] *See* New Jersey's Offshore Wind Program, www.bpuoffshorewind.nj.gov.

23.    On the federal side, projects need OSW leases as well as several permits or approvals awarded by different agencies.

24.    The first step in the process of developing an OSW project is obtaining a lease. All OSW energy generation projects must be sited on lease areas pursuant to leases issued by the BOEM. The lease entitles the lessee project to occupy and use a designated portion of the outer continental shelf ("OCS"), subject to obtaining necessary approvals, to install and operate facilities for the production of renewable energy.[20] Projects applying for NJBPU approval pursuant to OWEDA have secured a lease from BOEM prior to application.

25.    Even if NJBPU has approved a project and corresponding OREC price, as described *supra*, the NJBPU approved OSW energy generation project cannot be built without numerous federal approvals. Completion of each OSW energy generation project is dependent upon receipt of approvals from BOEM, including a Site Assessment Plan ("SAP") and/or Survey Plan for site assessment activities, Construction and Operations Plan ("COP") for facility construction activities, various post-COP approval pre-construction plans, and a General Activities Plan ("GAP") to operate the facility after construction.[21]

---

[20] 30 C.F.R. § 585.133; 30 C.F.R. § 585.200(a).

[21] *See* 30 C.F.R. 585.600.

26.     Currently, there are three NJBPU approved OSW energy generation projects that have BOEM leases on the OCS off the coast of New Jersey and have begun obtaining federal permits. Those projects are Atlantic Shores Offshore Wind Project 1, LLC ("Atlantic Shores South"), Invenergy Wind Offshore, LLC ("Invenergy"), and Attentive Energy, LLC ("Attentive").[22]

27.     On June 30, 2021, the NJBPU approved a 1,509.6 MW project submitted by Atlantic Shores South.[23] Atlantic Shores South is sited on BOEM lease area OCS-A 0499.[24] The Atlantic Shores South project is expected to result in an average of 2.97 million tons of avoided GHG emissions annually.[25] In July 2024, the

---

[22]  Attentive Energy Two Offshore Wind Project Permitting Dashboard https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/attentive-energy-two-offshore-wind-project.

[23] *In the Matter of the Board of Public Utilities Offshore Wind Solicitation 2 for 1,200 to 2,400 MW – Atlantic Shores Offshore Wind Project 1, LLC*, BPU Docket No. QO21050824, Order dated June 30, 2021 ("Atlantic Shores South Order"). Atlantic Shores South sought a new OREC price through a recent bidding process.  In February 2025, NJBPU announced that the process would not result in any awards.  Despite this development, Atlantic Shores retains NJBPU's 2021 approval.

[24] For avoidance of confusion, as used in this declaration, the phrase "Atlantic Shores South," refers to the specific project for which NJBPU approved an OREC, which is located on BOEM Lease OCS-A-0499. "Atlantic Shores South" does not refer to the BOEM lease area where the project is located. By contrast, BOEM uses the phrase, "Atlantic Shores South" to describe BOEM lease area OCS-A 0499, which encompasses additional OSW facilities proposed to BOEM but not approved by NJBPU, but not the specific NJBPU approved project located on that lease area. https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-south.

[25] Atlantic Shores South Order at 16.

Atlantic Shores South project received BOEM approval of its COP, with the project to begin construction in 2026 and a targeted completion date in 2029.[26]

28.    The second project with an approved OREC is Invenergy's Leading Light Wind, 2400 MW project, which was approved in January 2024 and is slated for completion in 2032.[27] The Invenergy project is sited on BOEM lease area OCS-A 0542.[28] The Invenergy project is expected to result in an average of 4.1 million tons of avoided GHG emissions annually.[29]

29.    The third project with an approved OREC is Attentive's 1342 MW project, which was approved in January 2024 and is slated for completion in July 2031.[30] The Attentive project is sited on BOEM lease area OCS-A 0538.[31] The

---

[26] https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-south.

[27] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Order Approving Leading Light Wind 2400 MW Project as a Qualified Offshore Wind Project (Order dated January 24, 2024) ("Invenergy Order").

[28] https://www.boem.gov/renewable-energy/state-activities/invenergy-ocs-0542.

[29] Invenergy Order at 26.

[30] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Order Approving Attentive Energy Two 1342 MW Project as a Qualified Offshore Wind Project (Order dated January 24, 2024) ("Attentive Order").

[31]    https://www.boem.gov/renewable-energy/state-activities/attentive-energy-ocs-0538.

Attentive project is expected to result in an average of 2.3 million tons of avoided GHG emissions annually.[32]

30.    Developers have also obtained leases from BOEM for a number of other lease areas on the OCS off the coast of New Jersey, but there are no current NJBPU approved projects for any of those lease areas. The lease areas include the following:

    i.    OCS-A 0549, leased by Atlantic Shores Offshore Wind, LLC.

    ii.    OCS-A 0498, leased by Ocean Wind, LLC.

    iii.    OCS-A 0532, leased by Orsted North America, Inc.

    iv.    OCS-A 0541, leased by Atlantic Shores Offshore Wind Bight, LLC

    v.    OCS-A 0539, leased by Community Offshore Wind, LLC

    vi.    OCS-A 0537, leased by Bluepoint Wind, LLC

    vii.    OCS-A 0544, leased by Vineyard Mid-Atlantic, LLC.

31.    In addition, BOEM's current Renewable Energy Leasing Schedule includes a "New York Bight 2" auction planned for 2027, with specific reference to New Jersey's goal of 11,000 MW by 2040, which may include additional lease areas

---

[32] Attentive Order at 26.

usable as sites for future NJBPU awards of OSW energy generation projects pursuant to OWEDA.[33]

32.    Although BOEM serves as the lead agency for the approval of OSW energy generation projects, in addition to the BOEM approvals, approvals, reviews or permits from other federal agencies are also necessary for an OSW energy generation project's construction and eventual completion. For example, with respect to Attentive, in addition to an SAP and COP, the project will require:

   a.  a Section 408 permit, a Section 10 Rivers and Harbors Act of 1899 permit, and a Section 404 Clean Water Act permit from the Department of the Army;

   b.  an Endangered Species Act Consultation from the Department of the Interior;

   c.  a Magnuson-Stevens Fishery Conservation and Management Act, Section 305 Essential Fish Habitat Consultation, and a Marine Mammal Protect Act Incidental Take Authorization from the Department of Commerce;

   d.  an Outer Continental Shelf Air Permit from the Environmental Protection Agency; and

---

[33]    Renewable Energy Leasing Schedule, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/RELS%20Information%Sheet%Handout%20v3.pdf.

e.  a Section 106 Review and an Environmental Impact Statement from

BOEM.[34]

33.     Consistent with the above-list, the "Federal Permitting Dashboard" for

Attentive sets forth the status of the project's federal government-wide approvals in

graphic format:[35]



---

[34]      Attentive    Energy    Two,    Permitting    Dashboard,
https://www.permits.performance.gov/permitting-project/fast-41-covered-
projects/attentive-energy-two-offshore-wind-project (last visited April 23, 2025).
[35] *Id.*

34.    Therefore, New Jersey's plan for OSW development also depends upon these permits and approvals to the extent already obtained by active projects, as well as analogous permits and approvals necessary for the completion of other active projects or anticipated future projects.

### THE PRESIDENTIAL MEMORANDUM'S HARM TO NEW JERSEY, NEW JERSEY'S OSW ENERGY GENERATION PLAN AND NEW JERSEY 'S OSW INDUSTRY

35.    As detailed below, the January 20, 2025 Presidential Memorandum targeting OSW ("Memorandum"),[36] along with subsequent federal actions taken pursuant to the Memorandum, jeopardizes the environmental, economic, and electric generation capacity benefits that will accrue to New Jersey from completion of the active OSW energy generation projects.

36.    NJBPU has invested substantial time and resources administering OWEDA and executing its role in implementing the statutory mandates of the GWRA and CEA.  NJBPU's OSW solicitation processes require year-round support from a team of approximately eight employees. The team spends approximately 30% of its time for half of each year preparing to issue a solicitation for OSW energy generation projects, and, for the remaining half of the year, roughly 40-60% of its

---

[36] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 20, 2025).

time on reviewing developer bids submitted in response to a solicitation. NJBPU bid review is also supported by a consultant, which costs NJBPU between $3 and $3.5 million dollars annually. The cost of the consultant is partially, but not entirely, offset by developer-applicant fees.

37.    The Memorandum and subsequent federal actions endanger the existence of both individual OSW energy generation projects and New Jersey's developing OSW industry as a whole because they exacerbate supply chain issues that already affect the nascent, fragile industry.

38.    To be constructed and reach the point of commercial operation, OSW energy generation projects need certain and predictable contractual terms to project their costs and revenue, attract and retain financial investments, and reach final investment decisions and commercial operation dates. For OSW projects in the United States, there is typically a three to five year interval between the time an OSW energy generation project secures an agreement to purchase its future electricity production (referred to as an "offtake agreement"), such as a NJBPU OREC price approval, and the time when the project finalizes construction contracts and pricing to ultimately move forward with final investment decisions.

39.    To increase the likelihood of a project reaching a final investment decision and commercial operation date, projects seek to minimize the duration between securing offtake and final investment decision (at which point their contract

costs and capital expenditures are final) to ensure the project business case remains financially viable and attractive to third party investment needed for construction.

40.    The limited supply of resources like ports, vessels, and manufacturing facilities needed in the construction of OSW energy generation projects also makes stable project construction schedules and a steady sequence of projects critical both for the ability of individual projects to move forward and for the commercial viability of supply chain and support facilities.[37] Through its regular solicitation schedule, NJBPU has attempted to create a consistent cadence of projects being developed in the State, which is undermined in the immediate term by the federal government's freeze in issuing permits to existing projects and in the long term by its freeze in awarding leases to new projects.[38]

41.    In contrast, introducing uncertainty and/or a risk of significant delay suppresses investors' desire to finance OSW energy generation projects because it renders investors unable to finalize and forecast project costs and estimate when a

---

[37] *See* U.S. Department of Energy, Pathways to Commercial Liftoff: Offshore Wind ("Liftoff Report") at 16, 23 (April 2024), https://liftoff.energy.gov/wp-content/uploads/2024/08/April-2024-LIFTOFF_DOE_Offshore-Wind-Liftoff-2.pdf ("Tight schedules and complicated logistics amplified knock-on delays and cost overruns across the supply chain."); *see id.* at 32 ("[A] stop and start build cycle . . . is also a barrier to investment in vessels and manufacturing facilities.").

[38] *See* Liftoff Report at 32 ("[A] clear OSW procurement schedule lets industry optimize project timelines and sizes and create smooth demand pipeline for supply chain investment."), 46.

project will begin operating and generating revenue. Thus, uncertainty generally endangers projects from reaching final investment decisions and commercial operation dates, and if unresolved, will lead to project cancellations.[39] An indefinite suspension of new federal approvals and permits, without which a project cannot be completed and reach operation, causes precisely the risk of significant delay that will lead to project cancellations. The sudden issuance by the Department of Interior of indefinite stop work orders as to construction of fully permitted projects, such as the April 16, 2025 order directed at the Empire Wind project in New York, causes precisely the type of uncertainty that could both lead to project cancellations and disincentive projects from being proposed in the first place.

42.    OSW energy generation project delays create uncertainty and disrupt order books for shovel-ready domestic supply chain facilities, resulting in delays to, or even loss of, those facilities and their associated job and economic benefits, while delays and uncertainty for these facilities in turn creates greater challenges for the OSW projects that were relying on them.[40] NJBPU expects developers to pause or abandon planned projects as a result of the uncertainty and risk of delay caused by the federal government's declared intention to suspend all approvals and permits on

---

[39] Liftoff Report at 43.

