UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; and STATE OF WASHINGTON,<br><br>      Plaintiff,<br><br>      v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OF AMERICA; DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; BUREAU OF OCEAN ENERGY MANAGEMENT; WALTER CRUICKSHANK, Acting Director of Bureau of Ocean Energy Management, in his official capacity; BUREAU OF LAND MANAGEMENT; JONATHAN RABY, State Director of the Bureau of Land Management, in his official capacity; UNITED STATES FISH AND WILDLIFE SERVICE; PAUL SOUZA, Regional Director of the United States Fish and Wildlife Service, in his official capacity; DEPARTMENT OF COMMERCE; HOWARD LUTNICK, Secretary of Commerce, in his official capacity; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, Chief of Staff of the National Oceanic and Atmospheric Administration, in her official capacity; NATIONAL MARINE FISHERIES SERVICE; EUGENIO PIÑEIRO SOLER, Director of the National Marine | CASE NO. 1:25-cv-11221 |

| |
|---|
| Fisheries Service, in his official capacity; UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL WILLIAM H. "BUTCH" GRAHAM, JR., Chief of Engineers for the United States Army Corps of Engineers, in his official capacity; ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, Administrator of Environmental Protection Agency, in his official capacity; DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, Secretary of Agriculture, in her official capacity; DEPARTMENT OF ENERGY; CHRIS WRIGHT, Secretary of Energy, in his official capacity; DEPARTMENT OF THE TREASURY; and SCOTT BESSENT, Secretary of the Treasury, in his official capacity, |
| Defendants. |

## DECLARATION OF MARGUERITE WELLS
### EXECUTIVE DIRECTOR OF ALLIANCE FOR CLEAN ENERGY NEW YORK

I, Marguerite Wells, pursuant to 28 U.S.C. § 1746, hereby declare that:

**RELEVANT BACKGROUND AND EXPERIENCE**

1. I am Executive Director of Alliance for Clean Energy New York, Inc. ("ACE NY"). I have over 15 years' experience in the clean energy industry, including grid-scale land-based and offshore wind energy, and have held this position since April 2024. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by ACE NY's member companies.

2. As Executive Director, I am the spokesperson for the organization and primarily responsible for ensuring ACE NY's effective advocacy and outreach operations on behalf of the renewable energy industry. I set the organization's legislative agenda and policy goals. I advocate

1

for the wind energy industry at the New York government, state agencies, the New York State Energy Research and Development Authority (NYSERDA), and the New York Independent System Operator (NYISO) by developing and delivering various policy positions, issuing media statements, responding on behalf of industry to public comment periods for relevant regulations, and conducting various speaking engagements to advance this industry. This work is done in consultation with ACE NY member companies. I also work to inform members of pertinent policy developments, media coverage, advocacy, and industry progress in the State of New York. This includes tracking, researching, and analyzing proposed policies that will affect the development of wind facilities.

3. ACE NY is a 501(c)(3) not-for-profit organization that serves as the premier multi-technology clean energy industry organization for the State of New York. ACE NY's mission is to promote the use of clean electricity technologies and energy efficiency in the State of New York, increase energy diversity and security, boost economic development, improve public health, reduce energy costs, and reduce air pollution. ACE NY's diverse membership includes companies engaged in the development, construction, and operation of land-based wind and solar power; offshore wind power facilities; energy efficiency contracting; manufacturing of clean energy equipment; and consulting to or supporting the clean energy industry. ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean energy industry in the State of New York.

4. I am aware of the litigation filed by several States against the federal government on May 5, 2025 challenging the categorical and indefinite cessation of federal agency permitting for wind projects nationwide. I submit this declaration in support of ACE NY's motion to intervene in support of State Plaintiffs in this litigation.

