**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF NEW YORK, *et al,* | No. 1:25-cv-11221-FDS |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al*, | |
| Defendants. | |

**[PROPOSED] PLAINTIFF-INTERVENOR ALLIANCE FOR CLEAN ENERGY**
**NEW YORK MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

    I.   Wind Energy Is Well Understood and Subject to Extensive Safeguards. .......................... 4

    II.  Defendants' Unlawful Actions to End All Wind Permitting. ............................................. 8

ARGUMENT ................................................................................................................... 12

    I.   ACE NY Is Likely to Succeed on The Merits. ............................................................. 12

       A.   ACE NY Has Standing. ....................................................................................... 12

       B.   Each Agency's Blanket Implementation of the Wind Ban Is a Final Agency Action Reviewable Under the APA ................................................................................... 13

       C.   The Wind Ban Is Arbitrary and Capricious. ......................................................... 15

       D.   The Wind Ban Violates APA Notice-and-Comment Requirements ........................... 23

       E.   The Wind Ban Is Contrary to Law ...................................................................... 24

       F.   The Wind Ban Violates OCSLA ......................................................................... 32

    II.  ACE NY's Members Are Suffering Irreparable Harm. ................................................. 32

    III. The Balance of the Equities and the Public Interest Favor Preliminary Injunctive Relief. 36

CONCLUSION ................................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
No. CV 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025) ........................................ 15, 21

*Alabama Ass'n of Realtors v. Dep't of Health and Human Services*,
594 U.S. 758 (2021) ................................................................................................ 33

*Am. Clinical Lab. Ass'n v. Becerra*,
40 F.4th 616 (D.C. Cir. 2022) ................................................................................ 13

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ............................................................................ 20

*Associated Fisheries of Me. v. Daley*,
127 F.3d 104 (1st Cir. 1997) .................................................................................. 16

*Boston Parent Coalition for Academic Excellence Corp. v. School Committee for the City of Boston*,
89 F.4th 46 (1st Cir. 2023) ..................................................................................... 13

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................................................ 17

*Citizen Awareness Network, Inc. v. Nuclear Regulatory Commission*,
59 F.3d 284 (1st Cir. 1995) .................................................................................... 16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................................ 16

*Clarian Health West, LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) .............................................................................. 23

*Clarke v. Securities Industry Ass'n*,
479 U.S. 388 (1987) ................................................................................................ 14

*Clinton v. City of New York*,
524 U.S. 417 (1998) ................................................................................................ 32

*Dep't of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) .................................................................................................... 21

*Doe v. Trump*,
No. 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025) ............................. 37

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ...................................................................................... 15, 17, 21

*Ensco Offshore Co. v. Salazar*,
    781 F. Supp. 2d 332 (E.D. La. 2011) ............................................................... 25

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................... 15, 18

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) ......................................................... 14

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ........................................................................ 14

*Hornbeck Offshore Wind Services v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010) .............................................................. 22

*Invenergy Renewables, Inc. v. United States*,
    422 F. Supp. 3d 1255 (Ct. Intl. Trade 2019) .................................................... 37

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016) ............................................................................... 29, 30

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
    468 F.3d 549 (9th Cir. 2006) ........................................................................ 27

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F. Supp. 2d 907 (1st Cir. 1989) ............................................................... 32

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 37

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021) ............................................................ 36

*Louisiana v. Biden*,
    622 F. Supp.3d 267 (W.D. La. 2022) ................................................. 14, 15, 24, 25

*Louisiana v. Biden*,
    No. 2:24-CV-0046, 2024 WL 3253103 (W.D. La. July 1, 2024) ............................. 24

*Mass. v. NIH*,
    No. 25-CV-10338, 2025 WL 702163 (D. Mass. March 5, 2025) ............................ 37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .................................................................................. 13

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004) ..................................................................... 18

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024) ......................................................................... 15

*Mexican Gulf Fishing Co. v. United States Dep't of Commerce*,
　60 F.4d 956 (5th Cir. 2023) ................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ....................................................... 15, 25

*Mountain States Legal Found. v. Hodel*,
　668 F. Supp. 1466 (D. Wyo. 1987) .......................................... 28

*Nantucket Residents Against Turbines v. BOEM.*,
　100 F.4th 1, 8 (1st Cir. 2024), *cert. denied* No. 24-337, 2025 WL 76449 (U.S. Jan. 13, 2025) 6

*Narragansett Indian Tribe v. Guilbert*,
　934 F.2d 4 (1st Cir. 1991) ................................................. 12

*Nat'l Council of Nonprofits v. Office of Management and Budget*,
　No. 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ................. 22, 24

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
　595 U.S. 109 (2022) ....................................................... 24

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*,
　752 F.3d 999 (D.C. Cir. 2014) ............................................. 26

*New Hampshire Hospital Ass'n v. Azar*,
　887 F.3d 62 (1st Cir. 2018) ............................................... 23

*New Hampshire Indonesian Cmty. Support v. Trump*,
　No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ............... 37

*New York v. Trump*,
　No. 25-cv-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ............... 16

*Nken v Holder*,
　556 U.S. 418 (2009) ....................................................... 37

*Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*,
　969 F.3d 12 (1st Cir. 2020) ............................................... 12

*Norton v. S. Utah Wilderness All.*,
　542 U.S. 55 (2004) ........................................................ 26

*NRDC v. Wheeler*,
　955 F.3d 68 (D.C. Cir. 2020) ............................................. 14

*NuVasive, Inc. v. Day*,
　954 F.3d 439 (1st Cir. 2020) ............................................. 12

*Ohio v. EPA*,
    603 U.S. 279 (2024) ..................................................................................................... 16

*Pacito v. Trump*,
    No. 25-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ........................................ 14, 15, 24

*Protect our Communities Found. v. Salazar*,
    No. 12CV2211-GPC PCL, 2013 WL 5947137, at *18 (S.D. Cal. Nov. 6, 2013), *aff'd sub nom.*
    *Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017) ................................ 7

*Protect Our Communities Foundation v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ........................................................................................ 7

*Restaurant Law Ctr. v. United States Dep't of Labor*,
    66 F.4th 593 (5th Cir. 2023) ........................................................................................ 33

*Ross-Simons of Warwick v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) .......................................................................................... 12

*S. Utah Wilderness All. v. BLM*,
    425 F.3d 735 (10th Cir. 2005) ...................................................................................... 27

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
    123 F.4th 1 (1st Cir. 2024), *cert. denied* No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025) 6,
    25

*Smiley v. Citibank*,
    517 U.S. 735 (1996) ...................................................................................................... 22

*State v. Trump*,
    No. 25-CV-01144 (JAV), 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) .............................. 14

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ...................................................................................................... 33

*TikTok Inc. v. Trump*,
    490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................................ 37

*United States v. Patton*,
    771 F.2d 1240 (9th Cir. 1985) ................................................................................. 25, 26

*Victim Rights Law Center v. Cardona*,
    552 F. Supp. 3d 104 (D. Mass 2021) ............................................................................ 24

*W. Watersheds Project v. Bureau of Land Mgmt.*,
    774 F. Supp. 2d 1089 (D. Nev. 2011) ........................................................................... 38

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008).................................................................. 12

**Statutes**

16 U.S.C. § 1371 ..................................................................... 30

16 U.S.C. § 1371(a)(1)(2) ....................................................... 30

16 U.S.C. § 1371(a)(5)(A)(i) ................................................... 30

16 U.S.C. § 1374 ..................................................................... 36

16 U.S.C. 1539 ................................................................. 29, 36

16 U.S.C. § 1539(a)(2)(B) ....................................................... 29

16 U.S.C. §§ 1531 *et. seq.* ..................................................... 29

16 U.S.C. §§ 668-668d ........................................................... 36

33 U.S.C. §§ 401-408 ............................................................. 36

33 U.S.C. § 1342 ..................................................................... 31

33 U.S.C. § 1344 ..................................................................... 28

33 U.S.C. § 1344(q) ................................................................ 29

33 U.S.C. §§ 1341-1346 .......................................................... 36

42 U.S.C. § 4370m-2 ............................................................... 32

42 U.S.C. § 7475(c) ................................................................. 31

42 U.S.C. § 7627 ..................................................................... 30

42 U.S.C. § 7661b(c) ............................................................... 31

42 U.S.C. §§ 7661-7661f ......................................................... 36

43 U.S.C. §§ 1331 *et. seq.* ..................................................... 25

43 U.S.C. § 1332(3) ................................................................. 25

43 U.S.C. § 1341(a) ................................................................. 26

43 U.S.C. § 1341(c), (d) .......................................................... 26

43 U.S.C. § 1349(a)(1) ............................................................ 32

43 U.S.C. § 1349(a)(3) .................................................................................................. 32

43 U.S.C. §§ 1701 *et seq.* ...................................................................................... 26, 36

43 U.S.C. § 1701(a)(4) ................................................................................................ 27

43 U.S.C. § 1702(j) ...................................................................................................... 27

43 U.S.C. § 1712 .......................................................................................................... 26

43 U.S.C. § 1712(e) ...................................................................................................... 26

43 U.S.C. § 1714 .......................................................................................................... 27

43 U.S.C. § 1714(a) ...................................................................................................... 28

43 U.S.C. § 1714(b) ...................................................................................................... 28

43 U.S.C. § 1714(c) ...................................................................................................... 28

43 U.S.C. § 1714(e) ...................................................................................................... 28

43 U.S.C. § 1714(h) ...................................................................................................... 28

43 U.S.C. § 1732(a) ...................................................................................................... 26

43 U.S.C. § 1766 .......................................................................................................... 28

5 U.S.C. § 551(8) ......................................................................................................... 24

5 U.S.C. § 553 .............................................................................................................. 23

5 U.S.C. § 553(b)(4)(A) ............................................................................................... 23

5 U.S.C. § 553(b)(4)(B) ............................................................................................... 23

5 U.S.C. § 553(d)(3) ..................................................................................................... 23

5 U.S.C. § 558 .............................................................................................................. 24

5 U.S.C. § 706 .............................................................................................................. 15

5 U.S.C. § 706(2)(A) ............................................................................................ 15, 24, 32

5 U.S.C. § 706(2)(C) .............................................................................................. 24, 32

5 U.S.C. § 706(2)(D) .................................................................................................... 23

