# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.,*

     Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*

     Defendants.

Case No. 1:25-CV-11221

**LEAVE TO FILE GRANTED ON:
May 21, 2025**

**BRIEF OF AMICUS CURIAE SAVE LONG BEACH ISLAND, INC. IN SUPPORT OF
DEFENDANTS' OPPOSITION TO THE MOTIONS FOR A PRELIMINARY
INJUNCTION**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………………

RULE 7.1 CORPORATE DISCLOSURE STATEMENT ..................................................................

INTRODUCTION AND INTERESTS OF AMICUS CURIAE .................................................... 1

ARGUMENT ..................................................................................................... 3

I. States' Spuriously Assert that Final Agency Action Occurred, and as such, their Putative
Reliance Interests are not Legally Cognizable................................................................. 3

   A.   There has been no Final Agency Action ............................................................ 3

   B.   States' Putative Reliance Interests are not Legally Cognizable ........................................... 5

II. The President Maintains Supervisory Authority to Direct Agency Permit Reviews ................. 6

   A.   Article II Take Care Clause Confers the Wind Directive's Authority and no
Environmental Statutes have been Contravened.......................................................... 6

III. Offshore Wind is Ineffective in Climate Change Mitigatory Efforts and Unsafe for Marine
Mammal Ecosystems ....................................................................................... 7

   A. Offshore Winds' Efficacy in Greenhouse Gas Reduction is Dubious.................................... 7

   B.   Environmental Harms of Offshore Wind are Substantial, Particularly on Marine Mammal
Ecosystems.............................................................................................. 12

CONCLUSION.............................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

Am. Corn Growers Ass'n v. Env't Prot. Agency, 291 F.3d 1, 12 (D.C. Cir. 2002) ...................... 7

Bennett v. Spear, 520 U.S. 154, 178 (1997)............................................................ 3

Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 113 (1948) ............ 3

Dalton v. Specter, 511 U.S. 462 (1994) .............................................................. 3

Franklin v. Massachusetts, 505 U.S. 788 (1992) ..................................................... 3

FTC v. Standard Oil Co. of California, 449 U.S. 232 (1980) ......................................... 4

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74 (1989) ............................. 7

Murray Energy Corp. v. Env't Prot. Agency, 936 F.3d 597, 626 (6th Cir. 2019) ...................... 7

Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974) ............................. 4

Soundboard Ass'n v. FTC, 888 F.3d 126, 1272 (D.C. Cir. 2018)....................................... 5

**Statutes**

33 U.S.C. § 1344(q) ................................................................................ 6

**Regulations**

30 CFR § 585.417 ................................................................................... 5

33 CFR § 325.2(d)(3)(ii) ........................................................................... 6

40 C.F.R. § 124.3(c) ............................................................................... 6

50 C.F.R. § 13.11 .................................................................................. 6

## RULE 7.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for *Amicus Curiae* Save Long Beach Island, Inc., certifies that the Amicus (private, not-for-profit, non-governmental organizations) does not have a corporate parent, subsidiary, or affiliate, and that it does not issue stock to the public.

## INTRODUCTION AND INTERESTS OF AMICUS CURIAE

Save Long Beach Island, Inc.[1] is a 501(c)(3)non-profit corporation, of over 10,000 supporters, organized under the laws of New Jersey, and created to guard human and natural resources. These resources include, for example: marine mammals, fish, and other species that inhabit, use, or migrate off the New Jersey and New York coasts; the aesthetic elements of Long Beach Island and the New York Bight; economic interests strongly tied to the maintenance of the environmental features comprising Long Beach Island and the New York Bight, inter alia. These resources, in particular, the marine mammals off the NJ and NY coasts, are being harmed (and will continue to be harmed), harassed, and killed, in large part by the activities authorized by NMFS and BOEM in the waters of the NJ/NY Bight. These marine mammals, not only are exceptionally important to the oceanic ecosystems, but they also impart carbon dioxide mitigatory effects. Save Long Beach Island, Inc. (hereinafter, "Save LBI") supporters have a legally protected interest in preserving the marine mammals, some of which, like the North Atlantic Right Whale, are critically endangered species.

