## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

             Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

             Defendants.

Civil Action No. 1:25-cv-11221-WGY

## DEFENDANTS' CONSOLIDATED RESPONSE MEMORANDUM IN OPPOSITION TO PLAINTIFFS' AND INTERVENOR'S MOTIONS FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

    I.     President Trump Issues the Wind Energy Memorandum ........................ 2

    II.    Plaintiffs and Intervenor Delay in Bringing the Present Action ............ 4

STATUTORY BACKGROUND............................................................................ 5

    I.     Federal Statutes Governing Offshore and Onshore Wind Energy
         Development ........................................................................................... 5

         A.    The Outer Continental Shelf Lands Act...................................... 5

         B.    The Clean Water Act ("CWA") and the Rivers and Harbors Act
            ("RHA")..................................................................................... 5

         C.    The Clean Air Act ("CAA")....................................................... 6

         D.    The Fixing America's Surface Transportation Act ("FAST Act") ............. 7

    II.    Wildlife and Marine Resource Conservation Statutes ........................... 8

    III.   Other Environmental Statutes ................................................................ 9

STANDARD OF REVIEW ................................................................................. 10

    I.     The Preliminary Injunction Standard.................................................... 10

    II.    The Administrative Procedure Act ("APA")......................................... 10

ARGUMENT ......................................................................................................11

    I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ........11

         A.    Article III Standing ................................................................. 12

         B.    State Plaintiffs and the District of Columbia Lack Standing................... 12

            1.    State Plaintiffs Fail to Allege Facts Plausibly Demonstrating
                Injury ........................................................................... 12

            2.    State Plaintiffs' Alleged Injuries Fail on Traceability and
                Redressability Grounds ................................................. 16

3.     Even if State Plaintiffs Had Standing, Their Injuries Are Not Within the Relevant Statute's Zones of Interests ........................ 18

4.     Plaintiffs Do Not Otherwise Have Standing Against Some Defendants ................................................................................. 19

C.     Intervenor Lacks Standing ........................................................................ 20

D.     Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted ....... 24

1.     Plaintiffs Fail to Identify a Final Agency Action .......................... 24

a.     The Wind Memo is Not Subject to the APA .................... 24

b.     Plaintiffs Fail to Identify a Final Agency Action ............. 25

E.     Plaintiffs' APA Claims Are Mispleaded .................................................. 31

F.     Neither the Wind Memo, Nor Agency Compliance with It, Is *Ultra Vires* ........................................................................................................... 33

G.     The OCSLA Citizen Suit Claims (Plaintiffs' Count V - Intervenor's Count VI) Fail to Comply with Notice Requirements and Fail on the Merits ........................................................................................................ 34

II.     Plaintiffs Have Not Shown Irreparable Harm Is Likely to Occur in the Time it Will Take to Litigate this Case on the Merits .................................................... 35

III.     The Balance of the Equities and Public Interest Do Not Support a Preliminary Injunction ............................................................................................ 39

IV.     Any Injunctive Relief Should Be Narrowly Tailored ........................................... 39

V.     Plaintiffs Should Be Ordered to Post Security Pursuant to Rule 65(c) if Successful ............................................................................................................... 40

CONCLUSION ...................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018)......................................................................................................... 37

*Akebia Therapeutics, Inc. v. Azar,*
976 F.3d 86 (1st Cir. 2020) ...................................................................................10, 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982)......................................................................................................... 13

*Allco Renewable Energy Ltd. v. Haaland*,
No. 1:21-cv-11171-IT, 2022 WL 2373914 (D. Mass. June 30, 2022) .................................... 34

*Allen v. Wright*,
468 U.S. 737 (1984)......................................................................................................... 17

*Am. Anti-Vivisection Soc'y v. USDA*,
946 F.3d 615 (D.C. Cir. 2020) ........................................................................................ 32

*Arizona v. Env't Prot. Agency*,
77 F.4th 1126 (D.C. Cir. 2023) ...................................................................................... 16

*Ass'n of Battery Recyclers, Inc. v. EPA*,
716 F.3d 667 (2013)............................................................................................... 18, 23

*AstraZeneca Pharms. LP v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
No. 24-1819, 2025 WL 1338088 (3d Cir. May 8, 2025) .................................................. 16, 30

*Axia NetMedia Corp. v. Mass. Tech. Park Corp.*,
889 F.3d 1 (1st Cir. 2018) .............................................................................................. 40

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020) ............................................................................. 35

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................................................................... 10, 24, 25

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964)......................................................................................................... 34

*Boston's Children First v. City of Boston*,
62 F. Supp. 2d 247 (D. Mass. 1999) ............................................................................... 36

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)......................................................................................................... 33

*Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*,
No. 1:15–cv–00912-LJO-BAM, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ...................... 33

*California v. Texas*,
593 U.S. 659 (2021) ............................................................................................................... 39

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................................................... 13

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ............................................................................................... 24

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ............................................................................................. 31

*Colvin & Son, LLC v. Haaland*,
763 F. Supp. 3d 1176 (D. Nev. 2025) .................................................................................... 32

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332, (2006) ........................................................................................................ 13, 23

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................................... 24

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020) .......................................................................................... 17, 18, 23

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ................................................................................................................... 10

*Doremus v. Board of Ed. of Hawthorne*,
342 U.S. 429 (1952) ............................................................................................................... 23

*DraftKings Inc. v. Hermalyn*,
118 F.4th 416 (1st Cir. 2024) ................................................................................................. 40

*Food & Drug Admin. v. Wages & White Lion Invs. LLC*,
604 U.S. __, 145 S. Ct. 898 (2025) ........................................................................................ 11

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......................................................................................................... 24, 25

*Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R.*,
144 F.3d 7 (1st Cir. 1998) ...................................................................................................... 11

*Garcia v. Cecos Int'l, Inc.*,
761 F2d 76 (1st Cir. 1985) ..................................................................................................... 34

*Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................................................... 37

*Gill v. Whitford*,
585 U.S. 48 (2018) ................................................................................................................. 40

iv

*Golden & Zimmerman, LLC v. Domenech*,
    599 F.3d 426 (4th Cir. 2010) ................................................................ 27

*Griffith v. Fed. Lab. Relations Auth.*,
    842 F.2d 487 (D.C. Cir. 1988) ............................................................. 34

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980) ............................................................................. 25

*Hearst Stations Inc. v. Aereo, Inc.*,
    977 F. Supp. 2d 32 (D. Mass. 2013) ........................................ 35, 36, 39

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) .......................................................................... 32

*Hunter v. Judson*,
    No. CV 15-30189-MGM, 2015 WL 7737332 (D. Mass. Dec. 1, 2015) ................................... 11

*In re Barr Lab'ys, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) ............................................................... 31

*In re California Power Exch. Corp.*,
    245 F.3d 1110 (9th Cir. 2001) ............................................................. 31

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    110 F.4th 295 (1st Cir. 2024) .............................................................. 20

*In re Rare Coin Galleries, Inc.*,
    862 F.2d 896 (1st Cir. 1988) ............................................................... 36

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ............................................................. 27

*Jafarzadeh v. Duke*,
    270 F. Supp. 3d 296 (D.D.C. 2017) ...................................................... 33

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ...................................................... 37, 38

*Karapetyan v. Mayorkas*,
    No. 2:24-CV-05838-SPG-AGR, 2025 WL 665651 n.4 (C.D. Cal. Feb. 5, 2025) ................... 32

*Kessler v. FCC*,
    326 F.2d 673 (D.C. Cir. 1963) ............................................................. 25

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................. 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...................................................................... 18, 23

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021) ................................................................ 39

*Louisiana v. Biden,*
   622 F. Supp. 3d 267 (W.D. La. 2022) ................................................................. 31, 37

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................... 12, 40

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ..................................................................................... 18, 24, 30

*Marquette Cnty. Rd. Comm'n v. EPA,*
   726 Fed. App'x 461 (6th Cir. 2018) .......................................................................... 26

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .................................................................................................. 13

*Morrison v. Olson,*
   487 U.S. 654 (1988) .................................................................................................. 39

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ............................................................................................. 14, 19

*Nat'l Educ. Ass'n v. United States Dep't of Educ.,*
   No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ............................ 39

*Nat'l Parks Conservation Ass'n v. Norton,*
   324 F.3d 1229 (11th Cir. 2003) ................................................................................ 26

*New York v. Trump,*
   No. 1:25-cv-00039, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ................................... 38

*Nieves-Marquez v. Puerto Rico,*
   353 F.3d 108 (1st Cir. 2003) .................................................................................... 36

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................................................. 39

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ............................................................................................. 24, 31

*NRDC v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020) .................................................................................... 30

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) .................................................................................. 33

*Oregon-California Trails Ass'n v. Walsh,*
   467 F. Supp. 3d 1007 (D. Colo. 2020) ........................................................................ 4

*Pacito v. Trump,*
   No. 25-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ................................... 30

*Penn. Mun. Auths. Ass'n v. Horinko,*
   292 F. Supp. 2d 95 (D.D.C. 2003) ............................................................................ 26

*Protect Our Cmtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ......................................................................... 4

*Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007) ......................................................................... 33

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) ......................................................................... 10

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ...................................................................................... 9

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ....................................................................... 21

*Schroer v. Billington*,
    525 F. Supp. 2d 58 (D.D.C. 2007) .............................................................. 33

*Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*,
    123 F.4th 1 (1st Cir. 2024) .............................................................. 18, 19, 23

*Shawnee Trail Conservancy v. Nicholas*,
    343 F. Supp. 2d 687 (S.D. Ill. 2004) .................................................... 26, 29

*Sherley v. Sebelius*,
    689 F.3d 776, 784 (D.C. Cir. 2012) ............................................................ 33

*Sierra Club v. Larson*,
    769 F. Supp. 420 (D. Mass. 1991) .............................................................. 37

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................... 12, 13, 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................................... 21

*Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects.*,
    90 Fed. Reg. 8363 (Jan. 29, 2025) ................................................... 2, 3, 27

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ....................................................................... 36

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .............................................................................. 12, 39

*Victim Rights Law Ctr. v. Cardona*,
    552 F.Supp.3d 104 (D. Mass. 2021) ........................................................... 11

*Voice of the Arab World. v. MDTV Med. News Now*,
    645 F.3d 26 (1st Cir. 2011) .................................................................. 10, 19

