# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al,*

　　　　Plaintiffs,

　　v.

DONALD J. TRUMP, *et al*,

　　　　Defendants.

No. 1:25-cv-11221-WGY

## PLAINTIFF-INTERVENOR ALLIANCE FOR CLEAN ENERGY NEW YORK SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW FOR MOTION TO DISMISS ........................................... 3

ARGUMENT ................................................................................................................. 5

I.    ACE NY HAS ESTABLISHED STANDING TO SUE ....................................... 5

    A.    ACE NY Has Established Injury In Fact and Traceability for Standing. ....................... 5

    B.    ACE NY Has Established Redressability for Standing. ................................. 8

II.   ACE NY'S COMPLAINT SETS FORTH PROPER CLAIMS FOR RELIEF. .................... 9

    A.    ACE NY's Claims Do Not Require Mandatory Duties of Agencies. ........................ 10

    B.    The Wind Ban Contravenes Numerous Mandatory Provisions. ................................... 13

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*American Ass'n of Univ. Professors v. Rubio,*
  No. 25-10685-WGY, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ...................................... 4, 8

*Anglers Conservation Network v. Pritzker,*
  809 F.3d 664 (D.C. Cir. 2016) ................................................................................. 14

*Antilles Cement Corp. v. Fortuno,*
  670 F.3d 310 (1st Cir. 2012) .................................................................................. 8

*Atieh v. Riordan,*
  727 F.3d 73 (1st Cir. 2013) .................................................................................... 4

*China Unicom (Americas) Operations Ltd. v. FCC,*
  124 F.4th 1128 (9th Cir. 2024) ............................................................................. 18

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) ............................................................................................. 11

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) ..................................................................................... 8

*Ensco Offshore Co v. Salazar,*
  781 F. Supp. 2d 332 (E.D. La. 2011) ............................................................... 3, 10, 15

*FEC v. Akins,*
  524 U.S. 11 (1998) ............................................................................................... 8

*Gonzalez v. United States,*
  284 F.3d 281 (1st Cir. 2002) ................................................................................. 1

*Hornbeck Offshore Servs. v. Salazar,*
  696 F. Supp. 2d 627 (E.D. La. 2010) ............................................................... 3, 9, 12

*Invenergy Renewables LLC v. United States,*
  422 F. Supp. 3d 1255 (C.I.T. 2019) ...................................................................... 7

*Kingdomware Techs. Inc. v. United States,*
  579 U.S. 162 (2016) ............................................................................................ 17

*Louisiana v. Biden,*
  622 F. Supp. 3d 267 (W.D. La. 2022) ........................................................... 3, 10, 12, 15

*Louisiana v. Biden*,
No. 2:24-CV-00406, 2024 WL 3253103 (W.D. La. July 1, 2024) .......................... 3, 10, 12, 13

*Marathon Oil Co. v. EPA*,
564 F.2d 1253 (9th Cir. 1977) ................................................................. 14

*Maryland Shall Issue, Inc. v. Hogan*,
971 F.3d 199 (4th Cir. 2020) ................................................................... 7

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ............................................................................ 8

*Multicultural Media, Telecom and Internet Council v. FCC*,
873 F.3d 932 (D.C. Cir. 2017) ............................................................... 11

*Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ............................................................... 13

*New Hampshire Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018) .................................................................. 13

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) ................................................................. 11

*New York v. Trump*,
No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ....................... 11

*Orr v. Trump*,
No. 1:25-CV-10313-JEK, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ................. 11

*Rhode Island v. Trump*,
No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025) .................. 11

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
123 F.4th 1 (1st. Cir. 2024) ................................................................. 11

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................ 1

*Texas Bankers Ass'n v. Office of the Comptroller*,
728 F. Supp. 3d. 412 (N.D. Tex. 2024) ..................................................... 8

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgt. Council*,
589 F.3d 458 (1st Cir. 2009) ................................................................. 9

**Statutes**

5 U.S.C. § 551(8) ................................................................................................ 14

5 U.S.C. § 558 ............................................................................................... 14, 15

5 U.S.C. § 701(a)(2) ............................................................................................ 11

5 U.S.C. § 702(A) ............................................................................................... 10

5 U.S.C. § 706(2)(A) ........................................................................................... 12

5 U.S.C. § 706(2)(C) ..................................................................................... 12, 13

5 U.S.C. § 555(b) ................................................................................................ 14

5 U.S.C. § 555 (e) ............................................................................................... 14

16 U.S.C. § 1375(a)(5)(A)(i) .............................................................................. 17

33 U.S.C. § 1344(q) ............................................................................................ 16

42 U.S.C. § 4370m .......................................................................................... 6, 14

43 U.S.C. § 1332(3) ...................................................................................... 14, 15

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 3

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 3

Fed. R. Civ. P. 65(a)(2) ..................................................................................... 4, 5

