# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-11221 |

## FIRST AMENDED DECLARATION OF
## KATHARINE PERRY

I, Katharine Perry, declare as follows:

1. I am currently employed by the State of New Jersey Board of Public Utilities ("NJBPU") as Deputy Director for Resource Adequacy within the Division of Clean Energy, which includes responsibility for the Offshore Wind Program. I have been employed by the State of New Jersey since early 2024. Prior to joining the State, I held roles in the private sector working on large-scale energy infrastructure projects, both as a consultant and as part of the development management team of an offshore wind developer.

2. I have extensive professional knowledge and experience regarding the role of offshore wind ("OSW") energy in New Jersey's plans to prepare for the

impacts of climate change and greenhouse gases, stimulate economic development, and support the development of new sources of clean electricity that can help meet the State's energy needs. My job duties include overseeing the development and execution of the NJBPU's OSW program, ensuring the timely and responsible procurement of OSW projects on behalf of the State in accordance with the State's clean energy goals and initiatives, further detailed below, and ensuring all procured OSW projects comply with the requirements imposed by any NJBPU project approval.

3.      I have a bachelor's degree in Natural Resource Studies, and a master's degree in Environmental Science and Management.

4.      In my capacity as Deputy Director I am aware of and familiar with the science related to global and local climate change as well New Jersey's plans to rely upon OSW energy to address them. As a result of my professional experience and my personal knowledge, my review of and involvement in the development of cited materials, and my personal knowledge of the NJBPU policies and planning related thereto, I can attest to the following.

5.      I am submitting this amended declaration in further support of the States of New York, Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Michigan,

Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, and Washington (collectively, Plaintiff States) opposition to Defendants' motion to dismiss.

### THE NEW JERSEY BOARD OF PUBLIC UTILITIES

6.      NJBPU is the New Jersey state agency with authority to oversee regulated utilities, which provide critical services such as natural gas, electricity, water, telecommunications, and cable television.[1] The law requires the NJBPU to ensure safe, adequate, and proper utility services at reasonable rates for customers in New Jersey.[2]  On this basis, NJBPU regulates the rates of electric utilities, and more generally, the utilities' distribution of electricity to millions of homes throughout New Jersey. This includes the approval of utility-run energy efficiency programs intended to reduce overall energy consumption and related emissions consistent with State law. NJBPU also regulates electric utilities' compliance with statutorily mandated renewable portfolio standards.[3] These standards require that a minimum percentage of the total amount of electricity the electric utilities purchase and sell to customers in New Jersey come from renewable sources, including OSW energy.[4]

---

[1] N.J. Stat. Ann. § 48:2-13.

[2] N.J. Stat. Ann. § 48:2-21; N.J. Stat. Ann. § 48:2-23.

[3] N.J. Stat. Ann. § 48:3-87(d).

[4] *Id.*

7.      In furtherance of NJBPU's responsibility to ensure safe, adequate, and proper utility service, in the context of interstate electricity transmission, NJBPU also advocates for the interests of New Jersey ratepayers before the Federal Energy Regulatory Commission ("FERC") and through NJBPU's relationship with regional electricity grid operator PJM Interconnection, LLC ("PJM").

8.      NJBPU also plays an integral role in the generation of statewide energy master plans, which are developed by a committee of interested state agencies and must be updated periodically.[5]

9.      In 2010, NJBPU was authorized by the Offshore Wind Economic Development Act ("OWEDA") to conduct competitive solicitations to select proposed OSW projects to receive offshore wind renewable energy credits ("ORECs") in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations is to enable a percentage of New Jersey's electric load to be supplied by OSW energy.[6] The OREC is the NJBPU approved price the project will be compensated for each megawatt ("MW") hour of electricity it generates and delivers to the grid, which is funded through charges passed through to New Jersey

_____

[5] N.J. Stat. Ann. § 52:27F-14.

[6] P. L. 2010, c. 57, §§ 1-6.

ratepayers by their electric utilities.[7] NJBPU's role in these respects is addressed further, *infra*.

### NEW JERSEY'S MANDATE TO DEVELOP OSW ENERGY TO COMBAT CLIMATE CHANGE AND SPUR ECONOMIC DEVELOPMENT

10.    For over a decade, New Jersey has invested substantial resources in developing and implementing its plan to use OSW energy as a mechanism to a) limit greenhouse gas emissions, b) stimulate economic development, and c) support the development of new sources of clean electricity that can help meet the State's energy needs.

11.    On July 6, 2007, the State enacted the Global Warming Response Act, P. L. 2007, c.112 ("GWRA"), which established a statewide limit on greenhouse gas emissions ("GHG") of 80 percent below 2006 GHG levels by 2050. In 2010, OWEDA was enacted.

12.    In 2018, New Jersey Governor Phil Murphy signed an Executive Order ("EO") that affirmed the State's commitment to "combat the threat of global climate change" to protect New Jersey and also "provide reliability and relief for the regional

---

[7] N.J.A.C. 14:8-6.6(c) (directing electric utilities to facilitate the transfer of OREC funding payments from ratepayers to OSW developers); *see* N.J. Stat. Ann. § 48:3-87(d)(4).

electric grid, which is the largest, most congested and most costly in the nation."[8] Moreover, the Governor saw that "an aggressive offshore wind energy production goal" could result in the State housing key parts of the OSW supply chain for the Atlantic Coast, which would "contribute to a stronger New Jersey economy."[9] To this end, Governor Murphy set a "goal of 3,500 MW of offshore wind energy generation by the year 2030."[10]

13.    Later that year, New Jersey's Clean Energy Act ("CEA"), P. L.2018, c.17, established one of the most ambitious renewable portfolio standards in the nation, which provides for 35 percent of the electricity sold in New Jersey to be supplied from renewable resources by 2025, and 50 percent by 2030, through a market-based system of matching electricity consumption with renewable energy certificates. This included increasing the number of MWs of offshore wind energy to be procured through the NJBPU's OSW renewable energy certificate program from 1,100 megawatts to 3,500 MW.[11]

14.    On January 21, 2020, the Legislature amended OWEDA to authorize NJBPU to conduct competitive solicitations for open access transmission facilities

---

[8] *Exec. Order No. 8* (Jan. 31, 2018), 50 N.J.R. 887(a) (Feb. 20, 2018).

[9] *Id.*

[10] *Id.*

[11] *Id.*, § 2.

to facilitate delivery of electricity from OSW energy generation projects to the electric grid in New Jersey.[12] Transmission facilities are facilities that electricity generation facilities, such as OSW energy generation projects, need to connect to in order to deliver electricity to the electrical grid. The concept of open access means that electricity generation facilities have the opportunity to connect to the transmission facility, and thereby to the grid, on a fair basis pursuant to rules set by PJM subject to FERC approval.

15. On January 27, 2020, the NJBPU released New Jersey's 2019 Energy Master Plan ("EMP"), which provided a comprehensive, forward-thinking blueprint for an equitable and smooth transition from reliance on fossil fuels that contribute to climate change to 100 percent clean energy sources on or before January 1, 2050.

16. The EMP proposed that the NJBPU develop a consistent and transparent OSW solicitation schedule through 2035 that supports a steady, long-term project pipeline, and coordinate with regional electric grid operator PJM to determine how much of New Jersey's energy demand should be met with OSW through 2050. The EMP also established goals related to the development of the OSW energy industry, including development of OSW supply chain facilities, jobs and job training programs to serve the mid-Atlantic OSW industry, and development port facilities to support the OSW industry.

---

[12] P. L. 2019, c. 440 § 2; N.J. Stat. Ann. § 48:3-87.1(e).

17.     The EMP also recommended expanding New Jersey's electric grid to accommodate New Jersey's then-current goal of 7,500 MW of OSW energy generation by 2035.[13] The EMP explained how "planned transmission to accommodate the [S]tate's [OSW] goals provides the opportunity to decrease ratepayers costs and optimize the delivery of [OSW] generation into the state's transmission system."[14]

18.     In September 2020, NJBPU issued the New Jersey Offshore Wind Strategic Plan ("Strategic Plan").[15] The Strategic Plan found that "[i]nvestments in planning and infrastructure are necessary to build the transmission infrastructure and regional markets needed for offshore wind energy to support a clean energy future."[16]

19.     By 2023, through a series of EOs, and consistent with the GWRA, CEA, and OWEDA, Governor Murphy increased New Jersey's OSW generation goal from 7,500 MW by 2035 to 11,000 MW by 2040, and accelerated New Jersey's

---

[13] EMP, Goal 2.2.1 ("Develop Offshore Wind Energy Generation") at 114.

[14] EMP at 117.

[15] Ramboll US Corporation, New Jersey Offshore Wind Strategic Plan (September 2020), https://www.nj.gov/bpu/pdf/Final_NJ_OWSP_9-9-20.pdf.

[16] *Id.* at 77.

renewable energy goal from 100 percent clean energy by 2050 to 100 percent clean energy by 2035.[17]

20.     In furtherance of the GWRA, CEA, and OWEDA, the NJBPU has approved several OSW energy generation projects, three of which, described below in greater detail, are currently in development. Each of the three approvals resulted from NJBPU proceedings in which NJBPU solicited proposals from developers to build OSW energy generation projects in Department of Interior, Bureau of Ocean Energy Management ("BOEM") lease areas off the coast of New Jersey for a specified OREC for a 20-year period of operations.[18] NJBPU's approval of OSW energy generation projects supports the statutory directive that at least 3,500 MW of electricity generation come from OSW.

21.     To reach New Jersey's 11,000 MW OSW goal, the NJBPU intends to conduct at least three additional solicitations for proposed OSW energy generation and expects these to take place by 2029.[19]  New Jersey has also worked with PJM and FERC to award an electricity transmission project and commence a solicitation for the award of a second transmission project, also detailed below, which are

---

[17] *Exec. Order No. 92* (Nov. 19, 2019), 51 N.J.R. 1817(b) (Dec. 16, 2019); *Exec. Order No. 307* (Feb. 15, 2023), 54 N.J.R. 1945(a) (Oct. 17, 2022); *Exec. Order No. 315* (Feb. 15, 2023), 55 N.J.R. 509(a) (March 20, 2023).

[18] N.J. Stat. Ann. § 48:3-87.1(c).

[19] *See* New Jersey's Offshore Wind Program, www.bpuoffshorewind.nj.gov.

necessary to facilitate the injection of electricity from OSW energy generation projects into the State's electrical grid.

### THE LANDSCAPE OF HEAVILY REGULATED OSW PROJECTS IN NEW JERSEY

22.     OSW energy generation projects need a variety of federal and state approvals and authorizations.

23.     On the federal side, projects need OSW leases as well as several permits or approvals awarded by different agencies.

