UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>                 Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>                 Defendants. | No. 1:25-cv-11221-WGY<br><br>Leave to file granted June 11, 2025 |

**PLAINTIFF STATES' SUPPLEMENTAL BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................ 1

    I.   The States Can Demonstrate Standing Through Specific Project Harms. .......................... 1

    II.  Agency Defendants' Implementation of the Wind Directive Violates the APA. ................ 7

CONCLUSION ............................................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Univ. Professors v. Rubio*,
  No. 1:25-cv-10685, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ........................................... 7

*Am. Pub. Health Ass'n v. Nat'l of Health*,
  No. 1:25-cv-10787, 2025 WL 1548611 (D. Mass. May 30, 2025) ......................................... 10

*Atieh v. Riordan*,
  727 F.3d 73 (1st Cir. 2013) ...................................................................................................... 7

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ................................................................................................................. 8

*City of Providence v. Barr*,
  954 F.3d 23 (1st Cir. 2020) ...................................................................................................... 8

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ................................................................................................................. 4

*Ensco v. Salazar*,
  781 F. Supp. 2d 332 (E.D. La. 2011) ....................................................................................... 9

*FEC v. Akins*,
  524 U.S. 11 (1998) ................................................................................................................... 5

*Gonzalez v. United States*,
  284 F.3d 281 (1st Cir. 2002) .................................................................................................... 1

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ................................................................................................................. 8

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ...................................................................................... 9

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
  923 F.3d 209 (1st Cir. 2019) .................................................................................................... 4

*New Jersey v. EPA*,
  989 F.3d 1038 (D.C. Cir. 2021) ............................................................................................... 6

*New York v. McMahon*,
  No. 1:25-cv-10601, 2025 WL 1463009 (D. Mass. May 22, 2025) ..................................... 4, 10

*New York v. Trump*,
  No. 1:25-cv-00039, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ................................................... 4

*Orr v. Trump*,
  No. 1:25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ............................................. 8

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*,
  461 U.S. 190 (1983) .................................................................................................................. 3

*Somerville Pub. Sch. v. McMahon*,
  No. 25-1495, 2025 WL 1576570 (1st Cir. June 4, 2025) ........................................................ 4

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009) .................................................................................................... 5

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) ..................................................................................................... 3

**Federal Statutes**

33 U.S.C. § 1344(q) ........................................................................................................................ 11

43 U.S.C. § 1332(3) ....................................................................................................................... 10

5 U.S.C. § 558(c) ........................................................................................................................... 10

5 U.S.C. § 706(2)(A) ....................................................................................................................... 8

5 U.S.C. § 706(2)(C) ....................................................................................................................... 8

**Federal Regulations**

30 C.F.R. § 585.613(e) .................................................................................................................... 9

30 C.F.R. § 585.628(f) ..................................................................................................................... 9

33 C.F.R. § 322.5 ........................................................................................................................... 10

33 C.F.R. § 323.6(a) ...................................................................................................................... 10

33 C.F.R. § 325.2(a) ........................................................................................................................ 9

33 C.F.R. § 325.2(d)(1)–(2) ........................................................................................................... 10

33 C.F.R. § 325.2(d)(3) ............................................................................................................. 9, 10

90 Fed. Reg. 8363 (Jan. 29, 2025) ................................................................................................... 1

iii

Following the Court's conversion of Defendants' opposition to Plaintiff States' (States) and Plaintiff-Intervenors' motion for preliminary injunction into a motion to dismiss, ECF 137, the States submit this supplemental brief to address two issues this Court raised at the hearing on June 5: (i) whether the States have standing to challenge § 2(a) of the Presidential Memorandum halting all approvals of wind-energy projects, *see* 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Directive), and (ii) whether Agency Defendants are acting contrary to law in implementing the Wind Directive. As discussed below, the States have demonstrated standing—including through tangible harms from impacts on specific projects—and also sufficiently pleaded that the Agency Defendants violated the Administrative Procedure Act (APA) by, *inter alia*, acting contrary to law.[1]

## ARGUMENT

### I. The States Can Demonstrate Standing Through Specific Project Harms.

The States have provided and hereby incorporate evidence of their standing in their complaint and briefs, and in the declarations previously filed in this case. The States now provide further explanation and declarations on specific harms to their interests from the halt's impact on at least two specific wind projects—SouthCoast and Atlantic Shores—and have filed an amended complaint reflecting the same, ECF 141 (Am. Compl.). *See Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002) (court may consider materials beyond pleadings on Rule 12(b)(1) motion).

