**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

Civil Action No. 1:25-cv-11221-WGY

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF RENEWED MOTION TO DISMISS**
**(**LEAVE TO FILE GRANTED BY THE COURT ON JUNE 18, 2025)

During the hearing on June 5, 2025, the Court made two things very clear. To survive a motion to dismiss, Plaintiffs and Intervenor would need to identify specific harms from specific projects in specific States. *See* Tr. of Hr'g at 7. They also would need to identify specific, mandatory statutory provisions that Defendants are allegedly violating. *Id*. at 6. Despite their best efforts over the course of three complaints, six briefs, and numerous declarations, Plaintiffs and Intervenor fail to satisfy these threshold criteria. Put differently, these are simply the wrong parties, bringing the wrong claims, at the wrong time.

Accordingly, the Court should dismiss Plaintiffs' and Intervenor's complaints for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Plaintiffs and Intervenor lack standing and have failed to identify final agency action necessary for this Court to exercise jurisdiction over their claims. Even if the Court were to have jurisdiction, Plaintiffs and Intervenor have failed to state a claim pursuant to Rule 12(b)(6).

**ARGUMENT**

I.    **Plaintiffs and Intervenor Lack Standing**

By confining federal court jurisdiction to "Cases" and "Controversies," Article III of the Constitution requires that a plaintiff have standing to sue. *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). Standing serves several purposes; among them, it assures that federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Id*. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)).

To have standing, plaintiffs must demonstrate a concrete and particularized injury that is actual or imminent; caused by the defendant; and that would be redressed by the requested judicial relief. *Id*. at 380. "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008)).

Although Plaintiffs have filed an amended complaint, they and Intervenor continue to lack standing for three reasons. First, their alleged future economic and other injuries are neither particularized nor imminent. Second, they cannot demonstrate that these alleged injuries are caused by agency implementation of the temporary cessation directive in the Wind Memo. And third, they cannot show that even if the Court were to grant their requested relief—vacatur of agency adoption and implementation of the temporary cessation directive—the permits, approvals, and authorizations complained of would be issued or that their alleged injuries would be redressed.

Plaintiffs' and Intervenor's shortcomings as to standing are best illustrated by looking to the alleged effects of specific projects on a handful of States that constitute the majority of their new allegations in their Amended Complaint, ECF No. 141, and the focus of their Supplemental Briefs, ECF Nos. 146 (Intervenor), 149 (Plaintiffs).

### A.      Massachusetts – SouthCoast

Massachusetts alleges that it has been harmed because of a delay in the issuance of three outstanding approvals for the SouthCoast wind project. Am. Compl. ¶ 197. The Commonwealth alleges the project sponsor, SouthCoast Wind Energy, LLC, has "already had to cancel critical supply-chain contracts" and is "incurring $70 million in annual costs." *Id.* ¶ 198. But these are alleged harms to SouthCoast Wind Energy, LLC, not the Commonwealth of Massachusetts. SouthCoast Wind Energy, LLC is not a party to this litigation, and Massachusetts may not assert the rights of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). For its part, Massachusetts alleges only that such delays would result in the delay or deprivation of various generalized benefits, Am. Compl. ¶ 201, and in vague "risk" to Massachusetts' investments in the wind energy industry, generally, *id.* ¶ 211.

These allegations fail to satisfy the particularized and imminent elements of the injury analysis. The Commonwealth concedes that, even assuming all of SouthCoast's permits were approved, the project is not anticipated to begin delivering wind energy until 2030. Pls.' Suppl. Br. 1. Moreover, many of Massachusetts' alleged harms are described as occurring years or decades into the future: *e.g.*, increased energy costs (2050), Am. Compl. ¶ 208; increased coastal property damage (2070s), *id.* ¶ 214; increased flooding to Commonwealth-owned properties (2030s), *id.*

