UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-11221-WGY

STATE OF NEW YORK, et al,
            Plaintiffs

vs.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al,
            Defendants

*  *  *  *  *  *  *  *

For Hearing Before:
Judge William G. Young

Preliminary Injunction/Motion to Dismiss

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, June 18, 2025

*  *  *  *  *  *  *

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S


TURNER SMITH, ESQ.
NATHANIEL-HAVILAND-MARKOWITZ, ESQ.
   Massachusetts Attorney General's Office
   McCormack Building
   One Ashburton Place
   Boston, MA 02108
   (617) 963-2784
   E-mail: Turner.smith@mass.gov
and
MICHAEL MYERS, ESQ.
RENE HERTZOG, ESQ.
   NYS Office of the Attorney General
   Environmental Protection Bureau
   The Capital
   Albany, NY, 12224
   (518) 776-2382
   Email: Michael.myers@ag.ny.gov
   For Plaintiffs


JAMES MICHAEL AUSLANDER, ESQ.
BROOK DETTERMAN, ESQ.
   Beveridge & Diamond, P.C.
   1900 N Street NW
   Suite 100
   Washington, DC 20036
   (202) 789-6009
   Email: Jauslander@bdlaw.com
   For Intervenor Plaintiff Alliance for Clean Energy NY


MICHAEL KEITH ROBERTSON, ESQ.
   DOJ-Enrd
   150 M Street NE
   Washington, DC 20002
   (202) 305-9609
   Email: Michael.robertson@usdoj.gov
   For Defendants

P R O C E E D I N G S

(Begins, 11:00 a.m.)

THE CLERK:  The Court will hear Civil Action 25-11221, the State of New York, et al versus Donald J. Trump, et al.

THE COURT:  Good morning.  I have authorized internet access to this proceeding, and so I must say, anyone who is accessing this proceeding pursuant to the internet, the rules of court remain in full force and effect, and that is that you must keep your microphone muted at all times.  Moreover, there's no taping, streaming, rebroadcast, or other transcription of these proceedings.  No screen shots as well.

We're here to entertain the motion of the -- it isn't the motion, but the opposition to the motion for a preliminary injunction.  With the case in its present form, this is treated as a motion to dismiss by the public officials.  I have been favored with extensive briefing, and I thank you, and I've had the opportunity to read all the briefs -- there are attachments and the like, but I represent to you that I've read all of the briefs carefully and I believe I'm ready for argument.

I think argument ought take no more than 20 minutes a side in the aggregate, which is going to mean that the states and the intervenors are going to split

their 20 minutes.  So work that out.

It's the public official's motion and I will -- since I'm not going to ask you all to introduce yourselves, when you rise to speak, would you then introduce yourselves, and at least to the plaintiffs, who you represent, so the Court Reporter can have a full record.

I turn to the counsel for the public officials.

MR. ROBERTSON:  Thank you, and good morning, your Honor, Michael Robertson on behalf of the defendants. May it please the Court.  I would like to reserve just maybe 5 minutes of my time for rebuttal.

THE COURT:  No reservations.  No rebuttal.

MR. ROBERTSON:  Thank you, your Honor.

As your Honor mentioned, there has been a lot of briefing on this case so far and it's difficult for me to understand maybe --

(Interruption, zoom.)

THE COURT:  Shut it off.

Go ahead.

MR. ROBERTSON:  Thank you, your Honor.

In terms about what I can add to the briefing this morning, as we mentioned in our reply --

THE COURT:  Well I have questions, so maybe I can just jump in with a few random questions and that

will -- and I do this only to help.  These are questions I have here.

I guess first, having read your brief, in essence it builds on what I confess is an invitation really from my remark saying, "Well let's not hear this today, I've got real problems whether we can ever get" -- that is not "we," "but the plaintiffs can ever get to where they want to go."  I continue to have those problems.  But viewing this through the lens of a motion to dismiss, I think that overstates it, and here's why.

As I view the claims under the Administrative Procedure Act, I -- upon reflection, further discussion with my law clerks, the -- the Administrative Procedure Act is designed to, um, require a process and, um, it -- even if -- and the cases -- the cases seem to say that if the process is not followed, it's the Court's duty to so declare, remand, and, um, ensure that the process is followed.  In a motion to dismiss, that's the standard under which I'm operating.  And I'll just telegraph my other questions, but you can fit them into your argument when you want.

You've talked with your clients, no doubt, and so I want to know, at least to the extent you can tell me, how long is this pause going to be in effect?  And even if you can't tell me that, what's a reasonable period

for a pause?  Are we premature here?

I think that's all I should say.  And honestly, I'm doing this to help and focus your argument.  Now you go ahead.

MR. ROBERTSON:  Of course, thank you, your Honor.  So maybe I'll address that second one first, maybe that's easiest.

THE COURT:  All right.

MR. ROBERTSON:  I do not know how long it will take, your Honor.  I do know that we have, um -- we have discussed it with the agencies and we've submitted declarations that, "Yes, this assessment and review, that is underway, there is work happening on that."  So, your Honor, there's nothing of concern there.

In terms of what would be a reasonable time period?  I'm not willing to say necessarily.  I do know what has happened.  That as a part of that assessment and review, the agencies are having to gather a lot of information to review past wind energy development.  So it's not a simple task by any means.

