UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
COMMONWEALTH OF MASSACHUSETTS;                       )
STATE OF NEW YORK; STATE OF                          )
ARIZONA; STATE OF CALIFORNIA;                        )
STATE OF COLORADO; STATE OF                          )
CONNECTICUT; STATE OF DELAWARE;                      )
DISTRICT OF COLUMBIA; STATE OF                       )
ILLINOIS; STATE OF MAINE; STATE OF                   )
MARYLAND; STATE OF MICHIGAN; STATE                   )
OF MINNESOTA; STATE OF NEW JERSEY;                   )
STATE OF NEW MEXICO; STATE OF                        )
OREGON; STATE OF RHODE ISLAND; and                  )
STATE OF WASHINGTON,                                 )
                                                    )
                    Plaintiffs,                      )
                                                    )
                and                                  )
                                                    )
ALLIANCE FOR CLEAN ENERGY NEW                        )
YORK,                                                )
                                                    )
                    Intervenor,                      )
                                                    )    CIVIL ACTION NO.
          v.                                         )    25-11221-WGY
                                                    )
DONALD J. TRUMP, in his official                     )
capacity as President of the                         )
United States; UNITED STATES OF                      )
AMERICA; DOUGLAS BURGUM, in his                      )
official capacity as Secretary of                    )
the Interior; BUREAU OF OCEAN                        )
ENERGY MANAGEMENT; WALTER                            )
CRUICKSHANK, in his official                         )
capacity as Acting Director of                       )
Bureau of Ocean Energy Management;                   )
BUREAU OF LAND MANAGEMENT;                           )
JONATHAN RABY, in his official                       )
Capacity as State Director of the                    )
Bureau of Land Management; U.S.                      )
FISH AND WILDLIFE SERVICE; PAUL                      )
SOUZA, in his official capacity as                   )
Regional Director of the United                      )
States Fish and Wildlife Service;                    )

DEPARTMENT OF COMMERCE; HOWARD          )
LUTNICK, in his official capacity       )
as Secretary of Commerce; NATIONAL      )
OCEANIC AND ATMOSPHERIC                 )
ADMINISTRATION; LAURA GRIMM, in         )
her official capacity as Chief of       )
Staff of the National Oceanic and       )
Atmospheric Administration;             )
National Marine Fisheries Service;      )
EUGENIO PIEIRO SOLER, in his            )
official capacity as Director of        )
the National Marine Fisheries           )
Service; U.S. ARMY CORPS OF             )
ENGINEERS; WILLIAM "BUTCH" H.           )
GRAHAM, JR., in his official            )
capacity as Chief of Engineers for      )
the United States Army Corps of         )
Engineers; ENVIRONMENTAL                )
PROTECTION AGENCY, US; LEE ZELDIN,      )
in his official capacity as             )
Administrator of the U.S.               )
Environmental Protection Agency;        )
US DEPARTMENT OF AGRICULTURE;           )
BROOKE ROLLINS, in her official         )
capacity as Secretary of                )
Agriculture; US DEPARTMENT OF           )
ENERGY; US DEPARTMENT OF THE            )
TREASURY; SCOTT BESSENT, in his         )
official capacity as Secretary of       )
the Treasury; and US DEPARTMENT OF      )
INTERIOR,                               )
                                        )
                    Defendants.         )
_____ )

YOUNG, D.J.                                    July 3, 2025

## MEMORANDUM AND ORDER

## I.    INTRODUCTION

New York, Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, Washington, and the District of Columbia (collectively, the "Plaintiff States"), together with Intervenor Plaintiff Alliance for Clean Energy New York ("ACE NY") sue President Donald J. Trump, the United States of America, the U.S. Department of the Interior ("DOI") and its Secretary Douglas Burgum, the Bureau of Ocean Energy Management ("BOEM") and its Acting Director Walter Cruickshank, the Bureau of Land Management and its State Director Jonathan Raby, the U.S. Fish and Wildlife Service and its Regional Director Paul Souza, and several other departments and agencies and their respective heads (collectively, the "Public Officials"), based on the Public Officials' allegedly unlawful pause of all federal agency approvals needed for offshore and onshore wind energy projects nationwide.

The Plaintiff States and ACE NY allege that the Public Officials implemented this pause in response to what the Plaintiff States call the "Wind Directive" and ACE NY calls the "Wind Ban," Section 2(a) of a Presidential Memorandum issued by

President Donald J. Trump on January 20, 2025, which purported
to withdraw the Outer Continental Shelf from leasing for
offshore wind energy projects and to pause leasing and licensing
for both offshore and onshore wind energy projects pending
completion of a comprehensive inter-agency review process,
citing several general grounds for concern, and that this
withdrawal and pause were unlawful for several reasons.

### A.  Procedural History

The Plaintiff States filed suit against the Public
Officials on May 5, 2025.  See Compl., ECF No. 1.  The Alliance
for Clean Energy New York ("ACE NY") moved to intervene on May
7, 2025.  ACE NY's Mot. Intervene, ECF No. 23.  This Court
allowed ACE NY's motion to intervene on May 15, 2025.  Elec.
Order, ECF No. 78.  ACE NY filed its Intervenor Complaint on May
21, 2025.  Compl. Intervention, ECF No. 114.  The Plaintiff
States subsequently filed an amended complaint on June 10, 2025.
First Am. Compl. ("FAC"), ECF No. 141.

The Plaintiff States bring five counts, all against the
agency defendants except where specified: (I) a violation of the
Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for
arbitrary and capricious action in adopting and implementing a
categorical and indefinite halt on wind-related approvals
without reasoned basis, justification for departure from past
agency policy, or analysis of reliance interests based on past

[4]

policy or inconsistencies with other executive actions promoting energy development, FAC ¶¶ 358-85; (2) a violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C) for action contrary to law and in excess of statutory authority in disregarding the requirements of laws and regulations governing federal permitting and approvals of wind energy, pending completion of an extra-statutory review process, id. ¶¶ 386-417; (3) an equitable claim for violation of federal law for the same statutory violations, id. ¶¶ 418-23; (4) a common law ultra vires claim (against all defendants) for the President's acting without congressional authorization in the same way, id. ¶¶ 424-30; (5) a citizen suit under the Outer Continental Shelf Lands Act ("OCSLA") (against defendants the United States, DOI, Secretary Burgum, BOEM, and Acting Director Cruickshank) for an OCSLA violation in failing to follow OCSLA's mandate that the DOI must follow its procedures in administering the Outer Continental Shelf, id. ¶¶ 431-42.

ACE NY brings similar claims, but also alleges, in its Counts II and IV, that the same challenged pause (6) is a substantive rule that failed to undergo public notice and comment rulemaking in violation of 5 U.S.C. § 706(D)(2), Compl. Intervention, ¶¶ 183-88; and (7) violates the United States Constitution, Article I, Sec. 8, Cl. 3, and Article IV, Sec. 3, Cl. 2, and the Fifth Amendment, because through it the President

has usurped the lawmaking and commerce powers of Congress and
its power to regulate United States territory and property, and
deprived affected owners or lessees of their property interests
without due process of law, id. ¶¶ 202-210.

