# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, et al.,

              Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

              Defendants.

No. 25-cv-11221-WGY

# PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

GLOSSARY ................................................................................................................ x

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 2

   A. Legal Background ............................................................................................ 2

   B. Factual Background ......................................................................................... 4

      1. Federal Support, Review, and Permitting of Wind-Energy Development .................. 4

      2. The Executive's Sudden Halt on Wind-Energy Development ....................................... 6

      3. Contemporaneous Inconsistent and Irreconcilable Executive Action ......................... 7

   C. Procedural History .......................................................................................... 8

III. ARGUMENT .................................................................................................... 9

   A. The States Have Established Standing. ............................................................ 9

   B. The Pause Violates the Administrative Procedure Act. ................................. 15

      1. Agency Defendants' Decisions to Indefinitely Pause All Wind Energy Permits and Approvals Are Reviewable Final Agency Actions. ................................. 15

      2. The Pause on Wind-Energy Permitting Is Arbitrary and Capricious. ......................... 16

         i. Agency Defendants Have Offered No Reasoned Explanation for their Categorical and Indefinite Pause on Wind-Energy Approvals. .......................... 17

         ii. Agency Defendants Failed to Acknowledge or Explain Their Abrupt Reversal From Past Policy, Findings, and Permitting Practice. ......................... 19

         iii. Agency Defendants Failed to Account for Serious Reliance Interests. ............... 20

         iv. Agency Defendants Ignored Inconsistencies with Contemporaneous Executive Action Promoting Other Domestic Energy Sources. ........................ 21

      3.   Agency Defendants' Permitting Pause Is Contrary to Law and Is in Excess of Statutory Authority. ............................................................................................... 23

   C.  Agency Defendants' Pause on Wind-Energy Permitting Should Be Vacated. .................. 29

IV. CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
No. 1:25-cv-10787, 2025 WL 1822487 (D. Mass. July 2, 2025) ...................................... 23, 31

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014)...................................................................................... 22

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018)...................................................................................... 30

*Avenal Power Ctr., LLC v. EPA*,
787 F. Supp. 2d 1 (D.D.C. 2011) .................................................................................. 35

*Backcountry Against Dumps v. Jewell*,
674 F. App'x 657 (9th Cir. 2017)...................................................................................... 7

*Belmont Mun. Light Dep't v. FERC*,
38 F.4th 173 (D.C. Cir. 2022) ...................................................................................... 14

*Bennett v. Spear*,
520 U.S. 154 (1997)...................................................................................................... 19

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) .......................................................................................... 19

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017)........................................................................................... 18

*Citizens Awareness Network, Inc. v. Nuclear Regul. Comm'n*,
59 F.3d 284 (1st Cir. 1995) ...................................................................................... 26, 31

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017)........................................................................................... 20

*Comm. for a Constructive Tomorrow v. DOI*,
No. 1:24-cv-00774, 2024 WL 2699895 (D.D.C. May 24, 2024)............................................. 7

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)...................................................................................................... 40

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019).......................................................................................... 21, 28, 30

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)..................................................................................................... 26, 27

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  No. 1:25-cv-00322, 2025 WL 1836009 (D.D.C. July 3, 2025) .............................................. 23

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ........................................................................................................ 21, 27

*Ensco Offshore Co. v. Salazar*,
  781 F. Supp. 2d 332 (E.D. La. 2011) ........................................................................ 20, 32, 33

*Farmers Union Cent. Exch., Inc. v. FERC*,
  734 F.2d 1486 (D.C. Cir. 1984) ............................................................................................ 28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................... 21, 22, 25, 26, 27

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................................................ 21

*FEC v. Akins*,
  524 U.S. 11 (1998) ............................................................................................................... 18

*Goodall v. Binienda*,
  405 F. Supp. 3d 253 (D. Mass. 2019) ..................................................................................... 6

*Gutierrez v. Saenz*,
  145 S.Ct. 2258 (2025) .......................................................................................................... 18

*Hornbeck Offshore Servs., LLC v. Salazar*,
  696 F. Supp.2d 627 (E.D. La. 2010) ..................................................................................... 24

*Housatonic River Initiative v. EPA*,
  75 F.4th 248 (1st Cir. 2023) ................................................................................................. 22

*Kingdom v. Trump*,
  No. 1:25-cv-00691, 2025 WL 1568238 (D.D.C. June 3, 2025) ............................................. 24

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016) ............................................................................................................. 38

*Littlefield v. DOI*,
  85 F.4th 635 (1st Cir. 2023) ................................................................................................. 22

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ....................................................................................................... 30, 31

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ................................................... 15, 18, 20, 25, 33

iv

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 12

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................................... 12, 17, 18

*Massachusetts v. Nat'l Insts. of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025) ...................................................... 24, 27, 40

*Massachusetts v. Trump*,
  No. 1:25-cv-11221, 2025 WL 1836592 (D. Mass. July 3, 2025)....2, 11, 12, 13, 17, 18, 19, 20,
  31, 33

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
  923 F.3d 209 (1st Cir. 2019) ................................................................................ 18

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004)............................................................................. 24

*Montana Env't Info. Ctr. v. Haaland*,
  No. 1:19-cv-00130, 2024 WL 1406535 (D. Mont. Apr. 2, 2024) ........................... 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................. 21

*Mountain States Legal Found. v. Hodel*,
  668 F. Supp. 1466 (D. Wyo. 1987) ........................................................................ 39

*Nantucket Residents Against Turbines v. BOEM*,
  100 F.4th 1 (1st Cir. 2024) ...................................................................................... 7

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*,
  879 F.3d 1202 (D.C. Cir. 2018).............................................................................. 28

*Nat. Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020).......................................................................... 17, 20

*Nat'l Env't Dev. Assn's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014)............................................................................... 30

*New Jersey v. EPA*,
  989 F.3d 1038 (D.C. Cir. 2021).............................................................................. 16

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*,
  461 U.S. 190 (1983)................................................................................................ 14

*Physicians for Social Responsibility v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020)................................................................................ 25

*Protect our Cmtys. Found. v. Salazar*,
  No. 1:12-cv-02211, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013) ........................................... 7

*Responsible Offshore Dev. All. v. DOI*,
  No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025) ................................................................. 7

*Rotinsulu v. Mukasey*,
  515 F.3d 68 (1st Cir. 2008) ..................................................................................................... 18

*Save Long Beach Island v. Dep't of Commerce*,
  No. 3:23-cv-01886, 2025 WL 1829543 (D.N.J. July 2, 2025) .................................................. 7

*Seafreeze Shoreside, Inc. v. DOI*,
  123 F.4th 1 (1st Cir. 2024) ........................................................................................................ 7

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  145 S. Ct. 1497 (2025) ............................................................................................................. 36

*Signal Peak Energy, LLC v. Haaland*,
  No. 1:24-cv-00366, 2024 WL 3887386 (D.D.C. Aug. 21, 2024) ........................................... 36

*Smiley v. Citibank (South Dakota), N.A.*,
  517 U.S. 735 (1996) ................................................................................................................. 22

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ..................................................................................... 23

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ................................................................................................................. 30

*Webb v. Injured Workers Pharm.*,
  72 F.4th 365 (1st Cir. 2023) ..................................................................................................... 12

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
  No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .............................................. 24

**Federal Regulations**

30 C.F.R.
  § 585.600 ................................................................................................................................... 3
  § 585.613 ........................................................................................................................... 3, 4, 25
  § 585.628 ............................................................................................................................. 3, 25

33 C.F.R.
  § 320.1(a)(4) ............................................................................................................................ 26
  § 320.4(n) ................................................................................................................................ 26
  § 322.5 ................................................................................................................................. 4, 26
  § 323.6(a) ............................................................................................................................ 4, 26

§ 325.2......................................................................................................................3, 26
§ 330.1(e)(1)...................................................................................................................26

36 C.F.R.
§ 800.8(a)(1)...................................................................................................................28

40 C.F.R
§ 52.21(a)(2)................................................................................................................4, 27
§ 55.1..............................................................................................................................27
§ 71.1..............................................................................................................................27
§§ 71.5–71.7...................................................................................................................27
§ 124.3(c).......................................................................................................................25
§§ 124.6–124.9...............................................................................................................25
§ 124.10(a).....................................................................................................................25
§§ 124.11–124.12...........................................................................................................25
§ 124.15(a).....................................................................................................................25

43 C.F.R.
§ 1610.5-3......................................................................................................................29
§ 2804.26....................................................................................................................4, 29
§ 2804.35........................................................................................................................29

50 C.F.R.
§ 13.11....................................................................................................................3, 28, 29
§ 13.21............................................................................................................................29
§ 17.22(b)....................................................................................................................4, 28
§ 17.32(b).......................................................................................................................28
§ 18.27(d)(3)..................................................................................................................29
§ 22.200(b)(7)................................................................................................................28
§ 22.250......................................................................................................................4, 28
§ 216.104(c)...................................................................................................................29
§ 216.34.....................................................................................................................4, 29
§ 222.302(b)...............................................................................................................3, 28
§ 222.303(e)...................................................................................................................28
§ 402.14(e).....................................................................................................................28
§ 600.920.......................................................................................................................27

86 Fed. Reg. 1281 (Jan. 8, 2021).........................................................................................4

89 Fed. Reg. 26,070 (Apr. 12, 2024)..................................................................................28

89 Fed. Reg. 42,602 (May 15, 2024)..................................................................................25

90 Fed. Reg. 16,777 (Apr. 21, 2025).............................................................................8, 22

90 Fed. Reg. 8363 (Jan. 29, 2025)........................................................................1, 6, 21, 22

Fed. R. Civ. P. 65(a)(2)........................................................................................................8

Fed. R. Civ. P. 56(e) ..................................................................................................... 9

**Executive Orders**

Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025) .......... 8, 22

Exec. Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433
    (Jan. 29, 2025) ..................................................................................................... 7, 8, 22

Exec. Order 14261*, Reinvigorating America's Beautiful Clean Coal Industry*,
    90 Fed. Reg. 15,517 (Apr. 14, 2025) ....................................................................... 8, 22

Exec. Order 14270, *Zero-Based Regulatory Budgeting to Unleash American Energy*,
    90 Fed. Reg. 15,643 (Apr. 15, 2025) ....................................................................... 8, 22

