Exhibit 5

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al,*

Plaintifs,

v.

DONALD J TRUMP, *et al*,

Defendants,

Case No. 1:25-cv-11221

## **DECLARATION OF MICHAEL BROWN**

Pursuant to 28 U.S.C. § 1746(2), I, Michael Brown, hereby declare as follows:

1.      I am the Chief Executive Officer of OW North America LLC ("Ocean Winds"). Ocean Winds is an owner, manager and developer of a portfolio offshore wind projects in the United States, including SouthCoast Wind Energy LLC ("SouthCoast Wind"), Bluepoint Wind LLC ("Bluepoint Wind"), and Golden State Wind LLC ("Golden State Wind").

2.      I have been employed at Ocean Winds since its inception, and have been the Country Manager for North America since 2022. I have over 15 years of professional experience in the renewable energy field.

3.      I execute this Declaration in support of the motion for summary judgment filed by the State of New York and other Attorneys General in this case based on my personal knowledge of the matters referred to herein.

### *SouthCoast Wind*

4.      I simultaneously serve as the Chief Executive Officer of SouthCoast Wind which is developing one of the commercial-scale wind farm and export cable corridors (together, the "Project") at issue in this matter. I assumed the role of Chief Executive Officer of SouthCoast Wind in March of 2024 after previously serving as the Chief Financial Officer and Chief Executive Officer from 2019 through 2022.  Collectively, I have worked on the Project for approximately six years.

5.      The Project will consist of up to 141 wind turbine generators ("WTGs") and up to two offshore substation platforms ("OSPs") forming an approximately 2,400-megawatt ("MW") commercial-scale offshore wind energy facility that will be constructed on BOEM Renewable Energy Lease No. OCS-A 0521 (the "Lease Area"). The Lease Area is located in federal waters on the Outer Continental Shelf ("OCS") approximately 23 miles south of Nantucket, Massachusetts, and approximately 60 miles from Rhode Island.

6.      Once fully operational, the Project will deliver approximately 2,400 MW of clean energy, enough to power more than 1.4 million homes in Massachusetts and Rhode Island, eliminating up to approximately 4 million tons of carbon emissions annually, and over 140 million tons of carbon emissions over the Project's lifetime.

7.      On December 13-14, 2018, after conducting a thorough environmental review and issuing an environmental assessment, the Bureau of Ocean Energy Management ("BOEM") conducted a competitive lease sale for commercial wind power on the OCS offshore

Massachusetts. The lease areas offered in this competitive sale process were the result of an extended public planning process regarding the issuance of the commercial lease and approval of site assessment activities. SouthCoast Wind (formerly known as Mayflower Wind Energy LLC) won lease OCS-A 0521 with a $135,000,000 winning bid. Since execution of the lease, SouthCoast has paid annual rental payments of $382,164 to BOEM for the Lease Area. In addition to the annual rental payments, in 2025 SouthCoast Wind began paying BOEM a yearly easement fee of $68,725. In the aggregate, SouthCoast has incurred in excess of $500,000,000 of development costs over and above payments to BOEM.

8.      In order to fully exercise its right to build a wind farm in the Lease Area, SouthCoast Wind was required to obtain approval of its Construction and Operations Plan ("COP") and related permits and authorizations from cooperating agencies. SouthCoast Wind began this process in 2020 when it submitted a Site Assessment Plan ("SAP"), as required by BOEM regulations to conduct site assessment activities in the Lease Area. BOEM issued its final approval for the SAP on May 26, 2020.[1] SouthCoast Wind and its affiliates conducted extensive surveys of the Lease Area pursuant to the approved SAP and subsequent survey plans to understand and characterize the environment and the Project site.

9.      In February 2021, SouthCoast Wind submitted a detailed COP to BOEM, describing the planned facilities and construction and operation activities for the Project. SouthCoast Wind updated the COP seven times to include updated technical and environmental information, and to respond to agency and public comments. The final version of the COP is thousands of pages long, including appendices, and it took thousands of staff and consultant hours

---

[1] *See* SouthCoast Wind (formerly Mayflower Wind), BOEM, https://www.boem.gov/renewable- energy/state-activities/southcoast-wind-formerly-mayflower-wind. These included meteorological, bathymetric, geological, geotechnical, geophysical, biological, archaeological, hazard, and oceanographic surveys.

to prepare, at significant costs.

