# Exhibit 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

STATE OF NEW YORK, et al.,

      Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

      Defendants.

Case No. 25-cv-11221-WGY

---

**DECLARATION OF KATHERINE S. DYKES**
**COMMISSIONER OF THE CONNECTICUT DEPARTMENT OF**
**ENERGY AND ENVIRONMENTAL PROTECTION**

I, Katherine S. Dykes, declare of my personal knowledge as follows:

1.    I am the Commissioner of the State of Connecticut Department of Energy and Environmental Protection (DEEP). I was appointed Commissioner of DEEP by Connecticut Governor Ned Lamont and confirmed by the Connecticut General Assembly on February 20, 2019. Prior to becoming Commissioner, I served DEEP as Deputy Commissioner for Energy (2012-2016) and as Chair of the Connecticut Public Utilities Regulatory Authority (2016-2019). I hold a bachelor's degree in history and environmental studies from Yale University, a master's degree in history, also from Yale, and a juris doctor from Yale Law School.

2.    In 2011, in recognition of the interconnectivity of effective energy and environmental policies, Connecticut Governor Dannel P. Malloy, in conjunction with the Connecticut General Assembly, merged the Department of Environmental Protection, the Department of Public Utility Control, and an energy office within the Office of Policy and

1

Management to create the single agency of DEEP.  This action resulted in a more successful alignment of Connecticut's energy and environmental policies.

3.      I am submitting this declaration in support of the State Plaintiffs' motion for summary judgment. I am generally familiar with the Executive Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (Memorandum) signed on January 20, 2025, by President Trump. Section one of the Memorandum withdraws from disposition all areas within the Outer Continental Shelf (OCS) as defined in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*, but does not alter the existing rights associated with existing leases. Section two (Wind Directive) of the Memorandum directs all relevant members of the executive branch not to issue or renew approvals, rights of way, permits, leases, or loans for onshore and offshore wind projects. During that pause, the Secretary of the Interior will lead an assessment of the environmental impacts of wind energy on wildlife, and of the economic implications of wind energy.

4.      The purpose of this declaration is to attest to the impact that the Memorandum and federal agency implementation thereof is having and will continue to have on Connecticut. Specifically, this declaration outlines the range of existing interests, from statutory to economic to health-based, that Connecticut has in developing both onshore and offshore wind as critical energy resources in the state's overall energy portfolio and the harms the Memorandum is inflicting on these state interests.

**Connecticut Is Experiencing Negative Effects of Climate Change**

5.      Connecticut's dense population and geography make it particularly vulnerable to the effects of climate change. As a coastal state with 332 miles of shoreline fronting on Long Island

2

Sound, and urbanized areas along several major navigable rivers, Connecticut is more susceptible than many other states to the effects of increased frequency and intensity of storm hazards.

6.    In Connecticut alone, Hurricane Irene (2011) caused power outages affecting 754,000 customers and inflicted over $1 billion in statewide damages, and Hurricane Sandy (2012) caused power outages affecting more than 600,000 customers and inflicted almost $2 billion in statewide damages, according to the National Oceanic and Atmospheric Administration (NOAA) National Centers for Environmental Information.

7.    Average annual temperatures in Connecticut have risen by over 0.9 degrees Celsius between 1980 and 2018.  Over the same period, winter temperatures have warmed by 1.6 degrees Celsius.  Conservative projections for Connecticut indicate annual mean temperatures will rise by three to six degrees Celsius by the end of this century, with winter warming at three times the rate of summer.

8.    Throughout the Northeast, coastal flooding has increased due to an approximately one-foot rise of sea level since 1900.  This rate of sea level rise exceeds the global average of approximately eight inches.  According to the Connecticut Institute for Resilience and Climate Adaptation (CIRCA), sea level rise along the Connecticut coast is projected to be as high as 20 inches by 2050.  Thus, the frequency and intensity of coastal flooding is likely to increase in the coming years.

