Exhibit 20

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-11221-WGY |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

## AMENDED DECLARATION OF ELIZABETH MAHONY

I, Elizabeth Mahony, declare of my personal knowledge as follows:

1.     I am currently employed by the Massachusetts Department of Energy Resources (DOER) as Commissioner. I have held this position since February 2023. Prior to joining DOER, I held positions at the Massachusetts Office of the Attorney General (AGO), DOER, and the Massachusetts Senate. At DOER, my job duties include directing the priorities of the agency, managing senior staff, engaging with internal and external stakeholders, and making final decisions on programming, financing, and policy.

2.     I am a graduate of Marist University and Suffolk University School of Law. My professional focus has been on the energy field since 2011, beginning with my role as the Counsel for the Senate chair of the Joint Committee on Telecommunications, Utilities, and Energy, where I led staff in developing major

1

energy legislation.[1] Immediately following that experience, I joined DOER as legal counsel, eventually serving as Acting General Counsel, with a special focus on the development of solar incentive regulations, policy report drafting, and management of the joint procurement of clean energy resources with the Massachusetts Electric Distribution Companies (EDCs) pursuant to Green Communities Act, St. 2008, c. 169, § 83A (Section 83A), as amended by the Competitive Electricity Act.[2] During this time, I coordinated for DOER the drafting of three solicitations for clean energy under Section 83A, including a multi-state effort among three states and six electric companies, resulting in multiple contracts for onshore wind and solar energy generation. At the AGO, I served in the Energy and Telecommunications Division, since renamed the Energy and Ratepayer Advocacy Division, focusing primarily on adjudications and investigations at the Department of Public Utilities (DPU) regarding utility clean energy procurements, solar program development, and clean energy rate design, as well as consumer protection advocacy and legislative engagement. My advocacy before the DPU included the adjudication of the requests for proposals, and resulting long-term contracts, for onshore wind, solar energy, offshore wind, and hydroelectric power generation. In this role I was the lead on matters related to solar energy and other types of distributed energy generation.

---

[1] An Act relative to competitively priced electricity in the Commonwealth, c. 209 of the Acts of 2012; and An Act relative to the emergency service response of public utility companies, c. 216 of the Acts of 2012.

[2] Section 36, of c. 209 of the Acts of 2012.

3.     The purposes of this amended declaration are to provide: (i) background on Massachusetts's process for facilitating the financing of offshore wind projects through power purchase agreements (PPAs); (ii) a status of offshore wind projects with current or former Massachusetts PPAs; (iii) an overview regarding investments made in support of Massachusetts's emerging offshore wind industry and its reliance on federal actions; (iv) a summary of offshore wind benefits for Massachusetts; and (v) a summary of the impacts of recent federal action on Massachusetts' offshore wind projects, including the SouthCoast Wind project.

4.     I am submitting this declaration in support of the Commonwealth's motion for summary judgement. I am generally familiar with the Executive Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (Memorandum) signed on January 20, 2025, by President Trump. Section one of the Memorandum withdraws from disposition all areas within the Outer Continental Shelf (OCS) as defined in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq*., but does not alter the existing rights associated with existing leases. Section two of the Memorandum (the Wind Directive) directs all relevant members of the executive branch not to issue or renew approvals, rights of way, permits, leases, or loans for onshore and offshore wind projects. During that pause, the Secretary of the Interior

will lead an assessment of the environmental impacts of wind energy on wildlife, and of the economic implications of wind energy.

## I.    Background on the Process for Launching Offshore Wind Projects

5.    As the State Energy Office, DOER is the primary energy policy agency for the Commonwealth. DOER's mission is to create a clean, affordable, resilient, and equitable energy future for all in the Commonwealth. DOER focuses on transitioning our energy supply to improve our energy system infrastructure, reduce and shape energy demand, and lower greenhouse gas emissions.  To meet DOER's objectives, DOER connects and collaborates with energy stakeholders to develop effective policy. DOER implements this policy through planning, regulation, and funding efforts. DOER provides tools to individuals, organizations, and communities to support their clean energy goals.

6.    Long-term contracts for offshore wind energy delivery support the Commonwealth's progress towards meeting its statutory requirements for renewable energy production and greenhouse gas emissions reductions. The Global Warming Solutions Act, M.G.L. c. 21N, § 3; St. 2008, c. 298, requires Massachusetts to achieve Net Zero greenhouse gas emissions by 2050.  Offshore wind plays a critical role in reducing emissions from the electric power sector.

7.    Massachusetts also has a long-standing Renewable Portfolio Standard (RPS), M.G.L. 25A, § 11F; 225 C.M.R. § 14.00, which requires that retail energy

suppliers annually increase the share of renewable energy generation when supplying Massachusetts electricity customers. Under these programs, clean energy generation is incentivized through the creation of transferrable renewable energy certificates (RECs) that are sold by generators at a market price to retail energy suppliers for their RPS compliance obligations. The Commonwealth therefore facilitates the financing of new clean energy projects by requiring the EDCs to solicit and enter into contracts with eligible clean energy projects, including RECs produced by offshore wind projects.

