**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, *et al,*

            Plaintiffs,

            v.

DONALD J. TRUMP, *et al*,

            Defendants.

No. 1:25-cv-11221-WGY

**PLAINTIFF-INTERVENOR ALLIANCE FOR CLEAN ENERGY**
**NEW YORK'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

STANDARD OF REVIEW ...................................................................................................... 10

ARGUMENT ............................................................................................................................ 11

I.   ACE NY HAS ESTABLISHED STANDING TO SUE. ...................................................... 11

II.  EACH AGENCY'S DECISION TO INDEFINITELY CEASE WIND
     ENERGY PERMITTING IS FINAL AGENCY ACTION REVIEWABLE
     UNDER THE APA. ...................................................................................................... 11

III. DEFENDANT AGENCIES' ACTIONS ARE ARBITRARY AND CAPRICIOUS............ 15

IV.  THE WIND BAN VIOLATES REQUISITE PUBLIC NOTICE AND COMMENT. ......... 22

V.   DEFENDANT AGENCIES' ACTIONS ARE CONTRARY TO LAW. .............................. 24

VI.  THE COURT SHOULD VACATE EACH DEFENDANT AGENCY'S
     DECISION TO ADOPT AND IMPLEMENT THE WIND DIRECTIVE. ......................... 25

CONCLUSION ........................................................................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
  No. 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025)............................................. 14, 21

*Am. Ass'n Univ. Professors v. Rubio*,
  No. 25-10685-WGY, 2025 WL 1051084 (D. Mass. Apr. 29, 2025) .................................. 14

*Am. Mun. Power-Ohio Inc. v. FERC*,
  863 F.2d 70 (D.C. Cir. 1988) ......................................................................................... 17

*Am. Pub. Health Ass'n v. NIH*,
  No. 25-10787-WGY, 2025 WL 1822487 (D. Mass. July 2, 2025)................................ 17, 18

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ..................................................................................... 20

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................................ 14

*Ass'n of Am. Univs. v. Dep't of Def.*,
  No. CV 25-11740-BEM, 2025 WL 2022628 (D. Mass. July 18, 2025) ............................ 27

*ATF v. FLRA*,
  464 U.S. 89 (1983) ........................................................................................................ 16

*Atlantic Fish Spotters Ass'n v. Daley*,
  8 F. Supp. 2d 113 (D. Mass. 1998) ................................................................................ 17

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................................... 11

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
  838 F.3d 42 (1st Cir. 2016) ........................................................................................... 10

*Cal. Cmtys. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ....................................................................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................... 10

*Cent. Maine Power Co. v. FERC*,
  252 F.3d 34 (1st Cir. 2001) ........................................................................................... 26

iii

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) ................................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ................................................................................... 16

*Clean Air Council v. Pruitt,*
  862 F.3d 1 (D.C. Cir. 2017) ....................................................................... 23

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ....................................................................................... 21

*Drs. for Am. v. Off. of Pers. Mgmt.,*
  No. 25-322-JDB, 2025 WL 1836009 (D.D.C July 3, 2025) .................... 17, 18, 27

*EDF v. Gorsuch,*
  713 F.2d 802 (D.C. Cir. 1983) ................................................................... 12

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ............................................................................. 16, 19

*Ensco Offshore Co. v. Salazar,*
  781 F. Supp. 2d 332 (E.D. La. 2011) ........................................................ 12

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................. 16, 19

*FEC v. Akins,*
  524 U.S. 11 (1998) ..................................................................................... 11

*Gailius v. INS,*
  147 F.3d 34 (1st Cir. 1998) ........................................................................ 26

*Goodall v. Binienda,*
  405 F. Supp. 3d 253 (D. Mass. 2019) .......................................................... 2

*Harmon v. Thornburgh,*
  878 F.2d 484 (D.C. Cir. 1989) ................................................................... 26

*Harper v. Werfel,*
  118 F.4th 100 (1st Cir. 2024) ..................................................................... 11

*Harrington v. Chao,*
  280 F.3d 50 (1st Cir. 2002) ........................................................................ 26

iv

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) ........................................................ 14

*Hornbeck Offshore Servs., LLC v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010) ............................................ 12, 22

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) ........................................................ 24

*John Doe, Inc. v. DEA*,
    484 F.3d 561 (D.C. Cir. 2007) ...................................................... 14

*Kingdom v. Trump*,
    No. 1:25-cv-691-RCL; 2025 WL 1568238 (2025) ........................................ 18, 20

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) .................................... 12, 18, 23, 25

*Massachusetts v. NIH*,
    770 F. Supp. 3d 277 (D. Mass. 2025) .................................... 18, 19, 21

*McDonnell Douglas Corp. v. U.S. Dep't of Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004) ...................................................... 18

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024) ........................................................ 16

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ........................................................ 21

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d. Cir. 2011) ........................................................ 12

*Minuteman Health Inc. v. U.S. Dep't of Health & Human Servs.*,
    291 F. Supp. 3d 174 (D. Mass. 2018) .................................................. 10

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................. 27

*Montana Wildlife Fed'n v. Bernhardt*,
    No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020) .......................... 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................ 16, 17

v

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................ 13

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*,
    No. 25-cv-239-LLA, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ................................. 12, 24

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ........................................................ 24

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ....................................................... 26

*National Educ. Ass'n v. United States Dep't of Educ.*,
    No. 25-cv-091, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ................................ 13

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ......................................................... 14

*New York v. Trump*,
    No. 25-CV-01144-JAV, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ...................... 14

*New York v. Trump*,
    No. 25-cv-0039-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ...................... 12

*New York v. Trump*,
    No. 25-11221-WGY, 2025 WL 1836592 (D. Mass. July 3, 2025) .......................... 9

*Orr v. Trump*,
    No. 25-cv-10313-JEK, 2025 WL 1145271 (D. Mass Apr. 18, 2025) ...................... 14, 15

*Pietrantoni v. Corcept Therapeutics Inc.*,
    640 F. Supp. 3d 197 (D. Mass. 2022) ................................................... 2

*Ramirez v. U.S. ICE*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ..................................................... 15

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) ...................... 27

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) .......................................................... 15

*Stenson Tamaddon, LLC v. IRS*,
    742 F. Supp. 3d 966 (D. Ariz. 2024) ................................................... 12

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) ............................................................ 17

*Trump v. CASA*,
    606 U.S. ---, 145 S. Ct. 2540 (2025) .............................................................. 27

*Thompson v. Evolve Bank & Trust*,
    728 F. Supp. 3d 202 (D. Mass. 2024) ............................................................ 15

*Victim Rights Law Ctr. v. Cardona*,
    552 F. Supp. 3d 104 (D. Mass 2021) .............................................................. 24

*W. Deptford Energy, LLC v. FERC*,
    766 F.3d 10 (D.C. Cir. 2014) ............................................................................ 9

*Western Watersheds Project v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) ........................................................... 12

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. April 15, 2025) .............. 12

**Statutes**

5 U.S.C. § 553 ........................................................................................................ 22

5 U.S.C. § 553(2)(D) ............................................................................................... 22

5 U.S.C. § 704 ................................................................................................... 11, 14

5 U.S.C. § 706(1) .................................................................................................... 15

