**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

Civil Action No. 1:25-cv-11221-WGY

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    I.     Factual Background ............................................................................ 2

          A.     President Trump Issues the Wind Memorandum ....................................... 3

          B.     Federal Agencies Begin Complying with the Wind Memorandum ........... 4

    II.    Legal Background ............................................................................ 4

          A.     Federal Statutes Governing Wind Energy Development ........................... 4

               1.     The Outer Continental Shelf Lands Act ("OCSLA") ................... 4

               2.     Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA") ......................................... 5

               3.     Section 402 of the CWA ......................................................... 5

               4.     The Clean Air Act ("CAA") ..................................................... 6

               5.     The Fixing America's Surface Transportation Act ("FAST Act") ...................................................................................... 6

          B.     Wildlife and Marine Resource Conservation Statutes .............................. 7

               1.     The Endangered Species Act ("ESA") ........................................ 7

               2.     The Bald and Golden Eagle Protection Act ("BGEPA") .............. 8

               3.     The Marine Mammal Protection Act ("MMPA") ....................... 8

               4.     The Magnuson-Stevens Fishery Conservation and Management Act ("MSA") ..................................................... 9

    III.   Procedural Background ...................................................................... 9

STANDARD OF REVIEW .................................................................................... 10

ARGUMENT ........................................................................................................ 11

    I.     Plaintiffs and Intervenor Fail to Establish Standing .............................. 11

          A.     New York Has Suffered No Injuries, Nor Are the Alleged Injuries Traceable to Defendants' Actions ........................................... 12

i

B.    Intervenor Has Failed to Identify a Specific Member that Would
Have Standing to Bring This Case On Its Own ........................................ 14

C.    New York's and Intervenor's Injuries Would Not Be Redressed by
Vacatur of the Challenged Decisions to Review Permitting
Procedures Under the President's Wind Memorandum ........................... 15

D.    New York's and Intervenor's Alleged Injuries Do Not Fall Within
the Relevant Statutes' Zones of Interest ................................................... 17

II.    New York and Intervenor Fail to Challenge Final Agency Action ...................... 21

III.    New York's and Intervenor's APA Claims Fail on the Merits .............................. 25

A.    Defendants' Decision to Follow the Wind Directive Was Not
Arbitrary, Capricious, an Abuse of Discretion, or in Excess of
Statutory Authority .................................................................................... 26

B.    Defendants' Decision Is Not Subject to Notice-and-Comment
Rulemaking ................................................................................................. 34

IV.    Any Relief Ordered Should Be Narrowly Tailored ............................................... 38

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................................................ 13

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
    707 F.2d 548 (D.C. Cir. 1983) ............................................................................ 37

*Am. Waterways Operators v. U.S. Coast Guard*,
    613 F. Supp. 3d 475 (D. Mass. 2020) ................................................................. 10

*Ass'n of Battery Recyclers, Inc. v. EPA*,
    716 F.3d 667 (2013) ............................................................................................ 17

*Associated Fisheries of Maine, Inc. v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ........................................................................ 25, 26

*Bennett v. Murphy*,
    166 F. Supp. 3d 128 (D. Mass. 2016) ................................................................. 11

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................... 22, 23

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016) ................................................................................. 11

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ...................................................................................... 26, 27

*California v. EPA*,
    72 F.4th 308 (D.C. Cir. 2023) .......................................................................... 2, 8

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................................ 34

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) .......................................................................... 13, 14

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................................ 39

*Diamond Alternative Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025) ................................................................................. 13, 16

*FCC v. Consumers' Rsch.*,
    145 S.Ct. 2482 (2025) ......................................................................................... 21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................................ 38

*Food & Drug Admin. v. Wages & White Lion Investments LLC*,
    145 S.Ct. 898 (2025)............................................................. 25

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)............................................................. 34

*Friedrich v. HHS*,
    894 F.2d 829 (6th Cir.)........................................................ 37

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ........................................ 22, 23

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    110 F.4th 295 (1st Cir. 2024) .............................................. 14

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    995 F.3d 18 (1st Cir. 2021) ................................................. 15

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
    510 U.S. 1301 (1993)........................................................... 38

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) .................................... 13, 14, 15

*Kessler v. FCC*,
    326 F.2d 673 (D.C. Cir. 1963) ........................................... 36

*Kinuthia v. Biden*,
    702 F. Supp. 3d 5 (D. Mass. 2023) ......................................11

*La Casa Del Convaleciente v. Sullivan*,
    965 F.2d 1175 (1st Cir. 1992) ................................. 35, 36, 37

*Levesque v. Block*,
    723 F.2d 175 (1st Cir. 1983) .............................................. 36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................. 17, 18, 21

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)........................................................11, 25

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ............................ 20, 21

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................... 12, 13

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)............................................................. 22

*Marquette Cnty. Rd. Comm'n v. EPA*,
    726 Fed. App'x 461 (6th Cir. 2018)................................... 24

iv

*Melone v. Coit*,
   100 F.4th 21 (1st Cir. 2024) ............................................................ 26, 34

*Nat'l Parks Conservation Ass'n v. Norton*,
   324 F.3d 1229 (11th Cir. 2003) ............................................................. 23

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................... 22, 39

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015) ........................................................ 12, 18

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
   506 F.2d 33 (D.C. Cir. 1974) ........................................................... 35, 36

*Penn. Mun. Auths. Ass'n v. Horinko*,
   292 F. Supp. 2d 95 (D.D.C. 2003) .......................................................... 23

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ......................................................................... 35

*Ranger v. FCC*,
   294 F.2d 240 (D.C. Cir. 1961) .............................................................. 36

*Reform v. U.S. Dep't of Homeland Sec.*,
   621 F. Supp. 3d 84 (D.D.C. 2022) .......................................................... 18

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   123 F.4th 1 (1st Cir. 2024) ..................... 10, 17, 18, 19, 20, 21, 26, 27, 37

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   No. 1:22-cv-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023)...................... 10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
   145 S.Ct. 1497 (2025).......................................................................11

*Shawnee Trail Conservancy v. Nicholas*,
   343 F. Supp. 2d 687 (S.D. Ill. 2004) ................................................... 23, 24

*Silver v. Internal Revenue Serv.*,
   269 F. Supp. 3d  (D.D.C. 2021) ............................................................ 18

*Silver v. Internal Revenue Serv.*,
   531 F. Supp. 3d 346 (D.D.C. 2021) ......................................................... 18

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016).......................................................................... 12

*Trump v. Am. Fed. of Gov't Emps.*,
   No. 24A1174, 2025 WL 1873449 (July 8, 2025) .......................................... 32, 33

*Trump v. CASA, Inc.*,
   No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025)........................................ 38

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ............................................................................ 22

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................ 38

*Victim Rights Law Ctr. v. Cardona*,
  552 F.Supp.3d 104 (D. Mass. 2021) .................................................... 25

**Statutes**

16 U.S.C. § 1361(6) ................................................................................. 19

16 U.S.C. § 1362(13) ............................................................................ 8, 9

16 U.S.C. § 1371(a) ................................................................................... 8

16 U.S.C. § 1531(b) ................................................................................. 19

16 U.S.C. § 1536(a)(2) ........................................................................ 7, 31

16 U.S.C. § 1536(b)(1)(A) ...................................................................... 31

16 U.S.C. § 1536(o)(2) .............................................................................. 8

16 U.S.C. § 1539(a) ............................................................................ 8, 30

16 U.S.C. § 1801(b)(1) ............................................................................ 19

16 U.S.C. § 1855(b)(2) .............................................................................. 9

16 U.S.C. § 668(a) .............................................................................. 8, 19

33 U.S.C. § 1251(a) ................................................................................. 19

33 U.S.C. § 1311(a) ................................................................................... 6

33 U.S.C. § 1342(a)(1) ..................................................................... 5, 6, 29

33 U.S.C. § 1342(b) ........................................................................... 29, 30

33 U.S.C. § 1369(b)(1) ....................................................................... 6, 30

33 U.S.C. § 1369(b)(1)(F) ...................................................................... 39

33 U.S.C. § 403 ....................................................................................... 19

42 U.S.C. § 4370m(6) ........................................................................... 6, 7

42 U.S.C. § 7401(b)(1) ............................................................................ 19

42 U.S.C. § 7475(c) ................................................................................... 6

42 U.S.C. § 7604(a)(2) ............................................................................ 16

42 U.S.C. § 7607(b)(1) ....................................................................... 6, 16

42 U.S.C. § 7627 ....................................................................................... 6

42 U.S.C. §§ 4321-4347 ............................................................................................... 5, 19

42 U.S.C. §§ 4370m-2(b) ................................................................................................ 19

43 U.S.C. § 1332(3) ........................................................................................................ 19

43 U.S.C. § 1337(p)(1) .................................................................................................... 29

43 U.S.C. § 1337(p)(8) ...................................................................................................... 5

43 U.S.C. § 1701(a)(8) .................................................................................................... 19

43 U.S.C. § 1761(a)(4) .................................................................................................... 29

43 U.S.C. §§ 1331-1356c .................................................................................................. 4

5 U.S.C. § 551(1) ........................................................................................................... 34

5 U.S.C. § 551(4) ........................................................................................................... 35

5 U.S.C. § 553 ............................................................................................................... 34

5 U.S.C. § 702 .......................................................................................................... 17, 22

5 U.S.C. § 704 ............................................................................................................... 22

5 U.S.C. § 706(1) ................................................................................................. 21, 33, 39

5 U.S.C. § 706(2) ........................................................................................................... 39

5 U.S.C. § 706(2)(A) ...................................................................................................... 25

5 U.S.C. § 706(2)(C) ...................................................................................................... 25

54 U.S.C. § 300101(1) .................................................................................................... 19

Pub. L. No. 114-94, 129 Stat. 1312 (2015) ....................................................................... 6

