UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| STATE OF NEW YORK, *et al*., | ) |
| Plaintiffs, | ) |
| v. | ) |
| DONALD J. TRUMP, in his official | ) |
| capacity as President of the United | ) |
| States, *et al.*, | ) |

CIVIL ACTION NO. 25-11221-WGY

**BRIEF AMICUS CURIAE OF CLIMATE JOBS MASSACHUSETTS, CLIMATE JOBS NEW YORK EDUCATION FUND, CLIMATE JOBS RHODE ISLAND, AND MAINE LABOR CLIMATE COUNCIL IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT**

Richard F. Griffin, Jr.
Pro Hac Vice Admission Pending
Bredhoff & Kaiser, PLLC
805 Fifteenth Street, NW, Suite 1000
7th Washington, DC 20005
(202) 842-2600
rgriffin@bredhoff.com

Nicole Horberg Decter
BBO # 658268
Kyle Andrew Berner
BBO # 706959
Segal Roitman, LLP
33 Harrison Avenue, 7th Floor
Boston, MA 0211
(617) 742-0208
ndecter@segalroitman.com

Counsel for Amici

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION .............................................................................................................. 1

INTERESTS OF AMICI..................................................................................................... 2

ARGUMENT ...................................................................................................................... 4

    The Amici Coalition Members Have Substantial Investments in Training Workers for the
    Offshore Wind Energy Industry and They, and the Workers They Have Trained Who Are
    Gainfully Employed in the Industry, Have Important Reliance Interests That Have Been
    Ignored by Defendants............................................................................................. 4

        I.    The Administrative Procedure Act Requires That, When Considering Regulatory
        Change, Agencies Must Address Adverse Effects on the Livelihood of Workers and
        Investments in Training Workers. ............................................................................. 4

        II.    The Offshore Wind Energy Industry Needed Skilled Workers and Training Programs to
        Provide Workers with the Specific Skills Necessary to Work in the Industry. ....................... 5

        III.    Amici Invested Substantial Funds to Develop the Necessary Training Programs to
        Provide Workers with Skills Specific to the Offshore Wind Energy Industry. ...................... 8

        IV.    Trained Workers Obtained Transformative Jobs in the Offshore Wind Energy Industry,
        with Good Wages and Benefits, Frequently Working Under the Terms of Project Labor
        Agreements. ...........................................................................................................11

        V.    Defendants' "Pause" Has Resulted in Trained Workers Losing Work and Rendered
        Amici's Investments in Training Programs Nugatory........................................................ 14

CONCLUSION.................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    No. CV 25-10787, 2025 WL 1822487 (D. Mass. July 2, 2025)................................................4

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of
    Mass./R.I., Inc.*,
    507 U.S. 218 (1993).................................................................................................................11

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)...................................................................................................................4

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025)......................................................................................................4

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).......................................................................................................................4

*Massachusetts v. Nat'l Insts. of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) .......................................................................................4

*Thakur v. Trump*,
    No. 25-CV-04737, 2025 WL 1734471 (N.D. Cal. June 23, 2025)............................................4

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 440 (D.R.I. 2025).............................................................................................4

**Other Authorities**

Avalon Hoek Spaans et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Building
    the Clean Energy Commonwealth: A Climate Jobs Roadmap for
    Massachusetts* (2024)................................................................................................................6

*Building Trades Union and Vineyard Wind Sign Historic Project Labor
    Agreement*, Vineyard Wind (July 16, 2025),
    https://www.vineyardwind.com/press-releases/2021/7/16/building-trades-
    union-and-vineyard-wind-sign-historic-project-labor-agreement ..........................................11

*Community Benefits Snapshot: Block Island Wind Farm Community Benefits
    Agreement*, World Res. Inst. (Jan. 31, 2025),
    https://www.wri.org/snapshots/community-benefits-snapshot-block-island-
    wind-farm-community-benefits-agreement ............................................................................12

*Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind
    Deployment Target by 2030*, Dep't of Energy (Mar. 29, 2021),
    https://perma.cc/9SAH-RT5J.....................................................................................................6

Forbes Breaking News, *Trump Goes On Sudden Tirade Against Windmills During Meeting with EU President Ursula Von Der Leyen* (YouTube, July 27, 2025), https://www.youtube.com/watch?v=1Asznj3uWKA ...........................................................1

Jeremy Stefek et al., Nat'l Renewable Energy Lab'y, *U.S. Offshore Wind Workforce Assessment* (2022).................................................................................7, 8

Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Building a Just Transition for a Resilient Future: A Climate Jobs Program for Rhode Island* (2022)................................................................................................................6

Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Climate for Change: A Complete Climate Jobs Roadmap for New York City* (2022)..................................6

