# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, *et. al.,* | |
| Plaintiffs*,* | |
| v. | Case No. 1:25-CV-11221-WGY |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.* | |
| Defendants. | |

**[PROPOSED] BRIEF OF AMICI CURIAE A CALIFORNIA COALITION IN SUPPORT OF THE STATES AND ACE-NY'S MOTIONS FOR SUMMARY JUDGMENT**

(Leave to file granted on _____, 2025)

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... 1

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................................... 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ............................................................................................................ 5

    I.    THE WIND DIRECTIVE WILL UNDERMINE THE STATE'S RENEWABLE ENERGY POLICY . 5

    II.    THE WIND DIRECTIVE WILL EXACERBATE RISING ENERGY COSTS ............................. 7

    III.    THE WIND DIRECTIVE HINDERS EMERGING OFFSHORE WIND DEVELOPMENT IN CALIFORNIA AND WILL RESULT IN UNIQUE HARMS TO CALIFORNIA'S ECONOMY ........ 9

        A.    The Development of Offshore Wind Will Contribute to Modernizing the Transmission System ............................................................................... 13

        B.    The Development of Offshore Wind Will Spur Upgrades at Ports .......... 14

CONCLUSION ........................................................................................................ 15

CERTIFICATE OF SERVICE ................................................................................ 17

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Massachusetts v. EPA*
  549 U.S. 497, 521 (2007) ................................................................................................. 3

*Telecommunications Rsch. & Action Ctr. v. F.C.C.*
  750 F.2d 70, 80 (D.C. Cir. 1984)..................................................................................... 4

**Statutes**

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et. seq........................................... 9

**Presidential Memoranda**

Presidential Memorandum (January 20, 2025) ............................................................... 1

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

*Amici* submit this brief to illustrate the significant harm to Californians of President Trump's Presidential Memorandum on wind energy, including how it threatens an emerging offshore wind industry that has been years in development, and impedes California's ability to build a robust renewable energy sector that will promote the State's interests in protecting the State and its constituents from future energy and climate challenges.[1]

*Amici* are a coalition representing various interests from the State of California, including environmental organizations, local government and planning bodies, organized labor, and industry trade groups. *Amici* possess interests in the promotion, planning, procurement, development, construction and consumption of wind energy as part of a renewable and reliable energy grid that supports the fourth largest economy in the world. *Amici* are:

Local Government Entities and Public Official

1. The San Francisco Public Utilities Commission ("SFPUC"), a department of the City and County of San Francisco, has provided hydroelectric power to city agencies and municipal functions since 1925. Today it also procures electricity from solar, wind, and other renewable sources to serve the demand of most private customers in the city.

2. Marin Clean Energy is a joint powers authority that began serving retail electric customers in 2010, and today serves more than 1.5 million residents and businesses in 38 communities across Contra Costa, Marin, Napa, and Solano Counties. Its mission is to confront

---

[1] On January 20, 2025, President Trump issued a Presidential Memorandum on the "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" directing federal agencies to (1) stop all new leasing of wind energy in the Outer Continental Shelf pending review, (2) cease issuing new or renewed approvals, rights of way, permits, leases or loans for onshore or offshore wind projects pending review; (3) review all federal wind leasing permitting processes and of all existing leases for the environmental necessity of terminating or amending them; and 4) directs the Secretary of Interior to place a temporary moratorium on the Lava Ridge Wind Project and directs the Secretary to "conduct a new comprehensive analysis of the various interests implicated by the Lava Ridge Wind Project and the potential environmental impacts." (hereinafter "Wind Directive").

the climate crisis by eliminating fossil fuel greenhouse gas emissions, producing renewable energy, and creating equitable community benefits.

3. Redwood Coast Energy Authority is a local agency working to provide clean, reliable electricity and valuable programs for Humboldt County residents and businesses.

4. Retired Assemblymember Jordan Cunningham (R), together with former Assemblymember David Chiu (D) who is counsel for the SFPUC in this brief, co-led a strongly bipartisan legislative effort that resulted in the 2021 passage of AB 525. That law jumpstarted the offshore wind industry in California by requiring the state to "quantify the maximum feasible capacity of offshore wind to achieve reliability, ratepayer, employment, and decarbonization benefits and to establish offshore wind planning goals for 2030 and 2045."[2]

Environmental Nonprofit Organizations

5. Brightline Defense Project is an environmental organization engaged in the equitable development of offshore wind in California and advocates for the benefits it can bring to regional and local communities and utility-scale clean energy to the state.

