## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

Civil Action No. 1:25-cv-11221-WGY

## DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS'
## AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.     New York Lacks Standing........................................................................................ 2

    II.    New York Fails to Identify Final Agency Action.................................................... 5

    III.  New York's APA Claims Fail on the Merits............................................................ 7

          A.    Agency Defendants Did Not Act Arbitrarily or Capriciously in
               Determining That They Are to Follow the Wind Directive Consistent
               with Applicable Law ................................................................................... 8

          B.    New York Cannot Show the Wind Directive Is Contrary to Law or in
               Excess of Statutory Authority ...................................................................11

          C.    Agency Defendants Were Not Required to Engage in Notice-and-
               Comment Rulemaking Before Determining Whether to Implement
               the Wind Directive ................................................................................... 17

    IV.  Any Remedy Here Should Be Limited and Narrowly Tailored............................ 19

CONCLUSION.................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................................. 19

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
   No. 1:25-cv-10787, 2025 WL 1822487 (D. Mass. July 2, 2025) .................... 8

*ANR Storage Co. v. FERC*,
   904 F.3d 1020 (D.C. Cir. 2018) ............................................................... 11

*Belmont Mun. Light Dep't v. Fed. Energy Reg. Comm'n*,
   38 F.4th 173 (D.C. Cir. 2022) ................................................................... 3

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................ 6

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) ............................................................... 19

*Cent. Me. Power Co. v. FERC*,
   252 F.3d 34 (1st Cir. 2001) ..................................................................... 19

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................ 5

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ............................................................... 12

*Dalton v. Specter*,
   511 U.S. 462 (1994) ............................................................................ 2, 18

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ............................................................................... 10

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) .................................................................................. 10

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .......................................................................... 10, 11

*Finnbin, LLC v. Consumer Product Safety Comm'n*,
   45 F.4th 127 (D.C. Cir. 2022) ................................................................. 19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................................ 2

*Global Tower Assets, LLC v. Town of Rome*,
   810 F.3d 77 (1st Cir. 2016) ....................................................................... 7

*Grocery Mfrs. Ass'n v. E.P.A.*,
  693 F.3d 169 (D.C. Cir. 2012) ................................................................. 4

*In re Cal. Power Exch. Corp.*,
  245 F.3d 1110 (9th Cir. 2001) ............................................................... 12

*La Casa Del Convaleciente v. Sullivan*,
  965 F.2d 1175 (1st Cir. 1992) ......................................................... 18, 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................ 11

*New Hampshire Hosp. Assoc. v. Azar*,
  887 F.3d 62 (1st Cir. 2018) ................................................................... 18

*New Jersey v. E.P.A.*,
  989 F.3d 1038 (D.C. Cir. 2021) .............................................................. 4

*North Carolina v. FERC*,
  730 F.2d 790 (D.C. Cir. 1984) .............................................................. 20

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) ............................................................................... 3

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ............................................................................... 4

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................... 19

*S. Utah Wilderness All. v. Palma*,
  707 F.3d 1143 (10th Cir. 2013) .............................................................. 7

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................................... 2

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................... 9

*Trump v. CASA, Inc.*,
  606 U.S. __, 145 S.Ct. 2540 (2025) ..................................................... 20

*Washington v. U.S. Dep't of Justice*,
  846 F.3d 1235 (D.C. Cir. 2017) ............................................................ 14

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
  778 F. Supp. 3d 440 (D.R.I. 2025) ......................................................... 9

**Statutes**

33 U.S.C. § 1365(a) ................................................................................ 14

42 U.S.C. § 4336a(g)(2) ......................................................................... 14

42 U.S.C. § 4336a(g)(3)(A) .................................................................... 14

42 U.S.C. § 7475(c) ................................................................................................ 15

42 U.S.C. § 7604(a) ................................................................................................ 14

42 U.S.C. § 7607(b)(1) ........................................................................................... 15

42 U.S.C. § 7661b(c) .............................................................................................. 15

43 U.S.C. § 1332(3) ................................................................................................ 13

5 U.S.C. § 553 ......................................................................................................... 17

5 U.S.C. § 555(b) .................................................................................................... 13

5 U.S.C. § 558(c) .................................................................................................... 13

