UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-11221-WGY

STATE OF NEW YORK, et al,
      Plaintiffs

vs.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al,
      Defendants

*********

For Hearing Before:
Judge William G. Young

Case-Stated Hearing

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, September 4, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

<pre>
                    A P P E A R A N C E S


  TURNER SMITH, ESQ.
  NATHANIEL-HAVILAND-MARKOWITZ, ESQ.
     Massachusetts Attorney General's Office
     McCormack Building
     One Ashburton Place
     Boston, MA 02108
     (617) 963-2784
     E-mail: Turner.smith@mass.gov
and
  MICHAEL MYERS, ESQ.
  RENE HERTZOG, ESQ.
     NYS Office of the Attorney General
     Environmental Protection Bureau
     The Capital
     Albany, NY, 12224
     (518) 776-2382
     Email: Michael.myers@ag.ny.gov
     For Plaintiffs


  JAMES MICHAEL AUSLANDER, ESQ.
  BROOK DETTERMAN, ESQ.
     Beveridge & Diamond, P.C.
     1900 N Street NW
     Suite 100
     Washington, DC 20036
     (202) 789-6009
     Email: Jauslander@bdlaw.com
     For Intervenor Plaintiff Alliance for Clean Energy NY


  MICHAEL KEITH ROBERTSON, ESQ.
     DOJ-Enrd
     150 M Street NE
     Washington, DC 20002
     (202) 305-9609
     Email: Michael.robertson@usdoj.gov
     For Defendants
</pre>

P R O C E E D I N G S

(Begins, 2:30 p.m.)

THE CLERK:  The Court will hear Civil Action Number 25-11221, the State of New York, et al versus Donald J. Trump, et al.

THE COURT:  Good afternoon counsel.  Let me start with a procedural -- with two procedural matters.

First, I've authorized internet access in this proceeding.  If you are attending the proceeding via the internet, please understand that the rules of court remain in full force and effect, that means there's no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

You must keep your microphone muted.  If you do not keep your microphone muted, we shall have to cut off your access.

The second procedural point is directed to litigants' counsel here.

Quite properly in an Administrative Procedure Act case, once the record is assembled, the matter then comes on for hearing on cross-motions for summary judgment, and that's what's happened here, and I've prepared, I've read the motions and supporting data. Well in the First Circuit and in this Court's practice, there was a refinement, which I find very helpful, to

cross-motions for summary judgment, and it comes out of the practice in the courts of the Commonwealth of Massachusetts where I started, and that's called a "Case-stated," and here's the benefits to a case-stated.

Technically if we submit these arguments this afternoon to the Court on, um, cross-motions for summary judgment, it's my duty to lean against each movant.  Now I know how to do that, I've handled many motions for summary judgment, but it's somewhat artificial when what we're arguing about is an agreed-upon factual record.

So in a case-stated, um, that's appropriate where the factual record is agreed upon and the parties agree that the Court renders, um, "judgment," if you will, insofar as it can, on the issues presented on that record, without drawing, um, inferences against the moving party.  And I propose to proceed in that fashion and treat this as a case-stated.

If anyone has any problem with that, please voice it when you argue and then you can file a post-trial objection, because that's not called out in the Rules of Civil Procedure.  But that's a fair way to proceed here, and that's the way I'm going to proceed.

Now, um, half an hour a side, that is I know I have two plaintiffs.  They'll argue first.  But you've got a half an hour between you.  The defendant has a

half an hour.  That's not an invitation to take a half an hour.  I've read all the relevant papers.  I believe I'm prepared for argument.

The last procedural point.  When you get up to argue, would you then introduce yourself, who you represent, so that the Court Reporter may have an accurate record.

This doesn't take away from your half hour, but I want to make a couple of initial observations and I do so solely to help you and to be transparent.  I've gotten further into this case in my preparation and I have at least a tentative observation to make about the law and then I've got a tentative observation to make about the nature of the parties here.  First, the law.

You're going to argue to me the requirements of the Administrative Procedure Act.  I fully accept that. But looking at the briefs, especially looking at the plaintiffs' briefs, reference is made, um, more generally to "And this was done ignoring the requirements of the law," or "This was not done ignoring the requirements of the law."

