# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*,

    Defendants.

Case No. 1:25-CV-11221

**Leave to File Amicus Brief Granted
on September 10, 2025 (ECF No. 217)**

## BRIEF OF *AMICI CURIAE* ENVIRONMENTAL ORGANIZATIONS IN SUPPORT OF THE STATES' AND ACE NY'S MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

RULE 7.1 CORPORATE DISCLOSURE STATEMENT ........................................... iv

INTRODUCTION AND INTERESTS OF *AMICI* ..................................................... 1

ARGUMENT ................................................................................................................. 3

I.     WIND IS A CRITICAL AND GROWING SOURCE OF ELECTRICITY IN THE
UNITED STATES THAT DELIVERS IMMENSE PUBLIC BENEFITS ...................... 3

    A.  Onshore and offshore wind power are critical to meeting U.S. energy
needs ................................................................................................................ 3

    B.  Wind power has enormous public health and climate benefits ..................... 4

II.    THE AGENCIES' IMPLEMENTATION OF THE WIND DIRECTIVE IS
ARBITRARY AND UNLAWFUL ................................................................................. 7

    A.  The Agencies have offered no reasoned explanation for deviating from their
established process for evaluating wind permits ........................................... 7

    B.  The Wind Directive's purported concerns about environmental impacts of wind
power are unexplained and unsubstantiated ............................................... 11

        1.  Risks to whales ..................................................................................... 12

        2.  Risks to birds ........................................................................................ 14

    C.  The Agencies' implementation of the Wind Directive is fundamentally inconsistent
with other federal actions and policies ....................................................... 16

CONCLUSION ........................................................................................................... 20

CERTIFICATE OF SERVICE .................................................................................... 23

## TABLE OF AUTHORITIES

### CASES

*Dep't of Comm. v. New York*,
  588 U.S. 752 (2019) ................................................................................................ 20

*FDA v. Wages & White Lion Invs.*,
  145 S. Ct. 898 (2025) ......................................................................................... 11, 20

*Louisiana v. Biden*,
  No. 24-cv-406, 2024 WL 3253103, (W.D. La. July 1, 2024) ................................. 11

*Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) ............................................................... 20

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ..................................................................................... 20

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) ............................................................................... 19

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
  123 F.4th 1 (1st Cir. 2024) ....................................................................................... 9

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
  2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................................................. 20

### STATUTES

5 U.S.C. § 558(c) ........................................................................................................ 10

5 U.S.C. § 704 ............................................................................................................. 10

5 U.S.C. § 706(2) ........................................................................................................ 10

16 U.S.C. § 1371(a)(5) ............................................................................................ 9, 10

16 U.S.C. § 1536(a)(2) .................................................................................................. 9

42 U.S.C. § 4336a(c) .................................................................................................. 10

43 U.S.C. § 1337(p)(4) ............................................................................................... 10

### REGULATIONS

30 C.F.R. § 585.605(b) ................................................................................................. 8

30 C.F.R. § 585.610 ...................................................................................................... 8

30 C.F.R. § 585.620(c)................................................................................................ 8

30 C.F.R. § 585.621 ................................................................................................... 8

43 C.F.R. § 46.130 (2008) ........................................................................................ 9

90 Fed. Reg. 16,102 (Apr. 17, 2025) ...................................................................... 19

## PRESIDENTIAL ACTIONS

90 Fed. Reg. 8,363 (Jan. 29, 2025) .............................................. 2, 10, 11, 12, 16, 18

Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025)...................................... 17

Exec. Order No. 14261, 90 Fed. Reg. 15,517 (Apr. 8, 2025) ..................................... 17

**RULE 7.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for *Amici Curiae* Citizens Campaign for the Environment, Clean Air Task Force, Conservation Law Foundation, Environmental Advocates NY, Environmental Defense Fund, Environmental Protection Information Center, National Wildlife Federation, Natural Resources Defense Council, New York League of Conservation Voters, Sierra Club, and Southern Environmental Law Center certify that none of the *Amici* (all private, not-for-profit, non-governmental organizations) has a corporate parent, subsidiary, or affiliate, and that none issues stock to the public.

## INTRODUCTION AND INTERESTS OF *AMICI*

*Amici Curiae* are local, regional, and national nonprofit organizations dedicated to advancing policies that protect the environment, wildlife, public health, and communities. *Amici* support Plaintiff States' and Plaintiff-Intervenor Alliance for Clean Energy New York (ACE NY)'s motions for summary judgment against President Trump's directive to stop all wind permitting (the "Wind Directive"), and the implementation of that directive by the Defendant Agencies. While no explicit rationale is provided, the Wind Directive and its implementation appear to rest on a false assumption that, at least under current permitting procedures, the development of wind power is per se incompatible with environmental protection and wildlife conservation. *Amici* submit this brief to dispel that assumption.[1]

When robust environmental review and permitting frameworks are applied, the responsible deployment of U.S. wind power is compatible with wildlife protection, public health, community protection, and economic development. As one federal agency has explained, the operation of wind turbines "do[es] not release emissions that pollute our air or water" and wind turbines "can be built with minimal impact to the environment or livelihoods of nearby residents."[2] Existing permitting processes provide an established framework for agencies to gather the information needed to ensure projects are consistent with those important values and meet federal standards. The responsible deployment of wind power is not only possible but necessary to address climate change, to make continued progress toward healthy air and clean water, and to meet increasing electricity demand affordably and reliably.

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their counsel made any monetary contributions intended to fund the preparation or submission of the brief. *Cf.* Fed. R. App. P. 29(a)(4)(E).

[2] U.S. DEP'T OF ENERGY NAT'L RENEWABLE ENERGY LAB. (NREL), *Wind Energy Basics*, https://perma.cc/SH6K-WXUX (last updated Mar. 25, 2025).

