**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
STATE OF NEW YORK, et al.,       )
                                )
                Plaintiffs,      )
                                )
and                              )
                                )
ALLIANCE FOR CLEAN ENERGY NEW    )
YORK,                            )
                                )        Civil Action
        Plaintiff-Intervenor,    )        No. 25-cv-11221-PBS
                                )
v.                               )
                                )
DONALD J. TRUMP, in his official )
capacity as President of the     )
United States, et al.,           )
                                )
                Defendants.      )
_____)
```

**MEMORANDUM AND ORDER**

December 8, 2025

Saris, J.

**INTRODUCTION**

On January 20, 2025, President Trump issued an executive memorandum titled "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects." 90 Fed. Reg. 8363 (Jan. 20, 2025) (the "Wind Memo"). The Wind Memo directed federal agencies to suspend issuing all new permits, leases, and other authorizations needed to develop and operate wind energy projects, both onshore and offshore, pending

a wide-ranging assessment of federal wind leasing and permitting practices. Pursuant to that directive, several federal agencies[1] (the "Agency Defendants") ordered an immediate pause in the issuance of all wind energy authorizations (the "Wind Order").

Seventeen states[2] and the District of Columbia (the "State Plaintiffs"), and Alliance for Clean Energy New York ("ACE NY," and together with the State Plaintiffs, "Plaintiffs"), bring this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., challenging the Wind Order. Now before the Court are the parties' cross-motions for summary judgment.[3]

---

[1] The agencies remaining in this suit are the Department of the Interior (and three of its subagencies: the Bureau of Ocean Energy Management, the Bureau of Land Management, and the U.S. Fish and Wildlife Service); the Department of Commerce (and two of its subagencies: the National Marine Fisheries Service and the National Oceanic and Atmospheric Administration); the Environmental Protection Agency; and the U.S. Army Corps of Engineers. Three other agencies were also originally named as defendants but were subsequently dismissed: the Department of Agriculture, the Department of Energy, and the Department of the Treasury. See Massachusetts v. Trump, 790 F. Supp. 3d 8, 25 (D. Mass. 2025). Several public officials were also named as defendants. For ease of reference, the Court refers to the defendants collectively as the "Agency Defendants."

[2] Those states are Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Washington.

[3] The Court has also reviewed and is thankful for the submissions of various amici: Save Long Beach Island, Inc. (Dkt. 111); a group of local, regional, and national environmental nonprofits (Dkt. 220); a California coalition consisting of local government entities, environmental nonprofits, a labor union, an industry trade group, and a public official (Dkt. 224); and a group of four

After review of the parties' submissions and a hearing, the Court concludes that the Wind Order constitutes a final agency action that is arbitrary and capricious and contrary to law. Accordingly, the Court **ALLOWS** Plaintiffs' motions (Dkts. 172, 175), **DENIES** the Agency Defendants' motion (Dkt. 179), and declares unlawful and **VACATES** the Wind Order.

## BACKGROUND

I.    **Factual Background**

The following facts are not in dispute.

The Wind Memo, which was published in the Federal Register, contains two sections. The first section, which is not at issue in this litigation, invokes the President's authority under section 12(a) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1341(a), to "withdraw from disposition for wind energy leasing all areas within the O[uter] Continental Shelf," thereby "temporarily prevent[ing] consideration of any area in the [Outer Continental Shelf] for any new or renewed wind energy leasing." Temporary Withdrawal of All Areas, 90 Fed. Reg. at 8363.[4] The second section, as relevant here, provides as follows:

---

coalitions that provide training programs for workers in the offshore wind energy industry (Dkt. 226).

[4] The first section of the Wind Memo also instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases" and to "identify[]

In light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm -- including negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals -- and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit wind projects, <u>the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Energy, the Administrator of the Environmental Protection Agency, and the heads of all other relevant agencies, shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices</u>. The Secretary of the Interior shall lead that assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals. The assessment shall also consider the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry.

<u>Id.</u> at 8363-64 (emphasis added).[5] In short, the Wind Memo directs

agencies to impose an indefinite moratorium on the "issu[ance]" of

all "new or renewed approvals, rights of way, permits, leases, or

---

any legal bases for [their] removal." Temporary Withdrawal of All Areas, 90 Fed. Reg. at 8363.

[5] The second section of the Wind Memo also contains several provisions not relevant to this litigation, including an order that several agencies "assess the environmental impact and cost to surrounding communities of defunct and idle windmills." <u>Id.</u> at 8364.

loans for onshore or offshore wind projects" until agencies complete a "comprehensive assessment and review" (the "Comprehensive Assessment") of those projects' impacts. Id. at 8364. The Wind Memo further provides that "[t]his memorandum shall be implemented consistent with applicable law." Id.

On the same day the Wind Memo was promulgated, the Acting Secretary of the Interior issued a written order "temporarily suspend[ing]" all "delegations of authority" within the Interior Department "[t]o issue any onshore or offshore renewable energy authorization, including but not limited to a lease, amendment to a lease, right of way, amendment to a right of way, contract, or any other agreement required to allow for renewable energy development." Dkt. 165-3 at 1. By its terms, the written order would "remain in effect for 60 days," id. at 2, but the Agency Defendants acknowledge that, to this day, all relevant agencies "have temporarily ceased issuing permits until the [Comprehensive] Assessment . . . is complete, as instructed in the Wind Memo," Dkt. 180 at 13. The Court uses the term "Wind Order" to describe the Agency Defendants' decision to suspend issuing all authorizations related to wind energy projects.

The Agency Defendants have represented that the Comprehensive Assessment is "underway" but have provided no information about its timeline or any anticipated end date. Id. at 12; see, e.g., Dkt. 123-3 ¶ 5 (stating that the Interior Department has held

"meetings . . . to plan how to further the ongoing assessment" and "has begun compiling and reviewing information . . . that is needed to support" it); Dkt. 123-7 ¶ 8 (attesting that the National Marine Fisheries Service has "identified staff" to assist with the Comprehensive Assessment and has "engaged in preliminary coordination to prepare to support the assessment"). These representations are not part of the administrative record.

## II.    **Procedural History**

On May 5, 2025, the State Plaintiffs brought the instant suit. As relevant here, the State Plaintiffs' operative complaint claims that the Wind Order is (1) arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A); and (2) contrary to law and in excess of statutory authority, in violation of 5 U.S.C. § 706(2)(A) and (C).

ACE NY -- a nonprofit association with various wind project developers and supply chain operators as its members -- filed its complaint in intervention on May 21, 2025. Like the State Plaintiffs, ACE NY claims that the Wind Order is arbitrary and capricious and contrary to law. ACE NY also claims that the Wind Order is procedurally improper in violation of 5 U.S.C. § 706(2)(D) because the Agency Defendants did not undergo notice and comment before implementing it.