[40] Liftoff Report at 41.

existing lease areas, which will invariably deteriorate the economics and business case for individual OSW energy generation projects.

43.     Delays and uncertainty for OSW energy generation projects also create uncertainty for state-level coordinated transmission solutions, like New Jersey's Prebuild Infrastructure ("PBI") described below, which, in addition to saving costs for ratepayers and minimizing environmental and community impacts, have been recognized by the United States Department of Energy as "critical" for OSW sector commercial success as well.[41]

44.     The risk of cancellation of the projects that New Jersey has approved threatens numerous benefits the State is due to receive from the projects, outlined further below.

### ATLANTIC SHORES OSW PROJECT

45.     Before Atlantic Shores South can begin construction, as conditions of its COP approval, it must submit documentation of over 50 pre-construction plans to BOEM or BOEM's sister bureau, the Bureau of Safety and Environmental and

---

[41] *See* Liftoff Report at 47 ("Going forward (for projects beyond Tranche 1 and Tranche 2) separate onshore upgrade solicitations will be critical for liftoff and can tap into existing pool of experienced onshore transmission developers.").

Enforcement ("BSEE"), for review.[42] Some of the submissions require agency approval, while others are sufficient if the agency does not object.[43] These conditions include submission to BSEE of a Facility Design Report ("FDR") and a Fabrication and Installation Report ("FIR") as required by BOEM and BSEE regulations, which must demonstrate that the plans are adequate to ensure safety and avoid undue harm to the environment.[44]

46.    Atlantic Shores South's project includes a guarantee to spend $848 million dollars during the development and construction phases of the project, which are expected to lead to a total $1.869 billion in direct, indirect, and induced economic

---

[42] *See* BOEM, Record of Decision, Atlantic Shores Offshore Wind South Project Construction and Operations Plan at Appendix A, July 1, 2024 ("Atlantic Shores South ROD").

[43] Atlantic Shores South ROD at Appendix A.

[44] Atlantic Shores South ROD at 39 and Appendix A, Section 2.6. 30 C.F.R. 585.632 and 30 C.F.R. 285.632 require the submission of the FDR and FIR prior to construction under an approved COP. The FDR "must demonstrate" that the project design will satisfy the project's obligation to ensure safety and avoid causing undue harm to the environment. 30 C.F.R. 285.701; 30 C.F.R. 285.105(a). The FIR "must demonstrate" that the project will be "fabricated and installed" in a manner that will satisfy the project's obligation to ensure safety and avoid causing undue harm to the environment. 30 C.F.R. 285.702; 30 C.F.R. 285.105(a). After receipt of the FDR and FIR, BSEE will determine within 20 business days whether the reports "are sufficiently complete and accurate" to fulfill the applicable requirements. 30 C.F.R. 285.704(a). If the reports are not sufficient, BOEM will notify the project of deficiencies within 20 business days. 30 C.F.R. 285.704(b). Reports are deemed submitted if BSEE does not notify the project of deficiencies within 20 business days. 30 C.F.R. 285.704(c).

benefits into the New Jersey economy throughout the life of the project, including both construction-related and permanent jobs. Atlantic Shores South made various other financial commitments, including committing to invest tens of millions of dollars in the development of OSW-related manufacturing facilities and leases and in OSW related workforce training and innovation, business development, educational and community programs.[45]

47.    By its application and as required by NJBPU's order approving the project, the Atlantic Shores South project committed to providing various specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and other initiatives.[46]

48.    Atlantic Shores South's infrastructure commitments include:[47]

a.  Using a new monopile fabrication facility to be developed by EEW American Offshore Structures, Inc. ("EEW") in Paulsboro, New Jersey.

b.  Establishing an OSW component assembly facility at the New Jersey Wind Port ("NJWP") in Lower Alloways Creek, New Jersey. The facility will

---

[45] Atlantic Shores South Order at 19-21.

[46] Atlantic Shores South Order at 17-21.

[47] None of the commitments enumerated in this paragraph have been funded.

bring $16.5-$24 million of in-State investment for buildings and tooling and create 50-70 direct jobs during the assembly of components for the Atlantic Shores South project. Atlantic Shores South committed to spend $35.6 million dollars for a 2-year marshalling lease at the NJWP.

c. Building an operations and maintenance ("O&M") center on an underutilized parcel in Atlantic City, New Jersey, which will provide at least 88 permanent jobs for the 30-year operational life of the project. The facility is also expected to create economic activity for a wide range of subcontractors including shipyards, spare part producers, and vessel and harbor services.

49.    Atlantic Shores South's commitments to public institutions include $10,000[48] to sponsor and lead a series of introductions to OSW seminars at the Rutgers University EcoComplex, $160,000[49] to serve as the lead sponsor for all New Jersey Wind Innovation and New Development Institute ("WIND Institute") events, and $10 million[50] for workforce training and innovation activities of the WIND Institute. Atlantic Shores South also committed to spending $400,000[51] to fund

---

[48] None of this commitment has been funded.

[49] None of his commitment has been funded.

[50] Of this amount, $500,000 has been paid, $9.5 million remains unpaid.

[51] Of this amount, $150,000 has been paid. The remaining $250,000 is to be funded over 5 years post FID.

student scholarships in workforce training programs at Rowan University, at least $700,000[52] over the first ten years of the lease to establish an Education and Community Outreach Center in partnership with Stockton University in Atlantic City, New Jersey, and $336,000[53] to provide summer programming in OSW for high school students through the Rutgers University Future Scholars program, which provides college preparation and a tuition free pathway to college for first-generation students from low income backgrounds. Atlantic Shores South has funded parts of each of these commitments, but, in total, over $10 million remains unfunded.

     50.    Atlantic Shores South's commitments to community groups and other initiatives include $4 million to establishing a workforce development fund to invest in New Jersey workforce training to build the skills and capabilities necessary for the OSW industry, $1 million to sponsor 5+ minority or women business enterprise OSW companies, $1 million to fund the purchase and construction of OSW-specific testing equipment[54], $320,000[55] to support the Boys & Girls Club of Atlantic City's science, technology, engineering, arts, and mathematics programming, up to

---

[52] Of this amount, $441,725 has been paid, $258,275 remains unpaid.

[53] Of this amount, $167,000 has been paid. The remaining $167,000 is to be funded over 5 years post FID.

[54] Of these two commitments, Atlantic Shores South has paid $917,334, $1,092,66 remains unpaid.

[55] Of this amount, $150,000 has been paid. The remaining $170,000 is to be funded over 5 years post FID.

$170,000 to support expanding vehicle electrification in Atlantic City by purchasing electric car chargers, $17,055[56] to join regional or demographic-focused chambers of commerce and host "Meet and Greets" for members, and $150,000[57] to expand communication and educational grants through the Barnegat Bay Partnership. Atlantic Shores South has provided significant funding from this group of commitments, but over $5 million remains unfunded.

51.     In the event Atlantic Shores South was deficient in its verified actual economic performance, Atlantic Shores South committed to make additional contributions to the workforce development fund, up to a shortfall of $36 million, and to return any shortfall over $36 million to New Jersey ratepayers on a dollar-for-dollar basis by reducing the price awarded to Atlantic Shores South for the generation and delivery of electricity from the project. With respect to Atlantic Shores South's operations jobs guarantee, any shortfall would be made up by an additional contribution to the workforce development fund at an initial rate of $50,000 per full-time equivalent year, which rate would escalate at a nominal annual rate of 2.5% after project completion to account for increases in worker training costs.[58]

---

[56] All of this commitment has been paid.

[57] Of this amount, $100,000 has been paid, $50,000 remains unpaid.

[58] Atlantic Shores South Order at 20-21.

52.     On February 21, 2025, following an analogous announcement of the first of Atlantic Shores South's two equity investors months before, the remaining Atlantic Shores equity investor announced that it was also writing down the value of its stake in the project due, in part to "significant evolutions in US offshore policy" that caused the investor to "reexamine our activities."[59]

### INVENERGY OSW PROJECT

53.     Invenergy's project includes a guarantee to spend $1.7 billion dollars during the first ten years of operation, with an estimated total of $3.7 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project.[60] Invenergy is required to pay a Research and Monitoring Fee ("RMI Fee") of $24 million to New Jersey, which is to be dedicated to research initiatives and regional environment, wildlife, and fisheries monitoring initiatives dedicated to assessing the impacts of OSW development on New Jersey's natural resources.[61]

54.     On September 25, 2024, NJBPU granted a stay, until December 20, 2024 of Invenergy's obligations under its award, including RMI Fee payments.  On

---

[59]  Barron's, France's EDF Writes Down US Offshore Wind Project, https://www.barrons.com/news/france-s-edf-writes-down-us-offshore-wind-project-7251ca80.

[60] Invenergy Order at 34.

[61] Invenergy Order at 56.

December 19, 2024, Invenergy requested an additional stay of its obligations until May 20, 2025.

55.    Invenergy made various other financial commitments, including commitments to invest tens of millions of dollars in the development of OSW-related manufacturing facilities and leases, operations and maintenance facilities, and in OSW related workforce training and innovation, business development, educational and community programs.[62] Invenergy's investments in OSW facilities are expected to directly create hundreds of permanent jobs and support 1,382 jobs during the design, permitting and construction phases of the Invenergy project.[63]

56.    By its application, and as required by NJBPU's order approving the project, Invenergy committed to providing various specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and initiatives.[64]

57.    Invenergy's infrastructure commitments include:[65]

---

[62] Invenergy Order at 28-35.

[63] *Id.* at 28-29.

[64] Invenergy Order at 28-35.

[65] None of the commitments enumerated in this paragraph have been funded.

a.    Using the EEW facility to produce all monopiles for its project and providing $105.25 million in funding for an expansion of the EEW facility. The expansion will create nearly 300 new permanent jobs.

b.    Using the NJWP to manufacture components of Invenergy's project, which would support 1,382 jobs, increase labor income by $125.6 million and increase New Jersey's gross domestic product $322.9 million during the design permitting and construction phases of the project.

c.    Purchasing various project components from a New Jersey based steel fabrication company, which is expected to support 200 jobs.

d.    Building an O&M center in Port Reading, New Jersey, which will create up to 100 construction jobs and cost $78.6 million to build.

58.    Invenergy's commitments to public institutions include $1.25 million to help advance the research of non-invasive methods for repairing composite materials at the Henry M. Rowan College of Engineering at Rowan University, through its Advanced Materials & Manufacturing Institute, $1 million to support the establishment and operation of the Offshore Wind Innovation Center at the WIND Institute, $1 million to establish the Applied Science Grant program, available to researchers and their associated teams at New Jersey public universities, to support research projects to advance high-impact research, development, and demonstration

projects across the offshore wind supply chain, $405,500 for the Newark School of Data Science and Information Technology, $1.5 million for the Mid-Atlantic States Career & Education Center program to provide instruction to high school students about career opportunities in offshore wind, $400,000 for offshore wind training programs at Rowan University, and $950,000 of targeted funding to New Jersey educational institutions – New Jersey Institute of Technology, Hudson County Community College, and New Jersey Community College Consortium. Invenergy has funded $250,000 of the foregoing commitments, but the remainder is outstanding.[66]

59.    Invenergy's commitments to community groups and other initiatives include:[67]

    a.  Providing $1 million to establish an Offshore Wind Innovation Campus at the Invenergy project's O&M port facility that will bring early-stage energy companies together with a curated set of industry partners. The goal of this campus will be to incubate and commercialize a wide range of offshore wind and renewable energy technologies — including, for example, robotics, grid technologies, AI-based modeling, and powerful computing centers.

---

[66] Of the $400,000 to be paid to Rowan University, $250,000 has been paid.