**The Benefits and Importance of Wind Energy**

5. The notable environmental benefits of wind energy are well studied and understood. Because wind energy does not emit greenhouse gases or other air pollutants, it does not contribute to climate change nor lower air quality, unlike many conventional sources of power. As it uses little to no freshwater, wind helps conserve water resources—particularly in regions with limited water availability. And, due to the rigorous environmental review required under the National Environmental Policy Act (NEPA) and other statutes, wind can be developed with minimal impacts to wildlife, biodiversity, and terrestrial environments where it is sited.

6. Offshore and land-based wind energy technologies are poised to play a critical role in meeting energy demand, which is set to increase dramatically in coming years due to Artificial Intelligence (AI) datacenters, a resurgence of domestic manufacturing, grid electrification, and a growing economy. For example, offshore wind is needed to help supply energy to regions with spatial and resource constraints as well as large population centers, such as NYISO zones J and K. In addition, land-based wind is already serving a substantial portion of the energy load in inland regions of the country. Both technologies will play an especially important role in meeting near-term demand increases, given their quick deployment timeframes as compared to many other resources and utility scale generation capabilities.

7. Finally, by adding diversity to the overall electricity generation portfolio, wind energy contributes to energy security and achieving a self-reliant power grid. When multiple different energy sources supply energy to the grid, this diversity of sources can help to mitigate risks in the event of supply disruptions or crises associated with weather events, cyberattacks, or global market disturbances. In addition, local energy supplies reduce the need for foreign imports which further stabilizes local energy grids.

**Impacts of the Presidential Memorandum on the Wind Industry**

8. On January 20, 2025, President Trump issued the *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects* (hereinafter "the Presidential Memorandum"). Among other things, the Presidential Memorandum precludes federal agencies from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." In response to the issuance of this Presidential Memorandum, various agencies responsible for permitting wind energy projects have ceased such activity. This declaration will refer to the Presidential Memorandum and its implementation by agencies collectively as the "Presidential Memorandum."

9. Based on my years of experience managing all stages of wind energy development in the State of New York (siting, permitting, financing, construction, and operations), and numerous conversations with ACE NY members on the topic, I am qualified to speak to the impact that permitting delays, like those created by the Presidential Memorandum, have on the land-based and offshore wind energy industries and associated businesses.

10. Land-based and offshore wind companies have complex commercial obligations, tight construction timelines, and limited options for contractors and material resources needed to complete construction. Though project developers build some flexibility into their development timelines, they are highly vulnerable to protracted delays lasting for months or years. Here, the permitting freeze created by the Presidential Memorandum has gone on for four months, and there has been no indication that it will end in the near future. The cessation of federal permitting for wind projects is already causing ACE NY's member companies considerable direct economic

harm and operational strain. Further delay would be highly detrimental to the industry, and for the reasons described below, may delay the projects and their benefits, and may force ACE NY's members to abandon their projects altogether.

11. Wind energy developers often enter into contracts with prospective off-takers—called "power purchase agreements" (PPAs)—before they commence with the project development process. These PPAs typically contain deadlines by which the wind project must begin delivering power. Delays in the fulfillment of these deadlines can lead to penalties or result in renegotiation of contract terms, often less favorable to the developer. Alternately, developers may not enter into new PPAs until this halt is lifted due to high business uncertainty. To ensure that these deadlines can be met, wind projects commence the supply chain procurement process before these projects are fully permitted. In other words, these projects begin placing orders with manufacturing facilities prior to the commencement of the federal permitting processes and while they are ongoing.

12. When wind energy permits are not issued within reasonable, expected timeframes, developers' material costs escalate dramatically. Project components, such as blades, towers, and turbines, are massive in size, and have very long ordering and production timelines. If the component production timeline does not align with the installation timeline, there can be insurmountable logistical problems or exorbitant fees associated with finding a location to store these components in a way that will not impact their structural integrity and life expectancy. When delays occur, wind energy developers may be required to cancel or postpone existing manufacturing orders, which will likely result in them paying a penalty to the manufacturer and/or incurring higher prices in the future due to inflation.