**Other Authorities**

American Recovery and Reinvestment Act, Pub. L. No. 111-5 (2009) ......................................... 4

*BLM, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, BLM Record of Decisions* (December 2005) .................................................... 27

Bobby Magill, *New Wind Farms Singled Out in Army Corps Water Permitting Pause*, Bloomberg Law (Feb. 12, 2025), https://news.bloomberglaw.com/environment-and-energy/new-wind-farms-singled-out-in-army-corps-water-permitting-pause ......................... 10

BOEM, "BOEM Rescinds Expanded Rice's Whale Protection Efforts" (Feb 20, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-expanded-rices-whale-protection-efforts ...................................................................................................................... 20

BOEM, "Vineyard Mid-Atlantic"  https://www.boem.gov/renewable-energy/state-activities/vineyard-mid-atlantic ............................................................................................... 10

BOEM, Lease and Grant Information, https://www.boem.gov/renewable-energy/lease-and-grant-information .................................................................................................................................. 9

BOEM, POSTPONED: Public Meetings on Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California (Jan. 28, 2025), https://www.boem.gov/newsroom/notes-stakeholders/postponed-public-meetings-draft-environmental-review-potential ............................................................................................... 10

BOEM, *Wind Energy Final Programmatic Environmental Impact Statement* (2005), https://windeis.anl.gov/documents/fpeis/index.cfm .................................................................. 6

*Declaring a National Energy Emergency* (Jan. 20, 2025) ............................................................. 1

Dep't of Energy, *Fact Sheet: Wind Energy Benefits,* https://www.nrel.gov/docs/fy15osti/62823.pdf (Jan. 2015) .................................................... 18

Dev Millstein et al., *Climate and air quality benefits of wind and solar generation in the United States from 2019 to 2022,* 1 CELL REPORTS SUSTAINABILITY 5-6 (2024)..................... 18

Energy Act of 2020, enacted as part of the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260 (2021) ....................................................................................................................... 4

Energy Improvement and Extension Act, enacted as part of the Emergency Economic Stabilization Act, Pub. L. No. 110-343 (2008) ........................................................................ 4

Energy Independence and Security Act, Pub. L. No. 110- 140 (2007) ......................................... 4

Energy Policy Act of 2005, Pub. L. No. 109-58 (2005) ............................................................... 4

Energy Tax Act of 1978, Pub. L. No. 95-618 (1978) ................................................................... 4

*Establishing the National Energy Dominance Council,* 90 Fed. Reg. 9,945 (Feb. 14, 2025) ........ 1

Executive Order 14154, "Unleashing American Energy," 90 Fed. Reg. 8353 (Jan. 29, 2025)... 19, 21

Executive Order 14156, "Declaring a National Energy Emergency," 90 Fed. Reg. 8433 (Jan. 29, 2025) .................................................................................................................. 19, 21, 38

https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic ................................................................................. 19

https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit ............................ 10

https://www.permits.performance.gov/proj/southcoast-wind-energy-llc-southcoast-wind/marine-mammal-protection-act-mmpa-incidental-take ......................................................... 11

In re Atlantic Shores Offshore Wind, LLC, OCS Appeal No. 24-01, Order Granting Motion for Voluntary Remand (Mar. 14, 2025), https://yosemite.epa.gov/OA/EAB_WEB_Docket.nsf/Filings%20By%20Appeal%20Number/9C7B7CF33923032185258C4D0058F4A7?OpenDocument .................................................. 11

Inflation Reduction Act, Pub. L. No.. 117-169 (2022) ............................................................... 4

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (2021) ............................................ 4

Lisa Friedman & Brad Plumer, *Trump Promises To End New Wind Farms*, New York Times (Jan. 7, 2025) .................................................................................................................. 9

NCSL, State Renewable Portfolio Standards and Goals, https://www.ncsl.org/energy/state-renewable-portfolio-standards-and-goals ................................................................................. 4

NERC, *2024 Long-Term Reliability Assessment* (2024); John D. Wilson, Zach Zimmerman, and Rob Gramlich, *Strategic Industries Surging: Driving US Power Demand*, Grid Strategies (2024)......................................................................................................................... 38

NOAA, "Frequent Questions—Offshore Wind and Whales" (last updated April 24, 2025), https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales; NOAA, "Rice's Whale: In the Spotlight," (Nov. 16, 2024), https://www.fisheries.noaa.gov/species/rices-whale/spotlight .................................... 20

*Reinvigorating America's Beautiful Clean Coal Industry And Amending Executive Order 14241*, Executive Order 14261, 90 Fed. Reg. 15,517 (April 8, 2025)................................................ 20

Richard K. Greene, States Use Incentives to Attract Renewable Energy Business, https://www.areadevelopment.com/taxesincentives/nov09/ renewable-business11.shtml ........ 4

*Rights-of-Way, Leasing, and Operations for Renewable Energy,* 89 FR 35634 (May 1, 2024).. 17

Ryan Wiser et al, LAND-BASED WIND MARKET REPORT, *Lawrence Berkeley National Laboratory* (2024), https://emp.lbl.gov/sites/default/files/2024-08/Land-Based%20Wind%20Market%20Report_2024%20Edition.pdf................................................ 18

Sara Dorn, *Trump Calls Windmills 'An Economic And Environmental Disaster' In Latest Rant Against Turbines*, FORBES (Jan. 15, 2025) ............................................................................. 9

*Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 29, 2025) ................................................................................. passim

*Trump vows to target offshore wind from "day one,"* Boston Herald (May 12, 2024) .................. 9

U.S. Department of Energy, How Wind Can Help Us Breathe Easier, https://www.energy.gov/eere/wind/articles/how-wind-can-help-us-breathe-easier .................. 3

WINDExchange, Economics and Incentives for Wind, U.S. Department of Energy, https://windexchange.energy.gov/projects/economics ............................................................. 8

*Zero-Based Regulatory Budgeting to Unleash American Energy,* Executive Order 14270, 90 Fed. Reg. 15,643 (April 9, 2025) ................................................................................................... 20

**Regulations**

30 C.F.R. § 550.184 ............................................................................................................... 36

30 C.F.R. § 585.613 ............................................................................................................... 26

30 C.F.R. § 585.648 ............................................................................................................... 26

33 C.F.R. § 320.4 ................................................................................................................... 17

33 C.F.R. § 325.2 ................................................................................................................... 29

40 C.F.R. § 124.15 ................................................................................................................. 31

40 C.F.R. § 124.3 ................................................................................................................... 31

40 C.F.R. § 124.3(c) .............................................................................................................. 31

40 C.F.R. § 124.3(g) .............................................................................................................. 31

40 C.F.R. § 71.5(a)(2) ............................................................................................................ 31

40 C.F.R. § 71.7 ..................................................................................................................... 31

50 C.F.R. § 18.27(d)(3) .......................................................................................................... 30

50 C.F.R. § 216.104(c) ........................................................................................................... 30

**INTRODUCTION**

Following a Presidential directive on its first day,[1] the present Administration has, in contravention of law, imposed a total and indefinite ban on any new or renewed federal agency "approvals, rights of way, permits, leases, or loans" needed for wind energy development anywhere in the United States ("Wind Ban"). In doing so, the Administration has arbitrarily and needlessly frozen hundreds of wind energy projects, both in offshore waters and on onshore public and private lands, threatening billions of dollars in investment and hundreds of thousands of American jobs. Plaintiff-Intervenor Alliance for Clean Energy New York ("ACE NY") seeks a preliminary injunction restraining this illegal action, and supports State Plaintiffs' related motion.

ACE NY is likely to succeed on the merits; the Wind Ban is unlawful several times over. It lacks any supporting administrative record, reflects zero legal analysis or factual findings, and was implemented by agencies in flagrant violation of the Administrative Procedure Act ("APA"). It conflicts with longstanding Congressional and agency policy across multiple Administrations, singles out the American wind industry for adverse treatment not accorded to any other energy source, and was adopted without regard to its harms to the industry and consumers and notwithstanding its high costs (to industry, the States, and the public) and negligible benefits. The Wind Ban is arbitrary especially viewed against the Administration's contemporaneous actions, including its declaration of an "energy emergency" and need for a "reliable, diversified and affordable" energy supply.[2] Indeed, wind energy is well-situated to

---

[1] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 29, 2025) ("Presidential Memorandum").
[2] *Declaring a National Energy Emergency*, (Jan. 20, 2025); *Establishing the National Energy Dominance Council,* 90 Fed. Reg. 9,945 (Feb. 14, 2025).

address such objectives as a proven, reliable, low-cost, and environmentally sound domestic energy source that already comprises an appreciable and growing share of the nation's energy supply. And while demanding that all wind permitting cease until completion of some new environmental and economic "comprehensive assessment and review" with no deadline, the Administration is taking steps to expedite other forms of energy (e.g., oil, gas, and coal) and has stated no similar concern about "potential inadequacies" under the same environmental review processes applicable to those sources as to wind. Above all, Congress has simply not delegated to the President or agencies any power to threaten an entire industry with ruin: the Ban is *ultra vires* root and branch. Agencies have no legal authority to indefinitely abdicate their Congressionally and regulatorily imposed obligations to timely issue decisions on wind energy projects.

This case also satisfies the remaining preliminary injunction factors. As to irreparable harm, the Wind Ban has caused severe economic damage to the wind industry, from developers of wind projects to suppliers of components to businesses and workers who support construction projects. That harm escalates every day the Wind Ban continues, and threatens catastrophic harm to the industry as a whole. Meanwhile, resuming wind permitting in the normal course while this litigation proceeds would harm no one, particularly as those projects are already subject to robust legal requirements and extensive studies, so the balance of equities favors injunctive relief. Allowing wind energy permitting to continue as Congress directed also is in the public interest, especially given the critical role wind energy plays in improving grid reliability and security and harnessing renewable sources to meet increasing domestic energy demands. The Administration can conduct a redundant and wasteful comprehensive study if it so wishes, but not as a pretext

for prejudging the outcome and attempting to shut down all wind energy projects. Accordingly, this Court should enjoin the Wind Ban pending its final resolution of this case on the merits.