The purpose of Save LBI's desired amicus curiae intervention is manifold. The primary purpose is to continue to protect the sacrosanct marine ecosystem of the East Coast, especially the NY Bight, the migratory corridor of the North Atlantic Right Whale (already in danger and will be further imperiled if the Wind Directive is reversed), the lives of marine mammals, some of which are designated as depleted (Northern Migratory Coastal Bottlenose Dolphin) and endangered (North Atlantic Right Whale), and the concomitant interests of the Save LBI membership which

---

[1] *Amicus* affirms that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their counsel made any monetary contributions intended to fund the preparation or submission of the brief.  Fed. R. App. P. 29(a)(4)(E).

will be inimically impacted if the Wind Directive were abrogated. In this brief, Save LBI endeavors to edify the Court regarding the scientific reality attendant the safety and efficacy of offshore wind, dispelling erroneous notions that offshore wind will substantially mitigate climate change (it will not) and does not devastate marine mammals (it does).

Finally, Save LBI wishes to further elucidate critical legal errors that State Plaintiffs make in their Complaint and Motion for Preliminary Injunction. At the threshold level, State Plaintiffs cannot demonstrate that final agency action has occurred, and as such, judicial review under the Administrative Procedures Act is inappropriate. In turn, no legally cognizable reliance interests flow from interim implementation steps which do not constitute final determinations on permits or approvals. Moreover, the President maintains ostensible authority under the Take Care Clause in Article II of the Constitution to direct inter-agency reviews of permitting programs, and there have been no clear statutory temporal deadlines contravened via the "Wind Directive."[2] Even if there were final agency actions by Defendant agencies (there have not been), the Wind Directive remains legally sound. Not only is it an entirely valid exercise of Presidential authority, no statutes have been violated, and the agencies are acting rationally in response to new legal, ecological, environmental, and economic concerns, as set forth by the Wind Directive.

Therefore, this Court should deny the Plaintiffs' requests for injunctive relief. The States' Complaint is predicated upon spurious legal arguments and their assertions of environmental safety and efficacy of offshore wind are entirely uncorroborated by multi-disciplinary evidence.

---

[2] https://www.whitehouse.gov/presidential-actions/2025/01/temporary-withdrawal-of-all-areas-on-the-outer-continental-shelf-from-offshore-wind-leasing-and-review-of-the-federal-governments-leasing-and-permitting-practices-for-wind-projects/

## ARGUMENT

I.    **States' Spuriously Assert that Final Agency Action Occurred, and as such,**

**their Putative Reliance Interests are not Legally Cognizable**

### A.  There has been no Final Agency Action

It appears that a primary fundament of most of the States' arguments is that the Federal Agencies have purportedly adopted and implemented the Wind Directive such that final agency action has occurred. However, for an action to be final, it must mark the consummation of an agency's decision-making process, to wit, it cannot merely be tentative or interlocutory. <u>Bennett v. Spear</u>, 520 U.S. 154, 178 (1997) (citing <u>Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.</u>, 333 U.S. 103, 113 (1948).

The facts underpinning the case at bar are much more concordant with <u>Franklin v. Massachusetts</u>,[3] 505 U.S. 788 (1992) and <u>Dalton v. Specter</u>, 511 U.S. 462 (1994) than <u>Bennet</u>. As emphasized by the Supreme Court in <u>Frankin</u>, "[a]n agency action is not final if it is only the ruling of a subordinate official, or **tentative**. The **core question is whether the agency has completed its decisionmaking process**, and whether the result of that process is one that will directly affect the parties [emphasis added]." The issue in Franklin was a Secretary of Commerce report to the President which served "more like a tentative recommendation than a final and binding determination." <u>Franklin</u>, 505 U.S. at 798.