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 10, 39

*Woonasquatucket River Watershed Council v. U.S. Dept of Agric.*,
   No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ................................... 37

**Statutes**

33 U.S.C. § 1251(a) .................................................................................... 19

33 U.S.C. § 1311(a) .................................................................................... 6

33 U.S.C. § 1342(a)(1) ................................................................................. 6

33 U.S.C. § 1369(b)(1) ................................................................................. 6

42 U.S.C. § 4332(2)(C) ................................................................................. 9

42 U.S.C. § 4370m(6) ................................................................................... 7

42 U.S.C. § 7475(c) .................................................................................... 7

42 U.S.C. § 7607(b)(1) ................................................................................. 7

42 U.S.C. § 7627 ...................................................................................... 6

42 U.S.C. §§ 4321 ..................................................................................... 9

43 U.S.C. § 1332(3) ................................................................................... 19

43 U.S.C. § 1337(p)(8) ................................................................................. 5

43 U.S.C. § 1341(a) .................................................................................. 3, 19

43 U.S.C. § 1349(a)(1) ................................................................................ 34

43 U.S.C. § 1349(a)(3) ................................................................................ 35

43 U.S.C. § 1761(a)(4) ................................................................................. 9

43 U.S.C. §§ 1331-1356c ............................................................................... 5

44 U.S.C. § 1505(a) .................................................................................... 2

5 U.S.C. § 553(b)(A) .................................................................................. 25

5 U.S.C. § 701(b) ..................................................................................... 10

5 U.S.C. § 702 ..................................................................................... 10, 18

5 U.S.C. § 704 ..................................................................................... 10, 24

5 U.S.C. § 706(1) ................................................................................ 31, 32, 40

5 U.S.C. § 706(2)(A) ................................................................................ 11, 33

5 U.S.C. § 706(2)(D) ................................................................................... 11

Pub. L. No. 114-94, 129 Stat. 1312 (2015) ........................................................... 7

U.S.C. § 1344 ........................................................................................................ 19

U.S.C. §§ 1344 ....................................................................................................... 5

**Rules**

Fed. R. Civ. P. 65(d)(1)(C) .................................................................................... 40

**Regulations**

30 C.F.R. § 585.613(e) ........................................................................................... 35

30 C.F.R. §§ 585.215-.239 ..................................................................................... 28

30 C.F.R. Pt. 585 .................................................................................................... 5

33 C.F.R. § 322.3(a) ............................................................................................... 5

36 C.F.R. § 800.1(c) ............................................................................................... 9

40 C.F.R. § 122.1 ................................................................................................... 6

40 C.F.R. § 124.19(l)(2) ......................................................................................... 29

40 C.F.R. § 55.6 ..................................................................................................... 6

40 C.F.R. §§ 124.3(a) ............................................................................................. 6

40 C.F.R. Part 124 .................................................................................................. 7

40 C.F.R. Part 6 ...................................................................................................... 9

43 C.F.R. Part 46 .................................................................................................... 9

50 C.F.R. § 13.11(c) ............................................................................................... 8

50 C.F.R. part 216 .................................................................................................. 8

74 Fed. Reg. 19638 (Apr. 29, 2009) ...................................................................... 5

86 Fed. Reg. 7619 (Feb. 1, 2021) .......................................................................... 2

88 Fed. Reg. 25251 (Apr. 26, 2023) ...................................................................... 2

**TABLE OF DECLARATIONS**

|  | Supporting Declaration | Reference |
|---|---|---|
| 1. | Declaration of Jessica Stromberg, Acting Associate Director, Office of Renewable Energy Programs, Bureau of Ocean Energy Management, U.S. Department of the Interior | BOEM Decl. |
| 2. | Declaration of Tunis McElwain, Deputy Chief and Acting Chief, Regulatory Program, U.S. Army Corps of Engineers | Corps. Decl. |
| 3. | Declaration of Matthew Giacona, Principal Deputy Director, Bureau of Ocean Energy Management, U.S. Department of the Interior | DOI Decl. |
| 4 | Declaration of Travis Voyles, Assistant Deputy Administrator, U.S. Environmental Protection Agency | EPA Decl. |
| 5. | Declaration of Elizabeth Maclin, Acting Deputy Assistant Director, Ecological Services Program, U.S. Fish and Wildlife Service | FWS-ES Decl. |
| 6. | Declaration of Jerome Ford, Assistant Director, Office of Migratory Bird Management, U.S. Fish and Wildlife Service | FWS-MB Decl. |
| 7. | Declaration of Samuel D. Rauch, III, Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Services, National Oceanic and Atmospheric Administration, U.S. Department of Commerce | NMFS Decl. |

## INTRODUCTION

Plaintiffs' claims assert nothing more than a policy disagreement over preferences for wind versus fossil fuel energy development that is outside the bounds of federal court jurisdiction. All agree that with increasing demands brought on by artificial intelligence and geopolitical uncertainty in the international energy arena, growth in domestic energy production will be at the forefront of ensuring continuing American prosperity and security. But President Trump has stated safety and environmental concerns with the growing wind energy sector. To ensure federally permitted wind energy production may continue in a reliable, affordable, and environmentally responsible manner, President Trump directed federal agencies to temporarily refrain from issuing wind energy permitting authorizations while the Department of the Interior leads a review of federal wind energy permitting and development practices.

Plaintiffs, 17 States and the District of Columbia, and Intervenor Alliance for Clean Energy New York ("Intervenor"), ask this Court to reach inside those agencies and enjoin their compliance with the temporary cessation directive—in effect, *compelling* the agencies to act in contravention of an executive directive. That misguided quest for extraordinary relief should be rejected. Plaintiffs and Intervenor fail to show standing, fail to identify any final agency action on which to base their claims, fail to identify statutory violations on the part of Defendants, disregard the considerable agency discretion and flexibility in the relevant statutory regimes, and otherwise fail to state a claim. In short, Plaintiffs ask the Court to elevate their energy preferences over the President's. As a consequence, Plaintiffs and Intervenor are unlikely to succeed on the merits of their claims—to say nothing of their failure to demonstrate the other necessary elements for preliminary injunctive relief. Their Motions for a Preliminary Injunction must be denied and their claims may be dismissed.

## FACTUAL BACKGROUND

Since George Washington, United States Presidents have used executive directives to guide administration of the Executive Branch. *See* Harold C. Relyea, Cong. Research Serv., 98-611 GOV, Presidential Directives: Background and Overview 1 (2008); *see also* 44 U.S.C. § 1505(a). Recent Executive Orders and executive memoranda have given agencies instructions regarding various environmental concerns. For example, in Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021), President Biden directed the Secretary of the Interior to review siting and permitting processes for renewable energy on public lands and in offshore waters, and directed the Secretary to pause new oil and natural gas leases while agencies conducted a comprehensive review of permitting and leasing practices. *Id.* at 7624-25, §§ 207-08. In Executive Order 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (Apr. 26, 2023), President Biden instructed each agency to carry out certain environmental reviews in a manner that considered extra-statutory environmental justice concerns. *Id.* at 25254, § 3(ix)(A). Similarly, on September 21, 2016, President Obama issued a Presidential Memorandum entitled, *Climate Change and National Security*, which, among other things, directed the creation of an interagency working group to develop a strategic approach to certain climate-related impacts.[1]

## I.      President Trump Issues the Wind Energy Memorandum

On January 20, 2025, President Trump issued a memorandum entitled, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review*

---

[1]  Available   at   https://obamawhitehouse.archives.gov/the-press-office/2016/09/21/presidential-memorandum-climate-change-and-national-security.

*of the Federal Government's Leasing and Permitting Practices for Wind Projects.* 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Wind Memo").

Section 1 of the Wind Memo withdraws from disposition for wind energy leasing all areas within the Outer Continental Shelf as the President is authorized to do under the Outer Continental Shelf Lands Act ("OCSLA"). *Id.*; *see* 43 U.S.C. § 1341(a) ("The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."). Plaintiffs muster no challenge to Section 1.

Section 2(a) of the Wind Memo provides two directives: (1) a *temporary* cessation—or hold—of certain wind energy authorizations ("temporary cessation directive"); and (2) a comprehensive assessment and review of federal wind leasing and permitting practices ("assessment and review directive"). 90 Fed. Reg. at 8363-64. Crucially, the Wind Memo instructs that these directives "shall be implemented consistent with applicable law." *Id.* at 8364. In other words, agencies must implement the Wind Memo consistent with their statutory authority and obligations. The President announced these directives based on concerns over potential legal deficiencies in past practices, the possibility of serious harm to various interests and marine mammals, and potential inadequacies of various environmental reviews.

The temporary cessation directive provides that the heads of relevant agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id*. at 8364. It did not "indefinitely halt" all wind energy development. Nor is it a "Wind Ban," as Intervenor claims. The directive certainly did not ban wind, it did not ban wind projects, and it did not ban wind project permits. Authorized projects continue to generate power and, in fact, Agency Defendants generally continue to review, analyze,

and process wind energy submissions and materials as directed by the Wind Memo and consistent with applicable law. BOEM Decl. ¶ 7; Corps Decl. ¶ 6; EPA Decl. ¶¶ 5, 15, 23; FWS-ES Decl. ¶¶ 7-8, 11; FWS-MB Decl. ¶ 11; NMFS Decl. ¶¶ 4-5.

The assessment and review directive tasks the Secretary of the Interior, in consultation with the heads of other agencies, to develop an assessment and review of the environmental impact of onshore and offshore wind projects. That effort is already underway. DOI Decl. ¶ 5; NMFS Decl. ¶ 8. The Wind Memo then identifies several concerns regarding wind energy development and generation for agency heads to consider, including the impacts on wildlife, "economic costs associated with intermittent generation of electricity[,] and the effect of subsidies on the viability of the wind industry." 90 Fed. Reg. at 8364. Similar concerns have been raised by all sides of the political divide across multiple administrations. *See e.g.* Am. Compl., *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-CV-00141 (D.D.C. May 13, 2024), ECF No. 33; *Oregon-California Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1044 (D. Colo. 2020); *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 576 (9th Cir. 2016). Concerns have likewise been raised about federal permitting and oversight. For example, a recent GAO report on wind permitting practices concluded that the relevant agencies "have not taken all necessary steps to ensure that they have the resources in place to conduct effective oversight and engagement with stakeholders." GAO, Offshore Wind Energy 44 (April 2025), https://www.gao.gov/assets/gao-25-106998.pdf.