**Regulations and Executive Orders**

30 C.F.R. § 585.613 ............................................................................................ 15

30 C.F.R. § 585.628 ............................................................................................ 15

33 C.F.R. § 320.4 ................................................................................................ 16

33 C.F.R. § 325.2 ............................................................................................. 7, 16

40 C.F.R. § 124.15(a) .......................................................................................... 17

40 C.F.R. § 124.3 ................................................................................................ 16

50 C.F.R. § 22.210(d) ............................................................................................. 17

50 C.F.R. § 22.250 .................................................................................................. 17

50 C.F.R. § 216.104(c) ........................................................................................... 17

50 C.F.R. § 216.104(d) ........................................................................................... 17

Executive Order, Declaring a National Energy Emergency,
   90 Fed. Reg. 8433 (Jan. 20, 2025) ..................................................................... 15

# INTRODUCTION

At its hearing on June 5, 2025, the Court collapsed Plaintiffs' preliminary injunction motions with final resolution on the merits, construed Defendants' filed opposition to a preliminary injunction as a motion to dismiss, set a hearing on that motion to dismiss for June 11, 2025, and allowed additional filings in advance.  ECF No. 137.  ACE NY submits this supplemental brief and accompanying supplemental declaration in opposition to the motion to dismiss and to further address the harm, redressability, and merits issues the Court raised at the June 5 hearing.  In deciding the motion to dismiss, the Court can consider Plaintiffs' filed complaints, briefing, and declarations to date.[1]  To avoid burdening the Court with duplicative filings, ACE NY incorporates those prior filings by reference in opposing the motion to dismiss.

The Court should decline to dismiss Plaintiffs' claims, and instead enter a schedule for the prompt filing of any administrative record and merits briefing.  As the Court recognized at the June 5 hearing, at this stage it must draw all inferences in Plaintiffs' favor.

ACE NY has amply demonstrated standing to challenge the Wind Ban on behalf of its members in need of federal permits for wind energy projects offshore and onshore nationwide, and provides more detail herein.  While Defendant agencies' actions plainly have nationwide scope and effect, all parties have also identified numerous specific examples of the Wind Ban's harms, which are very real.  Defendants' own filings admit that agencies have indefinitely refused to act on multiple wind projects being developed by ACE NY members, and ACE NY has identified other such projects.  In addition, the attached Supplemental Declaration of Marguerite Wells (Attachment A) lists all current federal offshore wind leases still requiring

---

[1] *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002).  The previous declarations were submitted to support harm for a preliminary injunction; injury for standing is less demanding, and only a concrete invasion of a legally protected interest, or risk of such an invasion, is required.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-42 (2016).

federal authorizations to construct and operate wind projects thereon, the vast majority of which are owned by ACE NY members. Yet, the Bureau of Ocean Energy Management ("BOEM") and other agencies have invoked the Wind Ban to decline taking action on any permits for these projects. ACE NY further has identified numerous members whose businesses rely on supplying vessels, materials, equipment, or labor for wind projects and thus have been harmed by the Wind Ban's preclusion of those projects. ACE NY also attaches a full list of its broad-based membership. Wells Supp. Decl., Attachment B.

Relief from the Wind Ban would redress ACE NY's members' injuries by allowing agency permitting processes to run their course without the obstacle of agencies first completing an ill-defined, redundant, interminable, and likely pretextual "comprehensive assessment and review" under Section 2(a) of the January 20, 2025 Presidential Memorandum. Whether individual wind projects are ultimately approved absent the Wind Ban is immaterial to the redressability inquiry. Plaintiffs need only demonstrate that, if the Wind Ban is set aside, they *might* receive a favorable decision. A recipient of an adverse decision at least has the opportunity to appeal that decision as warranted, as opposed to the indeterminate limbo under the Wind Ban.

On the merits, the Court inquired as to statutory mandates to conduct wind permitting. At the outset, that inquiry is premature and overly narrow on a Rule 12(b)(6) motion to dismiss. Plaintiffs have brought multiple claims, including under the Administrative Procedure Act ("APA"). Each Defendant agency has taken final agency action, in the form of its respective decision not to permit *any* wind projects nationwide, and those agency actions directly affect the rights of each ACE NY members in need of those agency decisions. ACE NY challenges such adoption of the Wind Ban not only as contrary to several statutes and regulations (Count III), but

also as arbitrary and capricious and improper substantive rulemaking (Counts I and II).  It is improper to pre-screen these APA claims in the absence of a lodged administrative record on which they must be adjudged.  Moreover, ACE NY is not legally required to establish that the agencies have violated a mandatory duty; indeed, an APA claim for agency abuse of discretion necessarily assumes some agency discretion.