24.     The first step in the process of developing an OSW project is obtaining a lease. All OSW energy generation projects must be sited on lease areas pursuant to leases issued by the BOEM. The lease entitles the lessee project to occupy and use a designated portion of the outer continental shelf ("OCS"), subject to obtaining necessary approvals, to install and operate facilities for the production of renewable energy.[20] Projects applying for NJBPU approval pursuant to OWEDA have secured a lease from BOEM prior to application.

25.     Even if NJBPU has approved a project and corresponding OREC price, as described *supra*, the NJBPU approved OSW energy generation project cannot be built without numerous federal approvals. Completion of each OSW energy generation project is dependent upon receipt of approvals from BOEM, including a

---

[20] 30 C.F.R. § 585.133; 30 C.F.R. § 585.200(a).

Site Assessment Plan ("SAP") and/or Survey Plan for site assessment activities,

Construction and Operations Plan ("COP") for facility construction activities,

various post-COP approval pre-construction plans, and a General Activities Plan

("GAP") to operate the facility after construction.[21]

26.    Currently, there are three NJBPU approved OSW energy generation

projects that have BOEM leases on the OCS off the coast of New Jersey and have

begun obtaining federal permits. Those projects are Atlantic Shores Offshore Wind

Project 1, LLC ("Atlantic Shores South"), Invenergy Wind Offshore, LLC

("Invenergy"), and Attentive Energy, LLC ("Attentive").[22]

27.    On June 30, 2021, the NJBPU approved a 1,509.6 MW project

submitted by Atlantic Shores South.[23] Atlantic Shores South is sited on BOEM lease

area OCS-A 0499.[24] The Atlantic Shores South project is expected to result in an

---

[21] *See* 30 C.F.R. 585.600.

[22] Attentive Energy Two Offshore Wind Project Permitting Dashboard https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/attentive-energy-two-offshore-wind-project.

[23] *In the Matter of the Board of Public Utilities Offshore Wind Solicitation 2 for 1,200 to 2,400 MW – Atlantic Shores Offshore Wind Project 1, LLC*, BPU Docket No. QO21050824, Order dated June 30, 2021 ("Atlantic Shores South Order"). Atlantic Shores South sought a new OREC price through a recent bidding process. In February 2025, NJBPU announced that the process would not result in any awards. Despite this development, Atlantic Shores retains NJBPU's 2021 approval.

[24] For avoidance of confusion, as used in this declaration, the phrase "Atlantic Shores South," refers to the specific project for which NJBPU approved an OREC, which

11

average of 2.97 million tons of avoided GHG emissions annually.[25] In July 2024, the Atlantic Shores South project received BOEM approval of its COP, with the project to begin construction in 2026 and a targeted completion date in 2029.[26]

28.    The second project with an approved OREC is Invenergy's Leading Light Wind, 2400 MW project, which was approved in January 2024 and is slated for completion in 2032.[27] The Invenergy project is sited on BOEM lease area OCS-A 0542.[28] The Invenergy project is expected to result in an average of 4.1 million tons of avoided GHG emissions annually.[29]

29.    The third project with an approved OREC is Attentive's 1342 MW project, which was approved in January 2024 and is slated for completion in July

---

is located on BOEM Lease OCS-A-0499. "Atlantic Shores South" does not refer to the BOEM lease area where the project is located. By contrast, BOEM uses the phrase, "Atlantic Shores South" to describe BOEM lease area OCS-A 0499, which encompasses additional OSW facilities proposed to BOEM but not approved by NJBPU, but not the specific NJBPU approved project located on that lease area. https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-south.

[25] Atlantic Shores South Order at 16.

[26] https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-south.

[27] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Order Approving Leading Light Wind 2400 MW Project as a Qualified Offshore Wind Project (Order dated January 24, 2024) ("Invenergy Order").

[28] https://www.boem.gov/renewable-energy/state-activities/invenergy-ocs-0542.

[29] Invenergy Order at 26.

2031.[30] The Attentive project is sited on BOEM lease area OCS-A 0538.[31] The Attentive project is expected to result in an average of 2.3 million tons of avoided GHG emissions annually.[32]

30.    Developers have also obtained leases from BOEM for a number of other lease areas on the OCS off the coast of New Jersey, but there are no current NJBPU approved projects for any of those lease areas. The lease areas include the following:

    i.   OCS-A 0549, leased by Atlantic Shores Offshore Wind, LLC.

    ii.  OCS-A 0498, leased by Ocean Wind, LLC.

    iii. OCS-A 0532, leased by Orsted North America, Inc.

    iv.  OCS-A 0541, leased by Atlantic Shores Offshore Wind Bight, LLC

    v.   OCS-A 0539, leased by Community Offshore Wind, LLC

    vi.  OCS-A 0537, leased by Bluepoint Wind, LLC

    vii. OCS-A 0544, leased by Vineyard Mid-Atlantic, LLC.

---

[30] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Order Approving Attentive Energy Two 1342 MW Project as a Qualified Offshore Wind Project (Order dated January 24, 2024) ("Attentive Order").

[31]    https://www.boem.gov/renewable-energy/state-activities/attentive-energy-ocs-0538.

[32] Attentive Order at 26.

13

31.    In addition, BOEM's current Renewable Energy Leasing Schedule includes a "New York Bight 2" auction planned for 2027, with specific reference to New Jersey's goal of 11,000 MW by 2040, which may include additional lease areas usable as sites for future NJBPU awards of OSW energy generation projects pursuant to OWEDA.[33]

32.    Although BOEM serves as the lead agency for the approval of OSW energy generation projects, in addition to the BOEM approvals, approvals, reviews or permits from other federal agencies are also necessary for an OSW energy generation project's construction and eventual completion. For example, with respect to Attentive, in addition to an SAP and COP, the project will require:

a. a Section 408 permit, a Section 10 Rivers and Harbors Act of 1899 permit, and a Section 404 Clean Water Act permit from the Department of the Army;

b. an Endangered Species Act Consultation from the Department of the Interior;

c. a Magnuson-Stevens Fishery Conservation and Management Act, Section 305 Essential Fish Habitat Consultation, and a Marine Mammal Protect Act Incidental Take Authorization from the Department of Commerce;

---

[33]    Renewable    Energy    Leasing    Schedule,    available    at https://www.boem.gov/sites/default/files/documents/renewable-energy/RELS%20Information%Sheet%Handout%20v3.pdf.

d. an Outer Continental Shelf Air Permit from the Environmental Protection Agency; and

e. a Section 106 Review and an Environmental Impact Statement from BOEM.[34]

33.    Consistent with the above-list, the "Federal Permitting Dashboard" for Attentive sets forth the status of the project's federal government-wide approvals in graphic format:[35]



---

[34]    Attentive Energy Two, Permitting Dashboard, https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/attentive-energy-two-offshore-wind-project (last visited April 23, 2025).

[35] *Id.*

34.    Therefore, New Jersey's plan for OSW development also depends upon these permits and approvals to the extent already obtained by active projects, as well as analogous permits and approvals necessary for the completion of other active projects or anticipated future projects.

### THE PRESIDENTIAL MEMORANDUM'S HARM TO NEW JERSEY, NEW JERSEY'S OSW ENERGY GENERATION PLAN AND NEW JERSEY 'S OSW INDUSTRY

35.    As detailed below, the January 20, 2025 Presidential Memorandum targeting OSW ("Memorandum"),[36] along with subsequent federal actions taken pursuant to the Memorandum, jeopardizes the environmental, economic, and electric generation capacity benefits that will accrue to New Jersey from completion of the active OSW energy generation projects.

36.    NJBPU has invested substantial time and resources administering OWEDA and executing its role in implementing the statutory mandates of the GWRA and CEA.  NJBPU's OSW solicitation processes require year-round support from a team of approximately eight employees. The team spends approximately 30% of its time for half of each year preparing to issue a solicitation for OSW energy generation projects, and, for the remaining half of the year, roughly 40-60% of its time on reviewing developer bids submitted in response to a solicitation.  NJBPU

---

[36] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 20, 2025).

16

bid review is also supported by a consultant, which costs NJBPU between $3 and $3.5 million dollars annually. The cost of the consultant is partially, but not entirely, offset by developer-applicant fees.

37. The Memorandum and subsequent federal actions endanger the existence of both individual OSW energy generation projects and New Jersey's developing OSW industry as a whole because they exacerbate supply chain issues that already affect the nascent, fragile industry.

38. To be constructed and reach the point of commercial operation, OSW energy generation projects need certain and predictable contractual terms to project their costs and revenue, attract and retain financial investments, and reach final investment decisions and commercial operation dates. For OSW projects in the United States, there is typically a three to five year interval between the time an OSW energy generation project secures an agreement to purchase its future electricity production (referred to as an "offtake agreement"), such as a NJBPU OREC price approval, and the time when the project finalizes construction contracts and pricing to ultimately move forward with final investment decisions.

39. To increase the likelihood of a project reaching a final investment decision and commercial operation date, projects seek to minimize the duration between securing offtake and final investment decision (at which point their contract

costs and capital expenditures are final) to ensure the project business case remains financially viable and attractive to third party investment needed for construction.

40.    The limited supply of resources like ports, vessels, and manufacturing facilities needed in the construction of OSW energy generation projects also makes stable project construction schedules and a steady sequence of projects critical both for the ability of individual projects to move forward and for the commercial viability of supply chain and support facilities.[37] Through its regular solicitation schedule, NJBPU has attempted to create a consistent cadence of projects being developed in the State, which is undermined in the immediate term by the federal government's freeze in issuing permits to existing projects and in the long term by its freeze in awarding leases to new projects.[38]

41.    In contrast, introducing uncertainty and/or a risk of significant delay suppresses investors' desire to finance OSW energy generation projects because it renders investors unable to finalize and forecast project costs and estimate when a

---

[37] *See* U.S. Department of Energy, Pathways to Commercial Liftoff: Offshore Wind ("Liftoff Report") at 16, 23 (April 2024), https://liftoff.energy.gov/wp-content/uploads/2024/08/April-2024-LIFTOFF_DOE_Offshore-Wind-Liftoff-2.pdf ("Tight schedules and complicated logistics amplified knock-on delays and cost overruns across the supply chain."); *see id.* at 32 ("[A] stop and start build cycle . . . is also a barrier to investment in vessels and manufacturing facilities.").

[38] *See* Liftoff Report at 32 ("[A] clear OSW procurement schedule lets industry optimize project timelines and sizes and create smooth demand pipeline for supply chain investment."), 46.

project will begin operating and generating revenue. Thus, uncertainty generally endangers projects from reaching final investment decisions and commercial operation dates, and if unresolved, will lead to project cancellations.[39] An indefinite suspension of new federal approvals and permits, without which a project cannot be completed and reach operation, causes precisely the risk of significant delay that will lead to project cancellations. The sudden issuance by the Department of Interior of indefinite stop work orders as to construction of fully permitted projects, such as the April 16, 2025 order directed at the Empire Wind project in New York, causes precisely the type of uncertainty that could both lead to project cancellations and disincentive projects from being proposed in the first place.