***SouthCoast.*** Prior to issuance of the Wind Directive, the SouthCoast project was on track to deliver 1,087 megawatts (MW) to Massachusetts and 200 MW to Rhode Island by 2030. Am.

---

[1] In particular, the States also sufficiently pleaded that Agency Defendants acted arbitrarily and capriciously in violation of APA Section 706(2)(A) because they provided no reasoned basis for categorically and indefinitely halting wind-energy approvals and departing from longstanding agency policy, failed to account for the States' significant reliance interests, and failed to explain inconsistencies with contemporaneous executive actions expediting other forms of energy. *See* ECF 141 (Am. Compl.) Count I; ECF 70 (States' Br.) 22–30; ECF 135 (States' Reply) 7–8.

Compl. ¶¶ 197–98. As detailed in the attached declaration of Michael Brown, SouthCoast Wind's Chief Executive Officer, the project had obtained its Construction and Operations Plan and was on schedule to receive its three remaining permits by March 27, 2025; indeed, Agency Defendants had informed SouthCoast that it would receive its three outstanding permits as scheduled, and the U.S. Army Corps of Engineers had already approved its Section 404 permit and merely needed to issue it. ECF 150 (Brown) ¶¶ 11–12, 14; Am. Compl. ¶ 197. Since January 20, however, Agency Defendants repeatedly delayed these remaining permits—now to the end of September, with more delays to come—citing the Wind Directive as the sole basis. Am. Compl. ¶ 197; *see also* ECF 123-2 (McElwain) ¶ 9; ECF 123-4 (Voyles) ¶ 17; Brown ¶¶ 12, 15–16, 19–21, 25–26, 36.

The delays and continued uncertainty caused by the Agency Defendants' permitting halt have already forced the company to cancel critical supply chain contracts and delay construction by a *minimum* of two years, postponing delivery of electricity to the grid from 2030 until at least 2032. Am. Compl. ¶ 198; *see also* Brown ¶ 34. And, as a direct result of the halt, the pending power purchase agreement negotiations—i.e., the contracts between developers and electric distribution companies that provide for delivery of electricity to Massachusetts—have already been delayed from March until the end of June. Am. Compl. ¶ 198; Brown ¶ 32. And if the halt is not lifted, and with costs mounting, the company likely will be forced to abandon power purchase agreement negotiations in both Massachusetts and Rhode Island, indefinitely stalling the project. Am. Compl. ¶ 198; *see also* Brown ¶ 35; ECF 151 (Mahony Am.) ¶¶ 34, 50–51, 56. By contrast, if the halt is lifted, SouthCoast can obtain its three outstanding permits and move forward with developing the project. Am. Compl. ¶¶ 198, 201; *see also* Brown ¶ 36.

The delay and eventual loss of SouthCoast's 1,087 MW of energy that will occur if the halt on wind-energy approvals is not lifted creates an imminent and substantial risk of future harms to