The allegations also clearly fail on causation.  Massachusetts does not tie any of these generalized, distant harms to the specific alleged delay of the SouthCoast project.[1]  Rather, its alleged injuries are tied to a future entirely "[w]ithout wind-energy development."  *Id.* ¶ 215; *see also id.* ¶ 208.  But the temporary cessation directive does not halt projects that are operating now, nor does it eliminate wind energy as a viable alternative in the future.  And in any case, the future availability of wind energy will depend on many events and actors beyond the timing of federal permits.  Massachusetts cannot show that a hypothetical lack of wind energy decades in the future would be due to the temporary cessation directive, rather than another, as yet unknowable cause.  *See Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) ("Causation is absent if the injury stems from the independent action of a third party" (citation omitted)). Massachusetts also concedes that any harms it may incur in the distant future will not be caused solely by a delay in energy *supply*, but also because of an entirely unrelated increase in energy *demand*.  Am. Compl. ¶ 203.  In short, the downstream injuries Massachusetts will allegedly suffer are "too speculative or otherwise too attenuated to establish standing."  *Food and Drug Admin.*, 602 U.S. at 390.

Even Massachusetts' somewhat more specific allegations fail on their own terms. Massachusetts also claims that if the SouthCoast project is unable to deliver electricity until 2032, the Commonwealth will be unable to meet its statutory goal for offshore wind energy procurement by 2027.  *See* Pls.' Suppl. Br. 2; Am. Compl. ¶ 198.  But Massachusetts concedes

---

[1] While Plaintiffs allege SouthCoast would also deliver wind energy to Rhode Island, Rhode Island alleges only equally distant harms in 2030, 2040, and 2050 impacting its wind-energy and climate-related goals without tying any of its alleged harms specifically to the SouthCoast project.  *See* Am. Compl. ¶¶ 341-43, 349.

that absent the Wind Memo, SouthCoast was not scheduled to deliver any wind energy until *2030*—already well past the Commonwealth's target date.  Pls.' Suppl. Br. 1.

Finally, Massachusetts provides no new facts to overcome its redressability problems. Massachusetts merely alleges in conclusory fashion that "[i]f the halt is lifted, wind projects, including SouthCoast, would proceed toward development, mitigating the risk of delay or loss of such benefits."  Am. Compl. ¶ 201.  But Massachusetts has not alleged—and cannot allege—that if the Court were to preliminarily enjoin or vacate the temporary cessation directive, the three outstanding permits would automatically issue (they would not) or that they would issue by a date certain to alleviate the supposed future harms.  Indeed, Massachusetts does not identify a single mandatory statutory deadline that would force the issuance of any of the three outstanding permits if the temporary cessation directive were enjoined.  At most, Massachusetts cites the 60-day deadline in 33 C.F.R. § 325.2(d)(3) for Corps engineers to issue Clean Water Act Section 404 permits. That argument ignores, however, that such deadline does not apply until *after* the Corps has all information necessary to issue a permit, including analyses under other environmental laws and other agencies' approvals.  *Id*. § 325.2(d)(3)(vi) (recognizing that compliance with other environmental laws such as the National Environmental Policy Act and Endangered Species Act "may prevent district engineers from being able to decide certain applications within 60 days").

For its part, Intervenor does not allege in its Complaint that SouthCoast Wind Energy, LLC is an ACE NY member.  *See* Interv.'s Compl. ¶ 70, ECF No. 114; *Doe v. City of Holyoke*, 764 F. Supp. 3d 2, 7 (D. Mass. 2025) (recognizing that "the court's review is limited to allegations in the complaint").  And Intervenor's cryptic briefing and declarations are

inconsistent at best.[2]  To the extent the project only "involve[s] ACE NY members," Interv.'s

Suppl. Br. 5, such vague, downstream economic effects are too attenuated to establish standing.

*See Food & Drug Admin.*, 602 U.S. at 383.  To the extent SouthCoast is a member, Intervenor,

like Massachusetts, fails to tie any particularized, imminent harms to a pending SouthCoast

permit that has been denied or has not been issued by a mandatory, statutory deadline.  And even

if it had, Intervenor would still lack associational standing because the circumstances concerning

each member's permits are highly varied and fact-intensive, requiring the individual participation

of each member.  *See Nat'l Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass.

2012).