Now in looking at, um, the *Louisiana v. Biden* cases that have been cited, um, there was a similar assessment and review that took place there.  I don't know if that's necessarily correlative, but that process took 10 months.  We don't know how long this process

will take necessarily yet.  But there is some precedent for assessment and review taking place within the executive branch.

Now in terms of your other question about process. I think that's what I mean by the best lens to look at that perhaps is through some other cases, um, that plaintiffs mention.  I do want to get to these, *Biden* and *Hornbeck* and *Ensco,* because those are very different, I think, than what we have here.

So in terms of that process, *Hornbeck* and, um, *Ensco*, and I believe the *L & G v. Podd* case really took -- they took issue with the complete shutdown and kind of the consideration of activities at the agency.  But that's not what we have.  You know here the agencies still are receiving applications, they're still reviewing applications, they're still analyzing applications for permits.  It's just that tail end piece, that temporary cessation that the issued directive affects.  And there's a --

THE COURT:  I mean but nothing happens.  They may be doing all these things, you're telling me -- I assume they are coming to work and they are accomplishing things each week in their work, but nothing's been issued at all since the wind directive was issued.

I mean that's the truth, isn't it?

MR. ROBERTSON:  Not quite, your Honor.  There is the *Empire Wind* case where that had a halt that was then lifted.  So that was not -- our position is that was not directly related to the temporary cessation directive, but it's an example of things still happening separate from this.

And what those cases that plaintiffs were really getting at, the cases plaintiffs decided were really getting at, was just this complete -- the complete change in process under different provisions in the oil and gas context, and that isn't kind of what we have here.  And there's even a --

THE COURT:  Just so we're clear -- and the plaintiffs are going to have to accept this or argue with respect to it, that it's a motion to dismiss.  So when you, as an Officer of the Court, tell me, "We're still accepting applications," "We're still evaluating applications," "We're taking the various steps that people in Interior and the subagencies normally do," "It's just the 'tail end,'" you say, "Nothing's issued out," now you say, "except for Empire Wind," I want you to know I accept that.  They're going to have to deal with that.  Except nothing's been acted upon, granted or denied since the wind directive came out, except for this Empire that you point out.

Go ahead.

MR. ROBERTSON:  I think our response to that, your Honor, is that's exactly right, in that there is no final agency action.

THE COURT:  Well I just repeated what you told me.

(Laughter.)

THE COURT:  So I'm not surprised that you think it's right.

(Laughter.)

THE COURT:  And so you're saying there's no final agency action.  Well, um, in the real world, and I'm not judging it, but we'll see what they say.  10 months is a long time.

I read a banking report, um, not long ago, like 4 days ago, which, um -- it's not in the record here, but I live in the real world, which shows that the banking investment money is all going oil and gas now, it's not coming from offshore wind.  And not surprisingly, because investors think that the pause is a halt.

We live in the real world.  And I must strictly follow the law as Congress has passed it.  And, um, one of the issues I must grapple with is whether there's been final agency action.  Um, I understand it.

Go ahead.

MR. ROBERTSON:  I think my two, maybe three

responses to that, your Honor, would be, um, there's no final agency action here that they've identified because that requires a consummation of this decision-making process.  So everyone agrees there is a decision-making process that is underway, but we need a consummation of that process.  And more importantly, there needs to be an attachment of some kind of legal right obligation.

Now in other government aspects, that may happen at different times, your Honor, based on different statutory regimes, but here, in the permitting context, those legal rights and obligations that applicants would have -- again not the states, the applicants, that would occur only when the permit is either granted or denied.

And that kind of brings me to one of the, um, preceding concerns, I guess, which is the standing issue.  And I think we've elaborated, I think in depth in our briefing, about why the states have not shown injury, causation, and redressability based on a permit that has not been issued.  But if I could add some more color to that based on the cases that plaintiffs have cited.  In particular, to the **Louisiana v. Biden** cases.

Now on first read there might be some superficial similarity in what's going on with those cases and this case --

THE COURT:  I thought so.

Go ahead.

MR. ROBERTSON:  There are some key differences though in the standing issue.

Now in this lease-sale case, the injury there was really attached to a particular lease sale -- two lease sales in fact, 257, 258, that did not go forward, they were planned to go forward on a date specific, certain, and they did not happen because of that pause.  Now why does that matter for the state standing there in that case?

Well in that case those states were to collect royalties and bonuses based on the winning bid of that sale.  So the states are basically saying, "That sale didn't go forward, a bid never came in, we never got our cut of that bid."  We don't have that here though with the wind permitting.  There's not a permit or a Clean Water Act permit application fee that an applicant would pay and then the states would then get a cut of it.  That's just not happening.  And the *L & G* case is slightly different, because there it revolved around, um, specific taxes that were being applied.

Now the way to think about that is that, um, Louisiana sets up -- "When oil and gas is produced or transferred in our state, you know we impose a tax on that and we take money."  Now these exporters were

saying, "Well we're going to dial back our production because there's this pause in place and we don't want to just sit on this mass of L & G."  And for the states involved, "If you're not going to produce, we're not going to be able to tax and we're going to lose that specific tax revenue."  And the courts noted this.  And they're not talking about just general taxes from economic issues, um, they were talking about these specific taxes.  They're -- it's not about -- um, "mere ripple effects aren't going to be enough to establish injury and standing, you need to be hit by the splash," if that makes sense, your Honor.  And so those two cases, I think, can be easily distinguished on standing grounds.