The Plaintiff States and ACE NY moved for a preliminary
injunction on May 12, 2025, seeking to enjoin the Public
Officials from implementing, relying on, or otherwise giving
effect to Section 2(a) of the challenged Presidential
Memorandum.  Pls.' Mot. Prelim. Inj., ECF No. 53; [Proposed]
Pl.-Intervenor ACE NY's Mot. Prelim. Inj., ECF No. 55.  At a
hearing held on June 5, 2025, according to its usual practice,
this Court collapsed these motions with trial on the merits
pursuant to Federal Rule of Civil Procedure 65(a)(2), and, with
the parties' consent, construed the Public Officials' opposition
to these motions, Defs.' Consol. Resp. Mem. Opp'n Pls.' Mots.
Prelim. Inj. ("Defs.' Opp'n"), ECF No. 123, as a motion to
dismiss, Elec. Clerk's Notes, ECF No. 137.  So construed, the
Public Officials' motion to dismiss has been fully briefed.
[Proposed] Pl.-Intervenor ACE NY Mem. Supp. Mot. Prelim. Inj.
("ACE NY's Mem."), ECF No. 62; Mem. Supp. Pls.' Mot. Prelim.
Inj. ("States' Mem."), ECF No. 70; Pl. States' Reply Supp. Mot.
Prelim. Inj. ("States' Reply"), ECF No. 135; Pl.-Intervenor ACE
NY Reply Mem. Supp. Mot. Prelim. Inj. ("ACE NY's Reply"), ECF
NO. 136.  The parties filed additional briefing to address

concerns raised by the Court at the June 5 hearing.  Pl.-
Intervenor ACE NY Suppl. Br. Opp'n Mot Dismiss ("ACE NY's Suppl.
Br."), ECF No. 146; Pl. States' Suppl. Br. Opp'n Defs.' Mot.
Dismiss ("States' Suppl. Br."), ECF No. 149; Defs.' Reply Br.
Supp. Renewed Mot. Dismiss ("Defs.' Suppl. Reply"), ECF No. 156.

The Court heard argument on the motion to dismiss on June
18, 2025, and made tentative rulings subject to this written
opinion.  Elec. Clerk's Notes, ECF No. 157.

This Court has subject matter jurisdiction over these
claims pursuant to 28 U.S.C. § 1331.

**B.    Facts Alleged[1]**

On January 20, 2025, President Trump issued a Presidential
Memorandum titled "Temporary Withdrawal of All Areas on the
Outer Continental Shelf from Offshore Wind Leasing and Review of
the Federal Government's Leasing and Permitting Practices for
Wind Projects," which directed agencies categorically and
indefinitely to halt all federal approvals necessary for the
development of wind energy, pending a multi-agency review
process.  90 Fed. Reg. 8363 (Jan. 29, 2025); FAC ¶ 2.  The
Plaintiff States and ACE NY specifically challenge the agencies'
implementation of Section 2(a) of the Presidential Memorandum

---

[1] These facts are drawn primarily from the Plaintiff States'
complaint.  Issues unique to ACE NY's Intervenor Complaint are
raised as they arise.

(the "Wind Directive"), which states that, "[i]n light of
various alleged legal deficiencies underlying the Federal
Government's leasing and permitting of onshore and offshore wind
projects, the consequences of which may lead to grave harm –
including negative impacts on navigational safety interests,
transportation interests, national security interests,
commercial interests, and marine mammals – and in light to
potential inadequacies in various environmental reviews required
by the National Environmental Policy Act to lease or permit wind
projects," the heads of "all . . . relevant agencies, shall not
issue new or renewed approvals, rights of way, permits, leases,
or loans for onshore or offshore wind projects pending the
completion of a comprehensive assessment and review of Federal
wind leasing and permitting practices," which assessment is to
be led by the Secretary of the Interior, and will "consider the
environmental impact of onshore and offshore wind projects upon
wildlife, including, but not limited to, birds and marine
mammals," and "the economic costs associated with the
intermittent generation of electricity and the effect of
subsidies on the viability of the wind industry."  90 Fed. Reg.
at 8363-64; FAC ¶ 3; Intervenor Compl. ¶ 3.

　　The Plaintiff States allege that the Wind Directive has
"stopped most wind-energy development in its tracks."  FAC ¶ 4.
They draw attention to the facial conflict between the Wind

Directive, which pauses development of a significant source of
the United States' current energy output, and the President's
declaring a "National Energy Emergency" brought on by
insufficient energy production, and calling for a "reliable,
diversified, and affordable supply of energy" via an Executive
Order issued the same day as the Wind Directive -- which
Executive Order, in addition to other executive actions, has
encouraged domestic energy development and recommended
regulatory shortcuts for it, with the notable exception of wind
energy.  Exec. Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025);
FAC ¶ 5.  They further allege that the Wind Directive has led to
the agency defendants' ceasing all wind energy-related
permitting and approvals and issuing a stop-work order to halt
construction of a previously permitted offshore wind project,
and that these actions pose an existential threat to the wind
energy industry, thereby harming the Plaintiff States' ability
to secure reliable, diversified, and affordable sources of
energy, in addition to harming their billions of dollars of
investments in related supply chains, jobs, and infrastructure,
and their statutory- and policy-based efforts to protect the
public health and welfare from pollution and greenhouse-gas
emissions.  FAC ¶¶ 6-8.

ACE NY, which is a 501(c)(3) not-for-profit organization
that promotes the use of clean energy technology and energy

efficiency in New York, and whose members include companies engaged in the development and operation of land-based wind and solar power in New York and nationwide and companies developing offshore wind power facilities, including some "in the process of developing wind facilities on lands that entail federal actions" and some involved in manufacturing and supply chain operations that rely on wind energy development, Intervenor Compl. ¶ 12, makes similar allegations regarding the Wind Directive's sweeping impact, id. ¶¶ 3, 8-10, and alleges direct harm to its members in the form of financial losses, impaired contractual obligations and supply chains, and the potential closure of some businesses, id. ¶ 76.

### 1. Factual Backdrop: Reliance History

As background to the challenged actions, the Plaintiff States and ACE NY complain that they have relied on a long history of the federal government's encouraging and thoroughly evaluating wind energy, and thus, as is relevant to their APA claims, that the Wind Directive and its implementation represent a dramatic course reversal without explanation or analysis of their vital reliance interests. See id. ¶¶ 113-33, 376-78; Intervenor Compl. ¶ 10. The Plaintiff States outline this reliance history beginning with the celebration of wind energy's growth during President George W. Bush's administration, continuing through President Trump's actions promoting wind

energy in his first term, and culminating in President Biden's
providing clean-energy tax credits and pledging the United
States to deploy thirty gigawatts of offshore wind energy by
2030, which attracted increased investment to the sector.  FAC
¶¶ 113-17.  They also point to various agency studies of the
impact of wind-energy projects on potentially affected wildlife,
the fishing industry, and local and state economies, to court
decisions finding that agencies have fulfilled their statutory
obligations and conducted adequate environmental reviews with
respect to wind projects, and to comprehensive agency reviews of
onshore wind energy projects and their environmental impacts,
painting a picture of a long, consistent history of governmental
awareness and evaluation of the risks and benefits posed by wind
energy.  Id. ¶¶ 118-26; see also Intervenor Compl. ¶¶ 38-48.

The Plaintiff States further outline wind power's role as
the largest source of renewable energy in the United States and
its unique provision of low-cost energy, which has attracted
billions of dollars in investments, hundreds of thousands of
jobs, and further reliance interests in the form of the states'
efforts to meet their own greenhouse gas emission reduction,
environmental protection, and population health goals.  FAC ¶¶
159-68.