Exec. Order 14285, *Unleashing America's Offshore Critical Minerals and Resources*,
    90 Fed. Reg. at 17,736 (Apr. 29, 2025) ......................................................................... 22

**Federal Statutes**

5 U.S.C.
    § 555(b) ........................................................................................................... 3, 24
    § 558(c) ............................................................................................................ 3, 24|
    § 704 ........................................................................................................................ 15
    § 706(2) ........................................................................................................... 15, 23

16 U.S.C.
    § 46 ........................................................................................................................... 4
    § 688 .......................................................................................................................... 2
    §§ 1361 *et seq.* ....................................................................................................... 2
    § 1371 .............................................................................................................. 28, 29
    § 1536 ....................................................................................................................... 2
    § 1536(b)(4) .............................................................................................................. 3
    § 1539(a)(2)(B) ...................................................................................................... 28
    §§ 1801 *et seq.* ....................................................................................................... 2
    § 1855(b)(2) ........................................................................................................... 27

33 U.S.C.
    § 403 ......................................................................................................................... 2
    § 1311 ................................................................................................................. 3, 25
    § 1342 ............................................................................................................ 2, 3, 25
    § 1344 ............................................................................................................... 2, 26

42 U.S.C.
    § 71.5(a)(2) ............................................................................................................ 26
    § 124.3 .................................................................................................................... 26
    § 124.15 .................................................................................................................. 26
    § 134 ......................................................................................................................... 4

§§ 4321 *et seq.* ............................................................................................... 2
§ 4336a(g) .................................................................................................... 27
§ 4370m-2(b)–(c) .......................................................................................... 3
§§ 7401 *et seq.* ............................................................................................... 2
§ 7475(c) ...................................................................................................... 26
§ 7661b(c) .................................................................................................... 26

43 U.S.C.
§§ 1331 *et seq.* ............................................................................................... 3
§ 1332(3) .................................................................................................. 3, 24
§ 1337(p) .................................................................................................. 3, 24
§§ 1701 *et seq.* ............................................................................................... 3
§ 1701(a)(4) ................................................................................................. 29
§ 1714 .......................................................................................................... 29
§ 1732(a)–(b) ............................................................................................... 29

54 U.S.C.
§ 306108 ...................................................................................................... 28
§§ 300101 *et seq.* ........................................................................................... 3

137 Stat. 10 (2023) ........................................................................................... 27

S. Rep. No. 109-229 (2006) .............................................................................. 27

**State Statutes**

2022, Mass. Acts c. 179 § 61(b) ....................................................................... 20

Minn. Stat. § 216B.1691, subd. 2g (2024) ......................................................... 20

N.Y. Pub. Serv. Law § 66-p ............................................................................... 20

R.I. Gen. Laws § 39-26-4 .................................................................................. 20

# GLOSSARY

Agency Defendants ..........................................U.S. Department of the Interior, Bureau of Ocean Energy Management, Bureau of Land Management, U.S. Fish and Wildlife Service, Environmental Protection Agency, National Marine Fisheries Service, U.S. Army Corp of Engineers

APA ..............................................................Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701-06

BGEPA ........................................................Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 688–668d

BLM ............................................................Bureau of Land Management

BOEM ..........................................................Bureau of Ocean Energy Management

CAA ............................................................Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*

COP ............................................................Construction and Operations Plan

Corps ..........................................................U.S. Army Corps of Engineers

Council ........................................................Federal Permitting Improvement Steering Council

CWA ............................................................Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*

DOE ............................................................U.S. Department of Energy

DOI ............................................................U.S. Department of the Interior

EIS ..............................................................Environmental Impact Statement

Energy Emergency Order ..............................Exec. Order 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025)

EPA ............................................................Environmental Protection Agency

ESA ............................................................Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*

Exemption Order ..........................................Regulatory Relief for Certain Stationary Sources to Promote American Energy, 90 Fed. Reg. 16,777 (Apr. 21, 2025)

FAST-41 ......................................................Fixing America's Surface Transportation Act, 42 U.S.C. §§ 4370m *et seq.*

FLPMA ........................................................Federal Land Policy Management Act, 43 U.S.C. §§ 1701 *et seq.*

GW ..............................................................Gigawatts

Magnuson–Stevens ......................................Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.*

MMPA ........................................................Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.*

MW ................................................................Megawatts

NEPA ............................................................National Environmental Protection Act, 42 U.S.C. §§ 4321 *et seq.*

NHPA ...........................................................National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq.*

NMFS...........................................................National Marine Fisheries Service

NPDES .........................................................National Pollutant Discharge Elimination System

NSR..............................................................New Source Review

OCSLA .......................................................Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*

PSD ..............................................................Prevention of Significant Deterioration

Reinvigorating Coal Order............................Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241, 90 Fed. Reg. 15,517 (Apr. 14, 2025)

RHA .............................................................Rivers and Harbors Act, 33 U.S.C. § 403

SAP ..............................................................Site Assessment Plan

States ...........................................................Plaintiffs

Unleashing Order ..........................................Exec. Order 14154, Unleashing American Energy, 90 Fed. Reg. 8353 (Jan. 29, 2025)

USFW ..........................................................U.S. Fish and Wildlife Service

Wind Directive .............................................Presidential Memorandum, Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363, 8363 (§ 2) (Jan. 29, 2025)

Zero-Based Budgeting Order.........................Exec. Order 14270, Zero-Based Regulatory Budgeting to Unleash American Energy, 90 Fed. Reg. 15,643 (Apr. 15, 2025)

## I.    INTRODUCTION

Seventeen States and the District of Columbia (States) challenge the decision of multiple federal agencies (Agency Defendants) to halt all wind-energy permitting pending an extra-statutory assessment pursuant to President Trump's Wind Directive.[1] The Wind Directive was signed 200 days ago, yet Agency Defendants have failed to provide a timeline for completing the assessment and resuming permitting. That indefinite pause has had grave consequences, casting the wind-energy industry into disarray and hobbling development of a source of reliable, affordable, and clean energy on which our States rely to meet rising energy demand.

Agency Defendants' sweeping actions violate the Administrative Procedure Act (APA) in two fundamental respects. First, the pause is arbitrary and capricious. The sparse administrative record—consisting of only the Wind Directive and a single Department of Interior (DOI) memorandum, ECF 165—confirms that each Agency Defendant's decision to adopt the pause is unreasoned and unsupported. The record reflects *no* explanation beyond reference to the Wind Directive, let alone the reasoning the APA demands. The record also fails to explain the departure from past findings that wind-energy impacts are minimal and mitigable, federal support for wind-energy development, and practice of duly acting on wind-energy approvals under applicable law. The record ignores the States' significant reliance interests in development of this critical energy resource. And Agency Defendants fail to reconcile internal inconsistencies as well as conflicts with contemporaneous Executive action declaring a National Energy Emergency and curtailing environmental review and expediting permitting for other energy sources.

---

[1] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, § 2(a), 90 Fed. Reg. 8363 (Jan. 29, 2025) (ECF 165-2, 165-5, 165-7, 165-9).

Second, Agency Defendants' actions cast aside the numerous laws and regulations prescribing timelines and standards in permitting wind-energy projects—and the APA's overarching demand that timelines be reasonable—effecting "a kind of de facto suspension of the law with respect to wind energy development." *Massachusetts v. Trump*, No. 1:25-cv-11221, 2025 WL 1836592, at *11 (D. Mass. July 3, 2025) (ECF 162). And with the indefinite pause, Agency Defendants have added an extra-statutory condition—the Wind Directive's amorphous assessment—to myriad permitting laws. Agency Defendants' actions are contrary to and exceed their authority under those laws. For these reasons, the States should prevail.

## II.    BACKGROUND

### A.    Legal Background

Wind-energy development is subject to numerous federal permitting laws and their implementing regulations, each of which is designed to ensure the responsible siting, planning, construction, operation, and decommissioning of wind-energy projects. Both onshore- and offshore-wind projects need permits for obstructions of navigable waters from the Army Corps of Engineers (Corps) under Section 10 of the Rivers and Harbors Act (RHA), 33 U.S.C. § 403; dredge-and-fill permits from the Corps or pollutant-discharge permits from the Environmental Protection Agency (EPA) under sections 404 and 402 of the Clean Water Act (CWA), 33 U.S.C. §§ 1344, 1342, respectively; permits for emission of air pollutants under the Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq*.; and approvals for impacts on protected species under the Endangered Species Act (ESA), 16 U.S.C. § 1536, Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. § 688, and Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361 *et seq*. These approvals trigger review of environmental impacts under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*.; on fisheries under the Magnuson–Stevens Fishery Conservation and Management Act (Magnuson-Stevens), 16 U.S.C. §§ 1801 *et seq*.; and on historical sites under the

National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101 *et seq*. Wind-energy projects on federal lands are subject to the Federal Land Policy Management Act (FLMPA), 43 U.S.C. §§ 1701 *et seq*. And offshore-wind projects are uniquely subject to the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331 *et seq*., which authorizes the Interior Secretary to issue offshore-wind leases, *id.* § 1337(p). OCSLA regulations also require offshore-wind projects to obtain Bureau of Ocean Energy Management (BOEM) approval of Site Assessment Plans (SAP) and Construction and Operations Plans (COP). 30 C.F.R. §§ 585.600, 585.613, 585.628.

The foregoing authorities strike a considered balance between expeditious and responsible development, requiring Agency Defendants to promptly process permit applications. OCSLA, for example, requires that development of wind energy on the Outer Continental Shelf be "expeditious and orderly," 43 U.S.C. § 1332(3), a duty that applies to the initial lease sales as well as decisions on developers' SAPs and COPs, 30 C.F.R. §§ 585.613, 585.628. Other permitting regimes similarly command expedition. *E.g.*, 16 U.S.C. § 1536(b)(4) & 50 C.F.R. § 222.302(b) (National Marine Fisheries Service (NMFS) to issue ESA incidental-take permits "in the shortest possible time"); 50 C.F.R. § 13.11 (U.S. Fish and Wildlife Service (USFWS) to issue permits under BGEPA and MMPA "as quickly as possible"). Others, like the CWA, provide a specific number of days by which an Agency Defendant must act. *See* 33 C.F.R. § 325.2(d) (60 days to decide 404 permit applications); *accord* 33 U.S.C. §§ 1311, 1342. And the APA itself requires that agencies shall conclude all matters presented to them "within a reasonable time." 5 U.S.C. §§ 555(b), 558(c).The Fixing America's Surface Transportation Act (FAST-41) likewise affirms Congress's desire for efficiency: Agency Defendants must post deadlines online and, if they fail to meet them, promptly notify the Federal Permitting Improvement Steering Council and submit regular status reports. 42 U.S.C. § 4370m-2(b)–(c). FAST-41 thus aims to ensure "agencies coordinate their environmental

and project review efforts to improve the timeliness, efficiency, predictability, and transparency of the decision-making processes." 86 Fed. Reg. 1281, 1281 (Jan. 8, 2021).