10.    On November 1, 2021, BOEM issued a Notice of Intent ("Notice") to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA") for its review of the COP.  That Notice began a more than three-year period of environmental review by the federal government involving SouthCoast Wind, eleven federal agencies, three state cooperating agencies, and an extensive array of other stakeholders, ranging from the fishing industry to local communities, to Native American Tribes and historic preservation organizations. The draft EIS ("DEIS") was published on February 17, 2023. After accepting and responding to public comments, BOEM published the final EIS ("FEIS") on November 15, 2024.[2]

11.    Appendix A to the FEIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review, as well as the numerous required federal, state, and local consultations and approvals required for the Project.

12.    BOEM's NEPA process included an extended 60-day public scoping process where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS.  BOEM held three public meetings on the DEIS. SouthCoast Wind attended all of the meetings. SouthCoast Wind also submitted comments in the NEPA process.

13.    In September 2024, SouthCoast Wind was selected to negotiate power purchase agreements ("PPAs") to provide 1,087 MW of offshore wind power to the Commonwealth of Massachusetts and 200 MW of offshore wind power to the State of Rhode Island. In its winning proposal, SouthCoast Wind committed to delivering power by 2030, a requirement of the

---

[2] *See* Notice of Availability of a Final Environmental Impact Statement for SouthCoast Wind Energy LLC's Proposed SouthCoast Wind Energy Project Offshore Massachusetts and Rhode Island, 89 Fed. Reg. 90316 (Nov. 15, 2024).

Massachusetts request for proposals.

14.     On December 20, 2024, BOEM issued a Record of Decision ("ROD") documenting the Department of the Interior's decision to approve, with conditions, the COP.[3] BOEM subsequently issued the COP approval for the Project on January 17, 2025.[4]

15.     With its COP approval, SouthCoast Wind has all but three of the federally required permits. The three outstanding permits include: (i) U.S. Army Corps of Engineers – Rivers and Harbors Act Section 10/Clean Water Act Section 404, (ii) U.S. Environmental Protection Agency – Clean Water Act National Pollutant Discharge Elimination System, and (iii) U.S. National Oceanic and Atmospheric Administration/National Marine Fisheries Service – Marine Mammal Protection Act ("MMPA") Incidental Take Authorization. According to the federal FAST-41 dashboard, SouthCoast Wind was scheduled to receive those permits no later than March 27, 2025. Following the issuance of the Presidential Memorandum[5], these three federal agencies subsequently delayed their final action on SouthCoast Wind permits on multiple occasions, each time directly citing the Presidential Memorandum as rationale for the delay in issuing the permits. Because of the Presidential Memorandum, each agency has essentially stopped working on SouthCoast Wind's permits. The status of each of these permits and details on each delay follows.

16.     SouthCoast Wind submitted a Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act joint application to the U.S. Army Corps of Engineers

---

[3] *See* Record of Decision, SouthCoast Wind Project Construction and Operations Plan, BOEM (December, 20, 2024) https://www.boem.gov/sites/default/files/documents/renewable-energy/state- activities/Record-of-Decision-SouthCoast-Wind-OCS-A-0521.pdf.

[4] *See* Conditions of Construction and Operations Plan Approval, Lease Number OCS-A 0521, BOEM (Jan. 17, 2025) https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SouthCoast%20Wind%20Conditions%20of%20COP%20Approval.pdf.

[5] January 20, 2025, Presidential Memorandum titled "*Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects.*"

("USACE") on December 2, 2022. USACE deemed the joint application complete on February 2, 2023 and published a 45-day public notice on February 17, 2023.