**Connecticut Has Taken Action to Address Climate Change and Has a Legislative Mandate to Transition to Clean, Renewable Energy**

9.    As Commissioner of DEEP, I am responsible for carrying out programs that protect our air, water, and lands and power our state with clean, reliable, and affordable energy. My role in leading and creating energy policies is to firmly place Connecticut on a successful clean energy trajectory to meet our climate change goals using a multifaceted approach.  Although not a

complete list, following are some of the key tools and requirements intended to guide us along this trajectory.

10.     We are reducing carbon dioxide ($CO_2$) emissions from fossil fuel-burning power plants through our participation in the multistate, market-based program known as the Regional Greenhouse Gas Initiative (RGGI).

11.     Connecticut is focused on implementing energy efficiency programs to reduce the demand for electricity and the amount of fuel needed to generate power and to in turn reduce costs for Connecticut residents and businesses.

12.     Connecticut has had a Renewable Portfolio Standard (RPS) in some form since 1998.  The RPS requires electric suppliers to obtain a specified percentage of the energy they sell or distribute to Connecticut customers from renewable sources, such as wind, through the purchase of Renewable Energy Certificates (RECs).  The total renewable output targets have increased each year, and Public Act 18-50, codified at Connecticut General Statutes (CGS) §16-245a, doubled the RPS requirement from 20% by 2020 to 40% by 2030. Public Act No. 25-173 modifies this provision to require the state's electric suppliers to directly meet an at least 33% renewable energy supply requirement by 2040, to account for removing emitting resources like biomass and landfill methane gas from eligibility under the RPS going forward. That requirement is, paired with a directive to DEEP to develop a schedule for solicitations of new zero-carbon renewable energy resources, such as wind, needed to serve an additional 7% of load with renewable energy by 2030 (i.e., to achieve a 40% renewable energy supply in the state by 2030).

13.     Public Act 18-82, "An Act Concerning Climate Change Planning and Resiliency," requires Connecticut to achieve economy-wide greenhouse gas (GHG) emission reductions of at least 45% below 2001's GHG emissions level by January 1, 2030, adding to the existing

requirement of at least 80% below 2001's GHG emissions level by January 1, 2050.  The Act also

incorporates GHG reductions into Connecticut's Integrated Resources Plan, Comprehensive

Energy Strategy, and various other state planning documents and efforts.

14.     Public Act 25-125, "An Act Concerning the Protection of the Environment and the

Development of Renewable Energy Sources and Associated Job Sectors," requires Connecticut to

achieve net-zero GHG emissions economy-wide by 2050.

15.     Public Act 22-5, "An Act Concerning Climate Change Mitigation," requires

Connecticut to achieve a 100% GHG emissions-free electricity supply in the state by January 1,

2040.

16.     In addition, in passing Public Act 19-71, "An Act Concerning the Procurement of

Energy Derived from Offshore Wind," as codified in CGS § 16a-3n, the Connecticut Legislature

created a process for DEEP to work with other state officials to solicit competitive proposals for

offshore wind projects. The Act also authorizes DEEP to direct the state's electric distribution

companies to enter into long-term contracts with bidders meeting certain criteria, which DEEP has

done.

17.     DEEP also has similar procurement authority for additional renewable energy

resources, including both onshore and offshore wind, codified in CGS §§ 16a-3f, 16a-3g, 16a-3h,

16a-3j, and 16a-3m.

**Connecticut Is Pursuing Both Offshore and Onshore Wind Generation to Meet the State's Energy and Environmental Needs**

18.     Connecticut has worked to shift reliance away from climate change-causing fossil

fuels and toward renewable energy sources, including wind.

19.     One way in which Connecticut is doing so is through planned and existing onshore

and offshore wind generation that it is procuring directly.

20.     In 2018 and 2019, using its authority under CGS §§ 16a-3n and 16a-3m, DEEP selected 200 megawatts (MW) and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. Rhode Island separately selected an additional 400 MW from Revolution Wind, for a total project size of 704 MW.

21.     In Connecticut, the Revolution Wind project entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to the Connecticut Public Utilities Regulatory Authority (PURA) for review and approval. PURA approved those contracts in Docket Nos. 18-06-37 and 18-05-04. Rhode Island's utility regulator separately approved that state's contract with Revolution Wind.