8.    To facilitate the financing of offshore wind energy, DOER and EDCs periodically solicit proposals from offshore wind developers for cost-effective long-term contracts for offshore wind energy, pursuant to the Green Communities Act, St. 2008, c. 169, § 83C (Section 83C), as amended by the Energy Diversity Act, and An Act Driving Clean Energy and Offshore Wind.[3]

9.    Offshore wind energy procured through the Section 83C process must "contribute to reducing winter electricity spikes" in an effort to capitalize on the power production of offshore wind during periods of grid stress in New England.

10.    An Act Driving Clean Energy and Offshore Wind, published as Chapter 179 of the Acts of 2022, codified the requirement of entering into cost-effective

---

[3] St. 2016, c. 188, s. 12 amended St. 2008, c. 169, s. 83. This section was later supplemented by St. 2018, c. 227, s. 21(a), and amended by St. 2021, c. 24, s. 69 and St. 2022, c. 179, s. 60-61.

long-term contracts following one or more competitive solicitations for 5,600 megawatts (MW) of offshore wind generation no later than June 30, 2027, and directed DOER to develop a staggered procurement schedule to meet that requirement.

11.    The process for Massachusetts' offshore wind solicitations includes development of a Request for Proposals (RFP), evaluation and selection of bids based on quantitative and qualitative factors, contract negotiations between project developers and the EDCs, and review of resulting contracts by the DPU. I will briefly outline each of these steps next.

12.    DOER coordinates with the EDCs and the AGO to develop the RFP to solicit competitive proposals for offshore wind projects. The RFP development process is overseen by an Independent Evaluator, to ensure the solicitation process is open, fair, and transparent. The drafting parties solicit public comment on the draft RFP, which the parties then file with the DPU for review and approval. Once approved, DOER and the EDCs jointly issue the final RFP publicly for bid submission.

13.    DOER and the AGO jointly select an Independent Evaluator to monitor and report on the timetable and method of solicitation and bid selection process to ensure an open, fair, and transparent solicitation and bid process that is not unduly influenced by an affiliated company. The Independent Evaluator submits a report to

the DPU regarding the RFP drafting process when the RFP is filed at the DPU, and a second report when contracts resulting from a solicitation are filed at the DPU for review and approval. DOER may request that the Independent Evaluator monitor contract negotiations between the selected developer(s) and the EDCs.

14.     Proposals received under a solicitation are reviewed and scored by the Evaluation Team, composed of DOER and the Executive Office of Economic Development, in consultation with the IE and EDCs. The evaluation process includes detailed analysis on both quantitative and qualitative factors to determine if proposals are cost-effective and meet various statutory criteria. The quantitative evaluation includes modeling of the regional electric power system to determine the impacts of the proposed project on wholesale electricity and environmental attribute market prices in New England and Massachusetts. The quantitative evaluation identifies the levelized unit net benefit of each proposal, which determines a numeric score combined with the qualitative evaluation numeric score to rank the proposed projects. Following the conclusion of the evaluation process, DOER, in consultation with the IE, issues a final, binding determination of any winning bid(s).

15.     Any selected project(s) then proceed to negotiate long-term PPAs with the EDCs. Prior to, or simultaneously with contract execution, Bidders are expected to negotiate and execute a memorandum of understanding (MOU) with DOER and the Massachusetts Clean Energy Center to memorialize the commitments made in

the bid package regarding economic development, environmental justice, and diversity, equity and inclusion plans.

16.    Executed PPAs are subject to DPU review and approval. The DPU considers recommendations by the AGO and DOER and approves a proposed contract if it finds that the contract is a cost-effective mechanism for procuring beneficial, reliable renewable energy on a long-term basis and in the public interest.

17.    Following regulatory approval of the PPAs, offshore wind developers proceed with project development, including securing financing and proceeding with necessary federal, state, and local permitting to site and construct the offshore wind farm and related transmission infrastructure.

18.    Offshore wind projects currently under development in the United States are subject to federal permitting and review by the Bureau of Ocean Energy Management (BOEM) since they are sited in federal waters on the Outer Continental Shelf. All projects need to submit a Construction and Operations Plan (COP) for BOEM review and approval. The approval of the COP and other federal permits is necessary for offshore wind projects to proceed with successful financing, construction, and operation of a project.

## II.    The Status of Offshore Wind Projects in Massachusetts

19.    Following the Massachusetts Legislature's direction to facilitate a staggered procurement schedule, DOER has initiated four offshore wind solicitation processes, three of which are complete.

20.    The first solicitation process began in 2017 when DOER and the EDCs issued the first RFP for long-term contracts for offshore wind under Section 83C (referred to as "83C Round I"). Following a full evaluation and review of all bids received, DOER selected Vineyard Wind LLC's bid of 800 MW (Vineyard Wind 1) and the EDCs filed long-term contracts with the DPU for review and approval on July 31, 2018.  DOER submitted a letter requesting that the DPU approve the contracts, and the DPU approved the contracts on April 12, 2019.[4] The Vineyard Wind 1 project represented the first utility-scale procurement of an offshore wind project in the United States.