5 U.S.C. § 706(2) ........................................................................................ 9, 15, 25, 27

5 U.S.C. § 706(2)(A) ....................................................................................... 10, 15, 24

5 U.S.C. § 706(2)(C) ............................................................................................ 10, 24

5 U.S.C. § 706(2)(D) ................................................................................................ 10

26 U.S.C. § 45(Y) ..................................................................................................... 8

26 U.S.C. § 48(E) ..................................................................................................... 8

26 U.S.C. § 48(E) ..................................................................................................... 8

**Court Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 10

Fed. R. Civ. P. 65(a)(2) .................................................................................. 9

**Regulations, Executive Orders, and Proclamations**

33 C.F.R. § 320.4 ........................................................................................ 19

89 Fed. Reg. 35634 (May 1, 2024) .............................................................. 19

90 Fed. Reg. 8327 (Jan. 29, 2025) ................................................................ 5

192 FERC ¶ 61064 (2025) ............................................................................ 8

Executive Order No. 14153, *Unleashing Alaska's Extraordinary Resource Potential*,
    90 Fed. Reg. 8347 (Jan. 20, 2025) ...................................................... 20

Executive Order No. 14154, *Unleashing American Energy*,
    90 Fed. Reg. 8353 (Jan. 20, 2025) ................................................. 20, 22

Executive Order No. 14156, *Declaring a National Energy Emergency*,
    90 Fed. Reg. 8433 (Jan. 20, 2025) ................................................. 20, 22

Executive Order 14261, *Reinvigorating America's Beautiful Clean Coal Industry and
    Amending Executive Order 14241*,
    90 Fed. Reg. 15517 (Apr. 8, 2025) ..................................................... 20

Executive  Order No. 14300, *Ordering the Reform of the Nuclear Regulatory Commission*,
    90 Fed. Reg. 22587 (May 23, 2025) ........................................................

One Big Beautiful Bill Act, H.R. 1, 119th Cong. (2025) ............................... 8

Proclamation No. 10956, *Regulatory Relief For Certain Stationary Sources to Further
    Promote American Energy*,
    90 Fed. Reg. 34583 (July 23, 2025) ..................................................... 20

**INTRODUCTION**

It is undisputed that, since its first day in office, the current Administration has foreclosed all federal permitting for any wind energy projects offshore or onshore across the nation. Indeed, Defendant agencies "admit that they have adopted and implemented the temporary cessation directive in Section 2 of the Presidential Memorandum" ("Wind Directive"). ECF 171 ¶ 1 (Answer to Alliance for Clean Energy New York ("ACE NY") Complaint). Having found Plaintiffs' Administrative Procedure Act ("APA") claims are justiciable and well-pleaded, ECF 162, the Court should grant Plaintiffs summary judgment and vacate Defendant agencies' sudden and indefinite stoppage of all wind permitting based on the Wind Directive ("Wind Ban").

The Wind Ban violates the APA in myriad ways.[1] It is arbitrary and capricious because it is entirely unsupported—as evident from the mere one-paragraph Wind Directive and now confirmed by the barren administrative record filed with this Court. It is an unexplained departure from decades of detailed scientific and economic studies and consistent agency practice supporting wind energy. It is contradictory to simultaneous government actions asserting a national energy emergency and expediting domestic energy production. It did not undergo APA notice and comment procedures required to fundamentally alter federal wind permitting requirements. It is predicated on Defendant agencies' advance completion of a "comprehensive assessment and review" that is likely illusory, pretextual, and predetermined, and at minimum is interminable and redundant of extensive previous analyses. And it is contrary to and exceeds agencies' authority under multiple statutes and regulations governing wind permitting. In sum,

---

[1] To avoid duplication, ACE NY incorporates by reference Plaintiffs States' same-day summary judgment filing, and all Plaintiffs' prior filings in support of a preliminary injunction and in opposition to Defendants' motion to dismiss. *See generally* ECF 62-69 (ACE NY preliminary injunction motion and supporting declarations), 140 (ACE NY supplemental declaration opposing motion to dismiss).

the Wind Ban is the opposite of reasoned agency decision-making, and is on all fours with

caselaw consistently striking down similar federal agency attempts to single out and freeze

certain energy sources.

Every day it remains in place, the Wind Ban continues to impose and exacerbate exigent

harms on the wind energy industry, jeopardizing projects, supply chains, jobs, and energy

resources critical to grid reliability and affordability. The Court thus should expeditiously resolve

this suit on the merits and vacate the Wind Ban to afford Plaintiffs complete relief and enable

Defendant agencies to resume wind permitting decisions irrespective of the Wind Directive.

## FACTUAL BACKGROUND

Growth of Wind Energy. The Wind Ban represents a targeted attack on one of America's

largest, fastest growing, lowest cost, and most environmentally friendly forms of energy

production. As this Court observed, prior to the Wind Ban, there was a "long, consistent history

of governmental awareness and evaluation of the risks and benefits posed by wind energy." ECF

162 at 11. The net benefits of this resource have been recognized by Congress, federal agencies,

and state and local governments, which all have taken measures to incentivize the growth of

wind energy. For over two decades, across multiple Administrations, the United States' declared

policy has been to support wind energy research, development, and deployment. In turn, the

wind industry has relied on these longstanding policies and commitments to invest billions of

dollars into planning and building wind projects nationwide.

Wind currently provides 10.2% of the nation's electricity.[2] Absent a continued halt per

the Wind Directive, wind energy will make up a significant portion of the 1,000 terawatt-hours

---

[2] U.S. Energy Information Administration, "Frequently Asked Questions,"
https://www.eia.gov/tools/faqs/faq.php?id=427&t=3. The Court may take judicial notice,
including of government-issued documents and material on government websites. *See Goodall v.*

(TWh) of new electricity needed by 2035 to meet growing demand. Wells Decl. ¶ 5 (ECF 63). Wind energy will play a particularly important role in meeting growing load needs in resource constrained locations where few alternatives are available, such as the three northeast regional transmission organizations and independent system operators (RTOs/ISOs)—New York Independent System Operator, Inc. (NYISO); ISO New England Inc. (ISO-NE); and PJM Interconnection, L.L.C. (PJM). *See, e.g.*, Goggin Decl. ¶ 36 (ECF 69); McNutt Decl. Ex. B (ECF 66-1). The wind industry directly and indirectly supports more than 300,000 U.S. jobs, including 20,000 wind manufacturing jobs at over 450 facilities, and these numbers are expected to grow substantially in coming years. *See, e.g.*, Wells Decl. ¶¶ 5-6 (ECF 63); Goggin Decl. ¶ 38 (ECF 69) ("As of 2023, the offshore wind industry was on track for a domestic supply chain that by 2030 would require an investment of at least $22 billion in ports, large installation vessels, and manufacturing facilities and 12,300-49,000 manufacturing jobs, which would span the country." (cleaned up)); *see also* Burdock Decl. ¶ 25 (ECF 64) ("To date, U.S. manufacturers have announced investments of $6.1 billion in specialized manufacturing or steel facilities in support of offshore wind."). The U.S. wind industry invested $10 billion in new projects in 2023 alone, and delivers an estimated $2 billion in state and local tax and land lease payments each year. Before the Wind Ban, the U.S. wind industry was on track to install 60 GW of new capacity in the next 5 years. McNutt Decl. ¶ 10 (ECF 66).