U.S.C. § 1344 ................................................................................................................ 31

U.S.C. § 7604(a)(2) ........................................................................................................ 21

U.S.C. §§ 1344 ................................................................................................................ 5

**Regulations**

30 C.F.R. § 585.102(c) .................................................................................................... 29

30 C.F.R. § 585.210 .......................................................................................................... 5

30 C.F.R. § 585.613 ........................................................................................................ 29

30 C.F.R. Pt. 585 ............................................................................................................. 5

33 C.F.R. § 322.3(a) ......................................................................................................... 5

33 C.F.R. § 325.2(d)(1) .............................................................................................. 31, 32

40 C.F.R. § 122.1 ............................................................................................................. 5

40 C.F.R. § 124.15(b) .................................................................................................. 16, 30

40 C.F.R. § 124.3(c) ........................................................................................................... 30

40 C.F.R. §§ 124.3(a) ........................................................................................................... 6

40 C.F.R. §§ 55.13-55.14 ..................................................................................................... 6

40 C.F.R. Part 124 ................................................................................................................ 6

43 C.F.R. § 2801.5 ............................................................................................................... 29

50 C.F.R. § 13.11 .................................................................................................................. 9

50 C.F.R. § 222.302(b) ................................................................................................... 30, 31

50 C.F.R. § 402.14 .............................................................................................................. 31

50 C.F.R. § 402.14(e) .......................................................................................................... 31

50 C.F.R. § 402.14(i)(1) ........................................................................................................ 8

50 C.F.R. §§ 18.27 ................................................................................................................ 9

50 C.F.R. §§ 216.104 ............................................................................................................ 9

50 C.F.R. §§ 22.200(d) .......................................................................................................... 8

50 C.F.R. §§ 402.14(a) ....................................................................................................... 7, 8

50 C.F.R. §§ 600.920 ............................................................................................................ 9

**Other Authorities**

72 Fed. Reg. 27717 (May 16, 2007) ..................................................................................... 2

74 Fed. Reg. 19638 (Apr. 29, 2009) ..................................................................................... 5

86 Fed. Reg. 7619 (Feb. 1, 2021) ......................................................................................... 2

88 Fed. Reg. 25251 (Apr. 26, 2023) ..................................................................................... 2

90 Fed. Reg. 8363 (Jan. 29, 2025) ............................................................................. 3, 26, 36

90 Fed. Reg. 8449 (Jan. 20, 2025) ...................................................................................... 38

**<u>INTRODUCTION</u>**

New York's case attacks a core tenet of administrative law and constitutional structure: federal agencies must follow the President's directives unless prohibited by existing law.[1]  Shortly after taking office, President Trump directed several federal agencies to temporarily cease issuing new or renewed permits and other authorizations for wind energy projects pending completion of a comprehensive assessment and review of federal leasing and permitting practices. But these agencies were expressly required to implement the President's directive only to the extent it was consistent with existing law.

Turning to this lawsuit, New York's claims fail on several threshold issues and on the merits. Starting with the threshold issues, New York lacks standing and has failed to identify a "final agency action" necessary for its Administrative Procedure Act ("APA") claims. And on the merits, the relevant agencies did not act arbitrarily or contrary to law by following President Trump's directive and temporarily ceasing decisions on certain permits or other authorizations.

Some context helps here. New York does not challenge the application of the President's directive to an individual permit. Nor does it demand the issuance of a permit it believes has been unlawfully delayed. New York instead claims that each agency's "decision" to follow the President's directive—even though conditioned on compliance with existing law—is somehow unlawful. New York's theory inexplicably requires this Court to assume that Congress—through statutory silence—forbid each agency from complying with the President's directive. To prevail on this claim, New York must show that *every* permit authorization for wind-energy projects is subject to an unstated, mandatory issuance deadline that would make it impossible to legally

---

[1] New York is joined by sixteen states, the District of Columbia, and Intervenor Alliance for Clean Energy New York ("Intervenor"). For ease of reference, this brief refers to all Plaintiffs and Intervenor as "New York," unless context requires otherwise.

comply with the President's directive. Yet no across-the-board statutes or regulations apply that require agencies to issue all authorizations by a specific date, so the directive can be carried out consistent with existing law. The Court should thus grant summary judgment in favor of Defendants.

## **BACKGROUND**

### I.    **Factual Background**

Executive orders and related executive directives serve to guide "the internal management of the executive branch" and direct "agency officials to consider certain policies when making regulatory decisions." *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023) (citation omitted); *see also* Comm. on Gov't Operations, 85th Cong., *Executive Orders & Proclamations: A Study of a Use of Presidential Powers* 1 (Comm. Print 1957);[2] Harold C. Relyea, Cong. Research Serv., 98-611 GOV, *Presidential Directives: Background and Overview* 1 (2008).

Presidents across the political spectrum have used such executive directives to shape agency handling of various environmental concerns, consistent with the President's policies. *E.g.*, Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619, 7624-25 §§ 207-08 (Feb. 1, 2021) (Biden-era executive order); Executive Order 13432, *Cooperation Among Agencies in Protecting the Environment with Respect to Greenhouse Gas Emissions From Motor Vehicles, Nonroad Vehicles, and Nonroad Engines*, 72 Fed. Reg. 27717 (May 16, 2007) (Bush-era executive order).[3]

---

[2] Available at https://babel.hathitrust.org/cgi/pt?id=mdp.39015034716152&seq=13.
[3] *See also* Executive Order 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251, 25254 § 3(ix)(A) (Apr. 26, 2023) (Biden-era executive order); Presidential Memorandum, *Climate Change and National Security* (Sept. 21, 2016) (Obama-era executive memorandum), available at https://obamawhitehouse.archives.gov/the-press-office/2016/09/21/presidential-memorandum-climate-change-and-national-security.

### A.     President Trump Issues the Wind Memorandum

On January 20, 2025, President Trump issued an executive memorandum entitled, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects.* 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Wind Memo"). Like presidential directives before it, the Wind Memo informs certain agencies of the President's wind energy policies and instructs those agencies to follow that policy "consistent with applicable law." *Id*. at 8364.

Section 2(a) of the Wind Memo provides two directives: (1) that the heads of relevant agencies conduct a "comprehensive assessment and review of Federal wind leasing and permitting practices" ("Assessment and Review"); and (2) that until that review is completed, they "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects" ("Wind Directive"). 90 Fed. Reg. at 8363-64. Crucially, the Wind Memo instructs that these directives "shall be implemented consistent with applicable law." *Id.* at 8364. In other words, agencies must follow the Wind Memo consistent with their existing statutory authority and obligations. The President announced these directives based on concerns over potential legal deficiencies in past practices, the possibility of serious harm to various interests and marine mammals, and the potential inadequacies of various environmental reviews. *Id*.

The Assessment and Review directive tasks the Secretary of the Interior, in consultation with the heads of other agencies, to develop an assessment and review of the environmental impact of onshore and offshore wind projects. That effort, led by the Department of the Interior, is underway. DOI Decl. ¶ 5, Dkt. 123-3; NMFS Decl. ¶ 8, Dkt. 123-7.

The Wind Directive did not "indefinitely halt" all wind energy development. Authorized projects continue to generate power, and in fact, Agency Defendants generally continue to review,

analyze, and process wind energy submissions and materials consistent with the Wind Memo and applicable law. BOEM Decl. ¶ 7, Dkt. 123-1; Corps Decl. ¶ 6, Dkt. 123-2; EPA Decl. ¶¶ 5, 15, 23, Dkt. 123-4; FWS-ES Decl. ¶¶ 7-8, 11, Dkt. 123-5; FWS-MB Decl. ¶ 11, Dkt. 123-6; NMFS Decl. ¶¶ 4-5.

### B.    Federal Agencies Begin Complying with the Wind Memorandum

The agencies named in the Wind Memo, including those within the Department of the Interior ("DOI"), the Environmental Protection Agency ("EPA"), that National Marine Fisheries Service ("NMFS"),[4] and the U.S. Army Corps of Engineers ("Corps"), received or were informed of the Wind Memo and its Wind Directive shortly after it was issued. *See* DOI Administrative R. Certification, Dkt. 165-1 ("AR Cert.)"; EPA AR Cert., Dkt. 165-4; NMFS AR. Cert., Dkt. 165-6; Corps AR Cert., Dkt. 165-8. Each of these agencies have temporarily ceased issuing permits until the Assessment and Review is complete, as instructed in the Wind Memo. *See* DOI AR Cert. ¶ 2; EPA AR Cert. ¶ 2; NMFS AR Cert. ¶ 2; Corps AR Cert. ¶ 2.

## II.    Legal Background

### A.    Federal Statutes Governing Wind Energy Development

Several federal statutes govern the various permitting requirements necessary for project approvals and the required environmental reviews. Beyond those statutes, several more are implicated by wind energy projects.

### 1.    The Outer Continental Shelf Lands Act ("OCSLA")

OCSLA governs the development of energy on the Outer Continental Shelf ("OCS"). 43 U.S.C. §§ 1331-1356c. The Secretary of the Interior, in consultation with other relevant federal

---

[4] NMFS is an agency of the National Oceanic and Atmospheric Administration within the U.S. Department of Commerce.

agencies, may grant a lease, easement, or right-of-way on the OCS for the purpose of renewable energy production, including wind energy. *Id.* § 1337(p)(1)(C).

To exercise this authority, DOI has issued regulations governing a multi-phase development process for offshore renewable energy projects that is managed by the Bureau of Ocean Energy Management ("BOEM"). *See* 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Part 585; *see also* 43 U.S.C. § 1337(p)(8); BOEM Decl. ¶ 2, Ex. A. For commercial wind energy, BOEM's development process generally consists of competitive leasing, 30 C.F.R. § 585.210; review of a lessee's Site Assessment Plan ("SAP"), *id.* § 585.605-18; review of a lessee's Construction and Operations Plan ("COP"), *id.* § 585.620-35; and other reviews as required by federal law, *e.g.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347.