Mariel Lutz, Alia Hidayat & Kate Petosa, *The Trump Administration and Congress' Attacks on Wind Power Are Killing Thousands of Jobs and Risk Thousands More*, Ctr. for Am. Progress (July 24, 2025), https://www.americanprogress.org/article/the-trump-administration-and-congress-attacks-on-wind-power-are-killing-thousands-of-jobs-and-risk-thousands-more/.....................................................................................................5

Matt Shields et al., Nat'l Renewable Energy Lab'y, *The Demand for a Domestic Offshore Wind Energy Supply Chain* (2022) ..............................................6, 7, 8

*North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor*, Ørsted (May 5, 2022), https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.............12, 13

North America's Building Trades Unions, Comment on Bureau Of Ocean Energy Management's Proposed Sale Notice: Atlantic Lease Sale 8 For Commercial Leasing For Wind Power On The Outer Continental Shelf In The New York Bight (Aug. 13, 2021), https://www.regulations.gov/comment/BOEM-2021-0033-0074 ................................................................................................11

Turn Forward, *Offshore Wind Work Opens Doors* (YouTube, Jul. 23, 2023), https://www.youtube.com/watch?v=Q4DIbnJc7jk................................................13

**INTRODUCTION**

Plaintiff States' and Plaintiff-Intervenor Alliance for Clean Energy New York's Motions for Summary Judgment persuasively demonstrate that the Defendants' indefinite "pause"[1] of offshore wind energy development violated the Administrative Procedure Act ("APA") by, among other things, ignoring interests and impacts the APA required them to consider. Amici are coalitions of labor and community groups (hereinafter "coalition members") that have committed substantial resources to training the skilled workforce needed to build and maintain offshore platforms, windmills, and turbines, as well as to construct the infrastructure necessary to support offshore wind energy development. Amici submit this brief in support of Plaintiffs' and Plaintiff-Intervenor's Motions to bring to the Court's attention particular interests the Defendants ignored in their ill-considered rush to eliminate offshore wind energy development: the interests of coalition members, who have extensively invested in training offshore wind energy workers, and the interests of those trained workers, seeking sustainable employment to support themselves and their families, who have spent countless hours developing the necessary skills to perform the complicated, often dangerous work of constructing and maintaining offshore wind farms. Defendants' "pause" threatens those workers' hard-won livelihoods. It has already caused many of them to lose work and to reconsider whether to continue in an industry where the promise of good jobs, at living wages with health care and retirement security, has become illusory because of ill-conceived and unlawfully executed arbitrary government action.

---

[1] President Trump has recently made clear that he intends the "pause" to be permanent. During a July 27, 2025 meeting with the European Commission President, Mr. Trump stated: "And the other thing I say to Europe: We will not allow a windmill to be built in the United States. They are killing us." Forbes Breaking News, *Trump Goes On Sudden Tirade Against Windmills During Meeting with EU President Ursula Von Der Leyen*, at 00:04–00:10, (YouTube, July 27, 2025), https://www.youtube.com/watch?v=1Asznj3uWKA.

**INTERESTS OF AMICI**

Amici are four coalitions whose members provide training programs to prepare workers for jobs in the offshore wind energy industry.

Amicus Climate Jobs Massachusetts ("CJMA"), a tax-exempt 501(c)(3) organization, is a coalition of local and regional labor unions and related organizations that collectively represent hundreds of thousands of workers employed in Massachusetts. CJMA works to support clean energy projects and the workers who build, operate, and maintain them. CJMA does so by promoting solutions to generate and distribute clean energy at scale and develop substantial opportunities for high-quality careers for existing and future energy workers. CJMA coalition unions already represent thousands of building and construction trades workers who are or have been directly employed in the construction of the Vineyard Wind Project offshore windfarm and related port construction at the Port of New Bedford, the first port in the United States constructed to meet the particular demands of the offshore wind industry. Similarly, CJMA coalition unions represent over 150 building trades and construction workers who will be working at the Port of Salem, tailoring the Port facility to the needs of offshore wind construction.

Amicus Climate Jobs New York Education Fund ("CJNYEF"), a tax-exempt 501(c)(3) organization, is a coalition of labor unions representing 2.6 million New York working men and women. CJNYEF is committed to building a clean energy economy at the scale climate science demands, creating good jobs, and supporting equitable communities and a more resilient New York. CJNYEF empowers New Yorkers, especially workers, in the civic engagement process to advance a low-carbon, equitable economy through trainings, workshops, and educational exchanges. Members of the CJNYEF coalition directly represent thousands of workers building turbines in the water off the coast of New York for offshore wind farms to generate electricity, as

well as in thousands of additional jobs that are integrally related to this industry—including manufacturing component parts and the construction of needed infrastructure.