6. 350 Humboldt is a grassroots climate action organization based on California's North Coast that is dedicated to rapidly completing the energy transition so global temperatures can be stabilized, and supports California's offshore wind goals as a critical component of this transition.

7. California Environmental Voters ("EnviroVoters") is a statewide organization that seeks to protect the land, air, water and health of all Californians, and advocates for wind energy as a critical component of the state's energy portfolio and an economy that is just and sustainable for all.

8. The Central Coast Alliance United for a Sustainable Economy ("CAUSE") is a grassroots community organization based on California's Central Coast that is committed to ensuring offshore wind supports a just transition to renewable, utility-scale energy that centers

---

[2] Cal. Legis. Info., *Assembly Bill No. 525 Energy: Offshore Wind Generation*, (Ch. 231, 2021), (codified at Cal. Pub. Res. Code §§ 25990–25991), https://tinyurl.com/3hbnf4mc (last visited Aug. 13, 2025).

environmental justice, health and safety of frontline communities, and delivers real local benefits such as good jobs, clean air, and community investment throughout the central coast.

9. Climate First: Replacing Oil & Gas ("CFROG") is an environmental advocacy organization engaged in the equitable development of offshore wind in California and advocates for the benefits it can bring to regional and local communities, including sustainable jobs and utility-scale clean energy.

Organized Labor

10. The International Brotherhood of Electrical Workers, Local 639, ("IBEW") is a labor union representing workers in the electrical industry on California's Central Coast, which emphasizes apprenticeships and training to ensure its members stay current with evolving technologies and advocates for fair wages, workplace safety, and comprehensive benefits.

Industry Trade Groups

11. Offshore Wind California is a nonprofit coalition of industry partners with a shared interest in promoting policies and public support for responsible development of offshore wind power as part of a comprehensive solution to California's renewable energy needs.

The harms described below will persist and mount as long as arbitrary agency action hinders California's energy policy. *Amici* respectfully request that the Court consider the implications of the Wind Directive and grant the Plaintiff States and Intervenor Plaintiff Alliance for Clean Energy New York (collectively "Plaintiffs") Motions for Summary Judgment.[3]

## **BACKGROUND**

California's ongoing challenges with climate change continue to be detrimental to the health of its economy and people. *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) ("The harms

---

[3] *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their counsel made any monetary contributions intended to fund the preparation or submission of the brief. *Cf.* Fed. R. App. P. 29(a)(4)(E).

associated with climate change are serious and well recognized."). These challenges take various forms, such as degrading air quality, intensifying climate disasters, and increasing energy costs, and manifest into serious public health concerns, particularly with low-income communities and communities of color. These communities bear the brunt of pollution from industrial facilities, ports, and transportation[4] and experience high rates of asthma, bronchitis, lung cancer, and other serious illnesses.[5] *Telecommunications Rsch. & Action Ctr. v. F.C.C.,* 750 F.2d 70, 80 (D.C. Cir. 1984) (Amongst other factors, agency "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake" and therefore unreasonable). Climate-related disasters have had catastrophic impacts on the state's population and economy. The recent Eaton and Palisades fires this past January in Los Angeles claimed 27 lives, burned over 40,000 acres and caused up to $53.8 billion in damage, punctuating the harsh challenges faced by the State and underscoring the need for safer infrastructure.[6]

California's energy grid faces increasing pressure from growing demands from population growth, electrification, and proliferating artificial intelligence data centers.[7] California's grid will require major upgrades and expansions to respond to these challenges safely and reliably.[8] Load-serving entities in the state also face increased costs to procure energy resources to meet increasing energy demands.

California addresses these challenges, in part, by adopting regulations and policies that support renewable energy and reduce Greenhouse Gas ("GHG") emissions. In particular, with hundreds of miles of coastline, California can access vast quantities of renewable energy from

---

[4] Cal. Air Res. Bd., *2022 Scoping Plan for Achieving Carbon Neutrality: Appendix G – Public Health* at 20-21 (Dec. 2022), https://tinyurl.com/2xtnkdjd (last visited Aug. 13, 2025).
[5] *Id*. at 20-22.
[6] S. Cal. Leadership Council & Los Angeles Cnty. Econ. Dev. Corp., *Impact of 2025 Los Angeles Wildfires and Comparative Study*, at 2 (Feb. 2025), https://tinyurl.com/3zh2ye2y (last visited Aug. 13, 2025).
[7] Cal. Council on Sci. and Tech., *Key Challenges for California's Energy Future*¸ at 7-8 (2024), https://tinyurl.com/s235rwzx (last visited Aug. 13, 2025).
[8] *Id*. at 11-12.

offshore wind with proper development. As the fourth-largest economy in the world, California is positioned to help make the United States a global leader in offshore wind. Developing offshore wind energy at scale in the state can attract significant investment capital[9] for an estimated trillion-dollar nationwide domestic industry.[10] However, the Wind Directive's halt of wind energy development undermines California's efforts.