5 U.S.C. § 704 ................................................................................................ 1, 5, 14

5 U.S.C. § 706(1) ...................................................................................2, 11, 12, 17

5 U.S.C. § 706(2) ............................................................................................11, 19

5 U.S.C. § 706(2)(D) .............................................................................................. 17

**Regulations**

30 C.F.R. §§ 585.620-.635 ................................................................................ 3, 4

33 C.F.R. § 325.2(d)(3) .......................................................................................... 16

36 C.F.R. § 800.8(a)(1) .......................................................................................... 13

40 C.F.R. § 124.10 ................................................................................................. 15

40 C.F.R. § 124.3(c) ............................................................................................... 15

40 C.F.R. § 71.5(a)(2) ............................................................................................ 15

40 C.F.R. §§ 124.15(b)(2) ...................................................................................... 15

40 C.F.R. Part 124 ................................................................................................. 15

43 C.F.R. § 2804.25(d) ........................................................................................... 13

43 C.F.R. § 2804.35 ................................................................................................ 13

50 C.F.R. § 13.11(c) .......................................................................................... 12, 13

50 C.F.R. § 216.104(c) ........................................................................................... 13

50 C.F.R. § 222.302(b) ........................................................................................... 12

50 C.F.R. § 402.14(e) ............................................................................................. 16

**Other Authorities**

90 Fed. Reg. 30821 (July 7, 2025) ......................................................................... 10

90 Fed. Reg. 8363 (Jan. 20, 2025) .................................................................... 6, 18

## INTRODUCTION

New York is caught between the proverbial rock and hard place.[1] On the one hand, the Administrative Procedure Act ("APA") bars New York from attacking directly the President's issuance of the Wind Memo and its Wind Directive. On the other hand, an attack on the pace at which an Agency Defendant issues a specific wind energy permit would present additional standing challenges and, in any event, be likely premature. Yet rather than bring a *timely* claim to compel agency action, New York invents a "decision" purportedly made by Agency Defendants and brings a claim under an inapplicable provision of the APA. 5 U.S.C. § 704. But by the Wind Directive's own terms, there has been no "decision," and for that reason New York has no cause of action under the APA. The Agency Defendants have merely followed the Wind Directive, consistent with applicable law, as the Directive itself commands.

New York's fundamental flaw permeates every aspect of its case. To start, New York cannot demonstrate a redressable injury traceable to Agency Defendants' purported "decision." Its claimed injuries flow—if at all—from individual permits that have *not* been unlawfully denied or unreasonably delayed and could only be redressed by an order *for* agency action. Nor can New York demonstrate a final agency action. A "decision" by an agency to follow a directive that requires it to later decide whether any particular permit can be paused consistent with applicable law, and if not, to grant or deny the permit, is quintessential *non-final* agency action. And, of course, deciding to follow a directive consistent with applicable law is not unlawful under the APA.

To avoid attacking individual agency determinations, New York mounts an indirect attack on the President's ability to direct agencies to implement executive policy consistent with

---

[1] For ease of reference, this brief refers to all Plaintiffs and Intervenor as "New York," unless context requires otherwise.

applicable law. But the Court has already dismissed that claim. And if New York is correct, and plaintiffs can use the APA to create and challenge agency "decisions" to follow an executive directive consistent with federal law, agency implementation and execution of the law will be seriously disrupted and undermined.[2] For the reasons below and in our opening brief, this Court must deny New York's and Intervenor's Motions for Summary Judgment and grant Defendants' Motion.

## **ARGUMENT**

### I.    **New York Lacks Standing**

As with any new administration, the current one has sought to implement its own policies on behalf of the American people. That process inevitably brings change and some uncertainty. But uncertainty is not injury. If it were, there would be no end to the line of potential plaintiffs claiming harm from possible impairment to state planning, policies, and agreements with each new administration. Instead, to have Article III standing, a plaintiff must establish an injury that is concrete, particularized, and actual or imminent. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). That injury must then be traceable to the defendants' conduct and likely to be redressed by a favorable decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

New York's claimed injuries do not meet this threshold.[3] To the extent New York attempts to establish injuries attributable to agency recognition of the Wind Directive, New York suggests

---

[2] Indeed, judicial review will also be undermined as plaintiffs will ask judges to determine the reasonableness of agency decisions with no administrative record beyond the orders given.

[3] If anything, New York's claimed injuries reflect its concerns over the President signing the Wind Memo and potential *future* actions agencies may (or may not) take, pending completion of an Assessment and Review of federal wind energy leasing and permitting practices. But the President's signing of the Wind Memo is "not reviewable under the APA." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). New York tries to circumvent this limitation—and ignores the strictures of 5 U.S.C. § 706(1)—in attempting to litigate the President's decision indirectly through Executive Branch agencies. That effort is outside the bounds of Article III.

four general categories of injury, none of which are imminent injuries traceable to Agency Defendants' conduct and redressable by this Court.

First, New York claims the Wind Directive "impedes [its] … authority to plan for reliable and affordable energy." Pls.' Mot. Summ. J. 10, Dkt. 173. New York relies on a preemption decision and an out-of-circuit decision of questionable import, neither of which supports standing here. *Id.* at 11. (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) and *Belmont Mun. Light Dep't v. Fed. Energy Reg. Comm'n*, 38 F.4th 173 (D.C. Cir. 2022)). Those cases did not find an injury based on alleged harm to a state's ability to plan its energy portfolio. Rather, *Pacific Gas* did not discuss standing at all, and *Belmont Municipal Light Development* found potential injury to state citizens and ratepayers where a FERC-approved program that would permit a regional non-profit to compensate generators tens of millions of dollars, presumably at the expense of those citizens and ratepayers. By contrast, the Wind Directive and the Agencies' decision to follow it do not interfere with "the States['] … traditional responsibility in the field of regulating electrical utilities." *Pac. Gas & Elec. Co.*, 461 U.S. at 205. New York may still address issues of rates, costs, and "related state concerns," *id.*, and remains free to plan its energy portfolio subject to applicable federal law.