Now when I trace out those references, and I'm speaking broad-brush here, there is a body of Congressional statutes substantively that are designed to regulate offshore wind energy, and beyond that, but

we'll say "offshore wind energy."  I look at all those statutes as having been passed in a, um, with a view, on the part of the Congress, that it was desirable to develop -- now that we have the capacity, the engineering capacity, to develop offshore wind as a source of clean energy, that that was a desirable goal of national policy, and that much like, um, drilling in the arctic wilderness, or where we think that there are fossil fuels, on federally controlled lands, that they'll be a permit process, it will be regulated, um, and the fairness and the like.  Those statutes all seem to me to go to -- "We're going to do this, how should we fairly regulate it?"

And now I -- I -- I've come to -- and I want to make a couple of comments about this Administration, because I don't know where this lawsuit's going.  And I try to be appropriately transparent and decide those things that I'm supposed to decide.

We've never had a President like President Trump.  He espouses -- he's the first President in our history to espouse a concept of the unified Presidency.  The idea is that the President of the United States -- and certainly he's a duly-elected -- after a full and fair election, the President of the United States, that he is the single, um, superior, executive, motive force for

all federal employees employed under Article II.  And I didn't get into that, but there's issues about whether that actually works out with the Federal Reserve and the like, but none of it's before this Court, and I make no comment on it.  Nor do I make any comment on the wisdom of this approach, it's not for me, but it's fair to say that that's his view, or it appears to me to be his view.  Now though he's not been in office all that long, a couple of things are, um, evident there.

One, is that, um, the approach to innovation is entirely different.  We're not looking to the various Cabinet Secretaries, agencies, divisions, departments, to innovate and create new ways to serve the public. I'm not saying there's no innovation, but it's all got to go through or appear to go through or emanate from the President himself.  That's one thing.

The second thing is that the President, this President, expresses his view -- and he's certainly transparent, and he's transparent in this issue, um, is he expresses his view through orders, through directives, through requirements.  So the idea of "reasoned discourse," um, in the sense of "Lincoln's Team of Rivals" or FDR combating the Depression or mobilizing for World War II and creating these bureaucratic empires that sparred with one another under

his final decision, that's absent from our discourse today. I mean I ask you, we're not seeing wonky white papers out of this Administration. And I come on the bench sensitive to both those points.

Now I've taken up enough time. It's 20 minutes to 3:00. A half an hour a side. I'm eager to hear you. We'll turn to the plaintiffs.

MS. SMITH: Thank you, your Honor. Turner Smith, Assistant Attorney General for the Commonwealth of Massachusetts, representing state plaintiffs. And with me at counsel table are attorneys from New York and Massachusetts as well. And thank you for the time today.

I propose splitting my time with counsel for plaintiff intervenor, ACE New York, 20 minutes for state plaintiffs, and 10 minutes. If it may please the Court?

THE COURT: Fine, I follow that.

MS. SMITH: Thank you, your Honor.

Our states have spent years and billions of dollars investing in the development of wind energy and we've done so because it provides a path for clean, reliable, and affordable energy for our states.

THE COURT: Well help me out on this. And I -- I accept that. I don't understand the defense to dispute that. Take that as undisputed. What difference does it

make?  The President's against this.

MS. SMITH:  So, your Honor, in that planning we have relied on a predictable permitting regime.  As your Honor mentioned, Congress directed that these permitting regimes be carried out, that development of --

THE COURT:  Well did they?  Did they require that these permitting regimes be carried out?  It's pretty clear they expected that they would.  And they regulated it.  Show me where they required that permitting regimes be carried out, where's the mandate of the Congress of the United States?

MS. SMITH:  So I'll point your Honor to the two -- to three specific places.  First, the APA Section 558(b) and 558(c) require that permits issue or licenses issue within a reasonable amount of time.  And we submit that it is per-se unreasonable to pause all permitting nationwide, again without regard to the law -- and I'm understanding your Honor's concern with that terminology, without regard to the particular circumstances of any particular case, and to do so indefinitely.  And so APA 558(b) and 558(c) provide a path here.

And I would also point your Honor to the OCSLA, the Outer-Continental Shelf Land Act, um, provision that requires expeditious and orderly development of the

Outer-Continental Shelf for energy resources generally, not just with respect to offshore wind.