Recognizing this, *Amici* have long supported the responsible development of onshore and offshore wind power, both by advocating for policies that facilitate the deployment of wind projects, and by engaging with developers, state and federal agencies, communities, labor unions, and other interested parties to identify ways to maximize the benefits of wind energy development while avoiding, minimizing, and mitigating adverse impacts. *See* Mot. for Leave 2-9. In recent years, in part because of the federal government's encouragement, wind energy development has taken off, providing more power to the nation's grid in a time of increasing demand. The Agencies' implementation of the Wind Directive halts this critical progress in its tracks, cutting off all permitting for wind projects of all types pending completion of a vague review that has no clear purpose, timeline, or avenue for public participation. *See* 90 Fed. Reg. 8,363, 8,363-64 (Jan. 29, 2025) (section 2(a)). By obstructing responsible wind energy development, the Wind Directive and its implementation undermine efforts to meet state climate and energy targets, while increasing reliance on fossil fuels, an outcome that carries well-documented risks to wildlife, public health, and the environment.

The Agencies' implementation of the Wind Directive cannot survive judicial review under the Administrative Procedure Act (APA): the Agencies have taken an abrupt, 180-degree turn in their approach to wind permitting, without acknowledging this about-face, and without providing any justification, let alone a reasoned one. The Court should grant summary judgment to the States and ACE NY and put a stop to the significant and irreparable harm that the Agencies' implementation of the Wind Directive is causing the States, responsible wind development, and the public who rely on and benefit from wind power.

# ARGUMENT

## I.  WIND IS A CRITICAL AND GROWING SOURCE OF ELECTRICITY IN THE UNITED STATES THAT DELIVERS IMMENSE PUBLIC BENEFITS

### A.  Onshore and offshore wind power are critical to meeting U.S. energy needs

For decades, the federal government has encouraged the development and expansion of the wind industry. *See* States Br., ECF No. 173, at 4-5; ACE NY Br., ECF No. 176, at 2. In recent years, wind power has experienced significant growth in the United States, and now accounts for over 10% of the nation's total electricity generation, with many states relying even more heavily on it.[3] Nine states generate more than 25% of their in-state electricity from wind.[4] Texas alone generated enough wind energy last year to power all of New England.[5]

As onshore U.S. wind power capacity has expanded, its costs have dramatically decreased. Onshore wind power is the most cost-effective form of electricity generation in the country in terms of levelized costs—installation, operation, and maintenance expenses spread over the expected lifespan of the turbines.[6] This cost advantage has made wind power increasingly competitive with other energy sources.[7]

Offshore wind power has also progressed significantly in recent years, emerging as a critical clean energy resource to meet electricity demand in many regions. Offshore wind is "generally stronger and more consistent" than onshore wind, and "found close to major coastal

---

[3] CLIMATE CENTRAL, *A Decade of Growth for U.S. Solar and Wind* (Mar. 12, 2025), https://tinyurl.com/2vtfa26f (compiling U.S. Energy Information Administration data).
[4] *Id.*
[5] *Compare id.* (Texas generated over 124,000 gigawatt-hours ("GWh") from wind), *with* ISO NEW ENGLAND, *New England's Electricity Use*, https://tinyurl.com/5h9t3s62 (New England used 119,000 GWh).
[6] *See* LAZARD, LEVELIZED COST OF ENERGY 9 (June 2024), https://tinyurl.com/3vpatt2p.
[7] *See* INT'L ENERGY AGENCY, RENEWABLES 2023: ANALYSIS AND FORECAST TO 2028, at 9 (rev. 2024), https://perma.cc/FU75-K3AJ (estimating that 96% of newly installed, utility-scale onshore wind capacity had lower generation costs than new coal and natural gas plants).

cities, where more than half of the U.S. population resides and energy needs are high."[8] Since the mid-2010s, U.S. efforts to develop offshore wind power have accelerated, driven by federal and state commitments and goals for offshore wind energy development. *See* States Br. 12-13. The Block Island Wind Farm off Rhode Island became the country's first operational offshore wind project in 2016.[9] The first utility-scale offshore wind project, the South Fork project off New York's Long Island, started operation in 2024.[10] Other East Coast states have committed to substantial amounts of offshore wind capacity, and have projects both planned and under construction. West Coast states have also adopted offshore wind goals and are moving forward with planning. These ambitious commitments and goals have driven project development, supply chain investments, and port upgrades, creating thousands of jobs and spurring local development and reinvestment in coastal and inland communities. *See* States Br. 11-13; ACE NY Br. 2. While offshore construction costs have not yet fallen as much as for onshore wind, the U.S. Department of Energy (DOE) predicts that costs will come down over the longer term, thanks to "growing offshore wind deployment and industry learning."[11]

### B.  Wind power has enormous public health and climate benefits

Responsibly developed wind projects offer substantial health and climate benefits by displacing—or obviating the need for new—high-polluting fossil fuel-fired facilities.

The human health harms of fossil-fuel energy are substantial and well documented. Extracting and burning fossil fuels produces a laundry list of harmful and toxic emissions,

---

[8] BOEM, RENEWABLE ENERGY FACT SHEET 1 (rev. Jan. 2021), https://perma.cc/NCE5-2W6R.
[9] Justin Gillis, *America's First Offshore Wind Farm May Power Up a New Industry*, N.Y. TIMES (Apr. 22, 2016), https://tinyurl.com/37cak62f.
[10] *35 Miles East of Long Island, the U.S. Has its First Large Offshore Wind Farm*, NPR (Mar. 14, 2025), https://tinyurl.com/4we8hz5m.
[11] Fuchs et al., NREL, THE COST OF OFFSHORE WIND ENERGY IN THE UNITED STATES FROM 2025 TO 2050, at vi (2024), https://tinyurl.com/m5xf66ys.

including sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide, mercury, and carcinogens. A recent study estimates that each year around 20% of premature deaths worldwide, and 350,000 premature deaths in the United States, are attributable to fine particulate matter pollution from burning fossil fuels.[12] The impacts of mercury pollution, too, are notable: even low levels of exposure can cause learning disabilities; higher levels of exposure can cause developmental, neurological, and cardiovascular problems, and even early death.[13] These health harms from fossil-fuel emissions also fall most heavily on low-income communities and communities of color, which commonly neighbor such facilities[14] and are disproportionately susceptible to harms from pollution because of cumulative environmental and social burdens.[15]

Meeting electricity demand with wind rather than fossil fuels significantly reduces those health harms. For example, one peer-reviewed study documented that in 2022, U.S. wind and solar generation "led to 1,200 to 1,600 fewer premature mortalities" nationwide thanks to reduced sulfur dioxide and nitrogen oxide emissions.[16] And a recent study projects that planned offshore wind generation would replace gas and coal power, "causing large emissions reductions" and "reduc[ing] annual estimated [U.S.] premature deaths . . . by 520 per year," with

---

[12] Anna Miller, HARVARD T.H. CHAN SCHOOL OF PUBLIC HEALTH, *Fossil Fuel Air Pollution Responsible for 1 in 5 Deaths Worldwide* (Feb. 9, 2021), https://tinyurl.com/56rakf74.
[13] NHDES, MERCURY: SOURCES, TRANSPORT, DEPOSITION AND IMPACTS (2019), https://perma.cc/DDF5-7TTJ.
[14] *E.g.*, Mohai et al., *Racial and Socioeconomic Disparities in Residential Proximity to Polluting Industrial Facilities*, 99:3 AM. J. PUB. HEALTH S649, S654 (2009), https://tinyurl.com/4tc32a2f.
[15] *See, e.g.*, Josey et al., *Air Pollution and Mortality at the Intersection of Race and Social Class*, 388 N. ENGL. J. MED. 1396, 1396 (2023), https://tinyurl.com/2eaevfjh (showing the health harms from fine particulate matter exposure are greater among marginalized subpopulations).
[16] Millstein et al., *Climate and Air Quality Benefits of Wind and Solar Generation in the United States from 2019 to 2022*, 1 CELL REP. SUSTAIN. 100105 (2024), https://tinyurl.com/y6pn754r.

low-income communities and communities of color "account[ing] for a disproportionately large share of the premature deaths avoided."[17]

The expansion of wind power as a replacement for fossil fuel-fired power is also a critical part of the fight against climate change. Climate change is an existential threat. It is driving rising temperatures, intensifying and increasing the frequency of extreme weather, and accelerating sea level rise, disrupting communities and ecosystems alike.[18] These changes threaten public health and the water sources, food systems, infrastructure, and economic systems on which modern society relies.[19] And they pose severe risks to wildlife, altering migration patterns, degrading habitats, and pushing many species towards extinction.[20]

Unlike fossil fuel-fired generation, wind turbines produce no direct climate-warming greenhouse gas emissions. Their total "carbon footprint"—including materials, construction, repairs, and decommissioning—is minimal compared to fossil fuel-fired plants.[21] Indeed, the life-cycle greenhouse gas footprints of coal- and natural gas-fired power are about 90- and 40-times greater, respectively, than wind power.[22] And research shows that greenhouse gas emissions related to a wind farm's construction can be offset in just a few years of operation.[23]

---

[17] RES. FOR THE FUTURE, OFFSHORE WIND POWER EXAMINED: EFFECTS, BENEFITS, AND COSTS OF OFFSHORE WIND FARMS ALONG THE US ATLANTIC AND GULF COASTS, at iv (rev. Feb. 2025), https://tinyurl.com/2m228dhs.
[18] *See* U.S. GLOBAL CHANGE RESEARCH PROGRAM, FIFTH NATIONAL CLIMATE ASSESSMENT 1-5 (2023), https://perma.cc/J7V7-FRYB.
[19] *See id.* at 1-23 to 1-28, 1-32 to 1-33.
[20] *See id.* at 1-31.
[21] Wang et al., *Life-cycle Green-house Gas Emissions of Onshore and Offshore Wind Turbines*, 210 J. CLEANER PROD'N 804 (2019), https://tinyurl.com/yc2frphw.
[22] U.S. DOE, *How Wind Can Help Us Breathe Easier* (Aug. 21, 2024), https://perma.cc/9QPR-6J52.
[23] Guezuraga et al., *Life Cycle Assessment of Two Different 2MW Class Wind Turbines*, 37 RENEWABLE ENERGY 37 (2012), https://tinyurl.com/sy56auw9.

In short, shifting from fossil-fuel power to wind power offers clear and substantial climate benefits. For this reason, every credible national and international climate mitigation scenario, including those developed by the Intergovernmental Panel on Climate Change,[24] the International Energy Agency,[25] the U.S. DOE,[26] and the National Renewable Energy Laboratory,[27] identifies onshore and offshore wind energy as essential components of the energy transition needed to avoid the worst consequences of climate change.

## II.  THE AGENCIES' IMPLEMENTATION OF THE WIND DIRECTIVE IS ARBITRARY AND UNLAWFUL

### A.  The Agencies have offered no reasoned explanation for deviating from their established process for evaluating wind permits

All forms of energy production affect the environment. While wind power has major climate and public health advantages when compared to fossil fuel-fired projects, *supra* Arg. I.B, care still must be taken to identify, avoid, minimize, and mitigate potential negative impacts, particularly with respect to wildlife and local communities. Existing federal permitting requirements provide a robust, established way for regulators to engage with developers and the public to address impacts. The Wind Directive's suggestion that these existing processes may be inadequate is both unsubstantiated and wrong, and the Agencies' implementation of that Directive is arbitrary and unlawful.

As the States explain, wind projects—like all other energy infrastructure projects—are subject to an array of laws governing exploration, siting, construction, and operation. States Br.