On July 3, 2025, another judge of this Court (Judge Young) denied the Agency Defendants' motion to dismiss the above claims.[6] See Massachusetts v. Trump, 790 F. Supp. 3d 8, 32 (D. Mass. 2025). The parties subsequently filed cross-motions for summary judgment, which are now before this Court.

## DISCUSSION

### I.    Constitutional Standing

To establish constitutional standing, "Plaintiffs must show (1) that they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief." Plazzi v. FedEx Ground Package Sys., Inc., 52 F.4th 1, 4 (1st Cir. 2022) (cleaned up) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021)). "If at least one plaintiff has standing, the suit may proceed." Biden v. Nebraska, 600 U.S. 477, 489 (2023); see also Comfort v. Lynn Sch. Comm., 418 F.3d 1, 11 (1st Cir. 2005) (en banc) ("So long as one plaintiff has standing to seek a particular form of

---

[6] The motion to dismiss was originally filed as an opposition to Plaintiffs' motions for a preliminary injunction. The Court, with the consent of the parties, collapsed Plaintiffs' motions with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2) and construed the Agency Defendants' opposition as a motion to dismiss. See Massachusetts, 790 F. Supp. 3d at 15-16. The Court then denied the motion as to Plaintiffs' APA claims and dismissed their other claims. See id. at 30-32. No preliminary injunction was issued.

global relief, the court need not address the standing of other plaintiffs seeking the same relief."), abrogated on other grounds by, Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701 (2007).

Judge Young previously found that Plaintiffs had constitutional standing at the motion to dismiss stage. See Massachusetts, 790 F. Supp. 3d at 20-24. Plaintiffs must, however, "support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). At the summary judgment stage, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" establishing standing. Lujan, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). As explained below, the Court concludes that the State Plaintiffs and ACE NY have each satisfied this requirement and that the Agency Defendants' arguments to the contrary are unpersuasive.

## A.  State Plaintiffs

The State Plaintiffs have produced ample evidence demonstrating that they face ongoing or imminent injuries due to the Wind Order. First, project delays caused by the Wind Order reduce or defer tax revenue and returns on the State Plaintiffs' investments in wind energy developments. See Wyoming v. Oklahoma, 502 U.S. 437, 447 (1992) (holding that decreased tax revenues

constitute injury in fact); Franchise Tax Bd. v. Alcan Aluminium Ltd., 493 U.S. 331, 336 (1990) (same as to diminished return on investment). For example, the Commonwealth of Massachusetts alone invested millions of dollars into the wind industry in 2024; it is a "rational economic assumption[]" that returns on those investments are imperiled by an indefinite suspension of wind permitting. Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 223 (1st Cir. 2019) (quoting Adams v. Watson, 10 F.3d 915, 923 (1st Cir. 1993)). Similarly, the State Plaintiffs provide documentation that the Wind Order has resulted in delays to a project planned by Atlantic Shores Offshore Wind that is expected to provide nearly $2 billion in economic benefits to the State of New Jersey. Those anticipated benefits are now jeopardized or deferred.

The Wind Order has also disrupted the State Plaintiffs' plans to themselves derive energy from wind projects. For instance, delays to the SouthCoast Wind project have postponed the delivery of thousands of megawatts of wind energy to the Commonwealth of Massachusetts. The Agency Defendants concede that those delays stem at least in part from their "evaluat[ing] the applicability of the Wind Memo" to the project. Dkt. 180 at 24. Schedule disruptions resulting from the Wind Order have likewise compelled the State of New York to cancel solicitations for a transmission

project that would have connected New York City's electricity grid to offshore wind generators and produced long-term cost savings.

Further, the State Plaintiffs point out that absent the Wind Order, the development of wind energy projects would lower energy costs. See Belmont Mun. Light Dep't v. Fed. Energy Regul. Comm'n, 38 F.4th 173, 185 (D.C. Cir. 2022) (holding that states suffer injury from increased electricity rates due to interests "in protecting their citizens and electric ratepayers"). The State Plaintiffs also present evidence that the Wind Order impedes their ability to reduce greenhouse gas emissions through renewable wind energy generation, see Massachusetts v. EPA, 549 U.S. 497, 521 (2007) (holding that states suffer injury in fact from the "serious and well recognized" "harms associated with climate change"), and forces them to incur expenses to shift toward other energy sources to meet renewable energy procurement and pollution-reduction targets, see New Jersey v. EPA, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (noting that "exacerbated administrative costs and burdens . . . constitute a concrete and particularized injury"). These continuing harms constitute injury in fact.

So, too, do the State Plaintiffs satisfy the requirements of causation and redressability. See FDA v. All. for Hippocratic Med., 602 U.S. 367, 380-81 (2024). The Wind Order caused the above injuries, which would be redressed by its vacatur. And the Supreme Court has held that a plaintiff has standing to assert that an

10

agency "based its decision upon an improper legal ground" even if the agency "might later, in the exercise of its lawful discretion, reach the same result for a different reason." Gutierrez v. Saenz, 606 U.S. 305, 320 (2025) (quoting FEC v. Akins, 524 U.S. 11, 25 (1998)).  The State Plaintiffs have adequately demonstrated Article III standing.

### B.   ACE NY

As an organization asserting standing on behalf of its members, ACE NY must show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). "The first two prongs of this test have constitutional dimensions; the third prong is prudential." Housatonic River Initiative v. U.S. EPA, 75 F.4th 248, 265 (1st Cir. 2023).

The Agency Defendants contend that ACE NY has failed to specify any member with standing. In mounting this challenge, the Agency Defendants are tilting at windmills. Contrary to their assertion, ACE NY does, in fact, identify various such members. See id. (noting that an association need only identify one member with standing). Those members include entities that operate (or

seek to operate) onshore and offshore wind energy projects in thirty-two states, as well as entities in the wind energy supply chain. And the injuries to those members from the Wind Order are manifest. For example, declarations submitted by ACE NY indicate that Atlantic Shores Offshore Wind -- a wind energy project development company which is among ACE NY's many members -- has had multiple permits stalled or withdrawn, with the government specifically citing the Wind Order as the rationale for withdrawing at least one of them. In response, Atlantic Shores Offshore Wind has "materially reduced its personnel, terminated contracts, and canceled project investments." Dkt. 146-1 ¶ 22. While development progress is stalled for various of ACE NY's wind developer members, many of them remain "required to pay rental fees on their stagnant leases," leaving "billions of dollars in stranded investments." Id. ¶ 4. Meanwhile, ACE NY's supply chain members "have lost and will continue to lose work and contracts as individual projects' development schedules are delayed." Dkt. 178 ¶ 3; see id. ¶ 5 (citing 82.8% decrease in quarterly supply chain contracts from 2024 to first half of 2025); All. for Hippocratic Med., 602 U.S. at 384-85 (noting that downstream economic injuries to suppliers can form basis for standing where injuries result from "predictable chain of events").