[67] None of the commitments enumerated in this paragraph have been paid.

b.  Making $112.7 million of project expenditures with Small, Minority, Woman, Veteran Business Enterprise and $35.40 million of expenditures with Veteran Owned Business and Disabled Veteran Owned Business.

c.  Spending $2 million to establish a catalytic training program focused on capacity-building and technical training to position existing small businesses in New Jersey for success in upcoming contracting opportunities in the state's growing offshore wind sector

d.  Providing $500,000 to help identify minority- and women-owned enterprises in the manufacturing space located in underserved and overburdened New Jersey communities ("OBCs"). These funds will also aid local supply chain mapping efforts to train veterans of the armed forces to prepare them for careers in the offshore wind sector.

e.  Contributing $2 million to a Fisheries Accelerator Fund to support and promote activities beneficial to the fisheries community. This fund will encourage advancements in fisheries management, technology, sustainability practices, and the overall development of the fishing industry.

f.  Providing $150,000 to fund the creation of the Paulsboro Economic Development Program. The fund will focus on building, strengthening, and recruiting businesses to Paulsboro, New Jersey, creating a more

attractive business environment, with the ultimate goal of growing jobs that are local to Paulsboro and accessible to Paulsboro residents.

g. Providing total electric bill credits of $94 million to energy-burdened households over the course of 20 years to compensate for the increase in utility bills due to the Invenergy project. The program would provide direct assistance to over 200,000 low-income, energy-burdened households in New Jersey by reducing their projected monthly electricity bill increase from the Invenergy project by 50%.

h. Investing $5 million in an electric vehicle charging hub project that will provide significant benefits to Northern New Jersey environmental justice communities such as Newark's Ironbound District, as well as the city overall.

i. Providing the Waterfront Alliance with $500,000 to institute a Maritime Activation Plan competitive grant program that would provide funding and technical assistance for environmental justice communities to develop plans to promote access, resilience, and economic development, and fund small-scale capital and planning projects for maritime activation.

j. Providing $350,000 in funding for the Children's Environmental Literacy Foundation to provide professional development training for teachers in environmental science and sustainability curricula, to develop

supplemental curricular resources for K-12 students relevant to climate, environmental justice, and offshore wind, and to cultivate workforce pathways in green careers for rising high school seniors.

k. Providing $150,000 to Gotham Whale for organizational support, data collection, and the education of young people in OBCs. Gotham Whale focuses on working with citizen scientists to record and study marine mammals in the New York Bight.

l. Providing $250,000 to the Boys & Girls Clubs of Monmouth County to support its Science, Technology, Engineering and Mathematics programs for young people in Asbury Park, Red Bank, Neptune, and Long Branch, New Jersey.

m. Providing Liberty Science Center with $500,000 to fund the development of an exhibit related to offshore wind and marine science, as well as supporting school trips from OBCs.

n. Providing Neighborhoods for a Sustainable Future $250,000 to enable the nonprofit to expand into North Jersey, where it will support resident-driven actions to advance energy efficiency and foster a clean energy transition by expanding the green workforce and increasing minority contracting.

o. Providing $1,000,000 to support members of Native American Tribes and Tribal Nations to respond and participate in ongoing environmental,

supply chain, and workforce initiatives related to offshore wind in the Bight.

p.  Providing $1,000,000 in funding for the Offshore Wind Scholars Program to provide grants to students in need of financial assistance (with a focus on students from OBCs) to attend New Jersey colleges and universities, participate in clean energy conferences, support youth programming to reinforce civic engagement, and create access to future wealth building opportunities.

60.    In the event Invenergy is deficient in its guaranteed spending, Invenergy committed to make additional economic investments equal to the shortfall.[68] At least 90% of any remaining shortfall would be applied to a reduction in the price awarded to Invenergy for the generation and delivery of electricity from the project, with the remaining 10% committed to fund additional workforce development investments.[69] With respect to Invenergy's jobs guarantee, any shortfall would be made up by additional contribution to workforce development training efforts.[70]

**ATTENTIVE ENERGY OSW PROJECT**

---

[68] Invenergy Order at 34-35.

[69] *Id.*

[70] *Id.*

61.    Attentive's project includes a guarantee to spend $760 million dollars during the first ten years of operation, and an estimated $3.1 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project.[71] Attentive is also required to pay New Jersey an RMI Fee of $15 million.[72] Attentive has already paid half of this commitment, with half of the remaining $7.5 million due on January 24, 2025, and the remainder due on January 24, 2026.

62.    On January 23, 2025, three days after the issuance of the Memorandum, Attentive asked that NJBPU suspend Attentive's obligation to make the January 24, 2025 payment due to, among other things, "delays associated with the anticipated federal permitting timeline" for the project.[73]

63.    Attentive made various other financial commitments, including commitments to invest tens of millions of dollars in the development of OSW-related manufacturing facilities and leases, operations and maintenance facilities, and in OSW related workforce training and innovation, business development, educational

---

[71] Attentive Order at 3, 34.

[72] *Id.* at 26.

[73] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Attentive Energy LLC Motion for Limited Stay, at 4 (January 23, 2025).

and community programs.[74] Attentive's investments in OSW facilities are expected to directly create hundreds of permanent jobs and support hundreds of jobs during the design, permitting, and construction phases of the Attentive project.[75]

64.    By its application, and as required by NJBPU's order approving the project, the Attentive project committed to providing the following specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and initiatives.[76]

65.    Attentive's infrastructure commitments include investing $58.85 million in an expansion of the EEW facility and to source components for Attentive's projects from the facility and establishing a tower manufacturing facility at the NJWP, the construction of which is expected to create 300 jobs and $350 million in economic output, as well as 500 indirect jobs and over $1.75 billion in economic impacts to New Jersey over the facility's lifespan.[77]

66.    Attentive's commitments to public institutions include $15 million, in addition to the RMI Fee, to fund programs with universities and science

---

[74] Attentive Order at 28-34.

[75] *Id.* at 28-29.

[76] Attentive Order at 28-35.

[77] None of the commitments enumerated in this paragraph have been funded.

organizations that align with the goals of the Research and Monitoring Initiative supported by the RMI Fee. Attentive also committed to investing $15 million in the WIND Institute. and $2 million to Rutgers University for the Offshore Wind Connect program, which focuses on student/faculty training, internships, and access programs, emphasizing STEM education.[78]

67.    Attentive 's commitments to community groups and other initiatives include:[79]

a.  Spending $8.4 million in the New Jersey Manufacturing Extension Program.

b.  Providing $2 million to the Trust for Public Land, specifically, through the Newark Green Schoolyards Project and the Barnegat Bay Watershed Program.

c.  Providing $2 million to MRV Group, a diversity supplier and consultant, for enhancing engagement with small, diverse businesses, community-based organizations, and overburdened communities in the clean energy industry.

d.  Providing $6.6 million to SeaAhead, a public benefit corporation dedicated to advancing ocean ventures. As the anchor sponsor for SeaAhead's mid-

---

[78] None of the commitments enumerated in this paragraph have been funded.

[79] None of the commitments enumerated in this paragraph have been funded.

Atlantic activities, Attentive aims to catalyze an innovation community, support innovative startups, and stimulate investment in technology aimed to sustainably use the ocean for economic growth.

e.  Providing $4 million to The OSW Workforce Pathways and Skills Collaborative, which aims to establish the Offshore Wind Network for community colleges, provide funds for the development of offshore wind-related workforce and academic programs, and foster partnerships between higher education institutions and local high schools to integrate them into the offshore wind industry.

f.  Providing $4 million to New Jersey SHARES, a non-profit organization dedicated to assisting income-eligible households with essential bills.

g.  Providing $4 million to the New Jersey Small Business Development Center for a comprehensive partnership targeting supply chain gaps, particularly in offshore wind, which emphasizes entrepreneurship support in Monmouth and Ocean Counties and facilitates statewide development for access to the NJWP, promoting outreach, education, recruitment, and small business support for diverse communities.

h.  Providing $1 million to the Returning Citizens Support Group for the Offshore Wind Reentry Workforce Initiative, intended to facilitate OSW workforce opportunities for returning citizens and justice-involved youth.

i.  Providing $3 million to an environmental justice partner for a grant program directed at engaging diverse organizations in the offshore wind industry and contributing to meaningful environmental justice efforts in OBCs across all of New Jersey.

j.  Providing $1 million to Waterfront Alliance for the "Offshore Explorers" program, which promotes offshore wind in schools with a focus on maritime or clean energy sectors, raising awareness of offshore wind benefits and opportunities.

k.  Providing $350,000 to the Paulsboro and Salem Community Coalition, $175,000 for each municipality, and $100,000 to the Elizabeth Community Coalition. The coalitions aim to boost local engagement in offshore wind, distribute microgrants, and establish consistent feedback channels. This aids in preparing participants for union jobs in the offshore wind industry.

l.  Providing $3.15 million to the International Brotherhood of Electrical Workers ("IBEW") Local 400 Joint Apprenticeship Training Fund to enhance its apprenticeship program. This investment supports pre-apprenticeship training for success in the offshore wind industry, offers direct entry to IBEW graduates into building trades unions, and upgrades equipment and facilities for green energy jobs.

m. Establishing a $1 million fund to address union training needs and expanding apprenticeship programs for offshore wind, with specific partner unions to be named later.

n. Providing $500,000 to the Native American Advancement Corporation, to aid in workforce development for local disadvantaged, rural, and tribal communities in southern New Jersey, and create employment pathways, offer resiliency-focused programming, and connect residents to offshore wind opportunities.

o. Establishing a Lasting Opportunity Fund of $14 million, allowing it to continue to make investments through its operations phase that have not been identified at this time. The Lasting Opportunity Fund will facilitate investments during the Project's operations phase.

68.     In the event Attentive is deficient in its guaranteed spending, Attentive committed to make additional economic investments equal to the shortfall.[80] At least 90% of any remaining shortfall would be applied to a reduction in the price awarded to Attentive for the generation and delivery of electricity from the project, with the remaining 10% going to funding for State-owned OSW programs and assets, including the WIND Institute or NJWP.[81] With respect to Attentive's jobs guarantee,

---

[80] Attentive Order at 35.

[81] *Id.*

any shortfall would be made up by additional contributions to the workforce development fund.

## HARM TO RELATED TRANSMISSION PROJECTS PLANNED TO INTEGRATE OSW ENERGY INTO THE INTERSTATE ELECTRIC GRID

69.    NJBPU has also worked to develop the transmission infrastructure necessary to efficiently address increasing demand for electricity and anticipate the need to integrate awarded and anticipated OSW energy generation projects into the interstate electric grid. As a result, the Memorandum and subsequent federal actions will also harm New Jersey by jeopardizing environmental and economic benefits that will accrue to New Jersey as a result of OSW-related electric transmission infrastructure projects, which are critical to allowing OSW energy projects to inject electricity into New Jersey's electric grid in a manner that minimizes costs, as well as environmental and economic disruption, and to New Jersey's long-term plans for developing clean energy generation capacity.

70.    In coordination with regional grid operator PJM, and pursuant to a FERC approved process, PJM solicited transmission solutions to serve New Jersey's OSW public policy needs for PJM's Regional Transmission Expansion Plan.[82] On

---

[82] *In The Matter of Offshore Wind Transmission*, BPU Docket No. QO20100630, Order dated November 18, 2020; *see* PJM, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Compliance Filing of PJM before the Federal Energy Regulatory Commission, Docket No. RM10-23-000, 36-38 (October 25, 2012) (evidencing FERC's approval of PJM's

October 26, 2022, the NJBPU approved a series of transmission projects through this process, which is known as the State Agreement Approach (SAA), including the Larrabee Tri-Collector Solution, that provide a coordinated transmission solution for 6,400 MW of OSW generation.[83] The Larrabee Tri-Collector Solution primarily includes the construction of a new electrical substation adjacent to an existing electrical substation to increase the amount of electricity that can be injected into the electric grid.[84] The Larrabee Tri-Collector Solution also utilizes existing utility rights of way and electrical transmission infrastructure to enable future OSW energy generation projects to cost-effectively connect to the electric grid through the use of

---

plan to use the SAA as a means for allowing states to pursue their public policy goals), https://www.pjm.com/directory/etariff/FercDockets/700/20121025-er13-198-000v2.pdf.