13. Permitting delays also substantially increase construction, labor, and shipping costs. Installation of wind turbines requires specialized equipment that is typically owned by third parties. Due to the limited availability of installation equipment and crews, developers must contract with construction companies to secure these services years in advance of the start of construction. If developers do not possess the required federal permits by the time construction is scheduled to commence, they may need to attempt to renegotiate existing construction and labor contracts. This could push a project's completion date out considerably and cause developers' costs to soar. Developers may, for example, have to pay extra for idle labor teams, rerouted shipping vessels, and other rescheduled transportation services as a result of changes in the construction timeline. And such resources may not be available at a later date when needed.

14. In addition, project financing contracts are heavily dependent on the anticipated timelines for construction, development, and operations. The uncertainty as to the duration of the permitting freeze is increasing the costs associated with financing a project. This is because project delays push back the date of operations and revenue generation that can lead to increased interest on existing loan agreements and additional borrowed capital for developers. Delays in project completion and permitting uncertainty also make projects riskier in the eyes of investors, which can result in projects being subject to higher risk premiums to offset the risk of being unable to secure sufficient financing. ACE NY's members are already facing these and other financing challenges in the wake of the Presidential Memorandum and agencies' implementation.

15. Permitting delays are also harmful to the wind energy supply chain and manufacturing sector. Until the permitting ban is lifted, developers cannot set new construction timelines, enter into new construction contracts, or place new manufacturing orders. Moreover, wind energy projects in later stages of development have postponed or suspended construction

timelines and have canceled orders due to uncertainty as to whether and when permitting will resume. Consequently, there is presently no demand for specialty equipment and materials produced at domestic manufacturing facilities. If this lack of demand persists, the domestic supply chain for wind energy development may completely collapse. If such a collapse occurs, any future domestic wind energy projects will have to source project components from foreign markets, potentially at a cost premium due to shipping expenses and other factors.

16. In sum, ACE NY's member companies stand to continue to lose significant capital each day that Presidential Memorandum remains in effect. The permitting delay is resulting in and will continue to result in concomitant project delays, and postponements in resulting benefits. If the permitting ban is not soon lifted, the resulting delays may render ACY NY's member companies' wind energy project uneconomic and force these companies to forfeit substantial investments made in their projects to date. If projects are abandoned, it will create ripple effects throughout the supply chain and may jeopardize the domestic wind energy industry's long-term survival.

### *Impacts Specific to ACE NY's Offshore Wind Members*

17. I have worked closely with ACE NY's offshore wind members to ascertain the specific impacts the Presidential Memorandum will have on their businesses and wind energy project development prospects. These members have faced, and will continue to face, substantial economic losses if federal agencies do not resume issuing the permits and authorizations these projects need to proceed. As such, the Presidential Memorandum and agencies' implementation have caused, and will continue to cause, direct and significant harm to ACE NY's offshore members. Many of these companies have already endured significant economic loss resulting in employee reductions due to the uncertainty caused by the

7

Presidential Memorandum. ACE NY members would move forward with project development project plans and permitting if the ban were lifted.

18. ACE NY members include all six leaseholders that were awarded leases in the 2022 New York Bight (NY Bight) Auction held by the U.S. Bureau of Ocean Energy Management (BOEM). Notably, BOEM's groundwork for this federal sale began during the first Trump Administration, including a Call for Information and Nominations published on April 11, 2018. This successful sale stands as the country's biggest offshore wind auction and included six lease areas totaling over 488,000 acres. The lease holders collectively invested $4.37 billion to secure winning bids for the leases. These leaseholders continue to pay rents of over $1 million a year to the federal government under the terms of those leases, but are unable to enjoy the benefits of those leases because of the Presidential Memorandum and its implementation. Since securing these leases, ACE NY members have made further investments and entered into contractual obligations based on the reasonable expectation that their leases would be developed. These lease holders are subject to damages or penalties if they are unable to fulfill contractual obligations or reliably forecast when these projects will be completed and begin to generate revenue. ACE NY members also hold leases in all Plaintiff States, many of which are adversely impacted by the Presidential Memorandum and its implementation including projects with offshore leases in Maine, Massachusetts, New York, Rhode Island, Connecticut, Maryland, New Jersey, Delaware, California, and onshore land leases in Colorado, Illinois, New Mexico, Arizona, New Mexico, Michigan, Oregon, and Washington.