## FACTUAL BACKGROUND

The Wind Ban represents a targeted and irrational attack on one of American's fastest growing, lowest cost, and environmentally safest energy sources. Wind currently provides 10.1 percent of the nation's electricity, and will make up a significant portion of the estimated 1,000 TWh of new electricity needed by 2035 to meet growing demand. The wind industry directly and indirectly supports more than 300,000 U.S. jobs, including 20,000 wind manufacturing jobs at over 450 facilities. In 2023 alone, the U.S. wind industry invested at least $10 billion in new projects, and it delivers nearly $2 billion in state and local tax and land lease payments each year.[3]

Wind energy is critical to energy security and independence, reducing air emissions, and improving power grid reliability and energy resource diversity.[4] Wind is an affordable energy source, diversifies states' energy mix, and is not "intermittent" (as the Presidential Memorandum avers) but rather more dependable in many respects than other sources.[5] The environmental and economic benefits associated with wind energy development have been recognized by Congress and state and local governments, which have taken measures to incentivize the growth of wind energy. For over two decades, across numerous Administrations, Congress has declared it the policy of the United States to support wind energy research, development, and deployment, and

---

[3] Wells Decl., ¶ 6.
[4] *See* U.S. Department of Energy, How Wind Can Help Us Breathe Easier, https://www.energy.gov/eere/wind/articles/how-wind-can-help-us-breathe-easier.
[5] Goggin Decl., ¶¶ 9-14, 28-39; McNutt Decl., Exhibit B, Understanding the Impact of the Presidential Memorandum on the Wind Industry at 13.

has enacted multiple tax incentives to advance wind energy.[6] Thirty states and the District of Columbia have active renewable or clean energy requirements, and "[a] recent analysis of state programs revealed 19 states that had a total of 26 programs specific to attracting renewable energy companies."[7]

## I.    WIND ENERGY IS WELL UNDERSTOOD AND SUBJECT TO EXTENSIVE SAFEGUARDS.

Wind energy has been thoroughly studied for many years and is one of the most sustainable ways to generate energy. The federal permitting process for wind energy projects is designed to minimize the impacts of those projects.

_Offshore Wind._ Before leasing and authorizing construction of wind energy projects on the Outer Continental Shelf, the Bureau of Ocean Energy Management ("BOEM"), a component of the Department of the Interior, works with other federal agencies, states, tribes, and the public to ensure that each project undergoes thorough environmental review.

To date, BOEM has approved eleven commercial-scale offshore wind projects. Each project undergoes multiple levels of environmental review. During initial planning and analysis, BOEM publishes a Notice of Intent to prepare an Environmental Assessment ("EA") of the potential impacts of site assessment and site characterization activities in a geographic area (e.g. the New York Bight) proposed for offshore wind leasing. BOEM then publishes a draft EA of its

---

[6] _See_ Energy Tax Act of 1978, Pub. L. No. 95-618 (1978); Energy Policy Act of 2005, Pub. L. No. 109-58 (2005); the Energy Independence and Security Act, Pub. L. No. 110- 140 (2007); the Energy Improvement and Extension Act, enacted as part of the Emergency Economic Stabilization Act, Pub. L. No. 110-343 (2008); the American Recovery and Reinvestment Act, Pub. L. No. 111-5 (2009); the Energy Act of 2020, enacted as part of the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260 (2021); the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (2021); and the Inflation Reduction Act, Pub. L. No.. 117-169 (2022).
[7] NCSL, State Renewable Portfolio Standards and Goals, https://www.ncsl.org/energy/state-renewable-portfolio-standards-and-goals; _see also_ Richard K. Greene, States Use Incentives to Attract Renewable Energy Business, https://www.areadevelopment.com/taxesincentives/nov09/renewable-business11.shtml

findings for agency, stakeholder, and public comment and, after consideration of all comments, it publishes a Final EA. This process typically takes approximately two years, after which BOEM holds competitive lease auctions.

Once leases have been issued, each lessee conducts BOEM-approved site assessment and characterization of its lease area and potential export cable routing options. Each lessee then may propose a Construction and Operations Plan ("COP") for development of an offshore wind project and submit it to BOEM for a completeness review to ensure there is sufficient data and analysis to meet all statutory and regulatory requirements. Each COP is updated several times before being declared complete. This stage takes approximately three to five years.

For each proposed COP that BOEM deems sufficient and complete, BOEM prepares an Environmental Impact Statement ("EIS"), which entails a project-specific assessment of the potential biological, socioeconomic, physical, and cultural impacts that could result from the construction and subsequent operation of the wind project. During this process BOEM consults with federal agencies including the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("USFWS") under Section 7 of the Endangered Species Act ("ESA") and the Magnuson-Stevens Fishery Conservation and Management Act; the Environmental Protection Agency ("EPA") under the Clean Air Act and the Clean Water Act; and the U.S. Army Corps of Engineers ("Corps") under the Clean Water Act and the Rivers and Harbors Act. BOEM also conducts a consultation process under Section 106 of the National Historic Preservation Act ("NHPA"), and consults with other federal agencies, tribes, states, and localities. Based on all that input, BOEM prepares a draft EIS that analyzes potential effects of the proposed project on air quality, bats and birds, benthic resources, coastal habitat and fauna, fish and essential fish habitat, marine mammals, sea turtles, scenic and visual resources, water

quality, wetlands, cultural resources, socioeconomics, and other topics. That draft EIS is published and subjected to public meetings and comments. BOEM then issues a final EIS, in consultation with cooperating agencies, and incorporates or addresses these comments, including by providing mitigation conditions.  The EIS process takes approximately one to two years.[8]

After these in-depth reviews, BOEM and other agencies have repeatedly determined that wind energy projects may be conducted safely and consistent with other OCS uses. Indeed, the government has successfully defended the sufficiency of its review and accuracy of its conclusions in every court case to date deciding claims against offshore wind projects. *See, e.g., Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1 (1st Cir. 2024), *cert. denied* No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025); *Nantucket Residents Against Turbines v. BOEM.*, 100 F.4th 1, 8 (1st Cir. 2024), *cert. denied* No. 24-337, 2025 WL 76449 (U.S. Jan. 13, 2025).

<u>Onshore Federal Lands</u>. To date, the Bureau of Land Management ("BLM") has issued 38 Right of Way ("ROW") grants for wind energy projects on federally-managed lands. These projects have likewise undergone extensive environmental review.[9] BLM prepared a programmatic environmental impact statement ("PEIS") of the impacts associated with wind energy development on the roughly 20 million acres of public lands in 11 western states with wind energy potential.[10] This review analyzed "the positive and negative environmental, social,

---

[8] *See also* Declaration of Maria Hartnett, Epsilon Associates, Exhibit B, "Adequacy of the Federal Offshore Wind Permitting and Environmental Review Processes" (May 8, 2025) (further detailing BOEM's wind energy processes and steps to avoid, minimize, and mitigate impacts).
[9] In addition to BLM review, ROW grantees may be required to obtain additional authorization, such as an incidental take statement issued by the U.S. Fish and Wildlife Service, a CWA Section 404 permit issued by the Corps, and additional permits required by states and tribal governments.
[10] BOEM, *Wind Energy Final Programmatic Environmental Impact Statement* (2005), https://windeis.anl.gov/documents/fpeis/index.cfm.

and economic impacts; discussion of relevant mitigation measures to address these impacts; and identification of appropriate, programmatic policies and best management practices to be included" in the 52 land use plans amended in the course of BLM's review.[11] BLM has consistently concluded that it is appropriate to allow wind development on federal lands because adverse effects are few and can be effectively mitigated, and "[t]he potential impacts of wind energy development on local and regional economies would be largely beneficial."[12]

Before approving any specific project, BLM conducts a project-specific EA or EIS that assesses potential environmental effects, including effects to air quality, bat populations and roosting habitat, avian populations, eagles, greater sage-grouse, climate and greenhouse gas emissions, endangered and threatened species, wetlands, cultural resources, and other topics. The review also considers socioeconomic factors such as employment, local and regional economies, residential property values, fire and fuels management, livestock, and recreation.[13] BLM has repeatedly and successfully defended its review of wind energy projects on BLM lands, establishing that its review properly addresses environmental effects. *See, e.g., Protect our Communities Found. v. Salazar*, No. 12CV2211-GPC PCL, 2013 WL 5947137, at *18 (S.D. Cal. Nov. 6, 2013), *aff'd sub nom. Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017); *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571 (9th Cir. 2016).[14]

---

[11] BOEM, *Wind Energy Final Programmatic Environmental Impact Statement, Executive Summary* (2005), https://windeis.anl.gov/documents/fpeis/maintext/Vol1/Vol1ExecSum.pdf.
[12] *Id.*
[13] Tule Wind Project, BLM Record of Decision (2011) (DOI Control Number: FES 11-06), https://www.tulewindeccmp.com/Record%20of%20Decision.pdf (finding measures to address environmental effects will address any impacts and the project will advance the public interest).
[14] *See also* Declaration of Benjamin Brazell, EDR, Exhibit B, "Adequacy of Environmental Assessments for Onshore Wind Energy Projects" (further detailing permitting processes and impact avoidance, minimization, and mitigation measures for land-based wind energy projects on public and private lands).

*Private Lands.* Of land-based wind projects, 99% occur on non-federal lands. The federal government itself has recognized that "[w]ind energy projects provide many economic benefits" to states and local communities.[15] These benefits include "direct and indirect employment, land lease payments, local tax revenue, and lower electricity rates–plus other financial incentives…. Wind energy projects create jobs and provide a revenue source for farmers and ranchers—which can be spent in the neighboring community."[16]

Regulation of wind projects on private property primarily implicates issues of land use and economic development that are within the historic police power of states and localities. These states and localities have their own environmental and public safety laws, so that projects on non-federal lands typically undergo extensive environmental and public interest review. The presence of wetlands, endangered species, or eagles may implicate the limited jurisdiction of the Corps or USFWS. In such circumstances, these federal agencies conduct NEPA review before taking action, but the relevant environmental impacts analyzed are typically limited to the specific activity requiring a federal permit (i.e., impacts to wetlands and protected wildlife). It is the role of state and local permitting authorities, not the federal government, to determine whether a particular wind energy project makes sense for their communities.