Notwithstanding the fact that tentative or interlocutory steps can mediate substantial financial burden or other costs on individuals/entities, that in and of itself is insufficient for "final

---

[3] The Court held that the President was not an "agency" under the APA and was not subject to review under it for abuse of discretion.

agency action." As expounded upon by the Supreme Court in <u>FTC v. Standard Oil Co. of</u> <u>California</u>, 449 U.S. 232 (1980),  FTC's complaint issued to respondent oil company for violating the Federal Trade Commission Act was not a final agency action under the APA, even if it generated significant litigation expense. "As we recently reiterated: 'Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'" Id. at 244 (quoting <u>Renegotiation Board v. Bannercraft Clothing Co.</u>, 415 U.S. 1, 24 (1974)).

While the States fulminate about reliance interests, all of the States' allegations delineated in paragraphs 142-158 of their Complaint as evidence of putative "final agency action," in fact, exemplify the types of "tentative" or "interlocutory" actions described in the aforesaid cases. The States do not provide evidence of final agency action, rather, the Complaint discusses various implementation steps and temporary pauses, but intriguingly, no final determinations as to specific offshore wind related permits. Indeed, even in the Environmental Appeals Board matter regarding the Clean Air Act permit for Atlantic Shores, of which Save LBI was the Petitioner, final agency action has not occurred. The Environmental Appeals Board granted EPA's voluntary remand, placing the Atlantic Shores' air permit back into a posture of review, but importantly, that permit has not been **<u>finally</u>** denied or granted.

The States' Complaint is bereft of any evidence evincive of final resolutions of permits or applications. Finally, even if final agency actions had occurred (they have not), the Plaintiffs seem to ignore the statutory and regulatory reality that BOEM maintains the authority to both suspend and/or cancel actively leased areas. See 30 CFR 585.417[4] (suspension criteria) and 30 CFR

---

[4] https://www.ecfr.gov/current/title-30/chapter-V/subchapter-B/part-585/subpart-E/subject-group-ECFRc167401b87a84b9/section-585.417

585.422[5] (cancellation criteria). So notwithstanding alleged reliance interests, and even if there were final agency actions, BOEM has the independent authority to abrogate fully federally approved lease areas. Such authority can and should be employed given the environmental review analyses for Northeast offshore wind projects have been replete with substantial analytic deficiencies on innumerable fronts.

### B.  States' Putative Reliance Interests are not Legally Cognizable

The States assert substantial reliance interests in connection with offshore wind. But such putative interests are of no moment in a known, evolving, regulatory context. As the Court in Soundboard Ass'n v. FTC, 888 F.3d 126, 1272 (D.C. Cir. 2018) enunciated, "the fact that an opinion of someone at an agency could potentially impact a regulated entity says nothing about whether that opinion is the culmination of the agency's decisionmaking . . . In addition, we do not believe finality can be measured by what the industry claims it will do or stop doing." In that case, the Court determined there was no final agency action, notwithstanding reliance interests by the Plaintiffs. "In any event, under FTC regulations, the 2009 Letter is not and could not be a basis for legally cognizable reliance interests . . . " Id. at 1273.

Therefore, while States are concerned about a prospective impact of the Wind Directive, as it stands, no final agency action has occurred, and no legally cognizable reliance interests can flow therefrom.

---

[5] https://www.ecfr.gov/current/title-30/chapter-V/subchapter-B/part-585/subpart-E/subject-group-ECFRf40425fc8d1bfaa/section-585.422

## II.    The President Maintains Supervisory Authority to Direct Agency Permit Reviews

### A.  Article II Take Care Clause Confers the Wind Directive's Authority and no Environmental Statutes have been Contravened

The States' contention that the Wind Directive is ultra vires or violative of environmental statutes appears to entirely ignore the President's supervisory authority under Article II of the Constitution, namely the "Take Care" Clause (shall take care that laws be faithfully executed). The President possesses the authority to direct agency officials to undertake reviews and otherwise request pauses of permitting, absent statutory violations.  The statutes cited by the States do not impose strict time deadlines.