## II.    Plaintiffs and Intervenor Delay in Bringing the Present Action

Over three-and-a-half months after President Trump issued the Wind Memo, Plaintiffs—joined by Intervenor[2]—filed the present suit challenging and now seeking to enjoin the President's

---

[2] For the sake of brevity, Defendants will refer to Plaintiffs and Intervenor simply as "Plaintiffs," unless drawing a distinction between the two is necessary.

temporary cessation directive in Section 2(a) and its implementation by the United States, twelve named federal agencies or subcomponents, and the individuals overseeing those agencies.

## STATUTORY BACKGROUND

### I.    Federal Statutes Governing Offshore and Onshore Wind Energy Development

#### A.    The Outer Continental Shelf Lands Act

OCSLA governs the development of energy on the Outer Continental Shelf ("OCS"), *see* 43 U.S.C. §§ 1331-1356c, including wind energy, *see id.* § 1337(p)(1)(C).  The Secretary of the Interior, in consultation with other relevant federal agencies, may grant a lease, easement, or right-of-way on the outer continental shelf for the purpose of renewable energy production. *Id.* § 1337(p)(1)(C). To carry out that authority, the Department of the Interior ("DOI") has issued regulations governing a multi-phase development process for offshore renewable energy projects that is managed by the Bureau of Ocean Energy Management ("BOEM"). *See* 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Pt. 585; *see also* 43 U.S.C. § 1337(p)(8); BOEM Decl. ¶ 2, Ex. A. But neither DOI's regulations nor OCSLA attach any independent mandatory deadlines for completion of BOEM's relevant reviews or decisions.  BOEM Decl. ¶ 2.

#### B.    The Clean Water Act ("CWA") and the Rivers and Harbors Act ("RHA")

The U.S. Army Corps of Engineers ("Corps") administers permits under Section 404 of the CWA and Section 10 of the RHA. A Section 404 permit authorizes discharges of dredged and fill material into "waters of the United States." 33 U.S.C. §§ 1344, 1362(7). Section 10 of the RHA prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." *Id.* § 403. A Section 10 permit is required to build structures or perform work in or affecting such waters. 33 C.F.R. § 322.3(a). The Corps "will decide" on a permit application within 60 days of its being deemed complete unless certain

conditions exist, such as if compliance with other environmental laws prevents a determination. *Id.* § 325.2(d)(3). The Corps follows its regulations and other environmental laws when processing Section 404 and Section 10 permits. *See* Corps Decl. ¶¶ 2-3.

The CWA, Section 402 also established the National Pollutant Discharge Elimination System ("NPDES") permit program. 33 U.S.C. § 1342(a)(1); 40 C.F.R. § 122.1. Pollutant discharges into waters of the United States are prohibited unless in compliance with CWA requirements, such as in compliance with an NPDES permit. 33 U.S.C. § 1311(a). NPDES permits "may" be issued by the Environmental Protection Agency ("EPA") unless a state agency is authorized to administer the NPDES program. *Id*. § 1342(a)(1), (b).

Upon receipt of a complete application, EPA decides whether to prepare a draft permit and accompanying "fact sheet," 40 C.F.R. §§ 124.3(a); 124.6(a), (d), (e); 124.8(a), which is then subject to a 30-day public comment period, *id.* § 124.10(b)(1). After its review of comments, EPA issues a permit decision. *Id.* § 124.15. Neither the CWA nor EPA's CWA regulations specify a specific, enforceable timeline by which final NPDES permits must be issued. If issued, they become effective 30 days later, unless a later date is set or review by the Environmental Appeals Board ("EAB") is requested. *Id.* § 124.15(b). A permit decision is not final until after EAB review. *Id*. § 124.19(l). *See, e.g.* EPA Decl. ¶¶ 12, 22-23, Exs. 3-4. After EAB review, permit decisions are subject to judicial review in federal circuit courts pursuant to 33 U.S.C. § 1369(b)(1).

## C.    The Clean Air Act ("CAA")

The CAA authorizes EPA to regulate air pollution from OCS activities. *See* 42 U.S.C. § 7627. EPA's regulations require permitting for OCS sources of air pollution and incorporate by reference permitting requirements for Prevention of Significant Deterioration ("PSD"), Nonattainment New Source Review, and Title V of the CAA. *See* 40 C.F.R. § 55.6. The CAA sets

6

deadlines for some permit decisions. *See* 42 U.S.C. § 7475(c) (PSD preconstruction); *id.* §7661b(c) (Title V operating permits). CAA permits are generally subject to the same or similar procedures and exhaustion requirements as NPDES permits, *see, e.g.*, 40 C.F.R. Part 124 (PSD permits), and are subject to federal circuit court review, 42 U.S.C. § 7607(b)(1). *See* EPA Decl. ¶¶ 18-19.

### D.    The Fixing America's Surface Transportation Act ("FAST Act")

The FAST Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015), is an omnibus transportation bill that, among other things, streamlines federal permitting for certain complex infrastructure projects. *See* 42 U.S.C. § 4370m(6). As a part of that effort, the Executive Director of the Federal Permitting Improvement Steering Council and federal agencies work together to set overall coordinated project plans and permitting timetables for covered projects. *See id.* § 4370m-2(c)(1)-(2). Information is then published to a "Permitting Dashboard" to track the status of any covered project. *See id.* § 4370m-2(b).

The FAST Act has several safeguards to allow for agency flexibility and discretion. For example, if an agency needs more time to complete an authorization, it may seek to modify the permitting timetable. *See id*. § 4370m-2(c)(2)(D). In the event disputes regarding a project's permitting timetable arise, the FAST Act provides for a dispute resolution process, the outcome of which is not subject to judicial review. *See id.* § 4370m-2(c)(2)(C). And while the FAST Act prescribes certain deadlines for the posting of information to the Permitting Dashboard and the dispute resolution process, it does not establish any mandatory timelines for completion of authorizations or reviews. If an agency fails to meet a completion date, the agency needs only to provide an explanation for the departure, an alternative completion date, and a monthly status report until the final agency action has occurred. *See id.* § 4370m-2(c)(2)(F)(ii).

## II.    Wildlife and Marine Resource Conservation Statutes

Plaintiffs' Complaint includes the Endangered Species Act ("ESA"), Bald and Golden Eagle Protection Act ("BGEPA"), Marine Mammal Protection Act ("MMPA"), and Magnuson-Stevens Fishery Conservation and Management Act ("MSA") among its list of laws purportedly "governing federal approvals of wind-energy development." Pls. Mem. 31. These laws do not authorize construction or operation of wind energy projects. Rather, they protect and conserve wildlife and marine resources. The agencies that administer these laws—the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS")—engage in consultations to ensure statutory standards are met and may grant certain exemptions from applicable take prohibitions. These consultations and exemptions do not authorize construction or operation of wind energy projects.

Notably, while Plaintiffs hand wave at alleged duties to process various requests for consultations and exemptions under these conservation statutes and their implementing regulations, Plaintiffs do not identify any mandatory deadline to act that has been missed or that is likely to be missed as a result of compliance with the Wind Memo's temporary cessation directive.[3] In other words, Plaintiffs do not identify any overdue or delayed consultation under the ESA or the MSA, incidental take permit decision under the BGEPA, or incidental take regulation decision under the MMPA. In fact, FWS and NMFS have explained in their declarations that they continue to *process* applicable requests notwithstanding the temporary pause on the *issuance* of approvals under the Wind Memo. FWS-ES Decl. ¶ 7-8, 11; FWS-MB Decl. ¶ 11; NMFS Decl. ¶ 5.

---

[3] Plaintiffs also ignore the robust discretion agencies have in processing exemptions. *See, e.g.*, 50 C.F.R. § 13.11(c); 50 C.F.R. part 216, subpart I.

## III.    Other Environmental Statutes

Plaintiffs allege the Wind Memo violates the Bureau of Land Management's ("BLM") right-of-way authority under the Federal Land Policy and Management Act ("FLPMA"), Compl. ¶ 408, and agency authority generally under the National Historic Preservation Act ("NHPA"). But Plaintiffs do not identify any specific BLM right-of-way or NHPA consultation allegedly affected by the temporary cessation directive. And even if they had, both statutes provide BLM and the consulting agency significant flexibility and discretion without imposing mandatory deadlines. *See, e.g.*, 43 U.S.C. § 1761(a)(4); 43 C.F.R. § 2804.25(d)(Table 1), (e)(2); 36 C.F.R. § 800.1(c).

Plaintiffs also allege the Wind Memo violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* NEPA serves dual purposes by informing agency decisionmakers of the potential environmental effects of proposed major federal actions and ensuring that relevant information is available to the public to enable their participation. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

To achieve those ends, NEPA requires agencies to prepare an environmental impact statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA also directs agencies to prepare an environmental assessment ("EA") for "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," unless an exclusion applies. *Id.* § 4336(b)(2). Generally, NEPA instructs agencies to complete an EIS within two years and an EA within one year from the date each is determined necessary, *see id.* § 4336a(g)(1), but these timeframes may be extended, *id.* § 4336a(g)(2). Agencies may also promulgate their own NEPA procedures. *E.g.*, 40 C.F.R. Part 6 (EPA); 43 C.F.R. Part 46 (DOI).

## STANDARD OF REVIEW

### I.    The Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Voice of the Arab World. v. MDTV Med. News Now*, 645 F.3d 26, 32 (1st Cir. 2011). Rather, it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citation omitted).

A plaintiff seeking a preliminary injunction must establish four elements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction. *See id.*; *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). Of these elements, the "most important is whether the movant has demonstrated a likelihood of success on the merits." *Akebia Therapeutics, Inc. v. Azar,* 976 F.3d 86, 92 (1st Cir. 2020).