In any event, Plaintiffs have identified multiple statutory and regulatory bases foreclosing the Wind Ban.  And Plaintiffs are not asking the Court to plow new ground; at least four prior court decisions have found that similar wholesale cessations of agency permitting and leasing for energy development are unlawful.  *See Louisiana v. Biden*, No. 2:24-CV-00406, 2024 WL 3253103 at 6 (W.D. La. July 1, 2024) (enjoining pause of liquified natural gas exports); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 292 (W.D. La. 2022) (enjoining so-called "pause" of oil and gas leasing); *Ensco Offshore Co v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (enjoining pause of oil and gas permitting); *Hornbeck Offshore Servs. v. Salazar*, 696 F. Supp. 2d 627, 631, 639 (E.D. La. 2010) (same).  The same rationale applies here—agencies cannot simply stop all wind development any more than they can simply stop all oil and gas development, and Defendants identify no authority to the contrary.  Therefore, ACE NY's claims are adequately pled and warrant full adjudication on the merits by this Court.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

The Court has construed Defendants' filed opposition to the preliminary injunction motions as a motion to dismiss.  Though the alleged grounds for dismissal are unspecified, ACE NY understands the Court's stated harm and redressability questions as pertaining to its jurisdiction under Fed. R. Civ. P. 12(b)(1), and its stated merits questions as pertaining to Plaintiffs' stated claims under Fed. R. Civ. P. 12(b)(6).  "Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), 'the reviewing court must take all of plaintiff's allegations as true and

must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff.'" *American Ass'n of Univ. Professors v. Rubio*, No. 25-10685-WGY, 2025 WL 1235084 at *6 (D. Mass. Apr. 29, 2025) (citation omitted).

While plaintiffs typically must "state a claim to relief that is plausible on its face" to defeat a motion to dismiss, even that low bar "plausibility standard has no place in APA review." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). Rather, "APA review presents no need for screening," because the court cannot fully address the merits in the absence of an administrative record. *Id.* ("The relevant inquiry is—and must remain—not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision."). Here, ACE NY suspects that no administrative record exists to support the Wind Ban, especially as Defendants concede agencies "are merely complying with the temporary cessation directed by the Wind Memo," i.e., the Presidential Memorandum issued on the first day of the current Administration. ECF No. 123 ("Def. Mem.") 32. But at minimum, it would be premature to dismiss any of Plaintiffs' claims at this stage, particularly as the Court has indicated its intent under Fed. R. Civ. P. 65(a)(2) to expedite final resolution of the merits in lieu of first deciding Plaintiffs' preliminary injunction motions.[2]

---

[2] Nor in this posture is the government prejudiced by the Court's present consideration of additional, cumulative information herein. ACE NY's present filing is consistent with its prior submissions, and Defendant agencies do not dispute that they are uniformly declining to decide permits to all wind project applicants. Defendants have the opportunity to present oral argument, file a supporting administrative record, and further brief any arguments at the merits stage.

## ARGUMENT

### I.    ACE NY HAS ESTABLISHED STANDING TO SUE.

#### A.    ACE NY Has Established Injury In Fact and Traceability for Standing.

As further demonstration of its standing, beyond its previous submissions, ACE NY provides a list of offshore wind energy leases issued under OCSLA, most of which are owned by ACE NY members, each of which require additional federal permits to construct and operate wind projects thereon. Wells Suppl. Decl., Attachment A. ACE NY also provides additional information on the status of those leases, including those for which it is undisputed that agencies have refused to act on wind energy permits due solely to the Wind Ban. *Id.* ACE NY further includes a full listing of its members, including, but not limited to, developers and suppliers of wind energy projects. Wells Suppl. Decl., Attachment B.

For example, ACE NY member Atlantic Shores has requested state regulators to vacate its "offtake agreement" in light of the severe uncertainties for its project caused by the Wind Ban. Wells Suppl. Decl. ¶ 23. Atlantic Shores "has materially reduced its personnel, terminated contracts, and canceled planned project investments," *id.* ¶ 22, demonstrating the Wind Ban's severe harms. See *id.* ¶¶ 8-25 (detailing effects of the Wind Ban on Atlantic Shores). The Bluepoint Wind and SouthCoast Wind projects likewise have incurred delays, and associated burdens and costs, due to the Wind Ban. ECF No. 136. BOEM also publicly announced that it has paused permitting for the Skipjack Wind project. Wells Suppl. Decl. ¶ 6. All of these projects involve ACE NY members.[3]

---

[3] BOEM's filed declaration suggests that SouthCoast Wind and Bluepoint Wind have failed to engage in the FAST-41 dispute resolution process for those projects, Stromberg Decl ¶¶ 9, 10, but the government has taken the position that such dispute resolution is available only to agencies, not project sponsors. *See, e.g.,* Permitting Council, "Fast-41 for Infrastructure Permitting" at 2 ("If agencies are unable to agree on a timetable, the Permitting Council's