42.    OSW energy generation project delays create uncertainty and disrupt order books for shovel-ready domestic supply chain facilities, resulting in delays to, or even loss of, those facilities and their associated job and economic benefits, while delays and uncertainty for these facilities in turn creates greater challenges for the OSW projects that were relying on them.[40] NJBPU expects developers to pause or abandon planned projects as a result of the uncertainty and risk of delay caused by the federal government's declared intention to suspend all approvals and permits on

[39] Liftoff Report at 43.

[40] Liftoff Report at 41.

existing lease areas, which will invariably deteriorate the economics and business case for individual OSW energy generation projects.

43.    Delays and uncertainty for OSW energy generation projects also create uncertainty for state-level coordinated transmission solutions, like New Jersey's Prebuild Infrastructure ("PBI") described below, which, in addition to saving costs for ratepayers and minimizing environmental and community impacts, have been recognized by the United States Department of Energy as "critical" for OSW sector commercial success as well.[41]

44.    The risk of cancellation of the projects that New Jersey has approved threatens numerous benefits the State is due to receive from the projects, outlined further below. In addition, the cancellation of any approved project would require the NJBPU to conduct additional solicitations to reach the State's OSW and clean energy goals and support the development of needed electric generation capacity in the PJM region, which would cause the State to incur additional costs in the form of staff time and consultant fees as described above.

---

[41] *See* Liftoff Report at 47 ("Going forward (for projects beyond Tranche 1 and Tranche 2) separate onshore upgrade solicitations will be critical for liftoff and can tap into existing pool of experienced onshore transmission developers.").

**ATLANTIC SHORES OSW PROJECT**

45.    At the time the Memorandum was issued, Atlantic Shores South had received all federally required permits, including its COP and its Clean Air Act permit.

46.    In response to Atlantic Shores revised permit application for a Clean Air Act permit submitted on June 24, 2024, the U.S Environmental Protection Agency ("EPA"), granted the permit on September 30, 2024. This was the last remaining federal permit the project needed.

47.    On February 28, 2025, however, EPA Region 2 filed a motion requesting that the Environmental Appeals Board remand Atlantic Shores South's Clean Air Act permit back to the Region for reevaluation. The motion cited the Memorandum as its basis. *In re Atlantic Shores Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 3, 2025). However, before the Environmental Appeals Board remand, EPA had defended the validity of the Clean Air Act permit on both substantive and procedural grounds from a third-party challenge.[42]  On March 14, the Environmental Appeals Board granted EPA's request. *In re Atlantic Shores*

---

[42] United States Environmental Protection Agency, Environmental Appeals Board, Atlantic Shores Wind, LLC docket, https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/77355bee1a56a5aa852571140 0542d23/9840f8e60c84779685258bee005e9430!OpenDocument.

*Offshore Wind, LLC*, OCS Appeal No. 24-01 (Mar. 14, 2025). Atlantic Shores South's motion to reconsider the remand was denied on April 15, 2025.

48.    On June 4, 2025, Atlantic Shores South filed a petition with the NJBPU asking that the NJBPU vacate its prior approval for the project to sell its electricity to the grid.[43]  A true and accurate copy of the petition, exclusive of attachments, is annexed hereto as Exhibit A. Atlantic Shores South indicated that its petition was prompted by the federal government's withdrawal of the Clean Air Act permit based on the Memorandum.

49.    As stated in its petition, without the Clean Air Act permit Atlantic Shores South cannot proceed with the construction of its project, which the federal government had previously approved to start as early as this year.[44]  In addition, Atlantic Shores South's other finalized and issued permits are now at risk due to misalignment in permit conditions and timelines, even if the EPA later reissues the Clean Air Act permit.[45]

---

[43] *In re Petition of Atlantic Shores Offshore Wind Project 1, LLC Seeking Consent of the Board to Terminate the OREC Order in Connection with its 1,509.6 MW Qualified Offshore Wind Project*, BPU Docket No. QO21050824 (June 3, 2025) ("June 2025 Petition").

[44] June 2025 Petition at 14.

[45] *Id.*

50.     As stated in the petition, the loss of the permit jeopardizes the project's funding and construction plans, which the federal government had approved to start as early as this year.[46]

51.     As stated in the petition, as a result of the Memorandum and the loss of the Clean Air Act permit and other actions taken by the current federal administration, Atlantic Shores South's parent company has reduced Atlantic Shores South's personnel, terminated contracts and cancelled planned project investments.[47] Atlantic Shores South's construction schedule has been paused because the project is no longer prepared to proceed with construction.[48]

52.     Atlantic Shores South informed NJBPU that the project is no longer viable under the existing terms and conditions of its approval for sale of electricity to New Jersey's grid.[49]

53.     As stated in the petition, as a direct consequence of the Memorandum, EPA reversed its position and withdrew Atlantic Shores South's Clean Air Act permit.[50] Now that the permit has been remanded, the Memorandum and EPA's

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 15.

[50] *Id.*at 13.

implementation of it stand in the way of a decision on that permit within one year as required by 42 U.S.C. 7475(c). As stated in the petition, a delay places Atlantic Shores South's other finalized and issued permits at risk due to potential misalignment in permit conditions and timelines.[51] As detailed below, New Jersey will suffer numerous harms if Atlantic Shore South is unable to proceed .

54.     In addition to the remand of the Clean Air Act permit approval, the Memorandum may also block the Atlantic Shores South from beginning construction via agency action regarding conditions on Atlantic Shores South's COP approval. Before Atlantic Shores South can begin construction, as conditions of its COP approval, it must submit documentation of over 50 pre-construction plans to BOEM or BOEM's sister bureau, the Bureau of Safety and Environmental and Enforcement ("BSEE"), for review.[52] Some of the submissions require agency approval, while others are sufficient if the agency does not object.[53] These conditions include submission to BSEE of a Facility Design Report ("FDR") and a Fabrication and Installation Report ("FIR") as required by BOEM and BSEE regulations, which

---

[51] *Id.* at 14.

[52] *See* BOEM, Record of Decision, Atlantic Shores Offshore Wind South Project Construction and Operations Plan at Appendix A, July 1, 2024 ("Atlantic Shores South ROD").

[53] Atlantic Shores South ROD at Appendix A.

must demonstrate that the plans are adequate to ensure safety and avoid undue harm to the environment.[54]

55.    New Jersey will be financially harmed if Atlantic Shores South's project does not proceed. Atlantic Shores South's project includes a guarantee to spend $848 million dollars during the development and construction phases of the project, which are expected to lead to a total $1.869 billion in direct, indirect, and induced economic benefits into the New Jersey economy throughout the life of the project, including both construction-related and permanent jobs. Atlantic Shores South made various other financial commitments, including committing to invest tens of millions of dollars in the development of OSW-related manufacturing

---

[54] Atlantic Shores South ROD at 39 and Appendix A, Section 2.6.  30 C.F.R. 585.632 and 30 C.F.R. 285.632 require the submission of the FDR and FIR prior to construction under an approved COP.  The FDR "must demonstrate" that the project design will satisfy the project's obligation to ensure safety and avoid causing undue harm to the environment.  30 C.F.R. 285.701; 30 C.F.R. 285.105(a).  The FIR "must demonstrate" that the project will be "fabricated and installed" in a manner that will satisfy the project's obligation to ensure safety and avoid causing undue harm to the environment.  30 C.F.R. 285.702; 30 C.F.R. 285.105(a).  After receipt of the FDR and FIR, BSEE will determine within 20 business days whether the reports "are sufficiently complete and accurate" to fulfill the applicable requirements.  30 C.F.R. 285.704(a).  If the reports are not sufficient, BOEM will notify the project of deficiencies within 20 business days. 30 C.F.R. 285.704(b).   Reports are deemed submitted if BSEE does not notify the project of deficiencies within 20 business days.  30 C.F.R. 285.704(c).

facilities and leases and in OSW related workforce training and innovation, business development, educational and community programs.[55]

56.    By its application and as required by NJBPU's order approving the project, the Atlantic Shores South project committed to providing various specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and other initiatives.[56] To the extent these commitments have not yet been satisfied, as detailed below, they would be lost if Atlantic Shores South's pending petition to vacate its NJBPU approval –itself a consequence of the memorandum, *see supra* ¶¶ 45-54–is granted.  Given Atlantic Shores South's indication that the project is currently unviable, due to the loss of its Clean Air Permit and the Memorandum, the as yet unfunded financial benefits will at least be delayed even if the project ultimately proceeds.

57.    Atlantic Shores South's infrastructure commitments include:[57]

a. Using a new monopile fabrication facility to be developed by EEW American Offshore Structures, Inc. ("EEW") in Paulsboro, New Jersey.

---

[55] Atlantic Shores South Order at 19-21.

[56] Atlantic Shores South Order at 17-21.

[57] None of the commitments enumerated in this paragraph have been funded.

b. Establishing an OSW component assembly facility at the New Jersey Wind Port ("NJWP") in Lower Alloways Creek, New Jersey. The facility will bring $16.5-$24 million of in-State investment for buildings and tooling and create 50-70 direct jobs during the assembly of components for the Atlantic Shores South project. Atlantic Shores South committed to spend $35.6 million dollars for a 2-year marshalling lease at the NJWP.

c. Building an operations and maintenance ("O&M") center on an underutilized parcel in Atlantic City, New Jersey, which will provide at least 88 permanent jobs for the 30-year operational life of the project. The facility is also expected to create economic activity for a wide range of subcontractors including shipyards, spare part producers, and vessel and harbor services.

58. Atlantic Shores South's commitments to public institutions include $10,000[58] to sponsor and lead a series of introductions to OSW seminars at the Rutgers University EcoComplex, $160,000[59] to serve as the lead sponsor for all New Jersey Wind Innovation and New Development Institute ("WIND Institute") events, and $10 million[60] for workforce training and innovation activities of the WIND

---

[58] None of this commitment has been funded.

[59] None of his commitment has been funded.

[60] Of this amount, $500,000 has been paid; $9.5 million remains unpaid.

Institute. Atlantic Shores South also committed to spending $400,000[61] to fund student scholarships in workforce training programs at Rowan University, at least $700,000[62] over the first ten years of the lease to establish an Education and Community Outreach Center in partnership with Stockton University in Atlantic City, New Jersey, and $336,000[63] to provide summer programming in OSW for high school students through the Rutgers University Future Scholars program, which provides college preparation and a tuition free pathway to college for first-generation students from low income backgrounds. Atlantic Shores South has funded parts of each of these commitments, but, in total, over $10 million remains unfunded.