the Commonwealth. *See Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023). States have well-established authority in determining the type of energy generation to be licensed. *See Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 212 (1983). After years of extensive planning, Massachusetts is counting on offshore wind projects—including SouthCoast—to deliver reliable, affordable, and clean energy to meet rising energy demand. Am. Compl. ¶ 201–10; *see also* Mahony Am. ¶¶ 52, 56. There is no alternative electric generation—including renewable generation—that could come online in the same timeframe as SouthCoast, much less deliver that much power to the Eastern region of the state. Am. Compl. ¶ 209; *see also* Mahony Am. ¶¶ 52–55. As a result, delay or loss of the SouthCoast project will deprive Massachusetts of energy reliability and affordability benefits. Am. Compl. ¶¶ 201–10; *see also* ECF 71-16 (Barton) ¶¶ 10–11; Mahony Am. ¶¶ 43–47. It will prevent realization of state investments and economic benefits. Am. Compl. ¶¶ 211–12; *see also* ECF 71-5 (Carlisle) ¶¶ 22, 25–27, 38; Mahony Am. ¶¶ 48, 56. It will impede and make more expensive achievement of statutory clean-energy and climate targets, including the state's 5,600 MW off-shore wind procurement target and its 2030 greenhouse gas emission-reduction target. Am. Compl. ¶¶ 194, 213; *see also* Mahony Am. ¶¶ 34, 52, 56. And it will increase greenhouse gas emissions, contributing to climate change harms to the state. Am. Compl. ¶¶ 213–14; *see also* ECF 71-2 (Brizius ¶¶ 16–24). *See generally* ECF 70 (States' Br.) 9–18; ECF 135 (States' Reply) 2; SouthCoast ROD 78, 84 (project would enhance grid reliability, contribute to state procurement goals, and reduce greenhouse gases equivalent to emissions of 800,000 motor vehicles a year), https://perma.cc/LRY3-AFS7; *see also* SouthCoast FEIS, App. G-25-26 (Nov. 2024) (over $75 million in local financial commitments), https://perma.cc/5QHG-N6E5. These benefits will now be postponed at least until 2032, with a substantial and imminent risk that continuation of the halt

will indefinitely stall the project and prevent delivery of *any* of the benefits on which the state is relying. *See* Am. Compl. ¶¶ 197–98, 201; *see also* Brown ¶¶ 34–35; Mahony Am. ¶¶ 50–51, 56.

Thus, Massachusetts has established a substantial and imminent risk of future harm to its financial and sovereign interests from additional project delays or indefinite postponement—a risk that increases with each day the halt's cloud of uncertainty hangs over the industry. *See Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 225–28 (1st Cir. 2019); *New York v. McMahon*, No. 1:25-cv-10601, 2025 WL 1463009, at *17 (D. Mass. May 22, 2025) (delay and uncertainty in educational funding are injury in fact to States where providing quality education to their citizens is a vital function), *stay denied sub nom. Somerville Pub. Sch. v. McMahon*, No. 25-1495, 2025 WL 1576570 (1st Cir. June 4, 2025); *cf. New York v. Trump*, No. 1:25-cv-00039, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025) (citing as evidence of irreparable harm chaos and uncertainty from agencies' categorical freeze of federal funding).

The Commonwealth's injuries are also plainly traceable to Agency Defendants' implementation of the Wind Directive. The fact that the company will be forced to either further or indefinitely delay the project stems directly from Agency Defendants' halt on issuance of permits based solely on the Wind Directive. *See* Am. Compl. ¶¶ 12, 197–98, 201; *see also* Brown ¶¶ 12, 15–16, 19–20, 25, 36; McElwain ¶ 9; Voyles ¶ 17. Thus, the government's action predictably causes the substantial and imminent risk of harms to Massachusetts from delayed or foregone project benefits. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); States' Reply 3.

Finally, lifting the halt would redress Massachusetts's injuries from risk of additional delay and indefinite postponement of the SouthCoast project. By removing the insurmountable barrier to issuance of SouthCoast's permits, a decision enjoining the implementation of the Wind Directive would allow the project to move forward and redress the Commonwealth's harms. Am. Compl.

4

¶¶ 12, 197–98, 201; *see also* Brown 36; *see Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467–68 (1st Cir. 2009) (holding that a favorable decision would provide plaintiff "effectual relief" by removing "a barrier to achieving approval" even though additional regulatory hurdles would need to be cleared before project could be commenced); *FEC v. Akins*, 524 U.S. 11, 25 (1998) (redressability satisfied "even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason."). And here, the agencies were on track to issue the permits in March 2025, the Corps had already approved one, and the agencies uniformly cited the Wind Directive as the sole basis for withholding decision. Am. Compl. ¶ 197; *see also* Brown ¶¶ 11–12, 14–16, 19–20, 25, 36; McElwain ¶ 9; Voyles ¶ 17.