     **B.**       **New Jersey – Atlantic Shores**

New Jersey's amended allegations fare no better.  New Jersey alleges similarly distant

injuries to far-off goals for the reduction of greenhouse gasses (2050), Am. Compl. ¶ 307;

offshore wind generation (2040), *id*. ¶ 309; and renewable energy generally (2035), ¶ *id*.  *See*

*also id.* ¶ 313 (alleging a vague threat from the Wind Memo to its ability to reach its own

statutory requirements).  These alleged harms are simply neither particularized—that is, tied to a

specific permit on a specific project—nor imminent, and thus do not satisfy the injury

requirement for standing.

Like Massachusetts, New Jersey asserts harm on behalf of a non-party project

applicant—Atlantic Shores Offshore Wind Project 1, LLC—but not the State itself.[3]  *Id*. ¶ 316.

---

[2] *Compare* Reply 5, n.7, ECF No. 136 (claiming only that <u>Defendants</u> identified ACE NY
members, including SouthCoast) *with* Interv.'s Suppl. Wells Decl. Attachment B, ECF No. 140
(listing SouthCoast's parent company as a member as to the Bluepoint project ("OCEAN
WINDS – BLUEPOINT") but not SouthCoast).
[3] To be clear, Defendants in no way concede that Plaintiffs' allegations of injury on behalf of
project applicants would be sufficient to establish standing if those same allegations had been
brought by the project applicants themselves.

At best, New Jersey vaguely alleges that money is coming its way "during the development and construction" of the Atlantic Shores[4] project in the future but fails to allege any facts establishing it has lost any contractually or legally obligated funds or that such loss is imminent. *Id*. ¶ 318. Indeed, New Jersey omits the fact that even absent the Wind Memo, according to the project applicant's own May 2024 Construction and Operations Plan ("COP"), the Atlantic Shores project was not estimated to be completed and delivering energy until "the mid-to-late 2020s."[5]

Upon just the slightest inspection, the alleged causal link between the Wind Memo and New Jersey's speculative harms also breaks down. Much of New Jersey's alleged injuries are not tied to specific projects but are associated with uncertainty in the wind energy sector generally and hypothetical cancellation of wind energy projects. But the temporary cessation directive does not cancel any project permits or authorizations, let alone any projects in their entirety. Indeed, authorized projects continue to produce wind energy and agencies continue to receive, review, and evaluate permit applications. *See* BOEM Decl. ¶ 7; Corps Decl. ¶ 6; EPA Decl. ¶¶ 5, 15, 23; FWS-ES Decl. ¶¶ 7-8, 11; FWS-MB Decl. ¶ 11; NMFS Decl. ¶¶ 4-5. Rather, it merely pauses certain decisions until the ordered assessment and review has been completed.

To the extent New Jersey and Intervenor attempt to allege injury resulting from the delay of a specific permit on a specific project, those allegations are isolated to Atlantic Shores.[6] In essence, they allege that EPA was required to issue the project sponsor, Atlantic Shores Offshore

---

[4] Defendants refer to the project at issue—Atlantic Shores South—simply as "Atlantic Shores."
[5] U.S. Dept. of the Interior, Bureau of Ocean Energy Mgmt., Atlantic Shores Offshore Wind Construction and Operations Plan for Commercial Lease OCS (OCS-A 0499), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Atlantic%20Shores%20South_Volume%20I_Project%20Description_05-01-2024.pdf (last visited June 13, 2025).
[6] New Jersey mentions other projects by Invenergy Wind Offshore, LLC, and Attentive Energy, LLC, Am. Compl. ¶¶ 319-20, but the State makes no attempt to tie any specific, imminent, non-speculative injuries to any permit delay in violation of a mandatory statutory deadline.

Wind, LLC, an Outer Continental Shelf Clean Air Act ("CAA") permit within one year of filing

its application pursuant to 42 U.S.C. § 7475(c) (providing that "[a]ny completed permit

application . . . shall be granted or denied not later than one year after the date of filing of such

completed application").  *See* Am. Compl. ¶ 317; Pls.' Suppl. Br. 5; Interv.'s Suppl. Wells Decl. ¶

17.