And that brings us to, you know what actually is the injury causation redressability issue here?  And the plaintiffs have just failed to identify any specific permit that has been delayed that has caused an injury.  Yes, they have identified these kind of general attenuated ripple effects, but not anything specific, particular, and imminent, um, from the cessation agency directive.

And that brings me to the other two cases I just want to point out briefly, your Honor, um, and these are the **Hornbeck** and *Ensco* cases.

One big big piece of these is that this was post *Deep Water Horizon,* and in those cases there was a shutdown on all operations.  So there was just a, um, a pause on actual drilling itself.  We are not shutting down currently-operating windmills, that's not disputed.  So it's unclear exactly how applicable these really are.

THE COURT:  Well they do complain that despite the wind directives saying that this has -- does not apply to leased, um, permits, they say it is interfering with the next steps with respect to leases already awarded.  That is a class of, um, injuries that they claim, at least I understand it to be.

MR. ROBERTSON:  And our position is those injuries are too far afield that they've alleged, there's nothing that -- it's far beyond the imminence requirement of what they put forward.

And finally just a key point on these two.  Those two cases were brought by project sponsors and applicants, which, as we kind of detail in our briefing, really needs to be the parties that are bringing a case.  If a project applicant thinks that it has been harmed by the delay of a specific permit, they're the ones who should come before your Honor, bring a 7061 claim, as the case may be, under the APA -- not a 7062, because there hasn't been final agency action, but that really

14

should be a party interest.

But instead we have this weird dynamic where we have the states, and I think we have a declaration from one of these project owners, and that the project owners aren't here, and what I think that really goes to is that, you know, a standing doctrine really helps reserve issues like this for the political branch. Certainly with the assessment and review, the executive branch is going to have something to say, wouldn't be surprised if the legislative branch also has something to say, and that's really where this discussion really should play out, not here in this 7062 world that we're really trying to tie ourselves in knots to try to find agency action where there is none. There is inaction in the 7061 context perhaps, if anything, but certainly not in a 7062 purview.

Thank you.

THE COURT: All right.

MR. ROBERTSON: And if there are no further questions, your Honor, I'll reserve the rest of my time for rebuttal.

THE COURT: Well there isn't going to be rebuttal. I have no rebuttal. But I have no further questions. I think I understand your argument. Thank you.

MR. ROBERTSON: Thank you, your Honor.

THE COURT:  Again, it wasn't an invitation to take 20 minutes and he didn't.

Go ahead.

MS. SMITH:  Thank you, your Honor.  Turner Smith from Massachusetts representing state plaintiffs in this matter.  I'd like to yield 8 minutes to plaintiff intervenor AC New York.

THE COURT:  You may do it that way.  That's fine.

MS. SMITH:  Wonderful.

I want to begin with this process question that the defendants spoke to.  They admit that -- as your Honor noted, they admit that there are no permits forthcoming, this is a blanket and categorical halt on all permitting.

THE COURT:  Well the "pause," he says, you know is reasonably 10 months, so maybe come back after a while if this ripens into a halt.

MS. SMITH:  Respectfully, your Honor, I didn't hear defendants to be saying this would take 10 months, I heard them to be saying that that's how long it took in *Louisiana v. Biden.*

THE COURT:  You are correct.  But I immediately longed onto that as an exemplar.

Go ahead.

MS. SMITH:  Correct.  While in this case the

defendants have provided no end date.  We are 5 months into this categorical and indefinite halt.  Their declarant, Giacona, admits that the halt or the assessment, um, on which the halt is pending, has just, quote, "begun," and the National Marine Fishery Service notes that they have only, at this point, identified staff to participate in it.  That provides cold comfort to the states in this case and to developers who need to move forward with these projects.

I also want to note, on the process question, you know they do state categorically that, um, these processes, under the various permitting laws, are still in effect.  The evidence is actually quite mixed on that question.  In particular, um, the, um, Corp admits that in this case they are not processing them, these permits, and that's *McKelline* at Paragraph 7.  In fact they've currently paused all processing of Arthur Kill terminal and SouthCoast as well, *McKelline* at 10 and 9.  And EPA also has not been responsive to both SouthCoast and Atlantic Shore's, um, request for information and further processing of their remanded air permits for Atlantic Shores and their 402 permits under the Clean Water Act.

THE COURT:  Let me, um, speak to that, because I said "Here he is, he's an Officer of the Court, so

naturally I accept that."  I think the appropriate standard under the -- the appropriate motion-to-dismiss standard is this, and if I've got it wrong, then, um, put your argument there.

I think that I must take all averments in your complaint, in the intervenors, in your favor, and draw all reasonable inferences in your favor if analysis leads me to consider his factual representation to the Court, if that bears on the legal analysis, and then I think my duty is, um, what?

MS. SMITH:  Yes, your Honor, um, you're correct with respect to the first part.  If your Honor looks to the declarations in support of the defendants' motion, your Honor can, um, at a certain point, resolve factual disputes.  But I submit that it's not appropriate to do so at this point, that that is not proper on a motion to dismiss, but rather at the merits stage.

THE COURT:  Well that's the 30,000 foot view, and that's the law, I understand that, we do motions to dismiss all the time.  But this is sort of a, um, to me an interesting issue here.  And, um, I've read -- I've read the complaint carefully.  I haven't read all these declarations, but I know we have them.  Candidly I'm skiddish about having the analysis depend upon declarations, that's not entirely fair, but I have to

with respect to standing, because it fleshes out what the allegations are.

All right, go ahead.