ACE NY additionally emphasizes the states', local
governments', and Native American tribes' unique roles, tied to

[11]

their sovereign interests and historic police powers over land use decisions and economic development, in developing land-based wind projects, the vast majority of which are sited on nonfederal lands, which roles it alleges the Wind Directive has arbitrarily usurped, in addition to harming the investment-backed interests of private parties in their own property. Intervenor Compl. ¶¶ 49-57, 179.

### 2. The Directive and Its Adoption

President Trump issued the Presidential Memorandum that includes the Wind Directive's categorical and indefinite halt on wind-energy approvals on January 20, 2025. FAC ¶ 127; 90 Fed. Reg. 8363. Section 1 of this Presidential Memorandum states that it does not affect "rights under existing leases." FAC ¶ 129; 90 Fed. Reg. at 8363. Section 2(a), that is, the Wind Directive, prohibits agency heads from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects," pending the completion of a comprehensive review of these practices. FAC ¶ 130; 90 Fed. Reg. at 8364. This comprehensive review, which is premised on purported legal deficiencies and negative safety, transportation, national security, commercial, and marine mammal wildlife impacts from wind energy projects, is to consider the environmental impact upon wildlife, the economic costs of intermittent electricity generation, and the effect of subsidies

on the wind industry's viability.  FAC ¶¶ 131-33; 90 Fed. Reg. at 8363-64.  No timeframe for this comprehensive review is given.  FAC ¶ 134.  In addition, Section 2(c) of the Presidential Memorandum requires the Secretary of the Interior to report to the President on the environmental impact and cost to surrounding communities of defunct windmills.  Id. ¶ 135; 90 Fed. Reg. at 8364.[2]

The agency defendants have allegedly adopted and implemented the Wind Directive by ceasing all pending approvals needed for wind-energy projects, which the Plaintiff States illustrate with examples of agency actors and websites citing the Presidential Memorandum when describing a pause on permitting, with reference to data allegedly showing a lag in agency permitting and environmental reviews, and with a description of the impact on specific delayed projects in Massachusetts and New York.  FAC ¶¶ 142-156.

---

[2] In addition to drawing this Court's attention to the facial conflict between the Wind Directive and other Executive Orders calling for vigorous promotion of energy production and curtailed environmental review processes for other forms of energy in the face of a purported national energy crisis, described in more detail above, the Plaintiff States point out that one of the relevant Executive Orders singles out Northeastern and West Coast states for their role in the alleged energy emergency.  FAC ¶¶ 136-41.

The Plaintiff States further detail their alleged harms with reference to impacted projects and other injuries affecting individual states.  Id. ¶¶ 169-357.

Along similar lines, ACE NY alleges that its members are experiencing severe and ongoing harms from costs to projects in development that cannot proceed without federal permits, lost income from projects delayed or canceled, and related harms affecting contractual obligations, financing, and supply chain issues.  Intervenor Compl. ¶ 76.

### 3. Statutory Schemes

The Plaintiff States allege that "[n]umerous statutes and their implementing regulations require Agency Defendants to consider and issue decisions on applications for wind-energy project approvals," such that these agency defendants must "comprehensively, but promptly, review, approve, deny, or otherwise act on applications to construct and operate wind-energy facilities, following specific procedures and standards." Compl. ¶¶ 56, 58.

The statutory and regulatory violations that the Plaintiff States allege most specifically are violations of OCSLA and its related regulations, because, implementing OCSLA's general statutory mandate of "expeditious and orderly development" of Outer Continental Shelf resources, 43 U.S.C. § 1332(3), Plaintiff States argue, "BOEM's regulations under OCSLA make

clear that it must promptly process applications and issue permit decisions by either approving, disapproving, or requesting revisions [of permit applications]," which the Wind Directive precludes, such that "by indefinitely preventing all lessees from obtaining approvals and permits necessary for offshore-wind projects, the DOI Defendants have effectively -- and unlawfully, under OCSLA -- removed *already leased* areas in the Outer Continental Shelf from use," States' Mem. 31-32; FAC ¶¶ 59-62; 30 C.F.R. § 585.613(e)(providing that, "[u]pon completion of our technical and environmental reviews and other reviews required by Federal laws . . . BOEM **will approve, disapprove, or approve with conditions** [Site Assessment Plans]" (emphasis added)); 43 U.S.C. § 1341(a) (providing that the President may "from time to time, withdraw from disposition any of the **unleased lands** of the outer Continental Shelf" (emphasis added)); <u>see also</u> ACE NY's Mem. 25-26; States' Suppl. Br. 8-9; ACE NY's Suppl. Br. 14-15.

The Plaintiff States and ACE NY also point to permitting procedure regulations such as those implementing the Clean Water Act, which, pursuant to the statutory command that "to the maximum extent practicable" the relevant permitting decisions should be made "not later than the ninetieth day after the date the notice for such application is published," 33 U.S.C. § 1344(q), provide for timely adjudication of permit applications

[15]

within sixty days (albeit with exceptions), 33 C.F.R. §
325.2(d), the timelines of which regulations are now allegedly
not being followed.  States' Mem. 32; FAC ¶¶ 63-68; ACE NY Mem.
28-32; States' Suppl. Br. 9-10; ACE NY's Suppl. Br. 15-16.  The
Plaintiff States make similar allegations as to other permitting
statutes with specific periods specified by regulation for
permitting decisions' review.  FAC ¶¶ 69-112; see also ACE NY's
Suppl. Br. 16-17.

## II.  ANALYSIS

### A. Pleading Standard

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil
Procedure, a complaint "that states a claim for relief must
contain . . .  a short and plain statement of the claim showing
that the pleader is entitled to relief."  To test the
sufficiency of the pleading, a defendant can file a motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  "When faced with
motions to dismiss under both 12(b)(1) and 12(b)(6), a district
court, absent good reason to do otherwise, should ordinarily
decide the 12(b)(1) motion first."  Katz v. Pershing, LLC, 806
F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.), aff'd, 672
F.3d 64 (1st Cir. 2012).  Whether a motion is brought under Rule
12(b)(1) or 12(b)(6), "the reviewing court must take all of
plaintiff's allegations as true and must view them, along with
all reasonable inferences therefrom, in the light most favorable

to plaintiff." Verlus v. Experian Info. Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.). To survive a motion to dismiss, the complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up).

### B. Article III Standing

The Public Officials argue that the Plaintiff States and ACE NY are not "directly affected by the agencies' temporary hold on making final decisions on *other parties'* permit applications." Defs.' Opp'n 12. They point out that plaintiffs must allege facts showing injury in fact, traceability, and redressability, and that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) (quoting Allen v. Wright, 468 U.S. 737, 758 (1984)); Defs.' Opp'n 12. This is because "causation and

redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction – and perhaps the response of others as well," so the plaintiff in this scenario has the burden "to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability." Lujan, 504 U.S. at 562.

This argument somewhat mischaracterizes the complaints. As to ACE NY, which relies on an associational standing theory based on direct harm to its members, ACE NY has alleged that its members are experiencing delays in permitting decisions leading to costs and other harms, Intervenor Compl. ¶ 76, and has supported these allegations with declarations pointing to specific projects, see, e.g., Decl. Marguerite Wells, Executive Director of ACE NY Supp. Mot. Prelim. Inj. ("Wells Decl.") ¶¶ 21-49, ECF No. 63 (detailing harms to member leaseholders and manufacturers allegedly attributable to Wind Directive). Thus, the argument that the harms at issue are too indirect does not defeat ACE NY's standing.