Under each permitting scheme, Agency Defendants also must base permitting decisions on application of specific substantive standards. *E.g.*, 30 C.F.R. § 585.613 (governing BOEM's review of OCSLA plans); 33 C.F.R. §§ 323.6(a) (Corps to review Section 404 permits using substantive "guidelines"), 322.5 (Corps to follow specific "policies and procedures" when reviewing RHA permits); 40 C.F.R. § 52.21(a)(2) ("requirements . . . [that] apply to the construction of any new major stationary source" under CAA); 50 C.F.R. §§ 17.22(b) (requirements for ESA permits), 22.250 (criteria for BGEPA permits), 216.34 (criteria for MMPA permits); 43 C.F.R. § 2804.26 (circumstances warranting denial of FLMPA right-of-way application).

## B.     Factual Background

### 1.     Federal Support, Review, and Permitting of Wind-Energy Development

For nearly fifty years, presidential administrations and multiple Congresses have acted to support the development of wind energy. For example, in 1978, President Carter signed the Public Utility Regulatory Policies Act, which required electric utilities to diversify their energy portfolio by purchasing renewable energy resources including wind energy. 16 U.S.C. § 46. In 1992, President Bush signed a law authorizing a wind-energy production tax credit. 42 U.S.C. § 134. In 2008, President George W. Bush's Department of Energy (DOE) encouraged large-scale wind-energy development by 2030.[2] President Obama oversaw the tripling of U.S. wind-energy

---

[2] DOE, *20% Wind Energy by 2030* (Dec. 2008), https://perma.cc/ZH5L-6WPK. The Court may take judicial notice of government-issued documents and material on government websites, which are not subject to dispute and which Agency Defendants should have considered before ceasing all wind-energy permitting. *See Goodall v. Binienda*, 405 F. Supp. 3d 253, 259 (D. Mass. 2019).

generation during his two terms in office.[3] President Trump's first administration was "very bullish" on wind energy and held seven offshore-wind auctions.[4] And President Biden continued the trend, announcing a goal of deploying 30 gigawatts (GW) of offshore-wind energy by 2030.[5]

Prior to the Wind Directive, Agency Defendants permitted wind-energy projects in the normal course, conducting statutorily mandated reviews and promptly acting on permit applications under applicable law. As a result, numerous assessments have built an extensive record demonstrating that the wind industry has a minimal and mitigable impact on the environment, commerce, and national security. For example, NMFS and USFWS (together, the Services) have repeatedly assessed wind-energy impacts on wildlife, including the North Atlantic right whale, and incorporated mitigation measures into multiple projects.[6] BOEM extensively reviewed effects on the fishing industry, finding potential benefits and directing mitigation measures.[7] And BOEM also found that wind-energy will benefit local economies.[8] Courts—

---

[3] The White House, *Fact Sheet: The Recovery Act Made the Largest Single Investment in Clean Energy in History, Driving The Deployment of Clean Energy, Promoting Energy Efficiency, and Supporting Manufacturing* (Feb. 25, 2016), https://perma.cc/HR8Q-Q5ZH.

[4] DOI, *Trump Administration Delivers Historic Progress on Offshore Wind* (Oct. 18, 2018), https://perma.cc/GX5B-HB6B; BOEM, *Lease and Grant Information*, https://perma.cc/3GBK-AQTK; *see* ECF 170 (Answer to States' Amended Complaint) ¶ 116.

[5] DOE, *Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030* (Mar. 29, 2021), https://perma.cc/9SAH-RT5J.

[6] *See, e.g.*, NMFS, *North Atlantic Right Whale 5-Year Review: Summary and Evaluation,* 24–25, 28 (Nov. 2022), https://perma.cc/62QZ-6XTE; USFWS, *Final Environmental Assessment, 2024 Eagle Take Permit Rulemaking*, 170–82 (Feb. 2024), https://perma.cc/5W4T-HY77.

[7] *See, e.g.*, BOEM, *Record of Decision: Atlantic Shores Offshore Wind South Project Construction and Operations Plan*, 22 (July 1, 2024) (Atlantic Shores COP ROD), https://perma.cc/HQ7P-ZY56; Vineyard Wind, LLC, *Draft Construction and Operations Plan*, 4-17 (June 3, 2020), https://perma.cc/KQS5-RNP2.

[8] *See, e.g.*, BOEM, *Record of Decision: Empire Offshore Wind: Empire Wind Project (EW1 and EW2) Construction and Operations Plan*, 28 (Nov. 20, 2023), https://perma.cc/JQE9-Q2AM; Bur. of Land Mgmt. (BLM), *Final Programmatic EIS on Wind Energy Deployment on BLM-Administered Lands in the Western United States*, ES-5 (June 2005), https://perma.cc/L9D9-E26Z.

including the First Circuit—repeatedly rejected claims that reviews were deficient or inadequate.[9]

### 2. The Executive's Sudden Halt on Wind-Energy Development

Those decades of federal support for timely permitting of wind-energy projects came to a halt on January 20, 2025, when President Trump issued the Presidential Memorandum including the Wind Directive. The Wind Directive prohibits Agency Defendants from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects" at least until "completion of a comprehensive assessment and review of Federal wind leasing and permitting practices" by the DOI Secretary in consultation with certain Agency Defendants and others. 90 Fed. Reg. at 8364. The Wind Directive orders that halt "[i]n light of various alleged legal deficiencies" in leasing and permitting wind energy, "the consequences of which may lead to grave harm—including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals," as well as purported "potential inadequacies in various [NEPA] environmental reviews." *Id.* at 8363. Ignoring Agency Defendants' extensive reviews of wind-energy projects, the Wind Directive orders the assessment to consider anew the "environmental impact of onshore and offshore wind projects upon wildlife," and review "economic costs associated with the intermittent generation of electricity[,] and the effect of subsidies on the viability of the industry." *Id.* at 8364.

---

[9] *E.g.*, *Seafreeze Shoreside, Inc. v. DOI*, 123 F.4th 1 (1st Cir. 2024), *cert. denied Seafreeze Shoreside, Inc. v. DOI*, No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025), *and Responsible Offshore Dev. All. v. DOI*, No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025); *Nantucket Residents Against Turbines v. BOEM*, 100 F.4th 1 (1st Cir. 2024), *cert. denied Nantucket Residents v. BOEM*, No. 24-337, 2025 WL 76449 (U.S. Jan. 13, 2025); *Comm. for a Constructive Tomorrow v. DOI*, No. 1:24-cv-00774, 2024 WL 2699895 (D.D.C. May 24, 2024); *Protect our Cmtys. Found. v. Salazar*, No. 1:12-cv-02211, 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013), *aff'd Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017); *Save Long Beach Island v. Dep't of Commerce*, No. 3:23-cv-01886, 2025 WL 1829543 (D.N.J. July 2, 2025).

Agency Defendants admit they have paused issuance of permits across the board pursuant to the Wind Directive. *See* ECF 170, ¶ 142 ("Defendants admit that they have adopted and implemented the temporary cessation directive in Section 2 of the Wind Memo"). For example, on January 24 the USFWS posted a notice that "[t]he U.S. Fish and Wildlife Service, pursuant to [the Wind Directive] is temporarily ceasing issuance of permits to wind facilities until further notice,"[10] and over the following two weeks, BOEM postponed and canceled wind-energy NEPA proceedings in California and New York, respectively, with the following notice:

> The Department of the Interior and the Bureau of Ocean Energy Management are implementing the Administration's Presidential Memorandum (PM) temporarily halting offshore wind leasing on the Outer Continental Shelf. The PM also pauses new or renewed approvals, rights-of-way, permits, leases, or loans for offshore wind projects pending a review of federal wind leasing and permitting practices.[11]

### 3.    Contemporaneous Inconsistent and Irreconcilable Executive Action

As Agency Defendants brought the wind-energy industry to a halt, the Executive has taken other actions emphasizing a need to accelerate domestic energy development while expediting permitting and curtailing environmental review for nearly every other energy resource. For example, simultaneous with the Wind Directive, President Trump declared a "National Energy Emergency," purportedly brought on by "insufficient energy production," to facilitate development of "a reliable, diversified, and affordable supply of energy." Exec. Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025) (Energy Emergency Order). The Order singled out Northeast and West Coast states for allegedly constraining energy supply and directed agencies to "use all lawful emergency or other authorities available to them to facilitate

---

[10] USFWS, *3-200-71: Eagle Incidental Take*, https://perma.cc/HC9J-UMND.
[11] BOEM, *Postponed: Public Meetings on Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California* (Jan. 28, 2025), https://perma.cc/AN9R-5FBQ; BOEM, *Virtual Public Meetings Cancelled for Vineyard Mid-Atlantic Offshore Wind Project* (Feb. 4, 2025), https://perma.cc/N449-GUWA.

the supply . . . of energy" in those states. *Id.* at 8434. Another Day 1 order "encourag[ed] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf." Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025) (Unleashing Order). Other executive orders fast-tracked and curtailed review for fossil-fueled energy sources. *E.g.*, Exec. Order 14261, *Reinvigorating America's Beautiful Clean Coal Industry*, 90 Fed. Reg. 15,517 (Apr. 14, 2025) (Reinvigorating Coal Order); Proclamation 10914 of Apr. 8, 2025, *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025) (Exemption Order); Exec. Order 14270, *Zero-Based Regulatory Budgeting to Unleash American Energy*, 90 Fed. Reg. 15,643 (Apr. 15, 2025) (Zero-Based Budgeting Order). In response, Agency Defendants expedited permitting and curtailed review for nearly all domestic energy sources—but pursuant to the Wind Directive altogether stopped permitting wind energy.[12]

## C.    Procedural History

The States filed suit on May 5, 2025. ECF 1. The operative complaint asserts five causes of action: Counts I–II seek review under the APA of the legality of the Agency Defendants' pause on wind-energy permitting; Counts III–IV alleged equitable and common law claims for unlawful and ultra vires action; and Count V alleged an OCSLA citizen suit claim. ECF 141. Alliance for Clean Energy New York (ACE NY) intervened, ECF 23, 78, and all Plaintiffs sought a preliminary injunction, ECF 53, 55. The Court consolidated the motions for preliminary injunction with a trial on the merits, and converted Defendants' opposition to the preliminary injunction motions into a motion to dismiss. ECF 137; *see* Fed. R. Civ. P. 65(a)(2).