17.     On December 20, 2024, USACE issued a joint Record of Decision ("ROD") with BOEM and the National Marine Fisheries Service ("NMFS"). In the joint ROD, USACE documented its decision "to issue a [Department of the Army] permit pursuant to section 10 of the [Rivers and Harbors Act] and section 404 of the [Clean Water Act] to Jennifer Flood representing SouthCoast Wind." The decision to issue the final Section 10/404 permit was made in the ROD and the final issuance of the Section 10/404 permit was scheduled for March 27, 2025.

18.     Despite the decision to issue the final permit having been made in December, on March 7, 2025, SouthCoast Wind was informed by BOEM via email, on behalf of USACE that, "Pursuant to the Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects* (the "Presidential Memorandum"), USACE is unable to render the final permit at this time. Therefore, USACE has identified an alternative completion date of June 26, 2025, and will continually reassess the schedule based on administration directives."  No other legal, statutory, or regulatory authority was provided for withholding the permit. Since February 2025, USACE has submitted five monthly status reports to the Federal Permitting Improvement Steering Council ("FPISC") on the Section 10/404 permit. All five status reports have cited only to the Presidential Memorandum as the sole cause of delay to the issuance of the Section 10/404 permit.

19.     On May 2, 2025, USACE communicated to SouthCoast Wind that USACE is still unable to render a final permit due to the Presidential Memorandum and would be delaying the final permit issuance date by an additional 90 days to September 24, 2025. SouthCoast Wind

has repeatedly objected to each delay.

20.     SouthCoast Wind submitted a NPDES permit application to EPA Region 1 on October 31, 2022. After submitting responses to agency comments and multiple revised applications, EPA deemed the application complete on September 29, 2023.

21.     On October 2, 2024, EPA published the draft NPDES permit and held a public comment period from October 3, 2024 through November 6, 2024. EPA held a public informational meeting and a public hearing on November 4, 2024. There were only nine comments submitted on the draft permit, including one from SouthCoast Wind.

22.     EPA was scheduled to issue the final NPDES permit to SouthCoast Wind on March 27, 2025. On February 26, 2025, in an Executive Director Determination, FPISC approved a request made by BOEM, on behalf of EPA, to delay the issuance of the final NPDES permit from March 27, 2025 to June 25, 2025.[6] The extension cited the Presidential Memorandum as the sole cause of delay and that SouthCoast Wind objected to the requested permitting timetable modification.

23.     On May 23, 2025, FPISC approved another request by BOEM, on behalf of EPA, to delay the final NPDES permit by an additional 90 days from June 25, 2025 to September 23, 2025.[7] The extension request again cited the Presidential Memorandum as the sole cause of delay to final permit issuance. The Executive Director Determination also cited SouthCoast Wind's objection to the delay and that "The Project Sponsor further represents that a 90-day extension could cause harm insofar as it interferes with the Project Sponsor's ability to make use of its Lease."

---

[6] See https://www.permits.performance.gov/sites/permits.dot.gov/files/2025-02/2025-02-26%20SouthCoast%20Executive%20Director%20Determination.pdf
[7] See  https://cms.permits.performance.gov/sites/permits.dot.gov/files/2025-05/2025-05-23%20SouthCoast%20Executive%20Director%20Determination.pdf

24.    EPA has been unresponsive to SouthCoast Wind's multiple outreach efforts to check on the status of the final permit and provide assistance since the issuance of the Presidential Memorandum on January 20, 2025.

25.    SouthCoast Wind filed a Petition for Incidental Take Regulations for the construction and operations of the Project to NMFS on March 18, 2022.

26.    After SouthCoast Wind addressed agency comments and submitted five updated versions of the application, NMFS deemed the application complete on September 19, 2022, and published a Notice of Receipt in the Federal Register on October 17, 2022.

27.    On June 25, 2024, NMFS published Proposed Incidental Take Authorization ("ITA") Regulations in the Federal Register and held a 45-day public comment period.