22.     Revolution Wind has received all necessary federal permits and is currently under construction, both onshore and in federal waters. The project is expected to reach commercial operation in 2026. At that point, the project will deliver electricity and RECs to Connecticut and Rhode Island, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

23.     In two separate procurements in 2015 and 2016, DEEP selected 126 MW from the Cassadaga onshore wind project and 5 MW from the Holiday Hill Community Wind onshore wind project. These projects entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to PURA for review and approval. PURA approved those contracts in Docket Nos. 17-01-10 and 17-01-11. These projects achieved commercial operation in 2021 and 2018, respectively, and are providing energy and RECs to support Connecticut's energy needs and clean energy targets.

24.     In addition to these examples of planned and existing onshore and offshore wind procurements, Connecticut also has an interest in future procurements of wind energy. Public Act

19-71 provides DEEP with existing statutory authority to conduct future competitive solicitations for up to 2,000 MW of additional offshore wind to meet Connecticut's energy and environmental requirements. DEEP also has additional authority to conduct new competitive solicitations for offshore wind and onshore wind under CGS §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

25.    Moreover, DEEP's October 2021 Integrated Resources Plan found that to achieve the state's target of a 100% GHG emissions-free electricity supply by January 1, 2040, significant additions of new zero-carbon generation will be required. This need includes potentially 352 MW to 557 MW of new onshore wind and 3,745 MW to 5,710 MW of new offshore wind by 2040 under a range of assumptions and scenarios, including availability of other generating resources.

**Connecticut Is Investing in the Region's Electricity Transmission Grid to Accommodate Higher Levels of Wind Energy**

26.    In addition to conducting state solicitations for new wind resources, Connecticut is also working regionally with other New England states and New England's independent regional grid operator, ISO New England (ISO-NE), to advance wind energy. On March 31, 2025, ISO-NE issued a request for proposals (RFP) from transmission developers to upgrade the transmission grid in Maine to accommodate the interconnection of at least 1,200 MW of onshore wind generation located in that state to the New England transmission grid.

27.    This RFP is the first procurement being conducted as part of a new regional transmission planning and procurement process that Connecticut worked to develop with ISO-NE and the other New England states, and which the Federal Energy Regulatory Commission (FERC) approved last year.  One piece of this approved framework was an agreement by the six New England states to allocate the costs of any selected project equitably across the states based on each state's share of regional electricity load. The New England states requested that the first RFP issued

by ISO-NE under this new process focus on transmission upgrades in Maine to facilitate onshore wind development.

28.    In determining whether a proposed transmission project submitted in response to the RFP is beneficial for electricity ratepayers, ISO-NE will factor in the benefits that the onshore wind unlocked by this new transmission will provide to Connecticut and the other New England states. These benefits include lower wholesale energy and capacity market costs and improved grid reliability.

29.    Connecticut and other New England states will still need to run separate state solicitations to purchase the wind energy that would be transmitted via the transmission upgrades in Maine, but the transmission upgrades resulting from the ISO-NE RFP will make such wind energy procurements possible by enabling the wind energy to flow to Connecticut and the other states.  These transmission upgrades will also make the eventual purchase of this wind energy more affordable, by sharing the costs of the necessary transmission upgrades across the six states.

30.    Regionalization of a significant portion of these transmission costs will substantially reduce the costs of such future state procurements for onshore wind. This will lead to direct savings for states, including Connecticut, that procure this generation to meet our energy and environmental needs. It also will lead to savings for all six states by enabling the connection of new generation resources that can lower wholesale energy and capacity market costs in ISO-NE.

**Wind Generation Provides Electricity Reliability and Affordability Benefits to Connecticut**

31.    Connecticut's efforts to procure energy from onshore and offshore wind generation and to develop new transmission to interconnect this wind generation to the region's grid are important to both reliability and affordability.

32.     ISO-NE's December 2023 final report on the "Operational Impact of Extreme Weather Events" concluded that New England must add additional electricity generation. That additional generation would include potentially 4,000 MW of new offshore wind generation (over and above projects like Revolution Wind already under construction) as well as thousands of megawatts of other new renewable energy resources by 2032.