21.    Vineyard Wind 1 received its final permits from the federal government in 2021. To date, the facility has completed construction of all foundations and is finalizing tower construction and blade installations.

22.    Once all 62 turbines (806 MW) are installed and delivering offshore wind energy, they will produce enough electricity to power over 400,000 homes and businesses.

---

[4] D.P.U. 18-76, -77, -78, Order, at 89 (2019).

23.    DOER and the EDCs initiated the second round solicitation under Section 83C with the issuance of an RFP for up to 800 MW of offshore wind on May 23, 2019 (83C Round II). The RFP was revised and reissued on August 7, 2019, in response to legislative changes that removed the requirement for all proposals to have a price less than the price resulting from the previous solicitation (referred to as a "price cap" requirement).[5]

24.    The 83C Round II solicitation generated proposals from three developers: Bay State Wind, Mayflower Wind (subsequently renamed SouthCoast Wind), and Vineyard Wind. The outcome of the solicitation was the selection of the 804 MW Mayflower Wind project, and the EDCs executed PPAs with Mayflower Wind on December 13, 2019. The DPU reviewed and approved the contracts on November 5, 2020.

25.    Following a public comment period, DOER and the EDCs launched a third round offshore wind solicitation (83C Round III) with the release of an RFP for up to 1,600 MW of offshore wind on May 7, 2021. The 83C Round III solicitation generated proposals from two developers: SouthCoast Wind and Commonwealth Wind. The outcome of the solicitation was the selection of two projects: 1,200 MW of a 1,232 MW project from Commonwealth Wind and 405 MW of a 480 MW

---

[5] An Act Relative to Offshore Wind Contract Pricing (Chapter 48 of the Acts of 2019) temporarily eliminated the price cap requirement for the Section 83C Round II solicitation, and the 83C Round II RFP was revised to remove this requirement.

project from SouthCoast Wind. The EDCs executed PPAs with both project developers on March 28, 2022. The DPU reviewed and approved the contracts on December 30, 2022.

26.    However, in the summer of 2023, the EDCs filed agreements with the DPU, at the request of the developers, to terminate the Commonwealth Wind and SouthCoast Wind contracts. For SouthCoast Wind, the termination represented the full 1200 MW project selected through both 83C Round II and 83C Round III solicitations. Both SouthCoast Wind and Commonwealth Wind requested termination because the development of the projects was no longer tenable due to significant inflationary pressures and supply chain issues. The negotiated termination agreements between the developers and the EDCs included Termination Payments totaling $108 million, which were credited back to Massachusetts ratepayers.

27.    The termination of projects selected in 83C Round II and 83C Round III highlights that macroeconomic shocks can derail the offshore wind project financing and timelines. Massachusetts uses fixed-price, long-term contracts to facilitate the financing of offshore wind projects, which are highly capital-intensive to construct. The fixed-price contract structure requires bidders to price their projects in a way that accounts for risks in the cost drivers of the project, but the project developers were not able to absorb the level of macroeconomic shocks from

11

inflation, interest rates, and supply chain disruptions resulting in the termination of the contracts.

28.    Offshore wind projects are also vulnerable to disruptions from federal permitting processes that control the construction and operations of the projects. For instance, Vineyard Wind 1 was delayed over three years from its originally planned commercial operation date as it awaited final federal permitting approvals during 2017 and 2020, which were necessary to begin construction. This delay ultimately harmed Massachusetts ratepayers, all ratepayers in the regional wholesale market, and Massachusetts's progress on its greenhouse gas reduction targets by delaying the delivery of cost-effective offshore wind power.

29.    Prior to launching a fourth round 83C solicitation (83C Round IV), DOER and the EDCs issued a request for public comment. The 83C Round IV RFP included new provisions including an Indexed Price Bid option to address the macroeconomic risks that led to the 83C Round III project terminations. Additionally, prior to receiving bids under the 83C Round IV solicitation, Massachusetts entered into a historic multi-state MOU with Connecticut and Rhode Island on October 3, 2023. This Multi-State MOU outlined how the three states may coordinate selection of offshore wind as each state solicits offshore wind energy generation through their respective state procurements. The goal of the MOU was to allow the three states to seek multi-state offshore wind proposals that would expand

benefits for the region, capture cost reductions by developing projects at scale, and develop into viable projects.

30.     Following evaluation of bids, including Multi-State Bids, in the 83C Round IV solicitation, Massachusetts initially selected three bids, including one bid jointly selected with Rhode Island. The three bids selected were Ocean Winds' 1,287 MW SouthCoast Wind (jointly selected with Rhode Island), Avangrid's 791 MW New England Wind 1, and 800 MW of Vineyard Offshore's 1,200 MW Vineyard Wind 2 project. Vineyard Wind 2 withdrew from contracting following Connecticut's decision not to select any of the project's output because the project's viability was predicated on contracting for the full 1,200 MW.

31.     Currently, the Massachusetts EDCs are negotiating long-term contracts with the SouthCoast Wind and New England Wind 1 projects. Collectively, these projects are poised to more than double Massachusetts's existing offshore wind capacity, powering over 1,000,000 Massachusetts homes.