Experts have concluded that wind energy is critical to energy security and independence, reducing air emissions, lowering energy costs, and improving power grid reliability and energy resource diversity. Goggin Decl. ¶ 10 (ECF 69) ("Economic and reliability factors have already

---

*Binienda*, 405 F. Supp. 3d 253, 259 (D. Mass. 2019); *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197 (D. Mass. 2022). Plaintiffs' declarations are also uncontroverted.

been fully weighed by the state and regional entities with the authority and expertise to assess those factors."). States, utilities, Federal Energy Regulatory Commission ("FERC")-regulated wholesale market operators and their stakeholders, and state utility regulators have all conducted detailed analyses of the economic and reliability impacts of offshore and land-based wind generation, and found them to be a valuable part of their energy portfolio. *Id.* Wind is not "intermittent," as the Wind Directive avers. *Id.* ¶ 8. Rather, wind output is most accurately described as variable because its output changes gradually and can be predicted; whereas nuclear and fossil fueled generators are more accurately described as intermittent, in that their output can unexpectedly drop to zero in a matter of seconds or less when they experience a failure. *Id.* ¶ 9. Wind energy contributes greatly to meeting peak electricity demand and resource adequacy, a finding that is confirmed by decades of real-world performance data. *Id.* ¶ 15.

Indeed, in some regions of the country, wind energy already makes up a substantial portion of the energy supply. For example, Southwest Power Pool, the grid operator for the Plains states, has at times obtained 90% of its electricity from wind generation, while the main grid operator in Texas has at times reached around 70% wind. *Id.* ¶ 12. The influx of low-cost renewable energy into these power grids has translated into substantial consumer savings. For example, in Texas, consumers are estimated to have saved $31.5 billion on wholesale power prices between 2010 and 2022 due to the inclusion of low-cost renewable energy.[3] Based on data derived from these real-world experiences, state regulators with the expertise and authority to make electricity generation mix choices have approved countless wind energy power purchase

---

[3] *Wind Energy Overview*, Texas Comptroller (2023), https://comptroller.texas.gov/economy/economic-data/energy/2023/wind.php#end12.

agreements to secure affordable and reliable wind energy power for their citizens. Goggin Decl. ¶¶ 13, 41 (ECF 69).

The Wind Directive. Despite the wind energy industry's unparalleled history of safety and success, a Presidential Memorandum on Inauguration Day (January 20, 2025) instructed all agencies to abruptly cease all wind energy permitting nationwide. 90 Fed. Reg. 8327, 8363 (Jan. 29, 2025). Even Defendants label this "wind directive" as a "cessation directive." ECF 165 at 2. Its sole grounds are summary assertions of "alleged" (and unspecified) "legal deficiencies underlying the Federal Government's leasing and permitting of … wind projects," along with "potential" (and unspecified) "inadequacies in various environmental reviews." 90 Fed. Reg. at 8363. It neither cites nor attaches any evidence or analysis for its asserted concerns. It has no end date, extending at least until completion of an open-ended "comprehensive assessment and review of Federal wind leasing and permitting practices." *Id*. at 8364. In sum, the Wind Directive mandates that Defendant agencies abdicate the permitting responsibilities ascribed to them by law based on only tentative and unsubstantiated assertions of speculative harm.

The Wind Ban. Defendant agencies concede they each promptly and unquestioningly adopted and implemented the Wind Directive. *E.g.*, ECF 171 ¶ 1. Also, as set forth in ACE NY's prior filings, Defendant agencies have made numerous public announcements implementing the Wind Ban. *E.g.*, ECF 114 ¶¶ 65-74 (ACE NY Complaint). The result has been a sudden and complete stoppage of wind permitting decisions, with none occurring over seven months.

The "Comprehensive Assessment." The Wind Directive demands a new "comprehensive assessment and review of Federal wind leasing and permitting practices," including "the environmental impact of onshore and offshore wind projects upon wildlife," "economic costs associated with the intermittent generation of electricity," and the "effect of subsidies" on the

wind industry. 90 Fed. Reg. at 8363-64. All indications are that this assessment is a pretense to stop all federal wind permitting indefinitely.[4] Four months after the Wind Directive, certain Defendant agencies generally declared to this Court that the assessment had barely begun. Giacona Decl. ¶ 5 (ECF 123-3) (declarant "attended meetings to plan how to further the ongoing assessment" and "DOI has begun compiling and reviewing information" for the assessment); Rauch Decl. ¶ 8 (ECF 123-7) (NMFS "identified staff to consult with the Department of the Interior [DOI]" and "engaged in preliminary coordination"). Several weeks later, when asked in open court about the assessment's timetable, Defendants "declined to give one." ECF 162 at 34. After two more months, the government still has provided no public information on its status.

Meanwhile, the government has proceeded as though no lift of the wind permitting halt is imminent and the outcome of any assessment is preordained against resumption of permitting. The government nowhere has acknowledged that the Wind Directive's stated concerns have already been extensively and recently studied, including directly by Defendant agencies themselves. Any new, "comprehensive" assessment of those issues will likely require many months and extensive staff time, at the same time that agencies are widely slashing budgets and personnel.[5] And in the interim, the government has engaged in repeated public attacks on wind

---

[4] When filing the administrative record, Defendants averred that Plaintiffs "do not dispute that the assessment and review—which they have not challenged—is currently underway and is being deliberated by the Department of the Interior and supporting agencies." ECF 165 at 2. That is wrong. ACE NY does dispute the assessment's existence and progress in the absence of meaningful information. And ACE NY does not challenge the assessment itself precisely because it is a black box, and because an assessment need not entail a permitting stoppage. Agencies have ordered reviews of regulations governing other energy sources even as they have continued permitting such projects. *See, e.g.*, DOI Secretarial Order 3418 (Feb. 3, 2025).

[5] For example, the White House Office of Management and Budget recently directed the Bureau of Land Management to cut spending on renewable energy "outside of Federal salary and payroll expenses, minimum expenses to maintain safe operations, or payments otherwise required by law." *White House tells BLM to cut spending on renewables, land purchases,* Politico E&E

energy, both substantively and rhetorically. For instance, DOI has sought to cut $80 million in funding for its renewable energy program to comply with the Wind Ban and other executive orders.[6] These related actions are inconsistent with any objective "assessment" being underway.

The Wind Ban's Acute and Ongoing Harms to the Wind Industry. The Wind Ban is destroying the nation's wind energy industry, as is its evident goal. ACE NY members have been forced into an indefinite holding pattern, with "little indication of whether or when the agencies will resume the regular permitting processes that are (at least someday) required." ECF 162 at 39. ACE NY's previous filings detail the Wind Ban's extensive economic harms to ACE NY's members, which include job losses and severe, ongoing harms to their businesses and investments. *See, e.g.* Wells Decl. (ECF 63); Wells 2d. Decl. (ECF 140); Burdock Decl. (ECF 64). Since that time, these harms have only continued to grow. *See* Burdock 2d. Decl. ¶ 4 ("Oceantic database metrics immediately reflect a slowdown through the first two quarters of 2025 after the Wind Directive"). For example, on July 17, the New York State Public Service Commission cancelled planning for the development of future offshore wind transmission until "the federal government resumes leasing and permitting for wind energy generation projects."[7]

These harms to industry translate to harms to the States and electricity consumers. If wind projects are delayed or canceled due to the Wind Ban, replacing that capacity on the same

---

News (Aug. 5, 2025), https://www.eenews.net/articles/white-house-tells-blm-to-cut-spending-on-renewables-land-purchases/.