### 2. Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA")

A permit under Section 404 of the CWA authorizes discharges of dredged and fill material into "waters of the United States." 33 U.S.C. §§ 1344, 1362(7). Section 10 of the RHA prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." *Id.* § 403. A Section 10 permit is required to build structures or perform work in or affecting such waters. 33 C.F.R. § 322.3(a).

The Corps administers Section 404 permits and Section 10 permits pursuant to its regulations, *see, e.g.*, 33 C.F.R. Parts 320, 325, and must often await actions by third parties, including agency completion of NEPA review, compliance with other environmental laws, and state certification under Section 401 of the CWA. *See id.* § 325.2(d)(3).

### 3. Section 402 of the CWA

The CWA also established the National Pollutant Discharge Elimination System ("NPDES") permit program. 33 U.S.C. § 1342(a)(1); 40 C.F.R. § 122.1. Under Section 402 of the

CWA, pollutant discharges into waters of the United States are prohibited unless done in compliance with CWA requirements, such as in compliance with a NPDES permit. 33 U.S.C. § 1311(a).

NPDES permits "may" be issued by EPA. *Id*. § 1342(a)(1), (b). EPA, among other things, decides whether to prepare a draft permit, provides for public comment, and issues permit decisions. *See* 40 C.F.R. §§ 124.3(a); 124.6(a), (d), (e); 124.8(a); 124.10(b)(1); 124.15. If issued, the permit becomes effective 30 days later, unless a later date is set or review by the Environmental Appeals Board ("EAB") is requested. *Id.* § 124.15(b). A permit decision is not final until after EAB review. *Id*. § 124.19(l). After EAB review, permit decisions are subject to judicial review in federal circuit courts pursuant to 33 U.S.C. § 1369(b)(1).

### 4.    The Clean Air Act ("CAA")

The CAA authorizes EPA to regulate air pollution from OCS activities. *See* 42 U.S.C. § 7627. EPA's regulations require permitting for OCS sources of air pollution and incorporate by reference permitting requirements for Prevention of Significant Deterioration ("PSD"), Nonattainment New Source Review, and Title V of the CAA. *See* 40 C.F.R. §§ 55.13-55.14. The CAA sets deadlines for some permit decisions. *See* 42 U.S.C. § 7475(c) (PSD preconstruction); *id.* § 7661b(c) (Title V operating permits). CAA permits are generally subject to the same or similar procedures and requirements as NPDES permits, *see, e.g.*, 40 C.F.R. Part 124 (PSD permits), and are subject to federal circuit court review, 42 U.S.C. § 7607(b)(1).

### 5.    The Fixing America's Surface Transportation Act ("FAST Act")

The FAST Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015), is an omnibus transportation bill that, among other things, streamlines federal permitting for certain infrastructure projects. *See* 42 U.S.C. § 4370m(6). The Executive Director of the Federal Permitting Improvement Steering

Council and federal agencies work together to set overall coordinated project plans and permitting timetables for covered projects. *See id.* § 4370m-2(c)(1)-(2). But the FAST Act does not establish any mandatory timelines for completion of authorizations or reviews, and if an agency needs more time to complete an authorization or review, it may seek to modify the permitting timetable. *See id.* §§ 4370m-2(c)(2)(D); 4370m-2(c)(2)(F)(ii)**.**

## B.    Wildlife and Marine Resource Conservation Statutes

New York's Amended Complaint references various statutes described below that generally protect and conserve wildlife and marine resources and their habitats. The statutes do not grant any agency the authority to authorize the construction or operation of a wind energy project. While the statutes authorize the agencies that administer them to issue certain exemptions from the protections that are set forth in the statutes for activities including wind energy projects, those exemptions, when granted, merely shield the permittees from liability for impacts that occur consistent with the terms and conditions that are specified in the exemption. The exemptions do not grant permission to construct or operate a wind energy project.

### 1.    The Endangered Species Act ("ESA")

Section 7(a)(2) of the ESA requires federal agencies ("action agencies") to ensure that any "action" they authorize, fund, or carry out "is not likely to jeopardize the continued existence of" a species listed as threatened or endangered under the ESA or "result in the destruction or adverse modification" of critical habitat designated for such species. 16 U.S.C. § 1536(a)(2).

To facilitate compliance with these requirements, action agencies must consult with one or both of the expert agencies that are charged with administering the ESA (the U.S. Fish and Wildlife Service ("FWS") or NMFS, the "consulting agencies") if a discretionary federal agency action "may affect" ESA-listed species or designated critical habitat. 50 C.F.R. §§ 402.14(a), 402.02. The

consultation process may include formal consultation, *id.* 402.14, and issuance of a written biological opinion ("BiOp") and incidental take statement by the consulting agency, *id.* § 402.14(g)-(h). 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(1).

Under ESA Section 10, where a project has no federal nexus, the consulting agencies are authorized to grant incidental take permits to non-federal applicants, the issuance of which is, itself, an action subject to internal intra-agency ESA Section 7 consultation. 16 U.S.C. § 1539(a).

### 2.    The Bald and Golden Eagle Protection Act ("BGEPA")

The BGEPA imposes criminal and civil penalties against "whoever" shall "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" bald and golden eagles, except as permitted by the Interior Secretary. 16 U.S.C. § 668(a)–(b). Under authority delegated by the Secretary, FWS has promulgated regulations authorizing it to issue permits for incidental take of eagles that "results from, but is not the purpose of, the activity." 50 C.F.R. §§ 22.200(d), 22.210(d). This program authorizes FWS to issue general permits, *id.* § 22.210, and specific permits, *id.* § 22.200, including permits for incidental take specifically from wind energy projects, *id.* § 22.250.

### 3.    The Marine Mammal Protection Act ("MMPA")

The MMPA places "a moratorium" on the "taking" of marine mammals, with enumerated exceptions. 16 U.S.C. § 1371(a); *see* 16 U.S.C. § 1362(13). One exception allows U.S. citizens to request authorization from FWS or NMFS for the "incidental, but not intentional" taking of "small numbers" of marine mammals subject to various restrictions. *See id.* §§ 1371(a)(5)(D)(i), 1371(a)(5)(A)(i). The Secretary of the appropriate Department, as delegated to FWS or NMFS, may authorize such incidental taking if the agency finds that the take will have a "negligible

impact" on the species and prescribes regulations "effecting the least practicable adverse impact" on the species, along with monitoring and reporting requirements. *Id.*

NMFS's regulations prescribe procedures for the issuance of such incidental take authorizations ("ITAs") under the MMPA. 50 C.F.R. § 216.104. FWS similarly has its own regulations governing its ITA procedures for marine mammals under the MMPA, 50 C.F.R. §§ 18.27, 18.33, and general permit procedures applicable to various statutes, 50 C.F.R. § 13.11.

### 4.    The Magnuson-Stevens Fishery Conservation and Management Act ("MSA")

The MSA requires federal action agencies to consult with NMFS on "any action authorized, funded, or undertaken" or proposed by such agency that "may adversely affect" any Essential Fish Habitat ("EFH"). 16 U.S.C. § 1855(b)(2). If the Commerce Secretary determines that an action would adversely affect EFH, he "shall recommend to such agency measures that can be taken by such agency to conserve such habitat." *Id.* § 1855(b)(4)(A). NMFS EFH regulations provide procedures for consultation with and making recommendations to federal action agencies. 50 C.F.R. §§ 600.920, 600.925.

### III.    Procedural Background

In May 2025, New York filed a five-count complaint against the President, the United States, and twelve federal departments or agencies, and their respective Secretaries or lead officials, asserting claims under the APA and other laws. Compl., Dkt. 1. Intervenor subsequently intervened with its own six-count complaint. Interv.'s Compl., Dkt. 114.

Both New York and Intervenor clarified that the only alleged government action they purport to challenge is the relevant agencies' "decision" to comply with the Wind Directive—*not* the subsequent downstream application of that alleged decision to specific projects or programs. *E.g.*, Pls.' Reply in Supp. of Mot. for Prelim. Inj. 6, Dkt. 135 (conceding that New York does not

challenge "the many individual actions … taken to implement the halt," as they are merely the product "of the final action challenged here: 'the decisions by the Agency Defendants to implement broad, categorical freezes on' wind-energy approvals" (citation omitted)); Interv.'s Reply in Supp. of Mot. for Prelim. Inj. 7, Dkt. 136 (challenging only "agency decisions to adopt the Wind Ban, not decisions on individual wind projects"); Hr'g Tr. 24:14, 18-19, June 18, 2025, Dkt. 159 (conceding that Plaintiffs "are not seeking an adjudication by a date certain for a specific project" but instead are only challenging an alleged agency decision to "categorically halt all wind energy approvals").

Through a tentative oral ruling, Dkt. 159, and written Memorandum and Order, Dkt. 162, the Court dismissed the President, Hr'g Tr. 32:7-8, June 18, 2025, and the Departments of Agriculture, Energy, and the Treasury and their respective Secretaries. Mem. and Order 30-31. The Court also dismissed all of New York's and Intervenor's non-APA claims. *Id.* 5-6, 43-48. Defendants then filed the administrative record for the challenged agency decisions.[5] *See id.* 13, 36; Notice of Filing Administrative R., Dkt. 165.

## **STANDARD OF REVIEW**

A plaintiff's failure to establish material facts necessary to prove Article III standing, statutory standing, and—for APA claims—final agency action, may be properly considered as grounds for judgment as a matter of law at the summary judgment stage. *See, e.g.*, *Am. Waterways Operators v. U.S. Coast Guard*, 613 F. Supp. 3d 475, 484-89 (D. Mass. 2020); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 1:22-cv-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023), *aff'd*, 123 F.4th 1 (1st Cir. 2024).