Amicus Climate Jobs Rhode Island ("CJRI") is a program of the Rhode Island Institute for Labor Studies and Research, a tax-exempt 501(c)(3) organization. CJRI is a broad coalition of labor, environmental, and community partners committed to a just transition to an equitable, pro-worker, pro-climate green economy, and educating the public on the renewable energy means to that transition. CJRI's coalition members represent hundreds of workers in Rhode Island currently building out Rhode Island's port infrastructure, constructing wind farms, and operating and maintaining wind turbines after they are built. CJRI's coalition members have invested substantial time and money creating and utilizing training programs specific to the offshore wind industry. Many individual workers have spent their own time and resources learning skills to equip them for future employment on the many jobs that the industry has promised to bring to Rhode Island.

Amicus Maine Labor Climate Council ("MLCC"), a fiscally sponsored tax-exempt 501(c)(3) organization, is a coalition of 20 public and private sector labor unions committed to addressing climate change and economic inequality, and to educating the public on renewable energy issues. MLCC coalition members represent hundreds of workers who have been employed in the offshore wind industry and who are depending for future work on the thousands of additional jobs that the industry promised. To prepare a skilled offshore wind energy workforce, MLCC and its coalition members have developed and implemented numerous training programs. Workers trained and represented by MLCC coalition members have worked to build out the Maine port infrastructure to support the offshore wind industry, on wind industry projects off the coast of Maine, and have travelled to put steel in the water off the coast from Massachusetts to Virginia.

ARGUMENT

**The Amici Coalition Members Have Substantial Investments in Training Workers for the Offshore Wind Energy Industry and They, and the Workers They Have Trained Who Are Gainfully Employed in the Industry, Have Important Reliance Interests That Have Been Ignored by Defendants.**

I.    **The Administrative Procedure Act Requires That, When Considering Regulatory Change, Agencies Must Address Adverse Effects on the Livelihood of Workers and Investments in Training Workers.**

Agency action which "makes worthless substantial past investment incurred in reliance upon the prior rule" is arbitrary and capricious. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring). Agencies must consider the reliance interests of regulatory beneficiaries when changing rules, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020), including the reliance interests of workers "whose careers and livelihoods were upended" by the agency's change of course. *Thakur v. Trump*, No. 25-CV-04737, 2025 WL 1734471, at *7 (N.D. Cal. June 23, 2025).

There is considerable recent precedent within the First Circuit for considering such reliance interests. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025) (agencies must consider "all relevant impacts of cutting off funding"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) (requiring agency to consider "staff laid off" and "projects halted" as reliance interests); *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. CV 25-10787, 2025 WL 1822487, at *18 (D. Mass. July 2, 2025) (requiring consideration of reliance on NIH grants); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 309 (D. Mass. 2025) ("Beyond the institutions, the reliance interests are plenty, ranging from

the researchers who chose to conduct research at certain institutions with the understanding that they would be supported, to the students who will no longer be admitted to these institutions, to the local communities that will suffer from the loss of community-based programming."), *judgment entered*, No. 25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

## II.    The Offshore Wind Energy Industry Needed Skilled Workers and Training Programs to Provide Workers with the Specific Skills Necessary to Work in the Industry.

Here, the people who relied on the agencies' rules—and whose interests were not considered in Defendants' "pause"—include tens of thousands of workers who sought training in offshore wind-specific skills, as well as the organizations providing the training. More than 17,000 offshore wind jobs are tied to projects—including Beacon Wind, Vineyard Wind 2, Excelsior Wind, Attentive Energy 1 & 2, and Leading Light Wind—that have been paused or are likely to be paused due to President Trump's Wind Directive. Mariel Lutz, Alia Hidayat & Kate Petosa, *The Trump Administration and Congress' Attacks on Wind Power Are Killing Thousands of Jobs and Risk Thousands More*, Ctr. for Am. Progress (July 24, 2025), https://www.americanprogress.org/article/the-trump-administration-and-congress-attacks-on-wind-power-are-killing-thousands-of-jobs-and-risk-thousands-more/.[2] And this estimate does not

---

[2] Plaintiff States catalogue the job loss consequences of the "pause" in footnote 17 at page 12 of their Memorandum in Support of their Motion for Summary Judgment, ECF No. 173. See, as an example, paragraph 14 in the Declaration of Drew Bohan, ECF No. 174-2: "The buildout of offshore wind infrastructure represents a historic opportunity for workforce development, particularly in coastal communities facing economic transition. Union labor agreements, apprenticeship programs, and port redevelopment plans are already under discussion. Without timely federal action, job creation efforts are put on hold, training pipelines stall, and local hiring targets may go unmet. This impact on the California workforce is not simply limited to job creation. The uncertainty of these jobs puts negative pressure on the market and disincentivizes potential workers from seeking to enter the workforce."

include the additional jobs that would have been created between 2024 and 2030 had the prior offshore wind goal remained in place—jobs that workers have already spent time and money training for. Lutz, *supra*; *see also* Climate Jobs Nat'l Res. Ctr., *Breaking Ground: The Inflation Reduction Act Two Years In* 11 (2024) (estimating that 83,138 jobs have been or will be created by current and planned offshore wind projects).