## ARGUMENT

### I.  The Wind Directive Undermines the State's Renewable Energy Policy

California law compels the State to primarily power its economy using renewable energy. Wind plays a vital role. Off- and onshore wind resources comprise significant portions of California's procurement goals. For the purpose of transmission planning in 2025, the California Public Utilities Commission ("CPUC") planned for the acquisition of 5.2 GW of in-state and 4.7 GW of out-of-state wind by 2030. By 2035, the CPUC planned for 7.9 gigawatts of in-state wind energy, 9 GW of out-of-state wind energy, and 4.5 GW of offshore wind energy.[11] The CPUC set a target of 25 gigawatts of offshore wind by 2045, which would power 25 million homes.[12]

Starting nearly two decades ago, California enacted a series of laws to address climate change and accelerate the transition to renewable energy:

---

[9] Cal. Energy Comm'n, *Assembly Bill 525 Offshore Wind Energy Strategic Plan Volume II: Main Report*, at 6 (June 2024), https://tinyurl.com/ycy3xns6 (last visited Aug. 13, 2025).
[10] Sagatelova, Mary, Fitzpatrick, Ryan, *Status Report: America's Competitive Advantage in Offshore Wind*, Third Way Breakthrough Energy and Boston Consulting Group, (2024), https://tinyurl.com/4hubs82a (last visited Aug. 13, 2025).
[11] CPUC, D.25-02-026, *Decision Transmitting Electricity Resource Portfolios to the California Independent System Operator For 2025-2026 Transmission Planning Process* 19 (Feb. 26, 2025), https://tinyurl.com/2ud3c482 (last visited Aug. 13, 2025).
[12] CPUC, *2024 California Renewables Portfolio Standard Annual Report*, 58 (Nov. 2024), https://tinyurl.com/ye3872y8 (last visited Aug. 13, 2025).

- In 2006, AB 32, the California Global Warming Solutions Act, capped greenhouse gas emissions mandating a return to 1990 emission levels by 2020.[13]

- In 2016, SB 32 mandated further reductions of statewide greenhouse gas emissions to 40% below the 1990 emissions level by 2030.[14]

- In 2018, SB 100 increased the Renewable Portfolio Standard for load serving entities to 60% of retail sales by the end of 2030 and a 100% clean energy grid by 2045.[15]

- In 2021, AB 525--California's primary offshore wind planning law--directed the California Energy Commission ("CEC") to assess suitable sea space, port and transmission needs, workforce and economic opportunities, and potential impacts to the environment, communities, and Tribal Nations.[16]

Changes to the law have continued, developing a more robust and diverse energy supply and creating a strong renewable energy industry that creates jobs. Continuing this transition remains critical for other reasons too: California experiences some of the worst pollution in the country, extreme heat, frequent drought, devastating wildfires and sea level rise, and rising energy costs. But the State can use its renewable energy resources to facilitate retirement of old, polluting infrastructure, and provide new economic opportunities for its people and economy.

Wind energy is crucial for energy portfolio diversity and resilience. Energy portfolio diversity refers to the use of multiple sources of energy, rather than being dependent on one source. This diversity provides greater resilience and reliability in California's energy systems.[17] Wind energy enhances the reliability of California's energy grid because it provides energy at times that

---

[13] Cal. Leg. Info., *AB-32 California Global Warming Solutions Act of 2006*, (Ch. 488, 2006) (codified at Cal. Health & Saf. Code § 38500 et seq.), https://tinyurl.com/y2f7ctf3 (last visited Aug. 13, 2025).

[14] Cal. Leg. Info., *Senate Bill No. 32: California Global Warming Solutions Act of 2016*, (Ch. 249, 2016), (codified at Cal. Health & Saf. Code § 38566), https://tinyurl.com/38bv3taz (last visited Aug. 13, 2025).

[15] Cal. Leg. Info., *Senate Bill No. 100:100 Percent Clean Energy Act of 2018*, (Ch. 312, 2018), (codified at Cal. Pub. Util. Code § 454.53), https://tinyurl.com/3tpkyhs4 (last visited Aug. 13, 2025).