Second, New York claims it is harmed because the Wind Directive risks various "financial commitments" and pledged contributions from the owners of wind energy projects like the South-Coast Wind Project ("SouthCoast"). Pls.' Mot. Summ. J. 12. But many of those "pledges" are in fact conditions of SouthCoast's COP,[4] intended to compensate commercial fisherman and other

---

[4] A Construction and Operations Plan, or "COP," is a detailed plan for the construction and operation of an offshore wind energy project on a lease submitted by the lessee to BOEM. *See* 30 C.F.R. §§ 585.620-.635. BOEM conducts environmental and technical reviews of the COP and decides whether to approve, approve with modification, or disapprove the COP. *Id.* at § 585.628.

businesses and mitigate harms that would be *caused by construction and operation of the project*.[5]
Moreover, the supposed pledges are not imminent, they are either triggered at some future date (at
the time of "physical construction," or "60 days after financial close") or have no timeframe asso-
ciated with them whatsoever. Brown Decl. ¶ 32, Dkt. 174-5. Others appear to be agreements be-
tween SouthCoast and third parties who are not a party to this lawsuit. *Id.* (identifying only a
contract with a "local academic institution"). If SouthCoast entered into separate contracts with
state-entities, none of those contracts have been provided as evidence. *See Grocery Mfrs. Ass'n v.
E.P.A.*, 693 F.3d 169, 174 (D.C. Cir. 2012) (plaintiffs who are not the object of administrative
action must substantiate their entitlement to judicial review). And any contract disputes would be
between SouthCoast and its contracting counterpart, so any resulting injury would not be traceable
to Agency Defendants' adoption of the Wind Directive and would not be redressable by the Court.

Third and fourth, New York alleges harms related to its "ability to implement … energy
and climate policies," and in the form of a "delay in transitioning from fossil-fueled generation."
Pls.' Mot. Summ. J. 12-13. But unlike in *New Jersey v. E.P.A.*, 989 F.3d 1038 (D.C. Cir. 2021),
New York does not claim impairment to a delegated authority to carry out a federal program it is
required to implement. *See id.* at 1045-46 (relying on impairment of the state's obligation to ad-
minister federal programs under the CAA). Rather, New York claims only impairment of its self-
created obligations under state law. *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)
("No State can be heard to complain about damage inflicted by its own hand."). Even so, these
alleged injuries are not redressable here, as the agencies are not required to grant any offshore wind

---

[5] SouthCoast Wind Project Construction and Operations Plan, Record of Decision, BOEM, p. 161,
¶ 6.1.1.3, December 20, 2024, https://www.boem.gov/sites/default/files/documents/renewable-en-
ergy/state-activities/Record-of-Decision-SouthCoast-Wind-OCS-A-0521.pdf (recognizing funds
are "direct financial mitigation for … commercial and for-hire fishing sectors" and "will compen-
sate … businesses impacted by the Development").

permit absent adoption of the Wind Directive. For New York to achieve its policies and transition from fossil fuels, the specific permits that would help it achieve these objectives still need to be reviewed and approved by the relevant agency authority and the projects subsequently built and operated.

Each of New York's claimed injuries above is speculative and fails to "satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Instead, they are grounded in fears that certain wind projects will not be approved or will have their approval delayed based on future policy decisions. But such harms require speculation as to the outcome of the agency Assessment and Review, and speculation as to the ultimate agency decision on a specific permit, neither of which is before this Court.

Even if, as New York claims, the Wind Directive has generated a specter of uncertainty that has caused concrete harms *now*, those harms cannot be redressed by vacating the Wind Directive or Agency Defendants' "decision" to follow it. Those harms can be redressed only, if at all, through a successful § 706(1) claim by a party with standing who demonstrates that a particular permit or authorization has been unlawfully withheld or unreasonably delayed. Vacating the supposed "decision" here—to implement the Wind Directive consistent with applicable law—will not redress those harms. Therefore, New York lacks standing to bring this case.

## II.    New York Fails to Identify Final Agency Action

"A preliminary, procedural, or intermediate agency action" is not reviewable under the APA until it is expressed as final agency action. 5 U.S.C. § 704. New York twists itself into knots trying to find final agency action where there is none. Unable to attack the President's issuance of the Wind Directive head-on, and refusing to argue that an Agency Defendant has unlawfully withheld or unreasonably delayed a permit decision under § 706(1), New York points to a "decision" made

by each Agency Defendant to follow the Wind Directive. But New York's formulation of the purported agency action here fails to satisfy either prong of *Bennett v. Spear*, 520 U.S. 154 (1997).

First, New York claims this "decision" marks the consummation of the agency decisionmaking process because it "reflects [each Agency Defendant's] ultimate determination to indefinitely disregard statues [sic] and regulations requiring action on applications for permits and approvals." Pls.' Mot. Summ. J. 16. Not so. If the agency action here is as New York contends—one in which each Agency Defendant received the Wind Memo and then decided to follow the Wind Directive—*that* decision necessarily includes the Wind Memo's explicit instruction to implement the Wind Directive "consistent with applicable law." 90 Fed. Reg. 8363, 8364 (Jan. 20, 2025). If an Agency Defendant were then to apply the Wind Directive to a particular permit in "disregard" of a statute or regulation that "requir[ed] action," the agency would, in essence, be amending its prior decision and deciding to apply the Wind Directive *inconsistent* with applicable law. New York does not identify (let alone challenge) any such instance. That alleged misapplication would be separate from the challenged "decisions" here, which are interim steps in overall decisionmaking processes, the consummation of which is reflected in individual permit decisions or the time taken decide on a specific application. Yet New York has elected not to challenge a specific permit decision or an Agency Defendant's alleged failure to make a decision on a specific permit application.