THE COURT: But that doesn't require -- well, I guess it does, and you're forthright in your argument. You're saying that the Congressional mandate requires -- because Congress makes the laws, they're instructing the Chief Executive to go forward with this development?

MS. SMITH: Yes, exactly, your Honor.

THE COURT: Where's the best case that supports that?

MS. SMITH: The *Ensco* decision, um, supports that, as your Honor recognized in the decision on the motion to dismiss, that the reasoning supports the proposition that you -- you can't -- you don't need a specific violation of a specific guideline to bring a lawsuit like this, it is not lawful, under OCSLA or under the APA's reasonable time provisions, to pause everything and to do so indefinitely, as they've done here. And I'll note that the *Ensco* court actually had to do with a 4-month drilling moratorium, and here we have no end in sight to the, um, the permitting pause that we're dealing with here.

I would also point your Honor to the Section 404 of the Clean Water Act and the implementing regulations that the Court has promulgated, through notice and

comment, that we're making with respect to those provisions.  There's a concrete -- in the regulations, a concrete 60-day deadline for action.  Again, reflecting the Court's understanding of Congress's command -- um, there's a provision in which Congress, um, dictates that permits should generally try to be issued -- um, it's prescriptive, not mandatory, but should be issued within 90 days.  And the Court has taken it a step further and limited it to 60 days, um, with narrow, narrow exceptions.  But certainly it's --

THE COURT:  But here the President directs, in essence, that there shall be no permits, um, or at least there shall be no permits while we pause.

MS. SMITH:  Correct, your Honor, and we believe that that is unlawful under all permitting regimes.  That was -- that statement was made and the agencies have made an across-the-board decision to implement it by pausing every permit nationwide.

THE COURT:  Because the President says so.

MS. SMITH:  As defendants admit, it's because the President says so, is their primary defense here.  But "Because the President says so" is not a reasoned explanation under the APA.  That cannot suffice as a reasoned explanation.  And I point the Court to the *Renosco Tucker* case, to the *Louisiana v. Biden* case from

2022.  I mean you can't hide behind an executive order as an agency.

THE COURT:  Well no one's -- I'm not so sure they're hiding behind anything.  But doesn't that counsel the Court, if I accept these arguments, to remand and say, "Well this won't do."  We've got a -- again, given the major shift in national policy, this Presidency seems to have tied our energy future to fossil fuels.  I express no opinion.  The policy is for the Congress and the executive.  But, um, that appears to be what his position is.

Shouldn't I, um, if I agree with you, remand?  You argue I've got to vacate it.  Well you don't say I've got to vacate it, you say I should, that's the wise exercise of my discretion.  But isn't the better policy to say "This won't do, these few pages, they're not enough, tell me why, in light of the reliance interests, the former effort to develop?"  That type of thing.  Isn't that the better course?

MS. SMITH:  We believe that vacatur under APA Section 7062 is the best course here because under the ***Allied Signal*** test, um, the disruptive consequences are massive here.  That's our primary reason.  And there's also the fact that these are serious legal harms.

But to speak to the consequences here.  The states

are already suffering significant harms as a result of this pause.  Again we're 8 months in and counting with no end in sight.  We have harms to our ability to provide reliable and affordable energy to our residents. We have harms to our ability to meet our statutory -- our state statutory clean energy and climate goals, as your Honor recognized.  We have significant economic harms that are playing out on the ground already.  And it's impacting our ability to provide pollution reduction benefits as well.  And so these are actual disruptive consequences to not just the permittees, but to the states themselves, um, that we think warrant vacatur here.

And then of course the serious legal harms that we've been discussing.  This was an unreasoned and in fact unwritten -- as was the case with the *Rubio* decision, an unwritten decision to pause everything, um, universally, again not applying the relevant law, not applying any discretion available to the agencies under the relevant law, and within a week freezing everything.

And the defendants have admitted as much.  As we pointed out in our brief, at ECF 180, at Page 24, they admit that they have paused all permitting.  They have not just adopted and implemented the wind directive, they have chosen to do so by pausing everything, all at

once across the board within a week.  The record reflects there's no way they could have exercised their discretion on that timeline.  And at ECF 123 in the various --

THE COURT:  Except I thought you agreed with me when I posited "Because the President said so."  I mean, um, if -- I really always try to speak directly.  It's not sophistry or bureaucracy, the President speaks fairly clearly.  He is the Chief Executive.  They obey. That's their duty.  His view.  To obey.  Of course he must take care that the laws passed by Congress are faithfully enforced.