---

[24] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2022: MITIGATION OF CLIMATE CHANGE 37, 57 (2022), https://tinyurl.com/mjvz6y4z.
[25] INT'L ENERGY AGENCY, NET ZERO BY 2050: A ROADMAP FOR THE GLOBAL ENERGY SECTOR 3 (rev. 2021), https://tinyurl.com/3zdr7pke.
[26] U.S. DOE, WIND VISION: A NEW ERA FOR WIND POWER IN THE UNITED STATES 181 (2015), https://perma.cc/5UTR-3LR3.
[27] NREL, 2024 STANDARD SCENARIOS REPORT: A U.S. ELECTRICITY SECTOR OUTLOOK, at x-xii (Dec. 2024), https://perma.cc/FGB7-ABX7.

2-4. And each law imposes specific substantive and procedural requirements. These laws exist, in part, to ensure that wind development proceeds in an environmentally responsible manner. As part of these established requirements, agencies must evaluate a project's environmental impacts; engage with the developer, affected communities, and the public on how those impacts could be avoided, minimized, or mitigated; and ultimately make a reasoned decision about whether, and on what terms, to approve the project.

The offshore wind permitting process illustrates the multiple levels of environmental review required before a project can be constructed and begin operation. Under the Outer Continental Shelf Lands Act (OCSLA), the Bureau of Ocean Energy Management (BOEM) authorizes offshore wind development in various stages. First, BOEM identifies areas for leasing based on spatial and environmental data and input from the public, other agencies, and affected state and tribal governments. BOEM then holds a lease auction and issues leases.[28] Once a wind developer secures an offshore lease, the developer prepares a plan describing proposed site assessment and characterization activities, including measures to avoid, minimize, and mitigate environmental impacts, 30 C.F.R. § 585.610, which BOEM must approve before covered activities may commence, *id.* § 585.605(b). After site assessment and characterization is complete, the developer prepares a construction and operations plan (COP), which must include a plan for protecting wildlife and natural resources, *e.g.*, *id.* § 585.621, and must be approved before construction can begin, *id.* § 585.620(c). Concurrent with these planning, leasing, and permitting processes, BOEM and other federal agencies review potential environmental impacts in a stepwise manner under OCSLA, the National Environmental Policy Act (NEPA), the Marine

---

[28] BOEM, FACT SHEET: WIND ENERGY COMMERCIAL LEASING PROCESS 1 (rev. May 2021), https://perma.cc/7Q2D-NJX5.

Mammal Protection Act (MMPA), the Endangered Species Act (ESA), the Magnuson-Stevens

Fishery Conservation and Management Act, and other laws.

Each of these laws imposes binding requirements on BOEM and other federal agencies

managing the offshore wind permitting process. NEPA requires BOEM "to take a 'hard look' at

the environmental impacts" of offshore wind projects, including impacts to wildlife and human

communities. *See Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 9 (1st Cir.

2024). Under NEPA, BOEM prepares a review before lease auctions to evaluate potential

environmental impacts of leasing and site assessment and characterization activities. After

leasing, BOEM prepares a detailed site-specific environmental impact statement at the COP

approval stage, which requires an analysis of measures to avoid, minimize, and mitigate impacts.

*See* 43 C.F.R. § 46.130 (2008) (repealed July 3, 2025). The National Oceanic and Atmospheric

Administration (NOAA) Fisheries and the U.S. Fish and Wildlife Service also assess the

proposed project's potential harm to marine mammals, birds, and other wildlife under the

MMPA and ESA. Under the MMPA, NOAA Fisheries must ensure the project would have no

more than a negligible impact on species, subject to conditions the developer must follow. *See* 16

U.S.C. § 1371(a)(5). And an ESA section 7 consultation must ensure that any agency action is

not likely to jeopardize the continued existence of any ESA-listed species or adversely modify its

critical habitat. *Id.* § 1536(a)(2). Reviews under OCSLA, NEPA, the MMPA, the ESA, and other

laws culminate in BOEM's issuance of a record of decision, which either approves the project,

approves it with conditions, or rejects it. If it approves the project, the record of decision will

identify binding mitigation measures the developer must follow to protect the environment. All

told, it can take almost a decade to progress from lease area selection to final permits for offshore

wind. *See* ACE NY Mem. in Supp. of Prelim. Inj., ECF No. 62, at 4-6.

These long-established permitting processes are not always implemented flawlessly. Nor are their outcomes always perfect. *Amici* often urge federal agencies to require more protective mitigation measures for many types of development, including wind power. But the existing legal requirements, when followed, give agencies the tools they need to understand a project's impacts and reach an informed final decision that balances relevant interests. These established processes provide certainty to the developer and the public alike: certainty that agencies will follow established statutory and regulatory requirements to reach a timely permit decision, *e.g.*, 5 U.S.C. § 558(c); certainty that there will be meaningful opportunity for public input leading to that decision, *e.g.*, 42 U.S.C. § 4336a(c) (NEPA); 16 U.S.C. § 1371(a)(5)(A)(i), (D)(iii) (MMPA); 43 U.S.C. § 1337(p)(4)(K) (OCSLA); and certainty that judicial review will be available as an avenue for relief for those dissatisfied and harmed by an unlawful or unreasonable agency decision, s*ee, e.g.*, 5 U.S.C. §§ 704, 706(2). *Amici* rely on these existing requirements and processes to advocate for robust and appropriate environmental protections in energy infrastructure permitting decisions, including for wind development. Mot. for Leave 2-9.

The Wind Directive and its implementation upend this established structure, suspending all federal permitting for all wind projects indefinitely, with no opportunity for public input. This indiscriminate and unexplained reversal of years of established practice is not necessary to ensure a "comprehensive assessment" of "environmental impact" for new or renewed wind permits. 90 Fed. Reg. at 8,364. Federal agencies have already conducted numerous general and project-specific studies analyzing a range of impacts from wind power development. *See* States Br. 5-6, 19. If the agencies conclude that areas are unsuitable for wind or that additional protections are needed for a particular project, they can—and should, consistent with their

authority and through established processes—omit those areas from or impose conditions on development.