To the extent that the Agency Defendants argue that ACE NY fails to show that its members' injuries were caused by (and can

be redressed by the vacatur of) the Wind Order due to uncertainty over whether individual projects would have timely proceeded in the absence of the permitting pause, that contention disregards the economic costs that ACE NY's members have already incurred in response to project delays. And ACE NY's members' injuries are "both traceable and redressable 'even though the [Agency Defendants] might reach the same result exercising [their] discretionary powers lawfully.'" Massachusetts, 790 F. Supp. 3d at 21 (quoting Akins, 524 U.S. at 25). ACE NY has thus established that it has members with standing to sue in their own right.

The Court also readily concludes that ACE NY has satisfied the other two prerequisites for associational standing. ACE NY's "mission is to promote the use of clean electricity technologies and energy efficiency . . ., increase energy diversity and security, boost economic development, improve public health, and reduce air pollution." Dkt. 114 ¶ 12. "The 'interests at stake' in this litigation" thus "are clearly 'related to [ACE NY's] core purposes.'" Housatonic, 75 F.4th at 265 (quoting Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006)). And the remedies sought by ACE NY -- i.e., declaratory relief and vacatur of the Wind Order -- are "'prospective relief' [that] would 'inure to the benefit of those members of [ACE NY] actually injured,'" meaning that "individual members' participation is not necessary to either the claim[s]

asserted or the relief requested." Id. (first quoting Warth v. Seldin, 422 U.S. 490, 515 (1975); and then quoting Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010)). ACE thus has established associational standing.

## II.  **Zone of Interests**

Next, the Agency Defendants contend that Plaintiffs do not fall within the zones of interests of the statutes under which they sue. As the Supreme Court has stated, the zone-of-interests analysis "requires [a court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). In other words, the inquiry turns on whether a plaintiff has a cause of action under a statute. See id. at 128.

The APA authorizes suit by any "person suffering legal wrong because of agency action[] or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. This cause of action belongs to "anyone even 'arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" FDA v. R. J. Reynolds Vapor Co., 606 U.S. 226, 233 (2025) (quoting Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)). "A plaintiff may sue under the APA unless her interests are so marginally related to or inconsistent with the purposes implicit in the statute that it

cannot reasonably be assumed that Congress intended to permit the suit. The inquiry is not especially demanding." Id. (cleaned up).

Plaintiffs contend that the Wind Order is contrary to two substantive provisions of the APA itself, see 5 U.S.C. §§ 555(b), 558(c), as well as a variety of statutes and regulations that collectively govern the permitting process for wind energy projects.[7] Because Plaintiffs either seek permits under these provisions (in the case of ACE NY's wind developer members) or directly benefit from the issuance of such permits (in the case of the State Plaintiffs and ACE NY's supply chain members), Plaintiffs' claims are well within the zones of interests of the provisions at issue, which all set forth timelines and standards for wind energy permitting. To take just one example, Plaintiffs invoke OCSLA, which aims to enable the "expeditious and orderly development" of the Outer Continental Shelf. 43 U.S.C. § 1332(3). Plaintiffs' claims, which likewise seek to expedite wind energy development, are within the zone of interests of that statute. See

---

[7] These laws include OCSLA, 43 U.S.C. § 1331 et seq.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Rivers and Harbors Act, 33 U.S.C. § 401 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq.; and the Fixing America's Surface Transportation Act, 42 U.S.C. § 4370m et seq.; and the various regulations promulgated under these statutes.

Louisiana v. Biden, 622 F. Supp. 3d 267, 291-92 (W.D. La. 2022) (holding that states' APA claims alleging violation of OCSLA due to oil and gas leasing moratorium satisfied zone-of-interests test).

Seafreeze Shoreside, Inc. v. U.S. Department of the Interior, cited by the Agency Defendants, is not to the contrary. 123 F.4th 1 (1st Cir. 2024), cert. denied, 145 S. Ct. 2680 (2025), and cert. denied, 145 S. Ct. 2681 (2025). In Seafreeze, an organization representing commercial fishermen sought to invoke "aesthetic and recreational interests in marine mammals" to oppose the development of an offshore wind facility under the Marine Mammal Protection Act. Id. at 21. The First Circuit held that the organization's claim did not fall within the zone of interests of that statute because the "protection of marine mammals . . . [wa]s not germane to the [organization]'s purpose, which [wa]s to represent the interests of commercial fisheries and related organizations." Id. Here, in contrast, the interests asserted by Plaintiffs in obtaining wind energy permits are aligned with the purposes of the statutory provisions that authorize and regulate the issuance of those permits. Indeed, the Agency Defendants cite no case in which a permit applicant was found to be outside the zone of interests of a statutory provision regulating permit issuance. Additionally, the First Circuit in Seafreeze found that the plaintiffs' claims were within the zone of interests of the

16

National Environmental Policy Act (another statute invoked by Plaintiffs here) because the discharge of fill material would have had "adverse economic effects" on commercial fishing. Id. Here, similarly, Plaintiffs have alleged various adverse economic consequences resulting from the Wind Memo.

## III. **Merits**

In the context of an APA challenge, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). The Court therefore reviews the parties' cross-motions for summary judgment "not to determine whether a dispute of fact remains," but rather to adjudicate, based on the administrative record, whether the Wind Order satisfies the APA's requirements. Id.

Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be," inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C). Judicial review of agency action under these standards is deferential and narrow. See Littlefield v. U.S. Dep't of the Interior, 85 F.4th 635, 643 (1st Cir. 2023).

The Court first addresses the issue of whether the Wind Order is a final agency action subject to judicial review. Finding that

17

it is, the Court then resolves, in turn, Plaintiffs' arguments that the Wind Order is arbitrary and capricious and contrary to law.

### A.    Final Agency Action

Under the APA, plaintiffs may challenge an "agency action," 5 U.S.C. § 706, which is defined to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," id. § 551(13); see id. § 701(b)(2). An agency action is "subject to judicial review" if it is "made reviewable by statute" or, as relevant here, when it is a "final agency action." Id. § 704. The Agency Defendants contend that the Wind Order is not a challengeable final agency action.

An agency action is considered "final" under the APA if two conditions are satisfied: "First, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)). The Court addresses each of these conditions in turn and concludes that each of them is met.

### 1. Consummation

The threshold question is whether a "temporary" pause can qualify as a "consummation of the agency's decisionmaking process." Id. (quoting Bennett, 520 U.S. at 178). The Court determines that it can.

An agency action can satisfy the "consummation" prong "notwithstanding the agency's characterization of the [action] as an interim" one. Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020). That is because

> an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency. In that event, the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision.

Id.; see, e.g., Clean Air Council v. Pruitt, 862 F.3d 1, 6 (D.C. Cir. 2016) (per curiam) (noting that an "interim" modification of the status quo can constitute final agency action); Salazar v. King, 822 F.3d 61, 83-84 (2d Cir. 2016) ("The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review."). Relatedly, "when agencies opt to make final administrative determinations in [a] two-stage way," the initial stage of the process may be a final agency action if it "itself [has] altered the legal status quo." Glob. Tower Assets, LLC v. Town of Rome, 810 F.3d 77, 84 (1st Cir. 2016).