[83] The Larrabee Tri-Collector Solution means Mid-Atlantic Offshore Development, LLC and Jersey Central Power & Light Company's ("JCP&L") jointly submitted proposal selected by the Board for New Jersey's inaugural offshore wind coordinated transmission solution under PJM's SAA. *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022.  This Tri-Collector solution includes 3 circuits, providing 3,742 MW to the Larrabee Collector Station, a new substation adjacent to the existing JCP&L Larrabee substation that represents the predominant portion of the Larrabee Tri-Collector Solution; *see also In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022.

[84] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 60-63.

41

common infrastructure.[85] This approach to expansion of the transmission grid limits environmental, permitting, and community impact risks relative to each OSW energy generation project separately establishing a route and infrastructure to connect its project to the electric grid.[86] The Larrabee Tri-Collector Solution and related projects are expected to save New Jersey ratepayers $900 million compared to the estimated cost of transmission facilities that otherwise would be necessary to achieve New Jersey's then-current 7,500 MW of OSW energy goal.[87]

71.    NJBPU is also currently evaluating bids submitted in response to a solicitation for the PBI, which is another transmission project necessary to efficiently facilitate connection of OSW energy generation projects to New Jersey's electrical grid.[88] An OSW energy generation facility must build export cables to transmit the energy from the ocean to a substation onshore where the electricity can be interconnected with the interstate electric transmission grid. Without coordinated

---

[85] *Ibid.*

[86] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 13-14 and 60-63.

[87] *In re Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 61.

[88] *In the Matter of the Opening of a Solicitation for a Transmission Infrastructure Project to Support New Jersey's Offshore Wind Public Policy*, Docket No. QO23100719 at 4-5 (Order dated November 17, 2023).

interconnection such as the PBI, each generation project must find its own landfall and build its own onshore corridor to carry power cables to its own interconnection destination. The PBI is infrastructure that will coordinate landfalls and onshore routes to accommodate multiple OSW projects' interconnection to the grid.

72. The PBI envisions a single construction effort to build duct banks and associated cable vaults that will house multiple cables, originating from up to four discrete OSW energy generation projects, which would enable each project to connect its respective cables to the interstate electric transmission system. Absent the PBI, four separate duct bank and cable vault projects, each with its own landfall and onshore route, would be necessary to accomplish the same goal at a greater cost and greater environmental and community disturbance. The PBI is intended to begin offshore and establish a single landfall point where cables from each project can use common onshore routing to connect to the Larrabee Tri-Collector Solution. In conjunction with the Larrabee Tri-Collector Solution, the PBI is also intended to reduce environmental and community impacts and permitting risk.[89] The Invenergy and Attentive projects both plan to use the PBI to connect to New Jersey's electricity transmission grid.[90]

---

[89] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 65-66.

[90] Invenergy Order at 21; Attentive Order at 21.

## HARM TO NEW JERSEY THAT WILL RESULT FROM
## THE LOSS OF OSW ENERGY GENERATION

73.     NJBPU's OSW-related activities are also critical to New Jersey's long-term strategy to meet forecasted capacity demands on New Jersey's electric grid using clean energy. By eliminating New Jersey's ability to rely upon OSW energy as part of that strategy, the Memorandum and resultant federal actions make execution of New Jersey's current plan, reliant upon OSW, impossible.  Without the availability of federal lease areas on which OSW energy generation projects can be sited, there will be no OSW energy generation. Scarcity and congestion issues on New Jersey's electrical grid will worsen without OSW energy generation, leading to greater costs for electricity to both the State and its residents. In addition, the execution of a new plan without OSW may not be impossible, but New Jersey's effort is at least substantially delayed, enabling the impacts of climate change to persist.

74.     Demand for electricity is currently outpacing supply on the regional grid operated by PJM.[91] The retirement of electricity generation facilities plus rapidly increasing electricity consumption (known as "load growth") outpace the

---

[91] The PJM grid serves 13 states, including: Delaware, Illinois, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia and West Virginia. PJM also serves the District of Columbia.

addition of new electricity generation facilities.[92] New Jersey's plan of adding 11,000 MW of OSW energy generation by 2040, including the Atlantic Shores South, Invenergy, and Attentive projects, and as-yet unapproved projects on existing BOEM leases, would ease this problem by increasing available supply. The need for additional supply from OSW is critical because PJM's forward-looking planning studies already envision a worsening deficit of supply relative to demand even relying upon the existence of New Jersey's 11,000 MW of OSW beginning in the early 2030s.[93] Thus, the absence of New Jersey's OSW energy generation will exacerbate the forecasted electricity supply problem, which also does not account for increasing demand from data centers and artificial intelligence.

75.    The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs.[94] Congestion occurs on an electrical grid when the demand for electricity in a particular area exceeds the capacity of the transmission infrastructure to deliver that electricity at lowest cost. When the

---

[92] PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks at 1, Feb. 24, 2023, https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[93] *Id.* at 5, Figure 1, 13, Figure 4, 16, Table 1 and 17, Figure 7.

[94] Grid Strategies, LLC, Transmission Congestion Costs Rise Again in U.S. RTOs, July 2023 at 2, Table 1, https://gridstrategiesllc.com/wp-content/uploads/2023/07/GS_Transmission-Congestion-Costs-in-the-U.S.-RTOs1.pdf.

transmission system is congested, the most efficient source of electricity is not used, and the area with remaining electricity demand is served from alternative, less-efficient, more expensive, sources of supply.

76.    PJM already suffers from rising annual congestion costs. For example, from 2021 to 2022 alone, congestion costs rose from $995 million to $2.5 billion.[95] Building out transmission infrastructure that connects NJBPU projects with approved ORECs to the grid could alleviate congestion, thereby reducing the costs of electricity to New Jersey and its residents, by creating an additional source of electricity supply close to, and to the east of, areas with significant demand.[96] In this way, New Jersey's planned OSW generation and transmission development would ease congestion and reduce costs, ultimately passed on to ratepayers including New Jersey and its residents, by complementing the existing west to east supply of electricity, while also serving as an alternative source of electricity that would increase reliability and resilience for the PJM grid.

## CONCLUSION

---

[95] *Ibid*.

[96] *See id.* at 5 (citing Lawrence Berkeley National Laboratory, Empirical Estimates of Transmission Value using Locational Marginal Prices, https://eta-publications.lbl.gov/sites/default/files/lbnl-empirical_transmission_value_study-august_2022.pdf, slide 3).

77.    All of the OSW energy generation and related transmission projects described above are components of New Jersey's broad plan to harness OSW energy to respond to climate change, spur economic growth, and meet forecasted energy demands with in-state sources of clean energy. These projects are collectively expected to inject billions of dollars into New Jersey's economy over the coming decades, resulting in the creation of jobs and tax revenue for New Jersey. The realization of New Jersey's plan depends upon BOEM and other agency permits and approvals already obtained by active projects, as well as those permits and approvals that will be needed for active project completion and for the completion of future projects. The planned OSW supply chain and transmission facilities are all predicated upon the OSW energy generation projects moving forward. New Jersey will experience the loss of all of these benefits if BOEM and other federal permits and approvals are terminated or become unavailable.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Katharine Perry

Deputy Director for Resource Adequacy

New Jersey Board of Public Utilities

Dated: April 30, 2025

48

EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, et al.,

                                    Plaintiffs,

                    v.                                    Case No. 25-cv-11221

DONALD J. TRUMP, et al.,

                                    Defendants.

## DECLARATION OF PAUL G. PINSKY

I, Paul G. Pinsky, declare as follows:

1.      I am the Director of the Maryland Energy Administration.  I submit this declaration in support of Plaintiffs' motion for a preliminary injunction.

**Personal background and qualifications**

2.      I received a B.A. in public affairs from George Washington University in 1972, and an M.A. in education in 1978.

3.      I served in the Maryland House of Delegates for 7 years and in the Maryland Senate for 28 years including 7 years as chair of the Environment subcommittee and 4 years as chair of the Education, Health, and Environmental Affairs Committee. I have served as Director of the Energy Administration since January 2023. As a legislator, I authored numerous environmental bills including

landmark legislation on climate change. I have served on the Maryland Commission on Climate Change since its inception in 2007.

4.      As MEA Director, I have responsibility for executing the mission and leading the staff of MEA in accomplishing State energy goals. I am also responsible for the day-to-day operations of the agency including its budget and finances.

**The Maryland Energy Administration**

5.      The Maryland Energy Administration ("MEA") is the State Energy Office. We are responsible for grantmaking activities for energy efficiency and renewable energy and also develop energy policy for the state, advising and representing the Governor's office on energy policy in the legislature and regulatory proceedings. MEA maintains small programmatic elements for offshore wind related grants and is very active in regulatory and policy proceedings. For instance, MEA provided witness testimony in all of Maryland's Offshore Wind Renewable Energy Credit ("OREC") proceedings, including the latest OREC rebid round in 2024 before the Public Service Commission.

6.      MEA works on broad policy matters related to advancing clean energy in the state and is also a grantmaking agency responsible for making grants for the direct expansion of clean energy projects throughout the state.

**Grid Impacts from Climate Change in Maryland**

7.      Increased frequency of storms and other erratic weather events can cause problems for our power grids, including outages, which may result in loss of life. A recent example of grid stress related to weather is Winter Storm Elliott from

late 2022 that nearly caused an outage in the PJM Interconnection (PJM) and did cause "numerous unplanned outages, derates or failures to start" in other jurisdictions according to a FERC report.[1] As FERC notes, "The Event was the fifth in the past 11 years in which unplanned cold weather-related generation outages jeopardized grid reliability."

**Maryland's Climate and Clean Energy Laws**

8.     There have been numerous climate and clean energy laws established in Maryland including the Healthy Air Act of 2006, the Maryland Offshore Wind Energy Act of 2013, the Clean Energy Jobs Act of 2019, the Climate Solutions Now Act of 2022, and the Promoting Offshore Wind Energy Resources (POWER) Act of 2023.

9.     The Healthy Air Act of 2006 established tighter limits on air emissions from power plants and required Maryland to join the Regional Greenhouse Gas Initiative (RGGI), a cooperative, market-based effort among eastern states to cap and reduce greenhouse gas emissions from the power sector. The state's commitment to RGGI was reaffirmed in 2018 with legislation prohibiting Maryland's withdrawal from the program without legislative approval.

10.     Maryland also has adopted ambitious requirements for reducing greenhouse gas emissions and limiting the impacts of climate change. The Climate

---

[1] Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott, FERC, NERC and Regional Entity Staff Report, October 2023, https://www.ferc.gov/news-events/news/ferc-nerc-release-final-report-lessons-winter-storm-elliott.

Solutions Now Act of 2022 provided the most recent updates to those requirements: a 60% reduction in GHG emissions by 2031 from 2006 levels and net-zero by 2045.

11.    Maryland has had numerous legislative initiatives over the years focused on the adoption of clean energy. These have largely centered on the state's renewable portfolio standard (RPS) which was last revised by the Clean Energy Jobs Act of 2019 to require steadily increasing renewable generation, rising to 50% of the state's electrical consumption by 2030.