19. None of the six NY Bight leaseholders yet has a BOEM-approved construction and operation plan (COP), and now, if the Presidential Memorandum and BOEM's implementation continue, none will be able to secure a COP. As a result of the Presidential

Memorandum and BOEM's implementation, BOEM has already cancelled public meetings for a Notice of Intent ("NOI") that has been issued for a lease holder in the NY Bight. BOEM, *New York Bight, "What's New."* (February 2025). https://www.boem.gov/renewable-energy/state-activities/new-york-bight. The inability to secure a COP as a result of the federal wind permitting ban places these lease holders at substantial risk, making it impossible for them to develop their leases and, in turn, recognize a return on their investment. If the federal wind permitting ban is not enjoined and vacated, these leaseholders stand to lose their entire investment. Several members of ACE NY have already announced a pause in U.S. offshore wind activity, until, among other things, they are certain they will be able to secure needed permits.

20.  ACE NY members also include developers that have secured all necessary permits for their offshore wind projects. One of these developers, Equinor, has received an indefinite stop-work order and can no longer proceed with offshore construction. That stop-work order expressly invoked the Presidential Memorandum. Equinor has already invested heavily in the U.S., including investments in oil and gas and renewable energy projects. Unless this decision is reversed, Equinor stands to lose many billions of dollars on this one project.

21.  Delay caused by a stop-work order is incredibly costly and threatens the viability of the project. Offshore wind projects rely on specialized vessels, equipment, and labor with finite availability. Delay may mean that these resources are no longer available to the developer. For example, only certain vessels, such as Wind Turbine Installation Vessels, (WTIVs), can install turbines during the construction of offshore wind facilities. There are currently only four WTIVs in the world that could install a 12MW turbine and most U.S. projects under construction in 2025 plan to use similarly sized turbines. These vessels are global assets and there is a high demand for their use as the Global Wind Energy Council predicts that global offshore wind

additions are likely to quadruple by 2030 from 2024 levels. Given this demand, these vessels have very small delivery windows. If an offshore wind facility is unable to start construction on the planned date, the vessels will be redeployed to other projects elsewhere in the world and may not be again available for two or three years. As such, even a short stop-work order could delay a project for a period of time at which point it may no longer be economically viable to develop.

### *Impacts Specific to ACE NY's Onshore Members*

22. I have worked closely with ACE NY's land-based wind members to ascertain the specific impacts the Presidential Memorandum will have on their businesses and project development prospects. These members have faced, and will continue to face, substantial economic losses if federal agencies do not resume issuing the permits and authorizations these projects need to proceed. The Presidential Memorandum and its implementation by agencies have caused, and will continue to cause, direct and significant harm to ACE NY's land-based members.

23. ACE NY members include land-based wind developers that require federal permits to develop on federal, state, and private lands. Because of the Presidential Memorandum and agencies' implementation, these members cannot obtain these federal permits where needed, despite complying with all applicable statutes and regulations, to move their projects forward on these lands.

24. Three ACE NY members have invested in projects that are currently halted because of the Presidential Memorandum and agencies' implementation. These members have made tens of millions of dollars in investments and entered into contracts for labor and materials based on reasonable expectations that the projects would be developed over a certain timeline. Because these members are unable to secure federal permits, they are not able to start

construction within their planned-for timeframes and, as a result, are incurring daily losses. If these members must ultimately abandon their projects because of the federal wind permitting ban, the members will not be able to deliver on contractual obligations and will incur even more significant financial losses.