## II.    DEFENDANTS' UNLAWFUL ACTIONS TO END ALL WIND PERMITTING.

Despite the wind energy industry's unparalleled history of safety and success, a Presidential Memorandum issued on Inauguration Day instructed all agencies to abruptly cease all wind energy permitting nationwide. 90 Fed. Reg. at 8,363. The *sole* grounds for this unprecedented order are "*alleged*" (and unspecified) "legal deficiencies underlying the Federal

---

[15] WINDExchange, Economics and Incentives for Wind, U.S. Department of Energy, https://windexchange.energy.gov/projects/economics.
[16] *Id.*

Government's leasing and permitting of … wind projects," along with "*potential*" (and likewise unspecified) "inadequacies in various environmental reviews." *Id.* (emphasis added). The Memorandum asserts that the Wind Ban is necessary during a new, open-ended "comprehensive assessment and review of Federal wind leasing and permitting practices." *Id.* It fails to mention, and in no way accounts for, the robust, years-long reviews already required for wind projects and courts' uniform rejection to date of alleged legal deficiencies. The Memorandum sets no timeframe for this assessment; in fact, there are no reported updates on its status in the several months following its issuance. Indeed, in light of campaign promises to "end" the offshore wind industry and ensure that "no [wind turbines] are being built,"[17] it appears that the Wind Ban only serves as an unlawful, extra-statutory, indefinite prohibition on wind energy development.

Federal agencies promptly set about implementing the Wind Ban, as evidenced by the cessation of all wind energy leasing, permitting, and approval processes across agencies, as well as actions to stop fully approved projects. Indeed, agencies have publicly announced that they are implementing the Wind Ban, but without citing any legal basis for their actions. For example, BOEM, the lead federal agency for offshore wind projects, on its website expressly states that "[t]he Department of the Interior and BOEM are implementing President Trump's memorandum temporarily halting offshore wind leasing on the Outer Continental Shelf. The memorandum also pauses new or renewed approvals, rights-of-way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices."[18]

---

[17] *See, e.g.,* Sara Dorn, *Trump Calls Windmills 'An Economic And Environmental Disaster' In Latest Rant Against Turbines*, FORBES (Jan. 15, 2025); Lisa Friedman & Brad Plumer, *Trump Promises To End New Wind Farms*, New York Times (Jan. 7, 2025); *Trump vows to target offshore wind from "day one,"* Boston Herald (May 12, 2024).
[18] BOEM, Lease and Grant Information, https://www.boem.gov/renewable-energy/lease-and-grant-information.

Likewise based on the Presidential Memorandum, BOEM has declared that it will not be holding public NEPA meetings related to wind energy development[19] and that it is choosing to miss or extend permitting milestones on the permitting dashboards for offshore wind projects.[20]

      The Corps publicly acknowledged its stoppage of all new Clean Water Act jurisdictional determinations, environmental assessments, public notices, and other permitting activities only for wind projects. A press article issued on February 12, 2025, quoted an email from a Corps spokesman stating that "[t]he pause was lifted for renewable projects, and the pause remains in place for wind and wind-related projects in accordance with the attached Executive Order." The article states that the latter reference is to the January 20 Presidential Memorandum.[21]

      On January 23, 2025, USFWS posted the following notice on its website: "The U.S. Fish and Wildlife Service, pursuant to Presidential Memorandum 'Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects' is temporarily ceasing issuance of eagle permits to wind facilities until further notice. In the interim, ePermits will no longer automatically issue general permits."[22] USFWS's spreadsheet tracking eagle incidental take permits issued for wind projects lists 111 permits issued in 2024 and six issued in 2025, so

---

[19] BOEM, POSTPONED: Public Meetings on Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California (Jan. 28, 2025), https://www.boem.gov/newsroom/notes-stakeholders/postponed-public-meetings-draft-environmental-review-potential (cancelling public meetings for California Wind PEIS); BOEM, "Vineyard Mid-Atlantic" https://www.boem.gov/renewable-energy/state-activities/vineyard-mid-atlantic (cancelling public meetings for Vineyard Mid-Atlantic project).
[20] *Id.*
[21] Bobby Magill, *New Wind Farms Singled Out in Army Corps Water Permitting Pause*, Bloomberg Law (Feb. 12, 2025), https://news.bloomberglaw.com/environment-and-energy/new-wind-farms-singled-out-in-army-corps-water-permitting-pause.
[22] USFWS, "Eagle Incidental Take: General Permit," https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

that the agency had been issuing such permits at a pace of approximately nine per month. On information and belief, no such permits have been issued since January 20, 2025. Moreover, on information and belief, USFWS has stopped issuing technical assistance letters for all wind projects.

NOAA and NMFS's February 2024 "Monthly Status Report" for an offshore project's Incidental Take Assessment under the MMPA provides that MMPA related milestones are being extended by three months on account of the "executive order entitled 'Temporary Withdrawal Of All Areas On The Outer Continental Shelf From Offshore Wind Leasing And Review Of The Federal Government's Leasing And Permitting Practices For Wind Projects.'"[23] The notice provides that "these dates may need to be revisited, depending on timing of the comprehensive assessment and review required by the January 20 Executive Order," and stated that "the Department of Commerce 'shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices.'"[24]

EPA likewise has cited to the Presidential Memorandum in the context of EPA's offshore air permitting decisions under the Clean Air Act, noting its intent to "reconsider [an offshore wind project] permit decision in light of the Presidential Memorandum" and without any reference to air quality concerns within EPA's jurisdiction.[25]

---

[23] Permitting Dashboard, MMPA Incidental Take Authorization, https://www.permits.performance.gov/proj/southcoast-wind-energy-llc-southcoast-wind/marine-mammal-protection-act-mmpa-incidental-take (milestone nonconformance explanation) (citing Ex. A).
[24] *Id.*
[25] *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01, Order Granting Motion for Voluntary Remand (Mar. 14, 2025), https://yosemite.epa.gov/OA/EAB_WEB_Docket.nsf/Filings%20By%20Appeal%20Number/9C7B7CF33923032185258C4D0058F4A7?OpenDocument.

In implementing the Wind Ban, agencies have provided no explanation, beyond pointing to the Presidential Memorandum, for refusing to move forward on wind permit applications contrary to agencies' legal obligations. The agencies also have provided no opportunity for the public to comment on actions that amount to dramatic regulatory and policy reversals.

## ARGUMENT

A preliminary injunction is necessary to stop the ongoing harm caused by the Wind Ban, including to ACE NY and its members. To issue a preliminary injunction, the Court considers (1) Plaintiff's likelihood of success on the merits, (2) Plaintiff's likely irreparable harm absent preliminary relief, (3) lack of harm to other parties from an injunction; and (4) the public interest favoring an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020). All four elements are readily met here. Consequently, this Court should enjoin agencies' implementation of the Wind Ban while this litigation proceeds.

## I.    ACE NY IS LIKELY TO SUCCEED ON THE MERITS.

Likelihood of success on the merits is "the most important of the four preliminary injunction factors." *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). To issue a preliminary injunction, the court need not "conclusively determine the merits of the underlying claims," *Ross-Simons of Warwick v. Baccarat, Inc*., 102 F.3d 12, 16 (1st Cir. 1996). "[A] court's conclusions as to the merits of the issues presented on a preliminary injunction are to be understood as statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). ACE NY is likely to succeed on the merits of its claims.

### A.    ACE NY Has Standing.

ACE NY has associational standing because at least one of its members can establish standing and the other requirements of associational standing are met. *Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616 (D.C. Cir. 2022); *Boston Parent Coalition for Academic Excellence Corp. v. School Committee for the City of Boston*, 89 F.4th 46 (1st Cir. 2023). That is, ACE NY is a leading national trade association representing developers of offshore and onshore wind projects requiring federal approvals that the Wind Ban now categorically and indefinitely prohibits, as well as other members of the wind energy industry injured in fact by this prohibition. The inability to obtain permits and approvals jeopardizes ACE NY's members' projects and businesses, including as discussed in Section II below and the Declarations of Marguerite Wells (ACE NY), Elizabeth Burdock (Oceantic Network), Charles Donadio (Atlantic Wind Transfers), and Kara McNutt (Wood Mackenzie). These injuries would not exist but for the delays caused by the Wind Ban. Enjoining the Wind Ban would result in agencies' resumption of permitting for wind energy in the normal course, without needing to await completion of a vacuous, redundant, and likely pretextual new "comprehensive assessment and review" of wind projects' environmental and economic effects. ACE NY's members also are directly regulated by the statutes that the Wind Ban violates, sufficing for prudential standing. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

**B.    Each Agency's Blanket Implementation of the Wind Ban Is a Final Agency Action Reviewable Under the APA.**

Each individual agency decision to cease issuing new or renewed approvals, ROWs, permits, leases, or loans for onshore or offshore wind development constitutes a discrete final agency action that is subject to judicial review pursuant to 5 U.S.C. § 706(2). Agencies' adoption of the Wind Ban (1) marks the consummation of the agency's decision-making processes and (2) determines rights or obligations or create legal consequences. *Harper v. Werfel*, 118 F.4th

13

100, 116 (1st Cir. 2024). The courts apply these finality factors against the backdrop of

Congress's "evident intent [in enacting the APA] to make agency action presumptively

reviewable." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987).

The Wind Ban has far-reaching legal consequences, including a "direct and immediate …

effect on the day-to-day business" of ACE NY's members. *FTC v. Standard Oil Co.*, 449 U.S.

232, 239 (1980). An agency's decision to categorically suspend statutory programs or activities

is reviewable under the APA. *Louisiana v. Biden*, 622 F. Supp.3d 267, 292 (W.D. La. 2022). As

explained *supra*, agencies have taken tangible action to implement the Wind Ban. Such action is

judicially reviewable regardless of whether it is formally announced or taken *sub silentio*.

"Precedent … is clear that the APA allows challenges to unwritten agency policies and

practices." *State v. Trump*, No. 25-CV-01144 (JAV), 2025 WL 573771 at *19 (S.D.N.Y. Feb. 21,

2025); *Louisiana*, 622 F. Supp. 3d at 292.