For example, the States adduce MMPA implementing regulation 50 C.F.R. § 13.11 "as quickly as possible" phraseology, but fail to contextualize as that same regulation provides, "However, we cannot guarantee final action within the time limit you request . . . Our processing time may be increased by . . . **time required for extensive consultation within the Service, with other Federal agencies**, and/or State or foreign governments [emphasis added]."

OCSLA does not contain a hard deadline, and the Clean Water Act ("CWA") 90-day reference is aspirational, not mandatory (see, "to the maximum extent possible"). 33 U.S.C. § 1344(q). The States cite 40 C.F.R. § 124.3(c) in attempt to support their CWA proposition, but that provision only relates to completeness of applications, not a stipulation to render a final permit decision within a certain time-frame. In the Rivers and Harbors Act, 33 CFR § 325.2(d)(3)(ii) explicitly supports the notion of a permit timeline pause, "District engineers will decide on all applications not later than 60 days after receipt of a complete application . . . unless the case must

be referred to higher authority." Moreover, regarding the Clean Air Act, as Save LBI explicated in its opposition to Atlantic Shores' Motion for Reconsideration in the Environmental Appeals Board Matter, *Murray Energy Corp. v. Env't Prot. Agency*, 936 F.3d 597, 626 (6th Cir. 2019), underscored that the Clean Air Act "does not require that a permit be '*issued'* within one year." And "nothing in the CAA provides for issuance of a PSD permit as a matter of right." *Am. Corn Growers Ass'n v. Env't Prot. Agency*, 291 F.3d 1, 12 (D.C. Cir. 2002). The Environmental Appeals Board was unpersuaded by Atlantic Shores' arguments and ultimately remanded their air permit to EPA. Nor is NEPA violated by the Wind Directive; and indeed, NEPA itself imposes a continuing duty to reassess projects as new environmental information arises. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74 (1989). In the remainder of the States' allegations, they were not (and cannot) adduce any single instance of the Wind Directive violating an environmental statute, a Directive which is entirely supported by the President's supervisory authority under the Article II Take Care Clause.

### III. Offshore Wind is Ineffective in Climate Change Mitigatory Efforts and Unsafe for Marine Mammal Ecosystems

### A. Offshore Winds' Efficacy in Greenhouse Gas Reduction is Dubious

In their Motion for Preliminary Injunction (p. 37-38), Plaintiff States aver, "the Wind Directive's indefinite halt on wind energy projects also will irreparably harm the States' ability to achieve their statutory obligations to reduce greenhouse gas emissions, procure clean energy, and meet specific statutory targets for wind energy." This is predicated upon a spurious premise, namely that meaningful greenhouse gas reductions will eventuate from employment of offshore wind projects. The available empirical and modelling data belie the States' conclusory assertions.

A capacity factor is the ratio between actual energy produced and the hypothetical maximum energy possible. It's a key metric in assessing emission displacement potential. Research demonstrates that a minimum capacity factor of 33% is necessary for wind power to induce any net reduction in $CO_2$ emissions when displacing combined cycle natural gas (CCGT). An Arizona State University study explained, "if wind power is displacing combined cycle natural gas the capacity factor has to be greater than 33% for a net reduction in CO2 emissions."[6] This is partially due to the inefficient ramping and cycling of gas plants required to compensate for wind variability. Combined cycle natural gas (CCGT) is currently the primary source of electricity generation in the United States, both in terms of total generation and dominance among fossil fuel sources.

Empirical data from numerous existing offshore wind projects generally suggests that capacity factors are insufficient to engender any significant greenhouse gas reduction. For example, the average capacity factor for 36 wind farms in/near United Kingdom was stated to be 37%,[7] but notably the study found that capacity factors for offshore wind decrease much more celeritously than onshore wind projects. "Hughes [6] found that the capacity factor of Danish offshore wind farms decreased from 39% to 15% during 10 years of operation, from 2002 to 2012. This indicates that the deterioration in capacity factor tends to be more rapid in offshore wind

---

[6] https://www.degruyterbrill.com/document/doi/10.7569/jsee.2017.629514/html

[7] https://docs.wind-watch.org/Wind%20Energy%20-%202024%20-%20Lorentzen%20-%20Immature%20Offshore%20Wind%20Technology%20UK%20Life%20Cycle%20Capacity%20Factor%20Analysis.pdf

farms."[8] Given a linear rate of decline, that implies that the Danish offshore wind farms' capacity factor was already below the aforesaid 33% between year 2 and year 3 of operation.