### II.    The Administrative Procedure Act ("APA")

The APA sets forth rights of action through which certain federal agency actions or inactions are subject to review by the courts. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020). But those rights of action come with limitations. For example, not every government official is considered an "agency" under the statute. *See* 5 U.S.C. § 701(b). Also, only those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" may seek judicial review of the pertinent agency action. *Id.* § 702. That agency action must, in turn, be either "made reviewable by statute [or] final agency action for which there is no other adequate remedy." *Id.* § 704; *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997) (setting forth the "final agency action" standard). Where APA review is available, that review is both narrow and deferential, and "reviewing courts must . . . not substitute their own judgment for

10

that of the agency." *Food & Drug Admin. v. Wages & White Lion Invs. LLC*, 604 U.S. __, 145 S.

Ct. 898, 917 (2025).

Under 5 U.S.C. § 706(2)(A), a court may set aside final agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. Similarly, under

§ 706(2)(C), a court may set aside final agency action that is "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." *Id.* Functionally, these provisions present "a

linguistic distinction without a practical difference." *Victim Rights Law Ctr. v. Cardona*, 552

F.Supp.3d 104, 127 (D. Mass. 2021). Section 706(2)(D) authorizes a court to set aside final agency

action that is conducted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## ARGUMENT

### I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

The most important element of the preliminary injunction calculus is whether the movant

can show a likelihood of success on the merits. *Akebia Therapeutics, Inc.*, 976 F.3d at 92. That

element is dispositive here. In short, Plaintiffs and Intervenor lack standing, cannot subject the

Wind Memo to APA review, fail to identify a final agency action subject to review, and otherwise

fail to state a claim for relief on the merits. For this reason, their motions must be denied and their

claims may be dismissed. *See, e.g.*, *Hunter v. Judson*, No. CV 15-30189-MGM, 2015 WL 7737332,

at *2 (D. Mass. Dec. 1, 2015).[4]

---

[4] Defendants will likely file a motion to dismiss on these grounds when their responsive pleading is due. Plaintiffs, however, preemptively rebutted Defendants' argument that they do not have standing, Pls.' Mem. 19, thus, Plaintiffs have had "an opportunity to . . . respond" to Defendants arguments and therefore sua sponte dismissal would be appropriate. *See Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R.*, 144 F.3d 7, 14 (1st Cir. 1998).

## A.    Article III Standing

To demonstrate standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Plaintiff has the burden of establishing all three elements, for every claim. *Id.* When the case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Where, as here, a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Plaintiffs and Intervenor[5]—none of whom are directly affected by the agencies' temporary hold on making final decisions on *other parties'* permit applications—have failed to meet their difficult burden of establishing any of the three required elements of standing.

## B.    State Plaintiffs and the District of Columbia Lack Standing

### 1.    State Plaintiffs Fail to Allege Facts Plausibly Demonstrating Injury

To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan,* 504 U.S. at 560). If a plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). The injury must be "*certainly* impending," and allegations of "*possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). Here,

---

[5] Intervenor also fails to identify specific members who are directly affected. *See infra* pp. 20-23.

State Plaintiffs fail to allege a "certainly impending" injury, relying instead on "possible future injury."

State Plaintiffs fail to allege an injury in fact that is "concrete and particularized." *Spokeo*, 578 U.S. at 339. State Plaintiffs allege future injuries due to the purported future effects of the temporary cessation directive. They allege that "the Wind Directive and Agency Defendants' implementation of it risk depriving States of energy reliability and affordability benefits, economic activity, health benefits, and environmental protection that were to come from their substantial investments in wind power." Compl. ¶ 168. But alleged risk to these extremely broad and unspecific benefits from wind power does not demonstrate that the States have "sustained . . . some direct injury . . . and not merely that [they] suffer[] in some indefinite way in common with people generally." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345, (2006) (quotation omitted).[6]

State Plaintiffs allege injuries that are not "actual or imminent, [but instead] conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. In so doing, Plaintiffs make two unsupported logical leaps.

*First*, State Plaintiffs fail to demonstrate that any particular wind project would be authorized and completed but for the Wind Memo, making their harms conjectural. Indeed, their Complaint is silent on this point. Most State Plaintiffs fail to identify ***any*** wind project likely to be affected by the Wind Memo. *See* Compl. ¶¶ 236-40 (Colorado); ¶¶ 241-55 (Connecticut); ¶¶ 259-60 (D.C.); ¶¶ 261-69 (Illinois); ¶¶ 295-98 (Michigan); ¶¶ 299-307 (Minnesota); ¶¶ 323-27 (New Mexico); ¶¶ 328-34 (Oregon); ¶¶ 348-54 (Washington). A few Plaintiff States mention specific wind projects but notably fail to allege that the projects are likely to be affected by the Wind Memo—that is, that there is a pending application that is being unlawfully delayed. *See id.* ¶ 258

---

[6] While State Plaintiffs rely on *Massachusetts v. EPA*, 549 U.S. 497 (2007), for their standing arguments, "[a] State does not have standing as *parens patriae* to [sue] the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982).

(Delaware: alleging the purchase of land for three substations but not alleging that the Wind Memo would affect the project); ¶ 283 (Maine: alleging that it is "pursuing floating offshore wind energy," but not alleging that the Wind Memo would affect the project); ¶ 291 (Maryland: alleging that there are "three offshore-wind leaseholders in Maryland-adjacent waters," and "[o]ne of those . . . received its final Construction and Operation Permit in late 2024," but not alleging that the Wind Memo would affect the project).[7]

Arizona and California identify specific wind projects that **may** need federal approvals but fail to describe their stage of development or when federal approvals would be sought, let alone any impacts that would befall the projects from a (purely hypothetical) delay in approval. *See* Compl. ¶¶ 216, 218 (Arizona: alleging that the Forged Ethic site will require the Bureau of Reclamation to conduct a NEPA review, but not alleging when such a request may occur); ¶ 233 (California: alleging that "an offshore-wind project in state waters near Vandenberg Space Force Base . . . is likely to require federal review and approvals," but not alleging when such review would be requested).

Only three states—New York, New Jersey, and Massachusetts—allege federal permitting delays (or other federal action) for specific wind projects caused by the Wind Memo. None of these states, however, adequately allege facts to demonstrate that these projects would be approved and completed but for the Wind Memo.

New York alleges that two projects have been put at risk. New York alleges that, "BOEM . . . issued a stop work order for Empire Wind." Compl. ¶ 178. But that stop work order

---

[7] Even if some Plaintiffs have standing, this Court should dismiss the claims brought by Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, New Mexico, Oregon, and Washington, as they "must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

was not based on the temporary cessation directive in the Wind Memo and has now been lifted. BOEM Decl. ¶ 11, Ex. E. New York also alleges that the schedule for the "construction of the Arthur Kill Terminal project was . . . disrupted . . . because, upon information and belief, the Corps has halted consideration of applications for permits under Section 404 of the [CWA] and Section 10 of the [RHA]." Compl. ¶ 184. But New York fails to allege that the terminal would be entitled to receive those permits and be completed absent the Wind Memo. Further, the Arthur Kill Terminal is a "wind component staging and assembly project," *id.* ¶ 152, which means the supposed benefits for New York would not vest upon completion, but only after the terminal helps construct *other* wind-energy projects, which are not identified and the completion of which is speculative.

New Jersey alleges that the Atlantic Shores Offshore Wind Project has been delayed due to EPA's remand request for a CAA permit while this project was being challenged in the EAB. *See* Compl. ¶ 310; *see also In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 14, 2025). EPA may, or may not, concur with its initial decision. Regardless, New Jersey cannot establish that the project is entitled to a permit, especially as that issue was being contested before the EAB and could further be contested in court. Moreover, New Jersey does not adequately allege any construction delays or that, if the CAA permit were received, the project would be completed.

Massachusetts alleges that although the SouthCoast Wind project "has secured most federal approvals[,] . . . progress on outstanding approvals has been paused pursuant to the Wind Directive." Compl. ¶ 197. Massachusetts submits no information that the project would be entitled to receive those outstanding approvals and be completed absent the Wind Memo.

Given that State Plaintiffs fail to demonstrate specific harms attributable to specific projects, Plaintiffs are left with their argument that the Wind Memo creates "regulatory

uncertainty," and thus that private parties have voluntarily delayed construction. Compl. ¶¶ 252, 298, 345. Such claims are regularly rejected because the "effects stemming from regulatory uncertainty are quintessentially conjectural." *AstraZeneca Pharms. LP v. Sec'y U.S. Dep't of Health & Hum. Servs.*, No. 24-1819, 2025 WL 1338088, at *5 (3d Cir. May 8, 2025); *see also Arizona v. Env't Prot. Agency*, 77 F.4th 1126, 1131 (D.C. Cir. 2023).

*Second*, State Plaintiffs fail to establish that the alleged downstream impacts from the supposedly lacking permits—energy reliability and affordability benefits, economic activity, health benefits, and environmental protection—are "imminent." *Spokeo*, 578 U.S. at 339. Indeed, they provide virtually no dates as to when specific wind-energy projects would begin to provide power, or how implementation of the Wind Memo has altered those dates. *See* Corps. Decl. ¶ 8. Generally, State Plaintiffs simply note aspirational dates for certain metrics for renewable energy. *See* Compl. ¶¶ 263, 295. For example, it may be that the Wind Memo—in some way—makes it more difficult for Illinois to be using "100% carbon-free energy generation by 2045." *Id.* ¶ 263. But that alleged injury is undoubtedly not imminent, which is required for standing purposes.

### 2. State Plaintiffs' Alleged Injuries Fail on Traceability and Redressability Grounds

State Plaintiffs must demonstrate both that the downstream harms they allege are "fairly traceable to the [Wind Memo], and . . . likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338. State Plaintiffs generally allege the benefits of wind energy in paragraphs 159-166 of their Complaint and specifically allege that those benefits are "at risk now because [of] the Agency Defendants' implementation of the Wind Directive," Compl. ¶ 167, and that the Wind Memo "risk[s] depriving States of energy reliability and affordability benefits, economic activity, health benefits, and environmental protection that were to come from their substantial investments in wind power," *id.* ¶ 168. These allegations are far too attenuated to confer standing.

State Plaintiffs fail to "to show a sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). State Plaintiffs' causal chain, which is not fully spelled out, appears to be (1) the temporary cessation directive stops all wind-energy projects requiring federal approvals; (2) following the conclusion of the assessment and review directive, the Agency Defendants will adopt a policy to not approve any wind-energy project, (3) States cannot develop wind energy projects on lands or areas requiring fewer or no federal approvals, (4) States cannot develop energy sources, such as geothermal or nuclear energy, that may provide similar benefits, and (5) nothing else will mitigate the impacts from fewer federally approved wind-energy projects.