ACE NY also has multiple members with land-based projects that have been affected by the Wind Ban.  These include Prattsburgh Wind, Canisteo Wind, and Heritage Wind, all of which have permits pending with the U.S. Army Corps of Engineers and which involve a total of over $1 billion in investments.  Wells Suppl. Decl. ¶¶ 31-34.  Because the Corps has conceded that it has stopped issuing permits for any wind projects, those permits will not be granted for as long as the Wind Ban is in place.  Five more identified projects in development by ACE NY members are scheduled to begin permitting in the third quarter of this year and will likewise be unable to obtain needed permits from the Corps.  Wells Suppl. Decl. ¶ 35.  Two of these projects also expect to seek general permits under the Bald and Golden Eagle Protection Act (BGEPA), *id.*, a category of permits that previously was automatically granted yet the U.S. Fish and Wildlife Service ("USFWS") now admits it will not issue due to the Wind Ban.  ECF No. 123-6 (Ford Decl.) ¶ 9.

ACE NY has established standing to sue also based on at least seven named members that manufacture components for wind projects, construct wind projects, and are otherwise involved in the wind energy industry, and that have been injured by the Wind Ban. The Arthur Kill Terminal supporting several offshore wind projects is one such member, as it has both been denied a permit decision in its own right and is a member of the industry that is harmed by the Wind Ban.  ECF No. 71 (Smith Decl.), Ex. 7 [NY-Gawlik] ¶ 8.  The Corps admits that it has not conducted a National Environmental Policy Act ("NEPA") process for the Terminal because of

---

Executive Director will mediate disputes."),
https://www.permits.performance.gov/sites/permits.dot.gov/files/2020-05/FAST_41_FS_20200325.pdf; 42 U.S.C. § 4370m-2(c)(2)(A) (setting schedule "with the concurrence of each cooperating agency").  Moreover, the statutory provision governing extensions of the permitting schedule does not appear to allow dispute resolution at all.  42 U.S.C. § 4370m-2(c)(2)(A).

the Wind Ban, ECF No. 123-2 (McElwain Decl.) ¶ 10, which means that the Terminal may not

be able to finalize a $48 million grant agreement with the U.S. Maritime Administration that is

conditioned on completion of NEPA review.  Smith Decl. Ex. 7 ¶ 9.[4]  ACE NY has identified

numerous other named members of the industry who have been harmed by the Wind Ban as

well.  ECF No. 65 (Donadio Decl.); ECF No. 64 (Burdock Decl.) ¶¶ 27, 33, 38, 42, 45.  And

Defendants' facile attempt to pass the buck to "third parties" ignores that the Wind Ban is

destroying demand for wind industry products by delaying and threatening the cancellation of

the projects on which their businesses depend.[5]  *See* Def. Mem. 22; ACE NY Reply 4; *see also*

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) (firearms dealer had

standing to challenge restrictions on gun ownership, and stating that "courts have likewise

consistently held that a vendor has third-party standing to pursue claims on behalf of its

customers"); *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1273-75 (C.I.T.

2019) (solar developer that is consumer of solar panels had standing to challenge import duties

on such panels, and rejecting argument that the developer's harm "arises from relationships with

third parties and not from the Government's own actions").

> In sum, ACE NY has identified numerous members that satisfy standing.  *See also* ACE

NY Reply 3-5.  In addition to those named members, the Court can properly consider evidence

---

[4] As to the Terminal, the Corps admits that it has not initiated a public comment process required by its regulations.  33 C.F.R. § 325.2 (public notice "will" be issued within 15 calendar days of receipt of a complete application); ECF No. 123-2 (McElwain Decl.) ¶ 10.  And as further discussed *infra*, the need for other agency actions before a final permit decision does not mean that an agency can avoid judicial review of failure to comply with applicable legal requirements.
[5] Defendant agencies assert that ACE NY member WindServe Marine's injuries were the result of BOEM's sudden stoppage of the fully-permitted Empire Wind project (by invoking the Wind Ban), which was just as suddenly allowed to resume construction a month later, after this lawsuit was filed.  Def. Mem. 22 n.11.  But WindServe Marine's business also depends on other wind energy projects that the Wind Ban has placed in limbo.  Wells Suppl. Decl. ¶ 29.

relating to other, unnamed ACE NY members in finding standing to sue, especially in light of the Administration's publicly demonstrated willingness to use the power of the executive branch to retaliate against firms, universities and other institutions, countries, current and former government officials, and individuals that publicly oppose its objectives. *Texas Bankers Ass'n v. Office of the Comptroller,* 728 F. Supp. 3d. 412, 418-420 (N.D. Tex. 2024) (collecting cases authorizing anonymous declarations to support associational standing). Only "at least one identified member" of ACE NY must suffer injury for standing, which ACE NY has demonstrated. *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); Def. Mem. 21 (government conceding same). Nothing requires ACE NY to identify every injury for all of its members. *Rubio*, 2025 WL 1235084 at *16.