59.    Atlantic Shores South's commitments to community groups and other initiatives include $4 million to establishing a workforce development fund to invest in New Jersey workforce training to build the skills and capabilities necessary for the OSW industry, $1 million to sponsor 5+ minority or women business enterprise OSW companies, $1 million to fund the purchase and construction of OSW-specific

---

[61] Of this amount, $150,000 has been paid. The remaining $250,000 is to be funded over 5 years after final financing for the project is secured, commonly known as the final investment decision ("FID").

[62] Of this amount, $441,725 has been paid, $258,275 remains unpaid.

[63] Of this amount, $167,000 has been paid. The remaining $167,000 is to be funded over 5 years post FID.

testing equipment[64], $320,000[65] to support the Boys & Girls Club of Atlantic City's science, technology, engineering, arts, and mathematics programming, up to $170,000 to support expanding vehicle electrification in Atlantic City by purchasing electric car chargers, $17,055[66] to join regional or demographic-focused chambers of commerce and host "Meet and Greets" for members, and $150,000[67] to expand communication and educational grants through the Barnegat Bay Partnership. Atlantic Shores South has provided significant funding from this group of commitments, but over $5 million remains unfunded.

60.    In the event Atlantic Shores South was deficient in its verified actual economic performance, Atlantic Shores South committed to make additional contributions to the workforce development fund, up to a shortfall of $36 million, and to return any shortfall over $36 million to New Jersey ratepayers on a dollar-for-dollar basis by reducing the price awarded to Atlantic Shores South for the generation and delivery of electricity from the project. With respect to Atlantic Shores South's operations jobs guarantee, any shortfall would be made up by an

---

[64] Of these two commitments, Atlantic Shores South has paid $917,334, $1,092,66 remains unpaid.

[65] Of this amount, $150,000 has been paid. The remaining $170,000 is to be funded over 5 years post FID.

[66] All of this commitment has been paid.

[67] Of this amount, $100,000 has been paid, $50,000 remains unpaid.

additional contribution to the workforce development fund at an initial rate of $50,000 per full-time equivalent year, which rate would escalate at a nominal annual rate of 2.5% after project completion to account for increases in worker training costs.[68]

## INVENERGY OSW PROJECT

61.    Invenergy's project includes a guarantee to spend $1.7 billion dollars during the first ten years of operation, with an estimated total of $3.7 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project.[69] Invenergy is required to pay a Research and Monitoring Fee ("RMI Fee") of $24 million to New Jersey, which is to be dedicated to research initiatives and regional environment, wildlife, and fisheries monitoring initiatives dedicated to assessing the impacts of OSW development on New Jersey's natural resources.[70]

62.    On September 25, 2024, NJBPU granted a stay, until December 20, 2024 of Invenergy's obligations under its award, including RMI Fee payments. On December 19, 2024, Invenergy requested an additional stay of its obligations until May 20, 2025.

---

[68] Atlantic Shores South Order at 20-21.

[69] Invenergy Order at 34.

[70] Invenergy Order at 56.

63.   Invenergy made various other financial commitments, including commitments to invest tens of millions of dollars in the development of OSW-related manufacturing facilities and leases, operations and maintenance facilities, and in OSW related workforce training and innovation, business development, educational and community programs.[71] Invenergy's investments in OSW facilities are expected to directly create hundreds of permanent jobs and support 1,382 jobs during the design, permitting and construction phases of the Invenergy project.[72]

64.   By its application, and as required by NJBPU's order approving the project, Invenergy committed to providing various specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and initiatives.[73]

65.   Invenergy's infrastructure commitments include:[74]

a.   Using the EEW facility to produce all monopiles for its project and providing $105.25 million in funding for an expansion of the EEW facility. The expansion will create nearly 300 new permanent jobs.

---

[71] Invenergy Order at 28-35.

[72] *Id.* at 28-29.

[73] Invenergy Order at 28-35.

[74] None of the commitments enumerated in this paragraph have been funded.

b.      Using the NJWP to manufacture components of Invenergy's project, which would support 1,382 jobs, increase labor income by $125.6 million and increase New Jersey's gross domestic product $322.9 million during the design permitting and construction phases of the project.

c.      Purchasing various project components from a New Jersey based steel fabrication company, which is expected to support 200 jobs.

d.      Building an O&M center in Port Reading, New Jersey, which will create up to 100 construction jobs and cost $78.6 million to build.

66.    Invenergy's commitments to public institutions include $1.25 million to help advance the research of non-invasive methods for repairing composite materials at the Henry M. Rowan College of Engineering at Rowan University, through its Advanced Materials & Manufacturing Institute, $1 million to support the establishment and operation of the Offshore Wind Innovation Center at the WIND Institute, $1 million to establish the Applied Science Grant program, available to researchers and their associated teams at New Jersey public universities, to support research projects to advance high-impact research, development, and demonstration projects across the offshore wind supply chain, $405,500 for the Newark School of Data Science and Information Technology, $1.5 million for the Mid-Atlantic States Career & Education Center program to provide instruction to high school students

about career opportunities in offshore wind, $400,000 for offshore wind training programs at Rowan University, and $950,000 of targeted funding to New Jersey educational institutions – New Jersey Institute of Technology, Hudson County Community College, and New Jersey Community College Consortium. Invenergy has funded $250,000 of the foregoing commitments, but the remainder is outstanding.[75]

67.    Invenergy's commitments to community groups and other initiatives include:[76]

a.  Providing $1 million to establish an Offshore Wind Innovation Campus at the Invenergy project's O&M port facility that will bring early-stage energy companies together with a curated set of industry partners. The goal of this campus will be to incubate and commercialize a wide range of offshore wind and renewable energy technologies — including, for example, robotics, grid technologies, AI-based modeling, and powerful computing centers.

b.  Making $112.7 million of project expenditures with Small, Minority, Woman, Veteran Business Enterprise and $35.40 million of expenditures with Veteran Owned Business and Disabled Veteran Owned Business.

---

[75] Of the $400,000 to be paid to Rowan University, $250,000 has been paid.

[76] None of the commitments enumerated in this paragraph have been paid.

33

c.  Spending $2 million to establish a catalytic training program focused on capacity-building and technical training to position existing small businesses in New Jersey for success in upcoming contracting opportunities in the state's growing offshore wind sector

d.  Providing $500,000 to help identify minority- and women-owned enterprises in the manufacturing space located in underserved and overburdened New Jersey communities ("OBCs"). These funds will also aid local supply chain mapping efforts to train veterans of the armed forces to prepare them for careers in the offshore wind sector.

e.  Contributing $2 million to a Fisheries Accelerator Fund to support and promote activities beneficial to the fisheries community. This fund will encourage advancements in fisheries management, technology, sustainability practices, and the overall development of the fishing industry.

f.  Providing $150,000 to fund the creation of the Paulsboro Economic Development Program. The fund will focus on building, strengthening, and recruiting businesses to Paulsboro, New Jersey, creating a more attractive business environment, with the ultimate goal of growing jobs that are local to Paulsboro and accessible to Paulsboro residents.

g. Providing total electric bill credits of $94 million to energy-burdened households over the course of 20 years to compensate for the increase in utility bills due to the Invenergy project. The program would provide direct assistance to over 200,000 low-income, energy-burdened households in New Jersey by reducing their projected monthly electricity bill increase from the Invenergy project by 50%.

h. Investing $5 million in an electric vehicle charging hub project that will provide significant benefits to Northern New Jersey environmental justice communities such as Newark's Ironbound District, as well as the city overall.

i. Providing the Waterfront Alliance with $500,000 to institute a Maritime Activation Plan competitive grant program that would provide funding and technical assistance for environmental justice communities to develop plans to promote access, resilience, and economic development, and fund small-scale capital and planning projects for maritime activation.

j. Providing $350,000 in funding for the Children's Environmental Literacy Foundation to provide professional development training for teachers in environmental science and sustainability curricula, to develop supplemental curricular resources for K-12 students relevant to climate,

35

environmental justice, and offshore wind, and to cultivate workforce pathways in green careers for rising high school seniors.

k.  Providing $150,000 to Gotham Whale for organizational support, data collection, and the education of young people in OBCs. Gotham Whale focuses on working with citizen scientists to record and study marine mammals in the New York Bight.

l.  Providing $250,000 to the Boys & Girls Clubs of Monmouth County to support its Science, Technology, Engineering and Mathematics programs for young people in Asbury Park, Red Bank, Neptune, and Long Branch, New Jersey.

m. Providing Liberty Science Center with $500,000 to fund the development of an exhibit related to offshore wind and marine science, as well as supporting school trips from OBCs.

n.  Providing Neighborhoods for a Sustainable Future $250,000 to enable the nonprofit to expand into North Jersey, where it will support resident-driven actions to advance energy efficiency and foster a clean energy transition by expanding the green workforce and increasing minority contracting.

o.  Providing $1,000,000 to support members of Native American Tribes and Tribal Nations to respond and participate in ongoing environmental,

supply chain, and workforce initiatives related to offshore wind in the Bight.

p. Providing $1,000,000 in funding for the Offshore Wind Scholars Program to provide grants to students in need of financial assistance (with a focus on students from OBCs) to attend New Jersey colleges and universities, participate in clean energy conferences, support youth programming to reinforce civic engagement, and create access to future wealth building opportunities.

68.    In the event Invenergy is deficient in its guaranteed spending, Invenergy committed to make additional economic investments equal to the shortfall.[77] At least 90% of any remaining shortfall would be applied to a reduction in the price awarded to Invenergy for the generation and delivery of electricity from the project, with the remaining 10% committed to fund additional workforce development investments.[78] With respect to Invenergy's jobs guarantee, any shortfall would be made up by additional contribution to workforce development training efforts.[79]

**ATTENTIVE ENERGY OSW PROJECT**

---

[77] Invenergy Order at 34-35.

[78] *Id.*

[79] *Id.*

69.    Attentive's project includes a guarantee to spend $760 million dollars during the first ten years of operation, and an estimated $3.1 billion in direct, indirect and induced economic benefits into the New Jersey economy throughout the life of the project.[80] Attentive is also required to pay New Jersey an RMI Fee of $15 million.[81] Attentive has already paid half of this commitment, with half of the remaining $7.5 million due on January 24, 2025, and the remainder due on January 24, 2026.

70.    On January 23, 2025, three days after the issuance of the Memorandum, Attentive asked that NJBPU suspend Attentive's obligation to make the January 24, 2025 payment due to, among other things, "delays associated with the anticipated federal permitting timeline" for the project.[82]

71.    Attentive made various other financial commitments, including commitments to invest tens of millions of dollars in the development of OSW-related manufacturing facilities and leases, operations and maintenance facilities, and in OSW related workforce training and innovation, business development, educational

---

[80] Attentive Order at 3, 34.