**Atlantic Shores.** Similarly, the States can establish standing based on harms to New Jersey from the substantial and imminent risk that the 1,510 MW Atlantic Shores project will be canceled as a result of Agency Defendants' halt on approvals. Prior to the Wind Directive, Atlantic Shores had all federal permits necessary for construction. Am. Compl. ¶ 314; *see also* ECF 152 (Perry Am.) ¶¶ 45–46. But a month later, the Environmental Protection Agency (EPA) invoked the Wind Directive to remand the project's Clean Air Act permit, which EPA had previously defended, Am. Compl. ¶ 314; *see also* Perry Am. ¶ 47; Voyles ¶ 23. Following months of unsuccessful attempts to get the permit reinstated, last week Atlantic Shores filed a petition with the New Jersey Board of Public Utilities (BPU) asking to vacate its offtake agreement—an approval to sell its electricity to the grid at a set price—on the ground that, "[w]ithout the Air Permit, [Atlantic Shores] cannot proceed with construction of the Project as a legal matter." Am. Compl. ¶ 315; *see also* Perry Am. Ex. A, ¶ 35. Atlantic Shores explained that the "loss of the Air Permit significantly jeopardizes Petitioner's funding and construction plans for the Project, which the federal government had approved to start as early as 2025." Am. Compl. ¶ 316; *see also* Perry Am. Ex. A, ¶ 35. As a result,

5

the company had to ask to pause construction "as there has been no indication when or if the essential Air Permit will be reinstated." Am. Compl. ¶ 316; *see also* Perry Am. Ex. A, ¶ 37.

The recent BPU filing demonstrates that—due to Agency Defendants' implementation of the Wind Directive—the project "is no longer viable." Am. Compl. ¶ 316; Perry Am. Ex. A, ¶ 38. If the company abandons the project due to Agency Defendants' implementation of the Wind Directive, New Jersey would suffer, *inter alia*, financial harms through the lost direct and indirect economic benefits, including jobs, workforce training, business, development, community programs, and tax payments. *See* Am. Compl. ¶ 318; *see also* Perry Am. ¶¶ 53, 55–60. For example, the State would suffer loss of a guarantee by Atlantic Shores to spend $848 million during development and construction of the project, which are expected to lead to $1.869 billion in economic benefits to New Jersey's economy throughout the project's life. Am. Compl. ¶ 318; *see also* Perry Am. ¶ 55. And New Jersey stands to lose millions of additional dollars in investments that Atlantic Shores had committed toward, *inter alia*, funding infrastructure and public institutions in the State. Am. Compl. ¶ 318; *see also* Perry Am. ¶¶ 56–60; *see also* Am. Compl. ¶¶ 321–24; Perry Am. ¶ 84 (detailing energy affordability and reliability impacts from loss of planned offshore wind, including Atlantic Shores). Even if Agency Defendants' implementation of the Wind Directive merely delayed the project, New Jersey would need to hold another solicitation to enable Atlantic Shores to proceed pursuant to a new offtake agreement, both delaying project benefits and causing significant administrative and regulatory burdens. *See* Am. Compl. ¶ 325; *see also* Perry Am. ¶ 36; *New Jersey v. EPA*, 989 F.3d 1038, 1045–49 (D.C. Cir. 2021). In either event, New Jersey will suffer cognizable harms. As with SouthCoast, these harms to New Jersey are traceable to and redressable by vacatur of the wind-permitting halt—the sole basis for EPA's remand.

While these two projects show impacts on late-stage permitting, Agency Defendants' halt

on wind-energy approvals has stopped wind-energy projects at *every* stage of permitting. *See* Am. Compl. ¶¶ 169–357; States' Br. 6–9; States' Reply 1, 4–5. For example, Agency Defendants cited the Wind Directive in refusing to even set permitting timelines, as required under FAST-41, for the Bluepoint offshore-wind project off of New York. *See* Am. Compl. ¶ 179. The Wind Directive has caused an imminent and substantial risk of harms—that would be lessened and thus redressable by vacatur of the halt—by stopping wind-energy development in all the States. *See Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 1235084, at *16 (D. Mass. Apr. 29, 2025) ("To carry its burden of establishing redressability, [plaintiff] need only show that a favorable ruling could potentially lessen its injury . . . .") (internal quotation and citation omitted)).