But New Jersey "must assert [its] own legal rights and interests, and cannot rest [its]

claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125,

129 (2004) (quoting *Warth*, 422 U.S. at 499).  And given this permit is unique to Atlantic Shores

and an adverse ruling could feasibly impact its interest, it—not New Jersey and not Intervenor—

is the right party vindicate this alleged harm.  *See Warth*, 422 U.S. at 511 (recognizing that an

association may have standing as the representative of its members, but only "so long as the

nature of the claim and of the relief sought does not make the individual participation of each

injured party indispensable to proper resolution of the cause"); *see also Nat'l Ass'n of Gov't*

*Emps.*, 914 F. Supp. 2d at 14.

Putting aside these threshold problems, New Jersey and Intervenor omit the basic facts

necessary to demonstrate injury and causation.  For instance: When was the permit application

first submitted?  Answer: September 1, 2022.  EPA Decl. Ex. 3, 1-2, n.2, ECF No. 123-4.  When

did the applicant finish revising its application?  Answer: June 28, 2024.  *Id*.[7]  When did EPA

issue a final permit decision on the permit?  Answer: September 30, 2024.  *Id*.  Was that interim

decision administratively challenged on October 15, 2024, which prevented it from becoming

effective?  Answer: Yes.  *See id.*; 40 C.F.R. § 124.15(b).

---

[7] As the Environmental Appeals Board explained, "[t]he June 28, 2024, revised permit
application is the *only* permit application in the administrative record, and it is attached to
Atlantic Shores' brief in this matter."  EPA Decl. Ex. 3, 1-2, n.2 (emphasis added).

Thus, if Atlantic Shores' CAA permit were required to be issued within one year of submission of its final revised application, that date—June 28, 2025—has not yet passed.[8]  If, however, the permit were required to be issued within one year from some earlier submission as Plaintiffs' would seem to suggest, that delay lapsed in 2024 and cannot possibly have been caused by the January 2025 Wind Memo.[9]

But this discussion is largely academic: *No* party has brought a 5 U.S.C. § 706(1) claim alleging an Atlantic Shores permit has been "unreasonably delayed," or rather, a claim under 42 U.S.C. § 7604(a) seeking to compel EPA to make a CAA permitting decision.[10]  To drive the point home, Plaintiffs have acknowledged that Atlantic Shores has asked the New Jersey Board of Public Utilities to vacate its prior approval.  Am. Compl. ¶ 315.  In other words, the project proponent has chosen one course of action, while third parties—New Jersey and Intervenor—are demanding another.

Finally, although New Jersey and Intervenor fail to allege they have suffered or will suffer any imminent, non-speculative injury caused by the Wind Memo, their supposed injuries are not redressable.  Even if the Court were to preliminarily enjoin or vacate the temporary cessation directive, EPA would still need to complete its administrative review and decide to issue the permit, and any decision to issue the permit would once again be subject to administrative challenge.  In short, New Jersey and Intervenor's allegations amount to policy

---

[8] But even if that date had passed, such delay is not automatically actionable.  Assuming Atlantic Shores would have standing, it would still need to bring a claim under the CAA, 42 U.S.C. § 7604(a)(2), to enforce the duty in 42 U.S.C. § 7475(c), after filing a notice of intent to sue EPA.  42 U.S.C. § 7604(b)(2).

[9] While not referenced by the EAB, EPA deemed Atlantic Shores' application complete on August 21, 2023.

[10] Congress displaced the APA for CAA unreasonable delay claims through 42 U.S.C. § 7604(a).

objections from "concerned bystanders" that cannot serve to establish standing.  *Food and Drug Admin.*, 602 U.S. at 382 (quoting *Allen*, 468 U.S. at 756).

### C.      New York – Empire Wind, Bluepoint, Lease Areas, & Arthur Kill

The only remaining new allegations of note in Plaintiffs' Amended Complaint and its Supplemental Brief pertain to projects and lease areas off the coast of New York.[11]  Plaintiffs and Intervenor fail, however, to establish standing to challenge the Wind Memo based on any of these allegations.