MS. SMITH:  Yes, your Honor, the Court certainly has discretion to consider the declarations in resolving a standing question, and I point the Court to *Heinrich v. Sweet*.

I guess returning to the process question.  All I need to say is that the, um -- the defendants here have implemented this categorical halt and done so indefinitely, there is no end date, and it's cold comfort to hear that maybe some defendants are in fact processing these.  In the meantime, these are expensive proceedings that take years, almost a decade, um, to complete.  And so you know for processes all -- or projects that are all along that continuum, it's cold comfort to hear that maybe one day, at some unknown time, they might receive a permit, and in the meantime maybe someone will be reviewing their application.

What defendants' arguments here essentially do is seek to evade all forms of review.  On the final agency action point, we think it presents a good example.  They're essentially claiming we have to wait for permits to issue, but of course we can't wait for permits to issue here because they won't issue, that's what we're

challenging is that categorical ban or "pause," as your Honor puts it, on the issuance of permits.  And so I think that's an important point on the final agency action piece.

Turning to the discussion of the Louisiana --

THE COURT:  Well how about his argument with respect to the states' standing?  If the -- the ACE has a better -- that's not an appropriate word.  ACE alleges associational standing and points out applicants.  The states aren't in that position.  He draws a distinction between ACE and the states and says you're really just a third-party here.

How do you deal with that?

MS. SMITH:  Your Honor, the states have incurred already significant harms and will continue to incur harms.

THE COURT:  Specifically what?

MS. SMITH:  Specifically, um, I'll point to the SouthCoast project.  That project, as a direct result of the wind directive, has had to cancel contracts that are critical to construction, and as a result the project has been pushed back by two years.  That's two years that those electrons cannot come into the grid and serve reliability and affordability needs that the Commonwealth has worked hard to secure.

THE COURT:  And on the record I have here -- I mean that's factually different from the taxes that we had in *Louisiana v. Biden*.  You see?  And he says, "All right" -- he knows I'm going to accept that.

But you think that's specific enough?

MS. SMITH:  Yes, your Honor, there are specific harms flowing from that project that I can speak to and that we discussed in our supplemental brief, in particular, um, on the reliability and affordability piece.  Again that's a two-year delay, but it will be more if the halt is not lifted and perhaps the project will be cancelled altogether, as we've articulated in our brief.  If that happens, the Commonwealth will not be able to replace this energy, period, on the time scale of the SouthCoast project.  And we certainly won't be able to do so with energy that's reliable and affordable and has the clean energy attributes of this particular power.

On reliability and affordability, I'll just note that this energy is coming into this -- is slated to come into the Southeast region of the state, which is a highly-congested transmission area, um, and it will also, um -- you know it's a densely-populated area as well, it serves important reliability needs both for that reason and because wind is strongest in winter

months when other resources in the New England region are quite constrained.  Those are significant reliability interests that our state has planned for very carefully, um, to secure reliability, um, and their affordability benefits as well.

On the, um, investments and economic benefits. I'll note that in the *Louisiana* cases there were benefits that the Court recognized as cognizable for standing purposes beyond mere tax revenue.  Certainly that was one of them, but there was also economic benefits attributable to the specific projects that were either cancelled or at risk of cancellation in the *L & G* export case and in the *Louisiana Oil and Gas* case, both of which found state standing.

On the sovereign harm question, which is a real harm to the Commonwealth, um, the Commonwealth has statutory --

(Phone rings.)

THE COURT:  Sorry.  Sorry.  I apologize.

(Pause.)

THE COURT:  I apologize.

MS. SMITH:  I thought maybe my time was up.

(Laughter.)

THE COURT:  I'll take it into account.

(Laughter.)

MS. SMITH:  With respect to our sovereign harm that we allege, it's again a real harm, an important harm, we have a 5600 megawatt statutory procurement target for offshore winds specifically by 2027.  That's procurement, that means contracting for that wind.  It does not mean having that wind come on line, as defendants suggested in their briefing.  We will not be able to meet that if we don't have 1,087 megawatts of offshore wind under contract for SouthCoast.  And as SouthCoast avers in their declaration and as, um, Elizabeth Matleys of the Department of Energy Resources Commission avers in her declaration --

THE COURT:  So your point as to specificity is, like any government entity, a responsible state municipality plans, and you have plans, the Commonwealth has plans, and you're saying this delay inevitably now, as we meet here in this courtroom today, interferes with the ability -- again in the real world, to accomplish the State's plan for, um, electric power?

MS. SMITH:  That's exactly right, your Honor.  And I point you to the Matleys amended declaration that we submitted with our supplemental brief which goes through the, um, ways in which it's impossible to replace this energy.

THE COURT:  Well let me ask this, because it had

not occurred to me until this point.  I suppose I better do a state-by-state review, shouldn't I?

MS. SMITH:  No, your Honor, we submit that that's not necessary as --

THE COURT:  Well not necessary if one of you wins -- um, "wins" is wrong, you've got a long road to hoe.  If one of you avoids dismissal.  But maybe not all the states avoid dismissal.

MS. SMITH:  So at this stage, your Honor, "standing is one is standing for all," as the Supreme Court recently reaffirmed in *Biden vs. Nebraska.*  For purposes of injunctive relief, that is a distinct question, as your Honor recognizes.  We submit that in the record before you at this point, there is ample evidence to conclude that this categorical and indefinite ban that the defendants themselves admit that they are implementing --

THE COURT:  I just want to be sure that I've got that point.  Your answer is, for standing, standing of one is standing of all.  For injunctive relief, if we ever got there, it would have to be analyzed plaintiff by plaintiff, correct?