The Plaintiff States are more properly the target of the Public Officials' third-party-standing argument, but this argument fails as to them as well. As another district court has observed in the context of a challenge brought by states to an extended pause on oil and gas leasing offshore and on public

lands, the Plaintiff States "have alleged . . . as a result of
the [Wind Directive] . . . [imminent] loss of jobs and economic
damage," in addition to lost "income" from pledged investments.
Louisiana v. Biden, 622 F. Supp. 3d 267, 285 (W.D. La. 2022).
This is harm to them allegedly caused by the Wind Directive
itself, not harm based on the decisions of some party not before
the Court.  In addition, "Plaintiff States have special
solicitude because they assert a congressionally bestowed
procedural right (the APA), and the government action at issue
affects the Plaintiff States' quasi-sovereign interests (damage
to economics, loss of jobs, . . . funding for state and local
governments)."  Louisiana, 622 F. Supp. 3d at 286.

Given the reasoning on which Lujan's caution against third-
party standing claims was based -- that is, on the concern that
such claims ask courts to speculate on actions of parties not
before the court or actions which it cannot compel by a
favorable ruling, 504 U.S. at 562 -- the Public Officials'
general argument against standing cannot be dealt with fully
without addressing the heart of the Public Officials' standing
arguments, which is, in essence, that the plaintiffs here may
not get what they want no matter what this Court rules, because
too many intermediate decisionmakers are involved in the permit-
issuing and other processes on which the threatened wind
projects depend, and so which amounts to a kind of

redressability argument.  Defs.' Opp'n 13-18; Defs.' Suppl.
Reply 5.

    This argument rests on a fundamental misconstrual of the
Administrative Procedure Act, which gives courts the relatively
modest task of correcting deviations in agency procedure -- and
not, of course, of second-guessing reasonably made decisions of
the Executive Branch, or peering behind the curtain to guess at
what an agency may do next.  See Federal Commc'ns Comm'n v.
Prometheus Radio Project, 592 U.S. 414, 423 (2021) (explaining
that APA arbitrary-or-capricious review requires only "that
agency action be reasonable and reasonably explained," and that
"a court may not substitute its own policy judgment for that of
an agency").  As the Supreme Court has observed, even where
"[a]gencies . . . have discretion about whether or not to take a
particular action," "those adversely affected by a discretionary
agency decision generally have standing to complain that the
agency based its decision upon an improper legal ground."
Federal Election Comm'n v. Akins, 524 U.S. 11, 25 (1998).
Injuries may therefore be both traceable and redressable "even
though the [agency] might reach the same result exercising its
discretionary powers lawfully."  Id.  "We rarely know when we
entertain a case . . . whether the agency's *ultimate* action will
be favorable to the [plaintiff].  Our job is limited to
correcting a legal error -- if error is committed -- in the

agency decision." Akins v. Federal Election Comm'n, 101 F.3d 731, 738 (D.C. Cir. 1996) (citations omitted), vacated on other grounds, 524 U.S.  At the same time, if legal error has been committed, "it has *always* been an acceptable feature of judicial review of agency action that a petitioner's 'injury' is redressed by the reviewing court notwithstanding that the agency might well subsequently legitimately decide to reach the same result through different reasoning." Id.  As the Supreme Court has summarized, "[w]hen a litigant is vested with a procedural right [such as those conferred by the APA], that litigant has standing if there is **some possibility** that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007) (emphasis added).  It is a feature, not a bug, of this review process that, when the smoke settles, the parties may find themselves in roughly the same place they began.

Although this analysis covers the core of the Public Officials' arguments on standing, this Court addresses their specific arguments below, while noting where this general analysis governs.

### C. State Plaintiffs' Standing

The Public Officials argue that the State Plaintiffs fail to satisfy the concrete injury requirement because, when alleged

injuries are forward-looking, plaintiffs must show an imminent, substantial risk of future harm, but the State Plaintiffs have alleged only possible future injury.  Defs.' Opp'n 12-13.  They argue that the alleged energy reliability and affordability, economic, health, and environmental benefits which the State Plaintiffs claim they will be deprived of if the Wind Directive continues to be implemented are "extremely broad and unspecific," and therefore not actual or imminent in the required sense.  Id. at 13.  More specifically, the Public Officials contend that the states do not "demonstrate that any particular wind project would be authorized and completed but for the Wind Memo," pointing out that only a few states mention specific wind projects, and some of those states that do mention specific projects do not specifically allege that these projects have pending applications that are currently being unlawfully delayed.  Id.

Similarly, but as to traceability, the Public Officials argue that the Plaintiff States' general allegations about energy and economic impacts and the like are too attenuated to satisfy this requirement, because the causal connection between a temporary cessation on wind project approvals and future energy crises depends on weak inferences, beginning with the assumption that the Wind Directive will cause agencies not to approve projects and continuing through the assumption that

other power generators will fail to provide the required power. Id. at 16-17.  As to redressability, the Public Officials argue that the Plaintiff States cannot show that but for the Wind Directive federal approvals would be forthcoming and would bring the wide-ranging benefits the Plaintiff States allege they would receive, particularly given the myriad factors that go into making wind energy projects successful.  Id. at 17-18.

These arguments are dealt with in large part by the observations supra, Section II.B: because they invoke a procedural right under the APA, the plaintiffs need plausibly allege only "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  Massachusetts, 549 U.S. at 518. The Public Officials acknowledge that at least some of the states allege harms related to specific projects in the course of the permitting process, Defs.' Suppl. Reply 3-12, which the plaintiffs allege has been indefinitely halted, and which halt has allegedly harmed them significantly, both with respect to these specific projects and otherwise, FAC ¶¶ 201-12, 318-25; States' Suppl. Br. 2-3, 6 (describing Massachusetts' and New Jersey's imminent harms in terms of unrealized energy and economic benefits, including lost jobs, frustrated state investments, and millions of dollars committed by specific wind energy projects to state projects); Decl. Elizabeth J. Burdock,

President and CEO, Oceanic Network ¶¶ 17-21, ECF No. 64
(describing delayed investments and lost work and documenting
"near-exponential curve" in investment growth through 2024
coming to an abrupt halt).  This is all that is required.  See
Louisiana v. Biden, No. 2:24-cv-00406, 2024 WL 3253103, at *12
(W.D. La. July 1, 2024) (finding standing for plaintiff states
based on "lost or delayed revenues tied to . . . natural gas
production" and "here and now injury by . . . delayed
investments" reducing future revenues).