---

[12] *E.g.*, DOI, *Press Release: Dep't of the Interior Implements Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://perma.cc/RR3U-ZULC.

Following supplemental briefing, ECF 146, 149, 156, and a hearing, Elec. Clerk's Notes, ECF 157, the Court issued a decision partially granting and partially denying the motion to dismiss. *Massachusetts v. Trump*, 2025 WL 1836592. The Court found that the States had standing based on allegations and evidence that "a total, indefinite pause on wind energy development will cause them financial and other economic harms," including "specific allegations regarding already-canceled or delayed supply chain contracts, power purchase agreements and agreement negotiations, and construction projects." *Id.* at *8. The Court then found that Agency Defendants' indefinite pause on wind-energy permitting was final agency action reviewable under the APA, concluded that the Plaintiffs plausibly pleaded APA claims that the pause is arbitrary and capricious and contrary to law, and therefore denied the motion to dismiss as to the States' Counts I and II. *Id.* at *12–13. The Court dismissed the States' other counts, finding Plaintiffs' claims better addressed under the APA. *Id.* at *14–15. Agency Defendants filed an Administrative Record on July 11, consisting only of the Wind Directive and a DOI Secretarial Memorandum, certifying the record as true, accurate, and complete. ECF 165. A hearing is set for September 4, 2025. ECF 157.

## III.     ARGUMENT

### A.     The States Have Established Standing.

To establish standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). At summary judgment, plaintiffs "must set forth by affidavit or other evidence specific facts" supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). Here, this Court has already found "concrete evidence" of standing based on numerous harms to the States caused by the pause on wind-energy permitting. *Massachusetts v. Trump*, 2025 WL 1836592, at *7–8. The States' evidence of harm submitted at

the summary judgment stage is even more fulsome and amply makes the requisite showing.

*Injury in Fact.* The pause has already harmed the States, and with each passing day, it creates a substantial, imminent risk of further harm. *See Webb v. Injured Workers Pharm.*, 72 F.4th 365, 375 (1st Cir. 2023). Agency Defendants admit that they have paused issuance of all wind-energy permits per the Wind Directive, ECF 170, ¶ 142, and they still have provided no timetable for completion of the assessment, ECF 123-2 (McElwain ¶ 6); ECF 123-6 (Ford ¶ 9); ECF 123-3 (Giacona ¶ 5); *see Massachusetts v. Trump*, 2025 WL 1836592, at *11. That indefinite pause and attendant uncertainty have brought planned projects to a standstill, with a 95% drop in wind-energy supply-chain contracts and a 98% drop in wind-energy investments in the first quarter of 2025. ECF 64 (Burdock ¶¶ 19, 21); ECF 66 (McNutt ¶ 13). The SouthCoast project is a case in point. The refusal by the Corps, USFWS, and EPA to timely issue the three remaining permits for the SouthCoast project forced the company to cancel critical supply chain contracts, delay pending power purchase agreement negotiations until the end of this year, and delay construction by a *minimum* of two years, postponing delivery of 1,087 MW of electricity to Massachusetts and 200 MW to Rhode Island until at least 2032 and threatening project cancellation. Decl. of Turner Smith (Smith Dec.) Ex. 5 [Brown] ¶¶ 13, 41–42, 54–55; *id.* Ex. 20 [MA-Mahony] ¶¶ 34, 50–52, 58. Such project delays, predictably, have harmed and will harm multiple State interests.

First, the indefinite pause impedes the States' well-established authority to plan for reliable and affordable energy. Wind energy can plug directly into high-demand, transmission-constrained markets, feed peak demand, and provide fuel diversity to enhance reliability, complementing other forms of energy when fuel is scarce.[13] States are also depending on wind energy to reduce reliance

---

[13] ECF 69 (Goggin ¶¶ 10–13, 19–26, 36); Smith Decl. Ex. 12 [CT-Dykes] ¶¶ 31–36; *id.* Ex. 24

on price-volatile fossil fuels and cut energy costs for their residents and for the States themselves.[14]

To revisit SouthCoast, there is *no* alternative electricity generation in Massachusetts, much less in the densely populated Eastern region, that could timely replace the project's 1,087 MW. Smith Dec. Ex. 20 [MA-Mahony] ¶¶ 43–47, 52–55; *see Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 212 (1983) (States have traditional authority over need for generating capacity and types of generating facilities); *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (State injury from increased electricity costs due to interest "in protecting their citizens and electric ratepayers in the traditional government field of utility regulation").

Second, States have invested billions of dollars in wind-energy-related infrastructure, research and development, jobs training programs, and supply chains—all on the line if the

---

[NJ-Perry] ¶ 84; *id.* Ex. 30 [NY-Williams] ¶¶ 33, 36–37; *id.* Ex. 8 [ME-Burgess] ¶¶ 27–28; *id.* Ex. 20 [MA-Mahony] ¶¶ 36, 45.

[14] *See* Smith Decl. Ex. 9 [WA-Butorac] ¶ 18 (clean energy is important for reliability and affordability during peak periods and extreme weather); *id.* Ex. 12 [CT-Dykes] ¶ 48 (developing wind-energy resources will lower wholesale energy and capacity market costs and reduce reliance on price-volatile fossil fuels); *id.* Ex. 23 [WA-Nightingale] ¶¶ 13–14 (wind is least expensive electricity resource and cost-competitive even without subsidies; halt on federal permitting will yield higher electric bills); *id.* Ex. 25 [MD-Pinsky] ¶ 21 (US Wind project to reduce wholesale costs and congestion in Eastern Shore); *id.* Ex. 30 [NY-Williams] ¶¶ 52, 53 (halt causes higher project costs that are likely to increase New York's electricity costs); *id.* Ex. 7 [MN-Bull] ¶ 20 (wind and other renewables often identified as lowest-cost resources); *id.* Ex. 11 [MA-Mahony] ¶ 45 (cost of electricity in Massachusetts will be dramatically higher without ability to utilize offshore-wind energy); *id.* Ex. 24 [NJ-Perry] ¶ 81 (without offshore wind, scarcity and congestion issues will worsen, leading to higher electricity costs); *id.* Ex. 1 [MA-Barton] ¶ 11 (based on ISO-NE study, without offshore wind capacity, University of Massachusetts would pay about $39 million more in energy costs in 2050); *id* Ex. 2 [CA-Bohan] ¶ 15 (without wind California would be deprived of resource diversification and grid resiliency benefits); *id* Ex. 27 [NM-Stair] ¶¶ 15–17 (high electric prices and increasing demand could be alleviated by quick to deploy, cheap wind energy in New Mexico); Ex. 31 [OR-Zelenka] ¶ 12 (forgoing development of wind energy would increase cost of electricity for Oregonians); Ex. 17 [MI-Jester] ¶ 12 (wind-energy development projected to save Michigan utility customers approximately $2.5 billion net present value through 2045 as compared to investment in natural gas plants); *see also* ECF 69 (Goggin ¶ 37).

permitting pause is not lifted.[15] The pause also has already caused and risks further losses of substantial economic benefits to the States and their residents alike,[16] including jobs and direct economic losses.[17] SouthCoast, for example, has made more than $65 million in local financial commitments, including $4 million directly to State entities like the Massachusetts Fisheries Compensatory Mitigation Fund, all under threat by the permitting pause. *See* Smith Decl. Ex. 5 [Brown] ¶ 32; *see Louisiana v. Biden*, 622 F. Supp. 3d 267, 285 (W.D. La. 2022) (finding standing where states alleged "loss of proceeds" and "loss of jobs and economic damage").

Third, the pause harms States' sovereign ability to implement their energy and climate policies. For Massachusetts, New York, Maryland, Maine, and New Jersey, the pause on wind-

---

[15] *See* Smith Decl. Ex. 10 [MA-Carlisle] ¶¶ 22, 25–27, 38 (over $18 million invested in developing offshore-wind workforce, $5.6 million in supporting a local offshore-wind supply chain, and over $12 million in offshore-wind research and development); *id.* Ex. 9 [WA-Butorac] ¶¶ 16, 29–30 ($118 million invested in clean energy infrastructure and planning, including wind); *id.* Ex. 22 [WA-Nguyen] ¶¶ 16, 29–30 (billions invested); *id.* Ex. 12 [CT-Dykes] ¶¶ 41–42; *id.* Ex. 30 [NY-Williams] ¶ 32 ($60 million for offshore-wind facility).

[16] *Id.* Ex. 24 [Perry] ¶¶ 55–60 (Atlantic Shores committed to spend $848 million during development and construction, which is expected to lead to $1.869 billion in economic benefits to New Jersey's economy); *id.* Ex. 7 [MN-Bull] ¶ 14 (benefits to rural agricultural communities via state production tax credit and developer payments); *id.* Ex. 13 [NY-Gawlik] ¶¶ 4, 8–10 (wind component staging and assembly facility held up by permitting halt, jeopardizing $48 million construction grant, project viability, and anticipated economic benefits); *id.* Ex. 2 [CA-Bohan] ¶ 11 (jeopardized offshore-wind development expected to generate over $1.8 billion in cumulative state and local tax revenue); *id.* Ex. 17 [MI-Jester] ¶ 13 (jeopardized local tax revenues from wind projects expected to be $1.337 billion in 2025 dollars); *id* Ex. 26 [AZ-Sahid] ¶¶ 15, 18–21 ($111 million from anticipated wind development at risk for Arizona State Land Trust's beneficiaries).