28.    NMFS was scheduled to issue the Final ITA Regulations in the Federal Register on February 25, 2025, and render the ITA on March 27, 2025. On January 21, 2025, NMFS informed SouthCoast Wind by email that the Final ITA Regulations and ITA decision were delayed to May 26 and June 25, 2025, respectively, and cited the Presidential Memorandum. Since January 2025, NMFS has submitted monthly status reports to FPISC on delays to the Final ITA Regulations and ITA decision. The four most recent monthly status reports have cited the Presidential Memorandum as the sole cause of delay to the issuance of the Final ITA Regulations and ITA decision.

29.    On May 13, 2025, NMFS informed SouthCoast Wind of an additional four-month delay to the final MMPA milestones. SouthCoast Wind objected to this delay and informed NMFS via email on May 15th that "this substantial, continuous delay interferes with SouthCoast's ability to perform under its Lease and causes significant harm to SouthCoast Wind."

30.    On June 27, 2025, the Massachusetts Department of Energy Resources

provided notice to SouthCoast Wind extending the June 30, 2025 deadline for power purchase agreement contract execution until December 31, 2025. Rhode Island Energy also updated its Procurement Docket to reflect the extension to December 31, 2025. As noted below, these delays are attributable to the Presidential Memorandum.

31.     SouthCoast Wind has invested over $600 million to date to plan, permit, develop, and enable the construction the Project, including for the above-described permit application preparation, submission, and approval activities. When making these investment decisions, SouthCoast Wind, Ocean Winds, and their sponsors and partners understandably expected that the federal government would follow valid statutes and regulations setting out criteria for issuance of permits. Although there have been no changes or even proposed changes to those statutes and regulations, the federal government appears to have stopped acting in accordance with them. These investments include:

   a.   Rights to OCS-A 0521 through competitive leasing process;

   b.   Land rights at the former coal-fired plant at Brayton Point for substation;

   c.   Interconnection rights to deliver contracted offtake to ISO-NE;

   d.   Major contracts for HVDC assets necessary for the Project in the tens of millions of dollars, the production of which assets has already begun;

   e.   Exclusivity rights for inter array cable supply at significant expense;

   f.   Exclusivity rights for export cables supply at significant expense;

   g.   Land rights for the New Bedford Marine Commerce Terminal at significant expense;

   h.   Exclusivity rights for Operation and Maintenance facilities at significant expense;

   i.   Exclusivity rights for transportation and installation services for major components at significant expense; and

    j.   Land rights for cable crossing of Aquidneck Island at significant expense.

32.      Additionally, SouthCoast Wind has pledged and committed to contributions of millions of dollars to benefit local communities and other stakeholders, including:

    a.   A Community Benefits Agreement with the Town of Portsmouth, Rhode Island, which would provide over $23 Million to the community over the life of its projects, starting as soon as the commencement of physical construction.

    b.   Payments to the Massachusetts Fisheries Compensatory Mitigation Fund would provide over $4 million to Massachusetts commercial and for-hire fishers over the life of the project, and an additional $1.5 million contribution to the Massachusetts Fisheries Innovation Fund to support programs and projects that ensure safe and profitable fishing. Half of those funds would be paid as soon as 60 days after financial close for its first project.

    c.   Negotiated agreement with the Rhode Island Coastal Resources Management Council to provide $250,000 in direct financial mitigation to the Rhode Island commercial and for hire fishing sectors, and an additional $30,000 is provided to support Rhode Island commercial fishers, for-hire charter fishers, and recreational fishers.

    d.   A contract for over $15 million to support pre-, during, and post-construction fisheries monitoring surveys to be performed in federal waters by a local academic institution to monitor and inform the fisheries mitigation strategy throughout the lifetime of the Project.

    e.   As part of its winning proposal to Massachusetts and Rhode Island, SouthCoast

Wind committed to:

    i.  Over $5 million to support supply chain development;

    ii.  Over $4 million to support development of the offshore wind workforce in New England, including $2,400,000 to support Bristol Community College's National Offshore Wind Institute Training Facility; and

    iii.  Over $13 million to support other community investments to benefit low-income ratepayers.

All of this funding will be delayed or potentially cancelled as a result of the indefinite delay attributable to the Presidential Memorandum.