33.     A key way that wind generation contributes to grid reliability is by reducing Connecticut and the New England region's reliance on fossil fuels, all of which must be imported from outside the region. New England currently relies on natural gas to generate approximately half of the region's electricity. This creates reliability concerns during the winter, when there is high natural gas demand for heating, or in cases where unanticipated disruptions to the pipeline system or unavailability of gas limits the ability of natural gas-fired generators to run. Wind energy can help fill these gaps and reduce the region's reliance on natural gas.

34.     ISO-NE's "Operational Impact of Extreme Weather Events" report further identifies a need for New England to replace over 5,000 MW of aging fossil fuel generation in the coming years with new sources of power generation to maintain a reliable grid. By contributing new power generation and diversifying the region's electricity mix, wind and other renewable energy resources can help address these reliability concerns.

35.     On March 25, 2025, at a hearing of the U.S. House of Representatives Committee on Energy and Commerce on "Keeping the Lights On: Examining the State of Regional Grid Reliability," ISO-NE's President and CEO Gordon van Welie testified to Congress that "New England has long been challenged by our location at the end of the energy pipeline, but the states have sought to take advantage of the vast offshore wind potential that is right at our doorstep. Offshore wind resources can be a strong and steady source of energy that is injected directly into

major load centers in New England, and their production profile during the winter is helpful for

offsetting the effects of the constraints on the gas pipeline system." Mr. van Welie also testified

that "New England has been counting on offshore wind as a major new source of energy and our

studies have shown substantial reliability benefits of offshore wind, primarily because it delays or

displaces the consumption of gas and oil so that it will be more available in the subset of high

demand periods when the wind does not blow," and "If the large amount of offshore wind that has

been contracted for by the states is significantly delayed or ultimately does not materialize, the

region would need to assess the potential impacts and determine what other options might be

needed to meet resource adequacy needs in the future."

36.     Mr. van Welie further testified that "Over the past few weeks, we have seen

firsthand the impact that shifts in federal policy can have on our region," specifically referencing

the Memorandum, and that "Due to recent federal executive actions, New England is facing new

uncertainty about the prospects for offshore wind, long viewed as an abundant, domestic source of

energy for our region. This could have implications in both the near and long term." Mr. van Welie

also noted that "As demand for electricity in New England grows, the region will need new

resources to meet resource adequacy needs. It will be critical to ensure that we have a policy and

regulatory framework in place that will allow for the entry of those resources."

37.     In addition to contributing to reliability, wind energy generation does not require

fuel to operate and thus has low or no marginal production costs. Therefore, it can lower wholesale

energy market costs in New England by displacing more expensive marginal cost generation from

fossil fuels.

38.     A December 2018 assessment by ISO-NE found that 1,600 MW of offshore wind

generation during an extended cold weather period from December 24, 2017, to January 8, 2018,

could have 1) lowered regional electricity production costs by $80 million to $85 million, resulting in an $11 to $13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; 2) avoided emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and 3) avoided consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil.

39.     By reducing reliance on fossil fuels, Connecticut's efforts to bring wind energy online also help insulate the state's electricity ratepayers from price spikes and volatility associated with these fossil fuels. Fossil fuels like natural gas and oil are traded on global markets and the prices of these fuels are impacted by geopolitical events. For example, Russia's 2022 invasion of Ukraine led to increases in natural gas prices, which contributed to increased costs to generate electricity using natural gas and higher electricity bills in Connecticut. Reducing Connecticut's reliance on natural gas to generate electricity by bringing wind and other renewable energy resources online helps to limit these impacts on Connecticut ratepayers.

**Connecticut's Investments in Wind Are Providing Economic Development**

40.     Connecticut's focus on regional collaboration, supportive policies, and strategic infrastructure investments has positioned the state as a key player in the wind industry in the United States, which benefits the state's economy.

41.     In addition to procuring energy from wind, Connecticut has invested in facilities such as the redeveloped Connecticut State Pier Terminal in New London, Connecticut, to support the development of offshore wind and create new jobs and economic development opportunities in the state. The State of Connecticut has committed over $200 million to the redevelopment of the State Pier Terminal, out of a total project cost of over $300 million.