32.     On January 17, 2025, BOEM announced its approval of the COP for the SouthCoast Wind Project.[6] This is the final approval needed for the project from BOEM following the Department of the Interior's Record of Decision issued in

---

[6] "BOEM Approves Construction and Operations Plan for SouthCoast Wind Project"; Bureau of Ocean Energy Management; January 17, 2025; https://www.boem.gov/newsroom/press-releases/boem-approves-construction-and-operations-plan-southcoast-wind-project

December 2024.[7] Several ancillary federal permits (Section 10/404, Marine Mammal Protection Act Incidental Take Authorization, and National Pollutant Discharge Elimination System Permit) are submitted and pending approval. Construction is expected to begin following regulatory approval of the PPAs.

33.     On July 1, 2024, BOEM announced its approval of the New England Wind COP, which authorizes construction and operation of New England Wind 1.[8] This is the final approval needed for the project from BOEM following the Department of the Interior's Record of Decision issued in April 2024.[9] Construction is expected to begin following regulatory approval of the PPAs.

34.     Massachusetts law directs solicitations for offshore wind generation to occur within 24 months of the prior solicitation until Massachusetts procures 5,600 MW of offshore wind. As such, DOER plans to begin a fifth round of offshore wind procurement in 2025 to meet our statutory requirement. However, ongoing uncertainty regarding federal actions impacting offshore wind projects creates risks for conducting a competitive offshore wind procurement at this time. Projects

---

[7] Record of Decision SouthCoast Wind Project Construction and Operations Plan; Bureau of Ocean Energy Management, US Department of the Interior; December 20, 2024.
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record-of-Decision-SouthCoast-Wind-OCS-A-0521.pdf

[8] "BOEM Approves Construction and Operations Plans for New England Wind's Offshore Wind Projects"; Bureau of Ocean Energy Management; July 1, 2024; https://www.boem.gov/newsroom/press-releases/boem-approves-construction-and-operations-plan-new-england-winds-offshore

[9] Record of Decision New England Wind Farm and New England Wind Project Construction and Operations Plan; Bureau of Ocean Energy Management, US Department of the Interior; April 1, 2024;
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf

eligible to bid into a new Massachusetts solicitation face heightened risk and uncertainty regarding their project costs and schedules due to recent federal actions relating to import tariffs, BOEM permitting, and other federal approvals required to construct offshore wind projects. Additionally, the EDCs and offshore wind developers have not yet finalized contracts for the projects selected in the prior Round 4 solicitation. As further described below, uncertainties stemming from the Wind Directive and other Federal actions create additional risk on these projects, and ultimately, the contract negotiations. Federal policy is an important factor in these projects and the EDCs and developers are working to gain greater certainty before finalizing the contracts.

## III.    Benefits of Onshore Wind to Massachusetts

35.    Onshore wind is an important part of the electricity generation mix serving Massachusetts residents and businesses with cost-effective, zero-emissions power. Under the statutory authority of Section 83 and Section 83A of the Green Communities Act, Massachusetts conducted competitive solicitations between 2010 and in 2015 for renewable energy resources that resulted in the Massachusetts EDCs signing long-term contracts for energy and RECs from seven utility-scale onshore wind projects in New England and New York that achieved commercial operation. These projects are currently generating over 600 MW of renewable energy for Massachusetts residents and businesses.

36.     There are substantial additional onshore wind resources available in northern New England which have not yet been developed. This is partly due to transmission constraints preventing the projects from exporting to the regional power grid. Recently, Massachusetts and the New England states worked with ISO New England, the regional grid operator, to build out the transmission system as a means to reduce wholesale power costs for ratepayers by unlocking access to these onshore wind resources. As an initial step in a multi-year process, ISO New England completed the 2050 Transmission Study in February 2024.[10]  The results provided a high-level assessment of the regional transmission system investment needed through 2050 to ensure reliability throughout the clean energy transition and informed stakeholders of the amount and type of transmission infrastructure necessary to ensure a reliable supply of cost-effective electricity for New England. The study demonstrated that additional transmission upgrades are needed to resolve bottlenecks on the interfaces between Maine and southern New England.

37.     Following the findings of the 2050 Transmission Study, ISO New England submitted tariff changes to FERC to create a process with the New England states to develop projects to realize the upgrades identified in the study, including a cost-allocation mechanism for those transmission improvements. FERC approved the tariff in July of 2024 and, at the request of the New England states and following

---

[10] https://www.iso-ne.com/static-assets/documents/100008/2024_02_14_pac_2050_transmission_study_final.pdf

a stakeholder process to solicit input and refine the process, ISO New England issued a Request for Proposals (RFP) for long-term transmission needs on March 31, 2025.[11] This RFP is the first-of-its-kind in the nation and seeks transmission upgrades that can allow the New England region to access new cost-effective generation to be built in northern Maine, including onshore wind resources.