[6] U.S. Dep't of the Interior, *Fiscal Year 2026 Discretionary Budget Request*, at 30 (2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

[7] *New York Halts Offshore Wind Transmission Plan Amid Federal Uncertainty*, Reuters (July 17, 2025), https://www.reuters.com/business/energy/new-york-halts-offshore-wind-transmission-plan-amid-federal-uncertainty-2025-07-17/; *see also* https://dps.ny.gov/news/commission-acts-protect-ratepayers-federal-offshore-wind-permitting-stalls/ (press release with access to order).

timeline is likely infeasible and, at minimum, will impose higher costs on ratepayers. Goggin Decl. ¶ 37 (ECF 69). As a result, the Presidential Memorandum puts ratepayers and businesses at risk of power outages due to supply shortfalls. At best, ratepayers will face increased costs as state regulators and utilities must scramble to line up replacement resources on short notice. *Id.* In short, contrary to the Presidential Memorandum's claims that a wind permitting halt is needed "to foster an energy economy capable of meeting the country's growing need for reliable energy" and while limiting the "effects on energy costs for Americans," the Presidential Memorandum sets up the reverse: limiting development of low-cost, reliable wind energy generation, raising Americans' energy costs, and threatening a shortfall in electricity supply. *Id.* ¶ 39.

The threats posed by the Wind Ban will be compounded if it is not soon lifted. For example, the One Big Beautiful Bill Act, promoted and signed by the President on July 4, 2025, creates an even greater immediate need for prompt action on wind permits by drastically accelerating the timeframes for wind facilities to begin construction or commence operations to qualify for investment and production tax credits. H.R. 1, 119th Cong. (2025); 26 U.S.C. § 48E; 26 U.S.C. § 45Y. Absent its vacatur, the Wind Ban, which has categorically prohibited permits for months and going forward, will countermand Congress' intent and run out the clock on securing federal permits while retaining tax credit eligibility, thereby resulting in compromised economic viability of projects and substantial economic losses for ACE NY members. Additionally, FERC recently directed Regional Transmission Organizations to now prioritize "shovel-ready" generation sources—energy projects that have obtained relevant permits and can begin construction upon grid interconnection approval—in the grid interconnection queue. 192 FERC ¶ 61064 (2025). By precluding wind energy projects from achieving "shovel ready" status, the Wind Ban enables other energy sources to "jump the queue," delaying wind energy

interconnection timelines in ways that may threaten wind project viability. *See generally W. Deptford Energy, LLC v. FERC,* 766 F.3d 10, 13-14 (D.C. Cir. 2014) (describing the interconnection queue).

In sum, the longer the Wind Ban is in place, the greater its impact on future deployment of wind energy technology will be. Immediate vacatur is needed to ensure that the rights and reliance interests of wind energy developers, investors, manufacturers, and others in the supply chain are protected.

This Litigation. In May 2025, Plaintiff States filed this suit against the Wind Ban, and ACE NY intervened as a Plaintiff. ECF 1, 23, 78. Plaintiffs moved for a preliminary injunction. ECF 53, 62. The Court consolidated the preliminary injunction motions with expedited merits briefing, and treated Defendants agencies' opposition to the preliminary injunction motions as a motion to dismiss. *See* ECF 137; Fed R. Civ. P. 65(a)(2).

On July 3, 2025, this Court issued a detailed 49-page decision on Defendants' motion to dismiss, permitting Plaintiffs to move forward with their APA claims under 5 U.S.C. § 706(2) against DOI, including its Bureau of Ocean Energy Management ("BOEM"), Bureau of Land Management ("BLM"), and Fish and Wildlife Service ("FWS"); the Environmental Protection Agency ("EPA"); the National Marine Fisheries Service ("NMFS"); and the U.S. Army Corps of Engineers ("Corps"). ECF 162, *New York v. Trump*, No. 25-11221-WGY, 2025 WL 1836592 (D. Mass. July 3, 2025). The Court found that the States and ACE NY had Article III standing and that Defendant agencies' decisions to adopt and implement the Wind Directive constituted final agency action. *Id.* The Court rejected Defendants' arguments to dismiss Plaintiffs' APA claims, including Counts I, II and III of ACE NY's Complaint. The Court ordered Defendant agencies to produce administrative records in support of these decisions. Trial Tr. 37:1 (June 18, 2025).

Defendant agencies produced their respective administrative records on July 11, 2025. Each non-DOI agency's record consists of nothing but the Wind Directive. DOI's record includes only one other document—a January 20, 2025, DOI Secretarial Order that suspended the DOI Secretary's delegated authority for various purposes, including for "renewable energy development," that by its terms expired on March 21, 2025, and that offers no insight on the Wind Ban. ECF 165. In short, Defendant agencies' administrative records are devoid of any evidence, justification, or documentation considered before adopting the Wind Ban.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[I]n the administrative law context … a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Boston Redevelopment Auth. v. Nat'l Park Serv*., 838 F.3d 42, 47 (1st Cir. 2016). "[S]ummary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health Inc. v. U.S. Dep't of Health & Human Servs*., 291 F. Supp. 3d 174, 189-90 (D. Mass. 2018).

Under the APA, a reviewing court "shall … hold unlawful and set aside" challenged agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D). "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party …." *Id.* § 706.

## ARGUMENT

## I.    ACE NY HAS ESTABLISHED STANDING TO SUE.

This Court's July 3 ruling found that ACE NY's standing was "firmly established." ECF 162 at 28. The Court cited ACE NY's declarations describing harms to its members associated with permitting delays as supporting "direct harm to its members," *id.* at 18. The Court rejected Defendants' argument that plaintiffs' injuries were not redressable because the wind projects in question would not be guaranteed to proceed, explaining that the Court's role is to "correct[] deviations in agency procedure" and that correcting these errors in agency action is sufficient to establish redressability. *Id.* at 20-21. As the Court found, to establish standing ACE NY need only show "a procedural violation paired with an injury that may possibly be redressed upon reconsideration," and "ACE NY has alleged that in spades." *Id.* at 27; *see also FEC v. Akins*, 524 U.S. 11, 25 (1998) ("Those affected by a discretionary agency action generally have standing to complain that the agency based its decision upon an improper legal ground … even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason."). Nothing in the subsequently filed administrative record affects these conclusions.

## II.    EACH AGENCY'S DECISION TO INDEFINITELY CEASE WIND ENERGY PERMITTING IS FINAL AGENCY ACTION REVIEWABLE UNDER THE APA.

The APA affords judicial review for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For an agency action to be final, it must (1) mark the consummation of the agency's decision-making processes and (2) determine rights or obligations or create legal consequences. *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024); *see also Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019) (final agency action need not carry the "force and effect of law" but must give rise to "appreciable legal consequences" (citations omitted)).