---

[5] Defendants dispute that there was any "decision" here that constitutes final agency action. *See infra* p. 21-24.

If a plaintiff's claims survive these fundamental hurdles, then the APA standard of review governs summary judgment. *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). "As a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S.Ct. 1497, 1511 (2025) (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024)). "But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA's] deferential arbitrary-and-capricious standard." *Id*. That inquiry asks, "only whether the agency action was reasonable and reasonably explained." *Id.* Thus, a motion for summary judgment becomes "simply a vehicle" for judicial review of agency action and whether that action was arbitrary and capricious, or otherwise unlawful, under § 706(2) of the APA. *Id*. And that arbitrary-and-capricious review, "even at the summary judgment stage, is narrow because the APA standard affords great deference to agency decisionmaking and the [agency's] action is presumed valid." *Kinuthia v. Biden*, 702 F. Supp. 3d 5, 9 (D. Mass. 2023), *appeal filed*, No. 23-2029 (5th Cir. Dec. 6, 2023) (quoting *Bennett v. Murphy*, 166 F. Supp. 3d 128, 139 (D. Mass. 2016)).

In short, if Agency Defendants made a "decision" to follow the Wind Memo, it is subject to the APA's highly deferential arbitrary and capricious standard of review. And to the extent that "decision" rested on agency discretion granted by statute, the Agency Defendants need only reasonably act within the boundaries of that authority.

## **ARGUMENT**

## I.    **New York and Intervenor Fail to Establish Standing**

To demonstrate standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by

a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). A plaintiff has the burden of establishing all three elements, for every claim. *Id.* Where, as here, a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," standing is not precluded, but it is "substantially more difficult" to establish. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted).

New York and Intervenor—neither of whom are directly affected by the agencies' temporary hold on making final decisions on *other parties'* permit applications—have failed to establish any of the three required elements of standing. Unlike at the motion to dismiss stage, at summary judgment "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" that establish standing. *Lujan*, 504 U.S. at 561 (citing Fed. R. Civ. P. 56(e)); *see also Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) ("A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." (citing *Lujan*, 504 U.S. at 561)).[6] But New York and Intervenor cannot do that here because there are no "specific facts" to support a finding that they have suffered a concrete injury in fact, caused by the Agency Defendants' temporary permitting pause, that is likely to be redressed by a favorable decision.

### A.    New York Has Suffered No Injuries, Nor Are the Alleged Injuries Traceable to Defendants' Actions.

New York's alleged injuries are not "actual or imminent, [but instead] conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560). In arguing that they have been injured, New York makes two unsupported logical leaps. First, New York fails to show that any particular wind project would be authorized and completed but for the Wind Memo, making

---

[6] Accordingly, the Court may now find that New York and Intervenor lack standing even though their claims survived Defendants' Motion to Dismiss.

its harm conjectural. Second, New York fails to establish that the alleged downstream impacts—energy reliability and affordability, economic activity, health benefits, and environmental protection—from the potential wind energy projects that currently lack permits are "imminent." *Id.* (citing *Lujan*, 504 U.S. at 560); *see, e.g.*, Defs.' Mot. to Dismiss 3-6 (identifying Plaintiffs' distant alleged harms); *see, e.g.*, Am. Decl. of Elizabeth Mahony ¶ 54 (describing injury to power generation in 2032); First Am. Decl. of Katharine Perry ¶ 19 (describing injury to goals set for 2035 and 2040).

New York also fails to "to show a sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)). New York's causal chain is that: (1) the temporary cessation directive stops all wind-energy projects requiring federal approvals; (2) following the conclusion of the Assessment and Review, the Agency Defendants will adopt a policy to not approve any wind-energy project; (3) states cannot develop wind energy projects on lands or areas requiring no federal approvals; (4) states cannot develop energy sources, such as geothermal or nuclear energy, that may provide similar benefits; and (5) nothing else will mitigate the impacts from fewer federally approved wind-energy projects. But states are generally not the recipients of wind energy permits, and they have their own permitting regimes for wind energy projects on state land. New York is not the "object" of the Wind Memo. *See Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025). Moreover, the Wind Directive is not responsible for the availability (or lack thereof) of other sources of energy. Thus, "the 'links in the chain of causation' between the challenged conduct and the alleged injury [are] 'far too weak for the chain as a whole to sustain … standing.'" *Dantzler*, 958 F.3d at 48 (quoting *Allen v. Wright*, 468 U.S. 737, 757-59 (1984)).

13

**B.      Intervenor Has Failed to Identify a Specific Member that Would Have Standing to Bring This Case On Its Own.**

Intervenor fails to meet the three-part test for standing which requires (1) its members have standing to bring suit on their own accord; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) the claims asserted and relief requested do not require an individual member's participation in the lawsuit. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024). Intervenor's members do not have standing to bring suit on their own. Broadly, Intervenor alleges two types of injuries for its members. Intervenor alleges direct injury to owners or operators of wind projects, which allegedly include daily delay costs, lost income, impaired contractual obligations, and harms to financing. *See* Interv. Compl. ¶ 76. Intervenor also alleges purely indirect injury to those in the "wind energy supply chain," including loss of business, increased materials costs, contract disruption, and potential business closures. *Id*.

With respect to direct injury to owners or operators of wind projects, Intervenor fails to show that a favorable decision in this litigation will result in the approval of particular projects for Intervenor's members. And vacatur of the purported "across-the-board Wind Ban," Interv. Supp. Br. in Opp. to Defs.' Mot. to Dismiss 8-9, Dkt. 139, would not prohibit Agencies from denying a permit or refusing to grant a permit for other reasons to the particular projects for which Intervenor members have permits pending.

With respect to indirect injuries to Intervenor members working in the "wind energy supply chain," such purported injuries are the result of "the independent action of a third party," not the Agency Defendants. *Dantzler*, 958 F.3d at 47 (quoting *Katz*, 672 F.3d at 71). Accordingly, their alleged injuries are not traceable to Defendants and Intervenor may not demonstrate standing through those members.

14

C.    **New York's and Intervenor's Injuries Would Not Be Redressed by Vacatur of the Challenged Decisions to Review Permitting Procedures Under the President's Wind Memorandum.**

To establish redressability, a plaintiff must show "that a favorable resolution of the claim would likely redress the professed injury." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 995 F.3d 18, 22 (1st Cir. 2021) (quoting *Katz*, 672 F.3d at 72). New York's and Intervenor's alleged injuries will not be redressed by equitable relief against the Agency Defendants' implementation of the Wind Directive. If anything, New York's alleged harms stem from specific downstream decisions to apply the Wind Directive to particular projects, not from Agency Defendants' categorical decision to follow the President's Wind Memo generally. New York and Intervenor concede those decisions are not before the Court. *See supra* p. 9-10.

Take for example, New York's focus on purported harms relating to the SouthCoast and Atlantic Shores wind projects. Pls.' Supp. Br. in Opp. to Defs.' Mot. to Dismiss 1-7, Dkt. 149. As for the SouthCoast project, EPA is considering a NPDES permit application under Section 402 of the CWA for the facility. Am. Compl. ¶ 153; EPA Decl. ¶¶ 13-17. BOEM sought an extension from the Permitting Council on EPA's behalf on May 5, 2025, in part, to allow EPA to evaluate the applicability of the Wind Memo to this decision. EPA Decl. ¶ 17. New York also complains that, due to the Wind Directive, the Corps has delayed issuing SouthCoast a permit under Section 404 of the CWA. Am. Compl. ¶ 197. Massachusetts made it clear that the purported "substantial and imminent risk of future harm to its financial and sovereign interests [are] from additional project delays or indefinite postponement." Pls.' Supp. Br. at 4. But any supposed delay by either EPA or the Corps in issuing a final decision on the respective SouthCoast applications is not before the Court, as both New York and Intervenor acknowledge.

Thus, a decision from this Court finding that the EPA's or the Corps' compliance with the Wind Directive was unlawful will not remedy New York's asserted harms, which allegedly stem from the fact that the applications are still pending or otherwise remain unissued. And that is because New York is not seeking any application-specific relief. New York is not asking this Court to direct EPA to make a decision on this NPDES permit, nor to direct the Corps to issue the Section 404 permit, "by a date certain," Hr'g Tr. 24:14, 18-19. Likewise, Intervenor is not "asking the Court to bless any particular project." *Id.* at 27:12-14. Even if the Court grants summary judgment in New York's favor, those applications would still be pending and New York's supposed harms would remain.

With respect to Atlantic Shores, a project on which Intervenor also focuses, Interv. Supp. Br. at 5, the CAA permit application is with EPA for review. As New York notes, the permit was tentatively granted and was under review before the EAB, and EPA sought remand of the decision from the EAB to review that permit before it became final and effective. Pls.' Supp. Br. at 5; *see also* EPA Decl. ¶¶ 18-23; 40 C.F.R. § 124.15(b). Again, the EPA Regional Office's decision to seek remand from the EAB is not before this Court, nor could it be, as only final permit decisions after EAB review are subject to judicial review. 42 U.S.C. § 7607(b)(1). And as explained above with respect to SouthCoast, a ruling in New York's and Intervenor's favor will not require that EPA conclude its remand by a date certain, nor that it reach a particular decision. If New York or Intervenor object—and assuming other jurisprudential requirements were met—they may sue on the grounds that there is "a failure of the Administrator to perform any act or duty under this chapter which is not discretionary." 42 U.S.C. § 7604(a)(2). But they have not.

Thus, unlike *Diamond Alternative Energy, LLC v. EPA*, this is not a case where "commonsense inferences about the operations of the [energy] market," 145 S. Ct. at 2138, lead

to a conclusion that New York's and Intervenor's requested relief will redress their claimed injuries. Because no specific pending agency actions with respect to permitting decisions for particular wind projects will be approved by the resolution of this case, neither New York nor Intervenor have shown that their alleged harms are redressable by a favorable decision from this Court.