The previously established goal of developing 30 gigawatts of offshore wind by 2030 would "support approximately 77,000 jobs in industry and surrounding communities."[3] Reaching this goal would require the installation of 2,100+ wind turbines, 2,100+ foundations, 6,200 kilometers of array cables and 5,200 kilometers of export cables, as well as 5 wind turbine installation vessels ("WTIVs"), 10 feeder barges, 58 crew transfer vessels ("CTVs"), 11 service operation vessels ("SOVs")., and 4 cable-laying vessels ("CLVs") by 2030. Matt Shields et al., Nat'l Renewable Energy Lab'y, *The Demand for a Domestic Offshore Wind Energy Supply Chain* 16 (2022) ("Supply Chain Report"). In fact, even installing 15 gigawatts of offshore wind by 2040 "could create 220,158 direct jobs," and up to 85,617 additional manufacturing jobs over a total of 18 years. Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Climate for Change: A Complete Climate Jobs Roadmap for New York City* 40 (2022). Offshore wind was projected to create more than 30,000 direct jobs in Massachusetts, Avalon Hoek Spaans et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Building the Clean Energy Commonwealth: A Climate Jobs Roadmap for Massachusetts* 33 (2024),[4] and 33,425 direct jobs in Rhode Island, Lara Skinner et al., Cornell

---

[3] *Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030*, Dep't of Energy (Mar. 29, 2021), https://perma.cc/9SAH-RT5J.

[4] Another offshore wind job estimate for Massachusetts is provided at paragraph 23 of the Declaration of Alison Brizius, ECF No. 174-3: "The 2050 CECP also estimates that up to 9,500 additional full-time offshore wind workers will be needed by 2050, with an additional 16,400 additional workers required for related sectors of electricity distribution and transmission."

Univ. Sch. of Indus. & Lab. Rels., *Building a Just Transition for a Resilient Future: A Climate Jobs Program for Rhode Island* 25 (2022).

Wind development requires workers to fill 113 unique roles, many of which require extensive, offshore-wind-specific training. These include roles across five major segments of the industry: development (including "site assessment, plant design, financing, project management, and permitting review"), manufacturing and supply chain ("the jobs to fabricate and assemble components, subassemblies, parts, and materials from multiple tiers of the manufacturing process," ranging "from engineering and component design to factory-level workers working production lines"), ports and staging ("terminal crews, logistics, and management-related roles located portside" as well "laborers and trade workers who support offshore wind plant construction and installation"), maritime construction ("the marine crew, engineers, and construction crews"), and operations and maintenance ("wind technicians and associated operating plant management"). Jeremy Stefek et al., Nat'l Renewable Energy Lab'y, *U.S. Offshore Wind Workforce Assessment* ix (2022) ("Workforce Report"). For example, all monopile and transition piece installation positions are "specific" to the wind "foundation installation process." *Id.* at 24. Turbine technicians are "specially trained in the particular turbine package," while cable installation requires "hydrographer certification" and "offshore-specific" training. *Id.* at 25, 26.

The prior administration emphasized the "immediate need for workforce development" by "[e]ducational institutions, unions, [original equipment manufacturers], and developers." Supply Chain Report at 42. These institutions heeded the call: As of October 2022, they were already offering 44 training programs across the country. Workforce Report at ix. For example, six of the seven maritime academies in the US "offer[ed] or develop[ed] offshore-wind-specific courses or programs." *Id.* at 37. Seven community colleges offered or planned to offer "curricula specifically

7

focused on offshore wind energy." *Id.* at 33. And beyond that, more than fifty universities offered "offshore wind energy courses." *Id.* at 38. Several unions began to develop a "training center," "apprenticeship program," sponsored maritime academy training, or made training investments. *Id.* at 35–36.

The declarations supporting the Plaintiff States' Motion for Summary Judgment, ECF Nos. 174-1 through 174-31, describe in detail the investments the States have made in support of the offshore wind energy industry, and amici will not burden the record here by duplicating that description—suffice it to say, their investment is substantial and their commitment to the industry long-standing. Private companies also have made major supply chain investments, totaling more than 1.6 billion dollars. Supply Chain Report at 2. These included investments in blades, nacelles, towers, monopiles, foundation platforms, secondary steel, transition pieces, array and export cables, and offshore substations. Virginia, New Jersey, New York, Maryland, Rhode Island, South Carolina, Connecticut, Massachusetts, and Texas were among the states which hosted offshore wind supply chain projects. *Id.* at tbl. 1.