[16] *See Supra footnote* 2.

[17] Cal. Nat. Res. Agency, *California Climate Adaptation Strategy: 2022 Implementation Report*, 10 (2022), https://tinyurl.com/3u59e3sm (last visited Aug. 13, 2025).

other renewable energy sources cannot.[18] This diversity can also be a price hedge against rising energy costs.[19]

Pursuant to the statutory requirements of AB 525, the CEC produced the Wind Energy Strategic Plan in 2024, which focused on the benefits of offshore wind development in federal waters off the California coast. The CEC found that economic benefits to California included job creation, supply chain development, and increased tax revenue to the State.[20] These benefits would not be limited to California: a domestic logistics network established in California could be exported to other West Coast states, who can take advantage of those existing resources and infrastructure to efficiently achieve their own wind goals. Distinguishable from some of the projects on the East Coast, most Pacific offshore wind turbines will be sited 20 or more miles off the coast out of visual range and will be on floating platforms rather than fixed platforms.[21]

The Wind Directive undermines these longstanding efforts to transition California's economy to renewable energy using wind power as a key component of its clean energy strategy.

## II. The Wind Directive Exacerbates Rising Energy Costs

California's deregulation of its electric industry in 1996 was followed by the proliferation of diverse, load serving entities ("LSEs"), including investor-owned utilities ("IOUs"), community choice aggregators ("CCAs"), and electric service providers ("ESPs") that provide retail energy to end users. Notably, California has 25 CCAs serving more than 11 million customers or approximately 38% of the load in IOU service territories.[22] CCAs are local government entities that offer an alternative to investor-owned utilities and procure electricity on behalf of their

---

[18] *Id.* at 10.
[19] *See Supra footnote* 9 at 99.
[20] *See Supra footnote* 9 at 127-128.
[21] *See Supra footnote* 9 at 120; See also Cart, Julie, *Central Coast Residents Fight to Stop Offshore Wind Farms*, CalMatters (Oct. 16, 2023), https://tinyurl.com/ydw4szdv (last visited Aug. 13, 2025).
[22] CalCCA, *Number of CCA Communities in California Hits 200 Mark* (Apr. 2021), https://tinyurl.com/ywrm7zmv (last visited Aug. 13, 2025).

customers. All LSEs, including CCAs, compete to procure sufficient resources at reasonable prices, but the costs of doing business continue to increase.

LSEs in California already face a daunting procurement environment. The CPUC reported to the Legislature that the cost for LSEs to procure renewable energy for their customers has significantly increased due to increased renewables portfolio standard requirements, supply chain constraints, elevated inflation and interest rates, and increasing energy demand, attributed to data centers and electric vehicles.[23] The CPUC also cites federal energy policy as a cause of uncertainty in the renewable energy market in 2025, which may lead to increased energy prices.[24]

The Wind Directive adds to this uncertainty by delaying the development of wind energy projects both offshore and onshore, making it harder for LSEs to develop balanced energy generation portfolios and achieve state and local renewable energy mandates. For example, San Francisco's CCA, CleanPowerSF, adopts a long-term plan in its 2022 Integrated Resource Plan (IRP) to meet San Francisco's requirement  for a 100% renewable or GHG-free electricity supply by 2025 and meets the State's requirement to reduce GHG emissions and meet  renewable portfolio standards.[25] When the IRP was adopted, CleanPowerSF already had 110.4 MW of onshore wind under contract and projected the need for additional renewable resources, including 100 MW of new onshore wind.[26] Similarly, Marin Clean Energy's 2022 IRP projected a need for new wind resources over its planning horizon to meet state reliability and GHG emissions targets that includes consideration of a combination of in-state, out-of-state, and offshore wind opportunities.[27] To support the development of offshore wind in the North Coast, Redwood Coast Energy

---

[23] CPUC, *2025 Padilla Report: Costs and Cost Savings for the RPS Program (Public Utilities Code §913.3)*, at 2 (May 1, 2025), https://tinyurl.com/4pzd67ed (last visited Aug. 13, 2025).
[24] *Id.* at 2.
[25] CleanPowerSF*, 2022 Integrated Resource Plan Compliance Filing (Public Version)* 6 (Nov. 1, 2022), https://tinyurl.com/5fhfdcj6 (last visited Aug. 13, 2025). (An IRP is a strategic blueprint for long-term energy planning.)
[26] *Id.* at 25-26.
[27] *Marin Clean Energy 2022 Integrated Resource Plan (Public Version)* 10 (Nov. 1, 2022), https://tinyurl.com/y4rawnj2 (last visited Aug. 13, 2025); *See also Supra footnote* 9 at 98—99.