Second, New York claims the Wind Directive has legal consequences because it "prevents action on wind-energy permit applications." Pls.' Mot. Summ. J. 16. But for there to be a legal consequence, concrete deadlines must apply across every permitting scenario, which is not the case. Where pertinent statutes and regulations already provide flexibility for Agency Defendants to complete their analyses, *see* Defs.' Mem. in Supp. of Cross Mot. Summ. J. 29-32, Dkt. 180,

adopting the Wind Directive consistent with applicable law cannot be said to have effectuated any legal consequences.

Intervenor's arguments on this point are equally unpersuasive. Intervenor argues Agency Defendants are not "undecided on whether or how to adopt and implement the Wind Directive." Interv.'s Mem. in Supp. of Mot. Summ. J. 13, Dkt. 176. Intervenor is only half right. Agency Defendants adopted the Wind Directive and determined to implement it consistent with applicable law. But Intervenor presumes the Wind Directive will be implemented *inconsistent* with applicable law, as to particular permit applications on particular projects. But that will turn on the specific facts of the permit application at issue and the specific legal requirements in the applicable statutes and regulations governing that permit—a question that is not before this Court because Intervenor and New York challenge the Agencies' decisions to follow Wind Directive only in the abstract.

To avoid the APA's limitations, New York has manufactured a "decision." But the only action by the Agencies here is to follow (as they must) the President's directive in accordance with applicable law. That is not the consummation of agency decisionmaking that has legal consequences. The decisionmaking process will conclude when decisions are made on individual permitting applications, and no such decisions or claims of unreasonable delay of such decisions are before the Court. *See Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 88 (1st Cir. 2016) ("two-stage administrative process[es]," do not present finality at stage one); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1159 (10th Cir. 2013) ("interim decisions of the agency as part of the process of deciding whether to grant" an application were not reviewable final agency actions).

## III.    New York's APA Claims Fail on the Merits

Even if the Court concludes that New York has standing and that the challenged "decision" here is a final agency action, New York's claims fail on the merits.

### A.    Agency Defendants Did Not Act Arbitrarily or Capriciously in Determining That They Are to Follow the Wind Directive Consistent with Applicable Law

New York's claim that Agency Defendants engaged in arbitrary and capricious action suffers from a fundamental problem: New York tries to map traditional criteria for finding final agency action unlawful onto non-traditional circumstances so it may avoid the APA's limitations on suits against the President and suits to compel agency action. By conjuring agency action where there is none, New York assembles strawmen, arguing that the agencies acted without reasoned explanation, reversed past policy, and ignored reliance interests and other Executive actions. But the specific "decision" challenged here—one to "broadly" and generally follow the Wind Directive consistent with applicable law—reflects none of these concerns.

Consider the implications of New York's position. If New York is correct, then each time a president instructs the Department of Defense, the Department of the Interior, or any other agency to take a *lawful* action, the agency, at minimum, must first gather-up its own experts, vet the president's policy justifications, amass evidence in support of the president's policy, consider alternatives to the president's instruction, solicit input and engage in public comment, analyze other Executive actions, and publish its findings all before it can "decide" to implement the president's directive consistent with applicable law. This flips the Executive Branch on its head.

In arguing that Agency Defendants were required to first independently compile evidence and buttress the President's stated justifications in the Wind Memo, New York relies on several cases that challenged downstream agency activity and are thus inapposite. Pls.' Mot. Summ. J. 17-19. For example, *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 1:25-cv-10787, 2025 WL 1822487 (D. Mass. July 2, 2025), did not involve a preliminary decision to implement an executive order consistent with applicable law, but rather subsequent *agency*-level directives and "the resultant, downstream individual terminations" that followed. *Id.* at *14. That is not the case here, where

New York has maintained it is *not* challenging those subsequent agency decisions. *See* Defs.' Mem. in Supp. of Cross Mot. Summ. J. 9-10.[6] New York challenges only an upstream determination by Agency Defendants to follow the Wind Directive. It is hard to fathom how an agency can act unreasonably for purposes of the APA by simply acknowledging it will follow a Presidential directive that itself calls for implementation to be consistent with applicable law.

New York also argues that Agency Defendants reversed agency policy without explanation and in doing so, failed to consider the reliance interests of the States and third parties. Pls.' Mot. Summ. J. 19-21. But the Wind Directive is not a rulemaking or other formal enactment of policy. And Agency Defendants have not changed policy insofar as New York can point to no permit or other authorization that was denied because of the Wind Directive. New York characterizes Agency Defendants' policy to be to "promptly issue[] permit decisions," *id.* at 20, but points to no statute or regulation that requires such pacing by demanding review of the subject permit by a date certain. More accurately, it has been agency policy to review wind energy permits and other authorizations in compliance with applicable federal laws. And given that the statutes or regulations in question do not identify a specific deadline for agency review, they afford sufficient discretion to the Agency Defendants to temporarily cease issuing permit approvals until completion of the Assessment and Review. The Assessment and Review, currently underway,[7] may recommend changes or "reversal"

---

[6] Similarly, in *Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021), the plaintiffs challenged an *agency* memorandum that ordered a temporary pause on removals of noncitizens—not the purported Agencies' "decision" that New York challenges here: that they must follow the Executive Order to review and issue revised guidance. *Id.* at 609. And, apart from involving the particulars of congressionally appropriated funds not at issue here, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025) *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025), concerned subsequent downstream memoranda by the Office of Management and Budget, National Economic Council, EPA, and other agencies inapposite to the challenge here.