All right.  We know why they did it, the President said so.  You agree with that?

MS. SMITH:  Yes, I agree that that is their primary rationale here.  They also though made an argument that suggests that they -- there will be some downstream application involved in their -- that they raise in their final agency action and standing and on the merits, there'll be some downstream application that will be a proper exercise of discretion, or could be, and we posit that as not the case.  They very clearly made the decision, pursuant to the Presidential command, notwithstanding the Savings Clause in that command to pause everything universally, across the board, without

regard and inconsistent with relevant law.

THE COURT:  Thank you.

Let me ask you um, this.  Assume you've persuaded the Court.  I vacate it.  So it would be -- if I vacate it, and that stands, then, um, not you people, but with people who have an interest in this can go forward and file permit applications and the like.

But given the President's view, where does it get you?  He'll tell them, "Deny it," and they will, because they have to follow orders.  And it's up to them whether to deny it or not.  And then what?  We'll go permit by permit and say, "Well in light of what Congress wanted, it can't be denied?"  Is that what you're asking?

MS. SMITH:  No, your Honor, we are asking the Court to vacate this particular insurmountable impediment to these projects moving forward.

THE COURT:  And I'm asking what happens then?

MS. SMITH:  So what happens then remains to be seen.  Obviously there have been some challenges playing out on the ground, and we will take each of those in turn.  In fact today, Connecticut and Rhode Island filed suit with respect to the Revolution Wind stop work order.  We will address each of these challenges, as they come down the line, through whatever cause of action makes most sense at the time, or not through a

cause of action.

THE COURT:  Well but you see -- and correct me if factually I'm wrong, and I'm not going to speak to another case drawn to the another judge, um, but I do read the papers.

All right.  So Revolution anyway says, "But we have all our permits, we've invested hundreds, thousands, millions of dollars here, and now you're revoking it?  That creates a host of issues."

In this case, over which I have responsibility to the defendants and to all the plaintiffs, nobody has any permits.  You'd like -- at most you want a playing field where the people who are interested in such appropriate development can file applications for permits, then these time limits and the like kick in.  But again, in the real world, the expectation is they'll be denied.  And you say, "Well we'll deal with that."  Before me?  Are we going to be sitting here?  I should live so long.

(Laughter.)

THE COURT:  I -- I'm not making a joke.  I'm talking seriously.

Is that the course that you expect from this litigation?

MS. SMITH:  Your Honor, once the indefinite pause on -- excuse me, on all permitting is lifted, the

agencies, as they are today, are obligated to follow all permitting laws and the well-established standards and procedures in those laws, and in following those laws they may decide to issue a permit, they may decide to deny a permit.  If they decide to deny a permit, for a reason that's not grounded in statutes and regulations that apply, maybe we'll be back here today, or in some other forum, arguing about that.  Well not today, but at some point.  But our hope is that agencies would take to heart that they are required to follow applicable law in processing and issuing these permits.

THE COURT:  Well I guess that's my point and I invite your rebuttal.  I vacate it.  You file permits. That's why I started out with my aside as to the unified view of the Presidency.  They don't have any discretion whether to allow it or deny it, unless -- I mean the President could change his mind.  I express utterly no opinion on that.  It's not my business.  But unless he changes his mind, I've got a pretty good idea what his instructions are.  He's saying it.  And he says "No." And his view of the Presidency is, "Those people who are subordinate to me are going to follow my instructions." That's the Presidency as we know it today.

So I just don't know where you are?  And I hear you, and the best you can say is, "Well we'll deal with

that if that happens, but we're entitled, on the basis of the flaws in this directive, to a vacatur so that we can reach that point."

Is that fair?

MS. SMITH:  Yes, I think your Honor said it better than I just did, which is to say, in a dismissal decision, um, saying that "When the dust settles" -- "It's a feature, not a bug of this system, but when the dust settles, the parties may find themselves in exactly the same place they began," and that's what we're going for here.

THE COURT:  Thank you.  All right.