The Wind Directive's call for a "comprehensive assessment" of wind development's "environmental impact," *see* 90 Fed. Reg. at 8,364, therefore cannot support the drastic change in agency policy seen here. *See FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 916-17 (2025)*.* If an agency needs more time or information to make a specific factual finding required to decide an application (like a pending permit), it can take a reasonable amount of time to investigate and make that determination.[29] But agencies cannot do what the Defendant Agencies have done here: impose an open-ended, government-wide ban on all further permitting action for all types of wind development, without offering an explanation tailored to specific statutory or regulatory findings for which additional time or information is needed. The desire to conduct a vaguely defined "comprehensive assessment" cannot justify an otherwise unexplained and open-ended shutdown of all forms of permitting for an entire industry—an industry that the federal government, until recently, expressly sought to promote. *See* States Br. 20; ACE NY Br. 19.

**B.  The Wind Directive's purported concerns about environmental impacts of wind power are unexplained and unsubstantiated**

The Wind Directive offers no reasoned justification for its prohibition on wind permitting approvals pending an indefinite and undefined assessment of environmental impacts of wind projects. It merely mentions that "potential inadequacies" in environmental analyses supporting

---

[29] For this reason, several *Amici* supported U.S. DOE's so-called "LNG pause" last year. But that was a very different circumstance: the pause applied to a single type of export authorization, for which the agency wanted to update specific economic and environmental analyses needed to make statutorily mandated findings. *See* U.S. DOE, THE TEMPORARY PAUSE ON REVIEW OF PENDING APPLICATIONS TO EXPORT LIQUEFIED NATURAL GAS (Feb. 2024), https://perma.cc/355N-FLEU. Even so, a court enjoined that pause. *See Louisiana v. Biden*, No. 24-cv-406, 2024 WL 3253103, at *14-15, *25-27 (W.D. La. July 1, 2024).

wind energy permitting could impact marine mammals and orders the assessment to consider

impacts of wind projects on wildlife, including marine mammals and birds. 90 Fed. Reg. at

8,363-64. And in implementing the Wind Directive, the Agencies have not offered additional

support or clarification.[30] *See* States Br. 17-18. But President Trump has made no secret of his

views on the environmental impacts of wind power. In speeches and on social media, he has

repeatedly claimed—without factual support—that offshore wind energy "kills" whales and that

both onshore and offshore wind is "killing [] millions of birds a year."[31] To the extent these

views are driving the Wind Directive and its implementation, they are scientifically baseless and

thus do not warrant a departure from existing permitting and environmental review processes.

### 1. *Risks to whales*

Federal agencies, state advisory groups, and independent scientists alike have found no

causal link between offshore wind development and whale deaths. As recently as April 2025, the

U.S. Government Accountability Office reported that NOAA, the federal agency responsible for

marine mammal management and conservation, "does not anticipate any death or serious injury

to whales from offshore wind related actions."[32] And on its website, NOAA explains that

---

[30] As the States and ACE NY point out, States Br. 17, ACE NY Br. 10, 17, the Administrative
Record in this case consists of only the Wind Directive and a single Department of Interior
Secretarial Memorandum issued the same day, ECF No. 165.

[31] *E.g.*, Donald Trump (@realDonaldTrump), TRUTHSOCIAL (Jan. 25, 2025),
https://tinyurl.com/4ays8kwr; ROLL CALL, *Press Conference: Donald Trump Holds a Media
Event at Mar-a-Lago – January 7, 2025*, Tr. at 26:34-26:51, https://tinyurl.com/nhdxnaxt; Oliver
Milman, *Trump Pledges to Scrap Offshore Wind Projects on 'Day One' of Presidency*, THE
GUARDIAN (May 13, 2024), https://tinyurl.com/wbwm5asr (May 11, 2024 rally); *see also*
Richard Valdmanis, *Trump Orders Suspension of New Offshore Wind Power Leasing*, REUTERS
(Jan. 21, 2025), https://tinyurl.com/5xzz4zwv (Inauguration rally).

[32] U.S. GOV'T ACCOUNTABILITY OFF., OFFSHORE WIND ENERGY 15 (Apr. 2025),
https://perma.cc/YFG2-3LTJ.

"[t]here are no known links between large whale deaths and ongoing offshore wind activities."[33]
BOEM has similarly stated that "[a]ll current evidence indicates that there are no links between
large whale deaths and ongoing offshore wind activities, including site characterization
surveys."[34] The Marine Mammal Commission, an independent government agency charged with
furthering the conservation of marine mammals and their environment, wrote that "[d]espite
several reports in the media, there is no evidence to link [recent whale] strandings to offshore
wind energy development."[35] At the state level, the Environmental Technical Working Group, an
independent advisory body to the state of New York, has also explained that there "is no
documented scientific evidence that offshore wind energy activities kill whales."[36] Independent
scientists, too, have found "no evidence that offshore wind development contributed to [whale]
strandings or mortalities."[37]

Even so, many whale species live in the regions available for offshore wind development.
Some are protected under the ESA, including the endangered North Atlantic right whale, North
Pacific right whale, and Rice's whale, and endangered or threatened population segments of
humpback whales, among others. While the largest known threats to whales are accidental vessel
strikes and entanglements in fishing gear,[38] it is critical that all ocean-based industries—

---

[33] NOAA Fisheries, *Frequent Questions – Offshore Wind and Whales*, https://perma.cc/MS79-V3MP (last visited July 29, 2025).

[34] BOEM, OFFSHORE WIND DEVELOPMENT AND WHALES 1 (rev. Apr. 2024), https://perma.cc/RK7Y-K534.

[35] MARINE MAMMAL COMM'N, UPDATE ON STRANDINGS OF LARGE WHALES ALONG THE EAST COAST 1 (Feb. 2023), https://perma.cc/UU98-5Z4V (referring to site assessment and characterization activities).