19

These principles have led various courts to conclude that an agency-imposed suspension of certain activities constitutes final agency action. See, e.g., Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 247-49 (3d Cir. 2011) (holding that moratorium on mineral drilling until completion of environmental impact statement constituted final agency action); Louisiana, 622 F. Supp. 3d at 291-93 (holding that indefinite "pause" on issuing new oil and natural gas leases constituted final agency action); Texas v. United States, 524 F. Supp. 3d 598, 642-43 (S.D. Tex. 2021) (holding that "100-day pause on removals" constituted final agency action); cf. Env't Def. Fund, Inc. v. Gorsuch, 713 F.2d 802, 813 (D.C. Cir. 1983) ("[S]uspension of the permit process as to a class of waste management facilities amounts to a suspension of the effective date of regulation governing that class, and may be reviewed . . . as the promulgation of a regulation.").[8] Even if a moratorium may eventually be lifted, the agency action effecting it "represents the consummation of the [agency]'s decisionmaking process with respect to the moratorium" and therefore is subject to APA challenge. Minard, 670 F.3d at 248 (emphasis added); see Texas, 524 F. Supp. 3d at 642 ("The immediacy of the implementation

---

[8] Various other courts have reached the same or similar conclusion. See, e.g., Louisiana, 622 F. Supp. 3d at 291-92 (collecting cases); Stenson Tamaddon, LLC v. U.S. IRS, 742 F. Supp. 3d 966, 988 (D. Ariz. 2024).

of the . . . pause demonstrates [the agency]'s decision <u>with regard to the pause itself</u> is final." (emphasis added)).

This case law makes clear that the Wind Order marks the consummation of the Agency Defendants' decisionmaking process. It is undisputed that the Wind Order "altered the legal status quo" under which the relevant agencies previously processed applications for leases, permits, and other authorizations necessary for wind project development. <u>Glob. Tower Assets</u>, 810 F.3d at 84. And the Agency Defendants concede that the Wind Order will remain in effect until, at the earliest, the Comprehensive Assessment is complete. In other words, the Wind Order -- despite being "characteriz[ed] . . . as an interim" undertaking -- "is the final word from the [A]gency [Defendants] on what will happen up to the time of any different permanent decision" resulting from the Comprehensive Assessment. <u>Wheeler</u>, 955 F.3d at 78.

More than ten months after the Wind Order instituted a "temporary" pause on the issuance of wind energy authorizations, no end to the Comprehensive Assessment appears to be in sight. The Agency Defendants neither included a timeline for that assessment in the administrative record nor provided an anticipated end date during the course of this litigation. The long-term nature of the Wind Order reinforces the finding that it constitutes final agency action.

2.    *Legal Consequences*

Under the second prong of the finality test, an agency action is final only if it is "one by which rights or obligations have been determined[] or from which legal consequences will flow." Hawkes Co., 578 U.S. at 597 (quoting Bennett, 520 U.S. at 178). Courts have regularly determined that this condition is satisfied when an indefinite pause is imposed by an agency. See, e.g., Louisiana, 622 F. Supp. 3d at 291 (concluding that "[t]here [was] no real question that [p]laintiff [s]tates ha[d] met the second prong of the Bennett test" due to a suspension of oil and natural gas lease issuance); Texas, 524 F. Supp. 3d at 643 (holding that "legal consequences . . . undoubtedly flow[ed]" from an 100-day pause on removals); Doe v. Trump, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) ("[A] 'suspension' or an indefinite delay . . . has significant real-world impacts on Plaintiffs' various situations."). A suspension on agency authorizations "prevent[s] [p]laintiffs from moving forward" with their proposed activities, such that they are "trapped without recourse due to the indefinite postponement of agency action." Connecticut v. U.S. Dep't of the Interior, 363 F. Supp. 3d 45, 60 (D.D.C. 2019) (quoting Soundboard Ass'n v. FTC, 888 F.3d 1261, 1268 (D.C. Cir. 2018)).

The Wind Order "gives rise to 'direct and appreciable legal consequences'" and thus satisfies the second prong of the finality test. Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at

178). Until full processing of applications related to wind energy projects resumes, no such project can move forward. Indeed, as was previously held in this litigation, the Wind Order amounts to a "de facto suspension of the law with respect to wind energy development." Massachusetts, 790 F. Supp. 3d at 27. For many of the same reasons that Plaintiffs have standing, see supra Section I, the legal consequences of the Wind Order are apparent.

The Court therefore concludes that the Wind Order constitutes a final agency action. Having made this threshold determination, the Court now turns to adjudicating whether the Wind Order complies with the APA.

### B.   Arbitrary and Capricious

Plaintiffs contend that the Wind Order is arbitrary and capricious in violation of the APA. See 5 U.S.C. § 706(2)(A) (instructing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion"). Plaintiffs highlight the sparsity of the administrative record (which consists solely of the Wind Memo and the Interior Department's implementing order), arguing that the Agency Defendants were obligated under the APA, and failed, to analyze their options and explain the basis for the Wind Order, notwithstanding that the Agency Defendants acted pursuant to the Wind Memo.

### 1.    Applicability of Arbitrary-and-Capricious Review

At the outset, the Court must address the difficult issue raised by the Agency Defendants' argument that arbitrary-and-capricious review does not even apply because their action was directed by the President. The Agency Defendants contend that because they "merely followed" the Wind Memo "as the [Wind Memo] itself commands," the Wind Order did not constitute a "decision" and therefore no reasoned explanation was required. Dkt. 209 at 6. In effect, the Agency Defendants ask this Court to hold that an agency is exempt from the requirements of § 706(2)(A) whenever it acts pursuant to a presidential command.

Circuit precedent forecloses this argument. The First Circuit has noted that an "agency action that carries out a presidential directive is ordinarily subject to APA review." Agatha v. Trump, 151 F.4th 9, 11 (1st Cir.), rev'd on other grounds, Trump v. Orr, __ S. Ct. __ (2025) [2025 WL 3097824]; see also New York v. Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025) (noting that the APA's restrictions are properly applied to agencies' "actions under . . . [e]xecutive [o]rders"). At least two other circuits have reached similar conclusions. See Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule from APA review because it carried out a presidential directive."); Chamber of Com. of the U.S. v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the [agency]'s regulations are based

24

on the President's Executive Order hardly seems to insulate them from judicial review under the APA . . . .").[9]

That does not end the matter, however, because a recent order on the Supreme Court's emergency docket addressed the applicability of the APA to an agency decision pursuant to a presidential directive. See Orr, __ S. Ct. __ [2025 WL 3097824]. Due to that order's relevance to the Agency Defendants' central argument here, an in-depth discussion of the procedural history of Orr is warranted.