12.    Offshore wind has played an explicit role in Maryland's RPS since the Maryland Offshore Wind Energy Act of 2013 created an offshore wind carve-out of Tier 1 resources representing a maximum of 2.5% of electricity. In 2019, the Clean Energy Jobs Act added a second round of offshore wind procurement representing a minimum of 1,200 MW. The Power Act of 2023 increased the State's offshore wind target to 8.5 GWs by 2031.

**Current Status of Wind Generation in Maryland**

13.    Three offshore wind developers currently hold leases in the mid-Atlantic that are expected to contribute to Maryland. One, US Wind, just completed a re-bid process and was granted a revised Offshore Wind Renewable Energy Credit (OREC) award through the Maryland Public Service Commission (PSC) but is still in the pre-construction phase. Another developer, Orsted, was previously awarded ORECs by the state, but canceled the award due to market dynamics in early 2024. This developer is engaged with the Maryland Department of General Services on a potential procurement, and they continue to retain their lease area. A final

developer, Equinor, was the winning bidder on an August 2024 lease sale, but has not yet announced plans to develop the site and has not started the federal permitting process.

14.     US Wind's project is the primary offshore wind project in the state and furthest along in development. The project's construction and operation plan was approved in late 2024. BOEM also issued a Final Environmental Impact Statement and Record of Decision for the project at that time. Construction is scheduled to begin in 2027 and the project is expected to be fully operational in 2030.

15.     The Maryland Public Service Commission recently reissued Offshore Wind Renewable Energy Credits (ORECs) for this project. *See* Md. PSC. Order No. 91496 (January 24, 2025). The Order noted the significant economic benefits that the project would bring to the state including $6.2 billion in total economic impact and 13,600 direct and secondary jobs. Order 91496 at 12-13.

16.     The project is also expected to bring significant investment in Maryland industry including a minimum $51 million investment in a steel fabrication facility and a minimum $26.4 million investment in the Tradepoint Atlantic shipyard in Baltimore County during Phase 1 of the project. Order 91496 at 36. Subsequent phases require an additional $296 million in investments in steel fabrication facilities and port improvements. *Id.* There is also a required investment of $90 million in a cable facility. *Id.* All these investments must be in-state.

17.     The PSC further found that US Wind will reduce an estimated 13.8 million short tons of carbon dioxide over the first 20 years of its operation, and

5

result in significant reduction in the emission of nitrogen oxides, sulfur dioxide, particulate matter, and volatile organic compounds over the same 20 year period resulting in approximately $275 million in total health savings over that period. Order 91496 at 13. My understanding is that a portion of these health savings would accrue to Maryland because the state pays a share of the Medicaid costs for its residents' hospital admissions.

18.     Maryland also has 245 MW of onshore projects in operation in the western part of the state including the 55 MW Dan's Mountain wind farm which recently finished construction.

**Grid Benefits of Offshore Wind**

19.     MEA contributed to past study work at PJM looking at a statutory buildout of transmission for offshore wind along the northeast coast. As part of the POWER Act, MEA, along with the PSC and PJM, have been working on a joint, Maryland-specific project, to analyze transmission solutions for our offshore wind projects. This has been an ongoing process that started in 2023 and continues today.

20.     These proposed buildouts will have additional grid benefits, especially to Maryland's Eastern Shore, in that it will alleviate current grid constraints and add flexibility in those geographic areas. Even though the buildout will occur for offshore wind, the additional line capacity can also be used to accommodate additional solar projects in the region.

21.     US Wind itself is expected to have a positive impact on the grid by lowering wholesale costs and reducing congestion in an area, Maryland's Eastern Shore, that has historically suffered from high congestion costs. Order 91496 at 12.

**The January 20 Wind Memo and Subsequent Agency Actions**

22.     I am aware that on January 20, 2025 President Trump issued a memo that indefinitely halted all federal approvals necessary for the development of offshore- and onshore-wind energy, *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo). I am also aware that federal agencies are implementing that freeze including BOEM's recently issued stop work order to the Empire Wind Project off the coast of New York.

**The Wind Memo and It's Implementation Harm Maryland**

23.     The indefinite freeze on approvals and renewals for wind projects specified by Section 2 of the Wind Memo, and the subsequent actions of federal agencies to implement that directive will impact the offshore wind industry in Maryland.

24.     First, market volatility resulting from the federal actions is likely having a chilling effect in the business and investment community, hampering private funding for these projects.

25.     Second, the dynamics of any individual offshore wind project are impacted by the health of the broader offshore wind industry, including economies

of scale in producing turbines and monopiles, the specialized ships needed for installation and maintenance, and the technical workforce needed to build, maintain, and operate these facilities.

26.     In Maryland, an indefinite delay of permit approvals and renewals, or a stop work order, like that issued by the Bureau of Ocean Energy Management to the fully permitted Empire Wind Project off the coast of New York on April 16, would deny the state all of the associated economic benefits cited earlier, namely the over $6 billion of economic stimulus injected into the state's economy along with the associated investments in manufacturing facilities. This would also have the impact of forgoing the well-paying jobs associated with these projects, both during construction and as the facilities shift to long-term operations and management.

27.     Any delay in this project also threatens to exacerbate potential grid reliability concerns which are currently met by importing significant amounts of electricity from nearby states. Load growth projections stemming from the development of data centers throughout PJM are exacerbating these concerns and the generation of additional electricity is important to meet the current moment.

28.     This lack of supply has significant implications on consumer electricity costs as well as grid reliability as shown by sharp increases in capacity prices within PJM over the past few years. Additional capacity is needed in order to help reduce these prices which directly impact consumers' energy bills.

29.     Offshore wind is also important to meeting the state's statutorily established climate and renewable energy requirements, including those set out in

8

the Climate Solutions Now Act (2022), The Maryland Offshore Wind Energy Act of 2013, the Clean Energy Jobs Act (2019), and the POWER Act (2023).

30.    Maryland is a densely populated state without other major domestic energy resources making offshore wind an essential piece of our efforts to produce domestic, affordable, clean energy given a challenging environment to site onshore wind and solar.

**Conclusion:**

31.    Maryland has repeatedly emphasized the importance of wind energy, and offshore wind energy specifically, to our state's future economy, environment, and electric grid. Our state has invested significantly in the buildout of the offshore wind industry and anticipates significant economic and environmental benefits from doing so. The Day One Wind Memo and subsequent federal actions implementing it, however, have already cast a chill on those efforts and threaten to further jeopardize those investments.

I declare under penalty of perjury that the foregoing is true and correct. Executed in  Baltimore, Maryland  on  May 9 , 2025.

_Paul G. Pinsky_
FB518AEA69FA450...

Paul G. Pinsky
Director
Maryland Energy Administration

9

EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al,

                              Plaintiffs,

                    v.

DONALD TRUMP, in his official capacity as President of the United States, et al.,

                           Defendants.

Case No. 25-cv-11221

## DECLARATION OF JOHN WILLIAMS

## EXECUTIVE VICE PRESIDENT FOR POLICY AND REGULATORY AFFAIRS

## NEW YORK STATE ENERGY RESEARCH AND DEVELOPMENT AUTHORITY

I, John Williams, declare as follows:

1.     I am the Executive Vice President for Policy and Regulatory Affairs at the New York State Energy Research and Development Authority (NYSERDA), a role I have held since October 2022. Since 2007, I have served in a number of leadership positions at NYSERDA, primarily with responsibility for policy and regulatory affairs.  I submit this declaration in support of the plaintiff States' motion for preliminary injunction.

**Personal background and qualifications**

2.     Prior to joining NYSERDA, I served as energy counsel for the New York State Assembly, staff attorney for The Energy Project of the Pace University School of Law, a public interest group advancing research and advocacy for energy and environmental policies, and a financial analyst for the Public Service Company of New Mexico, a combined electric and natural gas utility serving the largest markets throughout New Mexico.

3.     As Executive Vice President for Policy and Regulatory Affairs at NYSERDA, I am a Board-appointed Officer responsible for providing guidance on energy policy development for New York State through NYSERDA's Government and Regulatory Affairs unit, including support for the New York State Energy Planning Board. I also oversee NYSERDA's Policy, Analysis, & Research business

2

unit, providing economic analysis and scientific research to best inform policymakers in energy and environmental issues, as well as the Business Performance Management business unit, which provides market characterization and evaluation, statistical insights, and metrics and performance analysis, all of which guide effective clean energy strategies. I also serve as the designee for the NYSERDA Chairman on the New York State Board on Electric Generation Siting and the Environment. And I also serve on the Board of Directors of the National Association of State Energy Officials, which is the national non-profit association for the governor-designated energy officials from each of the 56 U.S. states and territories, currently in the role of Past Chair.

## NYSERDA

4.     NYSERDA was founded in 1975 as a public benefit corporation under Article 8, Title 9 and Title 9A of the State Public Authorities Law. Pursuant to these statutory authorities, NYSERDA plays a leading role in designing and implementing New York's policies and programs that advance the energy-related legislative, regulatory and policy goals of the State.  Included among those policy goals, the New York State Climate Leadership and Community Protection Act (Climate Act) seeks the procurement of at least 9 gigawatts of electricity generated by offshore wind resources to serve the state electricity system by 2035.

5.     Among its programmatic activities, NYSERDA administers the State's Clean Energy Standard,[1] pursuant to orders of the New York State Public Service

---

[1] New York's Clean Energy Standard is the successor to New York's Renewable Portfolio Standard (RPS) and has similar characteristics to RPS programs in other states.

Commission (Commission or PSC) issued since August 1, 2016.[2] In this role, NYSERDA competitively awards long-term contracts with developers of new large-scale generation resources eligible to participate in the program, including land-based and offshore wind. Following the enactment of the 2019 Climate Act, the PSC has incorporated the Climate Act's targets of 70% renewable energy and 9 gigawatts of offshore wind into the Clean Energy Standard.

6.    For awarded and contracted renewable energy generation projects, NYSERDA commits to purchase Renewable Energy Certificates (RECs); one REC represents the environmental attributes associated with 1 megawatt-hour (MWh) of electricity generated from the project and consumed in New York State.[3] In accordance with PSC orders, NYSERDA sells RECs to New York State's load-serving entities and also offers RECs for sale to the voluntary market, reducing the cost exposure of the program to ratepayers.

**Wind Generation in New York – Overview**

7.    Land-based and offshore large-scale wind projects play a critical and growing role in serving New York's energy demand. Over the past 25 years, 31 land-based wind projects and one offshore wind project have been constructed in New York, totaling almost 3,000 megawatts, situated in 11 counties in the State. These wind projects generated approximately five terawatt-hours of energy in 2023,

---

[2] New York Public Service Commission Case 15-E-0302. *Proceeding to Implement a Large-Scale Renewable Program and a Clean Energy Standard, Order Adopting a Clean Energy Standard;* Case 18-E-0071. *In the Matter of Offshore Wind Energy.*
[3] For offshore wind, these are known as Offshore Wind Renewable Energy Certificates, or ORECs.

approximately 4% of New York's in-state generation.  New York ranks 18th in the country for in-state wind project electrical generation installed capacity.[4]

8.      Both land-based and offshore wind are expected to play increasingly significant roles as the State pursues a zero-emissions electric system consistent with the Climate Act's objectives. The Climate Act Scoping Plan,[5] which provides comprehensive recommendations on how New York will reduce greenhouse gas emissions and achieve net-zero emissions, forecasts that achievement of a fully decarbonized grid could require the deployment of more than 14,000 megawatts of land-based wind and more than 14,000 megawatts of offshore wind by the statute's stated goal of 2040.