*Impacts Specific to Members in the Manufacturing Sector*

25. I have worked closely with ACE NY's members in the manufacturing sector to ascertain the impacts that the cessation of federal wind permitting will have on their businesses. These members have faced substantial economic losses if federal agencies do not resume issuing the permits and authorizations these projects need to proceed. The Presidential Memorandum and agencies' implementation have caused, and will continue to cause, direct and significant harm to ACE NY's members engaged in the manufacturing of turbines and other specialty equipment for wind energy projects.

26. These members have manufacturing facilities in New York, and throughout the country, that employ thousands of specialized workers to produce turbines for wind facilities. Because of the uncertainty created by the Presidential Memorandum and agencies' implementation, these members have reported that demand for specialized materials and equipment has plummeted. If the uncertainty is not resolved promptly, these members will experience significant financial loss and will likely have to lay off a number of employees.

*Impacts Specific to Members in the Construction Sector*

27. I have worked closely with ACE NY's members in the construction sector to ascertain the impacts that the cessation of federal wind permitting will have on their businesses. These members have faced substantial economic losses if federal agencies do not resume issuing the permits and authorizations that these projects need to proceed. The Presidential

11

Memorandum and agencies' implementation have caused, and will continue to cause, direct and significant harm to ACE NY's members engaged in the construction of wind projects.

28. These members have highly trained employees based in New York, and throughout the country, that employ hundreds of specialized workers to construct wind facilities. Because of the uncertainty created by the Presidential Memorandum and agencies' implementation, these members have reported that demand for their specialized wind project construction labor force has plummeted. If the uncertainty is not resolved promptly, these members will experience significant financial loss and will likely have to lay off a number of employees.

*ACE NY's and Its Members' Interests and Harms Are Nationwide in Scope*

29. ACE NY is the premier multi-technology clean energy industry organization for the State of New York, but the interests of ACE NY and its members are not limited to New York, but include (without limitation) all Plaintiff States. Many of ACE NY's onshore and offshore members have businesses that are national or international in scope, and ACE NY's members are currently in the process of developing land-based and offshore wind energy projects in many other States. The suspension in agency approvals for wind energy has accordingly affected ACE NY's members nationwide.

30. Similarly, many of ACE NY's manufacturing sector members have businesses that sell their products, and source their inputs, in nationwide markets, not only within New York. The nationwide suspension in agency approvals for wind energy has severely damaged demand for the products of ACE NY's manufacturing members.

31. The United States wind energy industry is an integrated national industry and cannot be disaggregated by State. ACE NY and its members depend on the existence of a

12

flourishing *national* wind energy industry. That industry requires a manufacturing supply chain, skilled labor, and specialized installation and transportation equipment, among other necessary inputs, all of which exist in nationwide and international markets. The electricity produced at wind facilities is often sold locally but may also be purchased or sold in regional electricity markets. The nationwide cessation of federal agency approvals for wind energy has accordingly directly affected the interests of ACE NY and its members.

### *ACE NY's and Its Members' Interests and Harms Are Distinct from Other Parties*

32. No existing party adequately represents the unique interests of ACE NY and its members, who are best suited to speak to the direct, project-specific and industry-wide impacts of the federal wind energy permitting ban.

33. ACE NY and its members possess unique experience and knowledge regarding the business realities of complex wind energy projects, such as project financing timelines, construction schedules, and contractor availability.

34. ACE NY and its members are also directly familiar with the extensive environmental reviews and robust protective conditions associated with wind energy projects.

35. These considerable and protected private interests are inherently distinct from the broader public goals that State Plaintiffs additionally seek to protect through this litigation.

36. Nor do Defendants here adequately represent ACE NY and its members, particularly given Defendants' unprecedented and unfounded efforts to impede wind energy projects at the heart of ACE NY and its members' interests.

## Conclusion

37. In sum, ACE NY's offshore wind, land-based wind, and manufacturing sector members are already being significantly harmed by the Presidential Memorandum. If the

13

Presidential Memorandum is not lifted, ACE NY's members will continue to suffer significant economic losses that will place their investments at risk and threaten the long-term viability of their projects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of May in 2025.

_____
Marguerite Wells
Executive Director, ACE NY