Moreover, the Wind Ban's self-labeling as a "Temporary Cessation" has no bearing on its

justiciability. "[T]he fact that the challenged actions are ostensibly temporary is immaterial—for

… *all* agency actions are subject to future change." *Pacito v. Trump*, No. 25-255, 2025 WL

655075, at *16 (W.D. Wash. Feb. 28, 2025). Interim agency action "counts as consummation of

agency decisionmaking for finality purposes" where it "firmly establishes [the agency's] current

position." *NRDC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020). In response to a challenge to a

similar Executive Order that directed the Interior Department to "pause" new oil and gas leases

on public lands or in offshore waters, a court explained that "a 'final agency action' does not

have to be defined as permanent to be considered final." *Louisiana,* 622 F. Supp. 3d at 292

(citing numerous cases supporting this holding).

14

Finally, the Wind Ban does not escape judicial review simply because it stems from the Presidential Memorandum. Nothing in the APA or caselaw prevents or exempts review of an agency action simply because it implements a presidential directive. *Pacito*, 2025 WL 655075, at *15; *Louisiana*, 622 F. Supp. 3d at 294-295. Exempting agency action from APA oversight just because it purports to carry out presidential policy "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025).

### C.    The Wind Ban Is Arbitrary and Capricious.

ACE NY will demonstrate that the Wind Ban is unlawful and should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review under the APA is based on the administrative record of the federal government. *Id.* § 706 ("the court shall review the whole record or those parts of it cited by a party"). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). Agency actions are arbitrary and capricious also where there is "[u]nexplained inconsistency" by the agency, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), or failure to provide a "reasoned explanation" for a change in policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

15

The government must offer a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Court's "inquiry … is to be searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Court must determine if the agency's action was "consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record." *Associated Fisheries of Me. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). This review "is not a rubber stamp; in order to avoid being deemed arbitrary and capricious, an agency decision must be rational." *Citizen Awareness Network, Inc. v. Nuclear Regulatory Commission*, 59 F.3d 284, 290 (1st Cir. 1995).

The Wind Ban fails the arbitrary and capricious test multiple times over. The agencies themselves have offered no explanation for their decisions to halt all wind-related permitting, much less the "satisfactory" explanation required by law. *Ohio*, 603 U.S. at 292. Nor is there any evidence that the agencies deliberated before abandoning their permitting processes for all new wind projects. *Cf. New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *12 (D.R.I. Mar. 6, 2025) ("abrupt" implementation of "blanket pause" on federal funding without explanation is arbitrary and capricious).

Nor does the Presidential Memorandum supply a rationale supporting the Wind Ban. Its one-paragraph Section 2(a) directs the Wind Ban due to "various *alleged* legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects" and "*potential* inadequacies in various environmental reviews" that "*may* lead to . . . negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals." 90 Fed. Reg at 8,363 (emphasis added). To address these illusory concerns, it directs a "comprehensive assessment and review of Federal

wind leasing and permitting practices" that considers "the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals" and "the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry." *Id.* The Administration and federal agencies have provided no other public explanation for the Wind Ban, and any *post hoc* justifications they may now advance should be given little weight. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

To the extent that these statements can be considered justifications, they are arbitrary and capricious. First, the Wind Ban arbitrarily creates "[u]nexplained inconsistenc[ies]" with prior policies. *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016). The Wind Ban conflicts with longstanding agency policy that agencies should encourage renewable energy development on public lands and prioritize the processing of applications for energy development. *See, e.g.*, *Rights-of-Way, Leasing, and Operations for Renewable Energy,* 89 FR 35634 (May 1, 2024) (noting that the rule's purpose was to "promote the greatest use of wind and solar energy resources"); 33 C.F.R. § 320.4 (directing the Corps "to give high priority to the processing of permit actions involving energy projects"). Moreover, the suggestion that agencies' wind-related NEPA analyses might be legally deficient represents a drastic and wholly unexplained departure from the position the government has taken, and courts have endorsed, in litigation. Defendant agencies have thoroughly analyzed wind energy and zealously defended their wind permitting programs, and the individual permitting decisions arising therefrom, successfully arguing that environmental review processes satisfy all statutory obligations. *See supra* Section I; ACE NY Complaint ¶¶ 38-57. Permitting for all large-scale energy projects face lawsuits—including the

very energy sources that the Administration is pushing to develop while prohibiting wind energy—so the existence of such litigation is unremarkable and does not justify the agencies' actions. The lack of any acknowledgement—let alone a reasoned explanation—for the government's sudden and unexplained reversal on these issues renders the reversal arbitrary and unlawful. *Fox*, 556 U.S. at 515-16.

Second, the vague suppositions underpinning the Wind Ban, including that wind energy might be harmful to the environment and wildlife, are unsupported by any administrative record and have no basis in fact. *See McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions."). The Wind Ban ignores the vast body of research demonstrating that wind energy is a safe and environmentally sound technology with extensive benefits to the public.[26] Moreover, as detailed *supra*, the federal agencies responsible for authorizing and permitting wind energy on public and private lands have themselves concluded time and again after thorough analysis that wind energy development is on balance beneficial and that any effects on impacts on wildlife or the environment are modest and can be mitigated. The federal government has failed to identify *any* evidence that indicates that the American wind industry poses an acute

---

[26] Dep't of Energy, *Fact Sheet: Wind Energy Benefits,* https://www.nrel.gov/docs/fy15osti/62823.pdf (Jan. 2015) ("Researchers estimate that wind energy in the United States in 2013 reduced direct power-sector carbon dioxide emissions by 115 million metric tons, equivalent to eliminating the emissions of 20 million cars during the year."); Ryan Wiser et al., LAND-BASED WIND MARKET REPORT, *Lawrence Berkeley National Laboratory* (2024), https://emp.lbl.gov/sites/default/files/2024-08/Land-Based%20Wind%20Market%20Report_2024%20Edition.pdf (finding that, in 2023, wind energy's combined climate, health, and grid benefits averaged $183/MWh); *see also* Dev Millstein et al., *Climate and air quality benefits of wind and solar generation in the United States from 2019 to 2022,* 1 CELL REPORTS SUSTAINABILITY 5-6 (2024) (finding that, from 2019-2022, wind and solar energy provided $249 billion in environmental benefits and helped to prevent between 1,200 and 1,600 premature deaths in the United States).

and impending threat to any resource, much less warranting an across-the-board emergency

stoppage of all federal permitting activities for wind energy. To the extent that a particular wind

installation could have environmental effects, those effects are identified and analyzed by the

existing (and comprehensive) federal environmental review process for wind projects, which

operates to avoid, minimize, and mitigate such effects.[27]

Tellingly, the Wind Ban inexplicably excludes *all* other energy sources from the

supposed comprehensive review, even though these other sources have, at a minimum, equal

potential to cause environmental harm and are generally subject to the same environmental

statutes. Indeed, on the same day that the Administration singled out the wind industry for

adverse treatment with the Wind Ban, the Administration declared a national energy emergency

and directed the Corps, the Department of the Interior, and other agencies to streamline

environmental reviews for energy development and rescind agency actions that might burden a

wide range of other energy sources. Executive Order 14154, "Unleashing American Energy," 90

Fed. Reg. 8353 (Jan. 29, 2025); Executive Order 14156, "Declaring a National Energy

Emergency," 90 Fed. Reg. 8433 (Jan. 29, 2025). Citing these directives, the Department of the

Interior recently announced that it was establishing a process to complete reviews under NEPA

for energy-related projects (again excluding wind) in only 28 days and also curtail consultation

under the ESA and NHPA.[28] NOAA has likewise rescinded certain whale-related requirements

---

[27] Hartnett Decl. ¶¶ 11-27 and Exhibit B, "Adequacy of the Federal Offshore Wind Permitting and Environmental Review Processes" (May 8, 2025); Brazell Decl. ¶¶ 13-20 and Exhibit B, "Adequacy of Environmental Assessments for Onshore Wind Energy Projects.

[28] https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

for the oil and gas industry.[29] The Administration has encouraged exclusions from detailed NEPA review and other streamlining measures for federal coal development,[30] and adopted a broad deregulatory initiative to benefit the energy industry.[31] The incongruity of the Wind Ban with these other actions cannot be reconciled, especially considering that NOAA has concluded that there is no link between wind energy development and mass whale deaths.[32] The inexplicable disparate treatment of similarly situated energy technologies is arbitrary, and strongly suggests that the true impetus for the Wind Ban has little to do with genuine concerns for marine mammals or other environmental concerns. Indeed, on information and belief, the Administration has abandoned regional research and monitoring approaches to protect whales. An agency "decision must give a reasoned analysis to justify the disparate treatment of regulated parties that seem similarly situated … and its reasoning cannot be internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

The Wind Ban's call for a "comprehensive assessment" of wind energy's impacts on consumer costs and grid reliability before issuing any new wind energy permit is likewise arbitrary and unsupported by any statutory or regulatory provision. Wind has already been and continues to be extensively studied through regular permitting and NEPA processes. An

---

[29] BOEM, "BOEM Rescinds Expanded Rice's Whale Protection Efforts" (Feb 20, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-expanded-rices-whale-protection-efforts (rescinding measures designed to prevent oil and gas vessels from striking critically endangered Rice's Whales).

[30] *Reinvigorating America's Beautiful Clean Coal Industry And Amending Executive Order 14241*, Executive Order 14261, 90 Fed. Reg. 15,517 (April 8, 2025).

[31] *Zero-Based Regulatory Budgeting to Unleash American Energy,* Executive Order 14270, 90 Fed. Reg. 15,643 (April 9, 2025).

[32] NOAA, "Frequent Questions—Offshore Wind and Whales" (last updated April 24, 2025), https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales; NOAA, "Rice's Whale: In the Spotlight," (Nov. 16, 2024), https://www.fisheries.noaa.gov/species/rices-whale/spotlight.

abundance of evidence demonstrates that wind energy is crucial for grid security and reliability, often creates net savings for ratepayers and consumers, and plays a key role in meeting the nation's present and future energy needs. Goggin Decl. ¶¶ 9-17. Contrary to the Presidential Memorandum's reference to "intermittent generation of electricity," wind energy is not an intermittent source of energy, and indeed in some cases can contribute more to grid reliability than other energy sources. Goggin Decl. ¶¶ 9, 28-34. The Wind Ban thus contravenes the Administration's own stated commitment to addressing what it has characterized as a nationwide "Energy Emergency" due to an "inadequate energy supply." *See* Executive Order 14156. The Wind Ban also is precisely the type of "agency actions that impose an undue burden on the identification, development, or use of domestic energy resources" that the Administration directs agencies to "suspend, revise, or rescind." *See* Executive Order 14154 Secs. 3(a), 3(b).