Moreover, Stateside, modelling simulations strongly corroborate the notion that observational capacity factors will be quite significantly lower than offshore wind manufacturers' aggressive projections. Based upon a best-case theoretical estimate, the AWS Truewind model estimates a 27% capacity factor for New England (onshore wind) and 35% for New England (offshore wind). "Based on the AWS Truewind model, the theoretical average capacity factor is 27% for onshore New England and 35% for offshore."[9] Given offshore New England contains some of the strongest average annual wind speeds on the East Coast of the USA,[10] the estimate of 35% for offshore New England would indubitably be even lower for locations south of New England in latitude.

As such, it is entirely unreasonable to dogmatically assert that offshore wind along the East Coast of the U.S. will induce meaningful reductions in greenhouse gas emissions; in fact, it is controvertible whether any such reductions will result. Both empirical and modelling data suggest the evidence is borderline that offshore wind will even exceed the break-even point of 33%. At capacity factors below 33%, negative net GHG emission reductions can result (i.e., more emissions than would have otherwise occurred without offshore wind), especially when accounting for the

---

[8] https://docs.wind-watch.org/Wind%20Energy%20-%202024%20-%20Lorentzen%20-%20Immature%20Offshore%20Wind%20Technology%20UK%20Life%20Cycle%20Capacity%20Factor%20Analysis.pdf

[9] https://www.iso-ne.com/committees/comm_wkgrps/othr/sas/mtrls/may212007/levitan_wind_study.pdf?utm_source=chatgpt.com
[10] https://www.energy.gov/eere/wind/articles/united-states-land-based-and-offshore-annual-average-wind-speed-100-meters

inefficiencies introduced by the intermittent nature of wind power and the resultant cycling of backup fossil fuel plants. Indeed, even Vineyard Wind concedes that there will be no climate mitigation impact, "Overall, it is anticipated that there would be no collective impact on global warming as a result of offshore wind projects, including the Proposed Action alone . . ."[11]

Similarly, these projects have virtually no effect on sea level rise. Save LBI, in its November 14, 2024 Report titled Climate Change & Sea level Rise Effects from the Atlantic Shores South Offshore Wind Project, shows - based on data from International Panel on Climate Change (IPCC) Reports - that the Atlantic Shores project will not reduce or stop sea level rise at all; it only delays whatever sea level rise is coming by about 9 days. That is because sea level rise occurs from heat transfer from the land to the oceans and ice caps, which is in turn depends on temperature differences and elapsed time. So modest land temperature reductions with increased time results in the same heat transfer and sea level rise.

This estimate is confirmed by another study titled Estimation of Climate Change Damage Functions for 140 Regions in the GTAP9 Database by Roberto Roson and Martina Sartori Development Economics, Development Prospects Group of June, 2016.[12] The formula shows the same effect from the IPCC data, that when the change in global temperature decreases but the time period increases proportionately, you get the same sea level rise. So, the only effect now of

---

[11] Appendix A - Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact Statement Volume II (Mar. 2021), https://tethys.pnnl.gov/sites/default/files/publications/Vineyard-Wind-1-FEIS-Volume-2.pdf, page 66.

[12] Their formula for sea level rise (SLR) is: SLR= $[(\alpha+\beta\Delta t) (T-2000)]$, where $\Delta t$ is the change in average global temperature with respect to the baseline [1985-2005], and $T$ is the year period. A panel estimation of the equation gives a value for the $\alpha$ coefficient of 0.000954281, and a corresponding value for $\beta$ is 0.003421296.

greenhouse gas reductions is to delay, but not to stop or reduce sea level rise. Their formula, using a value of 3.3 degrees centigrade for the expected change in global land temperature by 2100, shows a delay of 2 days in sea level rise from the Atlantic Shores project, consistent with the Save LBI/IPCC estimate of 9 days.