Here "the 'links in the chain of causation' between the challenged conduct and the alleged injury are 'far too weak for the chain as a whole to sustain . . . standing.'" *Id.* at 48 (quoting *Allen v. Wright*, 468 U.S. 737, 757-59 (1984)). To begin, the Wind Memo does not direct agencies to adopt a policy of not approving wind projects. As for the rest of the causal daisy-chain, the injuries complained of are the result of "the independent action of a third party." *Dantzler, Inc.*, 958 F.3d at 47. Plaintiffs' causation theory rests upon the allegation that their current power generators, which rely on fossil fuels, do not provide affordable and reliable energy, do not support economic activity, and harm public health and the environment. Even if true, third parties—not the Agency Defendants—are causing those harms.

Nor will the relief State Plaintiffs seek redress their alleged harms. "[I]t cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed." *Id.* Although State Plaintiffs undoubtedly support wind energy, they fail to demonstrate that, but for the Wind Memo, all federal authorizations will be approved and they will—in fact—have more "energy

reliability and affordability benefits, economic activity, health benefits, and environmental protection." Compl. ¶ 168.

Even without the Wind Memo, there is simply no assurance that wind energy projects would be permitted or provide the benefits in their jurisdictions and to their populations that State Plaintiffs allege. State Plaintiffs concede that "minor setbacks" unrelated to federal permitting "can dramatically increase costs and delay or even derail wind-energy development." Pls. Mem. 9. Further, wind energy "projects require numerous financing, planning, approval, and development steps," which are impacted by many factors apart from federal approvals. *Id.* State Plaintiffs' own assertions—that these projects are tenuous already—make clear that their success is not guaranteed absent the Wind Memo, which calls only for a temporary pause in approvals.

### 3. Even if State Plaintiffs Had Standing, Their Injuries Are Not Within the Relevant Statute's Zones of Interests

State Plaintiffs are also not within the zones of interest protected by the statutes in their claims. This test "asks whether 'this particular class of persons ha[s] a right to sue under this substantive statute.'"[8] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (2013) (concurring opinion)); *see also* 5 U.S.C. § 702. "The relevant statute . . . is the statute whose violation is the gravamen of the complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990).

In *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, the First Circuit looked at whether seafood dealers and fishermen could challenge DOI's approval to construct an offshore wind farm. 123 F.4th 1, 7-8 (1st Cir. 2024). The plaintiffs' injury was within NEPA's zone of interest because they "plausibly linked" the "major adverse impacts on mollusks, fish, and

---

[8] Although this test is distinct from prudential standing, *Lexmark*, 572 U.S. at 127, it is discussed in the standing section as it is a threshold issue that also looks at a plaintiffs' alleged injury.

crustaceans" to "the expected adverse economic effects of the project on their commercial fishing interests." *Id*. at 21.

Here, State Plaintiffs allege that Defendants are in violation of a dozen statutes: OCSLA, the CWA, the RHA, the CAA, NEPA, the ESA, the BGEPA, the MMPA, the MSA, the NHPA, FLPMA, and the FAST Act. Compl. ¶ 59-112. Counts I through IV each essentially allege that the Agencies are not promptly making permit decisions under these statutes. *Id*. ¶¶ 357, 389, 418, 421. As a general matter, a permittee who is improperly denied a permit under one of these statutes would suffer a legal wrong within the meaning of those statutes. The State Plaintiffs are not permit applicants under these statutes, nor do State Plaintiffs' injuries flow from the environmental harms these statutes are generally designed to protect. For instance, the CWA protects "the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), by prohibiting the discharging of dredge or fill material, *id*. 33 U.S.C. § 1344, into waters of the United States without a permit. That "the States stand to lose a critical source of energy due to project delays and cancellations," Pl. Br. at 20, is not "plausibly linked" to any purported harm to the Nation's waters that the CWA is designed to protect. *Seafreeze*, 123 F.4th at 21.

Accordingly, State Plaintiffs are not within the zone of interest of the listed statutes.[9]

### 4.    Plaintiffs Do Not Otherwise Have Standing Against Some Defendants

"[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (cleaned up).

---

[9] In Count IV, Plaintiffs also allege that Defendants are in violation of OCSLA. Compl. ¶¶ 423 (quoting 43 U.S.C. § 1332(3)), 424 (citing 43 U.S.C. § 1341(a)). Plaintiffs do not fall within the zone of interest for these provisions because they are not engaged in the development of the OCS. Even if they were, they may only bring Count IV against the Defendants that implement OCSLA.

State Plaintiffs allege no specific action or inaction by the Department of Energy, Energy Secretary Chris Wright, the Department of the Treasury, Treasury Secretary Scott Bessent, the Department of Agriculture, or Agriculture Secretary Brooke Rollins.[10] The only allegations against these Defendants are their general association with the interagency assessment and review. *See* Compl. ¶ 132. But State Plaintiffs' alleged injuries are supposedly tied to Section 2(a)'s temporary cessation directive, not the assessment and review directive. Furthermore, even if there were some cognizable injury related to the assessment and review directive, relief would not be appropriate against these Departments, as the only thing State Plaintiffs arguably allege they are doing is consulting with the Secretary of the Interior regarding this assessment and review.

State Plaintiffs' claims similarly fail against BLM, BLM's Acting Director Jon Raby, NMFS, and NMFS's Director Eugenio Pineiro Soler. Plaintiffs present only vague allegations that those entities "adopt[ed] and implement[ed]" the temporary cessation directive, but never identify any permit or authorization supposedly affected by the directive. Compl. ¶¶ 402, 408.

### C.    Intervenor Lacks Standing

Organizations like Intervenor ACE NY must meet a three-part test for standing: (1) its members must have standing to bring suit on their own accord; (2) the interests the organization seeks to protect must be germane to the organization's purpose; and (3) the claim asserted and relief requested must not require an individual member's participation in the lawsuit. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024). Here, Intervenor lacks standing because its members do not have standing to bring suit on their own accord.

Broadly, Intervenor alleges two types of injuries for its members. Intervenor alleges direct injury to owners or operators of wind projects, which allegedly include daily delay costs, lost

---

[10] Intervenor does not even bring claims against these agencies. *See* Interv. Compl. ¶¶ 13-27.

income, impaired contractual obligations, and harms to financing. *See* Interv. Compl. ¶ 76. Intervenor also alleges purely indirect injury to those in the "wind energy supply chain" including loss of business, increased materials costs, contract disruption, and potential business closures. *Id.* ¶ 76.

These alleged injuries do not support standing. First, "[P]laintiff-organizations [are required to] make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, Intervenor fails to identify a specific member that would have standing in its own right to bring suit— presumably because they have not identified a member that has a pending application that has been unlawfully delayed. *See generally* Interv. Compl.  Intervenor's declarations are of no help either. Interv. Mem. 13.

Declaration of Marguerite Wells. Wells fails to show an "identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498. The Wells Declaration discusses alleged harm to certain types of its members, e.g., "ACE NY's Members in the Construction Sector," Decl. ¶ 48, but fails to identify any particular member in that sector for purposes of establishing standing. Wells also discusses a "Company A" and "Company B," Decl. ¶¶ 24-41, but neither company is *identified*. Members must be identified to provide organizational standing so that Defendants have the ability to rebut the allegations. *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Wells also identifies "six leaseholders that were awarded leases in the 2022 New York Bight (NY Bight) Auction held by [BOEM]."  Decl. ¶ 21. Again, no individual leaseholder is identified. Just as important, Wells simply states that "none of the six NY Bight leaseholders has a BOEM-approved construction and operation plan ("COP"), and now . . . none will be able to

21

secure a COP." *Id.* ¶ 22. Notably missing from this alleged injury is when any specific leaseholder would even seek approval from BOEM for a COP—or any other federal authorization—that could be affected by implementation of the Wind Memo, much less any allegation of a pending COP that is at imminent risk of delay beyond a mandatory statutory deadline.

Declaration of Elizabeth Burdock. Burdock is the CEO and President of Oceantic Network, a non-profit that advances offshore wind and building a domestic supply chain. *See* Decl. ¶¶ 1, 2. Generally, Burdock discusses the effects of the Wind Memo on Oceantic's members. But ACE NY may only establish standing through its membership, not Oceantic's. A careful review of her declaration shows that Burdock fails to identify a member of ACE NY that has standing. Indeed, Burdock points to only three uninjured Oceantic Members who are also members of ACE NY. *See id.* ¶¶ 33 (Technostrobe); 42 (Windserve Marine); and 45 (Roman Stone). The alleged injuries for all three companies come, if at all, from the actions of its customer—third parties—not the Agency Defendants.[11]

Declaration of Charles Donadio. Donadio similarly alleges harm from third parties, not the Agency Defendants. Mr. Donadio founded Atlantic Wind Transfers, a member of ACE NY, Decl. 4, which is an "offshore wind farm support vessel company." Decl. ¶ 2. Atlantic Wind Transfers' alleged injury comes, if at all, from its customers, not from the Agency Defendants.

---

[11] None of these member companies are injured by a delay in any specific pending authorization. Instead, Technostrobe blames its injuries on "deteriorating market conditions." Burdock Decl. ¶ 33. Roman Stone supplies "precast concrete products to the offshore wind industry." *Id.* ¶ 45. WindServe Marine is a marine operations company that provides support to wind energy projects. *Id.* ¶ 42. WindServe "faces significant challenges in securing future employment for [its vessel] assets once existing contracts conclude." *Id.* Burdock states that WindServe may incur injury if the Empire Wind I project does "not move forward," Burdock Decl. ¶ 42, but BOEM recently authorized that project to continue, BOEM Decl. ¶ 11, Ex. E.

Declaration of Kara McNutt. McNutt is a consultant that prepared a report, which purports to estimate the economic effects of the Wind Memo. *See* Decl. at ¶ 8. But this does nothing to prove that any specific member of ACE NY has standing. The broad economic effects alleged to be the result of the Wind Memo shows only that ACE NY Members may "suffer[] in some indefinite way in common with people generally." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (quoting in *Doremus v. Board of Ed. of Hawthorne*, 342 U.S. 429, 433-34 (1952)).