### B.    ACE NY Has Established Redressability for Standing.

An order that Defendant agencies cease their across-the-board Wind Ban would constitute cognizable redress to ACE NY's members, regardless of what decisions agencies then will make on individual projects. Redressability for standing requires only that a plaintiff show "a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151-52 (2010) (opportunity to seek remedy before agency constitutes redress, even if outcome of agency proceedings is uncertain). Setting aside an unlawful agency decision satisfies Article III redressability "even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason." *FEC v. Akins*, 524 U.S. 11, 25 (1998) (citation omitted). If an agency disapproves a project, the applicant at least can seek judicial review or pursue other remedies to address any perceived deficiencies in the application or in the agency decision.

In an analogous case, the First Circuit found a plaintiff had standing to challenge one obstacle to development of an energy project even though the project in question would still require additional approvals. *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgt. Council,* 589 F.3d 458, 467-69 (1st Cir. 2009). The same is true here; removal of the Wind Ban's precondition for a completed comprehensive assessment would remove an independent obstacle to wind permitting. The economic stakes for ACE NY's members are high, and restoring the opportunity to obtain approval of their wind projects' permits, or to appeal denials, would concretely benefit the many businesses that are experiencing severe harms due to the Wind Ban's blanket preclusion of any permitting whatsoever.

## II.    ACE NY'S COMPLAINT SETS FORTH PROPER CLAIMS FOR RELIEF.

Satisfied of its jurisdiction, the Court should consider the merits on an expedited administrative record and briefing, rather than on a motion to dismiss, as explained *supra*. However, ACE NY here further addresses the Court's merits question at the hearing regarding violations of agencies' mandatory duties regarding wind permitting. First, a premise of mandatory duties is not dispositive of any of ACE NY's claims, and not even relevant to its Counts I and II. Second, the Wind Ban contravenes multiple applicable statutes and regulations.

Several cases enjoining prior blanket stoppages of energy development illustrate these points and demonstrate the soundness of ACE NY's APA claims in its complaint. Two cases reviewed permitting stoppages after the Deepwater Horizon incident offshore. Both decisions found that the Department of the Interior and BOEM had no authority under the APA and OCSLA to suspend offshore deepwater oil and gas permitting. In one, the agencies had imposed "a six-month moratorium on permits for new wells" and restricted drilling operations for existing wells. The court found that moratorium impermissible and issued injunctive relief. *Hornbeck Offshore Services,* 696 F. Supp. 2d at 631, 639. Another case involved a subsequent wholesale

9

stoppage of all deepwater oil and gas permitting offshore, such that some permits had been "pending from four to some nine months," causing indeterminate delays. Again, the court issued an injunction. *Ensco Offshore Co*, 781 F. Supp. 2d at 339. Those decisions are directly applicable here, where the agencies likewise claim authority to impose an indeterminate halt on permitting but can cite no statute or regulation that authorizes such a halt. And their holdings apply with even greater force to the Wind Ban given the absence of any duration and any demonstrated unaddressed risk stemming from wind energy development.

Two additional cases enjoined oil and gas halts imposed by the previous Administration. One enjoined a halt to oil and gas leasing, both offshore and onshore, finding that the agencies had no legal authority to impose such a halt and that the agencies' actions were arbitrary and capricious. *Louisiana,* 622 F. Supp. 3d at 292. The second enjoined a halt on permits for liquified natural gas exports, finding that the agencies lacked statutory authority to impose such a halt and that the agencies' actions were arbitrary and capricious. *Louisiana,* 2024 WL 3253103 at *6. Both decisions also found that the agency had failed to provide an opportunity for notice and comment, just as ACE NY argues in Count II of its complaint.

Here too, ACE NY has properly stated claims for relief in its complaint. And like in the cases above, Defendants have cited no authority for adoption of the Wind Ban, and have not attempted to explain the rationale of the Wind Ban or to defend it on the merits. Dismissal of Plaintiffs' claims thus is unwarranted and improper.