[81] *Id.* at 26.

[82] *In the Matter of the Opening of New Jersey's Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481, Attentive Energy LLC Motion for Limited Stay, at 4 (January 23, 2025).

and community programs.[83] Attentive's investments in OSW facilities are expected to directly create hundreds of permanent jobs and support hundreds of jobs during the design, permitting, and construction phases of the Attentive project.[84]

72.    By its application, and as required by NJBPU's order approving the project, the Attentive project committed to providing the following specific economic benefits to New Jersey, including infrastructure investments, commitments to public institutions and commitments to community groups and initiatives.[85]

73.    Attentive's infrastructure commitments include investing $58.85 million in an expansion of the EEW facility and to source components for Attentive's projects from the facility and establishing a tower manufacturing facility at the NJWP, the construction of which is expected to create 300 jobs and $350 million in economic output, as well as 500 indirect jobs and over $1.75 billion in economic impacts to New Jersey over the facility's lifespan.[86]

74.    Attentive's commitments to public institutions include $15 million, in addition to the RMI Fee, to fund programs with universities and science

---

[83] Attentive Order at 28-34.

[84] *Id.* at 28-29.

[85] Attentive Order at 28-35.

[86] None of the commitments enumerated in this paragraph have been funded.

organizations that align with the goals of the Research and Monitoring Initiative supported by the RMI Fee. Attentive also committed to investing $15 million in the WIND Institute. and $2 million to Rutgers University for the Offshore Wind Connect program, which focuses on student/faculty training, internships, and access programs, emphasizing STEM education.[87]

75.    Attentive 's commitments to community groups and other initiatives include:[88]

a.  Spending $8.4 million in the New Jersey Manufacturing Extension Program.

b.  Providing $2 million to the Trust for Public Land, specifically, through the Newark Green Schoolyards Project and the Barnegat Bay Watershed Program.

c.  Providing $2 million to MRV Group, a diversity supplier and consultant, for enhancing engagement with small, diverse businesses, community-based organizations, and overburdened communities in the clean energy industry.

d.  Providing $6.6 million to SeaAhead, a public benefit corporation dedicated to advancing ocean ventures. As the anchor sponsor for SeaAhead's mid-

---

[87] None of the commitments enumerated in this paragraph have been funded.

[88] None of the commitments enumerated in this paragraph have been funded.

Atlantic activities, Attentive aims to catalyze an innovation community, support innovative startups, and stimulate investment in technology aimed to sustainably use the ocean for economic growth.

e. Providing $4 million to The OSW Workforce Pathways and Skills Collaborative, which aims to establish the Offshore Wind Network for community colleges, provide funds for the development of offshore wind-related workforce and academic programs, and foster partnerships between higher education institutions and local high schools to integrate them into the offshore wind industry.

f. Providing $4 million to New Jersey SHARES, a non-profit organization dedicated to assisting income-eligible households with essential bills.

g. Providing $4 million to the New Jersey Small Business Development Center for a comprehensive partnership targeting supply chain gaps, particularly in offshore wind, which emphasizes entrepreneurship support in Monmouth and Ocean Counties and facilitates statewide development for access to the NJWP, promoting outreach, education, recruitment, and small business support for diverse communities.

h. Providing $1 million to the Returning Citizens Support Group for the Offshore Wind Reentry Workforce Initiative, intended to facilitate OSW workforce opportunities for returning citizens and justice-involved youth.

i.  Providing $3 million to an environmental justice partner for a grant program directed at engaging diverse organizations in the offshore wind industry and contributing to meaningful environmental justice efforts in OBCs across all of New Jersey.

j.  Providing $1 million to Waterfront Alliance for the "Offshore Explorers" program, which promotes offshore wind in schools with a focus on maritime or clean energy sectors, raising awareness of offshore wind benefits and opportunities.

k.  Providing $350,000 to the Paulsboro and Salem Community Coalition, $175,000 for each municipality, and $100,000 to the Elizabeth Community Coalition. The coalitions aim to boost local engagement in offshore wind, distribute microgrants, and establish consistent feedback channels. This aids in preparing participants for union jobs in the offshore wind industry.

l.  Providing $3.15 million to the International Brotherhood of Electrical Workers ("IBEW") Local 400 Joint Apprenticeship Training Fund to enhance its apprenticeship program. This investment supports pre-apprenticeship training for success in the offshore wind industry, offers direct entry to IBEW graduates into building trades unions, and upgrades equipment and facilities for green energy jobs.

m. Establishing a $1 million fund to address union training needs and expanding apprenticeship programs for offshore wind, with specific partner unions to be named later.

n. Providing $500,000 to the Native American Advancement Corporation, to aid in workforce development for local disadvantaged, rural, and tribal communities in southern New Jersey, and create employment pathways, offer resiliency-focused programming, and connect residents to offshore wind opportunities.

o. Establishing a Lasting Opportunity Fund of $14 million, allowing it to continue to make investments through its operations phase that have not been identified at this time. The Lasting Opportunity Fund will facilitate investments during the Project's operations phase.

76.     In the event Attentive is deficient in its guaranteed spending, Attentive committed to make additional economic investments equal to the shortfall.[89] At least 90% of any remaining shortfall would be applied to a reduction in the price awarded to Attentive for the generation and delivery of electricity from the project, with the remaining 10% going to funding for State-owned OSW programs and assets, including the WIND Institute or NJWP.[90] With respect to Attentive's jobs guarantee,

---

[89] Attentive Order at 35.

[90] *Id.*

any shortfall would be made up by additional contributions to the workforce development fund.

### HARM TO RELATED TRANSMISSION PROJECTS PLANNED TO INTEGRATE OSW ENERGY INTO THE INTERSTATE ELECTRIC GRID

77.    NJBPU has also worked to develop the transmission infrastructure necessary to efficiently address increasing demand for electricity and anticipate the need to integrate awarded and anticipated OSW energy generation projects into the interstate electric grid. As a result, the Memorandum and subsequent federal actions will also harm New Jersey by jeopardizing environmental and economic benefits that will accrue to New Jersey as a result of OSW-related electric transmission infrastructure projects, which are critical to allowing OSW energy projects to inject electricity into New Jersey's electric grid in a manner that minimizes costs, as well as environmental and economic disruption, and to New Jersey's long-term plans for developing clean energy generation capacity.

78.    In coordination with regional grid operator PJM, and pursuant to a FERC approved process, PJM solicited transmission solutions to serve New Jersey's OSW public policy needs for PJM's Regional Transmission Expansion Plan.[91] On

---

[91] *In The Matter of Offshore Wind Transmission*, BPU Docket No. QO20100630, Order dated November 18, 2020; *see* PJM, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Compliance Filing of PJM before the Federal Energy Regulatory Commission, Docket No. RM10-23-000, 36-38 (October 25, 2012) (evidencing FERC's approval of PJM's

October 26, 2022, the NJBPU approved a series of transmission projects through

this process, which is known as the State Agreement Approach (SAA), including the

Larrabee Tri-Collector Solution, that provide a coordinated transmission solution for

6,400 MW of OSW generation.[92] The Larrabee Tri-Collector Solution primarily

includes the construction of a new electrical substation adjacent to an existing

electrical substation to increase the amount of electricity that can be injected into the

electric grid.[93] The Larrabee Tri-Collector Solution also utilizes existing utility rights

of way and electrical transmission infrastructure to enable future OSW energy

generation projects to cost-effectively connect to the electric grid through the use of

---

[92] plan to use the SAA as a means for allowing states to pursue their public policy goals), https://www.pjm.com/directory/etariff/FercDockets/700/20121025-er13-198-000v2.pdf.

[92] The Larrabee Tri-Collector Solution means Mid-Atlantic Offshore Development, LLC and Jersey Central Power & Light Company's ("JCP&L") jointly submitted proposal selected by the Board for New Jersey's inaugural offshore wind coordinated transmission solution under PJM's SAA. *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022. This Tri-Collector solution includes 3 circuits, providing 3,742 MW to the Larrabee Collector Station, a new substation adjacent to the existing JCP&L Larrabee substation that represents the predominant portion of the Larrabee Tri-Collector Solution; *see also In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022.

[93] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 60-63.

common infrastructure.[94] This approach to expansion of the transmission grid limits environmental, permitting, and community impact risks relative to each OSW energy generation project separately establishing a route and infrastructure to connect its project to the electric grid.[95] The Larrabee Tri-Collector Solution and related projects are expected to save New Jersey ratepayers $900 million compared to the estimated cost of transmission facilities that otherwise would be necessary to achieve New Jersey's then-current 7,500 MW of OSW energy goal.[96]

79.    NJBPU is also currently evaluating bids submitted in response to a solicitation for the PBI, which is another transmission project necessary to efficiently facilitate connection of OSW energy generation projects to New Jersey's electrical grid.[97] An OSW energy generation facility must build export cables to transmit the energy from the ocean to a substation onshore where the electricity can be interconnected with the interstate electric transmission grid. Without coordinated

---

[94] *Ibid.*

[95] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 13-14 and 60-63.

[96] *In re Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 61.

[97] *In the Matter of the Opening of a Solicitation for a Transmission Infrastructure Project to Support New Jersey's Offshore Wind Public Policy*, Docket No. QO23100719 at 4-5 (Order dated November 17, 2023).

interconnection such as the PBI, each generation project must find its own landfall and build its own onshore corridor to carry power cables to its own interconnection destination. The PBI is infrastructure that will coordinate landfalls and onshore routes to accommodate multiple OSW projects' interconnection to the grid.

80. The PBI envisions a single construction effort to build duct banks and associated cable vaults that will house multiple cables, originating from up to four discrete OSW energy generation projects, which would enable each project to connect its respective cables to the interstate electric transmission system. Absent the PBI, four separate duct bank and cable vault projects, each with its own landfall and onshore route, would be necessary to accomplish the same goal at a greater cost and greater environmental and community disturbance. The PBI is intended to begin offshore and establish a single landfall point where cables from each project can use common onshore routing to connect to the Larrabee Tri-Collector Solution. In conjunction with the Larrabee Tri-Collector Solution, the PBI is also intended to reduce environmental and community impacts and permitting risk.[98] The Invenergy and Attentive projects both plan to use the PBI to connect to New Jersey's electricity transmission grid.[99]

---

[98] *In the Matter of Declaring Transmission to Support Offshore Wind a Public Policy of the State of New Jersey*, BPU Docket No. QO20100630, Order dated October 26, 2022, at 65-66.

[99] Invenergy Order at 21; Attentive Order at 21.