## II.     Agency Defendants' Implementation of the Wind Directive Violates the APA.

The States also have demonstrated that Defendants' actions violate the APA because, among other shortcomings, they are "not in accordance with law" and are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *see* Am. Compl. Count II. As an initial matter, the States' APA claims should be considered at the merits stage on review of the administrative record underlying their decision to halt wind-energy approvals, not on a pre-record motion to dismiss. *See Atieh v. Riordan*, 727 F.3d 73, 75 (1st Cir. 2013) (vacating Rule 12(b)(6) dismissal of APA claim because "judicial review of the agency's decision must proceed on the administrative record"). Moreover, the States have raised multiple claims that Agency Defendants' decision to implement the Wind Directive is arbitrary and capricious under APA Section 706(2)(A), including that Agency Defendants failed to explain their decision to categorically and indefinitely halt wind-energy approvals, *supra* note 1—a failure Defendants do not even attempt to rebut, *see* ECF 123 (Opp.) 24–35. Those Section 706(2)(A) claims plainly do not require violation of a mandatory duty, as would a claim under Section 706(1). *See* States' Reply 7. To conclude otherwise "would contravene settled precedent and would

improperly insulate wide swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency." *Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025).

In any event, as to the States' contrary-to-law claim, Agency Defendants' open-ended, across-the-board halt on any approvals under the many federal statutes that apply to wind-energy development is indeed contrary to those laws. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Therefore, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

None of the statutes and regulations cited in the States' complaint authorizes this across-the-board halt on all permits and approvals. States' Br. 31. Instead, Agency Defendants' actions indeed violate specific laws and regulations applicable to wind energy by sidestepping *all* permitting timelines, procedures, and standards. For example, the categorical halt—which has lasted nearly five months—violates the APA requirement that each "agency . . . within a reasonable time, shall set and complete . . . proceedings required by law and shall make its decision." 5 U.S.C. § 558(c). BOEM's halt on wind-energy approvals also precludes compliance with the Outer Continental Shelf Lands Act's (OCSLA) command, recognized by multiple courts and agencies, that the Outer Continental Shelf, "should be made available for expeditious and orderly development." 43 U.S.C. § 1332(3). And the halt violates regulations implementing that command, including that, "[u]pon completion of [BOEM's] technical and environmental reviews and other reviews required by Federal laws (e.g., CZMA), BOEM *will* approve, disapprove, or approve with conditions" an offshore-wind project's site assessment and construction and operations plans.

8

30 C.F.R. §§ 585.613(e), 585.628(f) (emphasis added). It is unlawful for BOEM to refuse to decide any approvals because of a review *not* required by federal laws.

Multiple courts have found halting leasing or permitting contrary to or inconsistent with OCSLA. One court held that BOEM acted contrary to OCSLA in violation of the APA when it paused oil and gas leasing pending a comprehensive review pursuant to an Executive Order. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 294 (W.D. La. 2022). The court explained that OCSLA "require[s] [the] agencies to sell oil and gas leases" and that, "by stopping the process, the agencies are in effect amending" OCSLA. *Id.* Similarly, in finding a likelihood of success on the claim that BOEM's moratorium on deepwater drilling permits unreasonably delayed those permits, another court held that OCSLA "establishes a non-discretionary duty on the Department of the Interior to act, favorably or unfavorably, on drilling permit applications." *Ensco v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011). Citing "OCSLA's command that drilling development be 'expeditious,' 43 U.S.C. 1332(3), and the APA's command that a permit be processed 'within a reasonable time,' 5 U.S.C. § 555" the court explained that "[n]ot acting at all is not a lawful option." *Id.*