First, Plaintiffs concede that Empire Wind is no longer under a stop work order.  Am. Compl. ¶ 178.  This effectively eliminates any viable allegation of particularized, imminent injury to New York and Intervenor as to the Empire Wind project, and they identify none.

Second, Plaintiffs and Intervenor half-heartedly claim the Wind Memo has prevented BOEM from "set[ting] permitting timelines, as required under FAST-41" for the Bluepoint project.  Pls.' Suppl. Br. 7; *see* Interv.'s Suppl. Br. 5.  But Plaintiffs identify no injury to New York from this alleged delay.  Instead, they allege simply that if the Wind Memo were vacated the project would "proceed" and enable it "to be available to provide energy to New York."  Am. Compl. ¶ 179.  Plaintiffs also ignore the fact that Bluepoint is in its early stages, years away from construction, and offer no projection for when it could begin supplying power to New York absent the Wind Memo.  Moreover, Plaintiffs and Intervenor identify no provision under the FAST Act that requires BOEM to establish a permitting timetable by a date certain.  And they fail to do so for good reason—there is none.  *See* 42 U.S.C. § 4370m-2(c)(2)(A).

---

[11] Plaintiffs do not seriously counter Defendants' contention that, at the very least, States other than Massachusetts, New Jersey, and New York and Defendants not implicated by the States' allegations should be dismissed.  Defs.' Mot. to Dismiss 14, 19-20, ECF No. 123.

Plaintiffs note twelve offshore-wind lease areas (including the Bluepoint project) that are not contractually committed to any State. Am. Compl. ¶ 179. All these projects are in their early stages, many of them without even an approved COP. *Id.* That these lease areas merely "<u>could</u> provide energy to New York," *id.* ¶ 179 (emphasis added), renders it impossible to conclude that any allegation of injury caused by the temporary cessation directive are particularized or imminent, as the standing inquiry requires.

Finally, to the extent New York and Intervenor raise new arguments concerning the Arthur Kill Terminal, Pls.' Suppl. Br. 10; Interv.'s Suppl. Br. 16, those efforts still fail to establish standing. Plaintiffs allege that "the Corps has halted consideration of applications for permits under [S]ection 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act." Am. Compl. ¶ 184.[12] Plaintiffs allege the cessation directive is jeopardizing the *Terminal's* ability to use grant money, but they identify no such injuries to the State caused by the Wind Memo. *Id.* Indeed, Plaintiffs concede that the Terminal is not expected to begin operations until 2027, rendering any potential injuries to the State speculative and not imminent. Even Intervenor admits that any supposed injuries to the Terminal would only be from the loss of anticipated benefits "once construction is complete." Interv.'s Suppl. Wells Decl. ¶ 30. In any event, such fact-specific allegations should be brought by the Terminal. *See, e.g.*, *Nat'l Ass'n of Gov't Emps.*, 914 F. Supp. 2d at 14.

Both parties claim the Corps has violated an obligation under 33 C.F.R. § 325.2(d) to issue public notice of the Arthur Kill Terminal's Clean Water Act ("CWA") permit within 15 days after receipt of all information required to be submitted by the applicant. Pls.' Suppl. Br. 10; Interv.'s Suppl. Br. 16. Once again, the Terminal itself has not brought a § 706(1) action

---

[12] Intervenor's Complaint does not mention the Arthur Kill Terminal at all.

claiming that public notice has been unlawfully withheld.  In any case, under the terms of the

regulations, the district engineer is merely to be "guided" by these time limits, and the parties

similarly fail to identify any mandatory statutory deadline the Corps has supposedly violated.

They also fail to explain how *they* are injured by the fact that the *public* has not yet received

notice.  And, like their other arguments, they fail to establish that the CWA permit would be

approved even if public notice were issued.

In sum, Plaintiffs' new allegations and Plaintiffs' and Intervenor's Supplemental Briefs

fail to establish an imminent, non-speculative injury caused by the Wind Memo that is

redressable by this Court.