MS. SMITH:  I don't know that I would put it that way.  We are not, in this case, seeking a nationwide injunction, let's be clear about that, the states.

THE COURT:  And I'm not disposed to even think about one.  However, I have these plaintiffs, and you're speaking for all of them, the various sovereign states within our federal system.  Well that's downstream.  But I'll accept your -- your representation now.

About a little more than 5 minutes.  Go ahead.

MS. SMITH:  Okay, thank you for that, your Honor. Um, let's see.

I guess I will address briefly the, um, the final agency action point.  And just to reemphasize, we are not in this case, as defendants note, bringing a Section 7061 claim, and it is our firm position that we need not do so.  That Section 706 claims are available to challenge a categorical arbitrary and unlawful halt, like this one.  And we need not wait for an ultimate permit decision to issue, or for egregious delay, with respect to a particular permit for a particular project. We are not seeking an adjudication by a date certain for a specific project.

What we're saying is that it is per se unreasonable and unlawful to categorically halt all wind energy approvals pursuant to all laws, but without reference to those laws, and that's what we're challenging here, and we think appropriately so, under Section 7062 of the APA.

THE COURT:  Thank you.

MS. SMITH:  And then I'll just briefly note, on the 12(b)(6) piece of this, that we believe that the, um, merit claims, including the contrary-to-law claims, should be assessed on the record, as we submitted in our supplemental brief, and we, um -- we think that we have plausibly pleaded certainly the arbitrary and capricious claims and the contrary-to-law claims.

In particular, um, you know we think, as I mentioned, that it is per se unreasonable under the APA, Section 558(c), to do this kind of indefinite and categorical halt without reference to governing law. It's also inconsistent with AKFA, and I point the Court to the *Ensco* case that the defendants mentioned as well, where, you know, the Court -- the District Court in that case found that it was plainly inconsistent with AKFA to have similar -- to "not act," I think is the way the Court put that.

And I think if the Court has no further questions, we would be happy to rest on our submissions.

THE COURT:  And I thank you.

And we'll turn to the intervenors.

MR. AUSLANDER:  Good morning, your Honor.

Can you hear me?

THE COURT:  I can.

MR. AUSLANDER:  Yes, good morning, your Honor, James Auslander for the plaintiff intervenor ACE New York.  ACE New York members are the developers and builders of wind energy projects and the applicants for the necessary federal permits that agencies here have stifled across the board.

The arguments your Honor has heard on the motion to dismiss have been repeatedly rejected in challenges -- sorry, to the government's defenses of past attempts at nationwide stoppages of energy permitting and leasing, and the same reasoning applies here for wind energy.  The government's supplemental brief said that "Such precedent involved distinct factual scenarios and allegations of injury as well as statutory regimes that are not presented in this case," end quote.  In reality we submit that they involve the same factual scenario and some of the same statutory regimes.

So why is it the same factual scenario?  I want to be clear about what it is that the wind ban does and what we're challenging.  The wind ban stops any wind projects, any permitting for any wind project, anywhere in the country, at any time.  No one's received a wind permit in the last four months.  No one's going to in the foreseeable future.  But the only condition that the government has put to start permitting again is this

comprehensive assessment and review.

And as the government has restated here today, that we have no idea how long that's going to take.  The government's declarations indicate it has not even begun, the 10-month period, pointing to, even in those cases, there were still injunctive relief, um, issues.

But our claims respectfully ask the Court to vacate and enjoin only that precondition to permitting, basically allowing agencies to resume their permitting functions for wind energy projects without awaiting completion of this vapid comprehensive assessment and review.  We're not asking the Court to bless any particular project, we're simply challenging agencies' blanket decisions --

THE COURT:  Well aren't you -- and I say this with respect, you're downstream here.  I understand that.  But this is the motion to dismiss.  You presume that -- that the motions to dismiss, as to your client, are denied.  Now if that happened, um, at some stage, um, maybe today, we'll have a case-management conference, and during that conference I will say, "How do you expect this case to unfold?"  And you will say, that we'll have to assemble a record as to the wind -- because I have to make some predicate legal rulings to get there, at least that they were plausibly pled, and

you'll say, "Well we'll need a record and then we'll need argument on that record."  And my next question, if we ever got that far, would be, "And suppose you win and the wind directive is, under 7062, vacated as arbitrary and capricious, contrary to law, um, on some basis?  And I won't go any further.  But what you're arguing is then downstream, "Then what happens?"  And if I get there, I'm going to be interested in that, um, "What sort of permitting process do you expect?"  But not today.  But you're saying you plausibly pled it and it would be error -- because I'm making rulings of law, it would be error to shut the courthouse doors to you, um -- because your standing is pretty clear, to you it would be error to shut the courthouse doors today.

That's your argument, right?

MR. AUSLANDER:  Yes, your Honor.  And I'm raising these issues, um, which again I believe also extends to the merits, particularly on the government's, I'll say, 12(b)(6) motion to dismiss, which are about merits and reasonably pertain to the merits of the case, and we respectfully submit that those should be considered on an expedited basis on the merits without their premature motion to dismiss.