    As to the Public Officials' argument that the Plaintiff
States' alleged harms are overly speculative and thus
insufficiently imminent, unlike the lost proceeds from the one
already-scheduled lease sale that was canceled by the pause in
Louisiana, 622 F. Supp. 3d at 279-80, this is a distinction
without a difference: the district court in Louisiana considered
the state plaintiffs' allegations of imminent job loss and other
financial and economic harms alongside the allegations of
already-lost potential proceeds, id. at 285, and here the
Plaintiff States allege additional harms not present in
Louisiana, such as energy reliability and affordability problems
due to reliance on the regulatory regimes the Wind Directive has
interrupted, and difficulty meeting state statutory emission-
reduction goals meant to benefit the states' residents, FAC ¶¶
159-68.  The First Circuit has observed that a state may show a

[24]

sufficiently imminent "substantial risk of fiscal injury to itself" based on "rational economic assumptions" and "concrete evidence."  Massachusetts v. United States Dep't of Health & Hum. Servs., 923 F.3d 209, 223 (1st Cir. 2019) (first quoting Adams v. Watson, 10 F.3d 915, 923 (1st Cir. 1993); and then quoting Clapper v. Amnesty Int'l USA, 568 U.S. 409, 420 (2013)).  The Plaintiff States' mundane assumption that a total, indefinite pause on wind energy development will cause them financial and other economic harms, when, for instance, Massachusetts alleges that it has invested hundreds of millions of dollars in offshore-wind infrastructure since 2011, and is to receive tens of millions in in-state investment in relation to one stalled project, which project is anticipated to generate more than 10,000 jobs, is eminently rational, FAC ¶¶ 211-12, and is backed up by concrete evidence in the form of declarations, see, e.g., Decl. Bruce K. Carlisle ¶¶ 22, 25-27, 38, ECF No. 71-5.  The Plaintiff States' specific allegations regarding already-canceled or delayed supply chain contracts, power purchase agreements and agreement negotiations, and construction projects, moreover, FAC ¶¶ 198, 315-18, bring the facts of this case in line with those confronted by the district court in the liquefied natural gas export pause case Louisiana v. Biden, where the court found imminent harm to state plaintiffs based on projected loss of tax revenues, decreased investments in natural

gas development and infrastructure, and already-delayed
contracts, investments, and construction, 2024 WL 3253103, at
*10.

To the extent that the Public Officials invite this Court
to engage in hair-splitting analysis of each state's alleged
harm, this Court declines to do so at this stage.  "So long as
one plaintiff has standing to seek a particular form of global
relief, the court need not address the standing of other
plaintiffs seeking the same relief."  Comfort v. Lynn Sch.
Comm., 418 F.3d 1, 11 (1st Cir. 2005) (en banc).  "[T]he
presence of one party with standing is sufficient to satisfy
Article III's case-or-controversy requirement."  Rumsfeld v.
Forum for Acad. and Institutional Rights, Inc., 547 U.S. 47, 52
n.2 (2006).  This Court is sensitive to the Public Officials'
concern that relief ought be tailored to redress actually-
affected projects, Defs.' Opp'n 40, but, because all plaintiffs
seek vacatur under the APA, this concern goes to the scope of
any additional injunctive relief, rather than to the plaintiffs'
standing to bring suit.

### D. Intervenor ACE NY Standing

The Public Officials argue that ACE NY also does not have
standing, because, under the associational standing theory it
relies on, it does not identify a specific member that would
have standing to sue in his or her own right, "presumably

[26]

because [ACE NY has] not identified a member that has a pending application that has been unlawfully delayed." Id. at 21. The Public Officials cavil with the declarations of ACE NY's members, largely on the basis that purportedly harmed construction companies, leaseholders, and the like are not identified by name, and their harms are too attenuated because they are not themselves affected permit applicants. Id. at 21-22. The Public Officials also argue that companies or persons in the wind energy supply chain business are harmed only indirectly, by third parties' choosing not to buy their products or utilize their services, and that such parties are not with the zone of interests protected by the statutes at issue or directly regulated by the statutes. Id. at 23.

Much of this argument is dealt with supra, Section II.B: again, all that is required is a procedural violation paired with an injury that may possibly be redressed upon reconsideration. Massachusetts, 549 U.S. at 518. ACE NY has alleged that in spades. See, e.g., Intervenor Compl. ¶ 76; Wells Decl. ¶¶ 21-49. Contra the Public Officials' initial contention, moreover, ACE NY has identified members affected by the Wind Directive by name. ACE NY Suppl. Br. 6-8. This Court again takes seriously the Public Officials' concern that relief ought be tailored to redress actually-affected projects, Defs.' Opp'n 40, but judges that this argument goes more to remedy than

standing, as injury, traceability, and redressability have been firmly established.

### E. Zone of Interests and Extraneous Parties

The Public Officials also argue that the State Plaintiffs' alleged injuries are outside the relevant statutes' zone of interests, given that the State Plaintiffs are not permit applicants under the statutes they invoke and their alleged harms do not flow from the kinds of environmental harms the relevant statutes are designed to protect against, foreclosing standing on statutory grounds. Defs.' Opp'n 18-19.

The zone of interests test is not "especially demanding," and only requires that plaintiffs be "arguably" within the zone of interests protected by the relevant statutes, such that "the benefit of any doubt goes to the plaintiff" and suit will be foreclosed on this grounds "'only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that"' Congress authorized the plaintiff to sue." Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 130 (2014) (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v Patchak, 567 U.S. 209, 225 (2012)). Confronted with the same argument in the similar context of an oil and gas leasing pause challenged by a group of state plaintiffs, the district court in Louisiana v. Biden declined to give the issue

extended consideration: "Clearly, all of the Plaintiff States' causes of action against Government Defendants are within the 'zone of interests' under the APA."  622 F. Supp. 3d at 290-91. This Court agrees: the Plaintiff States and the wind industry plaintiffs represented by ACE NY all seek to vindicate interests at least marginally related to the invoked statutes, which all have to do with some mix of environmental protection, responsible energy production, and expeditious land development.

The Public Officials also argue that certain of the plaintiffs' claims do not apply to certain defendants, as no specific action or inaction is alleged as to the Department of Energy and its Secretary, the Department of the Treasury and its Secretary, or the Department of Agriculture and its Secretary, and the plaintiffs' alleged injuries all pertain to the temporary cessation directive, not the interagency assessment and review component, which is the only action in which these agencies are involved.  Defs.' Opp'n 19-20.  The Public Officials similarly argue that the Bureau of Land Management ("BLM") and its Director and the National Marine Fisheries Service ("NMFS") and its Director ought be dismissed from this suit, as they are only vaguely alleged to have implemented the cessation directive, without being linked to any particular permit or authorization decision.  Id. at 20.

This Court again hesitates to draw fine distinctions between parties at this stage, when the gist of the plaintiffs' claims is that all relevant agencies have implemented an unlawful and largely unexplained government-wide pause on all wind energy development and permitting.  ACE NY argues at length that BLM has succumbed to a de facto unlawful revision of many of its land use plans, ACE NY Mem. 26-29, and implicates NMFS in the allegedly unlawful permitting pause twice-over, id. at 29-30; see also States' Mem. 3-4.  This Court draws the reasonable inference from the plaintiffs' complaints that these agencies have implemented the Wind Directive's pause, causing harm to the plaintiffs.  See FAC ¶¶ 406-07, 412-13; Intervenor Compl. ¶¶ 193, 196-97, 218-19.  As the plaintiffs have reminded this Court, moreover, "the [factual] plausibility standard has no place in APA review" because "[t]he relevant inquiry is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision."  Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013).  This Court disagrees, therefore, that these parties and their directors ought be dismissed at this stage.

On the other hand, neither the Plaintiff States nor ACE NY has leveled any specific allegations against the Departments of Agriculture, Energy, or Treasury, or their secretaries, and it

is hard to see how these agencies' participation in a multi-
agency review process could in itself be unlawful.  For this
reason, therefore, this Court agrees that these Departments and
their Directors ought be dismissed from this suit, and so
dismisses them.