[17] *Id.* Ex. 30 [NY-Williams] ¶ 31 (anticipating 18,000–23,000 additional jobs in New York due to wind industry); *id.* Ex. 9 [WA-Butorac] ¶ 16 (clean energy jobs outpacing U.S. economy by more than 2:1); *id.* Ex. 10 [MA-Carlisle] ¶ 38 (three selected Massachusetts offshore-wind projects anticipated to create more than 10,000 jobs); *id.* Ex. 20 [MA-Mahony] ¶ 48 (3,405 jobs from Massachusetts's existing offshore-wind project); *id.* Ex. 25 [MD-Pinsky] ¶ 15 (US Wind project expected to create 13,600 jobs); *id.* Ex. 24 [NJ-Perry] ¶¶ 55, 57, 59, 63, 65, 67 (State-approved projects to create thousands of jobs); *id.* Ex. 2 [CA-Bohan] ¶ 10 (development in California lease areas could support nearly 169,000 construction-related job-years and more than 5,700 operations and maintenance jobs); Ex. 28 [CO-Toor] ¶ 16 (fourth most wind energy jobs in the U.S.); Ex. 16 [Hughes] ¶¶ 9–10 (approximately 50,000 jobs in clean energy sector in Washington and Oregon).

energy approvals impedes compliance with statutes that call for procurement of specific amounts of offshore-wind energy by specific deadlines.[18] So, too, for attainment of States' statutory Renewable Portfolio Standards, which require achieving specific percentages of renewable electricity,[19] and statutory greenhouse-gas emission-reduction targets to mitigate impacts of climate change.[20] Delay or loss of the SouthCoast project, for example, would impede and make more expensive attainment of the Commonwealth's 2027 5,600 MW offshore-wind procurement target and its 2030 greenhouse gas emission-reduction target. Smith Dec. Ex. 20 [MA-Mahony] ¶¶ 34, 52, 58; *see New Jersey v. EPA*, 989 F.3d 1038, 1045–49 (D.C. Cir. 2021) (standing where rule made state's task of devising an adequate state plan more onerous).

Fourth, delay in transitioning from fossil-fueled generation caused by the pause on wind-energy approvals already has delayed and will continue to delay greenhouse gas emission

---

[18] *See* Smith Dec. Ex. 20. [MA-Mahony] ¶¶ 34, 52, 58 (5,600 MW by 2027); *id*. Ex. 30 [NY-Williams] ¶¶ 4, 46, 49 (9 GW of offshore wind by 2035; Wind Directive led to cancellation of transmission upgrade program that aimed to bring offshore wind into NYC); Ex. 15 [MD-Hoagland] ¶¶ 22, 31 (8.5 GW offshore wind by 2031); *id.* Ex. 8 [ME-Burgess] ¶ 34 (3,000 MW offshore wind by 2040); *id.* Ex. 24 [NJ-Perry] ¶ 13 (3,500 MW offshore wind by 2030).

[19] *Id*. Ex. 19 [NY-Leddy] ¶ 37 (70% by 2030); *id.* Ex. 20 [MA-Mahony] ¶¶ 7, 50 (increasing percentage); *id.* Ex. 9 [WA-Butorac] ¶¶ 17, 20, 33, 37 (100% by 2045); *id.* Ex. 12 [CT-Dykes] ¶ 12 (33% by 2040); *id.* Ex. 14 [IL-Granahan] ¶ 8 (40% by 2030, 50% by 2040); *id.* Ex. 8 [ME-Burgess] ¶¶ 11, 39 (80% by 2030); *id.* Ex. 7 [MN-Bull] ¶ 9 (100% by 2040); *id.* Ex. 15 [MD-Hoagland] ¶¶ 21–22, 36 (50% by 2030); *id.* Ex. 18 [RI-Kearns] ¶ 16 (100% by 2033); *id.* Ex. 24 [NJ-Perry] ¶ 13 (50% by 2030); *id.* Ex. 29 [Vaughan] ¶ 12 (D.C. law requires 52% by 2025); *id.* Ex. 2 [CA-Bohan] ¶ 7 (100% by 2045); *id* Ex. 27 [NM-Stair] ¶¶ 20 (40% by 2025, 100% by 2040); Ex. 31 [OR-Zelenka] ¶ 10 (100% by 2040); *id.* Ex. 17 [MI-Jester] ¶¶ 6–7 (100% by 2040).

[20] *Id*. Ex. 19 [NY-Leddy] ¶ 4 (40% by 2030 and 85% by 2050, from 1990 levels); *id.* Ex. 11 [WA-Creswell] ¶ 14 (net-zero by 2050); *id.* Ex. 3 [MA-Brizius] ¶ 22 (50% below 1990 levels by 2030, 75% by 2040, and net zero by 2050); *id.* Ex. 12 [CT-Dykes] ¶ 13 (45% below 2001 levels by 2030); *id.* Ex. 14 [IL-Granahan] ¶ 13 (all electricity generation emission-free by 2045); *id.* Ex. 8 [ME-Burgess] ¶ 10 (45% by 2030, and 80% by 2050, below 1990 levels); *id.* Ex. 7 [MN-Bull] ¶ 9 (50% by 2030 and net zero by 2050); *id.* Ex. 15 [MD-Hoagland] ¶ 20 (60% from 2006 levels by 2031; net-zero by 2045); *id.* Ex. 6 [NJ-Brunatti] ¶ 5 (80% below 2006 levels by 2050), *id.* Ex. 18 [RI-Kearns] ¶ 14 (45% by 2030, 80% by 2040, and net-zero by 2050, below 1990 levels); *id.* Ex. 2 [CA-Bohan] ¶ 7 (net-zero by 2045); Ex. 28 [CO-Toor] ¶ 11 (net-zero by 2050).

reductions, causing harm to state finances and state-owned property and infrastructure from more severe storms and hurricanes, intense heat waves, flooding, sea level rise, more frequent wildfires, and drought.[21] *See Massachusetts v. EPA*, 549 U.S. at 521–23; *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020). And it will delay reductions in other power plant emissions that harm public health and increase healthcare costs.[22] For example, delay or loss of the SouthCoast project will delay or deprive Massachusetts of annual greenhouse-gas emission reductions equivalent to those of 800,000 motor vehicles, contributing to climate harms in and to the State. SouthCoast Rec. of Decision 78, 84, https://perma.cc/LRY3-AFS7; Smith Decl. Ex. 3 [Brizius] ¶¶ 16–24. In short, "[t]he Plaintiff States' mundane assumption that a total, indefinite pause on wind energy development will cause them financial and other economic harms . . . is eminently rational" and "backed up by concrete evidence." *Massachusetts v. Trump*, 2025 WL 1836592, at *8 (citing *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 223 (1st Cir. 2019)).

**Traceability & Redressability.** "[I]f a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). Moreover, as this Court recognized, *Massachusetts v. Trump*, 2025 WL 1836592, at *8, "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant," *Massachusetts v. EPA*, 549 U.S. at 518; *accord Gutierrez v.*

---

[21] Smith Decl. Ex. 19 [NY-Leddy] ¶¶ 22–29; *id.* Ex. 11 [WA-Creswell] ¶¶ 6–9; *id.* Ex. 9 [WA-Butorac] ¶¶ 11–13; *id.* Ex. 3 [MA-Brizius] ¶¶ 17–18; *id.* Ex. 8 [ME-Burgess] ¶¶ 6–9; *id.* Ex. 12 [CT-Dykes] ¶¶ 6–8; *id.* Ex. 15 [MD-Hoagland] ¶¶ 6–18; *id.* Ex. 2 [CA-Bohan] ¶ 11; *id.* Ex. 21 [OR-McConnaha] ¶ 10; *id.* Ex. 6 [NJ-Brunatti] ¶¶ 16–35.

[22] *Id.* Ex. 25 [MD-Pinsky] ¶ 17 (US Wind project would result in $275 million in health savings from pollution reduction, some of which would likely accrue to State); *id.* Ex. 9 [WA-Butorac] ¶ 19, 36 (permitting halt will deprive Washington of air quality and public health improvements); Ex. 21 [OR-McConnaha] ¶ 18 (air quality improvements from wind energy would be reduced).

*Saenz*, 145 S.Ct. 2258, 2268–69 (2025) (citing *FEC v. Akins*, 524 U.S. 11, 25 (1998)). The Agency Defendants' indefinite pause on all wind-energy permitting is the cause of the States' harms. Vacatur of that pause would allow permitting to resume in due course, under well-established standards and procedures set forth in governing law. *Infra* Section III.B.3. If the halt were lifted, the industry—including projects like SouthCoast—would move ahead with development now in limbo. *See* Brown ¶¶ 56–57; ECF 55-2 (Wells ¶ 17). As in *Louisiana*, that is all that is required. 622 F. Supp. 3d at 286 (enjoining stop on oil and gas leasing would redress state economic harms).

**B.    The Pause Violates the Administrative Procedure Act.**

In an APA challenge, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Courts do not review the administrative record to determine if a material dispute of fact remains, but rather ask "whether the agency action was arbitrary and capricious." *Id.* Under the APA, a Court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C). Agency Defendants' pause on wind-energy permitting violates each such provision and should be set aside.