33.    SouthCoast Wind has executed a first-of-its kind Labor Peace Agreement ("LPA") for offshore wind operations and maintenance with the Massachusetts and Rhode Island AFL-CIO State Federations, the Rhode Island Building and Construction Trades Council, the Massachusetts Building Trades Union, and the Southeastern Massachusetts Building Trades Council. In the LPA, SouthCoast Wind agrees not to interfere in any organizing process led by the signatories during the operations and maintenance phase of the Project. The LPA is specifically tied to the Project that would be constructed as a result of the PPAs that are currently being negotiated. If the Presidential Memorandum remains in effect, the aforementioned unions will lose both the economic opportunity presented by operations and maintenance of the SouthCoast Wind project, and the opportunity to establish a policy of non-interference for offshore wind project operations and maintenance work.

34.    Additionally, SouthCoast Wind has already provided support to dozens of organizations throughout New England, including:

    a.  $2,400,000 to the SouthCoast Wind Fund, which is administered by the

SouthCoast Community Foundation. The SouthCoast Wind Fund was created to build employment, training and supply chain opportunities related to the offshore wind industry in the Southeastern Massachusetts and Rhode Island regions. There have been two rounds of grantmaking, resulting in almost $900,000 in funding to local organizations;

b. $800,000 to the Bristol Community College National Offshore Wind Institute Training Facility;

c. $450,000 for Energy Efficiency for Affordable Housing;

d. $200,000 in scholarship funds for students from the South Coast of New England;

e. $436,000 for research support on Highly Migratory Species; and

f. $40,000 for Veterans Job Placement.

As a good neighbor, SouthCoast Wind expects to continue these types of contributions throughout the life of the Project. However, should the Presidential Memorandum remain in effect, SouthCoast Wind will be unable to continue these types of contributions.

35.    SouthCoast Wind cannot move forward with development of the Project on the Lease Area without its remaining three federal permits. However, to preserve its ability to eventually generate revenue, SouthCoast Wind must continue to expend millions of dollars to maintain the Lease Area, easements, staff, office, and certain essential supply chain contracts.

36.    The federal agencies charged with issuing SouthCoast Wind's three outstanding permits could grant SouthCoast Wind's final permits based on the voluminous and sound administrative record SouthCoast Wind has established with the federal agencies over the past five years.  Based on the agreed upon FAST-41 schedule and the joint ROD, that final approval on the

three outstanding permits would have been received by March 27, 2025 as scheduled. However, the federal agencies have not been allowed to issue final permits under the Presidential Memorandum.

37.     As noted, SouthCoast Wind paid a lease acquisition fee of $135,000,000 and continues to pay to BOEM annual lease payments of $382,164. As of 2025, in addition to the Lease Area rent, SouthCoast Wind also pays BOEM a yearly easement fee of $68,725. SouthCoast Wind remains obligated to pay these amounts to the United States even though the Presidential Memorandum has stalled SouthCoast Wind's ability to continue development on the Lease Area.

38.     In May 2025, as a result of the uncertainty and indefinite delay created by the Presidential Memorandum, SouthCoast Wind reduced its workforce by more than fifty percent. SouthCoast Wind continues to pay millions of dollars in annual operating expenses, including salaries, rent, utilities, and taxes. These expenses continue to accrue daily, despite the fact that the Presidential Memorandum has stalled SouthCoast Wind's ability to continue development on the Lease Area.

39.     In its PPA negotiations, SouthCoast Wind continues to work with Massachusetts and Rhode Island to establish contract terms that can account for the uncertainty and the indefinite delay created by the Presidential Memorandum. As a result of the Presidential Memorandum, the execution of PPAs has been delayed most recently from June30, 2025, to December 31, 2025. Without clarity on when or how issues arising under the Presidential Memorandum will be resolved, it may be impossible for the parties to execute the PPAs.