42.     The State Pier Terminal is one of only three marshaling facilities on the East Coast that are currently assembling offshore wind turbines for deployment and was the first active turbine marshaling terminal with open ocean access. The State Pier Terminal is already supporting the assembly and delivery of approximately 160 turbines for three offshore wind projects – South Fork Wind, Revolution Wind, and Sunrise Wind – that will provide power to Connecticut, New York, and Rhode Island. Once installed, these projects will have an estimated output of 1,760 MW – enough to power more than 1 million homes. Staging and assembly operations at the terminal are expected to generate more than 100 well-paying jobs. The State Pier Terminal also has the potential to support further offshore wind deployments, together with associated jobs in Connecticut.

43.     In October 2023, Connecticut released an "Offshore Wind Strategic Roadmap" and launched the Connecticut Wind Collaborative, a public-private organization, to leverage the state's strengths in infrastructure, manufacturing, workforce, and research and development and to catalyze further economic growth, attract investment, and foster innovation in the state's offshore wind industry.

**The Memorandum Harms Connecticut by Curtailing Wind Energy Development and Introducing Regulatory Uncertainty**

44.     By introducing regulatory uncertainty in the development of new onshore wind and offshore wind, the Memorandum harms Connecticut in numerous ways.

45.     The Memorandum undermines Connecticut's ability to procure additional energy from onshore and offshore wind generation as needed to meet the state's energy and environmental requirements, including statutory requirements to reduce in-state GHG emissions and transition the state's electricity supply to non-GHG-emitting sources of power. As a result, the Memorandum harms Connecticut's ability to address GHG emissions and to protect its residents, as part of a

broader effort, from the growing impacts of climate change, which include increased flooding, extreme heat, wildfires, and extreme storms.

46.     The Memorandum also undermines Connecticut's efforts to develop new electricity transmission that will enable procurements of additional onshore wind generation. Specifically, the Memorandum threatens to reduce or eliminate the anticipated economic and environmental benefits to Connecticut from the ISO-NE RFP for new transmission that will accommodate the interconnection of additional onshore wind; under the Memorandum, required federal permits for new onshore wind infrastructure utilizing this transmission may be delayed or denied. The Memorandum could be particularly harmful if the ISO-NE RFP results in the selection and construction of a transmission project but then the Memorandum prevents or otherwise delays the development of the wind generation resources themselves. The harm to Connecticut from such an outcome would be higher transmission costs associated with the new transmission resulting from the ISO-NE RFP without the associated offsetting benefits from wind energy additions (wholesale energy and capacity market cost reductions and improved reliability).

47.     The Memorandum threatens the reliability of Connecticut's electricity grid. Delaying or preventing development of new wind energy in the region prevents Connecticut and the other New England states from bringing new energy resources online that ISO-NE has determined are important to ensuring a reliable electricity grid.

48.     The Memorandum undermines Connecticut's ability to ensure affordable electricity and protect the state's electricity ratepayers by developing wind energy resources that will lower wholesale energy and capacity market costs and will reduce the state's reliance on price-volatile fossil fuels, which all must be imported into the state and region and are vulnerable to price spikes caused by geopolitical events.

49.    The Memorandum also undermines Connecticut's ability to benefit economically from the investments the state has made to develop a state offshore wind industry with associated jobs in Connecticut, including Connecticut's investments in the redevelopment of the State Pier Terminal.

50.    In conclusion, through the Memorandum, the federal government is impeding both onshore and offshore wind energy development and thereby harming Connecticut, including by undermining compliance with the state's climate and renewable energy laws; damaging grid reliability; forcing reliance on other, more environmentally damaging, import-constrained, and price-volatile sources of electricity; increasing electricity rates to consumers; and hurting the state's economy through foregone job creation and long-term damage to the development of the wind energy industry in our state.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, Connecticut on July 18, 2025.


_____

Katherine S. Dykes

Commissioner of the Connecticut Department of
Energy and Environmental Protection


14