38.    This transmission process opens a pathway for new generation to be built and delivered to load centers, however, challenges to financing posed by an uncertain federal framework present new hurdles and drive costs upward. Onshore wind projects proposed to be built in Northern Maine would require federal permits for construction. First, all structures over 200 feet (including utility-scale wind turbines) are required to receive a "Determinations of No Hazard" from the Federal Aviation Administration. Depending on the location of projects, additional federal permits related to impacts on wildlife and habitat may be required, such as Clean Water Act Section 404 from the Army Corps of Engineers, Incidental Take Permit under the Endangered Species Act from the US Fish and Wildlife Service, Migratory Bird Treaty Act from the US Fish and Wildlife Service, and others. Any changes to the federal permitting expectations and timelines for onshore wind permits could

---

[11] See RFP materials available at: https://www.iso-ne.com/system-planning/transmission-planning/competitive-transmission

jeopardize the ability of the resources in Northern Maine to proceed with construction and operations to benefit Massachusetts and New England ratepayers.

## IV.    Benefits of Offshore Wind to Massachusetts

39.    Offshore wind is expected to play a crucial role in decarbonizing the power sector for Massachusetts. The 2050 Clean Energy and Climate Plan (2050 CECP) for Massachusetts outlines the Commonwealth's strategy to transform our energy supply to meet our Net Zero greenhouse gas emission target by 2050, which is required by law. Modeling results from the 2050 CECP indicate that Massachusetts will likely require 22,000 MW or more of offshore wind energy by 2050 in all scenarios in order to meet the Net Zero statutory requirement.[12] In the near-term, modeling conducted for the 2025/2030 CECP indicate that having contracted offshore wind projects operational on schedule is crucial to achieve our 2030 greenhouse gas targets for the power sector.[13]

40.    Offshore wind provides unique benefits as a power source for Massachusetts. Offshore wind energy resources off the coast of Massachusetts are abundant, with analysis from the National Renewable Energy Laboratory showing

---

[12] Massachusetts Clean Energy and Climate Plan for 2050, Workbook of Modeling Results: https://www.mass.gov/info-details/massachusetts-clean-energy-and-climate-plan-for-2050#clean-energy-and-climate-plan-for-2050-

[13] Massachusetts Clean Energy and Climate Plan for 2025/2030: https://www.mass.gov/doc/clean-energy-and-climate-plan-for-2025-and-2030/download

that the wind resource potential offshore Massachusetts and southern New England is some of the strongest in the country.[14]

41.    Offshore wind resources are also located relatively close to load centers like Boston, where electricity demand is the highest in New England and is expected to grow significantly in coming decades.[15] This proximity reduces the amount of transmission infrastructure that is needed to move the power from the generation site to consumers, which reduces costs for consumers and helps minimize environmental impacts from siting the transmission infrastructure.

42.    The offshore wind contracts resulting from Massachusetts's competitive procurements are cost-effective, provide substantial benefits for Massachusetts ratepayers, and are in the public interest. The 83C statute requires that any projects be cost-effective, and the Vineyard Wind 1 contracts will provide energy and RECs at a price materially below the projected cost of buying them in the market over the 20-year term of the contract.[16] Over the life of the contract, for example, the 800 MW Vineyard Wind project is projected to provide an average of 1.4 cents/kWh (in real 2017 dollars) of direct savings to ratepayers.[17]

---

[14] https://www.nrel.gov/images/nrellibraries/gis-images/high-res/wtk-100m-2017-01-min.jpg?sfvrsn=72de0250_1
[15] ISO-NE 2024 CELT Report: https://www.iso-ne.com/static-assets/documents/100011/2024_celt_report.xlsx
[16] DOER Testimony in 83C Round 1 at 18:
https://fileservice.eea.comacloud.net/FileService.Api/file/fileroom//10251395
[17] DOER Testimony in 83C Round 1 at 18:
https://fileservice.eea.comacloud.net/FileService.Api/file/fileroom//10251395

43.     Offshore wind is a crucial new supply resource to meet growing power demand in the region. ISO New England expects summer peak demand to increase 9 percent, while winter peak demand is projected to increase 30 percent over the next 10 years.[18] Offshore wind projects are ready to be deployed now to meet this surging electricity demand in New England. There are several offshore wind projects at advanced development stages which have supply chain contracts in place and interconnection queue positions secured, which position them as "shovel-ready" to begin construction and be the best available option to come online to deliver much-needed new power supply for New England. Supply chain constraints are delaying conventional natural gas power plant development in other parts of the country,[19] highlighting the importance of expediting offshore wind projects that have supply chain contracts in place so they can begin construction and provide crucial new energy supply for New England.