11

Consistent with this standard, this Court "rule[d] that the agencies' indefinite pause on wind energy leasing and permitting, as alleged, constitutes final agency action." ECF 162 at 36. Defendants concede as much: "Defendants admit that they have adopted and implemented the temporary cessation directive in Section 2 of the Presidential Memorandum." ECF 171 ¶ 1. As this Court reasoned, "significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." ECF 162 at 33. That ruling aligns with numerous cases similarly finding that an agency's decision to implement a nationwide moratorium, including targeting a specific energy source, is final agency action. *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011); *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010); *see also Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247–49 (3d. Cir. 2011); *EDF v. Gorsuch,* 713 F.2d 802, 813 (D.C. Cir. 1983); *Stenson Tamaddon, LLC v. IRS*, 742 F. Supp. 3d 966 (D. Ariz. 2024); *New York v. Trump*, No. 25-cv-0039-JJM-PAS, 2025 WL 715621, at *8-*9 (D.R.I. Mar. 6, 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, No. 25-cv-239-LLA, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,* No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. April 15, 2025).[8]

Here, Defendant agencies have consummated their decision to adopt and implement the Wind Ban, and the impact of that final decision on day-to-day business operations and

---

[8] Beyond such moratoria, courts similarly have found that other agency procedural changes affecting the legal rights of regulated entities are final and reviewable. *Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1059-66 (D. Idaho 2020), *rev'd, in part, on other grounds* 127 F.4th 1 (9th Cir. 2025); *see also Montana Wildlife Fed'n v. Bernhardt*, No. 18-cv-69-GF-BMM, 2020 WL 2615631, *5-7 (D. Mont. May 22, 2020), *rev'd, in part, on other grounds* 127 F.4th 1 (9th Cir. 2025).

"investment and project development choices" of ACE NY members "is not hard to understand." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280 (D.C. Cir. 2005). No one contends that Defendant agencies are undecided on whether or how to adopt and implement the Wind Directive. And Defendant agencies have provided no "timetable for the interagency review process that must be completed before the Wind Directive's pause may be lifted." ECF 162 at 34. The Wind Ban also has legal consequences: it "in effect amends several regulations by requiring the agencies must not follow the usual, specified procedures for an unspecified period of time," which amounts to a "de facto suspension of the law with respect to wind energy development." *Id.* at 35-36. The Wind Ban thereby has an "actual legal effect … on regulated entities" because it renders previously obtainable permits unobtainable. *Id.* at 35 (quoting *National Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091, 2025 WL 1188160, at *16 (D.N.H. Apr. 24, 2025) (citation omitted)).

Nothing since the Court's prior ruling alters this conclusion. In particular, the Wind Ban remains indefinite and unyielding, and the Administration has nowhere signaled resumption of federal permitting for wind projects. Nor does the lack of any meaningful administrative record in this case imply a lack of final agency action; it simply underscores that Defendant agencies' actions are indeed arbitrary and capricious and contrary to law. Although an administrative record can include documents implementing or executing an agency decision, Defendant agencies' certification of the record here indicates that the record as submitted is limited to "the evidence *considered*, directly or indirectly, by Defendants," ECF 165 at 4 (emphasis added), and therefore do not include such implementing documents. Nor do Defendant agencies dispute their public statements announcing implementation of the Wind Directive, regardless of their exclusion from the administrative record. *See, e.g.*, ECF 114 ¶¶ 65-74.

This Court should not "allow the meager administrative record[s] in this case to undercut finality." *John Doe, Inc. v. DEA*, 484 F.3d 561, 567 (D.C. Cir. 2007). As here, an agency may "reach the point" where it "imposes an obligation, denies a right or fixes some legal relationship as a consummation of the administrative process," yet may have "generated only a sparse administrative record." *Id.* Even if the agencies' internal directives were unwritten, they would be subject to judicial review. "Precedent … is clear that the APA allows challenges to unwritten agency policies and practices." *New York v. Trump*, 25-CV-01144-JAV, 2025 WL 573771, at *19 (S.D.N.Y. Feb. 21, 2025) (citing *Her Majesty the Queen in Right of Ontario v. EPA,* 912 F.2d 1525, 1531 (D.C. Cir. 1990) and other cases). "A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *Am. Ass'n Univ. Professors v. Rubio*, No. 25-10685-WGY, 2025 WL 1235084, at *21 (D. Mass. Apr. 29, 2025) (quoting *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) (cleaned up)). The onus is on Defendants to produce an administrative record to support the Wind Ban, and their failure to do so defeats rather than supports their defenses.

Nor does the fact that Defendant agencies acted to adopt and implement a presidential directive undermine finality. Nothing in the APA precludes review of agency action on that basis. *Orr v. Trump*, No. 1:25-cv-10313-JEK, 2025 WL 1145271, at *15 (D. Mass Apr. 18, 2025) ("The APA contains no exception for agency actions … that carry out an executive order." (citing 5 U.S.C. § 704)). Exempting agency action from APA oversight just because it purports to carry out presidential policy "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-00400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025); *see also New York v. Trump,* 133 F.4th 51, 70 n.17 (1st Cir. 2025) (rejecting

14

argument that an OMB directive was unreviewable under the APA simply because it implemented executive orders). As such, "neither the Supreme Court nor any Court of Appeals has ever 'excepted a final rule from APA review because it carried out a presidential directive.'" *Orr*, 2025 WL 1145271, at *15 (citing *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)).

Defendant agencies previously argued that this suit should have instead been framed as unreasonable delay claims for individual permitting decisions under 5 U.S.C § 706(1), rather than challenging final agency action under 5 U.S.C. § 706(2). ECF 162 at 41. But the government may not recast ACE NY's claims into ones that it prefers to defend. *Thompson v. Evolve Bank & Trust*, 728 F. Supp. 3d 202, 205 (D. Mass. 2024) ("Plaintiffs are the master of their own claims, and accordingly, determine in the first instance what law they will rely upon." (cleaned up)). This Court correctly concluded that, contrary to what the government has asserted, this is not a case challenging mere delay. ECF 162 at 41 (rejecting this argument because it "rests on the presumption that there was no final agency action here"). Moreover, the government's contention that ACE NY could have elected to file § 706(1) claims here does render ACE NY's § 706(2) claims unreviewable. No authority holds that those causes of action are mutually exclusive. *See, e.g. Ramirez v. U.S. ICE*, 568 F. Supp. 3d 10, 19, 24 (D.D.C. 2021) (explaining that agency's "basic failure to comply with a statutory obligation on a widespread basis" was unlawful under both APA §§ 706(1) and 706(2) (citations omitted)).

In sum, Defendant agencies' decisions to adopt and implement the Wind Directive on an agency-wide and nationwide basis constitutes final agency action, and those decisions are redressable under APA § 706(2).

## III.    DEFENDANT AGENCIES' ACTIONS ARE ARBITRARY AND CAPRICIOUS.

The Wind Ban reflects textbook arbitrary and capricious agency action under 5 U.S.C. § 706(2)(A). As this Court found, Defendant agencies have not "meaningfully contest[ed] the

substance" of this claim, "except to say that later decisions on specific permits will not be arbitrary or capricious." ECF 162 at 43. The administrative record comprising only the President's Wind Directive provides no support for Defendant agencies' decisions, confirming those decisions were made with *no* deliberation or explanation—that is, arbitrarily.