>    **D.    New York's and Intervenor's Alleged Injuries Do Not Fall Within the Relevant Statutes' Zones of Interest.**

In addition to establishing Article III standing, a party seeking to challenge an administrative agency's decision must also demonstrate that the interest it seeks to protect falls arguably "within the zone of interests [to be] protected" or regulated by the statute at issue. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation omitted). This test "asks whether 'this particular class of persons ha[s] a right to sue under this substantive statute'" and "is therefore an appropriate tool for determining who may invoke the cause of action[.]"[7]  *Id.* at 127, 130 (first alteration in original) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (2013) (concurring opinion)); *see also* 5 U.S.C. § 702.

In this Circuit, courts examine whether "the plaintiffs have plausibly linked … adverse impacts" of the alleged statutory violation to adverse effects on the plaintiffs' protected interests under the statute. *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 21 (1st Cir. 2024). In *Seafreeze*, the First Circuit affirmed the dismissal of an APA and MMPA claim brought by a nonprofit "whose membership include[d] fishing associations, seafood dealers, seafood processors, fishing vessels, and affiliated businesses[,]" *id.* at 8, because the "protection of marine mammals … [was] not germane to the [organization]'s purpose" and its actual interests

---

[7] Although this test is distinct from prudential standing, *Lexmark*, 572 U.S. at 127, it is discussed in the standing section as it is a threshold issue that also looks at a plaintiff's alleged injury.

in representing commercial fisheries was not protected by the MMPA, a wildlife and marine resources conservation statute, *id.* at 21. Applying the zone-of-interests test, *Seafreeze* declined to dismiss the plaintiffs' APA and NEPA claims because the administrative record established that the challenged wind project would cause "major adverse impacts on [fish] in the project area[,]" which the plaintiffs plausibly linked to adverse economic effects on their commercial fishing interests. *Id.* Unlike with the APA and MMPA claim, *Seafreeze* found that the adverse economic effects to the plaintiffs' commercial fishing interests fell within the zone of interests protected by NEPA.

Here, New York's and Intervenor's alleged injuries are "so marginally related to or inconsistent with the purposes implicit in the statute[s] that it cannot reasonably be assumed that Congress authorized [them] to sue." *Lexmark*, 572 U.S. at 130 (citation modified). Thus, they have not—indeed, *cannot*—"plausibly link[]" their alleged harms to any interests Congress intended the relevant statutes to protect. *Seafreeze*, 123 F.4th at 21. Notably, the Court based its previous zone-of-interests ruling on a "reasonable inference [drawn] from the plaintiffs' complaints" and "hesitate[d] to draw fine distinctions … at [the motion to dismiss] stage[.]"  Mem. and Order 30. But New York's and Intervenor's burden "grows heavier at each stage of the litigation," *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 621 F. Supp. 3d 84, 91 (D.D.C. 2022) (quoting *Osborn*, 797 F.3d at 1063), and the Court retains discretion to alter this finding at the merits stage. *E.g.*, *Silver v. Internal Revenue Serv.*, 531 F. Supp. 3d 346, 357 (D.D.C. 2021), *modified*, 269 F. Supp. 3d 5 (D.D.C. 2021), *aff'd*, No. 21-5116, 2022 WL 17420308 (D.C. Cir. Dec. 6, 2022) (recognizing plaintiffs' "attempt to hang their hat" on the court's motion to dismiss ruling "is a losing proposition").

New York's remaining APA claims—including alleged violations of OCSLA, CWA, RHA, CAA, NEPA, ESA, BGEPA, MMPA, MSA, NHPA, FLPMA, and the FAST Act—fall outside the

zones of interests of the listed statutes. Am. Compl. ¶ 59-112. As discussed above, the four wildlife

and marine resource conservation statutes—the MMPA, ESA, BGEPA, and MSA—provide

protections for wildlife and marine resources.[8] As the First Circuit recognized in *Seafreeze*, alleged

economic harms, such as those asserted by New York and Intervenor, do not fall within the zone

of interests protected by these statutes. *See* 123 F.4th at 21. And this Court noted previously, the

other statutes generally provide for "environmental protection, responsible energy production, and

expeditious land development" regarding a variety of resources.[9] Mem. and Order 29. Unlike the

---

[8] *See* MMPA, 16 U.S.C. § 1361(6) (enacted to achieve Congress's intent that marine mammals "should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management … to maintain the health and stability of the marine ecosystem"); ESA, 16 U.S.C. § 1531(b) (enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "provide a program for the conservation of such … species"); BGEPA, 16 U.S.C. § 668(a) (prohibiting a person from "knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, … export or import, at any time or in any manner any bald eagle … or … golden eagle"); MSA, 16 U.S.C. § 1801(b)(1) (declaring policy "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States").

[9] *See* OCSLA, 43 U.S.C. § 1332(3) (declaring policy that "the outer Continental Shelf . . . should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs[.]"); CWA, 33 U.S.C. § 1251(a) ("The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."); RHA, 33 U.S.C. § 403 ("The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited[.]"); CAA, 42 U.S.C. § 7401(b)(1) (intended "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"); NEPA, 42 U.S.C. § 4321 (intended to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment" and "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man"); NHPA, 54 U.S.C. § 300101(1) (declaring policy to "use measures, including financial and technical assistance, to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations[.]"); FLPMA, 43 U.S.C. § 1701(a)(8) (declaring policy that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values"); FAST Act, 42

harms in *Seafreeze* that fell within NEPA's zone of interest (including the assessment of environmental impacts), the alleged economic and other injuries here do not flow from the environmental and land management interests Congress designed these statutes to protect. *See Seafreeze*, 123 F.4th at 21 (finding that NEPA's zone of interests were implicated because the challenged approval of a wind project "itself acknowledge[d] that the discharge of fill material associated with the project will have major adverse impacts on [fish] in the project area[,]" which the plaintiffs plausibly linked to the alleged economic harms to their commercial fishing interests). In other words, while impacts to fish from the discharge of fill material may implicate the environmental interests protected by these statutes, New York and Intervenor have not demonstrated—and cannot demonstrate—that the Wind Memo's temporary permitting pause has harmed these interests.

The zone of interests analysis in *Louisiana v. Biden* is distinguishable. There, plaintiff States alleged that a pause on new oil and gas leases on public lands cost them shares of proceeds from lease sales under certain provisions of OCSLA and the Mineral Leasing Act ("MLA"). 622 F. Supp. 3d 267, 285 (W.D. La. 2022). *Louisiana* held that, by postponing and cancelling lease sales, agencies violated both the MLA and OCSLA because "[t]hose statutes require eligible oil and gas leases to continue to be sold in accordance with the statutes." *Id.* at 294. As the harms alleged directly stemmed from the revenue-sharing purposes of those statutory provisions, the court held that the plaintiffs' causes of action "clearly … [were] within the 'zone of interests' under the APA." *Id.* at 290–91. But here, neither New York nor Intervenor allege a similar statutory or regulatory interest stemming from the statutes at issue. And, as *Louisiana* observed, "there is

---

U.S.C. §§ 4370m-2(b),(c) (streamlining environmental review and permitting processes for covered infrastructure projects).

certainly nothing wrong with [agencies] performing a comprehensive review" prior to making leasing or permitting decisions. *Id.* at 293. Thus, even if New York and Intervenor had Article III standing, their alleged harms are not even "marginally related to," *Lexmark*, 572 U.S. at 130, let alone "plausibly linked" to, *Seafreeze*, 123 F.4th at 21, the relevant statutes' zones of interests.

## II.    New York and Intervenor Fail to Challenge Final Agency Action

Even assuming standing, Defendants are entitled to summary judgment because New York and Intervenor have not identified a reviewable "final agency action" under the APA.

As established *supra* p. 9-10, New York and Intervenor are *not* challenging the Defendants' *application* of the Wind Directive to particular projects.[10]  Instead, they challenge each Agency's determination, at the outset, that the Wind Directive applies to the respective Agency and that it must be followed.

As an initial matter, there is no relevant "decision" for the Agencies to make here at all. "[T]he President controls, supervises, and directs those executive officers and agencies." *FCC v. Consumers' Rsch.*, 145 S.Ct. 2482, 2512 n.1 (2025) (J. Kavanaugh, concurring). Once Defendants, as part of the executive branch under the President's direction, became aware of the Wind Memo and its Wind Directive, they were required to follow it consistent with applicable law. Any agency decisionmaking will take place only downstream, at the point at which the agencies determine whether and how to apply the Wind Directive to specific permits and authorizations on specific projects—decisions that New York and Intervenor do not challenge here. Rather, they challenge, in function if not in form, the exercise of executive authority by federal agencies. But that is not a

---

[10] Any delay to a specific project permit should be brought under 5 U.S.C. § 706(1) or 42 U.S.C. § 7604(a)(2) as the case may be, which New York and Intervenor have not done.

final agency action subject to review, it is merely an indirect attack on the President's authority to direct the executive branch.

Even if, as New York and Intervenor framed it, Defendants made "decisions" to follow the Wind Directive, those decisions are not final agency actions subject to review under the APA. Under the APA, only those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" may seek judicial review. 5 U.S.C. § 702; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). That agency action must, in turn, be either "made reviewable by statute [or] *final agency action* for which there is no other adequate remedy." 5 U.S.C. § 704 (emphasis added). Thus, not all "agency actions" are created equal and subject to APA review. Certain actions must be "reduced to more manageable proportions, and [their] factual components fleshed out, by some concrete action applying [it] to the claimant's situation." *Lujan*, 497 U.S. at 891; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (recognizing the targeted agency action must be "circumscribed" and "discrete").

"Final agency action" is action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates "legal rights or obligations," with "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The action "must not be of a merely *tentative* or interlocutory nature." *Id*. (emphasis added). Preliminary steps, "far upstream" of an agency's ultimate decision, are not final agency action. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024).