### III.    Amici Invested Substantial Funds to Develop the Necessary Training Programs to Provide Workers with Skills Specific to the Offshore Wind Energy Industry.

Amici actively participated in the ramped-up training necessary to prepare the skilled workforce for the offshore wind energy industry and committed substantial resources to the effort.[5] For example, in his declaration attached to this memorandum as Attachment 1, Francis Eanes, the MLCC Executive Director, describes the efforts of MLCC coalition members to develop and

---

[5] The States supported this workforce development training. For example, New York distributed $20 million in workforce development training grants. Workforce Report at 45. Massachusetts "support[ed] multiple programs," including at Bristol Community College and Massachusetts Maritime Academy, to develop wind-specific safety programs; it also funded K-12 education for offshore wind technicians. *Id.* at 32, 39.

provide such training programs: "Our member organizations have invested many hundreds of thousands of dollars to stand up and run and pay for training programs to train workers on skills specific to the offshore wind industry." Attach. 1 ¶ 5 (Eanes Decl.). He continues:

> In anticipation of working these jobs, our members invested in creating a pipeline of skilled workers who could do the work that was expected. It takes time to train workers, and so we cannot simply wait until jobs already exist to begin training, we have to be able to get ahead of the ball with investments in training. For example, they purchased a Mobile Training Center that could provide training for workers who would be working on offshore wind, as well as additional safety training that is specific to offshore wind (such as Fall Training and Rope Safety Training). The developers of offshore wind facilities required that all workers seeking offshore jobs complete a specified training curriculum. To the best of my knowledge, this curriculum had not been provided to American workers before the onset of offshore wind development in U.S. waters, and if American workers had not received this training, all of the jobs related to offshore wind construction and maintenance in American waters would have been from other countries.

*Id.* ¶ 9. He cites as examples Iron Workers Local 7's high-torque training[6] and sending workers to the Massachusetts Maritime Academy for Global Wind Organization ("GWO") certification,[7] and the North Atlantic States Regional Council of Carpenters' GWO Basic Safety Training, GWO Advanced Rescue Training, GWO Basic Technical Training, GWO Slinger Signaler and HUET

---

[6] "This is specialized equipment with powerful hydraulic tighteners to fasten the kinds of bolts used on the large wind turbines for offshore wind farms. In short, High-Torque Training teaches workers the proper use of this specialized equipment to minimize the possibility of bolt shearing from an overtightened bolt, or a loosening from an undertightened bolt. When these bolts are supporting equipment worth many millions of dollars, it is absolutely imperative that each and every bolt be properly fastened." *Id.* ¶ 11.

[7] At paragraph 6 of his declaration attached as Attachment 2, Kendall Martin, President of the Ironworkers District Council of the Mid-Atlantic States, describes the GWO certification as follows: "The GWO is a non-profit body that sets international standards for safety training in the wind energy industry. Its standards are created by the wind energy industry, and encompass a series of specific training modules, required to be taken under GWO accredited programs. Possession of a GWO training certificate issued by an accredited program is a required of those seeking employment in the offshore wind industry. The requirement was established by developers - the training ensures that workers seeking employment will be capable of performing high-quality work safely on an offshore wind farm." For additional details on the Ironworkers extensive training programs for offshore wind energy work, *see generally* Attach. 2 ¶¶ 5–14.

training, "all of which are trainings specifically required by the offshore wind industry for work on offshore wind projects." Attach. 1 ¶¶ 18, 19. He points out: "Our members make these kinds of investments in training workers to qualify for this type of work because offshore wind is ready to deliver hundreds of thousands of hours of work with great wages and benefits." *Id.* ¶ 17.

Similarly, Patrick Crowley, CJRI Co-Chair, attests at paragraphs 7–8 of his declaration (attached to this memorandum as Attachment 3) to the training activities of CJRI's members in Rhode Island:

> Our coalition members have invested time and money creating and utilizing training programs for the workers they represent that are specific to the offshore wind industry. These include trainings and certifications from the Society of Professional Rope Access Technicians, Helicopter Underwater Egress Training, and Rhode Island's own Global Wind Organization (GWO) accredited Basic Safety Training center, brought to the state through the dedicated efforts of the Rhode Island Building and Construction Trades Council in partnership with Building Futures and the Community College of Rhode Island (CCRI) . . . In addition, the GWO training that members of our coalition, including the International Brotherhood of Electrical Workers Local 99, International Union of Painters and Allied Trades Local 195, Iron Workers Local 37, the Laborers International Union of North America, and the United Brotherhood of Carpenters have worked to develop at CCRI offers specific modules in Working at Heights, Manual Handling, First Aid, Sea Survival, and Fire Awareness – training that is required to work on offshore wind projects.