Authority includes 40 MW, and up to a maximum of 75 MW, of planned new offshore wind located off the Redwood Coast by 2030;[28] this plan reflects significant outreach and engagement with stakeholders like the Humboldt Bay Harbor District to further local port development.[29]

A number of California CCAs, including CleanPowerSF, explored procuring from the Lava Ridge Wind Project, which is specifically halted by the Executive Order, constraining supply and forcing these CCAs to search for other wind resources in an already difficult procurement environment. The Wind Directive curtails development of the significant wind energy resources that exist on federal lands.[30] As of January 2025, only 3.7% of utility solar, onshore wind, and geothermal energy generating capacity operates on federal lands generating approximately 8.9 GW of electricity.[31] The National Renewable Energy Laboratory modeled that federal lands could generate approximately 1,300 GW of solar energy and 60 GW of wind energy, with a levelized cost of energy of less than $45/MWh, demonstrating the potential for federal lands to be a source of low-cost renewable energy.[32] Halting the development of wind energy derails California's efforts to strengthen its economy, diversify its energy resource portfolio, and reduce energy costs.

### III. The Wind Directive Hinders Emerging Offshore Wind Development in California and Will Result in Unique Harms to California's Economy

Investments in offshore wind energy would not have been made without federal encouragement. The Bureau of Ocean Energy Management ("BOEM"), an agency within the Department of the Interior, designated wind energy areas on the outer continental shelf ideal for development, held auctions, and leased those areas to private developers pursuant to the Outer

---

[28] Redwood Coast Energy Authority, *2022 Integrated Resource Plan of Redwood Coast Energy Authority [Public Version]* 25 (Nov. 1, 2022), https://tinyurl.com/3jzkajy8 (last visited Aug. 13, 2025).

[29] *Id.* at 60-61.

[30] *See generally* Mai, Trieu et al., *Land of Opportunity: Potential for Renewable Energy on Federal Lands Analysis*, NREL (Jan. 2025), https://tinyurl.com/ycyrcnpt (last visited Aug. 13, 2025).

[31] *Id.* at 1.

[32] Mai et al., *supra* note 29, at vi.

Continental Shelf Lands Act, 43 U.S.C. § 1331 et. seq. ("OCSLA"). In 2021, BOEM designated the Morro Bay and Humboldt Bay areas off the California coast. In December 2022, BOEM held its first federal offshore wind lease sale auction for California these two areas, totaling 373,268 acres.[33] The sale resulted in five leases executed in 2023 netting over $757 million in value for the federal government.[34] BOEM conservatively estimated that the five California leases could produce at least 4.6 GW of energy.[35]

The moratorium on new Federal offshore leasing is also affecting existing leases. For instance, in April 2025, offshore wind developer and California leaseholder RWE announced at least a temporary cessation of activities in the United States citing the political environment.[36] RWE is one of the leaseholders for the wind area in Humboldt, along with Vineyard Wind, with leases valued at $157.7 million and $173.8 million, respectively.[37] The uncertainty caused by the Wind Directive is harming wind developers, with layoffs being reported industry wide, including the California-focused staff at RWE and Vineyard Wind.[38] These negative effects are expected to further harm the industry as the tumult caused by the Wind Directive persists.

---

[33] U.S. Bureau of Ocean Energy Mgmt., *Pacific Wind Lease Sale 1 (PACW-1) for Commercial Leasing for Wind Power on the Outer Continental Shelf in California—Final Sale Notice* 87 Fed. Reg. 64093–64110 (Oct. 21, 2022).

[34] U.S. Bureau of Ocean Energy Mgmt., *PACW-1 Round by Round Results*, https://tinyurl.com/y7ysj7b9 (last visited Aug. 13, 2025); See also Press Release, U.S. Dept. of the Interior, *Biden-Harris Administration Announces Winners of California Offshore Wind Energy Auction* (Dec. 7, 2022), https://tinyurl.com/ycyyez8r (last visited Aug. 13, 2025).

[35] *See Supra footnote* 9 at 10; See also Press Release, U.S. Bureau of Ocean Energy Mgmt., *BOEM Announces Draft Environmental Review of Potential Mitigation of Future Development of Wind Lease Areas Offshore California* (Nov. 13, 2024), https://tinyurl.com/yzpfe3rr (last visited Aug. 13, 2025).