[7] On July 29, 2025, Secretary Burgum issued Order No. 3437. Section 5(b) directs the Assistant Secretary for Land and Minerals Management, within 45 days, to coordinate with other agencies and provide a report consistent with Section 2(a) of the Wind Memo and its call for an assessment

of agency policies and practices consistent with relevant statutes—or it may not. If, as a result of the Assessment and Review, Agency Defendants change course or reverse prior agency adjudications or regulations, at that time they will be required to explain their decisions consistent with *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), and consider reliance interests consistent with *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020), to the extent necessary under those decisions. But that moment and outcome have not arrived.

Finally, New York argues Agency Defendants' purported actions are arbitrary and capricious because they are inconsistent with other aspects of the Wind Memo and other Executive Orders. Pls.' Mot. Summ. J. 21-23. New York's argument is not an attack on any agency action, but an indirect attack on the President's issuance of the Wind Memo itself and other Executive Orders, which it cannot bring under the APA. Moreover, it is not inconsistent for the President to promote domestic energy production while at the same time taking steps to ensure that production addresses appropriate environmental and economic concerns. The Court should decline New York's invitation to wade into the domain of the Executive Branch and second-guess the wisdom of one executive directive over another. None of the cases cited by New York countenance such a position. *See, e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 784-85 (2019) (criticizing rationale in agency memorandum reinstating citizenship question in U.S. census as inconsistent with

_____

and review of federal wind leasing and permitting practices that describes and provides recommendations regarding environmental impacts, economic costs, and subsidies related to the wind industry. SO 3437 – Ending Preferential Treatment for Unreliable, Foreign Controlled Energy Sources in Department Decision Making, U.S. Department of the Interior, July 29, 2025, https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign. FWS has subsequently begun acting consistent with Secretary Burgum's order. *See*, *e.g.*, Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315, U.S. Department of the Interior, August 4, 2025, https://www.lawofrenewableenergy.com/wp-content/uploads/sites/984/2025/08/2025.08.04-Ensuring-Compliance-with-Bald-and-Golden-Eagle-Protection-Act-and-Exec-Order-14315.pdf.

actions taken by the agency found in the administrative record); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024-25 (D.C. Cir. 2018) (finding fault in agency decision treating company disparately compared to earlier agency decision involving competitor in the same natural gas storage market).

In short, New York cannot show that Agency Defendants acted arbitrarily or capriciously when they determined that they would follow the Wind Directive consistent with applicable law. New York has recourse if the Wind Directive is *applied* to a particular permit application for a particular project. If New York determines that an agency is applying the Wind Directive in a manner *inconsistent* with applicable law, such that a specific permit decision is unlawfully withheld or unreasonably delayed, New York—assuming it meets other jurisdictional requirements— can bring a § 706(1) claim. Or if the agency denies that individual permit application, New York— again assuming it satisfies jurisdictional requirements—can bring a § 706(2) claim and argue that the decision was not well-reasoned, inconsistent with agency policy, or otherwise arbitrary and capricious under the APA and related case law. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Fox Television Stations, Inc.*, 556 U.S. 502. But the blunderbuss and premature challenge presented here must fail.

**B.    New York Cannot Show the Wind Directive Is Contrary to Law or in Excess of Statutory Authority**

Early on, this Court asked a prescient question of New York: "[W]here have any of the public officials in this cause actually violated a statute that is mandatory and not prefatory?" Hr'g Tr. 6:21-23, June 5, 2025. Over two months later, New York still cannot identify statutory provisions that prohibit Agency Defendants from *temporarily* ceasing wind energy permits and authorizations. Indeed, New York's § 706(2)(A) and (C) claims essentially allege that each Agency Defendant lacks the "statutory jurisdiction" or "statutory right" to adopt the Wind Directive, such that doing so was "not in accordance with law." Thus, New York must show that federal statutes (or

11

regulations for purposes of its § 706(2)(A) claim) impose "specific procedures and timelines" for the issuance of wind energy authorizations that prohibit all implementation of the Wind Directive. Pls.' Mot. Summ. J. 24. But the statutory and regulatory provisions identified by New York do no such thing. Instead, they leave considerable discretion to the agencies in issuing authorizations and encourage—but do not require—action by a date certain. Without a mandatory deadline for each wind energy permitting scenario that each Agency Defendant is tasked with administering, New York cannot demonstrate that each Agency Defendants' "decision" to adopt the Wind Directive consistent with applicable law exceeded its statutory authority or was contrary to law.[8]