MS. SMITH:  Thank you, your Honor.

MS. AUSLANDER:  Thank you, your Honor.

(Pause.)

MS. AUSLANDER:  And I don't think my microphone is working here.

Can you hear me?

THE COURT:  I can.

MS. AUSLANDER:  I'll try to speak loudly.

Thank you, your Honor.  James Auslander of Beveridge & Diamond, appearing on behalf of the plaintiff intervenor, Alliance for Clean Energy of New York, for ACE New York, and the clean energy that it represents.  And I'll be brief, since I believe that the

19

plaintiff states ably addressed our claims, and unless your Honor has specific questions for me.

Your Honor focused, um, initially on what Congress has enacted and we agree with your Honor that Congress has enacted a policy, as well as a set of statutes, and agencies have implemented -- implemented regulations that encourage and set rules for the development of offshore wind and onshore wind.  But that's relevant to the contrary-to-law claims under the APA.  We have claims that your Honor can decide this case solely on based on arbitrary and capricious agency action.

And I believe your Honor, um, wrote it well, again probably better than I can say it, in your prior written opinion.  The fact that the agency has discretion or doesn't face strict timelines for every single action that has to happen, or be approved before a wind energy project can go forward doesn't mean that the agency can just shut down that program willy-nilly on the basis of a Presidential directive that invokes a couple of buzz words like "national security" or the environment.  The Administrative Procedure Act would be rendered meaningless if agencies could just point to the President's words and provide no administrative record for their actions.  And case after case stands for that proposition, that the President cannot just --

THE COURT:  Well let me try this out on you, the question I've already asked your colleague.

This is your strong argument because the record here is pretty thin, and that's being generous.

(Mr. Auslander laughs.)

THE COURT:  Now I'm not being funny.

Having said that, isn't the proper result to say -- for the reasons that you just quoted back to me, "This isn't enough.  Tell me, give me some reasoned, um, analysis as to why this now is your policy?"  That's open to this Court.  In other words, why shouldn't I remand it and let the agency, who is charged with this, um, come forward?

MR. AUSLANDER:  Your Honor, I think, and from ACE New York, we are indifferent as to whether your Honor remands or doesn't remand, it's the vacatur part that must accompany the remand.

The government, in its reply brief, raised the proposition of vacatur without remand, that is subject to the *Allied Signal* factors and the First Circuit case law adopting that, and they made no argument for that remedy or construe it as being waived.  But it's not appropriate in this instance.

We have -- we've been now 8 months and counting since this President's Administration took office, not a

single wind permit has been issued, um, not even decided.  And the reasons the agencies are not issuing denials or even doing the work to renew and issue denials is they're just pointing reflectively to the President's words and saying, "Well the President says I can't do it, so don't make me do it, and my job is done here."  But the APA requires more than that.  That can't be the end of the story.

So what we ask this Court to do is --

THE COURT:  The APA requires more than that when the President has made his final decision?

MR. AUSLANDER:  Yes, your Honor, case after case has said that the APA, the President's directive does not substitute for reasoned decision-making by the agencies.  And I believe that the defendants also believe that because the argument about being "consistent with applicable law," that they keep making, which is again a total post-hoc argument -- the agencies never even looked to see whether it was consistent with, um -- consistent with the law.  But the way that the defendants tell it, the President told the agencies not to issue any, um, wind permits, for any reason consistent with applicable law, and the agencies decided that they would not do so consistent with applicable law.  So there's no "consistent with applicable law"

limitation, the agencies just stopped.

They've said it in declarations, in their answers to the complaint, and in their briefing to this Court, that the President said "Stop, we don't view that as more complicated than just putting up our hands."  And that's not sufficient under the APA, under case law that we've cited up to the Supreme Court and on down.

And again, that would make the APA a "nothing burger," because every decision would come from up high, by the President, and best be -- and because the President can't be sued under the APA, so no agency decision would be reviewable under the APA.  That can't be what Congress intended.

And again I wanted to say one other thing.  The idea that this is going to upend the executive branch, and the defendants make that argument in their brief, is really a ludicrous idea.  Since the APA was passed, in 1946, agencies -- and probably before that, it wasn't codified, but agencies have had the obligation to act reasonably, to explain their actions, and to do what your Honor is suggesting should happen on remand.