[36] N.Y. ENV'T TECH. WORKING GRP., FREQUENTLY ASKED QUESTIONS: OFFSHORE WIND AND WHALES 2, 46 (Jan. 2025), https://tinyurl.com/2s3hyfuc.

[37] Thorne & Wiley, *Evaluating Drivers of Recent Large Whale Strandings on the East Coast of the United States*, 38 CONSERV. BIOL. 1 (Dec. 2024), https://tinyurl.com/mpf4pxax.

[38] *See id.* at 2.

including offshore wind—implement measures to avoid, minimize, and mitigate all risks to whales, lethal and otherwise. Environmental review is integrated at multiple points throughout the offshore wind permitting process, with agencies considering cumulative impacts and requiring avoidance, minimization, and mitigation measures—including seasonal restrictions for, and the use of noise abatement measures during, pile driving.[39] The appropriate way to develop and implement those measures is to faithfully adhere to environmental laws—like the ESA and MMPA—which are specifically designed to evaluate and address potential impacts. *See supra* Arg. II.A. Through robust application and implementation of existing permitting and environmental review processes, wind projects can be built and operated in a way that avoids, minimizes, and mitigates harm to whales. The Wind Directive and the Agencies' implementation of it provide no reason or justification to depart from these established processes.

### 2. Risks to birds

President Trump's claims that wind turbines kill "all" birds,[40] or even "millions of birds a year," *see supra* Arg. II.B, are baseless. Many bird species can navigate within or avoid wind turbines when their blades are in motion.[41] In fact, a recent study of turbines off the Virginia coast found zero bird collisions over a six-month period.[42]

Indeed, halting wind energy development *impedes* bird conservation by perpetuating continued fossil-fuel reliance, which poses great risks to birds through climate change-driven

---

[39] *See, e.g.*, BOEM, RECORD OF DECISION: ATLANTIC SHORES OFFSHORE WIND SOUTH PROJECT CONSTRUCTION AND OPERATIONS PLAN, App. A §§ 5.11.1, 5.12.2 (July 1, 2024), https://perma.cc/HQ7P-ZY56.

[40] *See, e.g.*, Sophie Lewis, *Trump Claims Wind Energy 'Kills All the Birds.' Cats and Windows are Actually Much More to Blame*, CBS NEWS (Oct. 23, 2020), https://tinyurl.com/2rs7wfdv.

[41] Willmott et al., *New Insights into the Influence of Turbines on the Behaviour of Migrant Birds: Implications for Predicting Impacts of Offshore Wind Developments on Wildlife*, J. PHYSICS: CONF. SERIES 2507, at 1, 7, 9 (2023), https://tinyurl.com/5n7b5esw.

[42] *Id.* at 7.

habitat loss, migration shifts, altered prey availability, and extreme weather. One 2019 study found that bird populations in North America have declined by 3 billion since 1970, due in part to climate change.[43] Also in 2019, the National Audubon Society warned that without swift greenhouse gas emission cuts, nearly two-thirds of North American bird species face extinction from climate change.[44] Other threats to birds also far surpass risks from wind energy. A study aggregating data from various peer-reviewed sources estimated that bird collisions with buildings account for hundreds to thousands of times more bird deaths annually than are attributable to wind turbines,[45] and another found that cats are responsible for thousands of times more bird deaths than are wind turbines.[46]

In addition, existing legal requirements allow BOEM and the Bureau of Land Management (BLM) to authorize wind projects only after extensive bird impact reviews, risk assessments, public input, and mitigation. Peer-reviewed studies show that wind energy development impacts on birds can be avoided, minimized, and mitigated through smart siting, responsible design, proven technologies, monitoring, and adaptive management.[47] Avoidance, minimization, and mitigation measures work best when applied throughout all project phases— from siting to operation to decommissioning. As a result of required environmental review during permitting, BOEM and BLM have the information needed to require practices to avoid,

---

[43] Rosenberg et al., *Decline of the North American Avifauna*, 366 SCIENCE 120 (2019), https://tinyurl.com/4x8p7sad.

[44] NAT'L AUDUBON SOC'Y, *Survival by Degrees: 389 Bird Species on the Brink* (2019), https://tinyurl.com/39wycdrz.

[45] *Compare* Loss et al., *Bird-Building Collisions in the United States: Estimates of Annual Mortality and Species Vulnerability*, 116 THE CONDOR 8 (2014), https://tinyurl.com/2p8x42vy, *with* NAT'L AUDUBON SOC'Y, *Wind Power and Birds* (2020), https://tinyurl.com/yrukmpm6.

[46] Loss et al., *The Impact of Free-Ranging Domestic Cats on Wildlife of the United States*, 4 NATURE COMMS. 1396 (2013), https://tinyurl.com/yj93tawj.

[47] *See generally* Arnett & May, *Mitigating Wind Energy Impacts on Wildlife: Approaches for Multiple Taxa*, 10:1 HUMAN-WILDLIFE INTERACTIONS 28 (2016), https://tinyurl.com/2ebb8aw8.

minimize, and mitigate these risks. Projects must comply with NEPA, the ESA, the Migratory

Bird Treaty Act, *see* 16 U.S.C. §§ 703-712, and the Bald and Golden Eagle Protection Act, *see*

16 U.S.C. §§ 668–668d. As responsible wind energy development expands, research and

adaptive management are key to refining mitigation strategies. Federal agencies, states, offshore

wind developers, and environmental organizations have proactively coordinated research,

identified data needs, and adopted adaptive management as the industry grows.[48] The Wind

Directive and its implementation provide no reasoned justification for departing from the

established permitting and review processes.[49]

### C. The Agencies' implementation of the Wind Directive is fundamentally inconsistent with other federal actions and policies

The unexplained inconsistency between the Agencies' implementation of the Wind

Directive and other Executive Branch actions and policies—including prioritizing fossil-fuel

energy development while dismantling protections for imperiled species—further underscores its

irrationality.