The litigation culminating in the Supreme Court's order in Orr involved an "Executive Branch policy requiring all new passports to display an individual's biological sex at birth." __ S. Ct. at __ [2025 WL 3097824, at *1]. On January 20, 2025, President Trump signed an executive order directing the State Department to require every passport to list its holder's biological sex assigned at birth. See Orr v. Trump, 778 F. Supp. 3d 394, 400 (D. Mass. 2025). In late January 2025, the State Department implemented that executive order by "requir[ing] all passports to reflect only applicants' sex assigned at birth" and

---

[9] Numerous district courts have held the same. See Kingdom v. Trump, No. 25-cv-691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (collecting cases); see also, e.g., Drs. for Am. v. Off. of Pers. Mgmt., 793 F. Supp. 3d 112, 145 (D.D.C. 2025); Woonasquatucket River Watershed Council v. U.S. Dep't of Agric., 778 F. Supp. 3d 440, 471 (D.R.I. 2025), appeal filed, No. 25-1428 (1st Cir. May 1, 2025); Louisiana, 622 F. Supp. 3d at 294-95.

mandating that all passport holders report their sex as either male or female. Id. A group of plaintiffs initiated several legal challenges to this State Department policy. See id. As relevant here, the plaintiffs claimed that the policy was arbitrary and capricious under the APA because "the record indicate[d] that the State Department considered virtually nothing aside from the [e]xecutive [o]rder's directive when it developed" the policy. Id. at 424.

Another session of this Court agreed and issued a preliminary injunction barring enforcement of the policy as to certain of the plaintiffs. See id. at 423-25, 433. The court noted that the policy "was adopted and announced mere days after" the executive order was issued and that the State Department had failed to "make factual findings," "explain why the facts supporting [its] prior passport policy no longer carr[ied] weight," and "address reliance interests affected by its reversal of the prior policy." Id. at 423-24.

Importantly, in arriving at this conclusion, the district court rejected two distinct arguments made by the government. First, the court disagreed with the government's position that the passport policy was unreviewable under the APA, holding that the "APA contains no exception for agency actions . . . that carry out an executive order." Id. at 419. Second, the government contended that 22 U.S.C. § 211a -- which provides that the Secretary of State

may grant passports "under such rules as the President shall
designate and prescribe" -- was "reason enough" for the State
Department's adoption of the policy pursuant to the President's
executive order, such that further study and explanation of the
relevant issues was not required. Id. at 424. The court rejected
this argument as well. See id.

The government appealed the district court's order and moved
for a stay pending appeal. The First Circuit denied the motion.
See Agatha, 151 F.4th at 13. In so doing, the First Circuit, like
the district court, addressed the government's two distinct
arguments in turn. First, the First Circuit disagreed with the
government's argument that the passport policy was "not subject to
review under the APA because it was 'compelled by' the President's
[e]xecutive [o]rder." Id. at 11. The First Circuit then rejected
the government's argument that the passport policy was
"unreviewable" because § 211a "commits the action [concerning the
content of passports] to the President's sole discretion." Id.

Having failed to persuade the First Circuit, the government
turned to the Supreme Court. In its briefing in support of its
application for a stay pending appeal, the government emphasized
the atypicality of the situation given the existence of § 211a.
Because § 211a "itself requires the [State] Department to follow
the President's 'rules,'" the government argued, the State
"Department considered the only aspect relevant . . .: that

27

[§ 211a] required it to follow" the executive order. Application for a Stay at 29-30, Orr, __ S. Ct. __ (No. 25A319) (quoting 22 U.S.C. § 211a). The government distinguished this situation from the ordinary "case where the challenged agency action is the exercise of discretion 'delegated to an agency head but directed by the President,'" highlighting that the litigation instead presented "a case where the exercise of discretion is 'committed to . . . the President' himself, and the challenged agency action just ministerially carries out the President's decision." Id. at 27 (alteration in original) (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2351 (2001)); see also Reply in Support of Application for Stay at 11, Orr, __ S. Ct. __ (No. 25A319) ("This case thus starkly contrasts with cases respondents cite where statutes vested an agency with the relevant decisionmaking authority." (citation omitted)). Given that distinction, the government stressed, the fact pattern in Orr did not "require the Court to hold that 'agencies automatically meet the APA's procedural requirements when they implement the President's policy views.'" Reply in Support of Application for Stay at 2-3, Orr, __ S. Ct. __ (No. 25A319) (quoting Respondents' Opposition to Application for Stay at 24, Orr, __ S. Ct. __ (No. 25A319)).

   On November 6, 2025, the Supreme Court granted the government's stay application. See Orr, __ S. Ct. at __ [2025 WL

3097824, at *1]. Only one sentence of the Supreme Court's order is relevant here:

> Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow. See 22 U.S.C. § 211a.

Id. (emphasis added). The phrasing of this sentence, in conjunction with the Supreme Court's citation to § 211a, makes clear that the Supreme Court is likely to accept the government's second argument -- i.e., that an agency need not provide a reasoned explanation, other than pointing to an executive order, in the specific scenario where a statute (such as § 211a) expressly delegates discretion to the President himself and "require[s] [the agency] to follow" directives pursuant to that delegation. Application for a Stay at 30, Orr, __ S. Ct. __ (No. 25A319). The Supreme Court's order says nothing, however, about the government's first argument -- i.e., that all other agency actions pursuant to executive orders are likewise exempted from the APA's requirement of reasoned explanation.

Indeed, interpreting Orr to have addressed the government's first argument would be inconsistent with Supreme Court precedent. The Supreme Court has previously directed arbitrary-and-capricious review of an agency action under the APA even where that agency action was carried out pursuant to a presidential directive. See Biden v. Texas, 597 U.S. 785, 793, 807-14 (2022) (holding that

agency memoranda issued pursuant to an executive order constituted final agency action under the APA and directing the district court to "consider . . . whether the [memoranda] comply with section 706 of the APA" (citing Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 46-57 (1983)). Because the Supreme Court "does not normally overturn, or . . . dramatically limit, earlier authority sub silentio," Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000), the Supreme Court's order in Orr cannot reasonably be read to imply that all agency actions stemming from presidential directives are exempted from APA review.

Accordingly, mindful that the reasoning of orders on the Supreme Court's emergency docket serve as precedent for lower courts, see Nat'l Insts. of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2660 (2025), this Court concludes that Orr did not overrule First Circuit precedent dictating that "agency action that carries out a presidential directive is ordinarily subject to APA review." Agatha, 151 F.4th at 11 (emphasis added); see New York, 133 F.4th at 70 n.17. Rather, that precedent still applies where no statute "expressly require[s] [the agency] to follow" a presidential directive. Orr, __ S. Ct. at __ [2025 WL 3097824, at *1].