## Development and Federal Permitting of Wind Projects in New York State

### Offshore Wind

9.      New York State has been engaged in the analysis and development of the offshore wind industry since before 2010, when NYSERDA published a series of studies related to the potential for offshore wind generation near Long Island and New York City.[6]

10.      In 2018, NYSERDA published the New York State Offshore Wind Master Plan,[7] which incorporated years of scientific analysis and extensive

---

[4] Lawrence Berkeley National Laboratory, *Land-Based Wind Market Report: 2024 Edition* (Aug. 2024), https://emp.lbl.gov/publications/land-based-wind-market-report-202.
[5] New York State Climate Action Council. 2022. "New York State Climate Action Council Scoping Plan." climate.ny.gov/ScopingPlan.
[6] NYSERDA, *Wind - R&D Technical Reports Archive*, https://www.nyserda.ny.gov/About/Publications/Energy-Analysis-Reports-and-Studies/Wind-Reports/Wind-Reports-Archive.
[7] NYSERDA, *Offshore Wind Master Plan*, https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/About-Offshore-Wind/Master-Plan.

engagement with stakeholders and the public to determine the most responsible and cost-effective pathways for developing offshore wind. The Master Plan published the results of 20 detailed technical studies, including a Fish and Fisheries Study that established a baseline understanding of existing information available for fish and fisheries in the offshore space, including feedback from fisheries stakeholders, which has since been used by state and federal agencies to minimize and avoid conflicts from offshore wind energy development.

11.     Since the publishing of the Master Plan, NYSERDA has continued to conduct scientific analysis and engage deeply with key stakeholders relevant to offshore wind. Among other activities, NYSERDA has established five Offshore Wind Technical Working Groups in commercial fishing, the environment, maritime commerce, jobs and supply chain, and environmental justice to bring key stakeholder groups together with state and federal regulators and the global offshore wind industry. These working groups each provide a forum for discussion around various topics to provide all parties a better understanding of the issues and consider and recommend approaches concerning the development of offshore wind.[8]

12.     As illustrated in the chart below, offshore wind projects require a large number of development, planning, approval and financing steps prior to being able to commence construction and go into operation. These sequenced steps include long-term engagement with the federal Bureau of Ocean Energy Management (BOEM) and at least 10 other federal agencies or departments to address at least 16

---

[8] NYSERDA, *Offshore Wind Technical Working Groups*, https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Connecting-With-New-Yorkers/Technical-Working-Groups.

federal statutes requiring numerous detailed submissions and reviews.[9] To secure financing and begin construction, an offshore wind project must receive final approval for those permits and secure an energy or OREC purchase contract from a buyer like NYSERDA and negotiate and finalize engineering, procurement and construction contracts. These steps take several years as shown below.[10]



## Land-based Wind

13.    Unlike offshore wind projects, which are located in federal waters, most land-based wind projects in New York State are located on private land and therefore do not entail the same level of federal agency permitting as offshore wind projects. However, there are numerous common federal determinations that are required for many land-based wind projects, including from the U.S. Fish and Wildlife Service and the U.S. Army Corps of Engineers.

## **Wind Generation in New York – Operating Projects**

14.    Thirty-one land-based wind projects have been constructed and are currently operating in New York, totaling over 2,800 megawatts. These projects

---

[9] NYSERDA, *New York State Offshore Wind Master Plan, Table of Permits and Approvals, Report 17-25x* (Aug. 2015), https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Connecting-With-New-Yorkers/Technical-Working-Groups.

[10] Bureau of Ocean Energy Management, *The Renewable Energy Leasing Process: Timeline of Operations*, https://www.boem.gov/renewable-energy/state-activities/boem-poster-renewable-commercial-leasing-process.

have entered operation over the past 25 years, but the pace of new land-based wind projects entering operation has increased, with 879 megawatts commencing operation over the past four years, nearly a third of the state's installed land-based wind capacity. Recent projects are also utilizing more efficient turbine technologies which can generate more energy per megawatt installed, meaning recent and forthcoming improvements to land-based wind technologies will be capable of supplying more energy compared to relatively older land-based wind projects.

15.    The 132-megawatt South Fork Wind Farm (South Fork) is New York's first operational offshore wind farm and is the first operational utility-scale offshore wind farm in United States federal waters. South Fork was developed jointly by Ørsted and Eversource and is located approximately 35 miles off Montauk. It is comprised of twelve 11-megawatt turbines; the project delivered energy from its first turbine to the local Long Island electric grid beginning in December 2023 and became fully operational in 2024.  More than 2,000 jobs can be attributed to the construction of the project, which saw more than $1 billion invested into a national supply chain of at least 173 contracts across at least 19 states.[11]  At present, the project is New York's sole operating offshore wind project.

**Wind Generation in New York – Projects Under Construction**

16.    There are currently two offshore wind projects under contract with NYSERDA that have commenced construction: Empire Wind 1, an 810-megawatt project developed by Equinor, and Sunrise Wind, a 924-megawatt project developed

---

[11] Oceantic Network, "Building South Fork Wind: An Offshore Wind Supply Chain Jobs Tour" (Jun. 6, 2024), https://oceantic.org/building-south-fork-wind-an-offshore-wind-supply-chain-jobs-tour/.

by Ørsted. The two projects, representing a combined 1,734 megawatts of nameplate capacity, were each awarded 25-year contracts as a result of New York's fourth offshore wind solicitation (ORECRFP23-1) and are both scheduled to be operational in 2027. Once operational, the Empire Wind 1 project will represent approximately 7.4% of the total nameplate capacity installed in New York City, and the Sunrise Wind project will represent approximately 8.3% of the total nameplate capacity installed in Long Island.[12]

17.    There are also two land-based wind projects under contract with NYSERDA that have commenced construction, collectively representing 457 megawatts of nameplate capacity.

**Wind Generation in New York – Projects Under Development**

18.    Currently there are twelve offshore wind lease areas in the region without contractual commitments to a state, enough to support approximately 20 gigawatts of offshore generation capacity. Any of these offshore lease areas could potentially serve New York State.

19.    Of the 12 offshore wind lease areas without contractual commitments to a state, three have successfully secured approval from BOEM through the Construction and Operations Plan (COP) process, and nine have yet to receive federal approval for their respective COPs. Three of those nine remaining lease

---

[12] The New York Independent System Operator, Inc., *2024 Load & Capacity Data Report (Gold Book)*, https://www.nyiso.com/documents/20142/2226333/2024-Gold-Book-Public.pdf/170c7717-1e3e-e2fc-0afb-44b75d337ec6.

areas submitted bids to NYSERDA's fifth offshore wind solicitation (ORECRFP24-1), which are currently under review.

20.    There are more than 20 land-based wind projects in development in New York State, in various stages of development. Many of these projects have not yet received their necessary federal permits.

**Benefits of Wind Projects to New York State**

Economic Benefits

21.    Land-based wind projects contracted with NYSERDA are expected to provide hundreds of millions of dollars in incremental economic benefits to New York State.  Of this, a significant amount is expected to be paid directly to local authorities (including towns, counties and school districts) via Payments In Lieu Of Taxes (PILOT) and host community agreements. These projects would also provide more financial support directly to the residents of the towns where the projects are built, in the form of bill credits paid annually over the first 10 years of the projects' operation.

22.    The wind energy industry supported over 4,400 jobs in New York State as of 2023.[13]

23.    The Empire Wind 1 and Sunrise Wind projects are projected to generate over $6 billion of in-state spending and support more than 7,000 jobs. NYSERDA's agreements with Empire Wind 1 and Sunrise Wind call for over $2.6 billion dollars in total economic benefits to accrue to New York State by the end of

---

[13] NYSERDA, *New York Clean Energy Industry Report*, https://www.nyserda.ny.gov/About/Publications/New-York-Clean-Energy-Industry-Report.

the third year of the projects' operations, including over $532 million in labor expenditures, $117 million to accrue specifically to minority, women-owned and veteran-owned enterprises and over $188 million associated with expenditures for iron and steel manufactured in the United States.

24.    NYSERDA's agreements with Empire Wind 1 and Sunrise Wind further call for $16.5 million in financial commitments, half of which is committed to monitoring of fish and invertebrates that support economically important fisheries, and half of which is committed to monitoring wildlife of conservation concern (such as marine mammals and avian fauna).

25.    Additional wind projects, once contracted with NYSERDA, are anticipated to accrue similar economic benefits, amounting to many billions of dollars of in-state spending, many thousands of local jobs (in aggregate, approximately 18,000 to 23,000 jobs are projected to be tied to offshore wind development in New York State[14]) and significant attendant economic benefits throughout the state and the country.

26.    As an example of the attendant economic activity associated with offshore wind, Equinor is executing a major capital investment plan to turn the South Brooklyn Marine Terminal (SBMT), located in the Sunset Park neighborhood of Brooklyn, into a state-of-the-art staging and assembly facility for offshore wind components, which will also serve as a regional operations and maintenance hub for

---

[14] NYSERDA, *New York State Offshore Wind Workforce Cap Analysis, Report Number 22-25* (September 2022), https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Programs/Offshore-Wind/New-York-State-Workforce-Gap-Analysis-2022.pdf.

Empire Wind 1 and other offshore wind projects. NYSERDA has entered into a grant agreement with the Equinor subsidiary responsible for these improvements to SBMT, under which NYSERDA has committed to provide $60 million upon substantial completion of the work. Construction on the project commenced in June 2024[15] and is well underway.

<u>Energy Benefits</u>

27.     The continued addition of wind generation in New York's energy mix provides critical resource diversity benefits to the State's energy system. The New York Independent System Operator (NYISO) has noted, "generating resource diversity of all types – in fuel source, mode of operation, geography, size, etc. – can contribute to the resilience and reliability of the power system."[16]

28.     Wind power can produce electricity at times when solar energy facilities cannot. In this way, wind energy compliments the increasing amount of solar generation being developed in New York.[17]

29.     In addition, modeling analysis from the NYISO shows that deployment of renewable energy resources including land-based and offshore wind projects have the potential to reduce resource production costs by displacing generation that

---

[15] Empire Wind, "Groundbreaking at South Brooklyn Marine Terminal to Transform Port into NYC Offshore Wind Hub," June 10, 2024, https://www.empirewind.com/2024/06/10/groundbreaking-at-south-brooklyn-marine-terminal-to-transform-port-into-nyc-offshore-wind-hub/.

[16] Analysis Group (November 2023). "Fuel and Energy Security In New York State: An Assessment of Winter Operational Risks for a Power System in Transition," https://www.analysisgroup.com/Insights/publishing/fuel-and-energy-security-in-new-york-state-an-assessment-of-winter-operational-risks-for-a-power-system-in-transition2/.

[17] New York State Department of Public Service Staff and NYSERDA, *Draft Clean Energy Standard Biennial Review*, https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={A0019490-0000-C313-A126-877CFFAA2B0C}.

would otherwise clear the market at a higher price.[18] This effect occurs because these resources reduce the need for low efficiency power plants, and also provide long-term price stability, while also increasing energy independence by reducing the need to import fuels into New York from other states and countries.