"When an agency changes course … it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 30 (2020) (quoting *Navarro*, 579 U.S. at 222). Defendants failed to consider the reliance interests of hundreds of American companies involved in wind energy development, the Americans who are employed by these companies, and the state and local communities that depend on the energy it supplies, as well as on its environmental and economic benefits. Companies make long-term investment decisions under the expectation that they will have the opportunity to seek and secure necessary federal permits. *See* Wells Decl. ¶¶ 10-19. Because it gravely damages those reasonable expectations, by administrative fiat and without valid justification, the Wind Ban is arbitrary and capricious. *See AIDS Vaccine Coalition v. US Department of State*, No. 25-00400 (AHA) 2025 WL 485324 at *5 (D.D.C. Feb. 13, 2025) (explaining that the Administration had no "rational

reason for disregarding the massive reliance interests of the countless small and large businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process"); *Nat'l Council of Nonprofits v. Office of Management and Budget*, No. 25-239 (LLA), 2025 WL 597959 at *15 (D.D.C. Feb. 25, 2025); *see also Smiley v. Citibank*, 517 U.S. 735, 742 (1996).

The Wind Ban is similarly arbitrary and capricious because it fails to consider its costs and benefits in the given circumstances. *See Mexican Gulf Fishing Co. v. United States Dep't of Commerce*, 60 F.4d 956, 973 (5th Cir. 2023). The costs of the Wind Ban include not only severe disruption of the wind industry and its employees, but also broader effects on the nation's energy supply in the context of what the Administration itself labels a national energy emergency. In adopting the Wind Ban, Defendant Agencies failed to consider these costs, which greatly outweigh any benefits of the ban. No agency administrative record shows otherwise. In an analogous challenge to Interior's stoppage of offshore oil and gas operations in response to the Deepwater Horizon incident, the Court held that the plaintiffs would likely show that Interior's action was arbitrary and capricious, explaining that it did not "take into measure the safety records of those others in the Gulf," and was not supported by "evidence indicating that the Secretary balanced the concern for environmental safety" with development interests. *Hornbeck Offshore Wind Services v. Salazar,* 696 F. Supp. 2d 627, 638 (E.D. La. 2010).

In summary, the Wind Ban is not the product of fact-finding or reasoned decision-making. Instead, the agencies immediately and summarily implemented the Presidential Memorandum with no published rationale and without further consideration or evaluation as required by law. The Presidential Memorandum itself does not supply a reasoned, legally sound

explanation for these agencies' actions, and fails to articulate a rational connection between the facts found and the choices made. The Wind Ban is therefore arbitrary and capricious.

### D.    The Wind Ban Violates APA Notice-and-Comment Requirements.

ACE NY is likely to succeed on its claim that the Wind Ban is a substantive rule adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA provides that, before changing policy through a substantive rule, an agency must follow specific procedures, including (1) publishing notice of the proposed rule in the Federal Register, (2) providing a period for interested individuals to comment on the proposed rule, and (3) publishing the adopted rule not less than thirty days before its effective date. 5 U.S.C. § 553. An agency is only exempt from these procedures when it issues interpretive rules, general statements of policy, or rules of agency organization, procedure, and practice, *id.* § 553(b)(4)(A), or it finds good cause for forgoing these procedures and publishes an explanation of "good cause" with the rule, *id.* §§ 553(b)(4)(B), (d)(3).

Here, no agency conducted public notice and comment for the Wind Ban, nor waited 30 days before implementing it. No agency invoked the APA's "good cause" exception, much less satisfied its narrow conditions that notice and comment would be "impracticable, unnecessary, or contrary to the public interest." *Id.* §§ 553(b)(4)(B).

Nor does the Wind Ban qualify as an interpretive rule or general statement of policy; it is a "legislative rule" that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citation omitted). "[A] so-called policy statement that in purpose or likely effect narrowly limits administrative discretion … must be taken for what it is—a binding rule of substantive law." *Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 358 (D.C. Cir. 2017) (cleaned up). The substantive Wind Ban leaves agency staff with no discretion and significantly

changes how the law is applied. *See Louisiana v. Biden*, No. 2:24-CV-0046, 2024 WL 3253103 at *15 (W.D. La. July 1, 2024) (holding that the Department of Energy violated the APA by implementing a liquified natural gas "Export Ban" without notice and comment); *Louisiana v. Biden*, 622 F. Supp. 3d at 295-96. That the Presidential Memorandum "effectively nullif[ies] pre-existing regulations that were themselves codified through notice-and-comment rulemaking only bolsters this conclusion." *Pacito*, 2025 WL 655075 at *19.

      E.      **The Wind Ban Is Contrary to Law.**

      Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). In other words, they "literally have no power to act except to the extent Congress has authorized." *Nat'l Council of Nonprofits*, 2025 WL 597959 at *15. Because no statute grants any agency authority to abdicate its permitting responsibilities, the Wind Ban constitutes an agency action "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), 706(2)(C).[33] The APA further requires that "when application is made for a license required by law, the agency ... within a reasonable time, shall set and complete ... proceedings required by law and shall make its decision." 5 U.S.C. § 558. A license is defined to include an "agency permit, certificate, approval, registration, ... or other form of permission," i.e., the types of actions that the Wind Ban forecloses. 5 U.S.C. § 551(8).

      The Wind Ban's prohibition on permits and authorizations directly conflicts with the language of governing statues and regulations, and with the APA's requirement that agencies make prompt decisions on permits and authorizations. A "new administration may not ... ignore

---

[33] Sections 706(2)(A) and (2)(C) contain a "linguistic distinction without a practical difference." *Victim Rights Law Center v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass 2021).

statutory standards in carrying out its regulatory functions." *State Farm*, 463 U.S. at 59 n.*

(Rehnquist, J., concurring in part and dissenting in part).

    1. *The Outer Continental Shelf Lands Act (OCSLA)*. OCSLA codifies federal jurisdiction

over the submerged lands seaward of state coastal waters, and governs the exploration,

development, and management of natural resources on the outer continental shelf ("OCS"). 43

U.S.C. §§ 1331 *et. seq.* OCSLA states that the OCS should be made available for "expeditious

and orderly development." 43 U.S.C. § 1332(3); *see also Seafreeze Shoreside, Inc*, 123 F.4th at

26. BOEM chiefly exercises the Interior Secretary's authority over offshore wind.

    OCSLA authorizes the Secretary to issue leases, including for offshore wind

development, 43 U.S.C. § 1337(o), but nothing in OCSLA confers authority upon BOEM to

pause issuing authorizations for wind energy on the OCS. Given Congress's plenary power over

federal lands and the OCS, the lack of express statutory authorization to issue anything like the

Wind Ban means that no such authority should be inferred. *See, e.g.*, *United States v. Patton*, 771

F.2d 1240, 1243 (9th Cir. 1985) ("Strict adherence to the wording of the statute is of particular

importance in construing a statute regulating public lands, over which Congress has unlimited

authority."). In *Louisiana v Biden,* the court held that an executive order pausing oil and gas

lease sales on the OCS was impermissible, as there is "no statutory authority that authorizes the

Executive Branch to pause the OCSLA [oil and gas leasing program]." 622 F. Supp. 3d at 289.

The court in *Ensco Offshore Co. v. Salazar* similarly found that permitting delays are

inconsistent with OCSLA. 781 F. Supp. 2d 332, 339 (E.D. La. 2011).

    Consistently, BOEM's binding regulations require that, once an OCS lease has been

issued, BOEM diligently act on subsequent authorizations for development of wind projects to

proceed. The regulations mandate that BOEM review submissions that relate to development of a

lease, conduct a review process, and make a decision to approve a request, disapprove it, or approve it with conditions. *See* 30 C.F.R. §§ 585.613 (site assessment plan), 585.628 (construction and operations plan), 585.648 (general activities plan for non-commercial leases and grants). It is blackletter law that agencies are bound by their regulations, *see, e.g., Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014), yet BOEM has not even attempted to square its actions with these provisions.

Finally, Congress has prescribed a statutory procedure by which the President can withdraw areas of the OCS from leasing, thus preventing development there. 43 U.S.C. § 1341(a). However, that mechanism is applicable by its terms only to "unleased" portions of the OCS. *Id.* To the extent that the Wind Ban prevents development on existing leases, it amounts to an unlawful withdrawal of leased lands on the OCS. *See Patton,* 771 F.2d at 1243*; see also* 43 U.S.C. § 1341(c), (d) (authorizing lease suspensions only on grounds of "war or national emergency" or "national defense").

2. *The Federal Land and Policy Management Act (FLPMA)*. FLPMA governs management of public lands administered by BLM. 43 U.S.C. §§ 1701 *et seq.* FLPMA requires BLM to manage lands in accordance with its own land use plans. 43 U.S.C. § 1732(a). Land use decisions, including exclusions of uses such as ROWs, remain subject to reconsideration only through revision of the land use plan involved. 43 U.S.C. § 1712(e). "Unless and until the plan is amended, [inconsistent actions] can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004). FLPMA provides a formal process for revision of land use plans that includes public involvement. 43 U.S.C. § 1712.

In adopting the Wind Ban, the Department of the Interior and BLM failed to follow these mandatory processes. The Wind Ban is inconsistent with dozens of governing BLM land use

26

plans across the United States. In 2005 BLM issued a Record of Decision ("ROD") adopting a comprehensive Wind Energy Development Program to develop wind energy resources on BLM lands. *BLM, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, BLM Record of Decisions* (December 2005). The ROD amended 52 BLM land use plans to provide for development of wind energy, and identified certain areas in which wind energy development would be excluded. *Id.* When an agency action significantly changes "the scope of resource uses" or the "terms, conditions and decisions" of the land use plan, BLM must first amend the land use plans and utilize the same planning process. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006). BLM's cessation of issuance of permits for wind projects significantly changed this program and land use plans without following the amendment process, violating FLPMA.

In addition to amending land use plans, BLM has adopted regulations providing that, in processing a solar or wind ROW application, BLM will "prioritize the application in accordance with 43 C.F.R § 2804.35," and "will evaluate" the application based on the information provided by the applicant and input from other parties and the public. 43 C.F.R. § 2804.25. Ending issuance of all wind energy ROWs is inconsistent with these regulatory provisions as well.