Finally, there is no basis presented in the final Environmental Impact Statements or elsewhere for these projects to even assume that greenhouse gas emissions on a regional scale will be reduced at all. This is in fact, contradicted by the consultant, Levitan & Associates Inc., engaged by a number of states to do these types of analyses. In its report to the Maryland Public Service Commission of March 17, 2017 titled, "Evaluation and comparison of US wind and Skip Jack proposed offshore wind project applications," regarding the "regional" state –interconnected PJM transmission grid, and the US wind project, Levitan states on page 92 that: "The market response that will displace 372 megawatts of planned onshore wind resources in western and central PJM will cause carbon emissions to increase in western and central PJM due to increased coal generation. Since coal generation is more than twice as carbon intensive as gas fired generation, the decrease in gas fired emissions in MMAC region is outweighed by the increase in coal emissions in western PJM, and overall emissions in PJM would increase due to the US Wind project."

Since the Atlantic Shores offshore wind project is also offsetting gas-fired generation in New Jersey and is part of the same PJM regional network, a similar situation exists for that and other projects. Therefore, it is anticipated that regional greenhouse gas emissions would increase and not decrease, contrary to the unsupported statements in the final EISs.

**B. Environmental Harms of Offshore Wind are Substantial, Particularly on Marine Mammal Ecosystems**

The Wind Directive raises genuine, veridical concerns about the deleterious impact of offshore wind on the environment and marine mammal ecosystems. Save LBI has been vigorously engaged in litigation efforts over the past two years to defend these voiceless creatures which have suffered (and will suffer) profound harm, attributable in substantial part to the environmentally improvident progression toward offshore wind development.

Apostolos Gerasoulis, Ph.D. has produced research findings which offer highly compelling statistical evidence demonstrating that offshore wind activity as the primary cause of the rapid increase in whale mortalities. As one can see depicted in the below Table 1, there was an 11.8-fold statistically significant increase in humpback whale mortality rates in the "Central Region" (see map below) during 2023 which precisely harmonizes with a tripling of offshore wind survey vessel traffic from an annual average of 58,895 vessel miles (2015-2022) to 171,440 vessel miles in 2023. Note that general shipping traffic exhibited only a marginal increase – from 1,800,359 to 1,973,891 vessel miles per year (less than 10%), clearly insufficient to induce the sharp increase in mortalities.

**Table-1: Statistical Significance and Strength of Humpback Whale Mortality Increases Across Regions in Image-3.**

| Region | 2006-2014 Before UME deaths/year | 2015-2024 During UME deaths/year | Change Factor | Statistical Significance / Correlation Strength | OSW Traffic (miles/year) | General Traffic >80m (miles/year) |
|--------|----------------------------------|----------------------------------|---------------|-------------------------------------------------|--------------------------|-----------------------------------|
| Central | 1.78 | 9.69 | 5.45x | Yes / Strong | 58,895 | 1,800,359 |
| Central-2023 | 1.78 | 21.00 | 11.8x | Yes / Very Strong | 171,440 | 1,973,891 |
| South | 1.98 | 4.50 | 2.27x | Yes / Weak | 20,520 | 2,138,830 |
| North | 3.89 | 3.50 | 0.90x | No / No Correlation | 0 | 383,548 |

To further enforce this causal relationship, the "North region" (see map below) serves as a useful control due to the absence of offshore wind survey vessel traffic. There (North Region), note that there was no increase in humpback whale mortalities, notwithstanding the fact that significant general vessel traffic was present – 383,548 vessel miles per year. These **findings directly belie** the assertion that increase whale mortality is ascribed to general vessel strikes. Rather, offshore wind surveying and concomitant activities are the primary etiologic factor in the mortality uptick.