Second, ACE NY's members working in the "wind energy supply chain" do not have standing because the injuries complained of are the result of "the independent action of a third party," not the Agency Defendants. *Dantzler*, 958 F.3d at 47. For each member of the supply chain, it is third parties who are buying their products or utilizing their services—not the Agency Defendants. Accordingly, their alleged injuries are not traceable to Defendants and Intervenor may not demonstrate standing through these members.

Lastly, even if ACE NY could show that its members working within the "wind energy supply chain" had Article III standing, they are not within in the zone of interests protected by the statutes under which it has brought claims.[12] *Cf. Seafreeze Shoreside, Inc.*, 123 F.4th at 21. In short, the interests of those selling goods or services for the construction of wind farms are not within the "'particular class of persons [that has] a right to sue under this substantive statute[s]'" at issue here. *Lexmark Int'l, Inc.*, 572 U.S. at 127 (quoting *Battery Recyclers,* 716 F.3d at 675–76 (concurring opinion)).

---

[12] ACE NY argues that its "members also are directly regulated by the statutes that the Wind Ban violates, sufficing for prudential standing." Interv. Mem. 13 (citation omitted). However, none of the ACE NY members identified by declaration are directly regulated by the agencies.

**D.      Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted**

**1.      Plaintiffs Fail to Identify a Final Agency Action**

"Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891. The targeted agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). A court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

By the APA's own terms, the challenged agency action must be "final." 5 U.S.C. § 704. An agency action is final where the action (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citations omitted). The action "must not be of a merely *tentative* or interlocutory nature." *Id.* (emphasis added).

The alleged agency actions Plaintiffs identify, and seek this Court to review, generally fall into four categories: (1) the President's temporary cessation directive in Section 2(a) of the Wind Memo; (2) agency implementation of the Wind Memo in the abstract; (3) generalized agency notices acknowledging the temporary cessation directive; and (4) agency project-specific announcements implementing the temporary cessation directive. None of these alleged actions, however, are final agency actions subject to APA review.

**a.      The Wind Memo is Not Subject to the APA**

The President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994). This precludes the Wind Memo from APA review. While the

Wind Memo instructs federal agencies to review and assess wind leasing and permitting practices that, upon finality, may (or may not) be subject to judicial review, the Wind Memo itself is not.[13]

For the same reasons, the Wind Memo is also not subject to the APA's notice-and-comment procedures. Nor does it provide any substantive changes to any wind energy policy; it simply defers the issuance of authorizations until completion of a later *substantive* assessment and review. Thus, if anything, it can only be characterized as a "rule of agency . . . procedure, or practice" that is exempt from notice-and-comment procedures. 5 U.S.C. § 553(b)(A); *see, e.g.*, *Kessler v. FCC*, 326 F.2d 673, 681 (D.C. Cir. 1963) (holding "freeze" order pausing filing of new applications pending possible promulgation of new rules was procedural and not subject to rulemaking requirements of the APA).

### b.    Plaintiffs Fail to Identify a Final Agency Action

At the agency level, Plaintiffs further attempt to manufacture final agency action where there is none.  Primarily, they claim a generalized agency "halt on wind-energy approvals" pending an environmental review is final agency action. Pl. Mem. 22; *see also* Interv. Mem. 13. They also maintain that agency implementation of that "halt"—both in the form of generalized notices and project-specific announcements—is likewise final agency action (without identifying a statutory or regulatory violation).  But none of these measures constitute final agency action.

As noted above, to be "final," an agency action must (1) "mark the 'consummation' of the agency's decisionmaking process," and (2) determine "rights or obligations" or otherwise result in "legal consequences."  *See Bennett*, 520 U.S. at 177-78 (citations omitted).  The agency must have "rendered its last word on the matter."  *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980).

---

[13] This is not to say that Presidential actions are unreviewable. They "may still be reviewed for constitutionality" through a cause of action in equity, but even a constitutional challenge to the President's actions is not permissible under the APA. *Franklin*, 505 U.S. at 801.

In the permitting context, final agency action is generally limited to the ultimate approval, modification, or disapproval of an applicant's permit. *E.g.*, *Penn. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 105 (D.D.C. 2003) (recognizing that alleged delay "while EPA is in the midst of attempting to formulate a national policy process" is not final agency action). An interim decision to merely postpone the permit decisionmaking process is not final agency action. *See Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687 (S.D. Ill. 2004); *see also Marquette Cnty. Rd. Comm'n v. EPA*, 726 Fed. App'x 461, 467 (6th Cir. 2018) ("In the absence of any decision from [an] agency to ultimately deny or grant the permit [courts] have nothing to review.").

Here, the Wind Memo calls for a review of wind leasing and permitting practices and directs agencies to temporarily hold off on issuing new authorizations. But that review is simply part of the overall decisionmaking process for each pending authorization. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir. 2003) (refusing to find final agency action where "further administrative action is forthcoming"). It neither marks an agency's final decision with respect to any particular permit, nor creates any legal rights or obligations for a pending applicant. By challenging the Wind Memo's implementation in the abstract, Plaintiffs are, in effect, challenging the *lack* of agency action. But an agency decision to hold and review a permit "as a part of its comprehensive . . . revision is not a final decision." *Shawnee Trail Conservancy*, 343 F. Supp. 2d at 701. The proper way to challenge a lack of agency action is to compel agency action under § 706(1), which Plaintiffs have not done. *See infra* pp. 31-33.

Plaintiffs' effort to cast generalized agency notices implementing the Wind Memo as final agency action fairs no better. Plaintiffs identify four general agency announcements or statements they claim violated the APA. *See* Compl. ¶¶ 145-48; Interv. Mem. 9-10. Each of these general notices, however, simply inform the public of the temporary cessation directive found in

Section 2(a) of the Wind Memo. None of them reflect the consummation of any agency permitting decision, determine any legal rights or obligations of any permit applicant, or implement new wind energy permitting and development policy. *See, e.g.*, *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 428, 431-32 (4th Cir. 2010) (holding that a "simply informational" agency publication did not constitute final agency action); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (holding that agency letter was not reviewable).

DOI Secretary's Order No. 3415 announced that, to ensure DOI actions were conducted consistent with administration policy goals, the delegated authority to approve wind energy authorizations was "hereby temporarily suspended, but the action may be approved by leadership." DOI Decl. ¶ 6, Ex. A. The Order emphasized that the suspension "does not limit existing operations under valid leases." *Id.*; *see* 90 Fed. Reg. 8364 ("This memorandum shall be implemented consistent with applicable law . . . ."). Thus, while the Order temporarily suspended delegated authority to issue new permit approvals, it did not make any permitting decision—approval, disapproval, or modification—with respect to any individual permit.

Similarly, FWS's Eagle Incidental Take General Permit Notice stated that FWS "is temporarily ceasing issuance of permits to wind facilities until further notice." FWS-MB Decl. ¶¶ 9, 12, Ex. 1. Even though FWS has considerable discretion and flexibility in making permitting decisions, *see* FWS-MB Decl. ¶ 5-8, the Notice did not disapprove of any permits. It stated general permits would no longer "automatically" issue, but said nothing about other permits like specific permits, and still encouraged applicants to complete general permit applications. *Id.*

Intervenor also points to a BOEM website notice entitled, "Lease and Grant Information, What's New." Interv. Mem. 9. As its title suggests, this advisory notice simply informs users of BOEM's website that the agency is "temporarily halting offshore wind leasing" in accordance with

27

the Wind Memo and simply restates the Wind Memo's directives as it pertains to BOEM's offshore energy development jurisdiction. BOEM Decl. ¶ 6, Ex. B. Again, like the Secretary's Order and the FWS Notice, the notice neither makes nor reflects any decision with respect to any proposed lease, *see* 30 C.F.R. §§ 585.215-.239, or plan, *see id.* §§ 585.605-.618, .620-.35.

Finally, Intervenor cites a news article that purports to quote a Corps email announcing that a "pause" remains in effect for wind energy projects in accordance with the Wind Memo. Interv. Mem. 10. Nothing within these scant allegations reveals anything more than the agency simply acknowledging the Wind Memo and its temporary cessation directive.

A step further down the administrative ladder, Plaintiffs allege that seven project-specific notices implementing the temporary cessation directive violate the APA. *See* Compl. ¶¶ 146, 148-50, 152; Interv. Compl. ¶ 69; Interv. Mem. 11.[14] But again, these notices do not constitute the "consummation" of the decisionmaking process. They do not approve, disapprove, rescind, or revoke *any* authorization, and the processes and analyses leading up to those decisions remain ongoing. BOEM Decl. ¶¶ 7-8; Corps Decl. ¶ 6; EPA Decl. ¶ 5; FWS-ES Decl. ¶¶ 7-8, 11; FWS-MB Decl. ¶ 11; NMFS Decl. ¶¶ 5-6. At most, they reflect an interim step, temporarily deferring a decision until completing the assessment and review, which is the essence of an ongoing decisionmaking process. Telling applicants that permitting decisions cannot be made until completing an assessment and review—i.e., until completing an ongoing decisionmaking process—is squarely in the heartland of non-final agency action.

Take, for example, two of the seven: the postponement or cancellation of virtual public meetings by BOEM for the Offshore California wind lease areas and the Vineyard Mid-Atlantic

---

[14] Plaintiffs also identify an eighth project, Empire Wind. Compl. ¶¶ 155-156. But that project is irrelevant to their claims here because the Secretary's halt construction order was not premised on the temporary cessation directive and has since been lifted. BOEM Decl. ¶ 11, Ex. E.

Offshore Wind Project. Compl. ¶¶ 148, 150; BOEM Decl. ¶ 8, Exs. C-D. In each instance, BOEM engaged in an ongoing decisionmaking process regarding anticipated environmental impact statements.  BOEM postponed or cancelled a previously scheduled virtual public meeting, but provided participants with instructions for submitting their comments in writing. The ultimate decisionmaking process for each environmental impact statement, however, remains ongoing. Interim administrative steps in that process—like the rescheduling of public meetings—cannot constitute final agency action. *See, e.g.*, *Shawnee Trail Conservancy*, 343 F. Supp. 2d at 701.