### A.    ACE NY's Claims Do Not Require Mandatory Duties of Agencies.

APA arbitrary and capricious review under 5 U.S.C. § 702(A) extends to agency action with a discretionary component, and does not hinge on the existence of a mandatory duty. This court recently addressed this issue, finding that "[e]ven in a domain, such as this, where Congress has 'confer[red] broad authority' on an agency, the agency remains subject to the

requirements of the APA and its actions remain subject to review for arbitrariness." *Orr v. Trump*, No. 1:25-CV-10313-JEK, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) (citation omitted) ("The Agency Defendants' position would contravene settled precedent and improperly insulate broad swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency."). The salient question is whether there is a "meaningful standard by which to judge" whether the agency has abused its discretion, not whether a statute creates a mandatory duty. *Dep't of Commerce v. New York*, 588 U.S. 752, 772 n.13 (2019).

Thus, courts routinely apply arbitrary and capricious review to discretionary agency action irrespective of whether the applicable statute creates a mandatory duty. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 69-70 (1st Cir. 2025) (rejecting argument that injunction must be limited to "nondiscretionary" aspects of agency programs); *Multicultural Media, Telecom and Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017) (Kavanaugh, J.) (finding that statutory language was not mandatory, then applying arbitrary and capricious review); *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621 at *12 (D.R.I. Mar. 6, 2025); *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *10 (D.R.I. May 6, 2025) (applying arbitrary and capricious review to agency reductions in force, and also separately analyzing the applicability of statutory mandates).[6] That is consistent with Congress' "enact[ment of] the APA to make agency action presumptively reviewable." *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1, 20 (1st. Cir. 2024). Predicating all APA review on a search for statutory

---

[6] A contrary rule would expand the APA's narrow exception to judicial review, which the Supreme Court has said should apply only in "rare circumstances," and which even Defendants do not claim applies here. *New York*, 588 U.S. at 772 (discussing agency actions "committed to agency discretion by law") (citing 5 U.S.C. § 701(a)(2)).

mandates to agencies also would improperly conflate the APA's distinct grounds for setting

aside final agency action. *Compare* 5 U.S.C. § 706(2)(A) (arbitrary and capricious (Count I of

ACE NY's complaint)) *with* 5 U.S.C. § 706(2)(A), (C) ("not in accordance with law" or "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (Count III of

ACE NY's complaint)).

As described above, courts have found agency actions similar to the Wind Ban to be

arbitrary and capricious because they are unreasoned, unsupported, or irrational, without hinging

those findings on violations of statutory mandates. One such court found a blanket freeze on oil

and gas leasing without explanation to be arbitrary and capricious, observing that "a command in

an Executive Order does not exempt an agency from the APA's reasoned decision-making

requirement." *Louisiana*, 622 F. Supp. 3d at 294-95; *see also Louisiana*, 2024 WL 3253103 at

*16 (blanket halt on permitting for natural gas exports pending completion of new studies was a

"complete reversal" of DOE policy "without explanation or reasoning" and was arbitrary and

capricious); *Hornbeck Offshore Serv.*, 696 F. Supp. 2d at 637-38 (offshore oil and gas permitting

moratorium failed to consider safety records of operators, lacked explanation, and was arbitrary

and capricious).

Similarly, per Count II of ACE NY's complaint, Defendant agencies in adopting the

Wind Ban have improperly promulgated substantive rules without requisite public notice and

comment. Such a claim likewise does not depend on the existence of a mandatory statutory duty

and instead turns on whether the agency has adopted a substantive requirement that constrains

agency discretion. For example, a summarily adopted policy precluding all oil and gas leasing

that "leaves the agency and its decisionmakers with no true discretion" is a substantive rule and

violates the APA notice and comment requirement. *Louisiana*, 622 F. Supp. 3d at 296-97; *see*

*also Louisiana*, 2024 WL 3253103 at *15 (agency ban on issuance of export licenses "broadly and immediately halts consideration of pending and future … export applications" and "changes the methods the DOE uses to review applications," triggering APA notice and comment requirement); *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 73-74 (1st Cir. 2018) (notice and comment required for agency policy decision that "likely involves large sums of money" and is "a new policy on a matter of considerable import").

Beyond statutes, it is blackletter law that agencies are bound by their adopted regulations, and cannot alter them without undertaking new APA rulemaking. *Nat'l Env't Dev. Ass'n Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014). As further discussed *infra*, the Wind Ban violates statutory requirements or effectively amends existing regulations. *See New Hampshire Hosp. Ass'n*, 887 F.3d at 73 (APA analysis considers whether agency action is "inconsistent with another rule having the force of law or otherwise alters … obligations imposed by a preexisting regulation") (cleaned up). But regardless, ACE NY's claim under Count II does not depend on identifying a violation of a mandatory provision of law.

### B.    The Wind Ban Contravenes Numerous Mandatory Provisions.

Count III of ACE NY's complaint challenges Defendant agencies' adoption of the Wind Ban as "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). ACE NY can prevail on this claim either by establishing that the agencies have contravened a statutory or regulatory mandate, or by establishing that the agencies' actions have no legal basis in the applicable statutes or regulations (such that their actions are "in excess of statutory authority" or "short of statutory right"). Here, the governing statutes and regulations require actions such that agencies may not simply and indefinitely refuse to act on permit applications.