## HARM TO NEW JERSEY THAT WILL RESULT FROM
## THE LOSS OF OSW ENERGY GENERATION

81.     NJBPU's OSW-related activities are also critical to New Jersey's long-term strategy to meet forecasted capacity demands on New Jersey's electric grid using clean energy. By eliminating New Jersey's ability to rely upon OSW energy as part of that strategy, the Memorandum and resultant federal actions make execution of New Jersey's current plan, reliant upon OSW, impossible.  Without the availability of federal lease areas on which OSW energy generation projects can be sited, there will be no OSW energy generation. Scarcity and congestion issues on New Jersey's electrical grid will worsen without OSW energy generation, leading to greater costs for electricity to both the State and its residents. In addition, the execution of a new plan without OSW may not be impossible, but New Jersey's effort is at least substantially delayed, enabling the impacts of climate change to persist.

82.     Demand for electricity is currently outpacing supply on the regional grid operated by PJM.[100] The retirement of electricity generation facilities plus rapidly increasing electricity consumption (known as "load growth") outpace the

---

[100] The PJM grid serves 13 states, including: Delaware, Illinois, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia and West Virginia. PJM also serves the District of Columbia.

addition of new electricity generation facilities.[101] New Jersey's plan of adding 11,000 MW of OSW energy generation by 2040, including the Atlantic Shores South, Invenergy, and Attentive projects, and as-yet unapproved projects on existing BOEM leases, would ease this problem by increasing available supply. The need for additional supply from OSW is critical because PJM's forward-looking planning studies already envision a worsening deficit of supply relative to demand even relying upon the existence of New Jersey's 11,000 MW of OSW beginning in the early 2030s.[102] Thus, the absence of New Jersey's OSW energy generation will exacerbate the forecasted electricity supply problem, which also does not account for increasing demand from data centers and artificial intelligence.

83. The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs.[103] Congestion occurs on an electrical grid when the demand for electricity in a particular area exceeds the capacity of the transmission infrastructure to deliver that electricity at lowest cost.

---

[101] PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks at 1, Feb. 24, 2023, https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[102] *Id.* at 5, Figure 1, 13, Figure 4, 16, Table 1 and 17, Figure 7.

[103] Grid Strategies, LLC, Transmission Congestion Costs Rise Again in U.S. RTOs, July 2023 at 2, Table 1, https://gridstrategiesllc.com/wp-content/uploads/2023/07/GS_Transmission-Congestion-Costs-in-the-U.S.-RTOs1.pdf.

When the transmission system is congested, the most efficient source of electricity is not used, and the area with remaining electricity demand is served from alternative, less-efficient, more expensive, sources of supply.

84.    PJM already suffers from rising annual congestion costs. For example, from 2021 to 2022 alone, congestion costs rose from $995 million to $2.5 billion.[104] Building out transmission infrastructure that connects NJBPU projects with approved ORECs to the grid could alleviate congestion, thereby reducing the costs of electricity to New Jersey and its residents, by creating an additional source of electricity supply close to, and to the east of, areas with significant demand.[105] In this way, New Jersey's planned OSW generation and transmission development would ease congestion and reduce costs, ultimately passed on to ratepayers including New Jersey and its residents, by complementing the existing west to east supply of electricity, while also serving as an alternative source of electricity that would increase reliability and resilience for the PJM grid.

---

[104] *Ibid*.

[105] *See id.* at 5 (citing Lawrence Berkeley National Laboratory, Empirical Estimates of Transmission Value using Locational Marginal Prices, https://eta-publications.lbl.gov/sites/default/files/lbnl-empirical_transmission_value_study-august_2022.pdf, slide 3).

### CONCLUSION

85.    All of the OSW energy generation and related transmission projects described above are components of New Jersey's broad plan to harness OSW energy to respond to climate change, spur economic growth, and meet forecasted energy demands with in-state sources of clean energy. These projects are collectively expected to inject billions of dollars into New Jersey's economy over the coming decades, resulting in the creation of jobs and tax revenue for New Jersey. The realization of New Jersey's plan depends upon BOEM and other agency permits and approvals already obtained by active projects, as well as those permits and approvals that will be needed for active project completion and for the completion of future projects. The planned OSW supply chain and transmission facilities are all predicated upon the OSW energy generation projects moving forward. New Jersey will experience the loss of all of these benefits if BOEM and other federal permits and approvals are terminated or remain unavailable due to the Memorandum and corresponding federal agency implementation.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge.

Katharine Perry

Deputy Director for Resource
Adequacy

New Jersey Board of Public Utilities

Dated: 6/9/2025

Scanned by TapScanner

# EXHIBIT A

PRELIMINARY PUBLIC COPY

**PERLMAN & MIRANDA LLC**
110 Edison Place, Suite 301
Newark, New Jersey 07102
(973) 707-3665
Attorneys for Petitioner,
Atlantic Shores Offshore Wind Project 1, LLC

| | |
|---|---|
| PETITION OF ATLANTIC SHORES OFFSHORE WIND PROJECT 1, LLC SEEKING CONSENT OF THE BOARD TO TERMINATE THE OREC ORDER IN CONNECTION WITH ITS 1,509.6 MW QUALIFIED OFFSHORE WIND PROJECT | STATE OF NEW JERSEY<br><br>BOARD OF PUBLIC UTILITIES<br><br><br>Docket No.: QO21050824 |

**VERIFIED PETITION**

By way of this Verified Petition, including all Exhibits referenced herein (collectively, the "***Petition***"), Atlantic Shores Offshore Wind Project 1, LLC ("***Petitioner***"), a limited liability company formed under and existing pursuant to the Delaware Limited Liability Company Act, having its general offices at 1 Dock 72 Way, Floor 7, Brooklyn, New York, 11205, respectfully petitions and invokes the jurisdiction of the New Jersey Board of Public Utilities (the "***Board***" or "***BPU***"), all in connection with Petitioner's 1,509.6 mega-watt ("***MW***") approved offshore wind ("***OSW***") project proposed to be located within Bureau of Ocean Energy Management ("***BOEM***") lease area OCS-A 0499 off the New Jersey coastline (the "***Project***"). Through this Petition, Petitioner respectfully requests the Board's consent pursuant to N.J.S.A. 48:3-87.1(3)(c)(4) to terminate the hereafter defined OREC Order. Through service of this Petition, Petitioner also

1

PRELIMINARY PUBLIC COPY

respectfully requests the consent of Rate Counsel, as a party to the OREC Order and pursuant to N.J.S.A. 48:3-87.1(3)(c)(4), to terminate the OREC Order.

## I.    BACKGROUND

1.    On August 19, 2010, the Offshore Wind Economic Development Act ("**OWEDA**") was signed into law, amending and supplementing the Electric Discount and Energy Competition Act, N.J.S.A. 48:3-49 *et seq.*

2.    OWEDA established, among other things, OSW as a class I resource under the renewable energy portfolio standards and directed the Board to establish an Offshore Wind Renewable Energy Certificate ("**OREC**") program requiring a percentage of the State of New Jersey's (the "**State**") electric load to be supplied by OSW from qualified OSW projects.[1]

3.    A qualified OSW project is defined as "a wind turbine electric generation facility in the Atlantic Ocean and connected to the electrical transmission system in this State and includes the associated transmission-related interconnection facilities and equipment and approved by the Board pursuant to section 3 of P.L. 1999, c. 23 (N.J.S.A. 48:3-51)."[2]

4.    An OREC is defined in OWEDA as representing the environmental attributes of one megawatt hour ("**MWh**") of electric generation from a qualified OSW project, and a qualified OSW project will be credited one (1) OREC for each MWh delivered to the transmission grid.[3]

5.    OWEDA also initially established the application requirements to be followed for OSW projects to be considered eligible to receive ORECs.[4]

6.    Following the passage of OWEDA, the Board adopted rules building upon the application requirements set forth in OWEDA and setting forth an application process and

---

[1] N.J.S.A 48:3-51.
[2] N.J.A.C. 14:8-6.1 *et seq.*
[3] N.J.S.A. 48:3-51; N.J.A.C. 14:8-6.1.
[4] N.J.S.A. 48:3-87.1.

PRELIMINARY PUBLIC COPY

evaluation framework for OSW projects, found at N.J.A.C. 14:8-6.1 *et seq.* (the "**OREC Regulations**"). In general terms and without limitation, the OREC Regulations: (i) establish application requirements; (ii) provide the Board the authority to establish application windows during which OSW developers may file applications to qualify their projects for ORECs; (iii) provide the Board the authority to impose conditions upon any grant of ORECs to an OSW developer; and (iv) provide various protections for the New Jersey ratepayer.[5]

7.    An order issued by the Board pursuant to OWEDA "shall not be modified by subsequent board orders, unless the modifications are jointly agreed to by the parties."[6]

8.    When originally signed into law, OWEDA called for the State OREC program to support "at least" 1,100 MW of OSW.[7]

9.    On January 31, 2018, Governor Murphy issued Executive Order No. 8, directing the Board, the New Jersey Department of Environmental Protection, and any other applicable State agencies to implement OWEDA in a manner to realize the development of 3,500 MW of OSW by 2030,[8] noticing that the State possesses "some of the best offshore wind resources in the world,"[9] and affirming the Garden State's commitment to "combat the threat of global climate change"[10] to protect New Jersey and also "provide reliability and relief for the regional electric grid, which is the largest, most congested and most costly in the nation".[11]

---

[5] I/M/O the Opening of Offshore Wind Renewable Energy Certificate (OREC) Application Window for 1,200 to 2,400 Megawatts of Offshore Wind Capacity in Furtherance of Executive Order No. 8 and Executive Order No. 92, BPU Docket No. QO20080555; I/M/O the Board of Public Utilities Offshore Wind Solicitation 2 for 1,200 to 2,400 MW – Atlantic Shores Offshore Wind Project 1, LLC, BPU Docket No. QO21050824, Order dated June 30, 2021, at 5.
[6] N.J.S.A. 48:3-87.1(3)(c)(4).
[7] P.L. 2010, Chapter 57, 12.
[8] NJ Exec. Order No. 8 at 2 (Jan. 31, 2018), https://nj.gov/infobank/eo/056murphy/pdf/EO-8.pdf.
[9] *Id*. at 1.
[10] *Id.*
[11] *Id.*

PRELIMINARY PUBLIC COPY

10.     The State Legislature followed suit and passed an amendment to OWEDA on April 12, 2018, which was signed into law by Governor Murphy on May 23, 2018, and increased the statutory goal of the OREC program to 3,500 MW.[12]

11.     In furtherance of Executive Order No. 8, the Board opened the First New Jersey Offshore Wind Solicitation on September 17, 2018 ("*First Solicitation*"), seeking to solicit 1,100 MW of OSW capacity.[13]

12.     On June 21, 2019, the Board announced its award in the First Solicitation to Ørsted's 1,100 MW Ocean Wind project.[14]

13.     Governor Murphy subsequently rescinded the 3,500 MW goal set forth in Executive Order No. 8 via issuance of Executive Order No. 92 on November 19, 2019, and directed State agencies to implement OWEDA in a manner to achieve 7,500 MW of OSW by 2035, finding that as a result of the efforts by the State following the issuance of Executive Order No. 8, "offshore wind development is a growing economic sector in the State with increases in supply chain presence, private investment in ports, workforce development efforts, and research and development for offshore wind industry and labor".[15]

14.     In furtherance of OWEDA and Executive Order 92, on September 10, 2020, the Board released its "New Jersey Offshore Wind Solicitation #2, Solicitation Guidance Document, Application Submission for Proposed Offshore Wind Facilities," opening its second application

---

[12] P.L. 2018, Chapter 17.