Like OCSLA, Section 404 of the Clean Water Act requires expeditious action: "to the maximum extent practicable" decisions should be reached "not later than the ninetieth day after the date the notice for such application is published." 33 U.S.C. § 1344(q). Corps regulations provide specific steps and timelines, 33 C.F.R. § 325.2(a), requiring that "district engineers *will* decide on all applications not later than 60 [calendar] days after receipt of a complete application." unless one of six exceptions applies, *id.* § 325.2(d)(3) (emphasis added). None of those exceptions encompasses a presidential dictate like the Wind Directive. But the Corps's Acting Regulatory Program Chief, Tunis McElwain, nonetheless cites the Wind Directive as the sole reason the Corps "has not issued" nor "intend[s] to issue any permits" until the Wind Directive's extra-statutory

9

"comprehensive" review is done. McElwain ¶ 6. Moreover, the Corps's regulations provide specific substantive criteria that apply to permitting decisions, all sidestepped here. *See, e.g.*, 33 C.F.R. §§ 322.5, 323.6(a). To take a specific example, as described *supra* Section I, the Corps—in violation of the 60-day deadline in 33 C.F.R. § 325.2(d)(3) and without regard for any requirements of Section 404—has now delayed SouthCoast Wind's Section 404 permit to the end of September. SouthCoast ROD 90; McElwain ¶ 9. Likewise, the Corps's decision to pause comment on the Section 404 permit for the Arthur Kill Terminal facility due to the Wind Directive, McElwain ¶ 10, is contrary to the Corps's notice-and-comment requirements, 33 C.F.R. § 325.2(d)(1)–(2).

Agency Defendants' blanket halt on wind-energy permitting thus makes it impossible to comply with their obligations under governing law—OCSLA, the Clean Water Act, and the other statutes and implementing regulations set forth in Count II. Such action is contrary to law under the APA. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 1:25-cv-10787, 2025 WL 1548611, at *13 (D. Mass. May 30, 2025) (denying motion to dismiss APA claims where the question "whether the Public Officials have thwarted the operations of the statute is at least plausibly pleaded"); *McMahon*, 2025 WL 1463009, at *28 (finding likely success on claim that the Department of Education's reduction in force was contrary to law where defendants had "not pointed to any case that indicates that the Secretary's effective dismantling of the Department is within her reorganization powers" and action made it impossible to comply with numerous federal laws requiring the Department to carry out certain functions).

## CONCLUSION

For the reasons herein and in the States' memorandum and reply in support of their preliminary injunction motion, ECF 70, 135, the Court should deny Defendants' motion to dismiss and instead enter a schedule for the prompt filing of any administrative record and merits briefing.

| Respectfully submitted, | Dated: June 11, 2025 |
|---|---|
| **LETITIA JAMES** *Attorney General of New York* | **ANDREA JOY CAMPBELL** *Attorney General of Massachusetts* |

By: */s/ Michael J. Myers*
Michael J. Myers*
   *Senior Counsel*
Laura Mirman-Heslin*
Rene F. Hertzog*
   *Assistant Attorneys General*
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
Michael.Myers@ag.ny.gov

*Counsel for the State of New York*

By: */s/ Turner H. Smith*
Turner H. Smith, BBO No. 684750
   *Assistant Attorney General & Deputy Chief*
Nathaniel Haviland-Markowitz, BBO No. 713940
   *Assistant Attorney General*
Jonathan Whitney, BBO No. 694760
   *Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
Turner.Smith@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
   *Attorney General of Arizona*

By: */s/ Mary M. Curtin*
Mary M. Curtin*
   *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
   *Attorney General of California*

By: */s/ Kate M. Hammond*
Kate M. Hammond*
   *Deputy Attorney General*
Robert Swanson*
   *Acting Supervising Deputy Attorney General*
Jamie Jefferson*
   *Deputy Attorney General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6531
Kate.Hammond@doj.ca.gov
Robert.Swanson@doj.ca.gov
Jamie.Jefferson@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
 *Attorney General of Colorado*

By: */s/ Carrie Noteboom*
Carrie Noteboom*
 *Assistant Deputy Attorney General*
Jessica L. Lowrey*
 *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6288 (Noteboom)
(720) 508-6167 (Lowrey)
Carrie.Noteboom@coag.gov
Jessica.Lowrey@coag.gov
FAX: (720) 508-6040