## II.    Plaintiffs and Intervenor Fail to Identify Final Agency Action[13]

Plaintiffs and Intervenor appear to argue that their APA claims are immune from a "pre-

record motion to dismiss," Pls.' Suppl. Br. 7; *see* Interv.'s Suppl. Br. 4, but the First Circuit

"recognizes an exception where the government alleges that the plaintiff's claim is legally

flawed."  *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs*., No. 23-CV-486-LM, 2025

WL 786527, at *2 (D.N.H. Mar. 12, 2025) (citing *Atieh v. Riordan*, 727 F.3d 73, 76 n.4 (1st Cir.

2013)).  As Defendants have shown, Plaintiffs' and Intervenor's claims here are legally flawed

because they are pleaded under APA § 706(2) as a challenge to final agency action en massse

when there is, in fact, no such final agency action.  Defs.' Mot. to Dismiss 25-33; *see, e.g.*

*Rauseo v. Army Corps of Eng'rs*, 368 F. Supp. 3d 202 (D. Mass. 2019).  In fact, Plaintiffs and

---

[13] Failure to identify final agency action in an APA case implicates the court's jurisdiction, *see Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007), although district courts have dismissed APA claims in response to motions that present both Rule 12(b)(1) and Rule 12(b)(6) challenges.  *See, e.g.*, *Rauseo v. Army Corps of Eng'rs*, 368 F. Supp. 3d 202 (D. Mass. 2019).

Intervenor improperly assert CAA violations under the APA that can be actionable only if pleaded under 42 U.S.C. § 7604(a).

Plaintiffs and Intervenor have done nothing to remedy these legal flaws. Plaintiffs' Amended Complaint carries forward the same claims that were wrongly pleaded to begin with and that are subject to dismissal. Neither Plaintiffs nor Intervenor make a serious attempt in their opposition briefs to rehabilitate their failure to identify final agency action. *See* Defs.' Mot. to Dismiss 25-34. They simply press ahead under their flawed premise that a generalized agency "halt on wind-energy approvals" pending an environmental review constitutes final agency action subject to judicial review under the APA and with their redundant non-statutory claims. Plaintiffs and Intervenor rightly make no claim that the Wind Memo itself is subject to judicial review under the APA.

Unable to show final agency action, Plaintiffs and Intervenor turn to misdirection. They argue against dismissal on the grounds that § 706(2) claims "do not require violation of a mandatory duty." Pls.' Suppl. Br. 7; Interv.'s Suppl. Br. 10-13. This is a red herring, as Plaintiffs' and Intervenor's § 706(2) claims are mispleaded to begin with. The claims for unreasonable delay that Plaintiffs and Intervenor *should have* pleaded under § 706(1) or 42 U.S.C. § 7604(a)—but have failed to—would, in fact, require them to identify at a minimum a discrete, mandatory action that each defendant agency has failed to take as a result of the Wind Memo. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Even then, alleging that a statutory deadline has been missed would not automatically prove unreasonable delay. Defs.' Mot. to Dismiss 31. Plaintiffs and Intervenor cite *Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025), Pls.' Suppl. Br. 8; Interv.'s Suppl. Br. 11, which does not help them since it does not involve claims of delay. Rather, *Orr* is an ongoing challenge under

§ 706(2) to "substantive changes" to the State Department's passport policy.  2025 WL 1145271
at *1.

Plaintiffs and Intervenor also attempt to avoid dismissal by arguing that, in addition to
asserting "arbitrary and capricious" § 706(2)(A) claims, they allege claims the Defendants are
"not in accordance with law" under § 706(2)(A) and "in excess of statutory jurisdiction,
authority, or limitations, or short of statutory right" under § 706(2)(C).  Pls.' Suppl. Br. 7; Interv.'s
Suppl. Br. 13-18.  Intervenor argues that these claims can survive a motion to dismiss by alleging
that "the agencies have contravened a statutory or regulatory mandate, or by establishing that the
agencies' actions have no legal basis in the applicable statutes or regulations."  Interv.'s Suppl.
Br. 13.  Intervenor then spends several pages discussing what it contends are statutory and
regulatory requirements of the APA, OCSLA, CWA, CAA, MMPA, and BGEPA that are
inconsistent with the Wind Memo.  *Id*. at 13-18.