My response, your Honor, is the government is trying to, um, I'll say "frontload" those questions and

get, on motion to dismiss grounds, when we have satisfied standing, we have been assured of at least one member of ACE New York that is, um, specifically burdened by the wind ban, and that's all that we had to do. We have submitted detailed declarations, reports with those declarations, that detailed the ban's impact to the industry as a whole as well as to the individual members, as your Honor requested at the last hearing, and we worked hard to pull that together for your Honor.

We alleged final agency action. Again, we submit that the First Circuit's decision in *New York v. Trump* on the federal funding freeze is, um -- the government chides us for challenging cases down in Louisiana, but we believe those are on all fours. But the *New York v. Trump* case is directed by me on the ability to sue a blanket freeze under 7062. And as, um, the states' counsel explained, there is no case law that says 7061 and '2 are regionally exclusive remedies, in fact the case law says the opposite.

And so I understand that the government would prefer that we bring individual permit challenges on permits that may never happen, but that is not our --

THE COURT: About 2 more minutes, Mr. Auslander. 2 more minutes.

MR. AUSLANDER: Yes. Thank you, your Honor.

And, um, I would say on -- again just also I wanted to point out that another court, just last week, the District of New Jersey, recognized the wind ban in court, that was a challenge rejecting the claims by the, um, amici, who filed a brief here in support of the government's Salvo Beach Island, um, dismissing those claims on the merits.  And in the course of that opinion, um, the judge in New Jersey indicated that the challenges to some of the approvals that had expired were now moot, um, that because of the Presidential memorandum, there was no longer a reasonable foreseeability that those permits could be issued.  Again, this is our point, that these are having real-world effects right now.

And the last thing I want to say, your Honor, is that -- and I take, let's say, particular umbrage with the government's statement that the wind ban does not, quote, "eliminate wind energy as a viable alternative in the future," end quote.  And again, I'd submit, your Honor, that of course it does.  The effect and the intent of the win ban is for wind projects to die on the vine, without any pathway for obtaining permits, that multi year, multimillion dollar investments can't take place, that planning, procurement, can't proceed, and all the while the holders of permits are still paying

annual rentals on top of millions of dollars already spent.

And so we submit that that's real harm, your Honor, and that all the merits issues should be rolled into an expeditious case-management order.  We're prepared to discuss dates today.  And, um, that these should be decided on the merits rather than on a motion to dismiss.

Thank you.

THE COURT:  Thank you.

All right, here's how we're going to proceed.  I, um, very much appreciate the oral arguments that have been made today, they have some real traction with the Court.  All parties.  Having said that, I'm going to make some tentative rulings today.  I make tentative rulings solely for the purpose of -- actually I can say it this way, of accommodating Mr. Auslander's concerns, so we know where we're going in this case, because in part the motion to dismiss is going to be denied.  And I mean to move directly to a case-management discussion.  In part it will be allowed.

When I say the rulings are "tentative," I mean that the matter warrants a written analysis, an opinion, and I propose to provide one.

I don't want you to think that, um, I came on the

bench with my mind made up.  That's not true.  I make tentative rulings so we know where we are.  When I come to write, if in whole or in part, any of these tentative rulings won't write, are, upon reflection, unsupported, I reserve the right flat-out to make alterations.  But, um, for today's purposes the Court rules as follows.

The Court dismisses this action with respect to the President of the United States, dismisses this action with respect to the cabinet secretaries, other than the Cabinet Secretary of the Department of the Interior.  The Court dismisses the action, um, under the claims of constitutional violation and ultra vires acts, not really developed in the briefing here and, um, really, um, matters which can be covered under the Administrative Procedure Act.

The Court again tentatively rules that, um, with more confidence as to ACE, but also as to the States, that the States do have Article III standing, and rules -- though the matter is going to take some particular reflection, rules that this "pause," so denominated, is, um, in fact final agency action.  If that's so, the Court denies the motion to suppress -- excuse me, the motion to dismiss on the APA claims.

I think I have these counts correct, but I can revise them.  The effect is to allow the public

officials' motion to dismiss as to the States' counts 3, 4, and 5, and ACE's Counts 4, 5, and 6.  Deny the public officials' motions to dismiss as to the States' counts 1 and 2 and ACE New York's counts 1, 2 and 3.  Those are tentative rulings only.

And I do want to talk now what's going to happen. And I want you to be really straightforward here, because this is a licensing scheme, and I have to say, as I said when first we met, I, um, believe -- because tentatively at least I'm acting that I am within the Congressional mandate when it passed the Administrative Procedure Act, and of course that law trumps any, um, wind directive.  But this is licensing, this is different than appropriating money, um, or different than a case where Congress has said "There shall be a Department of Education," or the like.

Here it appears that what Congress has in mind, in the most pertinent Act -- and this is not the only Act, but the Outer Continental Shelf Licensing Act, that we have this enormous asset -- the nation has this enormous asset, the sovereign people have this enormous asset, and we've expended, or we've claimed effectively that our borders cover the continental shelf, or most of it. And, um, Congress seems, when you look at this Act, to, um, recognize -- one, they recognize the value of wind

power, and they recognize that, with current technology, it may be possible to develop that power.  And much as they do with fossil fuels, they assert the nation's control over these spaces and have set up a leasing system, um, expecting that venture capital, quite property under our economic system, will go where the chance for profit is.  And, um, so we have a relatively complex leasing system, as counsel points out, which needs quite a run-up to be brought to effective fruition.

And so it's just against that background that I now ask the question -- and now I really turn to plaintiffs.  Anyone can speak, but if you've not already spoken, when you speak, would you introduce yourself.