### F. Final Agency Action and the Notice-and-Comment Requirement

The Public Officials argue that the plaintiffs fail the
two-prong test for identifying final agency action: that is,
that the action must mark the consummation of the agency's
decision-making process and be one by which rights or
obligations are determined or from which legal consequences
flow.  Id. at 24; Bennett v. Spear, 520 U.S. 154, 178 (1997).
Instead, they argue, the plaintiffs challenge a mix of the
temporary cessation-based "Wind Directive" itself, agency
implementation of the Wind Directive in the form of generalized
notices pertaining to it, and project-specific announcements
implementing it.  Id.  The Public Officials also point out that
the President is not an agency whose actions are reviewable
under the APA, and so argue that the Wind Directive itself is
not reviewable, and, for the same reasons, is not subject to the
APA's notice-and-comment requirement; moreover, to the extent
that it can be construed as a rule, the Wind Directive simply
pauses authorizations pending future substantive assessment,

rather than making any substantive changes itself, and thus represents a rule of agency procedure or practice rather than a substantive rule subject to notice-and-comment. Id. at 24-25. Likewise, the Public Officials argue, a generalized "halt on wind-energy approvals" is too amorphous to be challenged because judicial review of permitting decisions is generally limited to ultimate approvals, modifications, or disapprovals of permit applications, notices to the public do not determine legal rights or obligations, and even project-specific notices do not represent the consummation of the agency's decision-making process, but rather, temporarily defer decisions in contexts where the agency has discretion to do so and where no specific deadline is provided by statute or, at least without significant exception, by regulation. Id. at 26-30.

In sum, the Public Officials argue that the plaintiffs' complaints fit squarely within Lujan's warning against lawsuits that seek "*wholesale* improvement of [agency] program[s] by court decree," rather than attacking specific, final agency actions. 497 U.S. at 891; Defs.' Opp'n 30. They also distinguish cases relied on by the plaintiffs to establish that even temporary actions may be challenged on the grounds that the Public Officials here do not argue that the Wind Directive is not final because it is temporary, but rather because no agency has made a

decision representing the consummation of its decision-making
process or one with legal consequences.  Defs.' Opp'n 30-31.

 This Court will not exhaustively retread the ground covered
by the district court in Louisiana v. Biden when faced with
similar arguments.  622 F. Supp. 3d at 291-93.  "There is no
real question that [plaintiffs] have met the second prong of the
Bennett test because the [alleged] Stop [is an action] from
which legal consequences will flow," and a number of cases
support the proposition that significant pauses and blanket
moratoria are final agency actions that cannot be exempted from
judicial review merely by being characterized as intermediate.
Id. at 291-92; see, e.g., Clean Air Council v. Pruitt, 862 F.3d
1, 6 (D.C. Cir. 2016) (ruling that stay on rule's implementation
was final action because it was "essentially an order delaying
the rule's effective date, and [the D.C. Circuit] has held that
such orders are tantamount to amending or revoking a rule");
Natural Res. Def. Council v. Wheeler, 955 F.3d 68, 79 (D.C. Cir.
2020) ("[I]f an agency's indication of an intent to reconsider
an interim (or other action) suffices to render the action non-
final, agencies could evade judicial review of their actions . .
. ."); see also Environmental Def. Fund, Inc. v. Gorsuch, 713
F.2d 802, 813 (D.C. Cir. 1983) ("[S]uspension of the permit
process as to a class of waste management facilities amounts to
a suspension of the effective date of regulation governing that

class, and may be reviewed . . . as the promulgation of a
regulation.").  This makes good sense: after all, could an
indefinite "pause" on all agency action whatsoever be construed
as intermediate and thus unreviewable?  See GianCarlo Canaparo,
Administrative Inertia After Regents and Department of Commerce,
6 Admin. L. Rev. Accord 315, 334 & n.114 (2021) (observing, with
respect to the pause that was later challenged in Louisiana, 622
F. Supp. 3d, that "even [a] temporary moratorium may present a .
. . problem" under recent, controlling Supreme Court case law,
"either because it is, de facto, final, or because it amounts to
unlawful inaction," on the theory that the affected agencies
have a statutory obligation to administer the impeded programs).

      This Court questioned the Public Officials at the June 18
hearing on this motion as to whether there was any timetable for
the interagency review process that must be completed before the
Wind Directive's pause may be lifted, but the Public Officials
declined to give one.  Instead of suggesting a reasonable
timeframe for, or indeed any end on the horizon to, the Wind
Directive's implementation, the Public Officials stressed the
distinction between this case and the pause-type cases the
plaintiffs have relied on as comparators, see, e.g., Hornbeck
Offshore Servs., LLC v. Salazar, 696 F. Supp. 2d 627 (E.D. La.
2010) (granting preliminary injunction enjoining six-month pause
on deepwater drilling for oil in the Gulf of Mexico implemented

following Deepwater Horizon oil spill), on the grounds that this
pause is so far shorter, or has had fewer tangible consequences,
or less directly conflicts with statutory commands, than the
pauses at issue in those cases.  For substantially the same
reasons set out above in its imminence analysis with respect to
standing, however, see supra Section II.C, this Court does not
find the Public Officials' proposed distinction between these
other indefinite pause cases and this one persuasive.  Rather,
it is persuaded that the Wind Directive's pause, as alleged, is
de facto final.

"Whether an agency action has 'direct and appreciable legal
consequences' under the second prong of Bennett is a 'pragmatic'
inquiry."  Sierra Club v. EPA, 955 F.3d 56, 63 (D.C. Cir. 2020)
(quoting United States Army Corps of Engineers v. Hawkes Co.,
Inc., 578 U.S. 590, 598-99 (2016)).  "[A]n agency's action will
be considered final if, looking to the practical effects, it
'appears on its face to be binding' or if it 'is applied by the
agency in a way that indicates it is binding.'  The 'most
important factor' is 'the actual legal effect (or lack thereof)
of the agency action . . . on regulated entities.'"  National
Educ. Ass'n v. United States Dep't of Educ., No. 25-cv-091, 2025
WL 1188160, at *16 (D.N.H. Apr. 24, 2025) (quoting National
Mining Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014)).
Whether or not the Wind Directive ultimately requires the

[35]

affected agencies to act contrary to statute, it in effect amends several regulations by requiring that the agencies must not follow the usual, specified procedures for an unspecified period of time, enacting a kind of de facto suspension of the law with respect to wind energy development.  See Doe v. Trump, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) ("[W]hether the [challenged action] produces a 'suspension' or an indefinite delay, the [action] has significant real-world impacts on Plaintiffs' various situations.").  Looking to the actual legal effects of the agencies' actions -- that is, the indefinite suspension of leasing and permitting for all wind energy projects -- this Court rules that the agencies' indefinite pause on wind energy leasing and permitting, as alleged, constitutes final agency action.

Although closely related, this is distinct from the notice-and-comment issue.  The district court in Louisiana v. Biden concluded that the indefinite pause on oil and gas leasing on federal lands at issue there -- also implemented at the beginning of a new presidential administration -- was a substantive rule subject to 5 U.S.C. § 553's notice-and-comment requirement, because, applying the relevant test, it "impose[d] rights and obligations and [did] not leave the agency and its decisionmakers room to exercise discretion."  622 F. Supp. 3d at 295-96.  The court relied for this analysis at least in part on

its determination that specific statutory timelines at issue had
not been met because of the challenged action, and on its more
general observation that the challenged Executive Order
"eliminate[d] the agency's discretion because exercising
discretion would be disobeying a Presidential Executive Order."
Id. at 296.