**1.    Agency Defendants' Decisions to Indefinitely Pause Issuing All Wind-Energy Permits and Approvals Are Reviewable Final Agency Actions.**

The APA permits judicial review of "final agency action," 5 U.S.C. § 704, i.e., action (1) that "mark[s] the consummation of the agency's decisionmaking process" and (2) "from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). As this Court has already held, "the indefinite suspension of leasing and permitting for all wind energy projects" by each Agency Defendant—satisfies both prongs and thus "constitutes final agency action." *Massachusetts v. Trump*, 2025 WL 1836592, at *11. First, each Agency

Defendant's decision to pause all wind-energy permitting reflects its ultimate determination to indefinitely disregard statues and regulations requiring action on applications for permits and approvals. Caselaw is replete with "support [for] the proposition that significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." *Id.* at *10 (citing *Louisiana*, 622 F. Supp. 3d at 291–92; *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017); *NRDC*, 955 F.3d at 79). Were it otherwise, "an indefinite 'pause' on all agency action whatsoever [could] be construed as intermediate and thus unreviewable[.]" *Id.* Second, the pause has obvious legal consequences, as it prevents action on wind-energy permit applications. *See*, *e.g.*, *Louisiana*, 622 F. Supp. 3d at 291–92 (legal consequences from indefinite pause on oil and gas leasing); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011) (same, from deepwater drilling moratorium). The pause is reviewable final agency action.[23]

### 2. The Pause on Wind-Energy Permitting Is Arbitrary and Capricious.

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). Agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). They may not rely on explanations that are "contrived" or "incongruent with what the record reveals about

---

[23] To avoid duplication, Plaintiffs adopt further reasoning related to final agency action in Plaintiff-Intervenors same-day motion for summary judgment, at 11–15.

the agency's priorities and decisionmaking process." *Id.* at 784–85.

Further, when an agency changes its existing policy, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (emphasis in original). An "unexplained inconsistency" in agency policy renders agency action arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quotation marks omitted). And "[a] 'more detailed justification' may be required . . . when the agency's new position 'rests upon factual findings that contradict those which underlay [the] prior' position or when the agency's prior position 'has engendered serious reliance interests.'" *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Fox*, 556 U.S. at 515); *accord Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). Under these principles, each Agency Defendant's indefinite and blanket pause on wind-energy permitting is arbitrary and capricious in numerous respects.

### i. Agency Defendants Have Offered No Reasoned Explanation for Their Categorical and Indefinite Pause on Wind-Energy Approvals.

It is a "fundamental requirement of administrative law" that "an agency set forth its reasons for decision." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id*. (quotation marks omitted and emphasis in original). A court "must conduct a searching examination to ensure that the agency's decision is reasonably supported by the administrative record." *Littlefield v. DOI*, 85 F.4th 635, 643 (1st Cir. 2023).

Here, Agency Defendants provided no reasoned basis or support to categorically and indefinitely pause wind-energy development beyond bare reference to the Wind Directive, which itself lacks explanation. *See* ECF 123-1 to 123-7. The administrative record consists of nothing more than the Wind Directive and an outdated Interior memorandum that provides no rationale.

ECF 165 to 165-9. In remarkably similar circumstances, a court found agency actions arbitrary and capricious because the "seven-page administrative record does not provide *any* facts that could aid this Court in reasonably discerning what [the agency's] reasons were for instituting a 100-day pause" in removals pursuant to an Executive Order "aside from the general and conclusory concerns." *Texas v. United States*, 524 F. Supp. 3d 598, 655 (S.D. Tex. 2021) (emphasis in original); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 1:25-cv-10787, 2025 WL 1822487, at *16, *18 (D. Mass. July 2, 2025) (agency actions arbitrary and capricious where there was "disconnect between the decision made and the explanation given" and administrative record had "not a shred of evidence" supporting agency's claims); *accord Drs. for Am. v. Off. of Pers. Mgmt.*, No. 1:25-cv-00322, 2025 WL 1836009, at *20 (D.D.C. July 3, 2025).

Nor does the Wind Directive itself supply the required reasoned basis. It vaguely references "various *alleged* legal deficiencies underlying" federal wind-energy permitting that "*may* lead to grave harm" to navigational, transportation, national security and commercial interests and marine mammals, but it fails to specify a single deficiency or harm. ECF 165-2 at 1 (emphases added). The Wind Directive references "*potential* inadequacies in various environmental reviews" under NEPA, but again fails to cite any such shortcoming. *Id*. (emphasis added). Nor could it, as courts to date have rejected all claims that the wind-energy assessments questioned in the Wind Directive were deficient. *Supra* note 9. The Wind Directive's vagueness makes it impossible "to divine or fathom a relationship between the findings and the immense scope of the moratorium." *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp.2d 627, 637 (E.D. La. 2010). The Court should "not defer to the . . . conclusory or unsupported suppositions" in the Wind Directive relied on here. *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *accord Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 306 (D. Mass. 2025), *judgment*

*entered* No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

Moreover, Agency Defendants "cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant [Executive Order]. After all, 'furthering the President's wishes cannot be a blank check' for the Agencies to do as they please." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097, 2025 WL 1116157, at *18 (D.R.I. Apr. 15, 2025) (internal citation omitted); *see also Kingdom v. Trump*, No. 1:25-cv-00691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025); *Louisiana*, 622 F. Supp. 3d at 294–95. Accordingly, Agency Defendants' sweeping and indefinite halt on wind-energy approvals, untethered to any relevant standards, evidence, or explanation, is arbitrary and capricious.

### ii. Agency Defendants Failed to Acknowledge or Explain Their Abrupt Reversal From Past Policy, Findings, and Permitting Practice.

"Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (citation and quotation marks omitted). Here, Agency Defendants have failed to acknowledge, let alone explain, their sharp reversals from finding wind-energy development impacts minimal and mitigable, encouraging wind-energy development, and issuing wind-energy decisions under relevant law.

First, Agency Defendants have comprehensively studied the impacts of wind-energy construction and operations—including impacts to navigation, transportation, national security, commerce, and marine mammals obliquely referenced in the Wind Directive—and repeatedly concluded that potential risks are minimal or can be sufficiently mitigated. *See supra* Section II.B.1. Agency Defendants fail to assert any of the bases for their previous findings changed, much less provide the "more detailed justification" required in such circumstances. *Fox*, 556 U.S. at 515.

Second, longstanding federal policy has promoted wind-energy development through multiple Administrations. *See supra* Section II.B.1. Even the first Trump Administration declared "historic progress on offshore wind." *Id.* But Agency Defendants abruptly reversed course here and failed to "display awareness that [they are] changing position" now, or to "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515; *see supra* Section II.B.2.

Third, until now, Agency Defendants promptly issued permit decisions under OCSLA, the CWA, the RHA, the CAA, NEPA, the ESA, BGEPA, the MMPA, Magnuson-Stevens, the NHPA, and FLPMA. *See supra* Sections II.A, II.B.1. Their "failure to provide any explanation for [their] seemingly irrational change in policy renders [their] new policy arbitrary and capricious." *Citizens Awareness Network, Inc. v. Nuclear Regul. Comm'n*, 59 F.3d 284, 292 (1st Cir. 1995).

### iii.  Agency Defendants Failed to Account for Serious Reliance Interests.

"When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation and quotation marks omitted). Here, the States have developed substantial reliance interests—in wind energy's grid reliability and affordability benefits; its economic promise; its ability to assist in meeting state clean-energy and climate laws; and its pollution-reduction benefits—premised on nearly fifty years of federal government support for the development of wind energy, past federal reviews finding wind-energy impacts minimal and mitigable under relevant law, and the rational assumption that industry-wide permitting processes would continue in their normal course. For example, States have designed their energy policies to rely on development of wind-energy. *E.g.*, N.Y. Pub. Serv. Law § 66-p (2035 9 GW offshore-wind procurement target); 2022, Mass. Acts c. 179, § 61(b) (2027 5,600 MW offshore-wind procurement target); R.I. Gen. Laws § 39-26-4 (RPS of 100% by 2033); Minn. Stat. § 216B.1691, subd. 2g (2024) (RPS of 100% by 2040). Implementation of the Wind Directive to

pause all permitting will "necessitate systemic" or at least "significant change[s]" to the States'

reliance interests. *Encino Motorcars*, 579 U.S. at 222. Yet, in abruptly pausing all wind-energy

approvals, Agency Defendants failed to acknowledge or consider those interests, and wholly failed

to provide the "more detailed justification" required in light of them. *Fox*, 556 U.S. at 515; *see*

*Regents*, 591 U.S. at 33 ("[B]ecause [the agency] was not writing on a blank slate, it was required

to assess whether there were reliance interests, determine whether they were significant, and weigh

any such interests against competing policy concerns." (cleaned up)); *Massachusetts v. Nat'l Insts.*

*of Health*, 770 F. Supp. 3d at 311 (failure to consider reliance interests arbitrary and capricious).

### iv.  Agency Defendants Ignored Inconsistencies with Contemporaneous Executive Action Promoting Other Domestic Energy Sources.

Agency Defendants' categorical and indefinite pause on wind-energy approvals pending

further review is also arbitrary and capricious because it reflects "[u]nexplained inconsistenc[ies]"

*Encino Motorcars* 579 U.S. at 222, and fails to offer "genuine justifications . . . that can be

scrutinized by courts and the interested public," *Dep't of Commerce v. New York*, 588 U.S. at 785.

Indeed, their sole reliance on the Wind Directive reveals "contrived" explanations that are

"incongruent with . . . the agency's priorities and decisionmaking process." *Id*.

First, Agency Defendants' reliance on only the Wind Directive is "internally inconsistent."

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202 (D.C. Cir. 2018). In

particular, the Wind Directive references "the country's growing demand for reliable energy," yet

stops development of reliable energy resources by, *inter alia*, indefinitely pausing wind-energy

approvals. 90 Fed. Reg. at 8363; *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1520

(D.C. Cir. 1984) ("self-contradictory . . . logic does not constitute an adequate explanation").

Second, the blanket halt on wind-energy approvals inexplicably conflicts with numerous

other Executive actions, confirming that the Wind Directive's flimsy rationale is indeed contrived.

Most notably, citing "insufficient energy production" as an allegedly "extraordinary threat" to the Nation, that is "most pronounced in our Nation's Northeast and West Coast," the Energy Emergency Order announced the need for emergency measures to encourage development of "a reliable, diversified, and affordable supply of energy." 90 Fed. Reg. at 8434. And yet the Wind Directive—on which Agency Defendants solely rely—directed an indefinite pause of all wind-energy approvals, stalling development of a reliable and affordable form of energy that would diversify energy resources in our States. *Id.* at 8363.[24] Other Executive actions similarly conflict with the Wind Directive's halt of all permitting pending a "comprehensive review," *id.*, as they *expedite* permitting and *curtail* review for other forms of energy. For example, the Energy Emergency Order directs Agency Defendants to conduct expedited environmental review and permitting, and labels the ESA and MMPA as "obstacles" to energy development. 90 Fed. Reg. at 8436.[25] Pursuant to that order, DOI has announced emergency permitting under NEPA and the ESA "designed to *expedite the review and approval*, if appropriate, of projects related to . . . leasing, siting, production, . . . or generation of energy within the United States," taking "a multi-year process down to just 28 days at most." DOI, *Press Release: Dep't of the Interior Implements*

_____

[24] *See, e.g.*, Unleashing Order, 90 Fed. Reg. 8353 (Jan. 29, 2025) (declaring U.S. policy to "encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf"); Reinvigorating Coal Order, 90 Fed. Reg. 15,517 (Apr. 14, 2025) (to "provide for increases in electrical demand from emerging technologies, we must increase domestic energy production, including coal"); Exemption Order, 90 Fed. Reg. 16,777 (Apr. 21, 2025) (U.S. "electric grid must utilize all available power generation resources").