40.     SouthCoast Wind is expected to invest more than $33 million in the Massachusetts Clean Energy Center ("MassCEC") New Bedford Marine Commerce Terminal ("NBMCT") located in New Bedford, Massachusetts, to facilitate its use of the NBMCT for

construction. MassCEC, a quasi-state entity, will receive this funding if the PPAs are executed and SouthCoast Wind can proceed to construction. If the Presidential Memorandum's pause on offshore wind activities continues indefinitely, resulting in SouthCoast Wind inability to execute the PPAs and progress with construction of the Project, MassCEC will not receive these payments which will impact its ability to execute capital improvements and support NBMCT operations.

41.    SouthCoast Wind committed tens of millions of dollars in supply chain contract commitments to secure manufacturing slots that enabled its bid into the 2023 Multi-State Solicitation. As a result of the federal agencies' delay in issuing the final three federal permits, and SouthCoast Wind's inability to clearly identify reliable dates upon which the federal permits would be issued, SouthCoast had to cancel these critical path supply contracts, which resulted in further delays to the Project's development and the request for payments of tens of millions of dollars of termination fees.

42.    The large, complex, and interdependent nature of SouthCoast Wind's multi-billion dollar infrastructure project means that the cancellation of these critical path supply contracts results in a minimum two-year delay to SouthCoast Wind's ability to deliver power to the grid as the critical path supply chain needs to be rebuilt again from scratch, and new PPAs negotiated. The time cost of money applied to the significant amounts already expended plus the cost of continued overhead necessary to meet SouthCoast Wind's ongoing obligations all incurred solely due to the delay created by the Presidential Memorandum is in excess of $70 million per year.

### *Bluepoint Wind*

43.    On February 23, 2022, after conducting a thorough environmental review and issuing an environmental assessment of the impacts of leasing, site assessment, and survey

activities offshore in the New York Bight, BOEM conducted a competitive lease sale for commercial wind power on the OCS. The lease areas offered in this competitive sale process were the result of an extended federal and state public planning process regarding the issuance of the commercial leases and subsequent survey and site assessment activities. OW Ocean Winds East, LLC (renamed Bluepoint Wind LLC) won Lease Area OCS-A 0537 with a $765 million winning bid.

44.    Bluepoint Wind has been an active participant in the NEPA Programmatic Environmental Impact Statement ("PEIS") process for offshore wind in the New York Bight. This process, which was finalized last year, was established to assess potential impacts, and propose potential mitigations, from the development of six offshore wind leases in the New York Bight.

45.    Bluepoint Wind submitted its COP to BOEM in October 2024 and has been in regular communication with BOEM addressing comments and questions from staff. BOEM sent their first round of questions and comments to Bluepoint Wind on January 10, 2025, and Bluepoint Wind submitted formal responses to those comments and a revised iteration of the COP on June 3, 2025. Bluepoint Wind has spent over $500,000 responding to BOEM's questions and comments and updating the COP since the issuance of the Presidential Memorandum. The effort included the development of new studies and analysis, and the modification of existing studies and analysis, to comply with BOEM's comments and requests. On December 9, 2024, the Federal Permitting and Improvement Steering Council ("FPISC") designated Bluepoint Wind as a covered project under Title 41 of the Fixing America's Surface Transportation ("FAST") Act. Under the FAST Act, once a project has a FAST-41 initiation notice, FPISC is required to create "a concise plan for coordinating public and agency participation in, and completion of, any required Federal environmental review and authorization for the project" otherwise known as a Coordinated

Project Plan ("CPP". 42 U.S.C. § 4370m-2(c)). The FAST-41 website for Bluepoint Wind currently states that the CPP and permitting timetable were due to be posted on February 7, 2025. However, the page also currently states that, "BOEM is choosing to delay development of a permitting timetable until completion of the assessments outlined in the recently-issued Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*." [8]  BOEM has not given Bluepoint Wind any indication of when the CPP and permitting timetable will be posted so that Bluepoint Wind can prepare for its NEPA review.