44.     Offshore wind can also help reduce high winter electricity costs in Massachusetts and the New England region. New England experiences high wholesale electricity market prices in the winter months, when the region's natural

---

[18] ISO New England, Final Draft 2025 Energy and Seasonal Peak Forecasts (March 28, 2025), https://www.iso-ne.com/static-assets/documents/100021/energy_demand_fx2025_final.pdf.
[19] Plautz, Jason. "Want to build a gas plant? Get in line." E&E News. April 22, 2025. Available at: https://subscriber.politicopro.com/article/eenews/2025/04/22/want-to-build-a-gas-plant-get-in-line-00299503 (accessed April 24, 2025).

gas supply is constrained.[20] For example, the average wholesale electricity market price in December 2024 was $89/MWh, compared to $51/MWh during July (the summer peak demand period) and only $24/MWh during March (the "shoulder season" of lowest demand). The New England region is also highly exposed to price volatility from global commodity markets for fossil fuels. For instance, the region experienced severe electricity price spikes in 2022-2023 when the Ukraine invasion led to global natural gas price increases.[21] In 2023, more than half of the electricity produced in New England was produced by burning natural gas, resulting in an average of $3 billion flowing out of the region's economy every year.[22] Recent analysis by Synapse Energy Economics found that adding offshore wind to the New England grid could allow the region to retain $1.57 billion that would have otherwise flowed out of the region,[23] while also significantly reducing ratepayer costs by displacing high-cost natural gas and relieving pipeline constraints, particularly during winter.[24] After factoring in the cost of offshore wind contracts procured outside of the market, net annual electricity cost savings average $630 million under

[20] "Monthly LMP Indices"; ISO-NE; https://www.iso-ne.com/isoexpress/web/reports/pricing/-/tree/monthly-lmp-indices

[21] "Markets"; ISO NE; https://www.iso-ne.com/about/key-stats/markets

[22] "Charting the Wind: Quantifying the Ratepayer, Climate, and Public Health Benefits of Offshore Wind in New England"; Synapse Energy Economics, Inc.; June 3, 2024; page 2; https://www.synapse-energy.com/sites/default/files/Synapse%20Offshore%20Wind%20Benefits%20in%20New%20England%20202406 03%2024-024.pdf

[23] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12

[24] Synapse Energy Economics, Inc.; "Charting the Wind"; page 10

21

a reference case gas scenario, with annual savings increasing to more than $1 billion under a high natural gas price scenario.[25] Residential monthly bill savings would be $2.79 and $4.61, respectively.[26] Synapse also found significant public health benefits of $362 million every year, due to reduced criteria pollutants such as NOx, SOx, and particulates that result from fossil fuel combustion.[27]

45.    Analysis conducted by ISO New England, the regional electricity grid operator, shows that offshore wind resources' highest energy output occurs during winter months.[28] Adding offshore wind resources to the regional energy mix could significantly reduce winter supply constraints and reduce wholesale market prices. A 2018 assessment by ISO New England found that a hypothetical 1,600 MW offshore wind project would have performed particularly well during the region's 16-day cold spell in December of 2017 and January of 2018, during which natural gas and wholesale electricity prices dramatically spiked. The offshore wind project would have generated 435,257 MWh, saving the region $80 million to $85 million in production costs, reducing locational marginal prices by $11/MWh to $13/MWh, and avoiding 20% of natural gas usage during the period and 219,200 short tons of

---

[25] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12
[26] Synapse Energy Economics, Inc.; "Charting the Wind"; page 12
[27] Synapse Energy Economics, Inc.; "Charting the Wind"; page 13
[28] ISO NE Variable Energy Resource (VER) Data

$CO_2$.[29] ISO New England is counting on offshore wind resources to contribute new supply to meet growing electricity demand in the region.[30] The queue of projects planning to interconnect to the ISO New England grid includes 14,577 MW of offshore wind resources. A sensitivity analysis completed by ISO New England as part of their 2024 Economic Study found that without any offshore wind capacity, the cost of energy to ISO New England customers is 50% higher in 2050.[31] Furthermore, without offshore wind, the total annualized build costs increase by $26 billion, or 16.6%.[32]

46.    Massachusetts also has prime coastal locations near offshore wind lease areas that are available to provide interconnection to the electric grid, including at the sites of retired fossil fuel infrastructure like the former coal-fired plant at Brayton Point in Somerset, MA, the former fossil fuel-fired Mystic Generating Station in Everett, MA, and the former Pilgrim nuclear plant in Plymouth, MA. These locations will make interconnection efficient and lower the cost to interconnect new supply

---

[29] High-Level Assessment of Potential Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell: https://www.iso-ne.com/static-assets/documents/2018/12/2018_iso-ne_offshore_wind_assessment_mass_cec_production_estimates_12_17_2018_public.pdf

[30] Gordon van Welie (ISO New England) Congressional testimony. Available at: https://www.iso-ne.com/static-assets/documents/100021/final_isone_written_testimony_house_energy_committee_testimony_3_25_2025.pdf

[31] "2024 Economic Study: Policy Scenario Sensitivities & Follow-Up to Stakeholder-Requested Scenario"; ISO NE; March 19, 2025; https://www.iso-ne.com/static-assets/documents/100021/a06_2025_03_19_pac_2024_economic_studies_policy_scenario_sensitivities_and_follow_up_to_stakeholder_requested_scenarios.pdf

[32] "2024 Economic Study: Policy Scenario Sensitivities & Follow-Up to Stakeholder-Requested Scenario"; ISO NE; March 19, 2025; https://www.iso-ne.com/static-assets/documents/100021/a06_2025_03_19_pac_2024_economic_studies_policy_scenario_sensitivities_and_follow_up_to_stakeholder_requested_scenarios.pdf

resources to replace retired resources. Further, an operating co-generation plant in Sandwich, MA, may provide an interconnection point to maximize its current transmission capacity.