Agency action is arbitrary and capricious where it "(1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (rejecting challenge to federal approvals for offshore wind project). Agency action is also arbitrary and capricious if there is an "[u]nexplained inconsistency" in an agency's policy, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), or if an agency fails to provide a "reasoned explanation" for a change in policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Judicial review of agency actions "is to be searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Courts "must not rubberstamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *ATF v. FLRA*, 464 U.S. 89, 97 (1983) (cleaned up).

In this case, the Wind Ban's only reasoning apparent anywhere in the administrative record before the Court is Section 2(a) of the Wind Directive itself. Thus, to the extent that Defendant agencies have adopted that rationale (which they have not expressly done), the Wind Ban could have a chance at surviving only if the Wind Directive's one paragraph of text satisfies

the above standards and supplies a "satisfactory explanation." *State Farm*, 463 U.S. at 43 (citation omitted). It does not.

    <u>Lack of Consideration and Supporting Evidence</u>. The barren administrative record and Defendants' admissions demonstrate that Defendant agencies adopted and implemented the Wind Directive immediately and with no attempt to consider alternatives, weigh consistency with their legal obligations, decide the best course of action, or develop a reasoned explanation for their actions. The APA requires more. *See Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-322-JDB, 2025 WL 1836009 at *20 (D.D.C July 3, 2025) ("The defendants have not explained their decision making, and from the sparse administrative record it cannot 'reasonably be discerned.'"); *see also Am. Mun. Power-Ohio Inc. v. FERC*, 863 F.2d 70, 73 (D.C. Cir. 1988) ("[W]e cannot uphold the agency's decision … where the agency's decision articulates" no basis for its decision). Consequently, the Wind Ban lacks "any rational basis in documented fact." *Atlantic Fish Spotters Ass'n v. Daley*, 8 F. Supp. 2d 113, 118 (D. Mass. 1998) ("plane ban" was unsupported where the administrative record included "no credible evidence" of dangerous plane behavior). In another case where an agency implemented a presidential directive soon after inauguration, the Court held that the "sparse administrative record" and the agencies' rapid implementation timeline necessitated a finding that no reasoned decision-making had occurred. *Am. Pub. Health Ass'n v. NIH*, No. 25-10787-WGY, 2025 WL 1822487, at *16 (D. Mass. July 2, 2025) ("[T]here is no reasoned decision-making at all with respect to the NIH's 'abruptness' in the 'robotic rollout' of this grant-termination action." (citations omitted)); *see also Texas v. United States*, 524 F. Supp. 3d 598, 653-55 (S.D. Tex. 2021) (invalidating agency decision where agency implemented a presidential directive "within hours" of the President's inauguration because the administrative record lacked "any relevant data and information").

In any event, agencies are not exempt from the APA's reasoned decision-making requirement simply because they act pursuant to a presidential directive. *See NIH*, 2025 WL 1822487, at *18 (citing *Kingdom v. Trump,* No. 1:25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025)); *Louisiana*, 622 F. Supp. 3d at 294-295. "[T]he existence of an executive [mandate] does not automatically render an agency's implementing actions adequately reasoned." *Off. of Pers. Mgmt.*, 2025 WL 1836009, at *19. Otherwise, "the President could unilaterally eviscerate the judicial oversight that Congress contemplated in passing the APA." *NIH*, 2025 WL 1822487, at *18 (quoting *Kingdom*, 2025 WL 1568238, at *9-10)).

To the extent that the Wind Directive's passing, conclusory statements about "alleged" or "potential" concerns and call for a pretextual "comprehensive assessment" can even be considered justifications for the Wind Ban, they too are arbitrary and capricious. Defendant agencies can cite nothing in the administrative record to support such concerns about wind energy, which are contradicted by the years and volumes of legal, technical, scientific, and economic analyses and data evaluating wind energy projects. *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 305 (D. Mass. 2025) (finding that "NIH failed to provide any reasoning, rationale, or justification at all," and that its "conclusory statements will not do") (citations omitted); *see also McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions"). Nor is there any evidence that wind energy has an adverse impact on consumer costs and grid reliability; wind energy is not an "intermittent" energy source, and indeed in some cases can contribute more to grid reliability than other energy sources. Goggin Decl. ¶¶ 9, 28-34 (ECF 69). Wind energy also is complementary to other forms of energy, particularly in periods of highest energy demand. *Id.* ¶ 25. Even if evidence of the Wind Directive's stated concerns existed, it would not be pertinent

18

to wind permitting decisions made by most Defendant agencies, which have limited statutory mandates and are not responsible for regulating land use development or grid reliability.

Unexplained Change of Policy. The Wind Ban arbitrarily creates "[u]nexplained inconsistenc[ies]" with prior policy. *Navarro*, 579 U.S. at 222. When an agency seeks to change an existing policy, it must supply a "reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *NIH*, 770 F. Supp. 3d at 307. Here, the Wind Ban relies on the Wind Directive blindly and with no reasoned explanation to disregard longstanding agency policy, embodied in various statutes and regulations, that agencies should encourage renewable energy development on public lands and duly decide applications for energy development. *See, e.g.*, *Rights-of-Way, Leasing, and Operations for Renewable Energy*, 89 Fed. Reg. 35634 (May 1, 2024) (rule's purpose was to "promote the greatest use of wind and solar energy resources"); 33 C.F.R. § 320.4 (directing the Corps "to give high priority to the processing of permit actions involving energy projects.").

Moreover, the Wind Directive's bald suggestion that Defendant agencies' wind related permitting decisions might be legally deficient represents a drastic departure from the positions the government has repeatedly advocated in court to defend wind energy projects. ECF 62 at 6-7. Defendant agencies have zealously defended their wind permitting programs, and individual permitting decisions arising therefrom, arguing that existing environmental review processes satisfy all legal obligations. The lack of any acknowledgement—let alone a reasoned explanation—for this change in policy renders the agencies' decisions arbitrary and capricious. *Cf. NIH*, 770 F. Supp. 3d at 307 ("[T]he NIH Rate Change Notice failed to provide even the most basic level of "reasoning," let alone recognize or justify the disregarded facts that underlay its existing policy."); *see also Fox*, 556 U.S. at 515-16.

19

_Disparate Treatment of Energy Sources_. The Wind Ban is arbitrary and capricious also because it "violates the fundamental principle of administrative law that agencies must treat like cases alike … and fails to point to a relevant distinction between two facially similar cases that it decides to treat differently." _Kingdom_, 2025 WL 1568238, at * 9 (cleaned up); _see also ANR Storage Co. v. FERC_, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (An agency "decision must give a reasoned analysis to justify the disparate treatment of regulated parties that seem similarly situated."). While the Wind Directive posits that permits for wind development cannot be issued given generalized concerns about wind energy's impact on the environment and wildlife, Defendant agencies have simultaneously sought to expedite and simplify the permitting process for other energy technologies, including coal, oil, gas, and nuclear, by streamlining permitting and environmental reviews designed to protect wildlife and the environment, often implicating the same resources.[9] Similarly, the Wind Directive's stated economic concerns about wind energy contrast with the Administration's silence about the economics of energy sources like coal while actively promoting them. _See_ Exec. Order  No. 14261. Nor have Defendant agencies explained how it is feasible to address the President's declared national energy emergency without wind energy.[10] _See_ Exec. Order No. 14156. The inexplicably disparate treatment of and freeze on wind energy is unexplained and consequently arbitrary.