The second element is often crucial. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016). In *Hawkes*, for example, the Corps determined that a piece of land was subject to its statutory jurisdiction under the CWA. In holding that the determination was final agency action,

the Court carefully identified the "direct and appreciable legal consequences" that flowed from it: a "denial of [a] safe harbor" from liability for five years. *Id.* at 598-99.

Defendants agree that the challenged agency action as now framed by New York and Intervenor—that is, the initial agency determination whether to follow the Wind Directive—is the consummation of the agency's decisionmaking process as to that finite decision. How could it not be? The agencies received the Wind Memo and determined they had to follow it—end of story.[11]

But following the Wind Directive is not a decision by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted). Unlike the "denial of [a] safe harbor" in *Hawkes*, New York has not alleged the denial of a permit. New York has identified no legal rights, obligations, or consequences attributable to the challenged decision to temporarily pause wind permitting while the Agencies review their permitting practices.

Further, in the permitting context, final agency action is generally limited to the ultimate approval, modification, or disapproval of an applicant's permit. *E.g.*, *Penn. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 105 (D.D.C. 2003) (alleged delay "while EPA is in the midst of

---

[11] Defendants suspect that New York and Intervenor may attempt to revisit their prior concessions and argue that the final agency action challenged here also encompasses later decisions regarding whether and how to *apply* that determination to specific projects. But by doing so, New York and Intervenor will necessarily destroy their basis for satisfying the first element of final agency action: consummation of the agency decisionmaking process. If New York and Intervenor argue that the Court must also consider subsequent agency decisions regarding whether and how to apply the Wind Directive to a specific permit, the initial determination to follow the Wind Directive is only a preliminary first step. They cannot have it both ways. Like the issuance of the summons in *Harper*, the Wind Directive and the associated Assessment and Review would be only part of an investigative first step in a larger process. 118 F.4th at 116. They would precede any specific action directed toward a particular wind energy permit and enable the fact-finding necessary to take broader regulatory action, if needed. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir. 2003) (finding no final agency action where "further administrative action is forthcoming").

attempting to formulate a national policy process" is not final agency action). An interim decision to merely postpone the permit decisionmaking process is not final agency action. *See Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687 (S.D. Ill. 2004); *see also Marquette Cnty. Rd. Comm'n v. EPA*, 726 Fed. App'x 461, 467 (6th Cir. 2018) ("In the absence of any decision from [an] agency to ultimately deny or grant the permit [courts] have nothing to review.").

Each Agencies' determination to follow the Wind Directive and temporarily cease wind energy permits and other authorizations pending completion of the Assessment and Review is, by itself, merely a matter of internal agency process and procedure. It neither creates nor diminishes legal rights or obligations with respect to any particular permit, pending applicant, or the parties in this case. Indeed, New York and Intervenor fail to identify any *legal* consequences stemming from the Wind Directive. At most, they identify financial and other non-legal consequences arising from market absorption of the Wind Directive. But any legal consequences—such as the right to construct a wind project—flow from decisions on specific project permits and authorizations that, by New York's and Intervenor's own admissions, are not before the Court.

In its Memorandum and Order, the Court found New York had alleged a final agency action because they, in essence, alleged that the Wind Directive "in effect amends several regulations by requiring that the agencies must not follow the usual, specified procedures for an unspecified period of time…." Mem. & Order 36. But the Court's concerns are expressed not by the decision challenged here, but if at all, by its downstream application which is not before the Court.

By challenging an agency determination to follow the President's Wind Directive in the abstract, New York is, in effect, trying to challenge the *lack* of agency action on specific permits. But an agency decision to hold and review a permit "as a part of its comprehensive … revision is not a final decision." *Shawnee Trail Conservancy*, 343 F. Supp. 2d at 701. The proper way to

challenge a lack of agency action is to compel agency action under § 706(1), which New York has not done. *See* Defs.' Mot. to Dismiss, pp. 31-33, Dkt. 123. New York and Intervenor therefore fail to state a claim under the APA and summary judgment should be entered in Defendants' favor.

### III. New York's and Intervenor's APA Claims Fail on the Merits

Even if New York and Intervenor could establish standing and identify a final agency action subject to review under the APA (and they cannot), their claims would still fail on the merits. The relevant statutes and regulations do not prohibit wholesale the temporary cessation of decisions and the Agencies acted reasonably in following the President's directive.

Under the APA, agency action is presumed valid. *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). Therefore, when judicial review is available, that review is both narrow and deferential, and "reviewing courts must … not substitute their own judgment for that of the agency." *Food & Drug Admin. v. Wages & White Lion Investments LLC*, 145 S.Ct. 898, 917 (2025). The court's role "is only to determine whether the Secretary's decision … was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record." *Associated Fisheries of Maine, Inc.*, 127 F.3d at 109.

*Loper Bright* recognizes that, in some cases, the best meaning of a statute "may well be that the agency is authorized to exercise a degree of discretion." 603 U.S. at 394. "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court's role is limited to "recognizing" the delegation, "fixing the boundaries of the delegated authority," and "ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (citation modified).

### A. Defendants' Decision to Follow the Wind Directive Was Not Arbitrary, Capricious, an Abuse of Discretion, or in Excess of Statutory Authority.

Section 706(2)(A) of the APA directs courts to declare unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Section 706(2)(C) directs courts to do the same to agency action found to be "in excess of statutory … authority." *Id*. § 706(2)(C). Functionally, these provisions present "a linguistic distinction without a practical difference." *Victim Rights Law Ctr. v. Cardona*, 552 F.Supp.3d 104, 127 (D. Mass. 2021).

Agency action is arbitrary or capricious "if the agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, explained the decision in terms that run counter to the evidence, or reached a decision so implausible that it cannot be ascribed to a difference in view or the product of agency expertise." *Seafreeze*, 123 F.4th at 15 (citing *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024)). But courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). In other words, if the agency had a rational basis for taking the subject action, it must be upheld. *See Associated Fisheries of Maine, Inc.*, 127 F.3d at 109.

Defendants' determinations that they are to follow the Wind Directive were not simply reasonable, but compulsory. On January 20, 2025, President Trump issued the Wind Memo containing the Wind Directive which instructed the Agency Defendants to review their permitting practices and, in the interim, temporarily cease issuing new or renewed permits for wind energy projects. 90 Fed. Reg. 8363, 8364 (Jan. 29, 2025). Beyond that, the Wind Directive was premised on the President's finding of (1) "various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects" and the concern that

26

those deficiencies negatively impact safety, transportation, national security, commerce, and marine mammals; and (2) "potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit wind projects." *Id.* at 8363-64. The President also cautioned that the Wind Memo—including the Wind Directive—must "be implemented consistent with applicable law." *Id.* at 8364.

With the President's concerns in hand, and his instruction to act only within the bounds of various environmental permitting laws and the like, each agency acted reasonably in relying on the Wind Memo as the basis for following the Wind Directive. Notice of Filing Administrative R., Dkt. 165; DOI AR Cert. & AR, Dkts. 165-1, 165-2; EPA Cert. & AR, Dkts. 165-4, 165-5; NMFS AR Cert. & AR, Dkts. 165-6, 165-7; Corps AR Cert & AR, Dkts. 165-8, 165-9.[12] In effect, each agency determined that they were to temporarily cease issuing various wind energy permits and authorizations pending the review of permitting programs—but only to the extent permitted by applicable law. The agencies' basis for doing so was grounded in the President's stated concerns over potential legal deficiencies in leasing, permitting, and environmental reviews, which he concluded could result in serious harm. There is nothing irrational about relying on such concerns from the President. Even if not made with "ideal clarity," *Bowman Transp., Inc.*, 419 U.S. at 286, such justified and discernable decisionmaking—even if abbreviated—is all the APA requires.

---

[12] DOI also relied on Secretarial Order No. 3415. Sec'y of Interior Ord. No. 3415, Dkt. 165-3. Issued the same day as the Wind Memo, Secretarial Order No. 3415 temporarily suspended delegations of authority to Department Bureaus and Offices, including the authority to "issue any onshore or offshore renewable energy authorization." *Id.* at 1; *see* Reorganization Plan No. 3 of 1950, § 2, 64 Stat. 1262 (1950) (permitting the Secretary of the Interior to transfer functions of the Secretary to other agency officials). Like the Wind Memo, the Order retained room for the Secretary comply with applicable law. *See* Sec'y of Interior Ord. No. 3415 at 2 (permitting approvals by the Secretary and certain high-level officials, existing operations under valid leases, authorizations necessary to avoid threats to human health, welfare, or safety, and authorizations to avoid certain adverse impacts).

To understand why, it is helpful to imagine three scenarios. First, imagine a statutory landscape in which Congress explicitly directed that the timelines for agency decision-making on *all* wind project permit applications were entirely subject to the applicable agency's sole discretion. In that scenario, Defendants could temporarily cease issuing all such authorizations and not run afoul of *any* Congressional mandate.

Second, imagine that Congress directed that *all* wind project permits and authorizations will be deemed issued immediately on the day of receipt (or some other short deadline), without exception. In that scenario, it is difficult (if not impossible) to conceive how agencies could temporarily cease decisions on wind energy project permits and authorizations consistent with applicable law. Were an agency to decide to follow the Wind Directive in that scenario, it would run afoul of Congress's express instruction, and the agency would violate the APA for acting arbitrarily and in excess of its statutory authority.

But there is also a third scenario where Congress's direction is neither exclusive of nor coterminous with agency authority across the various laws and relevant agencies. In that scenario, there may be instances where Congress has set deadlines in issuing decisions on some types of wind energy project applications but has left others to the discretion of the applicable agency. In this instance, an agency may conclude that it can temporarily cease at least some wind energy decisions and not run afoul of existing law. In other words, so long as Congress has left at least one wind energy authorization deadline to the discretion of an agency, that agency may determine that deadline can be temporarily suspended "consistent with applicable law."