Attach. 3 ¶¶ 7–8 (Crowley Decl.)

And, in Massachusetts, "CJMA's building and construction trade union members, through their joint apprenticeship and training programs, have collectively invested millions of dollars to launch, operate, and fund training programs that equip their memberships with offshore wind-specific health and safety training and all of the skills necessary to complete construction on windfarms on and offshore." Attach. 4 ¶ 9 (Murphy Decl.). Painters District Council 35 has expended over $600,000 over the last five years alone to provide its members training essential to meeting offshore wind developer requirements, while Carpenters local unions have spent over $1,000,000 over the last five years providing offshore wind training to their members. *Id.* ¶¶ 10–

11.

### IV. Trained Workers Obtained Transformative Jobs in the Offshore Wind Energy Industry, with Good Wages and Benefits, Frequently Working Under the Terms of Project Labor Agreements.

Once trained in amici-sponsored programs, workers obtained gainful employment in the offshore wind energy industry. The industry's use of Project Labor Agreements ("PLAs") on many projects assured that those performing offshore wind energy work had good jobs, were paid prevailing wages, and were provided health care and pension benefits. PLAs are comprehensive labor-management collective bargaining agreements covering all the work to be done on large construction projects. *See generally Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ("Boston Harbor").[8]

For example, Vineyard Wind 1, Massachusetts' first offshore wind project, located 15 miles off the coast of Martha's Vineyard, was constructed pursuant to a PLA, *Building Trades Union and Vineyard Wind Sign Historic Project Labor Agreement*, Vineyard Wind (July 16, 2025),

---

[8] "PLAs are generally negotiated by the entity that controls contracting for the project and a council of labor organizations that represent all the trades that will be employed on the project. Through PLAs, the parties set standard work rules, establish various forums for communication and coordination, and prevent work stoppages with no-strike, no-lockout provisions, and speedy dispute-resolution mechanisms. They also set standard pay and benefit rates for each trade and address labor supply issues through provisions that commit the signatory unions to use their job referral procedures to ensure a steady supply of highly skilled workers. Both union and nonunion workers can register for referrals, and typically any contractor – union or nonunion – may bid for work on a covered project, as long as they agree to abide by the agreement and thereby to be held to the same standards." North America's Building Trades Unions, Comment on Bureau Of Ocean Energy Management's Proposed Sale Notice: Atlantic Lease Sale 8 For Commercial Leasing For Wind Power On The Outer Continental Shelf In The New York Bight, at 2 (Aug. 13, 2021), https://www.regulations.gov/comment/BOEM-2021-0033-0074. State and local governments have recognized that PLAs have significant value for government-sponsored projects: their project-long no strike, no-lockout clauses are a safeguard against the disruption that stems from labor disputes, and they ensure that the work is performed with a high quality, well-trained workforce.

https://www.vineyardwind.com/press-releases/2021/7/16/building-trades-union-and-vineyard-wind-sign-historic-project-labor-agreement, and, since its inception in 2021 until early July 2025, Ironworkers Local 37 members have worked 97,698 hours on the project, both on and offshore. Attach. 4 ¶ 16. Similarly, over the last four years, Massachusetts-based local Carpenters unions have worked over 800,000 hours on Vineyard Wind I, both on and offshore. *Id.* ¶ 17. In Rhode Island, the Block Island Wind Farm, a commercial wind farm generating clean energy for 17,000 Rhode Island homes, was constructed pursuant to a PLA "guaranteeing approximately 300 jobs for 10 different building trade unions and 30 unionized contractors and subcontractors during project construction." *Community Benefits Snapshot: Block Island Wind Farm Community Benefits Agreement*, World Res. Inst. (Jan. 31, 2025), https://www.wri.org/snapshots/community-benefits-snapshot-block-island-wind-farm-community-benefits-agreement.

And, in 2022, North America's Building Trades Unions ("NABTU") entered into a PLA, the National Offshore Wind Agreement, with Ørsted, a leading offshore wind energy developer, covering "all of Ørsted's contractors and subcontractors that will perform offshore windfarm construction from Maine down to Florida." Ørsted announced:

> [T]he National Offshore Wind Agreement (NOWA) sets the bar for working conditions and equity, injects hundreds of millions of dollars in middle-class wages into the American economy, creates apprenticeship and career opportunities for communities most impacted by environmental injustice, and ensures projects will be built with the safest and best-trained workers in America.

*North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor*, Ørsted (May 5, 2022), https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement. NABTU President Sean McGarvey concurred:

> The signing of this unprecedented agreement is historic for America's workers and our energy future. NABTU's highly trained men and women professionals have the best craft skills in the world. This partnership will not only expand tens of thousands

12

of career opportunities for them to flourish in the energy transition but also lift up even more people into the middle-class.