[36] Krebber, Markus, Speech of Dr. Markus Krebber, CEO of RWE AG, to the Annual General Meeting 2025, RWE AG (Apr. 30, 2025), https://tinyurl.com/y6mw7nyj (last visited Aug. 13, 2025).

[37] American Clean Power*, Offshore Wind Market Report*, at 18 (May 2023), https://tinyurl.com/5te29tnm (last visited Aug. 13, 2025).

[38] Vanderheiden, Isabella, *Mass Layoffs at Companies Working on Humboldt Offshore Wind Projects; At Least Some Local People Laid Off,* LOST COAST OUTPOST (Mar. 11, 2025), https://tinyurl.com/43xmz6m4 (last visited Aug. 13, 2025).

The Wind Directive also threatens the significant investments that offshore wind would bring to California communities and local economies. If the Wind Directive is allowed to delay the development of the offshore wind industry, the lost benefits to California are wide-ranging. Leaseholders were given credits at auction in return for significant investments in communities and labor. Across the five developers who were awarded leases, $117 million is committed to developing workforce training programs and the U.S. domestic supply chain for the industry.[39] In addition, all five leaseholders committed to Lease Area Use Community Benefit Agreements ("CBA"), with four each committing also to the General CBA, each at a rate of 5%, which together would total over $52 million in monetary and non-monetary benefits and funding for fishers, Tribal Nations and local communities.[40] These community benefits will not come to fruition if the projects are indefinitely halted.

A nonpartisan group of business leaders and investors studied the economic impacts of offshore wind development and found that developing just the Humboldt and Morro Bay Wind Energy Areas would generate 169,000 construction job-years, around 5,750 annual operations and maintenance jobs, and over $15 billion in local wages by 2040.[41] In 2019, California workers in renewable energy, energy efficiency, grid modernization and storage, clean fuels and clean vehicles earned a median hourly wage 30% higher than the statewide median, or about $27.50.[42] Still more of these jobs will be in engineering, business and operations fields with 41% of floating

---

[39] Berkeley Law's Center for Law, Energy, and the Environment, *Offshore Wind & Community Benefits Agreements in California,* at 15 (April 2024), https://tinyurl.com/47vw5wsz (last visited Aug. 13, 2025).
[40] The following leases can be accessed at: U.S. Bureau of Ocean Energy Mgmt., Commercial Lease Nos. OCS-P 0562 (California North Floating LLC), https://tinyurl.com/7prkcm99: OCS-P 0563 (Atlas Offshore Wind LLC, assigned from Equinor Wind US LLC), https://tinyurl.com/2s3b24hh; OCS-P 0564 (Golden State Wind LLC), https://tinyurl.com/5n8jst66; and OCS-P 0565 (Invenergy California Offshore LLC), https://tinyurl.com/5drzf7p8 (last visited Aug. 13, 2025).
[41] E2 (Environmental Entrepreneurs), *California's Offshore Wind Opportunity* (2023), https://tinyurl.com/3ps4zvx9 (last visited Aug. 13, 2025).
[42] *Id*. at 9.

offshore wind jobs and 20% of port development jobs necessitating a bachelor's degree or higher and strong opportunities for high-quality and high-wage jobs across the industry.[43] California would see a total economic benefit of $45 billion, including over $1.8 billion in state and local tax revenue from both sites and $75 million each year from their operation and maintenance.[44] Federal leases created the certainty needed for developers and California to commence in-depth planning for this massive new industry. The moratorium halts future projects and creates uncertainty for existing projects, potentially leading to the loss of these economic benefits.

Additionally, California's deregulation of its energy system led to a highly complex energy system, with many interacting technical and governance components.[45] Lead-times for developing large-scale clean energy projects can stretch over a decade to complete site assessment, permitting, manufacturing, construction, and grid integration.[46] Large scale offshore wind procurement poses unique challenges, requiring large investments in research and development, training, and coordinated regulatory action. California is undertaking this challenge. California authorized its Department of Water Resources ("DWR") to act as a centralized procurement entity for long-lead time resources.[47] In August 2024, the CPUC made an initial need determination of 7.6 GW of offshore wind authorizing DWR to procure up to that amount in its first solicitation expected in 2027.[48] If the blanket moratorium hinders DWR's ability to procure the authorized amount of

---

[43] Collier, Robert, et al., *California Offshore Wind: Workforce Impacts and Grid Integration,* Center for Labor Research and Education at the University of California, Berkeley, (Sept. 2019), https://tinyurl.com/mpcpkkee (last visited Aug. 13, 2025).