The provisions New York relies on do not prevent general adoption of the Wind Directive. For example, New York points to the timeline for completing formal ESA Section 7 consultation. Pls.' Mot. Summ. J. 28. Congress made the statutory requirement to complete formal ESA consultation "within the 90-day period" after initiation flexible and subject to extension. 16 U.S.C. § 1536(b)(1)(A)-(B). Where the agency action does not involve a permit or license applicant, consultation may be extended "within such other period of time as is mutually agreeable to the Secretary and the Federal agency." *Id.* § 1536(b)(1)(A). Where an applicant is involved, the consultation may be extended with the applicant's consent. *Id.* § 1536(b)(1)(B)(ii). Nor are incidental take permits under ESA Section 10 subject to mandatory issuance deadlines. *Id.* § 1539; 50 C.F.R. § 13.11(c); 50 C.F.R. § 222.302(b). In short, neither the ESA nor its implementing regulations categorically prohibit Agency Defendants from adopting the Wind Directive as a general matter. And

---

[8] Even if it could, not every delay is per se unlawful as the APA prohibits only *unreasonable* delay, 5 U.S.C. § 706(1), which New York does not argue. *See, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (finding unreasonably delay must be "egregious"); *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001) (collecting cases with "delays of years, not months").

New York does not allege that the Wind Directive has caused any specific ESA Section 7 consultation or Section 10 incidental take permit to be unlawfully delayed.

Many of the statutory and regulatory provisions New York identifies are general statements of policy or provide only vague, aspirational recommendations for when and how agencies should make application decisions, leaving ample discretion to the Executive Branch to take measures like implementation of the Wind Directive here. Pls.' Mot. Summ. J. 24-25, 27-29 (citing APA, 5 U.S.C. § 558(c) (requiring agencies to set and complete certain proceedings "within a reasonable time")).[9] [10]

While other provisions prescribe specific durations for certain agency reviews or interim steps, they also confer considerable discretion to the agency in determining when it may exceed those time periods. For example, NEPA instructs agencies to complete an Environmental Impact Statement within two years, and an Environmental Assessment within one year, of certain

---

[9] Further mangling the Congressionally-created APA process, New York cites both § 558(c) and § 555(b). But § 558(c) is inapplicable. Section 558(c) concerns the setting and completion of proceedings for formal adjudications and rulemakings involving licenses. Presumably, New York intended to cite only 5 U.S.C. § 555(b), which applies to APA proceedings generally and states that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.*

[10] *See also id.* (citing OCSLA, 43 U.S.C. § 1332(3) (declaring it to be the policy of the United States that the OCS "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of … other national needs"); NHPA regulations, 36 C.F.R. § 800.8(a)(1) (recommending only that agencies "consider their [NHPA consultation] responsibilities as early as possible *in the NEPA process*," and aim to complete their responsibilities "in a timely and efficient manner") (emphasis added); FWS general permitting regulations, 50 C.F.R. 13.11(c) (stating that FWS will process permit applications "as quickly as possible" but qualifying that it "cannot guarantee final action within the time limit you request" and timing "will vary" and "may be increased"); MMPA regulations, 50 C.F.R. § 216.104(c) (providing that the NMFS "Assistant Administrator shall evaluate each [incidental take] request" without mandating how long that evaluation may last); FLPMA regulations, 43 C.F.R. § 2804.35 ("prioritize[ing]" wind and solar applications for right-of-way grants, although, pursuant to 43 C.F.R. § 2804.25(d), BLM need only notify the applicant if review of the application will exceed 60 days)).

triggering events. 42 U.S.C. § 4336a(g)(1)(A)-(B). But New York ignores the very next provision, which allows the agencies to extend those deadlines as necessary. 42 U.S.C. § 4336a(g)(2).[11]

As for the CAA and CWA, New York's reliance on those permitting regimes in support of its APA claim is entirely misplaced. New York argues that the Wind Directive's "pause" is contrary to the CAA, CWA, and their implementing regulations because it delays permitting decisions that are otherwise required. Pls.' Mot. Summ. J. 25-26. But the APA is only available for final agency action "for which there is no other adequate remedy." 5 U.S.C. § 704. For the type of delay New York complains of here, Congress displaced the APA and created separate causes of action in the citizen suit provisions of the CAA[12] and CWA.[13] *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244-45 (D.C. Cir. 2017) (identifying circumstances in which Congress created adequate alternative remedies that bar APA review). Thus, if a permit decision under the CAA or CWA is nondiscretionary, as New York contends, then alleviating the cause of any delay in making that decision must be achieved through the respective citizen suit provisions and their mandatory conditions precedent—not through the APA.[14]

And even if New York's APA claim is permitted to proceed as to the CAA and CWA, it still fails. Under the CAA, the EPA is required to grant or deny a Prevention of Significant Deterioration

---

[11] While New York does not identify any EIS or EA that has been delayed beyond these periods without a proper extension, even if it had, Congress made clear that if an EIS or EA is improperly delayed, the "project sponsor"—not a third party State—"may obtain a review of an alleged failure by an agency to act in accordance with" one of these NEPA deadlines. 42 U.S.C. § 4336a(g)(3)(A).

[12] *See* 42 U.S.C. § 7604(a) (permitting civil actions "where there is alleged a failure of the Administrator to perform any act or duty … which is not discretionary with the Administrator ….").

[13] *See* 33 U.S.C. § 1365(a) (permitting civil actions "where there is alleged a failure of the Administrator to perform any act or duty … which is not discretionary with the Administrator.").