Your Honor can remand this, the agencies can go back and try to document that this is the way they want to go, they can try to document reasoned decision-making for why one or more wind projects can't go forward, but

what they can't do is to say, "Well the President told me so, um, we're not going to do any wind permitting, um, and we're not going to do it indefinitely."  And based on this pretextual study that is not going anywhere and we all know what the end result is going to be if and when it's ever issued.

Um, I think I'm at my time.  But what we would ask, again respectfully, is that the Court grant summary judgment for the plaintiffs, vacate the agencies' adoption and implementation of the President's wind directive, and if your Honor chooses to include in the order of remand for further decision-making and explication, ACE New York would not oppose that.

THE COURT:  Thank you.

And since you made reference to the word "summary judgment," um, unless someone disabuses me, I'm not going to treat these as summary judgment, what I'm going to do is declare rights on the record I have before me and the issues that are presented, and we'll go from there.  But thank you.

MR. AUSLANDER:  Yes, your Honor.

THE COURT:  And I'll hear from the defense.

MR. ROBERTSON:  Good afternoon, your Honor, Mike Robertson on behalf of the United States and for all the defendants.  I will try my best to be brief, um, there

24

are a few points I'd like to make that I'm hearing from my colleagues on the other side.

Let me first start perhaps with, um, thinking about the decision -- the decisions, plural, that are really before the agencies here, not before the Court, and that -- and those decisions are basically in the abstract, as if there were no permits whatsoever before those agencies.  Can they implement and follow a wind directive consistent with applicable law?  Yes or no.  They receive a wind directive.  They see an instruction.  And then they make a determination, "Yes or no, can I follow this?"  And each of them made the determination, "Yes, they could."  And that's because in each of these statutory regimes that you referenced, and my colleagues referenced, there's built-in flexibility and built-in room for the agencies to follow the wind directive.

Now what's the best way to think about all these regimes?  I think the framework really comes in three parts, which is really the best way.

First, many of them just have language that says, "Shall issue permits, will issue permits."  The wind directive does not say "All permits will not be issued," or anything like that.

Second, some of this language is very indeterminate, very precatory, might encourage permits

to say, "Okay, do it as quickly as possible," or "Do it expeditiously," but there are no mandatory timeframes associated with that.

And the third part of this framework are instances within these regimes where there may be deadlines, but those deadlines are flexible or they have exceptions built in, or it's a deadline within an intermediate process, so there might be like four or five steps, for instance, for your Honor to issue a permit.  Perhaps one of those intermediate steps may have a firm deadline, but the ultimate issuance of the permit does not.

And so each of these agencies, when faced with a wind directive, are able to consider their statutory regimes and then say, "Well of course we can follow this, because there's room in these statutes for us to do this."  And plaintiffs' intervenor have not pointed to any mandatory deadline that would be violated in the course of this.  What they point to are either this kind of general language, the precatory language, or these deadlines that have flexibility and exceptions.

And just looking at the APA, um, in OCSLA and --

THE COURT:  I guess you and I are at different levels, though I'm struggling to follow how you framed it, and I don't know that you've mischaracterized these regulatory statutes, but I'm not up there, if I've got

it right, at your level.

The wind directives, were I a bureaucrat, and I don't use that in a pejorative sense at all, but if I were in Article II and I got this directive, I wouldn't know what to do, so I would stop.  And so they did.  And why?  "Because the President told me to."  And as has been fairly persuasively argued, you don't sue the President under the APA, so maybe there's got to be more than that.

I'm looking for you to tell me why, on the record I have here -- and I'm not downstream, though I'm trying to think downstream, but again the law clerks and I, um, and we talked about this, and I've said to them, "Well they're not going to settle this case?" "No, they're not going to settle this case."  "So where are we going with this case?"  And honestly, um, I don't know.

Though I have a duty under the APA to see that the process that does apply to your clients -- not the President, to your clients, to see that the process is carried out even if -- as they just quoted back to me, "When the dust settles, they're not any further ahead."

I think I've stated the law correctly.  So tell me where I haven't.  And then tell me why the analysis I did, "The President told us not to do it, so we're not doing it," but why, what I have before me, this record,

is satisfactory?