First, as the States and ACE NY note, *see* States Br. 21-23; ACE NY Br. 20, the

Agencies have made no effort to reconcile their suspension of wind-energy approvals with the

President's declaration—concurrent with the Wind Directive—of a national energy emergency

based on a lack of a "reliable, diversified, and affordable supply of energy." Exec. Order No.

---

[48] *See, e.g.*, REG'L WILDLIFE SCI. COLLAB., *Integrated Science Plan for Offshore Wind, Wildlife, and Habitat in U.S. Atlantic Waters* (2024), https://tinyurl.com/37s8ezeh.

[49] Wildlife protection is not the only spurious rationale alluded to in the Wind Directive. The Directive's implication that wind energy development may cause unspecified "national security" harms, *see* 90 Fed. Reg. at 8,363, also lacks any explanation or support. The responsible development of wind power (and other renewable energy sources) is one of the few viable approaches to mitigating a true "existential threat" to national security: climate change. *See* U.S. DEP'T OF DEFENSE, CLIMATE RISK ANALYSIS 4 (Oct. 2021), https://perma.cc/5GA4-XPNT. By blocking a legitimate pathway for achieving necessary greenhouse gas emissions reductions, the Wind Directive's implementation runs counter to national security.

14156, 90 Fed. Reg. 8,433, 8,433 (Jan. 20, 2025). To address that purported energy emergency, the President ordered federal agencies to "facilitate" and "expedite the completion of" fossil-fuel projects under their authority, *id.*, including by speeding up ESA consultations and exemption processes for such projects, *id.* at 8,435-36. The Defendant Agencies accordingly have implemented new procedures to expedite fossil-fuel projects,[50] and yet have offered no reasoned explanation for fast-tracking those projects while stalling wind-energy projects indefinitely. Nor could they provide one, given the significant public health, grid reliability, and affordability benefits of wind compared to fossil-fuel extraction and power generation.[51] *See* States Br. 10-11, 13-14. In the face of a purported national energy emergency, it is illogical to suspend wind projects on which grid operators, electricity consumers, and states are relying to meet increasing demand.

The Wind Directive's immediate and substantial harms to the U.S. wind industry, *see* ACE NY Br. 7-9, also cannot be squared with this Administration's stated policy of "[r]einvigorating" "domestic energy production." Exec. Order No. 14261, 90 Fed. Reg. 15,517 (Apr. 8, 2025). Indeed, President Trump has ordered several of the Agencies to consider rescinding federal actions that would "transition the Nation away from coal production and electricity generation," *id.* at 15,518, on the basis that "[c]oal is abundant and cost effective, and can be used in any weather condition," and the "industry has historically employed hundreds of thousands of Americans," *id.* at 15,517. EPA is already reconsidering several pollution limits

---

[50] *E.g.*, Special Public Notice, U.S. ARMY CORPS OF ENG'RS, *National Energy Emergency Executive Order 14156* (Apr. 4, 2025), https://tinyurl.com/yp76z94j; Press Release, DEP'T OF THE INTERIOR, *Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://perma.cc/MR39-KL6U.
[51] *See generally* RES. FOR THE FUTURE, *supra* note 17; *see also* LAWRENCE BERKELEY NAT'L LAB., LAND-BASED WIND MARKET REPORT, at xi (2024 ed.), https://perma.cc/2BY9-F6XW (finding wind's health, climate, and grid benefits more than triple its average levelized costs).

that affect coal, with the aim of "help[ing] unleash American energy."[52] But the Agencies' coal-promoting policies and actions are irreconcilable with their abrupt about-face on wind approvals, which has severe economic repercussions for the U.S. wind industry and tens of thousands of American workers. Wind is more abundant,[53] more cost-effective,[54] and more weather-resilient[55] than coal, and wind generation employs more than twice as many workers.[56] The Agencies have provided no rational basis in economics, energy needs, or any other policy area that would justify propping up the floundering U.S. coal industry while simultaneously halting the U.S. wind industry.

Finally, the implied basis for implementing the Wind Directive—forestalling the risk of "grave harm" to wildlife and other interests stemming from potential procedural "deficiencies," *see* 90 Fed. Reg. at 8,363—strains credulity. Not only because wildlife protection can be addressed through longstanding statutory and regulatory requirements, *supra* Arg. II.A-B, but also because the Agencies simultaneously are seeking to gut the federal wildlife protections that permitting processes are intended to safeguard, and to fast-track non-wind projects that kill and harm species. For example, the Department of the Interior has adopted novel "alternative" permitting procedures that essentially waive the ESA's consultation requirements for fossil-fuel

---

[52] Press Release, EPA, *Administrator Zeldin Releases Statement on POTUS' New Energy-Related EO Signed Today*, Apr. 8, 2025, https://perma.cc/6K7C-KX27.

[53] *See, e.g.*, NREL, NREL TRIPLES PREVIOUS ESTIMATES OF U.S. WIND POWER POTENTIAL 1 (2011), https://perma.cc/HR8J-6UGB (finding lower 48 states have potential to generate up to 37 million GWh of wind energy annually—many times more than total U.S. electricity demand).

[54] *See, e.g.*, ENERGY INNOVATION, COAL COST CROSSOVER 3.0, at 1-2 (2023), https://tinyurl.com/4tfyzana (finding 99% of U.S. coal plants more expensive to operate than wind projects).

[55] *See, e.g.*, PJM INTERCONNECTION, PJM COLD SNAP PERFORMANCE DEC. 28, 2017 TO JAN. 7, 2018, at 13-21 (2018), https://tinyurl.com/2fr5w8je (describing coal outages during extreme weather event while wind energy helped maintain power reliability for the mid-Atlantic region).