Moreover, that method of applying APA review makes good sense. Where, as the government noted in its briefing in Orr, a statute

"expressly vests 'the President,' not the agency, with exclusive authority" to prescribe a rule, "[t]hat delegation puts the President's 'authority . . . at its maximum.'" Reply in Support of Application for Stay at 9, Orr, __ S. Ct. __ (No. 25A319) (second alteration in original) (first quoting 22 U.S.C. § 211a; and then quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). In such a scenario, requiring an agency to assess all relevant factors and issue a reasoned explanation before acting -- despite its discretion being specifically circumscribed by Congress's mandate that the agency follow the President's directive -- would contravene Congress's instructions and operate as an unauthorized (and pointless) workaround of the Supreme Court's holding that the President's own "actions are not subject to [the APA's] requirements." Franklin v. Massachusetts, 505 U.S. 788, 801 (1992); cf. Bradford v. U.S. Dep't of Lab., 101 F.4th 707, 731 (10th Cir. 2024) (finding that an agency action cannot "be[] an arbitrary and capricious exercise of agency discretion [where] the agency ha[s] no discretion to act otherwise"), cert. denied, 145 S. Ct. 1047 (2025). But where a "challenge is to an action delegated to an agency head but directed by the President," rather than "to an action that Congress ha[s] committed to the sole discretion of the President," a "different situation obtains: then, . . . the review provisions [of the APA] usually applicable to that agency's action should govern." Kagan,

supra, at 2351.[10] Insulating an agency action from arbitrary-and-capricious review in such a circumstance would undermine the APA and "shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." Su, 121 F.4th at 15.

---

[10] The Court finds Justice Kagan's prescient treatment of this topic persuasive. In relevant part, her 2001 article states as follows:

> It is true that the Supreme Court held in Franklin v. Massachusetts that the President is not an "agency" as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. This decision, however, arose from a challenge to an action that Congress had committed to the sole discretion of the President, separate from and subsequent to agency involvement. When the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern. Nothing in Franklin's interpretation of the APA or in its -- or any other case's -- underlying discussion of separation of powers issues is to the contrary. As Strauss notes, ever since Marbury v. Madison, the Court has posited a sphere of "superstrong" presidential discretion over political matters, not amenable to judicial control; but never has the Court indicated, nor could it consistent with rule of law principles, that all exercises of presidential authority fall within this zone. And so long as the courts remain open to legal challenges, the use of presidential directive authority cannot too greatly displace the clear preferences of the prior enacting (as opposed to the current overseeing) Congress with respect to agency action.

Kagan, supra, at 2350-51 (footnotes omitted) (quoting Peter L. Strauss, Presidential Rulemaking, 72 Chi.-Kent L. Rev. 965, 977 (1997)).

Here, the Agency Defendants concede that no statute expressly requires them to follow rules prescribed by the President regarding wind energy authorizations. The language of the Wind Memo itself provides insight on this point: the first section of the Wind Memo, which is not at issue in this litigation, specifically invokes section 12(a) of OCSLA -- which vests discretion in the "President of the United States" to "withdraw from disposition any of the unleased lands of the [O]uter Continental Shelf," 43 U.S.C. § 1341(a) -- to effect a withdrawal of such lands for wind energy leasing.[11] See Temporary Withdrawal of All Areas, 90 Fed. Reg. at 8363. The second section of the Wind Memo, in contrast, invokes no statutory grant of authority to the President, instead merely instructing certain agencies to implement a suspension of wind energy authorizations "consistent with applicable law." Id. at 8364; see id. at 8363-64. Indeed, Plaintiffs identify various statutes governing the permitting of wind projects that contemplate the prompt processing of permit applications by agencies, potentially indicating that the President's "power is at its lowest ebb" in directing otherwise. Youngstown Sheet & Tube Co., 343 U.S. at 637 (Jackson, J., concurring).

---

[11] The Court notes that § 1341(a) is similar to § 211a in that both statutes expressly vest discretion in the President to take a specified action.

Because Congress has not "committed to the sole discretion of the President" the ability to suspend wind energy authorizations, the "usually applicable" arbitrary-and-capricious standard of the APA governs the Court's review. Kagan, supra, at 2351. And, as the Court now will explain, the Agency Defendants have not satisfied that standard.

### 2.  Application to Wind Order

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). A court will generally not disturb an agency action unless "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or provided reasoning "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43. This standard of review is "deferential": the "court may not substitute its policy judgment for that of the agency." Prometheus Radio Project, 592 U.S. at 423.

"A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." State Farm, 463 U.S. at 59 (Rehnquist,

J., concurring). To change its "existing policies," an agency need only "provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016). That obligation "ordinarily demand[s] that [the agency] display awareness that it is changing position" but does not justify the application of a "heightened standard" of review. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514-15 (2009). The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . ., that there are good reasons for it, and that the agency believes it to be better." Id. at 515. When the agency's new position "rests upon factual findings that contradict those which underlay [the] prior" position or when the agency's prior position "has engendered serious reliance interests," however, the agency may be required to provide a "more detailed justification." Id.

Here, the administrative record consists of only two documents: the Wind Memo and the Interior Department's written order suspending the issuance of renewable energy authorizations pursuant to the Wind Memo. See Dkt. 165-2; Dkt. 165-3; Dkt. 165-5; Dkt. 165-7; Dkt. 165-9. The Agency Defendants have certified that these two documents constitute the entirety of the "evidence considered, directly or indirectly, by [the Agency] Defendants for the alleged decision" to "temporarily cease issuing new approvals

and other authorizations" pursuant to the Wind Memo. Dkt. 165 at 2, 4; see Dkt. 165-1 ¶ 6; Dkt. 165-4 ¶ 3; Dkt. 165-6 ¶ 6; Dkt. 165-8 ¶ 5. Although the Interior Department's written order stated that it would expire in sixty days and purported only to bind divisions of the Interior Department, all Agency Defendants acknowledge that they will continue to carry out the Wind Order at least until the completion of the Comprehensive Assessment. See, e.g., Dkt. 180 at 13.

This scant administrative record makes clear, and the Agency Defendants do not meaningfully dispute, that the Agency Defendants have not "reasonably considered the relevant issues and reasonably explained the[ir] decision" to implement the Wind Order. Prometheus Radio Project, 592 U.S. at 423. Indeed, the Agency Defendants candidly concede that the sole factor they considered in deciding to stop issuing permits was the President's direction to do so.

Further, given that the Wind Order constitutes a change of course from decades of agencies' issuing (or denying) permits related to wind energy projects, the Agency Defendants were required, at minimum, to "provide a reasoned explanation for the change" and to "display awareness that [they were] changing position." Encino Motorcars, 579 U.S. at 221 (quoting Fox Television, 556 U.S. at 515). They failed to do so. Instead, they implemented the Wind Order on Inauguration Day without elucidating

the "reasons for the new policy." Fox Television, 556 U.S. at 515.
And even assuming, arguendo, that the Wind Memo itself could be
characterized as the Agency Defendants' own explanation for their
manner of implementing it, the Wind Memo does not provide adequate
explanation: It merely includes a single sentence citing "various
alleged legal deficiencies underlying" wind permitting, "potential
inadequacies in various environmental reviews," and the
possibility that these vaguely defined issues "may lead to grave
harm." Temporary Withdrawal of All Areas, 90 Fed. Reg. at 8363
(emphases added). The Court is "unable to divine or fathom a
relationship between" this cursory sentence "and the immense scope
of the moratorium" on all wind energy authorizations. Hornbeck
Offshore Servs., L.L.C. v. Salazar, 696 F. Supp. 2d 627, 637 (E.D.