30.    Offshore wind projects such as Empire Wind 1, Sunrise Wind and future projects will interconnect to New York's Zones J (New York City) and K (Long Island), which the NYISO identifies to be constrained areas, meaning that each zone must be served primarily by local generators (such as offshore wind projects) due to transmission limitations.[19]

31.    Offshore wind projects will provide critical energy diversity benefits to the constrained zones that they interconnect to. Specifically, a recent analysis commissioned by the NYISO found that "the availability of a large quantity of offshore wind energy able to be injected directly into New York City and Long Island enhances grid reliability in modeled seventeen-day cold weather events as a complement to natural gas and oil-fired units by reducing dependency on oil inventories and helping to preserve limited oil and natural gas supplies."[20]

Environmental Benefits

32.    Wind projects will offset greenhouse gas emissions and co-pollutants such as nitrogen oxides, which will improve local air quality and lessen dependence

[18] New York Independent System Operator, Inc., *2023-2042 System & Resource Outlook, Appendix G: Production Cost Model Results* (July 22, 2024), https://www.nyiso.com/documents/20142/46037616/Appendix-G-Production-Cost-Model-Results.pdf.
[19] New York Independent System Operator, Inc., *Short-Term Assessment of Reliability: 2025 Quarter 1* (April 14, 2025), https://www.nyiso.com/documents/20142/16004172/2025-Q1-STAR-Report.pdf/7f9c9545-3a89-7c76-5da6-92fd7c5c6602.
[20] Analysis Group, *supra* note 14.

on generation sources that emit air pollutants, as further described in the declaration of Jonathan Binder of the New York State Department of Environmental Conservation.

## Grid Transition Efforts that Enable Connection of Wind Energy to the Grid

33.     In recognition of the State's aging grid, enhanced reliability outcomes and the benefits of facilitated renewable generation interconnection, New York State has been investing in its transmission and distribution infrastructure in recent years.  Several State transmission-related initiatives are underway to facilitate the injection of energy into the grid from new energy projects and help manage the potential costs of interconnection.

34.     In 2020,  New York enacted the Accelerated Renewable Energy Growth and Community Benefit Act (Accelerated Renewables Act), which provided for new efforts to identify system upgrades needed to meet renewable energy goals and provided authority to the Commission to expedite certain upgrades. Consistent with the Accelerated Renewables Act, the Commission has taken action on both near and long-term transmission infrastructure needs.

35.     In total, the Commission has approved over $8 billion of investment in a number of transmission improvement projects that support wind and other renewable resources. This investment includes the approval of 62 local transmission projects to support the integration of clean energy sources in upstate areas,

14

including wind generation;[21] Con Edison's proposal to develop the Brooklyn Clean

Energy Hub to address the local reliability needs and increased demand associated

with the electrification of vehicles and buildings in New York City as well as

provide interconnection points for up to 4,500 MW of new energy resources,

including offshore wind;[22] and upgrades to enhance reliability for Long Island and

New York City and allow for more efficient distribution of electricity generated by

existing generation resources as well as the potential integration of new electric

generation resources including renewable energy resources.[23]

36.    New York State is also actively reviewing additional transmission

infrastructure that would accommodate the integration of offshore wind, including

collaborating with other states and federal agencies to evaluate interregional

transmission to reduce costs.[24]

**The Wind Memo and Agency Implementing Actions**

37.    On January 20, 2025, President Trump issued a memorandum that

indefinitely halted all federal approvals necessary for the development of offshore-

---

[21] New York Public Service Commission Case 20-E-0197, *Proceeding on Motion of the Commission to Implement Transmission Planning Pursuant to the Accelerated Renewable Energy Growth and Community Benefit Act*, *Order Approving Phase 2 Areas of Concern Transmission Upgrades* (Feb. 16, 2023), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={0C1FE2AF-2922-4BF5-809C-5C93F4F73121}.
[22] New York Public Service Commission Case 20-E-0197, *Proceeding on Motion of the Commission to Implement Transmission Planning Pursuant to the Accelerated Renewable Energy Growth and Community Benefit Act, Order Approving Cost Recovery for Clean Energy Hub* (Apr. 20, 2023), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={70E99F87-0000-C112-92F7-F4F713A55987}.
[23] New York Public Service Commission Case 20-E-0497, *In the Matter of New York Independent System Operator, Inc. Proposed Public Policy Transmission Needs for Consideration for 2020*; New York Independent System Operator, Inc., *Board of Directors' Decision* (June 13, 2023), https://www.nyiso.com/documents/20142/38388768/Board-Decision-Long-Island-2023-06-13.pdf/b00023a4-0dcf-3774-3bfe-142667f3ffb7.
[24] Brattle, *Strategic Action Plan*, prepared for the Northeast States Collaborative on Interregional Transmission, https://energyinstitute.jhu.edu/wp-content/uploads/2025/04/Strategic-Action-Plan-Final.pdf.

and land-based-wind energy. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo). Section 2 of the Wind Memo directs that the heads of relevant federal agencies "shall not issue new or renewed approvals, rights or way, permits, leases, or loans for land-based or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id.* at 8364.

38.     Subsequent to its issuance, federal agencies with permitting responsibilities for wind energy projects have adopted the Wind Memo's indefinite halt on approvals of those projects and taken steps to implement that halt.

**The Wind Memo and Agency Implementing Actions Harm New York**

39.     The ongoing halt on all federal permitting blocks the advancement and realization of the intended benefits to New York State of the wind generation policies and investments described above.

40.     The permitting halt undermines New York State's implementation of its legislation and policy and threatens the State's progress toward its wind-specific statutory-procurement and greenhouse-gas emission targets set forth in the Climate Act. It disrupts timelines for offshore and onshore wind projects, which threatens the State's ability to foster the new economic development, employment opportunities and electric resource diversity that were pursued with offshore and onshore wind development.

16

41.     The halt further disrupts the progression of orderly development of the emerging industry and will likely disrupt the cost reduction to be realized by advancing from first-of-a-kind projects to sustained industry activity. It also introduces significant regulatory uncertainty, which disrupts state-federal coordination, complicates long-term planning, and risks the investments that would come from advancing specific projects.

42.     The permitting halt undermines New York State's efforts to diversify its energy supply and enhance grid resiliency and capacity to support downstate electric load growth while also meeting its environmental goals.

43.     The permitting pause will also limit New York State's ability to advance its State-legislated environmental policies and system resilience strategies that would alleviate the physical and resulting economic harms to New York from extreme weather patterns.

44.     The permitting halt is already resulting in an erosion of investor confidence in current and future projects, leading to investor requirements for higher risk premiums built into the financial models of these projects. These increased premiums, due to no other reason than induced uncertainty from the halt, will be passed along as increased electricity costs to New York's ratepayers. That loss of confidence and increased risk is also manifesting in reduced jobs: For example, it has been publicly reported that Vineyard Offshore has cut 50

positions,[25] and RWE has cut 73 positions,[26] both related to offshore wind activity. There is evidence that other companies and organizations have had layoffs or have decided not to fill posted positions[27] because of the permitting halt. Delays in offshore wind projects also has other economic effects, such as continued offshore wind lease costs paid by developers while being precluded from advancing their projects, thereby increasing costs and the number of years until they begin to receive revenue, as well as delayed workforce mobilization and supply chain disruptions, all of which reduce economic opportunity, and potentially increase costs that could result in higher electricity costs for ratepayers.

45.    The permitting halt also delays and potentially undermines the ability of projects to take advantage of the benefits of previously legislated and established federal tax credits that apply to wind project development, in consideration of eventual expiration dates. Any loss of tax credits would increase the cost for developers to build projects, causing unnecessary harm through increased costs to New York's electricity ratepayers, and in some cases could potentially undermine project viability.

**Conclusion**

46.    New York State has been pursuing decades-long development of wind energy resources, in recognition of the substantial economic, environmental and

---

[25] CAI, "Vineyard Offshore cuts 50 jobs" (Feb. 18, 2025), https://www.capeandislands.org/local-news/2025-02-18/vineyard-offshore-cuts-50-jobs.

[26] Boston Globe, "Global clean energy firm lays off 73 offshore wind employees based in Mass." (Mar. 8, 2025), https://www.bostonglobe.com/2025/03/08/business/offshore-wind-layoffs-rwe-clean-energy/.

[27] CNN, "Workers fear for the future as Trump casts a shadow over the wind industry" (Mar. 10, 2025), https://www.cnn.com/2025/03/10/business/economy-jobs-trump-wind-energy/index.html.

economic development benefits that New York State would realize. These benefits, as described, include local energy resource development leading to system resilience, reliability and resource diversity, as well as the economic benefits to business and localities from direct investment in the State's economy as well as the career opportunities in both energy and supporting industries. The permitting halt puts these benefits in jeopardy.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Albany, New York on May 7, 2025.


_____

**John Williams**

EXHIBIT 15

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

                                Plaintiffs,

                   v.

DONALD J. TRUMP, et al.,

                               Defendants.

Case No. 25-cv-11221

## Declaration of Peter Wyckoff,
## Deputy Commissioner of Energy Resources,
## Minnesota Department of Commerce

Peter Wyckoff declares as follows:

1.      I am the Deputy Commissioner for Energy Resources for the Minnesota Department of Commerce, a position I have held since 2024. I've been with the Department of Commerce since 2023. Prior to that I had positions with the U.S. Senate, the U.S. Department of Energy, and I spent many years as an academic environmental scientist. In sum, my career has focused on energy climate science and related issues since I graduated with my Ph.D in 1999.

2.      I oversee programs that, among other things, conduct environmental reviews for proposed energy projects including certain wind farms, work with the Minnesota Public Utilities Commission (Commission) to ensure that Minnesota meets our clean energy laws while supporting an electric system that is affordable and reliable,

work on transitioning to renewable energy, and provide energy assistance directly to Minnesotans.

3.      I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

4.      Among other things, the Minnesota Department of Commerce's Energy Resources Division:

> a.   promotes policies and provides services for reliable, affordable, and clean energy for Minnesota businesses and homes;
>
> b.   conducts environmental review for proposed energy projects;
>
> c.   conducts regulatory affairs through Public Interest Advocacy at the Commission, utility energy conservation programs, and telecommunications;
>
> d.   maintains a state emergency energy plan and recovery plan; and
>
> e.   provides resources, assistance, research and analysis on wind energy.

**Minnesota's Climate and Clean Energy Laws**

5.      In 2023, the Minnesota Legislature adopted laws to reduce emissions 50% by 2030 and achieve net-zero emissions by 2050.  It also adopted a carbon-free electricity standard for Minnesota utilities.  Electricity provided to Minnesota retail customers must be generated or procured from a from a carbon-free energy technology equivalent to the following standard percentages of the electric utility's total retail electric sales to retail customers in Minnesota: 80% for public utilities and 60% for other electric utilities by 2030, 90% for all electric utilities by 2035, and 100% for all electric utilities by 2040. Minn. Stat. § 216B.1691, subd. 2g (2024).

6.    To meet its 2040 climate goals, generating wind energy has been and will continue to be vital to the state. Wind is an abundant resource for renewable energy as Minnesota transitions away from reliance on fossil fuels. Wind energy represents a homegrown, reliable, affordable, and clean energy resource that is produced entirely in Minnesota. In contrast, Minnesota does not mine coal or drill oil, which produce fossil fuels. Fossil fuels are priced based on international markets, which can be volatile. As a result, transitioning to wind energy allows Minnesota to reduce its reliance on fossil fuels, thereby reducing the cost volatility associated with fossil fuels.

7.    Wind energy provides the largest share of Minnesota's electricity generation from renewable resources.  In 2023, wind energy accounted for more than three-fourths of the state's renewable energy generation and 25% of the state's total net generation, up from 22% in 2021. In 2023, Minnesota was among the 10 states with the largest share of in-state generation from wind.[1]  Minnesota ranked eighth in the nation in wind capacity and accounted for more than 3% of the U.S. total.[2]

**Current Status of Wind Generation in Minnesota**

Onshore Wind

8.    Minnesota has over 50 operating, repowered[3], permitted, in process, or expected wind farms, responsible for 25% of the state's energy generation.  As stated, these wind farms

---

[1]    Minnesota Profile Analysis, U.S. ENERGY INFORMATION ADMINISTRATION, (Sept. 19, 2024) U.S. Energy Information Administration - EIA - Independent Statistics and Analysis.