The Wind Ban also violates FLPMA because it unlawfully operates to withdraw land from wind energy development. 43 U.S.C. §§ 1714, 1702(j) (definition of withdrawal). Withdrawal "temporarily suspends the operation of some or all of the public lands laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands." *S. Utah Wilderness All. v. BLM,* 425 F.3d 735, 784 (10th Cir. 2005). Congress enacted FLPMA in part to "delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. § 1701(a)(4). Although FLPMA authorizes certain

withdrawals, such authority is expressly limited. 43 U.S.C. § 1714(a) ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section."). And withdrawal is subject to requirements that range from Federal Register publication and public hearing, *id.* § 1714(b), (h), to Congressional notification in some circumstances, *id.* § 1714(c), (e). The executive's failure to act on mineral lease applications due to a "suspension and delay of mineral leasing pending an environmental review" has been found invalid as an unauthorized withdrawal. *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987). The Wind Ban similarly removes BLM lands from wind energy development pending a "comprehensive assessment and review," effectuating an unlawful withdrawal under FLPMA.

Finally, the Wind Ban operates to suspend existing ROW grants by barring BLM from providing authorizations needed to develop the ROWs. FLPMA provides only two permissible grounds for suspension of a ROW: abandonment and FLPMA noncompliance. 43 U.S.C. § 1766. The statute also requires that holder of the ROW must be afforded "due notice" and appropriate administrative proceeding prior to suspension. *Id.* The Wind Ban does not meet the substantive preconditions for suspension, and BLM has not followed the procedure required by law.

*3. Clean Water Act ("CWA") Section 404.* Section 404 of the CWA regulates the discharge of dredge or fill materials into waters of the United States. 33 U.S.C. § 1344. The Corps is responsible for issuing Section 404 permits for such activities.

The Corps has reviewable discretion whether to grant a permit, but not to wholly disregard such requests. The CWA provides the Secretary "shall" enter into agreements with other agencies in order to "minimize … delays in the issuance of permits" and to "assure that, to the maximum extent practicable" a decision will be reached on a permit application "not later

than the ninetieth day after the date the notice for such application is published." 33 U.S.C.

§ 1344(q). The Corps' regulations applying to individual permits provide that the Corps "shall"

notify the applicant of an incomplete application within 15 calendar days; that public notice

"will" be issued within 15 calendar days of receipt of complete application; and that "[d]istrict

engineers will decide on all applications not later than 60 [calendar] days after receipt of a

complete application" (with six listed exceptions). 33 C.F.R. § 325.2. In systematically refusing

to issue decisions on permits related to wind development, the Corps has acted contrary to these

mandatory provisions.

  4. *Endangered Species Act (ESA) and Bald and Golden Eagle Protection Act (BGEPA)*.

The Wind Ban conflicts with the requirements of the ESA and BGEPA. The ESA establishes

protections for fish, wildlife, and plants that are listed as endangered or threatened. 16 U.S.C.

§§ 1531 *et. seq*. Section 10 of the ESA authorizes USFWS or NMFS to issue permits for the

incidental "take" of threatened and endangered species. 16 U.S.C. § 1539. Those agencies

"shall" issue an incidental take permit if it determines that specified requirements are met. 16

U.S.C. § 1539(a)(2)(B). This use of "shall" contrasts with the use of "may" in 16 U.S.C.

§ 1539(a)(1), a related provision, and demonstrates that Congress intended the former to be

mandatory. *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016).

  USFWS's ESA implementing regulations similarly use mandatory language, stating in

one provision that "upon receipt of a properly executed application for a permit, the Director

shall issue the appropriate permit" unless specified concerns are present. 50 C.F.R. § 13.21.

Other regulations provide that "[t]he Service will process the application when the Director

determines the application is complete," that "the Director will decide whether a permit should

be issued," and that the Director "will" issue the permit if he makes certain findings. 50 C.F.R.

§ 17.22(b). NMFS's comparable regulations provide that NMFS will attempt to approve applications "in the shortest possible time," 50 C.F.R. § 222.302(b), and that the agency "shall" issue a permit unless certain enumerated findings are made. 50 C.F.R. § 222.303(e). The agencies have no authority to adopt a contrary policy. Yet, the Wind Ban proscribes any permits indefinitely.

Per its BGEPA regulations, USFWS "will automatically" issue a general permit for identified activities meeting eligibility requirements if certain criteria are met. 50 C.F.R. § 22.210(d). Wind energy is specifically listed as a permissible permit category. 50 C.F.R. § 22.250. The Wind Ban illegally upends this binding framework.

5. *Marine Mammal Protection Act.* The MMPA establishes protections for marine mammals and includes a general prohibition on the taking and importing of marine mammals, subject to a number of exemptions. 16 U.S.C. § 1371. The MMPA provides that the NMFS or USFWS "*shall* allow … the incidental, but not intentional, taking … of marine mammals" if it finds, *inter alia*, that the effect of the take will be "negligible." 16 U.S.C. § 1371(a)(5)(A)(i) (emphasis added). Notably, in contrast to the mandatory "shall" in this provision, elsewhere the MMPA provides only that NMFS or USFWS "may" issue a permit, 16 U.S.C. § 1371(a)(1)(2), demonstrating that the use of "shall" is mandatory. *Kingdomware,* 579 U.S. at 172. NMFS and USFWS implementing regulations each provide that the agency "shall evaluate" each permit request. 50 C.F.R. § 216.104(c) (NMFS); 50 C.F.R. § 18.27(d)(3) (USFWS). The Wind Ban displays no awareness of the existing MMPA framework and instead summarily replaces it.

6. *Clean Air Act.* The CAA defines the EPA's responsibilities for protecting and improving the nation's air quality, including controlling air pollution from OCS sources. 42 U.S.C. § 7627. Accordingly, OCS wind developers must typically obtain a "Prevention of

Significant Deterioration" ("PSD") permit from EPA prior to commencing construction offshore. The CAA provides that applications for PSD permits "shall be granted or denied not later than one year after the date of filing of such completed application." 42 U.S.C. § 7475(c). EPA's PSD regulations provide that EPA "shall" review submitted applications for completeness within 30 days of receipt. 40 C.F.R. § 124.3. All draft permits "shall" be publicly noticed and made available for public comment, *id.*, and EPA "shall" issue a final permit decision after the close of public comment. *Id.* § 124.15.[34] The Wind Ban precludes EPA from meeting these obligations as applicable to wind projects.

    7. *Clean Water Act Section 402*. Pursuant to the CWA, the EPA Administrator may issue a National Pollutant Discharge Elimination System ("NPDES") permit for the discharge of any pollutant or combination of pollutants if the requested discharge meets the requirements provided in the statute. 33 U.S.C. § 1342. NPDES permits can be required for some types of wind energy facilities that will have such discharge. The Administrator is required to review NPDES permit applications for completeness within 30 days of receipt, 40 C.F.R. § 124.3(c), and provide the applicant with a timeline for preparing a draft permit, conducting public comment, and issuing a final permit. *Id.* § 124.3(g). The Wind Ban prevents compliance with these provisions.

    These statutory and regulatory provisions, among others, demonstrate that agencies are required to carry out their permitting responsibilities and to do so in a timely manner, and have no authority to adopt a uniform policy of taking no action on pending applications, or to adopt a

---

[34] Some OCS permits are issued instead under the CAA's New Source Review provisions. Applicable EPA regulations provide that, unless the Administrator determines an application is incomplete within 60 days of receipt, the application will be deemed complete. 40 C.F.R. § 71.5(a)(2). EPA "shall" take final action on each permit application (including a request for permit modification or renewal) within 18 months after receiving a complete application. 40 C.F.R. § 71.7; *see also* 42 U.S.C. § 7661b(c) (18-month deadline).

general policy of differentiating between applicants and giving highly adverse treatment to one category of applicants. Indeed, Congress has directed the opposite, providing in the FAST-41 legislation that agencies must adopt and follow a timetable in issuing permits for covered infrastructure projects, including many wind energy projects, to ensure that those projects proceed expeditiously. 42 U.S.C. § 4370m-2; *see also* ACE NY Complaint ¶¶ 149-156.[35] Moreover, no constitutional or statutory provision authorizes the executive branch to issue a unilateral ban on wind energy, and Congress has specifically denied that authority by adopting statutes prescribing permitting obligations. The U.S. Constitution does not authorize the executive branch to "enact, amend, or repeal statutes." *Clinton v. City of New York,* 524 U.S. 417, 438 (1998). Defendant agencies have contravened the law by open-endedly terminating their respective permitting programs for wind projects alone. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

### F.    The Wind Ban Violates OCSLA.

OCSLA provides a remedy to compel compliance with its provisions. 43 U.S.C. § 1349(a)(1). As set forth *supra*, the Wind Ban violates OCSLA and its implementing regulations, and these violations immediately affect ACE NY's legal interests. *Id.* § 1349(a)(3). It follows that ACE NY is likely to succeed on the merits of this claim as well as its APA claims.

## II.    ACE NY'S MEMBERS ARE SUFFERING IRREPARABLE HARM.

ACE NY's members face irreparable harm from the Wind Ban. For a preliminary injunction, "the irreparability of the injury is of paramount concern." *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F. Supp. 2d 907, 914 (1st Cir. 1989); *Restaurant Law Ctr. v. United States Dep't*

---

[35] Congress also specifically restricted extensions of the permitting timetable when such extensions occur for reasons within the control of the federal government (as is the case here), further demonstrating that the Wind Ban is at odds with Congress's intent in enacting FAST-41. *See* 42 U.S.C. § 4370m–2 (c)(2)(D)(iii) (limiting the time period of extensions unless those extensions occur for reasons outside the control of the government agencies involved, and providing for a report to Congress following certain such extensions).

*of Labor,* 66 F.4th 593, 597 (5th Cir. 2023) (the "key inquiry is 'not so much the magnitude but the irreparability'"). Costs incurred by a plaintiff to adhere to a government policy "later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs," because for example the United States is typically immune to monetary damages. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment). Unrecoverable lost business income, up to and including business closure, can also be irreparable harm. *Alabama Ass'n of Realtors v. Dep't of Health and Human Services*, 594 U.S. 758, 765 (2021).