There were 97 humpback whale carcasses recovered along the "Central Region" (NY/NJ) 2016-2024; the likely total is at least 485 due to carcass recovery rates of near 20%. 388 of those circa 485 are likely attributable to offshore wind activities. As another clear pictorial depiction of the far greater offshore wind activity in the "Central Region" see the below image (c/o Apostolos Gerasoulis, Ph.D):



Image-1:  North Central and south regions with offshore wind projects shown

Offshore wind activity and whale mortalities have been strongly correlated as a function time during the 2016-2024 period, as depicted in the below graph (c/o Apostolos Gerasoulis, Ph.D):



**Image-6: Offshore Wind Traffic vs Whale Deaths in the Central Region from 2015-2024(excluding 2021 outlier year)**

These statistical data are strongly corroborated by biological and empirical data globally, evincing robust spatiotemporal correlations between marine mammal strandings and high-intensity noise events. Indeed, there have been innumerable such events globally over the years utilizing noise devices which highly approximate the devices employed in offshore wind activities in the NY/NJ Bight and elsewhere. Here's a small selection. This list includes but is certainly not limited to:

- National Oceanic & Atmospheric Administration. "Navy Sonar Exercises May Have Played Role in Stranding of Melon-headed Whales in Hawaii." Science Daily. Science Daily, 28 April 2006. www.sciencedaily.com/releases/2006/04/060428094046.htm

- The near mass stranding of about 200 whales in Hawaii on the heels of a naval sonar exercise this week is drawing new attention to the growing evidence that sonar activity has been linked to many more deadly stranding, https://www.nbcnews.com/id/wbna5397896.

- What Caused the Largest Known Mass Stranding of Stejneger's Beaked Whales? March 19, 2021, New scientific article is the first comprehensive paper on this elusive, deep diving species, Stejneger's beaked whale. https://www.fisheries.noaa.gov/feature-story/whatcaused-largest-known-mass-stranding-stejnegers-beaked-whales.

- Cárdenas-Henao, H., & Reyes, J. C. (2015). Stranding of sei whales (Balaenoptera borealis) in southern Chile: An evidence of mass mortality due to harmful exposure. Marine pollution bulletin, 91(1), 278-287.

- Lacerda, M. V., Santos, M. C. O., & Souto, A. S. (2021). Strandings of marine mammals associated with seismic surveys in Brazil. Aquatic Mammals, 47(2), 183-191.

- Stone, C. J., &amp; Tasker, M. L. (2012). Potential effects of seismic surveys on cetaceans in UK waters. Journal of the Marine Biological Association of the United Kingdom, 92(8),1825-1836.

  http://www.smru.standrews.ac.uk/files/2015/10/MR1_and_MR2_update_VF1.pdf

Indeed, throughout Save LBI's litigation efforts, Dr. Robert Stern[13] has convincingly demonstrated, *inter alia*, that the sparker noise devices employed in offshore wind activities closely approximate the effects of many of the stranding events cited hereinabove, that the authorized marine mammal takes via offshore wind are significantly underestimated due to use of

---

[13] He holds a Doctorate degree in Applied Mathematics and Aeronautical Engineering from the New York University Courant Institute of Mathematics and Engineering School respectively. He previously managed the Office of Environmental Compliance in the United States Department of Energy that was responsible for the review of all of that Department's environmental impact assessments and statements.

inappropriate, scientifically unsound auditory weighting functions, understated noise source levels at the turbine site, overstated noise transmission loss as the noise propagates, and overstated disturbance noise level criteria, which, when all are combined in the calculation, results in a significant underestimate in the spatial extent of the elevated propagating noise and its impact on marine mammals.

With respect to the Atlantic Shores South Project authorized east of NJ, National Marine Fisheries Service's estimate of "0" Level A takes for the critically endangered North Atlantic Right Whale is far underestimated, and Dr. Stern estimates that with proper scientific assumptions, the number of Level A North Atlantic Right Whale Takes from permitted pile driving construction in December could be as high as 9 to 18, depending on the extent of night pile driving, or two orders of magnitude greater than that shown in the BiOp, clearly exceeding the right whale's biological removal rate and jeopardizing its continuing existence. If it is interested, Save LBI encourages the Court to view the extensive evidence for Save LBI's conclusions in its other litigations (such evidence is too protracted to fully perlustrate herein). However, below are key extracts from Dr. Stern's compelling executive summary on the impact of the proposed offshore wind projects in the NY Bight (in operational phase) on the North Atlantic Right Whale, which demonstrates that the offshore wind projects in the NY Bight will effectively block its migration, thereby threatening its continued survival.