Plaintiffs also take issue with BOEM's extension of deadlines reflected in the FAST-41 Permitting Dashboard for the SouthCoast Wind Project and the Bluepoint Wind Project. But the extension of a project deadline is not the consummation any permit decisionmaking process. Indeed, that decisionmaking process continues to play out. BOEM Decl. ¶¶ 9-10; NMFS Decl. ¶ 6; EPA Decl. ¶ 17. Moreover, the FAST Act expressly provides for the modification of project schedules. *See* 42 U.S.C. § 4370m-2(c)(2)(D), (F). That process grants the agency a high degree of flexibility to adjust schedules as necessary, underscoring the fact that mere extensions of those schedules, before any final permitting decision has been made, cannot constitute a final agency action subject to judicial review.

Next, the EAB's order granting EPA's motion for voluntary remand in the Atlantic Shores Wind Project also does not constitute "final agency action." EPA Decl. ¶ 22-23, Ex. 3 at 7. In this instance, the Board's order speaks for itself: "[t]he Agency's final action does not occur 'until the Regional Administrator issues a subsequent 'final permit decision' under section 124.19 *after* administrative review proceedings are exhausted.'"  *Id*. (citing 78 Fed. Reg. at 5284-85; 40 C.F.R. § 124.19(l)(2)). Because administrative proceedings were ongoing, the remand of the permit could not constitute final agency action.

The final two project-specific notices identified by Plaintiffs and Intervenor relate to an unidentified project and the Arthur Kill terminal and warrant little discussion. Here again, Plaintiffs appear to base their allegations on the extension of deadlines or postponement of various unidentified permits. Plaintiffs allege an MMPA permit on an unidentified project was extended 90 days. Compl. ¶ 146. But Plaintiffs fail to identify any statutory or regulatory deadline that was supposedly violated. Such thin allegations, without more, cannot serve as a final agency action.

Plaintiffs' failure to identify an agency action reviewable under the APA makes their case nothing more than an effort to seek "wholesale improvement of [the government's permitting] program[s] by court decree." *Lujan*, 497 U.S. at 891. Such concerns "cannot be laid before the courts for wholesale correction under the APA." *Id.* at 893.

Intervenor's reliance on *Pacito v. Trump*, No. 25-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025), to argue that judicial review is not precluded solely because the cessation directive is temporary, Interv. Mem. 14, misses the mark. Agency Defendants do not argue there is no final agency action here solely because the cessation directive is temporary. Rather, there is no final agency action here because no agency has made a decision that represents the consummation of its decisionmaking process or that has legal consequences. The government did not dispute in *Pacito* that the alleged agency actions implementing the Executive Order challenged in that case "represent[ed] the consummation of an internal administrative decisionmaking process" and had "legal consequences." *Id*. at *16. This also is plainly not a case like *NRDC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020), where EPA had promulgated a rule in the Federal Register that "firmly establishe[d] [the agency's] current position," and that would "continue to govern unless and until the agency issues a new rule." *NRDC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020). Agency Defendants have made no final decisions here, much less promulgated any rules. Nor have Agency

Defendants cancelled or rescinded any approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects akin to the cancellation and recission of oil and gas lease sales that the court found constituted reviewable agency actions in *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022).

### E.    Plaintiffs' APA Claims Are Mispleaded

Although the crux of Plaintiffs' Complaint is that agency action on wind energy projects is being unlawfully withheld and unreasonably delayed, Plaintiffs have failed to plead such an APA claim under § 706(1). 5 U.S.C. § 706(1). The reasons are apparent. Plaintiffs must allege "an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64. An unreasonable delay must be "egregious," and the Wind Memo was issued just four months ago. *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). Such a short pause would not constitute egregious delay warranting judicial intervention. *Id.* (even "a finding that delay is unreasonable does not, alone, justify judicial intervention" (quoting *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991))); *see also, e.g.*, *In re California Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001) (collecting cases with "delays of years, not months").

Avoiding § 706(1), Plaintiffs disguise their delay-based claims as challenges to final agency action. *See* Compl. ¶¶ 355-413 (Counts I and II pled under APA Section 706(2)); ¶¶ 414-419 (Count III pled in equity); ¶¶ 420-426 (Count IV pled under common law); ¶¶ 427-438 (Count V pled under OCLA's citizen suit provision). These claims are mispleaded. There is no final agency action here, *supra* pp. 25-30, and the claims are all based on the same basic allegation that "adopt[ing] and implement[ing] the Wind Directive's categorical and indefinite halt on [wind energy] approvals" is unlawfully withholding and unreasonably delaying agency action. Compl. ¶ 357 (Count I); *accord id.* ¶ 389 (Count II); ¶ 416 (Count III); ¶ 420 (Count IV); ¶ 432 (Count V).

31

Section 706(2) is "not the proper vehicle for Plaintiffs to allege their unreasonable delay claim because 'the agency action in question must be final agency action' to warrant judicial review under § 706(2)(A)." *Karapetyan v. Mayorkas*, No. 2:24-CV-05838-SPG-AGR, 2025 WL 665651, at *5 n.4 (C.D. Cal. Feb. 5, 2025) (citing, *inter alia*, *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 620 (D.C. Cir. 2020) (dismissing § 706(2) claim as duplicative of § 706(1) claim for agency's delay in rendering a visa application decision)); *accord Colvin & Son, LLC v. Haaland*, 763 F. Supp. 3d 1176, 1183 (D. Nev. 2025) (allegations of agency delay were "beyond the scope of th[e] Court's review" under APA § 706(2)). Plaintiffs should not be permitted to evade the APA's limitation of judicial review to "final agency action" by pleading redundant equitable causes of action. *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) ("[i]t would be anomalous to impute a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action" (internal quotation omitted)).

Even if Plaintiffs could rely on § 706(2), their Complaint fails to plausibly state a claim, as it fails to show that Defendants have missed legal deadlines or otherwise violated any law. Plaintiffs only vaguely cite a multitude of statutes, none of which contain any deadline that is alleged to have been violated here. Plaintiffs' attempt to fault Agency Defendants for failing to explain purported decisions to change policy is similarly implausible. As explained above, there have been no final decisions for the agencies to explain. *See supra* pp. 25-30. The Defendant Agencies are merely complying with the temporary cessation directed by the Wind Memo. As review under § 706(2) depends on the existence of final agency action—which is absent here—Plaintiffs have no plausible claim for failure to explain. DOI will lead the assessment and review, *see* DOI Decl. ¶ 5, and Agency Defendants will provide the necessary explanations when consummating their decisionmaking processes and issuing permit decisions. Those explanations

will satisfy the APA's "arbitrary and capricious" standard "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

### F.    Neither the Wind Memo, Nor Agency Compliance with It, Is *Ultra Vires*

Count IV alleges that the President and federal agencies lack the legal authority to institute a temporary cessation of "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore-wind projects." Compl. ¶¶ 420-26. Plaintiffs allege that Congress must, but did not, specifically authorize such inaction. *Id.* ¶¶ 420-21.

Count IV fails as an initial matter because it sounds in equity and is redundant of Count II, which pleads the same basic APA allegations under § 706(2). 5 U.S.C. § 706(2)(A), (C); Compl. ¶¶ 384, 389. The First Circuit has disallowed non-statutory review where APA review was available—the same result is warranted here. *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 312 (D.D.C. 2017) ("because plaintiffs are able to assert the same claim through the APA, they cannot obtain [*ultra vires*] relief"). Courts also have declined to review non-statutory *ultra vires* claims where the plaintiffs' APA claim failed for lack of final agency action. *Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*, 2015 WL 6167521, at *10–11 (E.D. Cal. Oct. 20, 2015). That is the case here. *See supra* pp. 25-26.

Even if Plaintiffs could proceed with an equitable *ultra vires* claim in addition to an APA § 706(2) claim, the scope of the Court's review would be limited. *Ultra vires* is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Because agencies "may not simply disregard an Executive [memorandum]," *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012), when acting consistent with applicable law, *ultra vires* review of agency action is limited to when an

agency's error is "patently a misconstruction of the Act," or "when the agency has disregarded a specific and unambiguous statutory directive," or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Lab. Relations Auth*., 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted).[15]

Plaintiffs do not show that a mandatory statutory directive is being violated. The Wind Memo does not direct agencies to take unlawful action, but rather to implement a temporary cessation of activity "consistent with applicable law." 90 Fed. Reg. at 8363. Furthermore, they do not identify any mandatory approval deadline that has been violated by Agency Defendants' implementation of the Wind Memo's temporary cessation. Indeed, Plaintiffs fail to even set forth specific agency actions that are allegedly being adversely withheld.

### G.    The OCSLA Citizen Suit Claims (Plaintiffs' Count V - Intervenor's Count VI) Fail to Comply with Notice Requirements and Fail on the Merits

OCSLA allows for adversely affected persons to bring a civil action in federal court against the federal government for alleged violations of OCSLA, its implementing regulations, or permit or lease terms issued under OCSLA. 43 U.S.C. § 1349(a)(1). But this provision comes with a catch: a litigant cannot bring an action until 60 days after giving the appropriate Federal official written notice of the alleged violation. *Id.* § 1349(a)(2)(A). "In the First Circuit 'strict compliance with the notice provision in environmental statutes' is required and 'failure to abide by . . . [such provision] is fatal to the suit and can be cured only by dismissal and refiling after proper notice.'" *Allco Renewable Energy Ltd. v. Haaland*, No. 1:21-cv-11171-IT, 2022 WL 2373914, at *1 (D. Mass. June 30, 2022) (quoting *Garcia v. Cecos Int'l, Inc.*, 761 F2d 76, 79 (1st Cir. 1985).

---

[15] This standard derives from the limited equitable review recognized in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Kyne*, however, should be confined to its "narrow limits" and "painstakingly delineated procedural boundaries." *Boire v. Greyhound Corp*., 376 U.S. 473, 481 (1964).