13

*Administrative Procedure Act.*  At the outset, APA Section 558 applies to all agency permitting provisions and requires that an agency receiving an application for a permit, license, or authorization "shall set and complete proceedings required by law and shall make its decision."  5 U.S.C. § 558.  As the Court emphasized at the June 5 hearing, a wind energy permit is a "license."  *See* 5 U.S.C. § 551(8) (definition of "license").  "Ordinarily, legislation using 'shall' indicates a mandatory duty."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012)).  APA Section 558 does not include specific deadlines, but does require that agencies "within a reasonable time" act on permits and authorizations provided for by other statutes, such that a uniform agency policy of indefinitely refusing to take action is contrary to law.  *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1260 n.25 (9th Cir. 1977) ("expeditious and judicious manner"); *see also* 5 U.S.C. §§ 555(b), (e) (requiring that agencies act "with due regard for the convenience and necessity of the parties and within a reasonable time," and that "prompt notice" be given of denials of applications, petitions, or requests). Congress has imposed further agency obligations to act on permit applications in FAST-41, which prescribes a transparent and expeditious process to govern permitting for covered projects, including most proposed offshore wind projects to date.  *See* 42 U.S.C. §§ 4370m *et seq.*; ACE NY Complaint ¶¶ 149-56.

*Outer Continental Shelf Lands Act.*  Congress in OCSLA made the OCS available "for expeditious and orderly development."  43 U.S.C. § 1332(3).  Congress adopted OCSLA during the energy crisis of the 1970s to ensure that the energy resources of the OCS were promptly

developed.[7]  This mandate prohibits an agency from adopting a wholesale policy of inaction on permitting energy projects.  Multiple courts have upheld this directive.  For example, one court found that "[n]ot acting on permit applications seems contrary to OCSLA's command that drilling development be 'expeditious,' 43 U.S.C. § 1332(3), and the APA's command that a permit must be processed 'within a reasonable time.' …. Together, OCSLA and the APA inform the government's action on permits and require that the government should act expeditiously to advance development in the Outer Continental Shelf, and not to curtail drilling unpredictably or indefinitely."  *Ensco*, 781 F. Supp. 2d at 336-37.  Another court agreed, finding "OCSLA establishes the Shelf as 'a vital national resource reserve held by the Federal Government for the public,'" and concluding that action "to stop the lease process for eligible lands is not within the discretion of the agencies by law under … OCSLA."[8]  *Louisiana*, 622 F. Supp. 3d at 277, 293.

BOEM's regulations provide that BOEM "will" promptly evaluate submissions relating to projects and make a decision to approve a request, disapprove it, or approve it with conditions.  *See, e.g.,* 30 C.F.R. §§ 585.613 (site assessment plan), 585.628 (construction and operations plan).  These provisions must be read together with OCSLA's "expeditious and orderly" development mandate and with APA Section 558's directive that permitting proceedings be "expeditious."  None of these provisions provides authority for BOEM to refuse to perform its permitting functions indefinitely.  *Louisiana*, 622 F. Supp. 3d at 293.

_Clean Water Act Section 404_.  The Corps admits that it has ceased issuing permits for wind energy projects, including postponing the deadlines for issuing the SouthCoast Wind

---

[7] The current Administration's declared national energy emergency indicates that this concern remains salient today.  Executive Order, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 20, 2025).

[8] Defendants do not deny this OCSLA mandate, mentioning it only in a footnote on prudential standing.  Def. Mem. 19 n.9.

permit and for commencing the public comment period for the Arthur Kill Terminal permit. ECF No. 123-2 (McElwain Decl.) ¶¶ 6, 7, 9, 10. Clean Water Act Section 404 requires the Corps to "minimize delays in the issuance of permits" and issue a decision "to the maximum extent practicable … no later than the ninetieth day after the notice for such application is published." 33 U.S.C. § 1344(q). The Corps' implementing regulations for Section 404 permits require that public notice "will" be issued within 15 calendar days of receipt of a complete application, 33 C.F.R. § 325.2, and that the Corps "will decide on all applications no later than 60 [calendar] days after receipt of a complete application." *Id*. The regulations also require that the Corps give energy projects "high priority." 33 C.F.R. § 320.4. Nothing in the regulations allows a categorical stop to Corps permitting.

Defendants' brief and the Corps' declaration touch on some of these provisions, but do not deny that that they create mandatory duties or cite any legal authority for the Wind Ban. With respect to SouthCoast Wind, for example, the Corps has missed its 60-day deadline by many months. ECF No. 123-2 (McElwain Decl.) ¶ 9.[9] And for the Arthur Kill Terminal, the Corps has violated its regulation requiring public notice within 15 days of receipt of a complete application. *Id.* ¶ 10.