[13] I/M/O the Opening of Offshore Wind Renewable Energy Certificate (OREC) Application Window for 1,100 Megawatts of Offshore Wind Capacity in Furtherance of Executive Order No. 8, BPU Docket No. QO18080851, Order dated September 17, 2018.

[14] "New Jersey Board of Public Utilities Awards Historic 1,100 MW Offshore Wind Solicitation to Ørsted's Ocean Wind Project," Press Release dated June 21, 2019 (https://www.nj.gov/bpu/bpu/newsroom/2019/approved/20190621.html).

[15] NJ Exec. Order No. 92 at 3 (Nov. 19, 2019), https://nj.gov/infobank/eo/056murphy/pdf/EO-92.pdf.

4

PRELIMINARY PUBLIC COPY

window for OREC proposals for utility scale OSW projects (the "*Round 2 Solicitation Guidance Document*").[16]

15.     In response to the Round 2 Solicitation Guidance Document, Petitioner filed an application with the Board seeking approval of its Project as a qualified OSW project and an award of ORECs.

16.     On June 30, 2021, in Docket Nos. QO20080555 and QO21050824, the Board issued an order granting the Project ORECs (the "*OREC Order*"). A true and accurate copy of the OREC Order is attached hereto as *__Exhibit A__*.

17.     Pursuant to the OREC Order, the Project shall, among other things, achieve commercial operations in two (2) phases: "Phase 1A" 761.6 MW by September 2027 and Phase 1B 748 MW by April 2028.[17]

18.     As set forth in the OREC Order, through completion of construction of the Project, Petitioner guaranteed certain levels of direct spend in New Jersey. Unlike subsequent OSW solicitations released by the Board, the Round 2 Solicitation Guidance Document, and the OREC Order which followed, did not mandate the posting of any securities or guaranties in connection with such guaranteed spend.[18] Instead, pursuant to the OREC Order, any shortfall to Petitioner's economic impact guarantees would result in, first, a contribution to a workforce development fund, and second, a concomitant decrease in OREC price.[19]

---

[16] I/M/O the Opening of Offshore Wind Renewable Energy Certificate (OREC) Application Window for 1,200 to 2,400 Megawatts of Offshore Wind Capacity in Furtherance of Executive Order No. 8 and Executive Order No. 92, BPU Docket No. QO20080555, Order dated September 9, 2020, at 4.

[17] OREC Order, Attachment B, paragraph 3.

[18] Compare New Jersey Offshore Wind Third Solicitation, Solicitation Guidance Document (March 6, 2023), Section 2.6; New Jersey Offshore Wind Fourth Solicitation, Solicitation Guidance Document (April 30, 2024), Sections 1.6, 2.6.

[19] OREC Order, page 21.

19.     Pursuant to the OREC Order, upon achieving commercial operations, and only upon achieving commercial operations, the Project shall be eligible for ORECs, but only for the MWh of energy actually delivered to the point of interconnection.[20]

## II.     PETITIONER'S EFFORTS TO DEVELOP THE PROJECT AND DELIVER ON COMMITMENTS

20.     Since the issuance of the OREC Order, Petitioner has expended tremendous efforts and resources to develop the Project and to progress through significant milestones, including, without limitation, the following:

 a. Completed all geotechnical and geophysical campaigns for detailed design;

 b. Achieved Coastal Zone Consistency, secured Final Environmental Impact Statement, Record of Decision, Construction and Operations ("**COP**") approval and issuance of all federal permits and New Jersey state permits required to commence construction of the Project;

 c. Undertook a comprehensive RFP process for all of the major equipment/components and engineering, procurement, construction and installation ("**EPCI**") services needed to construct the Project, completed preferred supplier and reservation agreements for the majority of the scopes of work, equipment and installation vessels, including a Preferred Supplier Agreement with turbine manufacturer Vestas and agreements with local New Jersey contractors Creamer-Jingoli for civil works engineering and design, Riggs-Distler for the Atlantic City Electric ("**ACE**") Cardiff substation

---

[20] *Id.*, page 26.

PRELIMINARY PUBLIC COPY

expansion, EEW Group for foundation manufacturing, and were in advanced stages of negotiation on the underlying supply and EPCI agreements;[21]

d. Secured parcels for the planned Atlantic City Operations and Maintenance center;

e. Executed an Interconnection Service Agreement ("*ISA*") including electing a self-build of the ACE Cardiff substation expansion, for which Petitioner had secured long-lead-time equipment and were in the process of completing the detailed engineering, procurement, and construction;[22]

f. Secured ownership of most of the parcels and easements in Atlantic City, Pleasantville and Egg Harbor Township needed for the Project's export cable landfall, export cable onshore route, and onshore substation;

g. Completed electro-magnetic surveys of utilities and a test pit program to support detailed design for the cable route and the ability to negotiate utility crossing or utility relocation agreements;

h. Progressed negotiations of a Project Labor Agreement following the execution of a Memorandum of Understanding with multiple unions;

i. Executed a Letter of Intent on January 11, 2023, between the New Jersey Economic Development Authority and Petitioner's parent company, Atlantic Shores Offshore Wind, LLC, and held advanced discussion on a lease agreement for a parcel to be used for wind turbine marshalling at the New Jersey Wind Port;

---

[21] As discussed further in Paragraph 36 below, because of the Presidential Wind Memorandum, these contracts have now been terminated.

[22] As alluded to in Paragraph 36 below, because of the Presidential Wind Memorandum, the contract with Riggs-Distler for the ACE Cardiff substation expansion has been terminated.

PRELIMINARY PUBLIC COPY

    j.    In preparation for taking a final investment decision ("*FID*") and achieving financial close in 2025, Petitioner engaged reputable financial advisors and subject matter experts and commenced a financing due diligence process and bank sounding, to which over 45 banks responded; and

    k.    Progressed in discussions with both Atlantic City and Egg Harbor Township on good neighbor agreements designed to compensate host communities for impacts associated with the construction and operation of the Project.

21.    To date, Petitioner has spent over ██████████ in developing the Project and has been fulfilling the financial commitments under the OREC Order, having spent over ██████████ locally in New Jersey in support of Project development, strategic academia and research partnerships, the Rutgers University EcoComplex fostering Small, Minority, Women, Veteran-Owned Business Enterprises ("*SMWVBEs*"), the Research and Monitoring Initiative, and funding of the New Jersey WIND Institute.

22.    In furtherance of the State's goal of housing key parts of the OSW supply chain for the Atlantic Coast in New Jersey that would contribute to a stronger New Jersey economy, another key focal point of Petitioner's activity and commitments includes efforts to grow the local supply chain and support skilled workforce development in partnership with the local labor unions and the WIND Institute, such as:

    a.    Supporting the WIND Institute, including their collaboration with NewLab on the Wind Innovation Center;

    b.    Training over 500 students through a New Jersey Pathways program with two high schools, four community colleges, two colleges, and local unions;

8

c.  Supporting Helmets to Hardhats to provide retiring service members with quality training and career opportunities in the OSW construction industry;

d.  Offering internship opportunities at Petitioner's parent company, Atlantic Shores Offshore Wind, LLC and the Stockton ECO Center;

e.  Collaborating with Rutgers University through its Future Scholars program;

f.  Supporting Atlantic Cape Community College to build their new OSW training facility;

g.  Scholarships to Rowan College and Kean Ocean students in OSW related fields;

h.  Organizing the South Jersey Energy Partnership Careers in Energy expo at the ECO Center, in cooperation with Stockton University; and

i.  Supporting New Jersey chambers of commerce by raising awareness about opportunities in OSW through meet-and-greet gatherings with new potential industry partners – in particular SMWVBEs.

23.    In addition to the above, Petitioner has advanced numerous initiatives since the OREC Order to engage with and contribute to local New Jersey communities, particularly those that are underserved and overburdened. These initiatives have included investments of over ███████ including:

a.  Supporting the Boys & Girls Clubs of Atlantic City to fund their science, technology, engineering, arts, and math programming. The program directly builds skills in technology, construction, and green energy innovation fields to support youth in the community access to occupations paying self-sustaining wages;

9

b.  Sponsoring the science, technology, engineering, and math program of the Egg Harbor Township Police Activities League, which included a wide variety of OSW programming ranging from blade design to autonomous underwater vehicles;

c.  Hosting Offshore Wind for Kids, teaching children in K-12 about OSW on the beach in Atlantic City, based out of our ECO Center on the boardwalk;

d.  Sponsoring KidWind activities in South Jersey, helping educators learn how to teach students about wind energy, including a teacher training and competition in Egg Harbor Township; and

e.  Participating in Atlantic Cape Community College's annual scholarship fundraiser to support the valuable programming there.

### III.   NEW JERSEY ROUND 4 OREC SOLICITATION – OPPORTUNITY TO RE-BID THE PROJECT TO ACCOUNT FOR INFLATION AND SUPPLY CHAIN CONSTRAINTS

24.   Following the issuance of the OREC Order, the Project, along with the greater OSW industry, has been subjected to once in a generation inflationary pressures and increased interest rates as a result of the COVID-19 pandemic, Russia's invasion of Ukraine, as well as a global surge in OSW demand that has strained supply chain capacities, increased installation vessel costs and diminished developers' ability to negotiate prices.

25.   Indeed, every OSW project approved in New Jersey, New York, and Massachusetts from 2019 through 2022 was subsequently cancelled or re-bid into a subsequent procurement at higher OREC pricing than initially approved and awarded.