*Counsel for the State of Colorado*

**WILLIAM TONG**
 *Attorney General of Connecticut*

By: */s/ Jill Lacedonia*
Jill Lacedonia*
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

By: */s/ Ian R. Liston*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorney General*
Ralph Durstein III*
 *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
 *Attorney General of the District of Columbia*

By: */s/ Estefania Y. Torres Paez*
Estefania Y. Torres Paez, BBO No. 705952
 *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Estefania.TorresPaez@dc.gov

*Counsel for the District of Columbia*

12

**KWAME RAOUL**
   *Attorney General of Illinois*

By: */s/ Jason E. James*
Jason E. James\*
   *Assistant Attorney General*
Office of the Attorney General
Environmental Bureau
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.James@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
   *Attorney General of Maryland*

By: */s/ Steven J. Goldstein*
Steven J. Goldstein\*
   *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*

**KEITH ELLISON**
   *Attorney General for the State of Minnesota*

By: */s/ Catherine Rios-Keating*
Catherine Rios-Keating\*
   *Special Assistant Attorney General*
Environmental and Natural
Resources Division
445 Minnesota Street, Suite 1800
Saint Paul, MN 55101
(651) 300-7302
Catherine.Rios-Keating@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**AARON M. FREY**
   *Attorney General of Maine*

By: */s/ Robert Martin*
Robert Martin\*
   *Assistant Attorney General*
6 State House Station
Augusta, ME 04333
(207) 626-8579
Robert.Martin@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
   *Attorney General of Michigan*

By: */s/ Lucas Wollenzien*
Lucas Wollenzien\*
Michael Moody\*
   *Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
WollenzienL@michigan.gov
Moodym2@michigan.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
   *Attorney General for the State of New Jersey*

By: */s/ Terel L. Klein*
Terel L. Klein\*
   *Deputy Attorney General*
Office of the Attorney General
25 Market Street, 7th Floor
Trenton, NJ 08625
(609) 376-2818
Terel.Klein@law.njoag.gov

*Counsel for the State of New Jersey*

13

| | |
|---|---|
| **RAÚL TORREZ**<br>　*Attorney General of New Mexico*<br><br>By: */s/ William Grantham*<br>William Grantham*<br>　*Assistant Attorney General*<br>408 Galisteo Street<br>Santa Fe, NM 87501<br>(505) 717-3520<br>wgrantham@nmdoj.gov<br><br>*Counsel for the State of New Mexico* | **DAN RAYFIELD**<br>　*Attorney General of Oregon*<br><br>By: */s/ Paul Garrahan*<br>Paul Garrahan*<br>　*Attorney-in-Charge*<br>Natural Resources Section<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096<br>(503) 947-4540<br>Paul.Garrahan@doj.oregon.gov<br><br>*Counsel for the State of Oregon* |
| **PETER F. NERONHA**<br>　*Attorney General of Rhode Island*<br><br>By: */s/ Nicholas M. Vaz*<br>Nicholas M. Vaz, BBO No. 693629<br>　*Special Assistant Attorney General*<br>Office of the Attorney General<br>Environmental and Energy Unit<br>150 South Main Street<br>Providence, RI 02903<br>(401) 274-4400 ext. 2297<br>nvaz@riag.ri.gov<br><br>*Counsel for the State of Rhode Island* | **NICHOLAS W. BROWN**<br>　*Attorney General of Washington*<br><br>By: */s/ Yuriy Korol*<br>Yuriy Korol*<br>　*Assistant Attorney General*<br>Washington Attorney General's Office<br>Environmental Protection Division<br>800 5th Ave Ste. 2000 TB-14<br>Seattle, WA 98104-3188<br>(206) 332-7098<br>Yuriy.Korol@atg.wa.gov<br><br>*Counsel for the State of Washington* |

*admitted pro hac vice*

**CERTIFICATE OF SERVICE & RULE 7.1 CERTIFICATION**

I, Rene F. Hertzog, certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing. Parties may access this filing through the Court's electronic system.

*/s/ Rene F. Hertzog*
Rene F. Hertzog