These arguments again miss the mark.  *All* § 706(2) claims (including any claim under
§ 706(2)(D) for lack of notice and comment) must challenge "final agency action," 5 U.S.C.
§ 704, and § 706(2) authorizes a reviewing court to "hold unlawful and set aside" only such
actions, findings, or conclusions.  Here, there are no reviewable final agency actions, findings, or
conclusions.  In the permitting context, those actions occur when the permit is either approved or
disapproved.  Plaintiffs may not do an end run around the APA's, the CAA's, or the CWA's
finality requirements by recasting their allegations of unreasonable delay as claims of "not in
accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of
statutory right."  Claims like Plaintiffs' and Intervenor's that seek to "compel agency action
unlawfully withheld or unreasonably delayed," *id*. § 706(1), are actionable only under § 706(1),
or for CAA claims, under 42 U.S.C. § 7604(a).  *See* Defs.' Mot. to Dismiss 31-33.

Plaintiffs' and Intervenor's Supplemental Briefs confirm that their true concern is with agency inaction, and unreasonable delay. They argue that Defendants are violating the APA's requirement to act "within a reasonable time," Pls.' Suppl. Br. 8; Interv.'s Suppl. Br. 14 (quoting 5 U.S.C. § 558(c)), and they make similar arguments that BOEM is failing to comply with OCSLA's command to make the Outer Continental Shelf "available for expeditious and orderly development" and that the Corps is failing to take "expeditious action" under the CWA, Pls.' Suppl. Br. 8-10; Interv.'s Suppl. Br. 15-16. These are not well-pleaded challenges to final agency action under § 706(2); they are mispleaded § 706(1) claims of unreasonable delay.

Finally, to try and save their APA arguments, Plaintiffs and Intervenor turn to out-of-circuit district court caselaw from the oil and gas arena. *See* Pls.' Suppl. Br. 9; Interv.'s Suppl. Br. 3, 9–10, 12–13, 15. This caselaw is readily distinguishable here, as it involved distinct factual scenarios and allegations of injury, as well as statutory regimes that are not presented in this case. The caselaw neither establishes the existence of final agency action in this case nor that Plaintiffs or Intervenor have properly pleaded their claims.

## III.    Plaintiffs and Intervenor Otherwise Fail to State a Claim for Relief on the Merits

For many of the same reasons noted above and in Defendants' constructive Motion to Dismiss, even if the Court were to find it has jurisdiction, Plaintiffs' and Intervenor's complaints should nonetheless be dismissed for failure to state claim under Rule 12(b)(6). Plaintiffs and Intervenor fail to identify final agency action. *Id.* 24-31. They fail to plead any material allegations against certain Defendants. *Id.* at 20. They fail to allege facts presenting a viable OCSLA citizen suit. *Id.* at 34-35. And additionally, Plaintiffs and Intervenor impermissibly plead non-statutory claims that are redundant with their APA claims and that fail to identify agency error that patently disregards specific and unambiguous statutory directives. *Id.* at 31-34.

## CONCLUSION

For the reasons stated herein and in Defendants' Motion to Dismiss, the Court lacks jurisdiction over Plaintiffs' and Intervenor's claims because they have failed to establish standing and have failed to identify a final agency action necessary for APA review. Even if the Court were to have jurisdiction, they have failed to state a claim on the merits. Accordingly, their complaints must be dismissed.

Respectfully submitted this 17th day of June 2025.

**ADAM R. F. GUSTAFSON**

Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Michael K. Robertson*

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

PHILLIP R. DUPRÉ
Senior Attorney (TX Bar No. 24069650)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 598-9530
Email: Phillip.R.Dupre@usdoj.gov

ROBERT P. WILLIAMS
Senior Trial Attorney (DC Bar No. 474730)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-0210 | Fax: (202) 305-0275
Email: robert.p.williams@usdoj.gov

16

KIERAN O'NEIL
Trial Attorney (AK Bar No. 2311132)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Tel: (202) 353-7548
Email: kieran.o'neil@usdoj.gov

*Attorneys for Federal Defendants*