What's going to happen now in this case?  Does anyone want to -- on the plaintiffs' side, want to speak to that?

MS. SMITH:  Yes, your Honor, thank you.  In terms of scheduling and --

THE COURT:  Well, yeah.  I don't ask you to predict outcome.

(Laughter.)

And I'm not offering any outcomes.

(Laughter.)

Well, um -- go ahead.

MS. SMITH:  Fair enough.

We think that the next appropriate step here is to require an expeditious filing of the administrative record supporting the decision to halt all wind energy permitting.

THE COURT:  The supporting wind directive?

MS. SMITH:  Excuse me.  I'm sorry.  Supporting the decision to implement the wind directive.

THE COURT:  Was that different than the directive?

MS. SMITH:  Um, we think probably not.  And in fact they have said, at Page 32 of their motion to dismiss PI opposition, um, that they are implementing the wind directive.

THE COURT:  I imagine that can't be much.  I mean the wind directive came out on the day the President was inaugurated.  So, um, it shouldn't seem to me too difficult to put that together.

So how long?

MS. SMITH:  We would propose 2 weeks, um, or less, if your Honor deems it appropriate.  And of course --

THE COURT:  How's 2 weeks?

MR. ROBERTSON:  Your Honor, Michael Robertson for the defendants.

I think 2 weeks would be very tight, your Honor. I think we have serious concerns about what exactly we

would be building an administrative record of, because if we look to their briefing --

THE COURT:  Well someone drafted it.  And I say this with utmost respect, the President does not himself draft it, and so, um, there was a transition group in to prepare for the President's inauguration, and as the President -- all Presidents do, to initiate the President's policies once he took office, which I fully respect.  So one imagines you can do that.  2 weeks is sufficient.

All right.  And then what?

MS. SMITH:  Um, your Honor, in line with recent cases, we would suggest that, um, plaintiffs have a week or two to file, um, or to evaluate what's in the record, decide whether to file, you know, a motion to supplement the record, or such.  And if that does not happen, I think we would propose that, um, July 30th be a date for cross-motions for summary judgment, in other words the parties would file at the same time and then we would file responses you know again at the same time on Thursday, August 7th.  We think that that gives the parties an appropriate amount of time to fully brief these issues based on the administrative record.

THE COURT:  Well let's see how this works out.

Today is the 18th of June.  By the 2nd of July,

the government will file an administrative record.  By the 9th of July, the, um, plaintiffs will file any motions to supplement the administrative record.  By the 30th of July, all parties will file simultaneous motions for summary judgment, which will be heard, and early in September, and Ms. Belmont, for whom I work, will suggest a date.

(Pause.)

THE COURT:  Which motions will be heard at 2:30 on Thursday, the 4th of September.

Now Mr. Robertson was on his feet, so that's -- what's the matter with that?

MR. ROBERTSON:  So one question, your Honor.  I think probably what we need is your tentative ruling to --

THE COURT:  Yeah, I agree, only I will get my opinion out just as rapidly as I can.

MR. ROBERTSON:  Thank you, your Honor.

And I think why that matters is for the administrative record that's being discussed.  So as I understand the plaintiffs' claims here is that the final agency action, which again that we do not agree it's a final agency action --

THE COURT:  Of course you don't.  But all your rights are saved.

MR. ROBERTSON:  -- is the amorphous implementation by the agencies of it.  And so that will be the administrative record.  And I assume that we would be creating it, but only for the Department of Interior, because that's the only department that is left.  And so that is the problem that the government has.

THE COURT:  Only the Department of Interior because they are the primary department.  I'll entertain the motions.  But, yes, that's my understanding.

All right?

(Silence.)

THE COURT:  All right.

But let's not stop there.  Let's assume -- and this is the problem I've had from the very beginning in this case.

So I hold this hearing.  Don't take any predictions on this, but you win, the plaintiffs win, and I say this is arbitrary and capricious, or something, and I say it respectfully, and so now the "pause" is legally without effect, and whatever could be done before there was a "pause," now can be done.

Then what?

MS. SMITH:  Well correct, your Honor, you would be vacating the "pause" itself and that would mean --

THE COURT:  That's what I just said.

MS. SMITH:  Correct, yes.  But the agency defendants would then resume permitting, um, under the applicable laws, all of --

THE COURT:  (Laughter.)  They resume considering the permits.

MS. SMITH:  Correct, resume considering the permits, and then ultimately issuing a decision, one way or the other, under applicable laws and well-established standards and timelines that would apply.

THE COURT:  So they win?

MS. SMITH:  Correct.  And that is enough to restore the certainty needed for financing, that your Honor mentioned, um, for the industry to take off once again --

(Interruption Zoom.)

THE COURT:  How -- well let me say this.

The President of the United States issued this wind "pause," wind directive that we've referred to.  He is the Chief Executive Officer of the executive branch. And I think the evidence is so clear, as not to require extensive citation, that he believes in this concept -- as yet untried at least through an entire presidency, he believes in this concept of the unitary presidency, where subsidiary agents are -- including cabinet officials and people subsidiary to them, are extensions

of his will.

Living in the real world, it looks like he's bet the country's energy future on fossil fuels.  It's not for this Court to question that.  And, um, Mr. Auslander is shaking his head and saying, "And of course we don't question it."  But living in the real world, you think that it's so clear that you're actually going to get somewhere after we've gone all through this?