The Supreme Court has defined a "substantive rule" as "one
'affecting individual rights and obligations,'" such that it is
"'binding' or ha[s] the 'force of law.'"  Chrysler Corp. v.
Brown, 441 U.S. 281, 301 (1979) (quoting Morton v. Ruiz, 415
U.S. 199, 232, 235, 236 (1974)).  The First Circuit has defined
"a legislative rule (interchangeably called a substantive rule)"
as "one that 'creates rights, assigns duties, or imposes
obligations, the basic tenor of which is not already outlined in
the law itself.'"  New Hampshire Hosp. Ass'n v. Azar, 887 F.3d
62, 70 (1st Cir. 2018) (quoting La Casa Del Convaleciente v.
Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992)).  In the context
of distinguishing between substantive and interpretive rules,
another session of this Court has observed that "[i]n
determining whether a rule carries the 'force of law,' [and so
is substantive rather than interpretive] the 'critical factor'
is 'whether it le[aves] the agency officials free to exercise
discretion in an individual case' or instead requires a uniform,
predetermined outcome that admits of no exception."  Monahan v.

[37]

Winn, 276 F. Supp. 2d 196, 214 (D. Mass. 2003) (Gertner, J.)
(quoting Charles H. Koch, Jr., 1 Admin L. & Prac. § 4.11 (2d ed.
2003)).

The Public Officials' argument that the Wind Directive is,
if anything, a rule of agency procedure or practice, rather than
a substantive rule subject to notice-and-comment, is addressed
by the court in Louisiana only briefly, and dismissed based on
the court's judgment that the challenged Executive Order
modified substantive rights and interests under the Fifth
Circuit's "substantial impact test." Id. Along similar lines,
ACE NY points to case law addressing agency action that
"effect[s] legal changes of general applicability" and
"effectively nullif[ies] pre-existing regulations that were
themselves codified through notice-and-comment rulemaking,"
judging this to be the stuff of substantive rules. Pacito v.
Trump, No. 2:25-cv-255, 2025 WL 655075, at *19 (W.D. Wash. Feb.
28, 2025); ACE NY Mem. 23-24.

This Court tentatively credits the plaintiffs' notice-and-
comment argument, without ruling that the agency action in
question here is a substantive rule at this stage. "To
determine the nature of a rule, the court must look at the
rule's effect on those interests ultimately at stake in the
agency proceeding. If a rule does not substantially affect or
jeopardize those ultimate interests, then it is procedural and

[38]

not substantive.  In short, context matters." Doe, 288 F. Supp. 3d at 1074 (citations omitted).  The context here supports at least the plausible inference that the Wind Directive is a substantive rule.  Unlike in cases where courts have found that temporary suspensions of license applications did not constitute substantive rules, "focus[ing] on the fact that the delay caused by a suspension did not by itself undermine the interests at stake," and that the challenged pauses were "related to the agencies' ongoing notice and comment rulemaking efforts," here the plaintiffs allege that their interests are undermined with every passing day of the challenged pause, and that there is little indication of whether or when the agencies will resume the regular permitting processes that are (at least someday) required.  Id.  In the case which the Public Officials themselves rely on to argue that the action challenged here is at most a rule of agency procedure or practice, the agency announced its intent to issue a notice of proposed rulemaking when it implemented the pause, and clarified that "procedural fairness required that the processing of applications currently on file be completed." Kessler v. F.C.C., 326 F.2d 673, 679 (D.C. Cir. 1963).  That is not the case here.  As alleged, the Wind Directive appears to leave the affected agency officials no discretion to deviate from its strictures, effectively removing

rights from the plaintiffs with no promise of a future
rulemaking or clear timeline for resolution of their rights.

At the same time, particularly given the undeveloped nature
of the arguments on this count, "whether notice and comment
rulemaking was necessary in this case is an issue that requires
an administrative record to properly resolve." J.O.P. v. U.S.
Dep't of Homeland Sec., No. 19-1944, 2020 WL 2932922, at *17 (D.
Md. June 3, 2020).

For these reasons, the motion to dismiss is denied as to
ACE NY's Count II.

### G. APA Pleading Challenge and Contrary to Law and Arbitrary or Capricious Claims

Given that "the [Rule 12(b)6 factual] plausibility standard
has no place in APA review," and thus this Court is not to make
factual plausibility judgments as to the plaintiffs' APA claims,
but only at most judgments as to whether "the underlying premise
of the complaint is legally flawed (rather than factually
unsupported)," the plaintiffs' claims that the challenged agency
actions were arbitrary or capricious and contrary to law do not
require extended analysis here, as "[t]he focal point of APA
review is the existing administrative record." Atieh, 727 F.3d
at 76 & n.4.  Related to the arguments addressed in the previous
section, however, the Public Officials argue generally that the
crux of the Plaintiff States' claims belongs under 5 U.S.C. §

[40]

706(1), which applies to agency actions unlawfully withheld or unreasonably delayed, and that the Plaintiffs' failure to plead under this section of the APA is both fatal to their claims and revealing of their claims' inadequacy, because that section requires discrete, mandatory actions and egregious delay, such that a four-month pause like the one at issue here simply would not qualify.  Defs.' Opp'n 31.

This argument rests on the presumption that there was no final agency action here.  Id. at 32.  This Court has ruled otherwise, so it does not discuss this argument at length.

It is relevant to the plaintiffs' 5 U.S.C. §§ 706(2)(A) and (C) contrary-to-law claim, however, that the district court in Ensco Offshore Co. v. Salazar, in the course of evaluating a 5 U.S.C. § 706(1) unreasonable delay challenge to a five-month moratorium on deepwater drilling and permitting, reasoned that "[n]ot acting on permit applications seems contrary to OCSLA's command that drilling development be 'expeditious,' and the APA's command that a permit must be processed 'within a reasonable time.'"  781 F. Supp. 2d 332, 336-37 (E.D. La. 2011). "Together," the court observed, "OCSLA and the APA inform the government's action on permits and require that the government should act expeditiously to advance development in the Outer Continental Shelf, and not to curtail drilling **unpredictably or indefinitely**."  Id. at 337 (emphasis added).  For these reasons,

[41]

the court determined that OCSLA "establishes a non-discretionary duty on the Department of the Interior to act, favorably or unfavorably, on drilling permit applications," such that "[n]ot acting at all is not a lawful option," and adopted the plaintiff's suggested thirty-day timeline for processing OCSLA permit applications, based on a deadline from a related statute. Id. at 336, 338-39.

Despite its factually distinguishable context -- the drilling permitting requirements are different from those at issue here -- the reasoning of the court in Ensco supports the proposition that, even in a case not specifically challenging agency delay under 5 U.S.C. § 706(1), an across-the-board pause on wind energy-related permitting may be contrary to law even if, as the Public Officials argue, no hard-and-fast deadlines have been violated. In rejecting the government's proposed relegation of the unspecified permitting timelines to the "unchecked whim of the administrative process," the court in Ensco judged that this view "would produce autocratic discretion at best," observing that "[w]here there should be a queue, there is instead an untended pile." Id. at 339. The court determined instead that "Congress anticipated a process that would generally embrace a **rational time frame** for agency action; one faithful to OCSLA's mandate of expeditious development." Id. at 339 (emphasis added). The Public Officials here may object to

this implied characterization of the Wind Directive -- they have argued that the relevant agencies are reviewing and processing wind energy applications and requests without acting on them, so their piles are not entirely untended, Defs.' Opp'n 3-4 -- and may of course argue from the administrative record that the agencies have complied with the statutory and regulatory mandates even as they have stretched the previously established permit approval timelines.  On the facts alleged, however, the plaintiffs have stated a claim for agency action contrary to law.