[25] *See also* Zero-Based Budgeting Order, 90 Fed. Reg. at 15,643 (directing EPA, BOEM, BSEE, and USFWS to sunset all regulations "governing energy production" issued pursuant to OCSLA, FLMPA, the ESA, MMPA, BGEPA, and Magnuson-Stevens, among others); Exemption Order, 90 Fed. Reg. at 16,777 (exempting power plants from hazardous air pollutant emission requirements to "ensur[e] that the Nation's power supply remains secure and reliable."); *cf.* Exec. Order 14285, *Unleashing America's Offshore Critical Minerals and Resources*, 90 Fed. Reg. at 17,736 (Apr. 29, 2025) (directing expedited permitting for Outer Continental Shelf minerals development).

*Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://perma.cc/RR3U-ZULC (emphasis added). Agency Defendants have fast-tracked those energy sources without any regard for their history of environmental impacts, while voicing such concerns to halt only wind energy development. The record thus fails to "give a reasoned analysis to justify the disparate treatment of regulated parties that seem similarly situated," *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018), and reveals "contrived" explanations that are "incongruent with . . . the agency's priorities and decisionmaking process," *Dep't of Commerce v. New York*, 588 U.S. at 785.

### 3. Agency Defendants' Permitting Pause Is Contrary to Law and Is in Excess of Statutory Authority.

The APA operates "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). It does so by, among other things, providing that courts "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). Agency action is "not in accordance with law" if it is contrary to statutory or regulatory mandates. *See, e.g.*, *Nat'l Env't Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1003 (D.C. Cir. 2014) (EPA directive violated implementing regulations); *Citizens Awareness Network, Inc.*, 59 F.3d at 291 (agency actions "inconsistent with the plain terms of . . . enabling statute"). A court "must exercise [its] independent judgment" to ensure "the agency has engaged in 'reasoned decisionmaking'" within the bounds of its authority. *Am. Pub. Health Ass'n*, 2025 WL 1822487, at *20 (quoting *Loper Bright*, 603 U.S. at 395, 412).

Here, Agency Defendants' indefinite pause is not in accordance with numerous laws and implementing regulations requiring Agency Defendants' timely action on wind-energy approvals

based on particular substantive criteria. As this Court explained, the permitting pause ordered by the Wind Directive and adopted and implemented by Agency Defendants "in effect amends several regulations by requiring that the agencies must not follow the usual, specified procedures for an unspecified period of time, enacting a kind of de facto suspension of the law with respect to wind energy development." *Massachusetts v. Trump*, 2025 WL 1836592, at *11. In particular, the pause is contrary to and exceeds the Agency Defendants' authority under the following laws and implementing regulations requiring them to follow specific procedures and timelines and apply specific standards in reviewing and approving wind-energy projects. Indeed, Agency Defendants have not only disregarded those laws and regulations, but also rewritten them by adding an extra-statutory condition on issuing any wind-energy permit decisions—namely, the completion of the Wind Directive's indefinite "assessment and review of Federal wind leasing and permitting practices"—thus plainly exceeding their statutory and regulatory authority.

*Administrative Procedure Act.* The APA requires that, "[w]hen application is made for a license required by law, the agency . . . within a reasonable time, shall set and complete . . . proceedings required by law and shall make its decision." 5 U.S.C. § 558(c); *see also id.* § 555(b). Holding up agency action indefinitely for reasons that are unlawful is per se *un*reasonable. As another court explained in invalidating BOEM's indefinite moratorium on issuing drilling permits, that command "inform[s] the government's action on permits and," along with OCSLA, "require[s] that the government should act expeditiously to advance development in the Outer Continental Shelf," not pause it indefinitely. *Ensco*, 781 F. Supp. 2d at 337.

*Outer Continental Shelf Lands Act.* OCSLA directs the Interior Secretary to make the Outer Continental Shelf (OCS) "available for expeditious and orderly development," 43 U.S.C. § 1332(3), including by issuing leases for offshore-wind development, *id.* § 1337(p). Pursuant to

24

OCSLA, BOEM has issued regulations to "facilitate more expedient and responsible development of offshore renewable energy projects." *Renewable Energy Modernization Rule*, 89 Fed. Reg. 42,602, 42,605 (May 15, 2024). Upon receipt of project plans, called SAPs and COPs, BOEM must conduct "reviews required by Federal laws" and then either "will approve, disapprove, or approve with conditions" the submitted plans. 30 C.F.R. §§ 585.613(e), 585.628(f). Substantive criteria govern BOEM's plan review. *Id.* §§ 585.613, 585.628.

Courts have found pauses like the one at issue here contrary to OCSLA. The *Louisiana* court held BOEM acted contrary to OCSLA and the APA in pausing oil and gas leasing pending a review pursuant to an executive order. 622 F. Supp. 3d at 294. Though there is "nothing wrong with performing a comprehensive review," the court explained, "there is a problem in ignoring acts of Congress and stopping the process while the review is being completed." *Id.* at 293. And the *Ensco* court observed that "[n]ot acting on permit applications seems contrary to OCSLA's command that drilling development be 'expeditious,' and the APA's command that a permit must be processed 'within a reasonable time.'" 781 F. Supp. 2d at 336–37 (citations omitted). "Not acting at all is not a lawful option." *Id.* at 336. As this Court already found, that reasoning "supports the proposition that . . . an across-the-board pause on wind energy-related permitting may be contrary to law." *Massachusetts v. Trump*, 2025 WL 1836592, at *13.

***Clean Water Act***. EPA implementing regulations require EPA to determine within 30 days whether an application for a NPDES permit under CWA Section 402 is complete and thereafter prepare a draft permit and solicit public comment. 40 C.F.R. §§ 124.3(c), 124.6–124.9, 124.10(a), 124.11–124.12. After the close of the comment period, the agency "shall issue a final permit decision." 40 C.F.R. § 124.15(a). The CWA authorizes EPA to issue NPDES permits if specified substantive requirements are met. 33 U.S.C. §§ 1311, 1342.

Section 404 likewise demands prompt action for dredge-and-fill permits from the Corps. *See* 33 U.S.C. § 1344(a) (Secretary "shall" publish notice within 15 days of complete permit application); *id.* § 1344(q) (agencies "shall" enter into agreements to "minimize . . . delays" in permit issuance and "assure that, to the maximum extent practicable" decisions are reached "not later than" 90 days after such notice); 33 C.F.R. § 325.2 (notice within 15 days; decisions within 60 days of complete application; Corps "should not delay processing of the application unless the applicant requests a reasonable delay, normally not to exceed 30 days"). As the Corps explained in its regulations, "the Corps believes that [permit] applicants are due a timely decision. Reducing unnecessary . . . delays is a continuing Corps goal." *Id.* § 320.1(a)(4). And Corps decisions on Section 404 permit applications must apply specific substantive "guidelines." *Id.* § 323.6(a).

**Rivers and Harbors Act**. In processing Section 10 permits under the RHA, the Corps also must follow strict timelines. 33 C.F.R. § 325.2(a), (d) (notice of application completeness within 15 days; decision within 60 days); *see also id.* § 330.1(e)(1) (automatic nationwide permit authorization if Corps does not respond within 45 days). Corps regulations recognize that "energy . . . development" is a "major national objective" and provide that "[d]istrict engineers will give high priority to the processing of permit actions involving energy projects." *Id.* § 320.4(n). Permit applications also must be assessed under specified "policies and procedures." *Id.* § 322.5.

**Clean Air Act.** The CAA requires EPA to issue permit decisions within one year or eighteen months of receiving Prevention of Significant Deterioration (PSD) and New Source Review (NSR) applications, respectively. 42 U.S.C. §§ 7475(c), 7661b(c); *see also* 40 C.F.R. §§ 71.5(a)(2), 124.3, 124.15. EPA lacks the power to circumvent that "patently clear and unambiguous" requirement. *Avenal Power Ctr., LLC v. EPA*, 787 F. Supp. 2d 1, 4 (D.D.C. 2011) (EPA appeal process did not exempt compliance with one-year deadline). EPA regulations make clear that CAA permitting is

"designed to [be] timely and efficient." 40 C.F.R. § 71.1. Indeed, EPA regulations explicitly forbid the use of Outer Continental Shelf air regulation "for the purpose of preventing exploration and development of the OCS"—precisely what EPA has done here for wind-energy. 40 C.F.R. § 55.1. Permit applications also must be reviewed against specific substantive requirements. *See, e.g.*, 40 C.F.R. §§ 52.21(a)(2) (PSD requirements), 71.5–71.7 (NSR requirements).

*National Environmental Policy Act*. The 2023 Fiscal Responsibility Act, 137 Stat. 10 (2023), imposes strict deadlines on NEPA review. Agencies "shall complete" environmental assessments or environmental impact statements (EIS) within one or two years, respectively, after certain conditions are met. 42 U.S.C. § 4336a(g)(1). Deadlines can be extended only by "so much additional time as is necessary." *Id.* § 4336a(g)(2). That is, "federal law now strictly *prohibits* an agency's EIS from going on endlessly." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 n.3 (2025); *cf. Signal Peak Energy, LLC v. Haaland*, No. 1:24-cv-00366, 2024 WL 3887386, at *7 (D.D.C. Aug. 21, 2024) (predicted exceedance of EIS deadline was cognizable procedural injury); *Montana Env't Info. Ctr. v. Haaland*, No. 1:19-cv-00130, 2024 WL 1406535, at *5 (D. Mont. Apr. 2, 2024) (delayed NEPA review "contravenes the intent of Congress").