46.     Bluepoint Wind is harmed by these delays and uncertainties that significantly increase permitting timeline and costs, yet Bluepoint Wind must continue to pay annual lease payments in the amount of $214,000 to maintain its rights to develop the leasehold.  Apart from the lease acquisition, by the end of April 2025 Bluepoint Wind had expended close to $100 million on the project, including $44 million for offshore survey work. The survey work consisted of the collection and analysis of geophysical, geotechnical, and benthic data to support site characterization, which is required for preparation of the COP and BOEM's NEPA review. These data sets are now aging with no certainty that they will remain acceptable for use by BOEM and the other federal cooperating agencies in Bluepoint Wind's NEPA process, putting the $44 million spent on collecting the data at risk of becoming obsolete and needing to be redone at considerable costs to Bluepoint Wind.

47.     Bluepoint Wind was required by BOEM to hire a third-party contractor to work at BOEM's instruction and support the review of Bluepoint Wind's COP.  Bluepoint Wind and

---

[8] https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/bluepoint-wind-1.

BOEM had continued to meet biweekly to review questions about the COP and revise where necessary. On July 16, 2025, a Project Coordinator at BOEM emailed Bluepoint Wind a single sentence, "At this time we have been advised by our leadership to cancel all meetings with external parties." Ultimately, meetings with BOEM were resumed three weeks later.

48.    Further, following the issuance of the Presidential Memorandum and delays in the permitting timelines, which has caused associated investor uncertainty, Bluepoint Wind was forced to:

(i) reduce its workforce by approximately two-thirds;

(ii) close its New Jersey office;

(iii) terminate or reduce scopes of work with existing contractors; and

(iv) cancel imminent contract awards and planned Requests for Proposals ("RFPs") for contractor-provided project design and development activities.

Absent the Presidential Memorandum and ensuing agency pause in activities, Bluepoint Wind would not have suffered the losses associated with items (i)-(iv), which amount to millions of dollars in value to Bluepoint Wind, its employees, contractors, landlords, and potential contractors. If the Presidential Memorandum's pause on offshore wind activities continues indefinitely, these expenditures and collaborations with the local, national, and international supply chain will not be made.

49.    In 2024, Bluepoint Wind contributed approximately $81,000 to 21 local nonprofits, industry associations, and chambers of commerce in New York and New Jersey, and participated in numerous community outreach volunteer activities. These local contributions will not continue in 2025 and beyond due to market uncertainties caused by the Presidential Memorandum. If federal permitting resumes and the Bluepoint Wind NEPA process proceeds to

the NOI stage, Bluepoint Wind will resume those contributions. If the Presidential Memorandum's pause on offshore wind activities continues indefinitely, these expenditures and collaborations with the local, national, and international supply chain will not be made.

### *Golden State Wind*

50.    On December 6-7, 2022, after conducting a thorough environmental review and issuing an environmental assessment of the impacts of leasing activities offshore of Morro Bay, California, BOEM conducted a competitive lease sale for commercial wind power on the OCS offshore California. The lease areas offered in this competitive sale process were the result of an extended public planning process regarding the issuance of the commercial leases and surveys and site assessment activities.  Golden State Wind (formerly known as Central California Offshore Wind LLC) won lease area OCS-P 0564 with a $150.3 million winning bid. As a component of its bid, Golden State Wind committed $30 million in workforce development and supply chain initiatives and to work closely with key local stakeholders to maximize the benefits to California from the emerging offshore wind industry. Apart from the lease acquisition costs, by the end of June 2025, Golden State Wind had expended $46 million to further the project. As a result of the indefinite delays caused the Presidential Memorandum, in the second quarter of 2025 Golden State Wind had to terminate almost all of its staff and close its California office.