47.    Offshore wind is an intermittent resource and the region is taking a variety of steps to reliably integrate a growing supply of intermittent resources into the electricity system. For example, the region is investing in energy storage to charge during low-cost periods when there is excess offshore wind and to discharge during high-cost peak times. Pairing energy storage with offshore wind will allow the Commonwealth to meet peak demand times with clean energy instead of high-cost and high-emissions fuel oil. Massachusetts is pursuing a suite of policies to support the deployment of cost-effective energy storage in Massachusetts, including through the first-in-the-nation Clean Peak Standard and a solicitation for attributes from energy storage in 2025. Vineyard Wind 1 has committed to providing $15 million to establish the Resiliency and Affordability Program to support funding for the construction of battery energy storage and solar energy projects to enhance resiliency and provide low-income ratepayer benefits in communities hosting Vineyard Wind 1.[33]

---

[33] "Citizens, Vineyard Wind Collaborate on Resiliency and Affordability Fund to Benefit Residents and Communities on Cape Cod, Islands and South Coast"; https://www.vineyardwind.com/news-and-updates/2018/3/29/citizens-vineyard-wind-collaborate-on-resiliency-and-affordability-fund-to-benefit-residents-and-communities-on-cape-cod-islands-and-south-coast

48.    The offshore wind industry has already provided substantial economic development benefits for Massachusetts. To-date, the Vineyard Wind 1 project has generated 3,405 full-time equivalent jobs, $331.1 million in labor incomes, and over $890 million in economic output.[34] The project's development, construction, and operation will support roughly 2,000 total jobs, generate more than 200 supply chain contracts across 29 U.S. states, and yield $2 billion in new investments in the United States. Offshore wind industry activity across the region is supporting shipbuilding in Louisiana, Florida, and Texas, cable manufacturing in North Carolina, and geotechnical survey services in Virginia. Vineyard Wind 1 has committed to mentoring and apprenticeship programs for skilled workforce training and has committed $10 million to the Offshore Wind Industry Accelerator Initiative to accelerate the offshore wind supply chain, businesses and infrastructure in Massachusetts.[35]

49.    Given the inability for offshore wind developers to receive sufficient revenue certainty from the wholesale market, offshore wind projects will not be able to be financed and constructed solely from the wholesale market at this time.

---

[34] Vineyard Wind 1 Impact on Jobs and Economic Output. Annual Report #3; November 2024.
[35] "Committing $15m to make Massachusetts the center of the offshore wind industry;" https://www.vineyardwind.com/masswinds

**V.    The Wind Directive Threatens Massachusetts' Best Opportunity to Add Utility-Scale Generation to Serve Quickly Growing Demand**

50.    The continuation of the Wind Directive is an impediment to SouthCoast Wind executing a PPA with the EDCs.  While other uncertainties are present, including economic challenges driven by separate actions at the federal level, those may be resolved through contractual provisions.  The Wind Directive, however, if left in place is an insurmountable challenge to project viability.

51.    On March 31, 2025, DOER, with the EDCs, notified the DPU of the need to extend the deadline for contract negotiations to June 30, 2025.  The Wind Directive was a primary reason for this delay.  The SouthCoast Wind project would require final federal permitting approvals in order to begin construction for operations in 2030 as planned (or, following recent delay caused by the Wind Directive, 2032).  The uncertainty that the Wind Directive creates is preventing SouthCoast Wind and the EDCs from setting the necessary critical milestone deadlines to execute a PPA. While SouthCoast Wind and the EDCs continue to negotiate the PPA, the unknowns driven by the Wind Directive continue to prevent meaningful progress.

52.    The SouthCoast Wind project represents over 1200 MW of new generation to serve Massachusetts and New England by the end of 2030, with 1087 MW to be procured by Massachusetts.  ISO New England is counting on offshore wind as a major new source of energy, particularly for its reliability benefits during

winter when the region's power supply is constrained, since offshore wind can displace high-cost gas and oil generation.[36] At present, there is no alternative utility-scale electric generation project proposed in New England that is able to construct and come online in the same timeframe, let alone one which could deliver power into the south coast region of the state or provide clean energy consistent with the Commonwealth's statutory clean-energy and climate targets. In order to meet 2030 emission-reduction sublimits, the state's planning models indicate Massachusetts will need 3,650 MW of offshore wind generating by 2030.[37]

53.    ISO New England projects that peak electric demand in New England will increase 9 percent over the next 10 years, which will require significant additional generation capacity.[38] Electric capacity from distributed solar generation (projects under 5 MW) continues to grow but is already assumed in Massachusetts planning. ISO New England finds that solar has limited value in meeting the region's energy needs during longer-duration winter cold spells and therefore cannot substitute for large-scale offshore wind resources if they do not materialize.[39]