---

[9] Exec. Order No. 14153, "Unleashing Alaska's Extraordinary Resource Potential," 90 Fed. Reg. 8347 (Jan. 20, 2025); Exec. Order No. 14154, "Unleashing American Energy," 90 Fed. Reg. 8353 (Jan. 20, 2025); Exec. Order No. 14156, "Declaring a National Energy Emergency," 90 Fed. Reg. 8433 (Jan. 20, 2025); Exec. Order 14261, "Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241," 90 Fed. Reg. 15517 (Apr. 8, 2025); Exec. Order No. 14300, "Ordering the Reform of the Nuclear Regulatory Commission," 90 Fed. Reg. 22587 (May 23, 2025); Proclamation No. 10956, Regulatory Relief For Certain Stationary Sources to Further Promote American Energy, 90 Fed. Reg. 34583 (July 23, 2025).

[10] The President has stated that "[w]e're not going to approve windmills unless something happens that's an emergency"—despite that the President has already declared a "national

20

<u>Reliance Interests.</u> Defendants failed to consider the reliance interests of hundreds of American companies like ACE NY's members involved in wind energy development, the Americans who are employed by these companies, and the state and local communities that depend on wind energy. *See* ECF 162 at 25-26 (finding that Plaintiffs have plausibly alleged that the Wind Ban causes imminent harm to reliance interests in the form of "contracts, investments, and construction" as well as "loss of tax revenue"). Companies make long-term investment decisions under the expectation that they will have the opportunity to seek and secure necessary federal permits. *See* Wells Decl. ¶¶ 10-19 (ECF 60). Because the Wind Ban gravely damages those reasonable expectations, Defendant agencies should have taken the "serious reliance interest" of wind energy companies and the supply chains they rely upon into account *before* implementing the Wind Ban. *NIH*, 770 F. Supp. 3d at 308-12. Their complete failure to do so here renders the Wind Ban arbitrary and capricious. *Id.* (grantees, researchers, and the public had significant reliance interests, which the agency had not considered); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (when an agency suddenly changes course, it must recognize "that longstanding policies may have engendered serious reliance interests that must be taken into account"); *AIDS Vaccine Coal.*, 2025 WL 485324, at *5 (the Administration had no "rational reason for disregarding the massive reliance interests of the countless small and large businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process").

<u>Costs and Benefits.</u> Finally, the Wind Ban is arbitrary and capricious because it fails to assess or consider its costs and benefits in the given circumstances. *See Mexican Gulf Fishing*

---

energy emergency." *See Offshore wind stalls as Trump's hostility deepens*, Climatewire (June 20, 2025), https://subscriber.politicopro.com/article/eenews/2025/06/20/offshore-wind-stalls-as-trumps-hostility-deepens-cw-00405111.

*Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023). The costs of the Wind Ban include not only severe disruption of the wind industry and its employees, but also broader effects on the nation's energy supply, particularly in the context of what the Administration itself labels an "Energy Emergency" due to an "inadequate energy supply." *See* Exec. Order Nos. 14154, 14156. The Wind Ban is *precisely* the type of "agency action[] that impose[s] an undue burden on the identification, development, or use of domestic energy resources" that the Administration directs agencies to "suspend, revise, or rescind." *See* Exec. Order No. 14154 §§ 3(a), 3(b). Defendant agencies failed to consider these costs of the Wind Ban, which greatly outweigh any benefits therefrom. *Hornbeck*, 696 F. Supp. 2d at 638 (DOI had a duty to properly balance environmental concerns with development interests before instituting a drilling moratorium in response to the Deepwater Horizon incident). Nothing mandates, much less authorizes, a total stoppage of wind permitting for however long Defendant agencies decide to take to complete a new comprehensive assessment or to determine what to do with it if it is ever completed.

In sum, the Wind Ban is not the product of fact-finding or reasoned decision-making. Instead, the Defendant agencies immediately and summarily implemented the Wind Directive with no published rationale and without further consideration or evaluation of the potential impacts of their actions as required by law. The Wind Directive itself does not supply a reasoned, legally sound explanation for these agencies' actions, and fails to articulate a rational connection between the facts found and choices made. The Wind Ban is therefore arbitrary and capricious.

## IV.    THE WIND BAN VIOLATES REQUISITE PUBLIC NOTICE AND COMMENT.

It is undisputed that Defendant agencies have not undertaken notice and comment rulemaking for the Wind Ban. Nor is there any real question that the Wind Ban is a substantive rule, for which notice and comment is required. 5 U.S.C. § 553. The Wind Ban thus was adopted "without observance of procedure required by law" in violation of the APA. *Id.* § 706(2)(D).

22

A substantive (or legislative) rule is one that is "binding" or has "the force of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (citations omitted). Significant pauses and blanket moratoria on agency action have substantive "legal consequences" for regulated entities and the public. *See* ECF 162 at 33 (quoting *Louisiana*, 622 F. Supp. 3d at 295-96). As this Court also recognized, to discern a substantive rule, the "'critical factor' is 'whether it le[aves] the agency officials free to exercise discretion in an individual case' or instead requires a uniform, predetermined outcome that admits of no exception." *Id.* at 37 (citation omitted). When an agency suspends or pauses the application of substantive rules that govern agency processes with the force and effect of law, it effectively promulgates a new substantive rule that is binding on regulated entities. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017).

The Wind Ban is a substantive rule that upends the entire federal permitting framework for wind energy, and so has legal consequences. At minimum, it adds a new substantive precondition—completion of a "comprehensive assessment"—to each Defendant agency's permitting requirements. The Wind Ban binds regulated entities to a new rule in a way that affects or jeopardizes "the interests ultimately at stake in the agency proceeding," i.e., their ability to pursue wind projects. *See* ECF 162 at 38. As this Court explained, "the Wind Directive appears to leave the affected agency officials no discretion to deviate from its strictures, effectively removing rights from the plaintiffs with no promise of future rulemaking or clear timeline for resolution of their rights." *Id.* at 39-40; *see also Louisiana*, 622 F. Supp. 3d at 296-97 (agency pause of oil and gas leasing was a substantive rule because it was nondiscretionary and reflected a "command" to agency staff).

This Court found that a conclusive determination on this claim "is an issue that requires an administrative record to properly resolve," ECF 162 at 40 (citation omitted). The now-filed

23

administrative record contains nothing suggesting that the Wind Ban is discretionary or flexible or that otherwise affects the Court's previous analysis or renders it only interpretative.

It follows that the Wind Ban is summarily adopted substantive rulemaking, which must be vacated. APA notice and comment serves the critical purpose of ensuring that regulated entities "are treated with fairness and transparency after due consideration and industry participation." *Iowa League of Cities v. EPA*, 711 F.3d 844, 870-71 (8th Cir. 2013). In other words, rather than proceeding (as here) by administrative fiat, agencies should act on the basis of full information, and the public and affected parties must be informed before an agency takes widespread action that may affect their rights and interests.