That third scenario, at minimum, is the one we find ourselves in here. Each named Agency Defendant is charged with authority over at least one wind energy project permit or other authorization for which Congress has not provided a non-discretionary, mandatory decisionmaking

28

deadline. It therefore cannot be the case that by simply following the Wind Directive, each agency (or any one agency) has acted arbitrarily or contrary to law.[13]

For example, under OCSLA, Congress authorized the Secretary of the Interior to "grant a lease, easement, or right-of-way on the outer Continental Shelf" for various activities, "if those activities—(C) produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas." 43 U.S.C. § 1337(p)(1). While Congress instructed the Secretary, when granting such authorizations, to consider twelve express requirements, Congress did not place a mandatory time frame for approval among them. *See id*. § 1337(p)(4)(A)-(L).

DOI's implementing regulations also provide for considerable agency discretion in carrying out Congress's directive. While DOI's regulations provide for certain administrative time periods,[14] none of them establish a mandatory time period for the completion of the Bureau of Ocean Energy Management's ("BOEM") review or decision-making on requests for activities on a lease or similar authorizations subject to the Wind Directive. *See, e.g.*, 30 C.F.R. § 585.613 (outlining BOEM's process for reviewing SAPs without imposing a specific timeframe for completion of BOEM's review); *id*. § 585.628 (same as to COPs).[15]

---

[13] It is important to again remember that New York has disavowed any challenge to an application of the Wind Directive to a specific pending application or a specific project. Thus, to succeed, New York must show as a matter of law that Defendants cannot lawfully follow the Directive.

[14] Those provisions include, for example, 30 C.F.R. § 585.102(c)'s requirement that BOEM document in writing any oral directive within 10 business days; § 585.211(a)'s requirement for a 45-day comment period for information and nominations for leasing; and § 585.213(d)'s requirement for a 60-day comment period following a proposed lease sale.

[15] While not challenged by New York or Intervenor, the same holds true for the Bureau of Land Management ("BLM") and its implementation of the Federal Land Policy and Management Act of 1976 ("FLPMA"). Title V of FLPMA authorizes the BLM "to grant, issue, or renew rights-of-way over, upon, under, or through [public] lands for" a range of uses, including "systems for generation, transmission, and distribution of electric energy." 43 U.S.C. § 1761(a)(4). These uses of public land include authorizations for wind energy rights-of-way. *See* 43 C.F.R. § 2801.5. Nothing in FLPMA or the implementing regulations mandate specific timelines for deciding such

Under Section 402 of the CWA, EPA is responsible for issuing permits under the NPDES permit program. 33 U.S.C. § 1342(a)(1).[16] While Congress directed the EPA Administrator to take certain actions relating to state NPDES programs within 90 days, *e.g.*, *id.* § 1342(c)(1), (3), the CWA does not specify any timeline by which a final decision on NPDES permits must be made for either new or existing facilities.

The same is true for EPA's CWA regulations. While 40 C.F.R. § 124.3(c) provides that, within 30 days of receiving a NPDES permit application, EPA shall inform the applicant whether its application is complete, this notice is not the issuance of a final permit implicated by the Wind Directive. Rather, once EPA determines an application is complete, EPA's regulations direct EPA to provide a "project decision schedule" with "target dates" for issuance of the draft permit, completion of the public review process, and, if the final decision is to approve, issuance of the final permit. *See id.* §§ 124.3(g)(1)-(4). This schedule includes only "target dates," not an enforceable deadline to decide on a final permit. Once EPA makes a final permit decision, it only becomes effective 30 days later, unless the permitting office sets a later effective date or review by the EAB is requested. *Id.* § 124.15(b). In other words, EAB review acts to suspend any compulsory timing requirement that a final permit is effective within 30 days of issuance of the final permit. EAB decisions are then subject to judicial review in federal circuit courts. 33 U.S.C. § 1369(b)(1).

NMFS and FWS likewise have discretion as to how long they may consider permit applications under the statutes they administer. For example, NMFS and FWS are authorized to grant incidental take permits to project applicants under ESA Section 10. *See* 16 U.S.C. § 1539(a). Congress did not require any compulsory deadline for deciding whether to issue an incidental take

---

applications and the BLM has considerable discretion to approve or deny applications for rights-of-way to use public lands. *Id.* §§ 2802.10(a), 2804.26.

[16] Authorized state agencies may also administer the NPDES program. 33 U.S.C. § 1342(b).

permit, but left the matter to the discretion of the Secretaries of Commerce and Interior "under such terms and conditions as he shall prescribe." *Id.* NMFS's regulations instruct *applicants* to submit their applications "at least 90 calendar days prior to the date on which the applicant desires to have the permit made effective." 50 C.F.R. § 222.302(b). But this 90-day period is merely aspirational: "[NMFS] will attempt to process applications deemed sufficient in the shortest possible time, but *does not guarantee* that the permit will be issued 90 days after notice of receipt of the application is published in the Federal Register." *Id.* (emphasis added).[17]

The Corps administers permits under Section 404 of the CWA as well as Section 10 of the RHA. Section 404 permits authorize discharges of dredged and fill material into "waters of the United States." 33 U.S.C. § 1344. In passing Section 404, Congress declared that notice must be published "[n]ot later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit." *Id*. at § 1344(a); *see* 33 C.F.R. § 325.2(d)(1). But Congress did not specify when the Corps must make a decision on the permit application. The Corps' regulations provide that the district engineer "will decide on all applications not later than 60 days after receipt of a complete application," but they provide multiple exceptions whereby that time period may be extended, including where "precluded as a matter of law or procedures required by law," or where "[i]nformation needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period." *Id*. § 325.2(d)(3)(i), (vi). The Corps

---

[17] The administration of ESA Section 7 does not result in an approval, right of way, permit, lease, or loan, but to the extent it is even relevant here, it provides similar discretion. Under Section 7, NMFS and FWS must complete formal consultation with federal action agencies and issue biological opinions where the action agency is proposing to authorize, fund, or carry out an action that is likely to adversely affect listed species or designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. The ESA and regulations expressly provide discretion to complete consultation "within such other period of time as is mutually agreeable to the Secretary and the Federal agency." 16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.14(e).

regulations acknowledge that procedures required under various other laws "may prevent district engineers from being able to decide certain applications within 60 days." *Id.* In other words, if DOI, EPA, or NMFS lawfully suspends its activities under applicable environmental laws (as shown above), and that information is needed by the district engineer, then that agency's suspension effectively transfers to the Corps. Thus, the Corps is permitted to extend its permitting authorization because the agencies it relies on for information are permitted to extend their own deadlines.

Finally, to the extent the above agencies are subject to the provisions of the FAST Act, the FAST Act also does not impose any mandatory deadlines that would prohibit the agencies from following the Wind Directive consistent with applicable law. The FAST Act requires agencies, as part of their development of a coordinated project plan, to "establish a permitting timetable that includes intermediate and final completion dates for action by each participating agency on any Federal environmental review or authorization required for the project." 42 U.S.C. § 4370m-2(c)(2)(A). But the permitting timetable may be modified freely in accordance with prescribed procedures. *Id*. § 4370m-2(c)(2)(D)(i)-(iii). Moreover, if an agency fails to meet a completion date or reasonably believes it will fail to meet a completion date, it need only provide an explanation for the departure, an alternative completion date, and a monthly status report until the final agency action has occurred. *See id.* at § 4370m-2(c)(2)(F)(ii). In short, the FAST Act expressly provides for the ability to extend wind energy permitting deadlines consistent with the Wind Directive.

For New York to prove that Defendants' implementation of the Wind Directive is arbitrary, capricious, or otherwise in excess of statutory authority, they must show that there is <u>no</u> instance in which Defendants could temporarily suspend decision on a wind energy project approval "consistent with applicable law." It cannot do so.

At least one Supreme Court Justice has opined that providing federal agencies with room to operate "consistent with applicable law"—as the Wind Directive did here—is key. *See Trump v. Am. Fed. of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *1 (July 8, 2025) (J. Sotomayor, concurring). There, the Supreme Court stayed a preliminary injunction against agency implementation of an Executive Order that called for the planning of agency reorganizations and reductions in force. *See id*. Refusing to put the cart before the horse, Justice Sotomayor noted that the resulting agency implementation of the Executive Order (i.e., "the plans themselves") were not before the Court and thus the Court had "no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Id.* That same restraint is warranted here. If, as here, an agency is capable of following an Executive directive "consistent with applicable law," it must be permitted to do so.

Revisiting the third scenario discussed above, New York may argue this begs the question: If Defendants were to temporarily suspend approving a permit or authorization that Congress unambiguously declared must be issued by a certain date, would that not violate the APA? The answer would turn on the specific statute, facts, and provision of the APA at issue. But New York has failed to show that every agency in every scenario faces a specific deadline for wind energy project-related applications. To be sure, Congress has created a right of action to compel agency action on matters pending before an agency even absent a statutory deadline. *See* 5 U.S.C. § 706(1) ("compel agency action unlawfully withheld or unreasonable delayed"); *see id.* § 555 ("[W]ithin a reasonable time, each agency shall proceed to conclude a matter presented to it."). But New York and Intervenor have not brought a § 706(1) claim with respect to any particular application pending before an agency. Instead, they have challenged each agency's "broad" decision to follow the Wind Directive in the abstract. But that broad decision "can be carried out

consistent with the constraints of law," *Trump*, 2025 WL 1873449 at *1 (J. Sotomayor, concurring); and should it have specific application to particular project authorization beyond those constraints, a party with standing may bring a § 706(1) claim. New York and Intervenor have thus failed to show that Defendants' decision to follow the Wind Directive violates § 706(2) of the APA.