*Id.*

Workers are eloquent about the transformation in their lives afforded by skilled unionized employment in the offshore wind industry, and the possibility of having long-term careers performing such work. Workers on the Vineyard Wind project in Massachusetts stated:

> "This project means a lot to me. I was here in New Bedford last year, working on the renovations to make sure this pier is stable. The wages and benefits that I receive in my union not only benefit me but my five-year-old son too," said Josh Griggsby, a member of Piledrivers Local 56. . . .

> "Using a project labor agreement to construct the country's first industrial-scale offshore wind farm guarantees union protections for workers on this project, the work stays local, and the workers represent the diverse communities they come from," said Kristin Wozniak, a member of International Brotherhood of Electrical Workers Local 223.

Vineyard Wind, *supra*.[9]

Rhode Island workers similarly benefited from work in the offshore wind energy industry. Oronde Hale, a member of Iron Workers Local 37 who worked on the Block Island Wind Farm, stated: "When the [wind] turbines were starting to get built, I knew I wanted to be on that list so I could save up enough money to buy a house. If it wasn't for that one job, I can't say I'd be where I am right now. It got us out of . . . borderline poverty to middle class. What offshore wind means to me is clean energy and financial freedom for the guys working on them." Turn Forward, *Offshore Wind Work Opens Doors*, at 0:18–0:48 (YouTube, Jul. 23, 2023), https://www.youtube.com/watch?v=Q4DIbnJc7jk.

Esther Rosario, CJNYEF Executive Director, shares some examples from New York:

---

[9] See also Declaration of Elizabeth Mahony ¶¶ 48, 58, ECF No. 174-20, for the economic development benefits, including jobs and "mentoring and apprenticeship programs for skilled workforce training" from Vineyard Wind 1.

Lisa H. is a member of the International Brotherhood of Electrical Workers ("IBEW"), Local 25 in New York. She is proud to have had the opportunity to work on performing electrical work on a converter station for an offshore wind farm in her community, because she wants her grandchildren to have the opportunity to live in an environment with clean air and clean water. This work, along with other work that she has gotten through her Local, allowed her to get a job with pay sufficient that she was able to put her two children through college. She has met fellow IBEW Local 25 members who are apprentices getting trained with the specialized skills necessary to work on offshore wind projects, and she hopes that these opportunities will continue to be available for them in the future.

Devin O. is a member of International Brotherhood of Electrical Workers ("IBEW"), Local 25. He worked on one of the first offshore wind turbines that went up off the coast of New York after getting trained to do so. His local, IBEW Local 25, put up a training facility to train apprentices and other members on the specialized skills necessary to work on offshore wind farms. Given their investment in training and learning these specialized skills, he hopes the jobs that the offshore wind industry represents will continue to be available for him and his fellow IBEW members. For Devin, his job meant that he was covered with health care benefits for himself and his family – including his two children. He is very glad that the offshore wind industry is being built – not only because of his own pay and benefits – but also because he is worried about the effects of climate change on his community.

Attach. 5 ¶¶ 15–16 (Rosario Decl.). In addition, Alex A., Leidy J., and Kevyn G. are apprentices who hope that their hard work learning the necessary skills for work on offshore wind energy projects will pay off in opportunities for jobs in the industry in New York. *Id.* ¶¶ 12–14.

In sum, the offshore wind energy industry has provided trained workers with transformative jobs, at high wages, with excellent benefits, and those workers had every reason to believe the governmental and industry promises that such work opportunities would continue and expand.

## V.   Defendants' "Pause" Has Resulted in Trained Workers Losing Work and Rendered Amici's Investments in Training Programs Nugatory.

At page 10 of their Memorandum in Support of their Summary Judgement Motion, ECF No. 173, Plaintiff States have pointed out that: "[The] indefinite pause and attendant uncertainty

14

have brought planned projects to a standstill, with a 95% drop in wind-energy supply-chain contracts and a 98% drop in wind-energy investments in the first quarter of 2025."

That standstill will decimate offshore wind energy workers' prospects for a better life. Moreover, those workers' earnings greatly benefited the communities in which they lived; without jobs those workers will not be making the purchases that support local businesses. In Massachusetts, for example, "A halt in wind project development would also jeopardize the thousands of good-paying, long-term jobs that the wind industry has already created and plans to create in Massachusetts and across the nation to build out thousands of megawatts of new wind power projects." Elizabeth Mahony Decl., at ¶ 58, ECF No. 174-20.[10] CJMA Executive Director Ryan Murphy concurs: "If the Presidential Memorandum . . . is upheld, the substantial investments made by CJMA building and construction trades union members to develop this industry and this industry's workforce in Massachusetts will be squandered. Moreover, many of these members' nascent careers in offshore wind will be upended." Attach. 4 ¶ 7.