[44] *See Supra footnote* 41 at 43.

[45] Cal. Council on Sci. & Tech., *Key Challenges for California's Energy Future*, at 1-2 (April 2025) https://tinyurl.com/8hmh7f5v (last visited Aug. 13, 2025).

[46] Cal. Indep. Sys. Operator (CAISO), *Managing the Evolving Grid* (rev. June 2025), https://tinyurl.com/6kjzdt4j (last visited Aug. 13, 2025).

[47] Cal. Legis. Info., *Assembly Bill No. 1373 Energy: Reliable Electricity Supply,* (Ch. 367, 2023), (codified at Cal. Pub. Util. Code §§ 400.1, 913.12, 9620.5), https://tinyurl.com/ynb2vprz (last visited Aug. 13, 2025).

[48] Cal. Pub. Util. Comm'n, Decision 24-08-064, *Decision Determining Need for Centralized Procurement of Long Lead-Time Resources*, at 2 (Aug. 29, 2024), https://tinyurl.com/599fwa2c , (last visited Aug. 13, 2025).

offshore wind resources, the procurement risk may then shift to LSEs who will have to make up the shortfall in centralized procurement on expedited timelines which most likely increases costs. This would not only risk grid reliability, it would also result in higher costs to California residents.

### A. The Development of Offshore Wind Will Contribute to Modernizing the Transmission System

New and upgraded transmission lines are needed to transmit the energy generated from offshore wind from the Humboldt and Morro Bay areas to California's major load centers. Humboldt County currently has only a grid export capability of 70 MW – 174 MW compared to its estimated offshore wind potential of 1.6 GW to 3 GW. Humboldt's grid, which has had few investments or upgrades since the post-World War II era, is largely isolated from the state's main electrical load centers.[49] This has spurred significant study and investments in new transmission lines in the region. The CAISO is responsible for conducting an annual transmission planning process ("TPP"), which looks over a 10-year planning horizon to plan for grid investments needed to interconnect resources like offshore wind.[50] CAISO's 2023-2024 plan approved $4.59 billion for transmission projects to deliver offshore wind energy off of the Humboldt coast.[51] $375 million from California's Proposition 4 Climate Bond is earmarked for clean energy infrastructure, including transmission projects for offshore wind.[52] California has undertaken substantial work to address this problem, and these efforts should not be wasted by a halt to federal permitting; this would be particularly harmful to Humboldt, which is sparsely populated and would not be a major load center without offshore wind. If development were indefinitely stalled or canceled, the resources used to plan and build transmission in region are likely to be wasted.

---

[49] Schatz Energy Research Center, *Transmission Alternatives for California North Coast Offshore Wind, Volume 3* (Feb. 2022), https://tinyurl.com/ype5ttsk (last visited Aug. 13, 2025).
[50] Cal. Indep. Sys. Operator (CAISO), *CAISO's Transmission Planning Process – A Brief Overview* (rev. Oct. 2023), https://tinyurl.com/5em53zdw (last visited Aug. 13, 2025).
[51] Cal. Indep. Sys. Operator (CAISO), *2023–2024 Transmission Plan*, 102 (May 2024), https://tinyurl.com/y4m6ejsh (last visited Aug. 13, 2025).
[52] Legis. Analyst's Off., *Proposition 4 [Ballot]* (rev. Nov. 5, 2024), https://tinyurl.com/ec8fsmdd (last visited Aug. 13, 2025).

**B.  The Development of Offshore Wind Will Spur Upgrades at Ports**

California ports will require massive build out and serve various functions prior to interconnection of offshore wind. CEC estimates that around $11-12 billion will be needed to upgrade existing ports to support staging and integration ("S&I"), operations and maintenance ("O&M"), and manufacturing/fabrication ("M&F") of offshore wind.[53] The ports of Humboldt and Long Beach have been designated for S&I and M&F required for initial development over the next decade.[54] However, a "coordinated multi-port strategy" will be needed, possibly involving 16 large and 10 small port sites for support.[55] The CEC is preparing a second-phase seaport readiness plan to refine recommendations for port development.[56]  S&I ports alone require 20 authorizations from at least nine agencies in local, state and federal jurisdictions, which will likely take 3-4 years after environmental review begins.[57]