[14] If a CAA permitting delay is not considered to involve an agency failure to perform a nondiscretionary duty, and the permitting deadline is considered discretionary, Congress still displaced the unreasonable delay remedy relevant here. *See* 42 U.S.C. § 7604(a) ("The district courts of the United States shall have jurisdiction to compel … agency action unreasonably delayed ….").

("PSD") preconstruction permit within one year after receiving a *complete* application. 42 U.S.C. § 7475(c). With respect to Title V operating permits, EPA must issue or deny a permit within 18 months of receiving a *complete* permit application. 42 U.S.C. § 7661b(c). But EPA has authority to determine whether an application is complete in the first instance. 40 C.F.R. § 71.5(a)(2).[15] CAA permits are generally subject to the same or similar procedures and exhaustion requirements as National Pollutant Discharge Elimination System ("NPDES") permits, *see, e.g.*, 40 C.F.R. Part 124 (PSD permits), and are subject to federal circuit court review, 42 U.S.C. § 7607(b)(1).

As for Section 402 permits under the CWA, New York oversimplifies EPA's regulations. New York argues that regulations directing EPA to review applications for completeness within 30 days, 40 C.F.R. § 124.3(c), and solicit public comment for "at least 30 days," 40 C.F.R. § 124.10, when combined with a general instruction that EPA "shall issue" final permit decisions sometime after the public comment period, *id.* § 124.15(a), creates a mandatory permit deadline. It does not. EPA's regulations only direct that it cannot issue a final permit decision until "[a]fter the close of the public comment period." *Id*. Along with the permit decision, EPA is required to respond to comments—but again, no deadline is provided by which those responses must be provided. Neither the CWA nor EPA's implementing regulations specify an enforceable timeline by which a final decision on a NPDES permit must be made. But once a final decision is made, if it is subject to Environmental Appeals Board ("EAB") review it does not become effective until the EAB review process is complete. 40 C.F.R. §§ 124.15(b)(2), 124.19(l)(2).

With respect to Section 404 permits under the CWA and Section 10 permits under the RHA, while the Corps generally must decide on a permit application within 60 days after it being deemed

---

[15] And of course, New York does not bring a delay claim challenging any specific permit application that has been delayed beyond the CAA's respective one-year or 18-month periods.

complete, *see* 33 C.F.R. § 325.2(d)(3), that limitation is subject to several exceptions. *Id.* § 325.2(d)(3)(i)-(vi). Most importantly, that 60-day deadline gives way if the district engineer requires other information, including information associated with other environmental reviews under NEPA, the NHPA, and the ESA, *id.* § 325.2(d)(3)(vi), which, as noted above, are not subject to mandatory deadlines. In other words, the Corps' deadline can be extended until completion of these other reviews and is not fixed and inflexible in every instance.[16]

In short, New York's APA claim as to nondiscretionary CAA and CWA permit decisions has been displaced by the citizen suit provisions in those statutes. For CAA permits, that is true regardless of whether the decision is discretionary or nondiscretionary. And if the permitting decisions are discretionary and New York's claim has not been displaced, the flexibility available within those statutes provides ample room for Agency Defendants to follow the Wind Directive.

Finally, even if the Court were to find that a given permitting regime had a mandatory, non-precatory deadline, that alone would not be sufficient to justify the broad, government-wide relief New York seeks here. In the context of a specific agency permitting regime, Article III and the Judiciary Act necessarily limit any relief to specific applications pending under that regime and which New York has shown to be the cause of its alleged harm. But New York does not identify any pending application that has run afoul of such a provision, let alone challenge the application of the Wind Directive to that pending application. Instead, New York argues, in effect, that because any agency's decision to follow the Wind Directive could create a situation in which a pending application slips past a statutory or regulatory deadline, *every* Agency Defendant's decision to follow the Directive must be vacated. New York provides no justification for that fallacious leap

---

[16] The same is true of other contingent agency activity whose deadline for completion floats with the completion of a preceding activity. *See, e.g.*, 50 C.F.R. § 402.14(e) (45-day period for ESA biological opinion contingent upon conclusion of formal consultation).

and Congress has already provided a means by which one can pursue a case to compel agency action unreasonably delayed. *See* 5 U.S.C. § 706(1).

In sum, to show that Agency Defendants' decision to follow the Wind Directive consistent with applicable law is contrary to law or in excess of their authority, New York must demonstrate that there is *no* scenario in which the Wind Directive may be applied lawfully at each Agency. But no statutory or regulatory provision expressly prohibits the temporary cessation of wind energy approvals demanded by the Wind Directive. The vast majority of provisions relied on by New York provide only aspirational goals for the issuance of wind energy permits and other authorizations. While a few provisions contain deadlines for some type of agency determination, they also afford Agency Defendants considerable discretion or are dependent upon other agency reviews and approvals. Others still involve their own separate enforcement mechanisms, not properly implicated or invoked in this case. Thus, even if the Wind Directive could not be applied in a given situation, there is at least one scenario in which each Agency Defendant could apply the Wind Directive consistent with applicable law. Accordingly, New York is not entitled to judgment on this claim.

### C.    Agency Defendants Were Not Required to Engage in Notice-and-Comment Rulemaking Before Determining Whether to Implement the Wind Directive

Intervenor argues that Agency Defendants also violated § 706(2)(D) by not engaging in notice-and-comment rulemaking. But this argument fails because it is constrained by the "decision" New York and Intervenor have elected to challenge.