MR. ROBERTSON:  So on that point, your Honor, I think it's important to look at the wind directives in the context of the whole wind memo.

So first let me say the government does not concede that the decisions challenged are final agency actions, and I'll leave that aside.

THE COURT:  Understood, and accepted for analysis, yes.

MR. ROBERTSON:  Yes.  So fighting this fight on this ground, if we look at the wind directive, the key parts of it are that there is going to be an assessment and review attached to this, and it's going to be consistent with applicable law, and the President's justifications that he provided for the wind directive.

Now it might mean a different scenario in the APA if none of those three things were there, if the President just said, "Full stop," and that's it.  But that abbreviated -- even if it's abbreviated, that explanation is sufficient under the APA to address this decision -- the decisions, excuse me, that the plaintiffs have challenged here.

Now a couple other points I want to make.

THE COURT:  Well that's conclusory, but that frames it exactly right.  If you're right about that,

you win.  And I'll say, "Well I've looked at the record, this is sufficient, so it's the end."  But I question whether that's right, whether this is sufficient?

MR. ROBERTSON:  I understand your Honor's question and, um, I think why the government submits that it's sufficient here is because we're kind of operating in this strange nether-space between the President's actual issuance and then specific project and permit applications, and this is what is in essence a kind of intermediate step that plaintiffs have framed agencies have taken, and because of that we think that the wind directive language is sufficient itself.

Now once we get downstream, maybe it's a different story, maybe more is necessary, but we're not there. And I think there's two things that really kind of -- really kind of drive for a project and permit-specific application here that's not being challenged.

One, the parties brought up Revolution Wind and, um, intervenor's counsel mentioned, "This can't be the end of the story."  But Revolution Wind I think -- well there's a few things there.

One, I understand that the plaintiffs have raised that, but that is actually a separate part of the wind memo, it's Section 1, not Section 2, which we have here, so it's kind of irrelevant for that purpose.  But what

it really displays is that the fight here, to the extent there is one, really should be played out on a project level and on a permit-specific level, um, kind of basis and application.

And that can be through a 7061 lawsuit, which is the *Ensco* case, which plaintiffs cited, and that decision turned on 7061, even though a 7062 claim was also brought.  And the decision itself turned on 7061.  And that's what the government has been submitting is the appropriate pathway here.  And even if considered appropriate, a 7061 lawsuit, a party that has met the jurisdictional requirements for the Clean Water Act, the Clean Air Act, um, the citizen lawsuit provisions have displaced the APA.  But we don't have any of those here.

And finally, if I could make just one more point, your Honor, as you were thinking about kind of what happens, um, or on what happens here?

If your Honor were to not decide, um, in favor of the government here, um, we would submit that this kind of screams out for a kind of permit-by-permit application, and project-by-project, um, statute-by-statute application.  So what do I mean by that?

To assume plaintiffs can show that any one of these statutes has a mandatory deadline such that

following the wind memo, the wind directive, would be inconsistent with that, their relief should be limited to that.  They're asking for across-the-board relief across all of these permitting regimes without showing that each individual one is somehow in violation of an obligation passed by Congress, from a mandatory statute or a regulation, and that's the only relief that they should be entitled to, and we would submit they haven't shown that at all.  But even if they had, they would be limited not to this kind of vacatur and remand to assess the decision in its entirety, but rather an instruction to an agency to not follow the wind directive specific to that one thing that they have shown in violation, and they haven't shown that thing.

So if no further questions from your Honor, I --

THE COURT:  No, I understand your point and I appreciate it.

MR. ROBERTSON:  Thank you.

THE COURT:  Let me say, as I have throughout, that my questions should not be taken in any way as challenging here, they're genuine questions, and I deeply appreciate the skill and the thoroughness of the briefing.

I've said all I properly could say from the bench. I'm going to take the matter under advisement.  I'm

going to treat it as -- and there are many cases in the First Circuit, so be very clear, I'm treating it, as to these issues, as a case-stated, and I expect to issue, in due course, a declaration of rights on this administrative record, and we'll see where we go from there.  But it is with my thanks for your very fine advocacy and efforts.

We'll stand in recess.

(Ends, 3:15 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, September 4, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 09-08-25
_____
RICHARD H. ROMANOW   Date