[56] *See, e.g.*, U.S. DOE, UNITED STATES ENERGY & EMPLOYMENT REPORT 4 (2024), https://perma.cc/N6L2-W729.

projects.[57] Interior also reduced the scope of federal protections for migratory birds.[58] The U.S. Fish and Wildlife Service and NOAA Fisheries have proposed to roll back protections for imperiled species.[59] NOAA purged hundreds of staff, including marine mammal and endangered species specialists,[60] and terminated multiple committees that advised on issues related to marine species conservation.[61] And the White House proposed to eliminate the Marine Mammal Commission, which has provided science-based oversight of federal programs affecting marine mammals for more than half a century.[62]

"[A]n agency's right hand [must] take account of what its left hand is doing." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Here, however, the Agencies have failed to offer any coherent rationale that would reconcile their implementation of the Wind Directive with their broader approach to energy development or wildlife conservation.

\*        \*        \*

In sum, the Agencies' implementation of the Wind Directive violates the APA's requirement of reasoned decision-making in at least three ways. First, the Agencies have reversed their years-long policy of promoting wind development, without "display[ing] awareness" of that change in course, let alone explaining it or considering communities' and

---

[57] DEP'T OF THE INTERIOR, ALTERNATIVE PROCEDURES FOR INFORMAL SECTION 7 CONSULTATION (Apr. 23, 2025), https://perma.cc/JHF8-FEXE.

[58] *See* Mem. from Acting Solicitor of the Interior, M-37085 (Apr. 11, 2025), https://perma.cc/H8UB-JJ2S.

[59] *See, e.g.*, 90 Fed. Reg. 16,102, 16,102-03 (Apr. 17, 2025) (proposing to rescind the definition of "harm" in ESA regulations); Press Release, BOEM, *BOEM Rescinds Expanded Rice's Whale Protection Efforts* (Feb. 20, 2025), https://perma.cc/BYH7-TQC7.

[60] *See, e.g.*, John Ryan, *NOAA Firings in Seattle Include Orca-saving Employee of the Year*, KUOW.ORG (Mar. 1, 2025), https://tinyurl.com/22k34bna.

[61] *See* Eric Katz, *NOAA Terminates Space, Climate and Marine Life Advisory Committees*, Gov't Exec. (Mar. 3, 2025), https://tinyurl.com/4k8pzd5s.

[62] *See* Public Letter from Frances Gulland, Chair, Marine Mammal Comm'n, *Marine Mammal Commission Proposed for Elimination*, https://tinyurl.com/4hzr35mb.

industry participants' "serious reliance interests." *White Lion Invs.*, 145 S. Ct. at 917. Second, the only potential explanation anywhere in view—the Wind Directive itself—offers no rationale for treating wind differently from other sources of power, all of which have comparable or more significant negative environmental and health externalities. *See supra* Arg. I.B. Third, the explanations the Wind Directive does offer are so unsubstantiated and incoherent, and so inconsistent with the President's simultaneous promotion of dirtier forms of power, *see supra* Arg. II.B-C, that they smack of pretext. The Supreme Court has squarely rejected that kind of "contrived reasoning" because it does not offer courts and the public a "genuine justification[] . . . that can be scrutinized." *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019).

The Agencies may not evade their obligation to engage in reasoned decision-making when implementing the Wind Directive because its author, the President, is not an "agency" under the APA. The APA requires *agencies* to act reasonably even when they are implementing unreasoned presidential directives. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (explaining that exempting agency implementation of presidential directives from APA review would "def[y] fundamental principles of administrative law" and "conflict with the plain language of the APA"); *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 WL 1116157, at *2 (D.R.I. Apr. 15, 2025) ("Agencies do not have unlimited authority to further a President's agenda."). Because the Wind Directive is not a "blank check" for the Agencies "to do as [they] please," *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025), the Agencies' implementation of the Directive cannot survive APA review.

## CONCLUSION

The Court should grant summary judgment to the States and ACE NY.

Date: September 10, 2025

Respectfully submitted,

/s/ Jared E. Knicley _____
Jared E. Knicley*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: (202) 513-6242
Email: jknicley@nrdc.org

Julia K. Forgie*
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Phone: (301) 434-2300
Email: jforgie@nrdc.org

Counsel for Amici Natural Resources
Defense Council, Citizens Campaign for
the Environment, Environmental
Protection Information Center, and New
York League of Conservation Voters


/s/ Lucy Lefkowitz _____
Lucy Lefkowitz*
National Wildlife Federation
11100 Wildlife Center Drive
Reston, VA 20190
Phone: (202) 797-6625
Email: lefkowitzl@nwf.org

Counsel for Amicus National Wildlife
Federation

/s/ Erica A. Fuller _____
Erica A. Fuller (BBO #669647)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Phone: (617) 850-1727
Email: efuller@clf.org

Counsel for Amici Citizens Campaign for the
Environment, Conservation Law Foundation,
Environmental Advocates NY, Environmental
Protection Information Center, National Wildlife
Federation, Natural Resources Defense Council,
New York League of Conservation Voters, Sierra
Club, and Southern Environmental Law Center


/s/ Megan M. Herzog _____
Megan M. Herzog (BBO #682948)
Donahue, Goldberg & Herzog
1008 Pennsylvania Avenue SE
Washington, DC 20003
Phone: (650) 353-8719
Email: megan@donahuegoldberg.com

Counsel for Amicus Environmental Defense Fund


/s/ Susan J. Kraham _____
Susan J. Kraham*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Phone: (212) 284-8035
Email: skraham@earthjustice.org

Counsel for Amici Environmental Advocates NY
and Sierra Club

/s/ Gudrun Thompson_____
Gudrun Thompson*
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Phone: (919) 967-1450
Email: gthompson@selc.org

*Counsel for Amicus Southern
Environmental Law Center*


* Admitted pro hac vice

/s/ Shaun Goho_____
Shaun Goho (BBO #652287)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: (617) 624-0234
Email: sgoho@catf.us

*Counsel for Amicus Clean Air Task Force*

**CERTIFICATE OF SERVICE**

I, Jared E. Knicley, certify that this document was filed through the CM/ECF system on September 10, 2025, and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

/s/ Jared E. Knicley
Jared E. Knicley