La. 2010). Whatever level of explanation is required when deviating
from longstanding agency practice, this is not it.

The Agency Defendants also failed to account for reliance
interests engendered by their previous policy of adjudicating wind
permit applications. For example, the State Plaintiffs point out
that various states "have designed their energy policies to rely
on [the] development of" wind energy projects, including by setting
procurement and pollution-reduction targets. Dkt. 173 at 32. The
Agency Defendants were obligated, at minimum, to "assess whether
there were reliance interests, determine whether they were
significant, and weigh any such interests against competing policy

37

concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
591 U.S. 1, 33 (2020). They did not do so, let alone provide the
"more detailed justification" required upon determining that
serious reliance interests exist. Fox Television, 556 U.S. at 515.

Accordingly, the Court finds that the Wind Order is arbitrary
and capricious. The Wind Order therefore must be set aside. See 5
U.S.C. § 706(2)(A).

### C.    Contrary to Law

Next, Plaintiffs claim that the Wind Order is "not in
accordance with law," id., and "in excess of statutory . . .
authority," id. § 706(2)(C). These two provisions of the APA
contain a "linguistic distinction without a practical difference"
in the context of an agency action that is allegedly contrary to
statutory requirements. Victim Rts. L. Ctr. v. Cardona, 552 F.
Supp. 3d 104, 127 (D. Mass. 2021). An agency action also must be
set aside as contrary to law when it is inconsistent with
regulations. See, e.g., Nat'l Env't Dev. Ass'n's Clean Air Project
v. EPA, 752 F.3d 999, 1011 (D.C. Cir. 2014); see also Norton v. S.
Utah Wilderness All. (SUWA), 542 U.S. 55, 65 (2004) (noting that
"law," as used in the APA, "includes . . . agency regulations that
have the force of law").

Multiple statutes and regulations provide the permitting
architecture for wind projects. See supra note 7. These laws
contain a variety of fixed deadlines, see, e.g., 33 U.S.C.

§ 1344(a) (requiring the Army Corps of Engineers to publish notice of a dredge-and-fill permit application within fifteen days of a completed application), and also more general language commanding agencies to act promptly, see, e.g., 50 C.F.R. § 13.11(c) (requiring the U.S. Fish and Wildlife Service to process certain permit applications "as quickly as possible").

Plaintiffs contend that the Wind Order violates various specific and general statutory and regulatory permitting deadlines, as well as provisions of the APA requiring reasonably expeditious agency proceedings, see 5 U.S.C. §§ 555(b), 558(c). The Agency Defendants respond that because "Congress has set deadlines in issuing decisions on some types of wind energy project applications but has left others to the discretion of the applicable agency," the Agency Defendants can theoretically satisfy all specific deadlines while still lawfully withholding final decisions on wind energy authorizations pursuant to the Wind Order. Dkt. 180 at 37.

Even if specific processing deadlines are met, the Wind Order necessarily directs agencies to violate two APA provisions. See FCC v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 300 (2003) (noting that an agency action is contrary to law under § 706(2) if it is inconsistent with "any law, . . . not merely those laws that the agency itself is charged with administering"). First, the APA requires that "within a reasonable time, [an] agency shall proceed

39

to conclude a matter presented to it." 5 U.S.C. § 555(b). This provision "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time.'" Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (quoting 5 U.S.C. § 555(b); accord, e.g., Fed. Energy Regul. Comm'n v. Powhatan Energy Fund, LLC, 949 F.3d 891, 903 (4th Cir. 2020); see also Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 171 (2016) ("[T]he word 'shall' usually connotes a requirement.").

Second, "[w]hen application is made for a license required by law, [an] agency, . . . within a reasonable time, shall set and complete proceedings required to be conducted in accordance with" procedures governing formal adjudications "or other proceedings required by law and shall make its decision." 5 U.S.C. § 558(c).[12] This provision requires that any adjudicatory hearings mandated by law with respect to license applications "be set and completed in an expeditious and judicious manner." City of West Chicago v. U.S. Nuclear Regul. Comm'n, 701 F.2d 632, 644 (7th Cir. 1983) (quoting Marathon Oil Co. v. EPA, 564 F.2d 1253, 1260 n.25 (9th Cir. 1977));

_____

[12] The Agency Defendants contend that § 558(c) governs only "formal adjudications and rulemakings involving licenses." Dkt. 209 at 18 n.9. Not so. The provision also expressly contemplates "other proceedings required by law." 5 U.S.C. § 558(c); see Marathon Oil Co. v. EPA, 564 F.2d 1253, 1260 n.25 (9th Cir. 1977) (noting that § 558(c) extends to "other types of licensing proceedings" beyond formal adjudications governed by §§ 556 and 557).

accord, e.g., Beach TV Props., Inc. v. Solomon, No. 15-1823, 2016 WL 6068806, at *12 (D.D.C. Oct. 14, 2016). The term "license" is defined broadly by the APA to include any "permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8). As noted in the Attorney General's Manual on the APA -- "a document whose reasoning [the Supreme Court] ha[s] often found persuasive," SUWA, 542 U.S. at 63 -- § 558(c) requires agencies to "hear and decide licensing proceedings as quickly as possible." Attorney General's Manual on the Administrative Procedure Act 89-90 (1947); see Marathon Oil, 564 F.2d at 1260 n.25. As with § 555(b), the word "shall" in § 558(c) reflects that that provision's directive is nondiscretionary. See Kingdomware Techs., 579 U.S. at 171.

     The Wind Order is contrary to both of these provisions of the APA. An indefinite halt on issuing (or denying) all authorizations related to wind projects violates the statutory requirement that agencies must "proceed to conclude . . . matter[s] presented to" them "within a reasonable time." 5 U.S.C. § 555(b); see Ensco Offshore Co. v. Salazar, 781 F. Supp. 2d 332, 336-37 (E.D. La. 2011) (holding that the Interior Department's inaction on permit applications pursuant to a moratorium on offshore drilling likely was inconsistent with § 555(b)). Nor is the moratorium on permitting of wind energy projects consistent with the Agency Defendants' obligation to "set and complete

41

proceedings" and "make [their] decision[s]" on license applications "within a reasonable time." 5 U.S.C. § 558(c).

Of course, §§ 555(b) and § 558(c) do not require any particular result, and the Court expresses no view on whether the Agency Defendants should issue or withhold any particular permit. Cf. Massachusetts, 790 F. Supp. 3d at 21 ("It is a feature, not a bug, of th[e] [APA] that, when the smoke settles, the parties may find themselves in roughly the same place they began."). But, while a President may direct a reappraisal of permitting practices after a change of administration, see State Farm, 463 U.S. at 59 (Rehnquist, J., concurring), the Agency Defendants may not, as they have done here, decline to adjudicate applications altogether, for an unspecified time, pending the completion of a wide-ranging assessment with no anticipated end date. See Louisiana, 622 F. Supp. 3d at 294 (holding that moratorium on oil and gas leasing was contrary to law because "[b]y stopping the process, the agencies [we]re in effect amending two Congressional statutes"); Texas, 524 F. Supp. 3d at 651-52 (finding that 100-day pause on removals likely was contrary to statute generally requiring removals within 90 days); Stenson Tamaddon, LLC v. U.S. IRS, 742 F. Supp. 3d 966, 992 (D. Ariz. 2024) (noting that an indefinite moratorium on processing certain claims would "directly contravene" a statute mandating that the agency "shall" process those claims). Rather, the Agencies must "either grant[] or deny[]

[each] permit application within a reasonable time. Not acting at all is not a lawful option." Ensco, 781 F. Supp. 2d at 336.