[2]    *Id*.

[3]    Wind repowering enables developers to "retrofit power plants on existing sites with new and/or refurbished technology, including erecting taller, more efficient wind turbines to increase productivity."  Wind Repowering Helps Set the Stage for Energy Transition, US DEPT. OF ENERGY, (June 2, 2021) Wind Repowering Helps Set the Stage for Energy Transition | Department of Energy.  Repowering allows wind farms to see significant boosts in efficiency, power capacity, and overall lifespan.

are permitted through the Commission and undergo an environmental review by the

Environmental Review Unit.

9.      Minnesota's best wind resources are in the western and southern parts of the state.

Accordingly, Minnesota's wind farms are located primarily in rural, agricultural counties in

western and southern Minnesota.

10.     Wind farms supplement income to agricultural counties and communities. This is

so for three primary reasons: first, farming and wind farms work well together because wind

turbines have a small footprint; second, the Minnesota production tax credit provides money to

counties and townships based on wind generation; and third, landowners work with developers to

create wind projects and get annual payments for hosting a wind turbine. There is no eminent

domain involved; these are private landowners who want to have a wind farm on their land.

**The Wind Memo**

11.     On January 20, 2025, the Trump Administration issued a pause on permits and

other approvals for onshore and offshore wind energy projects via a Presidential Memorandum

entitled *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind

Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind

Projects*, as well as subsequent agency actions implementing that moratorium. *See* 90 Fed. Reg.

8363 (Jan. 29, 2025) (Wind Memo).  Section 2(a) of the Wind Memo prohibits relevant federal

agencies from "issu[ing] new or renewed approvals, rights of way, permits, leases, or loans for

onshore or offshore wind projects pending the completion of a comprehensive assessment and

review of Federal wind leasing and permitting practices."

4

**The Harms the Wind Memo Inflicts on Minnesota**

12.    The Wind Memo may have a chilling effect on wind energy development in the state stemming from a chilling effect on the sector nationally and may jeopardize Minnesota's ability to meet its statutory clean energy goals by stymying wind energy development.

13.    Additional harms from the Wind Memo and resulting curtailment of Minnesota's wind industry could include harm to utilities' Integrated Resource Plans which help utilities plan for meeting future energy demand in the most cost-effective way; harms to rate payers who may have to pay higher prices or experience unreliability; and to MISO's long-range plan with uncertainty affecting transmission planning.

14.    The Wind Memo and agency actions implementing it pose significant risk to the viability of wind energy projects across the nation meant to mitigate climate and environmental harms associated with fossil fuel energy production and infrastructure.  Minnesota and Minnesotans have and will continue to suffer the harmful consequences of climate change. Such harms include intense heat that causes dangerous living conditions in urban centers; increases in extreme weather events such as drought and flooding; stress on aging transportation infrastructure; exacerbated negative health impacts such as asthma, allergies, and vector-born disease; increased air pollution; devastating ecosystem harm; and many other harms. By mid-century, without mitigation, the Midwest is projected to experience substantial loss of life, worsened health conditions, and economic impacts estimated in the billions of dollars as a result of climate change.[4]

---

[4]    Fourth National Climate Assessment Ch. 21: Midwest, Midwest - Fourth National Climate Assessment.

5

15.     Rising temperatures due to climate change also hurt Minnesotans who will have to pay higher home energy bills to keep cool. And higher home energy bills during very hot summers disproportionately affect people across Minnesota with low incomes.  Wind energy is an important tool for keeping home energy bills from rising because it is the cheapest form of electricity in Minnesota.

**Conclusion**

16.     Wind is an abundant, reliable, affordable, and clean energy resource that Minnesota must continue to tap to transition away from reliance on fossil fuels.  Increasing the production of wind energy will help the state meet its statutory clean energy goals.  The Wind Memo poses significant risk to the viability of wind energy projects across the nation meant to mitigate climate and environmental harms associated with fossil fuel energy production and infrastructure.  Minnesota and Minnesotans will suffer harmful consequences from the Wind Memo's stoppage of these mitigation efforts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Ramsey County, Minnesota on April 29, 2025.


Pete Wyckoff
Deputy Commissioner for Energy
Minnesota Department of Commerce

6

EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

|  |  |
|---|---|
| STATE OF NEW YORK,<br>et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DONALD J. TRUMP, et al.,<br><br>                    Defendants. | Case No. 25-cv-11221 |

**<u>DECLARATION OF DENISE BARTON</u>**

I, Denise Barton, declare as follows:

1. I am a resident of the Commonwealth of Massachusetts. I am over the age of 18. I have been an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the University of Massachusetts, in its Office of the General Counsel, as its Chief Deputy General Counsel.

3. As Chief Deputy General Counsel for the University of Massachusetts, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by University of Massachusetts employees and believe that information to be true.

4. The University of Massachusetts includes its five campuses (the University of Massachusetts Amherst, the University of Massachusetts Boston, the University of Massachusetts Chan Medical School, the University of Massachusetts Dartmouth, and the University of Massachusetts Lowell), as well as the University of Massachusetts Office of the President.

1

*See* M.G.L. c. 75. The University of Massachusetts maintains business records in the ordinary course of University of Massachusetts business which include, *inter alia*, records concerning its expenditures, including those for electricity.

5. I am submitting this declaration in support of the Commonwealth's motion for a preliminary injunction.  I am generally familiar with the Executive Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (Memorandum) signed on January 20, 2025, by President Trump.  Section one of the Memorandum withdraws from disposition all areas within the Outer Continental Shelf (OCS) as defined in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq*., but does not alter the existing rights associated with existing leases.  Section two of the Memorandum directs all relevant members of the executive branch not to issue or renew approvals, rights of way, permits, leases, or loans for onshore and offshore wind projects.  During that pause, the Secretary of the Interior will lead an assessment of the environmental impacts of wind energy on wildlife, and of the economic implications of wind energy.

6. The purpose of this declaration is to attest to the potential impact that the Memorandum may have on the University of Massachusetts as the largest electricity ratepayer in the Commonwealth.

7. The University of Massachusetts has 73,555 students and 26,615 full and part time employees who live, work, and study in its facilities.  Running this institution requires the operation and maintenance of hundreds of buildings, and the University of Massachusetts demands large amounts of energy to ensure facilities have running electricity, heating, and cooling.  The University of Massachusetts has 165 electricity accounts, and 21 net metering

projects.  The University of Massachusetts' electricity load growth is forecasted to be as much as 130% by 2050.

8.  As a product of this energy usage, the University of Massachusetts is the largest ratepayer in the Commonwealth, spending approximately $30 million for electricity and $40 million for natural gas annually.  Accordingly, the University of Massachusetts is sensitive to potential dramatic changes in energy prices.  A 15% change in annual energy costs can increase/decrease the University's energy budget by $10 million.

9.  ISO New England, the regional electricity grid operator for the New England region, has conducted studies to better comprehend the impact offshore wind can have on energy prices.

10.  As one example, a 2018 assessment by ISO New England found that a hypothetical offshore wind facility would have reduced marginal energy prices by $11/MWh to $13/MWh during New England's cold snap between December 2017 and January 2018.[1]  If this facility existed, the University of Massachusetts could have saved $400,000 over similar periods in the future.

11.  Additionally, a 2024 assessment indicated that without any offshore wind capacity, the cost of energy would need to be 50% higher in 2050 to meet state emissions goals.[2]  A 50% increase in energy prices would mean the University of Massachusetts would be paying $39 million more annually by 2050.

---

[1] ISO New England System Planning Department, *High Level Assessment of Potential Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell* (Dec. 17, 2018), https://www.iso-ne.com/static-assets/documents/2018/12/2018_iso-ne_offshore_wind_assessment_mass_cec_production_estimates_12_17_2018_public.pdf

[2] Kornitsky et al., *2024 Economic Study*, ISO-NE, at 21–23 (Mar. 19, 2025), https://perma.cc/EDS6-NJZJ.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on May 8, 2025, at Westborough, Massachusetts.

/s/ *Denise Barton*
Denise Barton
Chief Deputy General Counsel
University of Massachusetts, Office of the General Counsel
50 Washington Street
Westborough, MA 01581

EXHIBIT 17

# Presidential Documents

Memorandum of January 20, 2025

## Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects

**Memorandum for the Secretary of the Treasury[,] the Attorney General[,] the Secretary of the Interior[,] the Secretary of Agriculture[,] the Secretary of Energy[, and] the Administrator of the Environmental Protection Agency**

**Section 1**. *Temporary Withdrawal of Areas*. Consistent with the principles of responsible public stewardship that are entrusted to this office, with due consideration for a variety of relevant factors, including the need to foster an energy economy capable of meeting the country's growing demand for reliable energy, the importance of marine life, impacts on ocean currents and wind patterns, effects on energy costs for Americans—especially those who can least afford it—and to ensure that the United States is able to maintain a robust fishing industry for future generations and provide low cost energy to its citizens, I hereby direct as follows:

Under the authority granted to me in section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby withdraw from disposition for wind energy leasing all areas within the Offshore Continental Shelf (OCS) as defined in section 2 of the Outer Continental Shelf Lands Act, 43 U.S.C. 1331. This withdrawal shall go into effect beginning on January 21, 2025, and shall remain in effect until this Presidential Memorandum is revoked.

To the extent that an area is already withdrawn from disposition for wind energy leasing, the area's withdrawal is extended for a time period beginning on January 21, 2025, until this Presidential Memorandum is revoked.

This withdrawal temporarily prevents consideration of any area in the OCS for any new or renewed wind energy leasing for the purposes of generation of electricity or any other such use derived from the use of wind. This withdrawal does not apply to leasing related to any other purposes such as, but not limited to, oil, gas, minerals, and environmental conservation.

Nothing in this withdrawal affects rights under existing leases in the withdrawn areas. With respect to such existing leases, the Secretary of the Interior, in consultation with the Attorney General as needed, shall conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, identifying any legal bases for such removal, and submit a report with recommendations to the President, through the Assistant to the President for Economic Policy.

**Sec. 2**. *Temporary Cessation and Immediate Review of Federal Wind Leasing and Permitting Practices*. (a) In light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals—and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit

wind projects, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Energy, the Administrator of the Environmental Protection Agency, and the heads of all other relevant agencies, shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices. The Secretary of the Interior shall lead that assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals. The assessment shall also consider the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry.

(b) In light of criticism that the Record of Decision (ROD) issued by the Bureau of Land Management on December 5, 2024, with respect to the Lava Ridge Wind Project Final Environmental Impact Statement (EIS), as approved by the Department of the Interior, is allegedly contrary to the public interest and suffers from legal deficiencies, the Secretary of the Interior shall, as appropriate, place a temporary moratorium on all activities and rights of Magic Valley Energy, LLC, or any other party under the ROD, including, but not limited to, any rights-of-way or rights of development or operation of any projects contemplated in the ROD. The Secretary of the Interior shall review the ROD and, as appropriate, conduct a new, comprehensive analysis of the various interests implicated by the Lava Ridge Wind Project and the potential environmental impacts.

(c) The Secretary of the Interior, the Secretary of Energy, and the Administrator of the Environmental Protection Agency shall assess the environmental impact and cost to surrounding communities of defunct and idle windmills and deliver a report to the President, through the Assistant to the President for Economic Policy, with their findings and recommended authorities to require the removal of such windmills.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to any aspect of the Federal leasing or permitting of onshore or offshore wind projects or the Lava Ridge Wind Project, and may, in the Attorney General's discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) or subsection (b) of this section, as applicable. This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. You are authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, January 20, 2025*

[FR Doc. 2025–01966
Filed 1–28–25; 8:45 am]
Billing code 4310–10–P