Until the Wind Ban is lifted, ACE NY's members will suffer irreparable harm in the form of delay costs and lost revenue totaling in the billions of dollars, existential business risks, and other unrecoverable expenditures. The Wind Ban has brought ongoing development of wind energy to a halt, both on federal public lands and on private land.

The domestic wind industry has been severely affected by the delay in permitting associated with the Wind Ban and the uncertainty as to if and when construction of wind projects can resume. Facilities to produce wind turbines and equipment have closed and employees have lost their jobs. Investment in development of new wind installations has come to a halt. Wells Decl. ¶¶ 11-16, 21-22. A report by Wood Mackenzie concludes that if the Wind Ban continues into the second half of 2026, the result will be 33,000 lost jobs in the industry and $43 billion in lost investment, which rises to 96,000 jobs and $96 billion in lost investment if the Wind Ban continues through 2029. Declaration of Kara McNutt, Wood McKenzie, Exhibit B, Understanding the Impact of the Presidential Memorandum on the US Wind Industry at 8 (May 2025).

Existing projects that require federal permits and authorizations have postponed or suspended construction timelines. Because wind facilities are capital-intensive and installation of wind turbines requires specialized equipment that is typically owned by third parties, delays in construction have direct costs to developers under existing development and construction contracts. In light of the uncertainty as to when federal permitting will resume, developers cannot set new construction timelines or enter into new construction contracts. Wind development is generally financed by third parties, and delays in installation have direct costs to developers, investors, or lenders that have contractual financing arrangements in place, but now cannot reliably forecast when wind projects will be completed and begin to generate revenue.

The irreparable harms to the industry are described in detail in multiple declarations supporting this motion. As to offshore wind projects, ACE NY members have invested $4.37 billion in leases just in BOEM's 2022 auction of leases in the New York Bight, and continue to make lease payments even though BOEM is not taking any action to advance their wind energy projects. Wells Decl. ¶¶ 21-22. One ACE NY member has had its wind energy project, which had received all required federally permits, delayed by the Wind Ban and has had to reduce personnel, terminate contracts, and cancel planned investments in the project, leading to continuing financial harm. *Id*. ¶¶ 29-33. Another ACE NY member has experienced hundreds of millions of dollars in losses and estimates that the Wind Ban could cause a billion dollars in economic losses to its businesses. *Id.* ¶ 44. Three ACE NY members have invested tens of millions of dollars in pending land-based wind projects and are incurring daily losses. *Id.* ¶ 50.

The manufacturing supply chain and construction sector serving the wind industry are likewise seriously affected by the Wind Ban. ACE NY's members in those sectors are experiencing significant financial losses. *Id.* ¶¶ 52, 54. For example, Atlantic Wind Transfers, a

business that operates vessels that transfer crews and materials to wind energy facilities during construction or while they are in operation, is now experiencing "projected revenue losses of millions of dollars." Donadio Decl. ¶ 7.  These losses are "immediate" and they "cannot be recovered." *Id.* ¶ 9.

Two manufacturers of offshore wind components, Technostrobe and Roman Stone, have been forced to terminate staff and have experienced severe revenue losses. Burdock Decl. ¶¶ 33, 45. Companies collecting and analyzing geophysical, environmental, and acoustic data for offshore wind projects have lost millions of dollars and conducted extensive layoffs of staff.  *Id*. ¶¶ 34, 35, 36, 38. Vessel operators and vessel designers specializing in offshore wind projects have experienced substantial losses and project hundreds of millions of dollars in lost revenue. *Id*. ¶¶ 37, 39, 42. Other harms to the sector include losses to an offshore engineering business, *id*. ¶ 44, severe harms to a labor union whose members work on construction and installation of offshore wind facilities, *id.* ¶ 49, and severe harms to other related businesses, *id.* ¶¶ 27, 32, 40, 43, 46.

The Wind Ban creates substantial risks of project cancellation—indeed, that appears to be its very intent—resulting in a total inability to realize the benefits of project investments, as well as environmental benefits. And wind energy service companies, including those that manufacture turbine components and other components in the United States, face potential total loss of their businesses due to cancelled orders and demand for specialized materials, equipment, and labor. Wells Decl. ¶¶ 15, 20, 47, 49; Burdock Decl. ¶¶ 25, 33, 45. The Wind Ban has had similar effects on port investments, transmission grid upgrades, and similar essential infrastructure projects. Wells Decl. ¶ 28; Burdock Decl. ¶¶ 23-24.

ACE NY's members will generally not be able to recover the majority of these economic losses under existing law. Multiple statutes underlying ACE NY's claims include no waiver of sovereign immunity for revenues lost due to permitting delays, no matter how unreasonable those delays may be. 33 U.S.C. §§ 1341-1346; 33 U.S.C. §§ 401-408; 16 U.S.C. § 1539; 16 U.S.C. §§ 668-668d; 16 U.S.C. § 1374; 42 U.S.C. §§ 7661-7661f. OCSLA provides a limited remedy that is only available if a lease is expressly cancelled or suspended, which has not occurred here, rather than rendered indefinitely useless while lease periods continue to run. 30 C.F.R. § 550.184 (2024); *cf. Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021), *remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022) (oil and gas leasing pause created economic losses in the form of "loss of proceeds" that would be "would be difficult, if not impossible to recover, due to sovereign immunity"). FLPMA likewise contains no provision for recovery of lost profits or revenues when the federal government declines to issue authorizations needed to develop a ROW. 43 U.S.C. §§ 1701 *et seq.* Given this reality, ACE NY members seeking to develop wind projects likely will be unable to recover economic losses incurred and thus will suffer irreparable harm due to the Wind Ban.

In short, the Wind Ban has effectuated unprecedented uncertainty for the wind energy industry, and in so doing has threatened billions of dollars in investment in wind energy projects across the nation, as well as harmed many businesses severely and destroyed thousands of jobs. For these reasons, ACE NY's members will continue to suffer significant irreparable harm if the Court does not enjoin the Defendant agencies' implementation of the Wind Ban pending a decision on the merits of ACE NY's claims.

**III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.**

The final factors, balance of equities and the public interest, also weigh in favor of preliminarily enjoining the Wind Ban. Given that the government is the opposing party, these factors merge. *Nken v Holder*, 556 U.S. 418, 435 (2009); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020) (explaining that "the government's interest *is* the public interest") (emphasis in original).

The government and the public are not harmed by the issuance of an injunction that prevents agencies from enforcing unlawful actions. *See Doe v. Trump*, No. 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (there is "no public interest in the perpetuation of unlawful agency action"). Moreover, the government is not harmed by "a continuation of the status quo during the pendency of … litigation [which] only shortly prolong[s] the longstanding practice and policy of the United States government." *See New Hampshire Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025). Here, an injunction "supports the public interest in having agencies abide by federal law." *Mass. v. NIH*, No. 25-CV-10338, 2025 WL 702163 (D. Mass. March 5, 2025).

There is also a strong public interest in ensuring that the public can rely on the rule of law and a predictable permitting process. This interest extends beyond the wind industry to other industries and the public at large. Regulated parties cannot compete in the marketplace and make investment decisions if there is complete uncertainty as to whether they will be able to secure permits necessary for project development. *Invenergy Renewables, Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Intl. Trade 2019) (describing the harms caused by "eliminating the business certainty required by the solar industry to plan and develop future projects."). The government's unlawful actions here have frozen projects in place, undercut the predictability of federal

permitting processes, and threaten to deter future investment in wind and in other capital-intensive technologies.

The public has a strong interest in a reliable, affordable, lower emission energy supply. The Wind Ban has impeded the deployment of affordable, emission-free wind power amidst an energy emergency caused by surging load growth and the mass retirement of legacy generation sources. The North American Electric Reliability Corporation ("NERC") has estimated that over 79 gigawatts ("GW") of generation capacity will retire within the next decade, whereas load growth from AI data centers and semiconductor chip manufacturing facilities could increase demand by as much as 128 GW of capacity by 2029.[36] Future electricity supply constraints not only threaten to dramatically increase electricity prices for ratepayers—as the Trump administration has acknowledged through the declaration of an energy emergency—but "leaves us vulnerable to hostile foreign actors and poses an imminent and growing threat to the United States' national security." Executive Order 14156. Wind energy will be urgently needed to meet this surge in demand for electricity.[37] Despite this reality, the Wind Ban threatens to stunt the deployment of wind energy at the precise moment when it is most urgently required.

Finally, the Wind Ban impairs the public's ability to realize the benefits of wind energy. "Congress has articulated the public policy that our nation should incorporate clean energy as a part of America's future and it is essential … [for] decreasing greenhouse emissions." *See W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011), *aff'd*, 443 F. App'x 278 (9th Cir. 2011) (citing the Energy Policy Act of 2005). Because wind energy

---

[36] NERC, *2024 Long-Term Reliability Assessment* (2024); John D. Wilson, Zach Zimmerman, and Rob Gramlich, *Strategic Industries Surging: Driving US Power Demand*, Grid Strategies (2024).
[37] McNutt Decl., Exhibit B, Understanding the Impact of the Presidential Memorandum on the Wind Industry at 11-13.

will play an essential role in decarbonizing the electric grid, ensuring cleaner air for healthier citizens, and mitigating the impact of climate change, the Wind Ban seriously impedes the public's interest in achieving those goals.

Given that the Wind Ban is not in the government's or public's interest, while immediately harming ACE NY's members, the balance of equities tips in ACE NY's favor. All parties and the public will be served if the Court enjoins implementation of the Wind Ban and orders agencies to resume their vital work of diligently carrying out their statutory, regulatory, and contractual obligations under their respective permitting programs.

## CONCLUSION

For the foregoing reasons, ACE NY respectfully requests that this Court grant a preliminary injunction of the Wind Ban while this case proceeds on the merits.

Dated: May 12, 2025

Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.

*/s/ Brook J. Detterman*
Brook J. Detterman, BBO No. 675396
James M. Auslander, *pro hac vice*
155 Federal Street
Suite 1600
Boston, MA 02110-1716
(617) 419-2345
bdetterman@bdlaw.com
jauslander@bdlaw.com

*Attorneys for Proposed Plaintiff-Intervenor Alliance for Clean Energy New York*