### Executive Summary

- The final EIS does not quantify the underwater noise level from the operation of the turbines to be used. This is information that is essential to know in order to determine the impact of turbine operation from the full project on migrating endangered whales.

- The extent of operational turbine noise above the disturbance level criterion of 120 decibels(dB) from the wind complexes planned off the New Jersey and New York coasts is analyzed and presented in this report.

- Prior measurement studies of the trends in turbine noise source level versus turbine power allow for a reliable prediction of a noise source level between 181 to 192 dB from the turbines and foundations expected.

- Past agency practice and measurements of noise transmission loss, including one study on the New Jersey Continental Shelf, provide reliable noise transmission loss factors of 15 dB for noise spreading loss and 0.35 dB per kilometer for seabed attenuation. l

- With the lower source level of 181 dB and those noise loss parameters, it **requires 12 miles from the perimeter of the wind complex for the noise to dissipate to 120 dB.**

- The results are shown in the map below. The green line represents the North Atlantic right whale's (NARW) historic migration range, which is within 60 miles from shore.

- The red lines represent the distance from the wind complexes where the noise level will exceed the 120 dB level that will according to National Marine Fisheries Service (NMFS) critieria disturb the whale's behavior.

**Figure ES-1 , Extent of Operational Noise Levels Exeeding the Disturbance Criterion**



- There is general scientific consensus that the whale will try to avoid or stand-off from continuous noise above 120 dB.

- Given that, there is no route the whale could take within its historic migration range and avoid the 120 and greater decibel noise levels, thus jeopardizing its migration and continuing existence.

- There are no practical, observational mitigation measures that can be applied in an operational turbine setting.

- To leave the whale a migration corridor, wind energy projects in either the closer to shore New Jersey lease areas or the farther out New York Bight areas must cease. Given the other adverse impacts of the close-in lease areas on shore communities the choice should be obvious to any responsible decision maker.

It is an irrefragable fact that the National Marine Fisheries Service itself concedes the inimical impact of offshore wind activities on marine mammals, otherwise, they would not authorize "incidental take authorizations." In the latest legal action recently filed by Save LBI, Dr. Stern, Save the East Coast, Protect Our Coast – LINY, and Miss Belmar, Plaintiffs show that the National Marine Fisheries Service sanctioned the annual Level B harassment taking of nearly one-third of the Northern Migratory Coastal Bottlenose Dolphin and nearly two-thirds of same over the 5-year project period.

In sum, there exists compelling, multi-disciplinary evidence that offshore wind has been, is, and will deleteriously impacting marine mammals; assertions to the contrary simply are not objectively examining the available evidence.

## CONCLUSION

For the foregoing reasons, Save Long Beach Island, Inc. respectfully urges the Court to deny the requests for a preliminary injunction. Plaintiffs have failed to demonstrate final agency action, any clear violation of statutory authority, or that the Wind Directive is legally infirm. They have failed to demonstrate any substantive purpose and need for these projects in the environmental impact statements or elsewhere. Moreover, the record demonstrates that offshore wind projects raise serious, unresolved environmental concerns which warrant the interagency review initiated by the Executive Branch.

By*: /s/ Thomas Stavola Jr. Esq.*                    Dated: 5/21/2025
Thomas Stavola Jr. Esq.
MA BBO # 716408
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
Email: tstavolajr@stavolalaw.com
Phone: 732-539-7244
*Counsel for Amicus Curiae Save Long Beach Island, Inc.*

## CERTIFICATE OF SERVICE

I, Thomas Stavola Jr. Esq., certify that this document was filed through the CM/ECF system on May 21, 2025, and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