Neither Plaintiffs nor Intervenor complied with OCSLA's 60-day notice requirement.[16] Rather, both allege that their claims fall under the "imminent threat" or "immediate[] affect" exception to OCSLA's 60-day notice requirement. *See* Compl. ¶ 430; Interv. Compl. ¶ 227; 43 U.S.C. § 1349(a)(3). But this rationale fails. Any possible effect the Wind Memo could have on a legal interest could not occur until BOEM makes a determination on a pending OCSLA planning document. Moreover, Plaintiffs and Intervenor identify no mandatory statutory or regulatory OCSLA deadline that BOEM or Defendants allegedly violated. Indeed, DOI's regulations explicitly state that BOEM may approve, disapprove, or approve with modifications a party's proposed plans only *after* completion of "technical and environmental reviews and other reviews required by Federal laws." 30 C.F.R. § 585.613(e); *see id.* § 585.628(f) (same); *id.* § 585.648(e) (same). Because the Wind Memo directs only a temporary cessation of approvals of OCSLA planning documents, and not a final disapproval, not only does Plaintiffs' and Intervenor's immediacy argument fail, but their claims must also fail on the merits.

## II. Plaintiffs Have Not Shown Irreparable Harm Is Likely to Occur in the Time it Will Take to Litigate this Case on the Merits

Plaintiffs also fail to satisfy the second *Winter* factor, which requires a strong showing that they will sustain irreparable harm if the Court denies preliminary injunctive relief. Claims of irreparable harm "must show more than a tenuous or overly speculative forecast of anticipated harm," *Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32, 40 (D. Mass. 2013), and cannot be based on "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020). Plaintiffs have presented only hypothetical scenarios where they could eventually suffer harm; they have not demonstrated

---

[16] Defendants did not receive notice from Plaintiffs and Intervenor until on or about May 5, 2025 and May 7, 2025, respectively.

"a significant risk of irreparable harm if the injunction is withheld." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). Moreover, they fail to explain why an injunction now— as opposed to after summary judgment—is necessary. Therefore, Plaintiffs cannot carry their "substantial burden" to show that the "extraordinary equitable remedy" they seek is warranted. *Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 253 (D. Mass. 1999).

Plaintiffs' broad allegations of harm, *see* Pl. Mem. 34-39; Interv. Mem. 32-36, are based on impermissibly vague theories that fail to establish a causal connection to the Wind Memo.

*First*, Plaintiffs claim that Defendants' implementation of the temporary cessation directive "will delay and potentially derail" States' access to energy stores during winter seasons. Pls.' Mem. 35. This incorrectly presumes that the deferred issuance of federal wind leasing and permitting authorizations is permanent, rather than temporary. Pl. Mem. 34-39 (erroneously characterizing the directive as a "categorical and indefinite halt"). For this reason, Plaintiffs' citation to *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016), is misplaced. There, the Fifth Circuit considered whether an EPA rule requiring emission controls in Texas would irreparably harm the State by *permanently* closing power plants. *Id.* at 434. Plaintiffs' general "[s]peculation or unsubstantiated fears of what may happen in the future" with respect to wind leases and permits "cannot provide the basis for a preliminary injunction." *In re Rare Coin Galleries, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988).

*Second*, Plaintiffs claim that State investments will be stranded in wind-energy projects. Pls.' Mem. 36. This is similarly grounded in "overly speculative forecast[s] of anticipated harm." *Hearst Stations Inc.*, 977 F. Supp. 2d at 40. Although Plaintiffs detail expenditures in, and jobs associated with, offshore wind energy development, they fail to demonstrate how the hold on federal wind approvals imminently jeopardizes such investments or employment. In the cases cited by Plaintiffs, irreparable harm was found based on evidence of actual employment and economic

losses, or where there was a "substantial threat" such losses would occur. *See Woonasquatucket River Watershed Council v. U.S. Dept of Agric.*, No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025); *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022). Here, Plaintiffs point to no concrete evidence to suggest such losses have occurred or are *likely* to occur as a result of the Wind Memo. Further, Plaintiffs' job loss projections are highly speculative, as they are based on the number of jobs wind-energy-related projects are "expected" to generate in certain States. Pl. Mem. 36. Such bare allegations of what *may* occur at some indefinite time in the future are insufficient; Plaintiffs "must show that the injury complained of is of such imminence that there is a clear and present need for relief to prevent irreparable harm." *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

 *Third*, Plaintiffs claim that they will be obstructed from meeting State statutory obligations. Pls.' Mem. 37. This too is unpersuasive because it lacks a causal nexus with Defendants' actions. Plaintiffs fail to specifically allege how the Wind Memo's directives imminently "place[] [their] sovereign interests and public policies at stake." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). Although threats to state sovereignty can constitute irreparable harm, Plaintiffs fail to show that the Wind Memo so interferes with their ability to meet their State law requirements such as to "deprive[] [them] of" these interests, *id.* at 1227–28, or otherwise prevents Plaintiffs from using wind energy to "enforce [their] duly enacted plans," *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018). Plaintiffs rely on *Abbott*, 585 U.S. at 603 n.17, where the district court's injunctions forced Texas to contravene its own state elections law, and *Kansas*, 249 F.3d at 1227, where a National Indian Gaming Commission decision "place[d] the sovereign status of land within the State of Kansas wholly in the hands of the Miami Tribe and the [Commission]." But here, the Wind

Memo does not ban wind projects, nor does it ban any State projects, and thereby does not prevent Plaintiffs from complying with their State statutory obligations.

*Fourth*, a preliminary injunction is not necessary to protect the environment or public health. Plaintiffs' claims of harm are highly speculative and untethered to the Wind Memo and Agency Defendants' alleged inactions. For instance, Plaintiffs express concerns over impacts to projected 20-year gains in pollution reductions and health savings from a specific wind project in Maryland. Pl. Mem. 38-39. Claims of such speculative and distant harms do not imminently "hamper" "state efforts to . . . mitigate air pollution" warranting emergency injunctive relief. *Id.* (citing *New York v. Trump*, No. 1:25-cv-00039, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025)).[17]

Moreover, none of these alleged harms are irreparable.  Rather, any delay-oriented harms can be cured by a ruling in Plaintiffs' favor on the merits, and Plaintiffs have not sufficiently demonstrated that any irreparable harms will occur in the interim pending a final adjudication.

For many of the same reasons, Intervenor also fails to demonstrate irreparable harm to its members. Intervenor alleges that the temporary pause in federal wind energy approvals "creates substantial risks of project cancellation" and has "threatened billions of dollars in investment in wind energy projects." Interv. Mem. 35-36. But such harms are inherently conjectural and based on future projections of job and investment conditions in the wind industry. And, to the extent Intervenor alleges its members have already experienced specific personnel and revenue losses, such losses cannot reasonably be attributed to the Wind Memo or its directives. Indeed, Intervenor fails to allege a single statutory violation or final agency action causing such harms. As neither Plaintiffs nor Intervenor have demonstrated more than "tenuous or overly speculative forecast[s]

---

[17] Indeed, the assessment and review of federal wind projects pursuant to the Wind Memo could lead to enhanced decisionmaking for federal wind leasing and permitting that optimizes pollution reductions and mitigates emissions-related health and environmental harms.

of anticipated harm," they cannot meet their burden to warrant preliminary injunctive relief. *Hearst Stations Inc.*, 977 F. Supp. 2d at 40.

## III.    The Balance of the Equities and Public Interest Do Not Support a Preliminary Injunction

Plaintiffs also fail to satisfy the third and fourth *Winter* factors because the equities and the public interest tip sharply in Defendants' favor. These factors merge here because the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When addressing these factors, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted).

Plaintiffs' highly speculative harms are far outweighed by the intrusive effect an injunction could have on new agency decisionmaking and agency discretion. That discretion ensures that leasing and permitting decisions are sound and legally correct, and avoid or minimize environmental impacts consistent with applicable law. For these reasons, the balance of the equities and public interest weigh heavily against granting a preliminary injunction.

## IV.    Any Injunctive Relief Should Be Narrowly Tailored

Plaintiffs are not entitled to any relief whatsoever; however, should the Court determine otherwise, it should deny Intervenor's request to enjoin Section 2(a) of the Wind Memo nationwide. Interv. Mot. 1. Nationwide injunctions exceed a district court's authority under Article III and encroach on the President's executive power under Article II. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *accord Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting); *California v. Texas*, 593 U.S. 659, 687 (2021) (Alito, J., dissenting); *see also Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *31 (D.N.H. Apr. 24, 2025) (denying plaintiffs' request for nationwide injunction); *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying nationwide injunction outside plaintiff states).

39

Here, Intervenor has not shown a nationwide injunction is required to provide complete relief. At most, Plaintiffs have identified six projects or actions (not counting an unidentified project or Empire Wind) in only some Plaintiff States. *See supra* pp 28-30. Assuming Plaintiffs had a viable claim for preliminary relief (they do not), an appropriately tailored remedy would be an order for Agency Defendants to process any applications for those six projects. *Cf. Lujan*, 504 U.S. at 568 (critiquing party's failure to address "separate decisions to fund particular projects"); *Gill v. Whitford*, 585 U.S. 48, 66 (2018); *see also DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024); Fed. R. Civ. P. 65(d)(1)(C). Limiting relief to these projects would be workable and would not create confusion. Individual project proponents can assert APA § 706(1) claims for any agency action they allege has been unlawfully withheld or unreasonably delayed.

## V.    Plaintiffs Should Be Ordered to Post Security Pursuant to Rule 65(c) if Successful

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay costs and damages" sustained by the party wrongfully enjoined. Fed. R. Civ. P. 65(c). While the language of Rule 65(c) is mandatory, the First Circuit has recognized that "an amount that the court considers proper" grants the district court discretion in setting the dollar amount. *See Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018). If the Court issues an injunction, the Court must require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. At minimum, an appropriate bond here would be commensurate to the salaries and benefits the government must pay for any employees to carry out the awarded relief.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' and Intervenor's Motions and may dismiss their claims.

Respectfully submitted this 29th day of May 2025.

**ADAM R. F. GUSTAFSON**

Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Michael K. Robertson*

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

PHILLIP R. DUPRÉ
Senior Trial Attorney (TX Bar No. 24069650)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 598-9530
Email: Phillip.R.Dupre@usdoj.gov

ROBERT P. WILLIAMS
Senior Trial Attorney (DC Bar No. 474730)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-0210 | Fax: (202) 305-0275
Email: robert.p.williams@usdoj.gov

KIERAN O'NEIL
Trial Attorney (AK Bar No. 2311132)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Tel: (202) 353-7548
Email: kieran.o'neil@usdoj.gov

*Attorneys for Federal Defendants*