*Clean Water Act Section 402 and Clean Air Act.* For Clean Water Act Section 402 permits and Clean Air Act permits, EPA must establish a timetable for permit issuance at the outset of the permit proceedings, 40 C.F.R. § 124.3, and "after the close of the comment period

---

[9] The Corps tries to explain this delay by claiming other agencies are "evaluating MMPA incidental take authorization" and "evaluating Clean Water Act Section 402 authorization associated with the project." *Id*. Of course, like the Corps, those agencies have frozen such authorizations due to the Wind Ban. ACE NY has collectively sued all of these agencies to ensure that they cannot circularly point fingers at one another as the cause of any particular delay. The Corps' declaration also rebuts the government's assertion, Def. Mem. 8, that ACE NY has not identified any overdue incidental take regulation decision under the MMPA.

… EPA *shall* issue a draft permit," 40 C.F.R. 124.15(a) (emphasis added).  The Wind Ban undercuts these mandates.  For example, the comment period on SouthCoast Wind's Clean Air Act permit closed in November 2024, and EPA has publicly deferred any decision on the permit until at least September 2025 in reliance on the Wind Ban—a ten-month delay that cannot be reasonably justified either by the need to address nine public comments, or by a Wind Ban that is inconsistent with the statute.  ECF No. 123-4 (Voyles Decl.) ¶¶ 13-17.

        *Marine Mammal Protection Act.*  The MMPA provides that the National Marine Fisheries Service ("NMFS") "shall" allow incidental take if it makes the appropriate findings. 16 U.S.C. § 1375(a)(5)(A)(i).  The use of "shall" contrasts with the use of "may" elsewhere in the statute, demonstrating Congress's intent to impose a mandatory requirement.  *Kingdomware Techs. Inc. v. United States*, 579 U.S. 162, 172 (2016).  NMFS's regulations are similarly mandatory.  50 C.F.R. § 216.104(c),(d) (NMFS "shall" evaluate requests and "shall" publish determinations for public comment).  Defendants fail to explain how the Wind Ban comports with these NMFS requirements.

        *Bald and Golden Eagle Protection Act.*  USFWS regulations expressly authorize general permits under BGEPA for wind energy activities.  50 C.F.R. § 22.250.  The regulations provide for automatic issuance of general permits to applicants who meet the criteria for a permit. The regulations also define the criteria for permit issuance, and none of those criteria accommodates the total Wind Ban. 50 C.F.R. § 22.210(d).  USFWS's admission, ECF No. 123-6 (Ford Decl.) ¶ 9, that it will no longer issue this category of permits for any wind projects is therefore squarely inconsistent with the agency's own regulations providing a process for issuing such permits, and affording no mechanism for wholesale elimination.

In summary, Defendant agencies lack authority to adopt the Wind Ban because it necessarily conflicts with their mandatory obligations to act promptly on wind permit applications under applicable statutes and regulations.  To the extent that Defendant agencies claim to have implied authority to manage their permitting processes or to extend certain deadlines, the statutory and regulatory schemes under which they operate cannot be reconciled with a blanket and indefinite freeze on permitting decisions.  "An agency's assertion of an implied … authority may … be sharply limited, or even foreclosed, where the statutory structure negates that assertion of implied authority."  *China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024).  Defendants cannot insulate the unlawful Wind Ban from judicial review by labeling it merely a "policy disagreement."  Def. Mem. 1.  The Wind Ban is a wind industry-wide permitting freeze with widespread catastrophic effects, and warrants judicial review on the merits.

## CONCLUSION

For the reasons above and in its and State Plaintiffs' previous filings, the Court should decline to dismiss Plaintiffs' claims, and should set a case management conference to arrange for expeditious resolution on the merits.

Dated: June 10, 2025                              Respectfully submitted,

                                                 BEVERIDGE & DIAMOND, P.C.

                                                 */s/ Brook J. Detterman*
                                                 Brook J. Detterman, BBO No. 675396
                                                 James M. Auslander, *pro hac vice*
                                                 155 Federal Street, Suite 1600
                                                 Boston, MA 02110-1716
                                                 (617) 419-2345
                                                 bdetterman@bdlaw.com
                                                 jauslander@bdlaw.com

                                                 *Attorneys for Plaintiff-Intervenor*
                                                 *Alliance for Clean Energy New York*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed on June 10, 2025.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

BEVERIDGE & DIAMOND, P.C.

*/s/Brook J. Detterman*
Brook J. Detterman, BBO No. 675396
155 Federal Street
Suite 1600
Boston, MA 02110-1716
(617) 419-2345
bdetterman@bdlaw.com

19