26.   Throughout this time period, Petitioner remained steadfast in its commitment to maintain the Project schedule and meet its obligations under the OREC Order. Petitioner was in regular communication with Board staff, senior administration officials, agency leaders, elected

PRELIMINARY PUBLIC COPY

officials, and host community representatives to continue the permitting process. In addition, Petitioner remained consistent and transparent in public messaging related to the economic challenges facing the Project, and the need for an industry solution that enables mature, de-risked projects to stay competitive for financing while remaining a net benefit to New Jersey ratepayers. Moreover, in media interviews and in public testimony, Petitioner reinforced its commitment to the State and willingness to work on a sustainable path forward to deliver the Project. Perhaps most importantly, despite facing challenging macroeconomic conditions and unprecedented inflation, Petitioner continued making the substantial investments—including those described in Paragraph 20 above—necessary to maintain the Project's viability and deliverability. The Project's key value drivers of advanced permitting, supply chain security, and a mature interconnection plan were a direct result of these good faith efforts to progress the Project under extraordinary uncertainty.

27.     Petitioner also made significant efforts to combat misinformation and stop the spread of false claims connecting offshore wind development to an unusual mortality event impacting certain marine mammal populations. The Petitioner launched a large-scale public education campaign that promoted the economic and environmental benefits of offshore wind using paid and social media, targeted digital advertisements, earned media, speeches, op-eds, letters to the editor, virtual open houses, networking events, video shorts showcasing New Jersey-based businesses, and a grassroots canvass of more than 35,000 Atlantic County households near the onshore route.

28.     The BPU issued the Solicitation Guidance Document for the New Jersey Offshore Wind Fourth Solicitation on April 30, 2024 (the "***Fourth Solicitation***"), which provided for, among other things, the ability for a project that was previously selected as a Qualified OSW

11

PRELIMINARY PUBLIC COPY

Project in the First or Second Solicitation to submit a re-bid of its project. Petitioner submitted a re-bid of its Project on July 10, 2024, and submitted its Best and Final Offer on December 4, 2024. At that time, the Project held the distinct advantages of an advanced permitting program, existing supply chain investments, a mature interconnection plan, and a clear path to financing that would have enabled the Project to be the first OSW project to deliver power to New Jersey in 2029-2030.

### IV.    FEDERAL EFFORTS TO IMPEDE THE PROJECT

29.    On January 20, 2025, President Donald Trump issued a Presidential Memorandum titled "*Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*" (the "***Presidential Wind Memorandum***").[23]

30.    The Presidential Wind Memorandum directs agencies not to "issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." The Presidential Wind Memorandum does not establish a timeframe for completion of the review and the scope of the review is not clearly defined.[24]

31.    On February 3, 2025, the BPU announced that it would not proceed with an award in the Fourth Solicitation citing, in part, the "uncertainty being driven by federal actions and permitting." Thus, in effect, the Presidential Wind Memorandum not only has blocked existing permit approvals necessary to begin construction but has undermined efforts to improve OSW economics in New Jersey.

---

[23] 90 Fed. Reg. 8363 (Jan. 29, 2025).

[24] *Id.*

32.    Petitioner had received all federally required permits for the Project, and, until the Presidential Wind Memorandum, had no reason to believe the federal government would not uphold the permits which it had duly authorized and issued to Petitioner.  As a direct consequence of the Presidential Wind Memorandum, however, the federal government has reversed its position and withdrawn a critical permit from Petitioner without explanation.

33.    On September 30, 2024, the United State Environmental Protection Agency ("*EPA*") issued Air Permit Number OCA-EPA-R2 NJ 02 (the "*Air Permit*") to Petitioner, which covered the Project and a second project being developed by Petitioner's affiliate, Atlantic Shores Offshore Wind Project 2, LLC ("*Project 2*"), following a lengthy and in-depth multi-year permitting process that started with submission of the COP for the Project and Project 2 on March 25, 2021. After a Notice of Appeal was filed with the EPA's Environmental Appeal Board on October 15, 2024, the EPA filed a brief defending the Air Permit and requested dismissal of the appeal on November 5, 2024.

34.    On February 28, 2025, before the EAB had acted on the petition, the EPA abruptly reversed course and requested that the EAB remand the Air Permit back to the agency for further proceedings.  As sole justification for this request, the EPA stated that it wished to "reevaluate the Project and its environmental impacts in light of the [Presidential Wind Memorandum]," The EPA further stated that it desired a remand of the Air Permit "so that it may implement the [Presidential Wind Memorandum] and include the [Air Permit] in the comprehensive review of permitting practices called for in the [Presidential Wind Memorandum]," notwithstanding that the Presidential Wind Memorandum's Section 2 only applied to "new and renewed" Federal approvals.  The EAB granted the EPA's request to remand on March 14, 2025, over the objection of Petitioner and its affiliates (collectively, "*Atlantic Shores*"), and denied Atlantic Shores' motion

13

PRELIMINARY PUBLIC COPY

to reconsider the remand on April 15, 2025. Despite outreach by Petitioner following the denied motion, the EPA has provided no communication or announcements regarding what additional review it intends to conduct regarding the Air Permit.

35.    Without the Air Permit, Petitioner cannot proceed with construction of the Project as a legal matter.[25] As a direct consequence of the EAB's granting of EPA's request for a remand—justified solely on the basis of the Presidential Wind Memorandum—Petitioner's other finalized and issued permits for the Project are now at risk due to potential misalignment in permit conditions and timelines if the EPA in fact acts on the Air Permit and reissues it at a later date or issues an inexplicable denial of the Air Permit. The loss of the Air Permit significantly jeopardizes Petitioner's funding and construction plans for the Project, which the federal government had approved to start as early as 2025.

36.    The Presidential Wind Memorandum further undermines the future viability of fully approved projects such as the Project by providing the vague and open-ended directive that agencies "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases…."[26]

37.    Due to the uncertainty caused by the Presidential Wind Memorandum, the subsequent loss of the Air Permit, and other actions taken by the current administration more generally, Petitioner's parent company has been forced to materially reduce its personnel, terminate contracts, and cancel planned project investments. The Petitioner has also had to seek a pause to its construction schedule with the federal government as there has been no indication

---

[25] 30 C.F.R. § 585.700 (requiring compliance with the Clean Air Act OCS permit requirements at 40 C.F.R. Part 55).

[26] 90 Fed. Reg. at 8363.

when or if the essential Air Permit would be reinstated. Most recently, this includes cancellation of the ISA and associated upgrades to the regional transmission grid.

## V.    GOOD CAUSE TO TERMINATE THE OREC ORDER

38.    As a result of the foregoing developments, the Project is no longer viable upon the terms and conditions set forth in the OREC Order. This is despite Petitioner's diligent and good faith efforts to advance the Project toward completion as set forth in Section II of this Petition, including submission of a rebid of the Project in the Fourth Solicitation, which was concluded by the BPU without an award.

39.    The Presidential Wind Memorandum and the federal government's subsequent actions in response thereto have created significant uncertainty in the OSW industry and has directly impacted the feasibility of the Project.

40.    Also due to the Presidential Wind Memorandum and related agency actions, the Board's attempt to address the significant macroeconomic factors resulting from COVID-19 and Russia's invasion of Ukraine[27] outlined above in Paragraph 23 were not able to be effectuated through a successful outcome in the Fourth Solicitation. This, too, has affected the economic viability of the Project.

41.    Despite the Petitioner's sustained effort to advance the Project, it has become impracticable on the terms set forth in the OREC Order due to the foregoing reasons, all of which are entirely outside of Petitioner's control. The success of the Project is premised on Petitioner's ability to maintain necessary permits and approvals from the federal government, a construction schedule that is credible and that will enable price visibility and certainty for critical project

---

[27] *See, e.g.*, I/M/O the Board of Public Utilities Offshore Wind Solicitation for 1,100 MW – Evaluation of the Offshore Wind Applications, BPU Docket No. QO18121289, Order dated August 14, 2024.

15

PRELIMINARY PUBLIC COPY

components, the ability to achieve FID and to successfully achieve financial close for the construction financing.[28]

42.    Given this impracticability, Petitioner respectfully submits that good cause exists for the Board to consent to and enter an order terminating the OREC Order.

## VI.    NOTICE

43.    Communications and correspondence related to this Petition should be sent as follows:

Adam L. Peterson, Esq.
Pearlman & Miranda LLC
110 Edison Place, Suite 301
Newark, New Jersey 07102
Direct: (973) 707-356
Fax: (973) 893-5962
apeterson@pearlmanmiranda.com

with copies to:

Julia Pettit, Esq.
General Counsel
Atlantic Shores Offshore Wind, LLC
1 Dock 72 Way, Floor 7
Brooklyn, NY 11205
julia.pettit@atlanticshoreswind.com

## VII.    CONCLUSION AND REQUESTS FOR APPROVAL

44.    WHEREFORE, Petitioner respectfully requests that the Board  find that good cause exists to terminate the OREC Order, thereby releasing Petitioner, its agents, and its parent

---

[28] *See, e.g.*, M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 171 N.J. 378, 391 (2002) ("The essence of the principle [of impracticability] is that a party's performance under a contract is rendered impracticable by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made.")

16

PRELIMINARY PUBLIC COPY

companies from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of services, expenses and compensation whatsoever that the Board, Rate Counsel, or the State may have had, may now have, may claim to have, or may hereafter have or claim to have in any way arising out of or related to any act or omission of Petitioner, its agents, or its parent companies and further that terminating the OREC Order shall cease Petitioner's entitlement to ORECs in connection with the Project.

45.     WHEREFORE, Petitioner respectfully requests that the Board grant such other and further relief as it determines to be just and reasonable.


[remainder of page intentionally left blank]

17

**PEARLMAN & MIRANDA LLC**

Attorneys for Petitioner,
Atlantic Shores Offshore Wind Project 1, LLC

By: _____
    ADAM L. PETERSON, ESQ.
    Partner

4935-2992-0841.1

PRELIMINARY PUBLIC COPY

**VERIFICATION and POWER OF ATTORNEY**

STATE OF NEW JERSEY

                                 SS:

COUNTY OF ESSEX

       I, Julia Pettit, of full age, being duly sworn according to law, upon my oath, depose and say:

       1.       I am the General Counsel of Atlantic Shores Offshore Wind, LLC, the sole member and manager of Petitioner.

       2.       I reviewed the attached Petition and affirm that the information contained therein is true and accurate to the best of my knowledge and belief.

       3.       I hereby appoint and authorize Adam L. Peterson, Esq. of the law firm, Pearlman & Miranda LLC to prosecute the Petition and to appear on my behalf before the Board of Public Utilities in this matter and any matters relating to the Petition.

[Remainder of page intentionally left blank]

_____
Julia Pettit
General Counsel
Atlantic Shores Offshore Wind, LLC

Sworn and subscribed to before me

on this 25th day of ___May___, 2025.

_____

Notary Public            DAVID WAINGER
                  A Notary Public of New Jersey
              My Commission Expires August 25, 2026