And I -- I'm satisfied I have to, and I don't shrink from it, I will scrupulously follow the law, but at the end, if you win -- and I don't suggest you do, but if you win on these intermediate points, we get to a licensing scheme.  In a licensing scheme, inevitably licenses can be withheld so long as there is appropriate logical support for such action.  These are matters not for the courts, but solely -- at least if I understand the Congressional mandate, solely for the executive.

This is not something to be argued, but I'm open to comments on it, first Ms. Smith and then Mr. Auslander.  Do you have any comments on that?  The Court is just making observations.  And if my observations are askew, or just wrong, I really would like to hear it.

MS. SMITH:  We appreciate your Honor's observations and would only note that what the executive

is required to do, in these permitting schemes, is to follow the law, as your Honor knows, and they have to issue decisions that are reasoned and supported by the evidence according to the criteria and the relevant statutes.

THE COURT:  But be very clear, it's not for me then to evaluate that evidence.  The standard under the Administrative Procedure Act is could a reasonable factfinder come to this conclusion?  And I mean this is something that I am familiar with, I've been doing it all through my federal service, um, because this is something that's within the executive branch.  We deal with Social Security appeals all the time, just to give an example, which is under the same standard.  All right.  And so I understand it.

But I also understand that under the Supreme Court's *Department of Commerce* case, you -- all that's required is the standard, as you and I have both stated it, be laid out.  It doesn't prevent the executive from having other motives and views, um, and the like.  That opinion, from the Supreme Court of course informs, guides, binds, my approach to it.

Mr. Auslander, nothing is -- I just thought it appropriate to draw those observations.  I welcome your comments if I'm -- I know my duty under the

Administrative Procedure Act.  At least tentatively you're in court.  I will go through all the requisite steps and make decisions downstream, um, in accordance, strict accordance with the law.  I -- but I make the observations I made.

Yes, sir?

MR. AUSLANDER:  And we thank the Court for that observation because it does help us focus our advocacy and our briefing.

I'll say that I think your Honor has seen and will see our view versus that the President does not have the sole policy making role in this area, that Congress has specified policy that the government, um, that the executive branch can not wholly discard.  The several cases that have invalidated, um, oil and gas activities, administrations that, I think it's fair to say, were not hospitable to oil and gas development, um, following the rescissions of those permitting and leases pauses, those actions did go forward and they were considered, several were approved, several might not have been, I don't have an audit.  But the opportunity to pursue permitting decisions, get permitting decisions, and then to litigate or challenge permitting decisions is what I believe there are -- um, what it is we have a right to do under the APA, and --

THE COURT:  But and at least tentatively, um, you're beyond the motion to dismiss.

MR. AUSLANDER:  Yes, your Honor.

And again, our view is that this case is not about the individual agency actions, and I understand the government would like this to be about that or prefers that those are the way the cases are brought, but without this precondition of finishing another comprehensive review, the agencies can put forth, issue decisions, and then come what may, with those decisions or challenges to those decisions, they will probably be in separate actions, maybe before this Court, maybe in other courts around the country where these projects take place.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Robertson, you don't have to say anything, but I've talked perhaps over-much, and so I invite your comments.

MR. ROBERTSON:  I think your Honor's question about what next goes to the heart of the redressability problem here, and the standing issue, and I'm not going to rehash that, of course.  But if we just kind of play this out, let's say, and let's say we're back here a year from now with a new case challenging the assessment

and review, and that being the issue, you know so what happens?

Well two things.  One, the *Ensco* case that they mentioned, that medicine, the delay was like 8 or -- 8 to 18 times the normal amount.  So, you know, 10 months times 8 or 18, that's, I think, would potentially be unreasonable.

But if we're back here a year from now, the assessment review has been issued, we don't know what that's going to say, right?  The executive still needs to present that.  It could be just a recommendation.  They could tell the agency to carry on, "Do what you're doing."  And if that's what's happening, you know what exactly is the redress?

And I think what they have to show, the plaintiff intervenors have to show that there is a permit that has been unlawfully withheld.

THE COURT:  Respectfully, you're -- you're going back to argument now.  I, um -- I was really just wondering, um, and expressing some tentative views about how a Court would face these issues if, either in this court or some other, um, you were all back here about a permit, grant, or denial.

MR. ROBERTSON:  And I think, your Honor, I think they would have to show that that permit has surpassed

some kind of mandatory deadline that hasn't been issued that has caused them harm. And whether we do that now or we do that in the future, we don't have it, it hasn't been alleged, and that's our ultimate problem.

THE COURT: Well I hear you, but I, um, at least for now I disagree with that argument, because that's a conundrum that they can't meet. It seems to me tentatively that this action, um, constitutes final agency action for the purpose of getting to the next step, and, um, evaluating whether it had a sufficiently rational basis, giving all deference to the, um, in this case, the President of the United States, who issued this as his policy. This Court does not make policy. I understand that.

All right. One last thing, Mr. Robertson. Look, I'll work hard on this, I'll get out my written analysis as rapidly as I can. But what we've said here today I think makes clear what necessarily the Court's looking for if the rulings today all stand, and you can go forward on that basis. And I appreciate it.

MR. ROBERTSON: Thank you, your Honor.

THE COURT: And it's good to see you all. We'll stand in recess.

(Ends, 12:10 p.m.)

C E R T I F I C A T E


        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Wednesday, June 18, 2025, to the best of my skill and

ability.



/s/ Richard H. Romanow 06-23-25
_____
RICHARD H. ROMANOW  Date