The Court therefore DENIES the motion to dismiss as to the Plaintiff States' Count II and ACE NY's Count III.

For similar reasons, and given that the Public Officials do not meaningfully contest the substance of the Plaintiff States' arbitrary-or-capricious claim under 5 U.S.C. § 706(2)(A) -- except to say that later decisions on specific permits will not be arbitrary or capricious, Defs.' Opp'n 32-33 -- this Court also DENIES the motion to dismiss as to that claim, that is, Plaintiff States' and ACE NY's Count I.

### H. Equitable, Ultra Vires, and Constitutional Claims

The Public Officials briefly dispose of the plaintiffs' ultra vires and equitable claims, arguing that they duplicate the plaintiffs' claim under the APA that the agencies have exceeded their statutory mandates and that these kinds of claims

cannot be used to make an end-run around the final agency action requirement. Id. at 33. The Public Officials also argue that judicial review as to any surviving ultra vires claim would in any case be limited, because the ultra vires doctrine only applies to "'extreme' agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court," New York v. McMahon, No. 25-10601, 2025 WL 1463009, at *23 (D. Mass. May 22, 2025) (Joun, J.) (alteration in original) (quoting Federal Express Corp. v. United States Dep't of Com., 39 F. 4th 756, 764 (D.C. Cir. 2022)), and no patent misconstructions of statutes or specific, unambiguous statutory violations of this kind have been alleged. Id. at 34.

This Court agrees with the Public Officials, and applies this reasoning to ACE NY's constitutional claim as well. "[P]laintiffs' concerns are better addressed by []other count[s] of their complaint," that is, their APA claims. Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 40 (D.D.C. 2018). As to ACE NY's constitutional claim, because "judging the constitutionality of action taken by a coequal branch of government is 'the gravest and most delicate duty that this Court is called on to perform,'" id. (quoting Northwest Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 204 (2009)), "if a case can be

decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter," Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

Likewise, "because plaintiffs are able to assert the same claim through the APA, they cannot obtain relief . . . through the Court's inherent power to review ultra vires agency actions." Jafarzadeh v. Duke, 270 F. Supp. 3d 296, 311 (D.D.C. 2017). Although, as another session of this Court has recently observed, "ultra vires relief is designed to permit courts to 'reestablish the limits' on executive authority when it acts 'beyond its authority,'" Victim Rights L. Center v. United States Dep't of Educ., No. 25-11042, 2025 WL 1704311, at *15 (D. Mass. June 18, 2025) (Joun, J.) (quoting Aid Ass'n for Lutherans v. U.S. Postal Serv., 321 F.3d 1166, 1173 (D.C. Cir. 2003)), and is at least arguably available where the President has acted "without *any* authority, constitutional or statutory," McMahon, 2025 WL 1463009, at *22 n.17 (quoting American Fed'n of Gov't Emps., AFL-CIO v. Trump, No. 25-cv-03698, 2025 WL 1358477, at *18 (N.D. Cal. May 9, 2025)), the Supreme Court has recently reiterated that such claims are "essentially a Hail Mary pass," and are unavailable where plaintiffs have "an alternative path to judicial review," Nuclear Regul. Comm'n v. Texas, 605 U.S. --

[45]

--, 145 S. Ct. 1762, 1776 (2025) (quoting Nyunt v. Chairman, Broadcasting Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009)). Likewise, although "the Supreme Court has assumed without deciding that some ultra vires claims may lie against presidential action," on balance "it is unclear whether ultra vires review is available at all" to challenge presidential actions, because the President is not an agency and courts generally may not enjoin the President. American Foreign Serv. Ass'n v. Donald J. Trump, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Circ. June 20, 2025). In view of its ruling that the plaintiffs' APA claims may go forward and its judgment that the allegations here do not rise to the extremely high standard for such claims, this Court therefore follows the general rule that ultra vires is "a doctrine of last resort, 'intended to be of extremely limited scope,'" National Treasury Emps. Union v. Trump, No. 25-0935, 2025 WL 1218044, at *12 (D.D.C. Apr. 28, 2025) (quoting Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007)), and rules that ultra vires action has not been plausibly alleged here.

Particularly given that ACE NY collapses its constitutional and ultra vires claims into its APA-grounded contrary-to-law argument in its briefing, ACE NY Mem. 32, and the Plaintiff States argue only from absence that "[n]othing in the Constitution or any act of Congress authorizes the President or

Agency Defendants to categorically and indefinitely halt wind-energy approvals," States' Mem. 33, this Court judges that "[t]his is a classic APA claim," and that "[t]he specifics of plaintiffs' allegations are a far better fit for this doctrinal box," within which "the Court will be able to consider the allegations fully." Nielsen, 321 F. Supp. 3d at 40.  It applies this reasoning to the plaintiffs' ultra vires and ACE NY's constitutional claims, and to the Plaintiff States' equitable claim for violations of federal law, which duplicates their contrary-to-law claim under the APA.

The Court therefore ALLOWS the motion to dismiss as to the Plaintiff States' Counts III and IV and ACE NY's Counts IV and V.

### I. OCSLA Citizen Suit Claim (Plaintiff States' Count V; Intervenor's Count VI)

The Public Officials argue that OCSLA citizen suit claims cannot be brought until sixty days after giving the appropriate federal official written notice of the alleged violation, and that this requirement has not been met here.  Id. at 34-35.  The "imminent threat" or "immediate[] affect" exceptions to this rule do not apply, the Public Officials claim, because such effects could only happen after determinations are made only pending OCSLA planning documents, and, moreover, the Plaintiffs

identify no mandatory deadline that has been violated.  Id. at
35.

    This Court need not address the Public Officials' arguments
or any possible exhaustion issues, because the plaintiffs "have
not pursued and/or briefed this claim.  Additionally, the
citizen suit provision was not intended to operate as a means of
obtaining 'umbrella' relief for a series of agency decisions
that were or will be subject to judicial review under the APA."
Louisiana, 622 F. Supp. 3d at 296.

    This Court therefore ALLOWS the motion to dismiss as to the
OCSLA citizen suit claims, that is, Plaintiff States' Count V
and ACE NY's Count VI.

### III. CONCLUSION

The Plaintiffs sue the Public Officials for violations of the APA, for statutory violations in equity, for <u>ultra vires</u> action under the common law, for unconstitutional action in usurping congressional powers and seizing property without due process, and for an OCSLA violation under the statute's citizen suit provision.  The Public Officials move to dismiss all counts.

This Court DENIES the Public Officials' motion to dismiss, ECF No. 123, as to the Plaintiff States' Counts I and II and ACE NY's Counts I, II, and III.

This Court ALLOWS the Public Officials' motion to dismiss as to the Plaintiff States' Counts III, IV, and V and ACE NY's Counts IV, V, and VI.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[3]

---

[3] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.