Some projects trigger additional review during the NEPA process for which additional procedural and substantive requirements apply. For example, Magnuson-Stevens requires NMFS to review actions that "may adversely affect any essential fish habitat." 16 U.S.C. § 1855(b)(2); S. Rep. No. 109-229, at 6 (2006) (amending Magnuson-Stevens to integrate with NEPA for "one consistent and predictable review process for fishery management"). Lead agencies must provide NMFS "with a written assessment of the effects of that action on" such habitat, 50 C.F.R. § 600.920(e)(1), and NMFS must respond within 30 days, *id.* § 600.920(h)(4). Additionally, the NHPA and its regulations require agencies to consider a project's effect "on any historic property,"

54 U.S.C. § 306108, and to do so "as early as possible" to comply with NEPA and the NHPA "in a timely and efficient manner," 36 C.F.R. § 800.8(a)(1).

*Endangered Species Act.* Under implementing regulations, ESA consultation must conclude "within 90 days," unless that deadline is properly extended, and complete biological opinions are due 45 days later. 50 C.F.R. § 402.14(e). Upon receipt of an application for incidental take of protected species, USFWS or NMFS must follow specific notice-and-comment procedures and "shall" issue a so-called incidental-take permit if the applicable requirements are met. 16 U.S.C. § 1539(a)(2)(B). Regulations direct USFWS to timely process applications and render permit decisions, 50 C.F.R. §§ 17.22(b), 17.32(b), and NMFS to process applications "in the shortest possible time," *id.* § 222.302(b), and NMFS "shall" issue permits unless specific findings bar approval, *id.* § 222.303(e). As the Services explained, they are to facilitate "efficient permit application processing and decision-making." 89 Fed. Reg. 26,070 (Apr. 12, 2024).

*Bald and Golden Eagle Protection Act.* BGEPA regulations expressly authorize automatic issuance of general incidental-take permits for wind-energy projects if certain criteria are met, 50 C.F.R. § 22.250, and ineligible wind-energy projects may request a specific permit, *id.* § 22.200(b)(7). USFWS is to process applications "as quickly as possible," *id.* § 13.11(c), against specific standards, *id.* § 22.250(d)–(e) (listing criteria for general and specific incidental-take permits for eagles by wind-energy projects).

*Marine Mammal Protection Act.* Similarly, under the MMPA, the Commerce and Interior Secretaries "shall allow" an incidental take if it will have a "negligible impact" on the species and no "unmitigable adverse impact" on subsistence uses of the species. 16 U.S.C. § 1371(a)(5)(A). That mandatory language contrasts with other provisions of the MMPA, which provide only that a Service "may" issue a permit, *id.* § 1371(a)(1)–(2), confirming that use of "shall" is mandatory,

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016). Implementing regulations further provide that the Services "shall evaluate" each permit request, 50 C.F.R. §§ 18.27(d)(3) (USFWS), 216.104(c) (NMFS), and do so "as quickly as possible," *id.* § 13.11, and require applications be reviewed against substantive criteria, *id.* §§ 13.21 (USFWS), 216.34 (NMFS).

 ***Federal Land Policy and Management Act.*** Congress enacted FLPMA in part to "delineate the extent to which the Executive may withdraw lands" from certain uses "without legislative action." 43 U.S.C. § 1701(a)(4). FLPMA thus requires BLM to manage lands in accordance with its land-use plans, which designate lands as open for certain uses, called rights of way. *id.* § 1732(a)–(b); 43 C.F.R. § 1610.5-3. BLM regulations require BLM to "prioritize" solar and wind right-of-way applications, 43 C.F.R. § 2804.35, and BLM may deny an application under specified circumstances, *id.* § 2804.26(a). FLPMA also authorizes only specific use withdrawals, 43 U.S.C. § 1714(a), which remain subject to public notice and hearing requirements, *id.* § 1714(b), (h), and in some instances Congressional notification, *id.* § 1714(c), (e). As one court concluded, "suspension and delay" of federal land use "pending an environmental review" is an unauthorized withdrawal. *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987).

 In indefinitely pausing all wind-energy approvals, Agency Defendants have cast aside each of these carefully orchestrated, prescriptive permitting regimes applicable to wind energy, as well as the general standard that agencies conclude matters presented to them in a reasonable time, and have added a new, extra-statutory condition (completion of the Wind Directive's "comprehensive assessment") to each. Agency Defendants' pause of wind-energy permitting is thus contrary to and exceeds their authority under the foregoing laws and regulations in violation of the APA.

## C.   Agency Defendants' Pause on Wind-Energy Permitting Should Be Vacated.

 Vacatur of the Agency Defendants' decisions to adopt and implement the Wind Directive

is the proper remedy in this case. "[F]ederal courts have long understood [APA] § 706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). As this Court has explained, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d at 329. The same principle applies here, warranting vacatur of each Agency Defendant's decision adopting an across-the-board halt on wind-energy permitting.

## IV.    CONCLUSION

The Court should grant summary judgment for Plaintiffs and against all Agency Defendants, vacate Agency Defendants' decisions to adopt and implement the Wind Directive, and order Agency Defendants to resume wind-energy permitting consistent with all applicable law.

Respectfully submitted,                    Dated: August 8, 2025

**LETITIA JAMES**
*Attorney General of New York*

By: */s/ Michael J. Myers*
Michael J. Myers*
  *Senior Counsel*
Laura Mirman-Heslin*
Rene F. Hertzog*
Joya C. Sonnenfeldt*
  *Assistant Attorneys General*
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
Michael.Myers@ag.ny.gov

*Counsel for the State of New York*

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

By: */s/ Turner H. Smith*
Turner H. Smith, BBO No. 684750
  *Assistant Attorney General & Deputy Chief*
Nathaniel Haviland-Markowitz, BBO No. 713940
  *Assistant Attorney General*
Jonathan Whitney, BBO No. 694760
  *Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
Turner.Smith@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
 *Attorney General of Arizona*

By: */s/ Mary M. Curtin*
Mary M. Curtin*
 *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
 *Attorney General of California*

By: */s/ Kate M. Hammond*
Kate M. Hammond*
 *Deputy Attorney General*
Robert Swanson*
 *Acting Supervising Deputy Attorney General*
Jamie Jefferson*
 *Deputy Attorney General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6531
Kate.Hammond@doj.ca.gov
Robert.Swanson@doj.ca.gov
Jamie.Jefferson@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
 *Attorney General of Colorado*

By: */s/ Carrie Noteboom*
Carrie Noteboom*
 *Assistant Deputy Attorney General*
Jessica L. Lowrey*
 *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6288 (Noteboom)
(720) 508-6167 (Lowrey)
Carrie.Noteboom@coag.gov
Jessica.Lowrey@coag.gov
FAX: (720) 508-6040

*Counsel for the State of Colorado*

**WILLIAM TONG**
 *Attorney General of Connecticut*

By: */s/ Jill Lacedonia*
Jill Lacedonia*
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Counsel for the State of Connecticut*

31

**KATHLEEN JENNINGS**
  *Attorney General of Delaware*

By: /s/ *Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Ralph Durstein III*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**KWAME RAOUL**
  *Attorney General of Illinois*

By: /s/ *Jason E. James*
Jason E. James*
  *Assistant Attorney General*
Office of the Attorney General
Environmental Bureau
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.James@ilag.gov

*Counsel for the State of Illinois*

**BRIAN L. SCHWALB**
  *Attorney General of the District of Columbia*

By: /s/ *Estefania Y. Torres Paez*
Estefania Y. Torres Paez, BBO No. 705952
  *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Estefania.TorresPaez@dc.gov

*Counsel for the District of Columbia*

**AARON M. FREY**
  *Attorney General of Maine*

By: /s/ *Robert Martin*
Robert Martin*
  *Assistant Attorney General*
6 State House Station
Augusta, ME 04333
(207) 626-8579
Robert.Martin@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

By: */s/ Steven J. Goldstein*
Steven J. Goldstein*
  *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


**KEITH ELLISON**
  *Attorney General for the State of Minnesota*

By: */s/* Catherine Rios-Keating
Catherine Rios-Keating*
  *Special Assistant Attorney General*
Environmental and Natural
Resources Division
445 Minnesota Street, Suite 1800
Saint Paul, MN 55101
(651) 300-7302
Catherine.Rios-Keating@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
  *Attorney General of New Mexico*

By: */s/ William Grantham*
William Grantham*
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmdoj.gov

*Counsel for the State of New Mexico*

**DANA NESSEL**
  *Attorney General of Michigan*

By: */s/ Lucas Wollenzien*
Lucas Wollenzien*
Michael Moody*
  *Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
WollenzienL@michigan.gov
Moodym2@michigan.gov

*Counsel for the People of the State of Michigan*


**MATTHEW J. PLATKIN**
  *Attorney General for the State of New Jersey*

By: */s/ Terel L. Klein*
Terel L. Klein*
  *Deputy Attorney General*
Office of the Attorney General
25 Market Street, 7th Floor
Trenton, NJ 08625
(609) 376-2818
Terel.Klein@law.njoag.gov

*Counsel for the State of New Jersey*


**DAN RAYFIELD**
  *Attorney General of Oregon*

By: */s/ Paul Garrahan*
Paul Garrahan*
  *Attorney-in-Charge*
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

By: */s/ Nicholas M. Vaz*
Nicholas M. Vaz, BBO No. 693629
  *Special Assistant Attorney General*
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

By: */s/ Yuriy Korol*
Yuriy Korol*
  *Assistant Attorney General*
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, WA 98104-3188
(206) 332-7098
Yuriy.Korol@atg.wa.gov

*Counsel for the State of Washington*

*admitted pro hac vice*

34

## CERTIFICATE OF SERVICE & RULE 7.1 CERTIFICATION

I, Nathaniel Haviland-Markowitz, certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF). I further certify that counsel for Plaintiffs conferred with counsel for Defendants, who have indicated they plan to oppose this motion.

/s/ Nathaniel Haviland-Markowitz
Nathaniel Haviland-Markowitz, BBO No. 713940
Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
Commonwealth of Massachusetts