51.    On November 13, 2024, BOEM issued a California Draft PEIS to identify and analyze potential mitigation measures that BOEM could require as conditions of approval for future COPs or that lessees can incorporate directly into their COPs. As CEO of Ocean Winds, I submitted a comment letter to BOEM on February 12, 2025, with recommended actions for the Final PEIS.[9] Since issuance of the Presidential Memorandum, BOEM has indefinitely postponed

---

[9] Ocean Winds' comment letter noted, among other things, that  "[t]o strengthen America's energy dominance, it is essential to streamline environmental reviews while ensuring responsible resource development. President Trump

Docusign Envelope ID: AE29CD8F-A8FD-4BCE-A56B-21908997C0BE

scheduled public meetings on the Draft PEIS, and to my knowledge has stopped moving forward in drafting the Final PEIS but has not withdrawn it, leaving the situation in limbo. Golden State Wind is harmed by these delays and uncertainties which, in turn, delays its ability to prepare a COP that would be consistent with the Final PEIS (if there is to be one). That delay increases the permitting period and final in-service date for a wind energy project and as such increases the timing by which Golden State Wind would be able to generate operating revenues and continue to make more significant contributions to local communities. Despite the indefinite delays, Golden State Wind remains obligated to pay annual lease payments to BOEM in the amount of $241,000 to maintain its rights to develop the leasehold.

52.      The indefinite delays have also caused the cancellation of contracts for the leasing, installation, and monitoring of two metocean buoys which has led to a  loss of over one million dollars.

53.      Having a local office and staff in California had allowed Golden State Wind to be an active participant in local communities, including the following:

    a.  A Golden State Wind representative served on the Advisory Board of REACH, a local economic action coalition, and the company sponsored the second annual REACH Ideas + Actions Summit, where 400 community leaders participated in a program showcasing how innovation and people can flourish together to unlock transformative opportunities for the people of the Central Coast.

    b.  Golden State Wind had engaged with educational institutions including the San Luis Coastal Unified School District, supporting the "Innovate Initiative," a program of the San Luis Coastal Education Foundation in California, to help

---

has made permitting efficiency a priority in the first weeks of his second term.  A PEIS can be used as an important analytical tool to create efficiencies and reduce agency burden."

connect meaningful education initiatives for young students with the region's broader economic strategy.

c.  Golden State Wind staff provided volunteer assistance to Project Surf Camp, a Morro Bay-based nonprofit whose mission is to build confidence, social skills, and independence by introducing people to the water who would otherwise never receive such an opportunity.

These activities have not continued in 2025 due to the impact of the Presidential Memorandum.

*Conclusion*

54.      Across the three projects, expected permitting and in-service delays caused by the Presidential Memorandum have caused an impairment loss of approximately $310 million of the fair value of the assets.

55.      If the Presidential Memorandum is not lifted, issuance of SouthCoast Wind's final three federal permits will remain paused indefinitely, the development of the Project will continue to be delayed indefinitely, the execution of the PPAs with Massachusetts and Rhode Island will potentially not occur, and SouthCoast Wind will continue to incur hundreds of millions of dollars in costs directly related to the delay. In addition, without clarity regarding when the Presidential Memorandum will be lifted, as to date no information has been made available regarding the timing of completion of the special review mandated by the Presidential Memorandum, SouthCoast Wind will be forced to abandon current negotiations with Massachusetts and Rhode Island regarding the execution of the PPAs.

56.      If the Presidential Memorandum is lifted, the three federal agencies that have directly cited the Presidential Memorandum as the sole cause of the delay in issuance of SouthCoast Wind's final three permits could proceed with issuing those permits. Conclusion of

the federal permitting process would enable SouthCoast Wind to move forward with the development of the Project and manage the significant costs of developing a multi-billion dollar project. This resumption of activity would benefit the national and global supply chains, and specifically the State of Massachusetts and the local companies and communities therein.

57.    In addition, if the Presidential Memorandum is lifted, the permitting processes of the Bluepoint Wind and Golden State Wind projects is allowed to resume (thereby providing more clarity regarding the development timelines of the projects and better management of the millions of dollars of costs required to develop each project) Ocean Winds intends to resume activities developing those projects, including activities that economically benefit the national and global supply chains, and specifically the States of New York, New Jersey and California and the local communities and companies therein.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Boston, Massachusetts on August 7, 2025.

DocuSigned by:

*Michael Brown*

—B2F31605ED134D3…

Michael Brown
Chief Executive Officer
OW North America LLC