---

[36] Gordon van Welie, President and CEO, ISO New England Before the U.S. House Energy & Commerce Committee's Subcommittee on Energy March 25, 2025
[37] 2024 Massachusetts Climate Report Card: Power Decarbonization. Available at: https://www.mass.gov/info-details/2024-massachusetts-climate-report-card-power-decarbonization
[38] ISO New England, Final Draft 2025 Energy and Seasonal Peak Forecasts (March 28, 2025), https://www.iso-ne.com/static-assets/documents/100021/energy_demand_fx2025_final.pdf.
[39] Pre-Technical Conference Comments of ISO New England Inc. (June 4, 2025). Federal Energy Regulatory Commission Docket No. AD25-7-000. Available at: https://www.ferc.gov/media/gordon-van-welie-iso-ne-president-and-ceo

Massachusetts's limited available land and high population density are also not conducive to development of the utility-scale solar being built in other states.

54.     Beyond the generation or transmission anticipated to come on-line in 2025, there are zero proposed transmission-level projects similar to the size of SouthCoast Wind in the ISO NE queue anticipated to deliver power by 2030 or even 2032.  For example, there is no planned electric generation from new nuclear facilities or geothermal projects. Massachusetts law currently prohibits construction of new nuclear energy generation unless voters approve a specific project through a ballot initiative (or the Legislature eliminates this provision, which would take months to years).[40] Considering the two to three years it takes for a ballot initiative, along with additional years to site, permit, and construct, a nuclear facility is not practical by the end of 2030 or even 2032.

55.     Additionally, unlike offshore wind, New England does not have significant technical potential for enhanced geothermal electric generation. The National Renewable Energy Laboratory (NREL) Enhanced Geothermal Shot Analysis identified the Northeast as having low to the least favorability for geothermal resources, with less than 500 MW of resource capacity in Massachusetts.[41]  As part of this analysis, NREL's modeling did not identify any

---

[40] St. 1982, c. 503.

[41] Augustine, Chad, Sarah Fisher, Jonathan Ho, Ian Warren, and Erik Witter. 2023. Enhanced Geothermal Shot Analysis for the Geothermal Technologies Office. Golden, CO: National Renewable Energy Laboratory. NREL/TP-5700-84822. https://www.nrel.gov/docs/fy23osti/84822.pdf.

geothermal build out in Massachusetts through 2050. Any development of enhanced geothermal would not be at a scale to replace the capacity of SouthCoast Wind and would not come online until after SouthCoast Wind's anticipated commercial operation date.

56.    On June 30, 2025, DOER, with the EDCs, notified the DPU of the need to once again extend the deadline for contract negotiations to December 31, 2025. The Wind Directive was a primary reason for this delay.  While project developers and the EDCs continue to negotiate the PPA, the unknowns driven by the Wind Directive continue to prevent meaningful progress.

57.    On August 7, 2025, DOER notified the DPU that the planned Section 83C Round V RFP, previously anticipated for release in late Summer 2025, would be delayed until at least 2026. The Wind Directive, including its impact on the EDCs and project developer's ability to conclude the previous round's PPA negotiations, is among the reasons for the delay in the RFP schedule.  Following its passage in 2016, DOER and the EDCs issued a Section 83C RFP every 24 months, as the Commonwealth seeks to contract for offshore wind projects totaling 5,600MW by June 30, 2027.  The previous RFP issued on August 30, 2023, setting the expectation of a new RFP in August 2025, or shortly thereafter.  The uncertainties driven first by the Wind Directive call into question the ability to run a competitive solicitation, given the inability of additional projects to secure permits or even have confidence

29

in the timeline to secure permits.  Section 83C solicitations rely upon multiple bids to create competition, thus driving bidders to offer more lower-cost projects for ratepayers. Absent such anticipated competition, the RFP Drafting Parties, including DOER, the EDCs, the Attorney General's Office, and the Independent Evaluator determined that a competitive RFP process is not possible in 2025.

58.    An indefinite halt of federal permitting for onshore and offshore wind projects, if left in place, will harm Massachusetts residents and business through increased costs and absent sufficient generation to meet load growth would hinder local and national economic growth. Without a timely and predictable federal permitting process, wind developers will be unable to perform on existing state-level contracts for power, nor develop and build out new projects that are urgently needed to meet growing regional demand reliably and affordably, leading to increased costs for Massachusetts and New England ratepayers. A halt in wind project development would also jeopardize the thousands of good-paying, long-term jobs that the wind industry has already created and plans to create in Massachusetts and across the nation to build out thousands of megawatts of new wind power projects. Massachusetts is also counting on substantial new wind resources being built in the coming years to reduce carbon emissions that are already contributing to harmful climate impacts on residents, businesses, and communities. In conclusion, offshore wind is a critical energy resource to help reliably and affordably achieve

Massachusetts's energy demands and legislative greenhouse gas emission reduction mandates, while simultaneously reducing our reliance on out-of-state, emission-intensive energy sources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Boston, Massachusetts on August 7, 2025.

Elizabeth Mahony
Commissioner of the Massachusetts
Department of Energy Resources

31