## V.    DEFENDANT AGENCIES' ACTIONS ARE CONTRARY TO LAW.

The Wind Ban is not supported by any statutory or regulatory authority. Agencies "literally have no power to act except to the extent Congress has authorized." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *15. Agency action must be set aside as not in accordance with law if it is contrary to statutory or regulatory mandate. *See, e.g.*, *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1003 (D.C. Cir. 2014). As no statute or regulation grants any Defendant agency authority to abdicate its permitting responsibilities, the Wind Ban constitutes agency action "contrary to law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A); *id.* § 706(2)(C).[11] While agencies may conduct additional studies, "[t]he Executive Branch does not have the authority to stop the process under the [Mineral Leasing Act] or the [Outer Continental Shelf Lands Act] while a review is taking

---

[11] APA Sections 706(2)(A) and 706(2)(C) contain a "linguistic distinction without a practical difference." *Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass 2021).

place." *Louisiana*, 622 F. Supp. 3d at 289. The same is true under other laws and regulations governing wind energy permitting.

To avoid burdening the Court with duplicative briefing, ACE NY adopts the contrary to law arguments set forth in Plaintiff States' concurrently filed motion for summary judgment. The Wind Ban is contrary to multiple legal requirements including, but not limited to, under the APA Section 558; Outer Continental Shelf Lands Act; Clean Water Act; Rivers and Harbors Act; Clean Air Act; National Environmental Policy Act; multiple protected species laws; and the Federal Land Policy and Management Act. Each of these conflicts defeats the Wind Ban.

## VI.  THE COURT SHOULD VACATE EACH DEFENDANT AGENCY'S DECISION TO ADOPT AND IMPLEMENT THE WIND DIRECTIVE.

ACE NY respectfully requests that the Court order: (1) a declaratory judgment that defendant agencies have violated the APA, and (2) vacatur of each Defendant agency's decision to adopt and implement the Wind Directive. Vacatur will adequately redress the harms to ACE NY's members at issue in this case, which result from Defendant agencies' freeze on permit issuance. Defendant agencies have alleged (without support) that they "process" certain wind permit submissions but admit they are not issuing decisions per the Wind Directive. *E.g.*, ECF 123. Following vacatur, the agencies will be able to promptly resume deciding permits for wind projects regardless of the Wind Directive.[12]

This case is brought pursuant to the APA, 5 U.S.C. § 706(2). That provision authorizes this court to "hold unlawful and set aside agency action," language that has long been interpreted to authorize federal courts to vacate unlawful agency action in its entirety. "When a reviewing

---

[12] ACE NY reserves the right to seek further relief if Defendant agencies do not faithfully adhere to this Court's summary judgment order and remedy and instead attempt to implement the Wind Directive via other means.

court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual petitioners is proscribed.*'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)) (emphasis added). Similarly, the First Circuit has found that vacatur "is a proper remedy when an agency fails to explain its reasoning adequately." *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) *Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998).

Only full vacatur of Defendant agencies' implementation of the Wind Directive will provide complete relief to ACE NY's membership engaged in wind energy activities across the country. ACE NY has many members that operate nationwide and have wind projects requiring permits in numerous States. Wells 3d Decl. ¶¶ 4-7. At present, ACE NY's members have wind energy projects under development in 32 States, and ACE NY's members will continue to develop wind energy projects in coming months and years that may be located in additional States. Wells 3d Decl. ¶¶ 5, 8. ACE NY's members also provide components, construction services, and otherwise do business relating to wind energy. Those operations involve business activities in 17 additional States, and ACE NY's members could become involved in additional wind energy projects in additional States. Wells 3d Decl, at ¶¶ 6, 7, 8. Vacatur would provide a remedy to these ACE NY members, which are critical within a nationwide wind industry but do not directly seek permits. The Court should therefore vacate the Wind Ban in full.[13]

_____

[13] Nor is remand to the agency without vacatur an adequate remedy. The First Circuit has explained that, in deciding whether to remand to an agency without vacatur, a court should consider "the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001). Here, the Wind Ban's arbitrariness and inconsistency with legal requirements are severe. It is difficult to imagine that Defendant agencies could

In the event that Defendants invoke *Trump v. CASA* to try to limit the remedy in this case, it is inapposite to the APA claims presented here. *CASA* by its terms does not address the authority or propriety of district courts vacating unlawful agency action under the APA. *Trump v. CASA*, 606 U.S. ---, 145 S. Ct. 2540, 2554 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. See 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action")."); *see also id.* at 2569 (Kavanaugh, J., concurring) (describing APA vacatur as the "functional equivalent" of a universal injunction). Nor does *CASA*'s reasoning under the Judiciary Act of 1789 apply to vacatur deriving from the APA. The Supreme Court also has long recognized that complete vacatur is a "less drastic remedy" than injunctive relief. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

This Court and other courts have already addressed this issue post-*CASA* and held that *CASA* does not alter courts' longstanding ability to vacate a rule in full under the APA. *See, e.g., Ass'n of Am. Univs. v. Dep't of Def.*, No. CV 25-11740-BEM, 2025 WL 2022628, at *27 (D. Mass. July 18, 2025); *Off. of Pers. Mgmt.*, 2025 WL 1836009, at *22 n.17; *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *51 (D.D.C. July 2, 2025). This Court thus has the power under the APA to fully vacate the actions of the Defendant agencies before it. Here, only full vacatur will suffice to provide ACE NY and its diverse membership members with redress from the Wind Ban.

---

reinstate the Wind Ban consistent with applicable law, or that they could provide a non-arbitrary basis to do so. The agencies have proffered no factual showing of harms that would justify the Wind Ban even while completing a new comprehensive assessment. Similarly, the equities and the public interest weigh strongly against the agencies' position, as set forth in ACE NY's previous filings in support of a preliminary injunction.

**CONCLUSION**

For the reasons above and in ACE NY's and Plaintiff States' prior filings, the Court should grant summary judgment to Plaintiffs and against Defendants, and declare unlawful and vacate Defendant agencies' adoption and implementation of the Wind Directive, so that Defendant agencies can resume issuing wind-energy permit decisions and other approvals consistent with all applicable law.

Dated: August 8, 2025                    Respectfully submitted,

                                         BEVERIDGE & DIAMOND, P.C.

                                         */s/ Brook J. Detterman*
                                         Brook J. Detterman, BBO No. 675396
                                         James M. Auslander, *pro hac vice*
                                         155 Federal Street, Suite 1600
                                         Boston, MA 02110-1716
                                         (617) 419-2345
                                         bdetterman@bdlaw.com
                                         jauslander@bdlaw.com

                                         *Attorneys for Plaintiff-Intervenor*
                                         *Alliance for Clean Energy New York*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed on August 8, 2025.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

BEVERIDGE & DIAMOND, P.C.

*/s/ Brook J. Detterman*
 Brook J. Detterman, BBO No. 675396
 155 Federal Street
 Suite 1600
 Boston, MA 02110-1716
 (617) 419-2345
 bdetterman@bdlaw.com