**B.    Defendants' Decision Is Not Subject to Notice-and-Comment Rulemaking.**

Intervenor's Count II alleges that the Wind Directive is "a substantive rule that was issued without the notice-and-comment period required by [the APA,] 5 U.S.C. § 553." Interv. Compl. ¶ 185. This claim fails as a matter of law.[18]  Defendants are entitled to summary judgment on Count II because the individual Agency Defendants were not required to undertake notice and comment before they could comply with the Wind Directive.

The APA requires notice and comment only where an agency is undertaking a "rule making," 5 U.S.C. § 553, which the statute defines as the "agency process for formulating, amending, or repealing a rule," *id*. § 551(5). For much the same reasons that no agency has taken a final agency action here that could be subject to judicial review under the APA, *see supra* p. 21-24, no agency has initiated a process to formulate, amend, or repeal any rule that could be subject to notice and comment under the APA. Defendants are entitled to summary judgment on Count II for this reason alone.

Even if the Court were to find that the Agency Defendants have undertaken final agency action or rulemaking by following the Wind Directive, Count II still would fail. The APA requires notice and comment only for rules that are substantive, or "legislative" in nature; the statute

---

[18] To the extent Intervenor continues to press this claim against the President, the Court has dismissed the President from this action. Tr. 32:7-8, Dkt. 159. In any event, the President is not an agency under the APA, and therefore his actions cannot be subject to the APA's public notice-and-comment requirement. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994); 5 U.S.C. § 551(1) (definition of "agency").

expressly exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from the notice-and-comment requirement except where notice or hearing is otherwise required by statute. *Id.* § 553(b)(4)(A). In following the Wind Directive, the Agencies have—at most—interpreted the applicable law or announced a general statement of policy or rule of procedure or practice.[19] No agency has undertaken legislative rulemaking.

The Supreme Court has found the dividing line between legislative rules and interpretive rules to be that legislative rules have the "force and effect of law," whereas interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted); *accord La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992) (a substantive rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself" whereas an interpretive rule is "merely a clarification or explanation of an existing statute or rule") (citations omitted). "[N]either a rule nor a precedent," a general statement of policy is "merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications; … like a press release, [it] presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

In categorizing an agency rule, the First Circuit has explained that "'[t]he crucial question is whether the agency intends to exercise delegated [lawmaking] power … , and the intent usually

---

[19] The APA does not define the terms "interpretative rule," "general statement of policy," or "rule[] of agency organization, procedure, or practice." It defines only a "rule" as, in pertinent part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

can best be found in what the agency says at the time of issuing the rules.'" *Sullivan*, 965 F.2d at 1178 (citations omitted). Here, no Agency has made any statement that it is exercising legislative power. Nor has any agency created rights, assigned duties, or imposed obligations regarding wind energy-related applications. To the contrary, the agencies are temporarily refraining from making any final determinations of current or future eligibility. *See Pac. Gas & Elec. Co.*, 506 F.2d at 38 (general statements of policy are "not finally determinative of the issues or rights to which [they are] addressed").

Nor has any Agency Defendant modified the substantive standards by which it will evaluate the merits of any pending or future applications for wind energy-related applications. Indeed, the Wind Directive expressly commands that agencies "shall" implement the Directive "consistent with applicable law and subject to the availability of appropriations." 90 Fed Reg. 8364. As such, merely adopting the Wind Directive as a general matter does not amend or repeal any existing agency rules. An analogous case involved a Federal Communication Commission order that temporarily paused the filing of new applications for some, but not all, classes of standard radio broadcast stations pending a reexamination of its existing rules. *Kessler v. FCC*, 326 F.2d 673, 681 (D.C. Cir. 1963).  The D.C. Circuit held that the pause was not a substantive rule that created new standards, subject to the APA's notice-and-comment requirements. *Id.* Pointing to prior precedent, the D.C. Circuit noted that, "[o]f course all procedural requirements may and do occasionally affect substantive rights, but this possibility does not make a procedural regulation a substantive one." *Id*. at 682 (citing *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961)). Here too, the temporary pause is procedural; it is not legislative just because it may affect substantive rights.

Indeed, the First Circuit has found that "whether a rule has a substantial impact may be relevant in construing the intent of the agency in issuing the rule," but that a "substantial impact

does not make a rule legislative." *Levesque v. Block*, 723 F.2d 175, 182 (1st Cir. 1983). Years later, the First Circuit took note of the fact that several circuits, including the D.C. Circuit, "have moved away from considering the level of impact on interested parties as a factor in correctly classifying a rule or regulation." *Sullivan*, 965 F.2d at 1178. As evidence of this shift, the First Circuit quoted a statement by the D.C. Circuit that "the impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals." *Id*. (citing *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv*., 707 F.2d 548, 560 (D.C. Cir. 1983); *see also id*. (citing 2 K. Davis, Administrative Law Treatise § 7:8, at 39 (2d ed. 1979)), and *Friedrich v. HHS*, 894 F.2d 829, 836 (6th Cir.), *cert. denied*, 498 U.S. 817 (1990) ("Any determination by the Secretary regarding rules of Medicare reimbursement eligibility, regardless of how it is promulgated, will have a substantial impact on a large number of people.").

If this Court considers the impact of the Wind Directive relevant to its inquiry here, New York and Intervenor fail to show the Wind Directive is causing substantial impact that can be redressed by this Court. *Supra* p. 15-17. Even if New York and Intervenor could show substantial impact, that would not mean that the Agency Defendants must complete notice-and-comment rulemaking. For instance, in *Sullivan*, 965 F.2d at 1179, the First Circuit concluded that notice and comment would have been "overkill" where the agency's rule had enacted "a limited remedy for a limited period of time," which would be eliminated once certain data became available. So too here. The Agency Defendants have implemented a temporary procedural pause in issuing wind energy-related authorizations for a limited period of time until the results of a review and assessment are available. As in *Sullivan*, requiring notice and comment under these circumstances would be overkill. At most, the creation of a substantive rule subject to notice and comment may

be recommended upon completion of the Assessment and Review, but that effort remains underway and its ultimate outcome under deliberation.

## IV.    Any Relief Ordered Should Be Narrowly Tailored

New York and Intervenor are not entitled to any relief. But if this Court holds otherwise, it should deny any request to vacate or enjoin the Agency Defendants' implementation of the Wind Directive on a universal basis. Intervenor requests that the Court "permanently enjoin on a nationwide basis … [Agency Defendants] from implementing or otherwise relying on the Wind Ban … to halt or otherwise impede development of wind energy projects." Interv. Compl. at 61, ¶ 6.[20] Federal courts lack authority to issue universal injunctive relief because it "likely exceed[s] the equitable authority that Congress has given to federal courts." *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *13–14 (U.S. June 27, 2025) (granting stay of nationwide injunctions barring executive officials from applying Executive Order No. 14160, and noting universal injunctions "'improper[ly] intru[de]' on 'a coordinate branch of the Government' and prevent[] the Government from enforcing its policies against nonparties" (quoting *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993))). Moreover, it would risk running afoul of constitutional limits on the Court's Article III powers, to "render a judgment or decree upon the rights of the litigants." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (citation omitted). Here, a universal injunction would be broader than necessary to afford New York and Intervenor complete relief. To the extent New York or Intervenor have standing, that standing is based on harm emanating from alleged delays on specific projects or specific pending applications. Thus, any remedy must similarly be limited to

---

[20] State Plaintiffs, in contrast, clarified during the June 18, 2025, hearing that they are "not, in this case, seeking a nationwide injunction." Hr'g Tr. 23.

those specific projects or applications. Anything further would exceed this Court's authority and be inappropriate.

Nor may this Court compel Agency Defendants to *issue* currently pending permits or other authorizations. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."); *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (noting that a court reviewing agency action under 5 U.S.C. § 706(2) "must confine [itself] to ensuring that [the agency] remained within the bounds of reasoned decisionmaking" (internal citations and quotation marks omitted)). This remedy is only available to a party with standing (i.e., individual project proponents) upon successful litigation of a § 706(1) claim alleging a specific agency action was unlawfully withheld or unreasonably delayed. *See Norton*, 542 U.S. at 64; *cf. Lujan*, 504 U.S. at 568 (critiquing party's failure to address "separate decisions to fund particular projects"). New York has failed to bring such a claim here. Nor may the Court order the issuance of permits, the review of which falls under the exclusive jurisdiction of the courts of appeals, such as NPDES permits issued by EPA under the CWA. *See* 33 U.S.C. § 1369(b)(1)(F).

Rather, as the Court noted in its previous Order, it "takes seriously [Agency Defendants'] concern that relief ought [to] be tailored to redress actually-affected projects." Mem. and Order at 27. Accordingly, the only appropriate remedy here (if a remedy were appropriate) would be a limited vacatur or injunction. The effect of that limited remedy would be to lift any implementation of the Wind Directive by the remaining Agency Defendants—DOI, Department of Commerce, EPA, and the Corps—with respect to the specific wind projects and their pending applications and authorizations that are found to be inconsistent with applicable law and for which the States or Intervenor are able to prove a certainly impending harm. Further, limiting relief in such a way

would be practical and minimize risk of confusion for Agency Defendants responsible for overseeing federal wind leasing and permitting processes.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendants on all claims and deny New York's and Intervenor's motions for summary judgment.

Respectfully submitted this 8th day of August 2025.

**ADAM R. F. GUSTAFSON**

Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Michael K. Robertson*

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

ROBERT P. WILLIAMS
Senior Trial Attorney (DC Bar No. 474730)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-0210 | Fax: (202) 305-0275
Email: robert.p.williams@usdoj.gov

KIERAN O'NEIL
Trial Attorney (AK Bar No. 2311132)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Tel: (202) 353-7548
Email: kieran.o'neil@usdoj.gov

*Attorneys for Federal Defendants*