In Maine, according to MLCC Executive Director Francis Eanes:

[O]ur members anticipated many hours of work for jobs constructing twelve turbines that had been announced and funded for a Floating Research Array off the coast of Maine, using technology developed by the University of Maine. We also anticipated many hundreds of hours of work on jobs for offshore wind farms off the coast of Maine as a result of legislation that the state passed to procure energy from offshore wind farms. Moreover, in the short term, we further anticipated jobs with many thousands of hours of work constructing an offshore wind port in Maine. Because of the pause, none of these projects are moving forward right now, and none of these jobs are coming online.

Attach. 1 ¶ 9.

CJNYEF Executive Director Esther Rosario voices similar concerns:

[T]he Wind Directive continues to threaten the future of the industry and workers who have trained to acquire skills for additional construction projects in the

---

[10] See also paragraphs 35-42 of the Declaration of Bruce Carlisle, ECF No. 174-10, for the adverse consequences of the "pause" on Massachusetts offshore wind projects.

offshore wind industry. Without the prospect of future employment in the industry, workers are no longer incentivized to invest their time in developing the specialized skills that are required to assemble and install wind turbines offshore. The offshore wind halt creates uncertainty and fear over what opportunities will be available in this industry in the future.

Attach. 5 ¶ 18.

And in Rhode Island:

Prospects of future employment—good jobs, paying living wages, providing health care, and retirement security—for Rhode Island workers are being taken away without any justification or consideration of those workers' interests, and may not be recoverable. As a result of the pause, the training of additional workers with the necessary skills to do the complex work required in the off shore wind industry is for naught, and Rhode Island workers are questioning whether they should commit their future to this industry – meaning that, even if the industry comes back, American workers will not available to do these jobs – essentially ceding work in this growing global industry to workers from other countries.

Attach. 3 ¶ 10.

Training programs for "naught," good jobs lost, prospects for future offshore wind employment eliminated—the APA required the Defendants to weigh these workplace consequences when considering whether to "pause" offshore wind energy development. There is absolutely no evidence in the administrative record that the Defendants complied with their obligation.[11]

---

[11] For additional negative consequences to the interests of amici's members, see paragraph 33 of the Declaration of Michael Brown, ECF No. 174-5: "SouthCoast Wind has executed a first-of-its kind Labor Peace Agreement ('LPA') for offshore wind operations and maintenance with the Massachusetts and Rhode Island AFL-CIO State Federations, the Rhode Island Building and Construction Trades Council, the Massachusetts Building Trades Union, and the Southeastern Massachusetts Building Trades Council. In the LPA, SouthCoast Wind agrees not to interfere in any organizing process led by the signatories during the operations and maintenance phase of the Project. The LPA is specifically tied to the Project that would be constructed as a result of the PPAs that are currently being negotiated. If the Presidential Memorandum remains in effect, the aforementioned unions will lose both the economic opportunity presented by operations and maintenance of the SouthCoast Wind project, and the opportunity to establish a policy of non-interference for offshore wind project operations and maintenance work."

## CONCLUSION

Nowhere in President Trump's January 20, 2025 "pause" memorandum is there any mention of the adverse impact the "pause" will have on the legions of workers who spent considerable time and effort to acquire the complex array of skills necessary to work in the offshore wind energy industry, nor is there any discussion of their loss of the highly paid jobs the industry provided. The memorandum also ignored the reliance interests of those institutions that, like amici's coalition members, developed and administered the training programs required to ready those workers to perform work on offshore wind energy projects. This failure to consider important reliance interests adds support to the Plaintiff States' and Plaintiff-Intervenor's persuasive arguments that the Defendants' offshore wind energy "pause" contravened the Administrative Procedure Act's requirements. This Court should grant the Plaintiff States' and the Plaintiff-Intervenor's Motions for Summary Judgment.

Dated: August 15, 2025                Respectfully submitted,


                                      /s/ Kyle Andrew Berner
                                      Nicole Horberg Decter
                                      BBO # 658268
                                      Kyle Andrew Berner
                                      BBO # 706959
                                      Segal Roitman, LLP
                                      33 Harrison Avenue, 7th Floor
                                      Boston, MA 0211
                                      (617) 742-0208
                                      ndecter@segalroitman.com

                                      Richard F. Griffin, Jr.
                                      Pro Hac Vice Admission Pending
                                      Bredhoff & Kaiser, PLLC
                                      805 Fifteenth Street, NW, Suite 1000
                                      Washington, DC 20005
                                      (202) 842-2600
                                      rgriffin@bredhoff.com

                                      Attorneys for Amici

17