Significant monetary investments in port upgrades have already begun in anticipation of developing wind resources. At the state level, California's Climate Bond approved $475 million for this.[58] $228.2 million of which the Governor has proposed to distribute in the 2025-2026 fiscal year, and the remainder over the next two years.[59] There have also been significant local investments in ports. The Long Beach Harbor Commission agreed to commit up to $14 million in matching funds for a state grant and authorized an additional $6.5 million for the Port's capital

---

[53] Cal. State Lands Comm'n, *AB 525 Port Readiness Plan*, 5-6 (rev. July 2023) https://tinyurl.com/3pvfkrnv (last visited Aug. 13, 2025).
[54] *Id.* at 51.
[55] *Id.* at 114.
[56] Cal. Legis. Info, Assemb. Bill No. 3. *California Offshore Wind Advancement Act,* (Zbur, Chapter 314, Statutes of 2023), (2023), (at Cal. Pub. Res. Code §§ 25991–25992), https://tinyurl.com/ye42m55t (last visited Aug. 13, 2025).
[57] Yost, Awbrey and Jacobson, Arne, Schatz Energy Research Center, Cal Poly Humboldt University, *Permitting for Port Infrastructure to Support Offshore Wind in California* (2025), https://tinyurl.com/3t3fbnaf (last visited Aug. 13, 2025).
[58] *Cal. Leg. Info.*, *Senate Bill No. 867,* (Ch. 82, 2023), (codified at Cal. Pub. Util. Code § 740.20), https://tinyurl.com/mpsvjr62 (last visited Aug. 13, 2025).
[59] *Cal. Gov.'s Off.*, Dep't of Finance, *Governor's Budget Summary 2025–26* (Jan. 10, 2025), at 43, https://tinyurl.com/y4nstc8n (last visited Aug. 13, 2025).

14

budget for its 400-acre Pier Wind project.[60] The 400-acre Pier Wind could begin construction as early as 2027.[61] As with transmission, port investments must precede interconnection, and thus, permitting halts that sink the industry would also strand the assets.

## CONCLUSION

California has taken substantial steps to develop its offshore and onshore wind energy capacity. Wind energy development supports California's economic and environmental goals, and protects residents across the state. The Wind Directive impairs achievement of these goals. The Wind Directive's unsupported halt to permitting poses serious risks and threatens irreparable harm to California, its political subdivisions, and residents. Accordingly, the Court should grant the summary judgment requested by Plaintiffs.

Dated:  August 15, 2025                    Respectfully Submitted,

                                           DAVID CHIU
                                           City Attorney
                                           David S. Louk
                                           Deputy City Attorney

                                           By:    /s/ David S. Louk
                                                  David S. Louk (BBO #304654)
                                                  Deputy City Attorney
                                                  Office of City Attorney David Chiu
                                                  1390 Market St, Fl 7
                                                  San Francisco, CA 94102-5406
                                                  (415) 355-3314
                                                  David.Louk@sfcityatty.org

---

[60] Port of Long Beach, *New Funding Propels Pier Wind at Port of Long Beach* (Nov. 13, 2024), https://tinyurl.com/288xhrr6 (last visited Aug. 13, 2025).
[61] Port of Long Beach, *Port of Long Beach Releases Pier Wind Project Concept* (May 9, 2023), https://tinyurl.com/3s5ae3bj (last visited Aug. 13, 2025); Adnan Bajic, *Pier Wind at Port of Long beach Gets a Green Light*, Project Cargo J (Nov. 18, 2024), https://tinyurl.com/5xf4hp97 (last visited Aug. 13, 2025).

*Counsel for Amici San Francisco Public Utilities Commission, Marin Clean Energy, and Redwood Coast Energy Authority*

By:    /s/ Peter Ton
      Peter Ton* (CA Bar #232226)
      Ton Law PC
      2450 Potomac St
      Oakland, CA 94602-3033
      (510) 725-5318
      peter@tonlawpc.com

*Counsel for Amici Brightline Defense Project, 350 Humboldt, The Central Coast Alliance United for a Sustainable Economy, California Environmental Voters, Climate First: Replacing Oil & Gas, International Brotherhood of Electrical Workers Local 639, Offshore Wind California, and Retired California Assemblymember Jordan Cunningham*

*Certification for admission pro hac vice to follow

16

## <u>CERTIFICATE OF SERVICE</u>

I, _____, certify that this document filed through the CM/ECF system on

_____ will be sent electronically to the registered participants as identified on the

Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-

registered participants.

By: */s/*_____

17