The APA prescribes certain requirements when agencies engage in substantive rulemaking. 5 U.S.C. § 553. Generally, agencies must, among other things, publish notice of the proposed rule in the Federal Register, *id.* § 553(b), give the public opportunity to participate in the rulemaking, *id.* § 553(c), draft a general statement of the rule's basis and purpose, *id.*, and publish the rule no less than 30 days before its effective date, *id.* § 553(d).

17

Intervenor contends "[t]he Wind Ban" is a substantive rule and binds regulated entities by requiring the completion of the Assessment and Review before potential issuance of a permit. Interv.'s Mem. in Supp. of Mot. Summ. J. 13. But "the Wind Ban" is not what is being challenged. By simply attacking the Wind Directive on its face, Intervenor makes an indirect or collateral attack on the President's issuance of the Wind Memo, essentially arguing that the *President* issued a substantive rule and should have engaged in notice-and-comment rulemaking. But the President's issuance of the Wind Directive is not subject to APA review, *see Dalton*, 511 U.S. at 470, and the Court has dismissed any claim against the President, *see* Hr'g Tr. 32:7-8, June 18, 2025; Order 47, Dkt. 162. And while the Assessment and Review and potential downstream application of the Wind Directive to particular permits and authorizations may, potentially, be subject to review under the APA, Intervenor has brought no such challenges either.

Instead, New York and Intervenor have elected to challenge a theoretical decision somewhere between the President's issuance of the Wind Memo and Agency Defendants' application of the President's instruction to particular permits and authorizations. They have challenged a "broad" decision by each Agency Defendant to follow the Wind Directive, generally, "consistent with applicable law." 90 Fed. Reg. 8364. In other words, each Agency Defendant "decided" that it would take actions to follow the Wind Memo, but only insofar as those actions were permissible under existing law. Almost by definition, this is not a rule "that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *New Hampshire Hosp. Assoc. v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)).

If anything, the "decision" challenged here is an interpretive one, interpreting various wind energy permitting and environmental laws, and not subject to APA notice-and-comment

procedures. "An interpretive rule is issued by an agency merely to 'advise the public of the agency's construction of the statutes and rules which it administers.'" *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)). The "decision" as formulated by New York and Intervenor is one merely in which Agency Defendants decided that they had the authority under applicable laws to determine whether the President's Wind Directive could—or could not—be applied consistent with applicable law in at least one possible scenario.

This conclusion is necessary for the proper functioning of the Executive Branch. If Intervenor is correct, then each agency, when it receives a directive from the President to act in a manner consistent with applicable law, must first propose that it has authority to act consistently with applicable law, solicit public input on whether it has such authority, and wait 30 days to take any action directed by the President pursuant to that authority. Nothing in the APA imposes such a constraint on a new administration's implementation of policy reviews.

## IV.    Any Remedy Here Should Be Limited and Narrowly Tailored

If the Court finds that New York is entitled to any relief, that relief should be limited and narrowly tailored. The APA authorizes district courts to "set aside agency action." 5 U.S.C. § 706(2). "Undeniably, vacatur is 'equitable relief.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). And federal courts have broad (but not unlimited) discretion in crafting equitable relief. *See id.* This includes remand of an agency decision without vacatur. *E.g.*, *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)) ("A reviewing court that perceives flaws in an agency's explanation is not required automatically to set aside the inadequately explained order."). It also includes partial vacatur of an agency decision. *E.g.*, *Finnbin, LLC v. Consumer Product Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022)

(quoting *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984)) ("Successful challenges to one aspect of a rule yield partial vacatur unless there is 'substantial doubt' that the agency would have left the balance of the rule intact.").

Any vacatur should be limited only to the extent the challenged "decision" applies to specific projects with a pending permit or other authorization, and only to those projects that are either located within or delivering wind energy to those plaintiff States that the Court determines to have established standing or are tied to Intervenor's members. Moreover, vacatur should be further limited to only the pending permits or other authorizations on those projects for which the Court concludes it is impossible for agencies to apply the Wind Directive. Nor should the Court entertain ordering agency action on specific permitting decisions, which as described above, may be addressed by different causes of action potentially available to New York but not raised in this case. To order broader, universal relief would infringe on the rights of those States and interests who share the President's concerns that deficiencies in the wind leasing and permitting processes may lead to grave harm. *See, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. __, 145 S.Ct. 2540, 2561 (2025).

## CONCLUSION

Accordingly, the Court should grant summary judgment in favor of Defendants on all claims and deny New York's and Intervenor's motions for summary judgment.

Respectfully submitted this 22nd day of August 2025.

**ADAM R. F. GUSTAFSON**

Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

  */s/ Michael K. Robertson* _____

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section

4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

ROBERT P. WILLIAMS
Senior Trial Attorney (DC Bar No. 474730)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-0210 | Fax: (202) 305-0275
Email: robert.p.williams@usdoj.gov

KIERAN O'NEIL
Trial Attorney (AK Bar No. 2311132)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Tel: (202) 353-7548
Email: kieran.o'neil@usdoj.gov

*Attorneys for Federal Defendants*