The Agency Defendants resist this conclusion by arguing that Plaintiffs' § 706(2) challenge is an improper vehicle for challenging agency inaction in alleged violation of §§ 555(b) and 558(c). In their view, Plaintiffs have used the wrong tool in the APA toolbox. According to the Agency Defendants, Plaintiffs' sole potential avenue for relief was through § 706(1), which allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). See generally SUWA, 542 U.S. at 61-65 (discussing this provision).

Not so. Sections 706(1) and 706(2) are not mutually exclusive. See All. To Save The Mattaponi v. U.S. Army Corps of Eng'rs, 515 F. Supp. 2d 1, 10 (D.D.C. 2007); see also, e.g., Hi-Tech Pharmacal Co. v. U.S. FDA, 587 F. Supp. 2d 1, 10 (D.D.C. 2008) (noting that a "failure to act" that "is the functional equivalent of final agency action" may form "the basis for an APA claim pursuant to [§] 706(2)"). For that reason, multiple courts have held agency policies of inaction to be contrary to law under § 706(2). See, e.g., Louisiana, 622 F. Supp. 3d at 294; Texas, 524 F. Supp. 3d at 651-52. The Court does the same here.

Nor does the Wind Memo's savings clause -- which instructs agencies to "implement[] [the Wind Memo] consistent with applicable law" -- warrant a different conclusion. Temporary

Withdrawal of All Areas, 90 Fed. Reg. at 8364. It may be true, as the Agency Defendants argue, that if an "agency is capable of following an Executive directive 'consistent with applicable law,' it must be permitted to do so." Dkt. 180 at 42; cf. Trump v. Am. Fed'n of Gov't Emps., 145 S. Ct. 2635, 2635 (Sotomayor, J., concurring) (noting, where agency reduction-in-force plans pursuant to an executive order with similar savings clause were not yet before the Supreme Court, that the Court had "no occasion to consider whether the[] [plans] c[ould] and w[ould] be carried out consistent with the constraints of law"). But Plaintiffs have challenged "the Agency Defendants' actions under the" Wind Memo, not the Wind Memo itself. New York, 133 F.4th at 70 n.17. The proof is in the pudding: No permits have issued since the Wind Order was promulgated, and the Agency Defendants acknowledge that they will not issue any permits at least until they complete the Comprehensive Assessment, for which there is no timeline. See, e.g., Dkt. 123-2 ¶ 6 ("The [Army] Corps [of Engineers] . . . does not intend to issue any permits until the [C]omprehensive [A]ssessment . . . is completed."). That action is contrary to law. See Louisiana, 622 F.3d at 275, 294 (holding pause on oil and gas leasing to be contrary to law despite being implemented pursuant to executive order containing similar savings clause).

For these reasons, in addition to being arbitrary and capricious, the Wind Order must be set aside on the independent basis that it is contrary to law. See 5 U.S.C. § 706(2)(A), (C).[13]

## IV. Remedy

Where, as here, a court determines that an agency action is arbitrary and capricious or contrary to law, the APA authorizes the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2). "[T]he ordinary result" in response to finding an agency action unlawful "is that the [action is] vacated -- not that [its] application to the individual p[laintiffs] is proscribed." Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); see Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys., 603 U.S. 799, 829-30 (2024) (Kavanaugh, J., concurring) ("The text and history of the APA authorize vacatur. . . . [T]o 'set aside' a[n] [agency action] is to vacate it."); Ass'n of Am. Univs. v. Dep't of Def., __ F. Supp. 3d __, __

---

[13] Because the Court concludes that the Wind Order must be set aside as substantively invalid, the Court need not resolve ACE NY's additional claim that the Wind Order is procedurally invalid due to being adopted without notice and comment. See Cent. Or. Hosp. Dist. v. Sullivan, 757 F. Supp. 1134, 1145 n.13 (D. Or. 1991) ("Plaintiff also alleges that the notice and comment procedures of the APA were violated . . . . Because the court has found the Secretary's actions arbitrary and capricious, the court does not reach this claim." (citation omitted)).

(D. Mass. 2025) [2025 WL 2899765, at *27-30] (explaining in depth why vacatur is appropriate under the APA).

The Agency Defendants request that the Court issue at most a "limited vacatur" that lifts implementation of the Wind Order only "with respect to the specific wind projects and their pending applications and authorizations that are found to be inconsistent with applicable law and for which [Plaintiffs] are able to prove a certainly impending harm." Dkt. 180 at 48. But although the Supreme Court recently held that courts lack the authority to issue universal injunctions, it specifically declined to alter existing law on "whether the [APA] authorizes federal courts to vacate federal agency action." Trump v. CASA, Inc., 606 U.S. 831, 847 & n.10 (2025) (citing 5 U.S.C. § 706(2))). Under circuit precedent, vacatur "is a proper remedy when an agency fails to explain its reasoning adequately" or has acted contrary to law. Harrington v. Chao, 280 F.3d 50, 60 (1st Cir. 2002). And "[g]iven the breadth of the [Wind Order's] coverage, the p[roject]-specific vacatur requested by the [Agency Defendants] is not feasible." Custom Commc'ns, Inc. v. FTC, 142 F.4th 1060, 1075 (8th Cir. 2025) (per curiam).

ACE NY also expressly requests that the Court issue a declaratory judgment that the Agency Defendants have violated the APA. Because the Agency Defendants "offer no specific objection to declaratory judgment as an available or appropriate form of

46

relief[,] . . . the Court will issue declaratory judgment." Ass'n of Am. Univs., __ F. Supp. 3d at __ [2025 WL 2899765, at *30]; see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health, 145 F.4th 39, 50 (1st Cir.) ("[D]eclaratory relief . . . is well within the scope of the APA."), rev'd in part on other grounds, 145 S. Ct. 2658 (2025). Nor do the Agency Defendants develop any argument that the Wind Order should be remanded to the relevant agencies.

Accordingly, the Court vacates the Wind Order and declares it unlawful in violation of 5 U.S.C. § 706(2)(A) and (C).

## ORDER

For the foregoing reasons, Plaintiffs' motions for summary judgment (Dkts. 172, 175) are **ALLOWED** and the Agency Defendants' motion for summary judgment (Dkt. 179) is **DENIED**. The Wind Order is declared unlawful, see 5 U.S.C. § 706(2), and is **VACATED** in its entirety.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge